Barrett Beasley (SBN: 194143)
**SALIM BEASLEY LLC**
1901 Texas Street
Natchitoches, LA 71457
Tel: (318) 354-1043
Fax: (318) 354-1227
bbeasely@salim-beasley.com

Michael M. Buchman (*pro hac vice* pending)
Michelle C. Clerkin (*pro hac vice* pending)
**MOTLEY RICE LLC**
777 Third Avenue, 27th Floor
New York, NY 10017
Tel: (212) 577-0050
Fax: (212) 577-0054
mbuchman@motleyrice.com
mclerkin@motleyrice.com

*Attorneys for Plaintiff Douglas J. Reece*

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRCT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| DOUGLAS J. REECE, on his own behalf and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ALTRIA GROUP, INC., and JUUL LABS, INC.,<br><br>Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Douglas J. Reece, on behalf of himself and all others similarly situated, brings this Class Action Complaint against Defendants Altria Group, Inc. and Juul Labs, Inc., for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2 and Section 7 of the Clayton Act, 15

U.S.C. § 18. Plaintiff alleges, based upon the investigation of counsel and personal knowledge as to paragraph 16, as follows:

## I.    INTRODUCTION

1.      This is an antitrust class action against Defendants Altria Group, Inc. ("Altria") and Juul Labs, Inc. ("Juul"), concerning anticompetitive agreements between them in which Altria agreed to refrain from competing against Juul in the United States market for closed-system electronic cigarettes ("e-cigarettes") in return for a substantial ownership interest in Juul. Juul was and is the dominant player in the sale of closed-system electronic cigarettes ("e-cigarettes") in the United States ("relevant market"). E-cigarettes are electronic devices that deliver nicotine to a user by vaporizing a liquid nicotine solution.  In a closed system, the liquid is contained in a pre-filled, sealed cartridge or pod.

2.      In light of declining sales in the market for traditional cigarettes and a shift by consumers to alternative nicotine delivery devices, Altria viewed participation in the e-cigarette market as essential to its long-term survival.  In 2013, Altria entered the market through its subsidiary Nu Mark LLC. Its flagship product was the MarkTen e-cigarette.

3.      In 2015, Juul entered the relevant market with a sleek new device and quickly captured a substantial share of the market. By 2018, Juul had amassed market share of over 70 percent[1] stunning Altria and other competitors. Juul's swift rise posed a grave competitive threat to Altria in the both the e-cigarette and traditional cigarette markets. To eliminate that threat, Altria began a two-prong strategy of trying to acquire Juul while continuing to compete aggressively against it. Its efforts to acquire Juul were unsuccessful initially, and Altria introduced a new product known as the MarkTen Elite which closely resembled Juul's product.

4.      Altria continued to press the acquisition. In the fall of 2018, Juul agreed to negotiate with Altria under the condition that Altria stop competing with Juul in the market for e-

---

[1] Bonnie Herzog & Patty Kanada, *Nielsen: Tobacco All Channel Data Thru 8/11* at 10, Wells Fargo Securities (Aug. 21, 2018), *available at* https://athra.org.au/wpcontent/uploads/2018/09/Wells-Fargo-Nielsen-Tobacco-All-Channel-Report-Period-Ending-8.11.18.pdf.

cigarettes. Discussions would not begin until Altria had pulled its products off the shelves. Altria, at first, refused to consider this condition, but in October 2018 it succumbed to the pressure and began to withdraw its e-cigarette products from the relevant market.

5.     Two months later in December of 2018, Altria announced its intention to cease competing entirely in the relevant market.[2]

6.     Approximately two weeks after making this announcement, Altria disclosed that, on October 20, 2018, it had executed a Purchase Agreement and related agreements (the "Transaction") with Juul.

7.     Under the Purchase Agreement, Altria purchased a 35% non-voting stake in Juul, which Altria could convert to a voting stake upon receiving Hart-Scott Rodino approval. In addition, Altria and Juul executed: (i) a Relationship Agreement, which contained a non-compete provision ("the "Non-Compete") restricting Altria from competing in the relevant market; (ii) a Services Agreement, whereby Altria agreed to provide a variety of support services for Juul; (iii) an Intellectual Property License Agreement licensing Altria's e-cigarette intellectual property to Juul; and (iv) a Voting Agreement providing Altria representation on Juul's board of directors following the conversion of its shares. Pending Hart-Scott Rodino approval, the transaction provided Altria the right to appoint one of its executives to a non-voting "observer" position on Juul's board.

8.     Altria's investment in Juul and its exit from the market not only eliminated its existing e-cigarette product but also, through the Non-Compete, halted its ongoing innovation efforts toward developing a new and improved portfolio of products. Thus, consumers lost the benefit of current and future head-to-head competition between Altria and Juul, and between Altria and other competitors.

---

[2] *See MarkTen Discontinuation Notice* (Dec. 19, 2018), https://www.markten.com.

CLASS ACTION COMPLAINT

9. The transaction eliminated a threat to Juul's market dominance and required Altria to dedicate its vast resources, including distribution and shelf-space, to ensure Juul's continued market dominance.

10. After executing the transaction, Altria appointed its Chief Growth Officer as its observer on the Juul board of directors. Following that executive's departure from Altria to become Chief Executive Officer of Juul, Altria appointed its Chief Financial Officer and Vice Chairman to fill the observer position.

11. The Transaction's anticompetitive effects were particularly clear in the market for closed-system e-cigarettes given high barriers to entry, such as U.S. Food & Drug Administration ("FDA") approval. Repositioning new products in the market was also unavailing to counter the anticompetitive impact of the Transaction. Defendants cannot show the transaction restricting competition resulted in cognizable efficiencies sufficient to outweigh the competitive harm caused by Altria's agreement to exit the relevant market. Nor can Defendants point to pro-competitive benefits that could not have been achieved through less restrictive means. In fact, much of the Defendants' collaboration was restructured in January 2020 to eliminate its marketing aspects, further reducing the scope of theoretical benefits from their agreements.

12. Defendants' conduct has illegally restrained competition in the relevant market in violation of federal antitrust laws. As a direct and proximate result of Defendants' anticompetitive conduct, entities that purchased Juul products were overcharged and sustained injury to their business and property.

## II.    JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than one hundred members of the Class, and at least one member of the putative Class is a citizen of a state different from that of one of the Defendants.

14.     Venue is appropriate within this district under 28 U.S.C. §1391 because, at all relevant times, Defendants transacted business within this district, and the interstate trade and commerce described hereinafter is carried out, in substantial part, in this district. Further, Defendants and/or their agents may be found in this district.

15.     The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this district.

### III.     INTRADISTRICT ASSIGNMENT

16.     Assignment to any division in this District is proper because the interstate trade and commerce involved and affected by the violations of the antitrust laws was and is carried out within each division. Defendant Juul Labs, Inc. has its principal place of business in the San Francisco division.

### IV.     THE PARTIES

17.     Plaintiff Douglas J. Reece is a resident of the State of California. Douglas J. Reece purchased Juul products directly from Juul on the Juul.com website during the relevant period. Plaintiff was injured in connection with his purchases during the Class Period.

18.     Defendant Juul Labs, Inc. ("Juul"), is a Delaware corporation headquartered at 560 20th Street, San Francisco, California. Juul is the leading manufacturer of closed-system e-cigarettes, generating over $1 billion in sales in 2018.

19.     Defendant Altria is a Virginia corporation headquartered at 6601 West Broad Street, Richmond, Virginia. Altria is one of the country's largest tobacco companies and was formerly a manufacturer of closed-system e-cigarettes.

CLASS ACTION COMPLAINT

## V.   FACTUAL ALLEGATIONS

### A.   Industry Background

20.     The e-cigarette industry, to a large extent, reflects an evolution of the traditional cigarette industry, with many of the same tobacco companies competing to get consumers hooked on their addictive products.

21.     A 1988 report by the Surgeon General of the United States regarding nicotine and tobacco reached three conclusions:

(i)    Cigarettes and other forms of tobacco are addictive;

(ii)   Nicotine is the drug in tobacco that causes addiction;

(iii)  The physiological and behavioral processes that determine tobacco addiction are similar to those that determine heroin and cocaine addiction.

22.     As more research came out during the early 1990s, the addictive nature of nicotine in cigarettes became clearer and better understood. At the same time, big tobacco companies did their best to conceal the science.

23.     In April of 1994, top executives from the seven largest American tobacco companies – later dubbed the "seven dwarfs"[3] – testified in front of Congress regarding the health effects and addictive nature of their products. At one point during the hearing, Senator Ron Wyden presented a stack of medical research and the 1989 Surgeon General's report on the perils of smoking before asking each executive, in turn, if he believed cigarettes were addictive. Each said they believed nicotine was not addictive.[4] James W. Johnston, chairman and chief executive of R.J. Reynolds Tobacco Company ("RJR"), insisted that the risks associated with cigarettes were similar to those of other products, such as Twinkies or cola.[5]

---

[3] Sheryl Stolberg, *Where There's Smoke, There's Deceit,* L.A. Times (June 23, 1996), https://www.latimes.com/archives/la-xpm-1996-06-23-bk-17610-story.html.

[4] Philip J. Hilts, *Tobacco Chiefs Say Cigarettes Aren't Addictive*, N.Y. Times (Apr. 15, 1994), https://www.nytimes.com/1994/04/15/us/tobacco-chiefs-say-cigarettes-aren-t-addictive.html.

[5] *Id.*

CLASS ACTION COMPLAINT

24.     As the 1990s progressed the country learned, in part through information brought to light in lawsuits filed by states and their attorneys, that despite tobacco representatives sworn testimony to Congress nicotine was indeed addictive and tobacco was a nicotine delivery system.

25.     According to the National Institutes of Health, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products."[6] The cigarette industry has long known that "nicotine is the addicting agent in cigarettes"[7] and that "nicotine satisfaction is the dominant desire" of nicotine addicts.[8]

26.     For this reason, cigarette companies spent decades manipulating nicotine in order to foster and maintain addiction in their customers. For example, RJR developed and patented nicotine salt additives such as nicotine benzoate to increase nicotine delivery in cigarette smoke. As detailed in an RJR memorandum titled "Cigarette concept to assure RJR a larger segment of the youth market," manipulating the pH of nicotine was expected to give cigarettes an "additional nicotine 'kick'."[9] This kick is caused by increased nicotine absorption associated with higher pH.[10]

27.     Nicotine fosters addiction through the brain's "reward" pathway. A stimulant and a relaxant, nicotine affects the central nervous system; increases blood pressure, pulse, and metabolic rate; constricts blood vessels of the heart and skin, and causes muscle relaxation. When nicotine is inhaled it enters the bloodstream through membranes in the mouth and upper

---

[6] How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease: A Report of the Surgeon General, Chapter 4, Nicotine Addiction: Past and Present (2010), www.ncbi.nlm.nih.gov/books/NBK53017/ .

[7] *Tobacco Industry Quotes on Nicotine Addiction*, https://www.ok.gov/okswat/documents/ Tobacco%20Industry%20Quotes%20on%20Nicotine %20Addiction.pdf  (last accessed Apr. 7, 2020) (quoting Brown & Williamson official A.J. Mellman, 1989).

[8] *Id.* (quoting R.J. Reynolds Tobacco Co. marketing memo, 1972).

[9] *Id.* (quoting 1973 R.J. Reynolds Tobacco Co. memo titled, "Cigarette concept to assure RJR a larger segment of the youth market.").

[10] Pickworth et al., *Nicotine Absorption from Smokeless Tobacco Modified to Adjust pH*, J Addict Res Ther. 2014; 5(3): 1000184, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4271311/pdf/nihms-648030.pdf.

CLASS ACTION COMPLAINT

respiratory tract and through the lungs. Once nicotine in the bloodstream reaches the brain, it binds to receptors, triggering a series of physiologic effects in the user that are perceived as a "buzz" that includes pleasure, arousal, and relaxation of stress and anxiety. These effects are caused by the release of dopamine, acetylcholine, epinephrine, norepinephrine, vasopressin, serotonin, and beta endorphin. With regular nicotine use, however, these feelings diminish and the user must consume increasing amounts of nicotine to achieve the same pleasurable effects.[11]

28.     The neurological changes caused by nicotine create addiction. Repeated exposure to nicotine causes neurons in the brain to adapt to the action of the drug and return brain function to normal. This process, called neuroadaptation, leads to the development of tolerance in which a given level of nicotine begins to have less of an effect on the user.[12]

29.     Once a brain is addicted to nicotine, the absence of nicotine causes compulsive drug-seeking behavior, which, if not satisfied, results in withdrawal symptoms including anxiety, tension, depression, irritability, difficulty in concentrating, disorientation, increased eating, restlessness, headaches, sweating, insomnia, heart palpitations and tremors – and intense cravings for nicotine. Though smokers commonly report pleasure and reduced anger, tension, depression and stress after smoking a cigarette, many of these effects are actually due to the relief of unpleasant withdrawal symptoms that occur when a person stops smoking and deprives the brain and body of nicotine. Studies have found that most smokers do not like smoking most of the time, but do so to avoid withdrawal symptoms.[13]

---

[11] Neal L. Benowitz, *Pharmacology of Nicotine: Addiction, Smoking-Induced Disease, and Therapeutics*, Annu Rev Pharmacol Toxicol 2009; 49: 57-71, www.ncbi.nlm.nih.gov/pmc/articles/PMC2946180/.

[12] *Id.*

[13] Rigotti, *Strategies to help a smoker who is struggling to quit* JAMA 2012; 308(15):1573-1580, www.ncbi.nlm.nih.gov/pmc/articles/PMC4562427/; Paolini & De Biasi, *Mechanistic insights into nicotine withdrawal* Biochem Pharmacol 2011; 82(8):996-1007, www.ncbi.nlm.nih.gov/pmc/articles/PMC3312005/.

**B.** **The Rise of E-Cigarettes and Juul**

30.     The discovery of the negative impacts of tobacco use changed American society. Laws were enacted banning cigarette smoking in public places such as restaurants and bars. The prohibition sparked changes in Americans' smoking habits and added to increasing social stigma. Dramatically increased taxes provided another disincentive, and many Americans gave up smoking to live a healthier life. Rates of traditional smoking among the younger generations decreased drastically.

31.     In the face of withering profits from traditional cigarettes, tobacco companies searched for other ways to profit off of nicotine addiction. The first modern electronic cigarettes emerged in China in 2003, and they appeared in the U.S. market by the mid-2000s.[14]

32.     Around 2010, traditional tobacco companies started either entering the market with their own products or acquiring existing e-cigarette companies.

33.     Altria entered the market with its MarkTen e-cigarette in 2013, and over the next several years spent well over $100 million acquiring other existing e-cigarette platforms in order to augment its portfolio.

34.     James Monsees, the founder of Juul, saw the potential of e-cigarettes. Monsees has described the cigarette as "the most successful consumer product of all time . . . an amazing product."[15] Because of "some problems" inherent in the cigarette, Juul's founders set out to "deliver[] solutions that refresh the magic and luxury of the tobacco category."[16]

---

[14] U.S. Department of Health and Human Services, E-Cigarette Use Among Youth and Young Adults: A Report of the Surgeon General at 10 (2016), ncbi.nlm.nih.gov/books/NBK538680/pdf/Bookshelf_NBK538680.pdf.

[15] Chaykowski, *Billionaires-to-be: Cigarette breakers - James Monsees and Adam Bowen have cornered the US e-cigarette market with Juul. Up next: The world*, Forbes India (Sept. 27, 2018), www.forbesindia.com/article/leaderboard/billionairestobe-cigarette-breakers/51425/1.

[16] Mings, *Ploom model Two Slays Smoking with Slick Design and Heated Tobacco Pods*, Solid Smack (Apr 23, 2014), www.solidsmack.com/ design/ploom-modeltwo-slick-design-tobacco-pods/.

CLASS ACTION COMPLAINT

35.     Monsees saw "a huge opportunity for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products."[17] With a focus on recreating the "ritual and elegance that smoking once exemplified,"[18] Monsees and Adam Bowen founded Pax Labs in 2007 (from which Juul Labs was spun out in 2017) setting out to "meet the needs of people who want to enjoy tobacco but don't self-identify with – or don't necessarily want to be associated with – cigarettes."[19]

36.     In 2015, Pax Labs launched the Juul e-cigarette, a closed-system in a discreet "pod-based" format.  The device also represented a chemical breakthrough in the speed of its nicotine delivery. Since the 1960s tobacco companies have manufactured cigarettes that freebase nicotine using ammonia, which liberates the nicotine so that it can be quickly absorbed into the lungs and the brain. As one addiction expert has said, "[t]he modern cigarette does to nicotine what crack does to cocaine."[20] Pax Labs discovered that by adding benzoic acid to nicotine salts, which occur naturally in tobacco, they could mimic a cigarette's rapid nicotine delivery.[21]

37.     The Juul product is high-tech and also sleek.  As depicted below, the Juul e-cigarette looks like a USB flash drive, and it actually charges in a computer's USB drive. It is about the size and shape of a pack of chewing gum; it is small enough to fit in a closed hand.

---

[17] *Id.*

[18] *James Monsees – Co-founder and CEO of Ploom*, IdeaMensch (Apr 11, 2014), https://ideamensch.com/james-monsees/.

[19] *Id.*

[20] Jia Tolentino, *The Promise of Vaping and the Rise of Juul,* New Yorker, May 7, 2018, https://www.newyorker.com/magazine/2018/05/14/the-promise-of-vaping-and-the-rise-of-juul

[21] *Id.*

Juul is also easy to conceal. The odor emitted from Juul is a reduced aerosol without much scent – unlike the distinct smell of conventional cigarettes.

 

38.     The thin, rectangular Juul e-cigarette device consists of an aluminum shell, a battery, a magnet (for the USB-charger), a circuit board, an LED light, and a pressure sensor. Juul manufactures and distributes its nicotine formulation as Juul pods, which contain Juul's nicotine liquid. During the Class Period (defined below), Juul has sold its pods in four-packs in a variety of flavors, many of which have no combustible cigarette analog, including mango, "cool" cucumber, fruit medley, "cool" mint, and crème brulee.

39.     Each Juul pod is a plastic enclosure containing 0.7 milliliters of Juul's patented nicotine liquid and a coil heater. When a sensor in the Juul e-cigarette detects the movement of air caused by suction on the Juul pod, the battery in the Juul device activates the heating element, which in turn converts the nicotine solution in the Juul pod into a vapor consisting principally of nicotine, benzoic acid, glycerin, and propylene glycol. A light embedded in the Juul device serves as a battery level indicator and lights up in a "party mode" display of rainbow of colors when the device is waved around.

40.     The physical design of the Juul device (including its circuit board) and Juul pod determines the amount of aerosolized nicotine the Juul emits. By altering the temperature, maximum puff duration, or airflow, among other things, Juul can finely tune the amount of nicotine vapor the Juul device delivers.[22]

---

[22] Talih et al., *Characteristics and toxicant emissions of Juul electronic cigarette* Tob Control. 054616 (Feb 11, 2019), www.ncbi.nlm.nih.gov/pubmed/30745326/.

CLASS ACTION COMPLAINT

41.     Juul's product quickly gained traction among consumers, rapidly surpassing Altria and securing the largest share of the closed-system e-cigarette market.

42.     Juul used the cigarette industry's prior practices as a playbook.  Monsees has publicly admitted that Juul built its e-cigarette business by first consulting cigarette industry documents, including board meeting minutes, made public under the Master Tobacco Settlement Agreement that had been reached between the cigarette industry, governmental officials, and injured smokers. "[Industry documents] became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."[23]

43.     Juul researched how cigarette companies had chemically manipulated nicotine content to maximize delivery: "We started looking at patent literature. We are pretty fluent in 'Patentese.' And we were able to deduce what had happened historically in the tobacco industry." Among the documents Juul would have found were those documenting how to manipulate nicotine pH to maximize the delivery of nicotine in a youth-friendly vapor that delivers minimal "throat hit"—a combination that creates unprecedented risks of nicotine abuse and addiction, as detailed further below.[24]

44.     Juul also engaged former cigarette industry researchers to consult on the design of their product.  Juul's founder James Monsees noted in *Wired* magazine that "people who understood the science and were listed on previous patents from tobacco companies aren't at those companies anymore.  If you go to Altria's R&D facility, it's empty."  The Wired article stated that "some of those people are now on Pax's team of advisers, helping develop Juul."[25]

---

[23] Montoya, *Pax Labs: Origins With James Monsees*, Social Underground, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/.

[24] *Id.*

[25] Pierce, *This Might Just Be The First Great E-Cig*, Wired (Apr 21, 2015), www.wired.com/2015/04/pax-juul-ecig

CLASS ACTION COMPLAINT

45. Juul delivers doses of nicotine that are materially higher than delivered by combustible cigarettes. As a paper published by the European Union citing the United Kingdom Medicines and Healthcare Products Regulatory Agency notes, "an e-cigarette with a concentration of 20 mg/ml delivers approximately 1 milligram of nicotine in 5 minutes (the time needed to smoke a traditional cigarette, for which the maximum allowable delivery is 1 mg of nicotine)."[26] With at least 59 mg/mL of nicotine delivered in a salt form that increases the rate and efficiency of uptake (and even with a lower mg/mL amount), a Juul pod will easily exceed the nicotine dose of a traditional cigarette.

46. Comparison of available data regarding per puff nicotine intake corroborates the other Juul studies (mentioned above), indicating that Juul delivers about 30% more nicotine per puff. Specifically, a recent study of Juul pods found that "[t]he nicotine levels delivered by the Juul are similar to or even higher than those delivered by cigarettes."[27] The Reilly study tested Juul's Tobacco, Crème Brulee, Fruit Punch, and Mint flavors and found that a puff of Juul delivered $164 \pm 41$ micrograms of nicotine per puff. By comparison, a 2014 study using larger 100 mL puffs found that a Marlboro cigarette delivered 152—193 μg/puff.[28] Correcting to account for the different puff sizes between the Reilly and Schroeder studies, this suggests that, at 75ml/puff, a Marlboro would deliver between 114 and 144 μg/puff. In other words, empirical data suggests that Juul delivers up to 36% more nicotine per puff than a Marlboro.

47. Because Juul's nicotine salts actually increase the rate and magnitude of blood plasma nicotine compared to traditional cigarettes, the risk of nicotine addiction and abuse is higher for Juul e-cigarettes than traditional cigarettes. Thus, Juul pods are foreseeably

[26] *E-Cigarettes*, European Commission, https://ec.europa.eu/health//sites/health/files/tobacco/docs/fs_ecigarettes_en.pdf (citing United Kingdom Medicines and Healthcare Products Regulatory Agency and industry reports).

[27] Reilly *et al.*, *Free Radical, Carbonyl, and Nicotine Levels Produced by Juul Electronic Cigarettes*, Nicotine Tob Res 2019; 21(9):1274-1278 (the "Reilly study"), https://www.ncbi.nlm.nih.gov/pubmed/30346584.

[28] Schroeder & Hoffman, Electronic Cigarettes and Nicotine Clinical Pharmacology (May 2014) Tobacco Control 2014: 23:ii30-ii35, www.ncbi.nlm.nih.gov/pmc/articles/PMC3995273/.

CLASS ACTION COMPLAINT

exceptionally addictive when used by persons without prior exposure to nicotine – a fact not disclosed by Juul.  These facts have resulted in increased sales for Juul.

48.     Since its launch in 2015, Juul has become the dominant e-cigarette manufacturer in the United States. Its revenues grew by 700% in 2017.[29] According to a recent Wells Fargo report, Juul owned three-quarters of the U.S. market for e-cigarettes by the end of 2018.[30]

### C.     Defendants Entered Into an Unlawful Agreement Not to Compete

49.     Despite becoming the dominant market leader, Juul continually feared that its fierce competitor, Altria, could unseat it given that company's success, rich history and abundant human and capital resources. Juul correctly believed that Altria was aiming to take over the relevant market. As part of that effort, Altria began a strategy of attempting to acquire Juul while simultaneously competing aggressively against it in the relevant market. Initially, Juul rebuffed these efforts.

50.     In the summer of 2018, Juul took a different course by agreeing to merger negotiations on the non-negotiable condition that Altria pull its competing e-cigarettes from the relevant market. Negotiations had stalled temporarily when Altria previously balked at the condition. Altria eventually acceded to Juul's demand and began removing its products from the shelves in October 2018. With that commitment secured, negotiations resumed and culminated in a deal.

51.     On December 20, 2018, Juul and Altria executed a series of agreements (the "Transaction") granting Altria a 35% non-voting equity interest in Juul in exchange for a $12.8 billion all-cash investment. This investment did not require a notification under the Hart Scott Rodino Act ("HSR"). Defendants' Purchase Agreement incorporates various ancillary

---

[29] Durbin et al., Letter from United States Senators to Kevin Burns, CEO, Juul Labs Inc. (Apr 8, 2019), www.durbin.senate.gov/imo/media/doc/ FINAL%20 Juul%20Letter%204.8.19.pdf.

[30] Bonnie Herzog & Patty Kanada, *Nielsen: Tobacco All Channel Data Thru 8/11 - Cig Vol Decelerates* at 10, Wells Fargo Securities (Aug. 21, 2018) (data source: Nielsen XAOC Including C-Store), *available at* https://athra.org.au/wp-content/uploads/2018/09/Wells-Fargo-Nielsen-Tobacco-All-Channel-Report-Period-Ending-8.11.18.pdf.

CLASS ACTION COMPLAINT

agreements, including: (i) a Services Agreement; (ii) a Relationship Agreement; (iii) a Voting

Agreement; and (iv) an Intellectual Property License Agreement.

52.     The Transaction valued Juul at roughly $38 billion, more than double Juul's

reported value less than seven months earlier, speaking to the company's commercial success.

53.     On February 4, 2019, Juul and Altria filed for HSR clearance to convert Altria's

interest into voting securities (the "Antitrust Conversion") and to grant Altria permission to

appoint three (of nine) members of Juul's board of directors as specified in the Voting

Agreement.

54.     The Relationship Agreement includes a "Non-Compete" provision, which states

in the relevant part as follows:

> [Altria] shall not . . . directly or indirectly (1) own, manage, operate, control,
> engage in or assist others in engaging in, the e-Vapor business; (2) take actions
> with the purpose of preparing to engage in the e-Vapor Business, including
> through engaging in or sponsoring research and development activities; or (3)
> Beneficially Own any equity interest in any Person, other than an aggregate of
> not more than four and nine-tenths percent (4.9%) of the equity interests of any
> Person which is publicly listed on a national stock exchange, that engages
> directly or indirectly in the e-Vapor Business (other than (x) as a result of
> [Altria's] Beneficial Ownership of Shares or (y) engagement in, or sponsorship
> of, research and development activities not directed toward the e-Vapor Business
> and not undertaken with the purpose of developing or commercializing
> technology or products in the e-Vapor Business) . . . . Notwithstanding the
> foregoing, (x) the [Altria] and its Subsidiaries and controlled Affiliates may
> engage in the business relating to (I) its Green Smoke, MarkTen (or Solaris,
> which is the non-U.S. equivalent brand of MarkTen) and MarkTen Elite brands,
> in each case, as such business is presently conducted, subject to Section 4.1 of
> the Purchase Agreement, and (II) for a period of sixty (60) days commencing on
> the date of this Agreement, certain research and development activities pursuant
> to existing agreements with third parties that are in the process of being
> discontinued . . . .

55.     At the time the Non-Compete was signed, Altria had, over the preceding two

months, removed all of its e-cigarette products from the relevant market. In effect, Altria

committed to shut down its own e-vapor business and participate in that business exclusively

through Juul.

56.     Though it was later amended, under the initial Services Agreement, Altria agreed to provide certain services to Juul, divided between Initial and Extended Services. The Initial Services included: (i) leasing convenience store shelf space to Juul; (ii) regulatory consulting and distribution support; and (iii) the Extended Services included direct marketing support and sales services. Under the terms of the Relationship Agreement, the Non-Compete went into effect early in 2019 when Altria began to perform Extended Services. The Services Agreement had an initial six-year term, subject to early termination by mutual consent or in case of material breach, bankruptcy, or insolvency. If the Services Agreement expired, Altria could discontinue the Non-Compete, at which point it would lose its right to appoint Juul board members and its pre-emptive right to maintain its 35% stake in the company, but would regain its ability to compete in the market against Juul.

57.     The Intellectual Property License Agreement grants Juul a broad, non-exclusive, irrevocable license to Altria's e-cigarette intellectual property portfolio.

58.     On January 30, 2020, Juul and Altria announced amendments to their agreement, including an Amended Purchase Agreement, an Amended Relationship Agreement, an Amended Services Agreement, and a Revised Voting Agreement.

59.     Under the Revised Voting Agreement, after the Antitrust Conversion, Altria will instead have the right to: (i) appoint two (of nine) Juul directors; (ii) nominate one (of three) Juul independent directors; (iii) appoint one (of four) members of a Nominating Committee (who would have the right to veto independent director nominations); (iv) appoint two (of five) members and the chair of a new Litigation Oversight Committee (which would have responsibility for managing litigation involving both Altria and Juul, i.e., "Joint Litigation Matters"); and (iv) appoint one (of three) members of a Litigation Subcommittee (which would have authority, by unanimous vote, to change Juul's senior outside counsel responsible for Joint Litigation Matters). The Revised Voting Agreement would further grant Juul's CEO: (i) a board seat; (ii) a seat on the Litigation Oversight Committee; and (iii) a seat on the Litigation Subcommittee.

CLASS ACTION COMPLAINT

60.     The Amended Relationship Agreement gives Altria the option to be released from the Non-Compete if Juul is prohibited by federal law from selling vaping products in the United States for at least a year or if Altria's internal valuation of the carrying value of its investment falls below 10% of its initial value of $12.8 billion.

61.     The Amended Services Agreement eliminates all services except for regulatory support services. The amendment was effective at signing except with regard to Altria's provision of retail shelf space to Juul, which service was set to terminate after March 31, 2020.

**D.     The FTC Action**

62.     On April 1, 2020, the Federal Trade Commission ("FTC") filed a complaint against Altria and Juul under Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), Section 5(b) of the FTC Act, 15 U.S.C. § 45(b), and Section 11(b) of the Clayton Act, 15 U.S.C. § 21(b), alleging the Transaction violated Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 5 of the FTC Act, 15 U.S.C. § 45, and Section 7 of the Clayton Act, 15 U.S.C. § 18.

63.     The FTC alleged that the Defendants' conduct unreasonably restrained competition, and that the Transaction substantially lessened competition in the U.S. market for closed-system e-cigarettes by eliminating competition between Altria and Juul on price, innovation, promotional activity, and shelf space.

64.     The FTC complaint seeks to restore Defendants' incentives to compete, including divestiture of Altria's equity stake in Juul; rescission of Altria's purchase of that stake; the voiding of all agreements related to the Transaction, including the Non-Compete agreement and the Services Agreement between Altria and Juul, as well as a prohibition against any future non-compete agreements between Defendants, except with prior approval by the Commission; a prohibition against any transaction between Altria and Juul that combines their businesses in the e-cigarette market, except with prior approval by the Commission; a prohibition against any officer or director of either Defendant serving on the other Defendant's board of directors or attending its meetings; a requirement that, for a period of time, Altria and Juul provide prior notice to the FTC of acquisitions, mergers, consolidations, or any other combinations of their

businesses in the e-cigarette market with any other company operating therein; a requirement to file periodic compliance reports with the Commission; and a requirement that Defendants' compliance with the order be monitored at their own expense by an independent monitor.

## VI.    THE RELEVANT MARKET

65.    The relevant product market for the purposes of this action is the closed-system e-cigarette market.

66.    E-cigarettes are battery-powered devices that vaporize a liquid solution containing nicotine (an "e-liquid"). There are two broad categories of e-cigarettes: closed-system and open-tank. Closed-system e-cigarettes consist of a device housing a battery and a heating mechanism, and sealed cartridges or pods that are pre-filled with e-liquid. Examples of closed-system devices include cigalikes, which are similar to traditional cigarettes in size and shape, and pod-based products, such as Juul or MarkTen Elite, which look like USB drives. Subsequent to a FDA flavor ban that went into effect February 2020, closed-system pods and cartridges are available only in tobacco and menthol flavors.

67.    By contrast, open-tank e-cigarettes incorporate refillable tanks that customers manually fill with e-liquid. Because customers are able to select from (and mix together) a wide assortment of e-liquids, open-tank e-cigarettes allow a more customizable experience whereby users can experiment with different flavors and nicotine strengths. In addition, unlike with closed systems, users can customize the individual components of an open-tank system, such as the battery, heating coil, and atomizer (which houses the heating coil).

68.    Closed-system e-cigarettes are largely sold in different channels than open-tank products, and open-tank customers tend to seek a different experience than closed-system customers. The vast majority of closed-system e-cigarettes are sold through the multi-outlet channel, which consists primarily of convenience stores. Convenience stores offer a limited range of e-cigarette products, focusing on the highest-velocity brands. In contrast, open-tank e-cigarettes are sold almost exclusively at dedicated vape shops, retail outlets that typically carry

an extensive selection of e-liquids and parts for open-tank products and offer a high level of customer service.

69.     Defendants considered their respective Juul and MarkTen product lines to be direct competitors with each other and with other closed-system e-cigarette products and set prices based on competition with each other and with other closed-system products. Defendants further acknowledged that their closed-system e-cigarette products did not compete as closely with open-tank products.

70.     There are no reasonable substitutes for closed-system e-cigarettes. Closed-system e-cigarettes appeal to consumers because they are discreet due to their small size, and convenient due to their self-contained, ready-to-use format. Open-tank e-cigarettes are not an adequate substitute for closed-system e-cigarettes because they are larger, more complex, and require more manual operation by the user. Open-tank e-cigarettes generally appeal to a different customer type, one that appreciates their complexity and customizable nature.

71.     The relevant geographic market is no broader than the United States. Because of FDA's requirements (described below), foreign firms cannot import e-cigarettes into the United States without prior FDA approval.

72.     According to Nielson data, retail sales of closed-system e-cigarettes in the United States in 2018 constituted approximately $2.8 billion.[31]

**A. The E-Cigarette Market Has High Barriers to Entry**

73.     Under the FDA regulatory framework, a manufacturer of a new tobacco product, including an e-cigarette, must submit to the FDA a Premarket Tobacco Product Application ("PMTA") and receive the FDA's approval before marketing that product. An e-cigarette that was on the market prior to August 8, 2016 may remain on the market, but the manufacturer of

---

[31] Bonnie Herzog & Patty Kanada, *Nielsen: Tobacco All Channel BiWeekly Data Thru 11/17*, Wells Fargo (Nov. 27, 2018) (data source: Nielsen XAOC Including C-Store), *available at* https://athra.org.au/wp-content/uploads/2018/12/Wells-Fargo-Nielsen-Tobacco-All-Channel-BiWeekly-Report-Period-Ending-11.17.18.pdf.

that product must file a PMTA by May 12, 2020 in order to continue marketing it, and must remove the product in the event the PMTA is denied. An e-cigarette that was not on the market prior to August 8, 2016 cannot be marketed until it receives PMTA approval. At the time Defendants executed the Transaction, the deadline for an in-market applicant to file its PMTA was August 8, 2022.

74.    Preparing a PMTA requires a significant amount of resources—time, personnel, and money, which can range from several hundreds of thousands to multiple millions of dollars per product.

75.    The FDA announced on January 2, 2020 that it had finalized a new enforcement policy prohibiting all non-tobacco/non-menthol flavors for cartridge-based e-cigarettes until a PMTA authorization, which went into effect on February 6, 2020.

## VII.    MONOPOLY POWzER

76.    Throughout the Class Period, Juul dominated the relevant market and maintained power to control prices and exclude competition in that market.

77.    According to a Wells Fargo report on the tobacco industry based on Nielson scanner data, Juul had amassed a 72 percent market share by August of 2018. Altria's market share at that time was 8 percent.[32]

---

[32] Bonnie Herzog & Patty Kanada, *Nielsen: Tobacco All Channel Data Thru 8/11 - Cig Vol Decelerates* at 10, Wells Fargo (Aug. 21, 2018), *available at* https://athra.org.au/wp-content/uploads/2018/09/Wells-Fargo-Nielsen-Tobacco-All-Channel-Report-Period-Ending-8.11.18.pdf.

CLASS ACTION COMPLAINT

78.     Altria began pulling its products off the market in October 2018. By November, Altria's market share had fallen to 4 percent, and Juul's had grown to over 75 percent.[33]



79.     By December 2018, Altria had pulled its products off of the market entirely.

80.     The Transaction not only eliminated one of Juul's most successful competitors, it gave Juul access to Altria's vast resources and capital.

81.     The Transaction was intended to, and did, significantly increase Juul's monopoly power in the relevant market.

**VIII.    ANTICOMPETITIVE EFFECTS**

**A.    Altria Agreed to Withdraw from Current and Future Competition in Exchange for the Opportunity to Share in Juul's Dominant Position**

82.     During the negotiations between Juul and Altria, Juul's executives made clear their position that Altria could not remain a competitor in the relevant market if there was to be a deal.

_____

[33] *Supra* note 31.

83.     On July 30, 2018, in advance of a meeting between Juul's lead negotiators, Nick Pritzker, a Juul Board member, emailed Howard Willard, the Altria CEO, an opening term sheet for discussions. The term sheet included the term that Altria must withdraw from the relevant market.

84.     On August 1, 2018, the negotiators met at the Park Hyatt Hotel in Washington, DC to discuss terms. The attendees of this meeting consisted of the lead negotiators for each side: Nick Pritzker and Riaz Valani, two members of Juul's Board of Directors, Kevin Burns, Juul's CEO, Howard Willard, Altria's CEO, and Billy Gifford, Altria's CFO. No attorneys were present from either side at this meeting.

85.     After this meeting, Altria's top executives understood that ceasing to compete in the e-cigarette business might be a condition for reaching a deal with Juul.

86.     When Altria sought to modify Juul's proposed non-compete term, Juul responded negatively and reiterated its demands. On August 9, 2018, Billy Gifford sent over a markup of the term sheet to Nick Pritzker, Riaz Valani, and Kevin Burns.

87.     On August 15, 2018, Riaz Valani of Juul met with Dinny Devitre, one of Altria's Board Members at Mr. Devitre's office in New York.

88.     After negotiations between Juul and Altria were suspended temporarily, Altria's executives knew that they had to reaffirm their commitment to meeting Juul's demands if they were to restart talks successfully. On October 5, 2018, Altria's Howard Willard sent Nick Pritzker, Riaz Valani, and Kevin Burns a letter assuring them that Altria would exit the market. Upon receiving this letter, Kevin Burns forwarded it to Juul's Chief Legal Officer. The concessions contained in this letter helped to restart the stalled negotiations. Soon after, Altria began to take key steps that would facilitate a possible wind down of the Nu Mark business.

89.     On October 25, 2018, Altria announced that it was temporarily halting its MarkTen Elite business, ostensibly out of concern that pod-based systems and nontraditional flavors could be contributing to youth usage. A few days later, Altria and Juul, which was the

CLASS ACTION COMPLAINT

largest seller of a pod-based system and non-traditional flavors, agreed to basic deal terms, which included Altria not competing in the e-cigarette market.

90.    On December 7, 2018, after five years of continuous participation in the e-cigarette market, Altria announced its decision to wind down its remaining e-cigarette business, including its MarkTen cig-a-like.

91.    On December 9, 2018, Murray Garrick, Altria's General Counsel, emailed Jerry Masoudi Chief Legal Officer at Juul to discuss the deal.

92.    On December 20, 2018, less than two weeks after Altria announced its decision to discontinue its e-cigarette operations, Juul and Altria executed the transaction whereby Altria invested $12.8 billion and in return, Juul issued stock to Altria amounting to a 35% ownership stake in the company.

93.    The transaction also closed routes to other potential acquisitions or partnerships through which Altria might have participated in the relevant market.

94.    Juul's conduct as alleged herein had the purpose, capacity, tendency, and effect of restraining competition unreasonably, and the transaction substantially lessened competition, in the U.S. market for closed-system e-cigarettes, in the following ways, among others:

(i)    Eliminating Altria's competing products from the relevant market, thereby eliminating current and future price competition between Juul and Altria, in particular promotional activity to create awareness and drive sales;

(ii)   Eliminating current and future innovation competition between Juul and Altria; and

(iii)  Eliminating current and future competition between Juul and Altria for shelf space at retailers through rebates and other incentives.

95.    Altria's agreement to exit the relevant market eliminated one of Juul's most dangerous rivals. As a large, well-established, and well-funded company with longstanding relationships and significant shelf space with retailers nationwide, Altria had the resources and infrastructure to drive sales and compete aggressively.

96.     Before the shut-down of Nu Mark, Juul and Altria relied on price promotions to drive sales of their respective e-cigarette products. In addition, each monitored the other's pricing in setting its own strategy. Altria's decision to pull its MarkTen products brought this price competition to an end.

97.      In addition to price competition, Juul and Altria competed through product innovation, including device features and e-liquid formulations. For example, it was Juul's success that prompted Altria to acquire and further develop various pod-based e-cigarettes (including Elite), and to commit significant resources toward developing e-liquid formulations with nicotine salts and higher nicotine concentrations.

98.     Altria leveraged its ownership of leading brands across multiple tobacco categories in order to secure substantial and favorable shelf space at retailers throughout the United States. In 2018, for example, to Juul's alarm, Altria launched a major campaign to secure shelf space for its innovative tobacco products (including e-cigarettes), offerings retailers product discounts, slotting fees, and fixture payments. After the Transaction, instead of competing for shelf space, Altria leased its shelf space to Juul, effectively replacing its own MarkTen products with Juul's product.

99.     Based upon documents submitted to the Federal Trade Commission from Defendants it appears that before committing to the transaction, Altria had every intention of remaining in the relevant market for the long term. Altria's documents and executive statements repeatedly evince their recognition that e-cigarettes were the future of the tobacco industry and their absolute commitment to participate in that future. For example:

- Mr. Martin Barrington, Altria's former CEO, stated to investors: "So we'll be clear: We aspire to be the U.S. leader in authorized, non-combustible, reduced-risk products."[34]

---

[34] Martin Barrington, CEO, Altria Group, Inc., Address at the Consumer Analyst Group of New York Conference (Feb. 21, 2018), https://www.sec.gov/Archives/edgar/data/764180/00007641 8017000131/exhibit991-2017investorday.htm.

CLASS ACTION COMPLAINT

- Mr. Howard Willard, Altria's current CEO, in an interview with the Wall Street Journal, stated: "At a time when e-vapor is going to grow rapidly and likely cannibalize the consumers we have in our core business, if you don't invest in the new areas you potentially put your ability to deliver that financial result at risk."[35]

100.    Instead of continuing to pursue its ambitions in the relevant market through competition, including aggressive price promotions, product development, and incentives for shelf space, Altria sought a short cut to market leadership by investing in its competitor. Altria agreed to abandon its long-standing and significant efforts at current and future competition in exchange for a significant share of Juul's profits resulting from a significantly less competitive marketplace.

## IX.    LACK OF COUNTERVAILING FACTORS

101.    Juul cannot demonstrate that entry into the relevant market by new competitors or expansion by existing competitors would be timely, likely, or sufficient to offset the anticompetitive effects of the conduct alleged above.

102.    The entry of new competitors into the relevant market is unlikely because the regulatory approval process is exceptionally time-consuming and expensive. Defendants themselves estimate that preparing a PMTA for an e-cigarette would require substantial time and investment.

103.    In addition to achieving regulatory approval, a new entrant would need to: (i) develop or acquire a product; (ii) manufacture the product at quality and scale; (iii) sell the product; (iv) develop a distribution system; and (v) develop a marketing plan, including a plan to secure shelf space in retail outlets.

---

[35] Jennifer Maloney and Dana Mattioli, *Why Marlboro Maker Bet on Juul, the Vaping Upstart Aiming to Kill Cigarettes*, Wall St. J. (Mar. 23, 2019), https://www.wsj.com/articles/why-marlboro-maker-bet-on-juul-the-vaping-upstart-aiming-to-kill-cigarettes-11553313678.

CLASS ACTION COMPLAINT

104.    Existing closed-system e-cigarette competitors cannot effectively replace the lost competition because: (i) they lack Altria's brand strength to secure favorable shelf space at retailers; (ii) they lack the substantial resources Altria had at its disposal to commit to e-cigarette research and development as well as to pursuing regulatory approval; and/or (iii) the FDA's enforcement of restrictions on e-liquid flavors has negatively impacted the competitive presence of closed-system competitors other than Juul, who had voluntarily discontinued its flavors earlier.

105.    Nor are open-tank e-cigarette manufacturers likely to replace the lost competition, in part because the impending PMTA deadline will likely cause many of them to shut down, and because they are largely sold in the separate "vape shop" sales channel and would not likely be able to expand rapidly into convenience stores, where closed-system e-cigarettes are typically sold.

106.    Defendants cannot demonstrate cognizable efficiencies that would be sufficient to rebut the presumption that the transaction substantially lessened competition in the relevant market. Nor can Defendants demonstrate pro-competitive benefits of the Transaction that could not have been achieved through alternative, less restrictive means.

107.    Thus, Juul's unlawful conduct eliminated competition in the relevant market and deprived Plaintiff and the Class of the benefits of free and unrestrained competition that the antitrust laws were designed to ensure.

## X.    CLASS ACTION ALLEGATIONS

108.    Plaintiff brings this class action on behalf of himself and all others similarly situated under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking damages and injunctive relief on behalf of the following class (the "Class"):

> All persons or entities in the United States that purchased e-cigarettes directly from Juul from December 7, 2018 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period"). The following persons and entities are excluded from the Class: Defendants and their counsel, officers, directors, management, employees, parents, subsidiaries, and affiliates; federal governmental entities and instrumentalities of the federal

government, states and their subdivisions, agencies and instrumentalities; and the judges in this case and any members of their immediate families.

109.    The Class is sufficiently numerous. Plaintiff believes that the Class is so numerous and widely geographically dispersed throughout the United States that joinder of all members is impracticable. Moreover, given the costs of complex antitrust litigation, it would be uneconomic for many plaintiffs to bring individual claims and join them together.

110.    Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiff are aligned with, and not antagonistic to, those of the other members of the Class.

111.    Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation and have particular experience with mass action litigation involving tobacco products, including the litigation events leading up to the historic $246b Master Tobacco Settlement Agreement.

112.    Questions of law and fact common to members of the Class predominate over questions, if any, that may affect only individual Class members, because Defendants have acted on grounds generally applicable to the entire Class. Such generally applicable questions are inherent in Defendants' wrongful conduct.

113.    Questions of law and fact common to the Class include:

    (i)    whether the conduct alleged herein constitutes a violation of the federal antitrust laws;

    (ii)    whether the U.S. market for closed-system e-cigarettes constitutes a relevant market;

    (iii)    whether Defendants' possess sufficient market power in the relevant market to cause anticompetitive effects;

    (iv)    whether Juul possesses monopoly power in the relevant market;

    (v)    whether the conduct alleged herein caused anticompetitive effects in the relevant market;

CLASS ACTION COMPLAINT

(vi)  whether Defendants monopolized or attempted to monopolize the U.S. market for closed-system e-cigarettes;

(vii)  whether Defendants' conduct, as alleged in this Complaint, caused Plaintiff and the Class to pay supracompetitive prices for e-cigarettes and thereby suffer antitrust injury;

(viii)  the appropriate injunctive relief for the Class; and

(ix)  the appropriate measure of damages sustained by Plaintiffs and other members of the Class.

114.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action

115.   Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## XI.   CLAIMS FOR RELIEF

### COUNT ONE

### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1

### (Conspiracy in Restraint of Trade)

116.   Plaintiff incorporates the allegations set forth above as if fully set forth herein.

117.   Defendants entered into and engaged in continuing unlawful agreements for the purpose of unreasonably restraining trade in violation of Section 1 of the Sherman Act.

118.   The aforesaid violations of Section 1 consisted of an unlawful agreement in which Juul required Altria to withdraw from the relevant market and in exchange gave Altria an interest in Juul's continuing business in the relevant market from which Altria withdrew.  The purpose of

this agreement was to fix, raise, maintain or stabilize prices of closed end products in the relevant market as well as stifle innovation.

119.    The combination and conspiracy alleged herein has had the following effects:

   (i)    Eliminating Altria's competing products from the relevant market, thereby eliminating current and future price competition between Juul and Altria, in particular promotional activity to create awareness and drive sales;

   (ii)   Eliminating current and future innovation competition between Juul and Altria; and

   (iii)  Eliminating current and future competition between Juul and Altria for shelf space at retailers through rebates and other incentives.

120.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and class members were injured in their business or property. Plaintiff and class members bring this claim seeking treble damages pursuant to Section 1 of the Sherman Act and Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

## COUNT TWO

### Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)

### (Monopolization)

121.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

122.    Defendants, as alleged herein, have monopoly power in the close-system e-cigarette market in the United States.

123.    Defendants willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain a monopoly in that market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

124.    Beginning at least in or around the fall of 2018, Defendants entered into and engaged in continuing unlawful agreements for the purpose of further monopolizing the market for closed-system e-cigarettes.

125.    The conduct alleged herein has had the following effects:

(i)    Eliminating Altria's competing products from the relevant market, thereby eliminating current and future price competition between Juul and Altria, in particular promotional activity to create awareness and drive sales;

(ii)   Eliminating current and future innovation competition between Juul and Altria; and

(iii)  Eliminating current and future competition between Juul and Altria for shelf space at retailers through rebates and other incentives.

126.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and class members were injured in their business or property. Plaintiff and class members bring this claim seeking treble damages under Section 2 of the Sherman Act, 15 U.S.C. § 2 and Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

**COUNT THREE**

**Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)**

**(Attempted Monopolization)**

**(In the Alternative)**

127.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

128.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

129.    As detailed above, Defendants have monopoly power, or at a minimum, a dangerous probability of success in acquiring monopoly power, in the relevant market.

130.    Defendants have willfully, knowingly, and with specific intent to do so, attempted to monopolize the Relevant Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

131.    Defendants' anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the relevant market. Defendants' ongoing anticompetitive conduct presents a dangerous probability that Defendants will succeed, to the extent they have not already, in its attempt to monopolize the relevant market.

132.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and class members were injured in their business or property. Plaintiff and class members bring this claim seeking treble damages under Section 2 of the Sherman Act, 15 U.S.C. § 2 and Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

**COUNT FOUR**

**Violation of Section 7 of the Clayton Act (15 U.S.C. § 18)**

133.   Plaintiff incorporates the allegations set forth above as if fully set forth herein.

134.   The Transaction, in which Altria received a substantial ownership stake in Juul and for the purposes of which Altria withdrew its existing e-cigarettes from the market and halted its innovation on future products, substantially lessened competition in the U.S. market for closed system e-cigarettes.

135.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and class members were injured in their business or property. Plaintiff and class members bring this claim seeking treble damages under Section 7 of the Clayton Act, 15 U.S.C. § 18.

**COUNT FIVE**

**Declaratory and Injunctive Relief Under Sections 1 and 2 of the Sherman Act**

**and Section 16 of the Clayton Act (15 U.S.C. §§ 1-2, 26)**

136.   Plaintiff incorporates the allegations set forth above as if fully set forth herein.

137.   Plaintiff seeks declaratory and injunctive relief under the federal antitrust laws.

138.   Plaintiffs' allegations described herein constitute violations of Sections 1 and 2 of the Sherman Act.

139.   Defendants effectuated a scheme to restrain trade and monopolize a market.

140.   There is and was no legitimate, non-pretextual, pro-competitive business justification for Defendants' conduct that outweighs its harmful effect.

141.   As a direct and proximate result of Defendants' anticompetitive scheme, as alleged herein, Plaintiff and the Class were harmed as aforesaid.

142.   The goal, purpose and/or effect of the scheme was to prevent and/or delay competition to continue charging supra-competitive prices for e-cigarettes without a substantial loss of sales.

143.   The anticompetitive agreements alleged herein should be declared invalid and unenforceable.

144.   Plaintiff and the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this Count. Their injury consists of paying higher prices for e-cigarettes than they would have paid in the absence of those violations. These injuries will continue unless halted.

145.   Plaintiff and the Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), hereby seek a declaratory judgment that Defendants' conduct constitutes a violation of §§ 1 and 2 of the Sherman Act.

146.   Plaintiff and the Class further seek equitable and injunctive relief pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the proposed Class, pray for judgment against Defendant as follows:

I.     Determine that this action may be maintained as a class action and direct that reasonable notice of this action be given to the Class, and appoint the Plaintiff as the named representatives of the Class;

II.    Award Plaintiff and the Class damages (i.e., three times overcharges) in an amount to be determined at trial, plus interest in accordance with law;

III.   Enter judgment against Defendant and in favor of Plaintiff and the Class;

IV.    Declare the agreements alleged herein invalid and unenforceable;

CLASS ACTION COMPLAINT

V.     Grant injunctive relief that restores Defendants' incentives to compete in the relevant market, including, as appropriate, divestiture of Altria's equity stake in Juul, rescission of Altria's purchase of that stake, and/or any other relief ;

VI.    Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees, as provided by law; and

VII.   Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## XIII.    JURY DEMAND

147.   Plaintiff demands a trial by jury on all issues so triable.

Dated: April 7, 2020                          Respectfully submitted,

*/s/ Barrett Beasley*

Barrett Beasley
**SALIM BEASLEY**
1901 Texas Street
Natchitoches, LA 71457
(866) 269-5561
bbeasley@salim-beasley.com

Michael M. Buchman
Michelle C. Clerkin
**MOTLEY RICE LLC**
777 Third Avenue, 27th Floor
New York, NY 10017
(212) 577-0050
mbuchman@motleyrice.com
mclerkin@motleyrice.com

Joseph F. Rice
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
(843) 216-9000
jrice@motleyrice.com

William H. Narwold
**MOTLEY RICE LLC**
20 Church Street
Hartford, CT 06103
(860) 882-2676
bnarwold@motleyrice.com

John Alden Meade
**MEADE YOUNG LLC**
909 Poydras St., Suite 1600
New Orleans, LA 70112
(504) 799-3102
jam@meadeyoung.com

CLASS ACTION COMPLAINT