1  Todd A. Seaver (SBN 271067)
   Matthew D. Pearson (SBN 235339)
2  Carl N. Hammarskjold (SBN 280961)
   Colleen Cleary (SBN 306659)
3  **BERMAN TABACCO**
   44 Montgomery Street, Suite 650
4  San Francisco, CA 94104
   Telephone: (415) 433-3200
5  Facsimile: (415) 433-6382
   Email: tseaver@bermantabacco.com
6         mpearson@bermantabacco.com
          chammarskjold@bermantabacco.com
7         ccleary@bermantabacco.com

8  Christian Levis (*pro hac vice* forthcoming)
   Amanda Fiorilla (*pro hac vice* forthcoming)
9  **LOWEY DANNENBERG, P.C.**
   44 South Broadway, Suite 1100
10 White Plains, NY 10601
   Telephone: (914) 997-0500
11 Email: clevis@lowey.com
12        afiorilla@lowey.com

13 Anthony M. Christina (*pro hac vice* forthcoming*)*
   **LOWEY DANNENBERG, P.C**
14 One Tower Bridge
15 100 Front Street, Suite 520
   West Conshohocken, PA 19428
16 Telephone: (215) 399-4770
           Email: achristina@lowey.com
17
   *Attorneys for Plaintiff Matthew Blomquist*
18

19            **UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF CALIFORNIA**
20            **SAN FRANCISCO DIVISION**

21 DOUGLAS J. REECE, on his own behalf and    )   No. 3:20-cv-02345 WHO
   all others similarly situated,             )
22                                            )   Potentially Related Case Nos.
                                              )   4:20-cv-02512-VC
23                           Plaintiff,        )   4:20-cv-02597-JSW
                                              )
24 v.                                          )   **DECLARATION OF TODD A.**
                                              )   **SEAVER IN SUPPORT OF**
25 ALTRIA GROUP, INC., and JUUL LABS,         )   **ADMINISTRATIVE MOTION TO**
   INC.,                                       )   **CONSIDER WHETHER CASES**
26                                            )   **SHOULD BE RELATED**
                                              )   **(Civil L.R. 3-12(b) and 7-11)**
27                          Defendants.        )
                                              )   Judge: Hon. William H. Orrick
28                                            )

[No. 3:20-cv-02345 WHO] DECLARATION OF TODD A. SEAVER ISO ADMINISTRATIVE MOTION TO
CONSIDER WHETHER CASES SHOULD BE RELATED (Civil L.R. 3-12(b) and 7-11)

I, Todd A. Seaver, declare under penalty of perjury as follows:

1.      I am a partner in the San Francisco office of Berman Tabacco, counsel for Plaintiff Matthew Blomquist in the action entitled *Blomquist v. Altria Group, Inc. et al.*, No. 4:20-cv-02512-VC ("*Blomquist* action").  I am a member in good standing of the State Bar of California and admitted to practice in this District.  I submit this Declaration in support of the Administrative Motion to Consider Whether Cases Should be Related (Civil L.R. 3-12(b) and 7-11).  The matters set forth herein are of my own personal knowledge, and if called and sworn as a witness I could competently testify regarding them.

2.      Attached hereto as Exhibit A is a true and correct copy of the complaint in the *Blomquist* action, filed April 13, 2020 in the Northern District of California and assigned to the Honorable Judge Vince Chhabria.  The *Blomquist* Action is a proposed class action on behalf of direct purchasers e-cigarettes from Juul Labs, Inc.

3.      Attached hereto as Exhibit B is a true and correct copy of the complaint in *Martinez v. Altria Group, Inc., et al.*, No. 4:20-cv-02597-JSW ("*Martinez* action"), filed April 14, 2020 in the Northern District of California and assigned to the Honorable Judge Jeffrey S. White.  The *Martinez* Action is a proposed class action on behalf of direct purchasers e-cigarettes from Juul Labs, Inc. from December 7, 2018 through and until the anticompetitive effects of Defendants' unlawful conduct cease

4.      I have reviewed the complaints filed in the following actions, all of which arise out of the same series of transactions, occurrences, and events:

| CASE NAME | CASE NUMBER & COURT | DATE FILED |
|---|---|---|
| *Reece v. Altria Group, Inc., et al.* | 3:20-cv-02345 WHO (N.D. Cal.) | April 7, 2020 |
| *Blomquist v. Altria Group, Inc., et al.* | 4:20-cv-02512-VC (N.D. Cal.) | April 13, 2020 |
| *Martinez v. Altria Group, Inc., et al.* | 4:20-cv-02597-JSW (N.D. Cal.) | April 14, 2020 |

5.      Plaintiffs in all of the above cases concern substantially the same parties, transactions, and events.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6.      A stipulation pursuant to Civil Local Rule 7-11(a) could not be obtained with all parties, as service on defendants has been undertaken but counsel for defendants have yet to appear in the *Blomquist* action.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 20th day of April, 2020, at San Francisco, California.

*/s/ Todd A. Seaver*
Todd A. Seaver

# EXHIBIT A

Todd A. Seaver (SBN 271067)
Matthew D. Pearson (SBN 235339)
Carl Hammarskjold (SBN 280961)
Colleen Cleary (SBN 306659)
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA  94104
Telephone: (415) 433-3200
Facsimile:  (415) 433-6382
Email: tseaver@bermantabacco.com
        mpearson@bermantabacco.com
        chammarskjold@bermantabacco.com
        ccleary@bermantabacco.com

Christian Levis (*pro hac vice* forthcoming)
Amanda Fiorilla (*pro hac vice* forthcoming)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Email: clevis@lowey.com
        afiorilla@lowey.com

Anthony M. Christina (*pro hac vice* forthcoming*)*
**LOWEY DANNENBERG, P.C**
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Telephone: (215) 399-4770
        Email: achristina@lowey.com

*Attorneys for Plaintiff Matthew Blomquist*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MATTHEW BLOMQUIST, individually and on behalf of himself and all other persons similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ALTRIA GROUP, INC., and JUUL LABS, INC.,<br><br>Defendants. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Matthew Blomquist ("Plaintiff"), individually, by and through the undersigned counsel, brings this class action lawsuit against Defendants Altria Group, Inc. ("Altria") and Juul Labs, Inc. ("Juul"), on behalf of himself and all others similarly situated, and alleges, based upon information and belief and the investigation of counsel as follows:

## INTRODUCTION

1.      This case involves a series of anticompetitive agreements between Altria and Juul, in which Altria agreed to refrain from competing with Juul and exit the closed-system electronic cigarettes ("e-cigarettes") market in exchange for a 35% ownership interest in Juul.

2.      The closed-system e-cigarettes market emerged as an alternative to traditional smoking. Unlike traditional smoking, which involves heat-drying tobacco leaves, e-cigarettes deliver nicotine to the user by vaporizing a liquid nicotine solution. Closed-system e-cigarettes deliver the liquid nicotine in pre-filled, sealed cartridges. This alternative to traditional smoking quickly gained traction, increasing from seven million users in 2011 to 41 million users in 2018. During this same period, traditional smoking had steadily declined.

3.      Altria, the leading seller of traditional cigarettes, such as Marlboro, understood the necessity of developing a product in the rapidly emerging closed-system e-cigarette market in light of declining sales of traditional cigarettes. In August of 2013, Altria launched the MarkTen through its subsidiary Nu Mark, a product Altria invested substantial resources and funds to develop and market. Altria also leveraged its position in the traditional smoking market to obtain highly coveted shelf space in retailers across the United States to sell the MarkTen. Altria's efforts were successful, as the MarkTen became the second most popular closed-system e-cigarette brand by market share.

4.      Two years later, Juul rebranded and quickly became a leading seller of e-cigarettes. In 2016, Juul's sales had skyrocketed 700% and by 2017, the company had captured a third of the closed-system e-cigarette market.

5.      Altria made several attempts to acquire, or eliminate, Juul. For years Altria and Juul aggressively competed with one another, often monitoring each other's e-cigarette prices and racing against one another for the newest innovations. Altria, aware of Juul's success, went

so far as to release a similar pod-based product called the MarkTen Elite in an attempt to recapture the market.

6. Despite these efforts, by 2018 Juul had obtained 75% of the closed-system e-cigarette market. Altria, acknowledging the market share Juul had acquired, began to seriously pursue negotiations with Juul in the summer of 2018. In exchange, Juul demanded that Altria exit the closed-system e-cigarette market as a non-negotiable precondition before any deal could proceed. Negotiations came to a halt with Altria unwilling to concede to Juul's demands. After months without any progress, Altria ultimately agreed to Juul's request in early October 2018 and began pulling its products from the market as part of its agreement with Juul. On December 19, 2018, Altria discontinued all sales of its e-cigarette products.

7. Just one day later, on December 20, 2018, Altria and Juul announced that they had executed a Purchase Agreement and related agreements (collectively, "the Transaction"). Pursuant to the agreement, Altria purchased a 35% non-voting stake in Juul, convertible to a voting stake conditioned upon Hart-Scott Rodino ("HSR") approval. In addition, Juul and Altria executed (i) a Relationship Agreement, containing a non-compete provision prohibiting Altria from competing in the relevant market; (ii) a Service Agreement, under which Altria agreed to provide support services to Juul; (iii) an Intellectual Property License Agreement, licensing Altria's e-cigarette intellectual property to Juul; and (iv) a Voting Agreement, which provided Altria with representation on Juul's Board of Directors ("Board"). Upon HSR approval, Altria was also granted the right to appoint one of its executives to a non-voting observer position on Juul's Board.

8. Altria's orchestrated exit from the closed-system e-cigarette market in exchange for a portion of Juul's profits not only eliminated its existing products from the market, but, through the Non-Compete Agreement, halted ongoing innovation towards developing a new and improved line of products. Thus, customers lost the benefit of competition between Altria and Juul, and Altria and other competitors.

9. The Transaction eliminated Altria from the relevant market and any threat to Juul's market dominance. In fact, the Transaction only further ensured Juul's controlling share

in the market, as Altria had promised to provide Juul with its extensive resources, including its line of distribution and coveted shelf space at retailers across the United States.

10.    Because Juul had a dominant position in the market, after eliminating its competition Altria, it was able to charge supracompetitive prices for its products. Altria, in exchange for removing itself from the market, was able to share in these excessive profits as a result of their agreement.

11.    No additional market participants could offset the anticompetitive effects of the Transaction. First, for existing manufacturers to develop and market a competing product would require extensive time and capital funds, including money for product development or product acquisition. Second, new market participants face the burden of high entry barriers, including those set by the U.S. Food and Drug Administration ("FDA"), which require a complex, lengthy, and expensive regulatory process before a new product can receive approval.

12.    Defendants cannot show the Transaction resulted in cognizable market benefits sufficient to outweigh the harm to competition caused by the Transaction. Nor can they point to any pro-competitive benefits that could not be achieved through less restrictive means.

13.    Defendants' conduct has illegally restrained competition in the relevant market in violation of federal antitrust laws. As a direct and proximate result of Defendants' anticompetitive conduct, consumers and entities that purchased Juul products were overcharged and denied the benefits of innovation from a competitive market.

## THE PARTIES

14.    Plaintiff Matthew Blomquist is a resident of New Jersey. Matthew Blomquist purchased Juul products directly from Juul through the Juul.com website during the relevant period, including on September 13, 2019 and October 13, 2019.

15.    Defendant Juul is a Delaware corporation with its principal place of business in San Francisco, California. Juul is the leading manufacturer of closed-system e-cigarette devices with projected revenue of $3.4 billion in 2019.

16.    Defendant Altria is a Virginia corporation with its principal place of business in Richmond, Virginia. Altria is one of the world's largest producers and marketers of tobacco

products worldwide and, prior to its agreement with Juul, was a manufacture of closed-system e-cigarette devices through its subsidiary Nu Mark.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over this action pursuant to Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, respectively, and pursuant to 28 U.S.C. §§ 1331, 1337.

18.    This Court has general personal jurisdiction over Juul because Juul maintains its principal place of business in this District in San Francisco, California.

19.    This Court has specific personal jurisdiction over Altria because Altria has substantial contacts in this District out of which this cause of action arises. For example: (i)  Altria marketed its products in this District; (ii) Altria sold to consumers in this District; (iii) Altria entered an unlawful anticompetitive agreement with Juul in this district; and (iv) Altria engaged in a scheme and conspiracy with its co-conspirator Juul in this District.

20.    Venue is proper in this District under 28 U.S.C. § 1391(b) because Juul's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## INTRADISTRICT ASSIGNMENT

21.    Assignment to any division in this District is proper because the interstate trade and commerce involved and affected by the violations of the antitrust laws was and is carried out within each division. Defendant Juul Labs, Inc. has its principal place of business in the San Francisco division.

## FACTUAL ALLEGATIONS

### I.    INDUSTRY BACKGROUND

#### A.    Decline of Traditional Tobacco

22.    Prior to the twentieth century, the negative health effects of tobacco were largely unknown. Although several studies began to confirm the correlation between smoking and cancer by the early 1950's, the general public still remained largely unaware of the potential health risks. It wasn't until 1952, when Reader's Digest published "Cancer by the Carton," a

1    watershed article detailing the dangers of smoking, that the public finally began to take notice of

2    the possible health consequences of cigarette smoking. The article had a tremendous impact and

3    spawned several similar reports in other periodicals. The following year, cigarette sales declined

4    for the first time in over two decades.

5        23.    In the early 1960s, the tobacco industry suffered another blow with the formation

6    of the Surgeon General's Advisory Committee on Smoking and Health. The committee was

7    commissioned in response to political pressures and the growing body of scientific evidence

8    suggesting a causal relationship between smoking and cancer. In 1964, the committee released a

9    387-page report entitled "Smoking and Health." In unequivocal terms, it concluded that

10   cigarette smoking is causally related to lung cancer.

11       24.    The formation of the Surgeon General's Advisory Committee marked the start of

12   an epic battle between public health and big tobacco. In 1965, Congress passed the Federal

13   Cigarette Labeling and Advertising Act requiring the Surgeon General's warnings on all

14   cigarette packages. In the 1970's, all broadcast advertising of cigarettes was banned. Two

15   decades later, smoking was banned on all interstate buses and all domestic airline flights lasting

16   six hours or less. Despite the tumultuous onslaught of government regulation, the tobacco

17   industry remained financially unscathed until the 1990's.

18       25.    In 1994, Mississippi filed the first of 22 state lawsuits seeking to recoup millions

19   of dollars from tobacco companies for smokers' Medicaid bills. And on June 20, 1997, the

20   tobacco companies and state attorneys general announced a landmark $368.5 billion agreement

21   to settle the massive lawsuits against cigarette makers. The litigation ultimately exposed the

22   tobacco companies' knowledge and exploitation of nicotine addiction, cigarettes as a nicotine-

23   delivery system, and their targeted recruitment of "pre-smokers."

24       26.    Starting in 1990, the sustained campaign to discourage Americans from smoking

25   began to fully take effect, including: (i) high taxes on cigarettes; (ii) smoking bans in bars,

26   restaurants, workplaces, airports, airplanes, trains, and other enclosed spaces; (iii) requiring

27   smoking in restricted areas; (iv) restrictions on advertising; (v) ban on the sale to minors;

28   (vi) higher health care premiums to penalize smokers;  (vii) local and state smoking cessation

1   programs; and (viii) and other severe restrictions instituted by the Tobacco Master Settlement

2   Agreement ("MSA").

3          27.    The MSA was entered in November 1998, originally between the four largest

4   U.S. tobacco companies, Philip Morris Inc., R.J. Reynolds, Brown & Williamson and Lorillard

5   (the original participating manufacturers) and the attorneys general of 46 states. The MSA

6   restricts certain conduct by participating manufacturers, including advertising and certain

7   lobbying activities, created a national tobacco control foundation, and dismantled several

8   tobacco industry initiatives. Specifically, it imposed significant prohibitions and restrictions on

9   tobacco advertising, marketing, and promotional programs or activities. For example, it

10  prohibits or restricts: (i) direct and indirect targeting of youth; (ii) use of cartoon characters;

11  (iii) billboards, transit ads, and other outdoor advertising not in direct proximity to a retail

12  establishment that sells tobacco products; (iv) product placements in entertainment media;

13  (v) free tobacco product samples (except in adult-only facilities); (vi) gifts to youth in exchange

14  for proofs of purchase; and (vii) branded merchandise and brand name sponsorships.

15         28.    The MSA additionally prohibited certain practices that seek to hide negative

16  information about smoking and created a tobacco prevention foundation, the American Legacy

17  Foundation (now known as the Truth Initiative), a research and educational organization that

18  focuses its efforts on preventing teen smoking and encouraging smokers to quit. The foundation

19  is responsible for "The Truth" advertisement campaign,  which has had success in reducing

20  youth smoking.

21         29.    The MSA dismantled key tobacco industry initiatives and prohibits participating

22  manufacturers from creating other industry-wide groups unless such groups agree to act in a

23  manner consistent with the MSA's provisions. It also requires participating manufacturers to

24  make available online the non-privileged documents they disclosed during the discovery phase

25  of the tobacco litigation. These efforts fostered the dramatic reduction in cigarette smoking in

26  the 21st century. Current smoking has declined from 20.9% (nearly 21 of every 100 adults) in

27  2005 to 13.7% (nearly 14 of every 100 adults) in 2018, and the proportion of ex-smokers has

28  continued to increase.

CLASS ACTION COMPLAINT                                                                        6

30.     The following chart illustrates the growth and decline of cigarette consumption in the United States. In 1900, on a per-capita basis, American adults smoked approximately 54 cigarettes per year. That number increased almost exponentially until its peak in 1963, when an estimated 4,345 cigarettes were consumed per adult in that year alone. When tobacco use peaked in the mid-1960s, more than 40 percent of the U.S. adult population smoked cigarettes (National Center for Health Statistics 2005).



Per capita consumption of cigarettes among adults ages 18 years and older from 1900 to 2004. SOURCES: (ALA 2004, 2006; Capehart 2004).

**B.     Emergence of Nicotine Delivery Alternatives**

31.     Nicotine fuels the economy of addiction. It acts on nicotinic cholinergic receptors, triggering the release of neurotransmitters that produce rewarding psychoactive effects. With repeated exposure, users develop a tolerance to many of the effects of nicotine, thereby reducing its primary reinforcing effects and inducing physical dependence (*i.e.*, withdrawal symptoms in the absence of nicotine, including anxiety, tension, depression, irritability, difficulty concentrating, disorientation, increased eating, restlessness, headaches, sweating, insomnia, heart palpitations, tremors, and intense cravings). Smoking behavior is influenced by pharmacologic feedback and by environmental factors such as smoking cues, friends who smoke, stress, and product advertising.

32.     Tobacco companies have been capitalizing on the powerful acceleration of addictiveness for over a century. In response to the remarkable decline in cigarette smoking in America, they have sought to diversify their products by taking advantage of new nicotine delivery systems, such as e-cigarettes.

33.     E-cigarettes have been on the rise since they were first introduced in the United States in the mid-2000's. There are currently two main types of e-cigarettes on the market: open-system and closed-system e-cigarettes. Open-system e-cigarettes include a "tank" that is manually filled with e-liquid. The e-liquid, tank, and other parts are generally customizable. Open-system e-cigarettes are traditionally bulkier in size. In contrast to open-system e-cigarettes, closed-system e-cigarettes often resemble traditional cigarettes and are smaller by design. Closed-system e-cigarettes have sealed pods or cartridges that are disposed and replaced after each use.

34.     According to Euromonitor, the electronic cigarette market has grown from just $50 million in 2005 to an estimated $7.5 billion in 2016. In 2018, the Business Research company estimated the global market for e-cigarettes was approximately $14.05 and expected to grow to $29.39 billion through 2022.

35.     Almost every major tobacco company has sought to enter the market for e-cigarettes. For instance, tobacco giant Reynolds America is the parent company R.J. Reynolds Vapor Company, which produces VUSE brand e-cigarettes. British American Tobacco, the largest tobacco company in Europe, launched Vype, an e-cigarette brand.

36.     Altria viewed participation in the e-cigarette market as essential to its long-term survival. In 2013, Altria entered the market through its subsidiary Nu Mark. Its flagship product was the MarkTen e-cigarette. The following year Altria took steps to acquire Green Smoke, Inc., further expanding its portfolio in the closed-system e-cigarette market.

37.     Tobacco companies like Altria, armed with their extensive knowledge on nicotine addiction and marketing experience in the traditional cigarette market, originally played a large role in the e-cigarette market in the United States. However, another company

1  would soon surpass all competitors in the market for closed-system e-cigarettes, ultimately

2  becoming a behemoth in the industry.

3      38.    The main difference between open and closed-system e-cigarettes is the way the

4  e-liquid is delivered to the heating mechanism. Open-system e-cigarettes have a clearomizer

5  which is filled with e-liquid manually, whereas closed-system e-cigarettes come ready-filled

6  with e-liquid, and screw directly onto the e-cigarette battery. Open-system e-cigarettes also have

7  a removable mouthpiece, whereas the mouthpiece on closed-system e-cigarettes is built into the

8  e-cigarette tank, streamlining the entire mechanism into one portable device.

9      39.    In 2015, James Monsees and Adam Bowen, two individuals who had already

10  created, marketed, and produced two prior "vapor" products, founded Pax Labs ("Pax"). Pax

11  originally introduced "Juul," a closed-system e-cigarette brand, in June of 2015, along with a

12  marketing campaign called "vaporized." The campaign focused on email marketing, social

13  media marketing, and live events. The Juul launch party was hosted on June 4, 2015 in New

14  York City and was ultimately regarded as success.

15      40.    Pax, later rebranded as independent company Juul Labs, Inc. in 2017, was

16  relentless in its attempts to capture the market. Borrowing a page out of Big Tobacco's

17  playbook, Juul planned to establish market dominance by targeting non-smokers and younger

18  demographics. Juul advertisements would often feature young models "socializing and

19  flirtatiously sharing" the device. The company also relied on popular hashtags on social media

20  to increase its marketing reach to previously untapped demographics. In February 2020, reports

21  emerged that Juul had gone so far as to purchase ad space on popular children's networks, such

22  as Cartoon Network and Nickelodeon, to target underaged consumers. Several attorneys general

23  have sued the company for its advertising strategy, alleging the marketing campaign is

24  responsible for the surge in teen use of e-cigarette products.

25      41.    In addition to undercutting the costs of traditional ad campaigns, Juul's

26  marketing efforts were massively effective. According to ABC 7 News, Juul's sales rose 700%

27  in 2016. By the following year the company had captured a third of the closed-system e-

28  cigarette market. Ultimately, Juul acquired approximately 75% of the market by 2018.

CLASS ACTION COMPLAINT                                              9

## II.    UNLAWFUL AGREEMENT NOT TO COMPETE

42.    Altria, the third largest e-cigarette manufacturer during the relevant period, recognized that it could not effectively compete against Juul in the closed-system e-cigarette market. Rather than try to legitimately capture the market, such as by changing its business strategy or creating innovative products, Altria approached Juul in the summer of 2018 to reach an agreement to ultimately share in Juul's profits.

43.    As a precondition to negotiations, Juul demanded that Altria—one of its main competitors—exit the market for closed-system e-cigarettes entirely. Juul would not agree to negotiate with Altria in the absence of this precondition, which ultimately stalled negotiations for several months. After months without any concessions by Juul, Altria eventually conceded to Juul's demands. Altria began pulling its products from the market in October of 2018, under the guise that the pod system and its selection of flavors were contributing to youth usage. Altria completely discontinued its operations in the closed-system e-cigarette market on December 19, 2019.

44.    The next day, Juul and Altria announced that they had executed the Transaction, which granted Altria 35 percent non-voting equity interest in Juul in exchange for a $12.8 billion cash investment.

45.    Even though Altria was already providing Juul with a substantial cash infusion, which valued the company at more than twice its $15 billion valuation just seven months prior, Altria made several other concessions and agreed to provide certain essential services on Juul's behalf. For example, as discussed above, several other agreements were simultaneously executed, including: (i) a Service Agreement; (ii) a Relationship Agreement; (iii) a Voting Agreement; and (iv) an Intellectual Property Licensing Agreement.

46.    Although Altria had effectively shuttered its doors in the closed-system e-cigarette market in order to enter the Transaction, by virtue of the non-compete contained in the Relationship Agreement, Altria agreed not to re-enter the market unless exclusively through Juul:

 [Altria] shall not . . . directly or indirectly (1) own, manage, operate, control, engage in or assist others in engaging in, the e-Vapor business; (2) take actions with the purpose of preparing to engage in the e-Vapor Business, including through engaging in or sponsoring research and development activities; or (3) Beneficially Own any equity interest in any Person, other than an aggregate of not more than four and nine-tenths percent (4.9%) of the equity interests of any Person which is publicly listed on a national stock exchange, that engages directly or indirectly in the e-Vapor Business (other than (x) as a result of [Altria's] Beneficial Ownership of Shares or (y) engagement in, or sponsorship of, research and development activities not directed toward the e-Vapor Business and not undertaken with the purpose of developing or commercializing technology or products in the e-Vapor Business) . . . . . . Notwithstanding the foregoing, (x) the [Altria] and its Subsidiaries and controlled Affiliates may engage in the business relating to (I) its Green Smoke, MarkTen (or Solaris, which is the non-U.S. equivalent brand of MarkTen) and MarkTen Elite brands, in each case, as such business is presently conducted, subject to Section 4.1 of the Purchase Agreement, and (II) for a period of sixty (60) days commencing on the date of this Agreement, certain research and development activities pursuant to existing agreements with third parties that are in the process of being discontinued . . .

47.     Altria provided Juul with all the resources necessary to maintain, and further develop, it's dominant market position in the closed-system e-cigarette market. Under the Services Agreement, Altria agreed to both initial and extended services. Altria initially agreed to provide highly coveted convenience store shelf space to Juul, regulatory consulting, and distribution support. Under the extended services, Altria agreed to provide direct marketing support and sales services. The non-compete pursuant to the Relationship Agreement formally went into effect in early 2019, at the time Altria began performing extended services.

48.     Altria similarly granted Juul extensive rights pursuant to the Intellectual Property License Agreement, which provides Juul with a broad, non-exclusive, irrevocable license to Altria's e-cigarette intellectual property portfolio.

49.     On January 30, 2020, Defendants announced amendments to their agreement, including: (i) an Amended Purchase Agreement; (ii) an Amended Relationship Agreement; (iii) an Amended Services Agreement; and (iv) a Revised Voting Agreement.

50.     The Revised Voting Agreement provided that, after the Antitrust Conversion, Altria would have the right to: (i) appoint two out of nine directors on Juul's Board; (ii) nominate one of three independent directors; (iii) appoint one of four members of a

Nominating Committee, who would have the right to veto independent director nominations; (iv) appoint two of five members and the chair of a new Litigation Oversight Committee, which would have responsibility for managing litigation involving both Altria and Juul, *i.e.*, "Joint Litigation Matters"; and (v) appoint one of three members of a Litigation Subcommittee, which would have authority, by unanimous vote, to change Juul's senior outside counsel responsible for Joint Litigation Matters. The Revised Voting Agreement additionally granted Juul's Chief Executive Officer ("CEO"): (i) a board seat; (ii) a seat on the Litigation Oversight Committee; and (iii) a seat on the Litigation Subcommittee.

51. Pursuant to the Amended Services Agreement, Altria was only obligated to provide regulatory support services. The amendment went into effect at signing, except with respect to Altria's obligation to provide retail shelf space to Juul, an essential service for maintaining its market share, which terminated after March 31, 2020.

52. Pursuant to these various agreements, Juul was able to maintain, and further, its dominant share in the market for closed-system e-cigarettes. In the absence of Altria's necessary market competition, Juul was able to capitalize on its heightened position in the market and charge supracompetitive prices to consumers and distributors. Altria directly benefitted from these supracometitive prices due to its 35% interest in Juul.

## III. THE FTC ACTION

53. On April 1, 2020, the Federal Trade Commission ("FTC") filed an administrative complaint against Juul and Altria, alleging their series of agreements, including Altria's acquisition of a thirty-five percent stake in Juul, restrained competition in violation of federal antitrust laws.

54. The FTC brought claims against Defendants pursuant to Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), Section 5(b) of the FTC Act, 15 U.S.C. § 45(b), and Section 11(b) of the Clayton Act, 15 U.S.C. § 21(b), alleging their agreements violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Section 5 of the FTC Act, 15 U.S.C. § 45, and Section 7 of the Clayton Act, 15 U.S.C. § 18.

55.     The FTC contends that Defendants' agreements unreasonably restrained trade in the U.S. market for closed-system e-cigarettes. As a result of Defendants' agreement, competition for closed-system e-cigarettes was substantially lessened and innovation for future products was effectively halted.

56.     The FTC sought several forms of relief, including: (i) restoring incentives to compete in the relevant market, including Altria divesting its equity stake in Juul, rescission of Altria's purchase in Juul, and other appropriate relief; (ii) voiding all agreements related to the Transaction, as well as prohibiting future non-compete agreements amongst Defendants; (iii) prohibiting transactions between Altria and Juul that combine their business in the market for closed-system e-cigarettes, unless prior approval is granted by the Commission; (iv) prohibiting officers or directors on either board from serving on the other Defendants' respective board of directors and from attending its meetings; and (v) certain compliance monitoring and prior notice to the Commission.

## IV.     THE RELEVANT MARKET

57.     The relevant market in this action is the closed-system e-cigarette market.

58.     The market for e-cigarettes is essentially split into two distinct markets for e-cigarettes: the market for open-systems and closed-systems. Both systems rely on "e-liquid," which deliver a certain percentage of nicotine to the user.

59.     In a closed system there are essentially two pieces of equipment: the base, consisting of the battery and the heating mechanism, and either a sealed cartridge or pod. The base is rechargeable, and the cartridge or pod comes pre-filled with e-liquid. The e-liquid, flavor, and base cannot be customized. The cartridge or pod itself is disposable: once the e-liquid is used, the cartridge is thrown away and replaced with a new one. A typical disposable cartridge of e-liquid contains .5% nicotine, although percentages can vary as low as 0%. These devices are typically small and often inconspicuous. For instance, the Juul is often compared to a USB drive. A Juul device, the heating and battery housing unit, retails for $19.99. A price of four Juul pods, disposable e-liquid, currently costs $15.99 on Juul's website.

60.     In an open system, there is no cartridge to dispose of. Rather, the device itself is refilled with e-liquid in a "tank." Users of open-system e-cigarettes can customize the e-liquid they deposit into the system, including the possibility to combine several e-liquids to create unique flavors. Open-system e-cigarettes tend to deliver a higher level of nicotine and users can customize the strength of their device, *i.e.*, the level of nicotine they receive per use. The devices themselves are generally much larger and bulkier than closed-system e-cigarettes and the initial costs of the device are substantially higher, costing as much as $150.00, if not higher. The devices include interchangeable parts, such as coils, atomizer, and the tanks themselves. Users buy e-liquid by the bottle, in varying percentages of nicotine, which typically ranges from $10.00 to $30.00.

61.     The market for closed and open e-cigarette systems are vastly different, in terms of both demographics and price range. For instance, closed-system e-cigarettes are routinely sold in convenience stores and gas stations and are easily accessible to consumers. For example, in 2016, the MarkTen, produced by Altria, was available in over 70,000 retailers. By contrast, open-system e-cigarettes are normally only available in specialty vape shops, which are less accessible to an everyday consumer. Additionally, the market for open-system e-cigarettes have routinely suffered from product safety issues, ultimately deterring a large portion of consumers.

62.     Altria and Juul were direct competitors with one another in the closed-system market. As discussed above, Altria and Juul were head-to-head competitors in terms of bringing the latest innovations to market and often price-based their products in relation to one another. Given the vast difference in demographic, accessibility, and price, Altria and Juul did not consider manufacturers in the open-system e-cigarette market as competitors.

63.     There are no reasonable alternatives to closed-system e-cigarettes. Closed-system e-cigarettes are easily accessible, low-maintenance, cost-conscientious, and conspicuous. The only counterpart available on the market, open-system e-cigarettes, are not nearly as accessible, sell at a higher price point, and are bulkier in form.

64.     The geographic market is limited to the United States, as FDA requirements forbid the importation of e-cigarettes without prior FDA approval.

## V.    MARKET POWER

65.    The market for closed-system e-cigarettes is extremely limited. For instance, four companies make up approximately 95% of the entire market for closed-system e-cigarettes.

66.    Throughout the Class Period Juul consistently maintained a dominant market share. In August 2018, Juul possessed 72% of the entire market. By comparison, Altria maintained 7.5% market share.



67.    Approximately one month after Altria began leaving the market, Juul's market share increased to 75.3%. Altria's market share, on the other hand, had dropped to 4.4%.



68. Following the Transaction, Juul's market dominance continued to grow, as demonstrated by common metrics used to gauge market concentration.

69. Federal agencies often rely on the Herfindahl-Hirschman Index ("HHI") to measure concentration in a particular market. Under the Merger Guidelines, promulgated by the Antitrust Division of the Department of Justice and FTC, a merger is presumably illegal (because it excessively creates or enhances market power) when the post-merger HHI score exceeds 2,500 and the merger increases the HHI by 200 points or more.

70. Following the Transaction, the U.S. market for closed-system e-cigarettes resulted in an HHI score that exceeded 2,500, with an increase in HHI by more than 200 points. Therefore, Juul and Altria—through its 35% interest in Juul—possessed overwhelming market power following the Transaction.

VI.  ANTICOMPETITIVE EFFECTS

71. Altria and Juul were head-to-head competitors in the closed-system e-cigarette market during the relevant time period, with Juul maintaining approximately 75% market share in 2018.

72.     While Altria attempted to negotiate either an acquisition or merger with Juul in 2018, Juul executives demanded that Altria cease all operations in the closed-system e-cigarette market before they would engage in any meaningful negotiations.

73.     On July 30, 2018, Nick Pritzker, a Juul Board member, emailed Howard Willard, the CEO of Altria, an open term sheet for discussions. The term sheet included that Altria must withdraw from the closed-system e-cigarette market.

74.     On August 1, 2018, representatives for Altria and Juul met in Washington, DC to discuss the terms of the merger. The attendees consisted of Nick Pritzker and Riaz Valani, two members of Juul's Board, Kevin Burns, Juul's CEO, Howard Willard, Altria's CEO, and Billy Gifford, Altria's CFO. No attorneys were present from either side.

75.     Juul's attendees once again expressed to Altria's top executives that their withdrawal from the closed-system e-cigarette business was a precondition to reaching a favorable merger deal with Juul.

76.     Altria made several attempts to modify the non-compete term, but Juul reiterated its demands time and time again.

77.     On August 9, 2018, Altria CFO Billy Gifford sent over a markup of the term sheet to Juul's negotiators, Nick Pritzker, Riaz Valani, and Kevin Burns.

78.     On August 15, 2018, Riaz Valani met with Dinny Devitre, another Altria Board member, at Mr. Devitre's New York office. These talks were ultimately unsuccessful.

79.     Negotiations between Juul and Altria were temporarily suspended. While suspended, Altria's executives came to the conclusion that they had to meet Juul's demands if they were to successfully reengage Juul and restart negotiations.

80.     On October 5, 2018, Altria CEO Howard Willard sent Juul's representatives Nick Pritzker, Riaz Valani, and Kevin Burns, a letter stating that Altria would exit the closed-system e-cigarette market. Kevin Burns forwarded Altria's letter to Juul's Chief Legal Officer.

81.     Altria's concessions kicked-off the previously stalled negotiations. Immediately after, Altria began to take the necessary steps to facilitate a possible wind down of its closed-system e-cigarette business.

CLASS ACTION COMPLAINT                                                                                    17

82. Altria announced on October 25, 2018, that it was temporarily halting its production and marketing of its MarkTen Elite, under the guise that the pod system and its selection of flavors were contributing to youth usage. However, just a few days later, Altria and Juul agreed to the deal's basic terms. Part of these terms specifically included that Altria cease competition in the e-cigarette market.

83. Altria announced on December 19, 2018, that it was winding down its remaining e-cigarette business, including its MarkTen product line.

84. Just one day later, on December 20, 2018, Altria announced its decision to discontinue its e-cigarette operations. Juul and Altria then executed the Transaction whereby Altria invested $12.8 billion and in return, Juul issued stock to Altria amounting to a 35% ownership stake in the company.

85. This anticompetitive transaction eliminated routes to other potential acquisitions or partnerships through which Altria might have participated in the relevant market.

86. Juul's conduct in executing the deal with Altria unreasonably restrained competition in the U.S. market for closed-system e-cigarettes, including: (i) eliminating competition in the market between Juul and Altria, thereby eliminating price competition; (ii) eliminating current and future innovation between Juul and Altria; and (iii) eliminating competition between Juul and Altria for shelf space at retailers throughout the United States.

87. Altria's agreement to leave the relevant e-cigarette market eliminated one of Juul's main competitors. As one the nation's largest tobacco companies with longstanding business relationships with national retailers, Altria otherwise had the resources and infrastructure to drive sales and compete aggressively.

88. Before the shut-down of Altria's closed-system e-cigarette business, Juul and Altria relied on price promotions to boost sales of their e-cigarettes. Each checked up on one another's pricing in formulating its own pricing model. Altria's decision to withdraw MarkTen brought competition to a halt.

89.     Juul and Altria also competed through various product innovations. Juul pioneered various pod-based e-cigarettes which prompted Altria to commit significant resources toward developing e-liquid formulations with nicotine salts and higher nicotine concentrations.

90.     Altria leveraged its ownership of its flagship tobacco brands and categories in order to secure favorable shelf space at domestic retailers.

91.     In 2018, Altria launched a major campaign to secure shelf space for its tobacco products, including e-cigarettes, offerings retailers discounts, slotting fees, and fixture payments.

92.     After the Juul-Altria transaction, instead of competing and jockeying for shelf space, Altria leased its shelf space to Juul. This effectively replaced its own MarkTen products.

93.     FTC documents from Defendants make apparent that before committing to the transaction, Altria intended on remaining in the relevant market long-term.

94.     Altria's documents produced to the FTC and its executive statements evidence their acknowledgement that e-cigarettes were the thriving new future of the tobacco industry and committed to participating in that trend.

95.     For example, Altria's former CEO Martin Barrington, stated to investors in February 2018: "So we'll be clear: We aspire to be the U.S. leader in authorized, non-combustible, reduced-risk products."

96.     Additionally, Altria's current CEO Howard Willard told the *Wall Street Journal* in March 2019: "At a time when e-vapor is going to grow rapidly and likely cannibalize the consumers we have in our core business, if you don't invest in the new areas you potentially put your ability to deliver that financial result at risk."

97.     Altria circumvented competing in the e-cigarette market by anticompetitively investing in its upstart competitor. Altria abandoned competition in exchange for a significant share of Juul's profits resulting from a significantly less competitive marketplace.

## VII.    LACK OF COUNTERVAILING FACTORS

98.     There is a lack of procompetitive benefits to the Transaction, particularly because Juul already maintained approximately 75% of the relevant market share, and the Transaction eliminated Juul's main competitor, Altria.

99.     Entering the relevant market is an extremely difficult task for a new entrant, especially in light of the significant monopoly power Juul had prior to the transaction and the increased market power it now has after the Transaction.

100.    It is now even more difficult and less appealing of an option to enter the relevant market. A new market participant would need to engage to: (i) develop or acquire a product; (ii) manufacture a quality product and scale; (ii) obtain shelf space in retail outlets; (iv) develop a marketing strategy to gain appeal of its product; (v) develop a distribution system; and (vi) successfully sell the product.

101.    Before it even does that, however, a new market participant would need to submit a Premarket Tobacco Product Application ("PMTA") to, and get approval from, the FDA. A PMTA requires significant resources that can add up to millions of dollars for each product for which approval is sought.  At the time of the Transaction, Altria and Juul were not required to submit a PMTA *until August 8, 2022*, because they were on the market prior to August 8, 2016.  This saved Altria and Juul a significant amount of time (which led to additional profits) and resources (which increased their profit margins). This added requirement and expenditure of resources for new market participants, *before they are allowed to generate revenue*, increases the practical difficulties in entering the market.

102.    But once it jumps through all those regulatory hurdles, if it successfully does so, it must still *effectively* compete with Juul, which now has over 80% of the market share and benefits from the resources, brand power, and efforts of itself and of Altria. Significantly, a new market participant is highly unlikely to effectively secure favorable shelf space at retail outlets and to develop its name brand to the point where it can be a real market competitor.

103.    Other existing competitors in the relevant market also cannot effectively replace the competition eliminated by the Transaction, substantially for the same reasons listed above:

(i) they lack Altria's brand strength to secure favorable shelf space at retail outlets; (ii) they lack the substantial resources Altria had at its disposal to commit to e-cigarette research and development as well as to pursuing regulatory approval; and/or (iii) the FDA's enforcement of restrictions on e-liquid flavors has negatively impacted the competitive presence of closed-system competitors other than Juul, who has voluntarily discontinued its flavors.

104.    Additionally, open-system e-cigarette market participants are extremely unlikely to replace the lost competition because they are now required to submit a PMTA by May 12, 2020 in order to stay on the market. Subsequently, if their PMTA is denied, they must immediately remove their products from the market. As a result, many of these participants are simply unable to afford a costly and complicated regulatory hurdle and thus will shut down in the very near future.

105.    As discussed above, open-system e-cigarette products are largely sold in separate specialty vape shop sales channels and thus an expansion into retail outlets like convenience stores (where closed-system e-cigarettes are typically sold) is extremely unlikely given the unique selection of e-liquids and parts offered for open-system products and the related high level of customer service that is simply unattainable in a convenience store.

106.    The Transaction has no procompetitive benefits or efficiencies sufficient to rebut the presumption that the Transaction substantially lessens competition in the relevant market.

## **CLASS ACTION ALLEGATIONS**

107.    Plaintiff, Matthew Blomquist, brings this action pursuant to Federal Rule of Civil Procedure 23 on behalf of himself and all others similarly situated, as representative of the following Class:

> All persons or entities in the United States that purchased e-cigarettes from Juul from December 19, 2018, through present (the "Class Period").

108.    Excluded from the Class are affiliates, predecessors, successors, officers, directors, agents, servants, or employees of Defendant, and the immediate family members of such persons. Also excluded are any trial judge who may preside over this action and their law clerks, court personnel and their family members, and any juror assigned to this action.

---

CLASS ACTION COMPLAINT                                                                  21

109.    Plaintiff reserves the right to amend the Class definition if discovery and/or further investigation reveal that it should be modified.

110.    The members of the Class are so numerous that the joinder of all members of the Class in single action is impractical. Juul operates nationally and has a substantial customer base, as evidenced by its anticipated $3.4 billion revenue for the 2019 year. The Class members are readily identifiable from information and records in Defendant's possession, custody, or control.

111.    There are common questions of law and fact to the Class members, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

a.    Whether Defendants' conduct constitutes a violation of the federal antitrust laws;

b.    Whether the U.S. market for closed-system e-cigarettes constitutes a relevant market;

c.    Whether Juul possesses sufficient market power in the relevant market to cause anticompetitive effects;

d.    Whether Juul possesses monopoly power in the relevant market;

e.    Whether Defendants' conduct caused anticompetitive effects in the relevant market;

f.    Whether Defendants monopolized or attempted to monopolize the U.S. market for closed-system e-cigarettes; and

g.    Whether Defendants' conduct caused Plaintiff and the Class to pay supracompetitive prices for closed-system e-cigarettes.

112.    Plaintiff's claims are typical of those of other Class members because Plaintiff, like every other Class member, paid supracompetitive prices for closed-system e-cigarettes.

113.    Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained competent counsel experienced in litigating complex class actions, including antitrust and consumer class actions. Plaintiff intends to prosecute this action vigorously. Plaintiff's claims are typical of the claims of all of the other Class members, and

Plaintiff has the same non-conflicting interests as the other Class members. Therefore, the interests of the Class members will be fairly and adequately represented by Plaintiff and his counsel.

114.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims. There will be no difficulty in managing this action as a class action, and the disposition of the claims of the Class members in a single action will provide substantial benefits to all parties and to the Court. Damages for any individual Class member are likely insufficient to justify the cost of individual litigation so that, in the absence of class treatment, Defendant's violations of law inflicting damages in the aggregate would go unremedied.

115.    Class certification is appropriate under Federal Rules of Civil Procedure 23(a) and (b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Class, such that final injunctive or corresponding declaratory relief is appropriate to the Class as a whole.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1)**

**(Conspiracy in Restraint of Trade)**

116.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in each and every paragraph above, as though fully stated herein.

117.    Defendants entered into a series of unlawful agreements that resulted in an unreasonable and unlawful restraint of trade in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq*.

118.    During the Class Period, Defendants entered into a series of agreements designed to unlawfully concentrate Juul's market power for closed-system e-cigarettes.

119.    In order to increase Juul's market share, Altria agreed to exit the market for closed-system e-cigarettes, provide valuable intellectual property, necessary marketing and

distribution, and access to Altria's highly coveted shelf space in convenience stores across the United States. Altria, in return, benefitted by receiving a portion of Juul's excessive profits by virtue of its 35% interest in Juul.

120. These agreements ultimately restrained trade and resulted in higher prices and less competition and innovation in the market.

121. Defendants' conduct caused injury to Plaintiff and members of the Class who purchased closed-system e-cigarettes from Defendants at supracompetitive prices that they would not have otherwise paid in a competitive market.

122. Defendants' conduct constitutes a *per se* violation of § 1 of the Sherman Antitrust Act. Alternatively, under the rule of reason Defendants' conduct constitutes a violation of § 1 of the Sherman Antitrust Act. Defendants' conduct resulted in substantial anticompetitive effects, including: (i) eliminating competition in the market between Juul and Altria, thereby eliminating price competition; (ii) eliminating current and future innovation between Juul and Altria; and (iii) eliminating competition between Juul and Altria for shelf space at retailers throughout the United States.

123. As a direct, material, and proximate result of Defendants' violation of § 1 of the Sherman Antitrust Act, Plaintiff and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act, throughout the Class Period.

124. Plaintiff and members of the Class are each entitled to seek treble damages sustained in the market for closed-system e-cigarettes as a result of Defendants' violations of § 1 of the Sherman Antitrust Act under § 4 of the Clayton Act alleged herein.

125. Plaintiff and members of the Class are each entitled to seek declaratory and injunctive relief under § 1 of the Sherman Antitrust Act, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct.

**SECOND CLAIM FOR RELIEF**

**Violation of Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2)**

**(Monopolization)**

126. Plaintiff repeats, realleges, and incorporates by reference the allegations contained in each and every paragraph above, as though fully stated herein.

127. Defendants, as alleged in the complaint, have monopoly power in the close-system domestic e-cigarette market.

128. Defendants willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain a monopoly in that market in violation of § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

129. Defendants entered into and engaged in continuing unlawful agreements for the purpose of further monopolizing the market for closed-system e-cigarettes.

130. Defendants' conduct alleged in the complaint had the following anticompetitive effects: (i) eliminating competition in the market between Juul and Altria, thereby eliminating price competition; (ii) eliminating current and future innovation between Juul and Altria; and (iii) eliminating competition between Juul and Altria for shelf space at retailers throughout the United States.

131. As a direct, material, and proximate result of Defendants' violation of § 2 of the Sherman Antitrust Act, Plaintiff and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act, throughout the Class Period.

132. Plaintiff and members of the Class are each entitled to seek declaratory and injunctive relief under § 2 of the Sherman Antitrust Act, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct.

**THIRD CLAIM FOR RELIEF**

**Violation of Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2)**

**(Attempted Monopolization)**

133. Plaintiff repeats, realleges, and incorporates by reference the allegations contained in each and every paragraph above, as though fully stated herein.

CLASS ACTION COMPLAINT                                                                                      25

134.    Defendants have monopoly power, or at a minimum, a dangerous probability of success in acquiring monopoly power, in the relevant e-cigarette market.

135.    Defendants have willfully, knowingly, and with specific intent to do so, attempted to monopolize the relevant e-cigarette market in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

136.    Defendants' anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the relevant e-cigarette market.

137.    Defendants' ongoing anticompetitive conduct presents a dangerous probability that Defendants will succeed, to the extent they have not already, in its attempt to monopolize the relevant market.

138.    Plaintiff and members of the Class are each entitled to seek declaratory and injunctive relief under § 2 of the Sherman Antitrust Act, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct.

## FOURTH CLAIM FOR RELIEF

### Violation of Section 7 of the Clayton Act (15 U.S.C. § 18)

139.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in each and every paragraph above, as though fully stated herein.

140.    The merger transaction between Altria and Juul, in which Altria received a substantial ownership stake in Juul and for the purposes of which Altria withdrew its existing e-cigarettes from the market and halted its innovation on future products, substantially lessened competition in the U.S. market for closed system e-cigarettes.

141.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the class were injured in their business or property. Plaintiff and class members bring this claim seeking treble damages under Section 7 of the Clayton Act, 15 U.S.C. § 18.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Matthew Blomquist, individually and on behalf of the Class, respectfully requests that the Court:

A.     Certify the Class pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure and order that notice be provided to all Class members;

B.     Designate Plaintiff Matthew Blomquist as representative of the Class and the undersigned counsel as Class Counsel;

C.     Award Plaintiff and the Class compensatory damages in an amount to be determined by the Court and treble and punitive damages to punish Defendants' egregious conduct as described herein, and to deter Defendants and others from engaging in similar conduct;

D.     Award Plaintiff and the Class injunctive relief, as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices set forth herein;

E.     Award Plaintiff and the Class statutory interest and penalties;

F.     Award Plaintiff and the Class their costs, prejudgment and post judgment interest, and attorneys' fees; and

G.     Grant such other relief that the Court may deem just and proper.

### <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury as to all issues stated herein, and all issues so triable.

Dated: April 13, 2020                Respectfully submitted,

**BERMAN TABACCO**

By:    */s/ Todd A. Seaver*
            Todd A. Seaver

Matthew D. Pearson
Carl Hammarskjold
Colleen Cleary
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: tseaver@bermantabacco.com
      mpearson@bermantabacco.com
      chammarskjold@bermantabacco.com
      ccleary@bermantabacco.com

**LOWEY DANNENBERG, P.C.**

By: ___/s/ Christian Levis___
            Christian Levis (*pro hac vice* forthcoming)

Amanda Fiorilla (*pro hac vice* forthcoming)
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Email: clevis@lowey.com
       afiorilla@lowey.com

Anthony M. Christina (*pro hac vice* forthcoming*)*
**LOWEY DANNENBERG, P.C**
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Telephone: (215) 399-4770
Email: achristina@lowey.com

*Attorneys for Plaintiff Matthew Blomquist*

# EXHIBIT B

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Kyle P. Quackenbush (State Bar No.322401)
Anupama K. Reddy (State Bar No. 324873)
JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:  (415) 500-6800
Facsimile:   (415) 395-9940
Email:     jsaveri@saverilawfirm.com
           swilliams@saverilawfirm.com
           kquackenbush@saverilawfirm.com
           areddy@saverilawfirm.com

Attorneys for Individual and Representative Plaintiff
Anthony Martinez

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ANTHONY MARTINEZ,**<br><br>        Individual and<br>        Representative Plaintiff,<br><br>   v.<br><br>**ALTRIA GROUP, INC., and JUUL LABS, INC.,**<br><br>        Defendants. | Case No.<br><br>**ANTITRUST CLASS ACTION COMPLAINT FOR (1) UNLAWFUL RESTRAINT OF TRADE, 15 U.S.C. § 1, (2) UNLAWFUL MERGER AND ACQUISITION, 15 U.S.C. § 7, AND (3) INJUNCTIVE RELIEF, 15 U.S.C. § 26**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Anthony Martinez, alleges, on behalf of himself and all others similarly situated, brings this Class Action Complaint against Defendants Altria Group, Inc. and Juul Labs, Inc., for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and Section 7 of the Clayton Act, 15 U.S.C. § 18, as follows:

## INTRODUCTION

1.      This is an antitrust class action against Defendants Altria Group, Inc. ("Altria") and Juul Labs, Inc. ("Juul"), concerning anticompetitive agreements between them in which Altria agreed to refrain from competing against Juul in the United States market for closed-system electronic cigarettes ("e-cigarettes") in return for a substantial ownership interest in Juul. By these agreements, Altria and Juul agreed to divide and allocate the market for e-cigarettes. By this lawsuit, plaintiff seeks damages and injunctive relief for the collusive and concerted restraint in trade orchestrated by Defendants.

2.      E-cigarettes are electronic devices that deliver nicotine to a user by vaporizing a liquid nicotine solution. In a closed system, the liquid is contained in a pre-filled, sealed cartridge or pod. Juul was and is the dominant player in the sale of closed-system e-cigarettes in the United States.

3.      In light of declining sales in the market for traditional cigarettes and a shift by consumers to alternative nicotine delivery devices, Altria viewed participation in the e-cigarette market as essential to its long-term survival. In 2013, Altria entered the market through its subsidiary Nu Mark LLC. Its flagship product was the MarkTen e-cigarette.

4.      In 2015, Juul entered the market and quickly captured a substantial market share. By 2018, Juul had obtained market share of over 70 percent, stunning Altria and other competitors. Juul's swift rise posed a grave competitive threat to Altria in both the e-cigarette and traditional cigarette markets. To eliminate that threat, Altria began a two-prong strategy of acquiring Juul, while continuing to compete against it. Its efforts to acquire Juul were unsuccessful initially.

5.      With respect to competition, Altria introduced a new product known as the MarkTen Elite which closely resembled Juul's product. With respect to acquisition, Altria entered into negotiations to acquire an ownership interest in Juul. Initially, Juul refused to negotiate. But in the fall of 2018, Juul agreed to negotiate with Altria, under the condition that Altria stop competing with Juul in the market for e-cigarettes. In particular, Juul refused to proceed with negotiations unless and until Altria

had withdrawn its products. At first, Altria refused. In October 2018, however, Altria agreed and began to withdraw its e-cigarette products from the market.

6.      Two months later in December of 2018, Altria announced its intention to cease competing entirely in the relevant market. Approximately two weeks after making this announcement, Altria disclosed that, on October 20, 2018, it had entered into certain agreements with Juul. Among other things, the agreements provided that Altria would acquire certain ownership interests in Juul and other rights, in exchange for over $12 billion in cash and agreement by Altria to withdraw from and exit the e-cigarette market.

7.      The agreements between Altria and Juul whereby Altria and Juul agreed to allocate the market for e-cigarettes were anticompetitive. Defendants' conduct has illegally restrained competition in the relevant market in violation of the Sherman and Clayton Acts. As a direct and proximate result of Defendants' anticompetitive conduct, prices for e-cigarettes were raised, fixed and stabilized at supracompetitive levels. Altria's investment in Juul and its exit from the market eliminated its existing e-cigarette product and halted its ongoing innovation efforts toward developing new and improved products. Thus, consumers lost the benefit of current and future head-to-head competition between Altria and Juul, and between Altria and other competitors.

## JURISDICTION AND VENUE

8.      Plaintiff brings this action on its own behalf as well as that of the Class to recover damages, including treble damages, costs of suit, and reasonable attorney's fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 7 of the Clayton Act, as well as any and all equitable relief afforded them under the federal laws pleaded herein.

9.      Jurisdiction and venue are proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. § 1391(b), (c) and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District or is licensed to do business in this District. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and

conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## INTRADISTRICT ASSIGNMENT

10.     Pursuant to Civil Local Rule 3.2 (c) and (e), assignment of this case to the San Francisco Division of the United States District Court for the Northern District of California is proper because the interstate trade and commerce involved and affected by Defendants' violations of the antitrust laws action was substantially conducted with, directed to or impacted Plaintiff and members of the Class in counties located within the Division. Furthermore, Juul's principal place of business is located within this Division.

## PARTIES

11.     Plaintiff Anthony Martinez is a resident of the State of New York. Mr. Martinez purchased Juul products directly from Juul during the relevant period. Plaintiff was injured in connection with his purchases during the Class Period as a result of Defendants' anticompetitive and unlawful agreements alleged herein.

12.     Defendant Juul Labs, Inc. ("Juul"), is a Delaware corporation with its principal place of business located at 560 20th Street, San Francisco, California. Juul is the leading manufacturer of closed-system e-cigarettes, generating over $1 billion in sales in 2018. During the Class Period, Juul sold e-cigarettes directly or through its subsidiaries, agents and affiliates to purchasers throughout the United States. Juul is a party to the anticompetitive and unlawful agreements alleged herein.

13.     Defendant Altria Group, Inc. ("Altria") is a Virginia corporation headquartered at 6601 West Broad Street, Richmond, Virginia. Altria is one of the country's largest tobacco companies and was, prior to the anticompetitive agreements alleged, a manufacturer of closed-system e-cigarettes. During the Class Period, Altria sold e-cigarettes directly or through its subsidiaries, agents and affiliates to purchasers throughout the United States. Altria is a party to the anticompetitive and unlawful agreements alleged herein. Prior to those anticompetitive and illegal agreements, Altria sold and marketed e-cigarettes under the brand names MarkTen and Green Smoke. In 2018, Altria generated over $25 billion in sales.

ANTITRUST CLASS ACTION COMPLAINT

**AGENTS AND CO-CONSPIRATORS**

14.     The anticompetitive and unlawful acts alleged against the Defendants in this class action complaint were authorized, ordered or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

15.     Defendants' agents operated under the authority and apparent authority of their principals.

16.     Defendants, through their subsidiaries, affiliates and agents operated as a single unified entity.

17.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

18.     Each Defendant acted as the principal, agent or joint venture of, or for other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

**CLASS ALLEGATIONS**

19.     Plaintiff brings this action for damages and injunctive relief on behalf of himself and as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), on behalf of a similarly situated Class, which is defined, as follows:

> All persons or entities in the United States that purchased e-cigarettes directly from Juul from December 7, 2018 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").

This definition specifically excludes the following person or entities:

a.     Any of the Defendants named herein;

b.     Any of the Defendants' co-conspirators;

c.     Any of Defendants' parent companies, subsidiaries, and affiliates;

d.     Any of Defendants' officers, directors, management, employees, subsidiaries, affiliates or agents;

e.     All governmental entities; and

f.      The judges and chambers staff in this case, as well as any members of their immediate families.

20.     Plaintiff does not know the exact number of Class members, because such information is in the exclusive control of Defendants. Plaintiff is informed and believes that, due to the nature of the trade and commerce involved, there are thousands of Class members geographically dispersed throughout the United States and elsewhere, such that joinder of all Class members in the prosecution of this action is impracticable.

21.     Plaintiff's claims are typical of the claims of his fellow Class members because Plaintiff directly purchased a JUUL device from Juul, Plaintiff and all Class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Class.

22.     Numerous questions of law or fact common to the entire Class—including, but not limited to those identified below—arise from Defendants' anticompetitive and unlawful conduct:

a.      Whether Defendants combined or conspired with one another to fix, raise, maintain or stabilize prices for e-cigarettes sold at any time during the Class Period to purchasers in the United States;

b.      Whether Defendants combined or conspired with one another to divide or allocate the market for e-cigarettes sold at any time during the Class Period to purchasers in the United States;

c.      Whether Defendants had market power with respect to the relevant market

d.      The definition of the relevant product market;

e.      The definition of the relevant geographic market;

f.      Whether Defendants' conduct caused the prices of e-cigarettes sold at any time during the Class Period to purchasers in the United States to be artificially fixed, raised, maintained or stabilized at supracompetitive prices or price levels;

g.      Whether Plaintiff and the other members of the Class were injured by Defendants' conduct and, if so, the appropriate Class-wide measure of damages;

h.      Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

23.      These and other questions of law and fact are common to the Class and predominate over any questions affecting the Class members individually.

24.      Plaintiff will fairly and adequately represent the interests of the Class because he directly purchased e-cigarettes from one or more Defendants and it has no conflicts with any other members of the Class. Furthermore, Plaintiff has retained sophisticated and competent counsel who is experienced in prosecuting antitrust class actions, as well as other complex litigation.

25.      Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

26.      This class action is superior to alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

27.      The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## FACTUAL ALLEGATIONS

**Industry Background**

28.      The discovery of the negative impacts of tobacco use in the 1990's and early 2000's changed American society. Laws were enacted banning cigarette smoking in public places such as restaurants and bars. The prohibition sparked changes in Americans' smoking habits and added to increasing social stigma. Dramatically increased taxes provided another disincentive, and many Americans gave up smoking to live a healthier life. Rates of traditional smoking among the younger generations decreased drastically.

29.      The first modern electronic cigarettes appeared in the U.S. market by the mid-2000s. Around 2010, traditional tobacco companies started either entering the market with their own products or acquiring existing e-cigarette companies.

ANTITRUST CLASS ACTION COMPLAINT

30.     Altria entered the market with its MarkTen e-cigarette in 2013, and over the next several years spent well over $100 million acquiring other existing e-cigarette platforms in order to augment its portfolio.

31.     Juul was spun out of Pax Labs (Pax")), a San Francisco-based maker of vaporizers, in 2017. Started in 2007 by James Monsees and Adam Bowen, graduates of the design program at Stanford University, Pax was earlier called Ploom. Bowen left Pax in June 2011. Monsees left Pax in July 2017. Bharat Vasan served as CEO from February 2018 until September 2019.

32.     Monsees has described the cigarette as "the most successful consumer product of all time . . . an amazing product." Because of "some problems" inherent in the cigarette, Juul's founders set out to "deliver[] solutions that refresh the magic and luxury of the tobacco category." Monsees saw "a huge opportunity for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products." With a focus on recreating the "ritual and elegance that smoking once exemplified," Monsees and Bowen founded Pax to "meet the needs of people who want to enjoy tobacco but don't self-identify with—or don't necessarily want to be associated with—cigarettes."

33.     In 2015, Pax launched the Juul e-cigarette, a closed-system in a discreet "pod-based" format. The device deployed a chemical breakthrough in the speed of its nicotine delivery. Since the 1960s, tobacco companies have manufactured cigarettes that freebase nicotine using ammonia, which liberates the nicotine so that it can be quickly absorbed into the lungs and the brain. As one addiction expert has said, "[t]he modern cigarette does to nicotine what crack does to cocaine." Pax discovered that by adding benzoic acid to nicotine salts, which occur naturally in tobacco, they could mimic a cigarette's rapid nicotine delivery.

34.     JUUL, the product, was introduced in 2015. JUUL uses a proprietary blend of nicotine developed by Juul. According to Bowen, because it contains ten times as much nicotine as other e-cigarettes, JUUL packs a "bigger punch" as compared to other, similar products in the market. Bowen also stated that the idea behind the blend was to eliminate the need for smokers to go back to cigarettes after an unsatisfying experience with vaping.

35.     Each JUUL pod is a plastic enclosure containing 0.7 milliliters of Juul's patented nicotine liquid and a coil heater. When a sensor in the JUUL device detects the movement of air caused

by suction on the JUUL pod, the battery in the JUUL device activates the heating element, which in turn converts the nicotine solution in the JUUL pod into a vapor consisting principally of nicotine, benzoic acid, glycerin, and propylene glycol. A light embedded in the JUUL device serves as a battery level indicator and lights up in a "party mode" display of a rainbow of colors when the device is waved around.

36.     The physical design of the JUUL device (including its circuit board) and JUUL pod determines the amount of aerosolized nicotine the JUUL device emits. By altering the temperature, maximum puff duration, or airflow, among other things, Juul can finely tune the amount of nicotine vapor the JUUL device delivers.

37.     Juul's product quickly gained traction among consumers, rapidly surpassing Altria and securing the largest share of the closed-system e-cigarette market.

38.     Since its launch in 2015, Juul has become the dominant e-cigarette manufacturer in the United States. Its revenues grew by 700% in 2017. According to a recent Wells Fargo report, Juul controlled 75% of the U.S. market for e-cigarettes by the end of 2018.

39.     In July 2017, Juul Labs was spun out of PAX Labs as an independent company, with Tyler Goldman, former CEO of PAX Labs, named as CEO of Juul. In December 2017, Goldman was replaced by Kevin Burns. Monsees worked as Chief Product Officer and board member at Juul. Bowen worked as Chief Technology Officer and board member at Juul.

**Defendants Entered into Illegal and Anticompetitive Agreements to Divide and Allocate Markets and not to Compete.**

40.     Despite becoming the dominant market leader, Juul was concerned that its competitor, Altria, would use its company's success, rich history, experience in the tobacco business and abundant human and capital resources to compete with respect to product innovation and price.

41.     Consistent with these concerns, Altria began a strategy of attempting to acquire Juul while simultaneously competing aggressively against it. Initially, Juul rebuffed these efforts and sought to compete with respect to its e-cigarettes, particularly with respect to price.

42.     In the summer of 2018, Juul sought to reach illegal and anticompetitive agreements to divide and allocate the market for e-cigarettes and not to compete.

43.     Prior to that time, Altria had approached Juul to acquire an ownership interest in Juul, including potentially acquiring or merging with the company. Juul initially resisted Altria's efforts, seeking to impose onerous anticompetitive preconditions on the discussions. Among other things, Juul sought to obtain Altria's agreement, in exchange for valuable consideration, to control or allocate the market for e-cigarettes. In particular, Juul sought Altria's agreement that Altria withdraw its products from the e-cigarette market.

44.     On July 30, 2018, in advance of a meeting between Juul's lead negotiators, Nick Pritzker, a Juul Board member, emailed Howard Willard, Altria's CEO, an opening term sheet for discussions. The term sheet included a non-compete term which provided that Altria withdraw from the e-cigarette market.

45.     On August 1, 2018, the negotiators met at the Park Hyatt Hotel in Washington, DC to discuss terms. The attendees of this meeting consisted of the lead negotiators for each side: Nick Pritzker and Riaz Valani, two members of Juul's Board of Directors, Kevin Burns, Juul's then Chief Executive Officer, Howard Willard, Altria's Chief Executive Officer, and Billy Gifford, Altria's Chief Financial Officer. The participants discussed various business terms, including anticompetitive agreements not to compete. After this meeting, Altria's top executives understood that ceasing to compete in the e-cigarette business would be a condition for reaching a deal with Juul.

46.     When Altria sought to modify Juul's proposed non-compete term, Juul responded negatively and reiterated its demands. On August 9, 2018, Billy Gifford sent over a markup of the term sheet to Nick Pritzker, Riaz Valani, and Kevin Burns.

47.     On October 5, 2018, Altria's Howard Willard sent Nick Pritzker, Riaz Valani, and Kevin Burns a letter assuring them that Altria would accede to the non-compete terms and that Altria was prepared to agree to exit the market. The concessions contained in this letter helped to restart the stalled negotiations. Soon after, Altria began to take key steps that would facilitate a possible wind down of the Nu Mark business and exit from competition in the e-cigarette market.

48.     On October 25, 2018, Altria announced that it was temporarily halting its MarkTen Elite business, ostensibly out of concern that pod-based systems and nontraditional flavors could be

contributing to youth usage. Pursuant to such agreement, in October 2018, Altria began to removing its e-cigarettes from the market.

49.     A few days later, Altria and Juul, which was the largest seller of a pod-based system using non-traditional flavors, agreed to basic deal terms, which included Altria not competing in the e-cigarette market.

50.     On December 7, 2018, after five years of continuous participation in the e-cigarette market, Altria announced its decision to wind down its remaining e-cigarette business, including its MarkTen cig-a-like.

51.     On December 9, 2018, Murray Garrick, Altria's General Counsel, emailed Jerry Masoudi, Chief Legal Officer at Juul, to discuss the deal.

52.     On December 20, 2018, less than two weeks after Altria announced its decision to discontinue its e-cigarette operations, Juul and Altria subsequently executed certain agreements providing that Altria pay 12.8 billion in cash in exchange for newly issued Juul stock amounting to a 35% ownership interest in Juul.

53.     On December 20, 2018, Juul and Altria executed a series of agreements. Pursuant to the Purchase Agreement, Altria purchased for $12.8 billion in cash a 35% non-voting stake in Juul. The agreement was not submitted to the Department of Justice or the Federal Trade Commission on the grounds that the Hart-Scott-Rodino Act did not require notification. The agreement valued Juul at roughly $38 billion, more than double Juul's reported value less than seven months earlier, demonstrating Juul's competitive success.

54.     By its terms, the Purchase Agreement incorporates various ancillary agreements, including: (a) a Relationship Agreement, (b) a Services Agreement; (c) a Voting Agreement; and (d) an Intellectual Property License Agreement.

55.     The Relationship Agreement provides, among other things, that Altria and Juul would not compete with one another. In particular, the Relationship Agreement contains a "Non-Compete" provision, which provides, in pertinent part that:

ANTITRUST CLASS ACTION COMPLAINT

[Altria] shall not . . . directly or indirectly (1) own, manage, operate, control, engage in or assist others in engaging in, the e-Vapor business; (2) take actions with the purpose of preparing to engage in the e-Vapor Business, including through engaging in or sponsoring research and development activities; or (3) Beneficially Own any equity interest in any Person, other than an aggregate of not more than four and nine-tenths percent (4.9%) of the equity interests of any Person which is publicly listed on a national stock exchange, that engages directly or indirectly in the e-Vapor Business (other than (x) as a result of [Altria's] Beneficial Ownership of Shares or (y) engagement in, or sponsorship of, research and development activities not directed toward the e-Vapor Business and not undertaken with the purpose of developing or commercializing technology or products in the e-Vapor Business) . . . . Notwithstanding the foregoing, (x) the [Altria] and its Subsidiaries and controlled Affiliates may engage in the business relating to (I) its Green Smoke, MarkTen (or Solaris, which is the non-U.S. equivalent brand of MarkTen) and MarkTen Elite brands, in each case, as such business is presently conducted, subject to Section 4.1 of the Purchase Agreement, and (II) for a period of sixty (60) days commencing on the date of this Agreement, certain research and development activities pursuant to existing agreements with third parties that are in the process of being discontinued . . . .

In so doing, Altria agreed to withdraw from the e-cigarette market, allocating it exclusively to Juul.

56.    The Services Agreement provided, among other things, that Altria would provide certain services to Juul. In particular, Altria agreed to lease convenience store shelf space to Juul. Altria also agreed to provide certain regulatory consulting, and distribution support. Altria also agreed to provide direct marketing support and sales services.

57.    Under the terms of the Relationship Agreement, the Non-Compete went into effect early in 2019. The Services Agreement had an initial six-year term, subject to early termination by mutual consent or in case of material breach, bankruptcy, or insolvency. If the Services Agreement were to expire, Altria could discontinue the Non-Compete agreement, described above, at which point it would lose its right to appoint members to Juul's Board of Directors and its pre-emptive right to maintain its 35% stake in the company, but would regain its ability to compete in the market against Juul. As described below, the Services Agreement was subsequently amended.

58.    Under the Intellectual Property License Agreement, Altria granted Juul a non-exclusive irrevocable license to Altria's e-cigarette intellectual property.

59.    The Voting Agreement provided, among other things that Altria would obtain seats on Juul's Board of Directors following conversion of its shares.

ANTITRUST CLASS ACTION COMPLAINT

60. On February 4, 2019, Respondents filed for Hart-Scott-Rodino clearance to convert Altria's interest into voting securities (the "Antitrust Conversion") and to grant Altria permission to appoint three (of nine) members of Juul's Board of Directors, as provided by the Voting Agreement.

61. On January 30, 2020, Juul and Altria announced amendments to their agreement, including an Amended Purchase Agreement, an Amended Relationship Agreement, an Amended Services Agreement, and a Revised Voting Agreement.

62. Under the Revised Voting Agreement, after the Antitrust Conversion, Altria will instead have the right to: (i) appoint two (of nine) Juul directors; (ii) nominate one (of three) Juul independent directors; (iii) appoint one (of four) members of a Nominating Committee (who would have the right to veto independent director nominations); (iv) appoint two (of five) members and the chair of a new Litigation Oversight Committee (which would have responsibility for managing litigation involving both Altria and Juul, i.e., "Joint Litigation Matters"); and (iv) appoint one (of three) members of a Litigation Subcommittee (which would have authority, by unanimous vote, to change Juul's senior outside counsel responsible for Joint Litigation Matters). The Revised Voting Agreement also granted Juul's CEO: (i) a board seat; (ii) a seat on the Litigation Oversight Committee; and (iii) a seat on the Litigation Subcommittee.

63. The Amended Relationship Agreement gives Altria the option to be released from the Non-Compete if Juul is prohibited by federal law from selling vaping products in the United States for at least a year or if Altria's internal valuation of the carrying value of its investment falls below 10% of its initial value of $12.8 billion.

64. The Amended Services Agreement eliminates all services except for regulator support services. The amendment was effective at signing except with regard to Altria's provision of retail shelf space to Juul, which service was set to expire after March 31, 2020. The transaction eliminated a threat to Juul's market dominance and required Altria to dedicate its vast resources, including distribution and shelf-space, to ensure Juul's continued market dominance.

65. After executing the transaction, Altria appointed its Chief Growth Officer as its observer on the Juul board of directors. Following that executive's departure from Altria to become Chief

ANTITRUST CLASS ACTION COMPLAINT

Executive Officer of Juul, Altria appointed its Chief Financial Officer and Vice Chairman to fill the observer position.

66.    The Transaction's anticompetitive effects were particularly clear in the market for closed-system e-cigarettes given high barriers to entry, such as U.S. Food & Drug Administration ("FDA") approval. Repositioning new products in the market was also unavailing to counter the anticompetitive impact of the Transaction. Defendants cannot show the transaction restricting competition resulted in cognizable efficiencies sufficient to outweigh the competitive harm caused by Altria's agreement to exit the relevant market. Nor can Defendants point to pro-competitive benefits that could not have been achieved through less restrictive means. In fact, much of the Defendants' collaboration was restructured in January 2020 to eliminate its marketing aspects, further reducing the scope of theoretical benefits from their agreements.

**The FTC Action**

67.    On April 1, 2020, the Federal Trade Commission ("FTC") filed a complaint against Altria and Juul under Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), Section 5(b) of the FTC Act, 15 U.S.C. § 45(b), and Section 11(b) of the Clayton Act, 15 U.S.C. § 21(b), alleging the Transaction violated Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 5 of the FTC Act, 15 U.S.C. § 45, and Section 7 of the Clayton Act, 15 U.S.C. § 18.

68.    The FTC alleged that the Defendants' conduct unreasonably restrained competition, and that the Transaction substantially lessened competition in the U.S. market for closed-system e-cigarettes by eliminating competition between Altria and Juul on price, innovation, promotional activity, and shelf space.

## MARKET STRUCTURE

**Market Concentration**

69.    At the time of Altria's exit, the relevant market was already highly concentrated. Following Altria's exit, it became even more concentrated.

70.    The federal antitrust agencies, consistent with the Merger Guidelines and federal court decisions, measure concentration using the Herfindahl-Hirschman Index ("HHI"). The HHI is calculated by totaling the squares of the market shares of each firm in the relevant market. Under the

ANTITRUST CLASS ACTION COMPLAINT

Merger Guidelines, a merger is presumed likely to create or enhance market power—and is presumably illegal—when the post-merger HHI exceeds 2,500 and the merger increases the HHI by more than 200 points.

71. In the U.S. market for closed-system e-cigarettes, the Transaction resulted in a post-Transaction HHI exceeding 2,500, with an increase in HHI of more than 200. Thus, the Transaction resulted in concentration that establishes a presumption of competitive harm in the relevant market.

**Relevant Market**

72. The relevant product market for the purposes of this action is the closed-system e-cigarette market.

73. E-cigarettes are battery-powered devices that vaporize a liquid solution containing nicotine (an "e-liquid"). There are two broad categories of e-cigarettes: closed-system and open-tank. Closed-system e-cigarettes consist of a device housing a battery and a heating mechanism, and sealed cartridges or pods that are pre-filled with e-liquid. Examples of closed-system devices include cigalikes, which are similar to traditional cigarettes in size and shape, and pod-based products, such as Juul or MarkTen Elite, which look like USB drives. Subsequent to an FDA flavor ban that went into effect February 2020, closed-system pods and cartridges are available only in tobacco and menthol flavors.

74. By contrast, open-tank e-cigarettes incorporate refillable tanks that customers manually fill with e-liquid. Because customers can select from (and mix together) a wide assortment of e-liquids, open-tank e-cigarettes allow a more customizable experience whereby users can experiment with different flavors and nicotine strengths. In addition, unlike with closed systems, users can customize the individual components of an open-tank system, such as the battery, heating coil, and atomizer (which houses the heating coil).

75. Closed-system e-cigarettes are largely sold in different channels than open-tank products. Most closed-system e-cigarettes are sold through a multi-outlet channel, which consists primarily of convenience stores. Convenience stores offer a limited range of e-cigarette products, focusing on the highest-volume brands. In contrast, open-tank e-cigarettes are sold almost exclusively at dedicated vape shops, retail outlets that typically carry an extensive selection of e-liquids and parts for open-tank products and offer a high level of customer service.

ANTITRUST CLASS ACTION COMPLAINT

76.     Defendants considered their respective Juul and MarkTen product lines to be direct competitors with each other and with other closed-system e-cigarette products and set prices based on competition with each other and with other closed-system products. Defendants further acknowledged that their closed-system e-cigarette products did not compete as closely with open-tank products.

77.     There are no reasonable substitutes for closed-system e-cigarettes. Closed-system e-cigarettes appeal to consumers because they are discreet due to their small size, and convenient due to their self-contained, ready-to-use format. Open-tank e-cigarettes are not an adequate substitute for closed-system e-cigarettes because they are larger, more complex, and require more manual operation by the user. Open-tank e-cigarettes generally appeal to a different customer type, one that appreciates their complexity and customizable nature.

78.     A hypothetical monopolist in the closed-system e-cigarette market would find it profitable to impose at least a small but significant and non-transitory increase in price.

79.     The relevant geographic market is no broader than the United States. Because of FDA's requirements (described below), foreign firms cannot import e-cigarettes into the United States without prior FDA approval.

80.     According to Nielson data, retail sales of closed-system e-cigarettes in the United States in 2018 constituted approximately $2.8 billion.

**The E-Cigarette Market Has High Barriers to Entry.**

81.     Under the FDA regulatory framework, a manufacturer of a new tobacco product, including an e-cigarette, must submit to the FDA a Premarket Tobacco Product Application ("PMTA") and receive the FDA's approval before marketing that product. An e-cigarette that was on the market prior to August 8, 2016 may remain on the market, but the manufacturer of that product must file a PMTA by May 12, 2020 to continue marketing it and must remove the product in the event the PMTA is denied. An e-cigarette that was not on the market prior to August 8, 2016 cannot be marketed until it receives PMTA approval. At the time Defendants executed the Transaction, the deadline for an in-market applicant to file its PMTA was August 8, 2022.

82.     Preparing a PMTA requires a significant amount of resources—time, personnel, and money, which can range from several hundreds of thousands to multiple millions of dollars per product.

83.     The FDA announced on January 2, 2020 that it had finalized a new enforcement policy prohibiting all non-tobacco/non-menthol flavors for cartridge-based e-cigarettes until a PMTA authorization, which went into effect on February 6, 2020.

**Market Power**

84.     Throughout the Class Period, Juul dominated the relevant market and maintained power to control prices and exclude competition in that market.

85.     According to a Wells Fargo report on the tobacco industry based on Nielson scanner data, Juul had amassed a 72 percent market share by August of 2018. Altria's market share at that time was 8 percent.

86.     Altria began pulling its products off the market in October 2018. By November, Altria's market share had fallen to 4 percent, and Juul's had grown to over 75 percent.



87.     By December 2018, Altria had pulled its products off the market entirely. The Transaction not only eliminated one of Juul's most successful competitors, it gave Juul access to Altria's vast resources and capital.

ANTITRUST CLASS ACTION COMPLAINT

88.     The Transaction was intended to, and did, significantly increase Juul's monopoly power in the relevant market

**ANTICOMPETITIVE EFFECTS OUTWEIGH PROCOMPETITIVE BENEFITS, IF ANY**

**Anticompetitive Effects**

89.     Defendants' illegal agreements had the purpose and effect of raising prices, reducing output, reducing innovation and eliminating consumer choice.

90.     The purpose and effect of the illegal agreements was for Altria to withdraw from current and future competition in exchange for a share of the monopoly prices Juul was able to charge, and would be able to charge, due to its dominant position.

91.     The transaction also closed routes to other potential acquisitions or partnerships through which Altria might have participated in the relevant market.

92.     Juul's conduct as alleged herein had the purpose, capacity, tendency, and effect of restraining competition unreasonably, and the transaction substantially lessened competition, in the U.S. market for closed-system e-cigarettes, in the following ways, among others:

      a.     Eliminating Altria's competing products from the relevant market, including promotional activity to create awareness and drive sales, thereby eliminating current and future price competition between Juul and Altria;

      b.     Eliminating current and future innovation competition between Juul and Altria; and

      c.     Eliminating current and future competition between Juul and Altria for shelf space at retailers through rebates and other incentives.

93.     Altria's agreement to exit the relevant market eliminated one of Juul's most dangerous rivals. As a large, well-established, and well-funded company with longstanding relationships and significant shelf space with retailers nationwide, Altria had the resources and infrastructure to drive sales and compete aggressively.

94.     Altria leveraged its ownership of leading brands across multiple tobacco categories in order to secure substantial and favorable shelf space at retailers throughout the United States. In 2018, for example, to Juul's alarm, Altria launched a major campaign to secure shelf space for its innovative

tobacco products (including e-cigarettes), offering retailers product discounts, slotting fees, and fixture payments. After the Transaction, instead of competing for shelf space, Altria leased its shelf space to Juul, effectively replacing its own MarkTen products with Juul's product.

95.     Before the shut-down of Nu Mark, Juul and Altria relied on price promotions to drive sales of their respective e-cigarette products. In addition, each monitored the other's pricing in setting its own strategy. Altria's decision to pull its MarkTen products brought this price competition to an end.

96.     In addition to price competition, Juul and Altria competed through product innovation, including device features and e-liquid formulations. For example, it was Juul's success that prompted Altria to acquire and further develop various pod-based e-cigarettes (including Elite), and to commit significant resources toward developing e-liquid formulations with nicotine salts and higher nicotine concentrations.

97.     Based upon documents submitted to the Federal Trade Commission from Defendants, it appears that before committing to the transaction, Altria intended to compete over the long term. Altria's documents and executive statements repeatedly evince their recognition that e-cigarettes were the future of the tobacco industry and their absolute commitment to participate in that future. For example:

> a.     Mr. Martin Barrington, Altria's former CEO, stated to investors: "So we'll be clear: We aspire to be the U.S. leader in authorized, non-combustible, reduced-risk products."[1]

---

[1] Martin Barrington, CEO, Altria Group, Inc., Address at the Consumer Analyst Group of New York Conference (Feb. 21, 2018), https://www.sec.gov/Archives/edgar/data/764180/00007641 8017000131/exhibit991-2017investorday.htm.

b.    Mr. Howard Willard, Altria's current CEO, in an interview with the Wall Street Journal, stated: "At a time when e-vapor is going to grow rapidly and likely cannibalize the consumers we have in our core business, if you don't invest in the new areas you potentially put your ability to deliver that financial result at risk."[2]

98.    Instead of continuing to pursue its ambitions in the relevant market through competition, including aggressive price promotions, product development, and incentives for shelf space, Altria sought a short cut to market leadership by investing in its competitor. Altria agreed to abandon its long-standing and significant efforts at current and future competition in exchange for a significant share of Juul's profits resulting from a significantly less competitive marketplace.

**Lack of Procompetitive Benefits**

99.    Defendants cannot demonstrate cognizable efficiencies that would be sufficient to rebut the presumption that the conduct alleged substantially lessened competition in the relevant market. Defendants cannot demonstrate pro-competitive benefits of the conduct alleged that could not have been achieved through alternative means that would have been less restrictive on competition than the conduct alleged.

100.    Defendants cannot demonstrate that entry into the relevant market by new competitors or expansion by existing competitors would be timely, likely, or sufficient to offset the anticompetitive effects of the conduct alleged.

101.    The entry of new competitors into the relevant market is unlikely because the regulatory approval process is exceptionally time-consuming and expensive. Defendants themselves estimate that preparing a PMTA for an e-cigarette would require substantial time and investment.

102.    In addition to achieving regulatory approval, a new entrant would need to: (i) develop or acquire a product; (ii) manufacture the product at quality and scale; (iii) sell the product; (iv) develop a distribution system; and (v) develop a marketing plan, including a plan to secure shelf space in retail outlets.

---

[2] Jennifer Maloney and Dana Mattioli, *Why Marlboro Maker Bet on Juul, the Vaping Upstart Aiming to Kill Cigarettes*, Wall St. J. (Mar. 23, 2019), https://www.wsj.com/articles/why-marlboro-maker-bet-on-juul-the-vaping-upstart-aiming-to-kill-cigarettes-11553313678.

103.     Existing closed-system e-cigarette competitors cannot effectively replace the lost competition because: (i) they lack Altria's brand strength to secure favorable shelf space at retailers; (ii) they lack the substantial resources Altria had at its disposal to commit to e-cigarette research and development as well as to pursuing regulatory approval; and/or (iii) the FDA's enforcement of restrictions on e-liquid flavors has negatively impacted the competitive presence of closed-system competitors other than Juul, who had voluntarily discontinued its flavors earlier.

104.     Open-tank e-cigarette manufacturers are not likely to replace the lost competition, in part because the impending PMTA deadline will likely cause many of them to shut down, and because they are largely sold in the separate "vape shop" sales channel and would not likely be able to expand rapidly into convenience stores, where closed-system e-cigarettes are typically sold.

105.     Defendants cannot demonstrate cognizable efficiencies that would be sufficient to rebut the presumption that the transaction substantially lessened competition in the relevant market. Defendants cannot demonstrate pro-competitive benefits of the conduct alleged that could not have been achieved through alternative, less restrictive means.

106.     Defendants' unlawful conduct eliminated competition in the relevant market and deprived Plaintiff and the Class of the benefits of free and unrestrained competition that the antitrust laws were designed to ensure.

**DEFENDANTS' ANTICOMPETITIVE AGREEMENT AND INJURY TO PLAINTIFF AND THE CLASS**

107.     Defendants' combination and conspiracy as set forth herein has had the following effects, among others:

a.     Price competition among Defendants in the sale, marketing and distribution of e-cigarettes during the Class Period to purchasers in the United States has been restrained;

b.     Prices for e-cigarettes sold by Defendants during the Class Period to purchasers in the United States have been raised, fixed, maintained, and stabilized at artificial and non-competitive levels; and

ANTITRUST CLASS ACTION COMPLAINT

c.     The supplies of Defendants' e-cigarettes available for sale during the Class Period to purchasers in the United States has been artificially and unjustifiably restrained.

## CLAIMS FOR RELIEF

## COUNT ONE

## RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### 15 U.S.C. § 1

### (Against all Defendants)

108.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraphs as though fully set forth herein.

109.    Defendants entered into and engaged in continuing combination, conspiracy or agreement to unreasonably restrain trade or commerce in violation of Section One of the Sherman Act, 15 U.S.C. § 1 by artificially reducing or eliminating competition with respect to the sale, marketing and distribution of e-cigarettes sold to purchasers in the United States.

110.    In particular, Defendants have combined and conspired to divide and allocate the market for e-cigarettes to raise, fix, maintain or stabilize the prices of e-cigarettes sold to purchasers in the United States.

111.    The aforesaid violations of Section 1 consisted of an unlawful agreement in which Juul required Altria to withdraw from the relevant market and in exchange gave Altria an interest in Juul's continuing business in the relevant market from which Altria withdrew. The purpose of this agreement was to fix, raise, maintain or stabilize prices of closed system e-cigarettes products in the relevant market as well as stifle innovation.

112.    As a result of Defendants' unlawful conduct and acts taken in furtherance of their conspiracy, Altria's removed competing products from the relevant market, thereby eliminating current and future price competition between Juul and Altria, in particular promotional activity to create awareness and drive sales. Further, the unlawful conduct had the purpose and effect of eliminating current and future innovation competition between Juul and Altria; and eliminating current and future competition between Juul and Altria for shelf space at retailers through rebates and other incentives.

113.     For the purposes of formulating and effectuating their combination or conspiracy, Defendants did those things they combined or conspired to do, including (1) participating in meetings and conversations to eliminate competition from the market and (2) agreeing to allocate or divide the market for e-cigarettes between them.

114.     Defendants' anticompetitive and unlawful conduct is per se illegal

115.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and class members were injured in their business or property.

## COUNT TWO

### RESTRAINT OF TRADE IN VIOLATION OF SECTION 7 OF THE CLAYTON ACT, 15 U.S.C. § 18

### (Against all Defendants)

116.     Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraphs as though fully set forth herein

117.     The agreements, as described above, in which Altria received a substantial ownership stake in Juul and for the purposes of which Altria withdrew its existing e-cigarettes from the market and halted its innovation on future products, substantially lessened competition in the market for closed system e-cigarettes in the United States.

118.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and class members were injured in their business or property.

## COUNT THREE

### DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT AND SECTION 7 OF THE CLAYTON ACT, 15 U.S.C. § 26

### (Against all Defendants)

119.     Plaintiff incorporates the allegations set forth above as if fully set forth herein.

120.     Plaintiff seeks declaratory and injunctive relief under the federal antitrust laws.

121.     Plaintiff's allegations described herein constitute violations of Sections 1 of the Sherman Act.

ANTITRUST CLASS ACTION COMPLAINT

122.    Defendants effectuated a scheme to restrain trade and substantially lessen competition in the U.S. market for closed system e-cigarettes.

123.    There is and was no legitimate, non-pretextual, pro-competitive business justification for Defendants' conduct that outweighs its harmful effect.

124.    As a direct and proximate result of Defendants' anticompetitive scheme, as alleged herein, Plaintiff and the Class were harmed as aforesaid.

125.    The goal, purpose and/or effect of the scheme was to prevent and/or delay competition to continue charging supracompetitive prices for e-cigarettes without a substantial loss of sales.

126.    The anticompetitive agreements alleged herein should be declared invalid and unenforceable.

127.    Plaintiff and the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this Count. Their injury consists of paying higher prices for e-cigarettes than they would have paid in the absence of those violations. These injuries will continue unless halted.

128.    Plaintiff and the Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), hereby seek a declaratory judgment that Defendants' conduct constitutes a violation of § 1 of the Sherman Act.

129.    Plaintiff and the Class further seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct.

**DEMAND FOR JUDGMENT**

WHEREFORE, Plaintiff requests that the Court enter judgment on its behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

1.    This action may proceed as a class action, with Plaintiff serving as the Class Representative, and with Plaintiff's counsel as Class Counsel;

2.    Defendants have combined and conspired in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Plaintiff and the Class have been injured in their business and property as a result of Defendants' violations;

ANTITRUST CLASS ACTION COMPLAINT

3. Defendants have combined in a way that substantially lessened competition or to tended to create a monopoly in the market for closed system e-cigarettes in the United States, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and that Plaintiff and the Class have been injured in their business and property as a result of Defendants' violations;

4. Plaintiff and the Class are entitled to recover damages sustained by them, as provided by the federal antitrust laws under which relief is sought herein, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount subject to proof at trial, which is to be trebled in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15 and Section 7 of the Clayton Act, 15 U.S.C. § 18;

5. Plaintiff and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate from and after the date this class action complaint is first served on Defendants;

6. Plaintiff and the Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:

    a. A judicial determination declaring the rights of Plaintiff and the Class, and the corresponding responsibilities of Defendants; and

    b. Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from continuing and maintaining the conspiracy or agreements alleged herein; and

    c. Divestiture of Altria's equity stake in Juul and rescission of Altria's purchase of that stake;

7. Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Class;

8. Plaintiff and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

ANTITRUST CLASS ACTION COMPLAINT

9. Plaintiff and the Class receive such other or further relief as may be just and proper.

**JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

Dated: April 14, 2020

JOSEPH SAVERI LAW FIRM, INC.

By: _____*/s/ Joseph R. Saveri*_____
Joseph R. Saveri

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Kyle P. Quackenbush (State Bar No. 322401)
Anupama K. Reddy (State Bar No. 324873)
JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940

Attorneys for Individual and Representative Plaintiff
Anthony Martinez.

ANTITRUST CLASS ACTION COMPLAINT