[Counsel listed on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: JUUL LABS INC., ANTITRUST LITIGATION | Case No.: 3:20-cv-02345-WHO |
| | **NOTICE OF MOTION AND MOTION TO DISMISS ON BEHALF OF ALTRIA GROUP, INC. AND ALTRIA ENTERPRISES LLC** |
| This Document Relates to: ALL ACTIONS | Judge: Hon. William H. Orrick<br>Date: April 21, 2021<br>Time: 2 P.M PT<br>Ctrm: 2 |

**PLEASE TAKE NOTICE** that on April 21, 2021, at 2 P.M., or as soon thereafter as this matter may be heard, in Courtroom 2 of this Court, located at 450 Golden Gate Avenue, 17th Floor, San Francisco, California, Defendants Altria Group, Inc. and Altria Enterprises LLC will and hereby do move the Court for an order dismissing Plaintiffs' claims, as set forth in the accompanying Memorandum, alleged in the Consolidated Class Action Complaints (ECF Nos. 131-4, 133-3, 134-3), pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). This Motion is based on this Notice of Motion, the Memorandum of Points and Authorities, the Declaration of Rakesh Kilaru and exhibits attached thereto, the Request for Judicial Notice, any Reply Memorandum, the pleadings and files in this action, and such other matters as may be presented at or before the hearing.

Dated: January 15, 2021

By: */s/ Beth A. Wilkinson*

Beth A. Wilkinson (*pro hac vice*)
James M. Rosenthal (*pro hac vice*)
Rakesh N. Kilaru (*pro hac vice*)
J.J. Snidow (*pro hac vice*)
WILKINSON STEKLOFF LLP
2001 M Street, N.W., 10th Floor
Washington, D.C. 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
jrosenthal@wilkinsonstekoff.com
rkilaru@wilkinsonstekloff.com
jsnidow@wilkinsonstekloff.com

Moira Penza (*pro hac vice*)
WILKINSON STEKLOFF LLP
130 West 42nd Street, 24th Floor
New York, New York 10036
Telephone: (212) 294-8910
Facsimile: (202) 847-4005
mpenza@wilkinsonstekloff.com

Rahul R.A. Hari (State Bar No. 313528)
WILKINSON STEKLOFF LLP
11601 Wilshire Boulevard, Suite 600
Los Angeles, CA 90025
Telephone: (424) 291-9655
Facsimile: (202) 847-4005
rhari@wilkinsonstekloff.com

*Attorneys for Defendant Altria Group, Inc.*
*and Altria Enterprises LLC*

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................2

BACKGROUND .......................................................................................................4

I. THE REGULATORY FRAMEWORK FOR THE E-VAPOR INDUSTRY ....................5

II. NU MARK ENTERS THE E-VAPOR INDUSTRY IN 2013 ................................7

III. JLI ENTERS AND DISRUPTS THE E-VAPOR INDUSTRY IN 2015 ...........................7

IV. NU MARK FAILS TO DEVELOP A COMPETITOR TO JUUL ....................................8

V. ALTRIA'S NEGOTIATIONS WITH JLI ........................................................11

VI. AFTER THE AGREEMENTS, THE MARKET BECAME MORE COMPETITIVE ...14

LEGAL STANDARD ..............................................................................................16

STATEMENT OF ISSUES ........................................................................................18

ARGUMENT ..........................................................................................................19

I. THE COURT SHOULD DISMISS ALL OF THE CLAIMS FOR FAILURE TO PLAUSIBLY PLEAD INJURY ........................................................................19

    A. Plaintiffs Must Plausibly Allege Concrete Injury Under Article III And The Antitrust Laws..............................................................................................19

    B. The Complaint Does Not Plausibly Allege Antitrust Injury ................................21

    C. The Absence Of Injury Requires Dismissal Of Plaintiffs' Equitable Claims ......24

II. THE COURT SHOULD DISMISS THE SHERMAN ACT § 1 CLAIM FOR FAILURE TO PLAUSIBLY ALLEGE AN ANTICOMPETITIVE AGREEMENT........................25

    A. Plaintiffs Have Failed To Plausibly Allege An Agreement Precluding All Competition Between Altria And JUUL .............................................................25

    B. The Actual Non-Compete Agreement Is Lawful Under The Rule Of Reason.....29

        1. The Actual Non-Compete Agreement Is Not Per Se Unlawful ...............29

        2. The Non-Compete Is Facially Valid Under The Rule Of Reason ............31

III. THE COURT SHOULD DISMISS THE SHERMAN ACT § 2 CLAIMS FOR SIMILAR REASONS ........................................................................................32

IV. THE COURT SHOULD DISMISS THE CLAYTON ACT CLAIM..............................33

    A. Plaintiffs Cannot Plausibly Plead The Actual Potential Competitor Theory .......34

i

B.     Plaintiffs Cannot Plausibly Plead The Perceived Potential Competition Theory ...............................................................................................35

C.     Plaintiffs' Implausible Market-Concentration Allegations Cannot Save Their Pleading Failures ................................................................................35

V.     THE COURT SHOULD DISMISS INDIRECT PLAINTIFFS' STATE-LAW CLAIMS ...............................................................................................37

A.     The State-Law Claims Should Be Dismissed As Derivative Of The Federal Antitrust Claims .....................................................................................37

B.     The California UCL Claims Should Be Dismissed For Additional Reasons .......40

VI.     THE COURT SHOULD DISMISS PLAINTIFFS' UNJUST ENRICHMENT CLAIMS ...............................................................................................42

VII.     THE COURT SHOULD DISMISS THE COMPLAINT FILED BY PLAINTIFFS LARIMORE, MATSCHULLAT, AND MAY FOR FAILURE TO SERVE ...................43

VII.     THE COURT SHOULD DISMISS ALL OF THE CLAIMS FOR IMPROPER VENUE AND LACK OF PERSONAL JURISDICTION ..............................................45

A.     Venue Is Not Proper In The Northern District Of California ...........................45

B.     The Court Does Not Have Personal Jurisdiction Over Altria With Respect To The Federal-Law Claims ...........................................................................45

C.     The Court Does Not Have Personal Jurisdiction Over Altria With Respect To The State-Law Claims .............................................................................46

CONCLUSION ........................................................................................47

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Action Embroidery Corp. v. Atlantic Embroidery, Inc.*,
   368 F.3d 1174 (9th Cir. 2004) ..............................................................................45, 46

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
   190 F.3d 1051 (9th Cir. 1999) ......................................................................................19

*Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*,
   185 F.3d 606 (6th Cir. 1999) ...................................................................................37, 38

*Am. Needle, Inc. v. Nat'l Football League*,
   560 U.S. 183 (2010) ......................................................................................................25

*Amarel v. Connell*,
   102 F.3d 1494 (9th Cir. 1997) ......................................................................................19

*Anderson v. Apple Inc.*,
   No. 3:20-cv-02328, 2020 WL 6710101 (N.D. Cal. Nov. 16, 2020).................................24

*Ashcroft v. Iqbal*,
   556 U.S. 662, (2009) .........................................................................................16, 17, 22

*Auburn News Co. v. Providence Journal Co.*,
   659 F.2d 273 (1st Cir. 1981)..........................................................................................38

*Barr v. Roderick*,
   11 F.2d 984 (N.D. Cal. 1925) ........................................................................................41

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) .............................................................................................. *passim*

*Ben Elfman & Son, Inc. v. Criterion Mills, Inc.*,
   774 F. Supp. 683 (D. Mass. 1991).................................................................................39

*Biocad JSC v. F. Hoffmann-La Roche*,
   942 F.3d 88 (2d Cir. 2019) ............................................................................................37

*BNSF Ry. Co. v. Tyrrell*,
   137 S. Ct. 1549 (2017)....................................................................................................46

*Bolden v. City of Topeka*,
   441 F.3d 1129 (10th Cir. 2006) .....................................................................................44

THE ALTRIA DEFENDANTS'
MOTION TO DISMISS

*Boschetto v. Hansing,*
    539 F.3d 1011 (9th Cir. 2008) ....................................................................................46

*Boudette v. Barnette,*
    923 F.2d 754 (9th Cir. 1991) ......................................................................................45

*Bristol-Myers Squibb Co. v. Superior Court of California,*
    137 S. Ct. 1773 (2017) ..........................................................................................46, 47

*Brown Shoe Co. v. United States,*
    370 U.S. 294 (1962) ...................................................................................................34

*California Dental Ass'n v. Fed. Trade Comm'n.,*
    526 U.S. 756 (1999) ...................................................................................................40

*Cargill, Inc. v. Monfort of Colo., Inc.,*
    479 U.S. 104 (1986) ...................................................................................................24

*Cenedella v. Metro. Museum of Art,*
    348 F. Supp. 3d 346 (S.D.N.Y. 2018) .......................................................................38

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ...................................................................................................25

*Coalition For ICANN Transparency, Inc. v. VeriSign, Inc.,*
    611 F.3d 495 (9th Cir. 2010) ......................................................................................22

*Collins v. eMachines, Inc.,*
    134 Cal. Rptr. 3d 588 (2011) .....................................................................................43

*Cont'l T.V., Inc. v. GTE Sylvania Inc.,*
    433 U.S. 36 (1977) .....................................................................................................29

*Copperweld Corp. v. Indep. Tube Corp.,*
    467 U.S. 752 (1984) ...................................................................................................25

*Corsello v. Verizon N.Y., Inc.,*
    967 N.E.2d 1177 (N.Y. 2012) ....................................................................................43

*Credit Bureau Servs., Inc. v. Experian Info. Sols., Inc.,*
    No. 12-cv-2146, 2013 WL 3337676 (C.D. Cal. Jun. 28, 2013) .................................27

*Crocs, Inc. v. Australia Unlimited, Inc.,*
    No. 07-CV-00221, 2008 WL 4426170 (D. Colo. Sept. 25, 2008) .............................23

THE ALTRIA DEFENDANTS'
MOTION TO DISMISS

*Daniel v. Am. Bd. of Emergency,*
   *Med.*, 428 F.3d 408 (2d Cir. 2005) ................................................................................45, 46

*Davidson v. Kimberly-Clark Corp.,*
   889 F.3d 956 (9th Cir. 2018) ........................................................................................24, 25

*DeHoog v. Anheuser-Busch InBev SA/NV,*
   899 F.3d 758 (9th Cir. 2018) ........................................................................................35, 36

*Disney Enters., Inc. v. VidAngel, Inc.,*
   No. 2:16-cv-04109, 2017 WL 6883685 (C.D. Cal. Aug. 10, 2017)....................................27

*Dozier v. Enhanced Recovery Company,*
   No. 19-cv-01474-WHO, 2019 WL 5091157 (N.D. Cal. Aug. 5, 2019)...............................45

*Duttweiler v. Triumph Motorcycles (America) Ltd.,*
   No. 14-cv-4809, 2015 WL 4941780 (N.D. Cal. Aug. 19, 2015)..........................................41

*E.J. Brooks Co. v. Cambridge Sec. Seals,*
   105 N.E.3d 301 (N.Y. 2018) .............................................................................................42

*Eastman v. Quest Diagnostics Inc.,*
   108 F. Supp. 3d 827 (N.D. Cal. 2015)...........................................................................20, 21

*Edstrom v. Anheuser-Busch InBev SA/NV,*
   647 F. App'x 733 (9th Cir. 2016) .................................................................................36, 37

*Eng'rs v. United States,*
   435 U.S. 679 (1978) ..........................................................................................................30

*Fed. Trade Comm'n v. Ind. Fed'n of Dentists,*
   476 U.S. 447 (1986) ..........................................................................................................40

*Fed. Trade Comm'n v. Penn State Hershey Med. Ctr.,*
   838 F.3d 327 (3d Cir. 2016) ..............................................................................................36

*Fed. Trade Comm'n v. Steris Corp.,*
   133 F. Supp. 3d 962 (N.D. Ohio 2015) ..............................................................................34

*Feitelson v. Google Inc.,*
   80 F. Supp. 3d 1019 (N.D. Cal. 2015)....................................................................20, 23, 24

*Fenerjian v. Nong Shim Co.,*
   No. 13-cv-04115, 2015 WL 13000357 (N.D. Cal. Mar. 30, 2015) .....................................39

THE ALTRIA DEFENDANTS'
MOTION TO DISMISS

*Fenerjian v. Nongshim Co., Ltd,*
72 F. Supp. 3d 1058 (N.D. Cal. 2014)..................................................................42

*Fraser v. Major League Soccer, L.L.C.,*
284 F.3d 47 (1st Cir. 2002)..............................................................................34

*Frenzel v. AliphCom,*
76 F. Supp. 3d 999 (N.D. Cal. 2014)..................................................................24

*Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.,*
789 F. Supp. 760 (S.D. Miss. 1992)...................................................................32

*Ginsburg v. InBev NV/SA,*
623 F.3d 1229 (8th Cir. 2010) ..............................................................33, 34, 35

*Glen Holly Ent., Inc. v. Tektronix, Inc.,*
352 F.3d 367 (9th Cir. 2003).............................................................................19

*Golub v. Gigamon Inc.,*
372 F. Supp. 3d 1033 (N.D. Cal. 2019)..................................................4, 6, 15, 16

*Go-Video, Inc. v. Akai Elec. Co., Ltd.,*
885 F.2d 1406 (9th Cir. 1989)...........................................................................45

*GTE New Media Servs. Inc. v. BellSouth Corp.,*
199 F.3d 1343 (D.C. Cir. 2000).....................................................................45, 46

*H.L. Hayden Co. of N.Y. v. Siemens Med. Sys., Inc.,*
672 F. Supp. 724 (S.D.N.Y. 1987) ....................................................................32

*Hart v. United States,*
817 F.2d 78 (9th Cir. 1987)..............................................................................45

*Hu Honua Bioenergy, LLC v. Hawaiian Elec. Indus., Inc.,*
No. 16-cv-0634, 2018 WL 5891743 (D. Haw. Nov. 9, 2018)...................................32

*In re Apple & AT&T iPad Unlimited Data Plan Litigation,*
802 F. Supp. 2d 1070 (N.D. Cal. 2011)...............................................................40

*In re Canadian Imp. Antitrust Litig.,*
470 F.3d 785 (8th Cir. 2006).............................................................................23

*In re Century Aluminum Co. Sec. Litig.,*
729 F.3d 1104 (9th Cir. 2013).....................................................................3, 4, 27

THE ALTRIA DEFENDANTS'
MOTION TO DISMISS

*In re Graphics Processing Units Antitrust Litig.*,
253 F.R.D. 478 (N.D. Cal. 2008) ........................................................................23

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ...........................................................................29

*In re Nexium (Esomeprazole) Antitrust Litigation*,
842 F.3d 34 (1st Cir. 2016).................................................................................19

*Int'l Norcen Tech. v. Koninklijke Philips Elecs. N.V.*, No. 07-cv-0043,
2007 WL 4976364 & n.71 (C.D. Cal. Oct. 29, 2007) .........................................27

*Invictus Records, Inc. v. Am. Broad. Cos., Inc.*,
98 F.R.D. 419 (E.D. Mich. 1982)..................................................................32, 33

*JES Properties, Inc. v. USA Equestrian, Inc.*,
No. 802CV1585T24MAP, 2005 WL 1126665 (M.D. Fla. May 9, 2005) ............40

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) ......................................................17, 26, 27, 29

*KM Enterprises, Inc. v. Glob. Traffic Techs., Inc.*,
725 F.3d 718 (7th Cir. 2013) .......................................................................45, 46

*Kopel v. Kopel*,
229 So. 3d 812 (Fla. 2017) .................................................................................42

*Korea Supply Co. v. Lockheed Martin Corp.*,
63 P.3d 937 (Cal. 2003).....................................................................................40

*Kwikset Corp. v. Superior Court*,
246 P.3d 877  (2011) .........................................................................................40

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
726 F.2d 1381 (9th Cir. 1984) .......................................................................3, 31

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007) ...........................................................................................31

*Lektro-Vend Corp. v. Vendo Co.*,
660 F.2d 255 (7th Cir. 1981) .........................................................................3, 31

*Lenhoff Enterprises, Inc. v. United Talent Agency, Inc.*,
729 F. App'x 528 (9th Cir. 2018) .......................................................................38

THE ALTRIA DEFENDANTS'
MOTION TO DISMISS

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n,*
884 F.2d 504 (9th Cir. 1989) ......................................................................................31

*LiveUniverse, Inc. v. MySpace, Inc.,*
304 F. App'x 554 (9th Cir. 2008) ...............................................................................39

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.,*
140 F.3d 1228 (9th Cir. 1998) ....................................................................................19

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ....................................................................................................23

*Lyles v. Sangadeo-Patel,*
171 Cal. Rptr. 3d 34 (Cal. Ct. App. 2014) ..................................................................42

*Marder v. Lopez,*
450 F.3d 445 (9th Cir. 2006) ..................................................................................4, 15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) ....................................................................................................27

*Matsuura v. Alston & Bird,*
179 F.3d 1131 (9th Cir. 1999) ....................................................................................39

*Mattel, Inc. v. Greiner & Hausser GmbH,*
354 F.3d 857 (9th Cir. 2003) ................................................................................46, 47

*McGlinchy v. Shell Chem. Co.,*
845 F.2d 802 (9th Cir. 1988) ......................................................................................30

*Meisner Law Grp. PC v. Weston Downs Condo. Ass'n,*
909 N.W.2d 890 (Mich. 2017) ....................................................................................42

*Metro. Life Ins. Co. v. Cotter,*
984 N.E.2d 835 (Mass. 2013) ....................................................................................42

*Monsanto Co. v. Spray-Rite Serv. Corp.,*
465 U.S. 752 (1984) ....................................................................................................27

*Morales v. Trans World Airlines, Inc.,*
504 U.S. 374 (1992) ....................................................................................................41

*Mullins v. Premier Nutrition Corp.,*
No. 13-CV-01271, 2018 WL 510139 (N.D. Cal. Jan. 23, 2018) ................................43

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
  795 F.3d 1124 (9th Cir. 2015) ...................................................................................37

*Nelson v. Monroe Reg'l Med. Ctr.*,
  925 F.2d 1555 (7th Cir. 1991) .................................................................................2, 20

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
  472 U.S. 284 (1985) ................................................................................................29

*NYNEX Corp. v. Discon, Inc.*,
  525 U.S. 128 (1998) ................................................................................................32

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) .........................................................................................25, 31

*Olsen v. DeMayo*,
  210 A.3d 431 (R.I. 2019) .........................................................................................42

*Papasan v. Allain*,
  478 U.S. 265 (1986) ................................................................................................17

*Partner & Partner, Inc. v. ExxonMobil Oil Corp.*,
  326 F. App'x 892 (6th Cir. 2009) ..............................................................................38

*Philips v. Ford Motor Co.*,
  No. 14-cv-02989, 2015 WL 4111448 (N.D. Cal. July 7, 2015) .....................................41

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
  776 F.2d 185 (7th Cir. 1985) ................................................................................30, 32

*Pool Water Prods. v. Olin Corp.*,
  258 F.3d 1024 (9th Cir. 2001) ....................................................................2, 19, 20, 24

*QSGI, Inc. v. IBM Global Financing*,
  2012 WL 1150402 (S.D. Fla. 2012) ...........................................................................39

*Reudy v. Clear Channel Outdoors, Inc.*,
  693 F. Supp. 2d 1091 (N.D. Cal. 2010) ......................................................................20

*Rhynes v. Stryker Corp.*,
  No. 10-cv-5619, 2011 WL 2149095 (N.D. Cal. May 31, 2011) .....................................41

*Rice-Sherman v. Big Heart Pet Brands, Inc.*,
  No. 19-CV-03613-WHO, 2020 WL 1245130 (N.D. Cal. Mar. 16, 2020) ..........................43

ix

*RSA Media, Inc. v. AK Media Grp., Inc.*,
   260 F.3d 10 (1st Cir. 2001)...............................................................................................23

*Salas v. Toyota Motor Sales, U.S.A., Inc.*, No. 15-cv-8629,
   2016 WL 7486600 (C.D. Cal. Sept. 27, 2016)................................................................41

*Samiento v. World Yacht Inc.*,
   883 N.E.2d 990 (N.Y. 2008) ............................................................................................43

*Santagate v. Tower*,
   833 N.E.2d 171 (Mass. App. Ct. 2005)............................................................................43

*Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*,
   959 F.3d 341 (9th Cir. 2020)......................................................................................23, 24

*Somers v. Apple, Inc.*,
   729 F.3d 953 (9th Cir. 2013) ..................................................................................... *passim*

*Southway Theatres, Inc. v. Ga. Theatre Co.*,
   672 F.2d 485 (5th Cir. 1982) ............................................................................................27

*Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of Rhode Island*,
   997 F. Supp. 2d 142 (D.R.I. 2014)....................................................................................38

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2006)........................................................................................................29, 31

*Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*,
   346 U.S. 537 (1954)..........................................................................................................25

*Tkachik v. Mandeville*,
   790 N.W.2d 260 (Mich. 2010) .........................................................................................43

*United States v. Addyston Pipe & Steel Co.*,
   85 F. 271 (6th Cir. 1898) ..................................................................................................31

*United States v. AT&T Inc.*,
   310 F. Supp. 3d 161 (D.D.C. 2018)............................................................................33, 36

*United States v. AT&T, Inc.*,
   916 F.3d 1029 (D.C. Cir. 2019)........................................................................................36

*United States v. Baker Hughes Inc.*,
   908 F.2d 981 (D.C. Cir. 1990)..........................................................................................36

*United States v. Dairy Farmers of Am., Inc.*,
   426 F.3d 850 (6th Cir. 2005)................................................................34

*United States v. Falstaff Brewing Corp.*,
   410 U.S. 526 (1973)...............................................................34, 35

*United States v. Gen. Dynamics Corp.*,
   415 U.S. (1974)................................................................34

*United States v. Marine Bancorp., Inc.*,
   418 U.S. 602 (1974)..........................................................4, 34, 35

*United States v. Phila. Nat'l Bank*,
   374 U.S. 321 (1963)................................................................36, 37

*United States v. Phillips Petrol. Co.*,
   367 F. Supp. 1226 (C.D. Cal. 1973)...................................................34

*United States v. Siemens Corp.*,
   621 F.2d 499 (2d Cir. 1980)...........................................................34, 35

*United States v. Syufy Enters.*,
   903 F.2d 659 (9th Cir. 1990)................................................................37

*VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*,
   No. 14-CV-00804, 2015 WL 225328 (N.D. Ill. Jan. 15, 2015)...........................23

*W. Wholesale Supply, Inc. v. Holladay*,
   25 F. App'x 507 (9th Cir. 2001)......................................................22

*Wei v. State of Hawaii*,
   763 F.2d 370 (9th Cir. 1985)................................................................44

*White Motor Co. v. United States*,
   372 U.S. 253 (1963)................................................................30

*Williamson Oil Co. v. Philip Morris USA*,
   346 F.3d 1287 (11th Cir. 2003)......................................................29

*Yamaha Motor Co. v. Fed. Trade Comm'n*,
   657 F.2d 971 (8th Cir. 1981)................................................................34

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*,
   513 F. Supp. 1100 (E.D. Pa. 1981)...................................................32

**Statutes**

15 U.S.C. § 22 ...................................................................................................................45

Article III of the United States Constitution ............................................................18, 19

Mich. Comp. Laws § 445.784 (1984) ..................................................................................38

R.I. Gen. Laws Ann. § 6-13.1-3 ..........................................................................................40

R.I. Gen. Laws § 6-36-2 (1979) ..........................................................................................38

**Rules**

Fed. R. Civ. P. 8(a)(2)..........................................................................................................17

Fed. R. Evid. 201 ...................................................................................................................4

Federal Rule of Civil Procedure 4(m)................................................................................44

**Other Authorities**

Phillip E. Areeda & Herbert Hovencamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (4th & 5th Eds. 2013–2020)………..……………………………………………….*passim*

William Holmes & Melissa Mangiaracina, *Antitrust Law Handbook* § 7:2 (2014) ...............................40

To survive Rule 12, the complaints in this case must plausibly allege an anticompetitive agreement or acquisition that caused concrete injury to consumer welfare. They fail on every front.

As the Ninth Circuit has made clear, private antitrust plaintiffs must "plead[] sufficient facts to state a plausible antitrust injury," *Somers v. Apple, Inc*., 729 F.3d 953, 963 (9th Cir. 2013)—that is, facts showing "injury from higher prices or lower output," *Pool Water Prods. v. Olin Corp*., 258 F.3d 1024, 1034 (9th Cir. 2001) (quoting *Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555, 1564 (7th Cir. 1991)). Plaintiffs here *claim* supracompetitive prices and diminished output as a result of the challenged transaction between Altria[1] and Juul Labs, Inc. ("JLI"). But they do not allege any *facts* making those claimed injuries plausible, requiring dismissal with prejudice. *Somers*, 729 F.3d at 959; *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The absence of such allegations is not the whole story. The relevant facts regarding Plaintiffs' antitrust-injury allegations are knowable. The reason Plaintiffs do not make the necessary factual allegations is that they cannot. Across their complaints, Plaintiffs selectively cite a series of market reports that provide the precise type of factual information required to make their claims plausible—such as the prices of JUUL vaporizers and JUULpods and the volume of e-vapor products sold after the transaction. But those sources—which Plaintiffs have endorsed within the four corners of their complaints—show that since the transaction was completed, JLI's price and market share have *decreased*, even as consumers are buying more e-vapor products. In other words, the market is *more* competitive than before on the metrics of injury Plaintiffs have alleged. The Ninth Circuit affirmed dismissal of a complaint in materially identical circumstances, *see Somers*, 729 F.3d 953, and there is no basis for a different outcome here.

Plaintiffs' failure to plausibly allege antitrust injury requires dismissal of the complaint in full. But each of their theories of liability as to Altria fails for additional, independent reasons.

*First*, Plaintiffs have not plausibly alleged an unlawful agreement to restrain trade, as required to proceed under § 1 of the Sherman Act and on the derivative state-law claims. In antitrust cases, "[i]t is

---

[1] For purposes of this brief, "Altria" refers to Defendants Altria Group, Inc. and Altria Enterprises LLC.

important to be very precise in identifying the content of the agreement charged." Phillip E. Areeda & Herbert Hovencamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1404 (4th & 5th Eds. 2013–2020) (hereinafter "Areeda"). Here, Plaintiffs *allege* that Altria "agreed to . . . withdraw[] from the [e-vapor] market in return for a substantial ownership interest in JLI." Consolidated Class Action Compl. for All Direct Purchaser Actions ¶ 1, ECF No. 134-3 (hereinafter "DPP"); *see also* Consolidated Class Action Compl. for All Indirect Purchaser Actions ¶ 1, ECF No. 131-4 (hereinafter "IPP"); Consolidated Class Action Compl. for All Indirect Reseller Actions ¶ 1, ECF No. 133-3 (hereinafter "IRP") (similar). But the actual written agreement between the parties did *not* require Altria to pull any products from the market. It simply forbade Altria from developing or marketing *new* e-vapor products in order to protect JLI's proprietary information while Altria was providing regulatory services to JLI. That agreement easily survives the rule of reason, because it was "necessary to protect [JLI's] legitimate property interests." *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 265 (7th Cir. 1981); *see also L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1395 (9th Cir. 1984) (citing *Lektro-Vend*).

To the extent Plaintiffs are instead suggesting there was somehow a secret "side deal" in which Altria agreed to pull *existing* products, they offer no relevant facts—the who, what, where, when, and how—supporting the existence of such an agreement. And they are not writing on a blank slate—they received over 700,000 documents in pre-complaint discovery involving many of the people whose names appear in the amended complaint. Rule 12 precludes Plaintiffs from proceeding based on this kind of "naked" and unsupportable insinuation of misconduct. *Twombly*, 550 U.S. at 557.

Even setting that claim-ending flaw aside, it is not enough for Plaintiffs to assert an illegal agreement—they must also allege facts that rule out lawful "alternative explanation[s]" for Altria's decision to withdraw its e-vapor products. *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013). Here, Plaintiffs' complaints provide obvious alternative explanations. As Plaintiffs themselves allege, Altria's existing e-vapor products were rapidly losing market share. And even if Altria could have developed a new product, it could not have put that product on the market until it obtained regulatory approval from FDA, which Plaintiffs acknowledge is "an onerous application process that can take years." IPP ¶ 1; IRP ¶ 11. Plaintiffs' failure to plead "facts tending to exclude the possibility that

the[se] alternative explanation[s are] true," *In re Century Aluminum*, 729 F.3d at 1108, provides yet another reason for dismissal of their § 1 claim and the derivative state-law claims.

*Second*, Plaintiffs' own allegations preclude them from stating a claim under § 7 of the Clayton Act. Plaintiffs' core § 1 allegation is that Altria exited the e-vapor market in connection with its minority investment in JLI—meaning that Altria was not one of JLI's actual competitors at the time of the investment for purposes of Plaintiffs' § 7 claim. The law thus requires Plaintiffs to proceed on a "potential competitor" theory. *See United States v. Marine Bancorp., Inc.*, 418 U.S. 602, 623 (1974). Plaintiffs have failed to make any of the necessary allegations for that theory: that Altria would have re-entered the market but for the investment, or that Altria's mere presence outside the market was exerting competitive pressure on those within it. *See id.* at 623–25.

There are myriad other problems with Plaintiffs' claims, detailed further below—including the failure of some Plaintiffs to serve Altria and the absence of necessary allegations for the UCL or unjust enrichment claims. But at bottom, all of the claims can be dismissed on a simple and straightforward ground: Plaintiffs' complaints are long on claims of illegality, but woefully short of factual allegations that "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

## BACKGROUND

The failures of the complaints become apparent in light of the regulatory constraints on the e-vapor industry and the evolution of that industry over time, including through the Altria-JLI transaction. The section that follows lays out that necessary background, based solely on the relevant laws, the allegations in the complaints (which, to be clear, are one-sided and incomplete), and some of the documents cited in the complaints. As explained in the companion judicial notice motion, several documents cited by Plaintiffs in the complaints are properly part of the record on this motion. *See* Request for Judicial Notice in Support of Altria's Motion to Dismiss; Fed. R. Evid. 201; *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (holding that "[a] court may consider" a document "refer[red] to" in the complaint if it is "central to the plaintiff's claim" and "no party questions [its] authenticity"); *Golub v. Gigamon Inc.*, 372 F. Supp. 3d 1033, 1043 (N.D. Cal. 2019) (Orrick, J.) ("Documents alleged in a complaint and essential to a plaintiff's allegations may be judicially noticed . . . .").

# I.    THE REGULATORY FRAMEWORK FOR THE E-VAPOR INDUSTRY

E-vapor products represent an alternative to cigarettes.  Unlike cigarettes, which burn tobacco, e-vapor products generally use a battery to heat a liquid to produce an aerosol that contains, among other things, nicotine.  E-vapor products began to appear in the United States in "the mid-2000s."  DPP ¶ 45.

E-vapor products are now subject to extensive federal regulation.  *See, e.g.*, IPP ¶ 52 ("[N]icotine products are heavily regulated and require specific approvals . . . ."); IPP ¶ 53; IRP ¶ 50.  In 2016, FDA exercised its authority under the Family Smoking Prevention and Tobacco Control Act (hereinafter "TCA") to deem e-vapor products as tobacco products within its jurisdiction.  *See* IPP ¶ 53; IRP ¶ 50.  As a formal matter, that decision meant that e-vapor products would be regulated in much the same way as traditional tobacco products.  But as a practical matter, it meant that the e-vapor industry—which to that point had developed largely free of federal regulation—would technically be unlawful for the immediate future.  The TCA prohibits the sale of "new tobacco products" (*i.e.*, products not on the market in the United States as of February 15, 2007), absent premarket authorization from FDA (via a Premarket Tobacco Product Application, or "PMTA").  Ex. 1, *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization (Revised)* 3, 4  (Apr. 2020),  https://www.fda.gov/media/133880/download  [https://perma.cc/6YVA-G8HA] (hereinafter "Enforcement Priorities").

As Plaintiffs acknowledge—indeed, emphasize—obtaining premarket authorization is not easy: "Preparing a PMTA requires a significant amount of resources—time, personnel, and money, which can range from several hundreds of thousands to multiple millions of dollars per product."  DPP ¶ 133; *see also* IPP ¶ 141; IRP ¶ 138 (similar).  Products cannot be approved unless they meet an onerous standard—a manufacturer must show that the product is "appropriate for the protection of public health with respect to the risks and benefits to the population as a whole."  Ex. 1, *Enforcement Priorities* 4.  And FDA requires "scientific support" demonstrating that an e-vapor product has satisfied this standard.  IPP ¶ 52; IRP ¶ 50; *see also* IPP ¶ 54 ("The PMTA requires specific, experimental support."); IRP ¶ 51 (same).  To provide this "scientific support," e-vapor companies must "conduct certain investigations themselves and submit their own research," IPP ¶ 54 (internal quotation marks omitted); IPP ¶ 51 (same), including "clinical testing," IRP ¶ 139; IPP ¶ 142, and "human subject studies," IPP ¶ 54 (internal quotation marks

THE ALTRIA DEFENDANTS'
MOTION TO DISMISS

omitted); IRP ¶ 51 (same). These "scientific studies cost tens of millions of dollars per product." IPP ¶ 56, IRP ¶ 53. Many steps in the approval process can "take years." IPP ¶¶ 11, 142; IRP ¶¶ 11, 139. And no e-vapor manufacturer had even started that process when FDA extended its regulatory authority to e-vapor products in 2016, rendering all such products technically illegal. *See* Ex. 1, Enforcement Priorities 3–4.

Rather than erase the e-vapor industry for the foreseeable future, FDA in 2016 also announced that it would decline to exercise its enforcement authority against a discrete set of e-vapor products for a discrete period of time. *See id.* Specifically, FDA allowed e-vapor products that were on the market as of August 8, 2016 to remain on the market without a PMTA, notwithstanding the technical illegality of such products, so long as the manufacturer filed a PMTA by a certain date and thereafter received approval. *See* IRP ¶ 50 ("If the product has been on the market prior to August 8, 2016 – essentially, before the Deeming Rule – the product could continue to be sold while a PMTA was pursued."); IPP ¶ 53 (same); DPP ¶ 132 (similar). The PMTA filing deadline changed several times,[2] but was ultimately set at September 9, 2020. IPP ¶ 53; IRP ¶ 50.

But this limited grace period for products on the market as of August 8, 2016 was as far as FDA's enforcement discretion went. For e-vapor products that were *not* on the market as of that date, FDA required the manufacturer to file a PMTA and obtain approval *before* selling the product. DPP ¶ 132; *see also* IPP ¶ 53; IRP ¶ 50. And if a manufacturer made a material modification to a product that was available on August 8, 2016, the modified product would be considered a new product that likewise could not be sold without first going through the PMTA process. *Compare* Ex. 1, Enforcement Priorities 10 ("[N]ew tobacco products . . . may not legally be marketed without premarket authorization.") *with id.* (defining the term "new tobacco product" to include "any modification (including a change in design,

---

[2] The PMTA deadline was originally set for August 8, 2018. Ex. 2, Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act, 81 Fed. Reg. 28,973, 28,974, 28,978 (May 10, 2016) (providing that PMTAs are due 24 months after the rule's August 8, 2016 effective date). In July 2017, FDA extended the deadline until August 2022. *See* Ex. 1, Enforcement Priorities 5. In July 2019, a federal court moved the deadline up to May 2020. *See* Ex. 3, Enforcement Priorities for Electronic Nicotine Delivery Systems and Other Deemed Products on the Market Without Premarket Authorization; Guidance for Industry; Availability, 85 Fed. Reg. 720, 721 (Jan. 7, 2020). And in April 2020, that court extended the deadline to the final September 2020 date due to the COVID-19 pandemic. *See* IRP ¶ 50.

THE ALTRIA DEFENDANTS'
MOTION TO DISMISS

any component, any part, or any constituent, including a smoke constituent, or in the content, delivery or form of nicotine, or any other additive or ingredient) of a tobacco product").

The upshot of these regulations was to freeze the e-vapor industry in time, limiting it to devices in existence on August 8, 2016, in the form that they existed on that date. As explained below, the regulatory freeze was problematic for Altria, whose existing products were failing.

## II. NU MARK ENTERS THE E-VAPOR INDUSTRY IN 2013

Altria Group, Inc. is a holding company headquartered in Richmond, Virginia. DPP ¶ 17; IPP ¶34; IRP ¶ 32. Although Altria itself sells nothing, it owns operating subsidiaries, including one called Nu Mark LLC. DPP ¶ 3; IRP ¶ 7; IPP ¶ 7. Nu Mark entered the e-vapor field in 2013. DPP ¶ 3; IRP ¶ 7; IPP ¶ 7. Its "flagship product" was the "MarkTen e-cigarette," DPP ¶ 3, a so-called "cig-a-like" product that was "designed to look and feel like a traditional cigarette," DPP ¶ 48; *see also* IPP ¶ 126 (stating that cig-a-likes are "similar to combustible cigarettes in size and shape"); IRP ¶ 123 (same).[3] This cig-a-like design was quickly overtaken by runaway growth of "easy-to-use pod-based" products such as JLI's products, which do not look like cigarettes. DPP ¶ 52.

## III. JLI ENTERS AND DISRUPTS THE E-VAPOR INDUSTRY IN 2015

In 2015—before the market was frozen in place by FDA's regulations—JLI "launched the JUUL," a "pod-based" e-vapor product. DPP ¶ 50; *see also* IPP ¶ 5; (acknowledging JLI's "entry into the Closed-System E-Cigarette market in June of 2015"); IRP ¶ 5 (same). Before that time, "nothing like [JLI's] pods system exist[ed] on the market." Ex. 4, Shanelle Mullin, *Start Your Own Revolution: An Interview with James Monsees*, Onboardly (Apr. 30, 2014), https://web.archive.org/web/20140503045520if_/http://onboardly.com/entrepreneur-interviews/an-interview-with-james-monsees#.U2R2yGj7SUk (cited at DPP ¶ 47). JUUL stood out in several ways from already-available e-vapor products. Rather than mimicking a traditional cigarette, the JUUL vaporizer had a "sleek design" that used "easy-to-use pods." DPP ¶ 55. That design "allowed consumers to quickly replace the E-liquid to continue smoking." DPP ¶ 52. And the JUUL vaporizer employed

---

[3] Nu Mark also sold a similar cig-a-like e-vapor product "under the brand name . . . Green Smoke." DPP ¶ 116; *see also* IPP ¶ 60; IRP ¶ 57.

sophisticated electronics that were able to "alter[] the temperature, maximum puff duration, or airflow," thereby "fine[] tun[ing]" the vapor that JUUL delivered. DPP ¶ 54.

According to the complaints and documents cited in it, JLI's product also provided a superior nicotine experience to adult smokers. "Many [e-vapor products] didn't deliver enough nicotine to satisfy the cravings of smokers." Ex. 5, Jennifer Maloney & Dana Mattioli, *Why Marlboro Maker Bet on Juul, the Vaping Upstart Aiming to Kill Cigarettes*, Wall St. J. (Mar. 23, 2019), https://www.wsj.com/articles/why-marlboro-maker-bet-on-juul-the-vaping-upstart-aiming-to-kill-cigarettes-11553313678 [https://perma.cc/V2R9-MZK2] (hereinafter "*Why Marlboro Maker Bet on Juul*") (cited at DPP ¶ 149, IPP ¶ 162, IRP ¶ 159). JUUL was different, employing a "proprietary blend of E-liquid" that used "nicotine salts" to "mimic a cigarette's rapid nicotine delivery." DPP ¶ 51. This nicotine-salts blend, the complaints allege, was a "chemical breakthrough in the speed of its nicotine delivery" that "eliminate[d] the need for smokers to go back to cigarettes after an unsatisfying experience with vaping." *Id.* ¶ 51; *see also* IPP ¶ 5 (stating that the JUUL formula "mimics the ability of a cigarette to deliver nicotine to the human brain"); IRP ¶ 5 (same).

As a result of these product-specific advantages, JUUL "re-ignited" the e-vapor category after its launch, IPP ¶ 48 (internal quotation marks omitted); IRP ¶ 45 (same); and "became the market leader," IPP ¶ 5; IRP ¶ 5. JUUL "quickly gained traction among consumers, rapidly surpassing Altria and securing the largest share of the Closed-System E-Vapor market" that Plaintiffs have alleged. DPP ¶ 55. JLI's revenues "grew by 700% in 2017." DPP ¶ 56. "By the fourth quarter of 2017, [JLI] had more sales than any of its competitors . . . ." IPP ¶ 44; IRP ¶ 41. By October 2018, JLI had obtained "a 75% share" of the closed-systems e-vapor market that Plaintiffs allege. IPP ¶ 5; IRP ¶ 5.

## IV.    NU MARK FAILS TO DEVELOP A COMPETITOR TO JUUL

The industry was heading in a different direction (toward pods with salts) than where Nu Mark had started (a cig-a-like with no salts). And Nu Mark was way behind. It was not until late 2017 that Altria had even "acquired the rights to a pod-based product" like JUUL. DPP ¶ 58. That product—known as MarkTen Elite—did not reach the market until February 2018. *Id.* But as experience soon showed, "[n]ot all e-cigs are equal." IPP ¶ 137; IRP ¶ 134 (quoting FDA Commissioner Scott Gottlieb). In particular, MarkTen Elite simply lacked the "bigger [nicotine] punch" that "eliminate[d] the need for

smokers to go back to cigarettes." DPP ¶ 51; *see also id.* (stating that "other similar products in the market" do not have a nicotine formula similar to JUUL's).

Nu Mark had never been a leader in the e-vapor market, and its position only dwindled further. "Prior to JUUL's entry," Nu Mark "had a 16% share" of the e-vapor market. IPP ¶ 8; IRP ¶ 8. But by May 2018—after MarkTen Elite's release—Nu Mark had become "a distant third behind JUUL and [British American Tobacco's] Vuse" e-vapor product, with Altria CEO Howard Willard calling for "a more blunt assessment of [Nu Mark's] weaknesses." Ex. 5, *Why Marlboro Maker Bet on Juul* (cited at DPP ¶ 149, IPP ¶ 162, IRP ¶ 159)*.* By August 2018, Nu Mark's share (counting both its cig-a-like and pod products) had fallen to just "8 percent," half of what it had been previously. DPP ¶ 136; IPP ¶ 151; IRP ¶ 148. By November 2018, Nu Mark's "market share had fallen to 4 percent." DPP ¶ 137; IPP ¶ 152; IRP ¶ 149. Because of FDA's regulatory constraints, Nu Mark had few options to turn things around. As just explained, its efforts to acquire and then market existing products that could be sold under FDA regulaions had failed. And designing a new product would have no immediate impact because "[a]ny new product would have to go through a yearslong approval process." Ex. 5, *Why Marlboro Maker Bet on Juul* (cited at DPP ¶ 149, IPP ¶ 162, IRP ¶ 159); *see supra* at 6. As of the date this lawsuit was filed, no e-vapor product had yet received approval. IPP ¶ 119; IRP ¶ 116; *see also* DPP ¶ 155 ("No manufacturer has achieved PMTA approval for an [e-vapor] product . . . ."). So even if Nu Mark could have cleared the *technical* barriers necessary to develop a new and improved product, the *regulatory* barriers meant that such a product could not have gone to market anytime soon. *See* IPP ¶ 11 (describing the PMTA process as "an onerous application process that can take years"); IRP ¶ 11. For all its efforts and investment, Altria had proved unable to translate its cigarette know-how into competitive success in the e-vapor industry.

Furthermore, soon after MarkTen Elite was launched, pod-based e-vapor products became a focus of regulatory scrutiny. In statements made in April and September 2018, FDA Commissioner Scott Gottlieb raised concerns about youth usage of "products that closely resemble a USB flash drive"—*i.e.*, pods—and non-traditional flavors. Ex. 6, "Statement from FDA Commissioner Scott Gottlieb, M.D. on new enforcement actions and a Youth Tobacco Prevention Plan to stop youth use of, and access to, JUUL and other e-cigarettes," U.S. Food & Drug Admin. (Apr. 23, 2018), https://www.fda.gov/news-

events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-new-enforcement-actions-and-youth-tobacco-prevention [https://perma.cc/M9EM-CVJN] (cited at IPP ¶ 110; IRP ¶ 107); *see also* Ex. 7, "FDA takes new steps to address epidemic of youth e-cigarette use, including a historic action against more than 1,300 retailers and 5 major manufacturers for their roles perpetuating youth access," U.S. Food & Drug Admin. (Sept. 11, 2018), https://www.fda.gov/news-events/press-announcements/fda-takes-new-steps-address-epidemic-youth-e-cigarette-use-including-historic-action-against-more [https://perma.cc/P7C4-KYVL] (cited at IPP ¶ 110; IRP ¶ 107); *see also* IPP ¶ 110–112; IRP 107–109 (detailing FDA actions regarding youth vaping). These statements raised concerns "that pod-based systems and nontraditional flavors could be contributing to" this problem. DPP ¶ 83.

Altria responded to FDA's concerns and the failures of Nu Mark's products by winding down Nu Mark. In October 2018, "Altria announced that it was temporarily halting its [pod-based] MarkTen Elite business," DPP ¶ 83, an "immediate action" to address FDA's "serious concerns about underage access to and use of e-vapor products." Ex. 8, Letter from Howard Willard to FDA Commissioner Scott Gottlieb (Oct. 25, 2018) (cited at DPP ¶ 83). Altria also announced that it would "discontinue the sale of all other flavor variants of [the] cig-a-like product" other than the traditional flavors (tobacco, menthol, and mint). *Id.*

"Two months later, on or about December 7, 2018, Altria announced its intention to cease competing in the Closed-System E-Vapor market entirely." DPP ¶ 8; *see also* IPP ¶ 49; IRP ¶ 46 (noting Nu Mark's "withdrawal from the market in late 2018"); IRP ¶ 95 ("Altria announced the withdrawal of its MarkTen, and complete exit from the Closed-System E-Cigarette market, on December 7, 2018."). In a press release regarding these developments, Altria made clear its reasons for winding down Nu Mark: "Th[e] decision is based upon the current and expected financial performance of these products, coupled with regulatory restrictions that burden Altria's ability to quickly improve these products." Ex. 9, Press Release, Altria Group, Inc., Altria Refocuses Innovative Product Efforts (Dec. 7, 2018), https://www.businesswire.com/news/home/20181207005175/en/Altria-Refocuses-Innovative-Product-Efforts [https://perma.cc/H7EW-G497] (cited at DPP ¶¶ 8, 89; IPP ¶¶ 96, 98; IRP ¶¶ 93, 95). Nu Mark's products had failed, and the regulatory scheme precluded its ability to fix those products in the foreseeable future.

## V.    ALTRIA'S NEGOTIATIONS WITH JLI

Starting in August 2017, Altria also began to explore an investment in JLI.  DPP ¶ 61; IPP ¶ 13; IRP ¶ 13.  Altria and JLI's negotiations spanned most of 2018.  DPP ¶¶ 67–92; IPP ¶¶ 76–100; IRP ¶¶ 74–97.

From the outset, the parties made clear that any deal would be structured to comply with the relevant antitrust laws and ultimately receive Hart Scott Rodino ("HSR") approval from the FTC.  For example, "[o]n April 20, 2018," JLI CEO Kevin Burns sent a letter to Altria CEO Howard Willard stating that "JUUL's and Altria's respective anti-trust counsel would discuss and develop a plan with respect to seeking and obtaining regulatory approval[,] . . . including the treatment of any competitive products owned by Altria." DPP ¶ 69; IPP ¶ 78; IRP ¶ 75.

Altria also made clear that it would *not* agree to pull Nu Mark's existing products from the market as part of a deal.  On July 30, 2018, JLI sent Altria a term sheet providing that within nine months of the agreement, Altria would pursue one of three options with respect to its e-vapor products.  DPP ¶ 73; IPP ¶ 81; IRP ¶ 78.  The sheet provided that Altria would "divest" its products, *i.e.*, sell them to another company.  DPP ¶ 72; IPP ¶ 80; IRP ¶ 77.  If divestiture was "not reasonably practicable," Altria could "contribute [them] at no cost to [JLI]," DPP ¶ 72; IPP ¶ 80; IRP ¶ 77, or "cease to operate" its e-vapor products.  DPP ¶ 72; IPP ¶ 80; IRP ¶ 77.  As an initial matter, contrary to Plaintiffs' insinuations, the proposed term sheet suggested that JLI expected Altria's products to remain on the market if they had any commercial value, by requiring divestiture so long as it was "reasonably practicable."  In any event, Altria did not accept that term sheet, and indeed specifically rejected JLI's non-compete proposal.  As Plaintiffs acknowledge, Altria "sent over a markup of the term sheet" that "deleted [the] provision that would have required Altria to divest its [e-vapor] business, contribute it to JLI, or cease to operate it." DPP ¶ 77; *see also* IPP ¶ 84; IRP ¶ 81 (similar).[4]

---

[4] Plaintiffs' description of JLI's "blunt message" in response to the markup is misleadingly designed to suggest that JLI balked at Altria's refusal to agree to pull its products from competition with JUUL.  DPP ¶ 79; IPP ¶ 86; IRP ¶ 83.  As Plaintiffs themselves allege, what JLI actually balked at was that "[t]he commitment to *divest* MarkTen has been stricken."  DPP ¶ 79; IPP ¶ 86; IRP ¶ 83 (emphasis added).  But divesting MarkTen to a third party—even if Altria had agreed to do so, which it did not—would have left those products on the market where they would have continued to compete with JUUL.  Even in Plaintiffs' cherry-picked telling, therefore, JLI did not actually suggest that Altria needed to agree to an anticompetitive agreement to pull its products from the market.

Altria instead proposed a more limited non-compete agreement. In the August 2018 markup document, Altria suggested that it would "grant to [JLI]" a license to the intellectual property rights for MarkTen products *upon* receiving HSR pre-approval, at which point Altria would "refrain from competing . . . in the e-vapor business" *with those products*. Ex. 10, Email from William F. Gifford, Jr. to Nick Pritzker, Riaz Valani, and Kevin Burns with Attached Revised Term Sheet 3, 5 (Aug. 9, 2018) (hereinafter "Term Sheet of Aug. 9, 2018") (cited at DPP ¶ 77; IPP ¶ 84; IRP ¶ 81). As a result, the non-compete agreement applicable to the MarkTen products would have gone into effect only after the government determined that the transaction complied with the antitrust laws. And it would *not* have required Altria to pull its existing MarkTen products from the market as a condition of the transaction.

For that reason, the "October 5, 2018 [letter that] Altria's Willard sent [to] JLI[]" is self-evidently not the smoking gun Plaintiffs suggest. DPP ¶ 81; *see also* IPP ¶ 88; IRP ¶ 85 (quoting the letter). Plaintiffs characterize this October 5 letter as a "commitment given in writing by Altria to [JLI] . . . to withdraw Altria's MarkTen Elite products." IPP ¶ 182, IRP ¶ 178. The letter says the opposite: Willard stated only that Altria would "not compete in a manner *consistent with our previous discussions.*" DPP ¶ 81; IPP ¶ 88; IRP ¶ 85 (emphasis added). And as just explained, in those discussions, Altria never made any such "commitment," and instead made clear that it would agree to license its MarkTen products to JUUL and cease from competing with those products only upon obtaining antitrust approval of the deal. In other words, in those "previous discussions," Altria had stated that it would *not* agree to pull its existing MarkTen products from the market as a condition of the deal.

The final agreements likewise did not contain an agreement to pull Altria's products. On December 20, 2018, Altria entered into a series of agreements with JLI, most notably a Purchase Agreement, Services Agreement, and Relationship Agreement. "Pursuant to the Purchase Agreement, Altria purchased a 35% non-voting stake in JLI for $12.8 billion in cash." DPP ¶ 93; *see also* IPP ¶ 108; IRP ¶ 105 (similar). Pursuant to "[t]he Services Agreement," Altria agreed to "provide certain services to JLI," including "regulatory consulting" services. DPP ¶ 97; *see also* IPP ¶ 108; IRP ¶ 105 (similar). And pursuant to "[t]he Relationship Agreement," the parties entered into a written non-compete with the following terms:

> [Altria] shall not . . . directly or indirectly (1) own, manage, operate, control, engage in or assist others in engaging in, the e-Vapor business; (2) take actions with the purpose of

preparing to engage in the e-Vapor Business, including through engaging in or sponsoring research and development activities; or (3) Beneficially Own any equity interest in any Person, other than an aggregate of not more than four and nine-tenths percent (4.9%) of the equity interests of any Person which is publicly listed on a national stock exchange, that engages directly or indirectly in the e-Vapor Business (other than (x) as a result of [Altria's] Beneficial Ownership of Shares or (y) engagement in, or sponsorship of, research and development activities not directed toward the e-Vapor Business and not undertaken with the purpose of developing or commercializing technology or products in the e-Vapor Business) . . . . Notwithstanding the foregoing, (x) [Altria] and its Subsidiaries and controlled Affiliates may engage in the business relating to (I) its Green Smoke, MarkTen (or Solaris, which is the non-U.S. equivalent brand of MarkTen) and MarkTen Elite brands, in each case, as such business is presently conducted, subject to Section 4.1 of the Purchase Agreement, and (II) for a period of sixty (60) days commencing on the date of this Agreement, certain research and development activities pursuant to existing agreements with third parties that are in the process of being discontinued . . . .

DPP ¶ 95 (alterations in original); *see also* IPP ¶ 103; IRP ¶ 100 (similar).

Contrary to Plaintiffs' allegations, Altria did not "agree[] to exit the [e-vapor] market." IPP ¶ 182; IRP ¶ 178. To the contrary, the non-compete provision expressly *preserved* existing products—Altria and its subsidiaries were specifically permitted to "engage in the business relat[ed] to its [existing] Green Smoke, MarkTen . . . and MarkTen Elite brands." DPP ¶ 95; IPP ¶ 103; IRP ¶ 100.

Instead, the non-compete applied only to Altria's ability to develop *new* e-vapor products. Among other considerations, this limited non-compete was necessary to the regulatory services that Altria agreed to provide. As Plaintiffs acknowledge, Altria "has decades of experience . . . in designing scientific studies and presenting its results for the consideration of government regulators," IPP ¶ 55; IRP ¶ 52, expertise that it agreed to lend to JLI via the regulatory-services agreement:

As requested, [Altria agrees to] provide legal, project management and other support for advancing [JLI's] products through the PMTA, MRTP and other regulatory (including with respect to the FDA) authorization or approval processes [on] behalf of [JLI], including, after July 2020, to the extent [Altria] has available capacity, providing histological data, testing and analytical support and sourcing for product evaluation.

Ex. 11, Services Agreement, Exhibit A § II.F, at A-2 (Dec. 20, 2018) (cited at DPP ¶¶ 97–98; IPP ¶ 16; IRP ¶ 16). But in order to allow Altria to provide the regulatory services—in particular the "testing" and "product evaluation" services—Altria would need access to certain proprietary information from JLI,

which might theoretically allow Altria to use that information in order to develop more successful products.

The written non-compete was specifically tailored to solve this problem—to allow Altria to obtain access to that information and provide regulatory services without compromising JLI's proprietary information. To that end, the agreement did not require Altria to pull its MarkTen products, but merely prohibited Altria from marketing *new* products, equipped with JLI's proprietary information, which Altria could have gained by providing regulatory services to JLI. It was also targeted in duration. "Under the terms of the Relationship Agreement, the Non-Compete" did not go "into effect" until "early in 2019 when Altria began to perform Extended Services." IPP ¶ 108; IRP ¶ 105. And "[i]f the Services Agreement expired, Altria could discontinue the Non-Compete" and thereby "regain its ability to compete in the market against" JLI by launching new e-vapor products. IPP ¶ 108; IRP ¶ 105. The plain text of the non-compete reflects that it did only what was necessary to enable the regulatory services and existed only so long as those services did.

## VI. AFTER THE AGREEMENTS, THE MARKET BECAME MORE COMPETITIVE

As reflected in the complaints and two of the documents they cite, the months following the agreements featured none of the economic developments expected in a plausible antitrust case.

*First*, the price of JUUL did not increase after Altria began pulling Nu Mark products off the market, or after the Agreements were signed. In the twelve months from October 2018 (when MarkTen Elite was pulled from the market) to October 2019 (well after the Agreements were signed), JUUL's price actually *decreased* by 11.9% as compared to the previous twelve-month period, *i.e.*, from October 2017 to October 2018. Ex. 12, Bonnie Herzog & Patty Kanada, Wells Fargo Securities, *Nielsen: Tobacco*

*All Channel Data Thru 10/5 – Cig Vol Declines Moderate* 12 (Oct. 15, 2019) (hereinafter "Wells Fargo Report").[5]

Second, JLI's output increased. From October 2018 to October 2019, unit sales of JUUL were 129% higher than in the previous twelve-month period (October 2017 to October 2018). Ex. 12, Wells Fargo Report at 12. Unit sales in the broader e-vapor market increased as well. *Id.*

Third, Plaintiffs *say* that the "[t]ransaction . . . significantly increase[d] JLI's market share and market power in the relevant market." DPP ¶ 138. But according to the market-share chart pasted into Plaintiffs' complaint, JLI's market share *plunged* by almost ten percentage points in the year following the agreements.



IPP ¶ 48; IRP ¶ 45 (highlights added). In the year *after* the time period depicted in this chart, JLI's market share fell even further—from "75% in November 2018" to just "58%" by September 2020. Ex. 13, Jennifer Maloney, *Juul Shelves Plan for Feature That Counts Puffs*, Wall St. J. (Sept. 4, 2020),

---

[5] Plaintiffs include an excerpt of this report in their complaint—specifically the market-share chart that they paste into the text and that is duplicated in this section. IPP ¶ 48; IRP ¶ 45. Although they state that the chart comes from "a February 11, 2019 presentation" by Wells Fargo, *id.*, that description is facially incorrect, as evidenced by the fact that the chart shows market share information from months *after* February 2019. The chart actually comes from a *different* Wells Fargo analyst report—one from October 2019. *Compare* IPP ¶ 48; IRP ¶ 45 (showing a market-share chart) *with* Ex. 12, Wells Fargo Report at 13 (showing that exact same market-share chart). As a result, the Court may fairly consider the data contained in the rest of that report when evaluating the Motion to Dismiss. *See Marder*, 450 F.3d at 448; *Golub*, 372 F. Supp. 3d at 1043; *see generally* Request for Judicial Notice in Support of Altria's Motion to Dismiss.

https://www.wsj.com/articles/juul-shelves-plan-for-feature-that-counts-puffs-11599211801

[https://perma.cc/3LUB-XM6X] (hereinafter "*Juul Shelves Plan*")  (cited at DPP ¶ 148).

The cited chart also makes evident that other competitors remained in the e-vapor segment and continued to control a non-trivial share of e-vapor sales.  Some of those competitors, in particular NJOY and British American Tobacco (BAT), actually increased their market share.



IPP ¶ 48; IRP ¶ 45 (highlights added).  This trend continued after the period depicted in this chart as well. As of fall 2020, JLI's "rival Reynolds American Inc." was still "gain[ing] market share with its Vuse" e-vapor brand.  Ex. 13, *Juul Shelves Plan* (cited at DPP ¶ 148).

During the same time period, JLI saw sales plummet, recording a "1 billion" loss in 2019 and a "$46 million" loss in the first quarter of 2020.  *Id.*  And JLI's valuation fell from "38 billion" to "12 billion"—less than a third of what it had been at the time of the transaction.  *Id.*  In other words, after Altria's acquisition, JLI became *less* dominant in the marketplace, not more so.

### LEGAL STANDARD

"[I]n an antitrust case, especially where, as here, the potential expense of discovery is obviously great," *Somers*, 729 F.3d at 966, a plaintiff must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quoting *Twombly*, 550 U.S. at 570).  This plausibility requirement imposes several significant restrictions on Plaintiffs here.

*First*, "[p]lausibility requires pleading facts," not conclusions. *Somers*, 729 F.3d at 959. A plaintiff cannot simply assert the elements of an antitrust claim—she must back them up with factual allegations. *See id.* at 959–960; *see also Iqbal*, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' . . . Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" (alterations in original) (quoting *Twombly*, 550 U.S. at 555, 557)); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) ("[C]laimants must plead not just ultimate facts . . . but evidentiary facts."). Nor is a court "bound to accept as true a legal conclusion" even though it is "couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Ipse dixits simply "will not do." *Id.*

*Second*, the complaint must plausibly allege facts demonstrating that a legal violation *did* occur, not just facts establishing that a legal violation *might* have happened. *Id.* ("Factual allegations must be enough to raise a right to relief above the speculative level."). Put differently, a complaint may not merely be "factually neutral"; it must be "factually suggestive" of plausible liability. *Somers*, 729 F.3d at 960 (internal quotation marks omitted). And "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted); *see also id.* at 679 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (quoting Fed. R. Civ. P. 8(a)(2))).

*Third*, and relatedly, the facts alleged must exclude "other obvious alternative explanations" besides a violation of the law. *Somers*, 729 F.3d at 965 (internal quotation marks omitted). When a complaint fails to exclude benign explanations for the alleged conduct, a legal violation is "not a plausible conclusion." *Iqbal*, 556 U.S. at 682; *see also Twombly*, 550 U.S. at 567–568 (allegation of an antitrust conspiracy was implausible where there was an "obvious alternative explanation").

Under these standards, dismissal is warranted.

THE ALTRIA DEFENDANTS'
MOTION TO DISMISS

**STATEMENT OF ISSUES**

(1)      Whether Plaintiffs have plausibly alleged concrete injury as required by Article III of the United States Constitution.

(2)      Whether Plaintiffs have plausibly alleged antitrust injury as required by the antitrust laws.

(3)      Whether Plaintiffs have plausibly alleged an anticompetitive agreement under § 1 of the Sherman Act—which implicates several sub-issues:

         a.    Whether Plaintiffs have plausibly alleged that Altria agreed to pull its existing e-vapor products from the market in exchange for an ownership interest in JLI.

         b.    Whether Plaintiffs have stated a valid *per se* claim as to the narrow written non-compete agreement between Altria and JLI, which was part of a broader set of agreements.

         c.    Whether there is any basis for setting aside the narrow written non-compete agreement between Altria and JLI under the Rule of Reason.

(4)      Whether Indirect Plaintiffs have plausibly alleged a conspiracy to monopolize under § 2 of the Sherman Act, in light of their failure to plausibly allege an agreement to unreasonably restrain trade.

(5)      Whether Plaintiffs have plausibly alleged a claim under § 7 of the Clayton Act in light of their allegation that Altria had removed its products from the e-vapor market before the date of the agreements between Altria and JLI, which requires Plaintiffs to proceed under the "actual potential competition" or "perceived potential competition" doctrines.

(6)      Whether Indirect Plaintiffs have plausibly alleged a violation of certain state antitrust and consumer protection claims in light of their failure to plausibly allege a violation of state or federal antitrust law.

(7)      Whether Indirect Plaintiffs have plausibly alleged a valid California UCL claim in light of their failure to plead a basis for relief and the existence of an adequate remedy at law.

(8)      Whether Indirect Plaintiffs have plausibly alleged a valid unjust enrichment claim in light of their failure to plead that Altria received a benefit and the existence of an adequate remedy at law.

(9)     Whether the Court should dismiss the claims brought by Plaintiffs Daraka Larimore, Adam Matschullat, and Keith May based on their failure to serve the Altria Defendants.

(10)    Whether venue is proper in the Northern District of California.

(11)    Whether this Court has personal jurisdiction over Altria.

## ARGUMENT

## I.      THE COURT SHOULD DISMISS ALL OF THE CLAIMS FOR FAILURE TO PLAUSIBLY PLEAD INJURY

### A.      Plaintiffs Must Plausibly Allege Concrete Injury Under Article III And The Antitrust Laws

"In addition to the traditional limitations upon standing imposed by the Constitution," namely the requirement of an injury in fact, "Congress imposed additional limitations upon those who can recover damages under the antitrust laws." *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001). "These limitations are sometimes referred to as the antitrust standing requirements," *id*, and they are "more demanding" than what Article III requires. *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1232 (9th Cir. 1998) (quoting *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1997)); *see also Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 & n.3 (9th Cir. 1999).

In this respect, Plaintiffs bear a far heavier burden than the FTC in the parallel administrative proceeding upon which Plaintiffs have modeled their claims. "Private plaintiffs and the FTC as government enforcer stand in different shoes" when attempting to invoke the federal antitrust laws. *In re Nexium (Esomeprazole) Antitrust Litigation*, 842 F.3d 34, 60 (1st Cir. 2016). As the Ninth Circuit has explained, Congress "imposed additional limitations" upon private parties—the "most important" being "that the private party must prove the existence of antitrust injury." *Pool Water Prods.*, 258 F.3d at 1034 (internal quotation marks omitted); *see also* Areeda ¶ 335a ("Unlike the United States government, which is authorized to sue anyone who violates the antitrust laws, a private antitrust plaintiff must show 'standing' to sue."); Areeda ¶ 335f ("To prevail, a private plaintiff must establish both (1) that it has standing *and* (2) the defendant has violated the antitrust laws." (emphasis in original)). Plausibly pleading antitrust injury is thus a central element of a private antitrust complaint. *See Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 371 (9th Cir. 2003) ("To acquire antitrust standing, a plaintiff must

adequately allege . . . antitrust injury." (emphasis omitted) (internal quotation marks omitted)); *see also Feitelson v. Google Inc*., 80 F. Supp. 3d 1019, 1026 (N.D. Cal. 2015) (similar).

 "Antitrust injury," in turn, "'means injury from higher prices or lower output, the principal vices proscribed by the antitrust laws.'" *Pool Water Prods.*, 258 F.3d at 1034 (quoting *Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555, 1564 (7th Cir. 1991)); *see also Reudy v. Clear Channel Outdoors, Inc*., 693 F. Supp. 2d 1091, 1128 (N.D. Cal. 2010) ("The antitrust injury doctrine . . . requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers."). Critically, consistent with *Twombly* and *Iqbal*, it not enough merely to *say* that the alleged anticompetitive conduct led to higher prices or reduced output. As this Court has observed, "merely alleging that [defendants] charged above-competitive prices, without alleging *facts* demonstrating that plaintiffs were injured as a result of [defendants'] anticompetitive conduct, is insufficient." *Eastman v. Quest Diagnostics Inc*., 108 F. Supp. 3d 827, 831 (N.D. Cal. 2015) (Orrick, J.) (emphasis added).

The Ninth Circuit's decision in *Somers* shows this pleading requirement in action. The plaintiff there filed a complaint containing a claim under § 2 of the Sherman Act (which likewise requires proof of antitrust injury), alleging that Apple had charged "supracompetitive" prices for songs from the iTunes store. 729 F.3d. at 958. The district court dismissed the complaint in full under Rule 12(b)(6), and the Ninth Circuit affirmed. The Ninth Circuit began by echoing the principles set forth above—that "[p]lausibility requires pleading facts, as opposed to conclusory allegations," *id.* at 959; that a complaint must be "factually suggestive" of liability, *id.* at 960 (quoting *Twombly*, 550 U.S. at 557 n.5); and that "causal antitrust injury is a substantive element of an antitrust claim, and the fact of injury or damage must be alleged at the pleading stage," *id.* at 963. The court then affirmed the dismissal of the plaintiff's claim for failure to plausibly plead antitrust injury. *Id.* at 966.

The problem was not that the *Somers* plaintiff failed to *say* that she had experienced antitrust injury in the form of increased prices: She specifically alleged, albeit in conclusory fashion, that Apple's pricing was "supracompetitive," *id.* at 959, that "she suffered injury in the form of inflated music prices," *id.* at 964, and that Apple had charged "higher prices for its music than it could have in a competitive market," *id.* at 964. The problem was that the actual *facts* alleged in her complaint did not bear out these statements. Her complaint reflected that the price for music downloads from the iTunes store had

"remained the same (99 cents)" before Apple obtained an alleged monopoly, during the monopoly period, and after the alleged monopoly ended. *Id.* at 964. Those facts "render[ed] implausible Somers' conclusory assertion that Apple's software updates affected music prices" and required rejection of that theory of injury. *Id.* The court also rejected the argument that some other market factors—"such as superior product or greater efficiency"—might have masked a supracompetitive price increase that would otherwise have been observed. *Id.* at 965. Somers, the court concluded, had failed to allege facts taking that theory "beyond mere conceivability or possibility." *Id.*

As explained below, a straightforward application of *Somers* compels dismissal.

## B. The Complaint Does Not Plausibly Allege Antitrust Injury

Each of Plaintiffs' theories of antitrust injury—price, output, and innovation—fails under the principles set forth above.

*Price*. Plaintiffs assert, in almost too many places to count, that the Altria-JLI transaction has resulted in increased prices. *See, e.g.*, DPP ¶ 160 ("Prices for Closed-System E-Vapor products . . . have been raised, fixed, maintained, and/or stabilized at artificial and non-competitive levels[.]"); *see also*, *e.g.,* DPP ¶¶ 9, 139, 140, 181 (similar); IPP ¶¶ 190, 203, 213, 232, 250, 265, 288, 295, 304, 313, 330, 335, 336 (similar); IRP ¶¶ 210, 231 243, 252, 263, 271, 272, 277 (similar). The problem for Plaintiffs is that they do not support these "naked assertion[s]" of injury with any facts rendering them plausible. *Twombly*, 550 U.S. at 557. This failing alone is sufficient to warrant dismissal.

The absence of such allegations is conspicuous, because the complaints demonstrate that Plaintiffs are fully capable of citing pricing data when they believe it to be helpful. For example, Plaintiffs allege the price of a "JUUL starter pack" ($44.99), IPP ¶ 50; IRP ¶ 47, the price of a "pack of four JUULpods" ($15.99), IPP ¶ 50; IRP ¶ 47, as well as the price of a "MarkTen Elite device and two pod pack[]" ($5.99), IPP ¶ 61; IRP ¶ 58. But Plaintiffs never allege the price of JUUL *before* the allegedly anticompetitive transaction, identify the price of JUUL *after* that transaction, or explain how the price increased between those two points in time. If those knowable facts supported Plaintiffs' claims, they would have cited them. Their failure to do so confirms that their claims are implausible. *See Eastman, Inc.*, 108 F. Supp. 3d at 835 (holding that plaintiff's allegations of injury were "conclusory and

speculative and [did] not satisfy the requirement to plead plausible claims" where complaint did not allege "what [defendant's] prices [were] or how they compare[d] to competitive prices").

The reason Plaintiffs do not plead these facts is transparent: They refute Plaintiffs' theory of injury. The documents Plaintiffs cite in the complaints show that the price for JUUL actually *decreased*—by 11.9 %—in the 12 months following Nu Mark's decision to pull MarkTen Elite from the market as compared to the price in the previous twelve-month period. Ex. 12, Wells Fargo Report at 12. Rather than harming consumers, Nu Mark's exit from the market correlated with a net economic *benefit* for them—JUUL products became cheaper. *See W. Wholesale Supply, Inc. v. Holladay*, 25 F. App'x 507, 508 (9th Cir. 2001) (holding that the plaintiff "has not shown that it suffered antitrust injury" because there was "no evidence that the defendants' actions raised the prices of goods above competitive levels, or diminished their quality").

*Somers* is thus squarely on point. If anything, this is a more straightforward case than *Somers* because prices did not just "remain[] the same," 729 F.3d at 966, after the Altria-JLI transaction—*they actually went down, see* Ex. 12, Wells Fargo Report at 12 (showing a price decrease of 11.9% as compared to the previous twelve-month period). As the Ninth Circuit observed in *Somers*, "under basic economic principles, increased competition . . . generally lowers prices," and vice versa. 729 F.3d at 964. That prices *went down* after the transaction shows that Plaintiffs' conclusory allegations of supracompetitive prices are "[im]plausible in light of [those] principles." *Id.* (quoting *Coalition For ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 501 (9th Cir. 2010)).

**Output.** Plaintiffs' claims of injury from reduced output fail for similar reasons. Plaintiffs mention output in only two places. *See* DPP ¶ 139 ("Defendants' illegal agreements had the purpose and effect of . . . reducing output."); DPP ¶ 160 ("The supplies of Defendants' Closed-System E-Vapor products . . . ha[ve] been artificially and unjustifiably restrained."). Like Plaintiffs' pricing allegations, these output allegations are textbook examples of "conclusory" allegations, and Plaintiffs offer no facts to backstop them. *See Twombly*, 550 U.S. at 557; *Iqbal*, 556 U.S. at 678; *Somers*, 729 F.3d at 959.

And again, though unnecessary to resolve this motion, Plaintiffs' own citations refute their claims. The market reports cited in the complaints show that JLI's unit sales were actually *higher* (129% higher) in the 12 months from October 2018 to October 2019, *i.e.*, in the year after Nu Mark pulled MarkTen

Elite from the market, than in the previous twelve-month period. *See* Ex. 12, Wells Fargo Report at 12. Output in the broader e-vapor market increased as well. *Id.* In short, output *improved* following Altria's minority investment in JLI.

**Innovation.** Plaintiffs' passing assertions that they "were denied the benefits of competitive innovation" fail for a different reason. IPP ¶ 20; IRP ¶ 20; *see also* DPP ¶¶ 139, 142, 160 (similar); IPP ¶¶ 185, 203 (similar); IRP ¶¶ 181, 200 (similar). As case after case holds, passing "allegations of hypothetical loss of . . . innovation are entirely too conclusory and speculative" to establish standing. *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1029 (N.D. Cal. 2015); *see also VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, No. 14-CV-00804, 2015 WL 225328, at *5 (N.D. Ill. Jan. 15, 2015) ("[L]ack of innovation," standing alone, is "not a cognizable antitrust injury"); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 507 (N.D. Cal. 2008) (holding that antitrust injury could not be predicated on "reduced innovation" because "plaintiffs must demonstrate that they paid a higher price . . . than they otherwise would have paid in the absence of a conspiracy"); *Crocs, Inc. v. Australia Unlimited, Inc.*, No. 07-CV-00221, 2008 WL 4426170, at *3 (D. Colo. Sept. 25, 2008) (holding that the allegation that the defendant "stifled innovation and development" contained "insufficient facts to support an anti-trust injury"); Areeda ¶ 340b ("Quantifying the losses from any particular failure to innovate seems well nigh impossible. For that reason private damages actions would appear to be an unlikely vehicle for challenging innovation restraints." (emphasis omitted)).

Plaintiffs' vague allegations about innovation injury are not even "concrete and particularized" enough to satisfy Article III's requirement that alleged injury must not be "actual or imminent" rather than "conjectural or hypothetical." *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 959 F.3d 341, 349 (9th Cir. 2020) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Nor could Plaintiffs turn these conclusory innovation allegations into something plausible, because the regulatory regime seriously limits any kind of innovation in this market. Innovation that is precluded by the government cannot constitute antitrust injury. *See In re Canadian Imp. Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006) (plaintiff failed to show antitrust injury where "[t]he absence of competition" was "caused by the federal statutory and regulatory scheme adopted by the United States government"); *RSA Media, Inc. v. AK Media Grp., Inc*., 260 F.3d 10, 15 (1st Cir. 2001) (similar holding based on state-law

restrictions).  Plaintiffs repeatedly emphasize the high barriers to entry that FDA regulations place on potential new e-vapor products, and the lengthy time to market for those products. *See supra* at 6-7; DPP ¶ 132; IPP ¶ 53; IRP ¶ 50 (PMTA approval is required before marketing an innovative e-vapor product); IPP ¶ 142; IRP ¶ 139 (pre-application testing can "take years"); DPP ¶ 155 (PMTA application process is "exceptionally time consuming"); IPP ¶ 11; IRP ¶ 11 (detailing the "onerous [PMTA] application process that can take years").  But Plaintiffs ignore that those barriers would also apply to any attempts by Altria to develop a new product.

As a result, even if Altria had some innovative product (or modification to an existing product) developed in full at the time of the transaction in December 2018—and Plaintiffs do not allege Altria did—that product would not be on the market now or likely for "years."  IPP ¶¶ 11, 142; IRP ¶¶ 11, 139.  That means any notional harm from reduced innovation is not "actual or imminent" (the Article III requirement) and could not have translated into different "prices" or "output" in the market (the antitrust-injury requirement).  *See Skyline*, 959 F.3d at 349; *Pool Water Prods.*, 258 F.3d at 1034.

**C.    The Absence Of Injury Requires Dismissal Of Plaintiffs' Equitable Claims**

The antitrust standing requirement also applies to Plaintiffs' claims for equitable relief.  *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 (1986) (plaintiff invoking equity must still "allege an injury of the type the antitrust laws were designed to prevent"); *see also Feitelson*, 80 F. Supp. 3d at 1026.  For the reasons just given, Plaintiffs have not satisfied that requirement.

Plaintiffs' injunctive claims also fail to satisfy Article III because they fail to plead "a sufficient likelihood that [they] will again be wronged in a similar way," as is necessary to assert a "prospective remedy" such as injunctive relief.  *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018).  This Court and others have dismissed injunctive-relief claims where plaintiffs fail to plead that they are likely to purchase the product in question "in the future."  *Anderson v. Apple Inc.*, No. 3:20-cv-02328, 2020 WL 6710101, at *6 (N.D. Cal. Nov. 16, 2020) (Orrick, J.) (dismissing injunctive relief claim because plaintiffs did not allege that they were likely to purchase another iPhone in the future); *see also Frenzel v. AliphCom*, 76 F. Supp. 3d 999, 1015 (N.D. Cal. 2014) (Orrick, J.) (similar).  Nowhere in the dozens of pages of their complaints do any of the Plaintiffs assert any intention of purchasing JUUL products *in the future* such that there is a likelihood that they will "again be wronged in a similar way."

*Davidson*, 889 F.3d at 967. And their vague assertions that they are "threatened with further injury" as a result of Defendants' allegedly "unlawful conduct" do not suffice. *See, e.g.*, IPP ¶ 300; IRP ¶ 248; *see also* DPP ¶ 181 (similar). Without more, such allegations are mere "conjectur[e]" and fall well short of a "threatened injury" that is "*certainly impending*," rather than merely "*possible*." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 412 (2013) (emphases in original).

## II. THE COURT SHOULD DISMISS THE SHERMAN ACT § 1 CLAIM FOR FAILURE TO PLAUSIBLY ALLEGE AN ANTICOMPETITIVE AGREEMENT

Plaintiffs' § 1 claim independently fails because they have failed to adequately allege an agreement that produces "substantial anticompetitive effect[s]." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). As explained below, despite having access to over 700,000 documents produced to the FTC, Plaintiffs have not alleged a set of facts plausibly demonstrating the existence of the agreement they purport to challenge—*i.e.*, one in which Altria agreed to pull its e-vapor products from the market. And the actual limited non-compete agreement signed by the parties on its face is an ancillary agreement necessary to protect JLI's proprietary information that is valid under the rule of reason.

### A. Plaintiffs Have Failed To Plausibly Allege An Agreement Precluding All Competition Between Altria And JLI

It is black-letter law that "Section 1 of the Sherman Act . . . does not reach conduct that is 'wholly unilateral.'" *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984). It "applies only to concerted action." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010). Section 1 thus requires proof of "an agreement." *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954). And "[i]t is important to be very precise in identifying the content of the agreement charged," to ensure that liability attaches only to unlawful conduct. Areeda ¶ 1404; *see also id.* ¶ 1409 (it is critical "to ask precisely (1) who was in agreement with whom, and (2) *about what*?" (emphasis added)).

The agreement Plaintiffs have *attempted* to allege here is one in which Altria "agreed to . . . withdraw[] from the [e-vapor] market in return for a substantial ownership interest in JLI." DPP ¶ 1; *see also* IPP ¶ 1; IRP ¶ 1. But that alleged agreement is implausible for two reasons.

*First*, Plaintiffs need to provide more than just a "conclusory allegation of agreement at some unidentified point." *Twombly*, 550 U.S. at 557; *see also Somers*, 729 F.3d at 959 ("[C]onclusory

allegations" of an agreement do not suffice); *Kendall*, 518 F.3d at 1049 ("To state a claim under Section 1 of the Sherman Act . . . claimants must plead not just ultimate facts (such as a conspiracy) but evidentiary facts . . . ."). They must amass factual allegations showing a true "meeting of the minds." *Twombly*, 550 U.S. at 557. They have failed to provide any such allegations.

For starters, the written agreement between the parties—which Plaintiffs have previously described as the focus of their claims[6]—did not require Altria to withdraw from the e-vapor market. Plaintiffs characterize the "Relationship Agreement between Altria and JUUL" as containing this illicit promise. IPP ¶ 182; IRP ¶ 178. It did not. Plaintiffs do not—and cannot—identify any language in that agreement requiring Altria to remove a single e-vapor product from the market. Rather, in portions Plaintiffs themselves quote, the Relationship Agreement expressly *permitted* Altria to "engage in the business relating to [its] [existing] Green Smoke, MarkTen . . . and MarkTen Elite brands . . . as such business is presently conducted." DPP ¶ 95; IPP ¶ 103; IRP ¶ 100. In other words, the plain terms of the agreement—*i.e.*, the actual "evidentiary fact" alleged, *Kendall*, 518 F.3d at 1047–45—expressly repudiate Plaintiffs' conclusory allegation of an agreement to pull the products.

The same is true of "the commitment given in writing by Altria to JUUL on October 5, 2018." IPP ¶ 182; IRP ¶ 178. Although Plaintiffs *say* that Altria agreed "in writing" on this date to "withdraw Altria's MarkTen Elite products," IPP ¶ 182; IRP ¶ 178, the actual "writing" shows the opposite. In that October 5 letter, Willard stated that Altria would "not compete in a manner *consistent with our previous discussions*." DPP ¶ 81; IPP ¶ 88; IRP ¶ 85 (emphasis added). And as Plaintiffs acknowledge, in those "previous discussions," Altria specifically *rejected* a draft "provision that would have required Altria to divest its [e-vapor] business, contribute it to JLI, or cease to operate it," DPP ¶ 77; *see also* IPP ¶ 84; IRP ¶ 81, instead proposing a more-limited non-compete clause that would have gone into effect only if

---

[6] For example, lead counsel for Direct Purchaser Plaintiffs previously stated that their claims were based on the written agreement between the parties:

> [T]his is not a case where we have to infer an agreement and we are on a fishing expedition to go try to find documents that confirm the existence of an agreement. The agreement that we challenged here is pled specifically in our complaint and, in fact, it is admitted to in SEC filings and public materials.

Tr. of Case Management Conference at 20:4–8 (June 19, 2020), ECF No. 56 (emphasis added).

the FTC granted HSR approval.  *See* Ex. 10, Term Sheet of Aug. 9, 2018 (cited at DPP ¶ 77; IPP ¶ 84; IRP ¶ 81).  In other words, the complaints' "evidentiary facts" again contradict Plaintiffs' conclusory suggestions of an agreement to pull the products.[7]  *Kendall*, 518 F.3d at 1047–48.

Plaintiffs have nothing else.  They have now had access to over 700,000 documents that Altria produced to the FTC as part of the Commission's review of Altria's minority acquisition of JLI.  *See* Joint Stipulation and Order Regarding Production of Documents Previously Produced to the FTC (Aug. 12, 2020), ECF No. 98, at 3; *see also* Decl. of Kimberly D. Harlowe (June 26, 2020), ECF No. 62-1 (describing documents).  And they have had months in which to review them.  Yet they still have no factual allegations supporting the actual agreement they allege.  Courts have not hesitated to dismiss antitrust complaints that failed to establish an unlawful agreement before any discovery was taken.[8]  Here, the case is even stronger.

*Second*, in a § 1 case, Plaintiffs have an obligation to plead facts that tend to exclude "obvious alternative explanation[s]" for a defendant's conduct.  *Twombly*, 550 U.S. at 567; *see also Somers*, 729 F.3d at 965; *In re Century Aluminum*, 729 F.3d at 1108 (plaintiffs must plead "facts tending to exclude the possibility that [an] alternative explanation is true").  In other words, Plaintiffs must include facts that "ten[d] to exclude the possibility of independent action."  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597 n.21 (1986) ("[C]onduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy."); *Southway Theatres, Inc. v. Ga. Theatre Co.*, 672 F.2d 485, 494 (5th Cir. 1982) (the "basic rule" is "that the inference of a conspiracy is always

---

[7] Plaintiffs make passing reference to the "Amended Relationship Agreement entered into between Altria and JUUL on January 28, 2020" as somehow "perpetuat[ing] [the] withdrawal" of Altria's products.  IPP ¶ 182; IRP ¶ 178.  But by January 2020, Nu Mark's products had long since been discontinued.  And in any event, nothing in the amended agreement required Altria to pull any products from the market.  *See* Ex. 14, Amendment No. 1 to Relationship Agreement (Jan. 28, 2020) (cited at DPP ¶¶ 104, 106; IPP ¶¶ 117–18; IRP ¶¶ 114–15).  The document thus provides no evidence suggesting that Altria ever agreed to do so.

[8] *See, e.g.*, *Disney Enters., Inc. v. VidAngel, Inc.*, No. 2:16-cv-04109, 2017 WL 6883685, at *5, *7 (C.D. Cal. Aug. 10, 2017); *Credit Bureau Servs., Inc. v. Experian Info. Sols., Inc.*, No. 12-cv-2146, 2013 WL 3337676, at *10 (C.D. Cal. Jun. 28, 2013); *Int'l Norcen Tech. v. Koninklijke Philips Elecs. N.V.*, No. 07-cv-0043, 2007 WL 4976364, at *10 & n.71 (C.D. Cal. Oct. 29, 2007).

THE ALTRIA DEFENDANTS'
MOTION TO DISMISS

unreasonable when it is based solely on parallel behavior that can be explained as the result of the independent business judgment of the defendants"); Areeda ¶ 1413a ("[N]o conspiracy can be inferred from parallel behavior when each of the alleged conspirators had an 'independent' or 'good business reason' for the challenged act.").

Plaintiffs have not met that requirement, either. On the contrary, their complaints lay out an "obvious alternative explanation" for Altria's decision to pull the products from the market, *Twombly*, 550 U.S. at 567, namely that Altria made an "independent decision" to do so for business reasons, *id.* at 553.

As Plaintiffs' allegations make clear:

- All of Nu Mark's products, MarkTen Elite as well as the MarkTen cig-a-like, simply "did not sell very well." Ex. 15, Bonnie Herzog, *Wall Street Tobacco Industry Update*, Wells Fargo (Feb. 11, 2019), at 28, https://natocentral.org/uploads/Wall_Street_Update_Slide_Deck_February_2019. pdf [https://perma.cc/5F6F-9MUY] (cited at IPP ¶ 48; IRP ¶ 45).

- Nu Mark's market share was plummeting leading up to the decision to withdraw in Fall 2018. After reaching a high of 16%, IPP ¶ 8; IRP ¶ 8, it had tumbled to just 8% by August 2018—half of what it had once been just three years before. DPP ¶ 136; IPP ¶ 151; IRP ¶ 148. From there it continued to fall. DPP ¶ 137; IPP ¶ 152; IRP ¶ 149.

- During the same time period, JUUL products gained enormous "traction among consumers," DPP ¶ 55, in part because JUUL had a nicotine formulation that consumers preferred, one that "eliminat[ed] the need for smokers to go back to cigarettes after an unsatisfying experience with vaping," DPP ¶ 51, and which "other, similar products in the market" (including Nu Mark's products) simply did not have. DPP ¶ 51.

- Although Nu Mark had a product (MarkTen Elite) that was pod-based like JUUL, as a result of FDA action, Altria became "concern[ed] that pod-based systems" "could be contributing to youth usage." DPP ¶ 83.

- The regulatory scheme precluded Nu Mark from taking steps to fix its products without first going through an uncertain and "exceptionally time-consuming" regulatory approval process—a process that in the best-case scenario would have taken "years." DPP ¶ 155; *see also* IPP ¶¶ 139–42; IRP ¶¶ 136–39.

These facts, taken together, "just as easily suggest" that Altria's decision to pull its existing products was "rational, legal business behavior," rather than an unlawful agreement. *Kendall*, 518 F.3d at 1049. Under Ninth Circuit precedent, that means Plaintiffs have not plausibly alleged an unlawful agreement. *See id.*; *see also Somers*, 729 F.3d at 965 (plaintiff's allegations "stop[ped] short of the line between possibility and plausibility" due to other "obvious alternative explanation[s]" for defendant's conduct) (quoting *Twombly*, 550 U.S. at 557, 567); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015) (holding that allegations of conduct "that could just as well be independent action are insufficient to state a claim under § 1 of the Sherman Act" (internal quotation marks omitted)); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1310 (11th Cir. 2003) ("[I]f a benign explanation for the action is equally or more plausible than a collusive explanation, the action cannot constitute" a reason to infer anticompetitive conduct).

## B. The Actual Non-Compete Agreement Is Lawful Under The Rule Of Reason

Nor can Plaintiffs plausibly challenge the actual agreement between Altria and JLI. In that agreement, Altria agreed to abstain only from developing *new* e-vapor products while it was providing regulatory services to JLI. *See* DPP ¶ 95; IPP ¶ 103; IRP ¶ 100 (quoting the noncompete provision). That kind of narrow, tightly limited non-compete agreement is subject to, and valid under, the rule of reason.

### 1. The Actual Non-Compete Agreement Is Not Per Se Unlawful

For starters, there is no basis for deeming the limited non-compete signed by the parties to be *per se* unlawful. To justify *per se* treatment, an agreement must be "manifestly anticompetitive," *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49–50 (1977), such that it "lack[s] . . . any redeeming virtue," *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985); *see also Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (the *per se* rule is reserved for categories of conduct that are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality"

THE ALTRIA DEFENDANTS'
MOTION TO DISMISS

(quoting *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 692 (1978)). Courts have accorded such treatment only to agreements that have "no purpose except stifling of competition," *White Motor Co. v. United States*, 372 U.S. 253, 263 (1963)—for example, "horizontal and vertical price-fixing," "horizontal market division," "group boycotts and concerted refusals to deal," and "tie-in sales," *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 n.3 (9th Cir. 1988). By contrast, non-competes are not *per se* unlawful where they are "part of a larger endeavor whose success they promote" by allowing one party to trust another with "broader responsibilities, the better to compete against third parties." *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 189 (7th Cir. 1985) (providing an example).

The non-compete in this case was not the type of "naked" restraint on competition that has merited *per se* treatment. *Polk Bros.*, 776 F.2d at 189. As Plaintiffs acknowledge, it was part of an intricate tapestry of other agreements—a Purchase Agreement, a Relationship Agreement, and a Services Agreement whereby Altria would provide numerous services to JLI. *See* DPP ¶¶ 93–97. Plaintiffs acknowledge that Altria "has decades of experience . . . in designing scientific studies and presenting its results for the consideration of government regulators." IPP ¶ 55, IRP ¶ 52. And it was exactly that experience that Altria agreed to lend to JLI, by providing (among other things) "legal, project management and other support," as well as "histological data, testing and analytical support and sourcing for product evaluation," all ultimately designed to "advanc[e] [JLI's] products through the PMTA . . . authorization or approval processes." Ex. 11, Services Agreement (Dec. 20, 2019), at 28 (cited at DPP ¶ 92; IPP ¶ 16; IRP ¶ 16).

Because the non-compete permitted Altria to provide these regulatory services to JLI, the non-compete was "accompanied by new production," and it enhanced "compet[ition] against third parties." *Polk Bros.*, 776 F.2d at 188–89. After all, given the need to secure regulatory approval, JLI's "future now hinges on applications that [JLI] submitted to the FDA in July, seeking permission for its products to remain on the U.S. market." Ex. 13, *Juul Shelves Plan*, at 4 (cited at DPP ¶ 148). By better equipping JLI to successfully navigate that regulatory process, and ultimately keep its products on the market, the regulatory services helped preserve JLI's ability to "compete against third parties" at all. *Polk Bros.*, 776 F.2d at 189; *see also Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. at 688–89 (discussing the rule of reason in the context of non-compete agreements).

THE ALTRIA DEFENDANTS'
MOTION TO DISMISS

Plaintiffs do not and cannot plead that the written non-compete would fail the rule of reason.  *See* Areeda ¶ 2033c ("[A]ncillary noncompetition covenants ordinarily qualify for rule of reason treatment.").

*First*, "[c]ovenants not to compete are valid if (1) ancillary to the main business purpose of a lawful contract, and (2) necessary to protect the covenantee's legitimate property interests." *Lektro–Vend Corp.*, 660 F.2d at 265 (citing *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 282 (6th Cir. 1898), *aff'd as modified*, 175 U.S. 211 (1899)); *see also L.A. Mem'l Coliseum*, 726 F.2d at 1395 (citing *Lekro-Vend* and *Addyston Pipe*).  Just so here.  As explained above, the non-compete was one small part of a much broader agreement.  *See supra* at 29; *L.A. Mem'l Coliseum*, 726 F.2d at 1395 (non-compete covenants "may be valid if they are subordinate and collateral to another legitimate transaction" (internal quotation marks omitted)).  And on its face, the agreement was "necessary to protect [JLI's] legitimate property interests," *Lektro–Vend Corp.*, 660 F.2d at 265—namely, the proprietary information that Altria would need to access in order to provide regulatory services to JLI.  *See* Areeda ¶ 2134d3 (stating that "trade secrets" like this one "may not be readily protectable" by other means, thus necessitating the use of a non-compete provision).  No start-up company would willingly share its proprietary information with a competitor without assurances that those secrets could not be used against them.

*Second*, Plaintiffs have not offered any plausible factual allegations sufficient to meet their "initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Am. Express*, 138 S. Ct. at 2284; *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) ("In its design and function the rule [of reason] distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest."); *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 507–08 (9th Cir. 1989) (affirming district court's dismissal of "plaintiffs' Sherman Act § 1 claim for failure sufficiently to allege an unreasonable restraint of or injury to competition"); Areeda ¶ 1502 ("To avoid dismissal, the plaintiff must allege that competition in a specified market has been 'restrained.'  The most general and useful meaning of that term is an anticompetitive reduction in output, which is one that is capable of producing a price increase.").

As explained above, Plaintiffs do not allege that Altria would have successfully created innovative products in the absence of the non-compete, nor do they allege that the FDA would have approved any such products. *See supra* at 22-24. Nor can Plaintiffs plausibly allege that the agreement reduced output or increased JUUL's price: In the wake of the non-compete, output rose, JUUL's price fell, and the market became less concentrated than it was before the agreement. *See supra* at 22-23; Areeda ¶ 1912d ("A § 1 'restraint of trade' is best defined as an agreement tending to result in reduced output or higher prices in the market . . . ."); *Polk Bros.*, 776 F.2d at 188 ("[The] Rule of Reason . . . focuses on . . . the ability of the cooperators to raise price by restricting output."). Those outcomes improve, rather than undermine, competition, and preclude Plaintiffs from proceeding under the rule of reason.

## III. THE COURT SHOULD DISMISS THE SHERMAN ACT § 2 CLAIMS FOR SIMILAR REASONS

The failure to allege a plausible § 1 claim means the Indirect Plaintiffs' § 2 conspiracy claim fails as well. There can be no conspiracy to monopolize in the absence of a § 1 violation. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 513 F. Supp. 1100, 1320 (E.D. Pa. 1981) (citing Areeda ¶ 809); *see also NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 139 (1998) ("We do not see, on the basis of the facts alleged, how [plaintiff] could succeed on [its conspiracy-to-monopolize] claim without prevailing on its § 1 claim." (citing Areeda ¶ 651e)); *H.L. Hayden Co. of N.Y. v. Siemens Med. Sys., Inc.*, 672 F. Supp. 724, 741 n.21 (S.D.N.Y. 1987) ("Any section 2 conspiracy to monopolize must be covered under the broader umbrella of a section 1 conspiracy in restraint of trade."); Areeda ¶ 809 ("Any arrangement that could be considered a 'conspiracy' to monopolize must necessarily also be an unreasonable 'contract,' combination,' or 'conspiracy' in restraint of trade offending § 1.").

Courts have not hesitated to dismiss § 2 conspiracy-to-monopolize claims where the plaintiff failed to allege a plausible § 1 claim. *See, e.g.*, *Hu Honua Bioenergy, LLC v. Hawaiian Elec. Indus., Inc.*, No. 16-cv-0634, 2018 WL 5891743, at *2 (D. Haw. Nov. 9, 2018) (holding that the court's reasoning in dismissing the § 1 claim was "also sufficient to dismiss [the claim for] conspiracy to monopolize as well"); *Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.*, 789 F. Supp. 760, 778–78 (S.D. Miss. 1992) (same); *Invictus Records, Inc. v. Am. Broad. Cos., Inc.*, 98 F.R.D.

419, 436 (E.D. Mich. 1982) ("Having failed to demonstrate the requirements of a conspiracy claim under Sherman § 1, plaintiffs will not be allowed to replead the same facts and obtain relief under Sherman § 2."). The Court should therefore recognize this claim for what it is—"no more than an afterthought appended to [the] § 1 claim[]," *Invictus*, 98 F.R.D. at 436 (quoting Areeda ¶ 809)—and dismiss the conspiracy-to-monopolize claim for exactly the same reasons.

## IV. THE COURT SHOULD DISMISS THE CLAYTON ACT CLAIM

Plaintiffs also fail to state a plausible claim under § 7 of the Clayton Act. Plaintiffs have alleged that by the time of the agreements between Altria and JLI in December 2018, "Altria had removed its products from the [e-vapor] market entirely." DPP ¶ 137; *see also* IPP ¶ 96; IRP ¶ 93. That allegation has consequences under the Clayton Act.

Transactions between firms that are not actually competing are "treated under a far more lenient standard." Areeda ¶ 1100a; *see also id.* ¶ 929c (stating that acquisitions involving direct competitors "are dealt with far more aggressively than mergers of noncompetitors, even those whom the law regards as 'potential' competitors"). A transaction between non-competitors "does not reduce the number of competitors or raise concentration in the markets of either." *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1233 (8th Cir. 2010); *see also United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 192 (D.D.C. 2018) (stating that mergers between non-competitors "produce[] no immediate change in the level of concentration in any relevant market"). As a result, the "great majority of [transactions between non-competitors] are lawful, even when the individual markets in which the firms operate are highly concentrated." Areeda ¶ 929c. And the *only* "defensible antitrust rationale for condemning such mergers is some variation of the 'potential competition' doctrine." *Id.* ¶ 1100a; *see also Ginsburg*, 623 F.3d at 1233 ("The potential competition theories of § 7 address mergers between firms that are not actual competitors because they produce different products or operate in different geographic markets.").

As explained below, federal courts have endorsed two variations of the potential competition doctrine—the actual potential competitor theory and the perceived potential competitor theory. Plaintiffs have failed to state a claim under either approach.

## A.    Plaintiffs Cannot Plausibly Plead The Actual Potential Competitor Theory

To take advantage of the so-called "actual potential competition" doctrine, a plaintiff must show that the acquisition "foreclose[d] the acquiring firm's future *de novo* entry into the acquired firm's market." *Ginsburg*, 623 F.3d at 1234.[9]  Specifically, a plaintiff must plausibly allege that the acquiring firm "would, but for the acquisition, have entered the market as a competitor in the near future." *United States v. Siemens Corp.*, 621 F.2d 499, 505 (2d Cir. 1980); *see also Yamaha Motor Co., Ltd. v. Fed. Trade Comm'n*, 657 F.2d 971, 977 (8th Cir. 1981); *Fed. Trade Comm'n v. Steris Corp.*, 133 F. Supp. 3d 962, 978 (N.D. Ohio 2015) (stating that the relevant question is whether the defendant "probably would have entered the [market] . . . within a reasonable period of time"); *United States v. Phillips Petrol. Co.*, 367 F. Supp. 1226, 1232 (C.D. Cal. 1973) (similar).

Plaintiffs have not even attempted to make these allegations.  Plaintiffs do not allege (even in a conclusory fashion) that Altria would have put its e-vapor products back on the market but for the acquisition.   Given the business reasons that Altria had for pulling those products prior to the acquisition—reasons that the complaints specifically recognize, *see supra* at 27—any such allegations would be implausible.  *See* Areeda ¶ 1127a (stating that the question is whether the acquiring company had "the incentive, ability, and will to enter the market if the [acquisition were] forbidden"); *cf. United States v. Gen. Dynamics Corp.*, 415 U.S. 846, 498, 503–04 (1974) (noting that "weakness as a competitor" could mandate "a conclusion that no substantial lessening of competition occurred or was threatened"); *Brown Shoe Co. v. United States*, 370 U.S. 294, 346 (1962) (recognizing that "business failure" may be a "mitigating factor" that prevents a firm from "maintaining its competitive position").

Nor do Plaintiffs allege (again, even in conclusory fashion) that Altria would have developed a new, innovative e-vapor product and used it to re-enter the market.   The Clayton Act deals in "probabilities," not "ephemeral possibilities."  *Brown Shoe*, 370 U.S. at 323; *United States v. Dairy*

---

[9] The Supreme Court has not recognized this theory.  *See Marine Bancorp.*, 418 U.S. at 639 (reserving the question); *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 537 (1973) (same).  And "[o]nly one circuit" has expressly endorsed it, nearly 40 years ago.  *Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 70–71 (1st Cir. 2002) (citing *Yamaha Motor Co. v. Fed. Trade Comm'n*, 657 F.2d 971, 978–80 (8th Cir. 1981)).  Indeed, it has not "received serious attention by an appellate court in more than 35 years."  Areeda ¶ 1124.  Altria does not concede that this is a valid theory, but the Court need not answer that question because Plaintiffs have failed to allege the facts necessary to proceed even if it were valid.

THE ALTRIA DEFENDANTS'
MOTION TO DISMISS

*Farmers of Am., Inc.*, 426 F.3d 850, 858 (6th Cir. 2005) ("[E]phemeral possibilities will not satisfy the requirement of a reasonable probability." (internal quotation marks omitted)). But Plaintiffs have not even alleged something ephemeral. Nor could they. Even assuming Plaintiffs could identify some new product that Altria had in development, Plaintiffs would have to plead that Altria was prepared to launch it "in the near future." *Siemens Corp.*, 621 F.2d at 505. No such allegations would be plausible in light of the barriers to entry imposed by FDA's regulatory regime, which Plaintiffs themselves repeatedly emphasize. *See, e.g.*, DPP ¶¶ 132–34, 155–56; IPP ¶¶ 11, 53, 139–46; IRP ¶¶ 11, 50, 136–43.

### B. Plaintiffs Cannot Plausibly Plead The Perceived Potential Competition Theory

The "perceived potential competition" theory requires Plaintiffs to plead that the mere threat of "new entry by the acquiring firm induced competitors in the acquired firm's market to perform more competitively," even if the acquiring firm would not actually have entered the market. *Ginsburg*, 623 F.3d at 1234 (citing Areeda ¶ 1121a). In other words, under this standard, a plaintiff must plausibly allege that the mere presence of a potential competitor "waiting in the wings" (though not actually in the market) prevented those in the market from raising prices. *See Marine Bancorp.*, 418 U.S. at 624–25; *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 531–32 (1973).

Plaintiffs have not attempted to plead this theory either; their complaints are devoid of any allegation, whether plausible or not, that Altria's mere presence on the sidelines impacted others' pricing strategies. *See DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 764 (9th Cir. 2018) ("The claim is doomed from the start because the potential competitor theory lacks factual allegations in the complaint."). Nor would such an allegation (if made) be plausible. Instead, given the failings of Nu Mark's products when they were in the market and the regulatory constraints on Altria's ability to develop new products, *see, e.g.*, *supra* at 27, it is not plausible that Altria's mere existence would impact other e-vapor companies' pricing decisions.

### C. Plaintiffs' Implausible Market-Concentration Allegations Cannot Save Their Pleading Failures

Rather than attempting to meet the relevant standards, Plaintiffs offer a non-sequitur, arguing that the transaction led to increased concentration in the relevant market. But where, as here, a transaction did not lead to "the elimination of an actual competitor in [the] relevant market," any discussion of a

purported "increase in market concentration" is "inapposite." *DeHoog*, 899 F.3d at 764 (2019) (affirming dismissal of a Clayton Act claim where one of the companies involved in the transaction did not have "any business interests" in the relevant market). After all, when no actual competitor is eliminated, the "concentration of the [relevant] market stay[s] precisely the same." *Id.*; *see also Edstrom v. Anheuser-Busch InBev SA/NV*, 647 F. App'x 733, 735 (9th Cir. 2016) (because the transaction did not eliminate an actively competing product, "the challenged transaction does not increase [the defendant's] market share or the concentration of [the relevant] market"). Plaintiffs' market-concentration allegations thus do not advance the ball.

Those allegations are in any event implausible. Plaintiffs assert that "[f]ollowing Altria's exit, [the market] became even more concentrated," and recite that the transaction exceeded the Herfindahl-Hirschman Index (HHI) thresholds that the FTC uses to evaluate market concentration. DPP ¶¶ 129–31; IPP ¶¶ 147–49; IRP ¶¶ 144–46. But these sparse allegations do not suffice to establish that the transaction at issue would "lead to undue concentration in the market." *United States v. Baker Hughes Inc.*, 908 F.2d 981, 982 (D.C. Cir. 1990); *see also United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963); *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 192 (D.D.C. 2018). Plaintiffs offer literally no facts or figures substantiating their claims, including any actual HHI calculations, as the law requires them to do. *See Twombly*, 550 U.S. at 555.

Plaintiffs' claims and cited documents in fact display the opposite. For one, Plaintiffs' allegation that Altria was no longer a competitor in the e-vapor market at the time of the transaction precludes them from showing that the acquisition concentrated the marketplace. The acquisition of a firm absent from the marketplace by definition causes "no immediate change in the level of concentration in [the] relevant market." *AT&T*, 310 F. Supp. 3d at 192; *see also United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (same). So too with the HHI allegations—which are merely a proxy for measuring market concentration. *See Fed. Trade Comm'n v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 346 (3d Cir. 2016). The change in HHI "is always equal to double the product of the market shares of the two merging firms." Areeda ¶ 930a. A firm that has left the market by definition has zero market share, and so "the product of the market shares" is necessarily zero as a matter of basic arithmetic.

For another, the chart that Plaintiffs pasted into their complaints, IPP ¶ 47; IRP ¶ 45, shows that JLI's market share *plunged* in the months following the acquisition by more than ten percentage points. This chart directly contradicts Plaintiffs' assertion that the transaction "significantly increas[ed] JLI's market share," DPP ¶ 138, and entirely undermines Plaintiffs' conclusory assertion that the transaction caused the e-vapor market to become more concentrated, DPP ¶ 129; IPP ¶ 147; IRP ¶ 144. When the market share of the largest firm in the market declines—substantially—that means the market has become *less* concentrated than it was before. *See Phila. Nat'l Bank*, 374 U.S. 363 (noting that the higher one firm's "share of the relevant market," the higher the "concentration" in that market); Areeda ¶ 932e (noting that "decreasing concentration" occurs when "the market shares of the existing firms have been becoming more nearly uniform"); *id.* ¶ 932e n.30 (providing a numerical example). It also means the market has become more competitive. *See United States v. Syufy Enters.*, 903 F.2d 659, 665–66 (9th Cir. 1990) (finding "conclusive" the fact that the defendant's market share had declined—from a starting point of 100%—in the months following the acquisition and noting that, as a result, the market "was more competitive when this case came to trial than before [the challenged transaction]"). For this reason as well, the Court must dismiss Plaintiffs' § 7 claim. *See Edstrom*, 647 F. App'x at 735 (affirming dismissal of a § 7 claim because "the challenged transaction does not increase [the defendant's] market share or the concentration of the [relevant] market").

## V. THE COURT SHOULD DISMISS INDIRECT PLAINTIFFS' STATE-LAW CLAIMS

### A. The State-Law Claims Should Be Dismissed As Derivative Of The Federal Antitrust Claims

The Court should reject the Indirect Plaintiffs' efforts to restate their federal antitrust claims under California, New York, Michigan, and Rhode Island antitrust law, IPP ¶¶ 209, 228, 247, 312, 321; IRP ¶¶ 206, 251, 261, as well as California, Florida, Massachusetts, and Rhode Island consumer-protection law, IPP ¶¶ 256, 301, 303, 326; IRP ¶¶ 224, 249.

To begin, California, New York, Michigan, and Rhode Island courts have made clear that the analysis under their state antitrust laws is identical to federal law. *See Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1131 n.5 (9th Cir. 2015) (California) ("[T]he analysis under the Cartwright Act . . . is identical to that under the Sherman Act."); *Biocad JSC v. F. Hoffmann-*

*La Roche*, 942 F.3d 88, 101 (2d Cir. 2019) (New York) (the "Donnelly Act . . . is modeled after the Sherman Act and 'should generally be construed in light of Federal precedent.'" (internal citations omitted)); *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 619 n.4 (6th Cir. 1999) (Michigan) ("Michigan antitrust law follows federal precedents," and "reasoning regarding the federal antitrust claims applies equally to the state antitrust claims.")[10]; *Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of Rhode Island*, 997 F. Supp. 2d 142, 1552 (D.R.I. 2014) (Rhode Island) ("Court[s] appl[y] the same substantive law to the state and federal antitrust claims as the Rhode Island Antitrust Act mirrors the Sherman Act.").[11]

As each state's law reflects, if a plaintiff fails to allege a plausible federal antitrust claim, the state-law claims must be dismissed as well. *See Lenhoff Enterprises, Inc. v. United Talent Agency, Inc.*, 729 F. App'x 528, 531 (9th Cir. 2018) (California) ("[W]here a complaint alleges the same conduct as both a violation of the Sherman Act and a violation of California's Cartwright Act . . . the determination that the alleged conduct is not an unreasonable restraint of trade under the Sherman Act necessarily implies that the conduct is not unlawful under the Cartwright Act."); *Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 362–63 (S.D.N.Y. 2018) (New York) ("For the reasons that the plaintiff's claim under the Sherman Act is dismissed, the plaintiff's claim under the Donnelly Act must also be dismissed."); *Partner & Partner, Inc. v. ExxonMobil Oil Corp.*, 326 F. App'x 892, 898 (6th Cir. 2009) (Michigan) (holding that the Michigan Antitrust Reform Act claims "fail for the same reasons" as the federal claims); *Auburn News Co. v. Providence Journal Co.*, 659 F.2d 273, 278 (1st Cir. 1981) (Rhode Island) (stating that, "[w]ith respect to all antitrust claims made under state law, we reach the same results [as under federal law]" based on the "simpl[e]" "observ[ation]" that the state antitrust statute ties itself

---

[10] The Michigan legislature expressly tethered the Michigan Antitrust Reform Act ("MARA") to the federal antitrust laws, providing that "courts shall give due deference to interpretations given by the federal courts to comparable antitrust statutes." Mich. Comp. Laws § 445.784 (1984). Courts have similarly held that the analysis under MARA is identical to the federal antitrust statutes. *See, e.g.*, *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 619 n.4 (6th Cir. 1999).

[11] The Rhode Island Antitrust Act expressly provides that the statute "shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable, except where provisions of this chapter are expressly contrary to applicable federal provisions as construed." R.I. Gen. Laws § 6-36-2 (1979).

THE ALTRIA DEFENDANTS'
MOTION TO DISMISS

to the federal one).[12]

The same analysis applies to Plaintiffs' ostensible consumer-protection claims. Like Plaintiffs' Sherman Act claims, these state-law claims challenge an alleged restraint of trade that led to Plaintiffs paying allegedly non-competitive prices. *See* IPP ¶ 282 & IRP ¶ 231 (California); IPP ¶ 296 & IRP ¶ 234 (Florida); IPP ¶ 305 (Massachusetts); IPP ¶ 328 (Rhode Island). In this context as well, the two claims rise and fall together. The courts in California, Florida, and Massachusetts have made this point explicit. *See LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557-58 (9th Cir. 2008) (California) ("Where . . . the same conduct is alleged to support both a plaintiff's federal antitrust claims and state-law unfair competition claim, a finding that the conduct is not an antitrust violation precludes a finding of unfair competition."); *QSGI, Inc. v. IBM Global Financing*, 2012 WL 1150402 (S.D. Fla. 2012) (Florida) ("[When] a plaintiff's FDUTPA claim is based on the same allegations as its antitrust claim, failure to establish a violation of antitrust law is sufficient to conclude that the plaintiff has also failed to state a FDUTPA claim."); *Ben Elfman & Son, Inc. v. Criterion Mills, Inc.*, 774 F. Supp. 683, 687 (D. Mass. 1991) (Massachusetts) ("A [Massachusetts consumer-protection law] claim must fail . . . if the antitrust and contract claims fail."). And although Rhode Island courts have not yet addressed the question, there is every reason to think they would impose the same rule, given the near identical text and purposes of the Massachusetts, Florida, and Rhode Island statutes,. *See Matsuura v. Alston & Bird*, 179 F.3d 1131 (9th Cir. 1999) (holding that, in the absence of a controlling state-court decision, federal courts must "predict"

---

[12] In addition to suing on behalf of a putative class of California Plaintiffs, the Indirect Plaintiffs attempt to plead claims under California's Cartwright Act for non-California plaintiffs, via a "Nationwide Class" that includes plaintiffs from every state, and a "Cartwright Act Class" that includes plaintiffs from 31 states other than California. *See* IPP ¶¶ 168, 169, 208–26, 227–45; IRP ¶¶ 165, 166, 205–23. Altria believes this claim is improper, because the Cartwright Act cannot be extended to out-of-state purchases under the circumstances at issue here. Altria is in no way conceding this issue and reserves all rights to raise it in the future. But Altria is not raising it at this time in light of this Court's view that the issue is better decided with the benefit of a more-developed factual record. *See Fenerjian v. Nong Shim Co.*, No. 13-cv-04115, 2015 WL 13000357 at *4–*5 (N.D. Cal. Mar. 30, 2015) (Orrick, J.).

THE ALTRIA DEFENDANTS'
MOTION TO DISMISS

how the state supreme court would rule, based in part on "decisions from other jurisdictions").[13] As a result, all of these tagalong consumer-protection claims must be dismissed for the same reason as the federal clams.

## B. The California UCL Claims Should Be Dismissed For Additional Reasons

Indirect Plaintiffs' California UCL claims fail for three additional reasons. *First*, they are asking for relief that is unavailable. By their own account, those Plaintiffs purport to be seeking "damages" under the UCL. *See* IPP at 49 (alleging "violations of California's Unfair Competition Law" "[o]n behalf of the Nationwide Class for Damages"); *id.* at 52 (similar allegations "on behalf of the California Class for damages"). But "damages cannot be recovered" under the UCL, because a UCL action "is equitable in nature." *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 943 (Cal. 2003).

*Second*, Plaintiffs do not and cannot plausibly allege a basis for restitution—the only form of monetary recovery that is theoretically allowable under the UCL. *Korea Supply*, 63 P.3d at 945 (Cal. 2003). As this Court has recognized, a plaintiff may obtain restitution under the UCL only of funds that the defendant received from the plaintiff. Order on Substantive Mots. to Dismiss, *In Re: Juul Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation*, No. 19-md-02913-WHO, ECF No. 1084, at 97-98 (Oct. 23, 2020); *see also, e.g.*, *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 895 (2011) ("A restitution order . . . requires both that money or property have been lost by [the] plaintiff, on the one hand, and that it have been acquired by [the] defendant on the other."); *In re Apple & AT&T iPad Unlimited Data Plan Litigation*, 802 F. Supp. 2d 1070, 1077 (N.D. Cal. 2011) (dismissing a UCL claim where Plaintiffs failed to allege a proper basis for restitution from the defendant). Altria disagrees as to

---

[13] Moreover, Rhode Island's consumer-protection law is self-consciously modeled on the federal FTC Act. The statute itself instructs courts to give "due consideration and great weight" to the "interpretations of the Federal Trade Commission and the federal courts relating to § 5(a) of the [FTC] Act." R.I. Gen. Laws Ann. § 6-13.1-3. And the FTC and federal courts in turn interpret the FTC Act to be coextensive with the Sherman and Clayton Acts, at least for the purposes of alleged antitrust violations. *See California Dental Ass'n v. Fed. Trade Comm'n*, 526 U.S. 756, 762 n.3 (1999); *Fed. Trade Comm'n v. Ind. Fed'n of Dentists,* 476 U.S. 447, 454-455 (1986); William Holmes & Melissa Mangiaracina, *Antitrust Law Handbook* § 7:2 (2014) ("For the most part ... the [Federal Trade Commission Act] has been held coterminous with the Sherman and Clayton Acts."); *cf. JES Properties, Inc. v. USA Equestrian, Inc.,* No. 802CV1585T24MAP, 2005 WL 1126665, at *19 (M.D. Fla. May 9, 2005), *aff'd*, 458 F.3d 1224 (11th Cir. 2006) (interpreting in a similar manner a state consumer-protection law modeled on the FTC Act).

THE ALTRIA DEFENDANTS'
MOTION TO DISMISS

the extent to which the funds must be directly traceable to Plaintiffs, but for purposes of this motion, that disagreement is academic. Plaintiffs do not allege that Altria received even a single dollar—directly *or indirectly*—as a result of the supposedly supracompetitive prices that JLI charged. Indeed, any such allegation would be implausible in light of Plaintiffs' own pleadings that Altria has lost *billions* on its investment in JLI. *See* IPP ¶ 123 n.6 ("[Altria] has written down the value of that investment by a total of $8.6 billion."); IRP ¶ 120 n.6 (same).

*Third*, Plaintiffs have an adequate legal remedy for their alleged harm, which means they cannot proceed on a UCL claim as well. It is a "fundamental principle" that "equity will grant no relief where an adequate remedy at law exists." *Barr v. Roderick*, 11 F.2d 984, 986 (N.D. Cal. 1925); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). Thus, when a plaintiff "seeks damages under [a statute] for the exact same conduct that forms the basis of his UCL . . . claims," a plaintiff must "allege facts suggesting that damages . . . alone would not provide adequate relief." *Duttweiler v. Triumph Motorcycles (America) Ltd.*, No. 14-cv-4809, 2015 WL 4941780, at *8 (N.D. Cal. Aug. 19, 2015).

Here, Plaintiffs' UCL claim is explicitly premised on statutes—they allege "(1) violations of Sections 1, 2, and 3 of the Sherman Act" and "(2) the violations of section 16720," namely the Cartwright Act. IPP ¶¶ 21, 284; *see also* IRP ¶¶ 205–223 (premising claims on the Cartwright Act). And Plaintiffs do not allege that the damages remedies available under those causes of action are inadequate. Indeed, beyond "damages" under the UCL, IPP ¶¶ at 21—which are also available under the other statutes Plaintiffs invoke—Plaintiffs seek only "restitution and/or disgorgement," or just more money. IRP ¶¶ 266, 286. That form of relief can be "adequate[ly]" obtained via Plaintiffs' legal claims. *Duttweiler*, 2015 WL 4941780, at *8; *see also Salas v. Toyota Motor Sales, U.S.A., Inc.*, No. 15-cv-8629, 2016 WL 7486600, at *13 (C.D. Cal. Sept. 27, 2016) (collecting cases and dismissing UCL claim at 12(b)(6) stage because of an adequate remedy at law); *Philips v. Ford Motor Co.*, No. 14-cv-02989, 2015 WL 4111448, at *16–17 (N.D. Cal. July 7, 2015) (dismissing UCL claim because claim for fraudulent concealment provided adequate legal remedy and complaint failed to plausibly allege otherwise); *Rhynes v. Stryker Corp.*, No. 10-cv-5619, 2011 WL 2149095, at *4 (N.D. Cal. May 31, 2011) ("Plaintiffs' argument that they will have no adequate remedy at law if their other claims fail is unavailing. Where the claims

pleaded by a plaintiff *may* entitle her to an adequate remedy at law, equitable relief is unavailable."). As a result, the Court should dismiss Plaintiffs' UCL claims.

## VI. THE COURT SHOULD DISMISS PLAINTIFFS' UNJUST ENRICHMENT CLAIMS

Indirect Plaintiffs' effort to assert an unjust enrichment claim—presumably based on the state laws they invoke in their complaints—fails for similar reasons, because unjust enrichment is also an equitable claim. *See* IRP ¶¶ 270–277; IPP ¶¶ 334–341.

*First*, as with the UCL claim, Plaintiffs do not even attempt to plead—as they must—that Altria received a benefit from Plaintiffs. The law of each of the states they invoke is clear on this requirement. *See Lyles v. Sangadeo-Patel*, 171 Cal. Rptr. 3d 34, 40 (Cal. Ct. App. 2014) ("The elements for a claim of unjust enrichment are receipt of a benefit and unjust retention of the benefit at the expense of another." (internal quotation marks omitted)); *Kopel v. Kopel*, 229 So. 3d 812, 818 (Fla. 2017) ("[T]o prevail on an unjust enrichment claim, the plaintiff must directly confer a benefit to the defendant."); *Metro. Life Ins. Co. v. Cotter*, 984 N.E.2d 835, 850 (Mass. 2013) ("A plaintiff asserting a claim for unjust enrichment must establish . . . that the defendant received a benefit."); *Meisner Law Grp. PC v. Weston Downs Condo. Ass'n*, 909 N.W.2d 890, 900 (Mich. 2017) ("The essential elements of an unjust enrichment claim are (1) receipt of a benefit by the defendant from the plaintiff, and (2) which benefit it is inequitable that the defendant retain." (internal quotation marks and alterations omitted)); *E.J. Brooks Co. v. Cambridge Sec. Seals*, 105 N.E.3d 301, 312 (N.Y. 2018) ("[T]o sustain an unjust enrichment claim, a plaintiff must show that . . . the other party was enriched." (internal quotation marks and alterations omitted)); *Olsen v. DeMayo*, 210 A.3d 431, 438 (R.I. 2019) ("In an action to recover for unjust enrichment, a plaintiff must prove . . . that he or she conferred a benefit upon the party from whom relief is sought." (internal quotation marks omitted)).[14]

*Second*, to the extent Plaintiffs are relying on the unjust-enrichment law of California,

_____

[14] Although Plaintiffs fail to plead that Defendants received a direct or indirect benefit from Plaintiffs, this Court has recognized that both Michigan and New York law require plaintiff to show that she conferred a *direct* benefit on the defendant. *Fenerjian v. Nongshim Co., Ltd*, 72 F. Supp. 3d 1058, 1088–1090 (N.D. Cal. 2014) (Orrick, J.) ("[T]he transactions and relationships between the indirect purchaser plaintiffs and the defendants are too attenuated to state an unjust enrichment claim" under Michigan and New York law).

THE ALTRIA DEFENDANTS'
MOTION TO DISMISS

Massachusetts, Michigan, or New York, an unjust enrichment claim cannot proceed when there is an adequate remedy at law.  *See Collins v. eMachines, Inc.*, 134 Cal. Rptr. 3d 588, 597 (2011) ("In light of the adequate legal remedies, we conclude the complaint does not state a claim for restitution based on unjust enrichment."); *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012) ("An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim."); *Tkachik v. Mandeville*, 790 N.W.2d 260, 265 (Mich. 2010) ("[L]egislative action that provides an adequate remedy by statute precludes equitable relief.");  *Samiento v. World Yacht Inc.*, 883 N.E.2d 990, 996 (N.Y. 2008) (holding that an unjust enrichment cause of action "does not lie as plaintiffs have an adequate remedy at law"); *Santagate v. Tower*, 833 N.E.2d 171, 176 (Mass. App. Ct. 2005) ("An equitable remedy for unjust enrichment is not available to a party with an adequate remedy at law."); *see also Rice-Sherman v. Big Heart Pet Brands, Inc.*, No. 19-CV-03613-WHO, 2020 WL 1245130, at *14 (N.D. Cal. Mar. 16, 2020) (dismissing unjust enrichment claim because it was "not a true alternative theory of relief but rather [was] duplicative of [the] legal causes of action").

Although Plaintiffs mechanically plead that they "have no remedy at law," IPP ¶ 341; IRP ¶ 277, this assertion is both unsubstantiated and belied by the multitude of causes of action that Plaintiffs assert on the preceding pages.  Those legal claims make clear that Plaintiffs have an adequate legal remedy. And the relief Plaintiffs seek in their unjust enrichment claims, IPP ¶ 21; IRP ¶ 21—specifically, damages—are theoretically available through  their numerous other legal claims.  *Collins*, 134 Cal. Rptr. 3d at 596–97; *see also Mullins v. Premier Nutrition Corp.*, No. 13-CV-01271, 2018 WL 510139, at *2 (N.D. Cal. Jan. 23, 2018) ("In the Ninth Circuit, the relevant test is whether an adequate damages remedy is available, not whether the plaintiff . . . will be successful in that pursuit.") (collecting cases).

## VII.    THE COURT SHOULD DISMISS THE COMPLAINT FILED BY PLAINTIFFS LARIMORE, MATSCHULLAT, AND MAY FOR FAILURE TO SERVE

The Court should dismiss any claims brought by Plaintiffs Daraka Larimore, Adam Matschullat, and Keith May—three of the seven named Plaintiffs in the Indirect Purchaser Complaint—for failure to serve Defendants.  Among other things, that requires dismissal of the Eighth Claim for Relief in the Indirect Purchaser complaint, for which Larimore and Matschullat are the only named plaintiffs, *see* IPP ¶¶ 28, 29, 30, 246–53, and their individual case, *see Larimore et al. v. Altria Group, Inc. et al*, 3:20-

cv-02999-WHO (filed Apr. 30, 2020).

Federal Rule of Civil Procedure 4(m) requires a plaintiff to serve a defendant "within 90 days after the complaint is filed." If the plaintiff fails to do so, the complaint is subject to dismissal unless "the plaintiff shows good cause for the failure." Fed. R. Civ. P. 4(m). Plaintiffs Larimore, Matschullat, and May filed their complaint on April 30, 2020. Class Action Complaint, *Larimore et al. v. Altria Group, Inc. et al*, 3:20-cv-0299-WHO, ECF No. 1 (Apr. 30, 2020). They have never effected service on Defendants. And there is no "good cause" excusing their failure. There is no plausible argument that Defendants, or some other third party, interfered with the service process. *See Wei v. State of Hawaii*, 763 F.2d 370, 372 (9th Cir. 1985) (finding no good cause where plaintiff did not contend, among other things, he "was prevented from effecting service within the [time] limit by factors beyond his control"). On the contrary, Defendants have highlighted, again and again, the failure to serve, such that there is no plausible argument Larimore, Matschullate, and May were not aware of the issue. *See, e.g.*, J. Rosenthal Declaration ISO Extending Deadline, ECF No. 137-1 (Nov. 17, 2020); Joint Stipulation and Proposed Pretrial Order No. 1, ECF No. 126 (Oct. 19, 2020); Joint Case Management Statement, ECF No. 122 (September 14, 2020); Joint Stipulation and Order, ECF No. 112 (Aug. 21, 2020); Joint Stipulation and Proposed, ECF No. 109 (Aug. 20, 2020); Altria Certificate of Interested Parties, ECF No. 96 (Aug. 5, 2020); Altria Corporate Disclosure Statement, ECF No. 95 (Aug. 5, 2020); Joint Case Management Statement, ECF No. 78 (July 10, 2020).

The filing of the consolidated complaint does not excuse Plaintiffs' failure to serve. As this Court made clear, the consolidation of the Antitrust Actions had no bearing on Plaintiffs' obligations to comply with Rule 4(m)'s service deadline. *See* Pretrial Order No. 1, ECF. No. 129, at 2 (Oct. 20, 2020) ("This coordination does not . . . have the effect of making any entity a party to any action in which he, she, or it has not been named, served, or added in accordance to the Federal Rules of Civil Procedure."). Further, Rule 4(m)'s deadline expires 90 days after the "filing of the first version of the complaint naming the particular defendant to be served"—not any amended or consolidated complaint. *Bolden v. City of Topeka*, 441 F.3d 1129, 1149 (10th Cir. 2006); *see Wei*, 763 F.2d at 372 ("[Plaintiff's] desire to amend his complaint before effecting service does not constitute good cause" because "he could have amended the original complaint after serving it upon the defendants."); *Villarreal v. Eldorando Resorts Corp.*, No.

2:14-cv-014150-APG-VCF, 2015 WL 2097009, at *1 (D. Nev. May 5, 2015) ("The 120-day time limit for service does not restart each time a plaintiff files a new amended complaint.").

Accordingly, Larimore, Marschullat, and May should be dismissed from the Indirect Purchaser Complaint. *See Boudette v. Barnette*, 923 F.2d 754, 758 (9th Cir. 1991) (affirming dismissal of action for failure to timely serve complaint); *Hart v. United States*, 817 F.2d 78, 81 (9th Cir. 1987) (same); *Dozier v. Enhanced Recovery Company*, No. 19-cv-01474-WHO, 2019 WL 5091157, at *1 (N.D. Cal. Aug. 5, 2019) (same).

## VII. THE COURT SHOULD DISMISS ALL OF THE CLAIMS FOR IMPROPER VENUE AND LACK OF PERSONAL JURISDICTION

### A. Venue Is Not Proper In The Northern District Of California

Under the Clayton Act's venue provision, venue is proper only in a district where the defendant is an "inhabitant," "transacts business," or may be "found." 15 U.S.C. § 22. Because Altria Group, Inc. and Altria Enterprises LLC are incorporated and headquartered in Virginia, and Plaintiffs do not allege that they "transact[] business" in California, the case should be dismissed for lack of venue.

Altria recognizes that this argument is currently foreclosed by current Ninth Circuit precedent. *See Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1177–80 (9th Cir. 2004) (citing *Go-Video, Inc. v. Akai Elec. Co., Ltd.*, 885 F.2d 1406 (9th Cir. 1989)). Altria is preserving this argument for appellate review, because the Second, Seventh, and D.C. Circuits—as well as the leading treatise—correctly disagree with the Ninth Circuit's analysis and would order dismissal in this case. *See GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000); *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 424 (2d Cir. 2005); *KM Enterprises, Inc. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 728 (7th Cir. 2013); Areeda ¶ 271d.

### B. The Court Does Not Have Personal Jurisdiction Over Altria With Respect To The Federal-Law Claims

The federal-law claims should be dismissed for lack of personal jurisdiction. This argument is foreclosed by the same Ninth Circuit precedent described above, *see Action Embroidery Corp.*, 368 F.3d 1174, 1177–80 (9th Cir. 2004), but it implicates the same split in authority described above, and thus Altria is preserving this argument for appellate review. In the Second, Seventh, and D.C. Circuits,

Plaintiffs could not rely on the Clayton Act's worldwide service-of-process provision, because Altria is not an "inhabitant" of California, does not "transact[] business" in California, and may not be "found" there. *See GTE New Media Servs. Inc.*, 199 F.3d at 1351; *Daniel*, 428 F.3d at 424; *KM Enterprises,* 725 F.3d at 728; Areeda ¶ 271d. Plaintiffs would need to establish personal jurisdiction over Altria based on ordinary personal jurisdiction principles, which they cannot do for the reasons given below.

### C. The Court Does Not Have Personal Jurisdiction Over Altria With Respect To The State-Law Claims

Even if the Court holds that it has personal jurisdiction over Altria with respect to the federal-law claims, it does not have personal jurisdiction over Altria with respect to the state-law claims. While the Ninth Circuit has in the past recognized the doctrine of pendent personal jurisdiction, *see, e.g.*, *Action Embroidery Corp.*, 368 F.3d at 1181, that doctrine has been implicitly overruled by the Supreme Court. *See Bristol-Myers Squibb Co. v. Superior Court of California*, 137 S. Ct. 1773, 1781 (2017) (requiring that plaintiffs establish personal jurisdiction for each "specific claim[]"). As a result, Plaintiffs must establish personal jurisdiction with respect to the state-law claims either by showing general personal jurisdiction or specific personal jurisdiction. *See Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008) ("In opposition to a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper."). Plaintiffs cannot do either.

There is no doubt that this Court lacks general jurisdiction over Altria. Altria Group, Inc. and Altria Enterprises LLP are "not incorporated in [California] and [do] not maintain [their] principal place of business there." *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1559 (2017). Nor are these entities "so heavily engaged in activity in [California] 'as to render [them] essentially at home' in that State." *Id*.

This Court also does not have specific personal jurisdiction over Altria, because "the suit" here did not "arise out of or relate to [Altria's] contacts with [California]." *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (internal quotation marks and alterations omitted). To determine "whether [a] claim arises out of" a defendant's contact with a certain state, the Ninth Circuit "use[s] a 'but for' test to conduct [the] analysis." *Mattel, Inc. v. Greiner & Hausser GmbH*, 354 F.3d 857, 864 (9th Cir. 2003). Specifically, the question is whether "[b]ut for [the defendant's] contacts with [the forum state], [the plaintiff's] claims against [the defendant would] have arisen." *Id*. Plaintiffs cannot pass that test here. As explained above,

THE ALTRIA DEFENDANTS'
MOTION TO DISMISS

Plaintiffs do not allege that Altria Group, Inc. or Altria Enterprises LLP do any business at all in California. Altria did not sell any JUUL product in California (or anywhere else). And the complaint does not allege that Altria engaged in any anticompetitive conduct in California. Indeed, according to the complaints, Altria's only contacts with California were a handful of meetings: a "negotiating session" in San Francisco in August 2018, DPP ¶ 79, IPP ¶ 86, 87, IRP ¶ 83, 84; a "due diligence" trip in San Francisco held in November 2018, DPP ¶ 87, 222, IPP ¶ 94, IRP ¶ 91; and "numerous meetings"—in undefined locations, at undefined times, concerning undefined topics—somewhere within "the State of California." IPP ¶ 222, IRP ¶ 219. There is no doubt that Plaintiffs would still be bringing the exact same claims against Altria even if those allegations were removed from the complaint. As a result, the Court does not have personal jurisdiction over Altria with respect to the state-law claims. *Mattel*, 354 F.3d at 864.[15]

## CONCLUSION

The Court should dismiss the complaint pursuant to Rule 12(b)(1) and Rule 12(b)(6).

---

[15] In the alternative, the exercise of pendent jurisdiction is always discretionary, *see United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966), and the Court should decline to exercise it here.

Dated: January 15, 2021

Respectfully submitted,

WILKINSON STEKLOFF LLP

By: */s/ Beth A. Wilkinson*

Beth A. Wilkinson (*pro hac vice*)
James M. Rosenthal (*pro hac vice*)
Rakesh N. Kilaru (*pro hac vice*)
J.J. Snidow (*pro hac vice*)
2001 M Street, N.W., 10th Floor
Washington, D.C. 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
jrosenthal@wilkinsonstekoff.com
rkilaru@wilkinsonstekoff.com
jsnidow@wilkinsonstekoff.com

Moira Penza (*pro hac vice*)
WILKINSON STEKLOFF LLP
130 West 42nd Street, 24th Floor
New York, New York 10036
Telephone: (212) 294-8910
Facsimile: (202) 847-4005
mpenza@wilkinsonstekloff.com

Rahul R.A. Hari (State Bar No. 313528)
WILKINSON STEKLOFF LLP
11601 Wilshire Boulevard, Suite 600
Los Angeles, CA 90025
Telephone: (424) 291-9655
Facsimile: (202) 847-4005
rhari@wilkinsonstekloff.com

*Attorneys for Defendant Altria Group, Inc. and Altria
Enterprises LLC*

**CERTIFICATE OF SERVICE**

I, Beth A. Wilkinson, hereby certify that on January 15, 2021, I electronically filed the foregoing with the Clerk of the United State District Court for the Northern District of California using the CM/ECF system, which shall send electronic notifications to all counsel of record. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories identified above has concurred in this filing.

By: */s/ Beth A. Wilkinson*

Beth A. Wilkinson (*pro hac vice*)
WILKINSON STEKLOFF LLP
2001 M Street, N.W., 10th Floor
Washington, D.C. 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com