1
2
3
4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6
7                                              Case No.  20-cv-02345-WHO

8        IN RE: JUUL LABS, INC., ANTITRUST

         LITIGATION                            **ORDER ON MOTION COMPEL AND**
9                                              **MOTIONS TO DISMISS**

10                                             Dkt. Nos: 207, 209, 210, 211

11

12              There are four motions currently pending before me: (1) defendant Juul Labs, Inc.'s

13     ("JLI") motion to compel arbitration or strike the class claims of the Direct Purchaser Plaintiffs

14     ("DPPs"), Dkt. No. 210; (2) JLI's motion to dismiss the consolidated class complaints of the

15     DPPs, the Indirect Purchaser Plaintiffs ("IPPs"), and the Indirect Reseller Plaintiffs ("IRPs"), Dkt.

16     No. 207; (3) defendants Altria Group, Inc. and Altria Enterprises, LLC's ("Altria") motion to

17     dismiss the consolidated class complaints of the DPPs, IPPs, and IRPs; and (4) defendants

18     Nicholas Pritzker and Riaz Valani's ("Director Defendants") motion to dismiss the DPP claims

19     asserted against them.  For the reasons discussed below, I GRANT JLI's motion to compel the

20     claims of the three named DPPs to arbitration, stay the dismissal of the DPPs' claims against JLI

21     for 30 days and give the DPPs leave to amend to substitute in a proposed plaintiff whose claims

22     against JLI would not be subject to arbitration.  On the remaining motions, I dismiss a limited set

23     of claims but otherwise deny the motions to dismiss.

24                                    **BACKGROUND**

25              Three sets of plaintiffs bring antitrust and related state law claims against Altria and JLI

26     challenging the allegedly unlawful and anticompetitive agreement Altria entered into with JLI.[1]

27     _____

28     [1] The DPPs also allege federal antitrust claims against two of JLI's Board of Directors, Nicholas
       Pritzker and Riaz Valani.

United States District Court
Northern District of California

The heart of plaintiffs' allegations, as those made by the Federal Trade Commission ("FTC") in proceedings against JLI and Altria, is that Altria intentionally departed from the e-cigarette market (despite actively competing with JLI in that market) and joined forces with JLI under a non-compete agreement in order to gain access to and control over JLI's market-leading product and technology. In return, JLI (and its major investors) received billions of dollars as well as access to Altria's extensive distribution network, retail opportunities, and regulatory expertise.

Altria is alleged to have started investigating investing in JLI in 2017. DPP Consolidated Class Action Complaint, Dkt. No. 134-3 ("DPP CAC") ¶¶ 61, 62; IPP Consolidated Class Action Complaint, Dkt. No. 131-4 ("IPP CAC") ¶ 13; IRP Consolidated Class Action Complaint, Dkt. No. 133-3 ("IRP CAC") ¶ 13.[2] Valani and Pritzker were crucial players on JLI's side of the negotiations that spanned much of 2018, intensifying in the summer of 2018 and culminating in an agreement signed on December 20, 2018 whereby Altria acquired a 35% stake in JUUL for $12.8 billion. DPP CAC ¶¶ 8, 70, 74, 86; IPP CAC ¶¶ 14, 16, 77, 82, 84.

Altria's MarkTen Elite product (produced by Altria subsidiary Nu Mark) was its closest competitor to JUUL, and it had committed $100 million dollars to secure prime shelf-space for that product earlier in 2018. DPP CAC ¶ 3, 18, 125, 145; IPP CAC ¶ 7, 135. Plaintiffs allege that a key component of the JLI-Altria deal was that Altria leave the e-vaping market; they say that the JLI-Altria negotiations had stalled in the summer of 2018 over Altria's refusal to commit to that non-compete. DPP CAC ¶¶ 79, 80, 82; IPP CAC ¶ 88. The negotiations were allegedly restarted by an October 5, 2018 email where Altria agreed "that it would not compete in a manner consistent with our previous discussions in the U.S. e-vapor market for any period" exclusive of the transaction period during which Altria would perform services for JLI. DPP CAC ¶¶ 7, 81; IPP CAC ¶¶ 3, 14, 88. Soon after that October 2018 commitment, Altria withdrew its MarkTen Elite product from the market. IPP CAC ¶¶ 7, 14.

The alleged antitrust agreement ("Agreement") is comprised of at least the October 2018

---

[2] The allegations in the IPP and IRP Consolidated Class Action Complaints are practically identical but numbered differently.

commitment, the formalized "Relationship Agreement" from December 2018, and the "Amended

Relationship Agreement" from January 2020.  DPP CAC ¶¶ 81, 92, 95, 96, 104; IPP CAC ¶ 3.

The Relationship Agreement's Non-Compete provision, Article 3.1 of the Agreement, reads:

> [Altria] shall not . . . directly or indirectly (1) own, manage, operate, control, engage in or assist others in engaging in, the e-Vapor business; (2) take actions with the purpose of preparing to engage in the e-Vapor Business, including through engaging in or sponsoring research and development activities; or (3) Beneficially Own any equity interest in any Person, other than an aggregate of not more than four and nine-tenths percent (4.9%) of the equity interests of any Person which is publicly listed on a national stock exchange, that engages directly or indirectly in the e-Vapor Business (other than (x) as a result of [Altria's] Beneficial Ownership of Shares or (y) engagement in, or sponsorship of, research and development activities not directed toward the e-Vapor Business and not undertaken with the purpose of developing or commercializing technology or products in the e-Vapor Business) . . . .

> Notwithstanding the foregoing, (x) the [Altria] and its Subsidiaries and controlled Affiliates may engage in the business relating to (I) its Green Smoke, MarkTen (or Solaris, which is the non-U.S. equivalent brand of MarkTen) and MarkTen Elite brands, in each case, as such business is presently conducted, subject to Section 4.1 of the Purchase Agreement, and (II) for a period of sixty (60) days commencing on the date of this Agreement, certain research and development activities pursuant to existing agreements with third parties that are in the process of being discontinued.

Article 3.2 further prohibited competition on an indirect basis with respect to any upstream

affiliates of Altria.  IPP CAC ¶¶ 103-104; DPP CAC ¶ 95.

Altria described the scope of its Relationship Agreement with JLI in its Form 8-K, as

follows:

> The Relationship Agreement generally prohibits Altria from competing, or otherwise acquiring an interest in an entity competing, in the e-vapor business for a period of at least six years from Closing [of the Transaction], extendable thereafter unless terminated by Altria. If another person were to acquire 40% or more of Altria's voting power, or 30% of Altria's voting power combined with contractual control of a majority of Altria's board of directors, that person would also be subject to certain non-compete obligations set forth in the Relationship Agreement.

IPP CAC ¶ 16.  Plaintiffs allege that these "provisions remained in effect in the Amended

Relationship Agreement" entered into by Altria and JLI in January 2020.

On April 1, 2020, the FTC filed an administrative complaint ("FTC Complaint")

3

United States District Court
Northern District of California

challenging the lawfulness of both the agreements and the acquisition under Section 5 of the FTC

Act (15 U.S.C. § 45), alleging that Altria and JLI's conduct violated Section 1 of the Sherman Act

and Section 7 of the Clayton Act.  *Federal Trade Comm'n v. Altria Group, Inc., et al.*, Dkt. No.

9393 (F.T.C. April 1, 2020).  The FTC contends that the defendants' conduct was anticompetitive

under the rule of reason analysis but does not allege a *per se* restraint, which all three sets of

plaintiffs allege here.  DPP CAC ¶ 166; IPP CAC ¶ 109; IRP CAC ¶ 106.

Plaintiffs assert in three consolidated class complaints that the Agreements illegally

restrained competition in the relevant market in violation of federal and state antitrust laws, unfair

competition, and consumer protection laws.  IPP CAC ¶¶ 19, 20; DPP ¶¶ 102, 106, 108.  The three

Direct Purchaser Plaintiffs are Anthony Martinez (a resident of the State of New York), Jessica

McGee (a resident of the State of Minnesota), and Mallory Flannery (a resident of the State of

Iowa).  All allege that they purchased "Closed-System E-Vapor products, including devices and

pods, directly from JLI during the relevant period."  DPP CAC ¶¶ 13-15.  No other details are

provided regarding the dates or timeframes of their purchases.  The DPPs allege three claims

against three sets of defendants – JLI, Altria, and the Directors Valani and Pritzker – and seek

damages and equitable relief for:  (1) Restraint of Trade in Violation of Section 1 of the Sherman

Act, 15 U.S.C. § 1 (against all defendants); (2) Restraint of Trade in Violation of Section 7 of the

Clayton Act, 15 U.S.C. § 18 (against all defendants); and (3) Declaratory and Injunctive Relief for

Violations of Section 1 of the Sherman Act and Section 7 of the Clayton Act, 15 U.S.C. § 26

(against all defendants).[3]

The Indirect Purchaser Plaintiffs are Kurt Doughty (a resident of Rhode Island), Allison

Harrod (a resident of Florida), Daraka Larimore (a resident of Santa Barbara County, California),

Adam Matschullat (a resident of San Diego County, California), Keith May (a resident of Florida),

Dylan Pang (a resident of New York), and Kerry Walsh (a resident of Massachusetts).  IPP CAC

¶¶ 26-32.  All allege generally that they "purchased JUUL Closed-System E-Cigarettes indirectly

---

[3] Ten additional individual defendants were named in the DPP CAC, but they were dismissed by
stipulation on January 15, 2021.  Dkt. Nos. 197-206.

United States District Court
Northern District of California

from various retail locations during the Class Period." *Id.*  The IPPs assert sixteen claims against defendants JLI and Altria:  (1) Violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3 (on behalf of the Nationwide Class for Injunctive Relief); (2) Violation of Section 2 of the Sherman Act - Monopolization, 15 U.S.C. § 2 (against JLI, on behalf of the Nationwide Class for Injunctive Relief); (3) Violation of Section 2 of the Sherman Act – Attempted Monopolization, 15 U.S.C. § 2 (against JLI, on behalf of the Nationwide Class for Injunctive Relief); (4) Violation of Section 2 of the Sherman Act – Conspiracy to Monopolize, 15 U.S.C. § 2 (on behalf of the Nationwide Class for Injunctive Relief); (5) Violation of Section 7 of the Clayton Act, 15 U.S.C. § 18 (on behalf of the Nationwide Class for Injunctive Relief); (6) Violation of California's Cartwright Act, Cal. Bus. & Prof. Code § 16700, *et seq.* (on behalf of the Nationwide Class for Damages); (7) Violation of California's Cartwright Act, Cal. Bus. & Prof. Code § 16700, *et seq.* (on behalf of the Cartwright Act Class for Damages); (8) Violation of California's Cartwright Act, Cal. Bus. & Prof. Code § 16700, *et seq.* (by plaintiffs Daraka Larimore and Adam Matschullat on behalf of the California Class for Damages); (9) Violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* (the "UCL") (on behalf of the Nationwide Class for Damages); (10) Violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* (by plaintiffs Daraka Larimore and Adam Matschullat on behalf of the California Class for Damages); (11) Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201(2), *et seq.* (by plaintiffs Allison Harrod and Keith May on behalf of the Florida Class for Damages); (12) Violation of Mass. Gen. Laws ch. 93A § 1, *et seq.* (by plaintiff Kerry Walsh on behalf of the Massachusetts Class for Damages); (13) Violation of Section 340 of New York General Business Law (by plaintiff Dylan Pang on behalf of the New York Class for Damages); (14) Violation of the Rhode Island Antitrust Act R.I. Gen. Laws § 6-36-1, *et seq.* (by plaintiff Kurt Doughty on behalf of the Rhode Island Class for Damages); (15) Violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws § 6-13-1.1-1, *et seq.* (by plaintiff Kurt Doughty on behalf of the Rhode Island Class for Damages); and (16) Unjust Enrichment (by plaintiffs on behalf of each State Class for Damages).

The Indirect Reseller Plaintiffs Sofijon, Inc. ("Sofijon"), Rose And Fifth, Inc. ("RFI"),

Napht, Inc. ("Napht"), B&C Retail, Inc. ("B&C"), and Irwindale Fuel Station, Inc. ("Irwindale Fuel Station") are business headquartered in California.  IRP Big Puffs Vapor Store ("Big Puffs"), is headquartered in Jamestown, New York, IRP Somerset Party Store Inc. ("Somerset Party Store") is a Michigan corporation, and IRP Noor Baig, Inc. ("Noor Baig") is a Florida corporation. The IRPs allege generally that they "purchased JLI's closed-system e-cigarette products indirectly, for resale, during the Class Period, October 25, 2018 through the date on which Defendants' anticompetitive conduct ceases."  IRP CAC ¶¶ 23-30.  The IRPs assert eleven claims against defendants JLI and Altria for: (1) Violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3 (on behalf of the Nationwide Class for Injunctive Relief); (2) Violation of Section 2 of the Sherman Act - Monopolization, 15 U.S.C. § 2 (against JLI, on behalf of the Nationwide Class for Injunctive Relief); (3) Violation of Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2) (Attempted Monopolization Against JLI on behalf of the Nationwide Class for Injunctive Relief); (4) Violation of Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2) (Conspiracy to Monopolize) (on behalf of the Nationwide Class for Injunctive Relief); (5) Violation of Section 7 of the Clayton Act (15 U.S.C. § 18); (6) Violation of California Antitrust Statutes (on behalf of the Nationwide Class, on behalf of the Cartwright Act Class and by plaintiffs Sofijon, Rose And Fifth, Inc., B&C, Napht, Irwindale Fuel Station on behalf of the California State Class for Damages); (7) Violation of California's Unfair Competition Law, Cal. Bus.& Prof. Code § 17200, *et seq*. (on behalf of the Nationwide Class and by plaintiffs Sofijon, Rose And Fifth, Inc., B&C, Napht, Irwindale Fuel Station on behalf of California State Class); (8) Violation of the Florida Deceptive and Unfair Trade Practices Act (by Noor Baig on behalf of the Florida Class); (9) Violation of the Michigan Antitrust Reform Act (Mich. Comp. Laws § 445.771, *et seq*.) (by Somerset Party Store on behalf of the Michigan Class); (10) Violation of Section 340 of New York General Business Law (by Big Puff on behalf of the New York Class); and (11) Unjust Enrichment (on behalf of each State Class for Damages).

Defendants move to dismiss the class claims asserted by the IPPs, the IRPs, and the DPPs. Dkt. Nos. 207 ("Altria MTD"), 209 ("Director MTD"), 211 ("JLI MTD").  JLI also moves to compel to arbitration or strike the class claims asserted by the DPPs due to the arbitration

1   provision and class action waiver contained in JLI's terms and conditions displayed on JLI's

2   website.  Dkt. No. 210 ("MTC").

3                                              **DISCUSSION**

4   **I.    JLI'S MOTION TO COMPEL ARBITRATION OR STRIKE DPP CLASS ALLEGATIONS**

5         JLI moves to compel arbitration and in the alternative to strike the class claims of plaintiffs

6   Martinez, McGee, and Flannery.  When those plaintiffs created their accounts, the JLI website

7   through which they made their direct purchases required them to agree to arbitration and to waive

8   their right to pursue class claims.  I agree that the plaintiffs gave constructive assent to these

9   provisions through the hyperlinked Terms and Conditions to which they agreed.

10        **A.    Background**

11        JLI asserts that during the timeframe each of the three DPPs created their JLI accounts on

12  www.juul.com to purchase JLI's products – between August 2018 and July 2019 – the DPPs were

13  required to affirmatively check a box ("clickbox") on each version of the "Log In/Sign Up" page

14  they were presented, establishing their assent to the hyperlinked Terms and Conditions that

15  governed the terms of plaintiffs' access to and use of the site and their agreement to arbitrate

16  claims and waive a right to pursue a class action.  *See* Declaration of Eadon Jacobs (Jacobs Decl.,

17  Dkt. No. 210-1), Exs. 4-8 (screen shots of Log In/Sign Up pages from August 2018 and February

18  2019, the "Create Your Account" page on July 19, 2019, the "Welcome Back" screen from July

19  31, 2019, and the Log In/Sign Up page from July 2019); Exs. 10-12 (JLI's website Terms and

20  Conditions as they existed: (i) between June 29, 2017 and July 17, 2019; (ii) between July 17,

21  2019 and November 26, 2019, and (iii) from January 13, 2020 to date).[4]  JLI's Senior Director of

22  Product, Identity Verification & Ecommerce, Eadon Jacobs, states that "[s]ince at least August

23  2018," the clickbox was added and made it impossible for a user to create an account and use the

24

25  _____

26  [4] JLI declares that: (i) Martinez created his account on August 26, 2018 and made purchases
    through March 13, 2020; (ii) Flannery created her account on February 26, 2019 and made a
    purchase only on that date; and (iii) McGee created her account on July 19, 2019 and made a

27  purchase only on that date. Declaration of Eadon Jacobs in Support of Motion to Compel
    Arbitration or Strike Class Allegations (Jacobs Decl., Dkt. No. 210-1) ¶ 3 & Exs. 1-3.  Plaintiffs

28  do not contest those dates.

United States District Court
Northern District of California

website unless they affirmatively checked their agreement to the Terms and Conditions and

Privacy Policy.  Jacobs Decl. ¶ 4.  In his second declaration, submitted with JLI's reply, Jacobs

provides a more specific date based on his efforts to confirm that as of August 9, 2018, before the

date Martinez created his account on August 26, 2018, the clickbox requirement was in place.

Declaration of Eadon Jacobs in Support of Reply (Jacobs Reply Decl., Dkt. No. 236-1), ¶¶ 3-6.

JLI shows that access to the Terms and Conditions was readily available during account

creation.  The required clickbox was followed by this language: "By registering with JUUL Labs,

Inc. you agree to our Terms and Conditions and Privacy Policy."  Jacobs Decl., Exs. 4-6.[5]  By

clicking on the underlined terms, the individual would be taken to the Terms and Conditions or

Privacy Policy.  JLI notes that on July 31, 2019, when Martinez signed in to make a purchase, he

would have seen either the "Log In/Sign Up" screen or the "Welcome Back" screen where the Log

In/Sign Up screen also required the user to "check" the disclosure box, but the Welcome Back

screen simply reminded users that by registering they agree to the hyperlinked Terms and

Conditions.  Jacobs Ex. 7 & ¶ 7. When Martinez logged back in on February 27, 2020, he would

have seen a "Welcome Back" sign in page that did not require a clickbox to proceed but disclosed,

"By proceeding, you agree to our **Terms and Conditions** and **Privacy Policy**."  Jacobs Decl., Ex.

9.

While the Terms and Conditions varied over time, JLI declares that the arbitration and

class action wavier provisions at issue here remained constant.  Prior to 2020, the provisions

provided:

> GOVERNING  LAW,  VENUE,  AND  CLASS  ACTION  /JURY
> TRIAL WAIVER
>
> [* * *]
>
> Arbitration. Read this section carefully because it requires the parties
> to arbitrate their disputes and limits the manner in which you can seek
> relief from JUUL Labs. For any dispute with JUUL Labs, you agree
> to first contact us via email and attempt to resolve the dispute with us

[5] In each of the account creation pages presented to the three named plaintiffs, the "clickbox" disclosure sentence had the specific and hyperlinked words "Terms and Conditions" and "Privacy Policy" either underlined or presented in a different color font from the other words in the disclosure sentence.

United States District Court
Northern District of California

1
2
3
4
5
6

> informally. In the unlikely event that JUUL Labs has not been able to resolve a dispute it has with you after sixty (60) days, we each agree to resolve any claim, dispute, or controversy (excluding any claims for injunctive or other equitable relief as provided below) arising out of or in connection with or relating to these Terms, or the breach or alleged breach thereof (collectively, "Claims"), by binding arbitration by JAMS, under the Optional Expedited Arbitration Procedures then in effect for JAMS . . . . Nothing in this Section shall be deemed as preventing JUUL Labs from seeking injunctive or other equitable relief from the courts as necessary to prevent the actual or threatened infringement, misappropriation, or violation of our data security, Intellectual Property Rights or other proprietary rights.

7
8
9
10
11
12
13

> Class Action/Jury Trial Waiver. With respect to all persons and entities, regardless of whether they have obtained or used the Website or JUUL Labs Products or services for personal, commercial or other purposes, all claims must be brought in the parties' individual capacity, and not as a plaintiff or class member in any purported class action, collective action, private attorney general action or other representative proceeding. This waiver applies to class arbitration, and, unless we agree otherwise, the arbitrator may not consolidate more than one person's claims. You agree that, by entering into this agreement, you and JUUL Labs are each waiving the right to a trial by jury or to participate in a class action, collective action, private attorney general action, or other representative proceeding of any kind.

14   *Id.* These Terms and Conditions were governed by California law.  When Martinez accessed his

15   account in February and March 2020, the provisions expressly included that covered claims

16   included those related to the  "purchase or use of JUUL Products" and changed governing law to

17   Delaware.  Jacobs Decl., Ex. 12.

18          In all of the versions of the Terms and Conditions, the arbitration agreement and class

19   action waiver provisions were emphasized in a notice at the top of the page:

20   > GENERAL STATEMENT / WEBSITE TERM OF USE:

21
22
23
24

> JUUL Labs has adopted these Terms of Service to inform you of your rights and obligations when using the Website and/or when purchasing any JUUL Labs products or goods . . . . Your use of this Website, and/or your purchase of any Products constitutes your agreement to the following Terms of Service. If you do not agree to these Terms of Service you may not use the Website or purchase our Products from the websites.

25
26
27
28

> JUUL Labs may, and reserves the right, to from time to time modify, limit, change, discontinue, or replace the website and these Terms of Service at any time. In the event JUUL Labs modifies, limits, changes, or replaces the website or these Terms of Service, your continued use thereafter constitutes your agreement to such modification, limitation, change, or replacement.

> It is your responsibility to review these Terms of Service on a regular basis to keep yourself informed of any modifications, limitations, changes, or replacements.
>
> * * *
>
> Please read these Terms of Service carefully to ensure that you understand each provision. These Terms contain a mandatory individual arbitration and class action/jury trial waiver provision that requires the use of arbitration on an individual basis to resolve disputes, rather than jury trials or class actions.

*Id.*, Ex. 10; *see also id.*, Exs. 11-12 (materially identical).

Plaintiffs each state in declarations in support of their Opposition to the Motion to Compel that they do not recall seeing any disclosure of JLI's Terms and Conditions or that they saw a hyperlink to the Terms and Conditions on the JLI website when they created their accounts, and that they do not recall clicking or checking a box next to any disclosure of the Terms and Conditions. Declaration of Plaintiff Anthony Martinez (Martinez Decl., Dkt. No. 229-115) ¶ 4; Declaration of Plaintiff Mallory Flannery (Flannery Decl., Dkt. No. 229-16) ¶ 4; Declaration of Plaintiff Jessica McGee (McGee Decl., Dkt. No. 229-17) ¶ 4. They likewise declare that they "do not believe that [they] agreed to arbitration or to waive [their] right to proceed with a class action" and they "did not read or understand the Terms and Conditions." Martinez Decl. ¶ 8; Flannery Decl. ¶ 6; McGee Decl. ¶ 7.

In a prior related case, I addressed the enforceability of JLI's arbitration agreement as of August 2018. *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728 (N.D. Cal. 2019). Considering an "early sign-up" screen that did not have a mandatory "clickwrap" clickbox and where the Terms and Condition disclosure below the "sign up button" was not presented in "a different color, underlined, italicized, or in any way visually distinct from the surrounding text," I concluded that the Terms and Conditions disclosure was "not conspicuous enough to put" plaintiffs on notice. *Id.* at 764-65. Addressing the "later sign-up" page, I concluded that the addition of putting the hyperlinks in a different color was "without more" still not enough. *Id.* at 765–66 (distinguishing JLI's cases finding sufficient disclosure where hyperlinked terms were "underlined, highlighted, in all caps, or in a box," and noting that on the JLI later sign-in page the hyperlink to the password recovery page was displayed much differently, having been bolded, underlined, and in a larger

font size than" the Terms and Conditions hyperlink).   The facts here are different.

**B.     Legal Standard**

"The FAA, 9 U.S.C. § 1 et seq., requires federal district courts to stay judicial proceedings and compel arbitration of claims covered by a written and enforceable arbitration agreement. [] The FAA limits the district court's role to determining whether a valid arbitration agreement exists, and whether the agreement encompasses the disputes at issue." *Nguyen v. Barnes & Noble Inc*., 763 F.3d 1171, 1175 (9th Cir. 2014).  To determine whether a valid arbitration agreement exists, federal courts apply ordinary state law governing the formation of contracts, and federal courts sitting in diversity "look to the law of the forum state" when making choice of law determinations.  *Id*.

The internet has "not fundamentally changed the requirement that mutual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." *Id*., 763 F.3d  at 1175; *see also Long v. Provide Commerce, Inc*., 245 Cal.App.4th 855, 862 (2016) (relying on *Nguyen* and describing this as a "pure question of law").  Mutual assent does not require that the consumer  have actual notice of the terms of an arbitration agreement.  *Id*. at 863.  Instead, a consumer is bound by an arbitration clause if "a reasonably prudent Internet consumer" would be put on "inquiry notice" of the "agreement's existence and contents." *Id*.

"Contracts formed on the Internet come primarily in two flavors: 'clickwrap' (or 'click-through') agreements, in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use; and 'browsewrap' agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen." *Nguyen*, 763 F.3d at 1175–76.  As the *Nguyen* court explained, unlike a clickwrap agreement, a browsewrap agreement does not require the user to manifest assent to the terms and conditions expressly and a party may give "assent" simply by using the website.  *Id*. (citations omitted).  Therefore, a "defining feature" of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing it exists.  *Id* at 1176 (citing *Be In, Inc. v. Google Inc*., No. 12–CV–03373–LHK, 2013 WL 5568706, at *6 (N.D. Cal. Oct. 9, 2013)).  In those pure browsewrap cases,

United States District Court
Northern District of California

1  the enforceability of the contract depends on whether "the user has actual or constructive

2  knowledge of a website's terms and conditions." *Id.* (citation omitted).

3      "Whether a user has inquiry notice of a browsewrap agreement, in turn, depends on the

4  design and content of the website and the agreement's webpage. []  Where the link to a website's

5  terms of use is buried at the bottom of the page or tucked away in obscure corners of the website

6  where users are unlikely to see it, courts have refused to enforce the browsewrap agreement." *Id.*

7  at 1177 (citations omitted).  However, courts have "been more willing to find the requisite notice

8  for constructive assent where the browsewrap agreement resembles a clickwrap agreement—that

9  is, where the user is required to affirmatively acknowledge the agreement before proceeding with

10  use of the website." *Id.*  at 1176.  This type of agreement has been characterized as a third

11  category, as a "sign-in wrap" agreement and is regarded as a "blend" or "hybrid" of the two.  *Snow*

12  *v. Eventbrite, Inc.*, 3:20-CV-03698-WHO, 2020 WL 6135990, at *4 (N.D. Cal. Oct. 19, 2020);

13  *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 763 (N.D. Cal. 2019); *see also Meyer v. Uber*

14  *Techs., Inc.*, 868 F.3d 66, 75–76 (2d Cir. 2017) (collecting cases analyzing sign-in wrap

15  agreements).

16      Sign-in wrap agreements occur when "a website notifies the user of the existence of the

17  website's terms of use and, instead of providing an 'I agree' button, advises the user that he or she

18  is agreeing to the terms of service when registering or signing up." *Peter v. DoorDash, Inc.*, 445 F.

19  Supp. 3d 580, 585 (N.D. Cal. 2020) (internal quotation marks and alterations omitted); *see also*

20  *Zaltz v. JDATE*, 952 F. Supp. 2d 439, 451 (E.D.N.Y. 2013) (enforcing agreement where "in order

21  to have obtained a JDate.com account, and in order to have maintained that account through

22  various billing cycles, plaintiff clicked the box confirming that she had both read and agreed to the

23  website's Terms and Conditions of Service (which included the California forum selection clause),

24  even though she does not recall the specific terms at this time."); *Fteja v. Facebook, Inc.*, 841 F.

25  Supp. 2d 829, 838-39, 841 (S.D.N.Y. 2012) ("the Court concludes that Fteja assented to the Terms

26  of Use and therefore to the forum selection clause therein" although the system did not "contain

27  any mechanism that forces the user to actually examine the terms before assenting").

28      Each of the plaintiffs here accessed JLI's website through this third, sign-in wrap type of

1   agreement.[6]

2   **C.   Enforceability**

3   **1.   *Colgate* Decision, Estoppel, and Evidence of Sign-In Process**

4   Plaintiffs contend that in light of my determination in the *Colgate* case, JLI is estopped

5   from enforcing the arbitration provision against plaintiffs that created an account at least before

6   August 4, 2018 using the same Log In pages I determined were unenforceable in *Colgate*.  I agree.

7   However, JLI has presented evidence that by the time each of the DPPs created their accounts on

8   JLI's website, the design had been modified to include the clickbox.  Jacobs Reply Decl. ¶¶ 5-8.

9   Absent a direct purchaser class representative who created an account on or before August 4,

10  2018, I need not address the impact of the pre-August 9, 2018 account creation page.

11  Plaintiffs' attack on the sufficiency of the evidence regarding the different screen shots of

12  the Log In/Sign Up pages proffered by JLI as existing on the dates each named plaintiff created

13  their account (August 26, 2018 [Martinez], February 26, 2019 [Flannery], July 19, 2019

14  [McGee]), is unpersuasive.  At a minimum, the Jacobs Reply Declaration explaining how he

15  ascertained the presence of the affirmative clickbox on each of those dates is sufficient.  Jacobs

16  Reply Decl. ¶¶ 5-8.  While plaintiffs note that they were unable to pull from the Wayback

17  Machine screen shots from JLI's Log In/Sign Up pages on each of the specific dates each plaintiff

18  created their account, they and defendants have identified screen shots from immediately around

19  those dates.  While there could be some differences (other than noted below) between how the text

20  immediately adjacent to the affirmative clickbox appeared, plaintiffs have not identified Wayback

21  Machine screen shots from the relative time periods showing anything materially different from

22  the screen shots proffered by JLI on this motion.

23  JLI's evidence, as supplemented by Jacobs' Reply Declaration, is not like the evidence I

24  found insufficient in *Snow v. Eventbrite, Inc.*, 3:20-CV-03698-WHO, 2020 WL 6135990, at *5

25  (N.D. Cal. Oct. 19, 2020).  There, the defendant's approach to its motion to compel was to

26  "include one image of the sign-in wrap agreement as it existed in January 2016 and one as it exists

27  _____

28  [6] Plaintiffs do not dispute that the class action waiver provision rises and falls with the
    enforceability of the arbitration provision.

today." *Id.* at *5. Defendant merely stated that its images were "exemplary" of how the messages appeared from 2016 to the present and that their layout was "substantially identical" (a representation that later proved to be untrue). *Id.* The major problem I identified was that defendant did not "state the date when the website first adopted its present appearance" and did not say (with exceptions) which images "each plaintiff would have encountered on the date of his or her use of the platform," or look to the underlying code it used. *Id.* Here, that information is provided by the Jacobs' declarations and the appearance of the three relevant Log In/Sign Up pages supported by the Wayback Machine searches performed by plaintiffs.

### 2.    Enforceability

JLI does not dispute each DPPs' testimony that she or he did not have actual knowledge of the Terms and Conditions, much less the included arbitration and class action waiver provisions.[7] Actual knowledge, however, is not determinative. The relevant question is whether the addition of the affirmative assent clickbox in combination with the placement and design of the following disclosure containing the hyperlinks to the Terms and Conditions (and Privacy Policy) were sufficient to establish objective constructive assent.

JLI argues that by requiring the affirmative assent to the clickbox with the Term and Conditions hyperlinked in text immediately following the box, it used a "clickwrap-like" agreement, also known as a sign-in wrap agreement. It points to numerous cases enforcing similar sign-in wrap agreements where the hyperlinked Terms and Conditions are sufficiently disclosed. *See, e.g.*, *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1165-66 (N.D. Cal. 2016) (recognizing "our Circuit has recognized that the closer digital agreements are to the clickwrap end of the spectrum, the more often they have been upheld as valid and enforceable"

---

[7] The declarations of Flannery and McGee – who both created their accounts on their iPhone – that they do not recall whether the "disclosure was hidden under her keyboard as she typed her email address and password on her iPhone" is irrelevant where each had to affirmatively check the box next to the disclosure before creating the accounts. *Compare* Jacobs Reply Decl. ¶¶ 5-8. *with* Flannery Decl. ¶ 4; McGee Decl. ¶ 4. That they did not recall doing so or seeing any disclosure regarding Terms and Conditions is irrelevant as long as defendant has sufficient evidence that the disclosures were in fact available. *Lee v. Ticketmaster L.L.C.*, 817 Fed. Appx. 393, 395 (9th Cir. 2020) (unpublished) (noting plaintiffs cannot avoid the terms of online contract on the grounds they "failed to read it before signing," where they had a "legitimate opportunity to review it." (internal quotations and citations omitted)).

and enforcing process that "fell toward the browsewrap end of the spectrum" where "terms of use were available via a hyperlink to a different page and not presented immediately to plaintiffs for review" but contained "a typical clickwrap feature" requiring plaintiffs to "click a box separately affirming that they had read and agreed to the Terms of Use," and where "these boxes were separate from, and in addition to, the "Register Now!" or "Sign Up" button that needed to be pressed to complete the entire process."); *Holl v. United Parcel Serv., Inc.*, No. 16-CV-05856, 2017 WL 11520143, at *5 (N.D. Cal. Sept. 18, 2017) (compelling arbitration where enrollment "requires clicking a checkbox" to assent to terms including an arbitration agreement); *La Force v. GoSmith, Inc.*, 17-CV-05101-YGR, 2017 WL 9938681, at *4 (N.D. Cal. Dec. 12, 2017) (enforcing arbitration agreement where webpage "used to register contained a check box for indicating agreement to the Terms of Use"); *see also Snow v. Eventbrite, Inc.*, 3:20-CV-03698-WHO, 2020 WL 6135990, at *7 (N.D. Cal. Oct. 19, 2020) (finding adequate disclosure of arbitration agreement where "the 'I accept the terms of service' is directly above that Pay Now button, meaning that Snow had to scroll past it to press the button. It was also positioned close to the button. The words 'terms of service' appear as a hyperlink to the TOS itself.  That hyperlink is blue, while the text around it is gray. There is nothing about the text that would make it inconspicuous or non-obvious. As courts have held with respect to similar messages, a reasonably prudent user would be placed on inquiry notice by this particular sign-in wrap agreement.").

JLI also relies on a series of cases where arbitration provisions in terms and conditions were enforced absent a clickbox denoting agreement to the term conditions, where the hyperlinked text was conspicuous, appeared in close proximity to "sign up" buttons, and consumers were warned that by proceeding to use the website, the user was agreeing to those hyperlinked terms and conditions.  *See, e.g., Dohrmann v. Intuit, Inc.*, 823 Fed. Appx. 482, 484 (9th Cir. 2020) (unpublished) (finding sufficient a "browsewrap" agreement that did not have a separate clickbox to agree to terms and conditions, but instead contained a disclosure below the sign in button warning users that by "clicking sign in" they were agreeing to terms of use where the "relevant warning language and hyperlink to the Terms of Use were conspicuous – they were the only text on the webpage in italics, were located directly below the sign-in button, and the sign-in page was

relatively uncluttered."); *Lee v. Ticketmaster L.L.C.*, 817 Fed. Appx. 393, 394-95 (9th Cir. 2020) (unpublished) ("Although the Terms do not constitute a true pure-form clickwrap agreement as California courts have construed it (because Ticketmaster does not require users to click a separate box indicating that they agree to its Terms), Ticketmaster's website provided sufficient notice for constructive assent" where each time plaintiff clicked the "Sign In" and "Place Order" buttons plaintiff was conspicuously warned by proceeding he agreed to the Terms of Use that was displayed in blue font and contained a hyperlink to the terms); *Allen v. Shutterfly, Inc.*, 20-CV-02448-BLF, 2020 WL 5517172, at *3 (N.D. Cal. Sept. 14, 2020) (enforcing where customers were provided with a link to the "Terms and Conditions" above the "Submit Payment" button at checkout and the disclosure acknowledged that "by clicking 'Submit Payment' [the purchaser] agree[s] to the Privacy Statement and Terms of Service[.]"); *Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580, 582 (N.D. Cal. 2020) (JST) ("To complete the process and place an order, they clicked a 'Sign Up' button below this information. [] Directly below that button was a statement reading: 'By tapping Sign Up, Continue with Facebook, or Continue with Google, you agree to our Terms and Conditions and Privacy Statement.' [] The words "Terms and Conditions" appeared in blue text and were hyperlinked to the DoorDash Terms and Conditions in effect at the time. . . ."); *see also Meyer v. Uber Techs., Inc*., 868 F.3d 66, 78 (2d Cir. 2017) ("[W]e conclude that the design of the screen and language used render the notice provided reasonable as a matter of California law. The Payment Screen is uncluttered, with only fields for the user to enter his or her credit card details, buttons to register for a user account or to connect the user's pre-existing PayPal account or Google Wallet to the Uber account, and the warning that 'By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY,'" where hyperlinked Terms and Conditions and Privacy Policy were directly below the buttons for registration in blue and underlined).

Plaintiffs attempt to distinguish both of these lines of cases by pointing out – as I noted in *Colgate* – that the hyperlinks for the Terms and Conditions and Privacy Policy in the post-August 9, 2018 Log In/Sign Up pages were not highlighted in a different text color or set apart from other text on the page, and were instead presented as black or dark grey text in a gray box.  That is true

16

United States District Court
Northern District of California

only for the Log In/Sign Up pages from February 2019.  Jacobs Decl., Ex. 5.  But "Terms and Conditions" is now underlined immediately following the clickbox and presented on a relatively uncluttered page.  Plaintiffs also point out that the "Forgot Password" hyperlink on each version of the "Sign-In" screens was more prominently displayed and more significantly highlighted than the Terms and Conditions and Privacy Policy hyperlinks because it was bolded.  On each of the Log In/Sign Up pages at issue, the required "Sign Up" button is right beneath the affirmative clickbox with the obviously hyperlinked Terms and Conditions.  The way the Terms and Conditions were displayed on the Log In/Sign Up pages used by the three DPPs do not create a material difference between this motion and the motion in *Colgate*.

However, the addition of the affirmative assent clickbox, drawing attention to the text *immediately* following that contains the somewhat highlighted hyperlinked Terms and Conditions links, does change the analysis.  Other factors also support a finding of constructive assent. Each of the Log In/Sign Up pages was relatively clear and uncluttered.  As of and after August 9, 2018, the Terms and Conditions and Privacy Policy hyperlinks *were* in a different shade of text and in a different font-style.[8]  And by 2019, the hyperlinks following the clickbox were underlined and for part of that period also italicized.[9]

Plaintiffs' cases are not persuasive given the structure of the account creation pages each DPP used here.  In *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 57 (1st Cir. 2018), the court noted that, unlike here, "Uber chose not to use a common method of conspicuously informing users of the existence and location of terms and conditions: requiring users to click a box stating that they agree to a set of terms, often provided by hyperlink, before continuing to the next screen.  Instead,

---

[8] As noted in *Colgate*, use of a slightly different shade of text was the only way a consumer may know she or he was agreeing to hyperlinked Terms and Conditions, and that alone was insufficient. *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 765 (N.D. Cal. 2019).  In the later iterations of the Log In/Sign Up pages, however, the clickbox expressly drawing the user's attention and mandating affirmative attention *plus* the different colored, underlined and/or italicized text leads to a different conclusion.

[9] I need not separately address the "Welcome Back" screen that plaintiff Martinez may have seen following the creation of his account (where those Welcome Back screens do not require a customer who already has an account to affirmatively check again their agreement to the Terms and Conditions).

1     Uber chose to rely on simply displaying a notice of deemed acquiescence and a link to the terms."

2     *Id*. 893 F.3d at 62.  The court was concerned that the terms to which users were agreeing were

3     disclosed only in "bold white text enclosed in a gray rectangle" amidst dark gray text, and found

4     that the presence of numerous other "terms on the same screen with a similar or larger size,

5     typeface, and with more noticeable attributes diminished the hyperlink's capability to grab the

6     user's attention."  *Id*. at 63–64.

7           Unlike the cases the DPPs rely on, the Log In/Sign Up pages here do not have the same

8     amount of clutter and do not create a significant risk of confusion concerning what the Terms and

9     Conditions governed.  *See, e.g., Long v. Provide Com., Inc*., 245 Cal. App. 4th 855, 858 (Cal.

10    App. 2d Dist. 2016) (addressing a purely browsewrap agreement that did "not require users to

11    affirmatively click a button to confirm their assent to the agreement's terms; instead, a user's

12    assent is inferred from his or her use of the Web site" and which require a heightened level of

13    disclosure to be conspicuous); *Sgouros v. TransUnion Corp*., 817 F.3d 1029, 1035 (7th Cir. 2016)

14    (concluding defendants' "site actively misleads the customer. The block of bold text below the

15    scroll box told the user that clicking on the box constituted his authorization for TransUnion to

16    obtain his personal information. It says nothing about contractual terms. No reasonable person

17    would think that hidden within that disclosure was also the message that the same click constituted

18    acceptance of the Service Agreement."); *Starke v. SquareTrade, Inc*., 913 F.3d 279, 294 (2d Cir.

19    2019) (rejecting enforcement where "the 'Terms & Conditions' hyperlink was neither spatially nor

20    temporally coupled with the transaction. The 'Terms & Conditions' hyperlink was spatially

21    decoupled from the transaction because it was not provided near the portion of the Amazon

22    purchase page actually requiring [plaintiff's] attention (that is, the 'Add to Cart' button), or indeed

23    anywhere on the purchase page.  To provide conspicuous notice of the Post-Sale T&C,

24    SquareTrade could have simply included a noticeable hyperlink on the Amazon purchase page

25    directing consumers to review the terms and conditions."); *Applebaum v. Lyft, Inc*., 263 F. Supp.

26    3d 454, 466–67 (S.D.N.Y. 2017) (rejecting enforcement of arbitration agreement where the "'I

27    agree to Lyft's Terms of Service' is in the smallest font on the screen, dwarfed by the jumbo-sized

28    pink 'Next' bar at the bottom of the screen and the bold header 'Add Phone Number' at the top,"

United States District Court
Northern District of California

United States District Court
Northern District of California

1    all of which would misleading consumers even if the hyperlinked Terms of Service was easier to

2    identify).[10]

3         Plaintiffs' constructive assent to the arbitration agreement and class action waiver has been

4    demonstrated.

5         **D.    Unconscionability**

6         Plaintiffs argue that even if there is sufficient evidence of constructive assent to bind the

7    DPPs to the Terms and Conditions, I should not enforce the arbitration agreement against the three

8    DPPs because the Agreement is procedurally and substantively unconscionable.

9         Whether a contract is unconscionable is a question of law. *Patterson v. ITT Consumer Fin.*

10   *Corp.*, 14 Cal. App. 4th 1659, 1663 (Cal. Ct. App. 1993).  In California, unconscionability

11   includes an "absence of meaningful choice on the part of one of the parties together with contract

12   terms which are unreasonably favorable to the other party." *Lhotka v. Geographic Expeditions,*

13   *Inc.*, 181 Cal. App, 4th 816, 821 (Cal. Ct. App. 2010) (citation omitted). Accordingly,

14   unconscionability has both a "procedural" and a "substantive" element.  *Id.* (citation omitted).

15   Procedural unconscionability occurs where a contract or clause involves oppression,

16   consisting of a lack of negotiation and meaningful choice, or surprise, such as where the term at

17   issue is hidden within a wordy document. *Id.* "California law treats contracts of adhesion, or at

18   least terms over which a party of lesser bargaining power had no opportunity to negotiate, as

19   procedurally unconscionable to at least some degree." *Bridge Fund Capital Corp. v. Fastbucks*

20   *Franchise Corp.*, 622 F.3d 996, 1004 (9th Cir. 2010) (superseded by statute on other grounds).

21   Substantive unconscionability occurs where the provision at issue "reallocates risks in an

22   objectively unreasonable or unexpected manner." *Lhotka*, 181 Cal. App. 4th at 821 (citation

23   omitted). "Substantive unconscionability focuses on the one-sidedness or overly harsh effect of the

24   contract term or clause." *Id.* at 824–825.

25   Both the procedural and substantive elements must be met before a provision will be

26

27   _____

     [10] Plaintiffs do not dispute that their purchases through the JLI website would be covered by the
28   arbitration Agreement and class action waiver if the Terms and Conditions are enforceable against
     them.

deemed unconscionable, but both need not be present to the same degree.  Rather, "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Armendariz v. Found. Health Psychcare Services, Inc.*, 24 Cal. 4th 83, 114 (Cal. 2000).

### 1.   Procedural Unconscionability

Plaintiffs argue that the arbitration agreement is procedurally unconscionable because: (1) plaintiffs were addicted to nicotine when they created their accounts and purchased products to satisfy their existing addiction to and use of JLI's pod-based products (meaning they would have had to spend more to buy a new vaping system if they did not buy pods from JLI); (2) plaintiffs had no opportunity or ability to bargain with JLI over the arbitration agreement; (3) JLI did not require plaintiffs to view or read the Terms and Conditions before allowing them to create their accounts and purchase products; and (4) plaintiffs were not thereafter provided with a copy of the Terms and Conditions or the JAMS procedures for arbitration that governed the agreement.

Plaintiffs have not demonstrated significant procedural unconscionability.  First, plaintiffs cite no authority for their position that a consumer lacks capacity to consent simply because a product is addictive and the individual plaintiffs provide no evidence that they were incompetent to enter into an agreement because of their addiction.  *See In re Rains*, 428 F.3d 893, 901 (9th Cir. 2005) (despite claim of mental incompetency, settlement agreement enforced where "the record contained sufficient evidence to support a finding that Rains understood the nature, purpose and effect of his actions when he agreed to settle with the trustee and the creditor.").  Second, although the terms were unilaterally imposed, that does not make the arbitration agreement unenforceable. *Murphy v. Twitter, Inc*., 60 Cal. App. 5th 12, 37 (Cal. App. 1st Dist. 2021)  ("The fact that Murphy had no opportunity to negotiate the terms of service, standing alone, is insufficient to plead a viable unconscionability claim.").

Third and fourth, plaintiffs cite no cases requiring the immediate display or separate provision of an arbitration agreement or the rules governing the arbitration to consumers as predicates to enforceability.  The availability of the Terms and Conditions in the hyperlinked text immediately next to the clickbox where the DPPs affirmatively assented to the Terms and

Conditions is sufficient for enforceability.  The failure to provide consumers with a copy of the underlying rules governing the arbitration does not make the agreement or its enforcement unconscionable.  *See Baltazar v. Forever 21, Inc*., 62 Cal. 4th 1237, 1246 (2016) (where challenge is not to unconscionability of particular element of the underlying arbitration rules, but instead based on a "failure to attach" rules, enforcement is not unconscionable).

### 2.    Substantive Unconscionability

Plaintiffs argue that the arbitration agreement is substantively unconscionable because: (1) JLI retained the unilateral right to modify or change the Terms and Conditions, without notifying plaintiffs; (2) consumers are forced to bring their claims in San Francisco or (under the newer Terms and Conditions) Wilmington, Delaware and that choice of forums imposes unfair costs on consumers; (3) while consumers have to arbitrate their claims, JLI retains the right to seek "injunctive or equitable relief" from a court to protect its intellectual property, making the agreement impermissibly one-sided; (4) JLI purports to shorten the statute of limitations from four years to one; and (5) the JAMS rules are substantively unconscionable because they limit plaintiffs' rights to discovery, which is particularly intensive for antitrust claims.

On the first point, there is no dispute that JLI reserved the right to modify or change the Terms and Conditions, as the Terms and Conditions explain that a consumer's "continued use" of the site "constitutes your agreement to such modification."  Jacobs Decl., Ex. 10 at ¶ 1.  Plaintiffs' argument might have some force if JLI was attempting to enforce a materially different set of Terms and Conditions that none of these plaintiffs had assented to, but that is not the situation here.  *Compare In re Zappos.com, Inc., Customer Data Sec. Breach Litig*., 893 F. Supp. 2d 1058, 1066 (D. Nev. 2012) (where Terms of Use gave defendant "the right to change the Terms of Use, including the Arbitration Clause, at any time without notice to the consumer," and to make "those changes applicable to that pending dispute if it determined that arbitration was no longer in its interest," the court concluded that because "the Terms of Use binds consumers to arbitration while leaving Zappos free to litigate or arbitrate wherever it sees fit, there exists no mutuality of obligation," and therefore illusory and unenforceable); *with Ekin v. Amazon Services, LLC*, 84 F. Supp. 3d 1172, 1176 (W.D. Wash. 2014) (distinguishing *Zappos* as a case where the

United States District Court
Northern District of California

1    "unenforceable arbitration agreement was forced on those plaintiffs through a 'browsewrap'

2    'agreement' which required absolutely no affirmative action on the part of consumers.").

3         On the second point, specifying San Francisco as the location for arbitrations is not

4    procedurally unconscionable.  Plaintiffs voluntarily commenced their litigation here.  They do not

5    otherwise provide any authority that would undermine the arbitration agreement simply because it

6    specifies a location for arbitration (San Francisco or Wilmington), considering the JAMS rules or

7    otherwise.

8         On the third point, each of the three sets of Terms and Conditions that JLI contends (and

9    plaintiffs do not dispute) existed during the operative times provides that JLI "retain[s] the right to

10   seek injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or

11   threatened infringement, misappropriation or violation of a [sic] our copyrights, trademarks, trade

12   secrets, patents, or other intellectual property or proprietary right."  *See, e.g*., Jacobs Decl., Ex. 10;

13   *see also* Exs. 11 & 12.  These provisions arguably reserve the right to seek injunctive relief to

14   protect JLI's intellectual property in court to JLI only.  This limited reservation, however, does not

15   implicate the concern recognized by California courts in employment cases when an employer

16   seeks to compel the types of claims employee are likely to raise but preserves the employer's right

17   to go to court on claims it would likely initiate.  *See, e.g., Serafin v. Balco Properties Ltd., LLC*,

18   235 Cal. App. 4th 165, 181 (Cal. App. 1st Dist. 2015) (collecting cases); *see also Carbajal v.

19   CWPSC, Inc*., 245 Cal. App. 4th 227, 248 (Cal. App. 4th Dist. 2016) ("Courts repeatedly have

20   found an employer-imposed arbitration agreement to be substantively unconscionable when it

21   requires the employee to arbitrate the claims he or she is mostly likely to bring, but allows the

22   employer to go to court to pursue the claims it is most likely to bring.").  The types of relief JLI

23   has arguably reserved to itself to seek in court are not the type of claims that would likely be

24   raised by consumers who used JLI's website to purchase or research products.  This unilateral

25   right at most creates only a marginal substantive unconscionability and does not make the

26   Agreement unenforceable.

27        On the fourth point, plaintiffs correctly argue that the two applicable sets of Terms and

28   Conditions (existing from June 29, 2017 and July 17, 2019 and between July 17, 2019 and

United States District Court
Northern District of California

22

November 26, 2019) imposed a one-year statute of limitations, contrary to the four-year statute that would otherwise apply to plaintiffs' claims.  Exs. 10, 11 ("You agree that any cause of action you have that arises out of or relates to these Terms of Service or your use of the Website must be brought by you within one year after the cause of action accrues. Otherwise, any such action by you against JUUL Labs is permanently barred.").  Relying on one case arising in the employment context, they assert that reduction in the statute of limitations is substantively unconscionable.  DPP Oppo. to MTC at 21.  JLI does not respond at all to this argument.  I agree with plaintiffs that this provision is substantively unconscionable and will sever it, leaving the remaining provisions of the arbitration agreements enforceable.  Severance is appropriate because the agreements are not "so 'permeated' by unconscionability that it cannot be cured by severance." *Serafin, LLC*, 235 Cal. App. 4th at 183-84.

Finally, the proportionality rule of discovery in the JAMS rules appears consistent with the proportionality of discovery required under the Federal Rules.  While plaintiffs contend that the JAMS's Optional Expedited Arbitration Procedure limits them to "one discovery deposition," which they contend is unreasonable in an antitrust case, they ignore that the one-deposition rule is a default that will be reconsidered given the complexity of the case.[11]  Plaintiffs also ignore that even in arbitration they will have the benefit (provided under the Protective Order and Amended Protective Order entered in this case) of the discovery produced in the FTC action as well as discovery taken here.  Plaintiffs have provided no evidence, by declaration or otherwise, substantiating their claim that they will not be able to secure or use sufficient discovery in any JAMS arbitration of their antitrust claims against JLI.

In short, at most the arbitration agreements are marginally substantively unconscionable. The significantly unconscionable provision – limiting the statute of limitations in two of the Agreements – is readily severable.  The agreements are otherwise enforceable.

---

[11] Declaration of Kyle P. Quackenbush, Dkt. No. 229-1, ¶ 34, Ex. 13 (JAMS's Optional Expedited Arbitration Procedure, Rule 16.2(d)(v) (noting the "limitation of one discovery deposition per side (Rule 17(b)) shall be applied by the Arbitrator, unless it is determined, based on all relevant circumstances, that more depositions are warranted" considering the amount in controversy, the complexity of the factual issues in dispute, etc.).

United States District Court
Northern District of California

United States District Court
Northern District of California

### E.   Unenforceable Prospective Waiver

Plaintiffs also contend that the arbitration agreements contain unenforceable prospective waivers of plaintiffs' substantive rights under federal antitrust laws because the choice of law provisions in the agreements provide that they "shall be governed by the internal substantive laws of the State of California" or for the later Terms, "governed and interpreted under the laws of the State of Delaware, USA."  Jacobs Exs. 10, 12.  They also note that while the Clayton Act claims could be pursued under the agreement governed by California law, Delaware does not have a private right of action for antitrust violations.  Finally, they argue that given JLI's retention of the sole right to seek injunctive relief in court and JAMS procedures not conferring the right to award public injunctive or other equitable relief, the agreement should not be enforced.  *See, e.g., McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017) (waiver of right to seek public injunctive relief in any forum was contrary to California public policy and was thus unenforceable under California law).

JLI does not dispute that federal and state law-based *claims* may still be raised in arbitration, even though the Terms and Conditions (the contract) will be interpreted under California or Delaware law.  Defendants agree that nothing in the Terms waives any right to seek *relief* under any of the federal or state law claims raised by the DPPs.

As to the availability of "public injunctive relief," plaintiffs point out only that JAMS's Optional Expedited Arbitration Procedure, §§ 16.2-3, fails "to include an arbitrator's right to award injunctive and other equitable relief."  DPP Oppo. to MTC at 22.  Plaintiffs identify nothing in the arbitration agreements *or* the JAMS rules prohibiting any plaintiff from seeking public injunctive relief in the JAMS arbitration or elsewhere.[12]  This court must follow *DiCarlo v. MoneyLion, Inc.*, 988 F.3d 1148, 1158 (9th Cir. 2021), where the Ninth Circuit confirmed that "public injunctive relief" is generally available arbitration.

Nothing in the Terms and Conditions or the Agreements themselves constitutes an unenforceable prospective waiver.

---

[12] The provision of the arbitration agreements allowing JLI to seek injunctive relief to protect its intellectual property rights in court does not expressly restrict or imply that a consumer does not have the right to seek injunctive relief in arbitration.

F.    **Individual Defendants**

The DPPs argue that even if their claims against JLI are subject to arbitration, their claims against the JLI Director Defendants – Pritzker and Valani – should not be.  The Ninth Circuit has explained that "nonsignatories of arbitration agreements may be bound by the agreement under ordinary contract and agency principles." *Letizia v. Prudential Bache Securities, Inc.*, 802 F.2d 1185, 1187 (9th Cir. 1986) (citations omitted).  "[A]gents of a signatory can compel the other signatory to arbitrate so long as (1) the wrongful acts of the agents for which they are sued relate to their behavior as agents or in their capacities as agents [] and (2) the claims against the agents arise out of or relate to the contract containing the arbitration clause. . . ."  *Amisil Holdings Ltd. v. Clarium Capital Mgmt.*, 622 F. Supp. 2d 825, 832 (N.D. Cal. 2007) (internal citations omitted).

Here there is no dispute on the second prong; the antitrust claims against the Director Defendants arise out of or relate to the Terms and Conditions that governed the terms of sale to each DPP who necessarily purchased product through JLI's website.  On the first prong, plaintiffs argue that the Director Defendants' antitrust liability does not hinge on the acts they took as agents of JLI.  They instead contend that these individuals' antitrust liability hinges on acts they took in their own self-interest as "principals" or "major investors" of JLI seeking a massive payout from the Altria investment.  That distinction may have legal significance in other ways on other claims, but for the motion to compel arbitration I find that Pritzker and Valani should be covered by the arbitration agreements because they were acting as agents of JLI – even if they had their own ulterior motives – when conducting negotiations with Altria.  Plaintiffs cite no cases in support of their position that officers or directors acting as representatives of the corporate entity fall outside the protection of the corporate arbitration agreements.  Failure to cover director defendants in these circumstances could provide an easy way for plaintiffs to functionally avoid the significance of agreements to arbitrate by sending related claims against a corporation to arbitration but requiring claims against the corporation's officers or directors to proceed in court.  There is no policy or other reason to support that result.[13]

---

[13] There are no allegations in the complaints, for example, that Pritzker or Valani were ever acting outside of the scope of their roles with JLI or acting in unauthorized ways.

### G.      Remedy

For the foregoing reasons, JLI's motion to compel arbitration of the claims of Martinez, McGee, and Flannery against JLI and the Director Defendants is GRANTED.  The DPPs are given leave to amend to substitute a named direct purchaser plaintiff who purchased directly from JLI prior to August 9, 2018 or who otherwise is not subject to JLI's Terms and Conditions for direct purchases on or after August 9, 2018.  Such amendment, if possible, shall be made within thirty days (30) of the date of this Order.

JLI asks me to either dismiss or stay the litigation of antitrust claims brought by the DPPs in their Consolidated Class Action Complaint if I find that the three DPP plaintiffs' claims against JLI and the Director Defendants are subject to arbitration.  The DPPs did not address their preferred course of action in their opposition brief.  Within thirty days of the date of this Order, the DPPs shall notify me whether they want the claims of the three named DPP plaintiffs (Martinez, McGee, and Flannery) against JLI and the Director Defendants stayed or dismissed.

## II.     DEFENDANTS' MOTIONS TO DISMISS THE DPP, IPP, AND IRP CONSOLIDATED CLASS ACTION COMPLAINTS

Defendants each move to dismiss the Consolidated Class Action Complaints filed separately by the DPPs, IPPs, and IRPs.  Dkt. Nos. 207, 209, 211.  While I have granted JLI's motion to compel arbitration with respect to the three currently named DPPs for the claims asserted against JLI and the Director Defendants, I have stayed the effect of that order to give the DPPs leave to amend to substitute one or more named plaintiffs whose claims might (as in the *Colgate* case) not be subject to an enforceable arbitration agreement.  Therefore, I now consider the arguments of JLI and the Director Defendants' that the DPPs' claims against them should nonetheless be dismissed, as well as JLI and Altria's arguments in support of dismissing the IPP and IRP claims.[14]

---

[14] The most significant arguments in support of dismissal are made by Altria in its motion and reply.  Dkt. Nos. 207, 237.  Altria's arguments are joined by JLI and the Director Defendants (with respect to the DPP claims).  Dkt. Nos. 211, 209.  I will generally address the arguments as made by "defendants" unless there are unique arguments presented by particular defendants.

United States District Court
Northern District of California

### A. Antitrust Injury

Defendants argue broadly that no plaintiff in any of the three CACs has adequately alleged antitrust injury – plausible facts supporting an adverse impact on price, output of the products, or innovation in the market – that occurred following the alleged agreement to restrain trade. Defendants note that injury is not a showing required for the FTC action, but is a key showing required of private parties. *See, e.g., Pool Water Products v. Olin Corp*., 258 F.3d 1024, 1034 (9th Cir. 2001).

Antitrust injury is the "'type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Knevelbaard Dairies v. Kraft Foods, Inc*., 232 F.3d 979, 987 (9th Cir. 2000) (quoting *Atlantic Richfield Co. v. USA Petroleum Co*., 495 U.S. 328, 334 (1990)). There are four requirements generally recognized for antitrust injury: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent. *Id*. at 987.

The IPPs and IRPs allege harm from: (i) the lessening of choices in the market, as Altria is alleged to have been JLI's "most competitive rival" (IPP CAC ¶¶ 157, 158); (ii) the reduction of price competition that meant JLI could charge supracompetitive process for JUUL products (*id*., ¶¶ 20, 165, 265, 330); and (iii) the stifling of innovation that would have occurred had Altria stayed in the market. *Id*. ¶¶ 20, 107, 165. The DPPs allege similar harms, using slightly different language. They assert that as a direct and proximate result of the Agreement – causing Altria's complete departure from the market from close system e-vapor products – they suffered a range of antitrust injuries, including: (i) supracompetitive prices (DPP CAC ¶¶ 9, 139, 160(b), 179), (ii) reduced output (*id*., ¶ 139), (iii) reduced innovation (*id*., ¶¶ 9, 102, 139), and (iv) elimination of consumer choice (*id*., ¶ 139).

Defendants contend that plaintiffs cannot show antitrust injury because of a document that the IPP and IRP plaintiffs have incorporated by reference into their CACs. It demonstrates that in the twelve months following October 2018 (when Altria's MarkTen Elite product was pulled from the market), JLI's prices decreased by almost 12%, JLI's output substantially increased, and JLI's market share fell by ten percentage points while other competitors made significant market share

1   gains.  October 2019 "Wells Fargo Report," Ex. 12 to Altria's RJN; IPP ¶ 48, IRP ¶ 45.

2         At this juncture, the information that can be incorporated by reference does not fatally

3   undermine plaintiffs' allegations of antitrust injury.  The only information from that document

4   appropriate for consideration on these motions, as discussed later, is from the February 2019

5   Wells Fargo Report that these plaintiffs intended to rely on, and perhaps the actual chart from the

6   October 2019 Wells Fargo Report that was mistakenly included.[15]  Plaintiffs contend that they will

7   develop evidence (expert and otherwise) to explain that any short-term decrease in JLI market

8   share or output following Altria's withdrawal from the market was only a temporal situation

9   resulting primarily from JLI withdrawing its fruit-flavored pods in response to regulatory and

10  public pressure.

11        Defendants' challenges are better determined on a full record.  If I were to consider

12  defendants' evidence that the price of JLI's product decreased in the months following the

13  withdrawal of Altria's products from the market – which plaintiffs argue is not accurate "in

14  absolute terms" and needs expert analysis given the regulatory pressure and other factors at play –

15  plaintiffs still adequately allege that JLI charged supracompetitive prices despite the potential

16  decrease in absolute prices following the increased governmental and public criticism.  The

17  departure of the second largest competitor in the closed system e-vapor market – where Altria

18  allegedly held around 8% of the market – supports the plausible allegation that Altria's departure

19  led to supracompetitive process, reduced output, and reduced innovation.

20        The allegations here are not similar to those in *Somers v. Apple, Inc*., 729 F.3d 953, 964

21  (9th Cir. 2013).  There, the Ninth Circuit rejected plaintiffs' overcharge theory – that Apple's use

22  of digital music right restrictions (DRM), making iTunes music files and the iPod compatible only

23  with each other led to overcharges – as "implausible in the face of contradictory market facts

24  alleged in her complaint."  *Id*. at 967.  In particular, the plaintiff "acknowledges, under basic

---

[15]There is some dispute as to which Wells Fargo Report the IPPs/IRPs actually relied on in their CACs.  The Indirect Plaintiffs explain they intended to reference and include a chart from the February 2019 Wells Fargo Report but mistakenly included the chart from the October 2019 Report.  Dkt. No. 228 at 7 n.3.  As explained below, at most these two charts would be incorporated by reference, but not the remaining portions of the two Reports.

United States District Court
Northern District of California

economic principles, increased competition—as Apple encountered in 2008 with the entrance of Amazon—generally lowers prices. [] The fact that Apple continuously charged the same price for its music irrespective of the absence or presence of a competitor renders implausible Somers' conclusory assertion that Apple's software updates [imposing the DRM] affected music prices." *Id*.  As there was no price change in the market nor increased competition from other digital music platforms, there could have been no competition eliminated; that case was dismissed at the pleading stage.  *Id*.

Here, there is nothing on the face of the CACs – or in facts appropriately judicially noticeable that are not subject to dispute – that undermines plaintiffs' theories.  They allege that in the short term following the Agreement, the economic metrics in the market were impacted by JLI's decisions to withdraw its fruit-flavored pods and take other steps in response to the regulatory and public pressure *and* that they suffered from supracompetitive prices in the more concentrated market that was enabled by JLI and its most effective competitor reaching the Agreement to remove Altria from the market.[16]

Finally, defendants assert that plaintiffs' equitable relief claims must be dismissed (separate from the failure to adequately allege causation argument) because plaintiffs do not allege that they will be wronged in a similar way in the future.  Plaintiffs question whether the requirement to expressly allege likelihood of future injury is required in the antitrust context but do not dispute that they have not alleged possible future injury in their CACs.  Assuming the need to plead that possible or likely future injury applies in this context, defendants' motions to dismiss are GRANTED in this limited respect.  Plaintiffs are given leave to amend.  Within thirty (30) days of the date of this Order, they must file amended CACs containing (where appropriate) allegations that some or all of the named plaintiffs may suffer future injury to support the claims for equitable relief.

---

[16] I need not reach the other injuries alleged, including reduction in innovation.  But even if I agreed with defendants' characterization of plaintiffs' assertions as confirming the e-cigarette industry's high barriers to entry and innovation in the market, there are plausible inferences drawn from plaintiffs' allegations that Altria was well-positioned to bring new products and innovation to the industry despite those barriers.

United States District Court
Northern District of California

United States District Court
Northern District of California

### B.   Sherman Act Claims

#### 1.   Anticompetitive Agreement

Defendants argue that no plaintiff has adequately alleged a *per se* anticompetitive agreement in violation of Section 1 of the Sherman Act.  They point out that the three written agreements identified by plaintiffs as anticompetitive – the October 5, 2018 email, the Relationship Agreement (entered in December 2018) and the January 28, 2020 Amended Relationship Agreement – do not expressly require Altria to leave the market.  The written agreements, instead, allowed Altria to continue with its then current activities and only prevented Altria from entering the market with any *new* line of products, a restraint defendants characterize as reasonable as a matter of law to protect JLI's intellectual property.  Finally, defendants note that despite having access to over 700,000 pages of documents from the FTC production, plaintiffs do not add any more facts to support their *per se* theory.

Even assuming that plaintiffs had the time to review and absorb the FTC production before filing the CACs, defendants' arguments fail.  Plaintiffs identify facts supporting their theory that the *key* part of the overall Agreement between JLI and Altria was Altria's full exit from the e-vapor market.  That theory is supported by references in the IPP, IRP, and DPP CACs to facts known about the negotiations, the parties involved, the three writings identified above, and the acts and explanations Altria contemporaneously provided to explain its actions.  Although the required withdrawal of Altria from the market was not reduced to writing (which plaintiffs allege was for obvious reasons), plaintiffs have plausibly alleged that the withdrawal was key to the deal with JLI by inference supported by specifically identified facts.

Altria spends significant time in its motion and reply attempting to anchor alternative, non-antitrust explanations for its conduct.  It references documents and statements identified in the CACs to claim that Nu Mark was being trounced by JUUL despite Altria's heavy investments and retail power and that Altria was only in the beginning stages of developing a product utilizing technology similar to JLI's.  *See* Altria MTD at 27-29; Altria Reply at 14-18 (relying on *In re Cent. Aluminum Co. Securities Litig.*, 729 F.3d 1104 (9th Cir. 2013); *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011); *Name.Space, Inc. v. Internet Corp. for Assigned Names and Numbers*,

795 F.3d 1124, 1130 (9th Cir. 2015).

But, as the cases relied on by Altria demonstrate, "Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (emphasis in original). Here, plaintiffs' theory is more than plausible even if defendants' alternative theories ultimately may be more convincing to the jury. *Id*. ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)."). Plaintiffs have alleged facts "tending to exclude the possibility that the alternative explanation is true," including Altria's continued large scale spending on its research and development efforts to compete with JLI right up to the withdrawal of Nu Mark from the market. *See In re Cent. Aluminum Co. Securities Litig*., 729 F.3d at 1108.[17]

Altria's alternative explanations would require me to accept the gloss that it attempts to put on plaintiffs' allegations and the documents on which they rely. That is not appropriate at this juncture. For example, plaintiffs admit that Altria publicly commented (as identified in the DPP CAC) that part of the reason that it withdrew from the e-vapor market was the increasing regulatory pressure the FDA was putting on companies over youth vaping. Plaintiffs, however, contend that was a pretextual excuse. Plaintiffs' explanation is plausible, given Altria's alleged extensive regulatory experience that was subsequently put to use on behalf of JLI as well as its other public statements and heavy investment in its own e-vaping products throughout 2018 until it abruptly pulled its products from the market in October 2018. This is not a case where plaintiffs' allegations demonstrate the implausibility of their theories and support only legitimate, non-antitrust explanations.

Nor can defendants ignore plaintiffs' plausible allegations that a key part of the Agreement

---

[17] In *Name.Space, Inc. v. Internet Corp. for Assigned Names and Numbers*, unlike here, the plaintiffs' allegations were "fully consistent" with the defendants' express agreement to manage internet naming rights and defendants implemented the agreement with neutral rules. Absent factual allegations that the process was rigged to benefit defendants' own interests, the claim failed. *Id*., 795 F.3d at 1130.

was Altria's withdrawal in order to shift the focus to the specific, written non-compete provision in the Relationship Agreement.  Defendants may be correct that covenants not to compete, especially those entered in the employment context or ones otherwise intended to protect intellectual property, "should not be tested under the per se rule. Such covenants often serve legitimate business concerns such as preserving trade secrets and protecting investments in personnel." *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 900 (9th Cir. 1983).  However, the intended scope of the express, written non-compete agreements in the Relationship Agreement and plaintiffs' allegations regarding the non-written agreement to withdraw in whole from the market need to be considered together and tested on an evidentiary basis.

Finally, whether the Agreement was a "naked" *pro se* restraint (as characterized by plaintiffs given the unwritten but otherwise expressed requirement that Altria leave the market) or merely an "ancillary" restraint (as characterized by the defendants whereby Altria was only prohibited from introducing new products into the market and part of the defendants' "larger endeavor whose success they promote") cannot be determined at this juncture.  *See Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185, 188–89 (7th Cir. 1985).

Plaintiffs have adequately alleged a *per se* agreement.

### 2.    Quick Look & Rule of Reason

Defendants also argue that the limited, written non-compete agreement in the Relationship Agreement – preventing Altria from entering the market with new products to protect JLI's intellectual property – is legal as a matter of law under the rule of reason analysis, given the Relationship Agreement's express concern to protect JLI's intellectual property during the time that Altria provided critical distribution and regulatory services to JLI.  Defendants go so far as to argue that but for Altria providing regulatory services to JLI, the JUUL product might not secure PMTA approval and result in lessened competition.  *See* Altria MTD at 30.[18]  But this argument

---

[18] As the case Altria relies on explains, "[t]he covenant not to compete means that A may trust B with broader responsibilities, the better to compete against third parties. Covenants of this type are evaluated under the Rule of Reason as ancillary restraints, and unless they bring a large market share under a single firm's control they are lawful." *Polk Bros., Inc. v. Forest City Enterprises*, Inc., 776 F.2d 185, 189 (7th Cir. 1985).  Here, plaintiffs have alleged that the express covenant was part of the larger Agreement and, in fact, resulted in JLI securing a larger market share under

United States District Court
Northern District of California

1   ignores plaintiffs' allegations of the unwritten pre-condition to the Relationship Agreement that

2   Altria leave the market.  As noted above, that allegation has been adequately alleged.  Similarly, as

3   noted above, the plaintiffs have adequately alleged plausible antitrust injury.

4          The impact of the express non-compete provisions in the Relationship Agreement must be

5   considered in connection with the other relevant agreements including the Purchase Agreement,

6   the Services Agreement, the Intellectual Property License Agreement, and the Voting Agreement.

7   *See, e.g.,* Altria Mot. at 30-31; *see also* DPP CAC ¶¶ 93-97.  This analysis is heavily fact

8   dependent and cannot be resolved on the pleadings.  *See, e.g., In re Nat'l Football League's*

9   *Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1152 (9th Cir. 2019) ("we are required to take a

10  holistic look at how the interlocking agreements actually impact competition").

### 3.   Director Defendants

#### a.   Standard

13         The DPPs and the Director Defendants – Pritzker and Valani, named as defendants in only

14  the DPP CAC – engage in a vigorous debate over the standard required to hold corporate directors

15  liable under the Sherman Act.  The Director Defendants argue that individuals can only be

16  theoretically liable for a corporation's allegedly anticompetitive conduct under the Sherman Act

17  where the allegations establish the individuals' direct participation in a *per se* violation based on

18  those individuals' "inherently wrongful conduct."  *Murphy Tugboat Co. v. Shipowners &*

19  *Merchants Towboat Co., Ltd.*, 467 F. Supp. 841, 853 (N.D. Cal. 1979), *aff'd sub nom. Murphy*

20  *Tugboat Co. v. Crowley*, 658 F.2d 1256 (9th Cir. 1981) ("The generality of the [Sherman] Act's

21  prohibition, the often uncertain line between proper and improper conduct, and the social interest

22  in not deterring economically useful conduct by the imposition of excessive risks all of which the

23  Supreme Court recognized . . . make it appropriate to limit personal liability to cases of

24  participation in inherently wrongful conduct."); *see also Hightower v. Celestron Acq., LLC*, 5:20-

25  CV-03639-EJD, 2021 WL 2224148, at *11 (N.D. Cal. June 2, 2021) (applying "inherently

26  wrongful conduct" standard from *Murphy* and concluding allegations regarding former CEOs'

27

28  _____

    its control.

United States District Court
Northern District of California

individual acts in facilitating a horizontal antitrust conspiracy sufficient); *In re California Bail Bond Antitrust Litig.*, 511 F. Supp. 3d 1031 (N.D. Cal. 2021) (apply *Murphy* standard in conspiracy between various members of the California bail bonds industry to artificially inflate the price of bail bonds in violation of federal and California law, and concluding allegations against CEO of surety company sufficient where he allegedly "approv[ed] and ratif[ied] the conduct" at heart of conspiracy).

The DPPs dispute whether personal conduct in support of a *pro se* agreement needs to be alleged. They contend that "inherently wrongful conduct," if that is the correct standard to be applied, can arise in connection with agreements analyzed under the rule of reason. That debate does not need to be resolved now. Plaintiffs have adequately alleged both a *per se* violation and Pritzker and Valani's personal participation in it. The DPP CAC is replete with allegations that Pritzker and Valani, who were critical players in negotiating the Agreement with Altria, often acting as JLI's points of contact at meetings and in correspondence, had the ultimate aim to protect their investments and enrich themselves given the size of their ownership and additional investments as recent as July 2018 in JLI. *See, e.g.*, DPP CAC ¶¶ 19, 20, 68, 70, 71, 72, 74, 77, 79, 81, 86.

I cannot decide on the pleadings whether this conduct amounts to "inherently wrongful conduct" that Pritzker and Valani engaged in for their own enrichment and not as part of their fiduciary duties to JLI, or whether that conduct was indicative of legitimate business considerations on behalf of JLI and undertaken as part of the Director Defendants' fiduciary duties to JLI. If plaintiffs fail to prove their *per se* allegations, the issue of whether the individuals' conduct nonetheless amounts to actionable conduct under the "inherently wrongful" or a lesser standard may be raised again.

### b.   Injunctive Relief

The Director Defendants also argue that they cannot be liable for equitable or injunctive relief for the antitrust claims as the series of agreements constituting the anticompetitive Agreement were entered into by JLI and Altria and not the Director Defendants, and that the Director Defendants have no authority to compel JLI or Altria to take any action. The DPPs do

34

not address this argument or provide any authority showing that similarly situated directors can be required to provide the sort of injunctive relief the DPPs seek.

The DPPs claim for injunctive relief against the Director Defendants is DISMISSED without leave to amend.

#### 4.    Section 2 Conspiracy Claim

Finally, Altria argues the IPPs and IRPs Section 2 conspiracy claim fails for the same reasons their Section 1 claim fails.[19]  However, as noted above, the Section 1 claim survives and has been adequately alleged.  As a result, the Section 2 claim likewise survives.[20]

#### 5.    Section 2 Injunctive Relief

JLI separately argues that the IPPs and IRPs' Section 2 monopolization claims – given their indirect purchaser status, they can only seek injunctive relief – must be dismissed because these plaintiffs fail to plausibly plead that there is now or likely will be in the future an attempt by JLI to monopolize the closed-system E-vapor market.  In support, JLI points to plaintiffs' own allegations that "paint a picture of a market that is increasingly competitive, as to which JLI's influence is waning."  JLI Mot. at 8.

This argument is derivative of the similar argument made by Altria that plaintiffs have failed to plead antitrust injury given their own allegations and the Wells Fargo Reports, addressed above.  It fails for similar reasons.  Even though plaintiffs rely on market data from 2018 and even though absolute prices or market shares may have fallen for JLI in the short term following the Altria Agreement, plaintiffs' explanations (those changes were the result of acts JLI voluntarily took in response to regulatory pressure and public pressure) are not implausible or otherwise fatally undermined by their other allegations.  Whether or not plaintiffs will be able to prove that an injunction is necessary to correct for and otherwise prevent a future injury related to monopolistic conduct is better tested on an evidentiary record.

---

[19] The DPPs do not allege a Section 2 claim against any defendant.

[20] I acknowledge but need not reach the IPP and IRP argument that even in absence of a Section 1 claim, the Section 2 conspiracy-to-monopolize claim could survive.

United States District Court
Northern District of California

United States District Court
Northern District of California

### C.    Clayton Act Claims

#### 1.    Altria as Actual or Potential Competitor

Altria argues that the Section 7 claim must be dismissed because plaintiffs allege that by the time the Altria investment was finalized in December 2018, it had already removed its competing products from the market.  DPP ¶ 137, IPP ¶ 96, IRP ¶ 93.  In that circumstance, Altria contends, it was not a competitor.  According to Altria, plaintiffs cannot rely on their "actual competitor theory" but must instead rely on one of two theories, the "actual potential competitor theory" or a "perceived potential competitor theory."

To satisfy the actual potential competitor theory, Altria asserts that plaintiffs must show that the acquisition foreclosed Altria from future *de novo* entry and, but for the Agreement, Altria would have entered *de novo*.  Plaintiffs cannot do so, Altria argues, given their admissions in the CACs regarding the high barriers to entry created by the onerous regulatory scheme required for new products and the attendant expenses to enter the market.  Under the perceived potential competitor theory, Altria argues that plaintiffs must plausibly allege that the "mere threat" of Altria's potential entry prevented those already in the market from raising price, which plaintiffs have not attempted to plead.

Plaintiffs respond that in the situation here – where pursuant to the alleged antitrust Agreement a competitor leaves the market – Altria's voluntary departure does not insulate it from traditional Section 7 actual competitor analysis.  Plaintiffs point to their allegations that if the JLI deal was not effectuated, Altria was fully situated to bring and in fact made comments that it would bring the MarkTen Elite product back to the market.  IPP ¶¶ 67, 83, 91 IRP ¶¶ 64, 80, 88. These allegations are plausible at this juncture and sufficient to allege the actual competitor theory.

Unlike the cases relied on by defendants – that did not involve *agreements* that reduced the number of competitors in the market or otherwise altered concentration levels – plaintiffs' allegations are plausibly alleged in support of the Section 7 claim.[21]  Altria and JLI were actual

---

[21]  *See, e.g., F.T.C. v. A. Richfield Co.*, 549 F.2d 289, 299 (4th Cir. 1977) (recognizing that divestiture to a third party not involved in the merger could avoid an antitrust violation).

competitors at the time the alleged antitrust Agreement was made.  It does not alter Altria's actual competitor status that, as part of the alleged antitrust Agreement, Altria left the market by the time the Agreement was fully effectuated and publicly disclosed.

The plaintiffs also argue that even if Altria was able to voluntarily "terminate" its status as an actual competitor, their allegations adequately establish that it was an actual potential competitor.  They point to Altria's plans to reenter with the MarkTen Elite product and use of "growth teams" to develop next generation e-cigarettes.  *See* IPP ¶¶ 67, 83, 91 IRP ¶¶ 64, 80, 88; *see also* IPP ¶ 160, IRP ¶ 157.  These plausible allegations, plus the evidence regarding Altria's ability (unlike other potential entrants) to reenter the market given its extensive background, regulatory experience, and ample funds, render Altria both a potential actual competitor and a "perceived potential competitor."

### 2. Market Concentration

Altria challenges plaintiffs' market concentration allegations as inapposite because it was not an existing competitor to JLI when the Agreements was entered.  That argument has been rejected.  Altria also argues that allegations that the market became more concentrated following Altria's exit are implausible (given the chart in the Wells Fargo Report showing JLI's market share fell) and unsubstantiated (*e.g.*, with any actual Herfindahl-Hirschman Index (HHI) calculations).  As noted above, Altria overstates the significance and impact the Wells Fargo Report has at this juncture.  It provides no authority for the proposition that at the motion to dismiss stage – unlike where the government is attempting to enjoin a merger and evidence is required to establish its *prima facie* case[22] – a plaintiff must provide HHI calculations or anything similarly detailed.  Plaintiffs' market concentration allegations are sufficient.

### 3. JLI

JLI separately argues that because it did not acquire any stock, it cannot have liability under Section 7 of the Clayton Act.  Plaintiffs respond that caselaw recognizes that JLI is a proper defendant to this claim because it was the seller of the acquired assets and a party to the allegedly

---

[22] *F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001) ("Sufficiently large HHI figures establish the FTC's prima facie case that a merger is anti-competitive.").

United States District Court
Northern District of California

illegal acquisition, especially considering plaintiffs' claim for injunctive relief to undo the anticompetitive agreement. *See, e.g., Frike-Parks Press, Inc. v. Fang*, 149 F. Supp. 2d 1175, 1185 (N.D. Cal. 2001) ("the Ninth Circuit has recognized that sellers may be joined in a section 7 action against a purchaser when the plaintiff seeks rescission or divestiture, and the court needs jurisdiction over both the buying and selling company to fashion such equitable relief."). JLI is appropriately named as a defendant on this claim.

In addition, plaintiffs argue that through the anticompetitive Agreement JLI acquired "assets," like the shelf-space and services from Altria, that lessened competition and falls within the broad interpretation of assets under Section 7. *See Gerlinger v. Amazon, Inc.*, 311 F. Supp. 2d 838, 853 (N.D. Cal. 2004) (noting the broad interpretation of "assets" in the Ninth Circuit which includes "sales routes and sales volumes" and distribution rights). The determination of whether the "assets" secured by JLI here were more akin to "services" JLI paid for or more akin to licenses or distribution routes that could be considered "assets" under Section 7 must be resolved on an evidentiary record. *Id.* at 853 (finding allegations sufficient at motion to dismiss but considering evidence and rejecting claim on summary judgment).

### 4.  Pritzker and Valani

The Director Defendants also argue that because they acquired no stock or assets in the deal, they cannot be liable to the DPPs under Section 7. The DPPs respond that they have adequately pleaded that Pritzker and Valani were the primary architects of the Agreement and, as board members whose assent would be required to undo the deal, they are necessary to provide the complete injunctive relief they seek here (the undoing of the Agreement). However, the DPPs provide absolutely no authority or apposite caselaw in support of their position that board members are appropriate defendants under a Section 7 claim seeking injunctive relief against the corporate entity.

The Section 7 claim against the Director Defendants is DISMISSED with prejudice.

### D.  IPP State Law Claims

Defendants move to dismiss the IPP state law claims asserted under (i) the antitrust laws of California, New York, Michigan, and Rhode Island and (ii) the consumer protection laws of

United States District Court
Northern District of California

California, Florida, Massachusetts, and Rhode Island.

### 1.    State Antitrust and Consumer Protection Claims

Altria argues that the California, New York, Michigan, and Rhode Island antitrust claims are derivative and therefore rise and fall with the federal claims.  It argues the same for the consumer protection claims asserted under California, Florida, Massachusetts and Rhode Island law, because the claims all challenge an alleged restraint in trade that caused plaintiffs to pay allegedly supracompetitive prices (the same allegations underlying the antitrust claims).[23]  Even if I agreed with Altria that the state law claims are derivative, they cannot be dismissed because the federal claims survive.

### 2.    UCL Claims and Unjust Enrichment

Altria argues that there are additional reasons why the UCL and unjust enrichment claims should be dismissed.  First, Altria complains that the captions in the IPP complaint for the UCL claims ask for "damages," but only restitution is available.  However, the paragraphs under each UCL claim accurately identify restitution (not damages) as the relief sought.  IPP CAC ¶¶ 258, 263.

Second, Altria argues that the UCL and unjust enrichment claims must be dismissed because plaintiffs have not alleged that Altria received any funds or other benefits from plaintiffs as a result of the alleged anticompetitive arrangement or JLI's charging of supracompetitive prices.  Altria contends that plaintiffs cannot allege this as plaintiffs' CACs admit that Altria lost billions on its investment in JLI.  But even though Altria may have written down the value of its 33% ownership in JLI, how that devaluation occurred and what it means for Altria's existing ownership in JLI remain facts in dispute.  Moreover, the devaluation does not mean that Altria may not still be indirectly receiving funds from consumers due to JLI's charging supracompetitive prices for its products.  IPP ¶¶ 164-165, 263, 265-66; IRP ¶¶ 161-162, 233, 235, 237.[24]  This

---

[23] Altria admits that Rhode Island has not decided how closely its consumer protection claim adheres to conclusions reached on the federal antitrust claims, but argues that because Rhode Island's consumer protection law is similar to the other states (here, California, Florida, and Massachusetts) Rhode Island courts likely follow suit.

[24] Altria relies on *Fenerjian v. Nongshim Co., Ltd*, 72 F. Supp. 3d 1058 (N.D. Cal. 2014) to argue

United States District Court
Northern District of California

1   argument fails.

2   Third, Altria contends that because these plaintiffs have an adequate remedy at law, they

3   cannot proceed on the UCL claim or on the unjust enrichment claim under California,

4   Massachusetts, Michigan or New York law.  *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834

5   (9th Cir. 2020).  At this juncture, plaintiffs are given leave to amend to allege that their remedies

6   at law are inadequate to preserve their UCL claim.  *See, e.g., In re JUUL Labs, Inc., Mktg., Sales*

7   *Practices, and Products Liab. Litig.*, 497 F. Supp. 3d 552, 638–39 (N.D. Cal. 2020) ("[P]laintiffs

8   are given leave to amend to expressly allege that their remedies at law are inadequate and to

9   support their claim to equitable restitution under the UCL and FAL" and noting that hurdle was

10   likely to be cleared given "the allegations regarding unfair conduct are not otherwise coextensive

11   with plaintiffs' legal claims and given the preliminary stage of these proceedings").  As with the

12   UCL claim, plaintiffs are given leave to amend to expressly allege and provide context to their

13   allegations that their remedies at law are inadequate under California, Massachusetts, Michigan,

14   and New York law to preserve their unjust enrichment claims under California, Massachusetts,

15   Michigan, and New York law.

16   Accordingly, Altria's motion to dismiss the UCL and unjust enrichment claims under

17   California, Massachusetts, Michigan, and New York law is GRANTED with leave to amend so

18   that plaintiffs can allege that their remedies at law are inadequate.[25]

19   ### 3.   Service of IPP Complaints of Larimore, Matshullat, and May

20   Altria contends that three IPP plaintiffs – Larimore, Matshullat, and May – had not (at the

21

United States District Court
Northern District of California

22   _____

that the unjust enrichment claims under Michigan and New York law must be dismissed.  There, I
23   concluded – after full briefing under various states' laws – that "the transactions and relationships
between the indirect purchaser plaintiffs and the defendants are too attenuated to state an unjust
24   enrichment claim under" either Michigan law or New York law.  *Id.* at 1088, 1090.  That may be
the result here as well, but absent direct and full briefing on cases under these states' laws – that
25   Altria does not provide – I will not separately consider this argument now.  Nor will I address
arguments and cases raised only in reply.  *See, e.g.*, Altria Reply at 27 (relying on *In re Suboxone*
26   *(Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 705 (E.D. Pa.
2014) (addressing unjust enrichment claims under Florida law).

27   [25] To the extent that plaintiffs want to add additional allegations regarding how Altria benefitted
28   from JLI's charging consumers supracompetitive prices for its products, they may do so.

1    time Altria filed its motion to dismiss) served Altria.  It argues that this failure is significant

2    because these IPPs are the sole representatives for some of the IPP claims.  It asserts that there is

3    no good cause that could forgive this failure, and says in reply that the service of the IPP

4    Consolidated Class Action Complaint (that occurred after Altria's motion was filed) does not cure

5    the issue as Pretrial Order No. 1 in this case provides that filing a consolidated complaint does not,

6    on its own, join a party to this action.  ECF No. 129 at 2.

7         In response, plaintiffs argue that they had a good faith belief that defendants would not

8    raise a defense based on service, but they acknowledge they must have misunderstood the parties'

9    agreement.  Declaration of Thomas H. Burt, Dkt. No. 227-1.  Nonetheless, they contend that Altria

10   has not suffered any cognizable harm.  Altria knows all of the facts on which the IPP claims are

11   based.  Given the service of the IPP CAC, it likewise knows the basis of these three IPPs' claims.

12        There is no cognizable prejudice to Altria.  The three IPPs are given leave to serve their

13   original complaints on Altria at the same time the IPPs serve their Amended Consolidated Class

14   Action Complaints as required by this Order.

### 4.   Personal Jurisdiction over Altria on state law claims[26]

16        Altria argues that even if the court has jurisdiction over Altria on the federal law claims, it

17   lacks that jurisdiction for the state law claims.  Plaintiffs respond that because the federal claims

18   survive, as discussed above, pendent jurisdiction exists over the state law claims despite Altria's

19   argument that pendant jurisdiction was overruled by *Bristol-Myers Squibb Co. v. Super. Ct. of*

20   *California, San Francisco County*, 137 S. Ct. 1773 (2017).  *See, e.g., Chavez v. Stellar*

21   *Management Group VII, LLC*, 19-CV-01353-JCS, 2020 WL 4505482, at *8 (N.D. Cal. Aug. 5,

22   2020) (exercising pendant jurisdiction because "Bristol-Myers does not apply to federal courts and

23   federal laws"); *see also Contl. Automotive Sys., Inc. v. Avanci, LLC*, 19-CV-02520-LHK, 2019

24   WL 6735604, at *8 (N.D. Cal. Dec. 11, 2019) ("because the doctrine of pendant personal

25   jurisdiction authorizes personal jurisdiction over Plaintiff's state law claims. Pendent personal

26   _____

27   [26] Altria raises two arguments, foreclosed by Ninth Circuit precedent, for purposes of preserving them on appeal: that venue is not appropriate here under the Clayton Act and that this court does

28   not have personal jurisdiction over Altria under the federal claims.  Altria Mot. at 45-46.  The motion is DENIED on those arguments, and they are preserved for appeal.

1   jurisdiction is commonly applied where, as here, 'one or more federal claims for which there is

2   nationwide personal jurisdiction are combined in the same suit with one or more state or federal

3   claims for which there is not nationwide personal jurisdiction.'").

4     Even if pendent jurisdiction were not available given the posture of this case, specific

5   jurisdiction exists.  Altria allegedly negotiated the anticompetitive Agreement with a California-

6   based on company in part by attending meetings that took place in California.  IRP CAC ¶¶ 83, 84,

7   91, 94, 221; IPP CAC ¶¶ 86, 87, 94, 97, 224; DPP CAC ¶¶ 79, 87.  It is that anticompetitive

8   Agreement that caused the plaintiffs' harm.  There is jurisdiction over Altria.  *See also In re JUUL*

9   *Labs, Inc., Mktg. Sales Prac. and Products Liab. Litig*., 19-MD-02913-WHO, 2021 WL 3112460,

10   at *21 (N.D. Cal. July 22, 2021).

## III.   REQUEST FOR JUDICIAL NOTICE

12     In support of its motion to dismiss, Altria asks me to take judicial notice of fifteen exhibits,

13   nine under the doctrine of judicial notice (Exhibits 1-7, 9, 13) and six under the doctrine of

14   incorporation by reference (Exhibits 8, 10-12, 14-15).  Request for Judicial Notice, Dkt. No. 208.

15   Plaintiffs oppose in part.  Dkt. Nos. 233, 228.  I take judicial notice of the existence of the

16   regulatory publications (Exhibits 1-3, 6-7) for the fact that they were issued and the topics they

17   covered, but I do not take judicial notice of the disputed facts regarding the impact those

18   pronouncements had on any party.  I decline to take judicial notice of the news articles and press

19   releases (Exhibits 4-5, 9, 13).  The contents of those publications are not relevant to my

20   determination of the motions at issue.

21     The exhibits Altria argues are incorporated by reference into the CACs are: letters and

22   emails from JLI and Altria (Exs. 8, 10), the Service Agreement (Ex. 11), the October 2019 Wells

23   Fargo Report (Ex. 12), the January 2020 Amendment to the Relationship Agreement (Ex. 14), and

24   the February 2019 Wells Fargo Report (Ex. 15).

25     The IPP and IRPs object to the incorporation by reference in whole of Exhibits 11 and 14

26   (the Service Agreement and the Amendment), arguing that they are unauthenticated and

27

28

United States District Court
Northern District of California

introduced only to suggest an alternate explanation for Altria's conduct.  Dkt. No. 228.[27]   I agree with Altria that these two segments of the alleged antitrust agreement are incorporated by reference by the repeated citation to them in the CACs.  However, I cannot and do not resolve the parties' disputes over what certain provisions in those documents mean.  As noted above, the parties argue the provisions mean different things on their face or in the context of the other written and unwritten agreements and communications between the parties.  Exhibits 8 and 10, correspondence between the parties, are likewise incorporated by reference, but are not considered to resolve the parties' disputes over what the assertions and provisions in those communications mean.

Exhibits 12 and 15, the Wells Fargo Reports, will not be incorporated by reference, except for the one chart specifically included in the CACs (from the October 2019 Report) and the chart the Indirect Plaintiffs thought they were including (from the February 2019 Report).  The February chart is mentioned only twice in the complaints.  IPP CAC ¶ 48, IRP CAC ¶ 45 ("In a February 11, 2019 presentation, an analyst at Wells Fargo Securities, LLC said that JUUL "re-ignited" the e-cigarette category and depicted its dominance in the following chart").  In other portions of their CACs, the indirect plaintiffs also cite an unspecified Wells Fargo report addressing market share, but plaintiffs assert that is a reference to the same exact information.  *See* IPP CAC ¶ 151, IRP CAC ¶ 148 ("According to a Wells Fargo report on the tobacco industry based on Nielsen scanner data, JUUL had amassed a 72 percent market share by August 2018. Altria's market share at that time was 8 percent."); *see also* DPP CAC ¶ 136 ("According to a Wells Fargo report on the tobacco industry based on Nielsen scanner data, JLI had amassed a 72 percent market share by August of 2018. Altria's market share at that time was 8 percent."); ¶ 137 ("According to the same Wells Fargo report, Altria began withdrawing its products from the market in October 2018. By November, Altria's market share had fallen to 4 percent, and JLI's had grown to over 75

---

[27] The DPPs object to incorporation of reference for each of these because defendants allegedly rely on them only to present their own "version" or gloss on the contents to support their arguments, which is improper.  Dkt. No. 233.

United States District Court
Northern District of California

1    percent.").[28]

2          At most, therefore, the two charts and the explanatory language is subject to incorporation

3    by reference.[29]  Any other chart or information calling into question the *same* specific topic from

4    the same reports might possibly fall within the incorporation by reference doctrine but defendants

5    do not identify any *other* chart or information in the Reports that would meet those criteria.  The

6    incorporation by reference doctrine cannot be stretched to include the full and varied contents of

7    both Reports, prepared by a third-party and not adequately authenticated, whose conclusions are

8    disputed by the parties.

9                                            **CONCLUSION**

10         The motion to compel the three named Direct Purchaser Plaintiff claims against JLI and

11   the Director Defendants is GRANTED.  The effect of this Order is stayed for thirty (30) days to

12   allow the DPPs to substitute in a class representative whose claims against JLI and the Director

13   Defendants would not be subject to arbitration and for the DPPs to notify me whether they want

14   these claims dismissed or stayed pending arbitration.

15         Plaintiffs' claims for injunctive relief are DISMISSED, but plaintiffs are given leave to

16   amend to identify and include allegations that some or all of the named plaintiffs may suffer future

17   injury to support the claims for injunctive relief.

18         The UCL claim and state unjust enrichment claims under California, Massachusetts,

19   Michigan or New York law are DISMISSED, but plaintiffs are given leave to amend to plead that

20   their remedies at law are inadequate.

21         The DPPs' claim for injunctive relief against the Director Defendants is DISMISSED with

22   prejudice.  The DPPs' Section 7 claim against the Director Defendants is DISMISSED with

23   prejudice.

24         Defendants' motions are otherwise DENIED.

25   _____

26   [28] The indirect plaintiffs explain they mistakenly included the chart from the Wells Fargo October
     15, 2019 analyst report (Ex. 12) in their CACs but intended to include and referred to a chart from
27   the referenced Wells Fargo February 11, 2019 analyst report (Ex. 15). Dkt. No. 228 at 7 n. 3.

28   [29] As noted above, however, these charts do not fatally undermine the adequacy of plaintiffs'
     antitrust injury allegations.

United States District Court
Northern District of California

1    Plaintiffs shall file their amended Consolidated Class Action Complaints by September 20,

2    2021.

3    Dated: August 19, 2021

4

5    _____

6    William H. Orrick
     United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California