**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan (admitted *pro hac vice*)
*rkaplan@kaplanfox.com*
Elana Katcher (admitted *pro hac vice*)
*ekatcher@kaplanfox.com*
Jason A. Uris (admitted *pro hac vice*)
*juris@kaplanfox.com*
850 Third Avenue, 14th Floor
New York, New York 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206423)
*lking@kaplanfox.com*
1999 Harrison Street, Suite 1560
Oakland, CA  94612
Telephone: (415) 772-4700
Facsimile: (415) 772-4709

*Steering Committee Counsel for Indirect
Purchaser Plaintiffs and the Indirect
Reseller Plaintiffs and Counsel for Plaintiffs
Sofijon, Inc., Rose And Fifth, Inc., and
Napht, Inc.*

[Additional Counsel on Signature Page]

**CERA LLP**
Solomon B. Cera (SBN 099467)
Pamela A. Markert (SBN 203780)
595 Market Street, Suite 1350
San Francisco, CA 94105
Telephone: (415) 777-2230
Facsimile: (415) 777-5189
Email: scera@cerallp.com
Email: pmarkert@cerallp.com

*Steering Committee Counsel for Indirect
Purchaser Plaintiffs and the Indirect Reseller
Plaintiffs and Counsel for Plaintiff B&C
Retail, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE JUUL LABS, INC. ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>All Indirect Reseller Actions | Master File No. 3:20-cv-02345-WHO<br><br>**INDIRECT RESELLER PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

**Page(s)**

I.      INTRODUCTION ............................................................................................................. 1

II.     JURISDICTION AND VENUE ..................................................................................... 6

III.    INTRADISTRICT ASSIGNMENT ................................................................................ 7

IV.     PARTIES .......................................................................................................................... 7

V.      AGENTS AND CO-CONSPIRATORS ......................................................................... 11

VI.     FACTUAL ALLEGATIONS ........................................................................................... 11

    A.     Development of E-Cigarettes and The Rise of JUUL ........................................... 11

    B.     Altria Was Well-Positioned to Compete With JUUL ............................................ 14

    C.     JUUL's and Altria's 2018 Negotiations and the Resultant Non-Compete Agreement ................................................................................................................. 18

    D.     JUUL's Regulatory Problems and Altria's Responses ......................................... 25

VII.    MARKET STRUCTURE ................................................................................................. 30

    A.     Relevant Market ..................................................................................................... 30

    B.     The E-Cigarette Market's High Barriers to Entry ................................................. 32

    C.     Market Concentration ............................................................................................ 33

    D.     Monopoly Power .................................................................................................... 33

VIII.   ANTICOMPETITIVE EFFECTS .................................................................................. 34

IX.     CLASS ACTION ALLEGATIONS ............................................................................... 37

X.      CLAIMS FOR RELIEF .................................................................................................. 40

FIRST CLAIM FOR RELIEF
    Violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3 (On Behalf of the Nationwide Class for Injunctive Relief) ................................................................. 40

SECOND CLAIM FOR RELIEF
    Violation of Section 2 of the Sherman Act - Monopolization, 15 U.S.C. § 2 Against Juul (On Behalf of the Nationwide Class for Injunctive Relief) ............................................... 41

THIRD CLAIM FOR RELIEF
    Violation of Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2) (Attempted Monopolization Against Juul) (By Plaintiffs Sofijon, Rose And Fifth, Inc., B&C, Napht, Irwindale Fuel Station, and Noor Baig On Behalf of the Nationwide Class for Injunctive Relief) ........................................................................................................................ 42

INDIRECT RESELLER PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

Page

FOURTH CLAIM FOR RELIEF
  Violation of Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2) (Conspiracy to Monopolize) (By Plaintiffs Sofijon, Rose And Fifth, Inc., B&C, Napht, Irwindale Fuel Station, and Noor Baig On Behalf of the Nationwide Class for Injunctive Relief)........... 42

FIFTH CLAIM FOR RELIEF
  Violation of Section 7 of the Clayton Act (15 U.S.C. § 18) ............................................. 43

SIXTH CLAIM FOR RELIEF
  Violation of California Antitrust Statutes  (On behalf of the Nationwide Class, on behalf of the Cartwright Act Class and by Plaintiffs Sofijon, Rose And Fifth, Inc., B&C, Napht, Irwindale Fuel Station on behalf of the California State Class for Damages) ................... 44

SEVENTH CLAIM FOR RELIEF
  Violation of California's Unfair Competition Law, Cal. Bus.& Prof.  Code § 17200, et seq. (the "UCL") (On behalf of the Nationwide Class and By Plaintiffs Sofijon, Rose And Fifth, Inc.,  B&C, Napht, Irwindale Fuel Station on behalf of California State Class) ..... 46

EIGHTH CLAIM FOR RELIEF
  Violation of the Florida Deceptive and Unfair Trade Practices Act (By Noor Baig on behalf of the Florida Class) ........................................................................ 48

NINTH CLAIM FOR RELIEF
  Violation of the Michigan Antitrust Reform Act (Mich. Comp. Laws § 445.771, et seq.) (By Somerset Party Store on behalf of the Michigan Class) ............................................. 49

TENTH CLAIM FOR RELIEF
  Violation of Section 340 of New York General Business Law (By Big Puffs on behalf of the New York Class) ................................................................................... 50

XI.    LACK OF ADEQUATE REMEDIES AT LAW ............................................................. 51

XII.   PRAYER FOR RELIEF .................................................................................. 52

XIII.  JURY TRIAL DEMANDED .............................................................................. 53

Plaintiffs Sofijon, Inc., Rose And Fifth, Inc., Napht, Inc., B&C Retail, Inc., Noor Baig, Inc., Somerset Party Store Inc., Irwindale Fuel Station, Inc., and Big Puffs Vapor Store (collectively, "Plaintiffs"), individually and on behalf of all similarly situated persons and entities that indirectly purchased Juul e-cigarettes for resale allege the following against Defendants Altria Group, Inc. and Altria Enterprises LLC (together, "Altria") and Juul Labs, Inc. ("JUUL") for damages, injunctive relief and other relief pursuant to federal antitrust laws, state antitrust, unfair competition, and consumer protection laws, and the laws of unjust enrichment, and demand a trial by jury. The allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based upon publicly available information, the investigation conducted by and through their attorneys, and limited discovery conducted to date.

## I.      **INTRODUCTION**[1]

1.      This class action involves agreements among horizontal competitors JUUL and Altria to eliminate competition by Altria in the market for closed-system electronic cigarettes ("Closed-System E-Cigarettes") in exchange for a partial ownership interest in JUUL. These agreements effectuated a horizontal allocation of the market in that JUUL and Altria agreed that Altria would exit the market entirely and become a minority shareholder in JUUL.

2.      This conduct constitutes a per se violation of Sections 1 and 3 of the Sherman Act and constitutes an unlawful acquisition in violation of Section 7 of the Clayton Act. In violation of Section 2 of the Sherman Act, JUUL monopolized the relevant market of Closed-System E-Cigarettes sold in the United States and its territories, and JUUL and Altria conspired to monopolize that market.

3.      Defendants entered into written agreements including—the "Relationship Agreement", dated December 20, 2018; the "Amended Relationship Agreement", dated January 28, 2020; and a commitment letter from Altria to JUUL, dated October 5, 2018—that contained unequivocal non-compete provisions. On April 1, 2020, the Federal Trade Commission ("FTC") filed an administrative complaint ("FTC Complaint") challenging the lawfulness of both the

---

[1]      The allegations contained herein in the "Introduction" and "Factual Allegations" sections are substantially similar to the allegations in the Indirect Purchaser Plaintiffs' Amended Consolidated Complaint filed on September 20, 2021.

agreements and the acquisition under Section 5 of the FTC Act (15 U.S.C. § 45) and noted that the conduct in question violated Section 1 of the Sherman Act and Section 7 of the Clayton Act. *Federal Trade Comm'n v. Altria Group, Inc., et al.*, Dkt. No. 9393 (F.T.C. April 1, 2020).[2]

4.     Unlike open-tank system e-cigarettes that allow users to mix their own liquids and are sold primarily in specialty vape shops, Closed-System E-Cigarettes have pre-filled, disposable pods or cartridges that are conveniently sold in a range of retail stores, including convenience stores and gas stations, and are easy to use by consumers. The JUUL system is a closed one such that it is not modifiable by the consumer.

5.     JUUL's Closed-System E-Cigarette consists of three components: (a) a flat, rectangular device consisting of an aluminum shell, a battery, a magnet (for the USB charger), a circuit board, an LED light, and a pressure sensor; (b) a USB charger; and (c) a pre-filled, non-reusable e-liquid cartridge (known as a "JUULpod") that serves as a mouthpiece and contains a fixed concentration of nicotine mixed with flavoring and other additives that mimics the ability of a cigarette to deliver nicotine to the human brain. Since its entry into the Closed-System E-Cigarette market in June of 2015, JUUL quickly became the market leader, obtaining a 75% share by October of 2018.

6.     The Altria Group was previously known as Philip Morris Companies, Inc. until 2003 and is the leading manufacturer of combustible cigarettes in the United States and its territories. However, in the U.S., combustible cigarette sales volumes are declining between 4% and 6% annually. To offset these steady losses, Altria invested heavily in developing alternative nicotine-delivery products such as Closed-System E-Cigarettes. Its CEO believed that such products could overtake combustible cigarettes in sales within a decade.

7.     Altria entered the Closed-System E-Cigarette market in 2013, when its subsidiary Nu Mark LLC ("Nu Mark") began trials of the MarkTen Closed-System E-Cigarette. The product was

---

[2]     A redacted version of the FTC Complaint is available at: https://www.ftc.gov/system/files/documents/cases/d09393_administrative_part_iii_complaint-public_version.pdf. The FTC action did not include claims under Section 2 of the Sherman Act, but the concurring statement of Commissioners Rohit Chopra ("Chopra") and Rebecca Kelly Slaughter ("Slaughter") also said that the facts would sustain a claim under Section 5 of the FTC Act based on a theory of a conspiracy to monopolize in violation of Section 2 of the Sherman Act.

launched nationally in July of 2014. Altria added to its Closed-System E-Cigarette portfolio by acquiring Green Smoke Inc. for nearly $110 million in cash and $20 million in incentive payments in April of 2014. In February of 2018, it introduced the MarkTen Elite, a Closed-System E-Cigarette that resembled JUUL's product in both appearance and structure. In 2018, Altria spent $100 million to secure two-year commitments for prime retailer shelf-space for its MarkTen line. The same year, Altria launched its Apex product to compete with JUUL in online sales. In 2018, Altria generated over $25.364 billion in worldwide net revenues.

8.      Prior to JUUL's entry into the Closed-System E-Cigarette market, Altria had a 16% share of the e-cigarette market and was primed to become a dominant player in the Closed-System E-Cigarette market.

9.      In light of declining sales in the market for combustible cigarettes and a shift by consumers to alternative nicotine delivery devices, Altria viewed participation in the Closed-System E-Cigarette market as important to its long-term survival.

10.      The former CEO of the Altria Group, Marty Barrington ("Barrington"), laid out the rationale for his company's investment in e-cigarettes during a Consumer Analyst Group of New York conference held on February 21, 2018:

> [W]e knew the industry was evolving and adult tobacco consumers were seeking less harmful alternatives to combustible cigarettes. Preparing for this opportunity, we've spent years acquiring best-in-class regulatory and product development talent and building a compelling portfolio of non-combustible tobacco products with the potential to reduce risk.
>
> * * *
>
> We aspire to be the U.S. leader in authorized, non-combustible, reduced-risk products. The range of tobacco products available in the U.S. is diverse when compared to many international markets, and different product platforms appeal to different U.S. adult tobacco consumers. That's why we're taking a portfolio approach, focusing on the three most promising platforms for U.S. adult tobacco consumers: smokeless tobacco and oral nicotine-containing products, e-vapor and heated tobacco. . . .
>
> Our approach is clear: to maintain our leadership in combustible tobacco products while vigorously pursuing this innovation aspiration. Going forward, our strategies are to:
>
> • Maximize income from our combustible tobacco businesses;

INDIRECT RESELLER PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

- Grow income over time with non-combustible tobacco products; and

- Manage our diverse income streams and strong balance sheet to deliver consistent financial performance over the long term.

11. Altria was a serious competitor in the Closed-System E-Cigarette market. Because of Food and Drug Administration ("FDA") regulations that became applicable to e-cigarettes for the first time in 2016, companies that wish to enter or remain in the market must pass through an onerous application process that can take years and cost a manufacturer tens of millions of dollars. Thus, industry observers and analysts predicted that deep-pocket Big Tobacco companies such as Altria were best positioned for long-run industry dominance.

12. JUUL's rise presented Altria with a new and immediate threat on two fronts: it stood in the way of Altria's goal of leading the e-cigarette category and threatened to disrupt Altria's lucrative combustible cigarette business in the United States. Altria reacted to this threat by pursuing a dual-track strategy: (a) compete aggressively with JUUL, including through price promotions and product innovation; and (b) eliminate the threat by acquiring JUUL, its biggest Closed-System E-Cigarette competitor.

13. Negotiations between Altria and JUUL's private equity sponsors began no later than August 2017 and were described in Altria slide presentations under a code name ("Project Tree") as early as September 2017. The negotiations featured several iterations, including Altria acquiring JUUL entirely through various equity investment structures. Negotiations made intermittent progress, including exchanges of written terms in April 2018, but significant unresolved terms remained.

14. Altria's negotiations with JUUL intensified in the summer of 2018. JUUL insisted that a precondition for a purchase of a stake in the company was that Altria exit the market. As the FTC stated in paragraph 4 of the FTC Complaint, "[d]uring negotiations, [JUUL] insisted, and Altria recognized, that Altria's exit from the e-cigarette market was a non-negotiable condition for any deal. When Altria sought to weaken or remove any obligation to exit that market, [JUUL] conveyed that any such attempt was completely unacceptable." Altria accepted this condition in the commitment letter to JUUL dated October 5, 2018 and began dismantling its e-cigarette operations,

including removing the MarkTen Elite, Apex, and other e-cigarette products from the market.

15. Throughout the spring and summer of 2018, Altria continued to expand, plan for, market, and develop its suite of Closed-System E-Cigarette products that competed with JUUL. It continued on two fronts: (a) on the track to secure necessary Pre-Market Tobacco Approval from the FDA; and (b) to support and supplement its products in the marketplace, where it maintained a strong third-place position behind first-place JUUL and second-place Vuse brand.

16. Negotiations resumed and an agreement was signed on December 20, 2018. Altria acquired a 35% stake in JUUL for $12.8 billion. The deal was reflected in a number of separate agreements, including: (a) the "Purchase Agreement"; (b) a "Services Agreement", whereby Altria committed to provide various support services to JUUL; and (c) "Intellectual Property Licensing Agreement", which Altria described in a Form 8-K filed with the Securities & Exchange Commission as giving JUUL a "non-exclusive, royalty-free perpetual, irrevocable, sublicensable license to Altria's non-trademark licensable intellectual property rights in the e-vapor field. . . ." and (d) the aforementioned "Relationship Agreement" (the "Transaction"). In its Form 8-K, Altria specifically stated that:

> The Relationship Agreement generally prohibits Altria from competing, or otherwise acquiring an interest in an entity competing, in the e-vapor business for a period of at least six years from Closing [of the Transaction], extendable thereafter unless terminated by Altria. If another person were to acquire 40% or more of Altria's voting power, or 30% of Altria's voting power combined with contractual control of a majority of Altria's board of directors, that person would also be subject to certain non-compete obligations set forth in the Relationship Agreement.

17. Altria knew that a partnership with JUUL would stifle competition. In an October 2017 internal presentation, a "base scenario" assumption for the proposed Transaction was that "Juul grows without competition through 2020."

18. As JUUL summarized in a set of draft talking points for the announcement of the transaction: "$12 billion dollars that could have been spent competing with JUUL and our mission will now be used to help JUUL and our mission."

19. The non-compete provisions of the Relationship Agreement constitute a naked restraint of trade in the form of a market allocation between horizontal competitors. These

provisions remained in effect in the Amended Relationship Agreement entered into by Altria and JUUL on January 28, 2020. These agreements illegally restrained competition in the relevant market in violation of federal and state antitrust laws, unfair competition, and consumer protection laws.

20.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs were overcharged and sustained injury to their business and property. Plaintiffs and members of the proposed Classes were injured by the elimination of Altria as a competitor in the Closed-System E-Cigarette market, the payment of supra-competitive prices for JUUL's Closed-System E-Cigarettes[3] as a result, and were denied the benefits of competitive innovation that would have existed had Altria stayed in the Closed-System E-Cigarette market as an independent force.

## II.    JURISDICTION AND VENUE

21.    Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15, 26, to secure equitable and injunctive relief against Defendants for violating Section 1, 2 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2 and 3, and Section 7 of the Clayton Act, 15 U.S.C. § 18. Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, consumer protection, and unjust enrichment laws, and seek to obtain restitution, recover damages, and secure other relief against Defendants for violations of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law. This Court has jurisdiction over the subject matter of this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, Sections 1, 2 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, and 3, Section 7 of the Clayton Act, 15 U.S.C, § 18, and 28 U.S.C. §§ 1331 and 1337. This Court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332(d) and 1367 because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than one hundred members of the Class, and at least one member of the putative Class is a citizen of a state different from that of one of the Defendants. Venue is proper in this District pursuant to

---

[3]    References to purchases of JUUL's Closed-System E-Cigarettes include purchases of the JUUL device itself and/or JUULpods.

Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391 (b), (c), and (d), because JUUL is located in the District, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more Defendants are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District. The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## III.    INTRADISTRICT ASSIGNMENT

22.    Pursuant to N.D. Cal. Civil Local Rule 3.2 (c) and (e), assignment of this case to the San Francisco Division of the United States District Court for the Northern District of California is proper because the interstate trade and commerce involved and affected by Defendants' violations of the antitrust laws action was substantially conducted with, directed to or impacted Plaintiff and/or members of the Classes in counties located within the Division and JUUL's principal place of business is located within this Division.

## IV.    PARTIES

23.    Plaintiff Sofijon, Inc. ("Sofijon") is headquartered in Los Angeles County, California, with locations in Culver City, California and Santa Maria, California. Sofijon purchased in California JUUL's closed-system e-cigarette products indirectly, for resale, during the Class Period, October 25, 2018 through the date on which Defendants' anticompetitive conduct ceases. Sofijon was injured in its business or property in connection with its purchases during the Class Period as a result of Defendants' anticompetitive and unlawful conduct alleged herein. Sofijon continues to indirectly purchase Juul's closed-system e-cigarette products for resale, and intends to do so in the future, and thus faces the threat of continued harm unless the anticompetitive and unlawful conduct and agreements alleged herein is enjoined.

24.    Plaintiff Rose And Fifth, Inc. ("RFI"), is headquartered in Los Angeles, California,

with locations in Oxnard, California. RFI purchased JUUL's closed-system e-cigarette products indirectly, for resale, during the Class Period. RFI was injured in its business or property in connection with its purchases during the Class Period as a result of Defendants' anticompetitive and unlawful conduct alleged herein. RFI continues to indirectly purchase Juul's closed-system e-cigarette products for resale, and intends to do so in the future, and thus faces the threat of continued harm unless the anticompetitive and unlawful conduct and agreements alleged herein is enjoined.

25. Plaintiff Napht, Inc. ("Napht"), is headquartered in Los Angeles, California, with locations in Santa Maria, California. Napht purchased JUUL's closed-system e-cigarette products indirectly, for resale, during the Class Period. Napht was injured in its business or property in connection with its purchases during the Class Period as a result of Defendants' anticompetitive and unlawful conduct alleged herein. Napht continues to indirectly purchase Juul's closed-system e-cigarette products for resale, and intends to do so in the future, and thus faces the threat of continued harm unless the anticompetitive and unlawful conduct and agreements alleged herein is enjoined.

26. Plaintiff B&C Retail, Inc. ("B&C"), is headquartered in Ventura, California, with locations in Morro Bay, California, Paso Robles, California, Fillmore, California and Ojai, California. B&C purchased JUUL's closed-system e-cigarette products indirectly, for resale, during the Class Period. B&C was injured in its business or property in connection with its purchases during the Class Period as a result of Defendants' anticompetitive and unlawful conduct alleged herein. B&C continues to indirectly purchase Juul's closed-system e-cigarette products for resale, and intends to do so in the future, and thus faces the threat of continued harm unless the anticompetitive and unlawful conduct and agreements alleged herein is enjoined.

27. Plaintiff Irwindale Fuel Station, Inc. ("Irwindale Fuel Station") is headquartered in Los Angeles County, California, with locations in Irwindale, California. Plaintiff purchased in California JUUL's closed-system e-cigarette products indirectly, for resale, during the Class Period, October 25, 2018 through the date on which Defendants' anticompetitive conduct ceases. Plaintiff was injured in its business or property in connection with its purchases during the Class Period as a result of Defendants' anticompetitive and unlawful conduct alleged herein. Irwindale

INDIRECT RESELLER PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Fuel Station continues to indirectly purchase Juul's closed-system e-cigarette products for resale, and intends to do so in the future, and thus faces the threat of continued harm unless the anticompetitive and unlawful conduct and agreements alleged herein is enjoined.

28.    Plaintiff Big Puffs Vapor Store ("Big Puffs"), is headquartered in Jamestown, New York.  Big Puffs purchased in California JUUL's closed-system e-cigarette products indirectly, for resale, during the Class Period, October 25, 2018 through the date on which Defendants' anticompetitive conduct ceases. Big Puffs was injured in its business or property in connection with its purchases during the Class Period as a result of Defendants' anticompetitive and unlawful conduct alleged herein.

29.    Plaintiff Somerset Party Store Inc. ("Somerset Party Store") is a Michigan corporation with its principal place of business in Troy, Michigan. Plaintiff purchased JUUL's closed-system e-cigarette products indirectly, for resale, during the Class Period. Plaintiff was injured in its business or property in connection with its purchases during the Class Period as a result of Defendants' anticompetitive and unlawful conduct alleged herein.

30.    Plaintiff Noor Baig, Inc. ("Noor Baig") is a Florida corporation with its principal place of business in Orlando, Florida. Plaintiff purchased Juul's closed-system e-cigarette products indirectly, for resale, during the Class Period. Plaintiff was injured in its business or property in connection with its purchases during the Class Period as a result of Defendants' anticompetitive and unlawful conduct alleged herein. Noor Baig continues to indirectly purchase Juul's closed-system e-cigarette products for resale, and intends to do so in the future, and thus faces the threat of continued harm unless the anticompetitive and unlawful conduct and agreements alleged herein is enjoined.

31.    Defendant JUUL is a Delaware corporation with its principal place of business located at 560 20th Street, San Francisco, California 94107. JUUL is the leading manufacturer of closed-system e-cigarettes, generating over $1 billion in net revenue in 2018. JUUL was initially a division of Pax Labs ("Pax"), a maker of vaporizers based in San Francisco. Pax was founded in 2007 by James Monsees ("Monsees") and Adam Bowen ("Bowen"). Pax raised $13.9 billion in eight funding rounds from venture capitalists. As its sales grew, Pax spun off the division and

incorporated it as a separate company. Tyler Goldman, then the Chief Executive Officer ("CEO") of Pax, initially ran JUUL, but left in 2017. Kevin Burns ("Burns"), former head of yogurt maker Chobani, became the new CEO. Monsees is the company's chief product officer and Bowen is the company's chief technology officer. During the Class Period, JUUL sold e-cigarettes directly or through its subsidiaries, agents and affiliates to purchasers throughout the United States. JUUL is a party to the anticompetitive and unlawful agreements alleged herein, including the aforementioned Relationship Agreement and Amended Relationship Agreement.

32.     Defendant Altria Group, Inc. is a Virginia corporation headquartered at 6601 West Broad Street, Richmond, Virginia 22320. Prior to 2008, Altria Group also owned the international operations of Philip Morris. In 2008, Altria separated the firm's domestic and international operations. According to the Associated Press, the move cleared "the international tobacco business from the legal and regulatory constraints facing its domestic counterpart, Philip Morris USA." Altria is one of the country's largest tobacco companies and was, prior to the anticompetitive agreements alleged, a manufacturer of closed-system e-cigarettes. Altria stated that:

> Altria Group holds diversified positions across tobacco, alcohol and cannabis. Through our wholly owned subsidiaries and strategic investments in other companies, we seek to provide category- leading choices to adult consumers, while returning maximum value to shareholders through dividends and growth.
>
> Our tobacco companies – which have been the undisputed market leaders in the U.S. tobacco industry for decades – include some of the most enduring names in American business: Philip Morris USA, the maker of Marlboro cigarettes, and U.S. Smokeless Tobacco Company, the maker of Copenhagen and Skoal. We also own John Middleton, manufacturer of Black & Mild cigars, and Nat Sherman, a super-premium cigarette and cigar business. And we have 35 percent ownership of JUUL Labs, Inc., the nation's leading e-vapor company.

33.     During the Class Period, the Altria Group sold closed-system e-cigarettes directly or through its subsidiaries, agents and affiliates to purchasers throughout the United States and its territories. The Altria Group is a party to the anticompetitive and unlawful agreements alleged herein, including the aforementioned Relationship Agreement and Amended Relationship Agreement. In 2018, the Altria Group generated over $25.364 billion in worldwide net revenues.

34.     Defendant Altria Enterprises LLC is a wholly owned subsidiary of the Altria Group and is located at 6601 West Broad Street, Richmond, Virginia 22320. Altria Enterprises is a party to the anticompetitive and unlawful agreements alleged herein, including the aforementioned Relationship Agreement and Amended Relationship Agreement.

35.     Defendants Altria Group and Altria Enterprises are referred to collectively herein as "Altria."

## V.     AGENTS AND CO-CONSPIRATORS

36.     The anticompetitive and unlawful acts alleged against the Defendants in this class action complaint were authorized, ordered or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

37.     Defendants' agents operated under the authority and apparent authority of their principals. Defendants, through their subsidiaries, affiliates and agents operated as a single unified entity.

38.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

39.     Each Defendant acted as the principal, agent or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## VI.    FACTUAL ALLEGATIONS

### A.     Development of E-Cigarettes and The Rise of JUUL

40.     By 2013, the e-cigarette business had revenues of $1.7 billion a year. The numbers increased exponentially when JUUL entered the market. The following chart, taken from a 2018 research article, shows the dollar sales by company from 2011–17 with respect to retail channels tracked by the A.C. Nielsen Company ("Nielsen"):



**Figure 1** Sales dollar of e-cigarettes in Nielsen-tracked retail channels: by brand 2011–2017.

41.    By the fourth quarter of 2017, JUUL had more sales than any of its competitors, although Altria's sales numbers had been expanding over time.

42.    The market shares of tobacco companies competing in the e-cigarette market declined as a result of JUUL's entry and success. A 2018 research letter published in the *Journal of the American Medical Association* graphically depicts this development for the period from 2013–17.

INDIRECT RESELLER PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT



Figure. e-Cigarette Unit Sales and Market Share of e-Cigarette Unit Sales, by Manufacturer—United States, 2013-2017

43.     Other competitors in the Closed-System E-Cigarette market suffered setbacks that limited their ability to compete. For example, in April of 2018, R.J. Reynolds Vapor Co., a subsidiary of British American Tobacco, recalled its Vuse Vibe Power Units because of overheating, which led to a supply disruption.

44.     By October of 2018, JUUL had obtained a monopolistic share of the Closed-System E-Cigarette market.

45.     In a February 11, 2019 presentation, an analyst at Wells Fargo Securities, LLC said that JUUL "re-ignited" the e-cigarette category and depicted its dominance in the following chart.

INDIRECT RESELLER PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT



46.    Altria is the "MO" listed in this chart and it reflects the company's withdrawal from the market in late 2018 because of its non-compete agreement with JUUL.

47.    A JUUL starter pack had a retail price of $44.99, and a pack of four JUULpods cost $15.99. The device and the JUULpods were available "directly from JUUL Labs, Inc., other online retailers, and at 12,000 convenience stores in the U.S." By 2019, according to published reports, JUUL Closed-System E-Cigarettes were sold in 100,000 stores nationwide in addition to its own online retail portal.

**B.    Altria Was Well-Positioned to Compete With JUUL**

48.    Prior to JUUL's rise in popularity, Altria devoted a significant amount of time, money and resources competing with JUUL in the market for Closed-System E-Cigarettes in its oft-quoted quest to be a "market leader."

49.    Prior to Altria's agreement not to compete against JUUL, Altria was taking all necessary steps to bring its existing Closed-System E-Cigarette products to market. This meant efforts in two essential spheres. First, nicotine products are heavily regulated and require specific approvals which, in turn, need scientific support. Second, it meant continuing marketing efforts, ramping up manufacturing and distribution, all while continuing to develop future Closed-System

E-Cigarettes to compete with JUUL.

50.   Closed-System E-Cigarettes, like any new tobacco product, are subject to approval by the FDA. The FDA has had the ability to regulate tobacco products since the Family Smoking Prevention and Tobacco Control Act in 2009. In 2016, the FDA issued a rule deeming all tobacco products, including e-cigarette products, to be subject to these regulations. This is known in the industry as a "deeming rule."[4] Accordingly, e-cigarettes new to the U.S. market after February 15, 2007 need approval prior to going to market, unless they were substantially equivalent to a product already on the market. The approval required for products new after 2007 is called Pre-Market Tobacco Approval ("PMTA").  Despite the name, the approval is not truly pre-market for all competitors. If the product has been on the market prior to August 8, 2016 – essentially, before the Deeming Rule – the product could continue to be sold while a PMTA was pursued. The FDA set a date of May 12, 2020 for those product applications (which was later moved to September 9, 2020 due to the COVID-19 pandemic). PMTA was required for both JUUL and Altria.

51.   The PMTA requires specific, experimental support. In its Premarket Tobacco Guidance, the FDA acknowledges that it "does not believe there is adequate scientific information or regulatory experience with [e-cigarettes] to support a PMTA authorization using only information on earlier or other versions of the product …" and accordingly "it is likely that applicants will conduct certain investigations themselves and submit their own research" because existing research in the public domain would not satisfy the criteria.[5]  The Premarket Tobacco Guidance contained a section on the safety and ethics of "nonclinical and human subject studies" and included an invitation to applicants to discuss an investigational plan in advance with the Office of Science within the FDA's Center for Tobacco Products.

52.   Altria has decades of experience in the science of nicotine delivery devices, and specifically in designing scientific studies and presenting its results for the consideration of government regulators. In a November 2017 presentation to investors, Altria detailed the

[4]   *See* Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems, Guidance for Industry, June 2019 (Docket No. FDA-2015-D-2496) (hereinafter, "Premarket Tobacco Guidance").

[5]   Premarket Tobacco Guidance, pp. 26, 31.

INDIRECT RESELLER PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

"substantial amount of work" it has already undertaken to prepare numerous regulatory applications for submission to the FDA for e-cigarettes. Altria explained that its "significant investments in regulatory science have laid the groundwork for these submissions, and much of the foundational research is already underway."

53.   The scientific studies cost tens of millions of dollars per product. Altria and JUUL were well-positioned to afford this cost. Other competitors might reasonably be expected to exit the market as their deadlines for PMTA neared, leaving the market to consolidate in the hands of the strongest few.  When the September 9, 2020 extended deadline finally arrived, industry trade publications indicated that "many smaller manufacturers chose not to file applications at all, whereas some other companies submitted applications for only one or two products."

54.   As to the market, Altria had a solid position with its active and growing product offerings, third in market share behind JUUL, but gaining rapidly on second-place Vuse, which gained share early but was shown fading in Altria's internal market analysis.

55.   As reflected in a November 2017 document outlining Altria's "internal strategic initiatives," Altria was making plans to further secure its position by "improv[ing] production capability," "establishing capacity" and other steps "to effectively compete with Juul."

56.   Altria management emphasized the importance of the Closed-System E-Cigarette market during investor presentations and through internal incentive compensation plans. For example, in February 2018, Altria's then-COO Howard Willard ("Willard") explained, "Nu Mark's goal is to lead the U.S. e-vapor category with a portfolio of superior, potentially reduced-risk products that . . . generate cigarette-like margins at scale."

57.   Altria had a suite of products in its arsenal and pipeline that could compete with JUUL in the Closed-System E-Cigarette market in 2018, including the MarkTen, the MarkTen Elite, Apex, Green Smoke, CYNC, and Hudson.

58.   The MarkTen Elite was launched in February 2018. The "Elite" was a slim electronic device with a rechargeable battery and prefilled pods (in a variety of flavors) that was similar to JUUL's system. Altria closely studied JUUL's product and tailored its products to compete for market share. The MarkTen Elite, for example, was marketed with heavy promotional coupons to

ensure that the start-up cost to the user was less than JUUL. Altria's internal comparisons determined that MarkTen Elite could be marketed in this way and still approach JUUL's gross margin, making this marketplace positioning sustainable for the long haul. One advertisement indicated that a MarkTen Elite device and two pod packs could be purchased for as little as $5.99, and a battery and two pod packs could be purchased for $9.95.

59. In a March 2018 analyst report, Deutsche Bank continued to report on Altria's "further expansion planned for later in the year" in order to "compete more directly with rapidly-growing Juul."

60. In April 2018, Altria remained primed to "[l]ead the U.S. inhalable reduced-harm tobacco category market" and estimated that its MarkTen product would continue to experience increasing retail market share.

61. In a May 2018 presentation, Altria outlined its plans to "accelerate our progress toward leadership with reduced risk products," "develop plans to win" against its competition and "accelerate [its] innovation pipeline."

62. In its July 2018 earnings release, Altria touted the growth of Nu Mark, driven by expanded distribution. The release stated that "Nu Mark expanded MarkTen Elite from over 6,000 stores in the first quarter to more than 23,000 stores by the end of the second quarter." Altria expended considerable resources creating store displays for each of its Closed-System E-Cigarettes, consistent with long-term competition in the market.

63. In its July 2018, "Game Plan Discussion," Nu Mark outlined its long-term strategies, which emphasized "product innovation" and "[m]aximiz[ing] all available pathways to bring new products to market." The discussion also highlighted Nu Mark's strategy to improve manufacturing to deliver products "at a competitive cost."

64. As of July 2018, Altria had long-term plans to compete in the Closed-System E-Cigarette market beyond 2022.

65. In August 2018, Altria continued to be focused on "accelerat[ing] retail roll-out, improv[ing] retail execution and lower[ing] supply chain costs."

66. As late as September 2018—just weeks prior to agreeing to withdraw all of e-

INDIRECT RESELLER PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

cigarette products from the market—Altria was formulating agreements with Avail Vapor (an online and retail vape shop), with respect to the licensing of liquids used in Altria's e-vapor products, commercializing Altria e-vapor products in Avail's stores, and funding research and development for new innovative tobacco products and technologies.

67.    Altria's documents show that it did not slow the PMTA approval process for the MarkTen Elite until just days before agreeing to completely withdraw its products from the market.

- On October 9, 2018, Altria internally determined that "MarkTen PMTA is a go and should be staffed accordingly."

- On October 25, 2018, Altria externally announced withdrawal of other products, including the MarkTen Elite and Apex, from the market.

68.    Even with the JUUL Transaction almost complete, and while making public announcements that distanced itself from direct competition with JUUL, Altria kept the scientific efforts for approval moving forward. If the Transaction had for any reason fallen through, Altria would not have paused or relented in its efforts to get its competing products approved.

69.    Even after removing the MarkTen Elite product from the market, but before the Transaction was finalized, Altria took care in retiring the product.  On its face, the announcement did not tip Altria's hand that it was about to have an equity stake in the market-leading product, providing plausible deniability. But, the withdrawal of its Closed-System E-Cigarette products was done in such a way that Altria could easily resume marketing them if the Transaction fell through. Both scientifically and in the consumer marketplace, Altria had not fully committed to abandoning its own competitors to JUUL until the Transaction was publicly announced.

**C.    JUUL's and Altria's 2018 Negotiations and the Resultant Non-Compete Agreement**

70.    The negotiations between Altria and JUUL that led to the Relationship Agreement of December 20, 2018 were not publicly disclosed.  JUUL is a private company and has minimal public reporting obligations. Altria only reported on the end result, as reflected in its aforementioned Form 8-K. The allegations that follow are, therefore, based on the disclosures in the FTC Complaint, and limited internal Altria documents.

71.     On November 9, 2017, Willard, the former CEO of Altria, and Billy Gifford ("Gifford"), the Altria Group's CFO held a meeting with key Pax investors. Altria's goal was to "[c]omplete an investment / acquisition that provides access to Juul product and Pax capabilities."

72.     On November 21, 2017, Willard and Jon Moore, Nu Mark's Director of Marketing, had a call with representatives from Goldman Sachs (Pax's financial advisor) to discuss the potential deal.

73.     In the ensuing months, Perella Weinberg Partners (Altria's financial advisor) engaged with Goldman Sachs regarding the potential deal and facilitated further discussions between Altria and JUUL.

74.     On April 13, 2018, Willard sent Burns, and JUUL Board members Nick Pritzker ("Pritzker") and Riaz Valani ("Valani"), an email, copying Gifford, recommending a "Follow Up Discussion" early the following week during which he and Gifford would be prepared to share various proposals, including a proposal that "proposes a way for us to collaborate on . . . Sharing market and financial projections to gain agreement on the standalone and partnership value for the enterprise; ii) An efficient and appropriate due diligence process; and iii) A process to ensure that the strategy alignment and chemistry between our respective operating teams is supportive of a productive partnership that can create substantial value above what is achievable under a standalone scenario in a dynamic tobacco category environment."

75.     On April 20, 2018, Burns sent Willard a letter reflecting JUUL's "current thinking on price, payment and related terms." Among the key terms outlined was that "JUUL's and Altria's respective anti-trust counsel would discuss and develop a plan with respect to seeking and obtaining regulatory approval for the majority investment, including the treatment of any competitive products owned by Altria."

76.     By the summer of 2018, JUUL had made it clear to Altria that Altria's acquisition of a stake in JUUL was conditioned on its withdrawal from the e-cigarette market and discontinuance of its MarkTen Elite brand, which JUUL perceived as a competitive threat.

77.     On July 30, 2018, Pritzker sent Willard a draft term sheet for an agreement that incorporated this requirement. Specifically, the term sheet included the following key provision:

> Promptly and in no event later than nine months following the purchase, subject to the license referenced above, [Altria] will divest (or if divestiture is not reasonably practicable, contribute at no cost to [JUUL], and if such contribution is not reasonably practicable, then cease to operate), all [Altria] assets related to the field in the U.S., including all electronic nicotine delivery systems and products it acquired, developed or has under development.

78.    JUUL presented Altria with three options for meeting its demand for getting out of the e-cigarette business: (1) divest its e-cigarette assets; (2) contribute those assets to JUUL; or (3) cease operating those assets entirely. Continued competition from Altria's e-cigarette products was unacceptable. JUUL's former CFO confirmed that "what [JUUL was] more concerned with is we want a non-compete. How it's going to be accomplished, right, needs to be determined, and, frankly, we were putting the onus on [Altria] to figure it out."

79.    On August 1, 2018, Pritzker, Valani, Burns, Willard, and Gifford, met at the Park Hyatt Hotel in Washington, D.C. to discuss the term sheet; no lawyers for either company were permitted to attend. It was clear to Willard that Altria's exit from the e-cigarette market was a precondition to any deal with JUUL. Altria's draft talking points dated August 5, 2018, for Willard's use on a call with JUUL, noted that "[i]f we establish this partnership, then we expect that Altria will . . . potentially exit our own vapor business," and that "Altria has come a long way to accommodate you in this process, including . . . [[d]emonstrating flexibility with our existing vapor business, if necessary in order to form the partnership]."

80.    In other draft talking points, also dated August 5, 2018, Altria stated more broadly that, if an agreement could not be reached, Altria was prepared to "break off these discussions, shake hands, and agree to be competitors."

81.    On August 9, 2018, Gifford sent over a markup of the term sheet to Pritzker, Valani, and Burns that was "to serve as the basis of discussion at our upcoming meeting." That markup deleted a provision that would have required Altria to divest its e-cigarette business, contribute it to JUUL, or cease to operate it.

82.    During the August 9, 2018 meeting of the JUUL Board of Directors, the Board "generally expressed disappointment at many of the terms contained in the [Altria] summary of

- 20 -                      Case No. 3:20-cv-02345-WHO

terms."

83.     On August 15, 2018, Valani met with Dinny Devitre ("Devitre"), one of Altria's Board Members, at Devitre's office in New York. The purpose of this discussion was to go over a few key points of disagreement prior to a planned negotiating session in San Francisco between the Defendants. In connection with this discussion, JUUL delivered a blunt message to Altria: "You have retained the right under certain circumstances to compete not only with existing Mark Ten products, but also with products under development and future products. The commitment to divest Mark Ten has been stricken. This is not acceptable to us."

84.     During the week ending Friday, August 24, 2018, Altria's General Counsel Murray Garnick ("Garnick") was in San Francisco for negotiations with JUUL.

85.     The negotiations stalled at that point, but Willard later capitulated. He stated that he would accept this precondition and then confirmed it in a letter to Pritzker, Valani, and Burns, dated October 5, 2018, assuring them that:

> Altria would agree that it, and its current and future subsidiaries, will not compete in a manner consistent with our previous discussions in the U.S. e-vapor market for any period exclusive of the aforementioned transition period during which it provides support services.

86.     Burns forwarded Willard's letter to JUUL's Chief Legal Officer with a simple note: "Game on Again." The concessions contained in the letter led to the restart of the negotiations. Soon after, Altria began to take key steps that would facilitate a possible wind down of its Nu Mark business.

87.     On October 25, 2018, Altria announced that it was suspending its MarkTen Elite and Apex products, purportedly in deference to the FDA's concerns about e-cigarettes that attracted juvenile buyers.

88.     As a result, MarkTen Elite and Apex products were no longer available online and inventories in the hands of retailers would not be replenished. However, Altria sought to put MarkTen Elite "to bed in such a way that it can be easily revised [sic] later if the agile team wants to pursue it."

89.     On October 29, 2018, Garnick sent an email to Carmine Reale, Senior Assistant

General Counsel at Altria, stating "We have a list of competitors for the term sheet – we developed it in SF – do you have it?"

90.     On November 12, 2018, JUUL's CFO Tim Danaher ("Danaher"), Pritzker, Valani, Burns, Willard, Garnick, Chief Legal Officer Jerry Masoudi ("Masoudi"), and Altria's Kevin Crosthwaite ("Crossthwaite") participated in a conference call to "touch base."

91.     During the week of November 12, 2018, members of the Altria due diligence team flew to San Francisco for a "Diligence Trip." Diligence meetings were held throughout the week. Among the attendees were Burns, Danaher, JUUL Americas President Bob Robbins, Monsees, Masoudi; and Altria's Crosthwaite, Anthony Reale, TJ Edlich, David Wise, Brian Blaylock, Louanna Heuhsen, Mark Bradby, Mark Cruise, Rob Buell, Jason Flora, Matt Romyak, and Nicole Bielawski.

92.     On November 15, 2018, Garnick emailed Willard, Gifford, and Crosthwaite, stating that "if Tree goes forward, we need to consider canceling Mark Ten now (and saving money by not doing the HPHC analysis)."

93.     A few days later, Altria and JUUL agreed to the basic Transaction terms. On December 7, 2018, Altria announced that it was exiting the e-cigarette business entirely.

94.     On or around December 9, 2018, Willard, Garnick, Gifford, and Crosthwaite met with the "Tree principals" in San Francisco to discuss the deal.

95.     On December 9, 2018, Garnick emailed Masoudi at JUUL to discuss the deal. In response to Masoudi's inquiry about whether Defendants could sign a non-compete that would go into effect prior to antitrust clearance, Garnick reassured him that "[t]his is of course a nonissue, since we are not in the market anymore." This was only technically true:

- Altria had withdrawn some newer e-cigarette products on October 25, 2018, but only after deciding that PMTA for MarkTen, its best-selling existing e-cigarette, would move forward.

- Altria announced the withdrawal of its MarkTen, and complete exit from the Closed-System E-Cigarette market, on December 7, 2018.

- On December 9, 2018, two days later, Garnick said that antitrust clearance need

INDIRECT RESELLER PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

not delay Altria's noncompete with JUUL because Altria was "not in the market anymore."

96.     Altria rendered itself "not in the market anymore," in Garnick's words, so as to avoid a potential regulatory show-stopper, ***exactly two days*** prior to Garnick's statement.

97.     On December 20, 2018, the Altria-JUUL agreements were finalized.

In publicly announcing the deal, JUUL said in a press release: Today, we have been joined by an unlikely – and seemingly counterintuitive – investor in our journey. Altria today announced a minority investment of $12.8 billion into JUUL for a 35% ownership in the company along with services to accelerate our mission. We understand the controversy and skepticism that comes with an affiliation and partnership with the largest tobacco company in the US. We were skeptical as well. But over the course of the last several months we were convinced by actions, not words, that in fact this partnership could help accelerate our success switching adult smokers. We understand the doubt. We doubted as well. We made it very clear that any investment would need to meet demanding and specific criteria to ensure that they are committed to our mission.

98.     One of these criteria was that "an investor would have to allow JUUL to remain in control." The anticompetitive non-compete clause was not mentioned by JUUL.

99.     As JUUL summarized in a set of draft talking points for the announcement of the Transaction: "$12 billion dollars that could have been spent competing with JUUL and our mission will now be used to help JUUL and our mission."

100.    Article 3.1 of the Relationship Agreement between JUUL and Altria set forth the non-compete agreement. It reads, in relevant part:

[Altria] shall not . . . directly or indirectly (1) own, manage, operate, control, engage in or assist others in engaging in, the e-Vapor business; (2) take actions with the purpose of preparing to engage in the e-Vapor Business, including through engaging in or sponsoring research and development activities; or (3) Beneficially Own any equity interest in any Person, other than an aggregate of not more than four and nine-tenths percent (4.9%) of the equity interests of any Person which is publicly listed on a national stock exchange, that engages directly or indirectly in the e-Vapor Business (other than (x) as a result of [Altria's] Beneficial Ownership of Shares or (y) engagement in, or sponsorship of, research and development activities not directed toward the e-Vapor Business and not undertaken with the purpose of developing or commercializing technology or products in the e-Vapor Business) . . . .

Notwithstanding the foregoing, (x) the [Altria] and its Subsidiaries and controlled Affiliates may engage in the business relating to (I) its Green Smoke, MarkTen (or

- 23 -                   Case No. 3:20-cv-02345-WHO
INDIRECT RESELLER PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Solaris, which is the non-U.S. equivalent brand of MarkTen) and MarkTen Elite brands, in each case, as such business is presently conducted, subject to Section 4.1 of the Purchase Agreement, and (II) for a period of sixty (60) days commencing on the date of this Agreement, certain research and development activities pursuant to existing agreements with third parties that are in the process of being discontinued.

101. Article 3.2 further prohibited competition on an indirect basis with respect to any upstream affiliates of Altria.

102. The Relationship Agreement was later amended on January 28, 2020.

103. The Transaction directly removed Altria as an independent competitor in the Closed-System E-Cigarette market, and prevented Altria from introducing new e-cigarette products in the future. Additionally, the deal further impeded competition to the extent that Altria worked with JUUL to ensure that purchasers of Altria's tobacco products switch to JUUL rather than other Closed-System E-Cigarette companies' products, thus creating greater barriers to market entry for new entrants.

104. As the FTC stated in paragraph 62 of the FTC Complaint, the effect of the JUUL-Altria agreement was to: (a) "eliminat[e] MarkTen products from the relevant market, thereby eliminating current and future price competition between [JUUL and Altria], in particular promotional activity to create awareness and drive sales"; (b) eliminate "current and future innovation competition" between the companies; and (c) eliminate "current and future competition between [JUUL and Altria] for shelf space at retailers through rebates and other incentives." All of these identified harms constitute injury to Plaintiffs and members of the Classes.

105. Altria acquired a 35% stake in JUUL for $12.8 billion as a result of the Transaction. Altria was entitled to one "observer" on JUUL's Board at least until the FTC cleared the Transaction, which it has not. As the FTC explained at paragraphs 23–24 of the FTC Complaint with respect to the other agreements entered into between JUUL and Altria:

> Though it was later amended, under the initial Services Agreement, Altria agreed to provide certain services to [JUUL], divided between Initial and Extended Services. The Initial Services included leasing convenience store shelf space to [JUUL], regulatory consulting, and distribution support; the Extended Services included direct marketing support and sales services. Under the terms of the Relationship Agreement, the Non-Compete went into effect early in 2019 when Altria began to perform Extended Services. The Services Agreement had an initial six-year term,

subject to early termination by mutual consent or in case of material breach, bankruptcy, or insolvency. If the Services Agreement expired, Altria could discontinue the Non-Compete, at which point it would lose its right to appoint [JUUL] board members and its pre-emptive right to maintain its 35% stake in the company, but would regain its ability to compete in the market against [JUUL].

The Intellectual Property License Agreement grants [JUUL] a broad, non-exclusive, irrevocable license to Altria's e-cigarette intellectual property portfolio.

106.   The Relationship Agreement constitutes per se antitrust violations of Section 1 and 3 of the Sherman Act, collusive conduct in violation of Section 2 of the Sherman Act, and violates state antirust, consumer protection and unjust enrichment laws. JUUL and Altria are separate companies; neither owned the other. No joint venture was created between them. They were horizontal competitors who agreed that one of them would exit the market.

**D.   JUUL's Regulatory Problems and Altria's Responses**

107.   Before the Transaction was finalized, JUUL was facing severe regulatory criticism for marketing its e-cigarette products to teenagers. In April of 2018, Dr. Scott Gottlieb ("Gottlieb") of the FDA announced a "Youth Tobacco Prevention Plan" that would close access to e-cigarettes by minors; he pointed to numerous illegal sales of JUUL Products in this respect. In September of 2018, the FDA announced that it had undertaken the largest coordinated enforcement effort in its history issuing 1,300 warning letters or fines to retailers who sold JUUL and other e-cigarettes to minors as part of an "undercover blitz" of brick-and-mortar and online retailers. The agency also served JUUL and other manufacturers with comprehensive document requests. JUUL reported providing the agency with over 50,000 pages of documents.

108.   On November 3, 2018, JUUL discontinued retail sales of its mango, cucumber, creme and fruit JUULpods to third-party retailers and limited the distribution of these products to JUUL's own online shop.

109.   On September 9, 2019, the FDA sent JUUL a warning letter that stated: "[b]ased on our review of the information described above, FDA has determined that JUUL adulterated its products under section 902(8) of the FD&C Act (21 U.S.C. § 387b(8)) by selling or distributing them as modified risk tobacco products without an FDA order in effect that permits such sale or distribution." Thus, JUUL was accused of illegally selling its Closed-System E-Cigarettes. JUUL

responded by first eliminating sales in the United States and its territories of its fruit-flavored JUULpods on October 17, 2019. Thereafter, JUUL eliminated sales of mint-flavored JUULpods on November 7, 2019.

110.    On February 6, 2019, Gottlieb wrote a letter to Willard of Altria saying that Altria's plans for JUUL "contradict[ed] the commitments you made to the FDA in a meeting" held on October 18, 2018. He demanded another meeting and said that, "[w]hen we meet, Altria should be prepared to explain how this acquisition affects the full range of representations you made to the FDA and the public regarding your plans to stop marketing e-cigarettes and to address the crisis of youth use of e-cigarettes." Altria, JUUL, and Gottlieb met in March of 2019. Gottlieb was reported as saying that the meeting was "difficult" and that "he did not come away with any evidence that public health concerns drove Altria's decision to invest in Juul." The concurring statement of FTC Commissioners Chopra and Slaughter in support of the filing of the FTC Complaint reached a similar conclusion:

> [I]n October 2018, Altria publicly claimed that it was discontinuing its e-cigarette product due to concerns about youth vaping. This appears to be a pretext, as it was simultaneously looking to strike a massive deal with JUUL. With Altria's MarkTen out of the market, basic economic logic suggests that JUUL could capture those sales and further dominate the market.

111.    In 2019, various states and municipalities began imposing bans on JUUL and/or vaping products.

112.    Altria reacted by flexing its muscle as a shareholder and precipitating the ouster of some of JUUL's management. In September 2019, Burns resigned as JUUL's CEO, and was replaced by Crosthwaite, a Senior Vice-President of Altria who served as its Chief Growth Officer, oversaw Altria's entry into the e-cigarette market, and was Altria's designated interim "observer" on JUUL's Board pursuant to the terms of the Relationship Agreement.

113.    In October 2019, Crosthwaite brought in Joe Murillo ("Murillo") of Altria as JUUL's new chief regulatory officer; Murillo was the head of regulations at Altria and previously ran its e-cigarette business.

114.    Altria then sought to revise some of its December 2018 agreements with JUUL. The

INDIRECT RESELLER PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Services Agreement, Voting Agreement, and Relationship Agreement were amended on January 28, 2020. The FTC describes the amendments as follows in paragraphs 26–28 of its Complaint:

Under the Revised Voting Agreement, after the Antitrust Conversion, Altria will instead have the right to (1) appoint two (of nine) [JUUL] directors; (2) nominate one (of three) [JUUL] independent directors; (3) appoint one (of four) members of a Nominating Committee (who would have the right to veto independent director nominations); (4) appoint two (of five) members and the chair of a new Litigation Oversight Committee (which would have responsibility for managing litigation involving both Altria and [JUUL], i.e., "Joint Litigation Matters"); and (5) appoint one (of three) members of a Litigation Subcommittee (which would have authority, by unanimous vote, to change [JUUL's] senior outside counsel responsible for Joint Litigation Matters). The Revised Voting Agreement would further grant [JUUL's] CEO (1) a board seat, (2) a seat on the Litigation Oversight Committee, and (3) a seat on the Litigation Subcommittee.

The Amended Relationship Agreement gives Altria the option to be released from the Non-Compete if [JUUL] is prohibited by federal law from selling vaping products in the United States for at least a year or if Altria's internal valuation of the carrying value of its investment falls below 10% of its initial value of $12.8 billion.

The Amended Services Agreement eliminates all services except for regulatory support services. The amendment was effective at signing except as regards to Altria's provision of retail shelf space to [JUUL], which service terminates after March 31, 2020.

115.    On January 30, 2020 Altria filed an SEC Form 8-K that further described the Amended Relationship Agreement as follows:

The amendment to the Relationship Agreement provides for, among other things: (i) following antitrust clearance of the JUUL Investment, creation of a Litigation Oversight Committee of the JUUL board of directors, which will include two Altria designated directors (one of whom will chair such committee), that will have oversight authority and review of litigation management for matters in which JUUL and Altria are co-defendants and have or reasonably could have a written joint defense agreement in effect between them and, subject to certain limitations, will recommend to JUUL changes to outside counsel and litigation strategy by majority vote, with disagreements by JUUL's management being resolved by majority vote of JUUL's board of directors; and (ii) Altria to have the option to be released from its non-compete obligation (x) in the event JUUL is prohibited as a matter of federal law from selling vapor-based electronic nicotine delivery systems in the U.S. for a continuous period of at least 12 months (subject to tolling of this period in certain circumstances) or (y) if the carrying value of Altria's investment in JUUL is not more than $1.28 billion (which represents 10% of Altria's $12.8 billion initial carrying value of the JUUL investment).

116.    The FDA has not yet prohibited JUUL from selling vaping products in the United

INDIRECT RESELLER PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

States. On January 2, 2020, the agency adopted a policy that prioritized its enforcement efforts with respect to e-cigarettes. It stated:

> On Aug. 8, 2016, all e-cigarettes and other ENDS [electronic nicotine delivery systems] products became subject to the FDA's tobacco authorities, including the premarket authorization requirements in the Federal Food, Drug, and Cosmetic Act (FD&C Act). All e-cigarettes and other ENDS products on the market at that time needed to have authorization from the FDA to be legally marketed. However, as an exercise of its enforcement discretion, the agency had deferred enforcement of the premarket authorization requirements. To date, no ENDS products have been authorized by the FDA — meaning that all ENDS products currently on the market are considered illegally marketed and are subject to enforcement, at any time, in the FDA's discretion.
>
> Beginning 30 days from the publication of the notice of availability of this guidance in the Federal Register, the FDA intends to prioritize enforcement against these illegally marketed ENDS products by focusing on the following groups of products that do not have premarket authorization:
>
> —Any flavored, cartridge-based ENDS product (other than a tobacco- or menthol-flavored ENDS product);
>
> —All other ENDS products for which the manufacturer has failed to take (or is failing to take) adequate measures to prevent minors' access; and
>
> —Any ENDS product that is targeted to minors or likely to promote use of ENDS by minors.
>
> Cartridge-based ENDS products are a type of ENDS product that consists of, includes, or involves a cartridge or pod that holds liquid that is to be aerosolized when the product is used. For purposes of this policy, a cartridge or pod is any small, enclosed unit (sealed or unsealed) designed to fit within or operate as part of an ENDS product.
>
> By not prioritizing enforcement against other flavored ENDS products in the same way as flavored cartridge-based ENDS products, the FDA has attempted to balance the public health concerns related to youth use of ENDS products with considerations regarding addicted adult cigarette smokers who may try to use ENDS products to transition away from combustible tobacco products. In addition to data showing that cartridge-based ENDS products are most commonly used among youth, important findings from the 2019 Monitoring the Future survey focusing on youth use of JUUL indicate that youth preference for menthol- and tobacco- flavored e-cigarettes is much lower than that for mint- and fruit- flavored e-cigarettes. Because of the relatively low numbers of youth using both menthol- and tobacco-flavored, cartridge-based ENDS products, these products are not among the current enforcement priorities. However, should the FDA become aware of an increase of youth using any other flavored products (both cartridge-based or otherwise), the agency will take additional steps to address youth use of those products if necessary.

INDIRECT RESELLER PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

For all other products (cartridge-based or otherwise), including menthol-, tobacco-, and non-flavored ENDS products, the FDA will also prioritize enforcement where the manufacturer fails to take adequate measures to prevent youth access. For example, the FDA will consider whether the manufacturer has implemented adequate programs to monitor retailer compliance with age-verification and sales restrictions or if it has established and enforced penalties against retailers that fail to comply with those programs. The agency also will consider whether the manufacturer uses adequate age- verification technology (or requires that retailers who sell its products use such technology) to prevent underage access to its website and to prevent underage sales through the internet. In addition, consideration will be given to whether the manufacturer limits (or requires retailers who sell its products to limit) the quantity of ENDS products that a customer may purchase within a given period of time.

The FDA also intends to prioritize enforcement with respect to any ENDS products that are targeted to youth or likely to promote use of ENDS by youth. Examples include: products marketed with labeling and/or advertising that resemble kid-friendly foods and drinks such as juice boxes or kid-friendly cereal; products marketed directly to minors by promoting ease of concealing the product or disguising it as another product; and products marketed with characters designed to appeal to youth.

Importantly, the FDA's enforcement priorities are not a "ban" on flavored or cartridge-based ENDS. The FDA has already accepted and begun review of several premarket applications for flavored ENDS products through the pathway that Congress established in the Tobacco Control Act. Manufacturers that wish to market any ENDS product – including flavored e-cigarettes or e-liquids – are required by law to submit an application to the FDA that demonstrates that the product meets the applicable standard in the law, such as whether the product is appropriate for the protection of the public health. If a company can demonstrate to the FDA that a specific product meets the applicable standard set forth by Congress, including considering how the marketing of the product may affect youth initiation and use, then the FDA could authorize that product for sale.

The guidance also states that, after May 12, 2020, the FDA intends to also prioritize enforcement against any ENDS products that continue to be sold and for which the manufacturers have not submitted a premarket application. For ENDS products other than those in the three groups described above, if premarket applications are submitted by that date, the FDA intends to continue to exercise enforcement discretion for up to one year pending FDA review of the applications, unless there is a negative action by the FDA on such application or the product is authorized to be marketed by the FDA.

117.    While the FDA had the statutory power to force all e-cigarettes off the market as being sold illegally, it exercised its discretion not to do so and instead focused its enforcement authority on non-tobacco or non-menthol flavored e-cigarettes and e-cigarettes marketed to customers under the age of 21. JUUL ceased selling fruit-flavored and mint-flavored Closed-System

E-Cigarettes in October and November of 2019 and had modified its marketing policies so that it did not target persons under the age of 21. JUUL continues to market its Closed-System E-Cigarettes with Virginia Tobacco, Classic Tobacco, and Menthol flavoring.

118. The FDA required manufacturers to submit premarket applications for e-cigarettes pursuant to the Tobacco Control Act by May 12, 2020, and this requirement applies to e-cigarettes already being marketed. Tobacco-flavored or menthol-flavored e-cigarettes not being marketed to people under the age of 21 will be subject to an informal grace period of up to one year while the applications are being considered.

119. The FDA subsequently extended the May 12, 2020 filing deadline to September 9, 2020 in light of the COVID-19 pandemic.

120. JUUL filed a premarket application on July 30, 2020. So, JUUL will not yet be "prohibited by federal law from selling vaping products in the United States," and the non-compete clause contained in the Relationship Agreement between JUUL and Altria remains in full force and effect.[6]

## VII.    MARKET STRUCTURE

### A.    Relevant Market

121. The relevant product market for the purposes of this action is Closed-System E-Cigarettes.

122. E-cigarettes are battery-powered devices that vaporize a liquid solution containing nicotine (an "e-liquid"). There are two broad categories of e-cigarettes: closed-system and open-tank. Closed-System E-Cigarettes consist of a device housing a battery and a heating mechanism, and are used with cartridges or pods that are pre-filled with e-liquid and are non-reusable.

123. Examples of closed-system devices include cig-a-likes, which are similar to combustible cigarettes in size and shape (such as the MarkTen), and pod-based products, such as JUUL, MarkTen Elite, or Apex, which look like USB drives. Subsequent to the FDA flavor ban that went into effect in February 2020, closed-system pods and cartridges are available only in

---

[6]    Likewise, Altria has not written down the value of its $12.8 billion investment in JUUL below $1.28 billion. It has written down the value of that investment by a total of $11.2 billion, in separate write-offs undertaken in October of 2019, January of 2020 and October of 2020.

tobacco and menthol flavors.

124.    By contrast, open-tank e-cigarettes incorporate refillable tanks that customers manually fill with e-liquid. Because customers are able to select from (and mix together) a wide assortment of e-liquids, open-tank e-cigarettes allow a more customizable experience whereby users can experiment with different flavors and nicotine strengths. In addition, unlike closed-systems, users can customize the individual components of an open-tank system, such as the battery, heating coil, and atomizer (which houses the heating coil).

125.    Closed-System E-Cigarettes are largely sold in different channels than open-tank products, and open-tank customers tend to seek a different experience than closed-system customers, which prefer the smaller size, convenience, and ease of use of closed-systems.

126.    The vast majority of Closed-System E-Cigarettes are sold through the multi-outlet channel, which consists primarily of convenience stores. Convenience stores offer a limited range of e-cigarette products, focusing on the highest-velocity brands.

127.    In contrast, open-tank e-cigarettes are sold almost exclusively at dedicated vape shops, retail outlets that typically carry an extensive selection of e-liquids and parts for open-tank products and offer a high level of customer service.

128.    Most e-cigarette users are exclusive users of one design.

129.    Certain possible health differences between closed-systems versus open-system e-cigarettes have been reported.

130.    Altria reported on its sales and projected sales of e-cigarettes based on whether they were closed or open systems.

131.    Altria's marketing studies differentiated between closed-system and open-system vapors.

132.    Defendants considered their respective JUUL and MarkTen product lines to be direct competitors with each other and with other Closed-System E-Cigarette products, and set prices based on competition with each other and with other closed-system products. Defendants acknowledged that their Closed-System E-Cigarettes did not directly compete with open-tank products.

133.    There are no reasonable substitutes for Closed-System E-Cigarettes. Closed-System E-Cigarettes appeal to purchasers because they are discreet due to their small size, and convenient due to their self-contained, ready-to-use format. Open-tank e-cigarettes are not an adequate substitute for Closed-System E-Cigarettes because they are larger, more complex, and require more manual operation by the user. Open-tank e-cigarettes generally appeal to a different customer type, one that appreciates their complexity and customizable nature.

134.    As former FDA Commissioner Gottlieb noted in a Wall Street Journal article, "[n]ot all e-cigs are equal."  He urged the FDA to treat open and Closed-System E-Cigarettes differently based on their "different potential benefits and patterns of use…."

135.     The relevant geographic market is no broader than the United States. Because of FDA requirements, foreign firms cannot import e-cigarettes into the United States without prior FDA approval.

**B.    The E-Cigarette Market's High Barriers to Entry**

136.    Under the FDA regulatory framework, a manufacturer of a new tobacco product, including an e-cigarette, must submit a PMTA to the FDA.

137.    An e-cigarette that was on the market prior to August 8, 2016 may remain on the market, but the manufacturer of that product must have filed a PMTA in order to continue marketing it, and must remove the product in the event the PMTA is denied. An e-cigarette that was not on the market prior to August 8, 2016 cannot be marketed until it receives PMTA approval.

138.    Preparing a PMTA requires a significant amount of resources—time, research, and money—creating high barriers to entry in the e-cigarette market.

139.    JUUL estimated that preparing a PMTA for an e-cigarette would require approximately two and a half years after finalizing the product design. Clinical testing alone for certain products can take years.

140.    Altria estimated "that a PMTA for an [e-cigarette] would cost approximately $6 million per [] SKU" and JUUL estimated between $5 and $10 million per SKU. According to the FTC Complaint, Defendants' internal documents suggest that these figures may significantly underestimate the cost of the PMTA process. Another Big Tobacco company has estimated that it

- 32 -                    Case No. 3:20-cv-02345-WHO
INDIRECT RESELLER PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

would cost approximately $26 million to complete the process.

141. "JUUL's success can be partly attributed to its first mover advantage and the high barriers to entry in the US due to the FDA's deeming regulations." Altria is one of the few companies with the regulatory expertise, established Research & Development team, and sufficiently deep pockets to be a viable challenger to JUUL.

142. The FDA announced on January 2, 2020 that it had finalized a new enforcement policy which went into effect on February 6, 2020, prohibiting all non-tobacco/non-menthol flavors for cartridge-based e-cigarettes until a PMTA authorization is obtained.

143. Altria identified other barriers to entry in the e-cigarette market, including: product standards (including industry expertise and cost of implementation), operations (including ability to optimize costs and access to consumers), and the evolving category of reduced-risk products.

**C.     Market Concentration**

144. At the time of Altria's exit, the relevant market was already highly concentrated. Following Altria's exit, it became even more concentrated.

145. The Department of Justice and Federal Trade Commission, consistent with the Horizontal Merger Guidelines and federal court decisions, measure market concentration using the Herfindahl-Hirschman Index ("HHI"). The HHI is calculated by totaling the squares of the market shares of each firm in the relevant market. Under the Horizontal Merger Guidelines, a merger is presumed to enhance market power when the merger increases HHI by more than 200 points in a highly concentrated market, *i.e.*, in a market where the HHI is above 2,500.

146. In the U.S. market for Closed-System E-Cigarettes, the Transaction resulted in a post-Transaction HHI exceeding 2,500, with an increase in HHI of more than 200. Thus, the Transaction resulted in concentration that establishes a presumption of competitive harm in the relevant market.

**D.     Monopoly Power**

147. Throughout the Class Period, JUUL dominated the relevant market and maintained power to control prices and exclude competition in that market.

148. According to a Wells Fargo report on the tobacco industry based on Nielsen scanner

data, JUUL had amassed a 72 percent market share by August 2018. Altria's market share at that time was 8 percent.

149.    Altria began pulling its products off the market in October 2018. By November, Altria's market share had fallen to 4 percent, and JUUL's had grown to over 75 percent.

150.    By December 2018, Altria had pulled its e-cigarette products off the market entirely.

151.    The Transaction not only eliminated one of JUUL's most successful competitors, it gave JUUL access to Altria's vast resources and capital.

152.    The Transaction was intended to, and did, increase JUUL's monopoly power in the relevant market.

## VIII.   **ANTICOMPETITIVE EFFECTS**

153.    Defendants' conduct had the purpose, capacity, tendency, and effect of unreasonably restraining competition, and the Transaction substantially lessened competition in the U.S. market for Closed-System E-Cigarettes, including by:

- Eliminating Altria's Closed-System E-Cigarette products from the relevant market eliminating current and future price competition between Defendants, in particular promotional activity to create awareness and drive sales;

- Eliminating current and future innovation competition between Defendants; and

- Eliminating current and future competition between Defendants for shelf space at retailers through rebates and other incentives.

154.    Altria's agreement to exit the relevant market eliminated JUUL's most competitive rival. As a large, well-established, and well-funded company with longstanding relationships and significant shelf space with retailers nationwide, Altria had the resources and infrastructure to drive sales and compete aggressively.

155.    Before the shutdown of Nu Mark, JUUL and Altria relied on price promotions to drive sales of their respective e-cigarette products. In addition, each monitored the other's pricing in setting its own strategy. Altria's decision to withdraw its Closed-System E-Cigarettes from the market brought this price competition to an end.

156.    In addition to price competition, JUUL and Altria competed through product

INDIRECT RESELLER PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

innovation, including device features and e-liquid formulations. For example, it was JUUL's success that prompted Altria to acquire and further develop various pod-based Closed-System E-Cigarettes (including MarkTen Elite), and to commit significant resources toward developing e-liquid formulations with nicotine salts and higher nicotine concentrations.

157.    In the fall of 2018, Altria continued both its marketing and development efforts, and its move towards regulatory approvals. As a hedge against the risk that a deal with JUUL might fall through, Altria began implementing a "Plan B" that included the formation of "Growth Teams" that were charged with developing next generation e-cigarette products. At the time, Altria executives were willing to commit millions of dollars to these efforts, which only ended as, and in tandem with, the execution of the Transaction.

158.    Altria leveraged its ownership of leading brands across multiple tobacco categories in order to secure substantial and favorable shelf space at retailers throughout the United States. In 2018, for example, Altria launched a major campaign to secure shelf space for its innovative tobacco products (including e-cigarettes), offering retailers product discounts, slotting fees, and fixture payments. After the Transaction, instead of competing for shelf space, Altria leased its shelf space to JUUL, effectively replacing its own MarkTen products with JUUL Closed-System E-Cigarettes.

159.    Before committing to the Transaction, Altria intended to remain in the relevant market for the long term. Altria's documents and executive statements repeatedly evince their recognition that e-cigarettes were the future of the tobacco industry and their absolute commitment to participate in that future.

- Murillo stated: "And so we knew that the e-vapor category was a super important reduced risk opportunity for the company, and we were, you know, doing everything we could do to advance that."

- Barrington stated to investors: "We aspire to be the U.S. leader in authorized, non-combustible, reduced-risk products."

- Willard, in an interview with the Wall Street Journal, stated: "At a time when e-vapor is going to grow rapidly and likely cannibalize the consumers we have in our

core business, if you don't invest in the new areas you potentially put your ability to deliver that financial result at risk."

160. Altria sought a short cut to market leadership by investing in its competitor.

161. Altria agreed to abandon its long-standing and significant efforts at current and future competition in exchange for a significant share of JUUL profits resulting from a significantly less competitive marketplace.

162. Altria stood to benefit from increased JUUL retail prices on two fronts: (a) through increased JUUL profits as a direct investor in JUUL; and (b) through less cannibalization of Altria's combustible cigarette market. Altria's internal analysis shows higher gross margins for combustible cigarettes with increasing JUUL retail prices.

163. Altria's valuation of its investment in JLI is directly tied to the pricing and margins for JUUL Closed-System E-Cigarettes. Reduced competition and supra-competitive JUUL prices increase the value of Altria's investment.

164. Defendants cannot demonstrate cognizable efficiencies that would be sufficient to rebut the presumption that the Transaction substantially lessened competition in the relevant market. Nor can Defendants demonstrate pro-competitive benefits of the transaction that could not have been achieved through alternative, less restrictive means.

165. Defendants' unlawful conduct eliminated competition in the relevant market and deprived Plaintiffs and the Classes of the benefits of free and unrestrained competition that the antitrust laws were designed to ensure.

166. As specified in Paragraphs 23-30 above, certain Plaintiffs and members of the Class(es) are planned or likely future purchasers of JUUL Closed-System E-Cigarettes. Each Plaintiff has purchased JUUL Closed-System E-Cigarettes in the past at supra-competitive prices. Certain Plaintiffs and members of the Class(es) continue to purchase JUUL Closed-System E-Cigarettes, and intend to do so in the future. In the absence of injunctive relief, Plaintiffs and members of the Class(es) face likely future harm if no relief is achieved that cures the harm to competition in the market.

## IX.   CLASS ACTION ALLEGATIONS

167.   Plaintiffs bring this class action on behalf of themselves and all others similarly situated under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking injunctive relief under Sections 1 2 and 3 of the Sherman Act and Section 7 of the Clayton Act , and damages under California law, on behalf of the following class (the "Nationwide Class"):

> All businesses and entities in the United States that purchased closed-system e-cigarettes and/or pods indirectly from Juul for resale, from October 25, 2018 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period"). The following persons and entities are excluded from the Nationwide Class: Defendants and their counsel, officers, directors, management, employees, parents, subsidiaries, and affiliates; federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities.

168.   Plaintiffs also bring this class action on behalf of themselves and all others similarly situated under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking damages on behalf of the following multistate Cartwright Act Class (the "Cartwright Act Class"):

> All businesses and entities in the States of Arizona, Arkansas, California, the District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, and Wisconsin that purchased closed-system e-cigarettes and/or pods indirectly from Juul for resale, from October 25, 2018 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period"). The following persons and entities are excluded from the Nationwide Class: Defendants and their counsel, officers, directors, management, employees, parents, subsidiaries, and affiliates; federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities.

169.   Plaintiffs also bring this class action on behalf of themselves and all others similarly situated under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages for violations of individual state laws, on behalf of separate classes (each, a "State Class"), consisting of businesses and entities in each state that purchased during the Class Period closed-system e-cigarettes and/or pods indirectly from Juul for resale, under the laws of the following states: California, Florida, Michigan, and New York. The same persons and entities excluded from the Nationwide Class are excluded from each State Class. Each of the State Classes is individually

described and further defined:

    (A)    <u>The California Class</u>: All businesses and entities in the State of California that purchased closed-system e-cigarettes and/or pods indirectly from Juul for resale, from October 25, 2018 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").

    (B)    <u>The Florida Class</u>: All businesses and entities in the State of Florida that purchased closed-system e-cigarettes and/or pods indirectly from Juul for resale, from October 25, 2018 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").

    (C)    <u>The Michigan Class</u>: All businesses and entities in the State of Michigan that purchased closed-system e-cigarettes and/or pods indirectly from Juul for resale, from October 25, 2018 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").

    (D)    <u>The New York Class</u>: All businesses and entities in the State of New York that purchased closed-system e-cigarettes and/or pods indirectly from Juul for resale, from October 25, 2018 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").

170.    The Classes are sufficiently numerous. Plaintiffs believe that the Classes are so numerous and widely geographically dispersed throughout the United States that joinder of all members is impracticable. Moreover, given the costs of complex antitrust litigation, it would be uneconomic for many plaintiffs to bring individual claims and join them together.

171.    Plaintiffs will fairly and adequately protect and represent the interests of the Classes. The interests of Plaintiffs are aligned with, and not antagonistic to, those of the other members of the Classes.

172.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation and have particular experience with indirect antitrust litigation on behalf of indirect purchasers.

173.    Questions of law and fact common to members of the Classes predominate over questions, if any, that may affect only individual Class members, because Defendants have acted on grounds generally applicable to all members of the Classes. Such generally applicable questions are inherent in Defendants' wrongful conduct.

174.    Questions of law and fact common to the Classes include:

INDIRECT RESELLER PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

a.   whether the conduct alleged herein constitutes a violation of the federal antitrust laws;

b.   whether the U.S. and various State markets for closed-system e-cigarettes constitutes a relevant market;

c.   whether Defendants possess sufficient market power in the relevant market to cause anticompetitive effects;

d.   whether Juul possesses monopoly power in the relevant market;

e.   whether Juul and Altria conspired to maintain and enhance Juul's monopoly in the relevant market;

f.   whether the conduct alleged herein caused anticompetitive effects in the relevant market(s);

g.   whether Defendant JUUL monopolized the U.S. and various State markets for closed-system e-cigarettes;

h.   whether Defendants' conduct, as alleged in this Complaint, caused Plaintiffs and the Classes to pay supracompetitive prices for e-cigarettes and thereby suffer antitrust injury;

i.   the appropriate injunctive relief for the Classes; and the appropriate measure of damages sustained by Plaintiffs and other members of the Classes.

175.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

176.   Plaintiffs know of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## X.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### Violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3 (On Behalf of the Nationwide Class for Injunctive Relief)

177.   Plaintiffs repeat and reassert each of the allegations contained in the preceding paragraphs as if fully set forth herein.

178.   Defendants entered into and engaged in a continuing combination, conspiracy or agreement to unreasonably restrain trade or commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) by artificially reducing or eliminating competition with respect to the sale, marketing and distribution of closed system e-cigarettes sold to purchasers in the United States and its territories.

179.   In particular, Defendants have combined and conspired to divide and allocate the market for closed system e-cigarettes by eliminating Altria as a competitor, with the intended effect of raising, maintaining or stabilizing the prices of closed system e-cigarettes sold to purchasers in the United States and its territories.

180.   These violations of Section 1 and 3 consisted of, inter alia: (a) the unlawful Relationship Agreement between Altria and JUUL entered into on December 20, 2018 by which Altria agreed to exit the e-cigarette market in exchange for a 35% stake in JUUL; (b) the unlawful Amended Relationship Agreement entered into between Altria and JUUL on January 28, 2020 that perpetuated this withdrawal; and (c) the commitment given in writing by Altria to JUUL on October 5, 2018 to withdraw Altria's MarkTen Elite products. The purpose of all of these agreements was to raise, maintain or stabilize prices of closed system e-cigarette products, eliminate e-cigarette promotional activity by Altria, and eliminate Altria's independent presence as an innovative force with respect to e-cigarettes.

181.   Defendants' activities constitute a per se violation of Sections 1 of the Sherman Act.

182.   Defendants' conduct is also unlawful under the rule-of-reason standard of antitrust liability because at all relevant times Defendants possessed significant market power in the market for closed system e-cigarettes and their conduct had actual anticompetitive effects with no or

insufficient offsetting pro-competitive justifications.

183.    Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiff and members of the Class by eliminating independent competition by Altria on price, promotional activity, and innovation, reducing consumer choice, and allowing JUUL to raise, maintain or stabilize the prices of closed system e-cigarettes sold to purchasers in the United States and its territories.

184.    Defendants' unlawful conduct is ongoing and has not ceased. The present and future conduct by Defendants creates irreparable injury to both the Plaintiffs and the Class.  Plaintiffs and the Class are therefore entitled to injunctive relief pursuant to 15 U.S.C. § 26.

## SECOND CLAIM FOR RELIEF

### Violation of Section 2 of the Sherman Act - Monopolization, 15 U.S.C. § 2 Against Juul
### (On Behalf of the Nationwide Class for Injunctive Relief)

185.    Plaintiffs repeat and reassert each of the allegations contained in the preceding paragraphs as if fully set forth herein.

186.    At all times relevant to this action, Juul had monopoly power in the market for the sale of closed-system e-cigarettes in the United States. Juul controls a dominant share of the relevant market in the United States. Moreover, there are high barriers to entry in the market for closed-system e-cigarettes, including both technological and regulatory barriers.

187.    Juul has engaged in exclusionary conduct designed to prevent competition on the merits in the relevant market for closed system e-cigarettes, and thereby maintain and enhance their monopoly position in that market.

188.    Juul's anticompetitive conduct has decreased price competition in the relevant market, deprived consumers of free choice, and imposed antitrust price injury on wholesale distributors and end user customers.

189.    There are no legitimate business or pro-competitive justifications for Defendants' conduct and any purported legitimate business justifications are mere pretexts.

190.    Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

191.   If not enjoined, Juul will continue to engage in anticompetitive conduct that will further injure wholesalers, resellers, end users, and competition.

**THIRD CLAIM FOR RELIEF**

**Violation of Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2)**
**(Attempted Monopolization Against Juul)**
**(By Plaintiffs Sofijon, Rose And Fifth, Inc., B&C, Napht, Irwindale Fuel Station, and Noor Baig On Behalf of the Nationwide Class for Injunctive Relief)**

192.   Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in each and every paragraph above, as though fully stated herein.

193.   Juul has monopoly power, or at a minimum, a dangerous probability of success in acquiring monopoly power, in the relevant closed-system e-cigarette market.

194.   Juul has willfully, knowingly, and with specific intent to do so, attempted to monopolize the relevant e-cigarette market in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

195.   Juul's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the relevant closed-market e-cigarette market.

196.   Juul's ongoing anticompetitive conduct presents a dangerous probability that it will succeed, to the extent it has not already, in its attempt to monopolize the relevant market.

197.   Plaintiffs and members of the Class are each entitled to seek declaratory and injunctive relief under § 2 of the Sherman Antitrust Act, and other applicable law, to correct the anticompetitive effects caused by Juul's unlawful conduct.

**FOURTH CLAIM FOR RELIEF**

**Violation of Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2)**
**(Conspiracy to Monopolize)**
**(By Plaintiffs Sofijon, Rose And Fifth, Inc., B&C, Napht, Irwindale Fuel Station, and Noor Baig On Behalf of the Nationwide Class for Injunctive Relief)**

198.   Plaintiffs repeat and reassert each of the allegations contained in the preceding paragraphs as if fully set forth herein.

199.   Defendants entered into and engaged in a continuing combination, conspiracy or agreement to maintain and enhance Juul's monopoly in Sections 2 of the Sherman Act (15 U.S.C. §§ 2) by engaged in exclusionary conduct designed to prevent competition on the merits in the relevant market for closed-system e-cigarettes. Specifically, in exchange for a minority stake in Juul, Altria agreed to withdraw from the market, thereby securing Juul's ability to achieve monopoly profits by eliminating a competitor well-situated to compete on price and innovation.

200.   Overt acts in furtherance of this conspiracy consisted of, inter alia: (a) the unlawful Relationship Agreement between Altria and JUUL entered into on December 20, 2018 by which Altria agreed to exit the e-cigarette market in exchange for a 35% stake in JUUL; (b) the unlawful Amended Relationship Agreement entered into between Altria and JUUL on January 28, 2020 that perpetuated this withdrawal; and (c) the commitment given in writing by Altria to JUUL on October 5, 2018 to withdraw Altria's MarkTen Elite products.

201.   Defendants engaged in these acts with the specific intent of eliminating competition on the merits, and thereby reaping and sharing artificially inflated monopoly profits.

202.   Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiffs and members of the Class by eliminating independent competition by Altria on price, promotional activity, and innovation, reducing consumer choice, and allowing JUUL to raise, maintain or stabilize the prices of closed system e-cigarettes sold to purchasers in the United States and its territories.

203.   Defendants' unlawful conduct is ongoing and has not ceased. If not enjoined, Defendants will continue to engage in anticompetitive conduct that will further injure wholesalers, resellers, end users, and competition.

### FIFTH CLAIM FOR RELIEF

**Violation of Section 7 of the Clayton Act (15 U.S.C. § 18)**
**(By Plaintiffs Sofijon, Rose And Fifth, Inc., B&C, Napht, Irwindale Fuel Station, and Noor Baig) On Behalf of the Nationwide Class for Injunctive Relief)**

204.   Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in each and every paragraph above, as though fully stated herein.

205.   The merger transaction between Altria and Juul, in which Altria received a

substantial ownership stake in Juul and for the purposes of which Altria withdrew its existing e-cigarettes from the market and halted its innovation on future products, substantially lessened competition in the United States market for closed system e-cigarettes.

206.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the class were and continue to be injured in their business or property.

**SIXTH CLAIM FOR RELIEF**

**Violation of California Antitrust Statutes**
**(On behalf of the Nationwide Class, on behalf of the Cartwright Act Class and by Plaintiffs Sofijon, Rose And Fifth, Inc., B&C, Napht, Irwindale Fuel Station on behalf of the California State Class for Damages)**

207.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

208.    The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in California.

209.    California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

210.    Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code § 16750(a).

211.    A trust in California is any combination intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of merchandise, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust in California is unlawful except as provided by the Code. *Id*. at § 16726.

212.    Plaintiffs purchased JUUL closed-system e-cigarettes, including within the State of California, during the Class Period.  But for Defendants' conduct set forth herein, the price of JUUL closed system e-cigarettes would have been lower, in an amount to be determined at trial.

213.    Defendants enacted a combination of capital, skill or acts for the purpose of creating

INDIRECT RESELLER PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code § 16700, *et seq.*

214.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct preventing Plaintiffs in the exercise of due diligence from uncovering the unlawful conduct.

215.   Plaintiffs and members of the Cartwright Act Class were injured in their business or property, with respect to purchases of closed-system e-cigarettes nationwide and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

216.   Application of California law to claims based on purchases of JUUL products that occurred outside of California would not violate the Due Process Clause of the United States Constitution. JUUL engaged in anticompetitive conduct in California, and the connection between such conduct and California is not merely "slight and casual" or *de minimis*.

217.   JUUL's principal place of business is in San Francisco, California.

218.   A substantial amount of JUUL's sales occurred through California retail stores.

219.   JUUL hosted events targeted at high population areas, including California.

220.   JUUL executives responsible for orchestrating the non-compete arrangement with Altria are based in California.

221.   JUUL hosted numerous meetings with Altria leading up the Transaction in the State of California, including the diligence meetings that took place in November 2018 surrounding the close of the Transaction.

222.   At the diligence meetings, Defendants discussed various topics regarding the Transaction and non-compete arrangement.

223.   After the deal, Defendants' key executives and staff met regularly in Juul's San Francisco headquarters to implement the terms of the deal.

224.   Defendants' conduct caused harm to California residents and businesses.

225.   The State of California has a clear, substantial, legitimate, and compelling interest in protecting competition in California and entertaining claims by all victims of Defendants'

unlawful and anticompetitive conduct that emanated from within California's borders, not only those by California residents, and not only those by persons who purchased JUUL products within the State.

**SEVENTH CLAIM FOR RELIEF**

**Violation of California's Unfair Competition Law, Cal. Bus.& Prof. Code § 17200, *et seq.* (the "UCL")**
**(On behalf of the Nationwide Class and By Plaintiffs Sofijon, Rose And Fifth, Inc., B&C, Napht, Irwindale Fuel Station on behalf of California State Class)**

226. Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

227. During the Class Period, Defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

228. During the Class Period, Defendants illegal conduct substantially affected California commerce and purchasers.

229. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged in this Class Action Complaint, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

230. The Defendants' conduct as alleged in this Class Action Complaint violated Section 17200. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the violations of Section 16720, *et seq.*, of the California Business and Professions Code, as set forth above.

231. Defendants' acts, omissions, misrepresentations, practices, and nondisclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business

and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful, or fraudulent.

232. Defendants' acts or practices are unfair to purchasers of e-cigarettes in the State of California within the meaning of Section 17200, California Business and Professions Code.

233. Defendants' unfair conduct had the following effects: (1) closed-system e-cigarettes price competition was restrained, suppressed, and eliminated throughout California; (2) closed-system e-cigarettes prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout California; (3) Plaintiff and members of the classes who resided in California and/or purchased closed-system e-cigarettes in California were deprived of free and open competition in California; and (4) Plaintiff and members of the classes who resided in California and/or purchased e-cigarettes in California paid supracompetitive, artificially inflated prices in California for closed-system e-cigarettes.

234. Defendants' acts and practices are unfair, fraudulent, or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

235. Plaintiffs and members of the classes are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

236. The unfair conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

237. The unfair, fraudulent, deceptive, and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the classes to pay supracompetitive and artificially inflated prices for closed-system e-cigarettes. Plaintiff and the members of the classes suffered injury in fact and lost money or property as a result of such unfair competition.

238. The conduct of Defendants as alleged in this Class Action Complaint violates Section 17200 of the California Business and Professions Code.

239. As alleged in this Class Action Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the

members of the Nationwide and California Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

240.   Plaintiffs have no adequate remedy at law with respect to this claim, which is plead in the alternative to Plaintiffs' legal claims, and which is rooted in a different legal theory than Plaintiffs' legal claims.

## EIGHTH CLAIM FOR RELIEF

### Violation of the Florida Deceptive and Unfair Trade Practices Act
### (By Noor Baig on behalf of the Florida Class)

241.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

242.   The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, *et seq.* (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Florida Stat. § 501.204(1).

243.   The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. § 501.202(2).

244.   A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

245.   Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint. Fla. Stat. § 501.211(a) ("…anyone aggrieved by a violation of this [statute] may bring an action…").

246.   Members of the Florida Class purchased JUUL closed-system e-cigarettes within the State of Florida during the Class Period. But for Defendants' conduct set forth herein, the price per unit of JUUL would have been lower, in an amount to be determined at trial.

247. Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the closed-system e-cigarette market, a substantial part of which occurred within Florida.

248. Defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for closed-system e-cigarettes, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level, beginning at least as early as 2000 and continuing through the date of this filing.

249. Accordingly, Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

250. Defendants' unlawful conduct substantially affected Florida's trade and commerce.

251. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Florida Class have been injured in their business or property by virtue of overcharges for the e-cigarettes and are threatened with further injury.

252. By reason of the foregoing, members of the Florida Class are entitled to seek all forms of relief, including injunctive relief pursuant to Florida Stat. §501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

## NINTH CLAIM FOR RELIEF

**Violation of the Michigan Antitrust Reform Act (Mich. Comp. Laws § 445.771, *et seq.*)**
**(By Somerset Party Store on behalf of the Michigan Class)**

253. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

254. The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce…to prohibit monopolies and attempts to monopolize trade or commerce…[and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984.

255. Members of the Michigan Class JUUL closed-system e-cigarettes within the State of Michigan during the Class Period. But for Defendants' conduct set forth herein, the price per

INDIRECT RESELLER PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

unit of JUUL would have been lower, in an amount to be determined at trial.

256.   Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws. § 452.778(2).

257.   Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the closed-system e-cigarette market, a substantial part of which occurred within Michigan.

258.   Defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for closed-system e-cigarettes, for the purpose of excluding competition or controlling, fixing or maintaining prices in Michigan at a level higher than the competitive market level, beginning at least as early as 2018 and continuing through the date of this filing.

259.   Accordingly, Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Michigan.

260.   Defendants' unlawful conduct substantially affected Michigan trade and commerce.

261.   As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Michigan Class have been injured in their business or property by virtue of overcharges for closed-system e-cigarettes and are threatened with further injury.

262.   By reason of the foregoing, the members of the Michigan Class are entitled to seek all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

## TENTH CLAIM FOR RELIEF

### Violation of Section 340 of New York General Business Law
### (By Big Puffs on behalf of the New York Class)

263.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

264.   Article 22 of New York General Business Law generally prohibits monopolies and contracts or agreements in restraint of trade. The prohibitions were established with the goal of encouraging competition or the free exercise of any activity in the conduct of business, trade, or

commerce in New York. N.Y. Gen. Bus. Law § 340(1).

265. Under New York law, indirect purchasers have standing to maintain an action on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340(6).

266. Members of the New York Class purchased JUUL closed-system e-cigarettes within the State of New York during the Class Period. But for Defendants' conduct set forth herein, the price per unit of JUUL would have been lower, in an amount to be determined at trial.

267. Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the closed-system e-cigarette market, a substantial part of which occurred within New York.

268. Defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for closed-system e-cigarettes, for the purpose of excluding competition or controlling, fixing or maintaining prices in New York at a level higher than the competitive market level, beginning at least as early as 2018 and continuing through the date of this filing.

269. Accordingly, Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of New York.

270. Defendants' unlawful conduct substantially affected New York trade and commerce.

271. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the New York Class have been injured in their business or property by virtue of overcharges for closed-system e-cigarettes and are threatened with further injury.

272. By reason of the foregoing, the members of the New York Class are entitled to seek all forms of relief, including actual damages, treble damages, costs not exceeding $10,000 and reasonable attorneys' fees.

## XI.   LACK OF ADEQUATE REMEDIES AT LAW

273. To the extent that equitable relief is sought under any of the above claims, Plaintiffs plead such claims in the alternative to any legal claims and further plead that their legal claims do not provide adequate remedies at law. Plaintiffs' legal claims under the antitrust laws are not

adequate to provide relief for Plaintiffs' equitable claims alleging only unfair conduct. The legal claims thus do not inherently provide the same relief for the same harms as the equitable claims.

274.   Until discovery and other pretrial matters are complete, the extent to which the legal claims may provide the same relief for the same harms as could be available under claims providing equitable relief is unknown. Restitution may, for example, be measured differently than legal damages and provide for a different amount of relief. The difference between the value of restitution and legal relief will therefore be unknown until, at the earliest, the completion of expert reports and discovery.

## XII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment as follows:

(A)   Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and designating Plaintiff as class representative and Plaintiff's counsel as Class Counsel;

(B)   Award Plaintiffs and the Class damages and/or restitution in an amount to be determined at trial, plus interest in accordance with law;

(C)   Enter judgment against Defendant and in favor of Plaintiffs and the Class;

(D)   Declare the agreements alleged herein invalid and unenforceable;

(E)   Grant injunctive relief that restores Defendants' incentives to compete in the relevant market, including, as appropriate, divestiture of Altria's equity stake in Juul, rescission of Altria's purchase of that stake, and/or any other relief;

(F)   Award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees, as provided by law; and

(G)   Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## XIII.    JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


DATED: September 20, 2021                **KAPLAN FOX & KILSHEIMER LLP**

By: /s/ *Elana Katcher*
                    Elana Katcher

Robert N. Kaplan (admitted *pro hac vice*)
*rkaplan@kaplanfox.com*
Elana Katcher (admitted *pro hac vice*)
*ekatcher@kaplanfox.com*
Jason A. Uris (admitted *pro hac vice*)
*juris@kaplanfox.com*
850 Third Avenue, 14th Floor
New York, New York 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206423)
*lking@kaplanfox.com*
1999 Harrison Street, Suite 1560
Oakland, CA  94612
Telephone: (415) 772-4700
Facsimile: (415) 772-4709

*Steering Committee Counsel for Indirect Purchaser Plaintiffs and the Indirect Reseller Plaintiffs and Counsel for Plaintiffs Sofijon, Inc., Rose And Fifth, Inc., and Napht, Inc.*

**CERA LLP**
Solomon B. Cera (SBN 099467)
Pamela A. Markert (SBN 203780)
595 Market Street, Suite 1350
San Francisco, CA 94105
Telephone: (415) 777-2230
Facsimile: (415) 777-5189
Email: scera@cerallp.com
Email: pmarkert@cerallp.com

*Steering Committee Counsel for Indirect Purchaser Plaintiffs and the Indirect Reseller Plaintiffs and Counsel for Plaintiff B&C Retail, Inc.*

INDIRECT RESELLER PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

**YADEGAR, MINOOFAR & SOLEYMANI LLP**
Pedram Minoofar (SBN 198599)
Navid Yadegar (SBN 205315)
1875 Century Park East
Suite 1240
Los Angeles, California 90067
Telephone: (310) 499-0140
Facsimile: (888) 534-0290

*Counsel for Plaintiff Irwindale Fuel Station, Inc.*

**RUPP BAASE PFALZGRAF CUNNINGHAM LLC**
Arthur Bailey, Esq.
bailey@ruppbaase.com
Tel: (716) 664-2967
Thomas R. Grenke, Esq.
grenke@ruppbaase.com
Tel: (716) 854-3400
Marco Cercone, Esq.
cercone@ruppbaase.com
Tel: (716) 854-3400
1600 Liberty Building
424 Main Street
Buffalo, NY 14202

*Counsel for Plaintiff Big Puffs Vapor Store*

**REINHARDT WENDORF & BLANCHFIELD**
Garrett D. Blanchfield
Brant D. Penney
332 Minnesota Street, Suite W-1050
St. Paul, MN 55101
Tel: (651) 287-2100
Fax: (651) 287-2103
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com

*Counsel for Plaintiff Somerset Party Store Inc.*

**EDELSON LECHTZIN LLP**
Marc H. Edelson, Esq.
3 Terry Drive, Suite 205
Newtown, PA 18940
Tel: (215) 867-2399
medelson@edelson-law.com

*Counsel for Plaintiff Noor Baig, Inc.*