# EXHIBIT A

# EXHIBIT 5

# FILED UNDER SEAL

CONFIDENTIAL – FTC Docket No. 9393

**UNITED STATES OF AMERICA**
**FEDERAL TRADE COMMISSION**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**

| | |
|---|---|
| **In the Matter of:** | |
| **Altria Group, Inc.** a corporation; | **Docket No. 9393** |
| **and** | |
| **JUUL Labs, Inc.** a corporation. | |

**EXPERT REPORT OF KEVIN M. MURPHY, PH.D.**

**MARCH 15, 2021**

CONFIDENTIAL – FTC Docket No. 9393

**Table of Contents**

I.      Qualifications.................................................................................................................. 1

II.     Assignment ....................................................................................................................2

III.    Summary of Opinions ..................................................................................................... 4

IV.     Background ................................................................................................................... 14

    A.      Overview of E-Cigarettes.................................................................................... 14

    B.      The E-Cigarette Competitive Landscape ............................................................. 19

    C.      The Shift From Cig-a-Likes to Pod-Based Vaporizer Products.............................. 24

    D.      The Nature of Price Competition for E-Cigarettes................................................ 26

    E.      Regulatory Environment ..................................................................................... 28

    F.      The Ban on Non-Menthol and Tobacco Flavored Cartridges and Pods ................. 31

    G.      The Transaction Between Altria and JLI ............................................................. 39

V.      Altria's Discontinuation of its E-Cigarette Product Lines Did Not Diminish Competition or Harm Consumers........................................................................................................................ 41

    A.      There Are No Indications the Market Has Become Less Competitive Since Altria Discontinued Its E-Cigarette Products ................................................................................. 42

        1.      Overall prices are lower.......................................................................... 43

        2.      Overall output is higher .......................................................................... 45

        3.      Market concentration is lower ................................................................. 46

        4.      JUUL has lost share to rivals................................................................... 48

    B.      Altria and JLI Were Not Close Competitors........................................................ 56

    C.      JLI Did Not Lower Price In Response to MarkTen Elite's Launch......................... 59

    D.      JLI Did Not Raise Price As a Result of Altria's Discontinuation of E-Cigarette Sales........... 64

CONFIDENTIAL – FTC Docket No. 9393

E.    JLI Continues to Be and Is Increasingly Constrained by Competition from Other Rivals ....... 65

F.    The Transaction Creates Significant Potential Consumer Benefits .......................................... 67

VI.    Relevant Market Definition ........................................................................................................ 68

A.    Overview .................................................................................................................................... 68

B.    Dr. Rothman's Market Definition Analysis .............................................................................. 70

C.    Competitive Constraints and Market Definition ....................................................................... 75

VII.    No Structural Presumption Based on Market Shares or Concentration........................................ 83

A.    Dr. Rothman's HHI Analysis Is Flawed ................................................................................... 83

B.    Altria's Market Share In The FTC's Hypothetical Market Overstates Its Competitive
       Significance................................................................................................................................ 87

C.    MarkTen Elite's Share Overstated Its Competitive Significance ............................................. 89

D.    MarkTen and MarkTen Elite Were Highly Unprofitable and Were Not Projected to Become
       Profitable ................................................................................................................................... 92

VIII.    Dr. Rothman's Analysis of the Transaction and Altria's Discontinuation of Its Product Lines Is
        Flawed......................................................................................................................................... 97

A.    Dr. Rothman's Assumptions that Altria Would Have Maintained a 10 Percent Share or
       Achieved a 20 Percent Share by 2020 Are Unfounded and Speculative .................................. 98

       1.    Dr. Rothman's Review of Altria's Growth Projections Is Unreliable.................................... 99

       2.    Dr. Rothman's Assessment of the Impact of the Flavor Ban on Altria Is Flawed .............. 101

       3.    Dr. Rothman's Review of Altria's Profitability Is Incomplete and Unreliable................... 103

       4.    Dr. Rothman's Comparison of Different Products' Respective Sales After Launch Is
             Misleading ......................................................................................................................... 105

B.    Dr. Rothman's Analysis Using the Antitrust Logit Model and Compensating Marginal Cost
       Reductions Is Flawed .............................................................................................................. 106

       1.    The Antitrust Logit Model Inflates Consumer Welfare Effects from Product Entry and Exit
             ........................................................................................................................................... 106

CONFIDENTIAL – FTC Docket No. 9393

2.    Dr. Rothman's Analysis Fails to Capture Competitive Dynamics ..................................... 112

3.    Dr. Rothman's ALM Approach Ignores Actual Expansion by Rivals ............................... 115

C.    Dr. Rothman's Assessment of the Likelihood of Rivals' Supply Responses Is Misleading and Contradicted by the Facts ................................................................................................... 118

D.    Dr. Rothman's Assessment of Efficiencies Is Incomplete, Unreliable and Inconsistent with His Assessment of Alleged Harm .................................................................................................. 120

E.    Dr. Rothman's Analysis of the Transaction without Altria's Discontinuation of E-Cigarette Products Is Flawed .......................................................................................................... 123

IX.    Conclusions .................................................................................................................. 124

CONFIDENTIAL – FTC Docket No. 9393

## I.  **<u>QUALIFICATIONS</u>**

1. My name is Kevin M. Murphy.  I am the George J. Stigler Professor of Economics in the Booth School of Business and the Department of Economics at the University of Chicago, where I have taught since 1983.

2. I earned a doctorate degree in economics from The University of Chicago in 1986.  I received my bachelor's degree, also in economics, from the University of California, Los Angeles, in 1981.

3. At the University of Chicago, I am a member of the faculties of both the Booth School of Business and the Department of Economics.  I teach graduate level courses in microeconomics, price theory, empirical labor economics, and the economics of public policy issues.  In these courses, I cover a wide range of topics, including the incentives that motivate firms and individuals, the operation of markets, and the impacts of regulation and the legal system on market outcomes.  Most of my teaching focuses on two things: how to use the tools of economics to understand the behavior of individuals, firms, and markets; and how to apply economic analysis to data.  My focus in both research and teaching is on integrating economic principles with empirical analysis.

4. I have authored or co-authored more than 65 articles in a variety of areas in economics.  Those articles have been published in leading scholarly and professional journals, including the American Economic Review, Journal of Law and Economics, and Journal of Political Economy.

5. I am a Fellow of the Econometric Society and a member of the American Academy of Arts and Sciences.  In 1997, I was awarded the John Bates Clark Medal, which, at the time, was awarded every two years by the American Economic Association to an outstanding American economist under the age of forty.  In 2005, I was named a MacArthur Fellow, an award that provides a five-year fellowship to individuals who show exceptional merit and promise for continued and enhanced creative work.

CONFIDENTIAL – FTC Docket No. 9393

6.　In addition to my position at the University of Chicago, I am also a Senior Consultant at Charles River Associates ("CRA"). CRA is a consulting firm that specializes in the application of economics to law and regulatory matters. I have consulted on a variety of antitrust, intellectual property, economic damages and other matters. I have submitted testimony in Federal Court, the U.S. Senate, and to state regulatory bodies, and I have submitted expert reports in numerous cases. I have testified on behalf of the U.S. Federal Trade Commission and I have consulted for the U.S. Department of Justice. A list of the testimony I have given over the past four years is provided in my CV, attached as Appendix A. CRA charges $1,500 per hour for my time spent on this matter. My compensation does not depend on the outcome of this matter. My analysis is supported by colleagues at CRA.

7.　My opinions are based on the information available to me as of the date of this report. The materials that I have relied upon in forming the opinions I offer in this report are identified in Appendix B. My work on this matter is ongoing and I reserve the right to update my opinions as additional information becomes available.

## II. ASSIGNMENT

8.　I have been asked by counsel to Altria Group, Inc. ("Altria") and JUUL Labs Inc. ("JLI") to review the administrative complaint[1] of the Federal Trade Commission ("FTC") in this matter. According to the FTC Complaint, Altria and JLI entered into "a Purchase Agreement and a number of related agreements"[2] ("the Transaction"), whereby Altria acquired a minority 35 percent equity interest in JLI, on December 20, 2018.[3] The FTC Complaint also asserts that Altria "pull[ed] its MarkTen Elite product from the market in October 2018" and on December 7, 2018 announced "its decision to wind down the

---

[1]Administrative Complaint, In the Matter of Altria Group, Inc., and JUUL Labs, Inc., 9393, April 1, 2020 (hereinafter, "FTC Complaint").

[2] FTC Complaint, ¶6.

[3] FTC Complaint, ¶6.

CONFIDENTIAL – FTC Docket No. 9393

remainder of its e-cigarette business."[4]  The FTC alleges that "Altria's investment in JLI and its nearly simultaneous decision to exit the relevant market"[5] resulted in "consumers los[ing] the benefit of current and future head-to-head competition between Altria and JLI, and between Altria and other competitors."[6]

9.  In the context of the allegations made in the FTC Complaint, I have been asked to conduct an economic analysis to assess whether, and the extent to which, Altria's acquisition of a minority investment interest in JLI and its discontinuation of its line of e-cigarette products[7] (assuming for these purposes that the transaction caused that discontinuation) diminished competition or harmed consumers.

10.  In this regard, I have reviewed the report prepared by the FTC's economic expert, Dr. Rothman (the "Rothman Report"[8]) in this matter.  Dr. Rothman concludes in his report that the Transaction and Altria's discontinuation of its e-cigarette product lines "ha[ve] harmed and will harm consumers"[9] because "Altria's exit eliminates products that were and would have been attractive to consumers,"[10] and "eliminates a competitive constraint on all other competitors, which reduces their incentives to offer lower prices and invest in developing better products."[11]  Dr. Rothman "calibrate[s] an economic model of e-cigarette competition," and "use[s] the model to estimate the loss of consumer surplus from Altria's exit for two 'but for' scenarios—assuming Altria would have maintained its 10 percent share and assuming Altria would have grown its share to 20 percent by 2020."[12]

---

[4] FTC Complaint, ¶5.

[5] FTC Complaint, ¶7.

[6] FTC Complaint, ¶7.

[7] Throughout my report, I use the terms "e-cigarette products" and "e-vapor products" interchangeably.

[8] Expert Report of Dr. Dov Rothman, Ph.D., February 15, 2021 (hereinafter "Rothman Report").

[9] Rothman Report, ¶9.

[10] Rothman Report, ¶11.

[11] Rothman Report, ¶11.

[12] Rothman Report, ¶12.  As I shall explain, Dr. Rothman adopts an unorthodox interpretation of "consumer surplus" to encompass the mere removal of a product from the market, irrespective of the evidence of whether that

CONFIDENTIAL – FTC Docket No. 9393

11.     Using his "model of e-cigarette competition," Dr. Rothman concludes that "the loss of consumer surplus would be $33.6 million per year if Altria would have maintained a 10 percent share," and that "the loss of consumer surplus would be $66.5 million per year if Altria would have grown its share to 20 percent."[13]  Dr. Rothman also concludes that any benefits from the Transaction do not offset these estimated harms,[14] and that competitors' "entry or expansion would not be timely, likely, and sufficient to mitigate the harm from the transaction."[15]

### III.    SUMMARY OF OPINIONS

12.     Altria's discontinuation of the MarkTen and MarkTen Elite products and its acquisition of a minority investment interest in JLI did not diminish competition or harm consumers. Neither of these events harmed consumers through the elimination of significant head-to-head competition, as alleged in the FTC Complaint.  Altria's e-cigarette products did not compete closely with the JUUL product.  The overwhelming majority of Altria's e-cigarette sales (more than 90 percent in 2018) were from its MarkTen cig-a-like product, an older generation of e-cigarette devices that had already begun to decline significantly by late 2017 when JUUL's sales began to grow rapidly.  Altria's only e-cigarette product on the market that was designed to compete with pod-based products like JUUL was the MarkTen Elite product, which Altria launched in February 2018.[16]  Despite heavy

---

product offered any competitive constraint in the market.  The model that Dr. Rothman uses to estimate consumer harm assumes that if a particular product becomes unavailable to purchase, consumers are unable to find alternative products with comparable features or characteristics.

[13] Rothman Report, ¶144.

[14] Rothman Report, ¶146.

[15] Rothman Report, ¶17.

[16] Altria acquired the rights to MarkTen Elite in 2017. The product had been on the market before the 8/8/2016 deeming date. PX0018, Letter to J. Abell from D. Feinstein and J. Hedge re: Request for Additional Information and Documentary Materials issued to Altria Group, Inc., No. 20190791," October 3, 2019, at -007 ("In late 2017, the Company acquired the rights to a closed pod or hybrid-style evapor product that Nu Mark sold beginning in February 2018 as MarkTen Elite." Deposition of William Gardner (Altria), January 28, 2021 (hereinafter "Gardner Dep.") at 88:16-18 ("MarkTen Elite was launched by NuMark [sic] in early 2018, but it was previously sold in 2016. So it was a deemed product.").

CONFIDENTIAL – FTC Docket No. 9393

promotional efforts by Altria, the MarkTen Elite product did not achieve significant consumer acceptance or sales—it never achieved more than a 1 percent share of closed system e-cigarette cartridge unit sales[17, 18]—and its sales were highly unprofitable.

13.    Market evidence shows that competition with Altria did not constrain JLI's pricing and that JLI did not view Altria as a significant competitor. JLI did not reduce the prices of its JUUL products in response to Altria's launch of MarkTen Elite, nor did JLI raise the price of its products as a result of Altria ceasing to offer MarkTen and MarkTen Elite for sale. Furthermore, JLI's products did not lose sales as a result of MarkTen Elite's launch, nor did JLI gain sales volume as a result of Altria's discontinuation of its of e-cigarette product lines. To an economist, the absence of a competitive price response or sales impact on the product offered by one firm from the launch or discontinuation of a rival's product is direct evidence that the products are not close substitutes and, therefore, the firms are not close competitors.

14.    Economic analysis further shows that competition with other firms more than replaced any competitive constraint that JLI imposed on Altria's products. Competition in closed system e-cigarettes is highly dynamic. Leading up to Altria's discontinuation of its e-cigarette products, numerous other companies, including NJOY (Ace), Reynolds (Vuse Alto), JTI (Logic Pro) and EAS (Leap), launched pod-based vaporizers to compete with JLI, invested in aggressive price promotions and expanded distribution. In the context of such a highly dynamic and competitive marketplace, competition from Altria was readily replaced. Product variety at the top 20 chains that carried Altria's products increased after Altria's discontinuation of its e-cigarette products despite the discontinuation of

---

[17] Analysis of Altria Projected IRI data, based on MarkTen Elite's share of all closed-system cartridge unit sales. Projected IRI data is an aggregated view of more than 80,000 sample stores out of a universe of more than 350,000 stores that sell tobacco products. IRI projects total retail sales based on this representative sample of stores.

[18] Throughout my report, when presenting shares based on closed-system e-cigarette products I do not include disposable devices. Neither Altria nor JLI has sold disposable e-cigarette products. Thus, exclusion of these products from my calculations of shares makes them a conservative measure of Altria's and JLI's shares.

Altria's products, as measured by the average number of manufacturers with pod-based systems distributed in the chain.

15. Any competition from Altria was replaced by competition from more successful rivals. Whereas JLI did not respond to either the launch or discontinuation of Altria's e-cigarette product lines, JLI *did* cut prices on its e-cigarette devices subsequently in response to *other competitors*—specifically Reynolds (with Vuse Alto) and NJOY (with Ace)—having reduced their device prices. Reynolds and NJOY both substantially expanded sales of their pod-based e-cigarette products after Altria stopped the sale of MarkTen and MarkTen Elite, while JUUL sales fell. Reynolds and NJOY both achieved greater sales with their pod-based e-cigarette products than MarkTen Elite achieved based on the same amount of time on the market. The discontinuation of an unsuccessful product, and its replacement by more successful products, is part of the competitive process and does not constitute harm to competition or harm to consumers. Moreover, as I will explain, Dr. Rothman is mistaken in his assertion that Altria's discontinuation of its e-cigarette product lines reduces the incentives of rival manufacturers to invest in developing better products. As a matter of economics, the exit of a competitor will *not*, in general, lead to reduced incentives to create and improve products—it will often, if not typically, lead to the opposite effect by stimulating additional investment in new product development by rivals as they compete more intensely for business.

16. I find that Dr. Rothman's analysis suffers from numerous flaws, rendering his conclusions invalid and unreliable. In particular, Dr. Rothman's analysis assumes harm rather than proving it; it ignores actual post-event evidence that clearly shows lack of harm; and it disregards salient features of the market, including the limited substitutability between cig-a-likes and pod-based closed system e-cigarettes and the fact that JLI's competitors have expanded sales as rapidly after Altria discontinued its e-cigarette product lines as before. In addition, Dr. Rothman's choice of inputs leads his modeling to overpredict hypothetical harm, and his results are not robust to the selection of reasonable alternative inputs to his modeling.

6

CONFIDENTIAL – FTC Docket No. 9393

17.    Dr. Rothman's conclusion that Altria's discontinuation of its e-cigarette product lines is anticompetitive depends critically on two assumptions that he makes: (1) that Altria removed its e-cigarette products from the market because of the Transaction;[19] and (2) that the mere removal of a product from the market creates consumer harm, irrespective of the evidence of whether that product offered any substantial competitive constraint in the market. I do not have an opinion as to whether Altria would have discontinued its e-cigarette product lines had there been no transaction. I note that if Altria would have removed its products even had the Transaction not occurred, then there can be no anticompetitive harm from the discontinuation of those products. Even if Altria's discontinuation of its e-cigarette product lines resulted from the Transaction, the mere removal of a product from the market does not necessarily create consumer harm, as Dr. Rothman assumes. Dr. Rothman's analysis fails to recognize that consumers and competition are *not* harmed when an unsuccessful, unprofitable product is replaced by existing or new products that have greater consumer appeal, have greater innovative potential, and are more profitable. The replacement of products with limited consumer appeal by products with greater consumer appeal is part of the competitive process and is efficient from an economic perspective.

18.    Dr. Rothman speculates that Altria was well positioned to achieve significant sales growth in its then-existing e-cigarette products and/or to develop successful new e-cigarette products in the future.[20] Dr. Rothman offers no economic analysis or evidence to support this speculation, however. Nor does he provide any economic explanation for why Altria likely would have succeeded in the future by using the same resources that had led to the unsuccessful and unprofitable MarkTen and MarkTen Elite products. Dr. Rothman acknowledges that new product development and introduction is a very time-

---

[19] Altria discontinued all MarkTen Elite pods and devices, all Apex pods and devices, and all MarkTen items containing flavors other than tobacco, menthol, and mint on October 25, 2018, and all remaining e-cigarette products on December 7, 2018.

[20] Rothman Report, ¶¶106, 111.

CONFIDENTIAL – FTC Docket No. 9393

intensive process in the e-cigarette industry, given the regulatory backdrop.[21]  Dr. Rothman fails to recognize, however, that this implies any hypothetical new e-cigarette products that he believes Altria might have developed in the future would have been unlikely to reach the market (assuming they won regulatory approval) for multiple years, making any effect on the market of such a hypothetical new product speculative.[22]

19.    Dr. Rothman's assumption that the removal of a product from the market necessarily creates consumer harm also ignores market evidence showing that after Altria's discontinuation of sales of its e-cigarette products, multiple rivals expanded their sales of recently launched products, including Vuse Alto and NJOY Ace, and more than replaced any competition afforded by Altria.  Furthermore, Dr. Rothman's consumer harm conclusion also ignores the pro-competitive effects of Altria's investment in JLI, specifically the likelihood that existing and new JUUL products will obtain PMTA and MRTP approvals, which would stimulate additional competition.

20.    Dr. Rothman's conclusions are based almost entirely on predictions from economic models and fail to take account of any actual evidence of what happened in the market during the period that Altria was selling e-cigarette products and what has happened in the market since Altria's discontinuation of e-cigarette product sales.  While the FTC and other antitrust agencies frequently rely on predictions from economic models when reviewing unconsummated transactions,[23] in this matter there is real-world evidence about what actually happened to prices, quantities and shares when Altria began selling its MarkTen Elite product and in the period since Altria's investment in JLI and the

---

[21] Rothman Report, §VI.C.1 ("Getting a Product to the Market Would Require a Significant Upfront Investment and Would Take Multiple Years").

[22] My analysis focuses on existing e-cigarette products.  Given the regulatory backdrop in the e-cigarette industry, which I review briefly in Section IV.E], the hypothetical launch of new products by Altria would involve a multi-year process and there is no economic basis to suggest those hypothetical products would be a competitive constraint on current pricing or output decisions, nor has Dr. Rothman offered any economic analysis or evidence to support such a suggestion.

[23] Predictions from economic models are informative only when the modeling assumptions and data inputs comport with observed market facts.  As I have already noted, and as I explain in further detail in Section VIII of my report, Dr. Rothman's modeling assumptions and key data inputs are contradicted by economic facts and evidence.

discontinuation of its e-cigarette product lines. Dr. Rothman's analysis completely ignores the actual market evidence, instead exploring hypothetical and unsubstantiated "but for" worlds from his model that offer predictions completely counter to what actually happened in the market.[24]

21. Under the FTC's allegations, and as Dr. Rothman's analysis predicts, the discontinuation of Altria's MarkTen and MarkTen Elite product lines should have resulted in an increase in the prices of e-cigarette products, a reduction in the sales volume of e-cigarette products, an increase in JLI's market share, and an increase in market concentration. In fact, *none* of these predictions has come to pass. To the contrary, economic data show that after the discontinuation of Altria's product lines, e-cigarette prices are *lower* (including the prices of JUUL products), e-cigarette output is *higher*, JLI's share is *lower*, and market concentration also is *lower*. Furthermore, actual market data show that, contrary to Dr. Rothman's assumptions, retailers expanded the set of brands and the set of competitors whose products they sold following Altria's discontinuation of its e-cigarette product lines. To an economist, these facts represent strong and consistent evidence that competition was *not* diminished and consumers have *not* been adversely affected by Altria's investment in JLI or its discontinuation of sales of MarkTen and MarkTen Elite. That Dr. Rothman did not consider these real-world developments is a significant failing.

22. Dr. Rothman's use of the antitrust logit model and compensating marginal cost reduction ("CMCR") tool to quantify harm does not provide any *evidence* that consumers were harmed or that competition was diminished. Rather, those tools *assume* that such harm has occurred and merely seek to quantify the harm by imposing theoretical assumptions about the nature of competition and demand on price and share data from the period prior to Altria's investment in JLI and Altria's discontinuation of its e-cigarette products. The

---

[24] Economists regularly assess the reliability of a model by testing whether its predictions accord with real-world market data and evidence. Two former Directors of the FTC's Bureau of Economics and a former Senior Economic Counsel at the Department of Justice's Antitrust Division have counseled that "[a]ny model used to predict the effects of a merger must fit the facts of the industry in the sense that the model explains past market outcomes reasonably well. . . . [And] it is a serious mistake to use the methodology to predict the future without first making sure that it explains the past." Gregory J. Werden, Luke M. Froeb and David T. Scheffman, "A *Daubert* Discipline for Merger Simulation," *Antitrust*, Summer 2004: 89-95 at 89 and 94.

CONFIDENTIAL – FTC Docket No. 9393

failure of these tools, as Dr. Rothman applies them, to predict what actually happened in the market following those events shows clearly that any predictions of harm generated by these modeling tools cannot be considered reliable.  In fact, I show that actual expansion by NJOY and Reynolds was more than sufficient to offset the predicted hypothetical price effects from Dr. Rothman's theoretical model.

23.    Dr. Rothman limits his enquiry to facts that favor a finding of competitive harm.  In particular, in examining the question of market definition, Dr. Rothman considers only whether the market should include both closed- and open-system e-cigarettes, or only include closed-system e-cigarettes.  He fails to address anywhere in his report the question of the extent of competition between alternative types of closed-system e-cigarettes.[25]  Had Dr. Rothman done so, he likely would have defined a different relevant market: closed-system pod-based e-cigarettes.  At the very least, he would have realized the need to account in his analysis for the fact that demand for pod-based systems and cig-a-likes is highly differentiated such that consumer substitution between pod-based systems and cig-a-likes is more limited than substitution among pod-based systems.  This has significant consequences for Dr. Rothman's conclusions: while JUUL is a pod-based product, Altria's only pod-based product was MarkTen Elite whose share of closed-system e-cigarette sales never exceeded 1 percent.[26]  Had Dr. Rothman simply assumed a relevant market of pod-based products (rather than all closed-system e-cigarette products), but otherwise followed his same procedure for predicting the magnitude of hypothetical harm, his prediction would have been reduced by 88 percent from $33.6 million annually to only $4.1 million annually.

---

[25] As I explain in Section VI.C, *infra*, Dr. Rothman ignores the "smallest relevant market" principle of market definition.  *See* U.S. Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines,* August 19, 2010 (hereinafter "Guidelines"), §4.1.1.

[26] Altria Projected IRI data, based on MarkTen Elite's share of all closed-system cartridge unit sales.

CONFIDENTIAL – FTC Docket No. 9393

24.    Dr. Rothman's quantification of consumer harm also fails to take account of either the fact that both Altria[27] and JLI[28] discontinued their flavored products before the Transaction or the fact that the FDA announced a ban on the sale of non-menthol and tobacco flavored pods and cartridges in January 2020 to take effect the following month.[29]  Dr. Rothman's entire analysis—including his assessment of market concentration, his predicted price and welfare effects of Altria's investment in JLI, and his predicted price and welfare effects of Altria's discontinuation of its e-cigarette products—are predicated on the assumption that he can infer predicted price and welfare effects in a world without non-menthol and tobacco flavors based only on data from a period prior to the withdrawal of non-menthol and tobacco flavors.  In fact, as a result of the FDA's ban on flavored products, Altria would have been forced to discontinue the sale of products that made up the overwhelming majority (and potentially all[30]) of its pod-based vaporizer e-cigarette sales.  Despite this likely circumstance, Dr. Rothman counterfactually assumes that Altria would have achieved as much as a 20 percent share of the market in a world without non-menthol and tobacco flavors—a share that Altria never approached even before the discontinuation of flavored product sales.  It does not make any economic sense for Dr. Rothman to assess potential consumer harm from Altria's discontinuation of the sale of MarkTen Elite products when Altria would have

---

[27] Letter from Howard Willard, Chairman and CEO Altria to Scott Gottlieb, Commissioner US FDA, October 25, 2018, *available at* https://www.altria.com/-/media/Project/Altria/Altria/about-altria/federal-regulation-of-tobacco/regulatory-filings/documents/Altria-Response-to-FDA-E-vapor-October-25-2018.pdf, accessed on March 4, 2021.

[28] Angelica LaVito, "Juul to stop selling most e-cigarette flavors in retail shops in effort to curb 'epidemic' levels of teen vaping," CNBC, November 9, 2018, *available at* https://www.cnbc.com/2018/11/09/juul-to-stop-selling-mango-other-e-cigarette-flavors-in-stores.html, accessed on March 2, 2021. JLI stopped selling these flavors through its website in October 2019.  *See* Nathan Bomey, "Juul suspends all US sales of fruity e-cigarettes amid scrutiny," USA Today, October 17, 2019, *available at* https://www.usatoday.com/story/money/2019/10/17/juul-e-cigarette-flavors/4009168002/, accessed on March 2, 2021.

[29] PX9016 (FDA) at -002.

[30] As I discuss in Section IV.F *infra*, MarkTen Elite's Sweet Original, which Altria described as "a balanced tobacco blend with honeysuckle and fruit flavor" may or may not have been considered a non-menthol and tobacco flavor by the FDA.  *See* PX1647, Altria, "MARKTEN ELITE," January, 2018, at -014.  MarkTen Elite's other four flavors would have been covered by the FDA's ban on flavored e-cigarette products.

11

CONFIDENTIAL – FTC Docket No. 9393

had to cease selling all or nearly all product flavors in any event as a result of the FDA's ban on non-menthol and tobacco flavors.[31]

25.    Dr. Rothman's prediction of harm hinges critically on limitations of and biases inherent in the specific economic tools he employs, as well as modeling choices he makes. His results are highly sensitive to reasonable, alternative treatments of his model and its inputs, and the predictions of his model are contradicted by actual market data from the period after Altria discontinued its e-cigarette products. My analysis of actual market data shows that Altria's discontinuation of its e-cigarette product lines did not diminish competition or harm consumers. Nevertheless, I have re-run Dr. Rothman's analysis using alternative inputs and assumptions as a way to assess the robustness of his predictions of hypothetical price effects and hypothetical harm. I find that modifying his model to account for economic facts of the industry has substantial effects on Dr. Rothman's predictions of hypothetical harm, rendering his conclusions unreliable. In particular, when I modify his model to take account of the actual expansion by competitors observed in the market following Altria's discontinuation of its e-cigarette products, I find that Dr. Rothman's prediction of hypothetical harm largely vanishes.

a.    Dr. Rothman's prediction of hypothetical harm hinges critically on an assumption that consumers suffered substantially more loss of consumer surplus as a result of having to switch from the MarkTen products to other products available on the market, rather than as a result of higher prices. Approximately 80 percent of his prediction of harm

---

[31] Dr. Rothman's modeling analysis also assumes that the MarkTen Elite product would have obtained PMTA approval with certainty. Allowing for the possibility that MarkTen Elite would not have been approved, and Altria thus would have been prevented from continuing to sell its pod-based vaporizer product, or that its approval would have been delayed, would further undermine Dr. Rothman's prediction of consumer harm. I understand that Altria believed there was a significant risk that its products would not receive PMTA approval. *See* Deposition of Murray Garnick (Altria), February 3, 2021 (hereinafter "Garnick Dep.") at 15:13-14 ("I was told that our e-vapor products that were on the market would not get a PMTA"); *id.* at 16:14-15 ("There was no pathway to success with these products, and [they] would not get a PMTA"); Deposition of Paige Magness, January 15, 2021 (hereinafter "Magness Dep.") at 293:10-12 ("[W]e were unable to confirm that [Elite] would . . . pass muster on any of those four factors" for regulatory approval.); July 18, 2018 Email from Pepple to Fritts et al. attaching "Combined Assessment e-Vapor Pipeline" deck (ALGFTC0001310098, ALGFTC0001310100 at 5) (identifying 11 "Red Flags" with Elite, such as "Multiple challenges to FDA readiness," "Carbonyls," "PI Ingredient Issues," "minimal nicotine satisfaction," and "Battery safety issues").

CONFIDENTIAL – FTC Docket No. 9393

is made up of such loss, while only 20 percent relates to consumer surplus lost because Altria's discontinuation of its e-cigarette led to higher prices. In fact, his model predicts very small price effects from Altria's discontinuation of its e-cigarette products (1 percent or less). Despite his dependence on predicting harm from a loss of consumer surplus, Dr. Rothman relies on economic tools that are widely known in the academic literature for substantially overstating the consumer surplus associated with product entry and exit. Dr. Rothman does nothing to correct for the bias inherent in these tools.

b. Dr. Rothman's estimate of harm hinges critically on his assumption that Altria's and JLI's products were close substitutes. I demonstrate this by re-running Dr. Rothman's model assuming a market of pod-based vaporizers only. This has dramatic effects on his prediction of harm, reducing it by 88 percent to only $4.1 million annually, and his harm from price effects to $3.5 million annually.

c. Dr. Rothman's modeling further overstates alleged consumer harm by failing to take account of competitive dynamics in the e-cigarette industry. As Dr. Rothman notes, manufacturers, including Altria, offer discounts on devices in an effort to gain share. Yet, Dr. Rothman's model does not account for such pricing behavior: in predicting hypothetical harm, his model relies on a calibrated margin for Altria of 27 percent, but Altria's actual margin was only 2 percent. Correcting for this flaw reduces his prediction of harm by between 55 percent and essentially 100 percent, depending on whether I look at a market of all e-cigarettes or focus on a market for pod-based vaporizers, and reduces his prediction of JLI's price increase from 1 percent down to between essentially 0 percent and 0.5 percent.

d. Dr. Rothman's modeling ignores the potential for expansion or repositioning by rivals. Actual market evidence shows that multiple competitors introduced aggressive promotions, and expanded their distribution and sales following Altria's discontinuation of its e-cigarette products. Modifying his model to take account of expansion by competitors NJOY and Reynolds alone largely reverses his results and shows that consumers were not harmed as a result of Altria's discontinuation of e-cigarette sales.

13

CONFIDENTIAL – FTC Docket No. 9393

26.    Dr. Rothman asserts that any efficiencies would not be sufficient to offset his prediction of hypothetical harm. Because Dr. Rothman's predictions of hypothetical harm are wrong, his estimate of the efficiencies necessary to offset such harm is similarly flawed and overstated. Making similar corrections to Dr. Rothman's modeling of efficiencies that I made to his assessment of harm reduces his estimate of the efficiencies required to offset predicted hypothetical harm to essentially zero. In fact, even a slight increase in the likelihood of JLI's products receiving regulatory approval as a result of assistance from Altria—one of the pro-competitive efficiencies said to be generated by the transaction—can readily offset potential harm predicted by Dr. Rothman's model due to predicted higher prices.

27.    Based on my expertise and the analysis I have conducted, including my review of documents and other materials in this case, my economic and empirical analyses of actual market data, and my review of Dr. Rothman's analysis and report, I conclude that neither Altria's acquisition of a minority investment interest in JLI nor Altria's discontinuation of the sale of its e-cigarette products diminished competition or harmed consumers. My analysis is continuing, and I reserve the right to amend this report based on new information or analysis.

## IV.    BACKGROUND

### A.    OVERVIEW OF E-CIGARETTES

28.    Electronic cigarettes, also known as "e-cigarette" or "e-vapor" products, are battery-powered devices that generate nicotine vapor by heating and aerosolizing a liquid nicotine solution known as an "e-liquid."[32]  By allowing consumers to inhale aerosolized

---

[32] *See,* for example, https://smokefree.gov/quit-smoking/ecigs-menthol-dip/ecigs, accessed on March 2, 2021 ("E-cigarettes are battery-powered devices that work by heating a liquid into an aerosol that the user inhales and exhales. The e-cigarette liquid typically contains nicotine, propylene glycol, glycerin, flavorings, and other chemicals.).

CONFIDENTIAL – FTC Docket No. 9393

nicotine, e-cigarettes can be used as a potential replacement for smoking traditional (i.e., combustible) cigarettes.

29.     There are multiple different types of e-cigarettes, including:

a.  "*Open-system e-cigarettes,*"[33] also known as "open-tank products,"[34] are typically comprised of three parts—a mouth piece, a refillable tank that stores the e-liquid and contains the heating element that vaporizes the e-liquid, and a battery that can be re-charged.[35]  Open-system products allow the user to experiment with filling the e-cigarette with different flavors of e-liquids, as well as e-liquids made by any manufacturer, not necessarily the one that made the device, and to adjust device settings.[36]  Open-system products are distinguished from closed-system e-cigarette products, which are sold with pre-filled, ready-to-use e-liquid pods or cartridges.[37]

b.  "*Cig-a-likes*" are closed-system products whose look resembles a traditional combustible cigarette.[38]  Closed-system e-cigarettes are typically comprised of two parts: a disposable "cartridge" or "pod" that contains the e-liquid and also serves as a mouthpiece, and a "device" consisting of a battery and heating element that heats the

---

[33] Investigational Hearing of Craig Schwartz (Altria), December 9, 2019 (hereinafter "Schwartz IH") at 25:13-19 ("In an open system, you have a battery, you have a vessel and you have liquid, but there's a lot of interchangeability between the battery that you use, the liquid that you can pour in it today, the liquid you can pour in it tomorrow.  A lot of them have little dials or buttons.  You can dial up the energy, dial down the energy.").

[34] Investigational Hearing of Howard Willard (Altria), December 13, 2019 (hereinafter "Willard IH") at 54:3-6 ("There are other products where the device is designed such that you can buy a bottle of e-vapor liquid and manually fill a tank.  And that is typically referred to as an open tank product.").

[35] *See,* for example, https://www.blu.com/en/US/explore/explore-vaping/vaping-devices/what-is-an-open-ecigarette, accessed on March 1, 2021.

[36] Deposition of Lawrence Wexler (Turning Point Brands), January 29, 2021 (hereinafter "Wexler Dep.") at 33:10-17 ("Open systems had larger batteries, had a bigger range of flavors.  They gave the individual a way of customizing their vaping experience.  You could get different nicotine strengths, a much greater variety of flavors, you could get devices that had more or less energy, create big plumes of smoke, small plumes of smoke.").

[37] Schwartz IH at 24:25 to 25:3 ("A closed system essentially meant that the device, the battery, the receptacle, the vessel that had the liquid and the liquid all worked as one.").

[38] Willard IH at 101:15-17 ("A cig-a-like normally refers to an e-vapor product that visually looks more like a cigarette.  So it's a cylindrical tube.  Often times it's white.").

CONFIDENTIAL – FTC Docket No. 9393

e-liquid to create vapor.[39]  Cig-a-likes were introduced as one of the first types of closed-system products.[40]  Altria's MarkTen product was a cig-a-like product.  JLI does not sell and has never sold a cig-a-like product.

c.  "*Pod-based vaporizers*"[41] are closed-system e-cigarettes that are shaped and sized differently than cig-a-likes.[42]  These devices consist of a rechargeable battery to which a disposable or refillable cartridge (or "pod") of e-liquid is attached.  Pod-based vaporizers have largely displaced cig-a-likes.[43]  JUUL is a pod-based system, as was MarkTen Elite.  Pod-based vaporizers are further differentiated based on whether they use nicotine salt e-liquid ("nicotine salts") or non-salt e-liquid.[44]  JUUL pods use nicotine salts whereas MarkTen Elite pods used non-salt e-liquid.  Nicotine salts allow for greater nicotine satisfaction akin to that from smoking combustible cigarettes.  It is broadly understood that the nicotine satisfaction provided by nicotine salts and other factors is a top priority for most e-cigarette consumers.[45]

---

[39] *See,* for example, https://www.blu.com/en/US/explore/explore-vaping/vaping-devices/what-is-an-open-ecigarette, accessed on March 1, 2021.

[40] JLIFTC01987693, Roebling Research, "Proposal for JUUL Market Expansion Quantitative Research," September 9, 2016, p. 3 ("Cig-a-likes, or vaping devices that mimic the aesthetic of traditional cigarettes, were the first generation of vaping products and once made up the majority of the U.S. vaping market.  But for many smokers and vapers, they were underpowered and did not provide enough satisfaction.  Indeed our studies have shown that retention rates for cig-a-likes was [sic] low and that those users who did find satisfaction from using them are likely to defect to open system devices.").

[41] Unless otherwise noted, I use the terms "pod-based system" and "pod-based vaporizer" interchangeably.

[42] PX8000, Sheetz, "Declaration of Paul Crozier," March 17, 2020 at -003("Prior to JUUL's entry, most closed systems were cigalikes, which were modeled to look like cigarettes and were often not reuseable.").

[43] Deposition of Lamar Wade Huckabee (R.J. Reynolds Tobacco), February 4, 2021 (hereinafter "Huckabee Dep.") at 26:2-16 ("Q. . . . Cigalike products have declined substantially as a platform for an e-cigarette . . . over the past few years?  , , , A,  That is correct, . . . For consumers in the - - in the vaping category, the advent of pod products seem to have wider appeal.").

[44] Deposition of Jeffrey Eldridge (Imperial Tobacco Group), December 14, 2020 (hereinafter "Eldridge Dep.")  at 81:18-20 ("'About 75 percent of our competition offer nicotine salts for their pod devices.'"  (quoting EX 0011)); *see also*, for example, https://www.vapor4life.com/blog/whats-difference-pod-mods-vape-mods/, accessed on March 3, 2021 ("[P]od[s]… are used with nicotine salts, [so] they're more ideal for someone who has switched from smoking to vaping.").

[45] Investigational Hearing of William Gifford, Jr. (Altria), February 4, 2020 (hereinafter "Gifford IH") at 170:11-16 ("[W]e know that the conventional cigarette consumer is looking for alternatives, a large portion of them. They are looking and trying these alternative products to see if it meets their needs, both from a satisfaction of flavor and nicotine satisfaction."); Deposition of Michelle Baculis (Altria), December 22, 2020

16

CONFIDENTIAL – FTC Docket No. 9393

d. "*Disposable e-cigarettes*" are closed-system products that are designed to be discarded entirely after use.[46]  Pod-based vaporizers have become the most popular form for disposable e-cigarettes,[47] which have continued to compete in the e-cigarette market.[48]

30. Closed-system e-cigarettes can provide an alternative to traditional cigarettes if they provide adult smokers a similar experience.[49]  JLI, in particular, appears to have achieved success in this regard.  The company's former CEO Kevin Burns has testified that JLI started to see "accelerating decline of cigarettes correlating to our early share growth in

---

(hereinafter "Baculis Dep.") at 101:24-102:3 ("So I would say JUUL was one of the first products that actually delivered on the nicotine satisfaction that many adult smokers were looking for.").

[46] Wexler Dep. at 22:7-13 ("The way I term 'closed systems' is that the closed system is a system in which the liquid is embedded in the capsule, in the container, and it has the ability to either be one single unit, which can be disposable; where you buy the whole unit, including the battery.  We call those disposable[s].").

[47] *See*, for example, https://www.whichecigarette.com/disposable-pod-vapes/#:~:text=Disposable%20pod%20vapes%20VS%20classic%20disposable%20ecigs&text=The%20standard%20disposable%20pod%20vape,1.2ml%20e%2Djuice%20reservoir.&text=It's%20also%20stealthier%20and%20more,cig%2Da%2Dlike%20disposable, accessed on March 3, 2021 ("Manufacturers have ditched the traditional tobacco cigarette look and focused on a more modern approach.  The new design also made room for a bigger battery and a bigger e-liquid reservoir[,] . . . [and] most toss-able pod vapes use salts e-liquids as opposed to freebase nicotine.").

[48] At the end of 2018, disposable closed system e-cigarettes accounted for 3.9 percent of closed system e-cigarette dollar sales but have since quadrupled to nearly 15 percent, according to Altria IRI projected data.

[49] *See* https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-meetings-industry-related-agencys-ongoing-policy, accessed on March 10, 2021 (Gottlieb) ("We're also fully committed to the concept that products that deliver nicotine exist on a continuum of risk, with combustible products representing the highest risk, and electronic nicotine delivery systems perhaps presenting an alternative for adult smokers who still seek access to satisfying levels of nicotine, but without all of the harmful effects that come from combustion"); id. ("[W]e remain committed to advancing policies that promote the potential of e-cigarettes to help adult smokers move away from combustible cigarettes"); see at https://www.fda.gov/news-events/press-announcements/fda-takes-new-steps-address-epidemic-youth-e-cigarette-use-including-historic-action-against-more, accessed on March 10, 2021 (Gottlieb) acknowledging "the role that flavored e-cigarettes can also play in helping adult smokers quit"; id. ("We still believe that new innovations that don't use combustion, such as many e-cigarettes, may offer an important opportunity for adults to transition off combustible tobacco"); *see also* https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-new-enforcement-actions-and-youth-tobacco-prevention accessed on March 13, 2021 (Gottlieb) ("We see the possibility for ENDS products like e-cigarettes and other novel forms of nicotine-delivery to provide a potentially less harmful alternative for currently addicted individual adult smokers who still want to get access to satisfying levels of nicotine without many of the harmful effects that come with the combustion of tobacco.").

CONFIDENTIAL – FTC Docket No. 9393

2018"[50] resulting from the fact that "our user base was primarily smoking when they bought the product and with a high effectiveness of switching and high satisfaction with the product, they were abandoning and switching off of cigarettes."[51]

31.    Altria also has attributed JUUL's popularity and rapid sales growth in large part to the view that JUUL offers adult smokers "an experience …[which is] a suitable replacement for cigarettes, while simultaneously addressing social friction concerns."[52]  In contrast, in summer 2018, Altria noted that MarkTen Elite "didn't have the nicotine/salt content that drives satisfaction with Juul."[53]

32.    Documents and testimony indicate that pod-based vaporizers have achieved greater success than their predecessor cig-a-like products.[54]  While demand for cig-a-like products grew when they were first introduced, sales stagnated in 2016 and 2017 and then began to fall in early 2018 and have continued to decline since.  Consumer demand for pod-based vaporizers has grown much faster than for cig-a-likes.  Since March 2018, monthly sales of pod-based e-cigarettes have consistently and increasingly outpaced sales

---

[50] Investigational Hearing of Kevin Burns (JLI), January 23, 2020 (hereinafter "Burns IH") at 95:21-23

[51] Burns IH at 96:17-21.

[52] ALGFTC0001278052, Altria, "Nu Mark Business Update," February 9, 2018, at 36.

[53] Quigley Deposition at 22:15-23:22 (referring to PX7041 at -007) ("Q. Can you explain what the table on this page is showing? A. So this is now showing, for the same consumer segments and form factors, what products we had either on the market or what we had some development activity going on and where those products would fall in the same matrix.  And then the green would represent where we felt like our products were competitive, and the red was where we were not competitive.  So, for example, MarkTen Bold, as a cigalike, we felt was competitive to the Vuse cigalikes on the market.  And then the Cync and Elite products we felt were not competitive with the JUUL Vuse Alto and blu Intense.  Q. And what was the basis for feeling they weren't competitive?  A. It was the fact that we had no nicotine salt in the products.  So I think we talked about this in my last interview, when I took the business over, I think the thing that I learned that led this to be red is that we learned that, from a formulation point of view, we didn't have the right nicotine formulation and, ultimately, that's why the products were not selling relative to what we saw in the marketplace with the other pod products and JUUL that was growing so dramatically.  So there was a gap in nicotine satisfaction.").

[54] ALGFTC0005654012, Altria, "E-Vapor Closed Tank Opportunity Assessment," July 11, 2017, at 3 ("closed tank vapor products, particularly small, pod-based closed systems, are meeting unmet needs of a growing number of AS [adult smokers]"); Brace Dep. at 134:16-21 ("[In late September 2018,] the cigalike segment had really stagnated."); and Deposition of Pascal Fernandez (Altria), January 22, 2021 (hereinafter "Fernandez Dep.") at 69:5-9 ("So, you know, what we were observing back then is, the segments were shifting away from Cigalike, what we call Cigalike-type of products to pod-based type of products.").

18

CONFIDENTIAL – FTC Docket No. 9393

of cig-a-likes.  Since that time, growth in closed-system e-cigarette product sales has come entirely from pod-based vaporizers.  See Fig. IV.1.

**Fig. IV.1:  Sales of E-Cigarette Devices and Cartridges by Type, Altria IRI Projected Data**



### B.  THE E-CIGARETTE COMPETITIVE LANDSCAPE

33.    E-cigarette products are a highly competitive product space with many manufacturers producing numerous alternative brands and products.  Within the closed-system e-cigarettes space, prior to JLI's rapid growth that began in 2017, numerous manufacturers offered various brands of cig-a-like and pod-based products.  JLI's documents recognize numerous other manufacturers in 2017 including Reynolds (Vuse), Altria (MarkTen),

CONFIDENTIAL – FTC Docket No. 9393

ITG (blu), JTI (Logic), Von Erl (My Von Erl), and PhixVapor (Phix), among others.[55] Over time, category leadership in closed-system e-cigarettes has changed multiple times, reflecting a competitively dynamic marketplace.

34.    Altria is a major tobacco manufacturer and was the parent company of Nu Mark, the division of Altria that sold e-cigarette products until December of 2018.  Nu Mark's closed-system e-cigarette products included cig-a-likes (MarkTen, MarkTen XL, MarkTen Bold, MarkTen Bold XL, and Green Smoke) and pod-based vaporizers (MarkTen Elite and Apex by MarkTen).[56]  The MarkTen cig-a-like was launched nationally in July 2014; MarkTen XL, a version of MarkTen with double the cartridge size, was launched in February 2015; and MarkTen Bold, a version of MarkTen that contained nicotine salts, was launched in 2015-2016.[57]  Altria acquired Green Smoke in April 2014; its sales were mostly through the online channel.[58]  Altria acquired the rights to MarkTen Elite in late 2017 and began selling the product in February 2018.[59] MarkTen Elite, MarkTen, and MarkTen XL cartridges contained non-salt e-liquid, while MarkTen Bold and MarkTen Bold XL cig-a-like cartridges used nicotine salts.

---

[55] JLIFTC00118122, JLI, "Market & Customers Data," August 2017, at -126 (list of brands in "US vapor products market").  The Von Erl brand was subsequently acquired by ITG in 2018 and relaunched as the *my*blu pod-based product.

[56] Apex, a pod-based product developed by PMI, had minimal distribution, was removed a month after it launched. *See* PX0018, Response to Request for Additional Information and Documentary Materials issued to Altria Group, Inc., No. 20190791, October 3, 2019 ("Around September 2018, Nu Mark began selling a pod-based product called Apex that Philip Morris International ('PMI') had developed. … Apex was only sold online, to adult consumers in about ten states and was taken off the market the month after launch"). Apex by MarkTen had virtually no sales in 2017 and 2018, totaling only 460 device units (Analysis of Altria 2R data).

[57] https://csnews.com/altrias-markten-getting-supersized, accessed on March 7, 2021; and PX0018, Response to Request for Additional Information and Documentary Materials issued to Altria Group, Inc., No. 20190791, October 3, 2019 ("Various new flavor formulas were introduced for MarkTen XL between 2015 and 2016, including "MarkTen Bold").

[58] PX0018, Response to Request for Additional Information and Documentary Materials issued to Altria Group, Inc., No. 20190791, October 3, 2019 at -006 ("In April 2014, Nu Mark acquired Green Smoke"); PX0018 at -007 ("Nu Mark reduced its efforts on Green Smoke retail distribution to focus on e-commerce until the product was discontinued"); Green Smoke's accounted for 15.6 percent of Altria's e-cigarette sales in 2018 (Altria 2R).

[59] PX0018, Response to Request for Additional Information and Documentary Materials issued to Altria Group, Inc., No. 20190791, October 3, 2019, at -007 and Gardner Dep. at 88:16-18.

35.     JLI is an electronic cigarette company that manufactures JUUL, a closed system pod-based vaporizer with nicotine salt cartridges.  JUUL was launched in June 2015[60], when the electronic cigarettes segment was dominated by cig-a-likes.[61]  JUUL experienced rapid sales growth and became the market leader within closed systems in April 2018 based on device sales.[62]  However, since December 2019, JUUL has been replaced by Vuse as the leading e-cigarette product manufacturer based on devices sold.[63]  JUUL pods contain nicotine salts.

36.     ITG Brands, LLC ("ITG") is a subsidiary of the major tobacco manufacturer Imperial Brands PLC ("Imperial Brands").  ITG sells two reusable e-vapor products under its blu brand: *my*blu, a pod-based vaporizer introduced in 2017[64] and blu Plus+, a cig-a-like launched in 2014.[65]  It also sells a disposable device called blu Disposable.[66]  Blu's total unit sales have been increasing every year since 2016.[67]  ITG's pod-based vaporizer *my*blu has options for both non-salt e-liquid and nicotine salts cartridges, with the version using nicotine salts branded as *my*blu Intense.[68]  ITG has filed PMTAs for both its blu

---

[60] RESPONSE OF JUUL LABS, INC. TO SPECIFICATION 21 OF THE REQUEST FOR ADDITIONAL INFORMATION AND DOCUMENTARY MATERIALS, Oct. 10, 2019; https://www.businessinsider.com/juul-timeline-from-startup-to-tobacco-company-challenges-bans-2019-9#2016-juul-sales-skyrocket-700-6, accessed on March 11, 2021 ("June 1, 2015: Pax Labs launches the Juul").

[61] PX8011, ITG, "Declaration of Jeff Eldridge," April 1, 2020 at -006.

[62] *See* Fig. VI.2, *infra*.

[63] See Fig, V.5, *infra*.

[64] PX8011, ITG, "Declaration of Jeff Eldridge," April 1, 2020 at -005 ("ITG introduced the *my*blu device and *my*blu pods in 2017").

[65] https://www.prnewswire.com/news-releases/blu-ecigs-debuts-new-blu-plus-rechargeable-kit-at-nacs-trade-show-278248771.html, accessed on March 7, 2021.

[66] PX8011, ITG, "Declaration of Jeff Eldridge," April 1, 2020 at -004-005.

[67] PX8011, ITG, "Declaration of Jeff Eldridge," April 1, 2020 at -006.

[68] See https://www.blu.com/en/US/myblu-intense, accessed on March 7, 2021.

and *my*blu products.[69]  In May 2018, *my*blu had the highest share within closed-system e-cigarette products.[70]

37.    Japan Tobacco International ("JTI") is a major tobacco manufacturer that also sells e-cigarette products under the Logic brand.  JTI sells Logic Pro (pod-based vaporizer) and Logic Power (cig-a-like), both of which use non-salt e-liquid in their cartridges.  JTI also sells Logic Vapeleaf, an electronic cigarette that works by passing nicotine-free e-liquid through granulated tobacco inside the cartridge.[71]  JTI has submitted PMTAs for its portfolio of e-vapor products.[72]

38.    Reynolds American Inc. ("Reynolds") is a major tobacco manufacturer that also produces e-cigarette products under the Vuse brand.  Reynolds launched its Vuse closed-system cig-a-like product Solo in 2013; this product was internally developed by Reynolds.[73]  Vuse often had the highest device share among closed-system e-cigarette products from January 2016 through February 2018.[74]  Since December 2019, Vuse is now the leading e-cigarette product manufacturer based on devices sold.[75]  Reynolds obtained the rights to Vuse Vibe, a cig-a-like product, in 2016 and began selling it in July 2016.[76]  Reynolds also acquired the rights to Vuse Ciro, a cig-a-like product, and began

---

[69] Eldridge Dep. at 90:16-22 ("Q. Okay.  Do you know if ITG or Fontem has made PMTA filings for the blu and myblu products? A. Filings have been made. Q. Do you know when they were made? A. I do not have a date.  Before the deadline").

[70] *See* Fig. VI.2, *infra*.

[71] See PX8007, JTI, "Declaration of Anthony Hemsley," March 19, 2020 at -003.

[72] See PX8007, JTI, "Declaration of Anthony Hemsley," March 19, 2020 at -005 ("On August 19, 2019, Logic submitted its PMTAs for Logic Pro, Logic Power, and Logic Vapeleaf ENDS products").

[73] See PX8008, Reynolds, "Declaration of Wade Huckabee," March 31, 2020 at -008.

[74] *See* Fig. VI.2, *infra.*

[75] See Fig, V.5, *infra*.

[76] FTCJUUL_000007760, Reynolds, "RE: Cig-a-Like Category Volume Trend," January 16, 2019 at FTCJUUL_000007762 ("VIBE has the most potential of the 3 cig-a-like products in the VUSE portfolio"); PX8008, Reynolds, "Declaration of Wade Huckabee," March 31, 2020 at -009 (" RJR Vapor acquired the VUSE VIBE product in 2016. It had only a few months to work with the supplier before the product was essentially locked in place in August 2016. RJR Vapor began selling the product in July 2016.").

CONFIDENTIAL – FTC Docket No. 9393

selling it in July 2016.[77]  As cig-a-likes declined in popularity, Reynolds launched a pod-based system that used nicotine salts called Vuse Alto in August 2018.[78]  After its launch, Vuse Alto's sales grew rapidly and in December 2019, Vuse Alto's device sales surpassed those of JUUL.[79] Reynolds has filed PMTAs for its Solo, Alto, Ciro and Vibe products.[80]

39.    NJOY, LLC ("NJOY") is an independent e-cigarette company that sells a pod-based vaporizer that contains nicotine salts (NJOY Ace[81]) and disposable cig-a-like (NJOY Daily[82]).  NJOY has also sold a reusable cig-a-like product, Loop.[83] NJOY has filed PMTAs for its products.[84]  In July 2019, NJOY achieved a device share in excess of 30 percent.[85]

---

[77] PX8008, Reynolds, "Declaration of Wade Huckabee," March 31, 2020 at -008-009 ("VUSE CIRO: A closed system e-cigarette product line consisting of power units and pre-filled cartridges. The CIRO was intended as a cig-a-like product . . . . It was introduced in July 2016.").

[78] Huckabee Dep. at 89:4-6 ("Q. Okay. But Vuse Alto does have nicotine salts, correct? A. Correct"). The Vuse Alto product had been sold in limited quantities prior to August 8, 2016.  PX8008, Reynolds, "Declaration of Wade Huckabee," March 31, 2020 at -010 ("Smoore introduced the product in July 2016, and RJR Vapor reintroduced the product under the VUSE ALTO brand in August 2018.")

[79] *See* Fig. V.7, *infra.*

[80] Huckabee Ex. 18 ("Reynolds completes 2020 PMTA submissions with Alto e-cigarette submissions"); PX8008, Reynolds, "Declaration of Wade Huckabee," March 31, 2020 at -008 ("RJR Vapor submitted 15 PMTAs for its VUSE SOLO products on October 11, 2019"); https://www.prnewswire.com/news-releases/reynolds-completes-2020-pmta-submissions-with-vuse-alto-e-cigarette-applications-301124525.html, accessed on March 14, 2021 ("submitted additional applications for its Vuse Ciro and Vuse Vibe vapor products in April of 2020").

[81] https://njoy.com/us/shop/njoy-ace-pods/, accessed on March 7, 2021 ("Our NJOY ACE flavors provide satisfying vapor, using high quality nicotine salts.").

[82] https://njoy.com/us/shop/daily, accessed on March 11, 2021.

[83] See https://vaping360.com/reviews/njoy-loop-review/, accessed on March 7, 2021.

[84] Deposition of Andrew Farrell (NJOY), January 29, 2021 (hereinafter "Farrell Dep.") at 90: 5 ("[NJOY filed PMTAs] March of 2020").

[85] *See* Fig. V.7, *infra.*

CONFIDENTIAL – FTC Docket No. 9393

## C.  THE SHIFT FROM CIG-A-LIKES TO POD-BASED VAPORIZER PRODUCTS

40.     JLI's rapid sales growth beginning in 2017 revealed strong demand for pod-based systems.  As JLI's sales based on its pod-based system accelerated, numerous competitors began introducing pod-based systems and positioning them to compete for the growing demand for pod-based products.  These included Reynolds (Vuse Alto), NJOY (Ace), ITG (*my*blu), JTI (Logic Pro) and Altria (MarkTen Elite), among others.  While MarkTen Elite was among these new pod-based products, it did not rely on nicotine salts for its e-liquid, unlike JLI's JUUL, NJOY's Ace, ITG's *my*blu INTENSE[86] and Reynolds' Vuse Alto.

41.     In Fig. IV.2 and Fig. IV.3, I trace the rapid shift over time in relative sales of cig-a-like and pod-based vaporizer products, as seen in both device sales and cartridge sales, respectively.[87]  For both devices and cartridges, the shift in consumer purchasing patterns accelerated in fall 2017 and by the first half of 2018, sales of pod-based e-cigarette products had grown to exceed sales of cig-a-like products.  This trend continued through at least September 2020, the end date of available data.

---

[86] blu is a set of e-cigarette brands sold by ITG.  *my*blu is ITG's pod-based vaporizer device, and *my*blu INTENSE are *my*blu cartridges that contain nicotine salts. *See* https://www.blu.com/en/US/myblu-intense, accessed on March 7, 2021.

[87] While the rapid sales growth of JUUL during this period contributed to the overall shift in the relative shares of cig-a-likes and pod-based vaporizers, an analysis of share trends excluding JUUL sales also shows that cig-a-likes declined markedly as a fraction of total non-JUUL e-vapor sales over this period.

CONFIDENTIAL – FTC Docket No. 9393

**Fig. IV.2: Cig-a-like versus Pod-based Vaporizer Device Volume Share, Altria IRI Projected Data**



CONFIDENTIAL – FTC Docket No. 9393

**Fig. IV.3:  Cig-a-like versus Pod-based Vaporizer Cartridge Volume Share, Altria IRI Projected Data**



#### D.  THE NATURE OF PRICE COMPETITION FOR E-CIGARETTES

42.    In the case of closed-system e-cigarettes, price competition occurs largely along two dimensions—the price of the device and the price of the cartridges or pods that contain the e-liquid.  A user must obtain a device before being able to use the cartridges or pods with that device.[88]  Reusable devices typically last a number of months before needing to

---

[88] In general, closed-system devices can only be used with cartridges or pods made by the same manufacturer.

CONFIDENTIAL – FTC Docket No. 9393

be replaced, depending on usage.[89]  Cartridges or pods can contain anywhere from 0.4 milliliters ("mL") of e-liquid per cartridge or pod for smaller cartridges and pods, to 1.9 mL in the case of larger cartridges and pods.  JUUL pods contain 0.7 mL, while MarkTen cig-a-like cartridges contained 0.4 mL and MarkTen Elite cartridges contained 1.5 mL. A typical e-cigarette user may consume pods or cartridges at a rate of four cartridges or pods per week.[90]

43.    Converting adult smokers helps drive growth in e-cigarette demand.  However, e-cigarettes are what an economist calls an "experience good,"[91] which means that a smoker who is considering converting away from combustible cigarettes must first buy and try out an e-cigarette product before he or she can decide whether the experience is sufficiently pleasing to warrant continuing to make purchases.  For experience goods, a high upfront cost can act as a barrier to attracting new customers to "trial" a new product. In the case of e-cigarettes, the upfront cost is the purchase of the e-cigarette device.  At launch, the JUUL device sold at a suggested retail price of $34.99.[92]  To encourage product trials by new consumers, some e-cigarette companies have adopted the canonical "razor/razorblade" pricing model by discounting the price of the initial razor (or here, e-cigarette device) to help spur sales of razorblades (or here, e-cigarette cartridges).[93]

---

[89] Consumers may decide to purchase multiple devices, to store and use in different types of locations (e.g., at home, in the car, at the office; JLIFTC01930035, McKinsey & Company, "Unlocking value via Revenue Growth Management ("RGM") – Consumer Pricing Update," June 5, 2018, p. 9 ("Assumes 16 consumable pods per month used and 6 month device lifetime").

[90] JLIFTC01930035, McKinsey & Company, "Unlocking value via Revenue Growth Management ("RGM") – Consumer Pricing Update," June 5, 2018, p. 9 n.1 ("Assumes 16 consumable pods per month used and 6 month device lifetime"). *See also* JLIFTC02312224, JLI, "Demographics and Consumption," Oct. 25, 2017, p. 2 ("JUUL customers tend to consume between 4 and 5 Refill Kits per month (16-20 pods)").

[91] Phillip Nelson, "Information and Consumer Behavior," Journal of Political Economy, 78 (2), 1970: 311-29.

[92] JLIFTC00089810, JLI, JUUL Ordering Guide; JLIFTC01510868, JLI, JUUL Ordering Guide; and "RESPONSE OF JUUL LABS, INC. TO SPECIFICATION 10 OF THE REQUEST FOR ADDITIONAL INFORMATION AND DOCUMENTARY MATERIALS," October 4, 2019.

[93] JLIFTC02056752, JLI, "US August Country Review (Q4 2019 and 2020 Action Plan)", August 2019, at slide 93 ("Sunk cost effect.  Tendency of people to stick to a platform longer because of the price paid." "Effect of reducing device price. . . We will reduce the barrier to entry to JUUL platform for smokers and vapers."). Note that while lowering the device price can drive trial uses of an e-cigarette product, an increase in initial device sales does not by itself imply that consumers like a product and will continue to make purchases. To assess whether consumers like a particular product, cartridge sales also need to be analyzed.  Increases

CONFIDENTIAL – FTC Docket No. 9393

44.     Understanding this razor/razorblade pricing dynamic, e-cigarette manufacturers compete on price mostly by discounting the prices of their devices through promotions, as well as by offering starter kits that include an initial number of cartridges or pods bundled in the price the consumer pays to obtain a device.  For example, in August of 2019, almost a year after Altria discontinued sales of its MarkTen products, JLI noted that some of its competitors, namely NJOY and Reynolds, were following the razor/razorblade model by aggressively discounting their devices.[94]  JLI recognized that consumers did not perceive a particular advantage to its own products and so discounted its device price to remain competitive.[95]

## E.  REGULATORY ENVIRONMENT

45.     The FDA regulates the sale of e-cigarettes.  In order to sell an e-cigarette product, a manufacturer must obtain prior market authorization from the FDA.[96]  E-cigarettes first came under the FDA's purview through a 2016 FDA regulation known as the "Deeming

---

in the sale of cartridges after the initial device purchase indicate that consumers are continuing to use a given product, *i.e.*, purchasing razorblades to go with their razors.

[94] JLIFTC02056752, JLI, "US August Country Review (Q4 2019 and 2020 Action Plan)," August 2019, slide 1 ("NJOY is proving true razor / razor blade pricing model works to unlock addressable market. VUSE also coming down to $1 device price point; NJOY cannibalizing JUUL growth and threatening to take JUUL's established userbase."); and JLIFTC02196743, JLI, "NJOY Ace Competitive Understanding:  Qualitative Topline Learnings," July 2019, p. 3 ("Device price is THE core driver of Ace trial, offering low/no risk or commitment as a compelling benefit" "Many [users] have spent money on past devices they've found unsatisfactory so initial investment is a key barrier to trial that Ace has effectively removed with the $.99 promotion"), p. 4 ("Juul's device price is a barrier for Ace users, who do not find meaningful advantages to justify its cost – and because brand loyalty is generally low, it is common and easy for users to try something else").

[95] JLIFTC02196743, JLI, "NJOY Ace Competitive Understanding:  Qualitative Topline Learnings," July 2019, p. 5 ("Opportunity exists for Juul to close the current gap between its high price and perceived lack of consumer advantage versus Ace in order to recapture interest and usage among this competitive user… This may come in the form of a decrease in device price").

[96] 81 Fed. Reg. 28,974 (May 10, 2016), *available at* https://www.govinfo.gov/content/pkg/FR-2016-05-10/pdf/2016-10685.pdf, accessed on March 2, 2021; 81 Fed. Reg. at 29,009 to 29,015, *available at* https://www.govinfo.gov/content/pkg/FR-2016-05-10/pdf/2016-10685.pdf, accessed on March 2, 2021; and Investigational Hearing of Murray Garnick (Altria), November 22, 2019 (hereinafter "Garnick IH"), 30:19-23 ("[A]ny e-vapor product that was on the market as of August 2016 was allowed to stay on the market provided that the manufacturer file a PMTA within a certain deadline, and that deadline has changed over time.").

CONFIDENTIAL – FTC Docket No. 9393

Rule."[97]  Because some electronic cigarettes were already on the market at that time, FDA phased in its market authorization requirement over time and thereby avoided forcing an abrupt withdrawal of existing products from the market.  Specifically, the Deeming Rule included a compliance period allowing, through an exercise of prosecutorial discretion by the FDA, e-cigarette products that were on the market on the effective date of the rule, August 8, 2016 (sometimes referred to as an "8/8/16 product"[98]), to remain on the market through, initially, August 8, 2018 and thereafter, provided that an application for premarket authorization (i.e., a PMTA) was filed by that date.[99]  The FDA indicated that it did not intend to initiate enforcement actions with respect to 8/8/16 products for failure to have the requisite premarket authorization during this compliance period.[100]  But because this was a discretionary judgment by the FDA, the agency could change its approach, making regulatory compliance a high priority for e-cigarette manufacturers.

46.     The PMTA deadline was revised several times before finally being set to September 9, 2020.[101]  An e-cigarette product whose PMTA was submitted on or before September 9, 2020 is allowed to stay on the market for an additional twelve months while the FDA

---

[97] 81 Fed. Reg. 28,974 (May 10, 2016) and Investigational Hearing of Jose Murillo (JLI), December 20, 2019 (hereinafter "Murillo IH") at 20:7-9 ("[W]hat has emerged over a series of years is a general regulatory regime where e-vapor products are subject to the Tobacco Control Act through deeming.").

[98] *See* Investigational Hearing of Brian Quigley (Altria), December 10, 2019 (hereinafter "Quigley IH") at 91:13-18 and 104:25 (referring to e-cigarette products that were on the market prior to August 8, 2016 as "8/8 products").

[99] 81 Fed. Reg. at 29,009 to 29,015; *see also* Garnick IH at 30:19-23 ("[A]ny e-vapor product that was on the market as of August 2016 was allowed to stay on the market provided that the manufacturer file a PMTA within a certain deadline, and that deadline has changed over time."); and Murillo IH at 20:10-15 ("And then as part of that deeming, deadlines were set up, and the deadlines have since changed at least once or  twice, from memory, permitting products that were on the market as of a certain date to continue on the market until another certain date, by which time you'd have to file applications to remain on the market.").

[100] 81 Fed. Reg. at 29,011.

[101] FDA, "Individual Requests for Extensions of Sept. 9 Premarket Application Deadline," September 4, 2020, *available at* https://www.fda.gov/tobacco-products/ctp-newsroom/individual-requests-extensions-sept-9-premarket-application-deadline, accessed on March 2, 2021.

CONFIDENTIAL – FTC Docket No. 9393

considers the application.[102]  Notably, the extended compliance period applies only to 8/8/16 products; any new e-cigarette product introduced to the market *after* August 8, 2016 required and continues to require FDA market authorization before it can be sold.[103] This includes modified or altered versions of electronic cigarette products that were on the market as of August 8, 2016, because the FDA considers such modified products to be "new products."[104]  Unauthorized modifications include "the introduction of new product features, formulations or flavors."[105] In addition, the FDA could, and in January 2020 did, bar certain types of e-cigarettes from remaining on the market without a PMTA, even if they were 8/8/16 products, most notably flavored e-cigarettes.[106]  The penalties for selling a tobacco product without market authorization are severe, including civil penalties, seizures or injunctions, in addition to loss of credibility with the FDA.[107]

---

[102] 399 F. Supp. 3d at 487.

[103] 81 Fed. Reg. at 29,011 n.13 ("[A]ny new tobacco product that was not on the market on [August 8, 2016] is not covered by this compliance policy and will be subject to enforcement if marketed without authorization after the effective date.") and Garnick Dep. 30:24 to 31:2 ("But any new product that was not on the market as of 8/16 cannot be put on the market and could not have been put on the market without preapproval from the FDA…").

[104] Garnick IH at 30:15-18 ("Any modification of the product, with very few exceptions, required -- made it a new product requiring preapproval from the FDA."); and Murillo IH at 136:20 to 137:7 ("So in general, when you have a product in the market that is subject to a market order, you are very limited in the changes you can make to it before you have to apply for a new market order... because of the unique nature of the deeming rule, that is, that certain products were permitted to stay in the market under the exercise of enforcement discretion by the FDA, pending the deadline to get a PMTA, there were even arguably heightened rules on limiting changes that could be made to the product.").

[105] FDA, "FDA advances investigation into whether more than 40 e-cigarette products are being illegally marketed and outside agency's compliance policy," October 12, 2018, *available at* https://www.fda.gov/news-events/press-announcements/fda-advances-investigation-whether-more-40-e-cigarette-products-are-being-illegally-marketed-and, accessed on March 2, 2021.

[106] 85 Fed. Reg. 23,973 (announcing the availability of a final guidance for industry that describes, among other things, how FDA intends to prioritize its enforcement resources with regard to the marketing of ENDS products that do not have premarket authorization); FDA, Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization (Revised), April 2020, *available at* https://www.fda.gov/media/133880/download, accessed on March 15, 2021 (identifying as an enforcement priority "[a]ny flavored, cartridge-based ENDS product (other than a tobacco- or menthol-flavored ENDS product").

[107] FDA, "FDA advances investigation into whether more than 40 e-cigarette products are being illegally marketed and outside agency's compliance policy," October 12, 2018, *available at* https://www.fda.gov/news-events/press-announcements/fda-advances-investigation-whether-more-40-e-cigarette-products-are-being-illegally-marketed-and, accessed on March 2, 2021.

47.    Manufacturers must submit a PMTA for each e-liquid and e-cigarette device the manufacturer intends to put on the market.[108]  In evaluating a PMTA, the FDA is required to evaluate multiple factors in determining whether "permitting such tobacco product to be marketed would be appropriate for the protection of the public health."[109]  That analysis examines "the risks and benefits to the population as a whole, including users and nonusers of the tobacco product," and the increased or decreased likelihoods that adult users of tobacco products will quit and/or that non-users will start using tobacco products.[110]  PMTAs must include evidence that the manufacturer has a controlled design for the product capable of being manufactured with consistent quality; an assessment of the product's health risk profile relative to combustible cigarettes and other products in the same category; a demonstration of the product's actual use and performance; and an evaluation of the product's net benefit to the population as a whole taking into account the risks and benefits of the product to users and non-users.[111]

### F.    THE BAN ON NON-MENTHOL AND TOBACCO FLAVORED CARTRIDGES AND PODS

48.    In July 2017, the FDA announced its intention to seek "public comment on the role that flavors (including menthol) in tobacco products play in attracting youth and may play in

---

[108] HHS, FDA, Center for Tobacco Products, Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems, Guidance for Industry at § IV.A (June 2019), *available at* https://www.fda.gov/media/127853/download, accessed on March 2, 2021.

[109] 21 U.S.C. § 387j(c)(2)(A); Murillo IH at 15:2-14 ("[A]pplicants need to meet a standard under the statute that requires a showing that marketing of the product is 'appropriate for the protection of the public health,' which is the basic standard encapsulated in the Tobacco Control Act. That requires you to show a number of things from manufacturing control to risk profile versus a cigarette usually.  You have to show actual use and performance in the market by the target audience, in this case smokers.  And then you have to show whether there is a net benefit to the population as a whole, taking into account the risks and benefits of the product to both users and nonusers of the product."); and FDA Guidance Document, Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems (ENDS) (June 2019), *available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/premarket-tobacco-product-applications-electronic-nicotine-delivery-systems-ends, accessed on March 2, 2021.

[110] 21 U.S.C. § 387j(c)(4) and Murillo IH at 15:2-14.

[111] 21 U.S.C. § 387j(b)(1); HHS, FDA, Center for Tobacco Products, Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems, Guidance for Industry at §VI (June 2019), *available at* https://www.fda.gov/media/127853/download, accessed on March 2, 2021.

helping some smokers switch to potentially less harmful forms of nicotine delivery."[112] In September 2018, the FDA requested that the then-largest e-cigarette manufacturers (Reynolds, ITG, JLI, JTI, and Altria) develop "robust plans" to combat youth consumption of e-cigarettes including possible changes to the companies' sales and marketing practices, retail distribution, and sale of flavored and pod-based products.[113]

49.     In response to the FDA's concerns, which were also communicated in a September 12, 2018 letter to e-cigarette manufacturers,[114] Altria informed the agency on October 25, 2018, among other things, that it would voluntarily withdraw its MarkTen Elite product and MarkTen product flavors other than tobacco, menthol, and mint from the market.[115] Subsequently, on December 7, 2018, Altria announced that it was discontinuing the sale of its remaining e-cigarette product lines (including its traditional MarkTen product

---

[112] https://www.fda.gov/news-events/press-announcements/fda-announces-comprehensive-regulatory-plan-shift-trajectory-tobacco-related-disease-death, accessed on March 5, 2021.

[113] ALGFTC0001978510, Letter from Scott Gottlieb to Howard Willard, September 12, 2018, at 2; *see also* Statement of Comm'r Scott Gottlieb, Apr. 23, 2018, https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-new-enforcement-actions-and-youth-tobacco-prevention, accessed on March 15, 2020 ("The troubling reality is that electronic nicotine delivery systems (ENDS) such as e-cigarettes have become wildly popular with kids. We understand, by all accounts, many of them may be using products that closely resemble a USB flash drive, have high levels of nicotine and emissions that are hard to see. These characteristics may facilitate youth use, by making the products more attractive to children and teens."); https://www.fda.gov/news-events/press-announcements/fda-takes-new-steps-address-epidemic-youth-e-cigarette-use-including-historic-action-against-more, accessed on March 5, 2021 ("The agency is asking each company to submit to FDA within 60 days plans describing how they will address the widespread youth access and use of their products. If they fail to do so, or if the plans do not appropriately address this issue, the FDA will consider whether it would be appropriate to revisit the current policy that results in these products remaining on the market without a marketing order from the agency. This could mean requiring these brands to remove some or all of their flavored products that may be contributing to the rise in youth use from the market until they receive premarket authorization and otherwise meet all of their obligations under the law."); *and* https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-new-steps-address-epidemic-youth-e-cigarette-use, accessed on March 14, 2021 ("The biggest youth use seems to be among cartridge-based e-cigarettes, and not the open-tank vaping products.").

[114] ALGFTC0001978510, Letter from Scott Gottlieb to Howard Willard, September 12, 2018, at 2.

[115] Letter from Howard Willard, Chairman and CEO Altria to Scott Gottlieb, Commissioner US FDA, October 25, 2018, *available at* https://www.altria.com/-/media/Project/Altria/Altria/about-altria/federal-regulation-of-tobacco/regulatory-filings/documents/Altria-Response-to-FDA-E-vapor-October-25-2018.pdf, accessed on March 4, 2021.

32

flavors and the Green Smoke brand) and certain of its oral nicotine-containing products.[116]

50.    On November 13, 2018, in response to the FDA's stated concerns, JLI announced that it would voluntarily withdraw from retail distribution all flavors of JUUL pods with the exception of its tobacco, menthol, and mint products.[117]  JLI stopped selling these flavors through its website in October 2019.[118]  On November 7, 2019, JLI subsequently announced that it would also withdraw its mint flavor, leaving only its menthol and tobacco flavored products on the market.[119]

51.    On January 2, 2020, following a public comment period, the FDA finalized a policy to begin applying its existing requirement that e-cigarette products receive marketing authorization to products that were "flavored" (i.e., not menthol or tobacco flavored).[120] This policy is sometimes referred to as the FDA's "Flavor Ban."[121]

52.    Dr. Rothman asserts that "Altria's e-cigarette sales of consumables were mainly non-flavored, which would have put Altria in a favorable position given the FDA's emerging concerns in 2018 about youth vaping and flavored products."[122]  In making this claim,

---

[116] https://www.businesswire.com/news/home/20181207005175/en/, accessed on March 4, 2021.

[117] *See* Kevin Burns, "JUUL Labs Action Plan," JUUL Labs Nov. 13, 2018, *available at* https://www.juullabs.com/juul-labs-action-plan/, accessed on March 13, 2021.

[118] Nathan Bomey, "Juul suspends all US sales of fruity e-cigarettes amid scrutiny," USA Today, October 17, 2019, *available at* https://www.usatoday.com/story/money/2019/10/17/juul-e-cigarette-flavors/4009168002/, accessed on March 2, 2021.

[119] *See* PX9007 (JLI) at -001 ("JUUL Labs' CEO K.C. Crosthwaite announced that the company will immediately stop accepting orders from our retail partners for our Mint JUULpods in the U.S. and cease the sale of Mint JUULpods in the U.S. through our ecommerce site (JUUL.com).").; *see also* Investigational Hearing of Timothy Danaher (JLI), December 10, 2019 (hereinafter "Danaher IH") at 143:25–145:7, 188:20–189:18; and Deposition of Bob Robbins (JLI),  February 5, 2021 (PX7039) (hereinafter "Robbins Dep."), at 221:20–222:2 ("[Q.] Is it the case that JLI initially removed flavors from retail other than mint, menthol and tobacco? A. Yes, that is correct.").

[120] PX9016 (FDA) at -002.

[121] The FDA's decision to immediately enforce the pre-authorization requirement against flavored products does not foreclose the possibility that a company may eventually be permitted to sell flavored e-cigarette products (and does not apply to disposables). If a company files a PMTA for the flavored e-cigarette product and the FDA grants a market order, it could be sold on the market in the future.  *See* PX9016 (FDA) at -002.

[122] Rothman Report, ¶119 and Table 6.

Dr. Rothman ignores the significant competitive differentiation between cig-a-likes and pod-based vaporizer products. Altria's sales of menthol and tobacco e-cigarette products (what Dr. Rothman calls "non-flavored") were overwhelmingly associated with the MarkTen cig-a-like format. In 2018, MarkTen accounted for at least 98 percent of Altria's total menthol and tobacco consumables sales in starter and refill kits.[123] As I have shown, however, consumer demand for the cig-a-like format was rapidly declining, being eclipsed by sales of the pod-based vaporizer format by March 2018 and then falling to less than 10 percent of all e-cigarette consumables purchases by February 2020, when the FDA Flavor Ban came into effect. *See* Fig. IV.3, *supra*.

53.     At most, only 2.3 percent of Altria's menthol and tobacco consumables sales in 2018 were associated with the company's MarkTen Elite product, whose pod-based format more closely resembled the JUUL product.[124] Dr. Rothman cites to Altria documents and testimony noting that the MarkTen Elite "had a plethora of flavor systems" and a "variety of flavor-forward formulas."[125] This contrasts strongly with the JUUL product, which testimony indicates "had okay flavors."[126] Prior to voluntarily discontinuing all sales of the MarkTen Elite on October 25, 2018, Altria had marketed pods for this device in the following flavors: "Apple Cider," "Glacier Mint," "Hazelnut Cream," "Strawberry Brulee," and "Sweet Original."[127] The first four are clearly types of flavors that would be prohibited under the Flavor Ban. The fifth, Sweet Original, was described as, "a balanced tobacco blend with honeysuckle and fruit flavor."[128] While the Flavor Ban does not cover pure tobacco flavors, it is not clear how the FDA would have treated Sweet

---

[123] Analysis of Altria IRI Projected data. As I explain shortly, there is potential uncertainty as to whether the FDA Flavor Ban would have applied to four or all five of the MarkTen Elite product flavors. Thus, the figure 98 percent represents a lower-bound on the fraction of the share of Altria's total menthol and tobacco consumable sales derived from MarkTen sales.

[124] Analysis of Altria IRI Projected data.

[125] Baculis Deposition at 146:9–16 and PX1143 (Altria) Email from Kimberlee Pepple, August 27, 2018, at -007.

[126] Baculis Deposition at 165:5–18.

[127] Analysis of data from Specification 11 of Altria's Response to FTC Second Request.

[128] PX1647, Altria, "MARKTEN ELITE," January, 2018, at -014.

CONFIDENTIAL – FTC Docket No. 9393

Original.  The Flavor Ban would have forced Altria to discontinue selling nearly all or all its MarkTen Elite pods beginning February 2020 if the company had not already discontinued sales of its MarkTen Elite product on October 25, 2018.  Even if Sweet Original were not covered by the Flavor Ban, that flavor constituted less than one-quarter of MarkTen Elite sales and only 2.2 percent of Altria's total e-cigarette product sales in 2018.[129]

54.    JLI, ITG, NJOY and Reynolds—all of which had menthol and tobacco flavored pod-based e-cigarette products that were 8/8/16 products[130]—have adapted to the FDA's ban on non-menthol and tobacco flavors and have expanded sales of menthol and tobacco flavors with their pod-based products.  As a result, JLI has continued to face multiple competitors offering menthol and tobacco products with similar look-and-feel and nicotine experiences.  Fig. IV.4 shows that while JLI's shipments of flavored pods dropped as the company proactively withdrew its non-menthol and tobacco pods in advance of the FDA's Flavor Ban announcement, the company significantly grew its shipments of menthol and tobacco pods.  Figs. IV.5 through IV.7 provide similar views for each of ITG, Reynolds, and NJOY, respectively, and show that each of these pod-based e-cigarette competitors significantly expanded their shipments of menthol and tobacco flavor pods after the introduction of the FDA's Flavor Ban.  As a result, JUUL continued in 2020 to face significant head-to-head competition from e-cigarettes with very similar product look-and-feel and nicotine experience in the form of ITG's *my*blu, NJOY's Ace and Reynolds' Vuse Alto, among others.

---

[129] Analysis of data from Specification 11 of Altria's Response to FTC Second Request.

[130] See Figs. IV.4 through IV.7 showing tobacco and menthol flavored pod-based vaporizer products for each of JLI, ITG, Reynolds, and NJOY. *See* https://www.businessinsider.com/juul-timeline-from-startup-to-tobacco-company-challenges-bans-2019-9#2016-juul-sales-skyrocket-700-6, accessed on March 11, 2021 ("June 1, 2015: Pax Labs launches the Juul"); ITG00000475, "PROJECT INN – UPDATE MEMO," April 18, 2017 at -475 ("Majority of flavours and nic strengths in the market pre- 8-8-2016."); Farrell Dep. at 46:5-7 ("[T]he product which is now the NJOY Ace was on the market prior to 8/8/16"); PX8008, Reynolds, "Declaration of Wade Huckabee," March 31, 2020 at -010 ("Smoore introduced the product in July 2016, and RJR Vapor reintroduced the product under the VUSE ALTO brand in August 2018").

CONFIDENTIAL – FTC Docket No. 9393

55.    By contrast, nearly all of Altria's menthol and tobacco e-cigarette products were cig-a-likes,[131] which were differentiated from pod-based vaporizers such as JUUL by their product look-and-feel and nicotine experience.  If Altria had not discontinued the sale of its MarkTen Elite product and MarkTen product flavors on October 25, 2018 and its remaining e-cigarette products on December 7, 2018, the overwhelming majority of its post-Flavor Ban sales would likely have been in cig-a-like products that were strongly differentiated from, and thus not a close competitor to, JUUL.

**Fig. IV.4:  JLI Cartridge Quantity by Flavor Type and Product Type, Altria IRI Projected Data**



---

[131] Based on Altria IRI Projected data, cig-a-likes represented 98 percent of Altria's total sales of menthol and tobacco e-cigarette products in 2018.

CONFIDENTIAL – FTC Docket No. 9393

**Fig. IV.5:  ITG Cartridge Quantity by Flavor Type and Product Type, Altria IRI Projected Data**



CONFIDENTIAL – FTC Docket No. 9393

**Fig. IV.6:  Reynolds Cartridge Quantity by Flavor Type and Product Type, Altria IRI Projected Data**



CONFIDENTIAL – FTC Docket No. 9393

**Fig. IV.7:  NJOY Cartridge Quantity by Flavor Type and Product Type, Altria IRI Projected Data**



### G.  THE TRANSACTION BETWEEN ALTRIA AND JLI

56.    On December 20, 2018, Altria and JLI entered an agreement whereby Altria acquired non-voting securities constituting a 35 percent minority interest in JLI for $12.8 billion. The parties filed notifications under the Hart-Scott-Rodino Act for the conversion of these non-voting interests into voting securities.  On January 28, 2020, the parties amended their agreement.  Under the terms of the revised agreement, upon conversion of the non-voting securities, Altria will be entitled to designate two of nine directors on the

CONFIDENTIAL – FTC Docket No. 9393

JLI Board.[132]  Altria also agreed to provide regulatory affairs services to JLI, including assistance to JLI with obtaining FDA approval for its PMTA authorization and MRTP applications.[133,134]

57.      Altria has stated that its investment in JLI is a key aspect of the company's strategy to diversify and grow income with products other than traditional cigarettes.[135]  Demand for traditional cigarettes is declining and shifting toward reduced-harm products, and Altria has indicated that it expects this trend will continue.[136]  Through its investment in JLI, Altria will participate in a growth category as its core traditional cigarette business continues to decline due to shifting consumer preferences.[137]

---

[132] In addition to Altria's two designated directors, Altria will also have the right to designate one of three independent directors, subject to unanimous approval of the JLI Board's nominations committee.  *See* Altria Group, Inc., Form 8-K, January 30, 2020 *available at* https://investor.altria.com/sec-filings/sec-filings-details/default.aspx?FilingId=13872519  accessed on March 2, 2021.

[133] Altria Group, Inc., Form 8-K, January 30, *available at* https://investor.altria.com/sec-filings/sec-filings-details/default.aspx?FilingId=13872519 , accessed on March 2, 2021.

[134] *See* Response to Request for Additional Information and Documentary Materials issued to Altria Group, Inc., No. 20190791, October 15, 2019 ("Altria has negotiated, and continues to negotiate services to be provided to JLI related to their requirements to prepare a premarket tobacco product application (PMTA). Under SOWs numbers 7, 12, 15, 19 through 23, and 25, JLI has requested that Altria provide consulting services on their PMTAs." and "To date Altria and JLI have executed Statements of Work ("SOW") numbers 1 through 16; 18 through 25; and 27.").

[135] Altria Press Release, Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth (December 20, 2018), *available at* https://investor.altria.com/press-releases/news-details/2018/Altria-Makes-128-Billion-Minority-Investment-in-JUUL-to-Accelerate-Harm-Reduction-and-Drive-Growth/default.aspx , accessed on March 2, 2021.

[136] Altria Q 1 2018 Earnings Call Transcript, April 26, 2018, Remarks of Martin J. Barrington, *available at* https://seekingalpha.com/article/4166284-altria-group-mo-q1-2018-results-earnings-call-transcript, accessed on March 2, 2021 ("[A]s the [vapor] technologies get better and particularly as adult smokers are able to learn about the products that we would expect migration over time and that's why we[] have the innovation aspiration that we do.").

[137] Altria Press Release, Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth (Dec. 20, 2018), *available at* https://investor.altria.com/press-releases/news-details/2018/Altria-Makes-128-Billion-Minority-Investment-in-JUUL-to-Accelerate-Harm-Reduction-and-Drive-Growth/default.aspx, accessed on March 13, 2021 ("We are taking significant action to prepare for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes.").

CONFIDENTIAL – FTC Docket No. 9393

## V.    ALTRIA'S DISCONTINUATION OF ITS E-CIGARETTE PRODUCT LINES DID NOT DIMINISH COMPETITION OR HARM CONSUMERS

58.    The FTC Complaint alleges that consumers "lost the benefit of current and future head-to-head competition between Altria and JLI and between Altria and other competitors."[138] Dr. Rothman reaches the same conclusion.[139]  The economic evidence contradicts this view and shows that neither Altria's minority investment in JLI nor the discontinuation of its e-cigarette products diminished competition or harmed consumers.

59.    The FTC Complaint and Dr. Rothman's analysis focus on the removal of Altria's products as the measure of harm associated with the Transaction.  By doing so, their measure of harm fails to distinguish between harm related to an alleged reduction in competition due to the Transaction, and harm related to consumer surplus allegedly lost because of the discontinuation of product sales for commercial reasons.  Product discontinuations are a regular and efficient part of the competitive process—unsuccessful products are replaced by other products.  If the MarkTen products were replaced by other products that had greater appeal to consumers as evidenced by their rapid expansion of distribution and sales after Altria discontinued its product lines, then the measure of harm put forward by Dr. Rothman and the FTC does not provide an assessment of harm that would be relevant in evaluating the alleged anticompetitive effect of the Transaction. Conversely, if the Transaction did not allow JLI to raise price, Dr. Rothman's methodology would still assess harm based simply on the fact that Altria removed a product from the market.[140]  There is no economic basis to assume harm merely from the removal of a product when there was otherwise no increase in price, diminishment in overall output or reduction in product variety as is the case here.

---

[138] FTC Complaint, ¶7.

[139] Rothman Report, ¶11.

[140] In fact, Dr. Rothman's analysis finds very small price effects—Dr. Rothman predicts that Altria's discontinuation of its e-cigarette product lines led JLI to raise price by only 1 percent and led other rivals to raise price by fractions of a percent; roughly 80 percent of the harm he estimates is due to alleged loss of product variety due to the removal of the MarkTen products.

CONFIDENTIAL – FTC Docket No. 9393

60.     The real-world evidence shows that Altria's MarkTen cig-a-like product faced declining demand and its MarkTen Elite pod-based product performed poorly, and that after Altria stopped selling its MarkTen and MarkTen Elite products, retailers replaced them with products from other manufacturers that competed with JLI and that grew their sales rapidly.[141]  In any event, the minimal hypothetical loss of surplus that Dr. Rothman assumes would occur could readily be offset by the efficiencies created by Altria being able to provide JLI with regulatory advisory services under the terms of the Transaction to increase the likelihood that current and future JUUL products receive FDA approval, as I show in Section VIII.D.[142]

### A.   THERE ARE NO INDICATIONS THE MARKET HAS BECOME LESS COMPETITIVE SINCE ALTRIA DISCONTINUED ITS E-CIGARETTE PRODUCTS

61.     As an economist, I look for direct evidence to assess whether a market is functioning less (or more) competitively in the aftermath of a transaction or other event such as a product being withdrawn from sale on the market.  Directly analyzing the competitive effects from a merger or other market events provides the clearest indication of whether those events were anticompetitive or procompetitive.  My review of the direct evidence in this case finds no indication that the market has become less competitive since Altria discontinued its e-cigarette product lines.  To the contrary, the evidence shows that the e-cigarette marketplace remains highly competitive and dynamic.  During the period when Altria was discontinuing its product lines, rivals were launching products and competing aggressively on price, and retailers were expanding product variety by introducing brands from other manufacturers.  In such a dynamic marketplace, competition from the MarkTen and MarkTen Elite products was readily replaced.  This is reflected in the facts that: (i) overall prices are lower; (ii) overall output is higher; (iii) market concentration is lower; and (iv) the JUUL product has lost share to multiple competitors.  I review the economic evidence on each of these competitive indicia in the sections that follow.

---

[141] *See* Section V.A.4, *infra.*

[142] *See* Section V.F, *infra.*

CONFIDENTIAL – FTC Docket No. 9393

## 1.  Overall prices are lower

62.    Average prices have fallen since Altria's discontinuation of e-cigarette sales.  Fig. V.1 tracks the average industry price for pod-based vaporizer devices (across JUUL, Logic Pro, *my*blu, NJOY Ace, Vuse Alto and (when it was on the market) MarkTen Elite) from January 2018 through the end of September 2020.[143]  Average device prices have fallen sharply since Altria's discontinuation of e-cigarette sales.  The average industry device price fell from about $27 in September 2018 to around $8 in September 2020, representing a roughly 72 percent price reduction.  As I will explain (*see* Section V.A.4, *infra*), aggressive promotional pricing for devices by Reynolds and NJOY prompted JLI to cut its own device price.

---

[143] I focus on pod-based vaporizers as the demand for cig-a-likes declined dramatically throughout this period such that the share of cig-a-likes by September 2020 was only 5 percent of all closed system e-cigarette cartridge unit volumes based on IRI data and, as I show in Section VI.C cig-a-likes were not a significant competitive constraint on JLI and other pod-based vaporizers.

43

CONFIDENTIAL – FTC Docket No. 9393

**Fig. V.1: Average Industry Price for Pod-Based Vaporizer Devices[144]**



63.    The average industry price of cartridges for pod-based vaporizers also has fallen since Altria's discontinuation of e-cigarette sales. Over time, cartridge sizes have tended to grow in terms of the number of mL of e-liquid they contain. To reflect this trend, Fig. V.2 tracks the average industry price for pod-based vaporizer cartridges per milliliter. Between November 2018 and September 2020, the average industry cartridge price fell from about $5.68 per milliliter to about $4.81 per milliliter, a decline of more than 15 percent. The price decline for cartridges has been less pronounced than for devices, consistent with the razor/razorblade competitive dynamic that I previously explained.[145]

---

[144] I have included vertical lines in the chart indicating the approximate dates when sales of the MarkTen Elite product were discontinued, together with sales of non-menthol and tobacco flavored cig-a-like cartridges (labeled as "MarkTen Elite Discontinued"), and when sales of the remaining Altria e-cigarette products were discontinued (labeled as "Altria E-Cigarettes Discontinued"). This applies to Fig.s V.1, V.2, V.8 and V.9.

[145] See ¶42, *supra*.

CONFIDENTIAL – FTC Docket No. 9393

**Fig. V.2: Average Industry Price for Pod-Based Vaporizer Cartridges (per mL)**



## 2. Overall output is higher

64. Overall sales volumes of e-cigarettes are higher than they were prior to Altria's discontinuation of e-cigarette sales. While the observed growth in output was, at least in part, driven by an ongoing expansion of demand for pod-based vaporizers, expansion of output is consistent with a competitive and dynamic market in which rivals were investing in launching and aggressively promoting products, and in which retailers were expanding product variety by introducing brands from a growing set of manufacturers to take advantage of growing market opportunities. In such a dynamic marketplace, competition from Altria was readily replaced.

65. In October 2018, average weekly sales of pod-based vaporizer devices for the e-cigarette industry as a whole were approximately 412.8 thousand. In October 2019, approximately a year after Altria had stopped selling all e-cigarette products, average weekly industry sales of pod-based vaporizer devices were approximately 505.9 thousand, representing a

45

CONFIDENTIAL – FTC Docket No. 9393

22.5 percent increase.  Sales of cartridges for pod-based vaporizers also increased after Altria's withdrawal of its e-cigarette products.  In October 2018, average weekly industry sales of cartridges were approximately 12.1 million.  This figure increased to approximately 15.8 million in October 2019, representing a 30.7 percent increase.  See Fig. V.3.

**Fig. V.3: Average Weekly Sales of Pod-Based Vaporizer Devices and Cartridges**

### 3.  Market concentration is lower

66.    Overall market concentration, as measured by the Herfindahl-Hirschman Index of market concentration ("HHI")[146], is lower than prior to Altria's discontinuation its e-cigarette

---

[146] The HHI is a measure of market concentration constructed by summing the squares of each firm's share in the relevant market.  The HHI ranges from a maximum of 10,000 (pure monopoly) to a number approaching zero (in the case where each firm is atomistically small).

CONFIDENTIAL – FTC Docket No. 9393

product lines.  This is true regardless of whether I look at the HHI among pod-based vaporizer products or if I look at all closed-system e-cigarette products.

67.    For pod-based vaporizer products, the HHI in October 2018 was 8,492.[147]  The HHI fell to 6,240 in October 2019 and to 5,440 in September 2020, the final month for which I have data.  Thus, over this period, market concentration for pod-based vaporizer products fell by 3,052 points.  See Fig. V.4.

68.    If we measure concentration within the FTC's broader alleged market of all closed-system e-cigarette products, the HHI declined from 5,493 in October 2018 to 5,322 in October 2019 and to 5,022 in September of 2020, the final month for which I have data.[148]  Thus, over this period, market concentration for all closed-system e-cigarette products fell by 471 points.  See Fig. V.4.  The decline in the HHI reflects Altria's sales diverting primarily to products other than JLI's product JUUL and expansion and repositioning[149] by competitors including NJOY, Reynolds and ITG.

---

[147] The HHIs discussed in this and the following paragraph, as well as Fig. V.4 are based on Altria IRI Projected data.  I use October as the month of comparison as JLI's share was rising rapidly throughout the period prior to Altria's discontinuation of its e-cigarette products so that using earlier months is misleading.

[148] By contrast, the same measure of HHI for the months leading up to Altria's discontinuation of its e-cigarette products was increasing.

[149] As I explain in Section V.A.4, *infra,* one of the ways that competitive repositioning manifested itself in the e-cigarette industry was through sizable promotional discounts on e-cigarette devices, including by NJOY and Reynolds, which had the effect of positioning those rivals' products to be cheaper entry-point products for adult smokers who were considering converting to e-cigarettes.

CONFIDENTIAL – FTC Docket No. 9393

**Fig. V.4: HHIs for Pod-Based Vaporizers and All Closed-System E-Cigarettes**



#### 4. <u>JUUL has lost share to rivals</u>

69.    JUUL's share is significantly smaller than before Altria's discontinuation of e-cigarette sales.  In particular, JUUL has lost share to both Vuse Alto (by Reynolds) and Ace (by NJOY).  As I discuss below, Reynolds and NJOY began running aggressive promotions on their pod-based vaporizer devices, including offering devices for as little as one dollar.[150]  NJOY has run promotions since either December 2018 or January 2019 (except for a hiatus in or around September 2019 driven by a regulatory issue), and as of this year

---

[150] JLIFTC02056752, JLI, "US August Country Review (Q4 2019 and 2020 Action Plan)," August 2019, at slide 1 ("NJOY is proving true razor / razor blade pricing model works to unlock addressable market. VUSE also coming down to $1 device price point… NJOY cannibalizing JUUL growth and threatening to take JUUL's established userbase.").

has no plans to stop doing promotions;[151] Reynolds began running its device promotion in July 2019 and has continued to run it as of February 2021.[152] As I have explained, the e-cigarette product market exhibits the razor/razorblade competitive dynamic: "seeding" the market with inexpensive razors (or e-cigarette devices) can help generate increased sales of razorblades (or cartridges), which in turn stimulates increased future sales of razors (devices). This virtuous circle can only occur, however, if the trial purchase of a discounted e-cigarette devices provides a satisfying experience that prompts the customer to want to continue purchasing. As I discuss below, market evidence shows that this was the case for the Vuse Alto and NJOY Ace products[153] but, as I will discuss at greater length in Sections VII.C and VII.D, *infra,* early discounting and promotional pricing of MarkTen Elite did not help Altria overcome perceived problems with its pod-based vaporizer, as evidenced by the product's weak sales performance.

70.     The effects of aggressive device discounting by JUUL's rivals are evidenced directly in observed changes in sales and shares beginning in early 2019. Fig. V.5 and Fig. V.6 show the progression of weekly sales of pod-based vaporizers and cartridge volumes, respectively, from January 2018 through September 2020. As earlier noted, NJOY began running promotions for the NJOY Ace device in December 2018 or January 2019,[154] and

---

[151] Deposition of Andrew Farrell (NJOY), January 29, 2021 (hereinafter "Farrell Dep.") at 170:23-25 ("I believe the first time that we ran a 99-cent promotion, it was either December 2018 or January 2019, just to be specific".); 116:20-117:12 ("Is there anytime since you joined the company when NJOY has taken a hiatus from price promotions? A. Yes. Q. And when was that? A. That was in September of 2019. . . it followed an increase in publicity, headlines, around a potential rule, regulation . . . contemplated at the time that would ban any type of flavored e-cigarette."); 121:3-5 ("Q. Do you have any plans to stop doing price promotions on your products anytime soon? A. No.").

[152] FTCJUUL_000005545, Reynolds, "Alto 99 cts Performance Evaluation", at -48 (showing Alto's promotion beginning in July 2019); Huckabee Dep. at 86:6-8 ("Q. And the 99 cent promotion on the Alto device is still running, correct? A. It is.").

[153] This is also reflected in JLI documents. *See*, for example, JLIFTC02196743, Carrie Freitag, "Njoy Ace Competitive Understanding Qualitative Topline Learnings," July 2019 at p. 3 ("Trial for NJOY Ace is overwhelmingly driven by device promo price, but the brand then meets or exceeds usage expectations via other benefits and perceived advantages versus competition (including Juul)" and "Device price is THE core driver of Ace trial, offering low/no risk or commitment as a compelling benefit… Upon trial, Ace is largely over-delivering on expectations and their consumers do not feel like they're sacrificing a better experience in exchange for Ace's lower price").

[154] "Farrell Dep. at 170:23-25 ("I believe the first time that we ran a 99-cent promotion, it was either December 2018 or January 2019, just to be specific".)

we see the effects of this in rapidly growing sales of its pod-based vaporizer devices, with sales growing from less than roughly 2,500 devices per week throughout 2018 to a peak of more than 200,000 devices per week in September 2019 (see Fig. V.5). Over this same period, cartridge sales for the NJOY Ace also rose sharply from about 1,600 units in weekly cartridge volume throughout 2018 to about 1.16 million units in weekly cartridge volume starting in August 2019 (see Fig. V.6). While NJOY Ace sales subsequently declined from their peak levels, weekly sales of devices and particularly of cartridges remained significantly above pre-promotion levels throughout the remainder of the period for which data are available. Thus, it appears that NJOY was successful at "seeding" the market with its heavily discounted device, consumers generally liked their initial experience using the product, and many continued to make repeat purchases thereafter.

71.    At least part of the slowdown in NJOY Ace's sales growth may be explained by the fact that Reynolds also began running aggressive price promotions for Reynolds' Vuse Alto product during the same general timeframe,[155] creating additional strong competition. Here too, the market evidence shows that Reynolds' razor/razorblade pricing strategy was successful in growing sales of both its device and cartridges. Sales of the Vuse Alto device rose from an average of fewer than 50,000 devices per week over the period January to July 2019 before jumping to more than 200,000 devices per week in December 2019. After a short period of lower weekly sales, Vuse Alto device sales rose sharply again beginning in May 2020 and continued growing rapidly through the remainder of the period for which data are available. See Fig. V.5. Sales of Vuse Alto cartridges rose rapidly and nearly continuously from September 2018 through the entire time period. See Fig. V.6. As with NJOY, the sales evidence shows that Reynolds was highly successful at "seeding" the market for sustained sales of its product.

---

[155] FTCJUUL_000005545, Reynolds, "Alto 99 cts Performance Evaluation", at -48 (showing Alto's promotion beginning in July 2019); Huckabee Dep. at 86:6-8 ("Q. And the 99 cent promotion on the Alto device is still running, correct? A. It is.").

CONFIDENTIAL – FTC Docket No. 9393

**Fig. V.5: Pod-Based Vaporizer Device Sales by Brand (in Units)**



CONFIDENTIAL – FTC Docket No. 9393

**Fig. V.6:  Pod-Based Vaporizer Cartridge Sales by Brand**



72.    Significant growth by NJOY and Reynolds translated into market share gains for both firms, and these share gains largely came at the expense of JLI.  Fig. V.7 shows that JUUL's share of all pod-based vaporizer device sales fell from about 69 percent in October 2018 to about 43 percent in October 2019, before falling further to about 30 percent in September 2020, the last month for which I have data.  At different points over this period, NJOY Ace's device share reached as high as 31 percent and Vuse Alto's device share rose to reach nearly 60 percent.  These significant swings in market share over a relatively short period of time, with first NJOY Ace expanding to nearly match JUUL's market share in less than a year followed by Vuse Alto rapidly winning share and surpassing both JUUL and NJOY Ace, illustrate the dynamic nature of competition in e-cigarettes, with rival brands successfully repositioning and expanding to win sales. Contemporaneous JLI documents reflect the company's view that rivals were largely

CONFIDENTIAL – FTC Docket No. 9393

capturing share at JUUL's expense, but also note that some of the gains in rivals' share was attributable to Altria having discontinued its e-cigarette product lines, again illustrating how quickly rivals were able to take advantage of a competitive opportunity and expand sales and share.[156]

**Fig. V.7:  Pod-Based Vaporizer Device Sales Shares by Brand (by Units)**

73.     We observe a similar competitive dynamic in shares of cartridge volumes in Fig. V.8. During the period that Mark Ten Elite was on the market there was essentially no change in JUUL's share of pod-based vaporizer pods.  In contrast, in the first full year after

---

[156] JLIFTC02060582, JLI, " JUUL vs. NJOY Ace Key Retailer Landscape Overview," July 2019 p 4. ("NJOY Ace has taken EQ Pod share [at Wawa] primarily from remaining competitors.  Since MarkTen exited the market, some of NJOY Ace share gain could be attributed as a replacement of this brand.") and p. 14 ("In six months, NJOY Ace devices have captured 66% unit share [at Circle K].  Approximately 49% share was at JUUL's expense, but the remaining share can be attributed to MarkTen exiting the market.").

CONFIDENTIAL – FTC Docket No. 9393

Altria withdrew its e-cigarette products from the market, JUUL lost 15.6 percentage points in cartridge unit market share, before losing another 4.9 percentage points of share through the end of September 2020.  During that same period, NJOY Ace grew its cartridge share to 7.4 percent in September 2019 and Vuse Alto gained share almost continuously and held a 21.0 percent share at the end of September 2020.[157]  Again, these data illustrate that the e-cigarette marketplace is competitively dynamic and show that multiple competitors have successfully challenged JUUL for market share.

**Fig. V.8:  Pod-Based Vaporizer Cartridge Sales Shares by Brand**



74.    The dynamism of the competitive process, whereby rival products become increasingly available and expand their sales, is illustrated clearly at the Sheetz gasoline and convenience store chain.  Fig. V.9 shows monthly cartridge sales in unit volumes of all non-JUUL products from data provided by Sheetz over the period 2017-2020.  While Altria's products were on the shelf at Sheetz, Sheetz sold four closed system e-cigarette

---

[157] JUUL's pod size in milliliters (0.7mL) is substantially smaller than the pod sizes for most other competing pods so that unit shares understate gains by NJOY Ace and Vuse Alto relative to JUUL.

CONFIDENTIAL – FTC Docket No. 9393

brands:  JUUL, MarkTen, Reynolds' Vuse and JTI's Logic. The data show clearly the reduction in sales of the MarkTen products from March to April of 2019 associated with the end of sell-through at retail following Altria's discontinuation of the MarkTen products.[158]  Following discontinuation, rather than the consumer choice set shrinking and product variety declining, the opposite occurred.  Sheetz added products from three manufacturers that it did not previously sell when MarkTen was on the market—NJOY's Ace, ITG's *m*yblu, and EAS' Leap.  Furthermore, the data show that products from rivals more than replaced MarkTen's sales, with both NJOY and Vuse significantly outpacing MarkTen Elite in terms of sales performance.

75.   What happened at Sheetz is representative of what happened more broadly.  Using retail data from IRI, I find that among the top 20 chains that carried MarkTen products in 2018, the average number of manufacturers per store with distribution of pod-based vaporizers *increased* from 3 over the period October 2017 – September 2018 to 4 over the period October 2019 – September 2020, despite Altria's discontinuation of MarkTen Elite.

---

[158] While Altria stopped selling all MarkTen products to wholesalers in December of 2018, retailers were still able to sell out of inventory so that retail sales continued into early 2019.

CONFIDENTIAL – FTC Docket No. 9393

**Fig. V.9:  Closed-System E-Cigarette Cartridge Sales by Manufacturer Brand in Sheetz**



76.    My analysis shows that Altria's withdrawal of its e-cigarette products did not result in a reduction in product variety.  Instead, retailers replaced the MarkTen products with other products that proved more successful than MarkTen with consumers.  The process of replacing products with limited consumer appeal by products with greater consumer appeal is part of the competitive process and is efficient from an economic perspective.

## B.  ALTRIA AND JLI WERE NOT CLOSE COMPETITORS

77.    Dr. Rothman notes that, "the extent of the harm caused by Altria's exit depends on how significant a competitor Altria likely would have been absent the transaction."[159]  The FTC Complaint further alleges that "Altria's agreement to exit the relevant market

---

[159] Rothman Report, ¶131.

56

eliminated one of JLI's most dangerous rivals."[160]  Yet, Dr. Rothman fails to analyze the extent to which consumers viewed the MarkTen and MarkTen Elite products as close substitutes for the JUUL product.[161]  Instead, he relies on the assumption that when Altria discontinued sales of its MarkTen cig-a-like products, as well as its MarkTen Elite products, consumers substituted to JUUL in proportion to JLI's share in an assumed overall closed-system e-cigarette market.  This approach effectively assumes that JUUL and the MarkTen cig-a-like product were close substitutes, and that JUUL and MarkTen Elite were close substitutes.  In fact, however, the evidence shows that JUUL and the MarkTen and MarkTen Elite products were not close competitors and that diversion between Altria and JLI products was significantly less than Dr. Rothman's assumption.

78.    The FTC Complaint and Dr. Rothman largely ignore important aspects of competitive differentiation between cig-a-likes and pod-based vaporizers when evaluating the competitive effects of Altria's discontinuation of e-cigarette product sales.  As I explained in Section IV.A, cig-a-likes are differentiated from pod-based vaporizers by both their product look-and-feel and their nicotine experience.

79.    Altria's MarkTen was a cig-a-like product.  JLI does not market and has never marketed any cig-a-like products. JUUL is a pod-based system, as was MarkTen Elite.  However, even at its peak, the MarkTen Elite product never achieved more than a 0.9 percent share of e-cigarette cartridge unit sales.[162] Throughout the time that Altria sold e-cigarette products on the market, the overwhelming majority of its sales were from a product whose look-and-feel was not a close substitute to JUUL, and Altria's remaining e-cigarette product sales were from its MarkTen Elite product, which lacked the nicotine salts found in JUUL pods.  Product differentiation contributed to cig-a-likes and pod-based vaporizers being perceived differently by consumers and winning different levels

---

[160] FTC Complaint, ¶63.

[161] Dr. Rothman claims that "after MarkTen Elite was launched with a price promotion in February 2018, JLI implemented its own price promotion on kits." (Rothman Report, ¶136)  In fact, however, JLI's seasonal device price promotions were introduced prior to Elite's launch and the price promotion Dr. Rothman references was not a competitive response by JLI to MarkTen Elite's launch (*see* discussion Section V.C).

[162] Altria Projected IRI data, based on MarkTen Elite's share of cartridge unit sales.

of customer acceptance.  Altria's assessment of JUUL was that it provided consumers with "an experience …[which is] a suitable replacement for cigarettes, while simultaneously addressing social friction concerns."[163]  In contrast, Altria concluded that cig-a-like products such as MarkTen "were not going to be of sufficiently deep and broad appeal for smokers to be able to convert large numbers of them."[164]

80.    IRI sales data,[165] contemporaneous documents,[166] and testimony from business executives[167] show that consumer demand shifted sharply away from cig-a-likes in favor of pod-based vaporizers during the period that Altria's e-cigarette products were on sale. Whereas cig-a-likes represented more than 90 percent of total e-cigarette cartridge volume in early 2016, this fraction had fallen to about 59 percent by January 2018 and to less than 19 percent shortly before Altria discontinued sales of MarkTen.[168]  Because Altria's sales were overwhelmingly derived from its MarkTen cig-a-like product while JUUL's sales came entirely from its pod-based vaporizer product, this meant that Altria became an increasingly distant competitor to JLI during the time that Altria sold e-cigarette products on the market.

81.    Furthermore, as I explained in Section IV.F, given the FDA's announcement in January 2020 of its intention to ban non-menthol and tobacco flavors of e-cigarettes effective the following month, had Altria continued to offer e-cigarette products for sale after December 7, 2018, Altria and JLI would have become even more distant competitors.  At least four varieties of MarkTen Elite pods that Altria marketed in 2018 would likely have

---

[163] ALGFTC0000283725, Altria, "Nu Mark 2018 Three Year Strategic Plan," February 28, 2018, at 14.

[164] Murillo IH at 117:18-20.

[165] *See* Fig. IV.2, *supra*.

[166] *See*, for example, PX1229, "Board of Directors Presentation", May, 2018 at -013. *See also*, for example, PX1644, "Nu Mark Current Situation and Near Term Strategic Options", August 2, 2018 at -010.

[167] *See*, for example, Brace Dep. at 134:16-21 ("[In late September 2018,] the cigalike segment had really stagnated.") and Fernandez Dep. at 69:5-9 ("So, you know, what we were observing back then is, the segments were shifting away from Cigalike, what we call Cigalike-type of products to pod-based type of product[s]").

[168] Analysis of Altria IRI Projected data.

been regarded as non-menthol and tobacco flavors, such that FDA's Flavor Ban would force MarkTen Elite pods for those varieties off the market. Sweet Original, the only MarkTen Elite pod variety that appears to have tobacco in the description of its flavor, constituted less than one-quarter of MarkTen Elite's sales and only 2.2 percent of Altria's total e-cigarette sales in 2018.[169] The vast majority of Altria's sales came instead from its MarkTen cig-a-like product which, as I have noted, was strongly differentiated from pod-based vaporizers (such as JUUL) and was facing continuously declining consumer demand. Cig-a-likes accounted for 98 percent of Altria's sales of menthol and tobacco cartridges in 2018.[170] While the Flavor Ban would not have forced menthol and tobacco cartridges for the MarkTen cig-a-like product off the market, the twin facts that cig-a-likes were strongly differentiated from pod-based vaporizers and faced declining consumer demand would make Altria an even smaller and more distant competitor to JLI in the counterfactual where Altria had not discontinued sales of its e-cigarette products in late 2018.

### C. JLI DID NOT LOWER PRICE IN RESPONSE TO MARKTEN ELITE'S LAUNCH

82. According to the FTC's allegations and the predictions of Dr. Rothman's analysis, JLI should have lowered its price in response to MarkTen Elite's launch. Altria launched the pod-based MarkTen Elite product to try to compete with other pod-based systems, including JUUL, for the growing demand for pod-based e-cigarettes. The MarkTen Elite, as a pod-based product, was positioned more closely to JLI than the MarkTen cig-a-like product. Furthermore, according to Dr. Rothman, Altria "had projected that its share would increase to 20 percent by 2020," and "Altria was confident enough in its prospects to aspire to be the 'leader' in reduced-risk nicotine products."[171] Given declining demand

---

[169] Analysis of data from Specification 11 of Altria's Response to FTC Second Request.

[170] Analysis of Altria IRI Projected data.

[171] Rothman Report, ¶10.

for cig-a-likes, the growth Dr. Rothman assumes would have to come from growth in the MarkTen Elite product.[172]

83.    In fact, however, JLI did not lower its price in response to MarkTen Elite's launch, despite Dr. Rothman's claim to the contrary.[173]  The only evidence that Dr. Rothman offers to substantiate his claim that JLI responded to MarkTen Elite's launch by lowering its price is statements from Altria and competitors noting that they observed a reduction in JLI's price at a point in time after MarkTen Elite's launch.[174]  This apparent reduction in JLI's pricing was the result of a seasonal promotion on devices that was put in place well before MarkTen Elite's launch and that was aimed primarily at reducing the cost for

---

[172] PX1424 Altria, "E-Vapor Update," August 2018, at -012-013.

[173] Dr. Rothman notes, "after MarkTen Elite was launched with a price promotion in February 2018, JLI implemented its own price promotion on kits." (Rothman Report, ¶136)

[174] Dr. Rothman makes a claim in his Report that JLI did lower price in response to MarkTen Elite's launch. (Rothman Report, ¶136).  In support of this claim, Dr. Rothman points to observations by JLI's rivals that JLI ran a device promotion following MarkTen Elite's launch. (Rothman Report, fn337).  In fact, however, JLI's promotion schedule was set prior to MarkTen Elite's launch, and was not precipitated by MarkTen Elite's launch.  *See* Crozier Dep. at 76:22 – 77:17 (Q.  And did JUUL respond at all with new kinds of promotions of its own after Elite was introduced? A.  No, I mean, they just ran their normal -- they would do -- their offer was generally $20 off of a pod pack with the -- or battery and pod pack together.  But I don't recall them doing things above and beyond to address that. Q.  And am I correct that that promotion, that $20 off promotion was something that they had done before Elite was even introduced? A.  Yeah, that -- that was their standard offer.  I think it was 20 bucks off the battery with pods and then 10 or 15 off if it was just the battery alone device. Q.  Did JUUL seem particularly concerned with the Elite introduction? A. I don't recall them being concerned in our discussions at the category level when we were planning out promotions.").  Dr. Rothman provides no economic evidence or analysis that JLI lowered price in response to MarkTen Elite's launch.

cigarette smokers to try the JUUL product.[175,176,177,178]  The period after MarkTen Elite's launch is marked by very rapid growth for the JUUL product that was, in part, the result of JLI's promotional efforts.  JLI's successful efforts to grow its sales by promoting its

---

[175] "RESPONSE OF JUUL LABS, INC. TO SPECIFICATION 16 OF THE REQUEST FOR ADDITIONAL INFORMATION AND DOCUMENTARY MATERIALS," October 10, 2019.

[176] JLIFTC00056103 E-mail from Kevin Burns, p. 1 ("Will be aggressive sourcing promo opportunities focused on converting cigarette buyers at point of purchase." "I want to be aggressive on devices so that we are getting the product into the adult smokers [sic] hands and we continue to keep the heat on the category and the cigarette companies."); *see also*, JLIFTC00636393 E-mail from Kevin Burns, p. 4.

[177] Danaher Dep. at 23:9-23:15 ("Q. Did JUUL's product compete with MarkTen Elite?  A. MarkTen Elite was offered in the same category as JUUL.  My recollection, I don't really think that the company was ever too focused on how MarkTen Elite was performing."); Danaher IH at 71:22-73:13 ("Q.  So this is a way to give consumers lower prices? A.  Yes.  So we run -- and depending on the point of time that we're talking about, right, when we were in supply challenges, right, you obviously couldn't run as many promotions as you otherwise would have wanted to. Typically a good promotion calendar for a product like this would be two months on, two months off, right? And so you want to also get that awareness that I spoke about in terms of having the retailer put your promotion onto its window, right, or maybe some point-of-sale material.  So when you're in promotion, you get additional promotional material at retail. And given the fact that we weren't spending, historically, right, really any money on any traditional media, a good way for awareness would have been in the actual door, and you might want to help push a consumer into giving the product a little -- in terms of pushing the consumer into trying the product. If the consumer has already gone through, right, again, 70 plus percent of you smokers, right, have tried to switch or want to switch, right, tried 30 different times to quit, or switch, right, and you've been unsuccessful.  This might be an opportunity for you, oh, I've already thought about these other things in my mind, right, now I see that JUUL is on a discount, I've heard about JUUL and maybe I want to give it a try, right? And if you think about our competitors, depending on the point in time again, right, they would be promoting their products under the price perspective a lot lower than us.  There are products that are out there that are on the device side that are promoting down to a dollar. So certainly from a competitive set, when a consumer has already thought, okay, I may want to switch, right, for all the reasons that we've discussed, and I'm thinking about e-cigarettes generally speaking, and I see one product that's at a dollar, versus maybe a starter kit that's at $34 -- or a basic kit that's at $34.99, it might be a little bit too expensive to try JUUL, but maybe if it's down to $19.99, I might give it a try then.").

[178] Burns IH, pp. 26-27 ("Q. Would JUUL work with its retail partners in setting the timing of certain promotions, the scope? Can you explain how that would work? A. Yeah. So you would have to have an agreement with the retailer about what the promotion was, what the offering was, how you were going to represent it, when it was going to be offered, what that price point was, the economics of that offering. So there was a schedule that you have to book typically a full year out. You might know the promotion schedule at the start of the year for the year, and you would book those promotions, like all the other manufacturers of product would, with a specific retailer for a specific time slot with the specific offer with specific support from that retailer about how to promote the product. Q. And just out of curiosity, Mr. Burns, why would you need to book that out a year in advance? A. It's mostly driven by the retailers in terms of them trying to map this out. If you are a C store retailer and you have got hundreds of manufacturers of products in your store of every category, you need to coordinate who is getting what position and shelf space and banner and advertisement carefully. And then you have got to do careful inventory planning because you would typically see an increase in your usage. And they have got to push that all the way back to the distributor to make sure they have got enough product being delivered to them to handle whatever lift they expect to get out of the promotion.").

61

CONFIDENTIAL – FTC Docket No. 9393

devices through price reductions should not be misconstrued as a response by JLI to MarkTen Elite's launch.

84.    The introduction of seasonal promotions by JLI prior to MarkTen Elite's launch did lead to lower device prices after MarkTen Elite's launch than before, but not because of a response to MarkTen Elite's launch.  In fact, not only did JLI's seasonal promotions begin well before MarkTen Elite's launch, but JLI's seasonal promotions continued well after MarkTen Elite's discontinuation, and JLI lowered device prices even further following MarkTen Elite's discontinuation in response to competition from NJOY and Reynolds. For example, whereas the percentage decline in the JUUL device price from January 2018, just prior to MarkTen Elite's launch, to the average for the period when MarkTen Elite was on the market (March through October 2018) was 18 percent, the percentage decline in device price from the average for the period MarkTen Elite was on the market to the average for the period after JLI began responding to aggressive price competition from NJOY and Reynolds (October 2019 through May 2020) was 39 percent.[179],[180]  After Altria's discontinuation, in addition to aggressive price competition from NJOY and Reynolds, JLI faced competition from an expanded set of brands and manufacturers in retail chains where MarkTen competed.[181]  Thus, the actual data are consistent with the fact that JLI did not respond to MarkTen Elite's launch by lowering price, and the conclusion that competition from other competitors with pod-based systems more than replaced competition from Altria's MarkTen Elite.

85.    The irrelevance of MarkTen Elite as a competitive constraint can readily be seen in Fig. V.10, which shows the total sales volume (in cartridge units) of all pod-based systems, JLI's sales volume, the sales volume of other pod-based systems (including MarkTen Elite), and the sales volume of MarkTen Elite over the period January 2016 through July 2020 based on IRI data.  The figure demonstrates that neither MarkTen Elite's launch,

---

[179] NJOY and Reynolds, for example, ran $0.99 device promotions after Altria discontinued its e-cigarette products (see discussion in Section V.A.4 above).

[180] I excluded the month of MarkTen Elite's launch, February 2018, from either the period before the launch or the period when MarkTen Elite was on the market.  Including February in either period makes the decline from before to after MarkTen Elite's launch smaller.

[181] I discussed this in Section V.A.4 above.

CONFIDENTIAL – FTC Docket No. 9393

nor its discontinuation had any discernable impact on overall sales of pod-based systems, sales of JUUL pods, or even the combined sales of all non-JUUL pods. Not only was MarkTen Elite's share small, but its cartridge sales peaked in early September of 2018 and began declining almost 2 months prior to its discontinuation in October of 2018, despite sustained promotional spending by Altria. Furthermore, the chart clearly shows the extent to which rivals replaced and surpassed MarkTen Elite in terms of share and growth.

**Fig. V.10: Sales of Pod-Based Systems Before and After MarkTen Elite's Discontinuation**



86.    The lack of response by JLI to competition from MarkTen Elite provides clear evidence that competition from Altria did not constrain JLI's pricing. Therefore, Altria's discontinuation of its e-cigarette product sales did not provide JLI any incentive to raise price, and therefore did not diminish competition or harm consumers.

CONFIDENTIAL – FTC Docket No. 9393

**D. JLI DID NOT RAISE PRICE AS A RESULT OF ALTRIA'S DISCONTINUATION OF E-CIGARETTE SALES**

87.     According to the FTC's allegations and the predictions of Dr. Rothman's analysis, JLI should have raised price as a result of Altria's discontinuation of its e-cigarette product lines.  Unlike an antitrust review of an unconsummated transaction which must rely on predictions of the likely effect of a transaction on market outcomes, in this case we have the benefit of being able to look at actual market outcomes in assessing the impact of Altria's discontinuation of e-cigarette product sales on prices.  This is something Dr. Rothman fails to do.

88.     In fact, JLI did not increase JUUL prices in response to Altria's discontinuation of the its MarkTen Elite or MarkTen cig-a-like products.[182]  With respect to MarkTen Elite, as I outlined above, JLI did not respond on price to competition from MarkTen Elite.  It is not surprising, therefore, that JLI did not respond to Altria's discontinuation of the MarkTen Elite product by raising price.  With respect to Altria's cig-a-like products, as I show in Section VI.C, competition from Altria's MarkTen cig-a-like product was limited to competition with other cig-a-like products and did not constrain JLI's pricing.  In fact, not only did JLI not raise price following Altria's discontinuation of its e-cigarette products, but it further reduced its device prices in response to competition from NJOY and Reynolds.  As I noted above, the rate of decline in JLI's average device prices accelerated after Altria's discontinuation of its cig-a-like products relative to the initial

---

[182] JLI implemented a wholesale list price increase over November 1, 2018 to January 1, 2019 on 4-pod refill kits, including 5.0% Mint, Virginia Tobacco, Classic Tobacco, and Menthol as well as 3.0% Mint and Virginia Tobacco. ("RESPONSE OF JUUL LABS, INC. TO SPECIFICATION 17 OF THE REQUEST FOR ADDITIONAL INFORMATION AND DOCUMENTARY MATERIALS," October 20, 2019) Although this increase happened shortly after MarkTen Elite's discontinuation, it was announced to distributors in August 2018 and so was decided before Altria had discontinued Elite, much less at a time when JLI could have had knowledge that MarkTen Elite would be discontinued. (RESPONSE OF JUUL LABS, INC. TO SPECIFICATION 9 OF THE REQUEST FOR ADDITIONAL INFORMATION AND DOCUMENTARY MATERIALS," Oct. 20, 2019).  In fact, JLI had been planning this price increase many months before MarkTen Elite had been discontinued in order to rebalance margins in the distribution chain. In February 2018, JLI was already discussing the use of "gradual wholesale and dealer price increases" as a method to take some margin from distributors in the value chain. (JLIFTC00287923, JLI, "Consumable Pricing Strategy," Feb. 2018, at 2, 4) In June 2018, McKinsey recommended that JLI increase list and dealer price in Q3/Q4 2018. (JLIFTC00556824, McKinsey&Company, "Channel margin update," June 2018, at 9). In August 2018, JLI decided to increase the list and dealer price on 4-pod refill kits. Thus, the evidence clearly shows that the list price increase at the end of 2018 is not related to MarkTen Elite's discontinuation.

rate of decline due to the seasonal promotions JLI introduced prior to the launch of MarkTen Elite

89.    The fact that JLI did not respond to Altria discontinuing sales of its e-cigarette products by raising price clearly shows that Altria was not a competitive constraint on JLI and that, as a result, Altria's discontinuation of its e-cigarette products did not diminish competition or harm consumers.

### E.  JLI CONTINUES TO BE AND IS INCREASINGLY CONSTRAINED BY COMPETITION FROM OTHER RIVALS

90.    Whereas JLI's pricing was not constrained by competition from Altria, I do find evidence that JLI's pricing was constrained in part by competition from other rivals.  As I discussed above in Section V.C, JLI's introduction of seasonal promotions to lower the device price was aimed at making the JUUL device more affordable to smokers of combustible cigarettes.  Over the course of 2018 and into early 2019, JLI became concerned that it was suffering from an "inverted razor/razorblade model," with its device prices too high to attract new users.[183]  Despite the introduction of seasonal promotions, JLI's device prices remained a "barrier" to consumer adoption relative to aggressive promotional pricing introduced by NJOY and Reynolds with the launch of their respective Ace and Vuse Alto pod-based products.[184]  JLI saw both NJOY and

---

[183] JLIFTC01550902, McKinsey&Company, "Unlocking value via Revenue Growth Management ("RGM") - Consumer Pricing update," June 05 2018, p. 3 ("Today, JUUL's consumable/device pricing reflects an "inverted" razor/razor-blade model, with its device relatively expensive (higher than Blu/Vuse) and its consumable relatively cheap (below Blu/Vuse…and below Parliament on a pack-equivalent basis)"); and, JLIFTC01091866, McKinsey&Company, "Unlocking value via Revenue Growth Management ("RGM")," May 2018, at 4 ("JUUL currently prices devices at a super premium tier, much higher than competitors, while consumables are priced in a value tier"); JLIFTC02051595, JLI, "US Country Review (Q4 2019 and 2020 Action Plan)," August 2019, at 21 ("Pricing analyses show that JUUL is hitting the end of the runway at its current price point and is not priced in line with consumer expectations of the category").

[184] JLIFTC02196743, JLI, Njoy Ace Competitive Understanding Qualitative Topline Learnings," July, 2019 pp. 4-5 ("JUUL's device price is a barrier for Ace users, who do not find meaningful advantages to justify its cost - and because brand loyalty is generally low, it is common and easy for users to try something else." and, "[o]pportunity exists for Juul to close the current gap between its high price and perceived lack of consumer advantage versus Ace in order to recapture interest and usage among this competitive user...  This may come in the form of a decrease in device price, building overall stronger emotional connection and meaning behind the Juul brand, and/or improvements against perceptions of product

CONFIDENTIAL – FTC Docket No. 9393

Reynolds pursue aggressive strategies based on the razor/razorblade model of heavily promoting device prices to grow share.[185] Following Altria's discontinuation of e-cigarette product sales, NJOY and Reynolds, among others, increased sales and market share.[186] As a result, JLI began losing share and recognized the need to respond by lowering its devices prices.[187]

91.    Fig. V.11 shows JLI's device price and share within all closed system e-cigarettes, together with device prices for NJOY Ace and Vuse Alto and their combined share over the period 2018 to 2020. The chart illustrates the impact of competition from NJOY Ace and Vuse Alto on JLI's share and price. NJOY and Vuse's aggressive pricing is associated with share losses by JLI and leads to JLI lowering its devices prices.

---

functionality."); JLIFTC02276902 JLI, "US Country Review," April, 2019 p. 20 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

JLIFTC00414625, E-mail from Joseph O'Hara, July 2018, at -002 ("Imperial (IMB) has launched their *my*blu Intense pods and BAT will be launching the VUSE Alto in August. JUUL is about to face its toughest competition yet in US markets.").

[185] JLIFTC02068540 JLI, "US July Country Review (Q4 2019 and 2020 Action Plan) Abbreviated Update," August 20, 2019 at 6 ("NJOY proving true razor / razor blade pricing works to unlock addressable market, VUSE also coming down to $1 device price point… NJOY cannibalizing growth & threatening to take JUUL's established userbase"); JLIFTC02276902 JLI, "US Country Review," April 2019, p. 21 ("Customers prefer NJOY flavors over Tobacco/Mint varieties, and can enjoy at less than half the price of JUUL, in terms of $/ml."); JLIFTC02069258 "NJOY Investment Snapshot (2019)," July 29, 2019 at -259 ("NJOY is capturing all or most of category growth in its accounts by attracting adult smokers, while JUUL is typically flat in accounts in which NJOY has launched"); JLIFTC02050077, JLI, "JUUL LABS 2020 Device pricing strategy," July 25, 2019 p. 7 ("Njoy Ace's aggressive device pricing strategy will negatively affect our growth"; "Njoy Ace can sustain the aggressive user acquisition for atleast [sic] one more year"); JLIFTC00299391, E-mail from Owen Cornelius , February 7, 2019, at -402 ("Alto has also been running $0.99 device promos at major retailers and heavily increased its marketing spend since our Nov announcement").

[186] *See* discussion in Section V.A above; *see also* JLIFTC02195922, JLI, "US Country Review", June 2019, pp. 96,106 ("NJOY Ace has taken EQ Pod share [at Wawa] primarily from remaining competitors. Since MarkTen exited the market, some of NJOY Ace share gain could be attributed as a replacement of this brand" and "[i]n six months, NJOY Ace devices have captured 66% unit share [at Circle K]. Approximately 49% share was at JUUL's expense, but the remaining share can be attributed to MarkTen exiting the market."); JLIFTC00299391 E-mail from Owen Cornelius, December 10, 2018 at -420 ("Alto is the best performing launch by a major competitor in the past few years (compared to Ciro, Vibe, My Blu and Markten Elite").

[187] JLIFTC02276902 JLI, "US Country Review," April 2019, p. 22 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

CONFIDENTIAL – FTC Docket No. 9393

**Fig. V.11 Impact of Competition from NJOY and Vuse on JLI's Pricing and Share**



92. The fact that competition from NJOY and Vuse, among others, has forced JLI to lower price, while JLI did not respond to competition from Altria when it launched the MarkTen Elite pod-based products, and did not raise price after Altria discontinued its products from the market, demonstrates that Altria's discontinuation of its e-cigarette product lines did not diminish competition and, therefore, did not result in any harm to consumers.

### F. THE TRANSACTION CREATES SIGNIFICANT POTENTIAL CONSUMER BENEFITS

93. Based on my analysis of the evidence, I find that Altria's discontinuation of its e-cigarette products did not reduce competition or harm consumers. Therefore, there is no need to consider offsetting efficiencies from the Transaction. Nevertheless, I understand that the Transaction likely gave rise to potential consumer benefits. The Transaction offers JLI

the benefits of Altria's experience, expertise and substantial in-house resources in support of JLI's pending and future PMTA and MRTP applications before the FDA. The Altria regulatory advisory services that the Transaction makes available to JLI create significant potential consumer benefits by (i) increasing the likelihood or speed with which existing JUUL products can receive FDA approval; (ii) increasing the likelihood that new JLI e-cigarette products will receive market approval in the future; and (iii) expanding the demand for existing and new JUUL products if JLI receives MRTP approvals.

94.     Because consumer demand for e-cigarette products is growing, and because JUUL currently has a large share of e-cigarette sales, even a relatively modest increase in one or more of these dimensions has the potential to create substantial consumer benefits and to stimulate competition between JLI and other e-cigarette manufacturers. I demonstrate this proposition in Section VIII.D and discuss my criticisms of Dr. Rothman's analysis of efficiencies.

## VI.    RELEVANT MARKET DEFINITION

### A. OVERVIEW

95.     The purpose of defining the relevant market is to identify and incorporate into analysis competitive constraints on JUUL and MarkTen products that are relevant to an assessment of the allegations. The allegations here are that Altria's discontinuation of e-cigarette sales led to diminished current and future competition for e-cigarettes and harm to consumers.[188] The FTC's allegations require undertaking an assessment of the extent to which competition from Altria directly constrained JLI versus the extent to which JLI was principally constrained by competition from other sources.

96.     The Horizontal Merger Guidelines recognize that an antitrust "analysis need not start with market definition."[189] The Guidelines explain: "Evidence of competitive effects can inform market definition, just as market definition can be informative regarding

---

[188] FTC Complaint, ¶7.

[189] Guidelines, §4.

CONFIDENTIAL – FTC Docket No. 9393

competitive effects.  For example, evidence that a reduction in the number of significant rivals offering a group of products causes prices for those products to rise significantly can itself establish that those products form a relevant market.  Such evidence also may more directly predict the competitive effects of a merger, reducing the role of inferences from market definition and market shares."[190]

97.    In this report, I follow the Guidelines' approach of using market definition as a tool to identify and "evaluat[e] … competitive alternatives available to consumers." [191]  As the Guidelines recommend, I also perform a direct economic assessment of the likely competitive effects of the specific business conduct that the FTC is challenging.  As the Guidelines imply and as I will show in the context of my analyses, the competitive alternatives available to consumers and the competitive constraints on rival suppliers in a market are simply two sides of the same coin.  Economists understand that a careful application of economic analysis to directly assess the competitive effects of business conduct will reach the "the same conclusion regardless of market definition."[192]  But, importantly, this is true *only* if the market definition exercise is performed in a way that gives proper recognition and weight to the competitive constraints operating on the parties from substitute products and rival manufacturers as well as to the nature and strength of the competitive interactions between the parties.

98.    As I will show, Dr. Rothman's market definition analysis ignores or understates important competitive constraints on JUUL from other competitive products while at the same time overstating the significance of the competitive interaction between the JUUL and MarkTen as well as MarkTen Elite products.  These key errors void the structural presumption of anticompetitive effects that Dr. Rothman attempts to draw from concentration measures based on the alleged market for closed-system e-cigarette

---

[190] Guidelines, §4.

[191] Guidelines, §4.

[192] Franklin M. Fisher, "Market Definition: a User's Guide," *Workshop on Market Definition: Compilation of Papers*, Finnish Competition Authority, ed., Helsinki, 2002, pp. 38-54 at 39.  *See also* Dennis W. Carlton, "Market Definition: Use and Abuse," *Competition Policy International* 3(1) Spring 2007: 3 -27.

CONFIDENTIAL – FTC Docket No. 9393

products.[193]  In Section VII of my report, I show that economic data do *not* establish a presumption that Altria's discontinuation of sales of its MarkTen and MarkTen Elite products was anticompetitive.  To the contrary, the data clearly indicate that JLI has lost share to multiple rivals, including foremost to NJOY and Reynolds, in the immediate aftermath of Altria's discontinuation of e-cigarette sales, while at the same time overall market concentration has declined.  Neither of these facts is consistent with the allegation that the Altria's discontinuation of e-cigarette sales diminished competition and harmed consumers.

99.  Dr. Rothman's failure to accurately assess the competitive alternatives available to consumers and the competitive constraints on rival suppliers in the context of his market definition analysis also undermines his conclusion that the discontinued sale of Altria's e-cigarette products enabled JLI to raise price and reduce output.  In Section V of my report, I presented direct economic evidence showing that the discontinued sale of Altria's e-cigarette products in late 2018 did *not* cause a reduction in competition.  Output of closed-system e-cigarettes continued to grow in the aftermath of Altria's discontinuation of sales.  And, JUUL has lost—not gained—share within the FTC's alleged relevant market, as other competitors such as NJOY and Reynolds have priced devices aggressively and grown their sales rapidly.

## B.  DR. ROTHMAN'S MARKET DEFINITION ANALYSIS

100.  Consistent with the FTC Complaint's allegation,[194] Dr. Rothman asserts that "[t]he relevant market in this matter is closed-system e-cigarettes sold in the United States."[195]  To define this market, Dr. Rothman attempts to implement the Guidelines' Hypothetical Monopolist Test ("HMT") which asks whether a single entity controlling the prices of all

---

[193] Rothman Report, §IV.D.

[194] FTC Complaint ¶36.

[195] Rothman Report ¶62.  For purposes of my analysis, I do not take issue with Dr. Rothman's opinion that the relevant geographic market is the United States.

products in the market would find it profitable to impose a small but significant and non-transitory increase in price ("SSNIP") on one or more of the merged firm's products.[196]

101.   Dr. Rothman appeals to a critical elasticity analysis to support his contention that closed e-cigarette systems are a relevant product market.  A critical elasticity analysis compares the extent to which consumers would substitute to other products in response to a SSNIP with the "critical" amount of substitution that would make it just profitable for a hypothetical monopolist of the products in question to impose a SSNIP.  These substitution measures can be expressed in terms of the actual elasticity of demand for e-vapor products and a corresponding "critical" elasticity.  If the actual demand elasticity is smaller (in absolute value) than the critical elasticity, the hypothetical monopolist would not lose so many sales as to make the SSNIP unprofitable, and therefore the set of products constitutes a relevant market.[197]

102.   Using financial data from several e-cigarette manufacturers, Dr. Rothman calculates a critical elasticity of demand of 2.6. Dr. Rothman does not purport to estimate the actual elasticity of demand for e-cigarette products.  Instead, he relies on a sample of six academic studies that report estimates of the elasticity of demand for closed-system e-cigarette products.  Dr. Rothman notes that five of the six studies report elasticities that are smaller (in absolute value) than his calculated critical elasticity of demand, while one study reports a larger elasticity.[198]  Based on this, Dr. Rothman asserts that a critical elasticity test is passed and, therefore, closed-system e-cigarette products are a relevant market.

103.   The academic studies that Dr. Rothman cites, individually and collectively, do not provide a reliable basis on which to conclude that closed-system e-cigarette products are a relevant product market.  Each of these studies analyzes data from a period that ends

---

[196] Rothman Report ¶64, citing to Guidelines §4.1.1.

[197] *See*, for example, Gregory J. Werden, "Demand Elasticities in Antitrust Analysis," *Antitrust L. J.* 66 (2), 1998: 366-414 at 387-91.

[198] Rothman Report ¶81.

CONFIDENTIAL – FTC Docket No. 9393

before Altria began marketing MarkTen Elite.  A majority of the studies analyze data from periods that predate Altria's discontinuation of e-cigarette sales by at least four years.  The FTC Complaint alleges that MarkTen Elite, a product that "closely resembled JLI's product in appearance and structure,"[199] was an important competitive constraint on JUUL.  Studies that attempt to estimate the elasticity of e-cigarette demand using data that entirely pre-date Altria's marketing of MarkTen Elite cannot shed light on whether, in fact, MarkTen Elite competitively constrained JUUL—yet that issue is central to the market definition question in this case.  Similarly, studies based on data that substantially pre-date the market conditions leading up to Altria's discontinuation of e-cigarette sales cannot reliably shed light on the competitive constraints on JUUL from other e-cigarette rivals—yet that issue, too, is central to the market definition question in this case.

104.    Fig. VI.1 shows that consumer demand for closed-system e-cigarettes grew at an accelerating rate between early 2016 and mid-2019.  The majority of the studies that Dr. Rothman relies on for elasticity estimates are based on data that predate this rapid growth in demand.  Dr. Rothman does nothing to allow for the possibility that demand elasticities exhibited by earlier adopters of a product may be different from those of later adopters.  For example, early adopters may be motivated to try new products because of their new functionality and features so that price may be a less important factor in the purchasing decision.  This could lead to an understatement of the relevant elasticity by Dr. Rothman.

---

[199] FTC Complaint ¶3.

CONFIDENTIAL – FTC Docket No. 9393

**Fig. VI.1: Sales of Closed-System E-cigarettes, January 2016 – September 2020**



105.    The studies Dr. Rothman relies on also ignore important product differentiation among closed-system e-cigarettes.  I discuss this critical economic issue at greater length below. Fig. VI.1 shows that during the 12 months leading up to Altria's discontinuation of all e-cigarette products by December 7, 2018—a period excluded by each of the academic studies that Dr. Rothman relies on—weekly sales of cig-a-likes were essentially flat whereas weekly sales of pod-based vaporizers grew by 619 percent over that same period.  Each of the studies Dr. Rothman cites fails to differentiate between cig-a-likes and pod-based vaporizers, despite the fact that those products were characterized by very different demand conditions in the relevant period leading up to Altria's discontinuation of e-cigarette sales.  With very different demand trends, it is unlikely that demand elasticities would be the same for cig-a-likes and pod-based vaporizers.  As such, the

CONFIDENTIAL – FTC Docket No. 9393

studies cannot be reliably used to inform estimates of demand elasticities for the purpose of assessing likely competitive effects from Altria's discontinuation of e-cigarette sales.

106.	Finally, the studies Dr. Rothman cites use data from periods that predate significant changes in the competitive landscape in the run-up to and aftermath of Altria's discontinuation of e-cigarette sales.  As I previously mentioned and Fig. VI.2 shows, the MarkTen Elite was not marketed during the period analyzed by any of the studies upon which Dr. Rothman relies for his elasticity estimates. A majority of the studies also ended their analysis before a period during which the then-market leader Vuse from Reynolds lost more than half of its market share while JUUL grew from a share of less than 1 percent to more than half of all closed-system e-cigarette device sales.  All of the studies also used data that predates a period during which the market saw multiple brands trade the leading position in closed-system device sales (during 1H 2018), evidencing the highly dynamic nature of competition.  And finally, each of the studies used data that predates a period of sustained decline in MarkTen's share throughout 2018.  Studies that attempt to estimate the elasticity of demand for e-cigarette products using data that bear little resemblance to the competitive conditions prevailing at the time of the alleged conduct being analyzed do not provide a reliable basis to assess market definition.

**Fig. VI.2: Retail Sales Volume Shares of Closed-System E-Cigarette Devices by Brand**



### C. COMPETITIVE CONSTRAINTS AND MARKET DEFINITION

107. As I have explained, market definition is, at its heart, a tool to identify and evaluate the competitive alternatives available to consumers and that, therefore, constrain the pricing and other dimensions of competitive behavior by rival suppliers.

108. The competitive alternatives available to consumers are numerous. For example, a consumer who is considering traveling between Washington DC and Philadelphia might choose to drive, take a bus or train, or fly. While these are all alternative modes of transportation, the market definition exercise recognizes that they are not equally close substitutes for each other and may differ significantly based on price, convenience, and speed of travel among other dimensions. Market definition focuses on products that are

75

CONFIDENTIAL – FTC Docket No. 9393

close substitutes for each other.  In particular, the Guidelines articulate a "smallest market principle."  This reflects the customary practice that "when the Agencies rely on market shares and concentration, they usually do so in the smallest relevant market satisfying the hypothetical monopolist test."[200]  Application of the smallest market principle is designed to ensure that the relevant market includes only "products that are reasonably interchangeable with a product sold by one of the merging firms" and comprises only the set of constraints that collectively render it unprofitable for the hypothetical monopolist to impose a SSNIP.[201]

109.   While Dr. Rothman claims to implement the HMT, he strays from the Guidelines' smallest market principle.  Dr. Rothman's starting (and ending) point for market definition is all closed-system e-cigarette products.  Dr. Rothman considers the possibility that the relevant market may be broader, specifically that it may encompass both closed- and open-system e-cigarette products.[202]  As I previously explained, open systems require the user to fill the device with e-liquid manually and allow the user to experiment with e-liquids made by different suppliers.  Closed systems are sold with pre-filled, ready-to-use pods or cartridges. Dr. Rothman asserts that open and closed systems are not sufficiently close substitutes to belong in the same relevant market, in part because users view the two products as serving different purposes and they purportedly appeal to different types of consumers.[203]  I do not take a position on whether open systems are in the relevant product market.  Dr. Rothman offers no empirical analysis to support his exclusion of open systems from his relevant product market.  Furthermore, some closed-tank e-cigarette products that have been introduced offer the convenience of pod-based closed systems but also allow the flexibility of refilling pods that is typically

---

[200] Guidelines, §4.1.1.  *See*, also, Gregory J. Werden, "The 1982 Merger Guidelines and the Ascent of the Hypothetical Monopolist Paradigm," *Antitrust L. Journal* 71(1), 2003: 253-275.

[201] Guidelines, §4.1.1

[202] Rothman Report, §IV.B.1.

[203] Rothman Report ¶69.

CONFIDENTIAL – FTC Docket No. 9393

associated with open systems.[204] Thus, the lines between open-system and closed-system e-cigarette products have become blurred.

110.    While Dr. Rothman considers the possibility of a market that is broader than all closed e-cigarette systems, he does *not* consider the possibility that a narrower relevant market may exist.  In particular, Dr. Rothman effectively ignores the important product differentiation between cig-a-likes such as MarkTen and pod-based vaporizers such as JUUL.

111.    Documents and testimony indicate that pod-based vaporizers have achieved greater success than cig-a-likes at migrating and converting adult smokers to e-cigarette products.[205]  Consistent with this differential success, sales of pod-based vaporizers and cartridges have grown much faster than sales of cig-a-like products.  Sales of cig-a-like devices and cartridges peaked in 2018 2Q and have declined since that time; by early 2019 cig-a-like sales had fallen below levels from three years prior.  In contrast, sales of pod-based vaporizer devices and cartridges have grown rapidly over time and by March 2018, monthly sales of pod-based products began to exceed sales of cig-a-likes.  Since that time, growth in closed-system e-cigarette sales volume has come entirely from pod-based vaporizers.  See Fig. IV.2 and Fig. IV.3, *infra*.

112.    Dr. Rothman's failure to differentiate between cig-a-likes and pod-based vaporizers, despite the very different demand trends faced by each of these products, raises significant questions as to the reliability of his market definition conclusion.  Because market definition and competitive effects are two sides of the same coin, the shortcomings of Dr. Rothman's market definition analysis are revealed further in his competitive effects analysis that postulates the MarkTen cig-a-like product operated as a significant competitive constraint on JUUL's pod-based vaporizer.  Dr. Rothman's

---

[204] See PX4029, Altria, "Nu Mark BOD Orientation", April 11, 2018, at -030 (showing closed tank products made for open consumers).

[205] See Deposition of K.C. Crosthwaite, JLI, January 25, 2021 (hereinafter "Crosthwaite Dep.") at 214:9-214:14 ("My opinion, looking at the Cigalike platform, I do not think the way they are designed -- were designed, that they demonstrated that [conversion] potential. And the fact that they are essentially irrelevant in the market today I think confirms that.").

CONFIDENTIAL – FTC Docket No. 9393

operating assumption, which he never tests empirically, is at odds both with the competitive differentiation between cig-a-likes and pod-based vaporizers and the fact that there were numerous other pod-based alternatives available to JUUL consumers in the period before and after Altria's discontinuation of e-cigarette sales. Those alternatives included but were not limited to *my*blu, NJOY Ace, Vuse Alto, Logic Pro and Leap. Dr. Rothman fails to consider whether those pod-based alternatives, individually or collectively, were a closer and more significant competitive constraint on JUUL than the MarkTen cig-a-like product.

113. In fact, there is considerable evidence from the marketplace that substitution between cig-a-likes and pod-based vaporizers is limited and that cig-a-likes and pod-based vaporizers are in separate relevant markets. To test whether cig-a-likes and pod-based systems are close substitutes or not, I examined the discontinuation of Altria's cig-a-like product and looked at the extent to which sales lost by Altria diverted to other cig-a-likes versus to pod-based systems. I find that Altria's discontinuation of its cig-a-like products was matched by an increase in sales of rival cig-a-like products of nearly equal magnitude, and that total sales of cig-a-like products followed an unbroken, declining trend. This evidence is consistent with diversion from Altria's cig-a-like product to other cig-a-like products being essentially 100 percent, conditional on consumption of e-cigarettes and, therefore, with separate relevant markets for cig-a-like products and pod-based systems. Furthermore, my analysis provides empirical evidence supporting the conclusion that competition from Altria's cig-a-like product, which accounted for approximately 90 percent of Altria's e-cigarette sales, did not constrain JLI.

114. Focusing on Altria's discontinuation of its MarkTen and Green Smoke cig-a-like products, I examined the volume of rival cig-a-like products before and after Altria's discontinuation to assess whether rival cig-a-like volume gains captured all of the sales diverted from Altria's cig-a-like products. Because demand for Altria's cig-a-like products and cig-a-likes overall was declining, I controlled for an overall declining trend in cig-a-like sales. I did so by testing whether Altria's discontinuation of its cig-a-like

products was associated with an increase in the rate at which demand for cig-a-like products declined.

115. Fig. VI.3 shows sales of all cig-a-like products, sales of Altria's cig-a-like products, including the MarkTen cig-a-like and Green Smoke, and sales of non-Altria cig-a-like products over the period August 2017 to September 2020.[206] The chart shows that as Altria's sales declined following discontinuation of its product, sales of rival cig-a-like products increased such that the overall sales of cig-a-like products continued to decline at the same rate as before Altria's discontinuation.

**Fig. VI.3: Sales Volumes of All Cig-a-likes, Altria Cig-a-likes and Non-Altria Cig-a-likes**



116. I test this formally using a regression analysis. I regress the sales volume of cig-a-like products on a linear time trend to control for the decline in demand that was ongoing prior to Altria's discontinuation, and an indicator that flags the period after the discontinuation of Altria's product, together with that indicator interacted with the linear

---

[206] Sales of the MarkTen cig-a-like product represented approximately 99.7 percent of Altria's cig-a-like sales in the IRI data.

time trend.  The indicator for Altria's discontinuation and its interaction with the time trend allows me to test whether demand for cig-a-likes dropped at the time of Altria's discontinuation, or fell faster than the trend that was observed prior to Altria's discontinuation.  I find that the coefficients on the indicator for discontinuation and its interaction with the time trend are both very small in magnitude and statistically indistinguishable from zero.[207]  These results support a conclusion that Altria's lost sales diverted overwhelmingly to other cig-a-like products and did not divert in any meaningful amount to pod-based products.[208]  This shows that diversion from cig-a-likes to pod-based vaporizers was far less than proportional to shares within a closed-system e-cigarette market, and is consistent with separate relevant markets for pod-based vaporizers and cig-a-likes.

117.    In contrast with what is actually observed in the data, Dr. Rothman's logit model (that he uses to predict harm) predicts that removal of Altria's cig-a-like product would have led to a 14.7 percentage point decline in cig-a-like volume because it incorrectly assumes that diversion from cig-a-likes to pod-based vaporizers is proportional to share.[209]  Whereas Dr. Rothman's model assumes the diversion ratio from Altria's cig-a-like product to pod-based vaporizers is 42 percent, the actual diversion ratio appears to have been *de minimis*.

118.    Had Dr. Rothman conducted his economic modeling in the context of a relevant market comprising only pod-based systems, his results would have been very different, giving rise to much smaller predictions of hypothetical harm or no harm at all.  I discuss this further in Section VIII, *infra*.

---

[207] To be consistent with substantial diversion from cig-a-likes to pod-based systems, the estimated coefficients on the indicator for Altria's discontinuation and its interaction with the time trend would need to be negative, large and statistically significant.  The coefficient on the indicator for Altria's discontinuation is small (implying no more than a 4 percent reduction in total cig-a-like volume due to Altria's discontinuation), and the coefficient on the interaction term is positive, rather than negative, small and statistically insignificant.  My full results are presented in Appendix Exhibit D.1.

[208] The coefficient magnitudes imply that more than 96 percent of Altria's volume diverted to other cig-a-likes and no more than 4 percent of Altria's volume diverted to other products (or to non-consumption).

[209] I calculate this by using Dr. Rothman's model to simulate the removal of the MarkTen cig-a-like product in the same way he simulates the removal of both Altria's MarkTen cig-a-like and Elite products.  For this demonstration, I leave the MarkTen Elite product in, and simply assess the share of the MarkTen cig-a-like volume that diverts to pod-based products versus cig-a-like products in his model.

CONFIDENTIAL – FTC Docket No. 9393

119.    In addition to failing to explore the relative strength of competitive constraints from cig-a-likes vs. pod-based vaporizers on JUUL, Dr. Rothman also overlooks other important sources of competitive constraint on JUUL's pricing and related conduct.  Again, whether these additional constraints are dealt with in the context of defining the relevant market or analyzing competitive effects is much less important than ensuring that the constraints are recognized and factored into the antitrust evaluation of the FTC Complaint's allegations. Dr. Rothman fails to do so at either juncture of his analysis.  Notably, Dr. Rothman ignores the fact that JLI documents reflect the company's view that growth in JUUL sales has come overwhelmingly from adult smokers switching to e-cigarettes.[210]  Given this dynamic, JLI must price JUUL to be competitive in the broad context of providing an affordable and appealing product to attract adult smokers.

120.    JUUL's pricing is broadly constrained by competition with other e-cigarette products to attract adult smokers.  Consistent with this view, senior JLI executives have testified that JUUL price promotions "were designed to increase awareness, [and] stimulate trial" by first-time consumers.[211]  Thus, when JLI has run price promotions it has always done so on devices rather than cartridges.[212]  Running promotions on devices is consistent with encouraging first-time trial by consumers.  JLI has also introduced 2-pod starter kits (i.e., a device packaged with two replacement pods) at a lower price point than its traditional

---

[210] JLIFTC01784629, JLI, "JUUL Labs, Inc. Second Quarter 2018 Earnings," at -635 ("Most current smokers surveyed were switching from cigarettes to JUUL").

[211] Burns IH 96:13-14; *see also* Danaher IH 82:2-13 ("So are we cheaper than traditional cigarettes? Yes. When you speak about core competitive product, again, you know, our core competitive set, when a consumer has gone through that decision, 70-plus percent of you want to quit or switch, tried 30 different times. You know, you're thinking about switching or quitting because of the health risks associated with smoking and you want to find the reduced risk product, you don't like the social stigma, right, maybe you're not allowed around your grandkids as an example, and at that point, then, you're looking for potentially an e-cigarette product.").

[212] Burns IH 22:9-11 ("[W]e often will use price promotion on the device to get people to try the product."); *id.* 88:14-17 ("Again, the viewpoint from myself and the executive team was the best way to convert adults off of cigarettes is to get our product in their hands and have them try it"); Danaher IH 39:22 to 40:2 (

4-pod starter kit.[213]  Offering a lower entry price-point can encourage first-time trial by consumers who might otherwise be reluctant to purchase the product.  The fact that when JLI has cut price or run promotions it has done so on devices and starter kits, but not on the sale of replacement pods, is consistent with the view that JLI's pricing strategy has focused on growing demand by attracting consumers who do not already own the JUUL device.  JLI's pricing behavior also is consistent with the company competing against other e-cigarette suppliers to encourage consumer migration away from traditional cigarettes.[214]  Significantly, this competitive constraint from traditional cigarette pricing existed both before and after Altria's discontinuation of e-cigarette sales.

121. A mechanical application of the HMT, as Dr. Rothman has presented, that artificially constrains the set of products considered obscures the fact that JLI's incentives are driven more by growing volume through providing an alternative to combustible cigarettes than by competing narrowly for market share within existing e-cigarette sales.  In that context, increasing prices, reducing quality or slowing the pace of innovation would not serve JLI's incentive, or, through its minority investment interest, Altria's incentive, to increase profits by growing the volume of JUUL sales by converting more adult smokers.

122. To summarize, because market definition and the assessment of competitive effects are two sides of the same coin, it is unnecessary for me to determine the precise metes and bounds of the relevant product market in order to evaluate the competitive effects of the alleged conduct that the FTC is challenging.  Thus, I do not reach an opinion on whether the relevant market includes both open-system and closed-system e-cigarette products or only closed-system products, or whether there are separate relevant markets for cig-a-likes and pod-based vaporizers.  What is critical to a sound assessment of the challenged conduct in this case, however, is the recognition that JLI operated subject to a variety of

---

[213] RESPONSE OF JUUL LABS, INC. TO SPECIFICATION 9 OF THE REQUEST FOR ADDITIONAL INFORMATION AND DOCUMENTARY MATERIALS," October 20, 2019. The suggested retail price of a 4-pod starter kit was $49.99 at launch (JLIFTC00089810, JLI, "JUUL Ordering Guide" at -810 and JLIFTC01510868, JLI, "JUUL Ordering Guide" at -868); the suggested retail price of a 2-pod starter kit was $44.99 at launch (JLIFTC20000055, JLI, "JUUL Ordering Guide" at -055 and JLIFTC20000058, JLI, "JUUL Ordering Guide" at -058).

[214] *See* JLIFTC02049837, "JUUL LABS 2020 Device pricing strategy," July 25, 2019 at slide 12.

competitive constraints including, but not limited to, relatively closer competition with multiple other pod-based vaporizers, competition from the declining cig-a-like category, competition from open systems and hybrid systems, and the fact that it had to maintain its overall competitiveness to continue attracting new trials of its device by adult smokers. The competitively distant MarkTen cig-a-like product and the nascent MarkTen Elite product, which never achieved more than a 1 percent share of e-cigarette cartridge unit sales prior to its discontinuation, were relatively insignificant constraints, if any at all, on JUUL.[215]

## VII.  NO STRUCTURAL PRESUMPTION BASED ON MARKET SHARES OR CONCENTRATION

### A.  DR. ROTHMAN'S HHI ANALYSIS IS FLAWED

123.    The FTC Complaint alleges that the Transaction between Altria and JLI "resulted in concentration that establishes a presumption of competitive harm in the relevant market."[216] Dr. Rothman analyzes ownership concentration in the hypothesized market for closed-system e-cigarettes sold in the US using the HHI. Dr. Rothman calculates an HHI and change in HHI associated with Altria's discontinuation of the sale of its e-cigarette products and, based on this analysis, he concludes that the Transaction "is presumed to raise significant competitive concerns under the thresholds in the Guidelines."[217] Dr. Rothman's analysis of market concentration is flawed, rendering his conclusions unreliable and the FTC's allegations based on a structural presumption unfounded. In particular, Dr. Rothman's concentration analysis (i) arbitrarily and erroneously assumes that Altria's share would reallocate to other e-cigarette manufacturers in proportion to their market shares; (ii) assumes a change in market concentration after Altria discontinued e-cigarette sales rather than calculating it based on

---

[215] Altria Projected IRI data, based on MarkTen Elite's share of all closed-system cartridge unit sales.

[216] FTC Complaint, ¶45.

[217] Rothman Report, ¶90.

CONFIDENTIAL – FTC Docket No. 9393

real-world market data; (iii) ignores the fact that concentration, in fact, fell both in all closed-system e-cigarettes and in pod-based vaporizer products after Altria discontinued e-cigarette sales; and (iv) fails to account for the fact that cartridge volumes vary across different e-cigarette brands, which causes Dr. Rothman's assumed HHI and change in HHI to be significantly overstated.

124. Rather than looking to real-world evidence to observe what happened to concentration after Altria discontinued the sale of its e-cigarette products, Dr. Rothman simply *assumes* the impact on concentration from the discontinuation of Altria e-cigarette sales by calculating a predicted change in HHI using pre-event market shares that he arbitrarily adjusts by "assuming Altria's share is reallocated to the remaining competitors in proportion to their shares."[218]  (I.e., since Dr. Rothman calculates that JLI had 51.0 percent market share, he assumes that 51.0 percent of Altria's former customers switched to JUUL after MarkTen and MarkTen Elite sales were discontinued.)  Dr. Rothman's share reallocation calculation implicitly assumes that all e-cigarette products are equally close substitutes to one another, regardless of their product differentiation.  Dr. Rothman offers no analysis or evidence to substantiate this arbitrary assumption.  Dr. Rothman's assumption is directly contradicted by evidence that I presented in Section VI showing that, within the closed-system e-cigarette category, there is significant differentiation among products based on their look-and-feel (i.e., cig-a-likes versus pod-based vaporizers) and nicotine experience (i.e., nicotine salts versus non-salt e-liquid).  This differentiation makes it highly unlikely that Altria's share would have been reallocated after the discontinuation of its sales to other competitors without regard to the specific types of e-cigarette products that each of those competitors sold.

125. By assuming that more than half of Altria's share prior to discontinuing the sale of its e-cigarette products would be captured by JLI, based solely on JLI's market share within all closed-system e-cigarette products, Dr. Rothman calculates an increase in the HHI as

---

[218] Rothman Report, ¶88.

a matter of simple algebra.[219]  By itself, this assumption produces an increase in the HHI of 614 points, or virtually the entirety of the overall HHI increase of 652 points calculated by Dr. Rothman.[220]  Yet as I have explained, the assumption of share-proportional diversion is highly implausible given the significant product differentiation between Altria's and JLI's products—virtually all of Altria's market share in the time period on which Dr. Rothman relies related to its cig-a-like products, as opposed to pod products with a form similar that of JLI's JUUL.  Had Dr. Rothman instead assumed that Altria's sales would divert more strongly towards products that share a similar look-and-feel and nicotine experience (i.e., cig-a-likes), he would have allocated Altria's sales primarily to other manufacturers whose market shares were smaller than Altria's share, leading to a substantially smaller assumption concerning the calculation of the hypothetical change in HHI.

126.    But Dr. Rothman did not need to *assume* changes in market concentration after Altria discontinued e-cigarette product sales.  In place of arbitrary assumptions, Dr. Rothman could have turned to real-world evidence.  Had he done so, Dr. Rothman would have observed that actual market concentration in closed-system e-cigarettes *fell* after Altria discontinued the sale of its e-cigarette products.  For the reasons just explained, this market reality is consistent with what an economist would expect to observe based on product differentiation between cig-a-likes and pod-based vaporizers generally, and specifically between MarkTen Elite and JUUL.  The HHI for all closed-system e-cigarette cartridges, computed using Dr. Rothman's methodology, for October 2018 was 5,493.  By contrast, a year later and after Altria had discontinued sales of all e-cigarette products, the HHI had declined to 5,322 and then fell further to 5,022 in September 2020, the final month for which I have data.  The *actual decline* in the HHI of 471 points stands in stark contrast to Dr. Rothman's *assumed increase* in HHI of 652 points.  The HHI

---

[219] Dr. Rothman assumes that JLI's share would increase by 5.7 percent post-Transaction while Altria's share decreases by 10.1 percent.  Rothman Report, Table 2.

[220] Rothman Report, Table 2 calculates a total post-Transaction change in the HHI of 652 points.  Thus, the impact of his assumption that the majority of Altria's sales would divert to JLI accounts for 94 percent (=614/652) of the post-Transaction increase in HHI.

decline reflects Altria's sales diverting primarily to firms other than JLI and expansion and repositioning by competitors including NJOY, Reynolds and ITG.

127.    One way to understand the impact of Dr. Rothman's assumption that Altria's sales, which mostly comprised sales of its cig-a-like product, diverted to JLI in proportion to JLI's share within all closed systems, is to look at what would have happened had Dr. Rothman considered an alternative relevant market consisting of pod-based vaporizers only. Had he done so, Dr. Rothman would have found that the HHI increased as a result of Altria's discontinuation of its e-cigarette products by only 127 using his methodology, rather than his estimate of 652. Furthermore, if I look at what actually happened to concentration, as measured by the HHI, I find that the HHI fell from 8,492 in October 2018 to 6,240 in September 2019 and to 5,440 in September 2020, the final month for which I have data. The decline in the HHI of 3,052 points based on actually observed data stands in stark contrast to Dr. Rothman's assumed increase in HHI of 652 points, and, again, reflects Altria's sales diverting primarily to firms other than JLI and expansion and repositioning by competitors including NJOY, Reynolds and ITG. A comparison of Dr. Rothman's assumed change in HHI with the actual change in HHI in both Dr. Rothman's market as well as a market of pod-based systems only is shown in Fig. VII.1. In summary, neither a broad view nor a narrow view of the relevant product market supports the FTC Complaint's allegation, nor Dr. Rothman's assumption, that concentration increased as a result of Altria's discontinuation of its e-cigarette product sales.

CONFIDENTIAL – FTC Docket No. 9393

**Fig. VII.1: Dr. Rothman's Delta HHI Compared with Delta HHI from Actual Data**



B. **ALTRIA'S MARKET SHARE IN THE FTC'S HYPOTHETICAL MARKET OVERSTATES ITS COMPETITIVE SIGNIFICANCE**

128.   Market shares within a hypothetical market of all closed-system e-cigarettes overstate Altria's competitive significance.

129.   First, e-cigarette products are differentiated based on product look-and-feel and nicotine experience. The vast majority of Altria's sales of MarkTen products—90 percent based on cartridge units—were from sales of cig-a-likes, whereas 100 percent of JLI's sales were from its pod-based vaporizer product. Within pod-based vaporizers, Altria's MarkTen Elite product was differentiated from JUUL by the fact that the former used non-salt e-liquid whereas the latter contained nicotine salts. Altria's MarkTen product faced much closer competition from other cig-a-like products (such as Vuse Ciro, Vuse

87

CONFIDENTIAL – FTC Docket No. 9393

Vibe, and Vuse Solo from Reynolds, ITG's Blu, NJOY Daily, JTI's Logic Power, and National Tobacco Company's V2), while its MarkTen Elite product faced closer competition from other pod-based vaporizers that used non-salt e-liquid (such as *my*blu from ITG and Logic Pro from Japan Tobacco). JUUL was differentiated from both MarkTen and MarkTen Elite, making it a more distant competitor. Calculating market shares within a broad market of all closed-system e-cigarette products ignores this competitive differentiation, and thus overstates the extent of competition between Altria and JLI.

130.    Second, while total cig-a-like sales were essentially stagnant during the three years preceding Altria's discontinuation of e-cigarette product sales, sales of pod-based vaporizers were growing very rapidly (*see* Fig. IV.1, *supra*). As a result, cig-a-likes accounted for a continually declining share of all closed-system e-cigarette sales throughout the period leading up to Altria's discontinuation of product sales.[221] There is no evidence to suggest that this persistent trend would likely have abated but for Altria's discontinuation of e-cigarette sales. In a dynamic market, relying on historical market shares is unlikely to provide a reliable assessment of the relative competitive strengths of different firms.[222] As I have already noted, the vast majority of Altria's sales and market share within the FTC's alleged product market came from its cig-a-like products. Given the continually declining importance of cig-a-likes within all closed-system e-cigarettes, therefore, Altria's historical market share is a poor predictor of what its share would have been in the but-for world in which Altria continued to sell e-cigarette products.

---

[221] PX1424. Altria, "E-Vapor Update August 2018 BOD," August 23, 2018, at -012 (showing declining cig-a-like share from Q1 2017 through Q2 2018).

[222] Guidelines at §5.2 ("Market concentration and market share data are normally based on historical evidence. However, recent or ongoing changes in market conditions may indicate that the current market share of a particular firm either understates or overstates the firm's future competitive significance. The Agencies consider reasonably predictable effects of recent or ongoing changes in market conditions when calculating and interpreting market share data. For example, if a new technology that is important to long-term competitive viability is available to other firms in the market, but is not available to a particular firm, the Agencies may conclude that that firm's historical market share overstates its future competitive significance. The Agencies may project historical market shares into the foreseeable future when this can be done reliably.").

88

131. Third, Dr. Rothman ignores the fact that the FDA's ban on flavored e-cigarettes would have further reduced the competitive significance of Altria's MarkTen products in the but-for world.  As I showed in Section IV.F, the substantial majority of MarkTen Elite's sales were in non-menthol and tobacco flavors whose sale the FDA announced in January 2020 would be banned effective February 2020.  In 2018, the last year that Altria marketed MarkTen Elite, 77.0 percent of MarkTen Elite sales at multi-outlet and convenience stores were non-menthol and tobacco-like flavors.[223]  Based on these sales patterns, if Altria had not discontinued sales of MarkTen Elite on October 25, 2018, the FDA's Flavor Ban would very likely have sharply curtailed or eliminated entirely its sales of MarkTen Elite effective February 2020.  The Altria e-cigarette products in menthol and tobacco flavors that would have survived the FDA's Flavor Ban were mainly, if not entirely, in its cig-a-like product, MarkTen.  As just noted, however, demand for cig-a-likes was rapidly declining throughout this period.  As a result, Altria's primary products that could have remained on the market after the institution of the Flavor Ban would have been cig-a-like products without flavors, a segment that faced sharply declining demand.  For this additional reason, Altria's market share within a hypothetical market of all closed-system e-cigarettes overstates its competitive significance in the but-for world.

## C. MARKTEN ELITE'S SHARE OVERSTATED ITS COMPETITIVE SIGNIFICANCE

132. The conclusion that Altria's market share overstated its competitive significance is not due solely to the FTC Complaint's adoption of a broad all closed-system e-cigarette products market that conflates cig-a-likes with pod-based vaporizers.  This is also true within the segment of pod-based vaporizer products that included MarkTen Elite.

---

[223] This calculation conservatively treats Altria's Sweet Original flavor as tobacco.  If instead this flavor were designated as a non-menthol and tobacco flavor, then none of MarkTen Elite's sales would have been non-menthol and tobacco flavors.

133.    MarkTen Elite was heavily promoted during its short time on the market;[224] but for those promotions, its share would very likely have been substantially smaller.  As I show in the next sub-section, MarkTen Elite's gross margin and operating margin were negative throughout almost the entire time the product was on the market.  As a matter of economics, "buying" market share with promotional spending that results in consistently negative per unit margins is not sustainable in the long run.  Fig. VII.2 tracks weekly dollar sales of devices and cartridges across competing pod-based vaporizers at the same point in each brand's lifetime on the market.  By controlling for the length of time that a brand had been on the market, we can directly compare how sales performance evolved for each brand.  Fig. VII.2 shows that while MarkTen Elite sales initially grew when its devices were promoted, the product was not successful at converting early sales into sustained growth.  Indeed, MarkTen Elite's sales were outperformed by sales of Reynolds' Vuse Alto, NJOY Ace and ITG's *my*blu during the corresponding post-launch periods for each of those competitors.  Notably, Vuse Alto and NJOY Ace, which saw the highest pick-up among consumers also used salts, similar to JLI.  Even at the peak of its weekly sales, MarkTen Elite achieved lower acceptance among consumers than each of the other three products at comparable points in their market life.  Fig. VII.2 supports the conclusion that MarkTen Elite's share within pod-based vaporizers overstated its competitive significance.

---

[224] Altria's promotions generally took the form of buy one MarkTen Elite device, receive a free or discounted pod package.  *See* - ALGFTC0006010066, "MarkTen Elite Value Offer Details," June 6, 2018 at 1; ALGFTC0006010447, "MarkTen Elite Value Offer Details-Update," July 31, 2018 at 1; ALGFTC0006010359, "MarkTen Elite Value Offer Details," July 11, 2018 at 1; ALGFTC0006010368, "MarkTen Elite Value Offer Details," July 11, 2018 at 1.

CONFIDENTIAL – FTC Docket No. 9393

**Fig. VII.2: Total Sales of Pod-Based Vaporizers (Devices and Cartridges): Weeks After Launch, Altria IRI Projected Data**



134. MarkTen Elite also suffered from a high rate of product returns, creating a further reason why MarkTen Elite's initial sales experience was unlikely to be a reliable predictor of its future sales path. When a consumer finds that a product does not perform as expected, he or she may decide to return the purchase. Regardless of whether a return is made, though, a disappointing initial purchase means that the consumer is unlikely to make a repeat purchase, particularly in an industry such as e-cigarettes where there are numerous substitute products available to the consumer. A high product return rate is therefore likely to indicate that the product's current market share overstates its competitive significance, and potentially by a great deal. According to data from Altria for the period January 2018 through December 2018, returns were equal to 3.6 percent of MarkTen

91

CONFIDENTIAL – FTC Docket No. 9393

Elite's sales revenue.[225]  This rate was more than five times the return rate that JUUL experienced during the same period, which equaled 0.7 percent of total sales.[226]

### D. MARKTEN AND MARKTEN ELITE WERE HIGHLY UNPROFITABLE AND WERE NOT PROJECTED TO BECOME PROFITABLE

135. Neither MarkTen nor MarkTen Elite ever achieved profitability; both continued to lose money throughout their product life, and neither was projected to become profitable at the time of discontinuation.  Without reasonable prospects that either product would achieve profitability, market shares for MarkTen and MarkTen Elite cannot be viewed as reliable predictors of their competitive significance.

136. Altria's e-cigarette business had experienced multiple years of operating losses, as seen in Fig. VII.3.  While Altria experienced its largest overall operating loss for e-cigarettes in 2015, in the year leading up to the discontinuation of its e-cigarette products, the MarkTen Elite product was increasingly losing money on both a gross margin and operating margin basis, as shown in Fig. VII.4.

---

[225] Altria 2018 Returns Detail.XLSX; return date based on the date attributed to the General Ledger.

[226] RESPONSE OF JUUL LABS, INC. TO SPECIFICATION 11(a)-(b) OF THE REQUEST FOR ADDITIONAL INFORMATION AND DOCUMENTARY MATERIALS," Aug. 23, 2019; return date based on the date attributed to the General Ledger.

CONFIDENTIAL – FTC Docket No. 9393

**Fig. VII.3: Nu Mark Annual Operating Margin**



**Fig. VII.4: MarkTen Elite 2018 YTD Gross Margin and Operating Margin**



93

CONFIDENTIAL – FTC Docket No. 9393

137.    Based on projections in late 2018, Altria's e-cigarette products were forecast to be unprofitable through 2021, three years after the products were discontinued.[227]  In ordinary course documents prepared in November 2018, Altria forecast that its then remaining e-cigarette products would continue to experience substantial losses through at least 2021.[228]  Altria's three-year operating plan P&L forecast that e-cigarettes would experience operating income losses of $122 million ($2.54 per unit) in 2019, $60 million ($1.28 per unit) in 2020, and $53 million ($1.13 per unit) in 2021.  See Fig. VII.5.  While I do not think it is appropriate simply to assume in an economic model, as Dr. Rothman does, that a projection will necessarily come true in the face of contrary market evidence, the fact that, by the end of 2018, Altria was still projecting losses in its e-cigarette business provides further evidence that its products were not a competitive threat to JLI.

---

[227] ALGFTC0001186661, Altria, "Nu Mark 2019 OB Review," November 12, 2018, at 33.

[228] ALGFTC0001186661, Altria, "Nu Mark 2019 OB Review," November 12, 2018, at 33.

CONFIDENTIAL – FTC Docket No. 9393

**Fig. VII.5: Nu Mark Three-Year Plan**[229]

## Nu Mark 2019 OB 3YP P&L
$ in Millions

| | 2019 | $/Unit | 2020 | $/Unit | 2021 | $/Unit |
|---|---|---|---|---|---|---|
| MarkTen (cartridges) | 39 | | 39 | | 39 | |
| Green Smoke (cartridges) | 8 | | 8 | | 8 | |
| New Products | 1 | | 0 | | 0 | |
| Unit Volume ( in 000's) | 48 | | 47 | | 47 | |
| Gross Sales | $136 | $2.83 | $144 | $3.06 | $153 | $3.26 |
| Cash Discounts | 2 | 0.04 | 2 | 0.04 | 3 | 0.06 |
| Returns | 5 | 0.10 | 6 | 0.13 | 6 | 0.13 |
| Sales Incentives | 55 | 1.15 | 45 | 0.96 | 46 | 0.98 |
| Net Revenue | 74 | $1.54 | 91 | $1.94 | 98 | $2.09 |
| SVC | 52 | 1.08 | 51 | 1.09 | 49 | 1.04 |
| Standard Shipping | 3 | 0.06 | 3 | 0.06 | 3 | 0.06 |
| Total Costs | 55 | 1.15 | 54 | 1.15 | 52 | 1.11 |
| Marginal Contribution | $19 | $0.40 | $37 | $0.79 | $46 | $0.98 |
| FME - Spending | 13 | 0.27 | 10 | 0.21 | 10 | 0.21 |
| FME - Obsolescence | 3 | 0.06 | 2 | 0.04 | 2 | 0.04 |
| Available Profit | $3 | $0.06 | $25 | $0.53 | $34 | $0.72 |
| Marketing Expenses | 28 | 0.58 | 29 | 0.62 | 31 | 0.66 |
| Selling Expenses | 51 | 1.06 | 12 | 0.26 | 12 | 0.26 |
| Total Marketing & Selling | $79 | $1.65 | $41 | $0.87 | $43 | $0.91 |
| G&A | 19 | 0.40 | 44 | 0.94 | 44 | 0.94 |
| RD&E | 27 | 0.56 | - | 0.00 | - | 0.00 |
| Other (Inc)/Exp | - | - | - | - | - | - |
| Nu Mark OCI | ($122) | ($2.54) | ($60) | ($1.28) | ($53) | ($1.13) |
| OCI Variance vs. 2018 2RF 3YP | $0 | | $16 | | ($53) | |

Altria
Altria Client Services

ALCS I Nu Mark Decision Support Update I November 12, 2018 I Highly Confidential          33

138. While Altria's e-cigarette projected losses, in total dollars and per unit, were forecasted to decline somewhat over this period, it is notable that Altria's e-cigarette sales volume was forecast to be stagnant throughout the 2019-2021 timeframe. As Fig. VII.5 indicates, Altria forecast e-cigarette sales of 48 million units in 2019, dipping slightly to 47 million units in each of 2020 and 2021. Thus, it was not the case that the decline in forecasted losses was due to growing sales volume for Altria's e-cigarette products; to the contrary, Altria projected that sales of its e-cigarettes essentially would remain flat—notwithstanding the fact that the overall industry was continuing to grow rapidly over this period.

139. Forecasted revenue growth over the 2019-2020 period was due solely to assumed price increases and reduced sales incentives. Altria forecast per unit revenue on its e-cigarette products of $1.54 in 2019, rising to $1.94 per unit in 2020 and to $2.09 per unit in 2021.

---

[229] ALGFTC0001186661, Altria, "Nu Mark 2019 OB Review," November 12, 2018, at 33.

CONFIDENTIAL – FTC Docket No. 9393

See Fig. VII.5. Over this period, therefore, Altria forecast that it would raise price by 35.7 percent in an effort to boost top-line revenues notwithstanding stagnant projected sales volume. A further contributing factor to the shrinking projected losses was Altria's forecast that it would reduce sales incentives. Altria projected that it would cut promotional incentives from $1.15 per unit in 2019 to $0.98 by 2021, representing a reduction of approximately 15 percent.

140. Altria also forecast that it would need to continue to expend substantial ongoing marketing expense to maintain sales volume at a stagnant level. Fig. VII.5 indicates that Altria projected e-cigarette marketing expenses of $0.58 per unit in 2019, rising to $0.62 per unit in 2020 and again to $0.66 per unit in 2021. Rising per unit marketing expense in the face of stagnant sales volume is consistent with a product exhibiting low brand loyalty and low repeat purchasing by consumers. These facts suggest that Altria viewed it as necessary to spend increasing amounts on marketing to maintain sales volume by attracting new product trials by first-time users. Spending increased amounts per unit of sales is evidence that Altria operated in a highly competitive marketplace in which consumers are able to choose from numerous competitive alternatives.

141. Additional evidence that Altria's share overstated its competitive significance comes from the fact that the company projected that product returns would remain high and that expenses associated with those returns would increase as a percentage of sales revenue. Altria projected that returns expenses would be $0.10 per unit in 2019 and would rise to $0.13 in each of 2020 and 2021. See Fig. VII.5. Large and increasing returns expenditures indicates that a product's current market share—reflecting past trials and purchases by consumers—is unlikely to reliably predict the product's longer-term competitive significance in the marketplace. The fact that Altria anticipated growing returns expenses per unit of sales instead indicates that the company expected low consumer acceptance and satisfaction for its e-cigarette products.

142. Finally, while forecasted losses declined from 2019 to 2020, Altria's operating loss was projected to be nearly stagnant from 2020 to 2021 with an expected loss of more than a dollar on every unit sold.

CONFIDENTIAL – FTC Docket No. 9393

## VIII.    DR. ROTHMAN'S ANALYSIS OF THE TRANSACTION AND ALTRIA'S DISCONTINUATION OF ITS PRODUCT LINES IS FLAWED

143.    As I discussed in Section V, an examination of actual market data from the period after Altria discontinued the sale of its e-cigarette products shows that, in contradiction to the FTC's and Dr. Rothman's claims, prices have fallen, output has increased and concentration has fallen.  In assessing the impact of Altria's withdrawal of its e-cigarette products, Dr. Rothman ignores this real-world evidence and instead relies on theoretical models and assumptions about the extent to which competition from Altria constrained JLI.  As a result, Dr. Rothman reaches conclusions that are unsupported by real-world evidence and that do not provide a reliable basis for drawing conclusions about the impact of the Transaction or Altria's discontinuation of e-cigarette product sales on competition or consumers.

144.    Dr. Rothman's assumptions that Altria's MarkTen products would have achieved a 10 percent or 20 percent share by 2020 had Altria not discontinued its e-cigarette products are not supported by the evidence.  His reliance on the Antitrust Logit Model ("ALM"), a modeling tool that embeds at its center a particular set of assumptions concerning the nature of demand and supply, leads Dr. Rothman to overstate grossly any alleged harm.  His failure to consider actual market evidence that demonstrates the ease with which competitors expanded and replaced any competition that might have been attributable to Altria renders his conclusions inconsistent with the facts.  Dr. Rothman's selective review of the evidence and failure to consider alternative assumptions and inputs to his modeling render his conclusions invalid and unreliable.

97

A. **DR. ROTHMAN'S ASSUMPTIONS THAT ALTRIA WOULD HAVE MAINTAINED A 10 PERCENT SHARE OR ACHIEVED A 20 PERCENT SHARE BY 2020 ARE UNFOUNDED AND SPECULATIVE**

145.    Dr. Rothman notes that, "[t]he extent of the harm caused by Altria's exit depends on how significant a competitor Altria likely would have been absent the transaction."[230]  Had Altria not been a significant competitor, Dr. Rothman's predictions of harm have no relevance.  Dr. Rothman does not consider any scenarios in which Altria would not have been a "significant" competitor.  Dr. Rothman's prediction of hypothetical harm due to the Transaction hinges entirely on his consideration of two alternative "but for" scenarios that "assum[e] Altria would have maintained its 10 percent share and assum[e] Altria would have grown its share to 20 percent by 2020."[231]

146.    Dr. Rothman's 10 percent scenario assumes that Altria would have "maintained" the market share it had prior to its decision to discontinue sales of its e-cigarette products.[232]  Based on the evidence, it is very unlikely Altria would have maintained a 10 percent share had it not withdrawn its e-cigarette products from the market. Dr. Rothman ignores the fact that Altria's existing 10 percent share was attributable overwhelmingly to its MarkTen cig-a-like product.  More than 90 percent of MarkTen sales were of the cig-a-like product.[233]  As I discussed in Section IV.C, demand for cig-a-likes was clearly declining, and sales of the MarkTen cig-a-like product peaked in September of 2018 and had begun declining by the time Altria discontinued the MarkTen products.  This decline in demand for cig-a-likes occurred despite growing demand for pod-based systems.  Predicting hypothetical harm due largely to the removal of a product that was in decline and that did not effectively constrain JLI makes no economic sense.

147.    Furthermore, Dr. Rothman ignores the fact that Altria's projections of growing sales for its MarkTen products assumed, in keeping with industry trends, a decline in demand for

---

[230] Rothman Report, ¶131.

[231] Rothman Report, ¶12.

[232] Rothman Report, ¶143.

[233] Analysis of Altria IRI Projected data for 2018.

MarkTen's cig-a-like product and assumed growth would come from its pod-based product, MarkTen Elite.[234]  MarkTen Elite never achieved more than a 1 percent share of closed system e-cigarette cartridge unit sales.[235]  Therefore, Dr. Rothman's assumption of a 10 percent share in 2020, rather than reflecting an assumption that Altria would have "maintained" its existing share, must in fact assume that Altria would have grown the share of its MarkTen Elite product substantially, and his assumption of a 20 percent share in 2020 even more so.[236]  Dr. Rothman provides no economic analysis or evidence that either of these outcomes was likely to happen.

### 1. Dr. Rothman's Review of Altria's Growth Projections Is Unreliable

148.    In asserting that Altria's MarkTen products would have achieved a 10 percent or 20 percent share, Dr. Rothman appears to rely on Altria's internal forecasts of sales and share growth.[237]  Dr. Rothman's reading of these projections, made at the beginning of 2018 and before Elite had actual in-market experience, is selective and ignores the possibility, and, as the evidence shows, high likelihood, that those projections were optimistic and would not be realized.  Dr. Rothman fails to consider any scenario in which Altria does not perform as well as the projections he relies on.  Relying on the fact that Altria projected growth as evidence that growth was likely to occur without considering the foundations for the projection or assessing whether there was a real likelihood of success amounts to speculation and leads to invalid and unreliable conclusions.  In fact, as I show below, the sales growth and profitability performance of

---

[234] PX4012, Altria, "Nu Mark 2018 Three Year Strategic Plan", February 28, 2018.

[235] Altria Projected IRI data, based on MarkTen Elite's share of all closed-system cartridge unit sales.

[236] In fact, the Altria projections from February 2018 just prior to Elite's launch that Dr. Rothman cites in support of his alternative assumption of a 20 percent share for Altria by 2020 show that Altria was assuming MarkTen cig-a-like shipments would *decline* by 58 percent from 2018 to 2020 and that MarkTen Elite shipments would increase by 491 percent from 2018 to 2020.  Clearly, Altria believed its growth depended on the success of its MarkTen Elite pod-based product.  Yet, the same document assumes MarkTen Elite would achieve a 3 percent share among closed system e-cigarettes in 2018, when it in fact achieved only a 1.2 percent share, undermining Dr. Rothman's assumption that Altria would "maintain" a 10 percent share, let alone grow to achieve a 20 percent share.  PX4012, Altria, "Nu Mark 2018 Three Year Strategic Plan", February 28, 2018.

[237] Rothman Report, ¶143 and fn. 357 (referencing PX1289 Altria, "Strategy & Business Development, February 2018 BOD Executive Session," February 2018, at -005).

CONFIDENTIAL – FTC Docket No. 9393

the MarkTen products often fell short of Altria's projections. Dr. Rothman does nothing to account for the likelihood that the projections he relies on were overstated relative to the sales growth the MarkTen products would have achieved had Altria not discontinued them.

149. Altria's growth projections were continually revised downward as its performance fell below projections due to declining demand for cig-a-like products and MarkTen Elite's poor sales performance. In February 2017, Altria's Nu Mark division forecasted that MarkTen would achieve a 21 percent retail share in 2018.[238] By February of 2018, Nu Mark revised its projection for 2018 down to 15.7 percent.[239] This forecast furthermore assumed that 52 percent of Altria's sales of the MarkTen product for 2019 would be the pod-based Elite product, and only 48 percent would be the cig-a-like product.[240]

150. In fact, however, Nu Mark's actual share as calculated by Dr. Rothman through September 2018 was only 10 percent, falling short of the 2017 projection by more than 50 percent, and falling short even of the February 2018 projection by more than 30 percent. Had Dr. Rothman applied a similar degree of inaccuracy to the projections he relies on, he would have considered scenarios in which Altria had shares of 5 percent or 10 percent, rather than 10 percent or 20 percent.

151. Furthermore, whereas Altria predicted that 52 percent of Altria's sales in 2018 would be made up of the MarkTen Elite pod-based product, Altria's 2018 actual sales show that MarkTen Elite represented only about 10 percent of its sales, an 80 percent shortfall relative to projections. Since Altria recognized that future growth would depend on the success of its pod-based product, Dr. Rothman's failure to consider this discrepancy between projection and actual performance for the Elite product is particularly problematic and renders his analysis that relies on the 10 percent and 20 percent

---

[238] ALGFTC0004993001, Altria, "Nu Mark 2017 Three Year Strategic Plan", February 28, 2017 at 4.

[239] ALGFTC0007462279, Altria, "Nu Mark 2018 Three Year Strategic Plan", February 28, 2018 at 7.

[240] ALGFTC0007462279, Altria, "Nu Mark 2018 Three Year Strategic Plan", February 28, 2018 at 7 (Of 75 million units forecast to be shipped, 39 million are designated hybrid and 37 million are designated cig-a-like. [39/75 = 0.52] [37/75=0.48]).

projection scenarios invalid and unreliable.  If I were to adjust downward Dr. Rothman's assumptions to reflect the degree of accuracy in Altria's projection of MarkTen Elite's performance, Dr. Rothman's scenarios would consider a 2 percent share for Altria or a 4 percent share for Altria, rather than a 10 percent or 20 percent share.

152. Dr. Rothman could have examined the relationship between actual performance and Altria's projections for e-cigarettes more generally as one factor in assessing the reliability of the specific projections he relies on.  He did not do so.  Had he done so, he would have observed that actual performance often fell short of Altria's projections for its e-cigarette business.[241]

153. Dr. Rothman makes no allowance for the likelihood that the projections he relies on would fail to be realized, rendering his analysis and conclusions invalid and unreliable.

## 2. **Dr. Rothman's Assessment of the Impact of the Flavor Ban on Altria Is Flawed**

154. Dr. Rothman asserts that Altria would have been "in a favorable position given the FDA's emerging concerns in 2018 about youth vaping and flavored products."[242]  He provides estimates (see his Table 6) of the share of Altria's sales of closed system e-cigarettes that were tobacco or menthol flavored as 82.9 percent in 2018, compared to JLI's share of 10.5 percent, Reynolds share of 57.0 percent and NJOY's share of 53.4 percent.  Dr. Rothman's assessment fails to take account of the differentiation between cig-a-likes and pod-based vaporizers, and fails to consider actual market evidence of how the Flavor Ban has impacted shares.  As a result, Dr. Rothman's analysis is misleading and leads to invalid and unreliable conclusions.

155. Dr. Rothman's assertion that Altria was better positioned than its rivals with respect to the Flavor Ban assumes that companies with a higher percentage of tobacco and menthol

---

[241] For example, Nu Mark sales and operating profit fell substantially short of projections in 2016 and 2017 relative to 2015 projections and in 2018 relative to 2017 projections (FTCVOL000073, "BOD PRESENTATION NU MARK'S THREE YEAR PLAN (2015–2017)," February 24, 2015 at FTCVOL000164; ALGFTC0004993001, "Nu Mark 2017 Three Year Strategic Plan," February 28, 2017 at 5; ALGFTC0007462279, "Nu Mark 2018 Three Year Strategic Plan," February 28, 2018 at 8; PX1127, "Nu Mark Finance Update – September YTD," October 15, 2018 at -007).

[242] Rothman Report, ¶119.

CONFIDENTIAL – FTC Docket No. 9393

flavored sales prior to the Flavor Ban would somehow achieve higher shares or higher share growth after the Flavor Ban. Dr. Rothman could have looked at what actually happened to sales of manufacturers following the Flavor Ban to test this assumption. Had he done so, he would not have found evidence supporting his assumption. Whereas the company with the highest tobacco and menthol flavored share in 2018 according to Dr. Rothman's assessment was JTI (91.7 percent of its sales were tobacco and menthol flavored according to Dr. Rothman's analysis), JTI's Logic products achieved a share of all closed system e-cigarette cartridge sales of only 2.2 percent over January through September of 2020, after the Flavor Ban. By contrast, JLI, which had the lowest tobacco and menthol flavored share in 2018 (10.5 percent of its sales were tobacco and menthol flavored according to Dr. Rothman's analysis) had the largest share of closed system e-cigarette cartridge sales (68.5 percent).[243]

156.    A similar conclusion is reached if I look at share growth. JTI's share *fell* by 2.4 percentage points from 2018 to 2020, while the share of NJOY (only 53.4 percent tobacco and menthol flavored pods) increased by 4.8 percentage points and of Reynolds (only 57 percent tobacco and menthol flavored pods) increased by 2.7 percentage points.[244] This shows that Dr. Rothman's underlying assumption that the percent of tobacco and menthol flavored cartridges within a company's portfolio of cartridge sales prior to the Flavor Ban predicts sales or sales growth post Flavor Ban is incorrect.

157.    A significant flaw in Dr. Rothman's analysis is that he fails to account for differences across companies in the extent to which their product portfolio was made up of cig-a-like sales versus pod-based vaporizers. Altria had a relatively large share of its sales made up of cig-a-likes, and its cig-a-like sales had a higher share of tobacco and menthol flavored pods than its pod-based vaporizer cartridges. This, in part, accounts for the high percentage of Altria's sales that were made up of tobacco and menthol flavored cartridges in Dr. Rothman's calculation. However, cig-a-likes were declining in demand such that

---

[243] Analysis of Altria Projected IRI data.

[244] Analysis of Altria Projected IRI data.

the very factor Dr. Rothman identified as a predictor of future sales growth post Flavor Ban is in fact a predictor of declining sales in the case of Altria.

158.    Finally, Dr. Rothman's assessment that Altria would have been well-positioned post Flavor Ban hinges critically on his assumption that MarkTen Elite had a product that would have survived the Flavor Ban.  While a substantial share of the MarkTen cig-a-like's cartridge sales were tobacco and menthol flavors, the only MarkTen Elite pod that had a tobacco or menthol flavor was "Sweet Original," which was described as a "balanced tobacco blend with honeysuckle and fruit flavors."[245]  Dr. Rothman does not consider the fact that Altria would have had to discontinue sales of four of its five MarkTen Elite pod products, and possibly also discontinue sales of the Sweet Original flavor, as a result of the FDA's Flavor Ban.  Dr. Rothman never considers this scenario, nor does he explain why such a scenario could not have occurred.

159.    In short, Dr. Rothman's assessment of the likely impact of the Flavor Ban on Altria's prospects for success in a post Flavor Ban world is speculative and ignores actual market evidence that contradicts it.

    **3.    Dr. Rothman's Review of Altria's Profitability Is Incomplete and Unreliable**

160.    Dr. Rothman asserts that Altria's products "were earning positive gross and variable margins before Nu Mark was shut down in 2018."[246]  He calculates an average variable margin (see Rothman Report, Table 4) of 2 percent for Altria in 2018.  Dr. Rothman's assessment of margins is incomplete and misleading.  Once again, Dr. Rothman fails to consider the implications of Altria's strong dependence on its MarkTen cig-a-like product for his analysis of profitability.  Dr. Rothman's calculation of a 2 percent margin for Altria is based on an average margin across its cig-a-like and pod-based products, reflecting mostly sales of the cig-a-like product.  This is the margin he uses in his modeling where he assumes Altria would have achieved a 10 or 20 percent share by 2020.  Yet, what is most relevant to Dr. Rothman's analysis based on Altria's projections

---

[245] PX1647, Altria, "MARKTEN ELITE," January, 2018, at -014.  As I noted in Section IV.F, *supra,* the Sweet Original flavor might also have been covered by the Flavor Ban.

[246] Rothman Report, ¶116.

CONFIDENTIAL – FTC Docket No. 9393

of growth is the profitability of the pod-based Elite product, since those projections assume the success of the Elite product and declining demand for the cig-a-like product.

161.    Fig. VII.4 in Section VII above shows the gross margin for Altria's MarkTen Elite product.  Whereas Altria's average margin for MarkTen was 2 percent, the gross margin for MarkTen Elite in 2018 averaged -31 percent, reflecting a combination of low sales volume and the cost of Altria's heavy spending on marketing and promotions.  While other competitors, including NJOY and Reynolds, were also engaged in heavy promotion by discounting their device prices, they had greater success in the marketplace than Altria did with its MarkTen Elite product.  Dr. Rothman does not provide any evidence that Altria would have achieved profitability with the MarkTen Elite product.  The assumption that the MarkTen Elite product would have achieved profitability without supporting evidence is unreliable, particularly given MarkTen Elite's declining share prior to its discontinuation despite sustained promotional spending and the risk of its pods being discontinued because of the FDA Flavor Ban.

162.    Dr. Rothman considers Altria's margin as one factor in assessing whether "it would not have made business sense for Altria to shut Nu Mark down but for the transaction."[247]  In considering margin as a factor in assessing the likelihood Altria would have discontinued its e-cigarette products Dr. Rothman only examines Altria's gross margin.  Yet the economic assessment of whether a product is profitable or not depends not only on variable costs but also on any operating costs that are incurred if a product stays on the market but that are avoided if the product is discontinued.  Such operating costs could include production overhead, fixed costs associated with marketing or promotion, sales, general and administrative ("SG&A") costs and research and development ("R&D") costs many of which are not actually on the Nu Mark income statement at their full value due to how Altria accounts for those costs at a firm level.  Whereas Elite's gross margin was -31 percent, its operating margin was substantially lower at -47 percent.  Dr. Rothman's failure to consider Altria's operating margin, as well as his failure to consider other business issues such as regulatory issues confronting the product and the costs in

---

[247] Rothman Report, ¶109.

CONFIDENTIAL – FTC Docket No. 9393

resolving them, makes his assessment of the likelihood Altria would have discontinued the MarkTen products absent the Transaction invalid and unreliable.

### 4. Dr. Rothman's Comparison of Different Products' Respective Sales After Launch Is Misleading

163.    Dr. Rothman asserts that "MarkTen Elite's sales were…in a similar range as competitors after its launch in February 2018 and were growing."[248]  He references a comparison of pod-based systems based on their pod sales per week per store over their first 21 weeks after launch.  Dr. Rothman's assessment is incomplete and misleading.

164.    First, Dr. Rothman's comparison of MarkTen Elite's first 21 weeks with the first 21 weeks of the JUUL product is highly misleading.  JUUL's first 21 weeks occurred in 2016 when e-cigarette demand in general, and demand for pod-based systems specifically, were substantially smaller than when MarkTen Elite was launched.  JUUL also did not have the heavy support of a company like Altria, which can more rapidly roll out new products through its distribution network.  This makes the comparison misleading.

165.    Second, Dr. Rothman compares MarkTen Elite with other products based only on certain metrics that place MarkTen Elite's performance in a favorable light.  For example, if I compare MarkTen Elite to other pod-based systems that launched around the same time as MarkTen Elite—*i.e.*, NJOY's Ace, Reynolds' Vuse Alto and ITG's *my*blu—on the basis of sales, I find that while MarkTen Elite started out on a similar sales growth path to those of *my*blu and NJOY, it was substantially outpaced by Vuse Alto, which in the first 25 weeks on the market achieved monthly sales of roughly 4.7 times MarkTen Elite, and after the first 25 weeks Elite falls behind *my*blu and NJOY as well.  By week 33 right before Elite was discontinued, its sales were only 41 percent of *my*blu's sales, only 21 percent of NJOY's sales, and only 12 percent of Alto's sales.[249]  A comparison based on sales rather than sales per store is consistent with Dr. Rothman's analysis that relies on overall prices and shares.

---

[248] Rothman Report, ¶115.

[249] *See* Fig. VII.2 above.

CONFIDENTIAL – FTC Docket No. 9393

**B. DR. ROTHMAN'S ANALYSIS USING THE ANTITRUST LOGIT MODEL AND COMPENSATING MARGINAL COST REDUCTIONS IS FLAWED**

166. Dr. Rothman "calibrate[s] an economic model of e-cigarette competition," the "antitrust logit model (ALM)" and uses it "to estimate the loss of consumer surplus from Altria's exit…."[250] Dr. Rothman's analysis based on the ALM is fundamentally flawed and cannot be relied on to draw conclusions concerning whether the Transaction caused harm, or the magnitude of any such alleged harm.

**1. The Antitrust Logit Model Inflates Consumer Welfare Effects from Product Entry and Exit**

167. Dr. Rothman's assessment of antitrust harm hinges critically on his assumption that consumers were harmed as a result of the withdrawal of the MarkTen and MarkTen Elite products, and depends very little on whether competition from Altria constrained JLI's pricing, or even the pricing of other rivals. In fact, of the $33.6 million Dr. Rothman predicts as antitrust harm in his scenario where Altria has a 10 percent market share, $26 million, or approximately 78 percent, is attributable to his assumption that as a result of Altria's withdrawal of the MarkTen and MarkTen Elite products, consumers chose an alternative product that they allegedly did not like as much as the MarkTen or MarkTen Elite products. Only about $7.6 million, or 22 percent of the alleged harm, relates to Dr. Rothman's assumption that consumers would have paid higher prices due to reduced competition in the absence of the MarkTen products.[251]

168. Despite this critical dependence on estimating the effects of withdrawing a product on consumer surplus, the particular approach Dr. Rothman uses for predicting the impact of removing a product on consumer surplus—*i.e.*, the ALM—is notably poor at estimating consumer surplus associated with changes in a consumer's choice set due to product entry or removal. I explain why below.

---

[250] Rothman Report, ¶12.

[251] *See* Appendix Exhibit C.1.

169.    The ALM has the undesirable property of assuming that the value a consumer receives from consuming a product is uniquely driven by the identity of the product, rather than by its features and characteristics.  In the context of the ALM, hypothetically removing a product overstates lost consumer surplus because the model effectively assumes consumers are not able to find alternative products with comparable features or characteristics.  A canonical example of this problem is provided by the red bus/blue bus scenario.  In general, riders of buses do not value the particular color of the bus they ride.  However, an ALM applied to the demand for red buses and blue buses would find that removing red buses and replacing them with blue buses generates consumer harm.  In this scenario, the predictions of the ALM sharply contradict the reality that consumers are unaffected by switching bus colors.  The red bus/blue bus scenarios demonstrate how the ALM grossly overstates the value of new products, and grossly overstates the value lost when a product is removed from the market.  This is a well-known real-world limitation of the ALM that is widely recognized in the academic literature.[252]

170.    In the context of Altria's removal of MarkTen and MarkTen Elite, the hypothetical lost surplus predicted by Dr. Rothman's ALM is inflated because the model effectively assumes the MarkTen cig-a-like and MarkTen Elite products were unique and had no characteristics or features that were readily replaceable by characteristics and features of other products on the market.  Dr. Rothman does nothing to address this limitation of his ALM approach.  Whereas consumers would have had the opportunity to switch from the MarkTen Elite product to JUUL, NJOY Ace, Vuse Alto, or other pod-based products,

---

[252] Daniel A. Ackerberg, and Marc Rysman, Unobserved product differentiation in discrete choice models: estimating price elasticities and welfare effects, *RAND Journal of Economics*, Vol. 36, No. 4 (Winter, 2005), pp. 771-788, at 772: "These models [including logit] assume that each product added to the market adds one additional dimension to SUPD [symmetric unobserved product differentiation] space. … Researchers may intuitively think that in markets with more products, unobservable characteristic space should 'fill up' in some sense.  These standard models place strong restrictions on how this occurs. Because of the lack of crowding in the standard treatment of SUPD, *welfare calculations in standard models tend to overpredict gains from the introduction of new products*." [emphasis added]; *See also*, Jerry A. Hausman Valuation of new goods under perfect and imperfect competition, In *The Economics of New Goods,* University of Chicago Press. 1996, pp. 209-248, at 230 ("[T]he usual discrete-choice model used, the logit model, suffers from the well-known independence of irrelevant alternatives (IIA) problem. The IIA problem typically leads to a vast overestimate of the consumer's surplus from a new good because the model does not incorporate sufficiently the similarities to existing goods.").

many of which were heavily discounting their device prices to attract new consumers, Dr. Rothman's model assumes that consumers would have needed to be compensated by large amounts to make them whole.  For example, the results of Dr. Rothman's simulation modeling imply that, despite being able to switch to alternative products, many of which were offered at lower prices than the MarkTen Elite product, the 20 percent of hypothetical consumers in his simulation who were most affected by the discontinuation make up more than 50 percent of Dr. Rothman's predicted harm and would have needed to be compensated on average $2.60 per pod, or 67 percent of the price of a MarkTen Elite pod.[253]  Similarly, the 10 percent of hypothetical consumers in his simulation who were most affected by the discontinuation make up more than 30 percent of Dr. Rothman's predicted harm and would have needed to be compensated on average $3.28 per pod, or 84 percent of the price of a MarkTen Elite pod.

171.    In fact, consumers had many alternative products that offered an array of features and characteristics to choose from after Altria discontinued sales of the MarkTen and MarkTen Elite products.  MarkTen's cig-a-like product faced declining demand and competition from numerous alternative brands including Blu, Vuse Solo, Vuse Ciro, Vuse Vibe, Logic Power, NJOY Daily, and National Tobacco Company's V2.  Given the declining popularity of cig-a-like products, and declining demand for MarkTen, consumers switching from MarkTen to pod-based products may have switched even had the MarkTen product remained on the market, and those consumers would have suffered no loss in consumer surplus or may have experienced an increase in consumer surplus as a result of Altria's discontinuation of the MarkTen products rather than a reduction in consumer surplus.  Dr. Rothman does not even consider this possibility.

172.    MarkTen's Elite product faced competition from JUUL, which had much greater consumer appeal than Elite, as well as a growing set of other competing pod-based products including *my*blu, NJOY Ace, Vuse Alto, Logic Pro, and Leap.  NJOY and Ace began aggressively promoting their products with $0.99/device promotions shortly after Altria removed its products from the market, and JLI reduced its devices in response,

---

[253] These estimates assume the prices of other products are fixed.  See Appendix Exhibit C.3.

making the cost to consumers of switching from the MarkTen Elite product to alternative pod-based products less costly. Furthermore, the MarkTen Elite product was viewed as inferior by market participants and suffered from design flaws, making it unlikely consumers would have suffered substantial lost surplus from switching to products with greater consumer appeal.[254] Dr. Rothman asserts that Altria had plans to improve Elite and deal with its shortcomings.[255] However, he provides no evidence such plans would have succeeded in fixing Elite's shortcomings, that any changes to the product would obtain regulatory approval, that the changes would have been available in the near term (given the regulatory requirements, they likely would not), or that rivals would not have made equal or greater improvements to their own products, making his calculation of harm speculative.

173. The ALM furthermore has the undesirable property of assuming a highly restrictive pattern of substitution among products such that diversion ratios (*i.e.*, the percent of sales lost by one product that divert to another in response to a price increase of the first) are assumed proportional to market shares, irrespective of how similar or distance those products are with respect to their characteristics and features. An example of this problem is provided by the hypothetical removal of Porsche from the market for passenger cars in the US. Suppose an ALM were imposed on the passenger car market in the US, with shares measured by make and manufacturer. If the model were used to simulate the removal of Porsche, the model would assume that Porsche consumers would switch to other cars—pickup trucks, minivans, 4-door sedans, SUVs—simply in proportion to their market shares. In reality, we expect Porsche consumers would be more likely to switch to other high-end German-engineered cars. This is another well-

---

[254] See PX8008, "Declaration of Wade Huckabee," March 31, 2020 at -025 ("RJR Vapor regarded the MarkTen product as inferior in quality to other competing products being sold at that time. In RJR Vapor's assessment, the quality of the MarkTen Elite product was also inferior to that of competing products at that time."); Dr. Rothman acknowledges that "the MarkTen Elite product had some design issues" including leaking pods, a "high level of formaldehyde at the end of the cartridge when it was overheated from puffing on a dry coil," and "MarkTen Elite's nicotine content was not as high as JLI's, and it lacked nicotine salts" (Rothman Report, ¶112) (internal quotation omitted).

[255] Rothman Report, ¶112.

known real-world limitation of the ALM that is widely recognized in the academic literature.[256]

174.    In practice, this means that when Dr. Rothman simulates the removal of Altria's MarkTen and MarkTen Elite products from his assumed market, his model assumes that the sales lost by Altria divert to JLI and other competitors in proportion to their market shares. Because the JUUL product has a high share, the model assumes that the vast majority of these lost sales divert to JUUL. Dr. Rothman provides no justification for this assumption arbitrarily imposed by his model, and he does nothing to address this limitation of the ALM.

175.    Dr. Rothman's model of the effects of Altria's discontinuation of its MarkTen and MarkTen Elite products predicts JLI's price increased one percent, and his model of the effects of the Transaction without Altria's discontinuation of its product lines predicts Altria would have raised MarkTen and MarkTen Elite's prices by 5 percent. These hypothetical price effects are driven largely by Dr. Rothman's assumption, embedded in the use of the ALM, that diversion from the MarkTen products to JUUL was proportional to share.

176.    In fact, as I showed above in Section V.B and VI.C, diversion from the MarkTen products to JUUL was substantially smaller than proportional to share. As a result, Dr. Rothman's model grossly overstates the extent to which JLI benefitted from Altria's removal of the MarkTen products through increased demand for JUUL, and greatly overstates the measure of antitrust harm.

---

[256] Petrin, (2002) shows that this property, known as the "independence of irrelevant alternatives" (IIA), of the ALM leads to a drastic overstatement of the welfare associated with new products. (Amil Petrin, "Quantifying the Benefits of New Products: The Case of the Minivan," *Journal of Political Economy* 110 (4), 2002, pp. 705-729 at 722 The paper finds that (based on instrumental variable estimates) the mean compensating variation for the loss of minivan relative to the second-choice vehicle decreases from $7,414, when a logit demand model is used, to $1,247, when a richer model of demand is estimated (an 82 percent decrease). The paper also finds that the compensating variation related to the idiosyncratic logit error decreases from $51,663 to $396 (a 99 percent decrease). *See also*, Hausman (1996), *op. cit*.

CONFIDENTIAL – FTC Docket No. 9393

177.   This relates to a more fundamental criticism of his approach. Dr. Rothman's estimate of harm hinges critically on his assumption that Altria discontinued its product lines because of the Transaction[257] and his assumption that JLI and Altria are close substitutes. If Altria's and JLI's products were not close substitutes, Altria's discontinuation of product sales provides no direct economic benefit to JLI. If Altria would have discontinued its e-cigarette product lines anyway, then Dr. Rothman's measure of "harm" is irrelevant—his measure of lost consumer surplus due to the removal of MarkTen and MarkTen Elite would not have been caused by the Transaction.

178.   To demonstrate the impact that Dr. Rothman's assumption that JUUL and MarkTen were close substitutes has on his analysis, I consider a hypothetical scenario in which Altria discontinues its cig-a-like product (because of declining demand) but continues to sell its MarkTen Elite product. This hypothetical exercise still overstates price effects and hypothetical harm because the JUUL and MarkTen Elite products are still assumed to be close substitutes, which is unsupported by the evidence. However, this exercise illustrates the impact that the irrelevance of cig-a-likes as a competitive constraint on JLI has on Dr. Rothman's estimates.

179.   I implement this by re-running Dr. Rothman's analysis under an alternative assumption that cig-a-like products and pod-based vaporizers are in separate relevant markets. The results show that assuming a market for pod-based vaporizers reduces the predicted harm by 88 percent to only $4.2 million per year.[258] This implies that 88 percent of Dr.

---

[257] Dr. Rothman offers speculation and selective document citation, but no economic evidence or analysis, to support his opinion that Altria would have continued to invest in and sell the MarkTen and MarkTen Elite products in the hypothetical "but for" world in which Altria did not make a minority investment in JLI.

[258] The first row in Appendix Exhibit C.1 shows Dr. Rothman's result that predicts consumers were harmed by a total of $33.6 million annually from the withdrawal of Altria's MarkTen and MarkTen Elite products. Dr. Rothman's underlying data, which include Nielsen data provided to the FTC by JLI, did not provide an identifier for whether a product was a cig-a-like or a pod-based vaporizer product. I have therefore relied on alternative IRI data provided to the FTC by Altria, which allow me separately to identify cig-a-like and pod-based vaporizer products. In the second row of Appendix Exhibit C.1, I show the results of re-running Dr. Rothman's ALM using these alternative IRI data to establish a benchmark against which I can compare the impact of assuming a market of pod-based systems. The results are very similar to Dr. Rothman's results and show a prediction of harm equal to $33.6 million annually from the withdrawal of Altria's MarkTen and MarkTen Elite products. Assuming a separate relevant market for pod-based products reduces the prediction of harm from $33.6 million to only $4.1 million, a reduction of 88 percent.

CONFIDENTIAL – FTC Docket No. 9393

Rothman's predicted harm is attributable to his assumption that competition from Altria's MarkTen cig-a-like product constrained JUUL and other pod-based systems, an assumption that is contradicted by the evidence.

180.   Furthermore, it reduces Dr. Rothman's prediction of JUUL's hypothetical price increase due to Altria's discontinuation of the MarkTen products in the model to only 0.47 percent. This remaining price effect continues to overstate the impact of Altria's discontinuation of its e-cigarette products because of the other flaws in Dr. Rothman's analysis that I discussed above and address further below. This analysis demonstrates that the price effects alleged by the FTC to be due to the loss of competition between JLI and Altria, are driven in large part by an assumption that cig-a-likes and pod-based systems are close substitutes, an assumption that is contradicted by the evidence.

### 2.  Dr. Rothman's Analysis Fails to Capture Competitive Dynamics

181.   Dr. Rothman's ALM assumes that each e-cigarette company is setting its price to maximize its profits in the short run. Yet, Dr. Rothman's opinion states that, "Firms often incur short-term losses to enter new segments and develop new products. Altria expected to make a large upfront investment and earn profits over time."[259] Dr. Rothman's report further states that "MarkTen Elite was a new product for Altria in 2018, and Altria offered price promotions on it, consistent with how other e-cigarette manufacturers have marketed new products."[260] When data reflect the fact that firms price dynamically—for example, lowering prices aggressively in the short-run to gain share over the long term—then the data fail to fit the assumptions of the ALM as employed by Dr. Rothman. Whereas Dr. Rothman's model assumes that Altria's 10 percent share reflected strong preferences by consumers for the MarkTen products, in fact, its share also reflected the impact of heavy promotions that reduced the prices consumers had to pay to purchase the MarkTen products. Dr. Rothman's model fails to take this into account and so yields invalid and unreliable conclusions.

---

[259] Rothman Report, ¶110.

[260] Rothman Report, fn. 294.

CONFIDENTIAL – FTC Docket No. 9393

182.    The effects of this can readily be seen within Dr. Rothman's modeling inputs and outputs. Altria's actual observed margin of 2 percent is a problem for Dr. Rothman's model as such a low margin suggests that consumers did not have strong preferences for the MarkTen products, which in turn predicts that consumers did not lose much by switching to other products in response to the withdrawal of the MarkTen products. Dr. Rothman "solves" this problem by calibrating his model using an assumed, hypothetical margin of 27 percent for Altria's product. The higher margin rationalizes Altria's 10 percent share in the context of Dr. Rothman's model but grossly overstates Altria's actual margin of 2 percent.[261] Using the hypothetical 27 percent margin, Dr. Rothman's model then predicts much larger harm from the removal of the MarkTen product than is consistent with Altria's actual 2 percent margin. This makes no economic sense.

183.    To show that Dr. Rothman's conclusions are highly sensitive to his treatment of the data, I re-ran Dr. Rothman's ALM procedure, but this time, calibrating the model such that Altria's margin in the model matches its actual value of 2 percent.[262] This reduces the estimated harm from $33.6 million annually to only $5.8 million annually. Furthermore, the predicted increase in JLI's price falls from the 1 percent predicted by Dr. Rothman to only 0.26 percent.

184.    Dr. Rothman's approach effectively assumes that Altria's product was better than it was. This is particularly true for Dr. Rothman's scenario in which he assumes Altria would have grown to hold a 20 percent share by 2020. This more aggressive assumption not only assumes that Altria's product had greater consumer appeal than its actual margin suggested, but that it had even greater consumer appeal than its 10 percent share would suggest had it earned a higher margin.

---

[261] Dr. Rothman first calibrates the price parameter and share of outside good for his model using all non-negative margins in the data including Altria's 2 percent margin. However, once he has values for the price parameter and share of outside good, he then uses the first-order condition from profit maximization for Altria to solve for the cost (and thereby margin) that is consistent with Altria's observed share and price.

[262] I replaced the modeling step in which Dr. Rothman calibrates the price parameter and share of outside good using the sum of squared first-order conditions, with a step in which I calibrate the price parameter and share of outside good using only Altria's first-order condition.

CONFIDENTIAL – FTC Docket No. 9393

185.    Dr. Rothman alleges that "Altria expected to make a large upfront investment and earn profits over time."[263]  However, he provides no evidence that Altria's strategy of heavily promoting its price was successful.  While MarkTen Elite experienced initial growth as highlighted by Dr. Rothman,[264] its sales peaked in August of 2018, well before it was discontinued by Altria, and began declining until it was discontinued.  Yet Altria ran its aggressive promotions continually throughout this period, and MarkTen Elite's gross margin remained strongly negative and did not improve.  MarkTen Elite's share and growth fell short of Altria's expectations almost immediately, and its sales and growth performance trailed the performance of other pod-based systems that also launched in 2018.[265]  Dr. Rothman provides no basis for assuming that, despite this evidence to the contrary, Altria's strategy of heavy promotions would be successful in building sufficiently strong consumer appeal to achieve a 10 percent share by 2020 starting from about 1 percent in 2018, let alone a 20 percent share.

186.    To account in the context of Dr. Rothman's model for the fact that Altria's 10 percent share was the result of heavy promotions, and not entirely reflective of MarkTen's underlying consumer appeal, I re-ran Dr. Rothman's model but, whereas Dr. Rothman first uses the model to calibrate Altria's cost (and thereby margin), given its 10 percent share and observed price, I instead use Altria's actual marginal cost to calibrate Altria's price and share in a way that is consistent with Dr. Rothman's model.  This effectively allows me to determine a price and share for Altria assuming it ends its heavy promotions and its share is determined by underlying consumer appeal.  The result is that Altria's calibrated price rises by 24 percent, and Altria's calibrated share falls by more than 5 percentage points to 4.8 percent.  When I use this price and share in Dr. Rothman's welfare calculation, his prediction of welfare is reduced to only $14.9 million, of which $11.6 million is due to alleged loss of consumer surplus, and only $3.3 million is due to

---

[263] Rothman Report, ¶110.

[264] Rothman Report, ¶115.

[265] *See* paragraph 133 and my discussion in Section VIII.A.4, *supra*.

alleged price effects.  JUUL's price is predicted to increase by only 0.49 percent.  This shows that Dr. Rothman's prediction of harm based on his ALM is invalid and unreliable.

187.    Even with this adjustment, Dr. Rothman's calculations still overstate any consumer welfare loss for the other reasons I have discussed.  Roughly 90 percent of Altria's share was made up of the MarkTen cig-a-like product, which was steadily losing share reflecting declining consumer appeal.  Furthermore, the MarkTen Elite pod-based product generated negative gross margins consistent with even weaker consumer appeal than implied by the 2 percent margin Dr. Rothman calculates for the MarkTen brand as a whole.  If I re-run the above analysis using only pod-based vaporizer sales and calibrate prices and shares based on costs consistent with the 2 percent margin that Dr. Rothman calculates for Altria, predicted harm reduces to $0.17 million, which is a 99.5 percent reduction relative to Dr. Rothman's prediction of harm, and the predicted JLI price increase is only 0.02 percent.[266]

188.    The sensitivity of Dr. Rothman's conclusion to the margins he uses for calibration, and his failure to consider competitive dynamics in his modeling render his assessment of harm invalid and unreliable.

### 3.    Dr. Rothman's ALM Approach Ignores Actual Expansion by Rivals

189.    Dr. Rothman asserts that "[e]ntry would not be timely, likely, and sufficient to mitigate the effect of the transaction."[267]  His view is based on his assumption that "[g]etting products to market requires significant upfront investments and takes multiple years […] Any potential entry or expansion induced by Altria's exit would be unlikely to replace the competition lost due to Altria's exit."[268]  Dr. Rothman's view reflects a fundamental misunderstanding of the dynamic marketplace in which the removal of the MarkTen products occurred.  First, the majority of competition from Altria was competition from its MarkTen cig-a-like product which, as discussed above, would have had little effect on

---

[266] The actual, observed Elite margin is -47 percent.  If I were to use -47 percent instead of 2 percent, the result is that Dr. Rothman's prediction of harm vanishes, and his prediction of JLI's price increase is reduced essentially to zero percent.

[267] Rothman Report, ¶180.

[268] Rothman Report, ¶180

JLI as a competitive constraint. Furthermore, demand for cig-a-likes was declining and there were numerous other competitors with cig-a-like products who could replace MarkTen. This was not competition lost as a result of Altria discontinuing its products, and Dr. Rothman should not include it in assessing whether entry, expansion and repositioning would have been sufficient to offset competition lost from Altria. Doing so leads to incorrect conclusions concerning the likelihood that entry, expansion and repositioning would be sufficient to offset competition allegedly lost due to Altria's discontinuation of its e-cigarette products.

190.   With respect to MarkTen Elite, the period in which Altria discontinued the product was characterized by numerous product launches by rivals, aggressive price competition by rivals to grow share, and substantial investments by rivals in expanding distribution. For example, ITG launched *my*blu in November 2017, Reynolds launched Vuse Alto in August 2018, NJOY launched Ace in October 2018 and EAS launched Leap in October 2018. Over the 2017-2019 timeframe, there were at least 14 pod-based systems that newly gained distribution according to the IRI data, and that achieved at least 50,000 cartridge units sold in a month, according to IRI data, with 6 of them first gaining distribution according to IRI data after Altria's discontinuation of MarkTen Elite.[269] NJOY and Reynolds both heavily promoted their products by introducing $0.99/device promotions following Altria's discontinuation of its MarkTen Elite product.

191.   Dr. Rothman dismisses the possibility that this type of rapid and aggressive expansion at the time of Altria's discontinuation of the MarkTen products would have replaced competition from Altria by claiming, "current [*i.e.*, 2021] competitors do not expect to expand rapidly and are not aware of any potential entrants."[270] Dr. Rothman's reasoning here is flawed and inconsistent with his own testimony that Altria "had a strong incentive to compete"[271] in connection with the fact that "e-vapor CAGR … was projected to

---

[269] Analysis of Altria IRI Projected data.

[270] Rothman Report, ¶186.

[271] I note that having an incentive to compete is insufficient, by itself, to create a competitive constraint. In order to competitively constrain other suppliers in a market, a firm must have both the incentive and ability to

CONFIDENTIAL – FTC Docket No. 9393

increase to 26.7 percent from 2017 to 2020,"[272] as well as his assumption that Altria would have grown rapidly from a 10 percent share to a 20 percent had it not decided to discontinue its e-cigarette products.  Furthermore, Dr. Rothman's statement is based only on "current" expectations concerning the likelihood of expansion, and does not consider what the market looked like at the time Altria discontinued its products at the end of 2018.

192.    Dr. Rothman's assertion that competition would not have been replaced because "competitors…are not aware of any potential entrants," fails to allow that competition from Altria could have readily been replaced through expansion by companies that had procured or developed products prior to August 8, 2016 and were awaiting opportunities to launch and expand the sales of those products.  From 2017 to 2019, not only did rivals newly gain distribution with at least 14 pod-based systems according to IRI data, but many of these pod-based systems were successful in rapidly expanding their distribution following Altria's discontinuation of its e-cigarette product lines.  For example, among the top 20 chains that carried MarkTen products in 2018, the average number of manufacturers per store with distribution of pod-based vaporizers *increased* from 3 over October 2017 – September 2018 to 4 over October 2018 – September 2019, despite Altria's withdrawal of MarkTen Elite.[273]

193.    In the context of the kind of dynamic competition that was unfolding at the time of Altria's discontinuation of its MarkTen products, and given MarkTen Elite's small share, it would not have taken much for competitors to replace competition from Altria.

194.    To demonstrate that expansion by rivals was sufficient to mitigate any potential harm from Altria's discontinuation of its MarkTen products, I re-ran Dr. Rothman's analysis and solved for the amount by which competitors would have needed to expand sales to offset the hypothetical harm predicted by his model, and compare this amount to the

---

compete.  As I have explained in this report, the historic market performance of Altria's e-cigarette products indicates that Altria it lacked the ability to compete successfully in the e-cigarette products marketplace.

[272] Rothman Report, ¶93-94.

[273] Based on an analysis of STARS shipment data.

CONFIDENTIAL – FTC Docket No. 9393

amount by which two of JLI's rivals, NJOY and Reynolds (Vuse), *actually* expanded sales.  In the period, October 2019 – September 2020, NJOY and Reynolds expanded their sales of e-cigarettes by 81.5 million units more than their sales over the period October 2017 – September 2018.  This is roughly twice the level of sales expansion that would have been necessary to offset the hypothetical harm predicted by Dr. Rothman's model.

195.    If I perform this same calculation for Dr. Rothman's model but assuming a market of pod-based vaporizers only, I find that just 2.2 percent of Reynolds' and NJOY's pod-based vaporizer sales expansion would have been sufficient to offset the hypothetical harm predicted by Dr. Rothman's model.  If I further take account of competitive dynamics as I explained in Section VIII.B.2 by calibrating MarkTen Elite's price and share based on Altria's 2 percent gross margin as calculated by Dr. Rothman, then I find that just a *de minimis* percent of Reynolds' and NJOY's sales expansion would have been sufficient to offset the hypothetical harm predicted by Dr. Rothman's model.

C.  **DR. ROTHMAN'S ASSESSMENT OF THE LIKELIHOOD OF RIVALS' SUPPLY RESPONSES IS MISLEADING AND CONTRADICTED BY THE FACTS**

196.    Dr. Rothman asserts that "[e]ntry would not be timely, likely, and sufficient to mitigate the effect of the transaction."[274]  He further states, "[a]ny potential entry or expansion induced by Altria's exit would be unlikely to replace the competition lost due to Altria's exit."[275]  Dr. Rothman's claims are contradicted by actual events in the marketplace. Multiple e-cigarette competitors repositioned the pricing of their products and successfully and rapidly expanded their sales after Altria discontinued its e-cigarette product lines, such that total output of e-cigarettes increased, ownership concentration as measured by the HHI fell, and average industry prices fell.[276]  Rapid repositioning and expansion by competitors that causes prices to decline, output to rise and HHI to fall

---

[274] Rothman Report, ¶180.

[275] Rothman Report, ¶180.

[276] *See* Section V.A, *infra.*

CONFIDENTIAL – FTC Docket No. 9393

demonstrates clearly that those supply-side responses were sufficiently timely and likely to fully replace any competition lost due to the Transaction or Altria's discontinuation of its e-cigarette products.

197.    In assessing the likelihood of supply-side responses by rivals, Dr. Rothman focuses almost entirely on the question of whether there would be *de novo* entry.  He states that "[a]n entrant or current competitor would need to acquire a product that was sold in the United States prior to August 8, 2016, or it would need to develop and obtain PMTA approval for a new product or an improved version of an existing product."[277]  Dr. Rothman entirely ignores the possibility—and ultimately fact—that expansion or repositioning could occur through competitors that had 'seeded' the market with products prior to August 8, 2016 and have waited for opportunities to launch products and expand sales of existing products.

198.    This is in fact what happened.  The expansion of demand for pod-based vaporizers created opportunities for existing companies to reposition their product portfolios to focus on pod-based vaporizers.  For example, NJOY launched its pod-based product, Ace around October, 2018[278] and Reynolds launched its pod-based product, Vuse Alto in August 2018.  These products had both been on the market prior to August 8, 2016 but had not been widely sold prior to late 2018.  Other competitors that, by the time of Altria's discontinuation of the MarkTen products, had pod-based vaporizers and were able to take advantage of opportunities to expand include JTI with its Logic Pro and EAS with its Leap.

199.    As a result, Altria's products—and any competition they afforded—were more than replaced through repositioning and expansion by rivals.  For example, whereas Sheetz sold brands from only four manufacturers prior to Altria's discontinuation of its e-cigarettes—JUUL, MarkTen, Vuse and Blu—by 2019 it was selling brands from six manufacturers—JUUL, Vuse, NJOY, Blu, Logic and Leap—having dropped MarkTen

---

[277] Rothman Report, ¶181.

[278] Farrell Dep. at 45:19-21 ("NJOY began distributing this product under the name "NJOY ACE". . . around October of 2018.").

CONFIDENTIAL – FTC Docket No. 9393

and added brands from three other manufacturers.  Furthermore, JLI faced stronger price competition from NJOY and Vuse than it faced from Altria.  Consumers benefited through expanded choice set and lower prices.

200.   Dr. Rothman asserts that Altria's discontinuation of its e-cigarette product lines "eliminate[] a competitive constraint on all other competitors, which reduces their incentives to offer lower prices and invest in developing better products."[279]  As a matter of economics, the exit of a competitor will *not*, in general, lead to reduced incentives to create and improve products.  To the contrary, it will often, if not typically, lead to the opposite effect by stimulating additional investment in new product development by rivals as they compete more intensely for business.  With one fewer supplier, each competitor has a greater chance of being the one that develops and introduces a new product that appeals the most to consumers.  Perceiving a higher probability of success and hence profit and return on investments in product development, each competitor becomes willing to invest more effort and expend more resources to create new products (and improve the quality of existing products) at any given price.[280]  Contrary to Dr. Rothman's assertion, therefore, Altria's discontinuation of its e-cigarette product lines is likely to lead to more, not less, investment in product development.

### D.  DR. ROTHMAN'S ASSESSMENT OF EFFICIENCIES IS INCOMPLETE, UNRELIABLE AND INCONSISTENT WITH HIS ASSESSMENT OF ALLEGED HARM

201.   Based on his use of the ALM approach that I reviewed above, Dr. Rothman estimates that "efficiencies of 13.3 percent would be required if Altria otherwise would have maintained a 10 percent share and that efficiencies of 26.5 percent would be required if Altria otherwise would have grown its share to 20 percent."[281]  He then concludes that any actual efficiencies would "not likely … translate into enough consumer benefit to

---

[279] Rothman Report, ¶11.

[280] *See*, for example, Curtis Taylor, "Digging for Golden Carrots: An Analysis of Research Tournaments," *American Economic Review*, 85(4), September 1995: 872-890.

[281] Rothman Report, ¶12.

CONFIDENTIAL – FTC Docket No. 9393

offset the harm caused by Altria's exit."[282]  Because Dr. Rothman's predictions of hypothetical harm using the ALM model are flawed, his estimates of what degree of efficiencies would be necessary to offset such harm are also flawed.  In addition, Dr. Rothman ignores the possibility that the Transaction created efficiencies by increasing the likelihood that one or more of JLI's products receives regulatory approval.  These errors lead Dr. Rothman to draw the wrong conclusion regarding the sufficiency of the likely efficiencies from the Transaction.

202.    Using his ALM framework, Dr. Rothman calculates a "Compensating Marginal Cost Reduction" ("CMCR"), which is an estimate of the amount by which JLI's marginal costs would have to be reduced through synergies in connection with the transaction to offset the hypothetical harm predicted by his model.[283]  Using his scenario in which he assumes Altria would have "maintained" its 10 percent share in 2020, he estimates the required CMCR to be 13.3 percent.[284]  Because his CMCR analysis relies on the same modeling and assumptions that his prediction of harm relies on, it is subject to the same criticisms that I have explained in Sections VIII.A and VIII.B above.  This leads his CMCR estimate to be grossly overstated.  In particular, I find that if I assume a market of pod-based vaporizers rather than his market that includes cig-a-like products, his CMCR estimate falls to 6.4 percent.  If I further recalibrate Altria's price and share so to be consistent with his model given Altria's actual marginal cost, then his CMCR estimate falls to 0.1 percent.  Finally, since I showed in Section VIII.B above that actual expansion by rivals was sufficient to offset the hypothetical harm predicted by his model, factoring in expansion by rivals reduces his CMCR to zero.  Therefore, Dr. Rothman's estimate of the CMCR needed to offset hypothetical harm is not reliable and leads to the wrong conclusion concerning the sufficiency of efficiencies from the Transaction.

203.    Further, Dr. Rothman's assessment of efficiencies looks only at the possible benefits of the Transaction in terms of factors that may have reduced JLI's marginal costs (CMCRs).

---

[282] Rothman Report, ¶13.

[283] Rothman Report, ¶142-43.

[284] Rothman Report, ¶144.

CONFIDENTIAL – FTC Docket No. 9393

Dr. Rothman fails to consider efficiencies that could derive from Altria's experience and expertise in seeking and securing regulatory approval yielding an increased probability of JLI obtaining regulatory approval for its products. Instead, he considers only that such regulatory experience and expertise would have reduced the price JLI would have paid for assistance in preparing its PMTA, and concludes that "[i]t is … unlikely that any such cost savings would translate into consumer benefit," because "JLI spending less to obtain PMTA approval would increase JLI's bottom line, but it would be unlikely to give JLI an incentive to offer lower prices or invest more in developing better products."[285] Yet, given the demonstrated consumer appeal of the JUUL products and JLI's large share, even a small increase in the probability of regulatory approval could lead to a large increase in consumer surplus. For example, using Dr. Rothman's model, I find that a 1 percent increase in the probability with which JLI receives regulatory approval for its products would be sufficient to offset approximately 25 percent the hypothetical harm predicted by Dr. Rothman's model due to higher predicted prices.[286] As I showed in Section VIII.B above, Dr. Rothman's analysis grossly overstates any alleged harm from Altria's discontinuation of its e-cigarette products. If I re-run Dr. Rothman's model assuming a market for pod-based vaporizers only, then a 1 percent increase in the probability with which JLI receives regulatory approval for its products would be sufficient to offset 25 percent of all harm predicted by Dr. Rothman's model, including both harm due to higher predicted prices as well as alleged lost consumer surplus from the removal of the Altria products. Finally, if I re-run Dr. Rothman's model assuming a market for pod-based vaporizers only and re-calibrate Altria's price and share to account for competitive dynamics, then even a 0.1 percent increase in the probability with which

---

[285] Rothman Report, ¶15.

[286] Such an increase in consumer surplus could come about through increased likelihood of a single product, flavor or product modification, for example, achieving regulatory approval. Because Dr. Rothman's ALM approach grossly overstates predicted harm associated with consumer surplus due to the removal of a product, as I showed in Section VIII.B above, I assess the sufficiency of the efficiency against the predicted harm from his model that is attributable to higher prices.

122

JLI receives regulatory approval would offset all harm predicted by Dr. Rothman's model.[287]

204.   Dr. Rothman further asserts that his CMCR estimates "understate the efficiencies needed to fully offset the loss of consumer surplus from the transaction," because "[t]he ALM is a static model" that ignores dynamic competition.[288]   While I agree with Dr. Rothman's view that the ALM is a static model and that it ignores dynamic competition, I disagree with his conclusion that his CMCR is therefore understated.   In fact, I showed above that the implications of taking account of competitive dynamics in the context of his analysis using the ALM leads his prediction of harm to fall, and the CMCR to fall correspondingly.

### E.   DR. ROTHMAN'S ANALYSIS OF THE TRANSACTION WITHOUT ALTRIA'S DISCONTINUATION OF E-CIGARETTE PRODUCTS IS FLAWED

205.   In Appendix F to the Rothman Report, Dr. Rothman presents an analysis showing "the loss of consumer surplus from the partial acquisition alone, absent the non-compete, and the efficiencies required to offset it."[289, 290]   Based on this analysis, Dr. Rothman predicts

---

[287] Details of my analysis are provided in Appendix Exhibit C.2.

[288] Rothman Report, ¶145.

[289] Rothman Report, fn. 358.

[290] Dr. Rothman asserts that the non-compete agreement between Altria and JLI "was not necessary" in order to allow JLI to receive the full economic benefit of Altria's minority investment in JLI.  Rothman Report, ¶176.  Dr. Rothman offers no economic analysis or evidence to support this assertion.  In the context of cooperation between firms where "one participant may have special technical expertise that usefully complements another participant's manufacturing process," it is well understood by economists and the antitrust community that the realization of these procompetitive benefits may reasonably require restrictions on competition to "deter[] individual participants from undertaking free riding or other opportunistic conduct that could reduce significantly the ability of the collaboration to achieve cognizable efficiencies.  Collaborations sometimes include agreements to discourage any one participant from appropriating an undue share of the fruits of the collaboration or to align participants' incentives to encourage cooperation in achieving the efficiency goals of the collaboration." Federal Trade Commission and U.S. Department of Justice, Antitrust Guidelines for Collaborations Among Competitors, April 2000, pp. 6 and 24, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf, accessed on March 11, 2021.  In the case of Altria's investment in JLI and the parties' agreement allowing JLI to benefit from Altria's regulatory advisory expertise and resources, the parties will exchange sensitive R&D and other competitively sensitive information.  As a matter of economic analysis, the adoption of a non-compete

123

that the Transaction, assuming Altria had not decided to discontinue the sale of its e-cigarette products, would have led JLI to raise its price by 0.18 percent, and Altria to raise the price of MarkTen, MarkTen Elite and all other e-cigarette products, by 5 percent, and that this would have given rise to harm in the amount of $5.8 million per year.[291]  Such small price effects are inconsistent with a view that the Transaction absent Altria's discontinuation of the MarkTen products, caused harm to competition or harm to consumers.

206.    Dr. Rothman's analysis of the Transaction without Altria's discontinuation of its product lines suffers from the same flaws as his analysis of the impact of Altria's decision to discontinue the sale of its e-cigarette products that I have discussed in Section VIII.B. Correcting for these substantially reduces both the harm associated the Transaction as well as the estimated price effects from the Transaction.  These results are shown in Appendix Exhibit C.1.

## IX.    CONCLUSIONS

207.    I was asked to conduct an economic analysis to assess whether, and the extent to which, either Altria's acquisition of a minority investment interest in JLI or its discontinuation of the sale of its line of e-cigarette products diminished competition or harmed consumers.  I was also asked to assess the economic analyses and conclusions presented in the report prepared by the FTC's economic expert, Dr. Rothman.  Based on my review of materials in this case and the analysis I have conducted, I conclude that neither Altria's acquisition of a minority investment interest in JLI nor Altria's discontinuation of e-cigarette product sales diminished competition or harmed consumers.

208.    Altria and JLI were not significant head-to-head competitors in the FTC's proposed closed-system e-cigarette products market, nor in the alternative (narrower) market of

agreement is reasonably necessary to ensure that the benefits of Altria's and JLI's complementary assets are appropriately shared between the parties and are not unduly appropriated by a single party.

[291] Rothman Report, Appendix F and backup materials.

CONFIDENTIAL – FTC Docket No. 9393

pod-based vaporizer e-cigarette products that I analyzed. The e-cigarette products sold by Altria and JLI were strongly differentiated from each other in terms of both their product look-and-feel and nicotine experience. JLI did not reduce the prices of its JUUL products in response to Altria's launch of MarkTen Elite, nor did JLI raise the price of its products as a result of Altria ceasing to offer MarkTen and MarkTen Elite for sale. Furthermore, JLI's JUUL products did not lose sales as a result of MarkTen Elite's launch, nor did JLI gain sales volume as a result of Altria's discontinuation of sales of its products. To an economist, the absence of both a competitive price response and sales impact on the product offered by one firm from the start or discontinuation of sales of a rival's product provides direct evidence that the products are not close substitutes and, therefore, the firms are not close competitors.

209. Whereas JLI did not respond to either the start or discontinuation of e-cigarette sales by Altria, JLI *did* cut prices on its e-cigarette devices in response to other competitors, specifically Reynolds (with Vuse Alto) and NJOY (with Ace), having reduced their device prices. Reynolds and NJOY both substantially expanded sales of their pod-based e-cigarette products after Altria discontinued its e-cigarette sales, while JUUL sales fell. Reynolds and NJOY also both achieved greater sales with their pod-based e-cigarette products than MarkTen Elite achieved based on the same amount of time on the market. Rapid sales expansion by rivals and JLI's competitive pricing response to those rivals provide direct economic evidence that whatever competition the FTC and Dr. Rothman assert was lost when Altria stopped offering its own e-cigarette products was more than fully replaced by increased competition from other e-cigarette manufacturers.

CONFIDENTIAL – FTC Docket No. 9393

210. Dr. Rothman's analysis suffers from numerous flaws that render his conclusions invalid and unreliable. In particular, Dr. Rothman's analysis assumes harm rather than proving it; it ignores actual post-transaction evidence that clearly shows the lack of harm; and it disregards salient features of the market, including the limited substitutability between cig-a-likes and pod-based closed system e-cigarettes and the fact that competitors have expanded sales after the Transaction and Altria's discontinuation of sales. In addition, Dr. Rothman's choice of modeling inputs leads him to overpredict hypothetical harm, and his results are not robust to the selection of reasonable alternative inputs to his modeling. Most fundamentally, Dr. Rothman's analysis fails to recognize the basic economic principle that consumers and competition are *not* harmed when an unsuccessful, unprofitable product is replaced by existing or new products that have greater consumer appeal and are more profitable. The process of replacing products with limited consumer appeal by products with greater consumer appeal is part of the competitive process and is efficient from an economic perspective. Therefore, Altria's withdrawal of its e-cigarette products did not result in diminished competition or consumer harm.

Kevin M. Murphy

March 15, 2021

# Appendix A

# *Curriculum Vitae*

# **Kevin M. Murphy**

March 2021

*Business Address:*

*Home Address:*

The University of Chicago
Booth School of Business
5807 South Woodlawn Avenue
Chicago, Illinois  60637
email: kevin.murphy@chicagobooth.edu

1810 Pennington Court
New Lenox, Illinois 60451
Phone: (815)463-4756
Fax: (815)463-4758

## Current Positions

July 2005-Present: George J. Stigler Distinguished Service Professor of Economics, Department of Economics and Booth School of Business, The University of Chicago

Faculty Research Associate, National Bureau of Economic Research

Co-Director, Health and Human Capital Program, Health Economics Initiative, Becker Friedman Institute

## Education

University of California, Los Angeles, A.B., Economics, 1981

The University of Chicago, Ph.D., 1986

Thesis Topic: *Specialization and Human Capital*

## Previous Research and Academic Positions

2002-2005: George J. Stigler Professor of Economics, Department of Economics and Booth School of Business, The University of Chicago

1993 – 2002: George Pratt Shultz Professor of Business Economics and Industrial Relations, The University of Chicago

1989 – 1993: Professor of Business Economics and Industrial Relations, The University of Chicago

1988 – 1989: Associate Professor of Business Economics and Industrial Relations, The University of Chicago

1986 – 1988: Assistant Professor of Business Economics and Industrial Relations, The University of Chicago

1983 – 1986: Lecturer, Booth School of Business, The University of Chicago

1982 – 1983: Teaching Associate, Department of Economics, The University of Chicago

1979 – 1981: Research Assistant, Unicon Research Corporation, Santa Monica, California

## Honors and Awards

2008: John von Neumann Lecture Award, Rajk College, Corvinus University, Budapest

2007: Kenneth J. Arrow Award (with Robert H. Topel)

October 2005: Garfield Research Prize (with Robert H. Topel)

September 2005: MacArthur Foundation Fellow

1998: Elected to the American Academy of Arts & Sciences

1997: John Bates Clark Medalist

1993: Fellow of The Econometric Society

1989 – 1991: Sloan Foundation Fellowship, The University of Chicago

1983 – 1984: Earhart Foundation Fellowship, The University of Chicago

1981 – 1983: Fellowship, Friedman Fund, The University of Chicago

1980 – 1981: Phi Beta Kappa, University of California, Los Angeles

1980 – 1981: Earhart Foundation Fellowship, University of California, Los Angeles

1979 – 1981: Department Scholar, Department of Economics, University of California, Los Angeles

## Publications

## Books

Social Economics: Market Behavior in a Social Environment with Gary S. Becker, Cambridge, MA: Harvard University Press (2000).

Measuring the Gains from Medical Research: An Economic Approach, edited volume with Robert H. Topel, Chicago: The University of Chicago Press (2003).

Chicago Price Theory, by Sonia Jaffe, Robert Minton, Casey B. Mulligan, and Kevin M. Murphy, Princeton University Press (2019).

## Chapters in Books

"Income and Wealth in America," with Emmanuel Saez, in Inequality and Economic Policy, ed. Tom Church, Christopher Miller, John B. Taylor, Stanford, CA: Hoover Press (2015)

## Articles

"Government Regulation of Cigarette Health Information," with Benjamin Klein and Lynne Schneider, 24 *Journal of Law and Economics* 575 (1981).

"Estimation and Inference in Two-Step Econometric Models," with Robert H. Topel, 3 *Journal of Business and Economic Statistics* 370 (1985).

"Unemployment, Risk, and Earnings: Testing for Equalizing Wage Differences in the Labor Market," with Robert H. Topel, in Unemployment and the Structure of Labor Markets, pp. 103-139, ed. Kevin Lang and Jonathan S. Leonard. London: Basil Blackwell (1987).

"The Evolution of Unemployment in the United States: 1968-1985," with Robert H. Topel, in NBER Macroeconomics Annual, pp. 11-58, ed. Stanley Fischer. Cambridge, MA: MIT Press (1987).

"Cohort Size and Earnings in the United States," with Mark Plant and Finis Welch, in Economics of Changing Age Distributions in Developed Countries, pp. 39-58, ed. Ronald D. Lee, W. Brian Arthur, and Gerry Rodgers. Oxford: Clarendon Press (1988).

"The Family and the State," with Gary S. Becker, 31 *Journal of Law and Economics* 1 (1988).

"A Theory of Rational Addiction," with Gary S. Becker, 96 *Journal of Political Economy* 675 (1988).

"Vertical Restraints and Contract Enforcement," with Benjamin Klein, 31 *Journal of Law and Economics* 265 (1988).

"Income Distribution, Market Size, and Industrialization," with Andrei Shleifer and Robert W. Vishny, 104 *Quarterly Journal of Economics* 537 (1989).

"Wage Premiums for College Graduates: Recent Growth and Possible Explanations," with Finis Welch, 18 *Educational Researcher* 17 (1989).

"Industrialization and the Big Push," with Andrei Shleifer and Robert W. Vishny, 97 *Journal of Political Economy* 1003 (1989).

"Building Blocks of Market Clearing Business Cycle Models," with Andrei Shleifer and Robert W. Vishny, in <u>NBER Macroeconomic Annual,</u> pp. 247-87, ed. Olivier Jean Blanchard and Stanley Fischer. Cambridge, MA: MIT Press (1989).

"Efficiency Wages Reconsidered: Theory and Evidence," with Robert H. Topel, in <u>Advances in the Theory and Measurement of Unemployment</u>, pp. 204-240. ed. Yoram Weiss and Gideon Fishelson. London: Macmillan (1990).

"Empirical Age-Earnings Profiles," with Finis Welch, 8 *Journal of Labor Economics* 202 (1990).

"Human Capital, Fertility, and Economic Growth," with Gary S. Becker and Robert F. Tamura, 98 *Journal of Political Economy*, S12 (1990).

"Accounting for the Slowdown in Black-White Wage Convergence," with Chinhui Juhn and Brooks Pierce, in <u>Workers and Their Wages: Changing Patterns in the United States</u>, pp. 107-143, ed. Marvin Kosters. Washington, D.C.: American Enterprise Institute (1991).

"The Role of International Trade in Wage Differentials," with Finis Welch, in <u>Workers and Their Wages: Changing Patterns in the United States,</u> pp. 39- 69, ed. Marvin Kosters. Washington, D.C.: American Enterprise Institute (1991).

"Why Has the Natural Rate of Unemployment Increased over Time?" with Robert H. Topel and Chinhui Juhn, 2 *Brookings Papers on Economic Activity* 75 (1991).

"The Allocation of Talent: Implications for Growth," with Andrei Shleifer and Robert W. Vishny, 106 *Quarterly Journal of Economics* 503 (1991).

"Rational Addiction and the Effect of Price on Consumption," with Gary S. Becker and Michael Grossman, 81 *American Economic Review* 237 (1991).

"Wages of College Graduates," in <u>The Economics of American Higher Education</u>, pp. 121-40, ed. William E. Becker and Darrell R. Lewis. Boston: Kluwer Academic Publishers (1992).

"Changes in Relative Wages, 1963-1987: Supply and Demand Factors," with Lawrence F. Katz, 107 *Quarterly Journal of Economics* 35 (1992).

"The Structure of Wages," with Finis Welch, 107 *Quarterly Journal of Economics* 285 (1992).

"The Transition to a Market Economy: Pitfalls of Partial Planning Reform," with Andrei Shleifer and Robert W. Vishny, 107 *Quarterly Journal of Economics* 889 (1992).

"The Division of Labor, Coordination Costs, and Knowledge," with Gary S. Becker, 107 *Quarterly Journal of Economics* 1137 (1992).

"Industrial Change and the Rising Importance of Skill" with Finis Welch, in Uneven Tides: Rising Inequality in America, pp. 101-132, ed. Peter Gottschalk and Sheldon Danziger. New York: Russell Sage Foundation Publications (1993).

"Wage Inequality and the Rise in Returns to Skill," with Chinhui Juhn and Brooks Pierce, 101 *Journal of Political Economy* 410 (1993).

"Occupational Change and the Demand for Skill, 1940-1990," with Finis Welch, 83 *American Economic Review* 122 (1993).

"Inequality and Relative Wages," with Finis Welch, 83 *American Economic Review* 104 (1993).

"Why Is Rent-Seeking So Costly to Growth?" with Andrei Shleifer and Robert W. Vishny, 83 *American Economic Review* 409 (1993).

"A Simple Theory of Advertising as a Good or Bad," with Gary S. Becker, 108 *Quarterly Journal of Economics* 941 (1993).

"Relative Wages and Skill Demand, 1940-1990," with Chinhui Juhn, in Labor Markets, Employment Policy, and Job Creation, pp. 343-60, ed. Lewis C. Solmon and Alec R. Levenson. The Milken Institute Series in Economics and Education. Boulder, CO: Westview Press (1994).

"Cattle Cycles," with Sherwin Rosen and Jose A. Scheinkman, 102 *Journal of Political Economy* 468 (1994).

"An Empirical Analysis of Cigarette Addiction," with Gary S. Becker and Michael Grossman, 84 *American Economic Review* 396 (1994).

"Inequality in Labor Market Outcomes: Contrasting the 1980s and Earlier Decades," with Chinhui Juhn, 1 *Economic Policy Review* 26 (1995).

"Employment and the 1990-91 Minimum Wage Hike," with Donald R. Deere and Finis Welch, 85 *American Economic Review* 232 (1995).

"Examining the Evidence on Minimum Wages and Employment," with Donald R. Deere and Finis Welch, in The Effects of the Minimum Wage on Employment, pp. 26-54, ed. Marvin H. Kosters. Washington, D.C.: The AEI Press (1996).

"Social Status, Education, and Growth," with Chaim Fershtman and Yoram Weiss, 104 *Journal of Political Economy* 108 (1996).

"Wage Inequality and Family Labor Supply," with Chinhui Juhn, 15 *Journal of Labor Economics* 72 (1997).

- 5 -

"Quality and Trade," with Andrei Shleifer, 53 *Journal of Development Economics* 1 (1997).

"Vertical Integration as a Self-Enforcing Contractual Arrangement," with Benjamin Klein, 87 *American Economic Review* 415 (1997).

"Unemployment and Nonemployment," with Robert H. Topel, 87 *American Economic Review* 295 (1997).

"Wages, Skills, and Technology in the United States and Canada," with W. Craig Riddell and Paul M. Romen, in General Purpose Technologies and Economic Growth, pp. 283-309, ed. Elhanan Helpman.  Cambridge, MA: M.I.T. Press (1998).

"Perspectives on the Social Security Crisis and Proposed Solutions," with Finis Welch, 88 *American Economic Review* 142 (1998).

"Population and Economic Growth," with Gary S. Becker and Edward Glaeser, 89 *American Economic Review* 145 (1999).

"A Competitive Perspective on Internet Explorer," with Steven J. Davis, 90 *American Economic Review* 184 (2000).

"Industrial Change and the Demand for Skill," with Finis Welch, in The Causes and Consequences of Increasing Inequality, pp. 263-84, ed. Finis Welch.  Volume II in the Bush School Series in the Economics of Public Policy.  Chicago: The University of Chicago Press (2001).

"Wage Differentials in the 1990s: Is the Glass Half Full or Half Empty?" with Finis Welch, in The Causes and Consequences of Increasing Inequality, pp. 341-64, ed. Finis Welch.  Volume II in the Bush School Series in the Economics of Public Policy. Chicago: The University of Chicago Press (2001).

"Economic Perspectives on Software Design: PC Operating Systems and Platforms," with Steven J. Davis and Jack MacCrisken, in Microsoft, Antitrust, and the New Economy: Selected Essays, pp. 361-420, ed. Davis S. Evans. Boston, MA: Kluwer (2001).

"Current Unemployment, Historically Contemplated," with Robert H. Topel and Chinhui Juhn, 1 *Brookings Papers on Economic Activity* 79 (2002).

"The Economics of Copyright 'Fair Use' in A Networked World," with Andres Lerner and Benjamin Klein, 92 *American Economic Review* 205 (2002).

"The Economic Value of Medical Research," with Robert H. Topel, in Measuring the Gains from Medical Research: An Economic Approach, pp. 41-73, ed. Robert H. Topel and Kevin M. Murphy. Chicago: The University of Chicago Press (2003).

"School Performance and the Youth Labor Market," with Sam Peltzman, 22 *Journal of Labor Economics* 299 (2003).

"Entrepreneurial ability and market selection in an infant industry: evidence from the Japanese cotton spinning industry," with Atsushi Ohyama and Serguey Braguinsky, 7 *Review of Economic Dynamics* 354 (2004).

"Entry, Pricing, and Product Design in an Initially Monopolized Market," with Steven J. Davis and Robert H. Topel, 112 *Journal of Political Economy* S188 (2004).

"Diminishing Returns: The Costs and Benefits of Increased Longevity," with Robert H. Topel, 46 *Perspectives in Biology and Medicine* S108 (2004).

"Persuasion in Politics," with Andrei Shleifer, 94 *American Economic Review* 435 (May 2004).

"Black-White Differences in the Economic Value of Improving Health," with Robert H. Topel, 48 *Perspectives in Biology and Medicine* S176 (2005).

"The Equilibrium Distribution of Income and the Market for Status," with Gary S. Becker and Iván Werning, 113 *Journal of Political Economy* 282 (2005).

"The Market for Illegal Goods: The Case of Drugs," with Gary S. Becker and Michael Grossman, 114 *Journal of Political Economy* 38 (2006).

"Competition in Two-Sided Markets: The Antitrust Economics of Payment Card Interchange Fees," with Benjamin Klein, Andres V. Lerner, and Lacey Plache, 73 *Antitrust Law Journal* 571 (2006).

"The Value of Health and Longevity," with Robert H. Topel, 114 *Journal of Political Economy* 871 (2006).

"Social Value and the Speed of Innovation," with Robert H. Topel, 97 *American Economic Review* 433 (2007).

"Education and Consumption: The Effects of Education in the Household Compared to the Marketplace," with Gary S. Becker, 1 *The Journal of Human Capital* 9 (Winter 2007).

"Why Does Human Capital Need a Journal?" with Isaac Ehrlich, 1 The Journal of Human Capital 1 (Winter 2007).

"Critical Loss Analysis in the Whole Foods Case," with Robert H. Topel, 3 (2) GCP Magazine (March 2008).

"Exclusive Dealing Intensifies Competition for Distribution," with Benjamin Klein, 75 Antitrust Law Journal (October 2008).

"Fertility Decline, the Baby Boom and Economic Growth," with Curtis Simon and Robert Tamura, 2 The Journal of Human Capital 3 (Fall 2008).

"The Market for College Graduates and the Worldwide Boom in Higher Education of Women," with Gary S. Becker and William H. J. Hubbard, 100 American Economic Review: Papers & Proceedings 229 (May 2010).

"Explaining the Worldwide Boom in Higher Education of Women," with Gary S. Becker and William H. J. Hubbard," 4 Journal of Human Capital No. 3 (2010).

"How Exclusivity is Used to Intensify Competition for Distribution-Reply to Zenger," with Benjamin Klein, 77 Antitrust Law Journal No. 2 (2011).

"Achieving Maximum Long-Run Growth," *Federal Reserve Bank of Kansas City Proceedings of the Annual Jackson Hole Conference 2011.*

"On the Economics of Climate Policy," with Gary. S. Becker and Robert. H. Topel, 10 *B.E. Journal of Economic Analysis and Policy* No. 2 (2011).

"Measuring Crack Cocaine and its Impact," with Roland G. Fryer, Jr., Paul S. Heaton, and Steven D. Levitt, 51 *Economic Inquiry* No. 3 (July 2013).

"Some Basic Economics of National Security," with Robert H. Topel, 103 *American Economic Review* No. 3 (2013).

"Activating *Actavis*: A More Complete Story," with Barry C. Harris, Robert D. Willig, and Matthew B. Wright, 28 *Antitrust* No. 2 (Spring 2014).

"Competitive Discounts and Antitrust Policy," with Edward A. Snyder and Robert H. Topel, Chapter 5 of *The Oxford Handbook of International Antitrust Economics*, Volume 2 (2014).

"Gary Becker as Teacher," 105 *American Economic Review* No. 5 (2015).

"Black and White Fertility, Differential Baby Booms: The Value of Equal Education Opportunity," with Robert Tamura and Curtis Simon, 82 *Journal of Demographic Economics*, Issue 1 (2016).

"Human Capital Investment, Inequality, and Economic Growth," with Robert H. Topel, 34 *Journal of Labor Economics,* No. S2/Part 2 (2016).

"A Theory of Intergenerational Mobility," with Gary S. Becker, Scott Duke Kominers, and Jörg L. Spenkuch, *Journal of Political Economy 126*, no. S1 (October 2018): S7-S25.

"Gary Becker Remembered," with James J. Heckman and Edward P. Lazear, J*ournal of Political Economy 126*, no. S1 (October 2018): S1-S6.

Sample of "The Power of the Economic Approach: Unpublished Manuscripts of Gary S. Becker," Edited by Julio J. Elías, Casey B. Mulligan, and Kevin M. Murphy, University of Chicago Press (Forthcoming). Journal of Human Capital 2019 13:2, 140-141.

## Selected Working Papers

"Gauging the Economic Impact of September 11th," with Gary S. Becker, Unpublished Working Paper (October 2001).

"War In Iraq Versus Containment: Weighing the Costs," with Steven J. Davis and Robert H. Topel, NBER Working Paper No.12092 (March 2006).

"The Interaction of Growth in Population and Income," with Gary S. Becker, Unpublished Working Paper (2006).

"Persuasion and Indoctrination," with Gary Becker (2007).

"The Value of Life Near Its End and Terminal Care," with Gary S. Becker and Tomas Philipson (2007).

"On the Economics of Climate Policy," with Gary S. Becker and Robert H. Topel, Working Paper No. 234 (January 2010, Revised September 2010).

"The Manipulation of Children's Preferences, Old Age Support, and Investment in Children's Human Capital," with Gary S. Becker and Jörg L. Spenkuch, Unpublished Working Paper (February 2012).

"The Collective Licensing of Music Performance Rights: Market Power, Competition and Direct Licensing" (March 2013).

"Activating *Actavis* with A More Complete Model," with Michael G. Baumann, John P. Bigelow, Barry C. Harris, Janusz A. Ordover, Robert D. Willig, and Matthew B. Wright, (January 2014).

"A Theory of Bundling Advertisements in Media Markets," with Ignacio Palacios-Huerta, NBER Working Paper No. 229994 (December 2016).

## Selected Comments

Comment on "Causes of Changing Earnings Equality" by Robert Z. Lawrence. Federal Reserve Bank of Kansas City (1998).

"Comment: Asking the Right Questions in the Medicare Reform Debate," Medicare Reform: Issues and Answers, pp. 175-81, ed. Andrew J. Rettenmaier and Thomas R. Saving. Chicago: The University of Chicago Press (2000).

Comment on "Social Security and Demographic Uncertainty" by Henning Bohn, in Risk Aspects of Investment-Based Social Security Reform, ed. John Y. Campbell and Martin Feldstein. Chicago: The University of Chicago Press (2001).

Comment on "High Technology Industries and Market Structure" by Hal R. Varian. Federal Reserve Bank of Kansas City (2001).

## Popular Press Articles

"The Education Gap Rap," *The American Enterprise* (March-April 1990), pp. 62.

"Rethinking Antitrust," with Gary S. Becker, *Wall Street Journal* (February 26, 2001), A22.

"Prosperity Will Rise Out of the Ashes," with Gary S. Becker, *Wall Street Journal* (October 29, 2001), A22.

"The Economics of NFL Team Ownership," with Robert H. Topel, report prepared at the request of the National Football League Players' Association (January 2009).

## Articles About Murphy

"Higher Learning Clearly Means Higher Earning," by Carol Kleiman. *Chicago Tribune*, March 12, 1989, Jobs Section pp. 1.  Long article about "The Structure of Wages" with picture of Murphy.

"Why the Middle Class Is Anxious," by Louis S. Richman. *Fortune*, May 21, 1990, pp. 106. Extensive reference to Murphy's work on returns to education.

"Unequal Pay Widespread in U.S.," by Louis Uchitelle, *New York Times,* August 14, 1990, Business Day section pp. 1. Long piece on income inequality.

"One Study's Rags to Riches Is Another's Rut of Poverty," by Sylvia Nasar, *New York Times*, June 17, 1992, Business Section pp. 1. Long piece on the income inequality research.

"Nobels Pile Up for Chicago, but Is the Glory Gone?" by Sylvia Nasar, *New York Times* November 4, 1993, Business Section pp. 1. Long piece on Chicago School of economics. Featured a photo of five of the "brightest stars on the economics faculty" (including Murphy) and a paragraph about Murphy's research.

"This Sin Tax is Win-Win," by Christopher Farrell. *Business Week*, April 11, 1994, pp. 30. Commentary section refers to Murphy, Becker, and Grossman's work on rational addiction.

"Growing inequality and the economics of fragmentation," by David Warsh, *Boston Sunday Globe*, August 21, 1994, pp. A1. Two-page article with picture and biographical details about Murphy and his research; part of a series about "how the new generation replaced the old in economics."

"A Pay Raise's Impact," by Louis Uchitelle. *New York Times*, January 12, 1995, Business Section pp. 1. Article about consequences of proposed increase in the minimum wage. Articles featuring Murphy's comments on the minimum wage appeared in numerous

- 10 -

other publications, including the *Chicago Tribune*; in addition, Murphy was interviewed on CNN (January 26, 1995).

"The Undereducated American," *Wall Street Journal*, August 19, 1996, A12. Changes in the rate of returns to education.

"In Honor of Kevin M. Murphy: Winner of the John Bates Clark Medal," by Finis Welch, 14 *Journal of Economic Perspectives* 193 (2000).

## Testimony, Reports, and Depositions (Last 4 Years)

Expert Report of Kevin M. Murphy, February 23, 2017, in the Matter of 1-800 Contacts, Inc., Before the Federal Trade Commission, Office of Administrative Law Judges, United States of America. Docket No. 9372.

Expert Report of Kevin M. Murphy, March 1, 2017, in the Matter of Gene R. Romero, et al. v. Allstate Insurance, et al., The United States District Court for the Eastern District of Pennsylvania. Case No. 01-3894 (consolidated with other matters) (E.D. Pa.).

Deposition of Kevin M. Murphy, March 16, 2017, in the Matter of 1-800 Contacts, Inc., Before the Federal Trade Commission, Office of Administrative Law Judges, United States of America. Docket No. 9372.

Deposition of Kevin M. Murphy, March 27, 2017, in the Matter of Gene R. Romero, et al. v. Allstate Insurance, et al., The United States District Court for the Eastern District of Pennsylvania. Case No. 01-3894 (consolidated with other matters) (E.D. Pa.).

Supplemental Expert Report of Kevin M. Murphy, April 3, 2017, in the Matter of Parallel Networks Licensing, LLC v. Microsoft Corporation, The United States District Court for the District of Delaware. Case No. 13-2073-SLR.

Expert Report of Kevin M. Murphy, April 3, 2017, in the Matter of Optical Disc Drive Products Litigation (Acer America Corp., et al. v. Lite-On Corporation, et al.), The United States District Court for the Northern District of California, San Francisco Division. No. 3:10-md-2143, RS 5:13-cv-04991.

Expert Report of Kevin M. Murphy, April 3, 2017, in the Matter of Optical Disc Drive Products Litigation (Dell Inc. and Dell Products L.P., v. Hitachi, Ltd., et al.), The United States District Court for the Northern District of California, San Francisco Division. No. 3:10-md-2143 RS.

Expert Report of Kevin M. Murphy, April 3, 2017, in the Matter of Optical Disc Drive Products Litigation (Hewlett-Packard Company v. Toshiba Corporation, et al.), The United States District Court for the Northern District of California, San Francisco Division. MDL No. 2143, No. 3:13-cv-05370 RS.

Expert Report of Kevin M. Murphy, April 3, 2017, in the Matter of Optical Disc Drive Products Litigation (Ingram Micro Inc., et al. v. LG Electronics, Inc., et al.), The United States District Court for the Northern District of California, San Francisco Division. No. 3:10-md-2143 RS.

Expert Report of Kevin M. Murphy, April 3, 2017, in the Matter of Optical Disc Drive Products Litigation (All Indirect Purchaser Actions), The United States District Court for the Northern District of California, San Francisco Division. No. 3:10-md-2143 RS.

Expert Report of Kevin M. Murphy, April 3, 2017, in the Matter of Optical Disc Drive Products Litigation (Alfred H. Siegel v. Sony Corporation, et al. and Peter Kravitz v. Sony Corporation, et al.), The United States District Court for the Northern District of California, San Francisco Division. No. 3:10-md-2143 RS.

Deposition of Kevin M. Murphy, April 30, 2017 and May 1, 2017, in the Matter of Optical Disc Drive Products Litigation, The United States District Court for the Northern District of California, San Francisco Division. No. 3:10-md-2143 RS.

Trial Testimony of Kevin M. Murphy, May 10, 2017 and May 11, 2017, in the Matter of 1-800 Contacts, Inc., Before the Federal Trade Commission, Office of Administrative Law Judges, United States of America. Docket No. 9372.

Expert Report of Kevin M. Murphy, July 3, 2017, in the Matter of Blue Cross Blue Shield Antitrust Litigation (MDL No.: 2406), The United States District Court for the Northern District of Alabama Southern Division. Master File No. 2:13-CV-20000-RDP.

Deposition of Kevin M. Murphy, July 22, 2017, in the Matter of Blue Cross Blue Shield Antitrust Litigation (MDL No.: 2406), The United States District Court for the Northern District of Alabama Southern Division. Master File No. 2:13-CV-20000-RDP.

Expert Report of Kevin M. Murphy, August 25, 2017, in the Matter of Gene R. Romero, et al. v. Allstate Insurance, et al., The United States District Court for the Eastern District of Pennsylvania. Case No. 01-3894 (consolidated with other matters) (E.D. Pa.).

Expert Rebuttal Report of Kevin M. Murphy, September 18, 2017, in the Matter of Gene R. Romero, et al. v. Allstate Insurance, et al., The United States District Court for the Eastern District of Pennsylvania. Case No. 01-3894 (consolidated with other matters) (E.D. Pa.).

Expert Report of Kevin M. Murphy, November 3, 2017, in the Matter of Valassis Communications, Inc. v. News Corporation, News America Marketing, a/k/a News America Incorporated, a/k/a News America Marketing Group, a/k/a News America Marketing FSI L.L.C., a/k/a News America Marketing FSI, Inc.; and News America Marketing In-Store Services L.L.C., a/k/a News America Marketing In-Store Services, Inc., The United States District Court for the Southern District of New York. Case No. 1:17-cv-07378-PKC.

Deposition of Kevin M. Murphy, January 17, 2018, in the Matter of Valassis Communications, Inc. v. News Corporation, News America Marketing, a/k/a News America Incorporated, a/k/a News America Marketing Group, a/k/a News America Marketing FSI L.L.C., a/k/a News America Marketing FSI, Inc.; and News America Marketing In-Store Services L.L.C., a/k/a News America Marketing In-Store Services, Inc., The United States District Court for the Southern District of New York. Case No. 1:17-cv-07378-PKC.

Verified Statement of Kevin M. Murphy, January 19, 2018, In Re Biogen '755 Patent Litigation, The United States District Court for the District of New Jersey. Civil Action No. 10-2734 (CCC/JAD).

Trial Testimony of Kevin M. Murphy, February 1, 2018, In Re Biogen '755 Patent Litigation, The United States District Court for the District of New Jersey. Civil Action No. 10-cv-2734 (CCC/JBC).

Expert Report and Testimony of Kevin M. Murphy, February 28, 2018 in the Matter of Washington Metropolitan Area Transit Authority and Amalgamated Transit Union Local 689, Interest Arbitration Under Sections 66(C) Of the WMATA Compact, The United States District Court for the District of Columbia.

Expert Report of Kevin M. Murphy, June 29, 2018, in the Matter of Gene R. Romero, et al. v. Allstate Insurance, et al., The United States District Court for the Eastern District of Pennsylvania. Case No. 01-3894 (consolidated with other matters) (E.D. Pa.).

Expert Report of Kevin M. Murphy, July 30, 2018, in the Matter of Daniel Gordon, et al. v. Amadeus IT Group, S.A. et al.  The United States District Court for the Southern District of New York. Civ. A. No. 1:15-cv-05457-KPF.

Declaration of Kevin M. Murphy, August 16, 2018, in the Matter of Genentech, Inc., Biogen, Inc., Hoffmann-La Roche Inc., and City of Hope v. Celltrion, Inc., Celltrion Healthcare Co., Ltd., Teva Pharmaceuticals USA, Inc., and Teva Pharmaceuticals International GmbH, The United States District Court for the District of New Jersey. Civ. A. No. 18-cv-00574 (RMB) (KMW).

Expert Report of Kevin M. Murphy, September 21, 2018, in the Matter of Certain Memory Modules and Components Thereof, International Trade Commission, Washington, DC 20436.  No. 337-TA-1089.

Reply Declaration of Kevin M. Murphy, September 26, 2018, in the Matter of Genentech, Inc., Biogen, Inc., Hoffmann-La Roche Inc., and City of Hope v. Celltrion, Inc., Celltrion Healthcare Co., Ltd., Teva Pharmaceuticals USA, Inc., and Teva Pharmaceuticals International GmbH, The United States District Court for the District of New Jersey.  Civ. A. No. 18-cv-00574 (RMB) (KMW).

Expert Rebuttal Report of Kevin M. Murphy, October 9, 2018, in the Matter of Certain Memory Modules and Components Thereof, International Trade Commission, Washington, DC 20436.  No. 337-TA-1089.

- 13 -

Deposition of Kevin M. Murphy, October 29, 2018, in the Matter of Certain Memory Modules and Components Thereof, International Trade Commission, Washington, DC 20436.  No. 337-TA-1089.

Confidential Submission to the U.S. Department of Justice, Economic Considerations for Modification and Termination of the ASCAP Consent Decree, October 30, 2018.

Expert Report of Kevin M. Murphy, March 1, 2019, in the Matter of First Impressions Salon, Inc., Roy Mattson, KPH Healthcare Services, Inc., d/b/a Kinney Drugs, Inc. and Piggly Wiggly Midwest, LLC. v. National Milk Producers Federation, Cooperatives Working Together, Dairy Farmers of America, Inc., Land O'Lakes, Inc., Dairylea Cooperative Inc., Agri-Mark, Inc. d/b/a Cabot Creamery Cooperative, Inc., The United States District Court for the Southern District of Illinois. Case No. 3:13-cv-00454-SCW.

Expert Report of Kevin M. Murphy, March 15, 2019, in the Matter of Robert Binz V, Michael Binz, Leslie Clemenson, William Clynes, Andrew Margolick, Gregory Melita, and Nili Sinai-Nathan v. Amadeus IT Group, S.A., Amadeus North America, Inc., Amadeus Americas, Inc., Sabre Corporation f/k/a Holdings Corporation, Sabre Holdings Corporation, Sabre GLBL Inc., Sabre Travel International Limited, Travelport Worldwide Limited, and Travelport LP d/b/a Travelport, The United States District Court for the Southern District of New York.  Civ A. No. 1:15-cv-05457-KPF.

Verified Statement of Kevin M. Murphy, April 25, 2019, On Behalf of Union Pacific Railroad Company in NAFCA vs. Union Pacific Railroad Company, Before the Surface Transportation Board. STB Docket No. NOR 42144.

Deposition of Kevin M. Murphy, May 9, 2019, in the Matter of Robert Binz V, Michael Binz, Leslie Clemenson, William Clynes, Andrew Margolick, Gregory Melita, and Nili Sinai-Nathan v. Amadeus IT Group, S.A., Amadeus North America, Inc., Amadeus Americas, Inc., Sabre Corporation f/k/a Holdings Corporation, Sabre Holdings Corporation, Sabre GLBL Inc., Sabre Travel International Limited, Travelport Worldwide Limited, and Travelport LP d/b/a Travelport, The United States District Court for the Southern District of New York.  Civ A. No. 1:15-cv-05457-KPF.

Expert Report of Kevin M. Murphy, May 10, 2019, in the Matter of National Prescription Opiate Litigation (MDL No. 2804), The United States District Court for the Northern District of Ohio Eastern Division. Case No. 17-op-5004 and Case No. 18-op-45090. (Corrected and Restated Expert Report filed June 21, 2019).

Expert Report of Kevin M. Murphy, May 10, 2019, In Re Packaged Seafood Products Antitrust Litigation (Associated Wholesale Grocers, Inc. v. Bumble Bee Foods, LLC et al.), In the United States District Court of the Southern District of California. No. 15-md-2670.

Expert Report of Kevin M. Murphy, May 10, 2019, In Re Packaged Seafood Products Antitrust Litigation (W. Lee Flowers & Co., Inc. v. Bumble Bee Foods LLC, et al.), In the United States District Court of the Southern District of California. No. 15-md-2670.

- 14 -

Expert Report of Kevin M. Murphy, May 10, 2019, In Re Packaged Seafood Products Antitrust Litigation (Winn-Dixie Stores, Inc. and Bi-Lo Holding, LLC. v. Bumble Bee Foods, LLC et al.), In the United States District Court of the Southern District of California. No. 15-md-2670.

Expert Addendum Report of Kevin M. Murphy, May 24, 2019, In Re Packaged Seafood Products Antitrust Litigation (Affiliated Foods Midwest Cooperative, Inc. v. Bumble Bee Foods LLC, et al.), In the United States District Court of the Southern District of California. No. 15-md-2670.

Deposition of Kevin M. Murphy, June 6, 2019, in the Matter of National Prescription Opiate Litigation (MDL No. 2804), The United States District Court for the Northern District of Ohio Eastern Division. Case No. 17-op-5004 and Case No. 18-op-45090.

Expert Report of Kevin M. Murphy, June 10, 2019, In Re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, In the United States District Court for the Eastern District of New York. No. 05-md-1720 (MKB) (JO).

Deposition of Kevin M. Murphy, June 25, 2019, In Re Packaged Seafood Products Antitrust Litigation, In the United States District Court of the Southern District of California. No. 15-md-2670.

Expert Report of Kevin M. Murphy, July 15, 2019, in the Matter of Blue Cross Blue Shield Antitrust Litigation (MDL No.: 2406), The United States District Court for the Northern District of Alabama Southern Division. Master File No. 2:13-CV-20000-RDP.

Submission to the U.S. Department of Justice, Economic Considerations for Modification and Termination of the ASCAP Consent Decree, August 9, 2019.

Expert Report of Kevin M. Murphy, November 15, 2019, In Re Dealer Management Systems Antitrust Litigation, MDL 2817, The United States District Court for the Northern District of Illinois Eastern Division. No. 1:18-CV-00864. (Corrected and Restated Expert Report filed January 15, 2020).

Expert Report of Kevin M. Murphy, December 6, 2019, in the Matter of North American Soccer League, LLC v. United States Soccer Federation, Inc., and Major League Soccer, LLC, In the United States District Court for The Eastern District of New York.  No. 1:17-cv-05495-MKB-ST.

Expert Report of Kevin M. Murphy, December 20, 2019, in the Matter of The United States of America v. Sabre Corporation, Sabre GLBL Inc., Farelogix, Inc., and Sandler Capital Partners V, L.P., In the United States District Court for The District of Delaware. No: 1:19-cv-01548-LPS.

Expert Rebuttal Report of Kevin M. Murphy, January 3, 2020, in the Matter of The United States of America v. Sabre Corporation, Sabre GLBL Inc., Farelogix, Inc., and Sandler Capital Partners V, L.P., In the United States District Court for The District of Delaware. No: 1:19-cv-01548-LPS.

Expert Rebuttal Report of Kevin M. Murphy, January 10, 2020, in the Matter of The United States of America v. Novelis Inc. and Aleris Corporation, In the United States District Court for the Northern District of Ohio. No.: 1:19-cv-02033-CAB.

Expert Reply Report of Kevin M. Murphy, January 15, 2020, in the Matter of The United States of America v. Sabre Corporation, Sabre GLBL Inc., Farelogix, Inc., and Sandler Capital Partners V, L.P., In the United States District Court for The District of Delaware. No: 1:19-cv-01548-LPS.

Deposition of Kevin M. Murphy, January 18, 2020, in the Matter of The United States of America v. Sabre Corporation, Sabre GLBL Inc., Farelogix, Inc., and Sandler Capital Partners V, L.P., In the United States District Court for The District of Delaware. No: 1:19-cv-01548-LPS.

Deposition of Kevin M. Murphy, January 21, 2020, and January 22, 2020, In Re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, In the United States District Court for the Eastern District of New York. No. 05-md-1720 (MKB) (JO).

Deposition of Kevin M. Murphy, January 24, 2020, In Re Dealer Management Systems Antitrust Litigation, MDL 2817, The United States District Court for the Northern District of Illinois Eastern Division. No. 1:18-CV-00864.

Deposition of Kevin M. Murphy, January 27, 2020, in the Matter of The United States of America v. Novelis Inc. and Aleris Corporation, In the United States District Court for the Northern District of Ohio. No.: 1:19-cv-02033-CAB.

Expert Report of Kevin M. Murphy, February 3, 2020, In Re Opioid Litigation, In the Supreme Court of the State of New York County of Suffolk.  Index No.:400001/2017, Index No.: 400008/2017, and Index No.: 400016/2018.

Trial Testimony of Kevin M. Murphy, February 3, 2020, in the Matter of The United States of America v. Sabre Corporation, Sabre GLBL Inc., Farelogix, Inc., and Sandler Capital Partners V, L.P., In the United States District Court for The District of Delaware. No: 1:19-cv-01548-LPS.

Deposition of Kevin M. Murphy, February 13, 2020, in the Matter of North American Soccer League, LLC v. United States Soccer Federation, Inc., and Major League Soccer, LLC, In the United States District Court for The Eastern District of New York.  No. 1:17-cv-05495-MKB-ST.

Deposition of Kevin M. Murphy, February 19, 2020, In Re Opioid Litigation, In the Supreme Court of the State of New York County of Suffolk.  Index No.:400001/2017, Index No.: 400008/2017, and Index No.: 400016/2018.

Arbitration Testimony of Kevin M. Murphy, February 25, 2020, in the Matter of The United States of America v. Novelis Inc. and Aleris Corporation, In the United States District Court for the Northern District of Ohio. No.: 1:19-cv-02033-CAB.

- 16 -

Expert Report of Kevin M. Murphy, May 30, 2020, in the Matter of an Independent Review Process, Afilias Domains No. 3 Limited v. Internet Corporation for Assigned Names and Numbers, before The International Centre for Dispute Resolution.

Expert Report of Kevin M. Murphy, July 24, 2020, in the Matter of The State of Ohio v. McKesson Corporation, Cardinal Health, Inc., AmerisourceBergen Drug Corporation, and Miami-Luken, Inc., In the Court of Common Pleas for Madison County, Ohio. Case No. CVH20180055.

Expert Report of Kevin M. Murphy, August 27, 2020, in the Matters of The City of Huntington v. AmerisourceBergen Drug Corporation, et al., and Cabell County Commission v. AmerisourceBergen Drug Corporation, et al., In the United States District Court for the Southern District of West Virginia.  Civil Action Nos. 3:17-01362 and 3:17-01665.

Verified Statement of Professor Kevin M. Murphy and Professor Mark E. Zmijewski, September 1, 2020, Joint Petition for Rulemaking to Modernize Annual Revenue Adequacy Determinations on Behalf of Canadian National Railway, Norfolk Southern Railway and Union Pacific Railroad Company, Before the Surface Transportation Board. STB Ex Parte 766.

Deposition of Kevin M. Murphy, September 15, 2020, in the Matters of The City of Huntington v. AmerisourceBergen Drug Corporation, et al., and Cabell County Commission v. AmerisourceBergen Drug Corporation, et al., In the United States District Court for the Southern District of West Virginia.  Civil Action Nos. 3:17-01362 and 3:17-01665.

Expert Report of Kevin M. Murphy, September 18, 2020, in the Matter of Axon Enterprises, Inc., a corporation, In the United States of America Before the Federal Trade Commission Office of Administrative Law Judges.  Docket No. 9389.

Deposition of Kevin M. Murphy, October 2, 2020, in the Matter of Axon Enterprises, Inc., a corporation, In the United States of America Before the Federal Trade Commission Office of Administrative Law Judges.  Docket No. 9389.

Expert Report of Kevin M. Murphy, October 5, 2020, In Re Peanut Farmers Antitrust Litigation, In the United States District Court for the Eastern District of Virginia Norfolk Division, No. 2:19-cv-00463-RAJ-LRL.

Supplemental Verified Statement of Professor Kevin M. Murphy and Professor Mark E. Zmijewski, October 13, 2020, Joint Petition for Rulemaking to Modernize Annual Revenue Adequacy Determinations on Behalf of Canadian National Railway, Norfolk Southern Railway and Union Pacific Railroad Company, Before the Surface Transportation Board. STB Ex Parte 766.

Deposition of Kevin M. Murphy, October 16, 2020, In Re Peanut Farmers Antitrust Litigation, In the United States District Court for the Eastern District of Virginia Norfolk Division, No. 2:19-cv-00463-RAJ-LRL.

- 17 -

Verified Statement of Professor Kevin M. Murphy and Professor Mark E. Zmijewski, October 21, 2020, Joint Petition for Rulemaking to Modernize Annual Revenue Adequacy Determinations on Behalf of Canadian National Railway, Norfolk Southern Railway and Union Pacific Railroad Company, Before the Surface Transportation Board. STB Ex Parte 766.

Deposition of Kevin M. Murphy, November 9, 2020, in the Matter of Blue Cross Blue Shield Antitrust Litigation (MDL No.: 2406), The United States District Court for the Northern District of Alabama Southern Division. Master File No. 2:13-CV-20000-RDP.

Expert Report of Kevin M. Murphy, December 7, 2020, In Re Keurig Green Mountain Single Serve Coffee Antitrust Litigation, In the United States District Court for the Southern District of New York. Case No. 1:14-md-02542.

Expert Report of Kevin M. Murphy, January 11, 2021, in the Matter of The United States of America and Tobacco-Free Kids Action Fund, et al. v. Philip Morris USA Inc., et al. and ITG Brands, LLC, et al., The United States District Court for the District of Columbia. Civil Action No. 99-CV-2496 (PLF).

Declaration of Kevin M. Murphy, January 19, 2021, In Re Blue Cross Blue Shield Antitrust Litigation, In the United States District Court for the Northern District of Alabama Southern Division. Master File No. 2:13-CV-20000-RDP.

Expert Report of Kevin M. Murphy, January 20, 2021, In Re Pre-Filled Propane Tank Antitrust Litigation, in The United States District Court for the Western District of Missouri Western Division. MDL No. 2567, Case No. 14-MD-02567.

Deposition of Kevin M. Murphy, March 1, 2021, in the Matter of The United States of America and Tobacco-Free Kids Action Fund, et al. v. Philip Morris USA Inc., et al. and ITG Brands, LLC, et al., The United States District Court for the District of Columbia. Civil Action No. 99-CV-2496 (PLF).

Deposition of Kevin M. Murphy, March 10, 2021, In Re Pre-Filled Propane Tank Antitrust Litigation, in The United States District Court for the Western District of Missouri Western Division. MDL No. 2567, Case No. 14-MD-02567.

# Appendix B

CONFIDENTIAL – FTC Docket No. 9393

**Appendix B—Materials Relied Upon**

Administrative Complaint, In the Matter of Altria Group, Inc., and JUUL Labs, Inc., 9393, April 1, 2020

Expert Report of Dr. Dov Rothman, Ph.D., February 15, 2021

RESPONSE OF JUUL LABS, INC. TO SPECIFICATION 10 OF THE REQUEST FOR ADDITIONAL INFORMATION AND DOCUMENTARY MATERIALS

RESPONSE OF JUUL LABS, INC. TO SPECIFICATION 11(a)-(b) OF THE REQUEST FOR ADDITIONAL INFORMATION AND DOCUMENTARY MATERIALS

RESPONSE OF JUUL LABS, INC. TO SPECIFICATION 16 OF THE REQUEST FOR ADDITIONAL INFORMATION AND DOCUMENTARY MATERIALS

RESPONSE OF JUUL LABS, INC. TO SPECIFICATION 17 OF THE REQUEST FOR ADDITIONAL INFORMATION AND DOCUMENTARY MATERIALS

RESPONSE OF JUUL LABS, INC. TO SPECIFICATION 9 OF THE REQUEST FOR ADDITIONAL INFORMATION AND DOCUMENTARY MATERIALS

Response to Request for Additional Information and Documentary Materials issued to Altria Group, Inc., No. 20190791

U.S. Department of Justice and Federal Trade Commission, Horizontal Merger Guidelines, August 19, 2010

**Exhibits**

ALGFTC0000283725
ALGFTC0001186661
ALGFTC0001278052
ALGFTC0001310098
ALGFTC0001310100
ALGFTC0001978510
ALGFTC0004993001
ALGFTC0005654012
ALGFTC0006010066
ALGFTC0006010359
ALGFTC0006010368
ALGFTC0006010447
ALGFTC0007462279
FTCJUUL000005545
FTCJUUL000007760
FTCJUUL000007762
FTCVOL000073
Huckabee Ex. 18
ITG00000475
JLIFTC00056103
JLIFTC00089810
JLIFTC00118122
JLIFTC00287923
JLIFTC00299391
JLIFTC00414625

CONFIDENTIAL – FTC Docket No. 9393

JLIFTC00556824
JLIFTC00636393
JLIFTC01091866
JLIFTC01510868
JLIFTC01550902
JLIFTC01784629
JLIFTC01930035
JLIFTC01987693
JLIFTC02049837
JLIFTC02050077
JLIFTC02051595
JLIFTC02056752
JLIFTC02060582
JLIFTC02068540
JLIFTC02069258
JLIFTC02195922
JLIFTC02196743
JLIFTC02276902
JLIFTC02312224
JLIFTC20000055
JLIFTC20000058
PX0018
PX1127
PX1143
PX1229
PX1289
PX1424
PX1644
PX1647
PX4012
PX4029
PX7000
PX7002
PX7003
PX7004
PX7005
PX7007
PX7010
PX7012
PX7013
PX7014
PX7017
PX7019
PX7023
PX7024
PX7026
PX7030
PX7036
PX7037

CONFIDENTIAL – FTC Docket No. 9393

PX7041
PX7042
PX8000
PX8004
PX8007
PX8008
PX8011
PX9016

## Public Documents

Amil Petrin, "Quantifying the Benefits of New Products: The Case of the Minivan," Journal of Political Economy 110 (4), 2002.

Curtis Taylor, "Digging for Golden Carrots: An Analysis of Research Tournaments," American Economic Review, 85(4), September 1995.

Daniel A. Ackerberg, and Marc Rysman, Unobserved product differentiation in discrete choice models: Estimating price elasticities and welfare effects, RAND Journal of Economics, Vol. 36, No. 4 (Winter, 2005).

Dennis W. Carlton, "Market Definition: Use and Abuse," Competition Policy International 3(1) Spring 2007.

Franklin M. Fisher, "Market Definition: a User's Guide," Workshop on Market Definition: Compilation of Papers, Finnish Competition Authority, ed., Helsinki, 2002.

Gregory J. Werden, "The 1982 Merger Guidelines and the Ascent of the Hypothetical Monopolist Paradigm," Antitrust L. Journal 71(1), 2003.

Gregory J. Werden, "Demand Elasticities in Antitrust Analysis," Antitrust L. J. 66 (2), 1998.

Gregory J. Werden, "A Daubert Discipline for Merger Simulation," Antitrust, Summer 2004: 89-95.

Jerry A. Hausman Valuation of new goods under perfect and imperfect competition, In The Economics of New Goods, University of Chicago Press. 1996.

Phillip Nelson, "Information and Consumer Behavior," Journal of Political Economy, 78(2), 1970: 311-29.

## Data

CONFIDENTIAL Exhibit 11.3 - Spec 11(a) to (d).xlsx (Altria financial data).
CONFIDENTIAL Exhibit 11.5 - 11(d) to (k) 12(a) to (c).xlsx (Altria financial data).
Altria Projected IRI data.
ITG_00004563.xlsx (ITG financial data).
JLI Exhibit 11.1.xlsx (JLI financial data)
JLI Exhibit 11.5 (revised Sept 4 2019).xlsx (JLI financial data).
JLI Exhibit 11.7.xlsx (JLI financial data).
JTI-000672.xlsx (JTI financial data).
2015 Returns Detail.XLSX
2016 Returns Detail.XLSX
2017 Returns Detail.XLSX
2018 Returns Detail.XLSX
2019 NuMark Returns.XLSX
2020 Returns Detail.XLSX
RJV 2016 to 2019 YTB PL 11-07-19.xlsm (Reynolds financial data).

CONFIDENTIAL – FTC Docket No. 9393

Sheetz transaction data.
STARS data.

# Appendix C

CONFIDENTIAL – FTC Docket No. 9393

### Appendix C – Logit Simulation Modeling

This Appendix describes the Antitrust Logit Model (ALM) that Dr. Rothman uses "to estimate the loss of consumer surplus from Altria's exit."[1]  I first present the model in general terms and then describe the various simulation "runs" I discuss in the body of my report.

**The Logit Model**

The logit model is based on a random utility framework.  Each consumer chooses between $N + 1$ products, including $N$ inside products and one "outside good", which is referred to as product 0.[2]  The utility of consumer $i$ from choosing product $j$ is:

$$U_{ji} = \delta_j - \alpha \times p_j + \epsilon_{ji} \qquad (A1)$$

Where:

$\delta_j$= Product $j$'s "fixed effect" (reflecting the intrinsic quality or attractiveness of product $j$, common across all consumers).

$\alpha$ = Price coefficient.

$p_j$= Product $j$'s price.

$\epsilon_{ji}$= Consumer specific utility random shock, assumed to be independently and identically distributed according to a type I extreme value (Gumbel) distribution.[3]

The fixed effect of the outside good is normalized to zero: $\delta_j = 0$.[4]

---

[1] Rothman Report, ¶12.

[2] The outside good reflects the choice not to buy any of the inside goods (for example, buying tobacco cigarettes instead).

[3] See Kenneth Train, Discrete Choice Methods with Simulation, Published by Cambridge University Press, Chapter 3 available at https://eml.berkeley.edu/choice2/ch3.pdf.

[4] This is a normalization that is done without loss of generality, as adding a constant to all options (including the outside good) does not change the consumer's choices.

CONFIDENTIAL – FTC Docket No. 9393

It follows from the above assumptions that the market share of product $j$ is given by the following expression:

$$s_j = \frac{e^{\delta_j - \alpha \times p_j}}{1 + \sum_{h=1}^{N} e^{\delta_h - \alpha \times p_h}} \qquad (A2)$$

The share of the outside good is:

$$s_0 = \frac{1}{1 + \sum_{h=1}^{N} e^{\delta_h - \alpha \times p_h}} \qquad (A3)$$

It is important to note that the logit shares, $s_j$, are not the shares "among inside goods" that can be calculated using quantity sales. They represent shares of the entire "potential" market, including individuals who made the decision not to buy any electronic cigarettes. Let $s_j^{in}$ represent the share of product $j$ among inside goods (i.e., $s_j^{in} = \frac{q_j}{\sum_{h=1}^{N} q_h}$); then, $s_j = s_j^{in} \times (1 - s_0)$.

Following Dr. Rothman's approach, I assume firms maximize their static profits. As discussed in the Appendix of Dr. Rothman Report's, each producer's optimal price is characterized by its first-order condition (FOC):[5]

$$s_i + (p_i - c_i) \times \frac{\partial s_i}{\partial p_i} = 0 \quad (A4)$$

**Model Calibration**

A logit model can be calibrated in different ways. I follow the same main steps that Dr. Rothman used in his analysis.

I focus on the scenario where Altria would have maintained its share absent the transaction (the 10 percent share scenario).

The calibration uses the following inputs:

1.  Aggregate elasticity; I follow Dr. Rothman in assuming an elasticity of -1.3.
2.  Prices.

---

[5] The formula assumes that all firms sell a single product. A similar formula applies if firms sell multiple products.

CONFIDENTIAL – FTC Docket No. 9393

3. Quantities.

4. Margins.

I follow Dr. Rothman in using data from October 2017-September 2018 period.

I use Dr. Rothman's two-step algorithm to calibrate $s_0$ and $\alpha$:

1. Given a value for $\alpha$, I solve for the value of $s_0$ such that the aggregate elasticity of demand for the inside goods, $E(\alpha, s_0)$, is equal to the elasticity of demand for closed-system e-cigarettes:

$$E(\alpha, s_0) = -\alpha \times \bar{P} \times s_0 = -1.3 \qquad (A5)$$

where $\bar{P}$ is the share-weighted average price across all products.

2. For a given value of $s_0$, I solve for the value of $\alpha$ that minimizes the sum of the squared first-order conditions:

$$\Omega(\alpha, s_0) = \sum_{\substack{i>0 \\ i \in F}} \left[ s_i + (p_i - c_i) \times \frac{\partial s_i}{\partial p_i} \right]^2 \qquad (A6)$$

Where $s_j = s_j^{in} \times (1 - s_0)$ and $F$ is a specific set of firms. In the baseline specification, $F$ is the set of firms for which the margin is positive, as in Dr. Rothman's analysis. In other specifications, as described below, $F$ consists only of JLI or only Altria.

The algorithm is repeated until $s0$ and $\alpha$ satisfy Equation (A5) and minimize Equation (A6).

Given the calibrated $\alpha$ and $s0$, the product fixed effects $\delta_j$ are derived using the demand relationship. Taking the ratio between (A2) and (A3):

$$\frac{s_j}{s_0} = e^{\delta_j - \alpha P_j} \rightarrow \delta_j = \ln\left(\frac{s_j}{s_0}\right) + \alpha P_j \qquad (A7)$$

C-3

CONFIDENTIAL – FTC Docket No. 9393

At calibrated values of $\alpha$ and $\delta_j$, the FOCs (A4) do not need to hold with equality.[6]  To address this issue, Dr. Rothman calculates calibrated costs which set the FOCs to zero, given actual prices and shares, and the calibrated $\alpha$:

$$c_j^c = p_j - \frac{s_j}{\alpha \times s_j \times (1 - s_j)} \qquad (A8)$$

These calibrated costs are used to predict the price effects from the Transaction.  As explained in the body of the report, Altria's percentage margin based on these calibrated costs (27%) grossly overstates Altria's actual margin (2.4%).

As an alternative assumption Dr. Rothman could have made, one could treat observed actual costs as given and calibrate prices.  In other words, one could calibrate prices that set the FOCs to zero, given actual costs and the calibrated $\alpha$ and $\delta_j$:

$$p_j^c = c_j + \frac{s_j(p^c)}{\alpha \times s_j(p^c) \times (1 - s_j(p^c))} \qquad (A9)$$

These calibrated prices are then used as pre-discontinuation prices in order to predict the hypothetical price effects from the Transaction.


**Simulating the Effect of Altria's Discontinuation of MarkTen Products**

For each counterfactual scenario, I model the effect of Altria's discontinuation of the MarkTen products by removing Altria from the consumer's choice set and allowing prices and shares to adjust such that the FOC for each remaining producer holds.

As Dr. Rothman does, I also consider the case of the Transaction without assuming that Altria's discontinuation of its e-cigarette products was connected to the Transaction.  In this case, the FOCs for all firms remain the same, except for Altria, for which the FOC becomes:

$$s_{Altria} + (p_{Altria} - c_{Altria}) \times \frac{\partial s_{Altria}}{\partial p_{Altria}} + 35\% \times (p_{JLI} - c_{JLI}) \times \frac{\partial s_{JLI}}{\partial p_{JLI}} = 0$$

---

[6] This is because there are $N$ first order conditions (one for each product) and it is not possible to calibrate a single price coefficient that exactly satisfies all of them.

CONFIDENTIAL – FTC Docket No. 9393

I use Dr. Rothman's approach to calculate per-unit consumer welfare changes. In particular, I measure the change in consumer surplus between two scenarios, 0 (e.g., the pre-discontinuation scenario) and 1 (e.g., the post-discontinuation scenario), as the difference between the expected consumer surplus under the two scenarios:

$$Change\ in\ Consumer\ Surplus = \frac{1}{\alpha}\left[ ln\left( \sum_{j=0}^{J^1} e^{V_j^1} \right) - ln\left( \sum_{j=0}^{J^0} e^{V_j^0} \right) \right]$$

Where $V_j^k = \delta_j - \alpha \times p_j^k$ and $p_j^k$ is the price of product $j$ in scenario $k$.

I then calculate the total change in consumer surplus per year from the transaction by multiplying the change in consumer surplus per unit by the total units of closed-system consumables shipped between October 2017 and September 2018.[7]

**Simulation Runs**

In this section, I briefly describe the simulation runs in Exhibit C.1.

*Row "Rothman Report".*

This row replicates Dr. Rothman's simulation, which is based on a model where all firms are single product and each product is an aggregate that includes both cig-a-like products and pod-based vaporizer products.

As discussed above, Dr. Rothman (i) uses all FOCs for firms that have a positive margin to calibrate the model, and (ii) ensures that the pre-discontinuation FOCs hold by calibrating each firm's costs (given actual prices and calibrated parameters).

*Row "Cig-a-Likes & Pod-Based Vaporizers, 2 Altria Products"*

---

[7] Generally, the per unit change in consumer welfare is translated into a total change by multiplying the per unit change by the total "market size", including the outside good. Here, I adopt Dr. Rothman's approach.

CONFIDENTIAL – FTC Docket No. 9393

This row is based on Altria's IRI and STARS data. Shares are marginally different from the shares used by Dr. Rothman. I use these data sources for all the other runs as well.

Altria is assumed to sell two products: an aggregate of all of its cig-a-like products and an aggregate of all its pod-based vaporizer products.  All other firms are assumed to sell a single product, which is an aggregate that includes both cig-a-like products and pod-based vaporizer products.

In this run, I use all FOCs for firms that have a positive margin to calibrate the model; I then ensure that the pre-discontinuation FOCs hold by calibrating each firm's costs (given actual prices and calibrated parameters).

*Row "Pod-Based Vaporizers Only"*

This run only uses sales of pod-based vaporizers. It is otherwise identical to the previous run.

*Row "Cig-a-Likes & Pod-Based Vaporizers, 1 Altria Product, Calibrate Price Coefficient Using Altria's Margin Only"*

All firms are assumed to sell a single product, which is an aggregate that includes both cig-a-like products and pod-based vaporizer products.

The price coefficient $\alpha$ and outside good share $s_0$ are calibrated to match the aggregate market elasticity and Altria's FOC. This is done by only including Altria's FOC in equation (A6). An implication is that Altria's predicted cost and margin (given actual prices) are the same as its actual cost and margin.

I then ensure that the pre-discontinuation FOCs for the other firms hold by calibrating each firm's cost (given actual prices and calibrated parameters).

*Row "Cig-a-Likes & Pod-Based Vaporizers, 1 Altria Product, Re-Calibrate Altria's Price and Share Using Its Actual Cost"*

CONFIDENTIAL – FTC Docket No. 9393

All firms are assumed to sell a single product, which is an aggregate that includes both cig-a-like products and pod-based vaporizer products.

The price coefficient $\alpha$ and the outside good share $s_0$ are calibrated to match the aggregate market elasticity and JLI's FOC. This is done by only including JLI's FOC in equation (A6). An implication is that JLI's predicted cost and margin (given actual prices) are the same as its actual cost and margin.

I then ensure that the pre-discontinuation FOCs for the other firms hold by calibrating each firm's price (given actual costs and calibrated parameters).


*Row "Pod-Based Vaporizers, 1 Altria Product, Re-Calibrate Altria's Price and Share Using Its Actual Cost"*

This run only uses sales of pod-based vaporizers. It is otherwise identical to the previous run.

C-7

CONFIDENTIAL – FTC Docket No. 9393

## Exhibit C.1: Summary of Antitrust Logit Model Simulation Runs

| Description | MarkTen Discontinued | | | | | | | MarkTen Not Discontinued | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | **Welfare Change** | | | | **Price Change** | | **Welfare Change** | **Price Change** | | | |
| | | | % of Total Due to Discount. (Price-Reoptimized)* | | % of Total Change Due to Discontinuation At Constant Prices** | Percent of NJOY and Rey. Expansion Required to Offset Harm *** | | | | | | | |
| | Total ($M) | % Difference Relative to [1] (Rothman Report) | First Discontinue Cig-a-Like | Then Also Discontinue Vaporizers | | | JLI | Total ($M) | % Difference Relative to [1] (Rothman Report) | Altria | Altria Cig-a-Like | Altria Vapor. | JLI |
| | [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] | [13] |
| [1] Rothman Report | -$33.63 | - | N/A | N/A | 77.5% | 44.8% | 1.05% | -$5.79 | - | 5.00% | N/A | N/A | 0.18% |
| *Altria's IRI & STARS Data:* | | | | | | | | | | | | | |
| [2] Cig-a-Likes & Pod-Based Vaporizers, 2 Altria Products | -$33.55 | -0.2% | 90.5% | 9.5% | 77.5% | 44.6% | 1.05% | -$5.77 | -0.4% | N/A | 4.94% | 4.74% | 0.18% |
| [3] Pod-Based Vaporizers Only | -$4.15 | -87.7% | N/A | N/A | 15.9% | 2.2% | 0.47% | -$3.59 | -37.9% | N/A | N/A | 11.69% | 0.41% |
| [4] Cig-a-Likes & Pod-Based Vaporizers, 1 Altria Product, Calibrate Price Coefficient Using Altria's Margin Only | -$5.84 | -82.6% | N/A | N/A | 55.1% | 44.6% | 0.26% | -$1.56 | -73.0% | 0.77% | N/A | N/A | 0.07% |
| [5] Cig-a-Likes & Pod-Based Vaporizers, 1 Altria Product, Re-Calibrate Altria's Price and Share Using Actual Costs | -$14.89 | -55.7% | N/A | N/A | 77.9% | 19.9% | 0.49% | -$2.83 | -51.1% | 4.46% | N/A | N/A | 0.09% |
| [6] Pod-Based Vaporizers, 1 Altria Product, Re-Calibrate Altria's Price and Share Using Actual Costs | -$0.17 | -99.5% | N/A | N/A | 21.0% | 0.12% | 0.02% | -$0.12 | -97.9% | N/A | N/A | 6.86% | 0.02% |

*Notes:*

\* Percentage due to the discontinuation of MarkTen products, assuming prices are adjusted to satisfy optimality condition. Column [3] reports the percentage of total welfare change predicted by the model in connection to the discontinuation of Altria's cig-a-like product, allowing for prices to be reoptimized.  Column [4] reports the incremental percentage of total welfare loss predicted by the model when Altria's pod-based products are also discontinued, and prices are allowed to be reoptimized.

\*\* Percentage of total welfare change predicted by the model that is due to the discontinuation of the MarkTen products, when prices are kept at pre-discontinuation levels.

\*\*\* I use the expansion across both cig-a-like and pod-based vaporizes when both types of products are included in the analysis, and only the expansion of pod-based vaporizers when only vaporizers are included.

[1] Results in Dr. Rothman's report for the scenario where "Altria's Share Absent the Transaction" is Altria's actual unit share of 10.1%.

[2] Uses data source [b] to calculate shares and prices; disaggregates Altria into Cig-a-Likes and Pod-Based Vaporizers.

[3] Uses data source [b] to calculate shares and prices; only uses Pod-Based Vaporizer sales.

[4] Uses data source [b] to calculate shares and prices; the price coefficient is calibrated to fit Altria's margin.

[5] Uses data source [b] to calculate shares and prices; uses only JLI optimality condition to calibrate price coefficient; calculates prices that are consistent with observed costs and calibrated parameters and adjusts shares accordingly.

[6] As in [5] but limited to Pod-Based Vaporizer sales.

*Sources:*

[a] Rothman backup.

[b] Altria's IRI and STARS data.

CONFIDENTIAL – FTC Docket No. 9393

**Exhibit C.2: Summary of Efficiencies Needed to Compensate for Altria's Discontinuation of the MarkTen Products in Dr. Rothman's Model**

| Description | CMCR, Expressed as % of JLI's Cost | | Efficiency Related to the Likelihood JLI Is Not Discontinued | |
| | To Compensate for Discontinuation and Price Increase* | To Compensate for Price Increase Only** | % Reduction in Total Loss from 1% Increase in the Likelihood JLI Is Not Discontinued[x] | % Reduction in Price-Related Loss from 1% Increase in the Likelihood JLI Is Not Discontinued[x] |
|---|---|---|---|---|
| | [1] | [2] | [4] | [3] |
| [1] Rothman Report | 13.3% | 3.0% | 5.4% | 24.0% |
| *Altria's IRI & STARS Data:* | | | | |
| [2] Pod-Based Vaporizers Only | 6.4% | 5.4% | 22.4% | 26.6% |
| [3] Pod-Based Vaporizers, 1 Altria Product, Re-Calibrate Altria's Price and Share Using Actual Costs | 0.1% | 0.1% | 100.0% | 100.0% |

*Notes:*
\* Percentage reduction in JLI's cost needed to compensate for price effects predicted by the model related to the discontinuation of Altria's products.
\*\* Percentage reduction in JLI's cost needed to compensate for price effects predicted by the model related to Altria's discontinuation of its products. I first discontinue Altria and let users reallocate to the other products. Then, I calculate what is the JLI cost efficiency needed to compensate users for any price effect predicted by the model related to the discontinuation (given Altria's discontinuation).
[x] I assume Altria discontinues its products; I then calculate the value of JLI as the difference between the welfare when JLI's products are on the market and when it is not available. Column [4] ([3]) is calculated as 1% of JLI's value divided by the welfare from the price effect predicted by the model related to Altria's discontinuation of the MarkTen products (from the discontinuation of the MarkTen products and the related price effect predicted by the model).
[1] Results in Dr. Rothman's report for the scenario where "Altria's Share Absent the Transaction" is Altria's actual unit share of 10.1%.
[2] Uses data source [b] to calculate shares and prices; only uses pod-based vaporizer sales.
[3] Uses data source [b] to calculate shares and prices; uses only JLI optimality condition to calibrate price coefficient; calculates prices that are consistent with observed costs and calibrated parameters and adjusts shares accordingly; limited to pod-based vaporizer sales.

*Sources:*
[a] Rothman backup.
[b] Altria's IRI and STARS data.

CONFIDENTIAL – FTC Docket No. 9393

**Exhibit C.3: Distribution of Welfare Losses Predicted by Dr. Rothman's Model**



*Notes*: Based on the Rothman simulation model and data.

# Appendix D

CONFIDENTIAL -- FTC Docket No. 9393

**Exhibit D.1  Regression Analysis Measuring the Effect of Altria Discontinuation on Total Cig-a-like Volume**

*IRI Weekly Data, Total US Multi Outlet + Conv, November 2018 - May 2019*

| Independent Variables | Regression Coefficient |
|---|---|
| Time Trend | -0.0408*** |
| | (0.0130) |
| Altria discontinuation indicator | -0.0227 |
| | (0.0514) |
| Altria discontinuation indicator interacted with time trend | 0.0045 |
| | (0.0131) |
| Constant | 3.0922*** |
| | (0.0439) |
| | |
| Number of Observations | 26 |
| R-squared | 0.966 |

*** indicates statistical significance at 1 percent level

**Note:**

[1] The dependent variable (cig-a-like total volume) is expressed in millions of cartridges.

# EXHIBIT B

# EXHIBIT 9

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE:  JUUL LABS, INC.
ANTITRUST LITIGATION

This Document Relates To:          Case No.:
                                   3:20-cv-02345-WHO
ALL ACTIONS
-----------------------------/

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

VIDEO-RECORDED DEPOSITION OF NICHOLAS PRITZKER

San Francisco, California

Wednesday, October 23, 2024

Stenographically reported by:
LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
California CSR No. 10523
Washington CSR No. 3318
Oregon CSR No. 19-0458
Texas CSR No. 11318

Huseby Job No.:  00108550
California Firm Registration No.:  169

**Page 78**

THE WITNESS: My recollection, it may be wrong, but the one -- the structure that I remember thinking was possible with BAT was a simple investment in the company at a particular valuation without any other strategic implication in terms of sharing products or merging products or anything like that.

BY MR. SAVERI:

Q. So is it fair to say that that BAT transaction never, from your recollection, involved any kind of combination of the business operations of the two companies at the -- that were ongoing at the time?

A. I remember the structure that I thought was realistic. There might have been other conversations. I'm not sure what we explored with them initially.

Q. Right.

A. But, yeah, the one we settled on as something to take seriously was a simple investment by BAT into JLI.

Q. And do you recall generally how much they were interested in purchasing and what the price was?

A. Approximately. And, again, this might have

**Page 79**

been our interest, not theirs. But I believe at the time we were talking something like ███████ ████████████████████████████████████, but that's what we were -- that's what we were considering.

And as I recall, the valuation that we were looking for was something like ██████████.

Q. So you were interested in selling ████████████████████████████████████ ██████████████████████.

Q. Excuse me.

A. Yeah.

Q. I'm sorry. I just --

A. No, that's okay.

Q. I got confused.

A. Yeah.

Q. Let me try to straighten it out.

A. Yeah.

Q. Was the transaction that you recall BAT -- that you were interested in selling BAT ██████████ ████████████████████████████████ █████████████████████████████

A. No. █████████████████████████ ███████████████████

Q. Okay. That's -- that was -- that's really

**Page 80**

what threw me. So --

A. Yes.

Q. -- let me ask the question.

Does that imply, then, that they were -- you were asking them to pay a purchase price or invest something like ██████████████████████ of the company?

A. Right. Approximate in both of those cases, but that was -- that was ballpark, what I thought was realistic, given their interest and given our interest.

Q. Did you -- did you exchange term sheets with BAT?

A. I don't recall any term sheet. It's certainly possible, but I only remember verbal conversations with them.

Q. And in connection with those discussions, did you -- did they -- did you go far enough to hire lawyers to consult about papering the deal?

A. Certainly corporate counsel was involved in our conversations on some level. Once again, it may be that there were documents that were exchanged. I don't think so. It may be that the company was preparing for documents, but I don't think so.

I think our conversations with BAT were

**Page 81**

verbal. And they didn't get far enough to end up in documents, to the best of my recollection.

Q. To the best of your recollection, did you hire antitrust lawyers to consult with on that deal?

A. I don't think it got far enough to do that. No, I don't think so.

My recollection is it was a small enough investment that it was not -- it didn't seem to be a threshold issue. So I don't remember hiring antitrust lawyers if we did.

Q. So, Mr. Pritzker, I'm going to hand you a document which was previously marked as Exhibit 4 -- 74 in this case.

(Previously marked exhibit introduced, Exhibit PLX74.)

THE STENOGRAPHER: Four or 74?

MR. SAVERI: Seventy-four. It was marked as 74 with Mr. Valani.

BY MR. SAVERI:

Q. Will you take a moment to read that, sir?

MR. ELLINGSON: Did you say previously marked 74?

MR. SAVERI: Yeah. It's marked as 74. I think it's -- I don't know who's speaking. I think it's Tab 1 in the binder.

Page 118

MR. GUZMAN: Yeah, I'll ask you not to speculate. But if you have recollections or understandings, you're free to talk about that.

THE WITNESS: I could only speculate. I did not write this. I didn't write this letter. I wouldn't have done -- this does not reflect the deal that I would have advocated.

BY MR. SAVERI:

Q. Well, at this time, right, in April of 2018, Altria did, in fact, sell e-vapor products; is that correct?

A. I believe that's right.

Q. And do you understand that the treatment of Altria's competitive products that -- to be addressed had to do with the question of how to handle whether or not Altria was going to continue to compete in the market or cease?

Did you understand that?

MR. GELFAND: Object to the form. Lack of foundation.

THE WITNESS: My reaction to all of this, and I'm sure what I was thinking at the time, was that I knew that anything that was going to be done between the two companies was going to be subject to whatever regulatory system was in place and subject

Page 119

to approval by the FTC. And that's why we had counsel, to make sure that what we did, did not run afoul of regulations and that the regulatory body would be free in the -- to make a determination.

BY MR. SAVERI:

Q. Now, did you -- did you discuss at this time with your counterparts at Altria the antitrust issues?

A. I don't remember the time frame. Honestly, the antitrust issues to me were not -- we were so far from a deal that the question of how that deal would be approached by antitrust counsel was a back burner. But we did at some point talk about -- about antitrust issues.

Q. And just in terms of the sequence, to the best of your recollection at this time, in April of 2018 -- and I appreciate your testimony about how early this was -- were antitrust lawyers retained to participate or assist in these negotiations?

A. They were at some point. And I can't say whether it was on that -- on or before this date. I don't remember whether -- it was close to this time, but I don't know whether they were on board at that time.

Q. Okay. Great.

Page 120

You can put that aside.

Let me show you Exhibit 77, sir.

(Previously marked exhibit introduced, Exhibit PLX77.)

MR. SAVERI: That's in Tab 7 of the binder.

BY MR. SAVERI:

Q. And please take a moment to read it. Let me know when you have.

A. I see this.

Q. Okay. And if you look at the top of Exhibit 77, there's an e-mail from Mr. Valani to Mr. Willard with copies to yourself, Mr. Burns, and Mr. Gifford.

Do you see that?

A. I do.

Q. Okay. And Mr. Valani forwards to the group an e-mail that Mr. Willard had written earlier, it looks like, on that same day, on April 24th.

Do you see that?

A. Yes.

Q. And just so we're clear, this e-mail, 77, comes after the document I just showed you, just so we've got the sequence in mind.

A. Yes.

Q. Great.

Page 121

And so Mr. -- Mr. Willard writes (as read):

"Billy and I have a proposal to address your antitrust concern."

Do you see that?

A. I do.

Q. And, again, Billy is Mr. Gifford; right?

A. Yes.

Q. Okay.

MR. GUZMAN: Objection. I don't think you read that fully.

MR. SAVERI: Okay. Well -- okay. So let me just make sure I read it right.

BY MR. SAVERI:

Q. The e-mail from Mr. Willard says (as read):

"Billy and I have a proposal to partially address your antitrust risk concern."

Did I read that correctly?

A. Yes.

Q. Okay. Now, what antitrust risk concern had you raised prior to this April 24th e-mail from Mr. Willard?

A. Well, I don't remember exactly what that concern was at that time.

Q. Okay. Now, Mr. Valani responds and offers

Attorneys Eyes Only

**Page 122**

to set up a phone call.

    Do you see that?

A.   Yes.

Q.   And do you know -- do you recall whether that call occurred?

A.   I don't.

Q.   And so as you sit here today, you don't know whether that call happened or whether in -- during that call the antitrust risk concern that's mentioned here was discussed?

A.   I don't recall that call.

Q.   Okay.

    THE VIDEOGRAPHER:  Can we go off the record, Counsel, please?  Off the record for a second?

    MR. SAVERI:  Yeah.  Let's go off the record.

    THE VIDEOGRAPHER:  Off the record at 12:23 p.m.

    (Recess taken from 12:23 to 1:13.)

    THE VIDEOGRAPHER:  We're back on the record at 1:13 p.m.

    BY MR. SAVERI:

Q.   Good afternoon, Mr. Pritzker.

A.   Hello.

**Page 123**

Q.   I have one -- I have a couple of follow-up questions on the last exhibit I showed you, which I believe was 75.  Actually, it's the one -- it's the one that preceded that.  It's the -- the letter from Mr. Burns to Mr. Willard.

    You had it.

A.   I had it.

Q.   It's at the bottom.  It's right there (indicating).  It's that one right there (indicating).

A.   Okay.  Got it.

Q.   Great.

A.   That's the top.  Okay.

Q.   Okay, sir.  Do you have Exhibit 75 in front of you?

A.   Yes, I do.

Q.   Okay.  So let me ask -- let me ask you this:  Again, you were on the board of the company at the time; right?

A.   Yes.

Q.   And it's not your testimony that Mr. Burns that -- sent this proposal without the authorization of the company or the board, is it?

A.   That's not my testimony.  I -- my testimony is that I don't recall if the board approved this

**Page 124**

letter or even saw this letter before it went out. I don't know.

Q.   Okay.  Do you recall if you opposed at the board level the transmission of the letter or the terms that's created or contained in it?

A.   I don't recall that.

Q.   Okay.  You can put that aside.

    Mr. Pritzker, I'm handing you what's been previously marked as Exhibit 83.

    (Previously marked exhibit introduced, Exhibit PLX83.)

    BY MR. SAVERI:

Q.   And Exhibit 83 is an e-mail from yourself to, I believe it's, Jorge del Calvo and others, attaching a document called "Summary of Terms."

    Would you take a moment to review that, please, sir?

    And, Mr. Pritzker, you can take whatever time you want to look at it.  I'm going to ask you about the sections that begin on the bottom of the third page of the term sheet, "Antitrust Clearance," and then on the next section.

A.   Okay.  I can't say I'm an expert in this, in this cursory review, but I -- I'm ready for the questions on that section.

**Page 125**

Q.   Okay.  Terrific.

    Let's start with the first page of the document, sir.  And on the first page of the document, there's an e-mail from you to Jorge del Calvo, Mr. Valani, and others, including Mr. Handelsman, someone named James and Adam. That's Monsees and Bowen; correct?

A.   Yes.

Q.   And Mr. Burns, Mr. Danaher, Mr. Masoudi, and Ashley Gould.

    Do you see that?

A.   Yes.

Q.   It's dated July 30th, 2018.

    Do you see that?

A.   Yes.

Q.   And did you send that e-mail to those individuals on or about the date that's indicated here?

A.   I have no reason to think I didn't.

Q.   Okay.  And then you'll note that you are forwarding to them a communication that you had a little bit previously with Mr. Willard.

    Do you see that?

A.   Yes.

Q.   Okay.  And at that time, you and Mr. Valani

Page 126

were part of the team that was negotiating with Mr. Willard and Mr. Gifford at Altria; is that correct?

A.  Yes.

Q.  Okay.  And you indicate in your e-mail to Mr. Willard (as read):

"Howard, I'm attaching the term sheet we promised (if a bit delayed!)"

Do you see that?

A.  Yes.

Q.  And then you indicate that (as read):

"Riaz and I will plan to see you and Billy" -- that's Mr. Gifford -- "at the Park Hyatt in Washington, D.C., on Wednesday, 5:00 p.m.  Kevin will join us at 7:00 and dinner will be served."

Do you see that?

A.  Yes, I do.

Q.  Okay.  So -- and attached to this document is a -- is a -- is a table --

A.  Yes.

Q.  -- entitled "Summary of Terms for Potential Transaction - Richard."

Do you see that?

A.  Yes.

Page 127

Q.  And Richard was a code name that was used for Altria; correct?

A.  Right.

Q.  Do you recall that the -- that the name "Jack" was used as a code name for JUUL?

A.  Yes, it was.

Q.  And what was "Tree"?

Excuse me.  Was "Tree" the code name that was used for this proposed transaction?

A.  I'm -- I'm forgetting.  That sounds right, but I'm forgetting that code name.

Q.  Okay.  And the term sheet that you transmitted to Mr. Willard, had that been approved by the JUUL board before you transmitted it?

A.  I don't -- I don't recall.  You know, it was -- it was a nonbinding draft, I believe.  And I don't remember whether it was approved --

Q.  Well, is it --

A.  -- or submitted.

Q.  Okay.  Was it generally true that you kept the board informed about the progress of the discussions that you and the negotiating team, including Mr. Valani, were having on behalf of JUUL with Altria along the way?

A.  We did.

Page 128

Q.  Okay.  And so to the best of your recollection, given that, do you believe that these term sheets were approved by the board before they were communicated?

A.  I don't know if they were approved.  They were nonbinding.  I think my recollection is everybody understood that we were floating ideas back and forth and we were very far from a deal.

So I don't think anything was -- I don't recall anything being submitted for approval, since we were still at a formulating point.

Q.  But it's true, sir, isn't it, that there weren't any term sheets that were exchanged with Altria by you without informing the board before you did so?

MR. GUZMAN:  Objection.  Asked and answered.

THE WITNESS:  I can't say that.  I don't -- I don't -- I can't remember actually informing people necessarily or showing them term sheets.  I might have.  I might not have.  I don't know.

BY MR. SAVERI:

Q.  Okay.  There's a -- one of the recipients of your first e-mail was someone named Jorge del Calvo.

Page 129

A.  Yes.

Q.  Do you see that?

A.  Yes.

Q.  And was he an attorney?

A.  Yes.

Q.  With what law firm?

A.  Pillsbury.  They were outside counsel to JUUL.

Q.  Were they antitrust counsel?

A.  No.

Q.  So if you look at the term sheets, on the bottom of page 3, there is a section of the table that is entitled "Antitrust Clearance Matters," which starts at the bottom of that page and continues on to the top of the following page.

A.  Yes.

Q.  There's a series of bullet points.  I want to ask you about the -- about a number of them.

But -- but generally, is it -- is it the case that under this proposal, JLI was proposing to Altria three options with respect to its business, its e-cigarette business?

MR. GELFAND:  Object to the form.

THE WITNESS:  Before I ask you to repeat that --

Attorneys Eyes Only

Page 130

MR. SAVERI:  Yes.

THE WITNESS:  -- and giving me a chance to look back again, because we're outside of the section --

MR. SAVERI:  Yeah.

THE WITNESS:  -- when you asked me that --

MR. SAVERI:  Yeah.

THE WITNESS:  -- I need to amend my answer a bit.

Whereas Pillsbury were not the specialized antitrust counsel that we eventually hired, they did have antitrust attorneys that may or may not have been involved at this time but that were -- were consulted at times.

BY MR. SAVERI:

Q.  So, Mr. Pritzker, with the last question in mind, I want to draw your attention to the section in the Antitrust Clearance Matters that is the -- is the first section on page 4.

So if you look at Antitrust Clearance Matters, it starts at the bottom of page 3.  And then the table continues on to the top of the next page.

A.  Okay.  Okay.

Q.  And if you look at the first bullet point

Page 131

on the top of the fourth page, it begins (as read):

"Promptly and in no event later than nine months following the purchase ..."

Do you see where I'm reading from, sir?

A.  Yes.

Q.  Okay.  And in that section, JLI proposes three options to Altria; correct?

MR. GELFAND:  Object to form.

THE WITNESS:  I'm not sure I count the three you're talking about.

BY MR. SAVERI:

Q.  Well, let me -- let's do them.  It says that "Richard will" and the first is "divest."

Do you see that?

A.  Yes.

Q.  And then the second (as read):

"Or if divestiture is not reasonably practicable, contribute at no cost to Jack."

That's the next one.

Do you see that?

A.  Yes.

Q.  And then the next one is (as read):

"And if such a contribution is not reasonably practicable, then cease to

Page 132

operate."

Do you see that?

A.  I do.

Q.  So those are the three options.

MR. GELFAND:  Object to the form.

BY MR. SAVERI:

Q.  So were those, the -- the three items that we discussed, the options that JLI was proposing to Altria at the time?

MR. GELFAND:  Object to the form.

THE WITNESS:  I don't recall this document in this detail.  I always believed that if this deal proceeded to any kind of a final form that the FTC, as it -- as it examined the deal, would most likely require that Altria divest themself of their e-cigarette assets, in other words, sell them into the market.

That was -- to me, there had been a cigarette merger quite recently, which was Lorillard being purchased by BAT.  And in that transaction, Lorillard was required to divest several assets.  That seemed to me to be the most likely thing to happen.

And I don't know about the other alternatives.  In my view, that was likely what was

Page 133

going to happen.

BY MR. SAVERI:

Q.  Well, you would agree with me, sir, that the proposed terms which you sent to your counterparty had three options spelled out:  Divest; and if divestiture wasn't practicable, contribute; and if contribute -- contribution was not reasonably practicable, cease to operate.

Will you agree with me?

MR. GELFAND:  Object to the form.

THE WITNESS:  I do see this.  I -- and I note that on the -- on this proposal, which I might have transmitted but I didn't write.

BY MR. SAVERI:

Q.  Now, "contribute" means that -- as used here, would mean that JLI would come to receive all of Altria's e-vapor assets; correct?

MR. GELFAND:  Object to the form.  Lack of foundation.

THE WITNESS:  It could mean that, yeah.  I could see you could interpret it that way.

BY MR. SAVERI:

Q.  Now, at this time did JLI want those assets?

A.  My recollection is, no.  JLI did not think

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**

Attorneys Eyes Only          Nicholas Pritzker on 10/23/2024

Page 134

that they were seriously high-quality assets.

Q.   To the best of your recollection, at any time between this point in time and the time that the transaction had closed in December of 2018, did JUUL make any plans or projections regarding what contribution of Altria's assets to JUUL would have looked like or would have entailed?

MR. GELFAND:  Objection.  Lack of foundation.

THE WITNESS:  If it did, I was not privy to such plans.

BY MR. SAVERI:

Q.   Do you recall if Altria ever asked for JUUL, in the context of these negotiations, to reduce the acquisition price that they were going to pay based on the value of the contribution of the assets that Altria was going to contribute to JUUL?

MR. GELFAND:  Object to the form.

THE WITNESS:  I don't recall such a request.

BY MR. SAVERI:

Q.   Do you recall that Altria proposed that JLI -- that it would have paid a lower price based on -- to -- strike that.

Do you recall that Altria proposed to JLI

Page 135

that Altria pay less to JUUL based on the value of the assets that they offered to contribute?

A.   No, I don't.

MR. GELFAND:  Object to the form.

BY MR. SAVERI:

Q.   Now, did you understand that if JLI had received less cash, that would have ultimately meant that there was a smaller amount of money that could be distributed to the equity holders?

MR. GELFAND:  Object to the form.

THE WITNESS:  As I say, I don't remember any such proposal from Altria that -- that any use of their portfolio would affect the pricing.

BY MR. SAVERI:

Q.   Now, with respect to divestiture, were you aware of any plan that Altria ever made to divest its products?

A.   No.

Q.   Are you aware whether or not Altria ever had any other entity as a buyer or recipient of those assets to be contributed?

A.   No.

Are you saying at any time was I aware or at this time was I aware?

Q.   I was actually -- I wasn't very precise.

Page 136

And let's just generalize it from now, or when I say "now," from the point that this term sheet was written, which was July -- or, excuse me, was in July of 2018, to the time the transaction closed, which was in approximately December of 2018.

A.   Right.

Q.   Were you aware of any company or buyer who expressed an interest to Altria in acquiring Altria's assets?

A.   No.

Q.   And, again, are you aware of any plans that Altria made to divest?

A.   To sell those products?

Q.   Yes.

A.   No.

Q.   Sell those products or their business or any of the rights or -- of, you know, interest associated with that part of their business?

A.   I don't remember hearing about any such plans, no.

Q.   Okay.  Now, if Altria was able to find a buyer, presumably they would have not given it away. Do you -- well, strike that.

Let's do it this way:  There's a -- the next section in the term sheets are a section

Page 137

entitled "Richard Support Obligations."

Do you see that?

A.   Yes.

Q.   Okay.  And could you describe for me generally what the support obligations referred to here are generally?  What was the idea of support obligations in this context?

A.   The idea was that in the context of an investment by Altria in JUUL that there were services that it could provide JUUL that would expressly help -- help JUUL to compete against their own cigarette brand in various ways, in the form of the services that are enumerated here.

Q.   Well, in the event of divestiture, wouldn't those support obligations have also allowed JLI to compete against the entity that had acquired those assets in divestiture?

MR. GELFAND:  Object to the form.

THE WITNESS:  Well, to the extent that all of those things would -- would help, I was focused on the competition with cigarettes.  That was my main -- main concern.  That was our main goal.  So it certainly would have helped those efforts.

BY MR. SAVERI:

Q.   But we're -- what we're talking about,

**Page 138**

divestiture in this context, not of -- of Altria's cigarette business.  We're talking about divestiture of their e-cigarette business; correct?

A.   Okay.  I think I -- I see what you're driving at.

So if Altria were, in fact, required by the -- by the regulators to divest themselves of those --

Q.   Well, if they --

A.   -- those assets --

Q.   Excuse me.

A.   -- that in the -- in the course of the deal, by virtue of the fact that the services would have helped Altria, that those would have -- those would -- that that would be to the detriment, future detriment of the products that have been divested.

Q.   Yes.

A.   And that makes sense to me.  I don't remember ever talking about it in those terms, but I -- I see your point.

Q.   Now, further down in the -- in Richard Support Obligations, there's this last bullet point that begins "Richard agrees."

Do you see where I am?

(As read):

**Page 139**

"Richard agrees, comma, for so long
as it owns 5 percent of Jack's
outstanding shares" --
I'm sorry, it's on the -- it's on page 5 of the term sheet.

And I'm sorry about the way it was stapled.

A.   Yeah.  Yes.

Q.   Now, it says (as read):

"Richard agrees, for so long as it
owns 5 percent of Jack's outstanding
shares" --
And Jack, again, is JUUL; right?

A.   Yes.

Q.   (As read):

-- "to refrain from competing
anywhere in the world in the e-vapor
business (other than with respect to
MarkTen and MarkTen Elite prior to their
divestiture or contribution as described
above)."
Do you see where I'm reading?

A.   Yes.

Q.   So under that proposal that JUUL made, what was JUUL proposing that Altria agree to with respect to refraining from competition?

**Page 140**

A.   The concept is this:  That if the deal proceeded along the lines that Altria was requesting or requiring, which was that Altria, in fact, have directors on the board and also, at -- at JUUL's request, to provide services that that proximity to JUUL would -- would provide Altria with inside information, with technology, with plans, that it could use to compete against JUUL.  And that was not going to be acceptable to JUUL.

So if that were going to be required in a transaction; and, of course, subject to FTC approval, that would be something that would -- that they would have to agree to and, of course, as I say, would be subject to regulatory approval.

Q.   Does that provision that I've just been asking you to -- does that -- or did that proposal entail different obligations with respect to competition besides those that were mentioned in that Antitrust Clearance Matter section I asked about a minute ago?

MR. GELFAND:  Object to the form.

THE WITNESS:  I don't know whether I'd -- I don't have the time right now and maybe can't reconcile any contradictions that might exist between those sections.  This was written by

**Page 141**

lawyers, sent by lawyers, and I'm not suggesting that it was consistent.  Also, it was a draft.

So I -- I think it's quite -- quite general in terms of what was being considered at that time.

BY MR. SAVERI:

Q.   Okay.  But going back to the Antitrust Clearance Matters section, wasn't the point of that section to make sure that JUUL could not have competitive products in the market -- excuse me, that Altria couldn't have competitive products in the market after the transaction closed?

MR. GUZMAN:  Objection.

THE WITNESS:  I think I just described the rationale.  And, yes, subject to FTC approval, that was going to be a provision in the deal.  That was either going to be acceptable to the regulators or not.

BY MR. SAVERI:

Q.   Now, focusing on that section again, you -- the phraseology with respect to divestiture is (as read):

"Richard will divest, or if
divestiture is not reasonably
practicable ..."
Do you see that?

Page 142

A.   Yes.

Q.   Is there any reason that you're aware of that divestiture would not have been practicable?

A.   No, on the contrary.  I would have thought that divestiture would be completely practicable.

Q.   At that time do you -- were you aware of what the sales and revenue of Altria's MarkTen Elite product was?

A.   No.

Q.   Were you aware generally that the -- that the sales and revenue of that product were increasing at that time?

A.   No.  I don't think I -- I definitely don't know now, and I don't think I knew then anything about the revenues or profits of those products.

Q.   And then in the end, did Altria ever receive any consideration in the -- in the final deal for divesting the product?

MR. GELFAND:  Object to the form.

THE WITNESS:  The intention was that if this -- as the deal emerged finally, the notion was that if divestiture were required, that Altria would divest -- they would agree to divest, if required to do so, and that whatever proceeds were available were theirs to keep, if that answers your question.

Page 143

And that was the -- absolutely the intention of the deal and my expectation as to what was likely to happen if the deal were approved at all.

BY MR. SAVERI:

Q.   Let me hand you what's been marked as Exhibit 85.

(Previously marked exhibit introduced, Exhibit PLX85.)

THE WITNESS:  Okay to put away the last one?

BY MR. SAVERI:

Q.   I think so.

A.   Okay.  Well, I'll keep it handy.

Q.   Yeah.  There may be a moment where we're going to have to compare them, but I think right now I'll just ask you to look at 85.

So, Mr. Pritzker, 85 -- Exhibit 85 is an e-mail from you to Mr. Willard dated August 4th, 2018.

Do you see that?

A.   I do.

Q.   And you'll see that you write (as read):

"Howard, as discussed, attached term sheet, summary, and redline."

Page 144

Do you see that?

A.   I do.

Q.   And just so we're keeping it in sequence, you'll note that this occurred after the -- the prior document I just asked you about.

A.   Yes.

Q.   Okay.  Great.

And I'm going to have a couple of questions about the document.

Before we do this, sir, let me ask you this question:  The document, your e-mail to Mr. Willard, says or indicates that you spoke to Mr. Willard before you sent the term sheet.

Do you see that?

MR. GUZMAN:  Objection.

THE WITNESS:  Which term sheet are you referring to?

BY MR. SAVERI:

Q.   So -- I'm sorry, sir.  If you look at Exhibit 85, and if you look at -- which is I believe the one you have in your hand.

A.   Yes.

Q.   Your e-mail to Mr. Willard says (as read):

"Howard, as discussed, attached term sheet, summary, and redline."

Page 145

Do you see where I'm reading from?

A.   Yes.

Q.   Okay.  And my question -- well, I have two questions.

Did you send this e-mail to Mr. Willard on or about the date that's indicated here?

A.   I have no reason to think I didn't.

Q.   Very good.

And it -- do you recall a discussion you had with Mr. Willard about the terms that are in this term sheet immediately prior to you transmitting it to him on the -- on the 4th of August, 2018?

A.   I believe that what I meant by "as discussed," what was discussed was my sending the term sheet, not the terms of the term sheet.

Q.   Very good.

So if you look at the term sheet, there's -- I'll use the redline because it's probably easier to follow.

A.   Okay.

Q.   There's a section, it's the same section I asked you about -- one of the sections I asked you about a minute ago, called "Richard Support Obligations."  It's on the -- it's on the bottom of

Page 182

Q. Now, prior to this -- receiving this, had you discussed that provision with Mr. Willard?

MR. GELFAND: Object to the form.

MR. SAVERI: Let me withdraw that question.

BY MR. SAVERI:

Q. Now, just looking at this letter, at the time -- well, the -- the person who wrote the -- the letter was Howard A. Willard, III.

Do you see that?

A. Yes.

Q. And he was the chairman and chief executive officer of Altria at the time?

A. That's right.

Q. And Mr. Willard sent this letter to you, Mr. Valani, and the CEO, who were at the time those responsible at JUUL for the negotiations with Altria; is that correct?

A. That's right.

Q. Okay. And then -- and he -- and in his letter ...

THE VIDEOGRAPHER: It say the audio seems to be out on the --

MR. SAVERI: Just give me one second. I'll finish the document.

///

Page 183

BY MR. SAVERI:

Q. So Mr. Willard indicates that the discussions between the two companies -- well, strike that.

So among the proposals of terms, Mr. Willard included a provision that Altria would agree that its current and future subsidiaries would not compete consistent with our previous discussions.

Do you see that?

A. Yes.

Q. So that --

MR. GUZMAN: Object.

MR. SAVERI: That, in fact, is true, isn't it, that you and the other negotiators for JLI had prior to October 5th, 2018, discussed with Willard and others Altria's agreement that it and its current and future subsidiaries would not compete in the event --

MR. GUZMAN: Objection.

BY MR. SAVERI:

Q. -- as part of this deal?

MR. GUZMAN: Objection.

MR. GELFAND: Object to the form.

THE WITNESS: Well, my -- my main memory of

Page 184

this is that, obviously, any such transaction would be submitted to the regulators and that it was critical that if the regulators insisted on Altria divesting, selling, its e-cigarette devices, that it would agree to do so. And I believe that was consistent with our previous discussions.

BY MR. SAVERI:

Q. But what you just described doesn't appear anywhere in this letter, does it?

A. Well, there's a lot that doesn't appear in this letter. This is a very summary. It says "consistent with previous discussions." I don't really know what that means. I don't know what he had in mind. I didn't write it.

But if you ask me about a previous discussion, I would tell you that's one I remember having.

Q. Okay. But my question, sir, is what you just described is not specifically referred to in this letter, is it?

MR. GELFAND: Object to the form.

MR. GUZMAN: Objection.

MR. GELFAND: Misstates.

THE WITNESS: Well, there's a lot that isn't described. This -- the price isn't described

Page 185

in this letter. This is a -- this was an attempt by Mr. Willard to open the door to a conversation that would flush out the kinds of points that you're asking about in all of these areas and more.

BY MR. SAVERI:

Q. Well, you'd agree with me that the word "divestiture" is never mentioned in this letter?

A. No, it's not.

Q. And it's also true that price isn't mentioned in this letter?

A. There's much that isn't mentioned, yeah.

Q. Okay.

(Stenographer interrupted for clarification of the record.)

THE WITNESS: There is much that is not mentioned.

MR. SAVERI: Do we need to take a break on the tape?

Okay.

MR. GUZMAN: I think now would be a good time for a break.

MR. SAVERI: Okay. Yeah, I'm fine with doing that.

THE VIDEOGRAPHER: Off the record at 2:32 p.m.

**Page 218**

And not only don't I recall any such comment by Howard or Altria, I'm sure they would not have made any mention of the FDA process.

Q. Okay. Thank you.

In the antitrust section, I'll use the redline that's in --

A. What's the page number?

Q. Yeah. It's -- you know, it's page 5. It's the antitrust clearance section. I'm working from the redline. It starts on the top of page 5, and it goes on to page 6.

A. And this is a black line, not a redline.

Q. Yeah. I'm sorry.

A. And that's on page 5. Let me check. I think I can -- I see what you mean.

Q. Sometimes you have to deal with what you're given.

A. Okay.

Q. So do you have the antitrust clearance section in front of you?

A. Yes.

Q. And so among the provisions with respect to this, it indicates in the first section that (as read):

"Concurrent with the purchase,

**Page 219**

Richard will, to the extent Richard has the legal right to do so, irrevocably waive any claims that Jack has violated any Richard IP rights in the field of vapor-based electronic nicotine delivery systems, the field."

Do you see where I'm reading from?

A. Yes.

Q. And then it -- it says that (as read):

"If Richard has not otherwise transferred its interest in the e-vapor assets to a third party, then Richard agrees that it will contribute, upon receipt of any antitrust clearance to Jack, all assets relating to the field in the U.S., including all electronic nicotine delivery systems and products it acquired, developed, or has under development, as of blank 2018, in each case to the extent it has the legal right to make such contribution. And Jack shall pay Richard blank million in respect to such contribution."

Do you see where I'm reading from?

A. I do.

**Page 220**

Q. Okay. So in that provision, what Altria is suggesting that it -- that if it has not transferred its interest to another -- to another, then Richard agrees that it -- that's Altria -- will contribute it to JLI, subject to antitrust clearance. And in return from that, JLI shall pay Richard an unspecified sum in exchange.

Do you see that?

A. Yes.

Q. Okay. So in this provision, as -- as we kind of mentioned previously, this contemplated that Altria would contribute these assets to JUUL and JUUL should pay Richard for them.

Do you see that?

A. Well --

MR. GELFAND: Object to the form.

THE WITNESS: -- it's in the context of a number of other provisions.

BY MR. SAVERI:

Q. Well, let me ask you a question.

Was this the first time in a term sheet that Altria proposed that there would be some consideration flowing to Altria for the contribution of these assets as part of the deal?

MR. GUZMAN: Objection.

**Page 221**

THE WITNESS: My -- I don't know what it may say in other term sheets.

BY MR. SAVERI:

Q. Well, is it fair to say that after receiving this term sheet, the companies continued to negotiate?

A. Well, I notice -- I -- I must say I notice other provisions here relating to divestiture and other -- another -- other complicated provisions relating to the competition, all of which would be subject to -- to regulatory control.

Q. Sir, my question was, after receiving this -- these term sheets, did the negotiations continue?

A. They did.

Q. Okay. After this exchange of term sheets, did you ask Riaz Valani to communicate to Mr. Devitre or others that JLI was ready to do a deal?

A. I -- I don't recall that. I can't imagine that I did.

MR. SAVERI: Let's mark this the next one.

(Marked for identification purposes, Exhibit PLX126.)

MR. ELLINGSON: Counsel, this is the

**Page 266**

says.

MR. GELFAND:  Thank you very much.

MR. SAVERI:  Okay?  All right?

MR. GELFAND:  Off the record.

MR. SAVERI:  Thank you.

(Proceedings concluded at 4:40 p.m. PDT.)

---oOo---

**Page 267**

WITNESS CERTIFICATE

I certify under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at _____ on

_____.  _____.

   (Place)                    (Date)

_____

NICHOLAS PRITZKER

**Page 268**

E R R A T A   P A G E

I, NICHOLAS PRITZKER, the witness herein, have read the transcript of my testimony and the same is true and correct, to the best of my knowledge, with the exception of the following changes noted below, if any:

Page / Line /                Change                / Reason

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____

NICHOLAS PRITZKER

**Page 269**

STENOGRAPHER'S CERTIFICATE

I, LORRIE L. MARCHANT, a Certified Shorthand Reporter, holding a valid and current license issued by the State of California, CSR No. 10523, duly authorized to administer oaths, do hereby certify:

That the witness in the foregoing deposition was administered an oath to testify to the whole truth in the within-entitled cause.

That said deposition was taken down by me in shorthand at the time and place therein stated and thereafter transcribed into typewriting, by computer, under my direction and supervision to the best of my ability.

Should the signature of the witness not be affixed to the deposition, the witness shall not have availed himself/herself of the opportunity to sign or the signature has been waived.

I further certify that I am neither counsel for nor related to any party in the foregoing deposition and caption named nor in any way interested in the outcome thereof.

THE DISMANTLING, UNSEALING, OR UNBINDING OF THE ORIGINAL TRANSCRIPT WILL RENDER THE REPORTER'S CERTIFICATE NULL AND VOID.

In WITNESS WHEREOF, I have hereunto set my hand this 28th day of October, 2024.

_____

LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
California CSR No. 10523
Washington CSR No. 3318
Oregon CSR No. 19-0458
Texas CSR No. 11318

# EXHIBIT C

# EXHIBIT 8

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

------------------------X
IN RE: JUUL LABS, INC.    )
ANTITRUST LITIGATION      ) Case No.
                          )
This Document Relates To: )  3:20-cv-02345-WHO
                          )
ALL ACTIONS               )
------------------------X

*** HIGHLY CONFIDENTIAL ***

VIDEOTAPED DEPOSITION OF KEVIN C. CROSTHWAITE

Friday, November 15, 2024; 9:03 a.m. EST

Reported by:  Cindy L. Sebo, RMR, CRR, CLR, RPR, CCR, CSR, RSA, CA CSR 14409, NJ Certified CR 30XI0024460, NJ Certified RT 30XR00019500, NM CSR 589, NY Realtime Court Reporter, NY Association Certified Reporter, OR CSR 230105, TN CSR 998, TX CSR 12778, WA CSR 23005926, Remote Counsel Reporter, LiveLitigation Authorized Reporter, Notary Public

Job No. 00104912

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**

Highly Confidential                        Kevin C. Crosthwaite on 11/15/2024

Page 2

Confidential Videotaped Deposition of KEVIN C. CROSTHWAITE, held at the law offices of Cleary Gottlieb Steen & Hamilton LLP, 2112 Pennsylvania Avenue, Northwest, Washington, D.C. 20037, before Cindy L. Sebo, Registered Merit Court Reporter, Certified Real-Time Reporter, Certified LiveNote Reporter, Registered Professional Reporter, Certified Court Reporter, Certified Shorthand Reporter, Real-Time Systems Administrator, California Shorthand Reporter 14409, New Jersey Certified Court Reporter 30XI00244600, New Jersey Certified Realtime Reporter 30XR00019500, New Mexico CSR 589, New York Realtime Certified Reporter, New York Association Certified Reporter, Oregon CSR 230105, Tennessee CSR 998, Texas CSR 12778, Washington CSR 23005926, Remote Counsel Reporter, LiveLitigation Authorized Reporter and Notary Public, beginning at approximately 9:03 a.m. EST, when were present on behalf of the respective parties:

Page 3

APPEARANCES:

Attorneys for Direct Purchaser Plaintiffs:
JOSEPH SAVERI LAW FIRM
JOSEPH R. SAVERI, ESQUIRE
CHRISTOPHER J. HYDAL, ESQUIRE
40 Worth Street, Suite 602
New York, New York 10013
646.527.7310
jsaveri@saverilawfirm.com
chydal@saverilawfirm.com

Attorneys for Indirect Purchaser Plaintiffs and Reseller Plaintiffs:

KAPLAN FOX

ELANA KATCHER, ESQUIRE  (Via Zoom)

800 Third Avenue, 38th Floor

New York, New York 10022

212.687.1980

EKatcher@kaplanfox.com

Page 4

APPEARANCES (Continued):

Attorneys for Indirect Consumer Plaintiffs:
WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
KATE MCGUIRE, ESQUIRE (Via Zoom)
270 Madison Avenue
New York, New York 10016
212.545.4773
mcguire@whafh.com

Attorneys for Altria Group, Inc. and the witness:
WILKINSON STEKLOFF
JAMES ROSENTHAL, ESQUIRE
DHRUTI PATEL, ESQUIRE  (Via Zoom)
2001 M Street, Northwest, 10th Floor
Washington, D.C. 20036
202.847.4011
jrosenthal@wilkinsonstekloff.com
dpatel@wilkinsonstekloff.com

Page 5

APPEARANCES (Continued):

Attorneys for Defendants Pritzker and Valani:
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

MATTHEW J. WILKINS, ESQUIRE  (Via Zoom)

1615 M Street, Northwest, Suite 400

Washington, D.C. 20036

202.326.7912

mwilkins@kellogghansen.com

Page 6

A P P E A R A N C E S (Continued):

Attorneys for JUUL Labs, Inc.:

CLEARY GOTTLIEB STEEN & HAMILTON LLP

NOWELL D. BAMBERGER, ESQUIRE

2112 Pennsylvania Avenue, Northwest

Washington, D.C. 20037

202.974.1752

nbamberger@cgsh.com

-and-

SAMUEL BLANKENSHIP, ESQUIRE

Silicon Valley

1841 Page Mill Road, Suite 250

Palo Alto, California 94304

650.815.4127

sblankenship@cgsh.com

Page 7

A P P E A R A N C E S (Continued):

Attorneys for the witness:

LATHAM & WATKINS LLP

MARGUERITE (MAGGY) SULLIVAN, ESQUIRE

ALEXANDRA P. CLARK, ESQUIRE

555 Eleventh Street, Northwest, Suite 1000

Washington, D.C. 20004

202.637.1027

marguerite.sullivan@lw.com

alexandra.clark@lw.com

ALSO PRESENT:

KIM JOHNSON, Videographer

BAILEY DIAZ, Exhibit technician  (Via Zoom)

Page 8

--oOo--

INDEX OF EXAMINATION

KEVIN C. CROSTHWAITE

In re: JUUL Labs, Inc. Antitrust Litigation

Friday, November 15, 2024

--oOo--

EXAMINATION BY                    PAGE

Attorney Saveri                16

CERTIFICATE OF REPORTER               228

ERRATA                229

ACKNOWLEDGMENT OF WITNESS           231

Page 9

--oOo--

INDEX TO EXHIBITS

KEVIN C. CROSTHWAITE

In re: JUUL Labs, Inc. Antitrust Litigation

Friday, November 15, 2024

--oOo--

(Exhibits Provided Electronically to Certified

Stenographer and loaded in OneDrive Folder.)

PLX DEPOSITION

EXHIBIT NUMBER    DESCRIPTION                PAGE

Exhibit 497    E-mail with attachment, Wise to

Willard, March 27, 2017, Bates

stamped PX1633-001 through

PX1633-026                25

Exhibit 498    E-mail with attachment, Begley

to Willard and Chambers,

February 20, 2018, Bates stamped

PX4012-001 through PX4012-054    38

Highly Confidential

Page 10

--oOo--
INDEX TO EXHIBITS (Continued)
KEVIN C. CROSTHWAITE
In re: JUUL Labs, Inc. Antitrust Litigation
Friday, November 15, 2024
--oOo--
PLX DEPOSITION
EXHIBIT NUMBER     DESCRIPTION                 PAGE

Exhibit 499     E-mail with attachment, Brace

to Chambers, February 1, 2019,

Bates stamped PX1056-001

through PX1056-036          48

Exhibit 500     E-mail string with attachment,
Bates stamped PX1970-001
through PX1970-007          60

Exhibit 501     E-mail with attachment, Schwartz

to multiple recipients, July 22,

2018, Bates stamped PX1198-001

through PX1198-004          66

Page 11

--oOo--
INDEX TO EXHIBITS (Continued)
KEVIN C. CROSTHWAITE
In re: JUUL Labs, Inc. Antitrust Litigation
Friday, November 15, 2024
--oOo--
PLX DEPOSITION
EXHIBIT NUMBER     DESCRIPTION                 PAGE

Exhibit 502     E-mail string with attachment,

Bates stamped PX1300-001

through PX1300-010          83

Exhibit 503     E-mail string with attachment,
Bates stamped PX1304-001
through PX1304-003          93

Exhibit 504     E-mail string with attachment,

Bates stamped PX2506-001

through PX2506-015          106

Exhibit 505     E-mail string, Bates stamped
PX1008-001 through PX1008-002     133

Page 12

--oOo--
INDEX TO EXHIBITS (Continued)
KEVIN C. CROSTHWAITE
In re: JUUL Labs, Inc. Antitrust Litigation
Friday, November 15, 2024
--oOo--
PLX DEPOSITION
EXHIBIT NUMBER     DESCRIPTION                 PAGE

Exhibit 506     E-mail string, Bates stamped

PX1086-001 through PX1086-002     142

Exhibit 507     E-mail string with attachment,
Bates stamped PX4273-001
through PX4273-019          154

Exhibit 508     E-mail with attachment, Garnick

to Willard, Gifford, Crosthwaite

and Surgner, October 4, 2018,

Bates stamped PX1010-001

through PX1010-004          185

Exhibit 509     Letter, Gottlieb to Willard,
February 6, 2019, Bates stamped
PX9083-001                201

Page 13

--oOo--
INDEX TO EXHIBITS (Continued)
KEVIN C. CROSTHWAITE
In re: JUUL Labs, Inc. Antitrust Litigation
Friday, November 15, 2024
--oOo--
PLX DEPOSITION
EXHIBIT NUMBER     DESCRIPTION                 PAGE

Exhibit 510     E-mail with attachment, Willard

to Valani, Pritzger and Burns,

cc: Gifford, October 5, 2018,

Bates stamped PX2152-001

through PX2152-003          206

Exhibit 511     E-mail string with attachment,
Bates stamped PX1123-001
through PX1123-018          212

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
Highly Confidential          Kevin C. Crosthwaite on 11/15/2024

Page 14

--oOo--

INDEX TO PREVIOUSLY MARKED EXHIBITS

KEVIN C. CROSTHWAITE

In re: JUUL Labs, Inc. Antitrust Litigation

Friday, November 15, 2024

--oOo--

PLX

PREVIOUSLY MARKED                          PAGE

114                              58

Page 15

--oOo--

PROCEEDINGS

--oOo--

--oOo--

Washington, D.C.

Friday, November 15, 2024; 9:03 a.m. EST

--oOo--

THE VIDEOGRAPHER:  Here begins the videorecorded deposition of K.C. Crosthwaite, taken in the matter, In Re: JUUL Labs, Inc., Antitrust Litigation in the U.S. District Court, Northern District of California, Case Number 3:20-cv-02345.

Today's date is November 15th, 2024.  The time is 9:03.  This deposition is being held at 2112 Pennsylvania Ave, Northwest, Washington, D.C.

The court reporter is Cindy Sebo.  The video camera operator is Kim Johnson.  Both are on behalf Huseby.

Page 16

All attorneys present will appear on the written record.

So if the court reporter will please swear in the witness, we can proceed.

--oOo--

KEVIN C. CROSTHWAITE, after having been first duly sworn under penalty of perjury by the certified stenographer to tell the truth, the whole truth and nothing but the truth, testified herein as follows:

--oOo--

CERTIFIED STENOGRAPHER:  Thank you.

The witness is sworn, Counsel.

--oOo--

EXAMINATION BY COUNSEL FOR

DIRECT PURCHASER PLAINTIFFS

--oOo--

BY ATTORNEY SAVERI:

Q.    Good morning.  Joseph Saveri.  I'm

Page 17

one of the lawyers for the Direct Purchaser Plaintiffs in this litigation.  I'm going to be taking your deposition today.

So, Mr. Crosthwaite, what's your business address?

A.    My business address is here in D.C. at -- on F Street, 1000 F Street.

Q.    And where -- what's your home address?

Q.    Okay.  Now, Mr. Crosthwaite, you've been deposed before, I understand.

A.    Yes, sir.

Q.    Okay.  And so I'm just going to cover a few ground rules.

Okay?

A.    Okay.

Q.    Do you understand that you just took an oath to tell the truth?

A.    I do.

Q.    And do you understand that the oath

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
Highly Confidential        Kevin C. Crosthwaite on 11/15/2024

Page 18

you took is given the same weight as it would have been -- or as it would be if given in front of the jury in this case?

A.   I do.

Q.   Okay.  And do you understand that not telling the truth is criminal and can entail jail consequences?

A.   I do.

Q.   And do you understand everything you say today will be transcribed and recorded?

A.   I do.

Q.   And the video of your testimony may be played back to the jury at the trial?

A.   Understood.

Q.   Okay.  And in -- in order for us to have a clean transcript, it's important for us not to talk over one another.

Do you understand that?

A.   I do, sir.

Q.   Thank you.

And you're welcome to take breaks, but please do not do so while a

Page 19

pending -- a -- a question is pending.

Do you understand that?

A.   I understand.

Q.   Okay.  Great.

And if you don't understand a question, let me know, and I'll do my best to clean it up and rephrase it.

Okay?

A.   Okay.

Q.   Great.

Have -- is there any reason you can't provide your best testimony today?

A.   No.

Q.   And have you taken any medication today that would affect your ability to testify?

A.   I have not.

Q.   Have you consumed alcohol today?

A.   I have not.

Q.   Okay.  Sir, have you ever been convicted of a crime?

A.   I have not.

Q.   Okay.  And today, I'm going to use

Page 20

a shorthand for some of the parties to the case.

I'm going to use the word -- abbreviation "JLI" to refer to JUUL Labs, Inc.

Is that okay?

A.   Yes.

Q.   And I'm going to use the word "Altria" to refer to Altria Group, Inc.

Is that okay?

A.   It is.

Q.   Great.

And, sir, JLI was founded in the San Francisco Bay Area; is that correct?

A.   Yes.

Q.   And the JLI headquarters were located in San Francisco on 20th Street; is that true?

A.   There was -- I believe it was on 20th Street, yeah.

Q.   And when did JLI move its headquarters to Washington, D.C.?

A.   We moved our headquarters -- I don't remember the exact date we moved it.  It

Page 21

was -- I think it was at the end of 2019, but I don't remember the date.

Q.   And were you the CEO of the company at the time?

A.   I was.

Q.   And did you make the decision to move the company from San Francisco to Washington, D.C.?

A.   I recommended to our board that we relocate the headquarter address and headquarter personnel to D.C.

Q.   And the -- the board followed your advice?

A.   They did.

Q.   Did you ever move to San Francisco when you became the CEO of the company?

A.   I was living there temporarily.

Q.   Now, in May of 2018, Altria announced a major restructuring of the company.

Do you recall that?

A.   In --

Q.   In May of 2018.

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**

Kevin C. Crosthwaite on 11/15/2024

Page 22

A.    Altria, you said?

Q.    Yes.

A.    I don't remember the restructuring in May.

Q.    Well, do you recall that in approximately May of 2018, you became the chief -- chief growth officer of Altria?

A.    That sounds right, the title.

Q.    Okay. And you were the first CGO, correct?

A.    I believe they did not have the title prior to myself.

Q.    And can you tell me briefly what your responsibilities -- what you understood your principal responsibilities were as the chief growth officer at the time?

A.    So in 2018, when I started that role, I had a -- a variety of function -- different functions that rolled up to me at Altria. The functions were strategy and business development; I believe, then, I had innovative product development and some other

Page 23

Altria Client Service [sic] -- ALCS shorthand -- functions, like consumer -- MICR, I think it was called then -- consumer research market information.

So it's in -- it's in these functions that I had a pretty broad responsibility outside of the existing operating companies to -- to manage these functions. And that's what the chief growth officer had at the time.

Q.    And who did you report directly to when you were given that job?

A.    To Howard Willard, the CEO of Altria.

Q.    Okay. Do you recall in April of 2017, you met in San Francisco --

DOCUMENT TECHNICIAN: I don't know if you can still hear us, but we have lost the Zoom feed for the witness.

ATTORNEY SAVERI: Can we go off the record for --

THE VIDEOGRAPHER: He's back --

Page 24

ATTORNEY SAVERI: -- a second?

Okay.

THE VIDEOGRAPHER: -- I got him.

ATTORNEY SAVERI: We're good?

THE VIDEOGRAPHER: Um-hum.

BY ATTORNEY SAVERI:

Q.    Okay. I -- I'm sorry, sir.

A.    That's okay.

Q.    Do you recall in April of 2017, you met in San Francisco with James Monsees and Taylor Goldman?

A.    I did meet with James and Taylor -- that sounds like the right time. I don't remember if that's the exact date, but it seems like it would be the time frame.

Q.    Okay. And do you recall at the time that Mr. Monsees was one of JLI's founders?

A.    I do.

Q.    Okay. And do you recall that you were accompanied at that meeting by Jody Begley, David Wise and Steve Schroder?

A.    Yes.

Page 25

Q.    And at the time, Mr. Begley was the president of Nu Mark.

Do you recall that?

A.    I don't remember if that's what his title was then, but he was the president of Nu Mark at some point in time. I just don't recall if it was at that moment.

Q.    And do you recall who arranged that meeting with JLI in San Francisco?

A.    I don't remember who actually set it up.

Q.    Did you?

A.    I don't recall setting it up.

Q.    Okay.

--oOo--

(PLX Deposition Exhibit Number 497, E-mail with attachment, Bates stamped PX1633-001 through PX1633-026, marked for identification, as of this date.)

--oOo--

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**

Page 26

BY ATTORNEY SAVERI:

Q.   So I apologize.  My arms aren't long enough –

A.   You can toss it over.

Q.   – to – to – to reach –

A.   Pass it over.  I'll catch it.

Q.   – so I'm going – I'm going to do my best.

ATTORNEY SULLIVAN:  That's fine.

BY ATTORNEY SAVERI:

Q.   All right.  So, Mr. Crosthwaite, I handed you a document which I marked as Exhibit 497.

Do you have that in front of you, sir?

A.   Yes, sir, I do.

Q.   Okay.  And you can take a – a moment to read it –

A.   Okay.

Q.   – this is a e-mail from David Wise to Howard Willard dated March 27th, 2017.  It attaches a – a – a slide deck which is

Page 27

called – entitled Reduced-Harm Products, Scorecard Summary, March 2017.

I'm going to ask you a couple questions about, I guess, the fourth – well, it's the – if you look in the lower right-hand corner, it's the document that has the Document Number 1 – PX1633-06.

So if you – if you would, tell me when you're ready.

A.   Okay.  I'm just going to take a quick glance at the document –

Q.   Yeah.

A.   – and you said 6, which is my – I think it's my third page, right?

Q.   Yeah.  I – I – if – if we did our – if we did our –

A.   It's marked.  I'll get it – I'll get there.

DOCUMENT TECHNICIAN:  Counsel, this is the technician.

What tab number is it?

ATTORNEY SAVERI:  I'm sorry.

Page 28

It's Tab 2, sir.

DOCUMENT TECHNICIAN:  Thank you.

(Whereupon, the witness reviews the material provided.)

THE WITNESS:  Do you want me to read the rest of it?

BY ATTORNEY SAVERI:

Q.   No.  Let me just – I – I – you – you cert- – certainly can glance at it –

A.   Let me just quickly glance at it –

(Simultaneous unreportable crosstalk.)

CERTIFIED STENOGRAPHER:  Let him finish, please.

BY ATTORNEY SAVERI:

Q.   Absolutely.  Take your time to read the document.  I – I know that we're – we have a short amount of time, so, you know, I want to move through it, but please, sir.

CERTIFIED STENOGRAPHER:  Thank you.

Page 29

(Whereupon, the witness continues to review the material provided.)

THE WITNESS:  Okay.  I've gone through it.

BY ATTORNEY SAVERI:

Q.   Okay.  And so, again, sir, to – for purposes of the record, this document appears to be – or have been generated in – sometime in March of 2017.

If you look at that page that ends in the Docket – or Document Number PX1633-006, there's a slide that is entitled ALCS S&BD Perspective   RHP Competitive Positions.

Do you – do you – do you see that?

A.   Yes, sir.

Q.   I observe that you and I function in the same way with small type from time to time.

Okay.  Let me ask you.

ALCS – what does that mean?

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**

Page 30

A.   Altria Client Services.

Q.   And what is S&BD?

A.   Strategy and business development.

Q.   Okay.  And then is RHP reduced-risk products?  Is that an abbreviation for that?

A.   That's my assumption what it is -- means in this document.

Q.   Okay.  And at that time, did the category of reduced-harm products include, among other things, Altria's e-vapor products?

A.   In 2017, I think this is referring to --

Q.   Yeah.

A.   -- I don't recall the exact date, but I believe at that time, a -- a product was on the market from Altria.

Q.   Okay.  Now, under the -- in that slide, there are kind of -- it looks like there are these number rows that run from Number 1 to 5.
     Do you see that?

A.   I do see that.

Page 31

Q.   And the -- the -- the companies on those rows are all tobacco companies or -- or companies that sold nicotine-related products at -- at that time, correct?

A.   That's correct.

Q.   Okay.  And just for purposes of the record, what -- that logo -- what company is that?

A.   Which logo are you referring to?

Q.   In Number 1.

A.   Philip Morris International.

Q.   Okay.  And Number 2 is -- is what?

A.   Number 2 is British American Tobacco on the top logo --

Q.   Right.

A.   -- the -- the logo beneath that is Reynolds American -- I believe it's Incorporated, the I, which is a -- I think -- I believe is their U.S. subsidiary of that -- of the parent company.
     Number 3 logo is Altria, Number 4 logo is Japan Tobacco, and Number 5 logo is

Page 32

Imperial Brands.

Q.   Okay.  Looking at the third row, which was your company, Altria.
     Do you see that?

A.   I do.

Q.   And the first bullet point says, Number 2 vake -- vapor market share in the United States.
     Do you see that?

A.   I see that.

Q.   To the best of your knowledge, was that a true statement at the time, that Altria possessed the Number 2 vapor market share in the United States?

A.   I have no reason to think that it's wrong.

Q.   Okay.  And then the next bullet say -- says, PMI partnership provides access to IQOS and other platforms.
     Do you see that?

A.   I see that.

Q.   And is "PMI" a reference to

Page 33

Philip Morris International?

A.   In this context, I believe it is.

Q.   And what is IQOS?

A.   That is a -- a brand name that is used by Philip Morris International for their device -- system on their heat-not-burn product platform.

Q.   And then the bullet says, PMI partnership provides access to IQOS and other platforms.
     Do you see that?

A.   I see that.

Q.   And can you explain to me what that means?

A.   My recollection at this time of that agreement -- and I don't remember every detail, but that -- the -- Altria had a opportunity to be a distributor -- or distribute IQOS in the United States and other platforms. I'm not exactly sure what that's referring to.

Q.   Okay.  Fine.
     Would you just look briefly at

Page 34

the next page, sir?

A.   Sure.

Q.   And that -- that deck -- or slide -- slide is titled Consolidated R&D Expense -- and it looks like that's a million dollars -- 2017 OB.

Do you see that?

A.   I do.

Q.   Okay.  And "R&D" is an abbreviation for research and development, correct?

A.   In this context, I think it is, yes.

Q.   And in this context, what does "OB" mean?

A.   My -- what I believe this -- this means is original budget, which is a terminology used during a budget planning process that's -- was commonly used at the time.

Q.   Okay.  And if you look at the -- at -- at the -- at the graph, there's a -- there a -- I -- I don't know what you would call it -- there's a column at -- at the -- at the right.

Page 35

It's labeled 2017 OB.

Do you see that?

A.   I do.

Q.   Okay.  And the number at the top of that column is 236.

Do you see that?

A.   I see that.

Q.   And so does that mean that at the time, Altria budgeted $236 million in R&D expenses for the year 2017?  Am I reading that right?

A.   I didn't make this chart, but I -- I -- I read it by -- it is the culmination of the -- the three -- three things it says on here that ladders up to what is being characterized as R&D expense.

Q.   Is that consistent with your recollection at the time, that -- that Altria had budgeted approximately $236 million in R&D expenses for those products?

A.   Well, I'm -- I'm not -- I'm really not -- wouldn't have been that familiar with

Page 36

this page in 20- -- in 2017 to speak to it, so I don't -- I'm not sure.

Q.   Okay.  In -- would you agree that in 2017 -- strike that.

Would you agree that in 2018, Altria had in place a -- a sophisticated organization to market tobacco products?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  I'm sorry?  Let me -- I'm sorry.  Repeat that one more time.

BY ATTORNEY SAVERI:

Q.   Sure.

Would you agree with me that by or in 2017, Altria had in place a sophisticated organization to market tobacco or nicotine-containing products?

ATTORNEY SULLIVAN:  Objection to form.

Go ahead.

THE WITNESS:  I think in 2017 --

Page 37

Or did you say 2018?

BY ATTORNEY SAVERI:

Q.   I said 2018.

A.   Oh, sorry.

-- 2018, the company had a sophisticated sales and distribution system for core tobacco products, so the cigarette business, the moist smokeless tobacco business.  And I believe cigars at that time was in the -- in the system as well.

So my terminology -- I call that "core tobacco."  And I would agree in core tobacco, it was a sophisticated system.

Q.   And with respect to that -- that -- those core products, did that relationship include strategies for obtaining or managing displays and shelf space in retail locations?

A.   For those core tobacco products?

Q.   Yes.

A.   Yes.  That would be part of the -- another acronym, Altria Group Distribution Company.  AGDC's responsibilities would be to

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**

Kevin C. Crosthwaite on 11/15/2024

Page 38

manage those core tobacco products and retail stores.

Q.   Great.

So you can put that document aside, sir.

A.   Okay.

Here's okay?

ATTORNEY SULLIVAN:  Yeah.

BY ATTORNEY SAVERI:

Q.   Those will accumulate --

A.   I'm sorry --

Q.   -- through the morning.

A.   -- put it in the right spot.

--oOo--

(PLX Deposition Exhibit Number 498, E-mail with attachment, Bates stamped PX4012-001 through PX4012-054, marked for identification, as of this date.)

--oOo--

BY ATTORNEY SAVERI:

Q.   Okay.  Let me hand you what I've

Page 39

marked as 498, sir.

A.   Okay.

Q.   So, sir, I've handed you a document which I've marked as Exhibit 498.  It was -- for -- for housekeeping purposes, it has the -- the -- the Document Number PX4012.

The first page is an e-mail from Jody Begley to Howard Willard, a Brent Chambers.

Do you have that in front of you, sir?

A.   I do.

Q.   Okay.  And attached to it is a slide deck.

And if you look at the third page of the document, which is the first page -- page of the slide deck.

Are you with me, sir?

A.   I'm sorry.  This doc -- the --

Q.   The -- the -- the first page -- no. You're -- you're exactly in the right place.

A.   Okay.

Page 40

Q.   I just want to show you that -- that the first page of the slide deck is entitled Nu Mark 2018 Three-Year Strategic Plan.

Are -- are we on the same page?

A.   Yes, sir.

Q.   And --

ATTORNEY ROSENTHAL:  By the way, can I just object to foundation on the basis there's no evidence that the witness saw this document, but you can --

ATTORNEY SAVERI:  Yeah.  So you can -- you can -- you can object.  I don't think you can testify, but --

ATTORNEY ROSENTHAL:  Right --

ATTORNEY SAVERI:  -- noted.

ATTORNEY ROSENTHAL:  -- I'm objecting as to foundation.

ATTORNEY SAVERI:  Thank you.

BY ATTORNEY SAVERI:

Q.   And do you see that it's dated February 28, 2018?

Page 41

Do you see that?

A.   I do.

Q.   Okay.  Great.

So, sir, I just -- I have -- I'm going to ask you a couple questions, just generally, about a couple of the slides.  I'm going to ask you about the -- the -- the -- the slide -- it's Page 7 of the deck.  It has the -- the Document Number 009 on it and -- and the following page.  That's what I'm going to ask you.

But please take a moment to -- to review the document.

A.   Okay.

(Whereupon, the witness reviews the material provided.)

THE WITNESS:  Okay.  I've flipped through it.

BY ATTORNEY SAVERI:

Q.   Okay.  So thank you.

So --

A.   Of course.

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION

Highly Confidential          Kevin C. Crosthwaite on 11/15/2024

Page 42

Q.    -- first, let -- let me start with the first page.

You see that the -- the e-mail was sent by Jody Begley?

Do you see that?

A.    I see that.

Q.    And what was Ms. -- in February of 2018, what was Mr. Begley's job?

A.    I believe he was in charge of Nu Mark.

Q.    And what -- generally, what was Nu Mark at the time?

A.    In 2018, my recollection is Nu Mark was the operating company within Altria that had the responsibility for distributing the, you know, products that were not in the other core tobacco companies.

Q.    So did that include Altria's e- -- e-vapor products?

A.    Yes.

Q.    And did that include the e-vapor products sold under the MarkTen brand?

Page 43

A.    Yes.

Q.    Now, do you recall that later in that year, there were discussions at Altria about whether to continue the MarkTen products or to shut them down?

A.    Later in what year?

Q.    2018.

A.    Yes.

Q.    And do you recall having discussions with Mr. Begley about that subject?

A.    I don't recall having that conversation with Mr. Begley.

Q.    Okay.  And now, if you look at Page -- it's the page that ends in 009, Slide 7.  There's a -- there's a chart that's entitled Nu Mark Three-Year Plan Highlights.

Are you with me?

A.    I'm on that page.

Q.    Okay.  And CAGR -- you see that's referred to there?

Do you see that?

A.    In the top here (indicating)?

Page 44

Q.    Yeah.

That means compound annual growth rate, correct?

A.    That's my understanding.

Q.    Okay.  So do you recall that as of this time, Altria was predicting or planning increases for Nu Mark in -- Nu Mark products in both the cigalike and the hybrid products at compound annual growth rate of 24 percent?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  My -- my read of this chart -- I didn't create it --

BY ATTORNEY SAVERI:

Q.    Yeah.

A.    -- is actually not -- not that.

My read of this chart is, on the left side, it is projecting a category -- is making assumptions about future growth rates of two different segments.  A cigalike segment, the chart is projecting, will decline as a segment over a three-year period.  And I'm not quite

Page 45

sure what is in the definition of "hybrid" in this chart, but it is -- it is suggesting, at least in this chart, or anticipating that that segment or format will be growing.

Q.    And then to the right, that part of the chart is discussing or portraying MarkTen Retail Share.

Do you see that?

A.    I see that.

Q.    And that chart is predicting increases in -- in retail share, correct?

A.    This chart is predicting an increase of retail share, I'm assuming referring to the segment cigalike, which is projected to be a declining segment.  That's how I read the chart.

Q.    And the -- the reference to "PP" -- is that abbreviation for "percentage points"?

A.    I think it is in this chart, yes.

Q.    Okay.  Sir, if you turn to the next page --

A.    Sure.

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**

Highly Confidential    Kevin C. Crosthwaite on 11/15/2024

Page 46

Q.    -- there's a -- there's a chart that says Nu Mark Three-Year Plan Highlights.
Do you see that?

A.    I do.

Q.    And there's a -- an abbreviation, OCI, on the left part of the chart.
Do you see that?

A.    I see that.

Q.    And what's OCI?

A.    My understanding of this -- this acronym is operating company income. I'm assuming that's what it means on this page.

Q.    And to the right, it says Marginal Contribution.
Is -- is that -- is that a measure or -- does that mean contribution operating margin?

A.    I -- I don't know how -- how the marginal contribution assumptions on this page are being calculated.

Q.    Okay. Do you recall that at this time, Altria was projecting increased margin

Page 47

contribution for the Nu Mark products over the period that's indicated here?

A.    I mean, that -- that is what this chart says. I -- I don't know what's in this marginal contribution calculation.

Q.    Okay. You can put that aside.

A.    Sure.
The document or the page?

Q.    Yeah, you can put the whole thing aside.

A.    Okay.

Q.    Okay. Do you recall in the 2018 period that there were complaints that the MarkTen product leaked?

A.    I do.

Q.    Okay. And do you recall that the -- that Altria invested in addressing those leaks?

A.    I don't recall exactly what they did on that regard.

Q.    Okay. Do you recall that -- that Altria tracked the complaints it received for

Page 48

the MarkTen products, including in particular the MarkTen Elite products?

A.    I don't recall --

Q.    Okay --

A.    -- what was tracked.

Q.    -- great.
So can you try to move this along.
--oOo--
(PLX Deposition Exhibit Number 499, E-mail with attachment, Bates stamped PX1056-001 through PX1056-036, marked for identification, as of this date.)
--oOo--
BY ATTORNEY SAVERI:

Q.    So I've handed you what's been marked as --
This is what happens.
Sir, what's the number there?

A.    499.

Q.    Okay. 499.

Page 49

-- 499. It has the Document PX1056001. The first page is an e-mail from Michael Brace to Brent Chambers, and attached to that e-mail is a -- a -- a slide deck that's entitled Nu Mark Brand Update, MarkTen Elite, August 10th, 2018.
Do you have that --

A.    I do --

Q.    -- slide?

A.    -- I do.

ATTORNEY ROSENTHAL: I have the same foundational objection.

BY ATTORNEY SAVERI:

Q.    Okay. Sir, I want -- I'm just going to turn your attention to two slides in the deck. One has the Bates number or the Number PX1056-012.
It's actually the 10th page of the deck.

DOCUMENT TECHNICIAN: I'm sorry, Counsel. Could I have that tab number again?

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
Highly Confidential          Kevin C. Crosthwaite on 11/15/2024

Page 50

ATTORNEY SAVERI:  Sure.  I -- I apologize.

It's Tab 4.

BY ATTORNEY SAVERI:

Q.    There's -- Mr. Crosthwaite, there's a slide that's entitled MarkTen Elite Average Weekly Sales Volume.

Do you have that in front of you?

A.    I see that slide.

Q.    And then the next -- the next slide is MarkTen Elite Complaint Summary   July Year to Date.

Do you have that in front of you, sir?

A.    I have that in front of me.

Q.    Okay.  So let's -- let's start with the second.  It --

A.    Sir, I'm just quickly --

Q.    Yeah --

A.    -- very quick --

Q.    -- please glance --

Page 51

A.    -- I'm -- I'm just trying to -- I don't even -- I don't know what this document is.  I just want to make --

Q.    Yeah --

A.    -- sure I'm tracking --

Q.    -- yes --

A.    -- with the story here very quick.

Q.    -- yeah, please.

(Whereupon, the witness reviews the material provided.)

THE WITNESS:  Okay.  I'm sorry.  I got it.

BY ATTORNEY SAVERI:

Q.    Great.

So you recall, I asked you a minute ago about complaints regarding leaking of the MarkTen Elite product?

A.    I do.

Q.    Okay.  If you look at the chart that is on Page -- it looks like it's Page 11 of the slide deck, the MarkTen Elite Complaints Summary Chart.

Page 52

Q.    Do you see that?

A.    I see that.

Q.    Okay.  And do you see that the chart is entitled Complaints per Thousand (Retail and E-commerce)?

Do you see that?

A.    Yes.

Q.    And if you look at the -- the -- the -- the -- the beginning of -- it's organized chronologically.

Do you see that from -- yeah, you and I are in the same boat.

A.    I take your word for it.

Q.    So I -- you see that this chart indicates that at the beginning of the chart, it -- it -- there's approximately 10 complaints per thousand for MarkTen Elite?

Do -- do you see where I'm reading on the y-axis?

A.    I do.

ATTORNEY SULLIVAN:  Objection: lacks foundation.

Page 53

BY ATTORNEY SAVERI:

Q.    And do you see that over time, that chart, at least the trend line, is lower and to the right?

Do you see that?

ATTORNEY SULLIVAN:  Same objection.

THE WITNESS:  I -- I -- yes, I see the -- the trend change on the chart.  I -- I do not know how this is calculated.

BY ATTORNEY SAVERI:

Q.    Okay.  And did -- my question, sir:  Does this refresh your recollection that over this period of time that's portrayed in the chart, that complaints for the MarkTen Elite product had declined over time --

ATTORNEY SULLIVAN:  Objection to form.

BY ATTORNEY SAVERI:

Q.    -- as of July -- excuse me -- as of July of 2018?

A.    I mean, I -- I see what it says on

Page 54

the chart. I -- I just -- this time period, I don't recall the discussion regarding complaints declining or increasing. But that -- I -- I see the chart.

Q. Okay. Looking at the chart on the previous page, which indicates MarkTen Elite Average Weekly Volume Sales -- do you see that?

A. I do see that.

Q. And this chart plots weekly sales volume over time.

Do you see that?

And you can tell, I think, actually in this chart, it begins in approximately March of 2018, and it runs out into July of 2018.

Do you see that, sir?

ATTORNEY SULLIVAN: Objection to form: lacks foundation.

THE WITNESS: I -- I can actually read these. I see -- I see the -- the time periods on the bottom of this -- of this chart.

Page 55

BY ATTORNEY SAVERI:

Q. Okay. And this -- this chart indicates that over time, MarkTen Elite average weekly sales volume increases, correct?

ATTORNEY SULLIVAN: Objection: lacks foundation.

THE WITNESS: In the -- what I -- what I -- what I believe this chart is referring to is the volume performance of this product within certain stores that it is selling, the share in its stores selling. And I -- I mean, that's my -- that's my understanding of the chart based on the Share In Store Selling on the right. So in -- what it tells me, reading this chart, is in the stores that it was selling, this is the trend of the volume.

BY ATTORNEY SAVERI:

Q. And is that consistent with your recollection of the business at the time?

A. "The time" being -- I'm sorry --

Page 56

Q. The period from March 2018 to July 2018, the last day on the chart.

A. No. My -- my recollection of the business at that time, I -- I -- I was not necessarily focused on whether it was selling more in one store that it had been in versus another; it was assessing the -- the long-term viability that this particular platform would be a successful platform.

(Pause.)

THE WITNESS: Are we through with this one, sir?

BY ATTORNEY SAVERI:

Q. Yeah, absolutely. Thank you.

So, sir, I've -- I've handed you what's been marked as exhibit -- I think it's 500.

Do you have that in front of you?

A. 500, yes.

Q. Yeah. And this document has a -- a document number, 1579.

Page 57

Do you see that?

A. No.

Q. Down in the -- PX1579.

A. Oh, I'm sorry. Yes, I see that at the bottom.

Q. Right. It's an e-mail from Mr. Schwartz, dated June 8th, 2018, to a number of individuals. And about three lines down, it looks like you're one of the recipients.

Do you see that?

A. Yes, I see that.

Q. Okay. And did you receive this e-mail from Mr. Schwartz on or about the date that's indicated here?

A. I don't remember it, but I'm assuming I did.

Q. Okay. Will you take a moment to review it, sir?

A. Of course.

(Whereupon, the witness reviews the material provided.)

DOCUMENT TECHNICIAN: Counsel,

Highly Confidential

Page 58

what tab number is this?

ATTORNEY SAVERI:  Yeah, it's Tab 8.

I'm sorry about that.

DOCUMENT TECHNICIAN:  I'm sorry, Counsel.  For clarification, I have this previously marked as PLX-114.

Are we remarking it as 500?

ATTORNEY SAVERI:  I didn't appreciate that was the exhibit stamp in this case.

What – let's just leave it the way it is.

--oOo--

(PLX Deposition Exhibit Number 114 was previously marked for identification and handed to the witness.)

--oOo--

BY ATTORNEY SAVERI:

Q.    Actually, why don't you hand – why don't you – can you hand that back to me?

Page 59

A.    Of course.

ATTORNEY SULLIVAN:  So leave it as 114?

ATTORNEY SAVERI:  Yeah.  I'm going to retrieve my exhibit stamp.

BY ATTORNEY SAVERI:

Q.    So, sir, what's been previously marked as Exhibit PLX-114 is the document that I have in front of you – you have in front of you which has the – the – the document number in the lower right-hand corner, PX1579; is that correct?

A.    Correct.

Q.    Okay.  Have you had a moment to review that?

A.    I did.

Q.    Okay.  And so in this e-mail – well, let me first ask you, What was Mr. Schwartz' job at the time?

A.    I believe at this time, he was working in the operations side of Nu Mark.

Q.    Okay.  And so Mr. Schwartz in this

Page 60

e-mail is expressing appreciation to the team for the – the excellent work done to fix the leaking associated with the MarkTen Elite pod, correct?

A.    That's what it says.

Q.    Okay.  And do you recall that after resolution of the leaking issues, leakage complaints for MarkTen Elite decreased?

A.    I – I don't recall.

Q.    And do you recall that during that same time, sales of the MarkTen product increased?

A.    I don't recall.

Q.    Okay.  You can put that aside.

A.    Okay.

ATTORNEY SAVERI:  Oops.  I'm sorry.

--oOo--

(PLX Deposition Exhibit Number 500, E-mail with attachment, Bates stamped PX1970-001 through PX1970-007, marked for

Page 61

identification, as of this date.)

--oOo--

BY ATTORNEY SAVERI:

Q.    So this is Exhibit 500 now, and this is at Tab 9 in the binder, and this has the Document Number PX1970.

Do you have that in front of you, sir?

A.    I do.

Q.    Okay.  And there's an e-mail at the top of the page from Craig Schwartz to Jody Begley, dated October 31, 2018.

Do you see that?

A.    I see that.

Q.    And he attaches another e-mail that Mr. Schwartz wrote to Pamela Lieberman with copies to a number of individuals, including yourself.

Do you see that?

A.    I do.

Q.    Okay.  And just focusing on the – the – the e-mail from Schwartz to Lieberman,

Page 62

which shows you as a copy, to the best of your knowledge, did you receive that from Mr. Schwartz on or about October 31st, 2018?

A.    I'm assuming I did.

Q.    Okay.  And would you -- would you take a -- a moment to look at it?

A.    Of course.

Q.    I'm going to just ask you about the first page and the chart that's on the top of the second page.

A.    Okay.  Let me just quickly read it.

Q.    Please.

(Whereupon, the witness reviews the material provided.)

THE WITNESS:  Is this (indicating) the chart you --

BY ATTORNEY SAVERI:

Q.    Yeah.

A.    -- you wanted me to look at?

Okay.

Q.    Yeah, there's a chart that's entitled [as read] MT Elite and E-Com Leakage

Page 63

Complaints.

Do you see that?

A.    I do.

Q.    And, sir, that -- that chart plots MT Elite e-com sales versus complaints per thousand.

Do you see that?

A.    Yeah, that -- that is what it looks like the chart is -- is tracking, both sales for e-commerce and then complaints from e-commerce purchasers.

Q.    And -- and it covers the period from, I guess, sometime approximately in the beginning of September 2018 to the end of October 2018.

Do you see that?

A.    Yeah, it looks -- yeah, it seems to me, at least from the chart, it's, like, an eight-week -- eight-week period of time.

Q.    Okay.  And during that period -- you would agree with me that this chart indicates that complaints declined over time

Page 64

during that period, correct?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  I -- I mean, I take this chart as -- as being accurate that on e-commerce for this eight-week period, for consumers that brought this product to the e-commerce channel, the complaints for those consumers on e-commerce went down.

BY ATTORNEY SAVERI:

Q.    And for the same consumers during that period, sales increased, correct, as indicated in this chart?

A.    It seems like during this eight-week period, the sales did increase for a period of time.

Q.    Okay.  And this correspondence in this chart are dated at the end of October 2018.

Do you see that?

A.    You mean the last data point in the chart?

Q.    No; the -- the e-mail itself that

Page 65

attaches --

A.    Oh.

Q.    -- it, sir.

A.    October 31st, 2018.

Q.    And do you recall the date in which Altria informed the FDA that it was pulling its MarkTen product from the market?

A.    I don't remember the exact date.

Q.    Do you recall it was generally at the end of October 2018?

A.    I don't -- I don't remember -- I don't remember the exact date.

Q.    Okay.  So, for example, you don't recall, as you sit here today, that it was October 25th, 2018 when Altria sent its letter to the FDA?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  I -- I just -- like I say, I don't remember the date.

ATTORNEY SAVERI:  Okay.  You can put that aside.

Page 66

--oOo--

(PLX Deposition Exhibit Number 501, E-mail with attachment, Bates stamped PX1198-001 through PX1198-004, marked for identification, as of this date.)

--oOo--

BY ATTORNEY SAVERI:

Q.   Sir, I'm handing you -- sorry.  I don't really mean to chuck them at you.

A.   It's no problem.

Q.   Okay.  Sir, do you have Exhibit 501 in front of you?

A.   I do.

ATTORNEY SAVERI:  And for those of you playing at home, it's Tab 10.

Okay?

BY ATTORNEY SAVERI:

Q.   The document has the document number in the lower right-hand corner, PX1198.

Do you see that, sir?

A.   Yes.

Page 67

Q.   And this -- the first page of the document is an e-mail from Mr. Schwartz again to Brian Quigley, dated July 2nd, 2018.

Do you see that?

A.   I do see that.

Q.   And you're listed as the first cc recipient.

Do you see that, sir?

A.   I do see my name, yeah.

Q.   Okay.  And to the best of your recollection, did you receive this e-mail and the attachment from Mr. Schwartz on -- on or about the date that's indicated here?

A.   It looks like I did.

Q.   Okay.  Would you take a moment to look at the attachment, sir?

A.   Yep.  Let me just quickly read the e-mail.

Q.   Yeah, please.

(Whereupon, the witness reviews the material provided.)

THE WITNESS:  I see it.

Page 68

BY ATTORNEY SAVERI:

Q.   Okay.  So the attachment to the e-mail is something called a Business Update E-Vapor, and attached to that is -- are two slides, both of which are entitled JUUL Direct E-mail.

Do you see that?

A.   I do.

Q.   And at the time of this e-mail in July of 2018, JUUL was a competitor of Altria, correct?

A.   JUUL was a competitor in 2018.  I don't know the date of this e-mail from JUUL.

Q.   Yeah.

If you look at the lower right-hand -- there's a footer in the slide deck, and you can see it on the first page and the second page.  It says, July -- well, the first page says, 7/20/18, and on the next page, it says, July 19, 2018.

Do you see that?

A.   I do.

Page 69

I was just referring to -- I don't know the -- I don't know the date that this JUUL e-mail was distributed.

Q.   Okay.  Very good.

And so we saw from the previous e-mail -- in the previous e-mails that at least as of this time, there were -- the folks at Nu Mark felt that they had successfully fixed the leaking project -- the leaking issues with respect to the MarkTen Elite product.

Do -- do you recall that?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  In the e-mail that we looked at --

BY ATTORNEY SAVERI:

Q.   Yeah.

A.   -- from -- I think it was from Craig Schwartz --

Q.   Yeah.

A.   -- it seemed like they had identified some way to repair the -- the leak.

Page 70

Q.    Okay.  Now, do you -- can you explain to me why Altria was writing a -- or suggesting writing a direct e-mail to members of the JUUL community about these subjects?

A.    I don't -- I don't understand the question.

Q.    Well, the -- the slide indicates that this is an e-mail -- a direct e-mail to be sent to the JUUL community.

Do you see that?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  Yeah.  Again, I -- I -- I'm not familiar with this, but my -- my understanding of this slide is it is capturing an e-mail that was sent from JUUL to its customers --

BY ATTORNEY SAVERI:

Q.    Right.

A.    -- so I don't -- that's my read of what is on this page --

Q.    Okay.

Page 71

A.    -- having not seen this before.  I believe it was a JUUL communication to its consumers.

Q.    Okay.  Thanks.

Now, if you look at the first page of the e-mail -- the e-mail from Schwartz to Quigley, it indicates in the second paragraph, As you've requested, MarkTen Elite's new gasket remains on hold.

Do you see that?

A.    Yes.

Q.    And so it says, Please let me know if it's cleared for implementation.

Do you see that?

A.    I see that.

Q.    And so to the best of your recollection, was -- was Altria -- strike that.

To the best of your recollection, as of this time, had Altria developed a new MarkTen Elite gasket that, among other things, addressed the leaking problem?

A.    I -- I don't -- I don't recall what

Page 72

the -- I don't know what the manufacturing -- whatever the solution they're referring to was.

Q.    Do you know why, at this time, MarkTen Elite's new gasket was -- or had been put on hold, as indicated here?

A.    No.

Q.    But as indicated here, they were -- or Altria was ready to put that gasket into production once the okay was given, correct?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  I don't -- I cannot say Altria was ever okay putting that new gasket into production based on this e-mail.

And I'm not -- again, I'm not -- I don't know exactly what Craig means here when this -- the new gasket -- what he's referring to.

BY ATTORNEY SAVERI:

Q.    But he -- but Mr. Schwartz does indicate we're ready to go into production once

Page 73

given the okay, correct?

A.    He says it cleared for implementation.  Whether that means production or something different, I'm not sure.

Q.    Okay.  But the last sentence -- I'll just read it to you -- says, We're ready to go into production once given the okay.

Did I read that correctly?

A.    You did.

Q.    Okay.  And to the best of your recollection, was -- was Nu Mark ready to go into production with this product -- product once the okay was given?

ATTORNEY SULLIVAN:  Objection: lacks foundation; calls for speculation.

THE WITNESS:  Based on this e-mail, that's what Craig is saying.  I -- I just don't -- I don't recall that level of detail at that time.

BY ATTORNEY SAVERI:

Q.    Okay.  So you can put that aside.

A.    Sure.

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION

Highly Confidential    Kevin C. Crosthwaite on 11/15/2024

Page 74

Q.    Now, I asked you a -- a little while ago about your -- your first meeting in San Francisco with some of the -- the JLI folks.

Do you recall that?

A.    Yes.

Q.    And so -- and between the -- that time and when the transaction in which Altria acquired 35 percent of JUUL closed, did you participate yourself in communications with representatives of JLI?

A.    You mean between 2017 and -- and Altria's investment?

Q.    Yeah, in 2018.

A.    Yeah, I was a part of the -- the team at Altria that was working on this when I took responsibility as chief growth officer.

Q.    Okay.  And did -- did -- did you communicate with Kevin Burns?

A.    Yes, from time to time.

Q.    And Nicholas Pritzker?

A.    In certain settings, yes.

Q.    Riaz Valani?

Page 75

A.    Yes.

Q.    Okay.  And you're aware that Mr. Pritzker and Mr. Valani or at least the companies that were associated with them were the largest individual shareholders at JLI?

A.    At the -- at the time -- what time are you referring to?

Q.    Until the time Altria acquired an interest in the company.

A.    At that time, I -- they were, yes.

Q.    Okay.  Do you recall that Mr. Valani and Pritzker, or the companies they controlled, owned over 40 percent of the equity in JLI during that period?

A.    At the time of the -- Altria's investment?

Q.    Yeah.

A.    That sounds right.  I don't know exactly what their -- totality of their equity holdings were.

Q.    Okay.  And I asked you about communications with Mr. Burns and Mr. Pritzker

Page 76

and Ms. -- Mr. Valani.

Did you meet with them in person from time to time?

A.    During the period of negotiations --

Q.    Yeah.

A.    -- I did.

Q.    And did you communicate with them via e-mail?

A.    I remember communicating with Kevin -- I very well could have on e-mail.

Q.    And did you speak with any of those individuals on the -- on -- on the telephone?

A.    During which period?

Q.    Between the -- between -- any time between 2017, when there was the first meeting in San Francisco, and the time that the transaction closed in December 2018.

A.    I don't -- I don't -- I very well could have.  I don't recall.

I remember speaking with Kevin on the telephone, but I don't remember speaking

Page 77

with Nick and Riaz, but I could have --

Q.    Okay --

A.    -- I just don't remember.

Q.    -- now, there were other individuals at Altria that participated in those negotiations in addition to yourself, correct?

A.    Of course.  I was -- I provided a supporting role to them.

Q.    And so the individuals that participated in the negotiations on behalf of Altria included Howard Willard; is that correct?

A.    Correct.

Q.    And he was the CEO at the time, correct?

A.    Yes.

Q.    And Billy Gifford?

A.    Yes.

Q.    What was Mr. Gifford's job at the time?

A.    Chief financial officer.

Q.    And Mr. Garnick also participated in those discussions?

Page 78

A. Yes.

Q. And Mr. Garnick was the general counsel of the company, correct?

A. Yes. And I believe -- I believe additional -- I think he had a general counsel and -- I don't know if it was head of reg- -- regulation, but I think the title in -- involved more than general counsel.

Q. Okay. It's fair to say he had lawyer training and wore a lawyer hat in -- in these discussions?

A. Yes.

Q. Great.

Now, do you recall that JLI sent Altria the first draft of the term sheet in July of 2018?

A. I don't -- I don't recall who sent the first draft to whom.

Q. Okay. But is it -- but at the time that JLI -- I'll represent to you that JLI sent the first --

A. Okay.

Page 79

Q. -- term sheet to you -- or to Altria.

At the time, Altria and JLI were competitors with respect to the e-vapor market, is that correct, at that time?

A. In July of --

Q. Yeah.

A. -- of 2018, yes.

Q. Okay. And in July of 2018 -- well, MarkTen Elite was on the market; is that right?

A. Yes.

Q. Do you recall that MarkTen Elite came onto the market earlier in 2018?

A. MarkTen Elite came out of the market? I don't recall that --

Q. Came onto the market --

A. Oh, excuse me.

Q. -- excuse me, sir.

A. Yeah. I don't remember the launch date that it first came on the market.

Q. And as of July of 2018, there were a number of Nu Mark products on the market; is

Page 80

that correct?

A. Yeah. I don't remember exactly how many.

Q. Okay. Well, I'll -- MarkTen Bold was on the market.

Do you recall that?

A. I don't remember Bold.

Q. Okay. Apex? Was that on the market?

A. I don't remember if the test -- if Apex was -- was on the market or not.

Q. How about the Green Smoke product? Was that on the market?

A. You know, the cigalike -- cigalike products at the time, I think, were virtually not really in the retail system anymore. So I don't recall when the Green Smoke one came -- came off the market.

Q. Okay. And do you recall that in the first term sheet that Altria received from JLI, JLI asked Altria to give up or cease its activity with respect to those Nu Mark or

Page 81

MarkTen products?

ATTORNEY SULLIVAN: Objection: form.

THE WITNESS: I'd have to look at the first term sheet. I don't remember it.

BY ATTORNEY SAVERI:

Q. I -- I -- I just feel -- I just feel bad about chucking --

A. Don't feel bad.

Q. -- oh, wait. Give that back to me, sir --

A. I'll chuck it back.

Q. -- I'm sorry. I just realized that there was -- this had been previously marked, and I don't want to make the -- I don't want to make the same mistake twice.

A. So I got it.

Q. Okay.

What I've handed you, I just realized, is -- was previously marked as Willard Exhibit PX1300.

Do you see that sticker in the

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**

Page 82

upper right-hand corner?

A.    I do see it.

Q.    And --

(Sotto voce discussion between cocounsel.)

BY ATTORNEY SAVERI:

Q.    Sir, hand it back --

A.    Okay.

Q.    -- I'm sorry --

A.    No problem.

Q.    -- there's so many exhibit numbers on this --

A.    No problem.

Q.    -- so -- so this, I am marking as Exhibit 502 in this case --

A.    Okay.

Q.    -- which was previously marked as Willard Exhibit PX1300 in another case.

Okay.  And this is Tab 11 in the binder.

Page 83

--oOo--

(PLX Deposition Exhibit Number 502,
E-mail string with attachment,
Bates stamped PX1300-001 through
PX1300-010, marked for
identification, as of this date.)

--oOo--

BY ATTORNEY SAVERI:

Q.    Okay.  With that, sir, do you have that in front of you?

A.    I have Exhibit 502 in front of me.

Q.    Excellent.

So it -- if you look at Exhibit 502, the first page of the document is an e-mail from Howard Willard dated July 31, 2018 to you, Mr. Garnick, Mr. Gifford.

Do you see that?

A.    I do.

Q.    And if you'll scan down below that, there is an e-mail from Nicholas Pritzker dated July 30th, 2018 to Howard Willard.

Do you see that?

Page 84

A.    I see that.

Q.    And Mr. Pritzker writes, Howard: I'm attaching the term sheet we promised (if a bit delayed).  Please confirm receipt.  Riaz and I will plan to see you and Billy (anyone else?) at the Park Hyatt DC (24th and M) Wednesday 5:00 p.m.  Kevin will join us at 7:00 and dinner will be served.  Thanks for your patience. Best, Nick.

So -- and then will you -- attached to that is the document that Mr. Pritzker sent to Willard and Willard sent to you on that date.

Will you take a moment to look at that, sir?

A.    Sure.

Q.    And I'm going to ask you, in particular, about a section of the term sheet which starts on the bottom of Page 3.  It's called Antitrust Clearance Matters.

Do you see that?

A.    I see that.

Page 85

Q.    And it continues on to the top of the following page.

Do you see that, sir?

A.    I do.

Q.    Will you take a moment to review that?

A.    Okay.

(Whereupon, the witness reviews the material provided.)

THE WITNESS:  Okay.  I've flipped through it.

BY ATTORNEY SAVERI:

Q.    Okay.  Sir -- now, the term sheet is -- is entitled Summary of Terms for Potential Rich -- Transaction   Richard.

Do you see that?

A.    I do.

Q.    And "Richard" was a code name for Altria, correct?

A.    Correct.

Q.    Do you recall that -- it also refers to Jack.

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**

Highly Confidential   Kevin C. Crosthwaite on 11/15/2024

Page 86

"Jack" means JLI in this context, right?

A.   It does.

Q.   Okay.  So the -- the term sheet addresses a number of subjects.  Just to scan through them, the purchase agreement, antitrust clearance, support obligations, board rights, voting rights, protective provisions regarding ownership, a standstill agreement and restrictions on transfer.

Do you see that?

A.   I see these.

Q.   Okay.  And the -- if you look at the -- the -- at least on the purchase agreement, the first bullet, there's a -- there's a -- a blank for the -- the payment term.

Do you see that?

A.   I see that blank.

Q.   Okay.  Now, looking at the Antitrust Clearance section again, which is on the --

Page 87

A.   Third page?

Q.   -- yeah, on the third page -- or fourth.

JLI presented three options for Altria's e-vapor assets, correct?  One was to divest the assets; one -- another was contribute -- contribute them to JLI or -- or, third, to cease business operations, correct?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  There's a lot in this antitrust in these buckets.

BY ATTORNEY SAVERI:

Q.   Yeah.  So let me -- okay.  Very good.

So if you look at the -- the bullet on the top of the fourth page that begins, Promptly.

Are you with me, sir?

A.   Yep.

Q.   Okay.  And it starts, Promptly and in no event later than nine months following the

Page 88

purchase --

Do you see where I'm reading from?

A.   I see where you're reading from.

Q.   -- subject to the license referenced above --

Do you see where I'm reading from?

A.   I do.

Q.   Okay.

And it -- it -- then it goes on -- Richard will divest (or if divestiture is not reasonably practicable, contribute at no cost to Jack and if such a contribution is not reasonably practicable, then cease to operate), all Richard assets relating to the field in the U.S., including all electronic nicotine delivery systems and products if acquired, developed or has under development, period.

Do you see where I read from?

A.   I see where you read from.

Q.   Okay.  So in that term sheet, JLI

Page 89

is -- is providing that Altria will agree to one of those three options that I -- I just listed, correct?

ATTORNEY SULLIVAN:  Objection.

THE WITNESS:  I think -- this is apparently the first -- the first draft of a term sheet.  So that's -- that's what it says.  I -- I didn't draft it or -- kind of left -- this bucket was really a -- a -- a lawyer bucket.

BY ATTORNEY SAVERI:

Q.   Okay.  Now, at -- at this time when you received this term sheet, did you understand that JL- -- JLI was looking for cash purchase of part of its -- of its business?

A.   I don't recall at this time period, no, knowing any of the real economic details.

Q.   Well, you -- you were aware, weren't you, that one of the chief goals of JLI was to provide liquidity to its equity investors as a result of this transaction?  You were aware of that, weren't you?

Page 90

ATTORNEY SULLIVAN: Objection to form.

THE WITNESS: You mean at the time of this term sheet in July?

BY ATTORNEY SAVERI:

Q. Or through -- in fact, throughout the entire period of the negotiations, you -- you were aware of that, weren't you?

ATTORNEY SULLIVAN: Objection to form.

THE WITNESS: I -- I -- I cannot say specifically on the JLI side at the time, you know, what their prime goals or motivations were with their shareholders.

BY ATTORNEY SAVERI:

Q. Well, you understand that the way the deal was structured, in fact, provided for a large payment of cash which was a -- largely going to be used to pay equity investors, correct?

A. Correct.

Q. And you also are aware that the two

Page 91

biggest of those investors -- equity investors were Pritzker and Valani, or the entities that controlled, correct?

A. Correct.

Q. And do you recall, of the $12.8 billion that was paid by Altria, how much of that was distributed to the equity investors?

A. I don't know the exact amount. A large portion of that went out to compensate all equity holders for the creation of the 35 percent ownership. The exact number -- I -- I don't know the exact number.

Q. Do you recall it was in excess of $11 billion.

A. I believe it was right around 11, but -- yeah, I think that's -- it's 11 billion. I just don't know the exact number.

Q. And do you recall that Mr. Valani got about 2.6 of that?

A. That sounds right.

Q. And Pritzker got somewhere between 1-1/2 and $2 billion; is that correct?

Page 92

A. Yeah. I think -- I hate to quibble -- I think other -- the entities associated with the --

Q. Fair enough.

A. -- that sounds -- that's -- those sound familiar to me, the numbers.

Q. Okay. Well, do -- do you understand from this term sheet that the -- one of the basic provisions of the -- of these term sheets was that if Altria paid cash in exchange -- if -- excuse me -- if -- if -- do you understand that what JUUL was asking for was a payment of cash in exchange for a purchase -- percentage of an equity interest along with the agreement that J- -- that Altria would shut down its competitive e-vapor business?

ATTORNEY SULLIVAN: Objection to form.

THE WITNESS: You know, that's -- that's not how I recall it.

BY ATTORNEY SAVERI:

Q. Well -- you can put that aside.

Page 93

A. Sure.

ATTORNEY SAVERI: Sir, I'm handing you what's been marked as Exhibit 503.

--oOo--

(PLX Deposition Exhibit Number 503, E-mail string with attachment, Bates stamped PX1304-001 through PX1304-003, marked for identification, as of this date.)

--oOo--

ATTORNEY SULLIVAN: Thank you.

BY ATTORNEY SAVERI:

Q. And this is Tab 12. It has the Document Number PX1304.

The first page is an e-mail from Mr. Garnick to Tony -- Tony Reale dated August 6th, 2018 and with a copy to you --

A. I see that --

Q. -- do you see that?

A. -- I do see that.

Q. Okay. And how do you pronounce his

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**

Page 94

last name?

A.   To -- the first -- Mr. Reale?

Q.   Yeah.

A.   Reale.

Q.   Okay.  I just wanted to -- to make sure we're on the same page.

So Garnick sends this e-mail. He's attaching to you -- forwarding to you an e-mail that Mr. Reale sent to Willard.

It says, As discussed today, please see attached talking points for Howard's call to Tree.

Do you see that?

A.   I -- yes, I see that.

Q.   Okay.  To the best of your recollection, did you receive these e-mails and the attachment from Mr. Garnick on or about the date that's indicated here, August 6th, 2018?

A.   It looks like I did receive them.

Q.   Okay.  Now, he attaches a -- a Draft Script for Consideration.

Do you see that?

Page 95

A.   I see that.

Q.   And it refers to Project Tree.

Do you see that?

A.   I see that.

Q.   And Project Tree was the code name that Altria used for the acquisition of the interest in JLI, correct?

A.   Yes.

Q.   Okay.  So Mr. Garnick is with his e-mail attaching and circulating to the group some comments on this -- on a draft script that -- that Mr. Willard was to use with a call with representatives for JLI, correct?

A.   That's what it says.

Q.   Okay.  And if you look at the -- the script, there are a number of -- of items set forth or, you know, points to be made during the conversation.

Do you see that?

A.   Yes, I see it.

Q.   Okay.  And if you count down, I think eight, there's a -- there's a section that

Page 96

begins, If we establish this partnership.

Do you see that?

A.   Yeah, I'm sorry.  I'm just reading it before that.

Q.   Yeah, please.

A.   I'll just do that quickly.

Q.   Yep.

(Whereupon, the witness reviews the material provided.)

THE WITNESS:  Okay.  I've read them.

BY ATTORNEY SAVERI:

Q.   Okay.  So I was asking you to focus on that eighth section that begins, If we establish this partnership.

Do you see where I'm reading from, sir?

A.   I see that.

Q.   Okay.  And let me read it to you. It says, If we establish this partnership, then we expect that Altria will -- there's a colon, right -- accelerate Jack's growth, control --

Page 97

contribute meaningful synergies, potentially exit our own vapor business, and cannibalize our own combustible business.

Do you see that?

A.   I see that.

Q.   Okay.  So the term "potentially exit our own vapor business" is consistent with the -- with the terms that were set forth in Mr. Pritzker's term sheet, which I showed you a minute ago, correct?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  I -- I don't know if I can draw that -- the same conclusion from those two -- these two documents.

BY ATTORNEY SAVERI:

Q.   Well, this -- this draft script indicates that one of the things that Mr. Willard is going to say to the representatives of JLI, that the -- the proposed partnership will result in Altria exiting the -- Altria's vapor business, correct?

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
Highly Confidential    Kevin C. Crosthwaite on 11/15/2024

Page 98

ATTORNEY BAMBERGER: Objection to form.

THE WITNESS: I mean, that's -- that's what it says. I don't know exactly the context or whoever wrote these for Howard means by it.

BY ATTORNEY SAVERI:

Q. Okay. But the -- the Pritzker term sheet proposed three options to Altria, correct?

A. In the -- which -- in which --

Q. In the term sheet I just showed you.

A. Three options for?

Q. For Altria with respect to its vapor business.

One -- one was contribute; one was divest; and one was to shut it down, cease operations, correct?

ATTORNEY BAMBERGER: Objection.

ATTORNEY SULLIVAN: Objection to form.

THE WITNESS: I -- in the -- in

Page 99

that Antitrust Clearance portion, those sound like what we just read. There was others -- other stuff in there, but I -- I don't know exactly if that's what it says in there.

BY ATTORNEY SAVERI:

Q. Okay. And -- but at least in Willard's notes of the conversation he was to have with JLI, this indicates that one of the things he's going to say is that as part of this deal, Altria will potentially exit Altria's own vapor business, correct?

ATTORNEY SULLIVAN: Objection to form.

THE WITNESS: I don't -- I don't really know the context of how this is written or what he said -- I'm not even sure if this even was a script used.

BY ATTORNEY SAVERI:

Q. Okay. But, sir, you received this -- these communications, correct?

A. I did receive this.

Page 100

Q. All right. And you didn't object to these talking points or raise any questions about them before Mr. Willard's conversation with JUUL, did you?

ATTORNEY SULLIVAN: Object to the form.

THE WITNESS: Yeah, I -- I -- I see that I'm on here. I don't even remember reading this or providing any comments on this draft.

BY ATTORNEY SAVERI:

Q. Okay. Now, Mr. Willard or the -- the -- the notes that Mr. Willard was going to use based on the input from you and others also uses the word "cannibalize" our own combustible business.

Do you see that?

ATTORNEY SULLIVAN: Objection to form.

THE WITNESS: Yeah, one, I -- to be clear, I don't recall providing input on this script myself.

Page 101

BY ATTORNEY SAVERI:

Q. Well, you -- you're not going to disagree with me that you received this, are you?

A. No, sir. I -- I received it --

Q. Okay.

A. -- but I don't recall providing input on the content of what is in it.

Q. Okay. And the word "cannibalize" means destroy or damage, correct?

A. Let me just find where you are in that --

Q. It's in the same paragraph.

A. Oh, the same one. Okay.

Q. Yeah. And after he indicates that Altria will "potentially exit our own vapor business," the notes say "and cannibalize our own combustible business."

Do you see where I'm reading from?

A. I see where you're reading.

Q. Okay. So the word "cannibalize"

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**

Kevin C. Crosthwaite on 11/15/2024

Page 102

means destroy or damage, correct?

ATTORNEY SULLIVAN: Objection to form.

THE WITNESS: I -- I -- I can just offer to you how I read the -- this word in this -- in this sentence is it's a word, you know, used, at least in my mind, to replace the -- you know, the consumer that would have been using this product would now be using this product; so not destroy, but in the context of -- of that example.

BY ATTORNEY SAVERI:

Q. Okay. But under this set of facts where they exit the vapor business, one of the -- as you indicate, there will be Altria customers that will no longer be Altria customers and will become JUUL customers, correct?

ATTORNEY SULLIVAN: Object to the form.

Page 103

BY ATTORNEY SAVERI:

Q. That's what you mean by "cannibalize"?

ATTORNEY SULLIVAN: Objection to form.

THE WITNESS: Well, I -- I was just responding to your question about "cannibalize our own combustible business." And in that context, that's -- that's how I read what does that -- what does that mean.

BY ATTORNEY SAVERI:

Q. Okay. Now, if you scan all the way down, there's a last section.

Do you see that it begins with However?

A. I do.

Q. And it says, However, if you're unable to meet our ask on this point, then it's time to break off these discussions, shake hands and agree to be competitors.

Do you see that?

A. I see that.

Page 104

Q. Okay. So -- so that's -- that's like in boxing, right?

ATTORNEY SULLIVAN: Objection to form.

BY ATTORNEY SAVERI:

Q. Like, when someone's, like, about to get into a boxing fight, they meet in the middle of the ring and shake hands and then they fight, right?

ATTORNEY SULLIVAN: Objection to form.

THE WITNESS: I'm not sure of the question.

BY ATTORNEY SAVERI:

Q. Well, did you understand that that's what these talking points indicate, that we're -- no agreement to be reached, that the parties -- that's Altria and JUUL -- would break off discussions, shake hands and then compete?

A. I -- I look at the totality of these talking points as a bunch of different terms being discussed about whether or not

Page 105

there's going to be an investment. And I don't know what he's -- what specifically this one refers to, unable to meet our ask or [sic] this point -- I don't know which point that is -- then these discussions would break -- I mean, that -- that's how I read it.

Q. Well, what Mr. Willard was saying was a -- that if JLI was not, to use his terms, agreeable to -- to meet the Altria ask, then the discussions would be over and the companies would compete against one another -- one another.

Isn't that what this means?

A. I'm -- I'm speculating for what -- what this -- what this sentence means. I don't even know if Howard ever used these talking points.

Q. You can put that aside.

A. Sure.

Q. Okay. Sir, I want to hand this more gently.

A. No worries.

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**

Kevin C. Crosthwaite on 11/15/2024

Page 106

--oOo--

(PLX Deposition Exhibit Number 504, E-mail with attachment, Bates stamped PX2506-001 through PX2506-015, marked for identification, as of this date.)

--oOo--

BY ATTORNEY SAVERI:

Q.    Sir, I've handed you what's been marked as Exhibit 504.  It has the Bates Number PX2506.

Do you have that in front of you?

A.    Yes, I do.

Q.    Okay.  And if you look at the top of the -- the e-mail, there's a -- there's an e-mail from Jerry Masoudi to someone named mark@juul.com, dated August 21st, 2018.

Do you see that?

A.    I see that.

Q.    Okay.  And if you scan down, there's a series of e-mails.  At the bottom or

Page 107

kind of at the middle of the first page, there's an e-mail from Zachary Podolsky --

Do you see that?

A.    I see that.

Q.    -- dated August 21st, 2018, to -- to Kevin Burns at JUUL, with a copy to you.

Do you see that?

A.    I see that.

Q.    Okay.  And he says, Kevin --

Do you see that?

A.    I see that.

Q.    -- on KC's behalf --

KC is you, sir, correct?

A.    It is.

Q.    -- I am sending you the attached issues list as a Word document and a PDF.  Please let us know if you have any issues with the attachment.

And then there's an attachment which is entitled pre -- Project Tree Term Sheet Issues List.

Do you see that, sir?

Page 108

A.    Yes, I see that.

Q.    Okay.  And, sir, did Mr. Podolsky send to Kevin Burns at JUUL, on your behalf, on August 21st, 2018 that e-mail with the attached term sheet?

A.    It looks like I told him he could send this to JUUL.

Q.    Okay.  And at that time, was Mr. Burns the CEO of JUUL?

A.    Yes.

Q.    Great.

So I'm going to ask you a couple questions about -- about this.

A.    Okay.  Do you want me to read the term sheet?

Q.    Yeah.  Yes, please.

A.    Okay.

(Whereupon, the witness reviews the material provided.)

BY ATTORNEY SAVERI:

Q.    And -- yeah, please take a moment to review it.  I'm going to focus on the section

Page 109

on the top of the second page.  It's Number 3, Antitrust Clearance Matters --

A.    Okay.

Q.    -- but please take a moment to --

A.    Okay.

Q.    -- read the document.

A.    Okay.

(Whereupon, the witness reviews the material provided.)

THE WITNESS:  Okay.  I've flipped through.

ATTORNEY SAVERI:  Okay.  Can we go off the record?  I just have a light on.

THE VIDEOGRAPHER:  Off the record at 10:27.

--oOo--

(Whereupon, a recess was taken from 10:27 a.m. EST to 10:36 a.m. EST.)

--oOo--

THE VIDEOGRAPHER:  Back on the record at 10:36.

**Highly Confidential**

Page 110

BY ATTORNEY SAVERI:

Q.    Okay.  We're back on the record.

Mr. Crosthwaite, just prior to the break, I had shown you Exhibit 504.

Do you have that in front of you, sir?

A.    Yes, I do.

Q.    Okay.  And just to kind of back up so we're kind of oriented again.

Exhibit 504 is -- is an e-mail that Mr. Masoudi wrote to mark@juul.com on August 21st, 2018.  It attaches an e-mail that Zachary Podolsky sent to you on August 21st, 2018.

Do you see that?

A.    Yes.  He copied me on it.

Q.    Okay.  And just -- just in terms of the chronology, this was about two weeks after the prior document that I had shown you?

A.    Which one was that document?

Q.    Yeah, if you just want to look at --

Page 111

A.    Do you mind if I -- is that okay?

Q.    Yeah, yeah, please -- please do.

So the -- the prior document, 503, was -- which attaches the talking points for Mr. Willard is dated August 6th, 2018.

Do you see that?

A.    I see that.

Q.    Okay.  And the -- the document which I'm -- which I'm showing you now, 504, is about two weeks later.

Do you see that?

A.    Yes.

Q.    Okay.  So -- and just before the break, I had asked you to look at the term sheet -- that chart of term sheet terms that's attached to the e-mail.

Okay?

A.    Okay.

Q.    And I wanted to ask you about the Antitrust Clearance Matter section, which is Number 3 on the top of the second page.

Okay?

Page 112

A.    Um-hum.

Q.    Have you had a moment to review that?

A.    I have, sir.

Q.    Maybe just to back up a second.

With -- with the chronology in mind, do you recall that after receiving the -- the Pritzker term sheets which I showed you before the break, which -- which was at the end of the July -- July, that you met with a strategy team to formulate a response?

A.    Very well could have.

Q.    Did -- prior to the transmission of the response to the term sheet which was attached to this August 21st, 2018 e-mail, did you meet with members of the board of directors of Altria to get approval for this?

A.    For -- for what?

Q.    For communicating the -- the response to the term sheet back to JUUL.

A.    I don't recall myself doing it, but Howard could have.

Page 113

Q.    Okay.  Now, looking at the antitrust clearance matters, the way this table is set forth, there's a -- there's a column that lists the Jack position and then Richard position, correct?

A.    Yes.

Q.    And, again, Jack is JUUL, correct?

A.    Correct.

Q.    And Richard is Altria, correct?

A.    That is correct.

Q.    Okay.  And with respect to the antitrust clearance matters that were set forth in Mr. Pritzker's e-mail or communication of terms, Richard's position, the Altria position, begins at the right:  In general, we do not see any material substantive difference on these antitrust points.

Do you see that?

A.    Yes.

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  Yeah, I see what --

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
Highly Confidential                Kevin C. Crosthwaite on 11/15/2024

Page 114

I see what it says there.

BY ATTORNEY SAVERI:

Q.    Okay.  Well, the -- the JLI position, which is set forth in -- in the -- at the second bullet, says, Upon receipt of antitrust clearance, Richard to contribute to Jack all Richard e-vapor assets at no cost to Jack.

Do you see that?

A.    That is what it says.

Q.    And in the right-hand column, you would agree with them that there's no indication that Richard, Altria disagrees with that position, correct?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  Yeah, I -- I don't know if they did or -- or they didn't.  I -- I was not -- I did not provide this analysis on this antitrust clearance matter.

Page 115

BY ATTORNEY SAVERI:

Q.    Okay.  But you would agree with me that you asked Mr. Podolsky to send this to Kevin Burns, the CEO of JUUL, correct?

A.    I did give him the -- the clearance to distribute this e-mail.

Q.    Now, further down in the JUUL section, it -- it JUUL -- the JUUL position was that if antitrust clearance for contribution is not received within nine months, Richard to divest e-vapor assets with six -- within six months.

Do you see that?

A.    I see what that says.

Q.    And then it also says the parties are to use reasonable best efforts to obtain antitrust clearance for at least nine months.

Do you see that?

A.    I do see what that says.

Q.    And, again, in this term sheet that you communicated to -- or asked Mr. Podolsky to communicate to Mr. Burns, there's no

Page 116

disagreement expressed with respect to those terms --

ATTORNEY SULLIVAN:  Objection to form.

BY ATTORNEY SAVERI:

Q.    -- correct?

A.    Disagreement to the -- what terms?  To these --

Q.    Any --

A.    -- antitrust terms?

Q.    -- any -- yeah, any -- any of Jack's position.

As -- as --

A.    I just --

Q.    -- as written, In general, we -- it's written, We do not see any material substantive difference on these antitrust points.

And then you list some suggestions.

Do you see that?

ATTORNEY SULLIVAN:  Objection to

Page 117

form.

THE WITNESS:  Yeah, I -- I see it.

It's difficult for me to tell you, you know, what level of agreement or disagreement for the antitrust topic that I completely deferred to antitrust counsel and to -- on the Altria side, to Murray to handle.

BY ATTORNEY SAVERI:

Q.    Okay.  Do you recall, as of this time, what Altria contemplated or planned with respect to contribution or divestiture of its e-vapor assets?

ATTORNEY SULLIVAN:  Objection: form.

THE WITNESS:  Contribution -- you're -- you're asking -- so the question in -- you're asking me in -- in August --

BY ATTORNEY SAVERI:

Q.    Correct.

A.    -- at the time of this?

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION

Highly Confidential    Kevin C. Crosthwaite on 11/15/2024

Page 118

Q.    Yeah.

A.    No, I have no – I do not know.

Q.    Okay.  And do you know whether Altria, at any time, made any plans to divest its e-cigarette business or its vape -- e-vapor business?

A.    Not that I'm aware of.

Q.    So did Altria ever make any plans to identify potential buyers of its e-vapor business?

A.    Ultimately, I don't know if they did or didn't.  My -- I mean, my personal point of view, the assets weren't worth anything.  But I don't -- I don't -- I don't know if they did.

Q.    Now, at the time, was Altria limited in its ability to contribute or divest its e-vapor assets at this time?

A.    "Limited" meaning? I'm sorry.  In what context?

Q.    Well, at this time, did -- had Altria entered an agreement with PMI that limited Altria's ability to contribute or divest

Page 119

its e-vapor business?

ATTORNEY SULLIVAN:  Objection: form.

THE WITNESS:  I'm not – I don't – I'm not familiar with the details of that – of that particular agreement.

BY ATTORNEY SAVERI:

Q.    Okay.  Do you recall generally that there was such agreement that provided generally about that subject?

A.    I remember there was an agreement with PMI, but I don't – the terms and what the limitations were with e-vapor assets, I don't recall.

Q.    So as you sit here today, do you know whether or not that arrangement restrained in any way Altria's ability to exhibit or divest its e-vapor assets?

A.    I don't remember the details of that agreement, what it limited or didn't, as pertains to e-vapor.

Q.    Okay.  And did you ever discuss

Page 120

that subject with Mr. Garnick?

A.    I – I don't remember.  I very well -- I mean, I could have.  I – I don't recall it.

Q.    Okay.  But you don't – okay. Did you ever discuss that subject with Mr. Masoudi?

A.    Not that I recall.

Q.    Okay.  Now, this part of the term sheet discusses the subject of contribution. As of this time, what were Altria's plans for contributing its e-vapor assets to JLI as part of this transaction?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  I don't – in August, I don't -- I really don't recall what their -- what the plans were.  This was a time period where, you know, I -- I was working quite a bit on a variety of different things regarding e-vapor.  This – this potential deal was just -- was one

Page 121

of them, but I don't recall what the -- someone was thinking about contribution.

BY ATTORNEY SAVERI:

Q.    Okay.  And, for example, as of this time, did Altria make any plans or analysis of how the -- of the -- the two businesses, the Altria e-vapor business and the JLI business, would have been put together or fit together as part of a – a contribution of Altria's assets to JLI as part of this transaction?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  I don't -- I don't recall.

BY ATTORNEY SAVERI:

Q.    Okay.  You can put that aside.

A.    Sure.

Q.    Do you recall in August of 2018 that Altria had a board meeting in Montana?

A.    We usually had August board meetings.  That sounds about right.

Q.    Okay.  And so at the time, Altria

Highly Confidential

Page 122

owned a large ranch in the Crazy Mountains in Montana, correct?

A.   Yes.

Q.   And that ranch was also known as the Marlboro ranch; is that correct?

A.   It's -- it was the Crazy Mountain Ranch.

Q.   And it was -- it's about an 18,000-acre ranch.

Do you recall that?

A.   That sounds right.

Q.   Okay.  And this was a place that Altria offered all-expense-paid trips to reward Marlboro smokers, correct?

A.   I -- I think there were brand executions when it was all-expenses-paid.

Q.   And -- and the ranch had an old western town, correct?

A.   Yeah.

Q.   And it had a saloon and an event space and hotel rooms and a spa, correct?

A.   I think that's right.

Page 123

Q.   Okay.  And then at this August -- did Altria regularly have its August board meeting there?

A.   I think it moved around at times.  My recollection was years -- some years, they'd have a meeting at the ranch; other years, it would be somewhere else.  But . . .

Q.   Okay.  But focusing on this August 2018 period, you went to Montana during that period, correct?

A.   I did, yeah.

Q.   And Mr. Gifford went, correct?

A.   Yes.

Q.   And Mr. Garnick?

A.   Yes.

Q.   Mr. Quigley?

A.   I believe he did.

Q.   Okay.  And while you were there in August of 2018, you and others met to discuss the strategy, among other things, for -- with respect to the -- the -- the transaction that was being negotiated with JUUL; is that correct?

Page 124

A.   You mean with the board meeting?

Q.   Yeah.

A.   Yeah.  I mean, it was a lot on the board agenda, but that was one of the topics.

Q.   Well -- and weren't there also strategy sessions which weren't part of the formal board meeting where the subject of the JUUL transaction was discussed?

A.   I don't -- I don't know if they were --

Q.   Okay.

A.   -- part of the board meeting or not part of the board meeting.

Q.   Okay.  And at that time, is it fair to say you were a supporter of the deal with JLI?

A.   At the time of the board meeting?

Q.   In August of 2018.

A.   I was a supporter of taking a direction that I felt would be a better strategy for Altria to be successful in e-vapor, and considering an investment in JUUL was one of

Page 125

them.

Q.   Okay.  And at that time -- or as part of those meetings, did you make a presentation to the board about the -- about the JLI transaction?

A.   I do recall making a presentation.

Q.   And at that meeting, did you recommend that the board move forward with the transaction with JUUL?

A.   That would not have been my responsibility.  That --

Q.   Okay.

A.   -- would have been Howard's to -- to make any board recommendations --

Q.   Okay.

A.   -- I provided analysis about the transaction.

Q.   Well, during the board presentation -- well, is it fair to say that the board presentation you made supported moving forward with the transaction with JUUL?

A.   I have to look at the presentation

Page 126

that I gave at that time. I think it was providing, you know, the board an update on the state of discussions, among other topics. And then I would leave the board meeting. I wasn't a part of, you know -- I would be excused.

And whatever else they talked about from there or feedback on a variety of things, I -- I wouldn't be sitting in.

Q.    Yeah. I mean, you weren't a board member?

A.    I was not a board member. I was not the CEO. I was -- I'd come in, give a -- give a review, and I would leave.

Q.    At the same time that -- during this time, were you also discussing the subject of whether or not to move forward with the JLI transaction with -- with Brian Quigley?

A.    I don't recall that.

Q.    Okay. Now, during 2018, as we've seen, Mr. Quigley was in charge of Altria's Nu Mark business, correct?

A.    In 2018? Yeah --

Page 127

Q.    Yeah.

A.    -- he was.

Q.    And he was the president of that business, correct?

A.    I believe so, or maybe it was -- CEO, I think it was.

Q.    And he was responsible when MarkTen Elite was put on the market in February of 2018; isn't it correct?

A.    I believe that's right.

Q.    And was -- Quigley was also organizationally responsible for developing the MarkTen Elite product and bringing it to market, correct?

A.    He wasn't responsible for developing the product; he was responsible for commercializing the product.

Q.    Okay. And was Mr. Quigley also part of the team that was res- -- responsible for addressing the -- the issues with respect to the leaking pods?

A.    Yeah. I believe Craig Schwartz

Page 128

reported to Brian, and Craig had an operational responsibility. So in that regard, Brian would have been involved.

Q.    And at that time, Mr. Quigley knew that you were a supporter, generally advocating that Altria pursue the transaction with JUUL, correct?

A.    I don't --

ATTORNEY SULLIVAN: Objection to form.

THE WITNESS: -- know what time frame you're referring to.

BY ATTORNEY SAVERI:

Q.    In -- in August of 2018.

A.    In August 2018, I don't even know if I was an advocate at that time of doing a deal because I don't think there was a deal to be done at that point in time. So it's hard for me to say.

What I was an advocate for was that the current strategy of supporting products that were not effective to achieve their goal and had

Page 129

my -- you know, my view from assessments given to me at the time, significant problems to ever actually receive an FDA authorization, that continuing to support those two fundamental weaknesses was a bad strategy.

Q.    Now, Mr. Quigley disagreed with that, correct?

A.    He very well could have.

Q.    And you didn't share Mr. Quigley's view, did you?

A.    What is Mr. Quigley's view?

Q.    That Nu Mark -- that MarkTen Elite should -- well, the view that the transaction with JLI should be pursued and that, as part of that, the MarkTen Elite product should be shut down.

ATTORNEY SULLIVAN: Objection to form.

ATTORNEY BAMBERGER: Objection to form.

THE WITNESS: I'm trying to make sure I -- I understand your question and

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION

Highly Confidential    Kevin C. Crosthwaite on 11/15/2024

Page 130

answer --

BY ATTORNEY SAVERI:

Q.    Well, let -- let me back up.

I mean --

A.    Thank you.

Q.    -- I understand from your previous -- your immediately prior testimony that you thought that pursuing the transaction with JUUL was generally a strategy that should be pursued by Altria at the time?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  At the time -- if you're referring to August, I felt negotiating for a potential path forward to invest in JUUL was a -- was a good idea, and I was supporting that project.

At the same time, I was also supporting a significant effort to try to actually create a product that would be effective with its stated goal and have a shot at receiving a regulatory

Page 131

authorization.

So it was -- it was really both -- both things that I was working on at the same time period.

BY ATTORNEY SAVERI:

Q.    Now, do you recall that Mr. Quigley reviewed your plan presentation to the Altria board and disagreed with it?

A.    He very well could have.

Q.    Do you recall he said it was incomplete?

A.    I don't -- I don't know.

Q.    Do you recall that he said it had incorrect information?

A.    Yeah.  I remember receiving an e-mail from Brian.  I don't know what exactly was in it about the board meeting.

Q.    And do you recall that Mr. Quigley wrote to you and said that you were giving the board of directors only the bad news about MarkTen Elite?

ATTORNEY SULLIVAN:  Objection to

Page 132

form.

THE WITNESS:  It could have been in the e-mail I'm -- I'm remembering.  I don't remember exactly what he said.

BY ATTORNEY SAVERI:

Q.    Well -- and he also told you that it was incorrect to assert that MarkTen was declining.

Do you recall that?

ATTORNEY SULLIVAN:  Same objection.

If you have a document, you might show it to him.

THE WITNESS:  Yeah.  I -- I don't recall the exact e-mail that you're referring to or conversation that you're -- you're referring to.

BY ATTORNEY SAVERI:

Q.    Well, do you recall he said to you that you -- that it was inaccurate to represent to the board that MarkTen was declining when, in fact, it was not?

Page 133

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  I don't -- I don't recall.

--oOo--

(PLX Deposition Exhibit Number 505, E-mail string, Bates stamped PX1008-001 through PX1008-002, marked for identification, as of this date.)

--oOo--

BY ATTORNEY SAVERI:

Q.    Okay.  Let me -- sir, I think I've handed you what has been marked as Exhibit 505.

Do you have that exhibit --

A.    Correct, sir, it's 505.

Q.    Okay.  And it has the -- the Document Number PX1008.

Do you have that in front of you, sir?

A.    I do.

Q.    Okay.  And Exhibit 505 is a

Page 134

two-page document. The top of the first part of the e-mail is an e-mail from Mr. Quigley to Teresa Down [sic] dated August 14th, 2018.

Do you see that?

A.   I do see that.

Q.   And he attaches an e-mail that he sent to you earlier in that day.

Do you see that?

A.   Yes, I see that.

Q.   Okay. Now, Mr. – Mr. Crosthwaite, tell me when you've had a chance to review the document.

A.   I'm just reading it really quickly.

Q.   Yeah, sure.

(Whereupon, the witness reviews the material provided.)

THE WITNESS: Okay. I read it.

BY ATTORNEY SAVERI:

Q.   When was the last time you saw this document?

ATTORNEY SULLIVAN: Objection to the extent that the question calls for

Page 135

privileged information or communications.

Mr. Crosthwaite, I would advise you to only answer to the extent that you can without revealing the substance of any privileged communications.

BY ATTORNEY SAVERI:

Q.   When was the last time you saw this document?

ATTORNEY SULLIVAN: Same instruction.

THE WITNESS: I don't – I don't recall see – seeing this – this document from Brian to Teresa. I don't – I don't remember the last time.

BY ATTORNEY SAVERI:

Q.   Okay. As you sit here today, you don't recall ever seeing this document before?

A.   This – this paragraph or this document?

Q.   Exhibit 505.

A.   I – I don't – I don't have any memory of seeing this e-mail from Brian to

Page 136

Teresa –

Q.   Okay.

A.   – I – I don't recall a time seeing it.

Q.   Okay. Now the e-mail to you, which is dated August 14th, 2018, is the Subject – is the Subject – has the Subject line, BOD.

Do you see that?

A.   I do.

Q.   And "BOD" mean – means board of directors, right?

A.   Yes, I assume so.

Q.   And to the best of your recollection, you received this e-mail from Mr. Quigley on August 14th, 2018 –

A.   Yeah.

Q.   – on the date and time that's indicated?

A.   Yes.

Q.   Did he – when he wrote to you in August 14th – on August 14th, 2018, were you already in Montana, do you recall?

Page 137

A.   I don't recall.

Q.   Okay. So Quigley writes to you that your presentation to the board is, to use his word, flat out incorrect.

Do you see that?

A.   Yes.

Q.   And including because, as he puts it, [as read] MarkTen is growing volume is the second fastest growing brand in terms of volume behind JUUL.

Isn't it correct?

A.   Is growing – is growing volume – I see what he said, yeah.

Q.   Okay. So Quigley also says here that he has spoken with Mr. Burns and had agreed that MarkTen would continue; isn't it correct?

A.   Spoke with Mr. Burns?

Q.   Down at the – excuse me – with Mr. Willard, excuse me. Down – let me ask the question again.

A.   Okay.

Q.   Down at the bottom, there's a

Page 138

paragraph that begins, I had a discussion with Howard.

Do you see that?

A.    Okay.  I see that.

Q.    And "Howard" is Howard Willard; is that correct?

A.    That's who he's referring to.

Q.    The CEO of the company at the time, correct?

A.    Correct.

Q.    So Mr. Quigley tells you that he had a discussion with the CEO, where Mr. Willard agreed that it doesn't make sense to close up shop and we'll build -- while we build for the future.

Do you see that?

A.    I see that.

Q.    So he's telling you that he spoke to the CEO of the company and that Mr. Willard told him it doesn't make sense to close up shop.

Do you see that?

A.    I see what he's -- what he's

Page 139

writing.

Q.    And "close up shop" means shut down MarkTen, correct?

A.    I -- I'm -- I don't know what he means by "close up shop while we build for the future."

It could be MarkTen.  I don't know exactly what he's referring to.

Q.    Well, he was responsible for Nu Mark at the time, right?  He was the president of that organization, right?

A.    Well, yes, and which had the responsibility for commercialization of the SKUs.

Q.    Well, in the prior paragraph, he says, I am hearing that the decision has been made to stop Nu Mark.

Do you see that?

A.    I see what he wrote there.

Q.    And he says, I know the decision has not been made.

Do you see that?

Page 140

A.    I see that.

Q.    So when he's talking about closing up shop, he's referring to that, isn't he?

A.    So what I -- what I believe -- and I'm speculating what Brian means -- what he's referring to, at least my recollection at the time, is an investment decision.  Do you invest to support the products that are in the market that -- or -- or do you invest in -- I think I'm speculating now what he's saying here about the future, which would be in the creation of products that we felt would be a more competitive offering, would be designed without toxicology problems, that would be designed to be -- ultimately have a chance to be authorized.

So, you know, the -- the -- my -- these are my words now -- what I believe he is referring to is that decision, you know, support commercially the things you have, understanding their limitations, or invest in a different path.

And, yes, if you invest in a

Page 141

different path was ultimately the decision, then you would not be spending the money on the products that are commercially in the market.

Q.    Is it fair to say Mr. Quigley was angry with you at this time?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  I don't know.

BY ATTORNEY SAVERI:

Q.    Well, he says in his e-mail to Ms. Downs, I am over this BS.

Do you see that?

A.    I see that.

Q.    What's "BS" mean?

A.    I'm assuming he's mean -- it means bullshit.

Q.    So that's not an expression of happiness, is it?  He's angry with you, isn't he?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  I don't know.  He

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION

Kevin C. Crosthwaite on 11/15/2024

Page 142

could -- he -- he -- he could be. He could be frustrated. I -- I don't -- I don't know what he's -- means by he's over all the BS. He could -- he could have been angry at me.

BY ATTORNEY SAVERI:

Q.    And then he also indicates that he wants to have a meeting with you, the CEO and him to discuss this, correct?

A.    Yeah, he does.

ATTORNEY SAVERI:  Okay.  You can put that aside.

THE WITNESS:  Okay.

--oOo--

(PLX Deposition Exhibit Number 506, E-mail string, Bates stamped PX1086-001 through PX1086-002, marked for identification, as of this date.)

--oOo--

BY ATTORNEY SAVERI:

Q.    Let me give you the next one, sir.

Page 143

A.    Sure.

Q.    Sir, I've handed you what's been marked as Exhibit 506.

This has the Bates Number PX1086-001.  The top of the first page is an e-mail from Mr. Jupe to yourself dated June 9th, 2018 entitled [as read] K.C. (yes, a long . . . sorry).  And he attaches an e-mail from Mr. Schwartz to Mr. Jupe -- he includes a number of individuals.

Do you have that in front of you, sir?

A.    I do.

Q.    Okay.  And to the best of your recollection, did you receive this e-mail from Mr. Jupe on or about the date that's indicated here?

A.    See, I -- yeah.  I haven't read it, but it seems like, yes, I did.

Q.    Okay.  And he discusses in this e-mail plans for Elite -- the MarkTen Elite going forward.

Page 144

Do you see that?

A.    Do you mind if I just read it quickly?

Q.    No, I do not at all.

A.    Okay.

(Whereupon, the witness reviews the material provided.)

DOCUMENT TECHNICIAN:  I'm sorry. Counsel, can I have that tab number?

ATTORNEY SAVERI:  Yeah.  It's 15. I'm sorry, sir.

DOCUMENT TECHNICIAN:  And this is 506?

ATTORNEY SAVERI:  It is, sir.

(Whereupon, the witness continues to review the material provided.)

THE WITNESS:  I read it.

BY ATTORNEY SAVERI:

Q.    Now, this e-mail again refers to -- well, let me read this to you.

Mr. Jupe writes to you, K.C., right -- that's you?

Page 145

A.    Yes, that's me.

Q.    I know you raised the question as to the role of Elite going forward.

Do you see that?

A.    I do.

Q.    And that's a reference to the MarkTen Elite e-vapor product, correct?

A.    Yes.

Q.    And he says, I too question its role in the portfolio especially considering a sec -- successful outcome with Project Tree.

Do you see that?

A.    I do.

Q.    And Project Tree, again, is the -- is the deal that was being negotiated with JUUL at the time, correct?

A.    Correct.

Q.    Okay.  So he writes to you in the third paragraph that he has a plan for Elite 2.0 and, in parentheses, design for PMTA.

Do you see that below the bullets?

Page 146

A.    I do.

Q.    Okay.  And did you understand that those plans would -- under the -- the terms that were negotiated with JUUL, would have been stopped?

A.    No --

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  -- I don't have any recollection of that.

BY ATTORNEY SAVERI:

Q.    Well, it was -- wasn't it the case that at all times during the negotiations with JUUL, that a condition for JUUL was that Altria not compete in the e-vapor market?  Isn't it correct?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  I mean, if you're referencing back to the -- to the term sheets, whatever -- whatever they said.

But as it pertains to this --

Page 147

this e-mail, this is -- this is talking about R&D and development for Elite.

BY ATTORNEY SAVERI:

Q.    And under the terms that were proposed by JUUL, the -- the development of Elite would be ceased, correct?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  I was referring to the term sheet or -- during the negotiation -- I'm not sure I'm following your question.

BY ATTORNEY SAVERI:

Q.    Well, in June of 2018, as is indicated here, Mr. Jupe was communicating to you plans he had for the development of the Elite product line, correct?

A.    Yes.

Q.    Including something he called Elite 2.0.

Do you see that?

A.    I do.

Page 148

Q.    And also a next generation project including -- which was called Elite 3.0.

Do you see that?

A.    I do see that.

Q.    And those were nev- -- never developed, were they?

A.    Actually, I -- I don't know to these -- how far the development on these came.  They were certainly in -- in flight to be developed -- in the product development system.

Q.    And to the best of your knowledge, they were never, in fact, developed and brought to market, correct?

A.    Well, they couldn't have been brought to market.  With the FDA, you have to go through a clearance process.  So there was -- that's -- that's -- that's the reason why these were being discussed where they are, which is the assess -- at least the assessment that I agreed with was the current product on the market was doomed to fail for a variety of reasons.

Page 149

And this e-mail is simply talking about my recollection of it, talking about the development paths in the future for, you know, a second version, a third version that contemplates how to address the -- the fundamental reasons that the first version would fail.

Q.    And the (design for the PM-) -- excuse me.

A PMTA means what?

A.    A PMTA is a -- means premarket tobacco authorization.  It is the requirement that you have to receive from the Food and Drug Administration in order to commercialize your product in the United States.

Q.    And when Mr. Jupe referred to "plan for Elite 2.0 (design for PMTA)," he was referring to a design for a next-generation MarkTen product designed to satisfy or comply with those regulations, correct?

A.    Yeah, any -- any R&D work going on at this time would absolutely be assessed

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION

Highly Confidential    Kevin C. Crosthwaite on 11/15/2024

Page 150

through the standards required to ultimately achieve a PMTA authorization.

Q.    Okay.  You can put that document aside.

A.    Sure.

Q.    Do you recall in September of 2018 that Altria received a letter from the FDA?

A.    I believe so.  I -- I don't remember the exact date, but yes.

Q.    Well, on or about that time, Altria became aware that it was one of five companies that received a similar letter, correct?

A.    That could -- I don't -- I don't recall.

Q.    You don't recall.

And do you recall that the -- the FDA issued this letter to the five top-selling e-vapor or e-cigarette manufacturers: Altria, JLI, Reynolds, ITG and JTI?

Do you recall that?

ATTORNEY SULLIVAN:  Objection to

Page 151

form.

THE WITNESS:  It makes sense.  I didn't know -- I didn't know what five companies got the letter.

BY ATTORNEY SAVERI:

Q.    Okay.  And do you recall that the letter requested that each company submit plans to the FDA within 60 days of how the companies were going to address youth vaping?

A.    Hearing you say it, that sounds -- it reminds me what was in the letter.  I don't recall the FDA letter.

Q.    Okay.  And did Altria ask -- use the FDA scrutiny of JLI's e-vapor business as part of its strategy with respect to the negotiations with JLI?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  Did they -- can you please repeat that?

They use -- I'm not sure I'm following you.

Page 152

BY ATTORNEY SAVERI:

Q.    Yeah.

Did Altria use or analyze the -- the scrutiny of the FDA of JLI's e-vapor business in connection with its strategy to acquire an ownership interest in JLI?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  Not that I'm aware of.

BY ATTORNEY SAVERI:

Q.    Okay.  In fact, sir, though, you participated in a group analyzing the effect of the FDA's announcement on the risks to JLI's business; isn't that correct?

A.    I don't remember the meeting.  I could have.

Q.    Okay.  You concluded, didn't you, that the FDA scrutiny increased the risks to JLI substantially?

ATTORNEY SULLIVAN:  Objection to form.

Page 153

THE WITNESS:  I don't remember drawing that conclusion.

BY ATTORNEY SAVERI:

Q.    Okay.  You also analyzed the effect of the FDA's announcement on JLI's valuation, correct?

A.    I don't remember myself doing that --

Q.    Okay.

A.    -- valuation.

Q.    Did you conclude as part of that analysis that the FDA scrutiny substantially decreased the valuation of -- of JLI?

A.    I don't recall concluding that because I don't recall the analysis that you're referring to.

Q.    Okay.  And do you recall concluding that Altria could use the FDA's announcement to negotiate better terms for itself with respect to the acquisition of the ownership interest in JLI?

A.    I -- I don't remember myself

Highly Confidential

Page 154

drawing any conclusion like that.

--oOo--

(PLX Deposition Exhibit Number 507,

E-mail with attachment, Bates

stamped PX4273-001 through

PX4273-019, marked for

identification, as of this date.)

--oOo--

BY ATTORNEY SAVERI:

Q.    Let me hand you --

Oh, sorry.

A.    No problem.

Q.    -- what I've marked as Exhibit 507.

Sir, Exhibit 507 is a document with the Bates Number 4273.

A.    Okay.

Q.    The first page is an e-mail from yourself to Murray Garnick, dated September 21, 2018.

Do you see that?

A.    I see that.

Q.    Okay.  And it attaches a -- a slide

Page 155

deck which is entitled Project Tree, September 2018.

Do you see that?

A.    Yes.

Q.    Okay.  So I have some questions about the deck, but let me start this way:  To the best of your recollection, did you transmit this e-mail and the attachment to Mr. Garnick on September 21, 2018?

A.    It looks like I did.

Q.    Okay.  And it attaches a e-mail from someone named Christopher Boffi --

Do you see that?

A.    Yes.

Q.    -- at PWP Partners.  That's Perella Weinberg Partners.

Do you see that?

A.    I do.

Q.    And at this time, what services was Perella Weinberg Partners providing to Altria?

A.    Perella Weinberg was a investment banking advisor to the company --

Page 156

Q.    Okay.

A.    -- to Altria.

Q.    And if you look at the date of these -- this communication, it's September 21, 2018.

Do you see that?

A.    I see the date.

Q.    And do you recall that you sent this after you had learned that the FDA had written letters to you and JLI and others about e-vaping and asked to schedule a meeting within 60 days to talk to them about it?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  I don't remember the sequence of these e-mails and that letter.

BY ATTORNEY SAVERI:

Q.    All right.  So if you look at the -- the -- the -- the deck, the first page is called Project Tree, September 2018.

Do you see that?

Page 157

A.    Yes.

Q.    Okay.  And the -- the -- the first slide recites recent events.

Do you see that?

ATTORNEY SULLIVAN:  Have you had a chance to --

THE WITNESS:  Yeah, I'm gonna --

ATTORNEY SULLIVAN:  -- look at the document?

BY ATTORNEY SAVERI:

Q.    Oh, yeah.  I -- I'm sorry.  Please take a moment to read it.  I'm just --

A.    I'll go quick.

Q.    Okay.

DOCUMENT TECHNICIAN:  I'm sorry, Counsel.

The tab for 507?

ATTORNEY SAVERI:  Thirty-three.

(Whereupon, the witness reviews the material provided.)

THE WITNESS:  Okay.  I've flipped through it.

Page 158

BY ATTORNEY SAVERI:

Q.    Okay.  So I have a couple questions.

A.    Sure.

Q.    Let me kind of start, kind of, towards the front and kind of work -- work my way through it.

Okay?

So the -- the first substantive slide deck is the page that ends with the number 003, entitled Recent events.

Are you with me?

A.    I am on that page.

Q.    Okay.  And so that discusses or summarizes facts regarding JLI's performance and recent events regarding the FDA's announcement of its letters to the e-cigarette manufacturers, correct?

A.    That's what both these columns, I think, are referring to.

Q.    Okay.  And so this slide compares JLI's recent performance to the recent FDA

Page 159

announcement, correct?

A.    They're -- they're -- they're two separate things.  This is just stating JLI's business results to a certain period of time, and I read this slide as referring to a 9/12 announcement that the FDA has sent out a letter.

Q.    And then the last entry in the FDA Announcement column is Overhang on Tree's equity value until FDA clarifies future actions.

Did I read that correctly?

A.    That is what it says.

Q.    Okay.  Now, if you'll flip over two pages, there's another slide that says, Illustrative range of FDA outcomes.

Do you see that?

A.    0-0-5, yes.

Q.    And the slide describes certain likely FDA outcomes at the time, correct?

A.    I -- I don't know if it describes my view, not likely, just -- it just sort of lays out a -- a continuum of what the FDA could or could not do in the marketplace.

Page 160

Q.    Well, one was a ban on all vaping flavors except mint, correct?

A.    That is a scenario here.

Q.    And as is described here, that would put up to 60 percent of current Tree volume at risk, correct?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  What it is referring to in the bottom --

(The witness mumbles under his breath while reviewing the material provided.)

THE WITNESS:  -- it is -- it is speculating on a -- on a -- on a scenario if -- if the marketplace did not have flavors.  And I'm assuming when it says "ex. mint," it's -- in this scenario, I guess they're making an assumption that mint is still there.  That's my view, reading it.

Page 161

BY ATTORNEY SAVERI:

Q.    Okay.  And under that scenario, as indicated here, that put up to 60 percent of current JLI volume at risk, correct?

That's the conclusion of this chart?

A.    That's the hypothesis that this chart is making.

Q.    And another outcome was a ban on all vaping flavors, correct?

That's the one on the right?

A.    That is another out -- potential outcome that is here.

Q.    And that would put up to 90 percent of current Tree volume at risk, correct?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  I think -- my -- my read of this at the bottom, it is just capturing at that point in time what percent of Tree's volume resides in these different scenarios in that current time

Page 162

frame.

BY ATTORNEY SAVERI:

Q.    Would you agree with me that 90 percent is a significant number?

A.    Ninety percent is a significant number if you're talking about 90 percent of 100.

Q.    Yeah.

Okay.  So the next slide, on Page 006, discusses the market reaction to the FDA announcement, correct?

A.    That's what it says.

Q.    And it -- and it calculates or sets forth changes in market capital -- capitalization of certain companies after that announcement, right?

A.    It -- it seems like it's capturing a -- a change in market cap in one day -- I think that's "1" -- and then some period of time through 9/17.

Q.    So it indicates that a -- a day after the FDA announcement, Altria had a decline

Page 163

in its market capitalization of $7.5 billion, correct?

A.    I don't know.

Is that -- is it -- I -- I'm not sure if it's even showing.

Is it a decline?  Is that what it's meant to read?

Q.    Well, it says Change in Market Capitalization.

Is your recollection that Altria's market capitalization increased as a result of the FDA announcement?

A.    I don't -- I don't -- I don't remember the stock price that --

Q.    Okay.

A.    -- that day, honestly.

Q.    Do you recall that Altria's stock price, in fact, went down after this FDA announcement?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  I don't recall the

Page 164

stock prices that -- those days, honestly.

BY ATTORNEY SAVERI:

Q.    Okay.  And do you recall that as of September 17th of that year, that Altria's market cap had declined $5.6 billion after the FDA announcement?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  I -- I don't -- you're referring to what time period for this stock?

BY ATTORNEY SAVERI:

Q.    On September 17th, 2018.

A.    Their year-to -- year-to-date that year?

I just don't know the -- what -- what the stock movement was.

Q.    Okay.  So you -- okay.

Now, if you look at the next slide --

A.    Okay.

Q.    -- it's entitled Valuation

Page 165

considerations   market perspective.

Do you see that?

A.    I see that.

Q.    And as the title indicates, it -- this sets forth the implied reduction to JLI's U.S. business based on public market reaction to FDA announcement.

Do you see that?

A.    I see that, what it says.

Q.    So what this chart is doing is making kind of a similar calculation or analysis of the effect on -- on the valuation of -- of JLI after the FDA announcement, correct?

A.    I -- I don't think it's making it on the -- I mean, I didn't make this chart, so I'm trying to understand exactly what it says. I -- I -- my read of this chart is it's trying to talk about -- I'm not even sure what it means, honestly.

Maybe you -- you want to explain it to me?

I don't --

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION

Page 166

Q. Well --

A. -- know exactly how this chart is constructed.

Q. -- well, do you recall that at this time, JLI -- excuse me -- Altria was interested in continuing negotiations with JLI?

A. I think as of September that was still an -- a active dialogue.

Q. And do you recall that one of the questions that it was trying -- that Altria was trying to determine was what the valuation was of JUUL in the context of those negotiations?

A. I mean, I think valuation was -- was always a key term that was talked about throughout the negotiation.

Q. And this slide shows or attempts to set forth what the impact on that JUUL valuation was as a result of the FDA announcement, correct?

ATTORNEY SULLIVAN: Objection to form.

THE WITNESS: Yeah, actually,

Page 167

I -- sir, I don't -- I don't agree with that.

This is -- this is -- again, I may not be understanding the chart -- that's very possible -- how this was constructed. It is -- it is a -- it is trying to create projections for scenarios that could or could not happen based on an FDA announcement and then assigning assumptions to those scenarios if they did or didn't happen and what the potential impact could be to a valuation.

That's how I'm understanding it. If I'm understanding it incorrectly, please correct me.

BY ATTORNEY SAVERI:

Q. Well, do you recall that at the time, that JLI was estimated to be worth $28 billion?

A. I don't recall at -- at this time whether -- that very well could have been the -- the current view of valuation.

Page 168

Q. Well, in the reference here to the 28B valuation, that's an estimate of the JUUL -- of -- of valuation before the FDA announcement, correct?

A. That seems right to me.

Q. Okay. And this chart indicates what the -- what decreases or what changes to what valuation happened as a consequence of the FDA announcement, correct?

ATTORNEY SULLIVAN: Objection: form.

THE WITNESS: No, I don't see -- no, I don't think so, because there was no change to the JLI business as a result of that announcement.

This chart is projecting -- at least, again, I'm -- and if I'm wrong, sir, I am sorry; correct my understanding of this chart. It is projecting a potential outcome and then discounting -- if those things were to happen, this would be a valuation consideration.

Page 169

There was no change to JUUL's valuation the day -- the actual day of that FDA letter.

BY ATTORNEY SAVERI:

Q. Fair enough.

If you turn to the next chart, sir.

A. Sure.

Q. There's a -- it's entitled Valuation considerations   DCF perspective.

Do you see that?

A. I see that page, yes.

Q. And "DCF" is discounted cash flow, correct?

A. That's my understanding on this page, yes.

Q. Okay. And so in this chart, there is an attempt to calculate discounted cash flow if -- from a discounted cash flow perspective changes in valuation based on permanent volume reductions in JLI sales, correct?

A. I believe that is how this chart is

Highly Confidential

Page 170

constructed.

Q. All right. And this -- and, as the chart indicates, depending how great the increase in volume reduction was, that there would be a corresponding decline in valuation from a discounted cash flow perspective?

A. Yeah, I -- I think what this -- my read of what this chart is saying was that in a future -- to discount a future cash flow back, it is taking a forward-looking view and under scenarios that on a -- on a forward-looking view, if certain percentages of the company -- of JLI's volume was not present versus a previous assumption, then the -- then -- then the DCF value is corresponding to some of those assumptions.

Q. And the intervening event in that calculation was the activity of the FDA, correct?

A. Well, I -- I -- I think the -- I don't know what is in this model, like, that's feeding these scenarios.

Page 171

My assumption is this model is -- is projecting a certain series of SKUs or a category construct during that time that could be across that previous continuum that we had looked at.

That's my -- that's my guess of what is in this model.

Q. Okay. Thanks.

Turn to the next slide, please.

A. Sure.

Q. So -- excuse me. Maybe it's two slides in the deck. It's the page that ends 010, Assessment of Tree strategic options.

And -- and this chart sets forth an analysis of what JLI's strategic options were after the FDA announcement, correct?

A. Do you mind if I just read it quickly?

Q. Sure.

A. And I will answer your question.

Q. Yeah.

Page 172

(Whereupon, the witness reviews the material provided.)

THE WITNESS: Okay. I read it.

BY ATTORNEY SAVERI:

Q. Okay. So -- and, again, and my question was: Does this Tree -- does -- does this deck analyze or assess JLI's strategic options after the FDA announcement?

A. Yeah, I am assuming that the -- the date is after the FDA announcement and it is -- it is assessing, from the perspective of Altria side, what Tree could be thinking, or JUUL, in this case, could be thinking about its option set in the environment.

Q. Well, the -- the second line is IPO.

Do you see that?

A. I do.

Q. All right. And so this assesses that the likelihood of an IPO after that announcement was lower, correct?

A. Well, it assesses from the

Page 173

perspective of Altria assessing how some other company would be thinking about their option set.

Q. And that assessment was that it was less likely that JUUL would pursue an IPO?

ATTORNEY SULLIVAN: Objection to form.

THE WITNESS: I mean, certainly, in this -- in this version of this -- of this plan, that is an assumption that is made on this page.

BY ATTORNEY SAVERI:

Q. And the next one is the -- the assessment is that the likelihood of a tender offer was also less likely, correct?

A. That is what is on the page.

Q. And in particular, the second bullet indicates that the regulatory overhang also limits JUUL's ability to -- to borrow money, to raise debt, correct?

A. I'm sorry. Where -- where -- where are you reading that?

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION

Kevin C. Crosthwaite on 11/15/2024

Page 174

Q.    In the Tender offer line --

A.    Oh.

Q.    -- there are two bullets, and there's a commentary, and then it says, Not clear how Tree would fund tender offer.

Do you see that?

A.    I see what it says.

Q.    And it says, Note regulatory overhang also limits Tree's ability to raise debt.

Do you see that?

A.    Yeah.  These are -- again, these are assumptions that are being made about JLI.

Q.    Okay.  And then with respect to the others where there was more of a question, one was to Pursue Business Plan and Formulate Proposal to FDA.

Do you see that?

A.    On the top column?

Q.    Yeah.

A.    I do -- I see that.

Q.    So the assessment here is it was

Page 175

unclear whether or not that was more or less likely, correct?

A.    I'm just reading what the commentary says.

Q.    Yeah.

(Whereupon, the witness reviews the material provided.)

(The witness mumbles under his breath while reviewing the material provided.)

THE WITNESS:  So this is -- the commentary is speculating on what the JLI team is thinking about their proposal --

BY ATTORNEY SULLIVAN:

Q.    Yeah.

A.    -- in response to the FDA, and then it's speculating that -- that the investors of JLI would -- may be unwilling to take material valuation reduction.

Q.    And that "material valuation reduction" is -- refers to the valuation of JUUL, correct?

Page 176

A.    That is my understanding.

Q.    Okay.  And does that refresh your recollection that JUUL had been valued at approximately $28 billion at this time?

A.    It seems like that's -- was what the thinking was at this time.

Q.    Okay.  And the last item on this chart is Strategic Partnership Investment.

Do you see that?

A.    I do.

Q.    Okay.  And at that time, isn't that what Altria was negotiating with JUUL, a strategic partnership investment of cash in exchange for 35 percent of the company or some percentage of the company?

A.    Yeah, I think at this time, it's -- there -- there was certainly back-and-forth about an economic investment into JLI.  And whether this is referring to -- which I don't recall or know what JLI was doing with others at the time.  I think that's why there's a question mark.  That is just, you know, raising the

Page 177

question, trying -- trying to speculate what is JLI thinking as a result of the current FDA letter.

Q.    Okay.  And the next slide approaches these tactical considerations from Altria's perspective, correct?

A.    Yes.  That's what it says.

Q.    And it sets forth four:  Wait and See, Acquisition of Up to 45 Percent, Contingent Payment Structure, and Acquire Majority Stake in Tree.

Do you see that?

A.    I see that.

Q.    And those were all possible pathways that Altria was considering with respect to JLI at the time; is that correct?

A.    There may have even been more.  I -- there could be.

Q.    Okay.  Now, if you flip to the next chart, it says, Illus- -- Illustrative Tree valuation range.

Do you see that?

Page 178

A. I see the chart.

Q. Okay. And over on the right-hand column, under 28 million, there's the -- the numeral 12.6 circled.

Do you see that?

A. I see that.

Q. Why was 12.6 circu- -- circled?

A. I don't -- I need to make sure I understand what the chart even is.

Q. Yeah.

(Whereupon, the witness reviews the material provided.)

THE WITNESS: Okay. I think I understand what the chart -- what the chart says --

BY ATTORNEY SAVERI:

Q. Yeah.

A. -- and I don't know -- I don't know in particular why 12.6 was circled. Maybe at the time, in -- at this moment in time in September, the leading scenario was trying to get a 45 percent economic ownership level. It

Page 179

could be the reason why it was circled. I don't know.

Q. And just generally, is it the case that this chart indicates, for example, that assuming an illustrative JLI valuation of 28 million, the acquisition of 45 percent in equity would pencil out to a purchase price of $12.6 billion?

A. I think that is the math that this is -- this chart is showing.

Q. Well -- and ultimately, Altria paid $12.8 billion, correct, and applied -- and acquired 35 percent of the company, correct?

A. Correct.

Q. Why pay more for less of a company?

A. Well, I think it's important to the context of -- this chart is exactly what it says; it's an illustrative valuation. In any negotiation, two parties may have a different view of what is valuation.

It's -- Altria, at this time, was entitled to build an illustrative version of

Page 180

what it thinks it is. And in any good form of negotiation, you're ultimately going to conclude on what is a valuation that two parties would transact.

So I'm sure -- and I was on this side of the table at the time. I would have loved to have seen this valuation be a lot lower and achieve the goal. And -- that -- that's -- that's my understanding of -- to answer your question.

Q. Okay. And then the next chart talks about Top nonvalue terms for renegotiation.

Do you see that?

A. Yes, sir.

Q. And this -- this identifies certain terms that were subject to the negotiation that might -- or were suggested to be renegotiated in light of the FDA announcement, correct?

A. Let me just read them quickly --

Q. Please.

A. -- and I'll -- and I'll come back

Page 181

to you.

(Whereupon, the witness reviews the material provided.)

THE WITNESS: So I think what this is capturing, you know, at this moment in time of the -- of the negotiation are just what it says, are -- are nonvaluation-related deal terms that are being raised for consideration.

BY ATTORNEY SAVERI:

Q. And it -- you would agree with me that it doesn't include a discussion of the -- the -- the deal term that involved the contribution, divestiture or shutting down of MarkTen or the Nu Mark product line? That's not included here?

ATTORNEY ROSENTHAL: Object to the form.

ATTORNEY SULLIVAN: Objection.

THE WITNESS: Yeah. I don't -- I don't believe those were ever in- -- in- -- included, but certainly not on this page.

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
Highly Confidential    Kevin C. Crosthwaite on 11/15/2024

Page 182

BY ATTORNEY SAVERI:

Q. Okay. And if you turn to the next page, there's a discussion of Illustrative pathways.

Do you see that?

A. I do.

Q. Okay. And so this is kind of like a game scenario, right?

A. Let me take a peek at it, and I'll –

Q. Oh, yeah –

A. – it –

Q. – yeah, yeah, yeah –

A. – it's got – it's just got a lot –

Q. – you know, I – I got – I got it.

A. – this has got a lot on it.

Q. Yeah.

And I'll – I'll just – I'll – I'll just tell you – and here's my question: Were the three scenarios that were set forth

Page 183

there the – were they pathways that Altria was considering at the time?

A. I'm just going to read them quickly now, and I will respond.

Q. That's fine. I've given you the question before you read it just so –

A. Okay. I –

Q. – it's like the teacher's version of it.

Okay?

A. – I – I appreciate that –

Q. Okay.

A. – I'll quickly read it and come back to you.

(Whereupon, the witness reviews the material provided.)

THE WITNESS: So I think what – I haven't read anything on the right side of the chart. I'm just reading one, two and three. And it seems to be speculating on scenarios that – basically, who – who – who – who would call who first is –

Page 184

and then laying out, you know, in the event of that happening, what are topics that could be raised.

BY ATTORNEY SAVERI:

Q. Okay. Do you recall who called who first?

A. I – no, I do not.

Q. It was Willard who called Pritzker, right?

ATTORNEY SULLIVAN: Objection to form.

THE WITNESS: I don't recall.

BY ATTORNEY SAVERI:

Q. And did – did you participate in encouraging Mr. Willard to call Mr. Pritzker first?

ATTORNEY SULLIVAN: Objection to form.

THE WITNESS: I don't remember if – if I – I – I don't remember.

BY ATTORNEY SAVERI:

Q. Okay. You can put that aside.

Page 185

A. Okay.

–oOo–

(PLX Deposition Exhibit Number 508, E-mail with attachment, Bates stamped PX1010-001 through PX1010-004, marked for identification, as of this date.)

–oOo–

BY ATTORNEY SAVERI:

Q. Sir, 508 has the Bates Number PX1010.

It's an e-mail from Mr. Garnick to yourself and Mr. Willard dated October 4th, 2018.

Do you see that?

A. I see that.

Q. Okay. And it attaches some notes about restructuring FDA and Tree.

Do you see that?

A. I'm just reading the e-mail quick.

Q. Yes.

(Whereupon, the witness reviews the

Page 186

material provided.)

CERTIFIED STENOGRAPHER: He needs the tab.

ATTORNEY SAVERI: Oh, yeah. It's Tab 31. Great.

THE WITNESS: Yeah.

BY ATTORNEY SAVERI:

Q.   Okay. Sir, did you receive this e-mail from Mr. Garnick on or about the date that's indicated here?

A.   It looks like I did.

Q.   And he discusses some thoughts about tomorrow's call with the board.

Do you see that?

A.   I see that.

Q.   And do you recall that at this time, you -- you and others were preparing to make a presentation to the Altria board about the -- the status of the negotiations with Tree and the FDA announcement and the FDA's efforts regarding youth vaping?

ATTORNEY SULLIVAN: Objection to

Page 187

form.

THE WITNESS: We very well could have. I don't remember the exact board date, or anything.

BY ATTORNEY SAVERI:

Q.   Okay. So on the third page, there's a Section d called -- called [as read] Meeting position   want to give board advanced notice of our thinking going into the meet.

Do you see that?

A.   Yeah.

Do you mind if I just quickly orient myself with this --

Q.   Yeah, I -- I -- I absolutely do not mind.

A.   Okay. I will go fast.

(Whereupon, the witness reviews the material provided.)

THE WITNESS: Okay. I read through it.

BY ATTORNEY SAVERI:

Q.   Okay. So -- and the section

Page 188

entitled FDA confirms -- this is on the second page, the first page of the notes -- that on September 12th, Scott Gottlieb had sent letters to five companies requesting them to submit their plans to address underage use within 60 days, correct?

A.   I see that.

Q.   Okay. And it confirms Altria, JLI and others received those letters; isn't it correct?

A.   I see that.

Q.   And it confirms that the FDI -- FDA had set up meetings with each company, correct?

A.   Or -- or respond -- it sound -- it look -- what he wrote here is respond --

Q.   But --

A.   -- plans on how to address it.

Q.   -- and on the -- at the bottom, it indicates that Our meeting is set for October 18.

That's Altria, correct?

A.   Yes.

Page 189

Q.   And that JUUL's meeting was set to occur two days before, on October 16th, correct?

A.   That's what it says.

Q.   Okay. Now, on the next page, it sets forth a proposal for the board to review. This is under Section d.

Do you see that, Meeting position?

(The witness mumbles under his breath while reviewing the material provided.)

THE WITNESS: I see where it says d, yep.

BY ATTORNEY SAVERI:

Q.   And the first item is under Pod products.

Do you see that?

A.   Yes.

Number 1?

Q.   Yeah.

And it says, We are going to recommend that FDA require all pod products to

Highly Confidential

Page 190

be taken off the market until PMTAs are obtained.

Q.   Do you see that?

A.   I see what it says.

Q.   Okay.  And then it goes on to explain the reason for the recommendation.

Do you see that?

(Whereupon, the witness reviews the material provided.)

BY ATTORNEY SAVERI:

Q.   A?

A.   I see that.

Q.   The reason -- the reason stated is the Reason for recommendation is that pod products are causing the epidemic and the best way to deal with it is to ban absent prior approval of FDA.

Do you see that?

A.   I see what it says.

Q.   And then it goes on to say that This would have minimum impact on us but devastate JUUL in the short term.

Page 191

Correct?

A.   That's what he wrote.

Q.   Okay.  So this indicates that Altria understood that the position it was taking with respect to the ban on pod products would devastate JUUL in the short term, correct?

ATTORNEY ROBINSON:  Objection: form.

THE WITNESS:  I mean, this is Murray's notes.  I -- I -- you know, I don't want to speak for what Murray meant or -- behind his notes.  I wouldn't try to -- to do that.

But -- so I -- I don't know if this -- I can say that reflects what Altria's point of view was.

BY ATTORNEY SAVERI:

Q.   Okay.  But you would agree with me that this was -- this reflects at least what was being communicated to the board in connection with this discussion?

ATTORNEY ROBINSON:  Objection to

Page 192

form.

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  I ultimately am not sure what was communicated in Howard's discussion with the board, how he took Murray's notes and -- it's -- I don't know.

BY ATTORNEY SAVERI:

Q.   Well, he goes on to say that doing this, [as read] Number (1), Gives us good cover and story for taking MarkTen Elite off the market now.

Do you see that?

A.   I don't.

Where are you -- oh, Number -- b?

Q.   Yes.

(Whereupon, the witness continues to review the material provided.)

THE WITNESS:  I see where he wrote that.

BY ATTORNEY SAVERI:

Q.   Now, the second item is Flavors,

Page 193

right?

A.   Number 2?

Q.   Yeah.

We are going to recommend that FDA require all flavor e-vapor products be taken off the market until PMTAs are obtained except for tobacco, menthol, and mint.

Do you see that?

A.   Is that in b?  I don't know -- where are you?

Q.   Under the Flavors section.

A.   Oh, I'm sorry.

Okay.

Q.   Let me read it to you again --

A.   Okay.

Q.   -- We are going to recommend that FDA require all flavor e-vapor products be taken off the market until PMTAs are obtained except for tobacco, menthol, and mint.

Did I read -- read that correctly?

A.   That's what that says.

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION

Page 194

Q.    Okay.  Now, the rationale -- the reason for the recommendations indicates, Flavors are reportedly attractive to kids, so one way to squarely address the youth issue is to ban nontraditional flavors absent prior approval by FDA.

Do you see that?

A.    I see what he wrote in a.

Q.    Yeah.

And then he also writes the reason for it.

Do you see that?

In the -- in the --

A.    Under the Reason for unilateral action?

Q.    Yeah.

And the first is The overwhelming bulk of our sales -- that's Altria -- are in traditional flavors   tobacco, menthol and mint.

Correct?

A.    That's what it says.

Page 195

Q.    And then he says, Such a rule would be devastating to other competitors but limited impact on us.

Correct?

A.    That's what it says.

Q.    And "competitors" includes JUUL, correct?

ATTORNEY ROBINSON:  Objection to form.

THE WITNESS:  I'm assuming that he's just referring to -- again, this is Murray's document.  I don't know.

Maybe he's referring to competitors of -- that are in the e-vapor category, I -- I'm assuming.

BY ATTORNEY SAVERI:

Q.    And one of them was JUUL?

A.    Yeah, JUUL was in the e-vapor category.

Q.    And then, third, they were going to indicate -- on the next page -- We're going to tell the FDA that we would support legislation

Page 196

that would make 21 the minimum age of purchase.

Correct?

A.    Yes.

Q.    And as he indicates, this would do minimal damage to our business.

Correct?  That's in Line 4.

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  These moves are designed to --

(The witness mumbles under his breath while reviewing the material provided.)

CERTIFIED STENOGRAPHER:  If you're going to read, I've got to take it.

THE WITNESS:  Oh, sorry.

Do you mind repeating your question?

BY ATTORNEY SAVERI:

Q.    Mr. -- these notes indicate that the suggestion of these moves would do minimal punitive damage to the Altria business, correct?

Page 197

A.    I'm assuming that's what Murray is referring to in his notes.

Q.    And then if you look at the Tree section down at the bottom, there's a Line e -- Paragraph e.

Do you see that?

A.    I see --

Q.    Although we think the environment?

Do you see that?

A.    (No audible response.)

Q.    And the last line says, We would use the current environment to try to leverage a better deal.

Do you see that?

A.    I see it.

Q.    So that, in fact, confirms that Altria understood that it could use the current environment to try to leverage a better deal from JUUL, correct?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  I can -- yeah.

Page 198

This is what it says in Murray's note. You know, how -- how Altria was contemplating the macro environment in its negotiation is difficult for me to say.

BY ATTORNEY SAVERI:

Q.    Okay.  Did you have an opinion about whether or not the FDA's announcement actually improved or -- the relation -- the position of Altria with respect to bargaining with JUUL or not?

A.    I don't recall at the time having a very strong point of view.  As often the case with the FDA, you're never really sure what they're going to do or when they're going to do it.

It was clearly a -- a moment in time to start thinking about FDA going forward and what they may do with -- with the category, but I -- I can't say it had a big impact on how I thought about the deal.

Q.    All right.  Now, do you recall --

You can put that document

Page 199

aside.

A.    Okay.

Q.    -- that on October 18th, '28 [sic], Altria went to the FDA and presented its position?

Do you recall that, generally?

A.    I do generally recall the -- that meeting.

Q.    And during that meeting, did Altria ever tell Scott Gottlieb or any of his staff that it was in discussions at the time with JLI?

A.    I didn't go to -- I wasn't at that meeting, but I don't -- I don't recall exactly what they said.

Q.    Well, do you know whether or not that was disclosed to Mr. Gottlieb or the FDA at that time?

A.    I don't -- I don't recall.

Q.    And was -- did Altria, at the time, tell the FDA that even though it had come to the conclusion that e-cigarettes contributed to the youth vaping epidemic, that it was a -- at the

Page 200

time, negotiating to pay billions of dollars to JUUL for part of its business?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  I -- I really do not recall what -- what Howard said at the -- and I think Murray might have been there, too, at that meeting.

BY ATTORNEY SAVERI:

Q.    But you understand, don't you, that Altria never told the FDA any of that, correct?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  Yeah.  I don't know exactly what Howard said to Scott in that conversation.

BY ATTORNEY SAVERI:

Q.    Well, you know that -- that Mr. Gottlieb reacted negatively to that, correct?

ATTORNEY SULLIVAN:  Objection to form.

Page 201

THE WITNESS:  To?

BY ATTORNEY SAVERI:

Q.    Well, in fact, Mr. Gottlieb wrote a letter to Altria accusing it of dishonesty, correct?

A.    I don't know if those are the words Dr. Gottlieb used.  I'm happy to take a look at the letter.

Q.    Well, you've seen that letter, haven't you?

A.    I believe I've seen it before, but I don't -- I don't remember it.

Q.    Okay.  Well, let me show it to you.

A.    Okay.

--oOo--

(PLX Deposition Exhibit Number 509, Letter, Bates stamped PX9083-001, marked for identification, as of this date.)

--oOo--

BY ATTORNEY SAVERI:

Q.    Sir, this is Exhibit 509.

Page 202

A.    I got it.

Q.    The long arm of the law.

Okay.  Do you have Exhibit 509 in front of you?

A.    I have 509 in – in front of me.

Q.    Okay.  And this has the Bates Number – or the Document Number PX9083.

Do you have that in front of you, sir?

A.    I have that in front of me.

Q.    Okay.  And 9083 is a letter dated Scott – February 16th, 2019 from Scott Gottlieb, Commissioner of Food and Drugs, to Howard Willard, CEO of Altria, correct?

A.    I see that.

Q.    And in February 6 – excuse me – on February 6th, 2019, you were still with Altria, correct?

A.    Yes.

Q.    Okay.  Now, Mr. – have you seen this letter before?

A.    I think I saw it at the time, but

Page 203

I – it's been a long time.

Q.    Okay.  So Mr. Gottlieb says, [as read] I'm writing to request a meeting with you regarding representations you made in a meeting with the Food and Drug Administration (FDA) senior leadership on October 18th, 2018, and in a written submission that followed.

Do you see where I'm reading from?

A.    I do.

Q.    To go on, [as read] Where you acknowledge that Altria Group, Inc. has an obligation to take action to address the mounting epidemic of youth addiction to tobacco products.

Correct?

A.    Correct.

Q.    And that refers to the October 18th meeting that I've been asking you about between Altria and the FDA, correct?

A.    I believe it does.

Q.    Okay –

Page 204

CERTIFIED STENOGRAPHER:  He needs the tab.

BY ATTORNEY SAVERI:

Q.    And then – and then Mr. Gottlieb –

CERTIFIED STENOGRAPHER:  He needs the tab.

ATTORNEY SAVERI:  What?

CERTIFIED STENOGRAPHER:  He needs the tab.

Never mind.  He got it.

BY ATTORNEY SAVERI:

Q.    – and then he writes, After Altria's acquisition of a 35 percent ownership interest in JUUL Labs, Inc., your newly announced plans with JUUL contradict the commitments you made to the FDA.

Do you see that?

A.    Yes.

Q.    So – so the commissioner of the FDI – FDA is telling Mr. Willard that the announcement of the purchase of the 35 percent

Page 205

ownership interest contradicted statements that Altria made to him at that meeting and in written submissions, correct?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  That is – that is – I agree that you were reading this – this letter as it's – as it's stated.

ATTORNEY SAVERI:  Okay.  Let's go off the record.

THE VIDEOGRAPHER:  Off the record at 11:50.

--oOo--

(Whereupon, a recess was taken from 11:50 a.m. EST to 11:59 a.m. EST.)

--oOo--

THE VIDEOGRAPHER:  Back on the record at 11:59.

BY ATTORNEY SAVERI:

Q.    You can put that aside, sir.

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION

Kevin C. Crosthwaite on 11/15/2024

Page 206

--oOo--

(PLX Deposition Exhibit Number 510, E-mail with attachment, Bates stamped PX2152-001 through PX2152-003, marked for identification, as of this date.)

--oOo--

BY ATTORNEY SAVERI:

Q. Let me hand -- try to reach it to you.

A. Thank you.

ATTORNEY SAVERI: 510 --

ATTORNEY SULLIVAN: Thank you.

ATTORNEY SAVERI: -- is, for those at home -- on the phone, is Tab 19.

BY ATTORNEY SAVERI:

Q. So, sir, I've handed you what's been marked as 509, sir --

CERTIFIED STENOGRAPHER: Ten.

BY ATTORNEY SAVERI:

Q. -- 510. Excuse me. I get -- I get ahead of myself.

Page 207

So 510 has the Document Number PX2152.

Do you see that?

A. I see that.

Q. Okay. And just for chronology, the prior document, 508, which was the Garnick e-mail, was dated October 4th, 2018?

A. The Garnick e-mail to?

Q. Willard, with the --

A. That had his notes?

Q. Yeah.

A. Okay. That was the date before, you said?

Q. Yeah. And I just want to make sure we have the chronology straight.

A. Okay.

Q. Okay. So Exhibit 510 is an e-mail that Mr. Willard wrote to Riaz Valani and Nicholas Pritzker with a copy to -- to Billy Gifford.

Do you see that?

A. Yes.

Page 208

Q. And he attaches a letter that was written on his letterhead at Altria to Pritzker, Valani and Burns.

Do you see that?

A. I see that.

Q. Okay. And if you look at the letter, he -- he discusses a -- a proposed transaction.

Do you see that?

ATTORNEY SULLIVAN: Objection: lacks foundation.

THE WITNESS: I'm just --

BY ATTORNEY SAVERI:

Q. Yeah. Will you please take a look at it?

A. That's what I'm doing right now.

Q. Yeah. Yes, sir.

(Whereupon, the witness reviews the material provided.)

THE WITNESS: I read it.

BY ATTORNEY SAVERI:

Q. Okay. So starting towards the top

Page 209

of the first page, Mr. Willard, in the second paragraph, says, To that end, we would like to propose consideration of the following terms.

Do you see where I'm reading from?

A. I see what it says.

Q. And then he sets forth eight numbered paragraphs containing those terms, correct?

A. Yes.

Q. And the first provision is an investment purchase of 35 percent of JUUL, correct?

A. Thirty-five percent economic interest in the -- yes, the Topco.

Q. And then it also discusses the conversion those -- of shares from nonequity to equity -- I mean, nonvoting to voting shares, correct?

A. Yes.

Q. Okay. And then in addition, it -- it -- Item 2 talks about participation of board

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**

Highly Confidential     Kevin C. Crosthwaite on 11/15/2024

Page 210

seats.

Do you see that?

A.    I do.

Q.    And then it follows with provisions regarding preemptive rights and protective provisions.

Do you see that?

A.    I see a "preemptive rights."

Q.    And 4 are the protective provisions.

You see that?

And then the next paragraph, 5, talks about the support services.

Do you see that?

A.    I do.

Q.    And the sixth talks about competition.

Do you see that?

You with me?

A.    I see 6, yes.

Q.    And it says [as read], Altria would agree that it and its current and future

Page 211

subsidiaries will not compete in a matter consistent with our previous discussions, in the U.S. e-vapor market for any period, exclusive of the aforementioned transition period during which it provides support services.

Do you see that?

A.    I see what it says.

Q.    Okay.  And then the next paragraph is a -- is a lockup agreement, correct?

A.    Yes.

Q.    And the eight is a standstill agreement, correct?

A.    Yes.

Q.    Okay.  And the provision that contains the noncompete uses the word "agree," correct?

A.    You mean in the second -- the -- the third word?

Q.    Yeah -- yes --

A.    It has --

Q.    -- it says, Altria would agree.

Correct?

Page 212

A.    It has the word "agree."

Q.    And it doesn't use the word "unilateral" at all, does it?

Do you see the word "unilateral" anywhere in that paragraph?

A.    I don't see that word.

Q.    Okay.  You can put that aside.

Sir, let me hand you what's -- I've marked as 511.

--oOo--

(PLX Deposition Exhibit Number 511, E-mail string with attachment, Bates stamped PX1123-001 through PX1123-018, marked for identification, as of this date.)

--oOo--

ATTORNEY SAVERI:  And this has the Document Number PX1123.

BY ATTORNEY SAVERI:

Q.    Do you have that?

A.    I do.

Q.    And the first page is an e-mail

Page 213

that Mr. Garnick wrote to you, dated October 24th, 2018.

Do you see that?

A.    I see that.

Q.    And he attaches an e-mail from Steve Callahan to Howard Willard and others, also dated October 24th, 2018 but a little earlier in the day.

Do you see that?

A.    I see that.

Q.    Actually, it was only one minute earlier in the day.

Do you see that?

A.    It's technically earlier.

Q.    Yeah.  Yes, sir.

So did you receive the e-mail from Mr. Garnick on or about the time that's indicated there, on October 24th, 2018?

A.    It -- yes, I did.

Q.    Okay.  And he attaches the -- the e-mail from Mr. Callahan.  And Mr. Callahan says, The attached reflects updates following

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**

Page 214

our conversation last night. This includes review from IR/RA/GA/Nu Mark and Law.

Do you see that?

A.    I see what it says, yeah.

Q.    Okay. So I have a couple of questions about the attachment.

A.    Okay.

Q.    So --

A.    Do you want me to just quickly --

Q.    -- yeah, you can --

A.    -- flip through?

Q.    -- and so just --

A.    I don't remember this thing.

Q.    -- yeah. And so -- I'll just tell you. I want to ask you a couple of questions about what's called the "employee deskdrop" on Page 5 and then a couple questions about the potential questions that are set forth in 7 and 8.

Okay?

A.    I'll quickly go through it.

Q.    Yeah. Great.

Page 215

(Whereupon, the witness reviews the material provided.)

(The witness mumbles under his breath while reviewing the material provided.)

THE WITNESS: The questions are all about the Q and A --

BY ATTORNEY SAVERI:

Q.    Yeah --

A.    -- in the back or no?

Q.    -- great. So let's just start from here.

Do you recall that prior to the announcement of Altria's decision to withdraw e-vapor products from the market that the company prepared an internal communications and engagement plan?

A.    This is -- makes sense, to me, that they would have been planning with the communications of that decision.

Q.    Okay. And if you look at the first page, the strategy that's indicated here -- it's

Page 216

the -- it's, I guess, the third bullet under the section Strategy is, Coordinated --

A.    I've got to find you. I'm on --

Q.    Yeah, it's the first page.

A.    Oh, Page 1?

Q.    Yeah, under Strategy.

Do you see --

A.    Got it.

Q.    -- where I am?

And it says [as read],

Coordinated internal, external -- excuse me -- coordinated internal and external communications and engagement in -- in support consistency and timeliness of messages.

Do you see that?

A.    I do.

Q.    Okay. So will you agree with me that one of the things that was important for the company to do at this point was to coordinate its messaging regarding its announcement of its -- of withdrawal of the products to the FDA?

Page 217

ATTORNEY SULLIVAN: Objection to form.

THE WITNESS: I think -- I mean, there's always a principle to be coordinated on the company's messages, you know, so I don't -- I don't think this circumstance was different than others by just reading that Strategy bullet.

BY ATTORNEY SAVERI:

Q.    Okay. And if you look at the fifth page, there's something called "employee deskdrop."

Do you see that?

A.    Yes, I see it.

Q.    And an employee deskdrop is a communication -- an internal communication at Altria to all of its employees, correct?

A.    That's right.

Q.    So it was intended to kind of cover or reach the entirety of the company, correct?

A.    That would be my assumption.

Q.    Okay. And this communication

Page 218

confirms Altria's decision to remove pod-based products from the market, correct?

A.    Let me just quickly read it and make sure --

Q.    Yeah.

A.    -- that's what it says.

(Whereupon, the witness reviews the material provided.)

BY ATTORNEY SAVERI:

Q.    And it's -- it's, in particular, the section entitled Pod-Based Products.

Let me read it to you.

A.    Okay.

Q.    It says, [as read] Based on the publicly available information from FDA and others, we believe that pod-based products significantly contribute to the rise of youth use of e-vapor products.

Do you see where I'm reading, sir?

A.    Um-hum.

Q.    So we are removing our products

Page 219

MarkTen Elite and Apex by MarkTen   from the market until we receive a market order from FDA or the youth problem is otherwise addressed.

So this confirms that decision internally; this is how it was communicated broadly to the company, correct?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  I think this -- I mean, this is certainly how it was communicated, that business decision, on October 25th to the employees.

BY ATTORNEY SAVERI:

Q.    And, likewise, it -- it communicates the decision about certain flavor products below.

Do you see that?

The next paragraph under Flavors says, We are therefore discontinuing the sale of all e-vapor flavor varieties, with the exception of tobacco, menthol, mint, for our MarkTen and Green Smoke cigalike products.

Page 220

Correct?

Do you see where I'm reading that?

A.    I see where you're reading it.

Q.    So that -- this also communicates to the company that decision by Altria?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  It -- it communicates -- yeah, I mean, it -- it says what you read.

BY ATTORNEY SAVERI:

Q.    Okay.  And this doesn't say anything about the impact of the decision on JLI, correct?

A.    I don't think there's any mention of JLI in this document.

Q.    Okay.  And the following section or the -- the -- the section beginning Page 008, there are a series of answers to potential questions.

Do you see that?

Page 221

A.    I'm getting there.

Where it says "General" up top?

Q.    Yeah, General.

A.    Okay.

Q.    And the first question is, Isn't this just a way for you to knock out competitors in areas where you're not successful?  Doesn't this just help Marlboro?

Do you see where I'm reading from?

A.    I do.

Q.    And then below that, that's a proposed answer to that question, correct?

A.    That -- yes, that's what -- there's a proposed response to that question.

Q.    Okay.  And then on the next page, there's a question:  Isn't this just an effort to put pressure on JUUL, which has been disrupting the market and gaining massive market share, to the detriment of your company's products?

You see that?

Page 222

A.    I see that.

Q.    And the answer that's set forth there is, No.

Correct?

A.    That's what it says.

Q.    Okay.  And then -- and then it goes on to provide an answer, correct?

A.    I'm just reading the answer.

Yes, it -- it has more to it -- it says more.

Q.    Yeah.  But that answer doesn't say anything about the internal strategy or planning and analysis that Altria had conducted that analyzed the harm to JUUL from these -- from the FDA announcement, does it?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  Yeah, I -- I don't -- I'm not familiar with what you're -- how you're -- say that one more time.

What does it not include?

Page 223

BY ATTORNEY SAVERI:

Q.    Well, I -- I showed you a slide that -- with an analysis of the impact of the FDA announcement on the negotiation strategy before the break.

Do you recall that?

A.    I recall that slide.

ATTORNEY SULLIVAN:  Objection to form.

BY ATTORNEY SAVERI:

Q.    Okay.  And this answer about putting pressure on JUUL doesn't refer to any of those things, does it?

ATTORNEY SULLIVAN:  Same objection.

THE WITNESS:  Well, there -- I -- I just think they're -- you're just comparing two -- two different things.

This -- the slide, as I -- deck, as I recall it, was a -- primarily a discounted cash flow valuation consideration for scenarios of what JUUL

Page 224

could be thinking about their future business prospects, and this is simply answering a question that could be raised, that this -- isn't this an effort to put pressure on JUUL what, which has been disrupting, et cetera.

So I -- I just think they are two very different things.

BY ATTORNEY SAVERI:

Q.    Well, this doesn't say anything about the transaction that was under negotiation between JUUL and Altria at the time, does it?

A.    I mean, from my experience, we -- in any transaction, we wouldn't discuss them in real time with a all-employee communication.  They're treated as highly confidential.

Q.    Well -- and it doesn't say anything about Altria's conclusion that the FDA's announcement had the potential to devastate JUUL, does it?

ATTORNEY SULLIVAN:  Objection to form.

Page 225

THE WITNESS:  I -- I -- I think as you -- as you phrase it, that would mean that Altria was -- was speculating about future regulatory decisions the FDA could make and -- and as it could relate to JUUL business scenarios.

I don't even see how that would fit in this communication.

BY ATTORNEY SAVERI:

Q.    Now, it also has a question that -- that reads, If you say you don't believe you're contributing to this problem, why are you taking these actions?

Do you see that?

A.    I see that question.

Q.    And it doesn't say anything about the fact that the company was contemplating investing in or buying 35 percent of the company that was identified as the single biggest cause of this problem, correct?

ATTORNEY SULLIVAN:  Objection to form.

Page 226

THE WITNESS: I – I – I – I think this answer here is – is – is narrowly responding to the question that's above it, You say you're not -- believe contributing, et cetera -- and I think that's the proposed answer that somebody wrote to it.

BY ATTORNEY SAVERI:

Q.    Now, did -- did Altria understand that purchasing or contributing $12.6 billion to the -- the company that was the single biggest cause of this problem was contributing to the problem?

ATTORNEY SULLIVAN:  Objection to form.

THE WITNESS:  I -- I would -- it's certainly not how I thought about, ultimately, the decision to -- for Altria to make an economic investment.

ATTORNEY SAVERI:  Okay.  Thank you.

Can we go off the record for one

Page 227

second?

THE VIDEOGRAPHER:  Off the record at 12:15.

(Pause.)

THE VIDEOGRAPHER:  Back on the record at 12:17.

ATTORNEY SAVERI:  I don't have any further questions.  Thank you very much for your time this morning.

THE WITNESS:  Thank you, sir.

ATTORNEY SULLIVAN:  I have no questions.

THE VIDEOGRAPHER:  Okay.  Thank you.

We're off the record at 12:17.

(Witness excused.)

(Deposition concluded at 12:17 p.m. EST.)

Page 228

C E R T I F I C A T E

I, Cindy L. Sebo, Nationally Certified Court Reporter herein, do hereby certify that the foregoing deposition of KEVIN C. CROSTHWAITE was taken before me pursuant to notice at the time and place indicated; that said witness duly swore to tell the truth, the whole truth, and nothing but the truth under penalties of perjury; that said testimony of witness was correctly recorded to the best of my abilities in machine shorthand, thereafter transcribed under my supervision with computer-aided transcription; that deposition is a true and accurate record of the testimony given by the witness; that I am neither counsel, nor kin to any party in said action, nor interested in the outcome; and that a copy of this transcript obtained from a source other than the court reporting firm, including an adversary or co-counsel in the matter, is uncertified and may not be used at trial.

CINDY L. SEBO, RMR, CRR, CLR, RPR, CCR, CSR, RSA,
CA CSR 14409, NJ Certified CR 30XI0024460,
NJ Certified RT 30XR00019500, NM CSR 589,
NY Realtime Court Reporter, NY Association Certified Reporter, OR CSR 230105, TN CSR 998,
TX CSR 12778, WA CSR 23005926, Notary Public

Page 229

CAPTION: In re: JUUL Labs, Inc. Antitrust Litigation
KEVIN C. CROSTHWAITE            NO.  00104912
E R R A T A   S H E E T
PAGE_____ LINE_____ CHANGE _____
REASON FOR CHANGE:
_____
PAGE_____ LINE_____ CHANGE _____
REASON FOR CHANGE:
_____
PAGE_____ LINE_____ CHANGE _____
REASON FOR CHANGE:
_____
PAGE_____ LINE_____ CHANGE _____
REASON FOR CHANGE:
_____
PAGE_____ LINE_____ CHANGE _____
REASON FOR CHANGE:
_____
PAGE_____ LINE_____ CHANGE _____
REASON FOR CHANGE:
_____
PAGE_____ LINE_____ CHANGE _____
REASON FOR CHANGE:
_____
PAGE_____ LINE_____ CHANGE _____
REASON FOR CHANGE:
_____

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**

Highly Confidential    Kevin C. Crosthwaite on 11/15/2024

Page 230

CAPTION: In re: JUUL Labs, Inc. Antitrust Litigation

KEVIN C. CROSTHWAITE        NO.  00104912

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE _____

REASON FOR CHANGE:

_____

PAGE_____ LINE_____ CHANGE _____

REASON FOR CHANGE:

_____

PAGE_____ LINE_____ CHANGE _____

REASON FOR CHANGE:

_____

PAGE_____ LINE_____ CHANGE _____

REASON FOR CHANGE:

_____

PAGE_____ LINE_____ CHANGE _____

REASON FOR CHANGE:

_____

PAGE_____ LINE_____ CHANGE _____

REASON FOR CHANGE:

_____

PAGE_____ LINE_____ CHANGE _____

REASON FOR CHANGE:

_____

PAGE_____ LINE_____ CHANGE _____

REASON FOR CHANGE:

_____

Page 231

ACKNOWLEDGMENT OF WITNESS

I, KEVIN C. CROSTHWAITE, do hereby certify that I have read the foregoing pages herein, and that the same is a correct transcription of the answers given by me of the proceedings taken remotely to the questions therein propounded under penalty of perjury, except for the corrections or changes in form or substance, if any, noted in the attached errata sheet.

_____        _____

DATE                    SIGNATURE

Subscribed and sworn to before me this _____ day of_____, 20____.

My Commission expires:

_____

_____

Notary Public

Highly Confidential                                          Index: $11..18,000-acre

### Exhibits

**CrosthwaiteK 497**
9:10 25:16
26:13

**CrosthwaiteK 498**
9:15 38:15
39:4

**CrosthwaiteK 499**
10:8 48:10

**CrosthwaiteK 500**
10:13 60:19
61:4

**CrosthwaiteK 501**
10:16 66:2,
12

**CrosthwaiteK 502**
11:8 82:15
83:2,11,14

**CrosthwaiteK 503**
11:12 93:4,6

**CrosthwaiteK 504**
11:15 106:2,
10 110:4,10

**CrosthwaiteK 505**
11:19 133:6,
14,22 135:20

**CrosthwaiteK 507**
12:11 154:3,
13,14

**CrosthwaiteK 508**
12:14 185:3

**CrosthwaiteK 509**
12:20

201:16,22
202:3

**CrosthwaiteK 510**
13:8 206:2
207:17

### $

**$11**  91:14

**$12.6**  179:8
226:10

**$12.8**  91:6
179:12

**$2**  91:22

**$236**  35:9,19

**$28**  167:19
176:4

**$5.6**  164:5

**$7.5**  163:1

### (

**(1)**  192:10

### -

**--ooo--**  15:1,
3,4,7 16:6,
13,17,20
25:15,21
38:14,20
48:9,15
58:14,19
60:18 61:2
66:1,7 83:1,

7 93:5,11
106:1,7
109:16,19
133:5,11
142:14,20
154:2,8
185:2,8
201:15,20
205:13,16
206:1,7
212:10,16

### 0

**0-0-5**  159:16

**003**  158:11

**006**  162:10

**008**  220:19

**009**  41:9
43:14

**010**  171:13

### 1

**1**  27:7 30:19
31:10 162:19
189:19 216:5

**1-1/2**  91:22

**10**  52:16
66:16

**100**  162:7

**1000**  17:7

**10:27**  109:15,
18

**10:36**  109:18,
21

**10th**  49:6,18

**11**  51:20
82:19 91:15,
16

**114**  58:15
59:3

**11:50**  205:12,
15

**11:59**  205:15,
18

**12**  93:14

**12.6**  178:4,7,
19

**12:15**  227:3

**12:17**  227:6,
15,19

**12th**  188:3

**14th**  134:3
136:6,15,21

**15**  15:6
144:10

**1579**  56:22

**15th**  15:16

**16th**  189:2
202:12

**17th**  164:4,13

**18**  188:20

**18,000-acre**
122:9

**Highly Confidential**                                                          **Index: 18th..504**

**18th**  199:3
  203:6,18

**19**  68:20
  206:15

---
**2**
---

**2**  28:1 31:12,
  13 32:7,13
  193:2 209:22

**2.0**  145:19
  147:20
  149:17

**2.6**  91:19

**20-**  36:1

**2017**  23:16
  24:9 26:21
  27:2 29:9
  30:11 34:6
  35:1,10
  36:1,4,16,22
  74:11 76:16

**2018**  21:18,22
  22:6,17 36:5
  37:1,3,5
  40:3,22
  42:8,13 43:7
  47:12 49:6
  53:21 54:14,
  15 56:1,2
  57:7 61:12
  62:3 63:14,
  15 64:18
  65:4,10,15
  67:3 68:10,
  12,20 74:13

76:18 78:16
79:8,9,13,21
83:16,21
93:18 94:18
106:18 107:5
108:4
110:12,14
111:5 112:15
121:18
123:9,19
124:18
126:19,22
127:9
128:14,15
134:3 136:6,
15,21 143:7
147:14 150:6
154:19
155:2,9
156:5,21
164:13
185:14 203:6
207:7 213:2,
7,18

**2019**  21:1
  202:12,17

**2024**  15:6,17

**20th**  20:15,18

**21**  154:18
  155:9 156:4
  196:1

**2112**  15:18

**21st**  106:18
  107:5 108:4
  110:12,13
  112:15

**236**  35:5

**24**  44:9

**24th**  84:6
  213:2,7,18

**25th**  65:15
  219:12

**27th**  26:21

**28**  40:22
  178:3 179:6
  199:3

**28B**  168:2

**2nd**  67:3

---
**3**
---

**3**  31:21 84:19
  109:1 111:21

**3.0**  148:2

**307**  17:10

**30th**  83:21

**31**  61:12
  83:15 186:5

**31st**  62:3
  65:4

**35**  74:8 91:11
  176:14
  179:13
  204:14,22
  209:12
  225:18

**3:20-cv-02345**
  15:15

---
**4**
---

**4**  31:21 50:3
  196:6 210:9

**40**  75:13

**4273**  154:15

**45**  177:9
  178:22 179:6

**497**  25:16
  26:13

**498**  38:15
  39:1,4

**499**  48:10,21,
  22 49:1

**4th**  185:14
  207:7

---
**5**
---

**5**  30:20 31:22
  210:13
  214:17

**500**  56:17,20
  58:8 60:19
  61:4

**501**  66:2,12

**502**  82:15
  83:2,11,14

**503**  93:4,6
  111:4

**504**  106:2,10
  110:4,10
  111:9

Case 3:20-cv-02345-WHO   Document 573-4   Filed 09/26/25   Page 247 of 746

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
Highly Confidential          Kevin C. Crosthwaite on 11/15/2024          Index: 505..aforementioned

**505** 133:6,14, 16,22 135:20

**506** 142:15 143:3 144:13

**507** 154:3,13, 14 157:17

**508** 185:3,10 207:6

**509** 201:16,22 202:3,5 206:18

**510** 206:2,12, 21 207:1,17

**511** 212:9,11

**5:00** 84:7

### 6

**6** 27:13 202:16 210:20

**60** 151:8 156:12 160:5 161:3 188:6

**6th** 93:18 94:18 111:5 202:17

### 7

**7** 41:8 43:14 214:18

**7/20/18** 68:19

**7:00** 84:7

### 8

**8** 58:3 214:19

**8th** 57:7

### 9

**9** 61:5

**9/12** 159:5

**9/17** 162:20

**90** 161:14 162:4,6

**9083** 202:11

**9:03** 15:6,17

**9th** 143:6

### A

**a.m.** 15:6 109:18 205:15

**abbreviation** 20:2 30:5 34:9 45:18 46:5

**ability** 19:15 118:16,22 119:17 173:19 174:9

**absent** 190:16 194:5

**absolutely** 28:17 56:14 149:22

187:14

**accelerate** 96:22

**access** 32:18 33:9

**accompanied** 24:20

**accumulate** 38:10

**accurate** 64:5

**accusing** 201:4

**achieve** 128:22 150:2 180:8

**acknowledge** 203:12

**acquire** 152:6 177:10

**acquired** 74:8 75:8 88:18 179:13

**acquisition** 95:6 153:20 177:9 179:6 204:14

**acronym** 37:21 46:11

**action** 194:15 203:13

**actions** 159:9 225:13

**active** 166:8

**activity** 80:22

170:18

**actual** 169:2

**addiction** 203:14

**addition** 77:6 209:21

**additional** 78:5

**address** 17:5, 6,9 21:10 149:5 151:9 188:5,17 194:4 203:13

**addressed** 71:21 219:3

**addresses** 86:5

**addressing** 47:17 127:20

**Administration** 149:14 203:5

**advanced** 187:8

**advice** 21:13

**advise** 135:2

**advisor** 155:22

**advocate** 128:16,20

**advocating** 128:5

**affect** 19:15

**aforementioned** 211:4

Case 3:20-cv-02345-WHO    Document 573-4    Filed 09/26/25    Page 248 of 746

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
Highly Confidential          Kevin C. Crosthwaite on 11/15/2024          Index: Agdc's..announcement

AGDC's   37:22

age   196:1

agenda   124:4

agree   36:3,5,
  15 37:12
  63:21 89:1
  103:20
  114:12 115:2
  162:3 167:1
  181:11
  191:18 205:7
  210:22
  211:15,21
  212:1 216:17

agreeable
  105:9

agreed   137:15
  138:13
  148:20

agreement
  33:16 86:6,
  9,15 92:15
  104:17 117:5
  118:21
  119:6,9,11,
  20 211:9,12

ahead   36:21
  206:22

alcohol   19:17

ALCS   23:1
  29:13,22

all-employee
  224:15

all-expense-paid

122:13

all-expenses-
paid   122:16

Altria   20:7
  21:18 22:1,
  7,20 23:1,14
  30:1,16
  31:21 32:3,
  12 33:17
  35:9,18
  36:6,16
  37:21 42:14
  43:3 44:6
  46:22 47:17,
  22 65:6,15
  68:10 70:2
  71:17,19
  72:8,13
  74:7,15 75:8
  77:5,11
  78:15 79:2,3
  80:20,21
  85:19 89:1
  91:6 92:10,
  15 95:6
  96:21 97:21
  98:9,14
  99:11 101:16
  102:16,17
  104:18 105:9
  112:17
  113:9,14
  114:13
  117:8,12
  118:4,8,15,
  21 121:5,7,
  19,22 122:13

123:2 124:21
  128:6 130:10
  131:7 146:14
  150:7,10,19
  151:13 152:3
  153:18
  155:20 156:2
  162:22
  166:5,10
  172:11 173:1
  176:12
  177:15
  179:11,21
  183:1 186:18
  188:8,21
  191:4 194:19
  196:22
  197:17
  198:2,9
  199:4,9,19
  200:11 201:4
  202:14,18
  203:12,20
  205:2 208:2
  210:21
  211:21
  217:17 220:6
  222:13
  224:12 225:3
  226:9,18

Altria's   30:10
  42:18 74:12
  75:15 87:5
  97:22 99:11
  118:22
  119:17
  120:12 121:9
  126:20

163:11,17
  164:4 177:6
  191:16
  204:14
  215:14 218:1
  224:18

American
  31:13,17

amount   28:19
  91:8

analysis
  114:20 121:5
  125:16
  153:12,15
  165:11
  171:15
  222:13 223:3

analyze   152:3
  172:7

analyzed   153:4
  222:14

analyzing
  152:13

angry   141:5,
  18 142:5

announced
  21:19 204:16

announcement
  152:14
  153:5,18
  158:16
  159:1,6,8
  162:11,16,22
  163:12,19
  164:6 165:7,

Case 3:20-cv-02345-WHO    Document 573-4    Filed 09/26/25    Page 249 of 746

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
Highly Confidential          Kevin C. Crosthwaite on 11/15/2024          Index: annual..ATTORNEY

13 166:18
167:9 168:3,
9,15 171:16
172:8,10,21
180:19
186:20 198:7
204:22
215:14
216:21
222:15 223:4
224:19

**annual** 44:2,9

**answering**
224:3

**answers** 220:20

**anticipating**
45:3

**antitrust**
15:12 84:20
86:6,21
87:12 99:1
109:2 111:20
113:2,12,17
114:6,20
115:9,17
116:10,17
117:6,7

**anymore** 80:16

**Apex** 80:8,11
219:1

**apologize** 26:2
50:2

**apparently**
89:6

**appears** 29:8

**applied** 179:12

**appreciation**
60:1

**approaches**
177:5

**approval**
112:17
190:17 194:6

**approximately**
22:6 35:19
52:16 54:14
63:13 176:4

**April** 23:15
24:9

**Area** 20:12

**areas** 221:7

**arm** 202:2

**arms** 26:2

**arranged** 25:8

**arrangement**
119:16

**assert** 132:7

**assess** 148:19
172:7

**assessed**
149:22

**assesses**
172:19,22

**assessing** 56:7
172:11 173:1

**assessment**
148:19
171:13
173:4,14
174:22

**assessments**
129:1

**assets** 87:5,6
88:16 114:7
115:11
117:14
118:13,17
119:13,18
120:13 121:9

**assigning**
167:9

**assume** 136:12

**assuming** 45:13
46:12 57:16
62:4 141:15
160:17 172:9
179:5
195:10,15
197:1

**assumption**
30:6 160:19
170:14 171:1
173:10
217:21

**assumptions**
44:19 46:19
167:10
170:16
174:13

**attached** 39:13

49:4 68:4
84:11 94:11
107:15 108:4
111:16
112:15
213:22

**attaches** 26:22
61:15 65:1
94:20 110:12
111:4 134:6
143:8 154:22
155:11
185:17 208:1
213:5,20

**attaching** 84:3
94:8 95:10

**attachment**
25:17 38:16
48:11 60:20
66:3 67:12,
16 68:2 83:3
93:7 94:17
106:3
107:18,19
154:4 155:8
185:4 206:3
212:12 214:6

**attempt** 169:18

**attempts**
166:16

**attention**
49:15

**ATTORNEY** 16:21
23:20 24:1,
4,6 26:1,9,
10 27:22

Case 3:20-cv-02345-WHO    Document 573-4    Filed 09/26/25    Page 250 of 746

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
Highly Confidential                Kevin C. Crosthwaite on 11/15/2024                Index: attorneys..back

28:7,16 29:5
36:8,13,19
37:2 38:8,9,
21 40:8,12,
15,16,17,19,
20 41:19
44:10,14
48:16 49:11,
13 50:1,4
51:13 52:21
53:1,6,11,
17,19 54:17
55:1,5,19
56:13 58:2,
9,20 59:2,4,
6 60:16 61:3
62:17 64:2,
10 65:17,21
66:8,15,18
68:1 69:12,
16 70:11,18
72:10,20
73:14,20
81:2,6 82:6
83:8 85:12
87:9,13
89:4,11
90:1,5,9,15
92:17,21
93:2,12,13
96:12 97:11,
16 98:1,7,
19,20 99:6,
13,19 100:5,
11,18 101:1
102:2,13,20
103:1,4,11
104:3,5,10,

14 106:8
108:20
109:12 110:1
113:20
114:2,15
115:1 116:3,
5,22 117:10,
15,20 119:2,
7 120:14
121:3,11,15
128:9,13
129:17,19
130:2,11
131:5,22
132:5,10,18
133:1,12
134:18,21
135:6,9,15
141:6,9,20
142:6,11,21
144:10,14,18
146:7,11,17
147:3,7,13
150:22
151:5,17
152:1,7,11,
21 153:3
154:9
156:13,18
157:5,8,10,
18 158:1
160:7 161:1,
16 162:2
163:20
164:2,7,12
166:20
167:16
168:10 169:4

172:4 173:6,
12 175:14
178:16
181:10,17,19
182:1 184:4,
10,13,17,21
185:9 186:4,
7,22 187:5,
21 189:14
190:10
191:7,17,22
192:2,8,21
195:8,16
196:7,19
197:20 198:5
200:3,9,12,
17,21 201:2,
21 204:3,8,
12 205:4,9,
19 206:8,12,
13,14,16,20
208:10,13,21
212:17,19
215:8 217:1,
9 218:9
219:7,13
220:7,12
222:16
223:1,8,10,
14 224:9,21
225:9,21
226:8,14,20
227:7,11

**attorneys**   16:1

**attractive**
 194:3

**audible**   197:10

**August**   49:6
 93:18 94:18
 106:18 107:5
 108:4
 110:12,13
 111:5 112:15
 117:19
 120:17
 121:18,20
 123:1,2,9,19
 124:18
 128:14,15
 130:14 134:3
 136:6,15,21

**authorization**
 129:3 131:1
 149:12 150:2

**authorized**
 140:15

**Ave**   15:18

**average**   50:6
 54:7 55:3

**aware**   75:2
 89:18,21
 90:8,22
 118:7 150:11
 152:9

---

**B**

---

**back**   18:13
 23:22 58:22
 81:10,12
 82:7 109:20
 110:2,8
 112:5,20

130:3 146:20
170:9 180:22
183:14
205:17
215:10 227:5

back-and-forth
176:17

bad 81:8,9
129:5 131:20

BAMBERGER
98:1,19
129:19

ban 160:1
161:9 190:16
191:5 194:5

banking 155:22

bargaining
198:9

based 55:13
72:14 73:16
100:14 165:6
167:8 169:20
218:14

basic 92:9

basically
183:21

basis 40:10

Bates 25:17
38:16 48:11
49:16 60:20
66:3 83:4
93:8 106:3,
10 133:7
142:16 143:4

154:4,15
185:4,10
201:17 202:6
206:3 212:13

Bay 20:12

beginning
52:9,15
63:14 220:19

begins 15:9
54:13 87:18
96:1,14
103:14
113:15 138:1

Begley 24:20
25:1 39:8
42:4 43:10,
12 61:12

Begley's 42:8

behalf 15:22
77:10 107:12
108:3

beneath 31:16

big 198:19

biggest 91:1
225:19
226:11

billion 91:6,
14,16,22
163:1 164:5
167:19 176:4
179:8,12
226:10

billions 200:1

Billy 77:16
84:5 207:20

binder 61:5
82:20

bit 84:4
120:20

blank 86:16,
19

board 21:9,12
86:7 112:16
121:19,20
123:2 124:1,
4,7,12,13,17
125:4,8,14,
18,19 126:2,
4,9,11
131:8,17,20
132:21
136:10 137:3
186:13,18
187:3,8
189:5 191:20
192:6 209:22

boat 52:12

BOD 136:7,10

Boffi 155:12

Bold 80:4,7

borrow 173:19

bottom 54:21
57:5 84:19
106:22
137:22
160:10
161:19

188:18 197:4

boxing 104:2,7

Brace 49:3

brand 33:4
42:22 49:5
122:15 137:9

Brands 32:1

break 103:19
104:18 105:5
110:4 111:14
112:9 223:5

breaks 18:22

breath 160:12
175:9 189:10
196:12 215:4

Brent 39:9
49:3

Brian 67:3
126:17
128:1,2
131:16
135:13,22
140:5

briefly 22:13
33:22

bringing
127:13

British 31:13

broad 23:6

broadly 219:6

brought 64:7
148:12,15

BS    141:11,14
  142:4

bucket    89:9,10

buckets    87:12

budget    34:16,
  17

budgeted    35:9,
  19

build    138:14
  139:5  179:22

bulk    194:18

bullet    32:6,17
  33:8  86:15
  87:17  114:5
  173:18  216:1
  217:8

bullets    145:22
  174:3

bullshit
  141:16

bunch    104:21

Burns    74:18
  75:22  107:6
  108:3,9
  115:4,22
  137:15,17
  208:3

business    17:5,
  6 22:21 30:3
  37:8 55:21
  56:4 68:3
  87:8 89:15
  92:16 97:2,
  3,7,22 98:15

99:12 100:16
101:17,18
102:15 103:8
118:5,6,10
119:1 121:7
126:21 127:4
151:14
152:5,15
159:4 165:6
168:14
174:16
196:5,22
200:2 219:11
224:2 225:6

businesses
  121:6

buyers    118:9

buying    225:18

---

C

CAGR    43:19

calculate
  169:18

calculated
  46:20 53:10

calculates
  162:13

calculation
  47:5 165:11
  170:18

California
  15:14

call    34:21
  37:11 94:12

95:12 183:22
184:15
186:13

Callahan
  213:6,21

called    23:3
  27:1 68:3
  84:20 147:19
  148:2 156:21
  184:5,8
  187:7 214:16
  217:11

calls    73:15
  134:22

camera    15:21

cannibalize
  97:2 100:15
  101:9,17,22
  103:3,8

cap    162:18
  164:5

capital    162:14

capitalization
  162:15
  163:1,9,11

capturing
  70:16 161:20
  162:17 181:5

case    15:14
  18:3 20:1
  58:11 82:15,
  18 146:12
  172:13 179:3
  198:12

cash    89:14
  90:18 92:10,
  13 169:13,
  18,19 170:6,
  9 176:13
  223:21

catch    26:6

category    30:9
  44:18 171:3
  195:15,19
  198:18

causing    190:15

cease    80:21
  87:8 88:15
  98:17

ceased    147:6

Cedar    17:10

CEO    21:3,16
  23:13 77:13
  108:9 115:4
  126:12 127:6
  138:8,12,19
  142:8 202:14

cert-    28:9

certified
  16:9,14
  28:14,21
  186:2 196:14
  204:1,6,9
  206:19

cetera    224:6
  226:5

CGO    22:9

Case 3:20-cv-02345-WHO   Document 573-4   Filed 09/26/25   Page 253 of 746

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
Highly Confidential          Kevin C. Crosthwaite on 11/15/2024     Index: Chambers..communicating

Chambers  39:9
  49:3

chance  134:11
  140:15 157:6

change  53:9
  162:18 163:8
  168:14 169:1

channel  64:8

characterized
  35:15

charge  42:9
  126:20

chart  35:12
  43:15 44:13,
  17,21 45:2,
  3,6,10,12,
  16,19 46:1,6
  47:4 51:19,
  22 52:4,14,
  15 53:3,9,15
  54:1,4,5,9,
  13,22 55:2,
  8,13,16 56:2
  62:9,16,21
  63:4,9,18,21
  64:5,13,18,
  21 111:15
  161:6,8
  165:10,15,17
  166:2 167:4
  168:6,16,19
  169:6,17,22
  170:3,8
  171:14 176:8
  177:20
  178:1,9,14

179:4,10,17
  180:11
  183:19

chief  22:6,7,
  16 23:9
  74:16 77:20
  89:19

Christopher
  155:12

chronologically
  52:10

chronology
  110:18 112:6
  207:5,15

chuck  66:10
  81:12

chucking  81:8

cigalike  44:8,
  20 45:14
  80:14 219:22

cigarette  37:7

cigars  37:9

Cindy  15:20

circled  178:4,
  7,19 179:1

circu-  178:7

circulating
  95:10

circumstance
  217:7

clarification
  58:6

clarifies
  159:9

clean  18:16
  19:7

clear  100:21
  174:5

clearance
  84:20 86:7,
  21 99:1
  109:2 111:20
  113:2,12
  114:6,20
  115:5,9,17
  148:16

cleared  71:13
  73:2

Client  23:1
  30:1

close  138:13,
  20 139:2,5

closed  74:8
  76:18

closing  140:2

cocounsel  82:5

code  85:18
  95:5

colon  96:21

column  34:22
  35:5 113:3
  114:11 159:8
  174:19 178:3

columns  158:19

combustible

97:3 100:15
  101:18 103:8

commentary
  174:4 175:4,
  12

comments  95:11
  100:10

commercializatio
  n  139:13

commercialize
  149:14

commercializing
  127:17

commercially
  140:19 141:3

commissioner
  202:13
  204:20

commitments
  204:17

commonly  34:18

communicate
  74:18 76:8
  115:22

communicated
  115:21
  191:20 192:5
  219:5,11

communicates
  219:15
  220:5,10

communicating
  76:10 112:19

147:15

**communication**
71:2 113:13
156:4
217:16,22
224:15 225:8

**communications**
74:9 75:22
99:21 135:1,
5 215:16,20
216:12

**community**
70:4,9

**companies** 23:8
31:1,2,3
42:17 75:4,
12 105:10
150:11
151:4,8
162:15 188:4

**company** 21:3,
7,16,19
31:7,20 32:3
37:5,22
42:14 46:11
75:9 78:3
138:8,19
151:7 155:22
170:12 173:2
176:14,15
179:13,15
188:13
215:16
216:19
217:20 219:6
220:6

225:17,18
226:11

**company's**
217:5 221:20

**compares**
158:21

**comparing**
223:18

**compensate**
91:9

**compete** 104:19
105:11
146:15 211:1

**competition**
210:17

**competitive**
29:13 92:16
140:13

**competitor**
68:10,12

**competitors**
79:4 103:20
195:2,6,14
221:6

**Complaint**
50:12

**complaints**
47:13,22
51:16,21
52:4,16
53:15 54:2
60:8 63:1,5,
10,22 64:8

**completely**
117:7

**comply** 149:19

**compound** 44:2,
9

**conclude**
153:11 180:2

**concluded**
152:18
227:19

**concluding**
153:14,17

**conclusion**
97:14 153:2
154:1 161:5
199:21
224:18

**condition**
146:14

**conducted**
222:13

**confidential**
224:16

**confirm** 84:4

**confirms**
188:1,8,12
197:16 218:1
219:4

**connection**
152:5 191:20

**consequence**
168:8

**consequences**

18:7

**consideration**
94:21 168:22
181:9 209:3
223:22

**considerations**
165:1 169:10
177:5

**consistency**
216:13

**consistent**
35:17 55:20
97:7 211:2

**Consolidated**
34:4

**construct**
171:3

**constructed**
166:3 167:6
170:1

**consumed** 19:17

**consumer** 23:2,
3 102:8

**consumers**
64:7,9,11
71:3

**contemplated**
117:12

**contemplates**
149:5

**contemplating**
198:3 225:17

**content** 101:8

Case 3:20-cv-02345-WHO    Document 573-4    Filed 09/26/25    Page 255 of 746

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
Highly Confidential          Kevin C. Crosthwaite on 11/15/2024          Index: context..correct

context  33:2
  34:11,13
  86:2 98:5
  99:16 102:11
  103:9 118:19
  166:12
  179:17

Contingent
  177:9

continue  43:4
  137:16

continues  29:1
  85:1 144:15
  192:17

continuing
  129:4 166:6

continuum
  159:21 171:4

contradict
  204:16

contradicted
  205:1

contribute
  87:7 88:13
  97:1 98:16
  114:6
  118:16,22
  218:17

contributed
  199:21

contributing
  120:12
  225:12
  226:5,10,12

contribution
  46:14,16,19
  47:1,5 88:14
  115:9
  117:13,17
  120:10
  121:2,9
  181:14

control  96:22

controlled
  75:13 91:3

conversation
  43:12 95:18
  99:8 100:3
  132:16
  200:16 214:1

conversion
  209:17

convicted
  19:20

coordinate
  216:20

coordinated
  216:2,11,12
  217:5

copied  110:16

copies  61:17

copy  62:1
  93:18 107:6
  207:19

core  37:7,12,
  15,18 38:1
  42:16

corner  27:6
  59:11 66:20
  82:1

correct  20:12
  22:10 31:4,5
  34:10 44:3
  45:11 55:4
  59:12,13
  60:4 64:1,12
  68:11 72:9
  73:1 77:6,
  11,12,14
  78:3 79:5
  80:1 85:19,
  20 87:5,8
  89:3 90:20,
  21 91:3,4,22
  95:7,13
  97:10,22
  98:9,18
  99:12,21
  101:10
  102:1,19
  107:13
  113:5,7,8,9,
  10 114:14
  115:4 116:6
  117:21
  122:2,5,14,
  18,21
  123:10,12,22
  126:21
  127:4,9,14
  128:7 129:7
  133:16
  137:11,16
  138:6,9,10
  139:3 142:9

  145:7,16,17
  146:16
  147:6,17
  148:13
  149:20
  150:12
  152:15 153:6
  158:18
  159:1,18
  160:2,6
  161:4,10,15
  162:11 163:2
  165:13
  166:19
  167:15
  168:4,9,18
  169:14,21
  170:19
  171:17
  172:21
  173:15,20
  175:2,22
  177:6,16
  179:12,13,14
  180:19
  188:6,10,13,
  21 189:2
  191:1,6
  194:21
  195:4,7
  196:2,6,22
  197:19
  200:11,20
  201:5
  202:14,18
  203:16,17,20
  205:3 209:9,
  13,19 211:9,

12,16,22
217:17,20
218:2 219:6
220:1,15
221:13
222:4,7
225:20

correctly   73:8
159:10
193:21

correspondence
64:17

cost   88:14
114:7

counsel   16:16,
18 27:19
49:21 57:22
58:6 78:3,5,
8 117:7
144:9 157:16

count   95:21

couple   27:3
41:5,6
108:13 158:2
214:5,15,17

court   15:13,
20 16:3

cover   17:16
192:10
217:19

covers   63:12

Craig   61:11
69:19 72:17
73:17 127:22

128:1

Crazy   122:1,6

create   44:13
130:20 167:7

creation   91:10
140:11

crime   19:20

criminal   18:6

crosstalk
28:13

Crosthwaite
15:11 16:7
17:4,12
26:11 50:5
110:3 134:10
135:2

culmination
35:13

current   128:21
148:20 160:5
161:4,15,22
167:22 177:2
197:12,17
210:22

customers
70:17
102:17,18

D

D.C.   15:5,19
17:6 20:20
21:8,11

damage   101:10

102:1 196:5,
22

data   64:20

date   15:16
20:22 21:2
24:14 25:20
30:14 38:19
48:14 50:13
57:13 61:1
65:5,8,12,20
66:6 67:13
68:13 69:2
79:20 83:6
84:13 93:10
94:18 106:6
133:10
136:17
142:19
143:16 150:9
154:7 156:3,
7 172:10
185:7 186:9
187:4 201:19
206:6 207:12
212:15

dated   26:21
40:21 57:7
61:12 64:18
67:3 83:15,
20 93:17
106:18 107:5
111:5 134:3
136:6 143:6
154:18
185:13
202:11 207:7
213:1,7

David   24:21
26:20

day   56:2
134:7
162:18,21
163:16 169:2
213:8,12

days   151:8
156:12 164:1
188:6 189:2

DC   84:6

DCF   169:10,13
170:15

deal   90:17
99:11 120:22
124:15
128:17
145:15
181:8,13
190:16
197:13,18
198:20

debt   173:20
174:10

December   76:18

decision   21:6
139:16,20
140:7,18
141:1
215:14,20
218:1 219:4,
11,15 220:6,
14 226:18

decisions
225:4

deck   26:22
  34:3 39:14,
  17 40:2 41:8
  49:5,16,19
  51:21 68:17
  155:1,6
  156:20
  158:10
  171:12 172:7
  223:19

decline   44:21
  162:22 163:6
  170:5

declined   53:16
  63:22 164:5

declining
  45:15 54:3
  132:8,21

decreased   60:8
  153:13

decreases
  168:7

deferred   117:7

definition
  45:1

delayed   84:4

delivery   88:17

depending
  170:3

deposed   17:13

deposition
  15:10,17
  17:3 25:16
  38:15 48:10

58:15 60:19
  66:2 83:2
  93:6 106:2
  133:6 142:15
  154:3 185:3
  201:16 206:2
  212:11
  227:19

describes
  159:17,19

design   145:20
  149:8,17,18

designed
  140:13,14
  149:19
  196:10

deskdrop
  214:16
  217:12,15

destroy   101:10
  102:1,11

detail   33:17
  73:19

details   89:17
  119:5,19

determine
  166:11

detriment
  221:20

devastate
  190:22 191:6
  224:19

devastating
  195:2

developed
  71:20 88:18
  148:6,10,12

developing
  127:12,16

development
  22:21,22
  30:3 34:10
  88:19 147:2,
  5,16 148:8,
  10 149:3

device   33:6

dialogue   166:8

difference
  113:16
  116:17

difficult
  117:4 198:4

dinner   84:7

direct   16:19
  17:1 68:5
  70:3,8

direction
  124:20

directly   23:11

directors
  112:16
  131:20
  136:11

disagree   101:3

disagreed
  129:6 131:8

disagreement

116:1,7
  117:6

disagrees
  114:13

disclosed
  199:16

discontinuing
  219:19

discount   170:9

discounted
  169:13,18,19
  170:6 223:21

discounting
  168:20

discuss   119:22
  120:6 123:19
  142:9 224:14

discussed
  94:10 104:22
  124:8 148:18

discusses
  120:10
  143:20
  158:14
  162:10
  186:12 208:7
  209:16

discussing
  45:6 126:15

discussion
  54:2 82:4
  138:1,12
  181:12 182:3
  191:21 192:6

discussions
  43:3,10
  77:22 78:11
  103:19
  104:19
  105:5,10
  126:3 199:11
  211:2

dishonesty
  201:4

displays   37:17

disrupting
  221:19 224:6

distribute
  33:18 115:6

distributed
  69:3 91:7

distributing
  42:15

distribution
  37:6,21

distributor
  33:18

District
  15:13,14

divest   87:6
  88:12 98:17
  115:11
  118:4,16,22
  119:17

divestiture
  88:12 117:13
  181:14

doc   39:19

Docket   29:11

document   23:17
  26:12 27:6,
  11,19 28:2,
  18 29:7,11
  30:7 38:4
  39:3,6,16
  40:11 41:9,
  13 47:8
  49:2,20 51:2
  56:21,22
  57:22 58:5
  59:8,10 61:6
  66:19 67:2
  83:14 84:11
  93:15 107:16
  109:6
  110:19,20
  111:3,8
  132:12
  133:18
  134:1,12,20
  135:8,12,17,
  19 144:8,12
  150:3 154:14
  157:9,15
  195:12
  198:22 202:7
  207:1,6
  212:18
  220:17

documents
  97:15

dollars   34:6
  200:1

doomed   148:21

Downs   141:11

draft   78:15,
  18 89:6,8
  94:21 95:11
  97:17 100:10

draw   97:14

drawing   153:2
  154:1

Drug   149:13
  203:5

Drugs   202:13

duly   16:8


              E


e-   42:18

e-cigarette
  118:5 150:18
  158:17

e-cigarettes
  199:21

e-com   62:22
  63:5

e-commerce
  52:5 63:10
  64:6,8,9

e-mail   25:17
  26:20 38:16
  39:7 42:3
  48:11 49:2,4
  57:6,13
  59:17 60:1,
  20 61:10,15,

22 64:22
  66:3 67:2,
  11,18 68:3,
  6,9,13 69:3,
  6,14 70:3,8,
  16 71:6
  72:15 73:17
  76:9,11
  83:3,15,20
  93:7,16
  94:7,9 95:10
  106:3,16,17
  107:2 108:4
  110:10,12
  111:16
  112:15
  113:13 115:6
  131:16
  132:3,15
  133:7 134:2,
  6 135:22
  136:5,14
  141:10
  142:16
  143:6,8,15,
  21 144:19
  147:1 149:1
  154:4,17
  155:8,11
  185:4,12,20
  186:9 206:3
  207:7,8,17
  212:12,22
  213:5,16,21

e-mails   69:6
  94:16 106:22
  156:16

e-vaping
  156:11

e-vapor  30:10
  42:19,21
  68:4 79:4
  87:5 92:16
  114:7 115:11
  117:14
  118:5,9,17
  119:1,13,18,
  21 120:12,21
  121:7 124:21
  145:7 146:15
  150:18
  151:14 152:4
  193:5,17
  195:14,18
  211:3 215:15
  218:18
  219:20

earlier  79:13
  134:7 213:8,
  12,14

economic  89:17
  176:18
  178:22
  209:14
  226:19

effect  152:13
  153:4 165:12

effective
  128:22
  130:21

effort  130:19
  221:17 224:4

efforts  115:16
  186:20

eight-week
  63:19 64:6,
  15

eighth  96:14

electronic
  88:17

Elite  48:2
  49:6 50:6,12
  51:17,21
  52:17 53:15
  54:6 55:3
  60:3,8 62:22
  63:5 69:10
  71:20 79:10,
  12,14 127:8,
  13 129:12,15
  131:21
  143:21
  145:3,7,19
  147:2,6,17,
  19 148:2
  149:17
  192:11 219:1

Elite's  71:8
  72:4

employee
  214:16
  217:11,15

employees
  217:17
  219:12

encouraging
  184:15

end  21:1
  63:14 64:18
  65:10 112:9
  209:2

ends  29:11
  43:14 158:10
  171:12

engagement
  215:17
  216:13

entail  18:6

entered  118:21

entire  90:7

entirety
  217:20

entities  91:2
  92:2

entitled  27:1
  29:12 40:3
  43:15 49:5
  50:6 52:4
  62:22 68:5
  85:14 107:20
  143:7 155:1
  158:11
  164:22 169:9
  179:22 188:1
  218:11

entry  159:7

environment
  172:14
  197:8,12,18
  198:3

epidemic

190:15
  199:22
  203:14

equity  75:13,
  19 89:20
  90:19 91:1,
  7,10 92:14
  159:8 179:7
  209:18

EST  15:6
  109:18
  205:15
  227:19

establish
  96:1,15,20

estimate  168:2

estimated
  167:18

event  87:22
  122:20
  170:17 184:1

events  157:3
  158:11,16

evidence  40:10

exact  20:22
  24:14 30:14
  65:8,12
  91:8,11,12,
  17 132:15
  150:9 187:3

EXAMINATION
  16:18

excellent  60:2
  83:12

Case 3:20-cv-02345-WHO   Document 573-4   Filed 09/26/25   Page 260 of 746

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
Highly Confidential        Kevin C. Crosthwaite on 11/15/2024        Index: exception..feedback

exception
  219:21

excess   91:13

exchange
  92:11,13
  176:14

exclusive
  211:3

excuse   53:20
  79:17,18
  92:11
  137:18,19
  149:9 166:5
  171:11
  202:16
  206:21
  216:11

excused   126:5
  227:17

executions
  122:16

exhibit   25:16
  26:13 38:15
  39:4 48:10
  56:16 58:10,
  15 59:5,8
  60:19 61:4
  66:2,12
  81:21 82:11,
  15,18 83:2,
  11,14 93:4,6
  106:2,10
  110:4,10
  119:17
  133:6,14,15,

22 135:20
  142:15 143:3
  154:3,13,14
  185:3
  201:16,22
  202:3 206:2
  207:17
  212:11

existing   23:7

exit   97:2,7
  99:11 101:16
  102:15

exiting   97:21

expect   96:21

expense   34:5
  35:16

expenses
  35:10,20

experience
  224:13

explain   33:13
  70:2 165:20
  190:6

expressed
  116:1

expressing
  60:1

expression
  141:17

extent   134:22
  135:3

external
  216:11,12

**F**

fact   90:6,17
  132:22
  148:12
  152:12
  163:18
  197:16 201:3
  225:17

facts   102:14
  158:15

fail   148:21
  149:7

fair   78:9
  92:4 124:14
  125:19 141:4
  169:5

familiar   35:22
  70:14 92:6
  119:5 222:19

fast   187:16

fastest   137:9

FDA   65:6,16
  129:3 148:15
  150:7,17
  151:8,12,14
  152:4,19
  153:12 156:9
  158:22
  159:6,7,9,
  14,18,21
  162:11,22
  163:12,18
  164:6 165:7,
  13 166:18

167:9 168:3,
  9 169:3
  170:18
  171:16
  172:8,10
  174:17
  175:16 177:2
  180:19
  185:18
  186:20
  188:1,12
  189:22
  190:17
  193:5,17
  194:6 195:22
  198:13,17
  199:4,16,20
  200:11
  203:5,20
  204:17,21
  216:22
  218:15 219:2
  222:15 223:4
  225:4

FDA's   152:14
  153:5,18
  158:16
  186:20 198:7
  224:18

FDI   188:12
  204:21

February   40:22
  42:7 127:8
  202:12,16,17

feed   23:19

feedback   126:7

feeding  170:22

feel  81:7,8,9

felt  69:8
  124:20
  130:14
  140:12

field  88:16

fight  104:7,9

financial
  77:20

find  101:11
  216:3

fine  26:9
  33:21 183:5

finish  28:15

fit  121:8
  225:8

fix  60:2

fixed  69:9

flat  137:4

flavor  193:5,
  17 219:15,20

flavors  160:2,
  17 161:10
  192:22
  193:11
  194:3,5,19
  219:19

flight  148:9

flip  159:12
  177:19
  214:11

flipped  41:17
  85:10 109:10
  157:21

flow  169:13,
  18,19 170:6,
  9 223:21

focus  96:13
  108:22

focused  56:5

focusing  61:21
  123:8

folks  69:8
  74:3

Food  149:13
  202:13 203:5

footer  68:16

form  36:9,20
  44:11 53:18
  54:18 64:3
  65:18 69:13
  70:12 72:11
  81:3 87:10
  90:2,10
  92:18 97:12
  98:2,21
  99:14 100:6,
  19 102:3,21
  103:5 104:4,
  11 113:21
  114:16 116:4
  117:1,16
  119:3 120:15
  121:12
  128:10
  129:18,20

130:12 132:1
133:2 141:7,
21 146:8,18
147:8 151:1,
18 152:8,22
156:14 160:8
161:17
163:21 164:8
166:21
168:11 173:7
180:1 181:18
184:11,18
187:1 191:8
192:1,3
195:9 196:8
197:21
200:4,13,22
205:5 217:2
219:8 220:8
222:17 223:9
224:22
225:22
226:15

formal  124:7

format  45:4

formulate
  112:11
  174:16

forward  125:8,
  20 126:16
  130:15
  143:22 145:3
  198:17

forward-looking
  170:10,11

forwarding

94:8

foundation
  40:9,18
  52:22 54:18
  55:6 73:15
  208:11

foundational
  49:12

founded  20:11

founders  24:17

fourth  27:4
  87:3,17

frame  24:15
  128:12 162:1

Francisco
  20:12,15
  21:7,15
  23:16 24:10
  25:9 74:3
  76:17

Friday  15:6

front  18:2
  26:14 39:10
  50:8,14,16
  56:18 59:9
  61:7 66:13
  83:10,11
  106:12 110:5
  133:19
  143:11 158:6
  202:4,5,8,10

frustrated
  142:2

function  22:18

Case 3:20-cv-02345-WHO   Document 573-4   Filed 09/26/25   Page 262 of 746

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
Highly Confidential        Kevin C. Crosthwaite on 11/15/2024        Index: functions..hear

29:18

**functions**
22:19,20
23:2,6,8

**fund** 174:5

**fundamental**
129:4 149:6

**future** 44:19
138:15 139:6
140:11 149:3
159:9 170:9
210:22 224:1
225:4

---

**G**

---

**gaining** 221:19

**game** 182:8

**Garnick** 77:21
78:2 83:16
93:17 94:7,
17 95:9
120:1 123:14
154:18 155:8
185:13 186:9
207:6,8
213:1,17

**gasket** 71:9,20
72:4,8,14,18

**gave** 126:1

**general** 78:2,
5,8 113:15
116:15
221:2,3

**generally** 41:6
42:11 65:9
119:8,9
128:5 130:9
179:3 199:6,
7

**generated** 29:8

**generation**
148:1

**gently** 105:21

**Gifford** 77:16
83:16 123:12
207:20

**Gifford's**
77:18

**give** 80:21
81:10 115:5
126:12,13
142:22 187:8

**giving** 131:19

**glance** 27:11
28:9,11
50:22

**goal** 128:22
130:21 180:8

**goals** 89:19
90:13

**Goldman** 24:11

**good** 16:22
24:4 69:4
87:15 130:16
180:1 192:10

**Gottlieb** 188:3

199:10,16
200:19
201:3,7
202:13 203:2
204:5

**graph** 34:20

**great** 19:4,10
20:10 38:3
41:3 48:6
51:14 78:13
108:11 170:3
186:5 214:22
215:11

**Green** 80:12,
17 219:22

**ground** 17:16

**group** 20:7
37:21 95:10
152:13
203:12

**growing** 45:4
137:8,9,12

**growth** 22:7,16
23:9 44:3,9,
19 74:16
96:22

**guess** 27:4
63:13 160:19
171:6 216:1

---

**H**

---

**hand** 38:22
58:21,22
82:7 105:20

154:10 206:9
212:8

**handed** 26:12
39:3 48:17
56:15 58:17
81:19 106:9
133:14 143:2
206:17

**handing** 66:9
93:3

**handle** 117:9

**hands** 103:19
104:8,19

**happen** 167:8,
11 168:21

**happened** 168:8

**happening**
184:2

**happiness**
141:18

**happy** 201:7

**hard** 128:18

**harm** 222:14

**hat** 78:10

**hate** 92:1

**head** 78:6

**headquarter**
21:10

**headquarters**
20:14,20,21

**hear** 23:18

hearing  139:16 151:10

heat-not-burn 33:6

held  15:18

Highlights 43:16 46:2

highly  224:16

hold  71:9 72:5

holders  91:10

holdings  75:20

home  17:8 66:16 206:15

honestly 163:16 164:1 165:19

hotel  122:21

housekeeping 39:5

Howard  23:13 26:21 39:8 77:11 83:15, 21 84:2 98:6 105:16 112:22 138:2,5 200:6,15 202:14 213:6

Howard's  94:11 125:13 192:5

Huseby  15:22

Hyatt  84:6

hybrid  44:8 45:1

hypothesis 161:7

---

**I**

idea  130:16

identification 25:20 38:19 48:14 58:17 61:1 66:6 83:6 93:10 106:6 133:9 142:18 154:7 185:7 201:18 206:6 212:15

identified 69:22 225:19

identifies 180:16

identify  118:9

Illus-  177:20

illustrative 159:14 177:20 179:5,18,22 182:3

immediately 130:7

impact  166:17 167:12 190:21 195:3 198:19

220:14 223:3

Imperial  32:1

implementation 71:13 73:3

implied  165:5

important 18:16 179:16 216:18

improved  198:8

in-  181:21

inaccurate 132:20

include  30:9 37:16 42:18, 21 181:12 222:21

included  77:11 181:16,22

includes  143:9 195:6 214:1

including  48:1 61:17 88:17 137:7 147:19 148:2

income  46:11

incomplete 131:11

Incorporated 31:18

incorrect 131:14 132:7 137:4

incorrectly 167:14

increase  45:13 64:15 170:4

increased 46:22 60:12 64:12 152:19 163:11

increases  44:7 45:11 55:4

increasing 54:3

indicating 43:22 62:16

indication 114:12

individual 75:5

individuals 57:8 61:17 76:13 77:5,9 143:10

information 23:4 131:14 135:1 218:15

informed  65:6

innovative 22:22

input  100:14, 21 101:8

instruction 135:10

intended

217:19

**interest** 75:9
92:14 95:7
152:6 153:20
204:15 205:1
209:15

**interested**
166:5

**internal**
215:16
216:11,12
217:16
222:12

**internally**
219:5

**International**
31:11 33:1,5

**intervening**
170:17

**invest** 130:16
140:7,9,20,
22

**invested** 47:17

**investing**
225:18

**investment**
74:12 75:16
105:1 124:22
140:7 155:21
176:8,13,18
209:12
226:19

**investors**
89:20 90:19

91:1,7
175:17

**involved** 78:7
128:3 181:13

**IPO** 172:16,20
173:5

**IQOS** 32:19
33:3,9,19

**IR/RA/GA/NU**
214:2

**issue** 194:4

**issued** 150:17

**issues** 60:7
69:9 107:16,
17,21 127:20

**item** 176:7
189:15
192:22
209:22

**items** 95:16

**ITG** 150:19

───────────
J
───────────

**J-** 92:15

**Jack** 85:22
86:1 88:14
113:4,7
114:7,8

**Jack's** 96:22
116:12

**jail** 18:7

**James** 24:10,

12

**Japan** 31:22

**Jerry** 106:17

**JL-** 89:14

**JLI** 20:2,11,
14,19 25:9
74:3,10
75:5,14
78:14,20
79:3 80:21
86:1 87:4,7
88:22 89:14,
19 90:12
95:7,13
97:20 99:9
105:8 114:3
120:13
121:7,10
124:16 125:5
126:16
129:14
150:19
151:16
152:6,19
153:13,21
156:10 161:4
165:13
166:5,6
167:18
168:14
169:21
174:13
175:12,18
176:18,20
177:2,16
179:5 188:8
199:11

220:15,17

**JLI's** 24:17
151:14
152:4,14
153:5
158:15,22
159:3 165:5
170:13
171:15 172:7

**job** 23:12
42:8 59:19
77:18

**Jody** 24:20
39:8 42:4
61:12

**Johnson** 15:21

**join** 84:7

**Joseph** 16:22

**JTI** 150:20

**July** 50:12
53:20,21
54:15 56:2
67:3 68:10,
18,20 78:16
79:6,9,21
83:15,21
90:4 112:10

**June** 57:7
143:6 147:14

**Jupe** 143:6,9,
16 144:21
147:15
149:16

**jury** 18:3,13

JUUL  15:12
  20:3 68:5,
  10,12,13
  69:2 70:4,9,
  16 71:2 74:8
  92:12 100:4
  102:18
  104:18 107:6
  108:3,7,9
  112:20 113:7
  115:4,7,8
  123:22
  124:8,22
  125:9,21
  128:6 130:8,
  16 137:10
  145:15
  146:4,14
  147:5
  166:12,17
  168:2 172:12
  173:5 175:22
  176:3,12
  190:22 191:6
  195:6,17,18
  197:19
  198:10 200:2
  204:15,16
  209:12
  221:18
  222:14
  223:12,22
  224:5,12,20
  225:5
JUUL's  169:1
  173:19 189:1

_____

K

K.C.  15:11
  143:7 144:21
KC  107:13
KC's  107:12
Kevin  16:7
  74:18 76:11,
  21 84:7
  107:6,9
  108:3 115:4
key  166:14
kids  194:3
Kim  15:21
kind  30:18
  89:8 107:1
  110:8,9
  158:5,6
  165:11 182:7
  217:19
knew  128:4
knock  221:6
knowing  89:17
knowledge
  32:11 62:2
  148:11

_____

L

labeled  35:1
Labs  15:12
  20:3 204:15
lacks  52:22

54:18 55:6
73:15 208:11
ladders  35:15
Lane  17:10
large  90:18
  91:9 122:1
largely  90:18
largest  75:5
launch  79:19
law  202:2
  214:2
lawyer  78:10
  89:10
lawyers  17:1
laying  184:1
lays  159:21
leadership
  203:6
leading  178:21
leak  69:22
leakage  60:7
  62:22
leaked  47:14
leaking  51:16
  60:3,7 69:9
  71:21 127:21
leaks  47:18
learned  156:9
leave  58:12
  59:2 126:4,
  13

left  44:18
  46:6 89:9
legislation
  195:22
letter  65:15
  150:7,12,17
  151:4,7,11,
  12 156:17
  159:6 169:3
  177:3 201:4,
  8,9,17
  202:11,21
  205:8 208:1,
  7
letterhead
  208:2
letters  156:10
  158:17
  188:3,9
level  73:18
  117:5 178:22
leverage
  197:12,18
license  88:5
Lieberman
  61:16,22
light  109:13
  180:19
likelihood
  172:20
  173:14
likewise
  219:14

Case 3:20-cv-02345-WHO   Document 573-4   Filed 09/26/25   Page 266 of 746

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
Highly Confidential                Kevin C. Crosthwaite on 11/15/2024                Index: limitations..market

limitations
119:13
140:20

limited
118:16,18,22
119:20 195:2

limits 173:19
174:9

lines 57:8

liquidity
89:20

list 107:16,
21 116:19

listed 67:6
89:2

lists 113:4

litigation
15:12 17:2

living 21:17

located 20:15

locations
37:17

lockup 211:9

logo 31:7,9,
14,16,21,22

long 26:3
143:7 202:2
203:1

long-term 56:7

longer 102:17

looked 69:15
171:5

lost 23:19

lot 87:11
124:3 180:7
182:15,18

loved 180:7

lower 27:5
53:3 59:11
66:20 68:15
172:21 180:7

---

**M**

macro 198:3

made 95:17
118:4 125:20
139:17,21
173:11
174:13 203:4
204:17 205:2

major 21:19

Majority
177:10

make 21:6
35:12 51:3
81:15,16
94:5 118:8
121:5 125:3,
14 129:21
138:13,20
165:15 178:8
186:18 196:1
207:14 218:4
225:5 226:19

makes 151:2
215:18

making 44:19
125:6 160:19
161:8
165:11,14

manage 23:8
38:1

managing 37:16

manufacturers
150:19
158:17

manufacturing
72:1

March 26:21
27:2 29:9
54:14 56:1

margin 46:17,
22

marginal
46:13,19
47:5

mark 25:2,6
40:3 42:10,
12,13 43:16
44:7 46:2
47:1 49:5
59:21 69:8
73:11 79:22
80:22 126:21
129:12
139:10,17
176:22
181:15 214:2

mark@juul.com
106:18
110:11

marked 25:19
26:12 27:17
38:18 39:1,4
48:13,18
56:16 58:7,
16 59:8
60:22 66:5
81:14,20
82:17 83:5
93:3,9
106:5,10
133:9,14
142:18 143:3
154:6,13
185:6 201:18
206:5,18
212:9,14

market 23:3
30:16 32:7,
13 36:7,17
65:7 79:5,
10,13,15,16,
20,22 80:5,
9,11,13,18
127:8,13
140:8 141:3
146:15
148:13,15,21
162:10,14,18
163:1,8,11
164:5 165:1,
6 190:1
192:12
193:6,18
211:3 215:15
218:2 219:2
221:19

marketplace
  159:22
  160:16

marking   82:14

Markten   42:22
  43:4 45:6
  47:14 48:1,2
  49:6 50:6,12
  51:17,21
  52:17 53:15
  54:6 55:3
  60:3,8,11
  65:7 69:10
  71:8,20 72:4
  79:10,12,14
  80:4 81:1
  127:8,13
  129:12,15
  131:21
  132:7,21
  137:8,16
  139:3,7
  143:21 145:7
  149:19
  181:15
  192:11
  219:1,22

Marlboro
  122:5,14
  221:8

Masoudi   106:17
  110:11 120:7

massive   221:19

material   28:4
  29:2 41:16
  51:10 57:21

62:14 67:21
85:9 96:9
108:19 109:9
113:16
116:16
134:16
144:7,16
157:20
160:13 172:2
175:7,10,18,
20 178:12
181:3 183:16
186:1 187:18
189:11 190:9
192:18
196:13
208:19
215:2,5
218:8

math   179:9

matter   15:11
  111:20
  114:21 211:1

matters   84:20
  109:2 113:2,
  12

meaning   118:18

meaningful
  97:1

means   30:7
  33:14 34:16
  44:2 46:12
  72:17 73:3
  86:1 98:6
  101:10 102:1
  105:13,15

136:10
139:2,5
140:5 141:15
142:3
149:10,11
165:19

meant   163:7
  191:11

measure   46:16

medication
  19:14

meet   24:12
  76:2 103:18
  104:7 105:3,
  9 112:16
  187:9

meeting   24:20
  25:9 74:2
  76:16 121:19
  123:3,6
  124:1,7,12,
  13,17 125:7
  126:4 131:17
  142:8 152:16
  156:11 187:8
  188:19
  189:1,7
  199:8,9,13
  200:8 203:3,
  4,19 205:2

meetings
  121:21 125:3
  188:13

member   126:10,
  11

members   70:3
  112:16

memory   135:22

menthol   193:7,
  19 194:20
  219:21

mention   220:16

messages
  216:14 217:5

messaging
  216:20

met   23:16
  24:10 112:10
  123:19

Michael   49:3

MICR   23:2

middle   104:8
  107:1

million   34:5
  35:9,19
  178:3 179:6

mind   102:7
  111:1 112:7
  144:2 171:18
  187:12,15
  196:17
  204:11

minimal   196:5,
  21

minimum   190:21
  196:1

mint   160:2,
  18,20 193:7,

Case 3:20-cv-02345-WHO   Document 573-4   Filed 09/26/25   Page 268 of 746

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
Highly Confidential                Kevin C. Crosthwaite on 11/15/2024                Index: minute..notice

19 194:20 219:21

minute 51:16 97:10 213:11

mistake 81:16

model 170:21 171:1,7

moist 37:8

moment 25:7 26:18 41:12 57:17 59:14 62:6 67:15 84:14 85:5 108:21 109:4 112:2 157:12 178:20 181:5 198:16

money 141:2 173:20

Monsees 24:10, 17

Montana 121:19 122:2 123:9 136:22

months 87:22 115:10,12,17

morning 16:22 38:12 227:9

Morris 31:11 33:1,5

motivations 90:14

Mountain 122:6

Mountains 122:1

mounting 203:14

move 20:19 21:7,15 28:20 48:7 125:8 126:16

moved 20:21, 22 123:4

movement 164:17

moves 196:9, 21

moving 125:20

MT 62:22 63:5

mumbles 160:11 175:8 189:9 196:11 215:3

Murray 117:8 154:18 191:11 197:1 200:7

Murray's 191:10 192:7 195:12 198:1

---
N
---

named 106:17 155:12

narrowly 226:3

necessarily 56:5

negatively 200:19

negotiate 153:19

negotiated 123:22 145:15 146:4

negotiating 130:15 176:12 200:1

negotiation 147:11 166:15 179:19 180:2,17 181:6 198:4 223:4 224:11

negotiations 76:5 77:6,10 90:7 146:13 151:16 166:6,12 186:19

nev- 148:5

newly 204:15

news 131:20

next-generation 149:18

Nicholas 74:20 83:20 207:19

Nick 77:1 84:9

nicotine 88:17

nicotine-containing 36:18

nicotine-related 31:3

night 214:1

Ninety 162:5

noncompete 211:15

nonequity 209:17

nontraditional 194:5

nonvaluation-related 181:8

nonvalue 180:12

nonvoting 209:18

Northern 15:13

Northwest 15:19

note 174:8 198:1

noted 40:16

notes 99:8 100:13 101:17 185:17 188:2 191:10,12 192:7 196:20 197:2 207:10

notice 187:9

November  15:6, 16

Nu  25:2,6
40:3 42:10, 12,13 43:16
44:7 46:2
47:1 49:5
59:21 69:8
73:11 79:22
80:22 126:21
129:12
139:10,17
181:15

number  15:14
25:16 27:7, 21 29:11
30:19 31:10, 12,13,21,22
32:7,13 35:4
38:15 39:6
41:9 48:10, 20 49:16,17, 21 56:22
57:7 58:1,15
59:10 60:19
61:6,17
66:2,20
79:22 83:2
86:5 91:11, 12,17 93:6, 15 95:16
106:2,10
109:1 111:21
133:6,18
142:15
143:4,9
144:9 154:3,

15 158:11
162:4,6
185:3,10
189:19
192:10,15
193:2 201:16
202:7 206:2
207:2
212:11,18

numbered  209:8

numbers  82:11
92:6

numeral  178:4

---

**O**

---

oath  17:20,22

OB  34:6,13
35:1

object  40:9,13
100:1,5
102:20
181:17

objecting
40:18

objection
36:8,19
44:10 49:12
52:21 53:7, 17 54:17
55:5 64:2
65:17 69:12
70:11 72:10
73:14 81:2
87:9 89:4
90:1,9 92:17

97:11 98:1, 19,20 99:13
100:18 102:2
103:4 104:3, 10 113:20
114:15
116:3,22
117:15 119:2
120:14
121:11 128:9
129:17,19
130:11
131:22
132:11 133:1
134:21
141:6,20
146:7,17
147:7 150:22
151:17
152:7,21
156:13 160:7
161:16
163:20 164:7
166:20
168:10 173:6
181:19
184:10,17
186:22
191:7,22
192:2 195:8
196:7 197:20
200:3,12,21
205:4 208:10
217:1 219:7
220:7 222:16
223:8,15
224:21
225:21

226:14

obligation
203:13

obligations
86:7

observe  29:18

obtain  115:16

obtained  190:2
193:6,18

obtaining
37:16

occur  189:2

OCI  46:6,9

October  61:12
62:3 63:15
64:18 65:4, 10,15 185:14
188:20 189:2
199:3 203:6, 18 207:7
213:2,7,18
219:12

offer  102:5
173:15
174:1,5

offered  122:13

offering
140:13

officer  22:7, 16 23:9
74:16 77:20

Oops  60:16

Case 3:20-cv-02345-WHO Document 573-4 Filed 09/26/25 Page 270 of 746

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
Highly Confidential          Kevin C. Crosthwaite on 11/15/2024          Index: operate..percentage

operate 88:15

operating 23:7
42:14 46:11,
17

operational
128:1

operations
59:21 87:8
98:18

operator 15:21

opinion 198:6

opportunity
33:18

option 172:13
173:2

options 87:4
89:2 98:9,13
171:13,16
172:8

order 18:15
149:14 219:2

organization
36:7,17
139:11

organizationally
127:12

organized 52:9

orient 187:13

oriented 110:9

original 34:16

outcome 145:11
161:9,13

168:20

outcomes
159:14,18

overhang 159:8
173:18 174:9

overwhelming
194:18

owned 75:13
122:1

ownership 86:9
91:11 152:6
153:20
178:22
204:14 205:1

—— P ——

p.m. 84:7
227:19

pages 159:13

paid 91:6
92:10 179:11

Pamela 61:16

paragraph 71:8
101:13
135:18 138:1
139:15
145:19 197:5
209:2 210:12
211:8 212:5
219:18

paragraphs
209:8

parent 31:20

parentheses
145:20

Park 84:6

part 37:20
45:5 46:6
74:14 89:15
99:10 120:9,
13 121:9,10
124:6,12,13
125:3 126:5
127:19
129:14 134:1
151:15
153:11 200:2

participate
74:9 184:14

participated
77:5,10,21
152:13

participation
209:22

parties 20:1
104:18
115:15
179:19 180:3

Partners
155:15,16,20

partnership
32:18 33:9
96:1,15,20
97:21 176:8,
13

Pass 26:6

path 130:15

140:21 141:1

paths 149:3

pathways
177:15 182:4
183:1

patience 84:8

Pause 56:10
227:4

pay 90:19
179:15 200:1

payment 86:16
90:18 92:13
177:10

PDF 107:16

peek 182:9

penalty 16:9

pencil 179:7

pending 19:1

Pennsylvania
15:18

percent 44:9
74:8 75:13
91:11 160:5
161:3,14,21
162:4,5,6
176:14 177:9
178:22
179:6,13
204:14,22
209:12,14
225:18

percentage
45:18 92:14

Case 3:20-cv-02345-WHO   Document 573-4   Filed 09/26/25   Page 271 of 746

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
Highly Confidential          Kevin C. Crosthwaite on 11/15/2024          Index: percentages..Positions

176:15

**percentages**
170:12

**Perella**
155:15,20,21

**performance**
55:9 158:15,
22

**period** 44:22
47:2,13
53:14 54:1
56:1 63:12,
19,20 64:1,
6,12,15,16
75:14 76:4,
14 88:19
89:16 90:7
120:19
123:9,10
131:4 159:4
162:19
164:10
211:3,4

**periods** 54:21

**perjury** 16:9

**permanent**
169:20

**person** 76:3

**personal**
118:12

**personnel**
21:11

**perspective**
29:13 165:1

169:10,19
170:6 172:11
173:1 177:6

**pertains**
119:21
146:22

**Philip** 31:11
33:1,5

**phone** 206:15

**phrase** 225:2

**place** 36:6,16
39:21 122:12

**Plaintiffs**
16:19 17:2

**plan** 40:3
43:16 46:2
84:5 131:7
145:19
149:16
173:10
174:16
215:17

**planned** 117:12

**planning** 34:17
44:6 215:19
222:12

**plans** 118:4,8
120:12,18
121:5 143:21
146:3 147:16
151:7 188:5,
17 204:16

**platform** 33:7
56:8,9

**platforms**
32:19 33:10,
19

**played** 18:13

**playing** 66:16

**plots** 54:9
63:4

**PLX** 25:16
38:15 48:10
58:15 60:19
66:2 83:2
93:6 106:2
133:6 142:15
154:3 185:3
201:16 206:2
212:11

**PLX-114** 58:7
59:8

**PM-** 149:8

**PMI** 32:18,22
33:8 118:21
119:12

**PMTA** 145:20
149:10,11,17
150:2

**PMTAS** 190:1
193:6,18

**pod** 60:3
189:15,22
190:14 191:5

**pod-based**
218:1,11,16

**Podolsky** 107:2
108:2 110:13

115:3,21

**pods** 127:21

**point** 25:6
32:6 64:20
103:18 105:4
118:12
128:18
161:20
191:16
198:12
216:19

**points** 45:18
94:11 95:17
100:2
104:16,21
105:17 111:4
113:17
116:18

**portfolio**
145:10

**portion** 91:9
99:1

**portrayed**
53:14

**portraying**
45:6

**position**
113:4,5,14
114:4,14
115:8 116:12
187:8 189:8
191:4 198:9
199:5

**Positions**
29:14

possessed
  32:13

potential
  85:14 118:9
  120:22
  130:15
  161:12
  167:11
  168:19
  214:18
  220:20
  224:19

potentially
  97:1,6 99:11
  101:16

PP  45:17

practicable
  88:13,15

pre  107:20

predicting
  44:6 45:10,
  12

preemptive
  210:5,8

premarket
  149:11

prepared
  215:16

preparing
  186:17

present  16:1
  170:13

presentation
  125:4,6,18,

20,22 131:7
137:3 186:18

presented  87:4
  199:4

president
  25:2,5 127:3
  139:11

pressure
  221:18
  223:12 224:5

pretty  23:6

previous  54:6
  69:6 130:6
  170:14 171:4
  211:2

previously
  58:7,16 59:7
  81:14,20
  82:17

price  163:14,
  18 179:7

prices  164:1

primarily
  223:20

prime  90:13

principal
  22:15

principle
  217:4

prior  22:12
  110:3,19
  111:3 112:13
  130:7 139:15

190:16 194:5
207:6 215:13

Pritzker  74:20
  75:3,12,22
  83:20 84:2,
  12 91:2,21
  98:8 112:8
  184:8,15
  207:19 208:2

Pritzker's
  97:9 113:13

privileged
  135:1,5

problem  66:11
  71:21 82:10,
  13 154:12
  219:3
  225:12,20
  226:12,13

problems  129:2
  140:14

proceed  16:5

process  34:17
  148:16

product  22:22
  30:15 33:6
  47:14 51:17
  53:16 55:10
  60:11 64:7
  65:7 69:10
  73:12 80:12
  102:9,10
  127:13,16,17
  129:15
  130:20 145:7

147:17
148:10,20
149:15,19
181:15

production
  72:9,14,22
  73:3,7,12

products  27:1
  30:5,9,10
  31:3 35:20
  36:7,18
  37:7,15,18
  38:1 42:16,
  19,22 43:4
  44:7,8 47:1
  48:1,2 79:22
  80:15 81:1
  88:18 128:21
  140:8,12
  141:3
  189:16,22
  190:15 191:5
  193:5,17
  203:15
  215:15
  216:22
  218:2,11,16,
  18,22
  219:16,22
  221:21

project  69:9
  95:2,5
  107:20
  130:17
  145:11,14
  148:1 155:1
  156:21

projected
  45:14

projecting
  44:18,21
  46:22
  168:16,19
  171:2

projections
  167:7

promised  84:3

Promptly
  87:18,21

pronounce
  93:22

proposal
  174:17
  175:13 189:5

propose  209:3

proposed  97:20
  98:9 147:5
  208:7
  221:13,15
  226:6

prospects
  224:2

protective
  86:8 210:5,9

provide  19:12
  89:20 114:19
  222:7

provided  28:4
  29:2 41:16
  51:10 57:21
  62:14 67:21

77:7 85:9
90:17 96:9
108:19 109:9
119:9 125:16
134:16
144:7,16
157:20
160:13 172:2
175:7,10
178:12 181:3
183:16 186:1
187:18
189:11 190:9
192:18
196:13
208:19
215:2,5
218:8

providing  89:1
  100:9,21
  101:7 126:2
  155:20

provision
  209:11
  211:14

provisions
  86:8 92:9
  210:4,6,10

public  165:6

publicly
  218:15

pulling  65:6

punitive
  196:22

purchase  86:6,

14 88:1
89:14 92:13
179:7 196:1
204:22
209:12

Purchaser
  16:19 17:1

purchasers
  63:11

purchasing
  226:10

purposes  29:7
  31:6 39:5

pursue  128:6
  173:5 174:16

pursued  129:14
  130:9

pursuing  130:8

put  38:4,13
  47:6,9 60:14
  65:22 72:5,8
  73:21 92:22
  105:18
  121:8,16
  127:8 142:12
  150:3 160:5
  161:3,14
  184:22
  198:22
  205:20 212:7
  221:18 224:4

puts  137:7

putting  72:13
  223:12

PWP  155:15

PX1008  133:18

PX1008-001
  133:8

PX1008-002
  133:8

PX1010  185:11

PX1010-001
  185:5

PX1010-004
  185:6

PX1056-001
  48:12

PX1056-012
  49:17

PX1056-036
  48:13

PX1056001  49:2

PX1086-001
  142:17 143:5

PX1086-002
  142:17

PX1123  212:18

PX1123-001
  212:13

PX1123-018
  212:14

PX1198  66:20

PX1198-001
  66:4

PX1198-004
  66:5

PX1300    81:21
  82:18

PX1300-001
  83:4

PX1300-010
  83:5

PX1304    93:15

PX1304-001
  93:8

PX1304-003
  93:9

PX1579    57:3
  59:11

PX1633-001
  25:18

PX1633-006
  29:12

PX1633-026
  25:19

PX1633-06    27:7

PX1970    61:6

PX1970-001
  60:21

PX1970-007
  60:22

PX2152    207:2

PX2152-001
  206:4

PX2152-003
  206:5

PX2506    106:11

PX2506-001
  106:4

PX2506-015
  106:5

PX4012    39:6

PX4012-001
  38:17

PX4012-054
  38:18

PX4273-001
  154:5

PX4273-019
  154:6

PX9083    202:7

PX9083-001
  201:17

---

### Q

question    19:1,
  6 53:12 70:6
  103:7 104:13
  117:18
  129:22
  134:22
  137:20
  145:2,9
  147:12
  171:21 172:6
  174:15
  176:21 177:1
  180:10
  182:21 183:6
  196:18
  221:5,13,15,

  17 224:3
  225:10,15
  226:3

questions    27:4
  41:5 100:2
  108:13 155:5
  158:3 166:10
  214:6,15,17,
  18 215:6
  220:21
  227:8,12

quibble    92:1

quick    27:11
  50:21 51:7
  157:13
  185:20

quickly    28:11
  50:19 62:11
  67:17 96:6
  134:13 144:3
  171:19
  180:20
  183:3,13
  187:12
  214:9,21
  218:3

Quigley    67:3
  71:7 123:16
  126:17,20
  127:11,18
  128:4 129:6
  131:6,18
  134:2 136:15
  137:2,14
  138:11 141:4

Quigley's

  129:9,11

---

### R

R&d    34:4,9
  35:9,16,19
  147:2 149:21

raise    100:2
  173:20 174:9

raised    145:2
  181:9 184:3
  224:3

raising    176:22

ranch    122:1,
  4,5,7,9,17
  123:6

range    159:14
  177:21

rate    44:3,9

rates    44:19

rationale
  194:1

reach    26:5
  206:9 217:20

reached    104:17

reacted    200:19

reaction
  162:10 165:6

read    26:18
  28:6,17
  35:13 44:12,
  17 45:15
  54:20 62:11,

**Highly Confidential**                               Index: reading..recollection

22 67:17
70:20 73:6,8
88:20,21
96:10,19
99:2 102:5
103:10 105:6
108:14 109:6
134:17 137:8
143:7,18
144:2,17,20
157:12
159:5,10
161:19 163:7
165:17 170:8
171:18 172:3
180:20
183:3,6,13,
18 187:7,19
192:10
193:14,20
196:15
203:3,11
208:20
210:21
216:10
218:3,12,14
220:11

**reading** 35:10
52:19 55:16
88:2,4,7
96:3,16
100:9
101:19,21
134:13
160:21
173:22 175:3
183:19
185:20 203:8

205:7 209:4
217:8 218:19
220:2,4
221:9 222:8

**reads** 225:11

**ready** 27:9
72:8,22
73:6,11

**real** 89:17
224:15

**Reale** 93:17
94:2,4,9

**realized**
81:13,20

**reason** 19:11
32:15 148:17
179:1 190:6,
13,14 194:2,
11,14

**reasonable**
115:16

**reasons** 148:22
149:6

**recall** 21:20
22:5 23:15
24:9,16,19
25:3,7,8,13
30:14 43:2,
9,11 44:5
46:21 47:12,
16,19,21
48:3 51:15
54:2 60:6,9,
10,13 65:5,
9,14 69:11

71:22 73:18
74:4 75:11
76:20 78:14,
17 79:12,15
80:6,17,19
85:21 89:16
91:5,13,18
92:20 100:21
101:7 112:7,
21 117:11
119:8,14
120:3,8,17
121:1,14,18
122:10 125:6
126:18
131:6,10,13,
18 132:9,15,
19 133:4
135:12,17
136:3,22
137:1 150:6,
14,15,16,21
151:6,12
153:14,15,17
156:8
163:17,22
164:3 166:4,
9 167:17,20
176:20
184:5,12
186:16
198:11,21
199:6,7,13,
18 200:6
215:13
223:6,7,20

**receipt** 84:4
114:5

**receive** 57:12
62:2 67:11
94:16,19
99:22 129:3
143:15
149:13 186:8
213:16 219:2

**received** 47:22
80:20 89:13
99:20 101:3,
5 115:10
136:14
150:7,12
188:9

**receiving**
112:7 130:22
131:15

**recent** 157:3
158:11,16,22

**recess** 109:17
205:14

**recipient** 67:7

**recipients**
57:9

**recites** 157:3

**recollection**
33:15 35:18
42:13 53:13
55:21 56:3
67:11 71:17,
19 73:11
94:16 123:5
136:14 140:6
143:15
146:10 149:2

Case 3:20-cv-02345-WHO    Document 573-4    Filed 09/26/25    Page 276 of 746

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
Highly Confidential              Kevin C. Crosthwaite on 11/15/2024    Index: recommend..representations

155:7 163:10 176:3

**recommend** 125:8 189:22 193:4,16

**recommendation** 190:6,14

**recommendations** 125:14 194:2

**recommended** 21:9

**record** 16:2 23:21 29:7 31:7 109:13, 14,21 110:2 205:10,11,18 226:22 227:2,6,15

**recorded** 18:10

**reduced-harm** 27:1 30:9

**reduced-risk** 30:4

**reduction** 165:5 170:4 175:19,21

**reductions** 169:21

**refer** 20:3,7 223:12

**reference** 32:22 45:17 145:6 168:1

**referenced** 88:6

**referencing** 146:20

**referred** 43:20 149:16

**referring** 30:11 31:9 33:20 45:13 55:9 69:1 72:2,19 75:7 128:12 130:14 132:16,17 138:7 139:8 140:3,6,18 147:9 149:18 153:16 158:20 159:5 160:10 164:10 176:19 195:11,13 197:2

**refers** 85:22 95:2 105:3 144:19 175:21 203:18

**reflects** 191:15,19 213:22

**refresh** 53:13 176:2

**reg-** 78:6

**regard** 47:20 128:2

**regularly** 123:2

**regulation** 78:7

**regulations** 149:20

**regulatory** 130:22 173:18 174:8 225:4

**relate** 225:5

**relating** 88:16

**relation** 198:8

**relationship** 37:15

**relocate** 21:10

**remains** 71:9

**remarking** 58:8

**remember** 20:22 21:2 22:3 24:14 25:4, 10 33:16 57:15 65:8, 11,12,20 76:10,21,22 77:3 79:19 80:2,7,10 81:5 100:9 119:11,19 120:2 131:15 132:4 135:14 150:9 152:16

153:1,7,22 156:15 163:14 184:19,20 187:3 201:12 214:13

**remembering** 132:3

**reminds** 151:11

**remove** 218:1

**removing** 218:22

**renegotiated** 180:18

**renegotiation** 180:13

**repair** 69:22

**repeat** 36:11 151:20

**repeating** 196:17

**rephrase** 19:7

**replace** 102:8

**report** 23:11

**reported** 128:1

**reportedly** 194:3

**reporter** 15:20 16:3

**represent** 78:20 132:20

**representations**

203:4

**representatives**
74:10  95:13
97:20

**request**  203:3

**requested**  71:8
151:7

**requesting**
188:4

**require**  189:22
193:5,17

**required**  150:1

**requirement**
149:12

**res-**  127:19

**research**  23:3
34:10

**resides**  161:21

**resolution**
60:7

**respect**  37:14
69:10  79:4
80:22  98:14
113:11  116:1
117:13
123:21
127:20
151:15
153:19
174:14
177:16  191:5
198:9

**respond**  183:4

188:14,15

**responding**
103:7  226:3

**response**
112:11,14,20
175:16
197:10
221:15

**responsibilities**
22:14,15
37:22

**responsibility**
23:7  42:15
74:16  125:11
128:2  139:13

**responsible**
127:7,12,15,
16,19  139:9

**rest**  28:6

**restrained**
119:16

**restrictions**
86:10

**restructuring**
21:19  22:3
185:18

**result**  89:21
97:21  163:12
166:18
168:14  177:2

**results**  159:4

**retail**  37:17
38:1  45:7,
11,13  52:5

80:16

**retrieve**  59:5

**revealing**
135:4

**review**  29:2
41:13  57:18
59:15  85:5
108:22  112:2
126:13
134:11
144:16  189:5
192:18  214:2

**reviewed**  131:7

**reviewing**
160:12  175:9
189:10
196:12  215:4

**reviews**  28:3
41:15  51:9
57:20  62:13
67:20  85:8
96:8  108:18
109:8  134:15
144:6  157:19
172:1  175:6
178:11  181:2
183:15
185:22
187:17  190:8
208:18  215:1
218:7

**reward**  122:13

**Reynolds**  31:17
150:19

**RHP**  29:13

30:4

**Riaz**  74:22
77:1  84:4
207:18

**Rich**  85:15

**Richard**  85:15,
18  88:12,16
113:5,9
114:6,7,13
115:10

**Richard's**
113:14

**Richmond**  17:10

**right-hand**
27:5  59:11
66:20  68:16
82:1  114:11
178:2

**rights**  86:7,8
210:5,8

**ring**  104:8

**rise**  218:17

**risk**  160:6
161:4,15

**risks**  152:14,
19

**ROBINSON**
191:7,22
195:8

**role**  22:18
77:8  145:3,
10

**rolled**  22:19

rooms   122:21

ROSENTHAL
  40:8,15,17
  49:11 181:17

row   32:2

rows   30:19
  31:2

rule   195:1

rules   17:16

run   30:19

Running   17:10

runs   54:14

───────────────

         S
───────────────

S&bd   29:13
  30:2

sale   219:20

sales   37:6
  50:7 54:7,9
  55:4 60:11
  63:5,9
  64:12,15
  169:21
  194:18

saloon   122:20

San   20:12,15
  21:7,15
  23:16 24:10
  25:9 74:3
  76:17

satisfy   149:19

Saveri   16:21,

22 23:20
24:1,4,6
26:1,10
27:22 28:7,
16 29:5
36:13 37:2
38:9,21
40:12,16,19,
20 41:19
44:14 48:16
49:13 50:1,4
51:13 53:1,
11,19 55:1,
19 56:13
58:2,9,20
59:4,6 60:16
61:3 62:17
64:10 65:21
66:8,15,18
68:1 69:16
70:18 72:20
73:20 81:6
82:6 83:8
85:12 87:13
89:11 90:5,
15 92:21
93:2,13
96:12 97:16
98:7 99:6,19
100:11 101:1
102:13
103:1,11
104:5,14
106:8 108:20
109:12 110:1
114:2 115:1
116:5
117:10,20

119:7 121:3,
15 128:13
130:2 131:5
132:5,18
133:12
134:18
135:6,15
141:9 142:6,
11,21
144:10,14,18
146:11
147:3,13
151:5 152:1,
11 153:3
154:9 156:18
157:10,18
158:1 161:1
162:2 164:2,
12 167:16
169:4 172:4
173:12
178:16
181:10 182:1
184:4,13,21
185:9 186:4,
7 187:5,21
189:14
190:10
191:17
192:8,21
195:16
196:19 198:5
200:9,17
201:2,21
204:3,8,12
205:9,19
206:8,12,14,
16,20

208:13,21
212:17,19
215:8 217:9
218:9 219:13
220:12
223:1,10
224:9 225:9
226:8,20
227:7

scan   83:19
  86:5 103:12
  106:21

scenario
  160:3,15,18
  161:2 178:21
  182:8

scenarios
  161:22
  167:7,10
  170:11,22
  182:22
  183:21
  223:22 225:6

schedule
  156:11

Schroder   24:21

Schwartz   57:7,
  13 59:22
  61:11,16,22
  62:3 67:2,12
  69:19 71:6
  72:21 127:22
  143:9

Schwartz'
  59:19

Scorecard  27:2

Scott  188:3
  199:10
  200:15
  202:12,13

script  94:21
  95:11,16
  97:17 99:18
  100:22

scrutiny
  151:14
  152:4,19
  153:12

seats  210:1

Sebo  15:20

sec  145:11

section  84:18
  86:21 95:22
  96:14 103:13
  108:22
  111:20 115:8
  187:7,22
  189:6 193:11
  197:4 216:2
  218:11
  220:18,19

segment  44:20,
  21 45:4,14,
  15

segments  44:20

selling  55:11,
  12,14,17
  56:5

send  108:3,7

115:3

sending  107:15

sends  94:7

senior  203:6

sense  138:13,
  20 151:2
  215:18

sentence  73:5
  102:6 105:15

separate  159:3

September
  63:14 150:6
  154:18
  155:2,9
  156:4,21
  164:4,13
  166:7 178:21
  188:3

sequence
  156:16

series  106:22
  171:2 220:20

served  84:8

Service  23:1

services  30:1
  155:19
  210:13 211:5

sessions  124:6

set  25:10
  95:17 97:8
  102:14
  113:3,12
  114:4 166:17

172:14 173:3
182:22
188:13,19
189:1 214:18
222:2

sets  162:13
  165:5 171:14
  177:8 189:5
  209:7

setting  25:13

settings  74:21

shake  103:19
  104:8,19

share  32:7,13
  45:7,11,13
  55:11,14
  129:9 221:20

shareholders
  75:5 90:14

shares  209:17,
  18

sheet  78:15
  79:1 80:20
  81:5 84:3,18
  85:13 86:4
  88:22 89:7,
  13 90:4 92:8
  97:9 98:9,11
  107:20
  108:5,15
  111:15
  112:14,20
  115:20
  120:10
  147:10

sheets  92:10
  112:8 146:21

shelf  37:17

shop  138:14,
  20 139:2,5
  140:3

short  28:19
  190:22 191:6

shorthand  20:1
  23:1

shot  130:22

show  40:1
  132:13
  201:13

showed  97:9
  98:11 112:8
  223:2

showing  111:9
  163:5 179:10

shown  110:4,
  19

shows  62:1
  166:16

shut  43:5
  92:15 98:17
  129:15 139:2

shutting
  181:14

sic  23:1
  105:3 134:3
  199:3

side  44:18
  59:21 90:12

117:8 172:12
180:6 183:18

**significant**
129:2 130:19
162:4,5

**significantly**
218:17

**similar** 150:12
165:11

**simply** 149:1
224:2

**simultaneous**
28:12

**single** 225:19
226:11

**sir** 17:14
18:19 19:19
20:11 24:7
26:15,16
28:1,20
29:6,17 34:1
38:5 39:1,3,
11,18 40:6
41:4 45:20
48:20 49:14
50:15,19
53:12 54:16
56:12,15
57:18 59:7
61:8 63:4
65:3 66:9,
12,21 67:8,
16 79:18
81:11 82:7
83:9 84:15

85:3,13
87:19 93:2
96:17 99:20
101:5 105:20
106:9
107:13,22
108:2 110:6
112:4
133:13,16,20
142:22
143:2,12
144:11,14
152:12
154:14 167:1
168:17 169:7
180:15
185:10 186:8
201:22 202:9
205:20
206:17,18
208:17 212:8
213:15
218:20
227:10

**sit** 65:14
119:15
135:16

**sitting** 126:8

**sixth** 210:16

**SKUS** 139:14
171:2

**slide** 26:22
29:12 30:18
34:4 39:14,
17 40:2 41:8
43:14 49:4,9

50:6,10,11
51:21 68:16
70:7,15
154:22 157:3
158:10,21
159:5,13,17
162:9 164:20
166:16 171:9
177:4 223:2,
7,19

**slides** 41:6
49:15 68:5
171:12

**small** 29:19

**Smoke** 80:12,
17 219:22

**smokeless** 37:8

**smokers** 122:14

**sold** 31:3
42:22

**solution** 72:2

**someone's**
104:6

**sophisticated**
36:6,17
37:6,13

**sort** 159:20

**sotto** 82:4

**sound** 92:6
99:2 188:14

**sounds** 22:8
24:13 75:18
91:20 92:5

121:21
122:11
151:10

**spa** 122:21

**space** 37:17
122:21

**speak** 36:1
76:12 191:11

**speaking**
76:21,22

**specifically**
90:12 105:2

**speculate**
177:1

**speculating**
105:14
140:5,10
160:15
175:12,17
183:20 225:3

**speculation**
73:15

**spending** 141:2

**spoke** 137:17
138:18

**spoken** 137:15

**spot** 38:13

**squarely** 194:4

**staff** 199:10

**Stake** 177:10

**stamp** 58:10
59:5

Case 3:20-cv-02345-WHO    Document 573-4    Filed 09/26/25    Page 281 of 746

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
Highly Confidential            Kevin C. Crosthwaite on 11/15/2024            Index: stamped..SULLIVAN

stamped  25:18
  38:17  48:12
  60:21  66:4
  83:4  93:8
  106:4  133:7
  142:16  154:5
  185:5  201:17
  206:4  212:13

standards
  150:1

standstill
  86:9  211:11

start  42:1
  50:17  155:6
  158:5  198:17
  215:11

started  22:17

starting
  208:22

starts  84:19
  87:21

state  126:3

stated  130:21
  190:13  205:8

statement
  32:12

statements
  205:1

States  32:8,14
  33:19  149:15

stating  159:3

status  186:19

stenographer

16:10,14
28:14,21
186:2  196:14
204:1,6,9
206:19

Steve  24:21
  213:6

sticker  81:22

stock  163:14,
  17  164:1,11,
  17

stop  139:17

stopped  146:5

store  55:14
  56:6

stores  38:2
  55:10,11,16

story  51:7
  192:11

straight
  207:15

strategic  40:3
  171:13,15
  172:7  176:8,
  13

strategies
  37:16

strategy  22:20
  30:3  112:11
  123:20
  124:6,20
  128:21  129:5
  130:9  151:15
  152:5  215:22

216:2,6
217:8  222:12
223:4

Street  17:7
  20:15,18

strike  36:4
  71:17

string  83:3
  93:7  133:7
  142:16
  212:12

strong  198:12

Structure
  177:10

structured
  90:17

stuff  99:3

subject  43:10
  88:5  119:10
  120:1,7,10
  124:7  126:15
  136:6,7
  180:17

subjects  70:4
  86:5

submission
  203:7

submissions
  205:3

submit  151:7
  188:4

subsidiaries
  211:1

subsidiary
  31:19

substance
  135:4

substantially
  152:20
  153:12

substantive
  113:16
  116:17
  158:10

successful
  56:9  124:21
  145:11  221:7

successfully
  69:8

suggested
  180:18

suggesting
  45:2  70:3

suggestion
  196:21

suggestions
  116:20

SULLIVAN  26:9
  36:8,19  38:8
  44:10  52:21
  53:6,17
  54:17  55:5
  59:2  64:2
  65:17  69:12
  70:11  72:10
  73:14  81:2
  87:9  89:4

90:1,9 92:17
93:12 97:11
98:20 99:13
100:5,18
102:2,20
103:4 104:3,
10 113:20
114:15
116:3,22
117:15 119:2
120:14
121:11 128:9
129:17
130:11
131:22
132:10 133:1
134:21 135:9
141:6,20
146:7,17
147:7 150:22
151:17
152:7,21
156:13
157:5,8
160:7 161:16
163:20 164:7
166:20
168:10 173:6
175:14
181:19
184:10,17
186:22 192:2
196:7 197:20
200:3,12,21
205:4 206:13
208:10 217:1
219:7 220:7
222:16

223:8,14
224:21
225:21
226:14
227:11

**summarizes**
158:15

**Summary** 27:2
50:12 51:22
85:14

**support** 86:7
129:4 140:8,
18 195:22
210:13 211:5
216:13

**supported**
125:20

**supporter**
124:15,19
128:5

**supporting**
77:8 128:21
130:17,19

**swear** 16:4

**sworn** 16:8,16

**synergies** 97:1

**system** 33:6
37:6,10,13
80:16 148:10

**systems** 88:18

───────────
T
───────────

**tab** 27:21

28:1 49:21
50:3 58:1,3
61:5 66:16
82:19 93:14
144:9 157:17
186:3,5
204:2,7,10
206:15

**table** 113:2
180:6

**tactical** 177:5

**taking** 17:3
124:19
170:10 191:5
192:11
225:12

**talk** 18:17
156:12
165:18

**talked** 126:6
166:14

**talking** 94:11
100:2
104:16,21
105:16 111:4
140:2 147:1
149:1,2
162:6

**talks** 180:12
209:22
210:13,16

**Taylor** 24:11,
12

**teacher's**
183:8

**team** 60:1
74:15 112:11
127:19
175:13

**technically**
213:14

**technician**
23:17 27:19,
20 28:2
49:20 57:22
58:5 144:8,
12 157:15

**telephone**
76:13,22

**telling** 18:6
138:18
204:21

**tells** 55:15
138:11

**temporarily**
21:17

**Ten** 206:19

**tender** 173:14
174:1,5

**Teresa** 134:3
135:13 136:1

**term** 78:15
79:1 80:20
81:5 84:3,18
85:13 86:4,
17 88:22
89:7,13 90:4
92:8,9 97:6,
9 98:8,11

107:20
108:5,15
111:14,15
112:8,14,20
115:20 120:9
146:20
147:10
166:14
181:13
190:22 191:6

**terminology**
34:16 37:11

**terms** 85:14
97:8 104:22
105:8 110:17
111:15
113:14
116:2,7,10
119:12 137:9
146:3 147:4
153:19
180:12,17
181:8 209:3,
8

**test** 80:10

**testified**
16:11

**testify** 19:15
40:14

**testimony**
18:12 19:12
130:7

**thing** 47:9
214:13

**things** 30:10

35:14 71:21
97:18 99:10
120:21
123:20 126:7
131:3 140:19
159:3 168:21
216:18
223:13,18
224:8

**thinking** 121:2
172:12,13
173:2 175:13
176:6 177:2
187:9 198:17
224:1

**thinks** 180:1

**Thirty-five**
209:14

**Thirty-three**
157:18

**thought** 130:8
198:20
226:17

**thoughts**
186:12

**thousand** 52:4,
17 63:6

**three-year**
40:3 43:16
44:22 46:2

**time** 15:17
21:4 22:16
23:10 24:13,
15,17 25:1,6
28:17,19

29:19,20
30:8,15 31:4
32:12 33:15
34:18 35:9,
18 36:12
37:9 42:12
44:6 46:22
53:2,14,16
54:1,10,20
55:3,21,22
56:4 59:19,
20 60:11
63:19,22
64:16 68:9
69:7 71:19
72:3 73:19
74:7,19
75:6,8,10,15
76:3,15,17
77:13,19
78:19 79:3,5
80:15 89:12,
16 90:4,13
103:19 108:8
117:12,22
118:4,15,17,
20 120:11,19
121:5,22
124:14,17
125:2 126:1,
14,15 128:4,
11,16,18
129:2
130:10,13,18
131:4 134:19
135:7,14
136:3,17
138:8 139:10

140:7 141:5
145:16
149:22
150:10
155:19
159:4,18
161:20,22
162:19
164:10 166:5
167:18,20
171:3 176:4,
6,11,16,21
177:16
178:20
179:21 180:6
181:6 183:2
186:17
198:11,17
199:11,17,19
200:1 202:22
203:1 213:17
222:20
224:12,15
227:9

**timeliness**
216:14

**times** 123:4
146:13

**title** 22:8,12
25:5 78:7
165:4

**titled** 34:4

**tobacco** 31:2,
14,22 36:7,
17 37:7,8,
12,13,18

Case 3:20-cv-02345-WHO   Document 573-4   Filed 09/26/25   Page 284 of 746

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
Highly Confidential          Kevin C. Crosthwaite on 11/15/2024          Index: today..understanding

38:1 42:17
149:12
193:7,19
194:19
203:14
219:21

today 17:3
18:10 19:12,
15,17,22
65:14 94:10
119:15
135:16

Today's 15:16

told 108:6
132:6 138:20
200:11

tomorrow's
186:13

Tony 93:17

top 31:14
35:4 43:22
61:11 62:9
85:1 87:17
106:15 109:1
111:21 134:1
143:5 174:19
180:12
208:22 221:2

top-selling
150:18

Topco 209:15

topic 117:6

topics 124:4
126:3 184:2

toss 26:4

totality 75:19
104:20

town 122:18

toxicology
140:14

tracked 47:22
48:5

tracking 51:5
63:9

traditional
194:19

training 78:10

transact 180:4

transaction
74:7 76:18
85:15 89:21
120:13
121:10
123:21 124:8
125:5,9,17,
21 126:17
128:6 129:13
130:8 208:8
224:11,14

transcribed
18:10

transcript
18:16

transfer 86:10

transition
211:4

transmission

112:13

transmit 155:7

treated 224:16

Tree 94:12
95:2,5
107:20
145:11,14
155:1 156:21
160:5 161:15
171:13
172:6,12
174:5
177:11,20
185:18
186:19 197:3

Tree's 159:8
161:21 174:9

trend 53:3,9
55:17

trial 18:13

trips 122:13

true 20:16
32:12

truth 16:10,
11 17:20
18:6

turn 45:20
49:15 169:6
171:9 182:2

two-page 134:1

type 29:19

---

**U**

---

U.S. 15:13
31:19 88:17
165:6 211:3

ultimately
118:11
140:15 141:1
150:1 179:11
180:2 192:4
226:18

Um-hum 24:5
112:1 218:21

unable 103:18
105:3

unclear 175:1

underage 188:5

understand
17:13,19,22
18:5,9,18
19:2,3,5
70:5 89:13
90:16 92:8,
12 104:15
129:22 130:6
146:2 165:16
178:9,14
200:10 226:9

understanding
44:4 46:10
55:13 70:15
140:19
167:4,13,14
168:18
169:15 176:1

180:9

**understood**
18:14  22:14
191:4  197:17

**unilateral**
194:14
212:3,5

**United**  32:8,14
33:19  149:15

**unreportable**
28:12

**unwilling**
175:18

**update**  49:5
68:3  126:2

**updates**  213:22

**upper**  82:1

---
**V**
---

**vake**  32:7

**Valani**  74:22
75:3,12  76:1
91:2,18
207:18  208:3

**valuation**
153:5,10,13
164:22
165:12
166:11,13,17
167:12,22
168:2,3,8,22
169:2,10,20
170:5
175:19,20,21

177:21
179:5,18,20
180:3,7
223:21

**valued**  176:3

**vape**  118:5

**vaping**  151:9
160:1  161:10
186:21
199:22

**vapor**  32:7,13
97:2,7,22
98:15  99:12
101:16
102:15

**varieties**
219:20

**variety**  22:18
120:20  126:7
148:21

**version**  149:4,
6  173:9
179:22  183:8

**versus**  56:6
63:5  170:13

**viability**  56:8

**video**  15:21
18:12

**videorecorded**
15:10

**view**  118:13
129:1,10,11,
13  159:20
160:20

167:22
170:10,12
179:20
191:16
198:12

**Virginia**  17:11

**virtually**
80:15

**voce**  82:4

**volume**  50:7
54:7,10
55:4,9,18
137:8,9,12
160:6  161:4,
15,21  169:20
170:4,13

**voting**  86:8
209:18

---
**W**
---

**wait**  81:10
177:8

**wanted**  62:19
94:5  111:19

**Washington**
15:5,19
20:20  21:8

**weaknesses**
129:5

**Wednesday**  84:6

**weekly**  50:7
54:7,9  55:4

**weeks**  110:18

111:10

**weight**  18:1

**Weinberg**
155:16,20,21

**western**  122:18

**Willard**  23:13
26:21  39:8
77:11  81:20
82:18  83:15,
21  84:12
94:9  95:12
97:19
100:12,13
105:7  111:5
137:19
138:5,12,19
184:8,15
185:13
202:14
204:21
207:9,18
209:1  213:6

**Willard's**  99:8
100:3

**Wise**  24:21
26:20

**withdraw**
215:15

**withdrawal**
216:21

**word**  20:2,6
52:13  100:15
101:9,22
102:6,7
107:16  137:4

211:15,18
212:1,2,4,6

**words**  140:17
201:6

**wore**  78:10

**work**  60:2
149:21 158:6

**working**  59:21
74:15 120:20
131:3

**worries**  105:22

**worth**  118:13
167:18

**writes**  84:2
137:2 144:21
145:18
194:10
204:13

**writing**  70:2,3
139:1 203:3

**written**  16:2
99:17
116:15,16
156:10 203:7
205:3 208:2

**wrong**  32:16
168:17

**wrote**  61:16
98:5 110:11
131:19
136:20
139:19
188:15 191:2
192:20 194:8

201:3 207:18
213:1 226:7

---
**Y**
---

**y-axis**  52:19

**year**  35:10
43:3,6 50:12
164:4,15

**year-to**  164:14

**year-to-date**
164:14

**years**  123:5,6

**youth**  151:9
186:21 194:4
199:22
203:14
218:17 219:3

---
**Z**
---

**Zachary**  107:2
110:13

**Zoom**  23:19

# EXHIBIT D

# EXHIBIT 10

# FILED UNDER SEAL

Confidential

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

_____ )
                      ) Case No.
IN RE:  JUUL LABS, INC.    )
ANTITRUST LITIGATION     ) 3:20-cv-02345-WHO
                      )
This Document Relates To: )
                      )
ALL ACTIONS
_____

** CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER **

_____

VIDEO RECORDED EXAMINATION OF

JAMES WAPPLER

_____

TAKEN ON

TUESDAY, NOVEMBER 5, 2024

CERTIFIED STENOGRAPHER:
JESSIE WAACK, RDR, CRR, CCRR, NYRCR, NYACR,
CCR-NJ (No. 30XI008238700) CSR-TX (No. 11958)
CCR-WA (No. 21007264), CSR-CA (No. 14420),
REALTIME SYSTEMS ADMINISTRATOR
JOB NO.:  108231

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
James Wappler on 11/05/2024

Confidential

Page 2

VIDEO RECORDED EXAMINATION of JAMES WAPPLER, taken before JESSICA R. WAACK, Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter, Registered Diplomate Reporter, California Certified Realtime Reporter, New Jersey Certified Court Reporter (License No. 30XI008238700); Texas Certified Shorthand Reporter (License No. 11958); Washington State Certified Court Reporter (License No. 21007264); California Certified Shorthand Reporter (License No. 14420); New York Association Certified Reporter, New York Realtime Court Reporter and Notary Public of Washington, D.C. and the States of New York, Pennsylvania, Delaware, Maryland and Virginia, at Motley Rice LLC, 800 3rd Avenue, New York, New York, on Tuesday, November 5, 2024, commencing at 9:05 a.m. and concluding at 3:32 p.m.

Page 3

APPEARANCES

ON BEHALF OF THE DIRECT PURCHASER PLAINTIFFS:

MOTLEY RICE LLC
BY:  MICHAEL M. BUCHMAN, ESQ.
BY:  HANNAN A. SEIRAFI, ESQ.
BY:  KAREN SEIDEN, ESQ.
800 Third Avenue, Suite 2401
New York, New York  10022
PHONE: 212-577-0040
EMAIL: Mbuchman@motleyrice.com
EMAIL: Hseirafi@motleyrice.com
EMAIL: Kseiden@motleyrice.com
   -and-
ZWERLING, SCHACHTER & ZWERLING, LLP
BY:  JUSTIN M. TARSHIS, ESQ. (Remote)
41 Madison Avenue
New York, New York  10010
PHONE: 212-223-3900
EMAIL: Jtarshis@zsz.com

Page 4

APPEARANCES

ON BEHALF OF JUUL LABS INC.:

CLEARY GOTTLIEB
BY:  SAMUEL BLANKENSHIP, ESQ. (Remote)
1841 Page Mill Rd
Palo Alto, California  94304
PHONE: 650-815-4127
EMAIL: Sblankenship@cgsh.com

ON BEHALF OF THE ALTRIA DEFENDANTS:

ARNOLD & PORTER KAYE SCHOLER LLP
BY:  PAUL W. RODNEY, ESQ.
1144 Fifteenth Street, Suite 3100
Denver, Colorado  80202-2848
PHONE: 303-863-2319
EMAIL: Paul.rodney@amoldporter.com

Page 5

APPEARANCES

ON BEHALF OF THE WITNESS AND PERELLA WEINBERG PARTNERS:

COVINGTON & BURLING LLP
BY:  ANDREW A. RUFFINO, ESQ.
620 Eighth Avenue
New York, New York  10018
PHONE: 212-841-1097
EMAIL: Aruffino@cov.com

   ALSO  PRESENT

RICH MORALES, videographer
MARIO BARREDO, document tech

       --o0o--

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**

**James Wappler on 11/05/2024**

Page 6

INDEX TO EXAMINATION

WITNESS:  JAMES WAPPLER

EXAMINATION          PAGE

BY MR. BUCHMAN          15

BY MR. RODNEY          257

BY MR. BUCHMAN          264

INDEXED PAGES

PAGE

JAMES WAPPLER, sworn          14

REPORTER CERTIFICATE          265

INSTRUCTIONS TO WITNESS          266

DECLARATION UNDER PENALTY OF PERJURY    267

ERRATA SHEET          268

INFORMATION REQUESTED

Page    Line

111    23

124    6

WITNESS INSTRUCTED NOT TO ANSWER

None

Page 7

INDEX TO EXHIBITS

WITNESS:  JAMES WAPPLER

Tuesday, November 5, 2024

MARKED          DESCRIPTION          PAGE

Exhibit 234  Subpoena to Mr. Wappler          15

Exhibit 235  Third amended consolidated class action complaint          27

Exhibit 236  Mr. Wappler's LinkedIn profile          29

Exhibit 237  Deposition transcript of Mr. Wappler in FTC matter          32

Exhibit 238  Email dated September 12, 2018, with attachment; PWP_00008592          52

Exhibit 239  Email dated August 7, 2018; PWP_0000815          63

Exhibit 240  Email chain ending on January 18, 2018; PWP_00007043          74

Exhibit 241  Email dated November 30, 2018; PWP_00002251          88

Exhibit 242  Slide deck dated July 30, 2018; PWP_00004804          108

Page 8

INDEX TO EXHIBITS

WITNESS:  JAMES WAPPLER

Tuesday, November 5, 2024

MARKED          DESCRIPTION          PAGE

Exhibit 243  Email chain ending on August 19, 2018; ALGAT004893321          130

Exhibit 244  Email chain ending on August 15, 2018; PWP_00008216          138

Exhibit 245  Attachment to Exhibit 244; PWP_00008219          143

Exhibit 246  Email dated October 26, 2018; ALGFTC000106605          151

Exhibit 247  Email dated July 23, 2018; PWP_00008048          156

Exhibit 248  Email chain ending on August 5, 2018; ALGFTC00000726598          162

Exhibit 249  Email chain ending on August 23, 2018, with attachment; ALGFTC00001062139          168

Exhibit 250  Slide deck dated October 30, 2018; PWP_00008435          178

Page 9

INDEX TO EXHIBITS

WITNESS:  JAMES WAPPLER

Tuesday, November 5, 2024

MARKED          DESCRIPTION          PAGE

Exhibit 251  Slide deck dated December 2018; PWP_00001273  189

Exhibit 252  Slide deck dated November 19, 2018; PWP_00001147          196

Exhibit 253  AB Bernstein analysis; PWP_00004199          200

Exhibit 254  Potential CAGNY outline; PWP_00010521          213

Exhibit 255  Email chain ending on December 11, 2018, with attachment; PWP_00012061          220

Exhibit 256  Email dated February 25, 2019; PWP_00019923          223

Exhibit 257  Email dated October 30, 2018; PWP_00008421          232

Exhibit 258  Email dated December 15, 2018, with attachment; JLIFTC00927357          235

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**

James Wappler on 11/05/2024

Page 10

INDEX TO EXHIBITS

WITNESS:  JAMES WAPPLER

Tuesday, November 5, 2024

MARKED          DESCRIPTION          PAGE

Exhibit 259  Email chain ending on August 27, 2018; PWP_00042985   236

Exhibit 260  Relationship agreement   240

Exhibit 261  Email chain ending on January 18, 2018, with attachment; PWP_00007043   245

Exhibit 262  Email dated September 12, 2018; ALGFTC0001056399   246

Exhibit 263  Email chain ending on September 12, 2018; PWP_00008585   248

Exhibit 264  Skipped

Exhibit 265  Email dated July 18, 2018; PWP_00017223   251

Exhibit 266  Email dated August 16, 2018; PWP_00008237   252

Exhibit 267  Skipped

Exhibit 268  Email dated January 19, 2018; PWP_00007076   253

Page 11

INDEX TO EXHIBITS

WITNESS:  JAMES WAPPLER

Tuesday, November 5, 2024

MARKED          DESCRIPTION          PAGE

Exhibit 269  Email dated September 13, 2018; PWP_00000919   254

** All exhibits were attached to the original transcript **

--o0o--

Page 12

******

PROCEEDINGS

November 5, 2024, 9:05 a.m.

New York, New York

******

THE VIDEOGRAPHER:  This is the beginning of Media Number 1 in the deposition of James Wappler in the matter of JUUL Labs Inc. Antitrust Litigation.

Today's date is November 5, 2024, and the time on the monitor is 9:05 a.m. Eastern time.

My name is Richard Morales.  I am the videographer.  The court reporter is Jessie Waack, and we are here with Huseby Global Litigation.

Counsel, please introduce yourselves after which the court reporter will swear in the witness.

MR. BUCHMAN:  Michael Buchman of Motley Rice on behalf of the direct purchaser plaintiffs.

MS. SEIRAFI:  Hannan Seirafi of Motley Rice on behalf of the direct

Page 13

purchasers.

MS. SEIDEN:  Karen Seiden on behalf of Motley Rice [inaudible].

THE STENOGRAPHER:  I can't hear you.  Excuse me.  I can't hear you.

MS. SEIDEN:  You can't hear me?

THE STENOGRAPHER:  No.

MS. SEIDEN:  Karen Seiden on behalf of Motley Rice, Plaintiffs.

MR. BUCHMAN:  Direct purchaser plaintiffs.

MR. RUFFINO:  Andrew Ruffino from Covington & Burling LLP, counsel to Perella Weinberg Partners and the witness.

MR. RODNEY:  Paul Rodney from Arnold & Porter on behalf of the Altria defendants.

MR. BUCHMAN:  Good morning, Mr. Wappler.

THE STENOGRAPHER:  One moment, please.

///

///

///

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION

Confidential    James Wappler on 11/05/2024

**Page 14**

\*\*\*\*\*

JAMES WAPPLER, sworn on oath and/or affirmed, called as a witness herein, was examined and testified as follows:

\*\*\*\*\*

EXAMINATION

MR. RUFFINO: Are there any appearances by zoom?

MR. BUCHMAN: We should probably get those on the record, remote.

Would anyone who's attending remotely please identify yourselves.

MR. TARSHIS: Justin Tarshis of Zwerling, Schacter & Zwerling on behalf of the indirect purchaser plaintiffs.

MR. BLANKENSHIP: And Samuel Blankenship from Cleary Gottlieb Steen & Hamilton on behalf of JUUL Labs Inc.

THE STENOGRAPHER: That was Justin Tarshis and Sam Blankenship.

MR. BUCHMAN: Is there anyone else on the line before we proceed?

THE STENOGRAPHER: No.

MR. BUCHMAN: You can see it?

**Page 15**

Okay. Super.

THE VIDEOGRAPHER: Michael, could you -- ball facing up. Yes. Thank you.

EXAMINATION

BY MR. BUCHMAN:

Q. Good morning, Mr. Wappler. We met briefly this morning. My name is Michael Buchman. I'm with Motley Rice, and I represent the direct purchaser plaintiffs. Thank you for appearing today.

Before we begin, I just want to show you what has been marked as PLX 234.

(Whereupon, Exhibit 234 is marked for identification.)

BY MR. BUCHMAN:

Q. Would you please -- throughout the course of the day, feel free to take your time reviewing the document before you start answering questions. I will give you an opportunity to review it.

If you would let me know once you've reviewed it and are comfortable answering questions based on the document that's been presented to you.

**Page 16**

A. Go ahead.

Q. Have you seen this document before?

A. It looks familiar.

Q. Okay. This is a subpoena for you to appear today to give testimony. Counsel, will you stipulate that this deposition is being conducted pursuant to the subpoena and that Mr. Wappler is appearing here today pursuant to the subpoena?

MR. RUFFINO: Yes.

MR. BUCHMAN: Thank you.

BY MR. BUCHMAN:

Q. We're finished with this document.

Mr. Wappler, would you please state your full legal name for the record?

A. James Wappler.

Q. And how long have you lived there?

**Page 17**

A. I believe since 2017.

Q. Okay. And you understand that you've taken an oath here to tell the truth today, correct?

A. Correct.

Q. And is there any reason that you cannot give complete and accurate testimony as you sit here today?

A. No.

Q. You're not on any medication that would affect or impair your memory?

A. Correct.

Q. Do you understand that your testimony here today is being transcribed by the court reporter and recorded by videotape?

A. Yes.

Q. And do you understand that the videotape could be played in court to the judge or jury during a trial if we get to a trial in this case?

A. Yes.

Q. You have been deposed before, correct, in the FTC proceeding?

A. Correct.

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
James Wappler on 11/05/2024

Confidential

Page 18

Q.   Are there any other occasions in which you have been deposed?

A.   No.

Q.   Let's go over a few ground rules just so we're on the same page.

If there's – at any point during the day that you would like to take a break, please let me know, and we'll take a break so long as no question is pending. You have to answer a question that's pending before we take a break.

Do you understand that?

A.   I do.

Q.   Do you understand that you need to respond orally to questions and can't nod your head?  We need – we need verbal cues, not nonverbal cues.

A.   I got it.

Q.   If you don't understand one of my questions, would you please let me know?

A.   Yes.

Q.   Okay.  I'll be happy to rephrase the question.  If you don't hear a question, would you also let me know and I will repeat the question?

Page 19

A.   Yes.

Q.   If your attorney objects to any question during the course of the day, which I'm sure he will, you have to answer the question unless there is a privilege assertion.

Do you understand that?

A.   I do.

Q.   We should both try not to interrupt each other during the deposition, because it makes the court reporter's job more difficult.

So I'm going to ask my question in its entirety, and if you would kindly allow a moment to pass before you proceed with your answer, that will give your counsel an opportunity to interpose an objection and also make sure that you understand the question in its entirety.

Are we okay with that?

A.   That makes sense.

Q.   Great.  If you need to consult with your lawyer during the course of the day regarding a privilege issue with regard to one of my questions, please let me know,

Page 20

and we'll take a break.

Mr. Wappler, are you represented by an attorney here today?

A.   Yes.

Q.   And who is that attorney?

A.   Andrew Ruffino.

Q.   And he's representing you in context with the subpoena that we marked as the first exhibit?

A.   Yes.

Q.   Okay.  Has he represented you before in any other matter?

A.   His firm has, yes.

Q.   Okay.  In what other matters has his firm represented you?

A.   I believe this prior deposition related to this situation.

Q.   When you say "this situation," you're referring to the Federal Trade Commission proceeding?

A.   Yes.

Q.   Any other times or occasions where his firm has represented you?

A.   Yes.  On a variety of mergers and acquisitions transactions over the years.

Page 21

Q.   And how many years?

A.   Probably 10 to 15 years.

Q.   And is there a written agreement between your firm and counsel's firm concerning your deposition here today?

A.   I believe so, yes.

Q.   Okay.  And who is paying for your counsel's representation in connection with this matter?

A.   Perella Weinberg Partners.

Q.   And prior to today's deposition, did you prepare for the deposition?

A.   Yes.

Q.   How did you prepare for the deposition?

A.   I had two meetings with Mr. Ruffino.

Q.   And were those meetings in person?

A.   One was telephonic, one was in person.

Q.   Which was first, the telephonic meeting or the in-person meeting?

A.   Telephonic.

Q.   And when did that meeting take

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
Confidential                     James Wappler on 11/05/2024

Page 22

place?

A.  Last week.  I don't remember the particular date.

Q.  Was there anyone else on the call with you and Mr. Ruffino at the time during that telephonic conversation?

A.  No.

Q.  And how long did that telephonic conversation last?

A.  I believe about 30 or 45 minutes.

Q.  And just to be clear, I don't want you to mistake any of my questions for trying to intercede with attorney-client communications, so I want you to assume that I'm not asking you to divulge the sum or substance of any conversation that you've had with Mr. Ruffino or any other attorney in connection with this matter.

Is that understood?

A.  Understood.

Q.  Okay.  When you had your conversation with Mr. Ruffino, did you review any documents prior to that first telephonic conversation or that telephonic conversation?

Page 23

MR. RUFFINO:  You can answer that yes or no.

THE WITNESS:  No.

BY MR. BUCHMAN:

Q.  Prior to your telephonic conversation with Mr. Ruffino, did you undertake to prepare yourself in any way for that meeting?

A.  No.

Q.  And you mentioned that you had an in-person meeting with Mr. Ruffino?

A.  Correct.

Q.  And when did that in-person meeting take place?

A.  Yesterday.

Q.  And where did that meeting take place?

A.  The Perella Weinberg Partners New York office.

Q.  Is that 575 Fifth Avenue?

A.  767 Fifth Avenue.

Q.  767.

A.  Close.

Q.  And aside from Mr. Ruffino, who else did you meet with during that meeting?

Page 24

A.  Nobody.

Q.  And how long did that meeting last?

A.  Approximately one hour.

Q.  And prior to that meeting, did you prepare for the meeting in any way?

A.  No.

Q.  You didn't review any documents prior to that meeting?

A.  Correct.

Q.  In preparation for that in-person meeting with Mr. Ruffino, did you speak with anyone in advance?

A.  No.

Q.  And after that meeting took place, did you do anything to prepare for today's deposition?

A.  No.

Q.  And you said that meeting was for one hour?

A.  Yes.

Q.  And did you review any documents during that meeting?

A.  No.

Q.  In preparation for today's

Page 25

deposition, have you spoken with Peter gross?

A.  No.

Q.  Have you spoken with anyone on your Perella team that worked on the JUUL-Altria matter –

A.  No.

Q.  – in connection with this deposition?

A.  No.

Q.  Mr. Wappler, do you have an understanding about what this case is about?  And I'm not asking you again here to divulge the substance of any communications that you've had with counsel.

But just generally speaking, what is your understanding of what this case is about?

MR. RUFFINO:  You can answer that to the extent you can do so without revealing the substance of communications with your lawyers involving legal advice.

///

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**

Confidential                    James Wappler on 11/05/2024

Page 26

BY MR. BUCHMAN:

Q. And if you're unable to answer the question because all of the information that you've received was from Mr. Ruffino, then please let me know that you're unable to answer the question. We're good with that.

A. Yeah.

MR. BUCHMAN: Great.

THE WITNESS: My understanding is that this is related to civil litigation regarding Altria's investment in JUUL Labs.

BY MR. BUCHMAN:

Q. Do you have any other understanding of the case beyond what you've just testified to?

A. No.

Q. Do you have any understanding about the elimination of competition allegations in the case?

A. Generally speaking, yes.

Q. What is your understanding of that?

A. The Plaintiffs assert that there

Page 27

was, I guess, damages incurred by anticompetitive behavior.

(Whereupon, Exhibit 235 is marked for identification.)

BY MR. BUCHMAN:

Q. I'm not going to ask you to review the document in its entirety. I'm just going to ask you some general questions about the document.

So if you want to peruse it first and let me know once you're comfortable having perused it briefly, I'll start my questions. And if you need to look further, we can take some time and you can look at the document.

A. Okay.

MR. RUFFINO: Does this have an exhibit number?

MR. BUCHMAN: I'm going to introduce it as PLX-235. And the first document should have been PLX-234, which was the subpoena.

THE WITNESS: Okay.

BY MR. BUCHMAN:

Q. Mr. Wappler, I've handed you

Page 28

what's been marked as PLX-235. It's a document that was filed on 9/7/23. It's entitled, "Third Amended Consolidated Class Action Complaint" in a case encaptioned: In Re: JUUL Labs Inc. Antitrust Litigation. And the document relates to the Direct Purchaser actions.

Have you seen this document before or a version of this document, meaning the second amended consolidated class action complaint or the first consolidated class action complaint?

A. No. I don't recall seeing this.

Q. So prior to today, you haven't read or seen this version of this document?

A. Correct.

Q. Thank you. I have no further questions based on this document.

Mr. Wappler, have you ever used LinkedIn?

A. Yes.

Q. When is the first time you used LinkedIn, as you recall?

A. I don't remember the specific time frame. Probably 2008 time frame,

Page 29

somewhere in there.

Q. And why did you use LinkedIn?

A. Professional networking.

Q. Okay. And how did you use LinkedIn?

A. Professional networking.

Q. How did you go about using it? Let me withdraw the question. Did you create a profile on LinkedIn?

A. I believe so, yes.

Q. And when you created the profile on LinkedIn, did you personally create that profile, or did you have some other person set up that profile for you?

A. I believe I created it myself.

Q. Okay.

(Whereupon, Exhibit 236 is marked for identification.)

BY MR. BUCHMAN:

Q. Mr. Wappler, I'm handing you what's been marked as PLX-236. This is an excerpt of your LinkedIn profile that was pulled down in the past few days. We didn't print out the whole thing for purposes of brevity, but I just have a few

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
**James Wappler on 11/05/2024**

Confidential

Page 30

questions I would like to ask you based on the first two pages of your LinkedIn profile.

So when you've had a chance to review it and you're comfortable answering questions, please do let me know.

A.   Go ahead.

Q.   Okay.  So does this look like a version of the original document that you created on LinkedIn a couple of years ago?

A.   Yes.  But, although, I think it was created many years ago.

Q.   I'm sorry.  Many years ago?

A.   Yeah.

Q.   Excuse me.

A.   Yeah.

Q.   And the information, having perused this document, contained herein looks accurate with regard to your work experience and with your education experience?

A.   Yes.

Q.   Is there anything else that you would add to your work experience other than your reference to Perella Weinberg

Page 31

Partners for 15 years and four months, Deloitte Consulting for three years and Mercer for one year and three months?

A.   That looks comprehensive.

Q.   Okay.  And with regard to your education, University of Chicago Booth School of Business MBA and the University of Texas at Austin the red McCombs School of Business where you had a BA in  – or BBA, excuse me, in finance, also correct?

A.   Correct.

Q.   Anything else that you would add with regard to your education besides those two –

A.   No.

Q.   – esteemed schools?

A.   No.

Q.   Okay.  I'm finished with that document.

Now, earlier today we asked you questions if you had been deposed before and you mentioned that you were deposed in the FTC proceeding Altria-JUUL Labs matter.

A.   Correct.

Q.   Okay.  I am going to mark as

Page 32

PLX-237 a copy of that transcript.

(Whereupon, Exhibit 237 is marked for identification.)

BY MR. BUCHMAN:

Q.   Are you ready to proceed?

A.   Yes.

Q.   Does perusing this document before I ask questions refresh your recollection that on January 29, 2021, you were deposed orally in the Altria vs. JUUL Labs matter?

A.   Yes.  I do remember making – providing this deposition.

Q.   Okay.  And the fact that this deposition is before you reflects that it was recorded by a stenographer, correct?

A.   Correct.

Q.   Okay.  And do you believe that this is a true and accurate copy of the deposition transcript?

MR. RUFFINO:  Objection to form.

BY MR. BUCHMAN:

Q.   Let me withdraw the question.

Do you have any reason to dispute that this is not a true and accurate copy

Page 33

of the deposition transcript taken on January 29, 2021?

MR. RUFFINO:  Objection to form.

MR. BUCHMAN:  What's the basis for the form objection?

MR. RUFFINO:  I don't think there's any foundation that he knows – that he's had enough time – this is hundreds of pages.

MR. BUCHMAN:  Okay.  We'll go through it then.

BY MR. BUCHMAN:

Q.   Mr. Wappler, you were deposed on January 29, 2021, correct?

A.   Correct.

Q.   And after you gave your deposition, were you afforded an opportunity to review the deposition transcript for accuracy?

A.   I believe so, yes.

Q.   Okay.  And did you do that?

A.   I believe so, yes.

Q.   And how did you go about doing that?

A.   I reviewed it to ensure that it

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
Confidential                    James Wappler on 11/05/2024

Page 34

aligned with my memory.

Q. And how long did it take you to do that?

A. I don't recall.

Q. Do you consider yourself a methodical person?

A. Generally speaking, yes.

Q. Okay. And when you reviewed the transcript for accuracy, did you endeavor to do it in a methodical manner?

A. Yes.

Q. And if you saw something that was wrong within the transcript, you would have asked your counsel to make corrections or seek corrections to the transcript or filled out an errata sheet, correct?

A. Correct.

Q. And did you fill out an errata sheet?

A. I don't recall.

Q. Do you recall whether you signed this deposition transcript?

A. I don't remember.

Q. Based upon your review of the deposition transcript, is there anything

Page 35

that as you sit here today you would like to amend or modify based on the recorded testimony that you gave in the FTC proceeding on January 29, 2021?

MR. RUFFINO: Objection to form.

THE WITNESS: Based on my review, no change is required.

BY MR. BUCHMAN:

Q. Okay. And when you gave this deposition, you were under oath to tell the truth, correct?

A. Correct.

Q. And you endeavored to tell the truth throughout the entire proceeding when you were giving oral testimony, correct?

A. Correct.

Q. Okay. I'm finished with this document. Thank you.

The testimony that you gave to the FTC, do you generally recall what that was about?

A. Generally, yes.

Q. Okay. And what was that about?

A. The FTC's alleged anticompetitive behavior related to Altria's investment in

Page 36

JUUL.

Q. The FTC's allegation?

A. Correct.

Q. Okay. And what was the Altria investment in JUUL?

A. Altria acquired a 35 percent stake in JUUL I believe in December 2018.

Q. And why did Altria acquire 35 percent stake in JUUL in December of 2018?

MR. RODNEY: Object to form.

BY MR. BUCHMAN:

Q. To your knowledge, why did JUUL – I'm sorry – Altria acquire a 35 percent stake in JUUL in or around December of 2018?

A. Altria was – wanted to become a more meaningful participant in the e-vapor sector.

Q. A more meaningful competitor?

A. To the extent, yes, that's a participant.

Q. And what was the e-vapor sector that you refer to?

A. I'll probably butcher the

Page 37

scientific definition of e-vapor, but a reduced-risk product that involved vaporization delivery of nicotine.

Q. Can you be more specific?

A. So as a – there's a variety of nicotine delivery systems, combustible cigarettes, so on and so forth. E-vapor was perceived and is perceived as a less harmful delivery of nicotine. There are a variety of e-vapor devices currently in the market and previously in the market that did that.

Q. And what were those devices in or around December of 2018?

A. Mostly handheld devices. Some were cigalike products that had one cylinder called rod that delivered e-vapor. Others were pod-based devices where you put a pod into a larger kind of stick.

And then there were open e-vapor devices too that consisted of a variety of components to deliver the e-vapor nicotine.

Q. And have you heard the term "open tank" or "open system"?

A. Yes.

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
James Wappler on 11/05/2024

Confidential

Page 38

Q. Aside from open tank or open system, what other types of systems were there?

A. The pod-based and the cigalike is how I would define them.

Q. Okay. What open-tank systems in or around – strike that.

In or around 2018, what open-tank systems did Altria manufacture, market and sell in the United States?

MR. RODNEY: Object to form.

THE WITNESS: I don't recall them manufacturing or selling any open-tank systems.

BY MR. BUCHMAN:

Q. Okay. With regard to pod-based systems in or around 2018, what pod-based systems did Altria sell?

A. I don't recall them selling any pod-based systems.

Q. In around 2018, what cigalike products did Altria sell?

A. They primarily commercialized cigalike products under the brand MarkTen.

Q. And were there any subcomponents

Page 39

of MarkTen – I'm sorry. Let me withdraw the question.

Were there other products with the MarkTen name besides MarkTen?

A. I don't recall all of the various products under the MarkTen brand umbrella. I do remember a product MarkTen and MarkTen Elite. There may be others – there may have been others.

THE VIDEOGRAPHER: Zoom is reconnecting, by the way. I think it's a network thing.

MR. BUCHMAN: Just let me know when you're ready to proceed, please.

THE VIDEOGRAPHER: Do you want to go off the record for a second?

MR. BUCHMAN: Sure. Let's go off the record.

THE VIDEOGRAPHER: The time is 9:36 a.m.

We're going off the record.

(Whereupon, a recess was taken at 9:36 a.m.)

THE VIDEOGRAPHER: The time is 9:37 a.m.

Page 40

We're back on the record.

BY MR. BUCHMAN:

Q. Mr. Wappler, I didn't ask you with regard to PLX-237 whether you reviewed that transcript prior to today's deposition in preparation for today.

A. I did not.

Q. Okay. Thank you.

Before we took our quick break, we were talking about the different products that Altria has sold in or around 2018.

Do you recall when Altria first entered the market with a MarkTen-type product?

A. I do not.

Q. Do you recall how long – strike that.

Did there come a time where Altria removed MarkTen products from the market?

A. Yes.

Q. Do you recall when that was?

A. I don't recall the specific date. I believe it was late 2018, likely December

Page 41

time frame.

Q. And we were talking a moment ago about Altria acquiring a 35 percent stake in JUUL.

Do you remember that testimony you gave?

A. I do.

Q. Okay. And when did Altria first become interested in acquiring a stake in JUUL?

MR. RODNEY: Object to form.

THE WITNESS: I'm not sure when Altria first began looking at JUUL. I started advising Altria on a potential investment in JUUL beginning in 2018.

BY MR. BUCHMAN:

Q. And when you say started advising Altria on JUUL, what did you mean by that?

A. So Perella Weinberg Partners is a financial advisory firm, and we advise on strategic matters, mergers and acquisitions, general financial advisory services.

Q. And what work did you do in the beginning of 2018 before you started

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**

James Wappler on 11/05/2024

Page 42

advising Altria on JUUL?

A.  Before I started advising?

Q.  Yeah, let me withdraw the question.

A.  Okay.

Q.  You testified that you started advising Altria about a potential interest in JUUL in or around the beginning of 2018, correct?

A.  Yes.

Q.  Now, prior to advising them, did you do any work in order to give advice to Altria?

A.  I did.  I had worked with Altria on other matters beginning in 2014, I believe.  And I was aware of the broader nicotine landscape and had done research on the landscape leading up to that time frame.

Q.  And what did you mean by "broader nicotine landscape"?

A.  Everything from cigarettes to oral nicotine to cigars.  The general nicotine landscape.

Q.  And can you describe the work

Page 43

that you undertook prior to advising Altria about the JUUL opportunity?

A.  Can you clarify?

Q.  Sure.  You advised Altria on potential interest in JUUL, correct?

A.  Correct.

Q.  And I wanted to just know what work you did specifically to educate yourself so that you could educate your client.

A.  Yes.  So I researched the U.S. and global nicotine market, Altria's position in it as well as the trends in combustible cigarettes and cigars and traditional tobacco products and reduced-risk products such as e-vape.

Q.  Okay.  Thank you.

And did you create any documents in connection with that work?

A.  I believe so.

Q.  What type of documents did you create?

A.  Documents related to Altria's business plan, their growth rates, their profitability, what they should expect if

Page 44

they were to execute their business plan, meet or miss their business plan.

Q.  And in your prior testimony you had mentioned that you had done work with Altria in or around 2014?

A.  Correct.

Q.  Okay.  Prior to working with Altria in or around 2014, did you have any previous experience in connection with the nicotine market?

A.  No.

Q.  So this was relatively new work that you were undertaking in connection with the nicotine market in Altria?

A.  Relatively new.

Q.  When you say "relatively," why do you classify the word "relatively" in connection with your answer?

A.  Because I started working with Altria in 2014, and we're talking about an advisory assignment in 2018.  Approximately four years of work had transpired in the nicotine space.

Q.  And when you first started looking at this – or when you first

Page 45

started researching this, did anyone else at Perella work with you on this matter?

A.  Yes.

Q.  And who was that?

A.  Peter Weinberg.  I believe the – several other junior team members were involved.  I believe the gentleman named Adam Kallaus and a gentleman named Kane Herrick.  There may be others that I don't remember.

Q.  Can you spell Mr. Kallaus' last name for the record?

A.  K-a-l-l-a-u-s.

Q.  Okay.

A.  I think.

Q.  And the third name was Kane – I'm sorry?

A.  K-a-n-e.  Herrick, H-e-r-r-i-c-k.

Q.  Thank you.

And do you recall when you first started consulting with – or speaking with Altria about the JUUL opportunity, what you shared with them at the time?

A.  I don't remember the specifics.

Q.  Do you recall what Altria's

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
**James Wappler on 11/05/2024**

Page 46

response was to your first presentation to them?

A. I don't recall their specific response.

Q. What happened, if you could walk me through on a high level, what happened with regard to the idea that you presented to them about an interest opportunity in JUUL?

A. Based on what I recall, JUUL was a relatively early stage, high-growth disruptive company in the e-vapor space, and Altria began to look at it and think about its overall growth prospects in the nicotine space. I helped them analyze the opportunity from time to time throughout 2018.

Q. And you used the word "disruptive." What did you mean by that?

A. It was one of the e-vapor companies that was doing well in the marketplace and converting a lot of traditional smokers into the e-vapor category.

Q. What other companies did you look

Page 47

at in the e-vapor space at the time?

A. I recall looking at a few also early stage relatively small companies. I don't recall the specific names, though.

Q. Do you recall how many there were, approximately?

A. My memory is a little vague on the specific number. I would say a handful or so.

Q. But JUUL stuck out as a better opportunity than the others?

A. Correct.

Q. And why was that, aside from what you've testified so far? Were there any other reasons?

A. JUUL was differentiated in its kind of tech-oriented innovation categories. And it was distinguished in its ability to convert adult smokers.

Q. What did you mean by tech-oriented innovation?

A. So it was a West Coast headquartered company, San Francisco area. And it was founded by kind of individuals who were familiar with the broader kind of

Page 48

West Coast tech landscape and had that mindset.

Q. Mr. Monsees?

A. Correct.

Q. And who else?

A. Adam – I'm blanking on his last name.

Q. Okay. If you think about it, let me know.

A. Yeah.

Q. If we see it in some of the docs, let me know.

Did there come a time when Altria was interested in your information and wanted to act on it?

A. Yes.

Q. Okay. And what happened next?

A. Well, the discussion and evaluation of JUUL had a lot of starts and stops. There were moments where Altria wanted to pursue JUUL.

There were moments when Altria did not want to pursue JUUL or felt they could not get a deal done with JUUL, so there were multiple kind of starts and

Page 49

stops.

Q. Were there stops and starts also because JUUL wanted certain things or didn't want certain things to occur?

A. Yes.

Q. Okay. Could you walk me through on a high level what the stops and starts were with respect to Altria?

A. At the high level – and I don't remember all of the starts and stops, but JUUL had very high expectations for valuation.

And Altria had a number of analyses and thoughts trying to understand how JUUL's worth that much and ultimately how they would provide enough value to JUUL to get a deal done.

Q. Were there any other aspects that were stops and starts for Altria?

A. Yes. This is not a comprehensive list, but I recall governance in particular being a key aspect that I was focused on, for example, number of board seats. And Altria's overall level of influence on JUUL.

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**

Page 50

There was also a lot of discussion about the percent stake, and Altria was initially interested in acquiring all or a majority of JUUL.

And there was a lot of back and forth on the appropriate ownership stake that worked for JUUL and Altria.

Q.  And what about the stops and starts for JUUL?

A.  I don't know exactly what JUUL was motivated by through all of this.  From my perspective as the financial advisor, they were primarily focused on valuation and how much cash Altria would provide as well as governance, I would say.

Q.  To the best of your recollection, was one of the stops and starts for JUUL the issue concerning Altria's products remaining in the market?

A.  I don't recall that being a key focus point for JUUL.

Q.  What about with regard to Altria?  Was keeping their products in the marketplace and competing against JUUL's product an initial concern?

Page 51

MR. RODNEY:  Object to form.

THE WITNESS:  I personally did not spend a lot of time on that discussion or that analysis.  My understanding is there were a number of attorneys and antitrust specialists focused on that.

BY MR. BUCHMAN:

Q.  And for Altria, who were those individuals that you recall?

A.  I don't recall.

Q.  Do you recall – withdrawn.

And you testified that you first spoke with Altria around the beginning of 2018 with regard to the opportunity concerning JUUL, correct?

A.  Yes.

Q.  Can you walk me through the first, say, two quarters of 2018 and what events transpired in connection with Altria's potential interest in JUUL?

A.  What I recall, this is many years ago, but I recall a conversation between Altria and JUUL – or perhaps Altria's financial advisors – I'm sorry, JUUL's

Page 52

financial advisors at Goldman Sachs and Altria and the discussions surrounded JUUL's growth prospects, their pathway to a potential IPO.

And if Altria were going to pursue some sort of M&A pathway with JUUL, that would be a potential time to do it prior to JUUL pursuing an IPO in earnest.

Q.  Anything else?

A.  I recall – I don't remember the specific number, but I recall JUUL and/or its advisories signaling to us that they expected a significant valuation if they were to pursue an IPO, and that was a surprise to Altria on the magnitude of that valuation.

Q.  So I would like to fast forward to around September of 2018.  And I'm going to introduce this document as an exhibit, PLX-238.

(Whereupon, Exhibit 238 is marked for identification.)

THE WITNESS:  Okay.

BY MR. BUCHMAN:

Q.  So, for the record, PLX-238 was

Page 53

previously marked as PX 3180 in your prior deposition in the FTC matter.  It's been Bates stamped in the lower right-hand corner PWP_00008592 through 8596.

Mr. Wappler, have you had an opportunity to review this document?

A.  Yes.  Just now.

Q.  Okay.  And are you comfortable answering questions based upon that review?

A.  Yes.

Q.  Okay.  This document – you've seen this document before, correct, sir?

A.  Yes.

Q.  You've seen this document before, because you're the author of the document, and you sent it on September 12, 2018, to Dave Bailey, Christopher Boffi – am I pronouncing it right?  Boffi?

A.  Yes.

Q.  And Abigail Shepard, correct, sir?

A.  Correct.

Q.  And you sent this document to Messrs. Bailey and Boffi and Ms. Shepard in the ordinary course of business at Perella,

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
**James Wappler on 11/05/2024**

Confidential

Page 54

correct?

A. Correct.

Q. Are you comfortable with me just referring to your company as Perella?

A. Yes.

Q. Thank you.

And you – and this is the type of document that Perella would have saved in the ordinary course of business at Perella, correct?

A. Correct.

Q. And the document is subject line "Tree," correct?

A. Yes.

Q. Why did you send this document to Messrs. Bailey and Boffi and Ms. Shepard at the time?

A. I don't recall all of the specifics around this document, but I believe this is around the time frame where the FDA made some announcements related to increased scrutiny and regulation on the e-vapor space, specifically regarding – related to flavors in the e-vapor space.

And after that announcement was

Page 55

made, there were changes in the market capitalization or equity value of large-scale traditional tobacco companies.

Q. And the email contained an attachment, correct, sir?

A. Yes.

Q. And the – well, let's work on the email first.

The email says, "Team. I spoke with KC this afternoon. Everyone agrees today's events had a profound impact on the Tree discussions."

Did I read those first two sentences correctly?

A. Yes.

Q. In the second sentence, you say, "today's events"?

A. Yes.

Q. What are today's events that you are specifically referring to?

A. I don't remember the specifics, but I'm assuming, based on my memory, that this was related to the FDA update.

Q. And the third line says, "I would like to send three slides to the Altria

Page 56

team this evening that provides a brief summary of the situation."

Did I read that correctly?

A. Yes.

Q. Okay. And then it says, "Can you develop these slides sometimes – sometime after the market closes," right?

A. Yes.

Q. Okay. Now if we turn to the PWP_00008593 is marked "empty file," but there are a couple of pages – actually three pages that follow that. And there's handwriting on the three remaining pages, correct, sir?

A. Yes.

Q. And the first page with handwriting has at the top – this is on PWP_00008594.

It says, "September 12 FDA update: Market reaction." Did I read that correctly?

A. Yes.

Q. Is the handwriting on this document yours?

A. Yes. It appears to be.

Page 57

Q. Okay. And was this a slide that you created to send to the Altria team that evening of September 12, 2018?

A. Yes. It looks like I created this.

Q. Okay. And how did you go about creating this document or this page?

A. I don't recall the specifics. I sketched it out and scanned it to them or sketched it out on some sort of iPad-type device. I don't remember.

Q. And what were you trying to convey through this page?

A. Again, based on my memory of the FDA update, I believe I was trying to convey that because of the increased regulatory pressure on companies such as JUUL in the e-vapor space, the equity values of other tobacco companies increased.

Q. And just for the record, if you could read in the lower left-hand corner, does it say, "Current market cap"? Is that what it says?

A. "Current market cap," an

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
**James Wappler on 11/05/2024**

Confidential

Page 58

abbreviation for capitalization.

Q. Okay. And then "current price/zone EPS"?

A. Current price/2019 E, EPS. E for estimate.

Q. And EPS is earnings per share?

A. Correct.

Q. Okay. And then if we could turn the page to the next handwritten portion. Selected analyst commentary?

A. Yes.

Q. Again, your handwriting here, sir?

A. Yes.

Q. And there's a star and it says, "Add the quotes that I bracketed in attached analyst reports"?

A. Yes.

Q. Okay. And what analyst reports were you referring to?

A. I don't remember.

Q. Okay. If we turn the page again, top of the page, "Summary Observations." All of this page is your handwriting again, consistent handwriting with the prior two

Page 59

pages?

A. Correct.

Q. Okay. And what were you trying to convey on this page?

A. Similar to what I just mentioned. That following the FDA update, there was an increase in equity value for traditional tobacco company – companies such as Altria, British American Tobacco, Philip Morris International, so on and so forth.

It would also appear that I'm trying to convey the analysts – the research analysts are skeptical of JUUL's ability to navigate the FDA situation on their own.

And, finally, it would appear that on this last bullet that I thought it was a decent chance that the FDA update would potentially limit JUUL's ability to pursue an IPO.

Q. And in the second bullet point, there's a subpart that says – and correct me if I'm wrong – analyst – "analysts," plural, "also perceive's today's update as a positive for IQOS"?

Page 60

A. Yes.

Q. Did I read that correctly?

A. Yes.

Q. What was IQOS at the time?

A. IQOS was and is Philip Morris International's heat-not-burn product, or one of their key heat-not-burn products.

Q. And was IQS – IQOS on the market at the time you wrote this?

A. Globally, yes. I don't believe it was on the market in the United States.

Q. I'm sorry. You said globally it was –

A. Sorry –

Q. – but not in the United States –

A. – correct.

Q. – you meant outside of the United States it was available, but not within the U.S.?

A. Correct.

Q. Okay. And why was IQOS mentioned by you here?

A. I don't recall.

Q. Was IQOS something of interest to

Page 61

Altria at the time or something potentially of interest to Altria at the time?

A. I believe at the time Altria had a distribution agreement with PMI related to IQOS. But it was not – I don't remember it being actively in the marketplace in the United States.

Q. For those of us that aren't as sophisticated with regard to the IQOS product, could you please explain what that product is in laymen terms?

A. Yes. Again, apologies for the lack of scientific knowledge on this, but it is a product that you take a cylindrical rod with tobacco in it, put it into a heater, for lack of a better term that heats the cylindrical rod but does not combust it.

And because it heats it up to a certain amount, or a certain degree, it creates some sort of smoke or nicotine delivery that is perceived as being healthier than traditional combustion.

Q. And at the time, did the IQOS product have a component involving or what

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
**James Wappler on 11/05/2024**

Confidential

Page 62

was referred to as MESH?

A.  I don't think so.  I believe MESH was PMI's e-vapor product, if memory serves.

Q.  Okay.  And did you reduce these slides in handwritten form to a PowerPoint presentation?

A.  I'm assuming so, but I don't recall.

Q.  And to the best of your recollection, did you send these slides or a version of these slides to Altria's team as reflected on the first page of your email?

A.  I don't remember sending it, but perhaps.

Q.  You likely did?  Okay.

And going back to the last page, second bullet point, first subpart, it reads, I believe, and please correct me if I'm wrong, "On the other hand, analysts are generally optimistic on established companies such as Altria," and that's in – it's ", such as Altria, ability to work constructively with the FDA."

Page 63

Did I read that correctly?

A.  Yes.

Q.  And what did you mean by that?

A.  JUUL was a new entrant into the nicotine sector, and they did not know the most effective ways of working with the FDA to get regulatory approvals.  And companies such as Altria had a longer track record with the FDA.

Q.  And does that relate to the third bullet point, second subpart where it says, and correct me if I'm wrong "Presumably increased JUUL's appetite for strategic partner"?

A.  It could have, yes.

Q.  I'm finished with this document. We've been going about an hour.  I'm happy continuing on, but I would like to afford you an opportunity to take a break, if you would like.  It's up to you.

A.  I can keep going unless anyone else needs to go.

Q.  Okay.  Keep going.

(Whereupon, Exhibit 239 is marked for identification.)

Page 64

BY MR. BUCHMAN:

Q.  Mr. Wappler, I've handed you what's going to be marked as PLX-239.  It was previously an exhibit in the FTC deposition and marked PX 3173.  It's PWP_0000815 through 816.

Would you please review the document and let me know when you're comfortable answering questions based on the document.

(Pause for reading/reviewing.)

A.  Okay.

Q.  Mr. Wappler, have you seen this document before?

A.  Yes.

Q.  Yes.  And you've received – you've seen this document before, because you received it from Peter Weinberg on August 7, 2018?

A.  Yes.

Q.  And you received this document from Mr. Weinberg on August 7, 2018, in the ordinary course of business at Perella?

A.  Yes.

Q.  And this is the type of document

Page 65

that Perella would save in the ordinary course of business, correct?

A.  Yes.  Yes.

Q.  And the subject line of this document is, "Altria reference materials," correct?

A.  Correct.

Q.  And below this email that you received from Mr. Weinberg, it appears you sent Mr. Weinberg an email on August 6 at around 11:37 p.m.

Am I correct on that?

A.  Yes.

Q.  And in that email, you have approximately eight different topics that you've identified and discussed with him in this email, correct?

A.  Correct.

Q.  And in the second topic, it's entitled "Term Sheet," correct?

A.  Yes.

Q.  What was the term sheet at that time?

A.  I don't recall.

Q.  What is a term sheet?

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
James Wappler on 11/05/2024

Page 66

A. A term sheet is typically a preliminary summary of potential terms or – including valuation, others, to get a transaction completed.

Q. At the time, was this one of those starts and stop periods between Altria and JUUL?

A. Yes. There were continuous starts and stops, so I don't recall exactly what the situation was on this date, but presumably there was a term sheet floating around at this time at least.

Q. And in the second portion of this under "Term Sheet," you use all capital letters to communicate with Mr. Weinberg at the time, correct?

MR. RUFFINO: Objection to form.

BY MR. BUCHMAN:

Q. There are – let me withdraw the question.

In subpart 2 entitled, "Term Sheet," there are portions where you use lower cases to communicate with Mr. Weinberg and there are other occasions where you use all caps, correct?

Page 67

MR. RUFFINO: Objection to form.

THE WITNESS: I believe the lower case writing is my commentary, and the all caps is Mr. Weinberg's response to my summary.

BY MR. BUCHMAN:

Q. Thank you for the clarification. I understand.

So Mr. Weinberg was responding to your statements in all caps?

A. I believe that's right.

Q. Okay. And in the middle portion of the paragraph, Mr. Weinberg appears to be saying – do you see the language where it says, "We shut down all of our e-vapor business"?

Do you see that?

A. Yes.

Q. What did you communicate with Mr. Weinberg around this time – withdrawn.

Let me withdraw it.

The word "we," did you understand or do you understand "we" meaning – "we" meaning to be Altria?

A. Yes.

Page 68

Q. And it says, "We shut down all of our e-vapor business," meaning Altria, correct?

A. Correct.

Q. And what communications did you have with Mr. Weinberg around this time period regarding Altria shutting down all of its e-vapor business?

A. I don't recall the specific conversations related to it.

Q. Why were – why was Mr. Weinberg discussing Altria's shutting down all of its e-vapor business with you at the time?

MR. RODNEY: Object to form.

THE WITNESS: I'm assuming there was some reference to Altria's e-vapor business in the latest term sheet referenced in this document.

BY MR. BUCHMAN:

Q. And then if we go down to 4 entitled, "(Project Eagle PMI)."

Do you see that, sir?

A. I do.

Q. What was Project Eagle in or around August of 2018?

Page 69

A. I don't recall exactly, but I believe that was referencing a potential transaction between Altria and PMI. That transaction had been looked at from time to time by Altria.

Q. Sir, just so the record is clear, PMI means Philip Morris Industries?

A. International.

Q. International. Thank you.

And, again, what was the transaction that you were referring to?

A. Again, I don't recall the specifics. But typically it was looked at some combination between Altria and Philip Morris International in the form of an acquisition of Altria by PMI or potentially a merger between the two companies.

And to be comprehensive, I think at one point there was a perspective of Altria acquiring PMI, but I don't recall exactly what transaction was referenced at this time.

Q. Were there also discussions at the time between PMI and Altria about developing innovative new products?

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
Confidential                    James Wappler on 11/05/2024

Page 70

A. No. Not that I recall.

Q. Have you ever heard of – strike that.

Were there any communications between PMI and Altria concerning MESH technology and the introduction of a MESH technology-based system in the e-vapor market?

A. Not that I recall.

Q. And it looks like Mr. Weinberg is saying, "I think our vulnerability increases. I'm right that stock goes down more than 5 percent and the signaling that Altria picked up JUUL over IQOS... their stock gets hit as well."

Do you have an understanding of what he was conveying to you there?

A. I don't remember the specifics, but now that I look at this, I believe what Mr. Weinberg is referring to is a potential situation where if Altria stock declines, then perhaps Philip Morris International would attempt to acquire us, "us" being Altria.

Q. And Mr. Weinberg uses the words

Page 71

"Altria picked a JUUL over an IQOS."

Do you understand what he meant by that?

A. No, I do not.

Q. Why was IQOS being discussed in connection with Project Eagle?

A. Because IQOS was and still is PMI's primary reduced-risk product in the heat-not-burn category.

Q. And that's a product that competes in the e-vapor market – strike that.

At the time, that was a product that competed in the e-vapor market?

A. I don't think so. I think of IQOS – I call it IQOS – competing with combustible cigarettes.

Q. Why is that?

A. Because it's more similar to a combustible cigarette-type form.

Q. And what's the basis for your belief?

A. Just the form factor of it.

Q. And then at the top of the document, it says, "Thanks, James.

Page 72

Comments below. Looking forward to discussing in more detail on the way down to Richmond."

Did I read that correctly?

A. Yes.

Q. And did you and Mr. Wappler take a trip down to Richmond?

A. I'm assuming so. I don't recall.

Q. Okay. And why would you go to Richmond?

A. Because we would occasionally meet with Altria in Richmond, which is the location of their headquarters.

Q. Okay. In or around August of 2018 when you took a trip to Richmond, what were the topics that you wanted to talk to Altria about at the time?

A. I don't recall the specifics. I'm assuming this summary probably captures a good chunk of them.

Q. Do you recall any communications that you had with Altria in or around August of 2018 during your trip down there concerning Altria's shutting down its e-vapor business?

Page 73

A. I do not recall that.

Q. Okay. Whatever happened to Project Eagle?

A. Project Eagle, I think it was also at one point called Project Universe. Again, it was analyzed from time to time.

And at one point I believe the following year in 2019 there was formal discussions between Altria and PMI related to a potential merger of equals, but the transaction ultimately did not happen.

Q. And why was that?

A. A variety of reasons. One reason was there was a leak, and both Altria and PMI confirmed they were in discussions. In my opinion, the market was somewhat surprised and confused by the potential discussions. PMI's share price traded down, and it spooked them from pursuing the deal further.

Q. When you say "it spooked them," who do you – who are you referring to? Altria?

A. Philip Morris International.

Q. Okay. What specifically spooked

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
**James Wappler on 11/05/2024**

Confidential

Page 74

PMI?

MR. RODNEY: Object to form.

THE WITNESS: Their share price went down when the merger discussions were publicized and confirmed.

BY MR. BUCHMAN:

Q. Were there any other aspects that spooked PMI?

A. I don't know.

(Whereupon, Exhibit 240 is marked for identification.)

BY MR. BUCHMAN:

Q. Mr. Wappler, I'm handing you what will be marked as PLX-240. It's PX 3163 from your FTC deposition transcript, and it's Bates stamped PWP_00007043 through 7062.

Would you please let me know once you've had an opportunity to review the document and are comfortable answering questions on this document?

MR. RUFFINO: Is this PLX-240?

MR. BUCHMAN: 240.

(Pause for reading/reviewing.)

THE WITNESS: Okay.

Page 75

BY MR. BUCHMAN:

Q. Mr. Wappler, have you seen this document before?

A. Yes.

Q. You've seen this document before, because you were the author of the document and sent it to Philip Yates and cc'd Peter Weinberg both at Perella on January 18, 2018, correct?

A. Correct.

Q. And when you sent this document on January 2018, you sent it in the ordinary course of business at Perella?

A. Yes.

Q. And this is the type of document that Perella saves in the ordinary course of business?

A. Yes.

Q. And the subject is Altria, correct?

A. Yes.

Q. And there's an attachment called tree structure.PDF, correct?

A. Correct.

Q. Okay. And the document says –

Page 76

strike that.

The email says, "Philip, thanks for the follow-up" – sorry. "Thanks for following up. Things were very quiet on the JUUL front up until 24 hours ago, and now the process is beginning to move quickly."

Did I read that correctly?

A. Yes.

Q. And what occurred prior to things heating up very quickly?

A. I don't recall the specifics, but based on this email, it would appear that I had a call with Goldman Sachs the day prior and understood how they were thinking about the prospects of JUUL and their potential pathway to an IPO.

Q. And the GS referenced in the email is Goldman Sachs?

A. Correct.

Q. Okay. And going down a couple of lines, it says, "Following that call, Altria indicated a preference to get back to GS," or Goldman Sachs, "quickly with a proposal structure."

Page 77

Did I read that correctly?

A. Yes.

Q. And then it says, "We worked with Altria to develop the attached framework which is generally in line with our prior discussions about earnout, et cetera."

Did I read that correctly?

A. Yes.

Q. "Some of these numbers are still in flux and obviously subject to negotiation, but this captures the current thinking," correct?

A. Correct.

Q. Sorry. Did I read that correctly?

A. Yes.

Q. Thank you.

"Altria plans to socialize this structure with GS in the next 24 to 48 hours."

Did I read that correctly?

A. Yes.

Q. And what does "socialize" mean?

A. Typically it means to discuss informally.

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
Confidential                                James Wappler on 11/05/2024

Page 78

Q. Okay. And then it goes on to say, "To be clear, Altria would, quote, 'discuss,' closed quote, with Goldman rather than sending a formal proposal."

Did I read that correctly?

A. Yes.

Q. Why is it that Altria would discuss with Goldman rather than sending a formal proposal?

A. A variety of reasons. And, again, I don't recall the specific thinking at that moment, but typically it would be because Altria's thinking is still somewhat fluid, perhaps changing a bit.

And there's also a concern about potential leak whenever you put things in writing.

Q. Leaks to the marketplace of the deal?

A. Leaks to anybody, but including the marketplace.

Q. And then if you turn the page to PWP_00007044, there is a second document which is the attachment that's referenced in the attachments on the email as tree

Page 79

structure.PDF, correct, sir?

A. Yes.

Q. And it's a preliminary working draft for discussion purposes only, and the document is on Perella Weinberg Partners letterhead in the lower left-hand corner, correct, sir?

A. Correct.

Q. Do you recall who prepared this document?

A. I do not.

Q. The document is entitled "Project Tree: Illustrative Transaction Structure. January 2018."

Did I read that correctly?

A. Yes.

Q. Okay. Did you have any involvement in the preparation of this document?

A. I believe – I don't remember specifically what my role was, but, yes, this looks familiar and looks like something I would have been involved in.

Q. Okay. What portions look familiar to you?

Page 80

A. I reviewed the first few slides, the structural considerations and capturing Altria's perspective on how it could perhaps pursue a transaction and how that compares to what JUUL's expectations were.

Q. What was the purpose of this document, the attachment, I'm referring to?

A. Again, I don't recall all the specifics, but I believe it was to help guide a discussion between me at Perella Weinberg Partners and various Altria executive and management team members.

Q. And what Altria individuals?

A. I don't remember all of them, but probably Howard Willard, K.C. or Kevin Crosthwaite, and various members of the strategy and business management team.

Q. And who within Perella?

A. Mostly me, Peter Weinberg and the working team.

Q. I'm sorry. The working team?

A. Yeah.

Q. At the time, who was the working team in January of 2018?

A. I believe it was the same

Page 81

individuals I referenced earlier.

Q. The three individuals –

A. Adam – yes.

Q. I'm not going to –

A. Okay.

Q. – ask you to repeat them.

A. Okay.

Q. The same three individuals that you referenced earlier in the deposition?

A. I believe so, yes.

Q. Okay. Thank you.

And then if you turn to PWP_00007054, there is a Roman II, "Case Studies." Please let me know once you've gotten there.

A. Okay.

Q. What is a case study or case studies?

A. It can mean many things. In this context it appears to reference precedent situations where corporations made investments in other companies. And those investments aren't necessarily an outright acquisition. They could be a partial stake and some sort of collaboration with them.

Confidential

Page 82

Q. And you use the word "precedent." What's your understanding of the word "precedent" as you used it in that last answer?

A. Sorry. You're on Slide 12055?

Q. Well, no. I was referring to your answer. Your last answer you used the word "precedent." What –

A. Happened in the past.

Q. I'm sorry. Let me make sure I'm clear.

In your last answer you used the word "precedent" –

A. Yes.

Q. – correct?

A. Correct.

Q. And what did you mean by using the word "precedent" in connection with a case study as referenced in 7054?

A. It happened in the past.

Q. Have you created case studies before?

A. Yes.

Q. And when you conduct a case study, do you try and use the best example

Page 83

of something similar to the actual deal that may be proposed?

A. Typically, yes.

Q. And the – if you turn the page to 7055, the page is entitled, "Case Studies Overview."

And the first bullet says, "Limited precedent of Altria's proposed structure for JUUL transaction." Subpart, "However, there are multiple examples where publicly traded companies own controlling stakes in other publicly traded companies within the same/similar industry."

Did I read that bullet and sub-bullet correctly?

A. Yes.

Q. And did you have any involvement in putting this page together?

A. I don't recall, but most likely, yes.

Q. Okay. And what's your understanding of that bullet and sub-bullet?

A. My understanding is that the structure that Altria was contemplating

Page 84

earlier in – as referenced earlier in this presentation was different and somewhat unique than other partial ownership stakes that were observed in the marketplace.

Q. And who performed this case study here?

A. I don't recall.

Q. Do you recall when it was performed?

A. I don't recall.

Q. As you sit here today, do you know how it was performed or how it was worked up?

A. I do not.

Q. And in the second bullet point it says, "PWP evaluated three of these situations: Selected case studies include," and then it lists McDonald's/Chipotle, ABI/Grupo Modelo, and the next one is IAC/Match.

Did I read that correctly?

A. Yes.

Q. And the PWP is Perella Weinberg Partners?

A. Yes.

Page 85

Q. And do you know why these three deals were referenced?

A. I believe they were selected as being generally relevant to a situation where one publicly traded company, which is relatively large, owns a stake in another publicly traded company.

Q. And McDonald's and Chipotle were selected here because they were in the same or similar industry?

A. Not necessarily. I don't recall the specifics. But I believe it was primarily focused on any companies that were relatively large publicly traded that also owned a stake in other publicly traded companies.

So, for example, IAC/Match, I would consider that mostly in the media sector rather than the consumer retail sector. So I think it was a little less focused on the sector.

Q. Okay. But McDonald's and Chipotle are basically in the same or similar industry, being food services, correct?

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
Confidential                    James Wappler on 11/05/2024

Page 86

A. Oh, correct. Yes.

Q. And ABI Group – ABI/Grupo Modelo, same or similar industry?

A. Correct.

Q. Okay. And did the deal between McDonald's and Chipotle go through, to the best of your knowledge?

A. I believe it did, yes.

Q. Okay. And did McDonald's or Chipotle drop any of their products from the market in connection with the deal?

A. I don't – I don't know.

Q. Do you know if that was a provision or term of the deal –

A. I do not.

Q. – between the two?

A. I do not.

Q. What about with regard to ABI/Grupo Modelo?

A. I don't know.

Q. Okay. I'm finished with this document. We've been going a little more than an hour and 35 minutes. Would you like to take a break, or would you like to keep going?

Page 87

MR. RUFFINO: Maybe a break for Jessie.

THE STENOGRAPHER: I'm fine. I'm fine to continue.

MR. RUFFINO: I think this is a good time for a break, short break.

MR. BUCHMAN: Okay. Thank you.

THE WITNESS: Okay.

THE VIDEOGRAPHER: The time is 10:36 a.m.

We're going off the record.

(Whereupon, a recess was taken at 10:36 a.m.)

THE VIDEOGRAPHER: The time is 10:49 a.m.

We're back on the record.

BY MR. BUCHMAN:

Q. So in my earlier questioning, I misspoke and I referred to open tank. I meant to say closed tank.

So if we could go back and just talk briefly about Altria's closed-tank products that were in the market in 2018 to the best of your knowledge.

A. Yes. I believe those closed-tank

Page 88

products are in the cigalike category, which is how I reference them under the MarkTen brand umbrella, including products such as MarkTen Elite.

Q. Any other products?

A. There may have been other products, but not that – I don't remember the specific brand names.

Q. Okay. And then I asked you some questions earlier about IQOS.

And did you ever hear of a product called CSEV? It may have employed MESH technology.

A. Perhaps, but it doesn't – it doesn't resonate with me. I don't recall.

Q. Okay.

(Whereupon, Exhibit 241 is marked for identification.)

BY MR. BUCHMAN:

Q. Mr. Wappler, I'm having marked as PLX-241 what was previously marked as PX 3157 in the FTC deposition. And it's PWP_00002251 through 2305.

Would you please review the email and the attachment, and let me know once

Page 89

you've had an opportunity to review them in their entirety. And, again, that was PLX-241.

(Pause for reading/reviewing.)

BY MR. BUCHMAN:

Q. And not to disrupt your review, but just while you're reviewing, you'll notice that there are certain pages with handwriting on them. If you could pay attention to that as well, and I'll be asking you questions whether that's your handwriting or someone else's.

A. Understood.

Q. Thank you.

(Pause for reading/reviewing.)

A. Okay.

Q. Just going back to other product discussions, have you ever heard of a product called VEEV, V-E-E-V?

A. Yes.

Q. What was VEEV or what is – or strike that.

What is VEEV?

A. I believe VEEV is PMI's e-vapor product.

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
Confidential                    James Wappler on 11/05/2024

Page 90

Q.   And how would you describe that e-vapor product?

A.   I actually don't know too much about it.

Q.   So focusing on the document before you, have you seen this document before?

A.   Yes.

Q.   You've seen this document because you sent it on November 30, 2018, to Nick Fabre.

Am I pronouncing that correctly?

A.   I think so, yes.

Q.   Christopher Boffi and Adam Kallaus?

A.   Yes.

Q.   And you sent it in the ordinary course of business at Perella?

A.   Yes.

Q.   And Perella saved it in the ordinary course of business?

A.   Correct.

Q.   And the subject line is "Comments," correct?

A.   Correct.

Page 91

Q.   And there's an attachment to the email that you sent with a BOD preview materials Version 8.PDF, correct?

A.   Yes.

Q.   And BOD means board of directors as used in this attachment line?

A.   Yes.

Q.   And the email says, "Thanks for sending. A few edits attached and some reshuffling. Try to make this a little more logical flow since it will be sent to the directors. I have one question on the DCF footnote related to taxes on the synergies. Otherwise I think it's pretty straightforward. Please feel free to send directly to Bryan once you make these edits once we get coordinated on that tax question."

Did I read that all correctly?

A.   Yes.

Q.   And who's the Bryan that you're referring to in the email?

A.   I believe that's referring to Bryan Blaylock at the strategy team at Altria.

Page 92

Q.   And when you say you "made a few edits attached and some reshuffling," you're referring to the BOD preview that's attached to the email?

A.   Yes.

Q.   Okay. And so if we turn to the next page, there's a blank empty file. It's 0000252. And then after that, there's a document entitled, "Board Update. December 2018. Preliminary Working Draft," and that's PWP_00002253, correct?

A.   Correct.

Q.   And that's on Altria Client Services' letterhead –

A.   Correct.

Q.   – in the lower left corner?

A.   Yes.

Q.   And there is handwriting throughout this board update, December 2018 preliminary working draft, correct?

A.   Yes.

Q.   And do you recognize that handwriting?

A.   I do.

Q.   Is that handwriting your

Page 93

handwriting?

A.   It appears that way.

Q.   Is all of the handwriting in that document your handwriting, to the best of your knowledge?

A.   To the best of my knowledge, everything that I've reviewed is my handwriting.

Q.   Okay. What was this – what was the purpose of this document?

A.   I don't recall the specifics of exactly where things stood when this was developed; however, it would appear that it is a draft presentation that would ultimately be delivered to the Altria board of directors.

Q.   And who prepared this document?

A.   I don't recall exactly who was involved in it, but it looks like Perella Weinberg Partners was involved in the creation of part of it.

Q.   And what parts of the document was Perella involved with, to the best of your knowledge?

A.   I don't recall which specific

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
**James Wappler on 11/05/2024**

Page 94

slides, but it's not uncommon for Perella to collaborate with the Altria strategy team in the development of a presentation like this.

Q. But clearly your handwriting reflects the Perella work product –

A. Yes.

Q. – in this document, correct?

A. Yes.

Q. Okay. And if we turn to lower Bates number in the right-hand corner 00002257, there's a page with your handwriting on it, and please correct me if I'm wrong, and it says, "Section Divider Tree Update."

A. Yes.

Q. That's just basically an insert dividing page?

A. Correct.

Q. Okay. And then after it, there's a page 00002258 entitled, "Selected Scenario Analysis," correct?

A. Yes.

Q. Okay. And then below it there's a line that says, "We plan to discuss two

Page 95

potential standalone scenarios at the December board meeting," correct?

A. Yes.

Q. And it's got a strikethrough on it?

A. Yes.

Q. Does that look like it's your strikethrough?

A. Yes.

Q. Why was that struck through?

A. I don't recall.

Q. Okay. If you go down to the two scenarios, the second scenario is entitled, "Pursue Tree, Maple and H2O," correct?

A. Yes.

Q. And Tree is the potential deal with JUUL, correct?

A. Yes.

Q. And Maple is a deal between Altria and a Canadian cannabis company?

A. Correct.

Q. And H2O is a deal with whom, proposed deal with whom?

A. I actually don't remember.

Q. I got to ask you, where do you

Page 96

guys come up with these code names for all these – I mean, Maple is clever because it's a Canadian cannabis company.

A. Yes.

Q. But do you guys have a method for this –

A. Typically the junior staff members.

Q. Pick it?

A. Yeah.

Q. Good for them.

All right. So under "Pursue Tree/Maple and H2O," there are three bullet points, correct?

A. Yes.

Q. There – and you made modifications to these three – to two of the three bullet points, correct?

A. Correct.

Q. And in the third bullet point, the original was "Preserve options to pursue Eagle in the future."

Do you see that?

A. Yes.

Q. And that's struck through?

Page 97

A. Correct.

Q. And is that your strikethrough?

A. It appears to be.

Q. Okay. And why at the time you sent this email with the attachment did you – strike that.

Did you make the changes in this document in or around November of 2018?

A. It would appear that way, yes.

Q. Okay. So in November of 2018, with regard to this page and a provision "preserve option to pursue Eagle in the future," why did you strike through this provision?

A. I do not recall.

Q. Was there discussion at the time within Perella and/or Altria to preserve the option to pursue Eagle in the future?

A. I don't remember the specifics of it, no.

Q. What is meant by "preserve option to pursue Eagle in the future"?

A. I believe that's referencing a potential transaction with Philip Morris International at some point in the future.

Page 98

Q. And would that refer to an acquisition or a merger, or was it limited to specific projects?

A. It could relate to a number of things including PMI acquisition of Altria and Altria acquisition of PMI, a merger. That's – that's how I would define Project Eagle.

Q. Okay. Was preserving an option to pursue Eagle in the future something that was of interest or concern to Altria in November of 2018?

MR. RODNEY: Object to form.

THE WITNESS: I don't remember it being a key issue.

BY MR. BUCHMAN:

Q. Mr. Wappler, I didn't ask you if it was a key issue. I was just asking you if it was a concern or something that Altria was interested in at the time?

A. I don't recall.

Q. Okay. And if we could turn to PWP_00000261. The heading on the page is "Project Tree Selected Transaction Terms."

Did I read that correctly?

Page 99

A. Yes.

Q. And there are three categories on the left side: Transaction, Valuation, and Governance/Other.

Did I read that correctly?

A. Yes.

Q. Okay. Did you have any involvement in the creation of this slide?

A. I don't remember creating it, but I remember being involved in the overall presentation.

Q. Okay. And in the third portion, Governance/Other, there are – strike that.

There are four bullet points, correct?

A. Correct.

Q. The third bullet point reads, "Altria commits to conduct e-vapor operations exclusively through Tree."

Did I read that correctly?

A. Yes.

Q. Okay. And what, as you sit here today, does that reflect?

A. I believe it reflects – the current terms that are represented in this

Page 100

presentation show that Altria would use JUUL as it's exclusive e-vapor product or investment.

Q. And this was in November of 2018, correct?

A. Yes.

THE STENOGRAPHER: Can we go off the record, please?

MR. BUCHMAN: Sure.

THE VIDEOGRAPHER: The time is 11:05 a.m.

We're going off the record.

(Whereupon, a recess was taken at 11:05 a.m.)

THE VIDEOGRAPHER: The time is 11:08 a.m.

We're back on the record.

BY MR. BUCHMAN:

Q. This gives me a chance to go back to the email, the first page. If you could just briefly go back to 00002251 where it references "Attachments BOD Preview Materials."

Could you just clarify for the record what's a preview material for the

Page 101

board of directors?

A. I don't recall this specific situation. But typically preview materials would be sent to the board in advance of an in-person board meeting.

Q. To prepare them for the board meeting?

A. Yes.

Q. Okay. And when you're working on this project, did you attend any border meetings?

A. Yes.

Q. Did you ever make presentations to board of directors –

A. I believe so –

Q. – Altria –

A. – I believe so.

Q. – concerning this project –

A. Yes.

Q. – tree?

How many board of directors meetings did you attend?

A. I don't remember the specific number.

Q. How many presentations did you

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
James Wappler on 11/05/2024

Confidential

**Page 102**

make to the board of directors concerning Tree, Project Tree?

A. I don't remember the number.

Q. Do you recall whether you made a board of directors presentation concerning the attachment to your November 30, 2018, email?

A. It's possible I did, but I don't remember the specific board meeting.

Q. When you were making – strike that.

When you attended board of director meetings at Altria, do you recall whether the meetings were recorded or meeting minutes were taken?

A. I do not remember them being recorded. I believe minutes were taken.

Q. And after board of director meetings were conducted and meetings were taken, would you have received copies of the meeting minutes with respect to projects that you were working on for Altria at the time?

MR. RUFFINO: Objection to form.

THE WITNESS: No, I don't

**Page 103**

remember receiving minutes.

BY MR. BUCHMAN:

Q. Do you recall whether anyone at Perella received meeting minutes concerning board of director meetings with respect to Project Tree?

A. I do not believe they did.

Q. Okay. Okay. So we looked at page 2258 a moment ago. I'm just going to ask you to pull that aside and turn also to 2268. So 10 pages ahead.

A. Okay.

Q. Would you please take a moment to compare those two pages and let me know when you're ready to answer questions?

A. Okay.

Q. So on 2258, it has "Scenario status quo" and "Pursue Tree, Maple and H2O"?

A. Yes.

Q. And on 2268, it has a heading of "Selected scenario analysis (including Eagle)" with three scenarios: "Status quo, Maple plus H2O," second one is "Pursue Tree Maple and H2O," and third, "Pursue Project

**Page 104**

Eagle in near term."

Did I accurately state the headings in the document?

A. Yes.

Q. Okay. And so it appears that "Pursue Project Eagle in the near term" has been added to this as a scenario, correct?

A. Yes.

Q. Okay. And it says "Combine with Eagle" – and this is your handwriting again?

A. Yes.

Q. Why don't I ask you to read your handwriting, because there's parts I can't understand.

A. Combined – the first bullet, that's where you –

Q. Yes, sir.

A. "Combine with Eagle either through an MOE," meaning merger of equals,

Q. Okay. And then below that it says, "Altria shareholders would own less" – would – "~44 percent of combined

**Page 105**

company in MLE"?

A. Correct.

Q. What's the squiggle?

A. Approximately.

Q. Approximately. Okay. And then the second bullet point – and that was taken out?

A. Yes.

Q. Why was it taken out?

A. I don't recall.

Q. You took it out, though, right?

A. It appears that way.

Q. Okay. And second bullet point is "Eliminate redundant operating expenses and join forces and reduce harm investments and attempt to drive growth and mitigate disruption," correct?

A. Correct.

Q. Then there's a third bullet point – what did you mean by that?

A. If Altria were to combine with PMI, they would be able to capture cost synergies and perhaps collaborate on reduced-risk products in the future.

Q. And reduced-risk products means

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
James Wappler on 11/05/2024

Confidential

Page 106

e-vapor products?

A. That would include reduced – that would include e-vapor, yes.

Q. Okay. And then the third bullet point is – if you could read it for me, because I can't. I'm sorry.

A. "Not clear consolidation addresses disruptive challenges to core tobacco business (note BAT)" referencing British American Tobacco, "share price has declined percent, unknown percent, since January 2017 even with the benefit of RAI," referencing Reynolds American acquisition.

Q. And then there are brackets put on the far left side of this scenario, and there it looks like in your handwriting a note, "Yellow highlight this row."

A. Yes.

Q. And why did you want to yellow highlight this row?

A. I believe this is essentially a duplicate of 2258 with the addition of that third row. And the yellow highlight would just highlight the third row as the new addition.

Page 107

Q. Gotcha. Thank you.

And you struck out the "preserve option to pursue Eagle in future" on this page like you did on 2258, correct?

A. Correct.

Q. And as you sit here today, do you recall in November of 2018 having any communications with anyone in Altria concerning Altria committing to conduct e-vapor operations exclusively through Tree?

A. I remember it being part of the term sheet, but it was not a focus area of mine.

Q. Do you recall having any communications with anyone at Perella in November of 2018 concerning Altria's commitment to conduct e-vapor operations exclusively through Tree?

A. Yes. As it relates to the term sheet. But it was not a focus area of mine or my colleagues at PWP, Perella.

Q. And I believe you testified earlier that it was the focus of lawyers?

A. Yes.

Page 108

Q. And those were Altria's lawyers?

A. Yes.

Q. Were there any non-lawyers that were working with Altria that it was a focus or a concern of theirs?

And when I say "it," I'm referring to the language that I just read that Altria would commit to conduct e-vapor operations exclusively through Tree.

Do you understand my question?

MR. RODNEY: Objection to form.

THE WITNESS: Yes.

MR. RODNEY: I'm sorry. I object to form.

THE WITNESS: I do not recall any non-lawyers focusing on that term.

BY MR. BUCHMAN:

Q. Okay. I'm finished with that document. Thank you.

(Whereupon, Exhibit 242 is marked for identification.)

BY MR. BUCHMAN:

Q. Sir, I've handed you what's been marked PLX-242. It is a document with a Bates stamp of PWP_00004804 through 4819.

Page 109

It's a document entitled, "Project Tree Update. July 30, 2018." It's on Altria Client Services' letterhead.

Would you review the document and let me know when you're comfortable answering questions based on the document?

A. Yes.

(Pause for reading/reviewing.)

A. Okay.

Q. Let me just go back to the last document quickly and ask a couple follow-ups.

In that document, you made a number of handwritten edits to the document, which was going to be – which were preview materials being sent to the board of directors, correct?

A. Correct.

Q. And to the best of your knowledge as you sit here today, were the changes that you proposed making made to the final version of the document?

A. Most likely, but I don't recall. Go ahead.

Q. I'm sorry. Please, go ahead. I

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
Confidential                      James Wappler on 11/05/2024

Page 110

didn't mean to interrupt you.

A.  I don't know exactly what state of the draft process this document is -- is related to.  But so some of them may have been made; all of them may have been made. I don't know.

Q.  You said that it was normal for -- you didn't say normal, but usually that Perella would collaborate with Altria on documents like this, correct?

A.  Correct.

Q.  Okay.  So once you made these proposals, who would you send them to either within Perella or within Altria?

A.  Typically no one within Perella, but it looks like this document was sent to Bryan Blaylock at Altria.

Q.  Okay.  And would Mr. Blaylock typically make your edits to documents before presenting them to the board?

A.  Sometimes, yes.  Sometimes, no.

Q.  Okay.  And did you ever receive a final version of this document from Mr. Blaylock before it was presented to the board?

Page 111

A.  I likely did, but I don't recall.

Q.  Did you receive a copy of the document as it was presented or at the time it was presented to the board?

A.  I don't recall the specifics of that.

Q.  Would it be normal for you to receive a copy of documents that you made comments to that were being presented to the board of Altria?

A.  Yes.

Q.  And how would you receive them? Electronically or in hard copy format?

A.  Electronically.

Q.  So if you made changes to these -- to this document and they were input, you would have received an electronic version of the document once any comments were made?

A.  Yes.

MR. RUFFINO:  Objection to form.

MR. BUCHMAN:  Okay.  I'm going to ask that we receive a copy of the final version of this document.  I don't believe that we've received it.

Page 112

MR. RUFFINO:  I'll take it under advisement.

MR. BUCHMAN:  Under advisement, that's fine.

BY MR. BUCHMAN:

Q.  Okay.  Let's move on to the next document.

Okay.  So we're on Project Tree. This is update July 30, 2018, PLX-242.  And you've had a chance to review this in its entirety and comfortable answering questions based on the document.

(Pause for reading/reviewing.)

A.  Yes.

Q.  Okay.  Mr. Wappler, if you would kindly turn to PWP_00004806.

A.  Okay.

Q.  Did you have any involvement in putting this page together?

A.  I do not think so.

Q.  Okay.  And it says, "Our current vapor portfolio is exposed to regulatory challenges."

Do you see that?

A.  Yes.

Page 113

Q.  I read that correctly?

A.  Yes.

Q.  Okay.  And there are three categories here.  It says Pre-8.8.16 product, Pre-8.8.16 product again and Post-8.8.16 product?

A.  Yes.

Q.  Okay.  And the Pre-8.8.16 category, it says "Anticipate FDA authorization," and it references Apex?

A.  Yes.

Q.  What was Apex in July of 2018?

A.  I'm not familiar with Apex.

Q.  Okay.  In the Pre-8.8.16 product middle category it says, "Expect to make significant modifications ahead of FDA authorization," and it lists MarkTen XL, MarkTen Elite, VIM by MarkTen and Cync.

Did I read those correctly?

A.  Yes.

Q.  What is your understanding of MarkTen XL?

A.  Similar to what I described earlier, MarkTen is a cigalike product in the e-vapor category owned by Altria.

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
**James Wappler on 11/05/2024**
Confidential

Page 114

Q. Closed tank?

A. Yes. I believe so.

Q. And MarkTen Elite, closed tank?

A. I think MarkTen Elite is a pod-based product.

Q. Okay. And VIM by MarkTen?

A. I'm not familiar with that one.

Q. Cync?

A. I think it's a pod-based product. I'm not very familiar with it.

Q. Okay. And on the far right side it says "Post-8.8.16 product. PMTA approval required." It says "Project Hudson. Anticipated market launch in 2022."

Did I read that correctly?

A. Yes.

Q. What's your understanding of Project Hudson?

A. I'm not familiar with it.

Q. Are you aware of any other products that Altria anticipated launching in the market in or around July of 2018?

A. No.

Q. If you turn the page, this looks

Page 115

like your handwriting again?

A. Correct.

Q. And I'm having a hard time reading the star. Does it say, "Insert volume forecast"?

A. Yes.

Q. What volume forecast are you referring to?

A. I'm not sure specifically, but this would seem like the type of forecast that would be developed by Altria and showing what they thought the JUUL unit volume would look like in the future.

Q. So would a volume forecast be a sales forecast?

A. Not necessarily. It would be the number of units rather than the revenue attributed to those units. So not necessarily sales, but volume.

Q. But how – to the best of your knowledge, how would Altria have conducted a volume forecast in July of 2018?

A. They have a group within Altria that analyzes the U.S. nicotine ecosystem and provides forecasts for a variety of

Page 116

products including e-vape, and they would have developed that.

Q. And what resources would they have used to conduct a volume forecast in 2000 – July of 2018?

MR. RODNEY: Object to form.

THE WITNESS: I'm not sure what all resources they have.

BY MR. BUCHMAN:

Q. Has anyone at Perella ever conducted a volume forecast concerning the e-vapor market?

A. I don't recall a specific forecast developed by Perella. We typically relied on Altria for that input to the analysis.

Q. If you were to conduct an e-vapor volume forecast, what resources outside of Perella would you rely on besides Altria?

A. We would look at publicly disclosed information from other tobacco companies. We would also look at third-party data sources such as Euromonitor, and we would look at Wall Street analyst research.

Page 117

Q. What other third-party data existed in July of 2018 that you might have looked at?

A. I don't think we would have looked at anything else.

Q. And what was – did you say Euromonitor?

A. Yes.

Q. Would there be – strike that.

Would Euromonitor focus on the European market?

A. That's a good question. I don't know.

Q. Was there a comparable data source in the – concerning the United States e-vapor sales that you're aware of?

A. I believe we would have used Euromonitor for the United States. I'm not aware of other third-party sources that we would have used.

Q. So the Euromonitor would have covered the U.S. market?

A. I believe so, yes. Although I'm not sure what they covered in 2016.

Q. When you say –

A. Or --
Q. In my last question I said the "U.S. market." When I said "U.S. market," what did you understand the U.S. market to mean?
A. The nicotine market inclusive of all products: cigarettes, cigars, e-vapor, heat-not-burn. Oral as well.
Q. So all products that are --
A. Yes. Although, I am not the person that runs the Euromonitor screen, so I can't confirm exactly which products are included in that analysis.
Q. Okay. Then if you turn the page to PWP_00004809.
A. Yes.
Q. There's handwriting there that says, "Thinking on a partnership with Altria has evolved," and it's struck out "prior proposal is no longer valid."
Do you see that?
A. Yes.
Q. And is that your handwriting?
A. Yes.
Q. And why did you strike out "prior

proposal is no longer valid" and proposed changing it with "thinking on a partnership with Altria has evolved"?
A. I don't remember the specifics. This appears to be one of the starts and stops in the discussions with JUUL.
Q. And what did you -- why did you use the word "evolved"?
A. I don't remember the specific reasons why.
Q. And then if you could kindly turn to PWP_00004814. This is all handwriting, and it looks to be your handwriting again?
A. Yes.
Q. And the top of the document says, "Risks in investing in JUUL and strategies to mitigate risk."
Did I read that correctly?
A. Yes.
Q. And you're proposing a slide here?
A. Yes.
Q. And the slide that you're proposing has three categories, investment consideration categories?

A. Looks like four.
Q. I'm sorry. You're right. Four. My mistake.
The third category is, "New entrants into e-vapor" -- I'm sorry. I can't read that word.
A. "New entrants into e-vapor category/JUUL market position challenged."
Q. Okay. And then across from that, the first bullet point is, "Review of competitive products currently in the market" -- "currently in market."
A. Yes.
Q. Okay. What did you mean by that?
A. An analysis of all the relevant e-vapor products.
Q. And how would -- strike that.
Who were you proposing conduct a review of competitive products currently in the e-vapor market?
A. The broader strategy team inclusive of Altria as well as PWP and other parties that may have been involved.
Q. And who at Perella was part of that broader strategy team?

A. The same -- the same deal team. So I would include transactions such as Altria's investment in JUUL as part of their strategy team, strategic efforts, I should say.
Q. Are you referring to the three people --
A. Yes.
Q. -- that you spoke about at the beginning of the deposition?
A. Yes.
Q. But we've seen additional -- we've seen documents that list additional individuals to those three.
Would they also be included if you had been emailing them in the past?
A. Yes.
Q. Okay. And who would have been part of that broader strategy team within Altria around this time period of July of 2018?
A. Bryan -- and this is not a comprehensive list, but by my memory would have been Bryan Blaylock, David Wise, I think was involved, K.C. Crosthwaite, I

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
James Wappler on 11/05/2024

Confidential

Page 122

think the head of strategy at the time.

Q.   And what was Bryan Blaylock's title at Altria at the time?

A.   I do not remember.

Q.   And do you know if a review of competitive products currently in the e-vapor market was conducted either at Altria or Perella, as you suggested here in the third category of this slide, proposed slide?

A.   I believe there – I recall this being a review of particular products throughout that time period, but I don't know if Altria conducted a comprehensive analysis.

Q.   Did Perella conduct a comprehensive analysis?

A.   I do think they – no, not a comprehensive analysis.

Q.   Did Perella conduct any analysis in connection with the third bullet point review of competitive products currently in the e-vapor market?

A.   I believe Altria asked us to look at a few products from time to time

Page 123

throughout this time period, but I don't remember the specific ones.

Q.   Do you know if you did that, Perella did that?

A.   I don't recall the specific work output, but I do recall broadly looking at products from time to time.

Q.   And if Perella conducted that analysis as requested by Altria, what form of the review in written form would exist, if it had been completed?

MR. RUFFINO:  Objection to form.

THE WITNESS:  It would be electronic, if it was completed.

BY MR. BUCHMAN:

Q.   And what type of document would it have been?

MR. RUFFINO:  Objection to form.

BY MR. BUCHMAN:

Q.   Let me withdraw.

Would it have been – would the competitive – would the review of competitive products currently in the e-vapor market at this time in July of 2018 have taken – if conducted by Perella, have

Page 124

taken the form of a PowerPoint presentation or some other electronic document?

MR. RUFFINO:  Objection to form.

THE WITNESS:  PowerPoint presentation.

MR. BUCHMAN:  Okay.  We're going to request that we receive a copy of that competitive product review.  I don't believe that we received it, and I know you're gonna take it under advisement and get back to me, correct?

MR. RUFFINO:  Yeah.  I just – his testimony was a hypothetical discussion about what might have been done, and I don't believe that he's confirmed that we know that something exists.

I will take your request under advisement and we'll look.  And if we find additional materials that weren't previously collected, we will produce them.

MR. BUCHMAN:  Okay.

BY MR. BUCHMAN:

Q.   And just to be clear, the

Page 125

individuals that would likely have conducted such a review of competitive products currently in the e-vapor market as of July 18, 2018, per Altria's request would have been Peter Weinberg, Adam Kallaus, Kane Herrick and there were a group of other individuals on your emails, correct?

A.   Correct.

Q.   And who specifically would you have expected to be the lead person conducting that review as suggested by Altria –

A.   I would –

Q.   – within Perella?

I'm sorry.  I didn't mean to cut you off.

A.   I would have been the lead.

Q.   Okay.  Do you recall assigning this review to any individual to be responsible for and report to you?

A.   No.

Q.   Among the individuals who you've identified so far as working on your team, who would you likely have assigned this to

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**

Confidential                                    James Wappler on 11/05/2024

Page 126

given their experience and/or seniority?

MR. RUFFINO: Objection to form.

THE WITNESS: I don't recall who specifically would have been the go-to person, so to speak, for that assignment at the time. As we discussed earlier, the team had some people at one point in the project and then some additional names towards the end of the project.

So it's hard to say hypothetically who I would have assigned that – that task to.

BY MR. BUCHMAN:

Q. Okay. And if we could turn to PWP_00004817, please.

Again, this document appears to be your handwriting?

A. Yes.

Q. Okay. And the top of the page says, "Recommended next steps"?

A. Yes.

Q. And the first bullet point is "Altria-JUUL meeting on 8/1 to review latest JUUL proposal."

Page 127

Did I read that correctly?

A. Yes.

Q. Was there an Altria-JUUL meeting on August 1 to review the latest JUUL proposal?

A. I don't recall.

Q. As you sit here today, what is your recollection, if any, of the JUUL proposal at the time?

A. I do not recall anything specific about the JUUL proposal at that time.

Q. And was a slide made as you proposed here in your handwritten comment?

A. I don't know.

Q. Okay. What – what was this document used for either within Perella – strike that.

Was a final version of this document created using your comments to the document?

A. I don't know.

Q. After you made the comments to this document, who would you have sent your proposed changes to?

A. I don't know. Someone at

Page 128

Altria's strategy team, possibly Bryan Blaylock.

Q. Okay. And after you sent – after you – after you sent or would have sent this document to Mr. Blaylock, would you have received a copy of your edits and a final version of the document?

MR. RUFFINO: Objection to form.

THE WITNESS: Perhaps. I'm not familiar with the specific context of this document. So there are situations where I would send Bryan Blaylock revisions and we've received a final version.

There would be situations where I would send Bryan Blaylock revisions and there would be no final version of the presentation, a meeting would get canceled, for example, there would be no delivery of the presentation. So I don't know the specifics on this one.

BY MR. BUCHMAN:

Q. Okay. And on the first page of this document, it's entitled, again, "Project Tree Update," correct?

Page 129

A. Yes.

Q. Who was this document, at the time you were making edits to the document, designed to update?

A. I don't recall.

Q. Would you have expected Mr. Blaylock to have input your proposed changes as reflected through the document?

A. I think, as we discussed earlier, sometimes he would take the edits and sometimes not.

Q. Okay. And would he send you a copy back of proposed changes if implemented?

MR. RUFFINO: Objection to form.

THE WITNESS: Typically, yes.

BY MR. BUCHMAN:

Q. Okay. And do you recall receiving a final version of this document from Mr. Blaylock or anyone else at Altria after you sent your edits?

A. I do not recall.

Q. And if you had received such a document, would you have received it in electronic format?

Confidential

Page 130

A. Yes.

Q. And it would have been sent to your email at Perella?

A. Yes.

Q. Okay. I have no further questions on this document. Thank you.

(Whereupon, Exhibit 243 is marked for identification.)

MR. BUCHMAN: Actually, you know what, let me take those three back. Let me just take the first page off.

BY MR. BUCHMAN:

Q. Mr. Wappler, I've handed you what's being marked as PLX-243. It's a single-page email Bates stamped ALGAT004893321.

When you've had an opportunity to review the document, the email, would you please let me know?

A. Okay.

Q. Mr. Wappler, you've seen this document before, correct –

A. Yes.

Q. – or this email before?

Yes?

Page 131

A. Yes.

Q. Okay. And you sent an email to Carmine – is it Reale? – at Altria –

A. Yeah.

Q. – on August 6 – I'm sorry, August 19, 2018?

A. Yes.

Q. And you sent that in the ordinary course of business of Perella even though it was a Sunday?

A. Yes.

Q. And Perella – Perella saved this document in the ordinary course of business?

A. Yes.

Q. And in August of 2018, who was Carmine Reale?

A. He was a – I believe a member of the strategy and business development team at Altria.

Q. And the subject line of this document is "Call," correct?

A. Yes.

Q. And the document – I'm sorry. The email says, "Anthony. Do you have five

Page 132

minutes available this afternoon to catch up on the latest Tree term sheet? In particular, I'd like to make sure we coordinate on the implications of these latest terms on Project Eagle (e.g., global noncompete binds an acquirer, etc" –

A. Yes.

Q. – did I read that correctly – closed paren, period. Sorry.

Did I read that correctly?

A. Yes.

Q. Okay. And then Mr. Reale responds to you and says at 2:16 p.m. on August 19, "I think we are all aware of Project Eagle implications, particularly the one that you called out, but, of course, makes sense to talk. I'm heading to New York later this afternoon, and I'll be there through Tuesday evening attending to parental matters. Would 3 today," I assume 3 p.m. "today work for a call?"

Did I read that correctly?

A. Yes.

Q. And then you respond and said, "Yes, thanks. I'll plan on calling you at

Page 133

3:00 p.m."?

A. Yes.

Q. And in the lower email that you sent, you reference the latest Tree term sheet?

A. Yes.

Q. What was – what is your understanding of the term sheets – the term sheet status at that time –

A. I don't.

Q. – in August of 2018?

A. I don't remember the specific status in August 2018 or on this particular date, August 19, 2018.

Q. I'm sorry. August 19, 2018. My bad.

"In particular, I would like to make sure we coordinate on the implications of these latest terms on Project Eagle," correct?

A. Yes.

Q. What did you mean by you wanted to "coordinate on the implications of these latest terms on Project Eagle"?

A. Again, I don't recall the

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
James Wappler on 11/05/2024

Confidential

Page 134

specific status of the discussions with JUUL or that particular term sheet, but I do recall broadly there was an awareness, at least at some point in the discussion, if Altria were to have an exclusive relationship with JUUL, how would that impact a potential consolidation with PMI in the future.

Q. What – I'm sorry. Go ahead.

A. And that would be Project Eagle.

Q. And I believe in your last answer you said "exclusive relationship." What did you mean by that?

A. Where JUUL would have been Altria's only e-vapor product or investment.

Q. I'm sorry. Could you – could we be – could we say that again, please, for the record?

With regard to the implications of these latest terms on Project Eagle, what did you mean?

A. Again, I don't recall the specific term sheet or the specific status of the discussions. But broadly around

Page 135

this time period, I do remember there being discussion about if JUUL were Altria's only e-vapor product or investment, the question then became, well, what would happen if, for example, another company acquired Altria.

And this is referencing PMI vis-à-vis Project Eagle.

Q. And that's why you put in the – you referenced the global noncompete binds an acquirer?

A. Yes.

Q. And what did you mean by "binds on acquirer"?

A. Again, I'd have – this appears to be language from a term sheet, would be my strong sense. And this appears to imply if another company acquired Altria, then that company would be bound to the same exclusive provisions of this particular term sheet.

Q. And the term sheet you're referring to is the Project Tree term sheet between Altria and JUUL?

A. It would appear that way, yes.

Page 136

Q. Okay. And do you recall having any conversations with Mr. Reale outside of these emails on Sunday, August 19, 2018?

A. It would appear that I called him at 3:00 p.m., but I do not recall the substance of that discussion.

Q. Generally speaking, when you had conversations with individuals from Altria concerning Project Tree, would you take notes of your conversations or otherwise record them?

A. No.

Q. You'd never taken handwritten notes?

A. Very rarely.

Q. And when you did take handwritten notes, how would you go about doing that?

MR. RUFFINO: Objection to form.

THE WITNESS: I don't recall taking notes on Project Tree.

BY MR. BUCHMAN:

Q. You don't recall taking electronic or handwritten notes –

A. Correct.

Q. – on Project Tree other than the

Page 137

PowerPoint presentations that we've seen your handwriting on?

A. Correct. And those are – everything we reviewed so far are comments or edits rather than notes.

Q. Okay. Thank you for the clarification.

How long did this conversation occur between you and Mr. Reale on August 19, 2018, if you recall?

A. I don't remember.

Q. Okay. You had a call with Mr. Reale that day on a Sunday. Was it normal for you to have conversations with Altria people on weekends concerning Project Tree?

A. It would depend on the status of the discussions. Some weekends perhaps, other weekends nothing.

Q. Was there something important that you wanted to discuss with Mr. Reale that weekend that needed to be discussed on Sunday?

A. I don't recall the specific context of why that Sunday conversation was

Confidential

Page 138

the right time.

Q.   Other than what's recorded in the email itself, sir?

A.   Correct.

Q.   Okay.

(Whereupon, Exhibit 244 is marked for identification.)

BY MR. BUCHMAN:

Q.   Mr. Wappler, I'm having marked as PLX-244 what's been Bates stamped as PWP_00008216 through 217.

Please let me know once you've had an opportunity to review the emails and are comfortable answering questions based on the document.

And just to streamline this, because I don't want to drag this out and I know you want to get out of here, I'm going to focus on the first top line here, the FYI.  You don't need to go below that, please, unless you feel the need to.

A.   Okay.

Q.   With regard to the top email, the 20:22:34, 4:00 p.m. ETD email, you've seen this document – you've seen this email

Page 139

before, correct, sir?

A.   Yes.

Q.   You've seen this email before, because you authored the email and sent it on August 15, 2018, to Peter Weinberg, Christopher Boffi, Dave Bailey and Abigail Shepard, correct?

A.   Yes.

Q.   And you sent it in the ordinary course of business at Perella?

A.   Yes.

Q.   And this is the type of document that Perella saves in the ordinary course of business?

A.   Yes.

Q.   And the subject of the – of the email is, "Forward draft terms (5).doc," correct?

A.   Correct.

Q.   And does the (5) reference that it's the fifth generation of a draft term sheet?

A.   I don't know.

Q.   What is your – let me withdraw the question.

Page 140

What is your understanding of the (5)?

A.   It could be a version.  It could be something else.  I don't know.

Q.   What could the something else have been?

MR. RODNEY:  Object to form.

THE WITNESS:  I don't know.  I didn't – I don't recall drafting that or naming that file.  So it's hard to say what –

BY MR. BUCHMAN:

Q.   Okay.

A.   – someone else could do.

Q.   Okay.  And then the email has a reference to "Attachments, draft terms (5).doc," correct?

A.   Yes.

Q.   And the second – strike that.

The third line of this email at the top says, "Looks like Tree wants us to concede some key points prior to the meeting."

Did I read that correctly?

A.   Yes.

Page 141

Q.   When you said "it looks like they want us to concede some key points," do you have an understanding as you sit here today what the basis for your conclusion was there?  Was there a document that you had reviewed?

A.   I don't recall the specifics of this email or those particular points; however, as we discussed, there were a lot of starts and stops to this negotiation or exploration, and it would – it wouldn't surprise me if JUUL was demanding that we concede some points prior to meeting with the Altria team.

And that would be typical negotiating tactic for them to ask for things before they would even get in the room with Altria.

Q.   Okay.  But the language that you use here looks like "Tree wants us to concede some key points prior to the meeting," that's referencing a draft term sheet at the time around August 15 of 2018 as referenced in the subject line in the attachments, correct?

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
James Wappler on 11/05/2024

Confidential

Page 142

A. It would appear that way, yes.

Q. Okay. And then it says, "Prior to the meeting."

Do you see that, sir?

A. Yes.

Q. And what meeting are you referring to here as of August 15, 2018?

A. I don't recall the specifics of that meeting.

Q. Was it a meeting to discuss the terms in the term sheet?

A. It could have been.

Q. But as you sit here today, you have no recollection of a meeting –

A. Correct.

Q. – around that time period with individuals from JUUL regarding Project Tree?

A. Correct.

Q. Do you recall having any meetings with people from Altria regarding Project Tree in connection with the draft term sheet around this time period, August 15, 2018?

A. I don't remember specific

Page 143

meetings with Altria team members around this time, but I believe I had meetings with them.

Q. And what, to your recollection, did you discuss with individuals from Altria around August of – August 15 of 2018 regarding the draft term sheet?

A. I don't recall the specifics other than presumably we discussed the draft term sheet.

Q. I'm going to ask you to hold on to that document. If you could kindly put it to the side. I'm going to give you another document to consider in connection with that document.

(Whereupon, Exhibit 245 is marked for identification.)

BY MR. BUCHMAN:

Q. Mr. Wappler, I've had marked as PLX-245 a two-page document in the lower right-hand corner PWP_00008219 and 8220.

Once you've had an opportunity to review the document and are comfortable answering questions based on it, please let me know. I will tell you that the majority

Page 144

of my examination will concern the second bullet point.

A. Okay.

Q. Thank you.

(Pause for reading/reviewing.)

A. Okay.

Q. Have you seen this document before?

A. I don't know. I don't recall it.

Q. Is this the attachment that's referenced in the prior document, 8216?

A. Could be. It appears to reference draft Altria-JUUL terms, but I don't recall if this was that particular time frame or the context of this particular document.

Q. Okay. And PLX-245, is this a document that you drafted?

A. I'm sorry. This is the document – this is – yeah, 245.

Q. Yes, sir.

A. I do not believe I – I don't recall drafting this, no.

Q. Okay. Do any of the strikethroughs or comments that are

Page 145

contained in this document your comments?

A. They do not look like my comments.

Q. Okay. As you sit here today, do you have any understanding as to whose comments they are?

MR. RUFFINO: Objection to form.

THE WITNESS: I'm not sure. They look like legal comments to me from some attorney.

BY MR. BUCHMAN:

Q. Okay. And the second bullet point reads "We understood that you (and," and then there's a strikethrough on or "your successors," there's a strikethrough on that, and then it says "successors and" strikethrough on or, "current addition ans" strikethrough or, "future affiliates) would not compete against us in vapor in the U.S. and that JUUL would be the vehicle for all vapor assets.

"You have retained the right under certain circumstances to compete not only with existing MarkTen products but also with products under development and

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
James Wappler on 11/05/2024

Confidential

Page 146

future products. The commitments to divest MarkTen has been stricken. This is not acceptable to us."

Q. Did I read that correctly?

A. Yes.

Q. And what is your understanding of who was communicating the information contained in the second bullet point?

MR. RODNEY: Object to form.

THE WITNESS: So, again, I don't know exactly what document this is. This would appear to be a document reflecting JUUL's perspective on a draft term sheet.

BY MR. BUCHMAN:

Q. So the reference to "you" in the first sentence means Altria?

A. That's my interpretation of this.

Q. And the "you" in the second sentence would be referencing Altria retaining – trying to retain the right under certain circumstances to compete not only with existing MarkTen products but also with products under development in future products, correct?

Page 147

A. Yes. That's my assumption.

Q. And it's your reasonable assumption that "you" refers to Altria, because it also references MarkTen products which were an Altria product, correct, sir?

MR. RODNEY: Object to form.

THE WITNESS: Yes.

BY MR. BUCHMAN:

Q. Sir, you're nodding your head –

A. Yes.

Q. I'm sorry. Yes?

A. Yes.

Q. "The commitment to divest MarkTen has been stricken. This is not acceptable to us."

"The commitment to divest MarkTen has been stricken" was something that was done by Altria or someone acting on Altria's behalf in the term sheet, correct?

MR. RUFFINO: Objection to form.

THE WITNESS: I don't know.

BY MR. BUCHMAN:

Q. And the "this is not acceptable to us," you understand the "us" to refer to JUUL, correct?

Page 148

A. Correct.

MR. BUCHMAN: Why don't we take a break. I'm going to come back to this document, and we can talk about whether we should – let's just go off the record.

THE VIDEOGRAPHER: The time is 12:06 p.m.

We are going off the record.

(Whereupon, a break for lunch was taken from 12:06 p.m. to 12:37 p.m.)

THE VIDEOGRAPHER: The time is 12:37 p.m.

We are back on the record.

BY MR. BUCHMAN:

Q. Good afternoon, Mr. Wappler.

The document that we were looking at, PWP_00008219 in the second bullet point, the metadata suggests that this document was the attachment to the email, which was 244, PLX-244. So they are connected.

The second bullet point – with respect to the second bullet point, we

Page 149

talked about the "This is not acceptable to us" last sentence. And that is JUUL communicating to Altria that it was not acceptable to JUUL that Altria retain the right to compete with existing MarkTen products under development and future products as well, right?

A. Correct.

Q. At the time that this email was sent in August of 2018, as you sit here today, do you have an understanding of what products were under development at Altria in the e-vapor market?

A. I was not aware of any products under development other than the MarkTen products that we reviewed earlier this morning.

Q. And when it says "and future products," what future products is it referring to, if any, that you're aware of?

A. I'm not aware of any specific products that were under development.

Q. At the time you received this document 8219 with the second bullet point, with respect to the sentence at the end of

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
Confidential                    James Wappler on 11/05/2024

Page 150

the paragraph of bullet two, "This is not acceptable to us," what was your understanding as to why it was not acceptable to JUUL that Altria retain the right to compete with MarkTen products and products under development and future products?

A.   As I think I mentioned earlier, this whole notion of exclusivity noncompete and all of that was primarily the focus point of the attorneys who were focused on that realm of the term sheet.

However, from a business perspective, I was aware of JUUL's concern about allowing a large cap tobacco company to own a stake in its company, being – sit on its board, presumably have some access to its product pipeline.

And they were concerned about Altria essentially stealing trade secrets, using that stake and its information as a JUUL investor to its advantage over time.

Q.   They were concerned that Altria would compete with JUUL even though they were working as a company within an

Page 151

investment interest in JUUL at the time, correct?

MR. RODNEY:  Object to form.

THE WITNESS:  My understanding is that there was some concern on their end along those lines, yes.

BY MR. BUCHMAN:

Q.   Was JUUL's position as reflected in this document acceptable at the time to Altria?

MR. RODNEY:  Object to form.

THE WITNESS:  I don't recall Altria's specific stance on this – this issue at this time.

BY MR. BUCHMAN:

Q.   Did there come a time where Altria accepted that it would not – withdrawn.

Let's move on to the next document.

(Whereupon, Exhibit 246 is marked for identification.)

BY MR. BUCHMAN:

Q.   Mr. Wappler, I've handed you what's been marked as PLX-246 which is

Page 152

Bates stamped ALGFTC000106605 through 6612.

The first document is an email. I understand that you are not an author, recipient or CC individual on the email, but with regard to the document behind the email, Project Tree documentation October 18, 2018, it is a PWP or Perella Weinberg Partners document based on the lower left-hand corner of the document on ALGFTC000106606.

Do you see that, sir?

A.   Yes.

Q.   Have you seen this document regarding the Project Tree documentation, October 18 PWP document, and the pages that follow it prior to today?

A.   I don't – I don't know.  I don't recall this particular document, but it would appear that PWP helped compile a variety of documents that are in this package.

Q.   Would a document like this have been finalized – could a document like this have been finalized without your involvement?

Page 153

MR. RUFFINO:  Objection to form.

THE WITNESS:  Again, I don't know the context of this.  It's possible. So, for example, if someone at Altria called Chris Boffi, for example, a member of my team and said, can you collate five attachments in one document, send it back to me, I probably would have been cc'd on that. But it's an administrative task.  It's not really a product development, if that makes sense, or a document that was actually developed.

BY MR. BUCHMAN:

Q.   Okay.  And if you turn to page 66068, this appears to be a letter on Altria letterhead, which is signed on 66069 by one Howard A. Willard III –

A.   Uh-huh.

Q.   – do you see that?

A.   Uh-huh.

Q.   Have you seen Mr. Willard's signature before?

A.   Probably.

Q.   Go ahead.

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
James Wappler on 11/05/2024

Confidential

Page 154

A. It doesn't stand out to me, but I've probably seen it.

Q. Okay. Does this look like his signature?

A. I don't know.

Q. Okay. What's the purpose of the document entitled, "Project Tree Documentation. October 2018" and the letter that follows?

A. I don't recall the specific purpose of this package.

Q. Okay. And if you could turn to page 66069. And I would call your attention, please, to the sixth point.

And could you please read that into the record?

A. "Altria would agree that it and its current and future subsidiaries will not compete in a manner consistent with our previous discussions in the U.S. e-vapor market for any period exclusive of the aforementioned transition period during which it provides support services."

Q. And in October of 2018, was that your understanding of Altria's position

Page 155

with regard to competing in the U.S. e-vapor market?

A. I don't have specific recollection of exactly the starts and stops and where everything stood. But based on this document, this appears to be from Howard reflecting Altria's latest thinking on terms, yes.

Q. Okay. And in the second-to-last full paragraph, second sentence, it says, "We stand ready to reengage with you immediately to proceed forward along the lines set out above."

Did I read that correctly?

A. Yes.

Q. And this letter was addressed to Nicholas Pritzker, Riaz Valani and Kevin Burns at JUUL, correct?

A. Yes.

Q. So the "we stand ready to engage with you," the "you" is referred to Altria – is referred to JUUL, correct?

A. Yes.

Q. And Altria was ready to immediately proceed forward along the lines

Page 156

outlined above with JUUL in connection with Project Tree, correct?

A. It would appear that way, yes.

Q. Okay. I have no further questions on this document.

(Whereupon, Exhibit 247 is marked for identification.)

THE WITNESS: Ready.

BY MR. BUCHMAN:

Q. Mr. Wappler, I've had marked as PLX-247 a single-page email that was previously PX 3169 in the FTC deposition transcript. It's Bates stamped PWP_00008048.

And you've seen this document, this email before, correct, sir?

A. Yes.

Q. And you've seen this email before because you authored it and sent it to David Wise on July 23, 2018, correct?

A. Correct.

Q. And who is David Wise at the time?

A. I don't remember his specific title, but he was a member of Altria's

Page 157

strategy and business development team.

Q. And did you – strike that.

This email has at the heading "Draft Script," correct?

A. Correct.

Q. And this is a draft script for what?

A. I don't recall the specific circumstances related to this, but after reviewing it, it would appear that this was during one of the starts and stops during negotiations.

Some member of the Altria team could deliver some of these talking points to JUUL as we were trying to acquire a stake in JUUL's business.

Q. And did you draft this entire draft script?

A. I don't recall drafting it, but I believe I likely did, I mean, based on this email.

Q. Okay. And the last paragraph of this email says, "We sincerely hope that this proposal will gain momentum with the JUUL board, but if not, we're prepared to

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
**James Wappler on 11/05/2024**

Confidential

Page 158

go back to focusing on our internal Altria portfolio and product development pipeline."

Did I read that correctly?

A. Yes.

Q. And when it says "this proposal," what proposal is it referring to?

A. I mean, it appears here that, for example, halfway through the email it says "To that end we're prepared to offer," bracketed, "13 billion for a 49.9 percent stake."

So broad strokes, $13 billion for slightly less than half the business. And my sense is that this is, you know, an increase in an offer valuation from where JUUL – from where Altria was previously at.

Q. Is this a summary of proposals that were more expansive as contained in a term sheet that Altria presented to JUUL?

A. I don't know for certain, but I don't recall there being a formal term sheet at this stage.

Q. Okay. And in the last part of

Page 159

the sentence of the last paragraph in the email, it says, "On our internal" – "On our internal Altria portfolio and product development pipeline," did you write that portion of this email?

A. Yes.

Q. And what did you mean by "internal Altria portfolio"?

A. Altria's portfolio of nicotine products inclusive of combustibles, e-vapor, so on and so forth.

Q. And what did you mean by "product development pipeline"?

A. New products that Altria could develop over time.

Q. And what products were you aware of when you drafted the product development pipeline language existed within Altria at that time?

A. Nothing specific.

Q. Nothing specific that you remember, or there were no products in the pipeline – in the product development pipeline at the time?

MR. RODNEY: Object to form.

Page 160

THE WITNESS: So my role as a financial advisor, I was aware that they had R&D personnel and capabilities, but I wasn't privy to the specific development pipeline that they were working on at the time.

BY MR. BUCHMAN:

Q. But you knew there was a product development pipeline in existence, otherwise you wouldn't have referenced the product development pipeline, correct?

A. I believe there was a product development pipeline.

Q. And you don't recall as you sit here today what the e-vapor products were in that product development pipeline, do you, sir?

A. Correct.

Q. Okay. Thank you.

But Altria was developing new products in its product development pipeline at the time, correct?

MR. RUFFINO: Objection to form.

THE WITNESS: I actually don't know the status of their product

Page 161

development pipeline.

BY MR. BUCHMAN:

Q. In the e-vapor – strike that.

If Altria was developing products in the e-vapor product development pipeline, what products would they have competed with in the marketplace for e-vapor products?

MR. RUFFINO: Objection to form.

MR. BUCHMAN: Withdrawn.

BY MR. BUCHMAN:

Q. Mr. Wappler, with regard to the products, e-vapor products in the product development pipeline, would such products have competed against JUUL's product at the time?

MR. RUFFINO: Objection to form.

THE WITNESS: Can you say it one more time.

BY MR. BUCHMAN:

Q. Sure. Let me withdraw it.

If there were products in Altria's product development pipeline that were e-vapor products, would those products have competed against JUUL's e-vapor

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
**James Wappler on 11/05/2024**

Confidential

Page 162

products at the time?

A.   Yes.  If Altria were developing e-vapor products, those e-vapor products would have competed with JUUL.

Q.   Okay.

(Whereupon, Exhibit 248 is marked for identification.)

BY MR. BUCHMAN:

Q.   Mr. Wappler, I've had marked as PLX-248 what was previously marked as PX 1390 in your FTC deposition.  It's ALGAT – I'm sorry, ALGFTC00000726598 through 6601.

Would you please review the document and attachment – the email and attachment and let me know when you've had a chance to review it in its entirety.

(Pause for reading/reviewing.)

A.   Okay.

Q.   All right.  Focusing on the second email from the top going down, it's at 9:31:02 p.m.

You've seen this email before, because you were the author of the email on August 5, 2018, at 9:31:02 p.m.?

Page 163

A.   I'm sorry.  Where do you see the 9:31?

Q.   Right here, sir.

A.   Okay.  Yep.  Gotcha.

Q.   Are you with me?

A.   Yup.

Q.   Do you want to review it a little more before you answer questions?

A.   Ready to go.

Q.   Okay.  Let's do it.

So you authored this email on August 5, 2018, in your ordinary course of business at Perella, correct?

A.   Yes.

Q.   And you sent this email in the ordinary course of business to Messrs. Reale, Beard – Beard, Blaylock, Nussbaum, K- – Podolsky, Larson and Boffi and Ms. Kane?

A.   Yes.

Q.   And you sent it in the ordinary course of business at Perella?

A.   Yes.

Q.   And it was saved by Perella in the ordinary course of business?

Page 164

A.   Yes.

Q.   And the subject line is, "Draft script"?

A.   Yes.

Q.   And it says, "Attached please find a revised version for the group's review.  Thanks."

And there's a document that follows this email, which is 6600 through 6601.  It's marked "Confidential draft 8/5/18 Project Tree draft script for consideration."

Do you see that, sir?

A.   Yes.

Q.   Okay.  And did you draft the draft script for consideration?

A.   I think I drafted part of it. Based on the email chain, it looks like I collaborated with certain members of the Wachtel Lipton legal team on part of it as well.  I don't recall exactly which bullets are mine versus theirs.

Q.   And what was the purpose of the draft script for consideration?

A.   Again, there are so many starts

Page 165

and stops in this negotiation, I don't recall the specific tactical situation that Altria was in on August 5, 2018.

Q.   The 6600 references at the top "Thanks for sending the revised term sheet."

Do you see that, sir?

A.   Yep.

Q.   Okay.  This draft script for consideration was for Altria to consider sending to JUUL?

A.   I don't think Altria would send anything to JUUL.  This would be potential talking points that Altria could use in their next discussion with JUUL.  That's – that's how I would think about a script.

Q.   So the document references a revised term sheet and also uses the term "current term sheet."  Do you recall the term sheet at the time that this document references?

A.   I do not.

Q.   And if you go to the eighth section symbol or what's called a bullet point, it starts with, "If we establish

this partnership"?
A. Yes.
Q. This looks like JUUL saying to Altria, if we establish this partnership, then we expect that Altria will accelerate Jack's growth, contribute meaningful synergies, potentially -- oh, wait. Excuse me.
This document suggests that Altria is going to say, "If we establish this partnership, then we expect that Altria will accelerate Jack's growth, contribute meaningful synergies, potentially exit our own vapor business and cannibalize our own combustible business and then could potentially be forced to sell our stake in Jack to a third party at the valuation to the large degree a result of our various intrusions to Jack."
Did I read that correctly?
A. Yes.
Q. What's your understanding of that paragraph and why it's there?
A. I think it's -- and, again, I don't recall the specific context of this

script, but I believe it's demonstrating, you know, a range of terms that were provided that we thought would be in JUUL's favor that they would like to hear, and then also saying our concern, though, that if we provided those terms, they could sell our -- so Altria's stake to a third party, and that would disrupt Altria's business.
Q. Whose language was the "potentially exit our own business"? Was this Perella language or was that Altria language?
A. I don't recall.
Q. And by "own vapor business," we're talking about the e-vapor business at Altria?
A. That would be my assumption, yes.
Q. Okay. And the email that comes before this document is from Carmine Reale to other individuals and it says, "As discussed today, please see attached discussing points for Howard's call to Tree."
Do you see that?
A. Yes.

Q. Do you recall having any conversations with any of these individuals identified above, Mr. Reale, Mr. Willard, Mr. Garnick, Mr. Gifford or Mr. Crosthwaite, concerning the Project Tree script on August 5, 2018?
A. I do not recall speaking with them.
Q. Okay. Do you recall having any communications with anyone within Perella around this time period about the draft script other than the email communication below that you sent?
A. No, I do not.
Q. Okay. I'm finished with this document.
(Whereupon, Exhibit 249 is marked for identification.)
BY MR. BUCHMAN:
Q. Mr. Wappler, I've had marked as PLX-249 an email and an attached document. It's ALF -- I'm sorry -- ALGFTC00001062139 through 62153.
Please let me know when you've had an opportunity to review the document.

A. Okay.
Q. I'm just going to focus your attention on the middle of the page of the email, which is 62139. You've seen this document before, sir -- this email before, sir?
A. Yes.
Q. And you've seen this email before, because you're a recipient of this email from Karessa Kane on August 22, 2018, at 11:56 p.m.?
A. Yes.
Q. And you received this document in the ordinary course of business at Perella?
A. Yes.
Q. And Perella would have saved this document in the ordinary course of business, correct?
A. Correct.
Q. And the email that you received was -- had a subject line of "Forward: Term sheet issues list," correct?
A. Yes.
Q. And the email that you received would have had an attachment containing the

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
**James Wappler on 11/05/2024**

Confidential

Page 170

document that follows this email?

A. Yes.

Q. Okay. And the document that follows as – previously marked as PX 1496 was the email 001.

Do you see that in the lower right corner?

If we turn to PX 1496-003, also – it's an ALGFTC0001062141.

Do you see that?

A. Yes.

Q. Okay. So what is this document, this sideways document?

A. This appears to be an issues list related to one of the draft term sheets.

Q. Okay. And the document's titled "Project Tree term sheet issue list based on Jack draft of August 18, 2018," correct?

A. Correct.

Q. And then it says, "Topic Jack position in August 18 draft. Richard position, Jack position." Is that sort of an order that the document is taking?

I've never seen this before, so can you walk me through this and sort of

Page 171

educate me on how this is laid out?

A. I cannot. I'm having a hard time determining who has which position here based on this document.

Q. I'm glad I'm not alone.

A. Yeah.

Q. Okay. Humor aside, if you could turn to PX 1496-0037. It's also ALGFTC0001062145.

A. Got it.

Q. Okay. The heading in this document is, "Noncompete," correct?

A. Yes.

Q. In this portion of the document. Excuse me.

And would you just read into the correct – into the record each bullet point?

A. "Noncompete, noncompete is worldwide and binds Richard's upstream affiliates/acquirers." Next bullet. "Noncompete to be in United States and will bind Richard and its current and future subsidiaries but does not extend to upstream affiliates and acquirers."

Page 172

"Noncompete" – next bullet. "Noncompete applies to Richard and its, quote, 'controlled,' end quote, affiliates, i.e., downstream. And Jack accepts that it will be limited to U.S. In addition, if a controlling or commonly controlled exits, i.e., upstream or sister, then subject to the delivery by the controlling affiliate of an agreement to hold the business of Richard and Richard's controlled affiliates separate, Richard shall be provided a period of time to cause such controlling or commonly controlled affiliate to cease.

"If such competition does not timely cease, then Richard shall undergo a loss of rights similar to those in the exit right mechanism but will still be obligated to provide support services and Richard and its subs and remain subject to the noncompete."

Final bullet. "Please confirm that except as to MarkTen and MarkTen Elite, noncompete commences on signing."

Q. Okay. And this is paragraph 16 of the document?

Page 173

A. Yes.

Q. And just for the record to be clear, this paragraph insofar as it references a Richard, that's Altria, to your knowledge, correct, sir?

A. I believe that's right.

Q. Okay.

A. Yes.

Q. And –

A. Yes, it is.

Q. – Jack is JUUL, correct?

A. Yes.

Q. What is a noncompete, from your nonlegal understanding as a layperson?

MR. RODNEY: Object to form.

THE WITNESS: My definition of a noncompete would be one party would not compete with the other party in the space.

BY MR. BUCHMAN:

Q. Okay. And if you look at the fourth bullet point that you read into the record, "Please confirm that except as to MarkTen and MarkTen Elite, noncompete commences on signing," do you have any

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
**James Wappler on 11/05/2024**

Confidential

Page 174

understanding of what that references?

A. Again, this is not an area of the term sheet that I focused on; however, my interpretation of that would be that upon signing in this iteration of the term sheet, MarkTen and MarkTen Elite would not compete with JUUL.

Q. Well, it says here that the noncompete –

A. Except –

Q. – commences on signing –

A. Yes –

Q. – except as to –

A. – yes. You're right.

Q. – MarkTen and MarkTen Elite.
Do you have any understanding, as you sit here today, why MarkTen and MarkTen Elite were identified as being an exception?

A. I do not.

Q. Did Altria later withdraw the MarkTen and MarkTen Elite products from the market in 2018?

A. Yes, they did withdraw those products in 2018.

Page 175

Q. And if you look down at 17, again, I'm a little confused about this structure why it's 16 and then 17. 17 says, "Scope of Richard's R&D activities to be clarified."
Did I read that correctly?

A. Yes.

Q. And it seems to be that the scope of Richard's R&D means research and development, correct?

A. Yes.

Q. And Richard, again, is Altria?

A. Yes.

Q. So Altria's R&D activities need to be clarified to JUUL in connection with the noncompete in paragraph 16, correct?

A. That's my interpretation of this, yes.

Q. Okay. And then the second bullet point, "Agreed with understanding that Richard can't prepare to compete in advance of termination of noncompete."
Did I read that correctly?

A. Yes.

Q. And who's agreeing here with the

Page 176

understanding that Richard can't compete – can't prepare to compete in advance of termination of noncompete?

MR. RODNEY: Object to form.

THE WITNESS: I don't know who is agreeing to this.

BY MR. BUCHMAN:

Q. Well, who's the author of the document?

A. I don't know.

Q. Were you involved in any communications with anyone at Altria or JUUL concerning the preparation of the Project Tree term sheet issues list based on the Jack draft of August 18, 2018?

A. It would appear that I reviewed this issues list, but I don't recall preparing it or any part of it.

Q. Did you have any discussions with anyone within Perella regarding the noncompete contained in paragraph 16 and the additional comments in paragraph 17?

A. We were aware of the noncompete issue on the issues list, and we talked about it as an item on the issues list, but

Page 177

we were not focused on it.

Q. Okay. And did you have communications with anyone at Altria about paragraph 16 and paragraph 17?

A. I don't recall any specific conversations on this topic.

Q. Okay. And then if you turn to the next page of the document, the second bullet point at the top says, "Richard can accept Jack's proposal."
Did I read that correctly?

A. Yes.

Q. And Richard here is Altria?

A. Yes.

Q. And Jack, again, is JUUL, correct?

A. Yes.

Q. And then the next bullet point is, "Resolved."

A. Yes.

Q. The issue is resolved?

A. It appears to be, yes.

Q. Thank you. I have no further questions on this document.

///

Confidential

Page 178

(Whereupon, Exhibit 250 is marked for identification.)

BY MR. BUCHMAN:

Q. Mr. Wappler, I've had marked as PLX-250 –

A. Uh-huh.

Q. – a document that's Bates stamped – it's identified as Project Tree October 30, 2018. It's Bates stamped PWP_00008435 –

A. Uh-huh.

Q. – through 8438. So a three-page document. That's handwriting on the second page of the document, which I'm going to ask you about. And please let me know when you've had a chance to review the document in its entirety.

(Pause for reading/reviewing.)

A. Okay.

Q. So this exhibit, PLX-250 is entitled – is "Project Tree, October 30, 2018."

Does that date stand out in your mind for any reason concerning Project Tree?

Page 179

A. No, not at this time.

Q. Do you have any reason as to when the term sheet was signed between Altria and JUUL in connection with Project Tree?

A. I do not remember.

Q. Okay. If you could kindly turn to the second page, which is PWP_00008436.

Have you seen this page before?

A. It looks like my handwriting.

Q. Okay. And the top of the page looks like "Illustrative Scenario Analysis"?

A. Uh-huh.

Q. Then there are two other headings, "Strategic Alternatives" and looks like "Commentary/Implications to Tree"?

A. Yes.

Q. Okay. And would you please state for the record what you were trying to communicate here?

MR. BUCHMAN: And I know it's a compound question, Counsel.

BY MR. BUCHMAN:

Q. But why were you creating this

Page 180

flowchart?

MR. BUCHMAN: Objection?

MR. RODNEY: I'll object to form, since you set it up so nicely for me.

MR. BUCHMAN: Thank you.

THE WITNESS: I don't recall the specific circumstances related to this particular page; however, when I read the rest – or read the rest of the document, it appears this is designed to be a graphical representation of, you know, what could happen in certain circumstances if Altria were to pursue an Eagle transaction in the future.

BY MR. BUCHMAN:

Q. All right. This document, this page concerns a hypothetical if Altria were to pursue Project Eagle, and more specifically, the impact on PMI and Altria as a result of any existing noncompete agreement between Altria and JUUL, correct?

A. Yeah. I think that's a fair summary.

Q. Okay. So you had an understanding of the noncompete provision

Page 181

in order to prepare this document, correct?

A. Yes. It appears to be summarized on the following pages too.

Q. Okay. And could we just walk through this?

Could you just explain to the jury moving from left, top to bottom, each aspect of this flowchart and your thinking as you walk through the implications of the noncompete on PMI and Altria?

MR. RUFFINO: Objection to form.

THE WITNESS: I can –

BY MR. BUCHMAN:

Q. Let me withdraw the question. Sorry to interrupt your rhythm –

A. Okay.

Q. – but I want to avoid the objection.

Can you walk we through from left to right your thinking with regard to this flowchart?

A. Well, I can summarize what I – what I think was meant to be conveyed here. I don't recall writing this at the time, but obviously I did.

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
James Wappler on 11/05/2024

Page 182

So this is what I would describe as a decision tree or a flowchart of some sort. So the first sort of pathway is, okay, if the Tree transaction closes, if Altria were to pursue an investment in JUUL and then in the future no Eagle transaction occurs, so Altria remains kind of standalone, then there's nothing to talk about. All terms kind of would remain in place, and there's no implications on Eagle, by definition.

Q. May I stop you there –

A. Yes.

Q. – just – just to make sure the record's clear.

So at this stage, though, you're assuming that the Altria-JUUL deal goes through with a noncompete provision; am I correct, sir?

A. I don't recall the specific time frame of this, but this would seem to illustrate as if that transaction goes through with that term.

Q. "With that term" –

A. Yes.

Page 183

Q. – meaning the noncompete –

A. Yes –

Q. – correct?

A. – yes.

Q. Okay. Please proceed.

A. So if JUUL – if Altria pursued and closed the JUUL transaction and then subsequently Altria combined with Eagle, meaning PMI, then there would be two pathways: One pathway would be if PMI, the acquirer of Altria, that is, decides to compete with JUUL, then what it says is the combined PMI/Altria company would preserve existing relationship with JUUL. No change to the economic or governance terms would happen.

Q. I'm sorry. I didn't mean to cut you off, but the top box goes to the right first.

Could you walk us through that first and then down? Or have you already covered that first box?

A. I think I covered it – so if there's no Eagle transaction, status quo. No change to Tree, economic or governance

Page 184

terms so –

Q. Okay.

A. – then that's just the status quo.

Q. Then we're moving down to the box that says Eagle transaction, Altria combines with Eagle, meaning, Eagle-PMI around 2020?

A. Yes.

Q. Now if we could proceed from there, please.

A. Okay. So in the hypothetical scenario where Altria combines with PMI, which Altria's been calling Project Eagle, then there would be two options in this illustration.

Option 1 would be the combined Altria Eagle company decides to compete – sorry, decides not to compete with JUUL. If there is no decision to compete with JUUL, then the existing relationship with Tree would remain intact and there would be no change to the Tree economic or governance terms.

Q. Can I stop you there? I'm sorry.

Page 185

A. Yes.

Q. I just want to take this breakdown –

A. Yes.

Q. – box by box.

So we're at Eagle – we're at this Eagle decides not to compete with Tree, correct?

A. Yes.

Q. And then to the right it says, "Combined/Altria Eagle preserved existing relationship with Tree with no change to Tree or economic or governance terms." And Tree refers to JUUL, correct?

A. Correct.

Q. And the "no change to Tree economic or governance terms" refers to the provision that we saw earlier that the economics or governance terms would change with regard to Altria if Altria or one of its related companies was actually competing with JUUL after the transaction between JUUL and Altria?

MR. RODNEY: Object to the form.

///

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
**James Wappler on 11/05/2024**

Confidential

Page 186

BY MR. BUCHMAN:

Q. Are you following me, sir?

A. I think so. But I would have to re-review the specific language of that last term and think about how it translates to this. But, yes, my understanding of – there's no decision to compete, then nothing would change. That would make intuitive sense to me.

Q. Nothing would change between Altria and JUUL?

A. I think that's correct, yes.

Q. Okay. With regard to project Tree's provisions?

A. Yes.

Q. Okay. Thank you for making that clear.

Now if we could go down to the next box.

A. So the next box says if in this hypothetical scenario where Altria combines with PMI, which is called Project Eagle, and the combined company decides to compete with JUUL, so this is – that's the final scenario, and then it says Tree concerned

Page 187

about a competitor having significance influence rights.

And the next bullet says combined Altria-Eagle lose some governance rights but preserve economic ownership and equity method accounting, and then there's a few sub-bullets.

One is maintain 35 percent stake with preemptive rights. Vote steps down from 35 percent to 25 percent. Lose board seats. Obligated to provide support services for initial six-year term. And must vote in favor of change of control. Stake can get dragged along in sale, e.g., for example, BAT or JT could acquire Tree.

Q. And what was your understanding of your use of the word "stake can be dragged along in sale"?

A. My understanding of that at this point, based on what I remember, is that in this hypothetical scenario, if JUUL were to sell its entire company to, for example, British American Tobacco or Japan Tobacco, then Altria would be forced to sell – or the combined Altria-PMI company in this

Page 188

example would be forced to sell its 35 percent stake so that the strategic acquirer could acquire all of JUUL.

Q. Okay. I'm finished with that document. Thank you.

Let me follow up with that document. Did the proposals that you made on that page get reduced to a PowerPoint slide?

A. I don't remember.

Q. And whatever happened with Project Eagle as you referenced it in that page?

MR. RODNEY: Object to form.

THE WITNESS: Nothing. There was no combination with Project Eagle and that decision tree was never activated.

BY MR. BUCHMAN:

Q. Okay. And why was there no execution of the Project Eagle proposal?

MR. RODNEY: Object to form.

THE WITNESS: So I think we covered this briefly before, but in my opinion, there was a leak. The market reacted negatively to Altria's

Page 189

potential combination with PMI. PMI share price traded down, and it spooked PMI from completing the transaction.

MR. BUCHMAN: Okay. If we can go to the next doc. Thank you.

(Whereupon, Exhibit 251 is marked for identification.)

MR. RODNEY: Can we go off the record for just a moment

MR. BUCHMAN: Sure.

THE VIDEOGRAPHER: The time is 1:32 p.m.

We're going off the record.

(Whereupon, a recess was taken at 1:32 p.m.)

THE VIDEOGRAPHER: The time is 1:33 p.m.

We're back on the record.

BY MR. BUCHMAN:

Q. Mr. Wappler, I've had marked as PLX-251 a document Bates stamped in the lower right-hand corner PWP_00001273 through 12752.

It's entitled "Project Tree" dated December 2018, all market data as of

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
Confidential                     James Wappler on 11/05/2024

Page 190

December 18, 2018. And it's got the Perella Weinberg Partners logo in the bottom left-hand corner.

A.   Yes.

Q.   Would you please review it and let me know when you've had an opportunity to review it.

A.   I'm ready.

Q.   Okay. Have you seen this document before?

A.   Looks familiar, yes.

Q.   Okay. And it's familiar because it's a Perella Weinberg document?

A.   Yes.

Q.   And, to the best of your knowledge, did you have any involvement in the preparation or commenting on this document?

A.   Yes.

Q.   Okay. What portions of this document did you draft?

A.   This appears to be a kind of a summary document capturing the terms and valuation related to Project Tree. And I'm assuming I was heavily involved in the

Page 191

development of this document.

Q.   If you look at the first page of the document, in a box that says, "All market data as of December 18, 2018," what specifically is the market data that's being referenced there?

A.   It would appear from a valuation perspective we have certain exhibits and analyses related to trading multiples, market valuation.

In the context of a discounted cash flow analysis, there's interest rates and various financial market data that's current as of December 18, 2018.

Q.   Okay. On page 2 of the document, II is valuation summary, correct?

A.   Yes.

Q.   And throughout the document it uses the word "valuation"?

A.   Yes.

Q.   In our preparation for today's deposition, we have not seen any valuation conducted by either Perella or Altria concerning the value of the MarkTen or MarkTen Elite products in the fall of 2018,

Page 192

and specifically with regard to either divestiture or removing them from the market in December of 2018, as you've testified to.

Was any such valuation conducted by either Perella or Altria?

MR. RUFFINO:  Objection to form.

THE WITNESS:  I don't recall doing a formal valuation on MarkTen.

BY MR. BUCHMAN:

Q.   Or MarkTen Elite?

A.   Yeah, any member of the MarkTen family.

Q.   Or any of Altria e-vapor products existing at the time or in the pipeline?

A.   Correct.

MR. RODNEY:  Object to form.

BY MR. BUCHMAN:

Q.   And why was no valuation conducted at that time?

MR. RODNEY:  Object to form.

THE WITNESS:  My understanding is that they were unprofitable and had severe regulatory headwinds from an approval standpoint. And, in my

Page 193

opinion, there was no buyer for those assets.

MR. BUCHMAN:  Move to strike. Nonresponsive.

BY MR. BUCHMAN:

Q.   Mr. Wappler, why was there no valuation conducted at all?

A.   Because I think it would be de minimis. That's my view.

Q.   And what's your view based on?

A.   The fact that it's – the products were unprofitable, had severe regulatory headwinds and would be difficult to monetize.

Q.   But what documents did you rely on in reaching that – in reaching your conclusion?

A.   I think there was – in the Altria business plans that showed they were negative margin products. And I think they publicly disclosed that they were negative at one point.

Q.   Didn't Altria also say that the company was engaging in a cost-savings measure, and that was the reason why – I

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
Confidential                    James Wappler on 11/05/2024

Page 194

mean, there seems to be multiple statements made internally by Altria at the time, correct?

MR. RUFFINO: Objection to form.

MR. RODNEY: Objection.

THE WITNESS: Can you repeat the question?

BY MR. BUCHMAN:

Q. I'll withdraw the question.

So if you turn kindly to page PWP_000012727.

A. Okay.

Q. If you see the box that says, "Exclusivity exit rights"?

A. Yes.

Q. And the first bullet point says what, sir?

A. "Altria commits to conduct e-vapor operations exclusively through Tree for six years."

Q. Why was – do you have an understanding why it was six years?

A. I don't recall why six years was the agreed number.

Q. Well, why was there a limitation

Page 195

put on this as indicated in this first bullet point?

MR. RODNEY: Object to form.

THE WITNESS: What do you mean by "limitation"?

BY MR. BUCHMAN:

Q. A six-year limitation.

A. Oh, yeah, I don't recall the significance of the time period or the six years specifically.

Q. Well, how was that arrived at?

A. Through negotiations with JUUL.

Q. And who specifically negotiated those terms between Altria and JUUL –

MR. RODNEY: Object to the form.

BY MR. BUCHMAN:

Q. – to the best of your knowledge?

A. To the best of my knowledge, Altria management team as well as antitrust counsel.

Q. And who's antitrust counsel for Altria at the time?

A. I believe it was Wachtel, maybe another firm. I don't know.

Q. Okay. I'm finished with this

Page 196

document. Thank you.

(Whereupon, Exhibit 252 is marked for identification.)

BY MR. BUCHMAN:

Q. Mr. Wappler, I've had marked as PLX-252, it's a document Bates stamped PWP_00001147 through 1179.

A. Yes.

Q. Have you seen this document or a version of this document before?

A. This appears to be an Excel model that was used by the Perella Weinberg Partners team. I remember seeing the model, but I don't remember seeing a printout like this.

Q. And the value – the document is entitled, "Project Tree Valuation Draft As of Monday, November 19, 2018." Correct?

A. Yes.

Q. And if you turn the page, there are a category of items listed and a column below "FYE December"?

A. Yes.

Q. Okay. Where did all this information come from? Altria?

Page 197

A. Yes. And – and, again, I'm not familiar with this particular forecast, but in a situation like this, Altria would be providing to us, to "us" being Perella Weinberg Partners, their view on the forecast of JUUL. And we would have used that to develop a valuation of JUUL.

Q. So is this document a product of – a work product from Perella, or is this work product from Altria?

A. I would describe it as a collaboration. So oftentimes Perella is used to have fingers on the keyboard, so to speak, and bring a forecast to life with heavy input from Altria on the assumptions.

Q. Okay. What conclusions were reached based on this document?

A. I don't recall this particular version, but ultimately the model for Project Tree would have been used to drive valuation for the asset.

Q. Okay. I'm finished with this document.

Mr. Wappler, earlier today I believe you testified about analysts –

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
James Wappler on 11/05/2024

Confidential

Page 198

A. Yes.

Q. – we looked at some documents where analysts were referenced, correct?

A. Yes.

Q. And what's an analyst?

A. It is a research analyst, typically at some sort of financial institution that provides perspectives on publicly traded companies, whether they are good investments or bad investments, buy, sell, hold, target share price, so on and so forth.

Q. And do analysts try or tend to focus on particular industries?

A. Yes.

Q. Okay. And have you heard of AB Bernstein?

A. I have heard of it, yes.

Q. Okay. In December of 2018, who was AB Bernstein?

A. I believe it's just a research analyst firm.

Q. Okay. And was it a research analyst firm that was focusing on global tobacco and nicotine?

Page 199

A. Perhaps. I've heard of the firm, but I'm not familiar with that particular analyst.

Q. Okay. And, to your knowledge, was AB Bernstein focused on the Altria Group in connection with the global tobacco and nicotine business?

A. Perhaps. I don't recall that firm.

Q. Have you ever heard of an individual by the name of Elliot Callum or Callum? C-a-l-l-u-m.

A. The name does not resonate with me.

Q. Okay. Have you ever heard of an individual by the name of Garg? I'm going to butcher this Shreeya, S-h-r-e-e-y-a. And Garg is spelled – it's a first name, G-a-r-g.

A. That name does not resonate with me either.

Q. It would if you knew it, right –

A. Correct.

Q. – it's so unusual?

Okay. And then also Tony Chen,

Page 200

C-h-e-n?

A. No. It does not resonate.

Q. Okay. All right.

(Whereupon, Exhibit 253 is marked for identification.)

BY MR. BUCHMAN:

Q. Okay. I've handed you what's been marked as PLX-253, which is a document Bates stamped PWP_00004199 through 4254.

A. Uh-huh.

Q. Would you please review the document and let me know once you've had an opportunity to review it?

I will tell you that I'm going to endeavor to limit my questions to page 4200 if that helps.

A. Okay.

Q. But I invite you to look at the whole document if you feel the need to do so.

(Pause for reading/reviewing.)

A. Okay.

Q. Mr. Wappler, at the top of the document it says, "For the exclusive use of Tamara Howe at Altria Group Inc." And it's

Page 201

dated December 20, 2018.

Do you see that in that shading color?

A. Yes.

Q. And in December of 2018, who was Tamara Howe?

A. I do not know.

Q. Okay. At Perella, did Perella subscribe to analyst reports on the global tobacco and nicotine business?

A. Yes. I believe we had access to some but not likely all of the research available.

Q. What analysts did – analyst companies did Perella subscribe to in December of 2018 regarding the tobacco and nicotine business?

A. I don't remember the specific research firms. It kind of varies depending on which subscription is in place at a particular time.

Q. In connection with the Project Tree, did you review analyst reports in order to be informed or prepare documents in connection with Project Tree?

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**

Confidential

**James Wappler on 11/05/2024**

Page 202

A. Yes.

Q. What analyst reports did you generally look to for information about the tobacco and nicotine business at that time?

A. Yeah. So research from major money center banks: Goldman Sachs, Morgan Stanley, J.P. Morgan, Barclays, UBS, so on and so forth. AB Bernstein could have been one of those. I just don't recall.

Q. And this document has a Bates stamp of PWP at the bottom of it, but at the top it looks like it was an Altria Group subscription.

Did Altria share analyst reports with you that it received in connection with Project Tree?

A. It's possible. And, again, sometimes — we don't have every single research report available, and we don't get them on a realtime basis.

So it's somewhat common, for example, someone in IR at a client, investor relations at a client to send PWP a research report realtime if they feel it's relevant. I don't know if that's what

Page 203

happened here, but that could have been what happened here.

Q. And people rely on industry — sorry.

People look to and rely on analyst reports from time to time in business, in general, correct?

A. Yes.

Q. And in connection with the tobacco and nicotine market, people look to and relied on analyst reports from time to time, correct?

A. Correct.

Q. And there's a perception in the nicotine and tobacco industry that analyst reports offer some value, correct?

A. Yes.

Q. And they offer value because they provide views and information, correct?

A. Yes.

Q. And people pay money for those analyst reports in order to access that information, correct?

A. Correct.

Q. And in this document, in the

Page 204

middle of the top portion of the page, it says, "$60 U.S."?

A. Yes.

Q. So that looks like it's $60 that it would cost for this version of the subscription to this document, correct?

A. Incorrect.

Q. Okay.

A. My interpretation of that is that is a target share price for Altria's equity.

So what they are saying is no, which is the Altria ticker in their judgment should trade at $60 U.S.

Q. Right. So if we turn to the next page and it says deals — I'm sorry. "Details, deal terms and financials," right?

A. Uh-huh.

Q. And the second paragraph, if you would read into the record, please, the entire second paragraph.

A. "The deal could be subject to scrutiny from the FTC/DOJ with respect to antitrust concerns given that Altria

Page 205

recently discontinued its MarkTen/Green Smoke vaping products, parenthetical, a precursor to this move by JUUL? There is unlikely to be concern at a vaping level. But concerns could arise if the FTC concludes that vaping products are in direct competition with cigarettes and defines, quote, 'the market,' end quote, as cigarettes plus vaping products combined rather than just vaping products.

"Having worked in regulatory consulting for a number of years, our high-level view is that cigarettes are likely to be considered more of a, quote, 'distant,' end quote, substitute to vaping and, therefore, not form part of the market definition; however, there's clearly a degree of uncertainty here."

Q. Have you ever heard this portion of this report or this sort of view in another analyst's report in or around 2018?

A. I don't recall that particular concept.

Q. Have you ever — have you ever had any communications with Altria about

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
Confidential  James Wappler on 11/05/2024

Page 206

this particular paragraph or this particular report?

A. I don't recall having a discussion with them on this.

Q. Have you ever had communications with anyone at Altria about withdrawing the MarkTen Green Smoke vaping products from the market prior to consummating the deal with JUUL in order – period?

A. I was aware that they discontinued the products, but I was not part of that decision process.

Q. When did you first become aware that the MarkTen and Green Smoke products had been withdrawn – were going to be withdrawn from the market?

A. I don't recall when I was informed of that. I think the decision was publicly made in early December 2018.

Q. My question to you, sir, is: Before the product – before the MarkTen and Green Smoke products were removed from the market, did you have any communications with anyone at Altria about their removal?

In other words, did you have

Page 207

prior knowledge of the removing of the products before the removal?

A. I think I was made aware of the plan to discontinue them, but I don't recall when I was made aware or under what circumstances. It could have been the day before, for example, of the public announcement.

Q. Okay. And how would you have become aware?

MR. RUFFINO: Objection to form.

THE WITNESS: I don't remember.

BY MR. BUCHMAN:

Q. Was it in writing?

MR. RUFFINO: Objection to form.

THE WITNESS: I don't remember.

BY MR. BUCHMAN:

Q. Do you recall who?

A. No.

Q. Do you recall who told you? Excuse me.

A. No. And to be clear, I'm not even sure I was made aware. But this is the type of thing where I likely would have been made aware.

Page 208

Q. Have you ever had any communications with anyone concerning Altria discontinuing MarkTen and Green Smoke vaping products from the U.S. market as a precursor to the Project Tree deal?

A. No, I don't recall having that conversation with anybody.

Q. Well, when you – I believe you testified that you learned of the MarkTen and Green Smoke products being removed from the market prior to their removal, correct?

MR. RODNEY: Object to form.

BY MR. BUCHMAN:

Q. Am I recalling your testimony correctly?

A. I believe I was – let me make sure we're clear.

I believe I was made aware of their decision to remove the products before it was publicly announced, but I'm not sure when or how or who.

MR. BUCHMAN: Why don't we take a quick break.

///

///

Page 209

THE VIDEOGRAPHER: The time is 1:56 p.m.

We are going off the record.

(Whereupon, a recess was taken at 1:56 p.m.)

THE VIDEOGRAPHER: The time is 2:02 p.m.

We're back on the record.

BY MR. BUCHMAN:

Q. So, Mr. Wappler, with regard to the document that's before you we were just talking about before the break, it indicates that there was a perception by at least one analyst that the discontinuation by Altria that MarkTen and Green Smoke vaping products was a precursor to the move or the Project Tree deal with JUUL, correct?

MR. RODNEY: Object to form.

THE WITNESS: Yes.

BY MR. BUCHMAN:

Q. Okay. And are you aware as you sit here today whether any other analyst had a similar view to AB Bernstein's view in the details of the second paragraph of

Confidential

Page 210

this document?

MR. RODNEY: Object to form.

THE WITNESS: I'm not aware of any other analyst. I don't recall that being a key area of focus for analysts.

BY MR. BUCHMAN:

Q. Okay. If we could just move back, please, to Exhibit 248, PLX-248.

A. Okay.

Q. Okay. Do you need a second to review the – I can tell you what provision –

A. Yeah, go ahead.

Q. – I'm going to ask you about. It's the last bullet point of the page and it carries over to the top of the next page.

A. Okay. So you're saying "Agreeing to a minority stake"?

Q. It's right here, the second document, "Project Tree –

A. Yeah.

Q. – "draft script –

A. Okay.

Q. – "for consideration." And it

Page 211

starts off with, "I think you'll agree."

Do you see that?

A. Yes.

Q. Okay.

A. All right.

Q. That last bullet point says, "I think you'll agree that Altria has come a long way to accommodate you in this process, including: Meeting your requested valuation of 28 billion (12.6 billion for 45 percent, U.S. only, with Altria's operational support commencing immediately upon closing) agreeing to a minority stake instead of a controlling position demonstrating," then the next bullet point at the top of the page in brackets, "Demonstrating flexibility with our existing vapor business if necessary in order to form the partnership."

Did I read that correctly?

A. Yes.

Q. Okay. Did you draft that portion of this script?

A. I don't recall.

Q. Do you know who did draft this

Page 212

portion of the script?

A. I do not.

Q. Do you have any reason – strike that.

Do you have any understanding, as you sit here today, why the bullet point has a bracket before the word "demonstrating" and why there's a bracket after the word "partnership" on the first bullet point on page 726601?

A. No.

Q. Is it possible that that bracket was in there to indicate that maybe we shouldn't include in this the draft script and we should have conversation about this and removing it before it's actually sent?

MR. RODNEY: Object to form.

THE WITNESS: It's possible.

BY MR. BUCHMAN:

Q. Do you recall having any communications with anyone within Altria concerning Altria's flexibility with its existing vapor business in order to form the partnership with JUUL?

A. I don't recall being focused on

Page 213

that, no.

Q. Do you have any recollection of any communication with anyone within Perella concerning Altria demonstrating flexibility with its existing vapor business if necessary in order to form a partnership with JUUL –

A. No.

Q. – at this time?

A. Correct. No.

(Whereupon, Exhibit 254 is marked for identification.)

BY MR. BUCHMAN:

Q. Mr. Wappler, I've had marked as PLX-254 a document Bates stamped PWP_00010521 through 524. I realize it's 2:00 p.m., and to move this along, if you could focus your review on the first two paragraphs on the first page and the section Roman numeral V JUUL on 523, those are primarily what I will focus on.

But please do feel free to review the entire document if you feel the need to.

(Pause for reading/reviewing.)

IN RE: JUUL LABS, INC. ANTITRUST LITIGATION
James Wappler on 11/05/2024

Confidential

Page 214

A. Okay.

Q. Okay. Have you seen this document before or a version of this document?

A. It looks familiar to me, but I don't recall the specific context around it.

Q. Okay. And at the top of the document it says, "Potential CAGNY outline," correct?

A. Yes.

Q. Do you have an understanding of what CAGNY refers to?

A. Yes. CAGNY, it's a research analyst conference in New York for consumer companies that Altria participates in.

Q. And it says, "Highly preliminary draft for discussion purposes," correct?

A. Correct.

Q. Okay. And do you recall around when this document was created?

A. I don't recall; however, CAGNY I believe is typically in February. So it was probably in early 2019, based on reading this.

Page 215

Q. And it says, "Highly preliminary draft for discussion purposes." Discussion purposes between whom?

A. Again, I don't recall the context around this particular document.

Q. Would this document preliminary draft have been for discussion purposes internally within Perella?

A. Could be.

Q. Okay. And the objective that's identified in the first full paragraph says, "Outline Altria's focus on long-term sustainable growth; explain the quote, 'journey,' closed quote, Altria went on in 2018. Discuss how Altria still has a lot of work to do but is very excited about the future; orient analysts and shareholders on the long-term strategy benefits of Cronos and JUUL."

Did I read that correctly?

A. Yes.

Q. What is your understanding of this paragraph as you sit here today?

A. Altria had not been very dynamic on the M&A front in the years leading up to

Page 216

this. They made two investments that were meaningful in 2018; one was cannabis investment in Cronus, the other was an e-vapor investment in JUUL.

And they also had a new CEO at the time, a relatively new CEO, Howard. So I think my reference – or the reference here to journey is this is a bit of a shift versus where they had been historically. And they were transitioning into sort of a future – future state of the company.

Q. Okay. And do you have any recollection of drafting that first paragraph in this document?

A. I don't recall doing it, but it looks like something I could have written.

Q. You use the term "journey" from time to time –

A. Yes. Correct.

Q. Okay. And the tone section, did you draft this as well?

A. Perhaps.

Q. Okay. And what's meant to be recorded in this paragraph on tone?

A. Again, I don't recall all the

Page 217

specific context, but given the shift in kind of overall M&A strategy as well as kind of forward thinking that Altria was exhibiting with these investments, the plan or hope here would be to say, hey, we are going to explain to analytics at this conference our overall thinking with not just the terms, but the logic behind it.

Q. You said in your last answer "we're going to explain." Who is the "we" you're referring to?

A. If this is a potential script or talking points or inspiration or something like that for CAGNY, this would be for the management of Altria.

Q. So someone at Altria was going to make a presentation to CAGNY?

A. Presumably, yes.

Q. Okay. And if you could turn to P – by the way, let me withdraw that for a second.

The document – is this a final version of the – it says it's a preliminary draft. Were there later drafts of this document, to your knowledge?

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
**James Wappler on 11/05/2024**

Page 218

A. Not to my knowledge. I don't know.

Q. Okay. If you could kindly turn to PWP_000010523, Roman numeral V JUUL.
Do you see that, sir?

A. Yes.

Q. Okay. And if you move down to (f).
Do you see that?

A. Yes.

Q. And it says, "Conducted in-depth evaluation of our internal capabilities in competitor's strategies in the e-vapor space"?

A. Yes.

Q. Did I read that correctly?

A. Yes.

Q. Who conducted the in-depth valuation? Was it Altria or Perella or both of you? And I know it's compound.

MR. RODNEY: Object to form.

MR. BUCHMAN: Duly noted.

THE WITNESS: Again, in the context of this document, I believe this is designed to inspire potential

Page 219

talking points or scripts for this -- this conference. And so this is describing Altria's evaluation of its own internal capabilities and the competitors in the e-vapor space.

BY MR. BUCHMAN:

Q. Have you ever seen the in-depth evaluation that's represented in paragraph (f)?

A. No. Not an in-depth evaluation.

Q. Have you ever seen an in-depth evaluation of Altria's internal capabilities and Altria's competitor's strategies in the e-vapor space conducted by Altria?

A. No.

Q. Has Perella ever conducted an in-depth evaluation of Altria's internal capabilities and Altria's competitor's strategies in the e-vapor space?

A. No.

Q. Okay. I'm finished with this document.

MR. RUFFINO: Going back to 254?

MR. BUCHMAN: We may.

Page 220

(Whereupon, Exhibit 255 is marked for identification.)

MR. RUFFINO: Are we marking the email and the attachment as a single exhibit?

MR. BUCHMAN: I believe we are, PLX-255.

MR. RUFFINO: Thank you.

MR. BUCHMAN: The metadata suggests they were connected.

BY MR. BUCHMAN:

Q. Okay.

A. Okay.

Q. Had a chance to review?

A. Yes.

Q. So we've marked as Exhibit PLX-255 a single page email PWP_00012061 and an attachment to the email PWP_00012062.
Have you had a chance to review these two documents?

A. Yes.

Q. Okay. And the email is an email from Bryan Blaylock on December 11, 2018, which you received in the ordinary course

Page 221

of business at Perella, correct?

A. Correct.

Q. And other PWP partners receive the email as well?

A. Yes.

Q. This is the type of document that Perella would have saved in the ordinary course of business, correct?

A. Yes.

Q. The subject of the document is "BOD Presentations," correct?

A. Correct.

Q. BOD meaning board of directors? This is another board of directors presentation?

A. Yes.

Q. Similar to the one that we saw earlier today, correct?

A. Correct.

Q. And the attachment, there is an attachment to the document, "Discussion materials - Eagle BOD 12.1," correct?

A. Yes.

Q. Okay. And would 12.1 mean December of a particular year?

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
James Wappler on 11/05/2024

Confidential

Page 222

A.  I think they mean 12.11 so December 11 would be my interpretation.

Q.  Okay.  But December 11, but it doesn't identify a year, but you would assume it's 2018 –

A.  Correct.

Q.  – given that it's a 2018 email, correct?

A.  Yes.

Q.  Okay.  So if you turn to the next document, it's entitled "Project Eagle December 2018."  There's an Altria Clients Services logo in the bottom left-hand corner.  It's PWP_00012062, and the PowerPoint is through 12079, correct?

A.  Yes.

Q.  And the email attachment identifies discussion materials, it identifies Project Eagle and Project Tree as well.  The first page says "Project Eagle," correct?

A.  Yes.

Q.  And that's the same Project Eagle we were talking about earlier with PMI?

A.  Yes.

Page 223

Q.  And if you turn to page 6.

A.  Yes.

Q.  It references at the top, "Since the announcement of BAT - RAI, we have continually assessed PMI's interest in an MO combination."

A.  Yes.

Q.  And MO is what?

A.  It's Altria's ticker symbol.

Q.  Okay.  And what's being conveyed on this page of the document?

A.  It appears that there are some benefits and some considerations.  So pluses and minuses, if you will, on PMI's potential combination with Altria.  I can expand on that if you would like.

Q.  Nope.  That's fine for now.

Okay.  I'm finished with that document.

(Whereupon, Exhibit 256 is marked for identification.)

BY MR. BUCHMAN:

Q.  Mr. Wappler, I've had marked PLX-256 a document previously marked as PX 3188 in the FTC deposition,

Page 224

PWP_00019923.

Please review the document and let me know when you've had a chance to review it.

(Pause for reading/reviewing.)

MR. RODNEY:  While he's looking at the document, I notice our copies don't have the FTC – that's – that's our current exhibit.  I thought you had an FTC exhibit marker on there.  Never mind.

MR. BUCHMAN:  PX 3188, you don't have that.

MR. RODNEY:  I don't have it.

MR. RUFFINO:  It's not on mine.

MR. RODNEY:  We don't have it.  It's not – it's not a big deal.

(Simultaneous unreportable crosstalk occurs among parties regarding document numbering.)

MS. SEIRAFI:  It's just one has – I can print – I can print it –

MR. BUCHMAN:  We'll supplement the record at the end of the deposition so everybody has it.  And we'll email

Page 225

you a copy, if need be.  Sorry about that.

MR. RODNEY:  No worries.  I'm sorry.  What's the PX exhibit number?

MR. BUCHMAN:  PLX-256, PX 3188.  PWP_00019923.  Single-page email.

MR. RODNEY:  Okay.

THE WITNESS:  And I'm ready when you are.

BY MR. BUCHMAN:

Q.  Thank you, sir.

You've seen this document before, correct?

A.  Yes.

Q.  You've seen this document because you sent this email to Christopher Boffi, Dave Bailey and Abigail Shepard on February 25, 2019, correct?

A.  Yes.

Q.  And when you sent this, you sent it in the ordinary course of business at Perella?

A.  Yes.

Q.  Is this the type of document that Perella would save in the ordinary course

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
James Wappler on 11/05/2024

Confidential

Page 226

of business?

A. Yes.

Q. And the subject of the document is Eagle?

A. Yes.

Q. And Eagle references the same Project Eagle with regard to PMI, correct?

A. Yes.

Q. Okay. And it says, "Here is my list of key prep items prior to Eagle meeting. Please let me know if you have — if you have any thoughts/suggestions."
Did I read that correctly?

A. Yes.

Q. Okay. At this time in February of 2019, was there an Eagle meeting with PMI scheduled?

A. I don't remember the specific dates and time frames of the potential Eagle meetings, but I do recall there being preliminary discussions with Eagle regarding a potential transaction around this time.

Q. Okay. And this was preliminary, because it's typical when you have

Page 227

discussions that you require the other side and the other side requires of you to enter into a nondisclosure agreement, correct?

A. That's one of the key elements, yes.

Q. Correct. So paragraph 2 says, "Confirm if NDA already in place. If not, when signed," correct?

A. Correct.

Q. I read that correctly?
So based on that, you would assume there was no NDA presently in place with PMI and that this was the early stages and an NDA needed to be signed before the parties can proceed further with discussions —

A. Correct.

Q. — protected conversations with one another, correct?

A. Yes.

Q. Okay. And then if you look down at the fifth section, it says, "Antitrust considerations (just MESH any other areas?)"
Do you see that, sir?

Page 228

A. Yes.

Q. Did I read that correctly?

A. No.

Q. No? What did I —

A. I'm sorry. Yes, you did.

Q. I'm sorry. I'm rifle shotting the questions trying to get you out of here fast.
"Antitrust considerations" references what, sir?

A. Potential challenges by the FTC, for example, on anticompetitive terms of a transaction.

Q. Was MESH a consideration or a concern? Let me break it down.
At the time in February of 2019 with regard to Section 5 antitrust considerations, was MESH a consideration at the time?

A. Yes. It was a consideration.

Q. Okay. Why was it a consideration?

A. From my viewpoint, there was a separation between Altria and PMI years prior to this. So they operated in —

Page 229

operated in distinct geographies. And they already had a distribution agreement on heat-not-burn.
And the only other product category that I could think of that was potentially overlapping was e-vapor. And PMI, to the best of my knowledge, had an e-vapor product called MESH.
And at this time Altria had an investment in JUUL, so that would be the only product overlap globally.

Q. And what is MESH that you are referring to here?

A. PMI's e-vapor product.

Q. Earlier we looked at and we discussed an exhibit that consisted of a flowchart that you hand created, correct?

A. Yes.

Q. Okay. Does that hand-created flowchart reflect the considerations that are being referenced in paragraph 5 of this document, or are they similar?

MR. RUFFINO: Objection to form.

MR. BUCHMAN: I'll break it down. I'm sorry. I'm trying to get you out

Confidential

Page 230

of here.

BY MR. BUCHMAN:

Q. Paragraph 5 represents – reflects antitrust considerations, correct?

A. Yes.

Q. Okay. Earlier today you saw a flowchart?

A. Yes.

Q. And you hand created that flowchart?

A. Yes.

Q. And in that flowchart it referenced Project Eagle?

A. Yes.

Q. Okay. Is this the same Project Eagle that's referenced in that flowchart?

A. Yes.

Q. And is the consideration with respect to MESH something that was part of your outline of that flowchart?

A. Yes.

Q. Okay. And why?

A. Because we did not know PMI's level of excitement, optimism on MESH versus JUUL or anything about their e-vapor

Page 231

strategy. So this was the only area where we could see there would be potential antitrust concerns or considerations in a PMI-Altria merger.

Q. And then it says, "Any other areas."

What other areas are reflected here that you were thinking about in February – on February 25, 2019, as referenced in that parenthetical?

A. So this is my email to my internal Perella team, and I'm asking them, because I could not think of any other areas. So any other areas, question mark.

Q. So did you have any other discussions with Mr. Boffi about Section 5 of your email after you sent it to him on February 25, 2019?

A. I don't recall specific discussions with him.

Q. Did you have any conversations with Mr. Bailey about Section 5 of your email sent on February 25, 2019, after you sent it?

A. I don't recall specific

Page 232

discussions with Mr. Bailey.

Q. Same questions with regard to Ms. Shepard?

A. No.

Q. Okay. I'm finished with this document.

(Whereupon, Exhibit 257 is marked for identification.)

MR. RODNEY: I'm just going to note this one also has an FTC sticker on it that we don't have, maybe – we'll review all the exhibits to make sure we have the same exhibit.

MR. BUCHMAN: Thank you.

MR. RODNEY: Thank you.

THE WITNESS: I'm ready.

BY MR. BUCHMAN:

Q. Have you seen this document before?

A. Yes.

Q. And you've seen this document before, because you sent it to Mr. Weinberg on October 30, 2018, correct?

A. Correct.

Q. And you sent it in the ordinary

Page 233

course of business at Perella?

A. Yes.

Q. And Perella would have saved this as part of the ordinary course of business at Perella, correct?

A. Yes.

Q. And the subject is, "Two updates," correct?

A. Yes.

Q. The first paragraph says, "We spent two hours at Wachtel office yesterday and signed the JUUL term sheet at 8:00 p.m. last night."

Did I read that correctly?

A. Yes.

Q. And earlier today I asked you if you recalled when the JUUL term sheet was signed.

Do you recall that?

A. I remember you asking the question, yes.

Q. And you were unable to answer the question.

Does this document refresh your recollection that the term sheet was signed

Confidential

Page 234

around October 29 of 2018?

A. Yes.

Q. Okay. As you sit here today, do you have any -- strike that.

When the document was signed on October 29, were you physically present at Wachtel's office?

A. I think I was, but I don't recall specifically where I was or what room we were in.

Q. As you sit here today, do you have any recollection of the signing of the term sheet concerning Project Tree between JUUL and Altria on October 29, 2018?

A. I remember being at Wachtel's office and agreeing on a term sheet. I don't recall the specific signing of it.

Q. And who was there that day?

A. I don't recall everyone with perfect clarity, but I believe it was Howard, Willard, Billy Gifford, K.C. Crosthwaite, Murray Garnick, myself, outside counsel from Wachtel. There may have been other folks there.

Q. And as you sit here today, do you

Page 235

have any recollection of the noncompete provision being discussed on October 29 prior to the signing of the term sheet?

A. I don't recall it being a specific discussion point.

Q. Okay. Do you recall anything else about the signing of the term sheet that day and Wachtel's office?

A. No.

Q. Okay.

(Whereupon, Exhibit 258 is marked for identification.)

BY MR. BUCHMAN:

Q. You have what's been marked as PLX-258, which begins with an email of PX 2132-001 through -- and that's an email through PX 2132-017. Please let me know when you've had a chance to review this document.

(Pause for reading/reviewing.)

A. Okay.

Q. Okay. The document PLX- -- I'm sorry, PX 2132-002, it says at the top "Summary of terms for potential transaction Richard." And the email suggests this is

Page 236

the final term sheet.

Does this look like the final term sheet?

A. It's hard for me to say for certain, but this is dated December 15, 2018, so it's probably nearly final if it's not final.

Q. Okay. I'm finished with this document.

(Whereupon, Exhibit 259 is marked for identification.)

BY MR. BUCHMAN:

Q. I've handed you what's been marked as PLX-259. It's PWP_00042985 through 986.

A. Uh-huh.

Q. It was previously marked PX 3196.

(Pause for reading/reviewing.)

A. Okay.

Q. Okay. You've seen this email before, correct?

A. Yes.

Q. You've seen this email before because of the top email you sent on August 27, 2018, to Peter Weinberg?

Page 237

A. Yes.

Q. And you received an email from Mr. Weinberg on Sunday, August 26, 2018, at 4:07 p.m. prior to you sending the earlier -- the one that's referenced on the top?

A. Yes.

Q. And before that, you sent an email it looks like to him at 11:10 -- I'm sorry, at 10:11 on August 26, 2018, correct?

A. Yes.

Q. And earlier you testified that there were stops and starts -- or starts and stops in the negotiations between Altria and JUUL concerning Project Tree, correct?

A. Correct.

Q. And can you describe for me these emails and your communications with Mr. Weinberg?

A. I don't remember all of the details around this particular time frame, but this appears to be an email from me indicating that there was at least some

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
James Wappler on 11/05/2024

Page 238

momentum on August 26 about a potential transaction. And it looks like JUUL wants – or wanted to meet with Altria on Monday in New York City.

I flagged that for Peter Weinberg, and then I – he said he could not attend the meeting, so it was just me there from Perella.

And then the next day on Monday, August 27, kind of mid-afternoon, it looks like 3:37 p.m., I notified Peter that Altria and JUUL were unable to find a pathway forward and each side flew home. And, you know, we'll see what happens next.

Q. And down below in the one, two, three – third paragraph down in the email you sent to Mr. Weinberg at 10:11 a.m., it says, "The board doesn't want us to have a sign and close."

Did I read that correctly?

A. "A simultaneous sign and close," yes.

Q. Did I miss "simultaneous"? I'm sorry.

"The board does not want us to

Page 239

have a simultaneous sign and close," correct?

A. Yes.

Q. And the board being referenced there is who?

A. The Altria board of directors.

Q. And why didn't Altria board of directors want to have a simultaneous sign and close?

A. They viewed it as highly unusual and not in line with market precedent for an M&A transaction like this.

Q. Okay. And the next sentence says, "They want us to wait for antitrust approval prior to cutting – cutting the 12.6 bn check," correct?

A. Yes.

Q. And in the top email above at 15:37:08 you say, "Bad news on the meeting today. The Tree side just couldn't get their heads around this antitrust issue."

A. Yes.

Q. Is the section below that I just read about the sign and close and getting approval – antitrust approval prior to

Page 240

cutting the 12.6 billion check the antitrust issue you are referencing in that top paragraph?

A. I believe that's right.

Q. Okay. Is there any other antitrust issue that was being discussed at the time – at the time?

A. Not that I recall.

Q. Okay. I'm finished with this document.

(Whereupon, Exhibit 260 is marked for identification.)

BY MR. BUCHMAN:

Q. Mr. Wappler, I've had marked as PLX-260 a document entitled, "Relationship By and Among JUUL Labs Inc., Altria Group, Inc. and Altria Enterprises LLC" dated as of December 20, 2018. It bears a PWP_00014494. Bates stamp on the last page is PWP_00014557.

I'm not asking you to review this document in its entirety. Have you, obviously, seen this document before?

A. Yes.

Q. And what is this document?

Page 241

A. It is a relationship agreement between JUUL and Altria. It looks like the final version, December 20, 2018.

Q. And if you turn to page PWP_00014555.

A. Okay.

Q. Please let me know when you're there.

A. Yep.

Q. Okay. At the back of this document there's a heading Altria Group Inc., and there's a signature from a William F. Gifford Jr., correct?

A. Correct.

Q. And at the time he was the chief – I'm sorry – the vice chairman and chief financial officer?

A. Yes.

Q. And there's a reference to an investor sub Altria Enterprises LLC?

A. Yes.

Q. And there's a name David A. Wise, vice president and treasurer, correct?

A. Correct.

Q. And both individuals appear to

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
Confidential                                James Wappler on 11/05/2024

Page 242

have signed the document on behalf of Altria and the investor sub Altria Enterprises LLC, correct?

A. Correct.

Q. Okay. And on the page before that, there's a reference to the company JUUL Labs Inc., there's a reference to Kevin Burns and a signature there, correct?

A. Yes.

Q. And at the time, Kevin Burns was the chief executive officer of JUUL Labs Inc.?

A. Yes.

Q. And do you believe this is the final version of the relationship agreement between JUUL and Altria?

A. I do, yes.

Q. Okay. And if you turn to page 21 of the document but PWP_00014518 –

A. Yes.

Q. – you'll see a reference to "Article 3, Noncompete." Have you read this article before?

A. I believe I have, yes.

Q. Okay. When did you first read

Page 243

this article? Was it before the document was signed or after?

A. I was provided with a version before the document was signed.

Q. Okay. How soon in advance before –

A. I don't recall the –

Q. – December 20, 2018, did you receive a version of this document or a draft?

A. I don't recall all the specifics, but I probably received several drafts leading up to that date.

Q. Okay. And when you received drafts of this document, specifically with regard to the direct noncompete and the indirect noncompete as referenced on page 23, which is 00014520, do you recall making any comments or having any input with regard to these two sections, 3.1 and 3.2?

A. I do not.

Q. Do you recall whether anyone at Perella had any input with regard to Section 3.1, direct noncompete, or

Page 244

Section 3.2, indirect noncompete?

A. No.

Q. "No," you don't recall or, "no," nobody at Perella –

A. I do not recall.

Q. – had any input?

A. I don't recall anyone at Perella being involved in the noncompete terms.

Q. Okay. Prior to the execution of this document, did you have any communications with anyone regarding Section 3.1 of the noncompete contained in Article 3?

A. I do not recall having communications with anyone on this term.

Q. Same question with regard to 3.2. Do you recall having any communications with anyone concerning Section 3.2, indirect noncompete, prior to this document being executed?

A. I do not.

Q. As you sit here today, in December of 2018 – well, withdrawn.

MR. BUCHMAN: I have just a few more documents to go through. We are

Page 245

nearing the end. If you want to take a break now, or we can power through this.

THE WITNESS: Let's power through, from my perspective.

MR. BUCHMAN: Okay.

THE WITNESS: But let me know if others need to take a break.

MR. RODNEY: Power through is good for me. I'm going to have a very small number of questions. Maybe we can take a small break before.

MR. BUCHMAN: Okay.

MR. RUFFINO: Jessie, are you okay to continue?

THE STENOGRAPHER: If we read Bates numbers slower, yes.

MR. BUCHMAN: My apologies. I'm sorry. I'm trying to get this done.

(Whereupon, Exhibit 261 is marked for identification.)

BY MR. BUCHMAN:

Q. Okay. I've handed you what's been handed as PLX-261, which is an email on PX 3163 or PWP_00007043, and then a

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
Confidential                James Wappler on 11/05/2024

Page 246

document that follows it marked PWP_00007044, PX 3163-002, and the last page is PWP_00007062, PX 3163-020. This was previously marked as PX 3163 in the FTC deposition.

Have you seen this document before, besides the deposition?

A. Yes. I think we already reviewed this one today.

Q. Okay. This is a Wappler email dated January 18, 2018. You think we've seen this one before?

A. Yes.

Q. Okay. Then we don't –

MR. RODNEY: PLX-[indiscernible].

THE STENOGRAPHER: Excuse me. Could you repeat that number?

MR. RODNEY: 240.

BY MR. BUCHMAN:

Q. All right. PLX-262. Actually, take this one. We've seen this one before.

So this one's going to be 262.

(Whereupon, Exhibit 262 is marked for identification.)

Page 247

BY MR. BUCHMAN:

Q. And this is marked PX 1622-001 through 003. Have you seen this document before?

A. Yes.

Q. You've seen this document before, because you authored the doc – the email and sent it to Kevin Crosthwaite, Carmine Reale, David Wise and Bryan Blaylock on September 12, 2018?

A. Yes.

Q. You sent it in the ordinary course of business at Perella?

A. Yes.

Q. And Perella saved the document in the ordinary course of business?

A. Yes.

Q. And the document subject is "Market reaction," and there's an attachment. The subject is "Market reaction," correct?

A. Yes.

Q. And there's an attachment of "September 12 FDA update analysis," correct?

Page 248

A. Yes.

Q. And there's a two-page PowerPoint presentation in color attached to the email?

A. Yes.

Q. Okay. I'm finished with this document.

(Whereupon, Exhibit 263 is marked for identification.)

BY MR. BUCHMAN:

Q. I had marked as PLX-263 a two-page document, PX 3179-001 through 002. It was previously marked PX 3179.

Have you seen this document before?

A. Yes.

Q. Okay. And in the email at the bottom is an email from Abigail Shepard to – well, it was to a group of other individuals, but you were cc'd, correct?

A. Yes.

Q. You received this in the ordinary course of business at Perella?

A. Yes.

Q. Perella saved it in the ordinary

Page 249

course of business?

A. Yes.

Q. The subject is "FDA released steps to address youth e-cigarette use"?

A. Yes.

Q. And you responded to this – strike that.

You – yes. You responded to this email at 11:08 a.m. on September 12, and you sent it to Peter Weinberg?

A. Yes.

Q. And you sent it in the ordinary course of business?

A. Yes.

Q. Saved by Perella in the ordinary course of business?

A. Yes.

Q. And it has the same FDA release steps to address youth e-cigarette use, correct?

A. Yes.

Q. And why did you forward it to Peter Weinberg at the time?

A. It was relatively impactful on our client's equity value and the

Confidential

Page 250

negotiations – we thought it might be impactful to the negotiations with JUUL.

Q. And then you sent an email at 11:38 on September 12, 2018, to Peter Weinberg, correct?

A. Yes.

Q. Regarding the same subject, "FDA release steps to address youth e-cigarette use"?

A. Yes.

Q. And you sent that in the ordinary course of business at Perella?

A. Yes.

Q. And Perella saved the document in the ordinary course of business?

A. Yes.

Q. PLX-264.

DOC TECH: Counsel, this is the exhibit tech. I have exhibit numbers that are off by one digit on what was uploaded to the private portal.

MR. BUCHMAN: Glad it's at the end of the day. So why don't we correct it after the deposition. And this one will be 263.

Page 251

DOC TECH: 5.

MR. BUCHMAN: 5 okay. Sorry. Excuse me.

THE STENOGRAPHER: I need to renumber then, because that's not what my sticker has.

MR. BUCHMAN: Okay.

THE STENOGRAPHER: If you could hand that back to me. This is going to be renumbered as 265.

(Whereupon, Exhibit 265 is marked for identification.)

BY MR. BUCHMAN:

Q. Have you had a chance to review the document?

A. Yes.

Q. Okay. And this is PX 3185-001, previously marked PX 3185. You're the author of the document, correct?

A. Yes.

Q. You sent it on July 18, 2018, to Peter Weinberg in the ordinary course of business –

A. Yes –

Q. – at Perella?

Page 252

A. – yes.

Q. And Perella saved it in the ordinary course of business?

A. Yes.

Q. And the subject is "Update," correct?

A. Yes.

Q. Okay. Finished with this document.

(Whereupon, Exhibit 266 is marked for identification.)

THE WITNESS: I'm ready.

BY MR. BUCHMAN:

Q. Okay. I've handed you what's been marked as PLX-266. It's previously marked PX 3176. You've seen this document before, because you're the author of the email to Christopher Boffi on September 18?

A. Yes.

Q. You sent the document in the ordinary course of business at Perella?

A. Yes.

Q. Perella saved it in the ordinary course of business?

A. Yes.

Page 253

Q. There's no subject line on this email, is there?

A. Correct.

Q. Can you briefly summarize what this email is about and why you sent it?

A. I don't recall the context for the email, why I sent it; however, it appears to be a list of a variety of PowerPoint slides, and I'm asking Chris Boffi to develop for me inclusive of the volume assumptions and forecast metrics related to JUUL and valuation related to that.

Q. Thank you, sir.

(Whereupon, Exhibit 268 is marked for identification.)

THE WITNESS: Okay.

BY MR. BUCHMAN:

Q. You've seen this document before?

A. Yes.

Q. And you authored the email and send it to Peter Weinberg, Philip Yates, Christopher Boffi, Kane Herrick on January 19, 2018 –

A. Yes.

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
James Wappler on 11/05/2024

Confidential

Page 254

Q. – in the ordinary course of business at Perella?

A. Yes.

Q. And Perella saved the document in the ordinary course of business?

A. Yes.

Q. And the subject line of this document is "Tree update," correct?

A. Yes.

Q. Okay.

(Whereupon, Exhibit 269 is marked for identification.)

THE WITNESS: Okay.

BY MR. BUCHMAN:

Q. You've seen this document before, because you're the author of the document. It's an email you sent on September 13, 2018, to Christopher Boffi?

A. Yes.

Q. You sent it in the ordinary course of business at Perella?

A. Yes.

Q. And Perella saved the document in the ordinary course of business?

A. Yes.

Page 255

Q. The subject line is "Potential script," correct?

A. Yes.

Q. What's this a potential script for?

A. I don't recall the specifics on this. It appears to be a – again, one of these starts and stops where we were – appear to be currently stopped at this point. And this could be a script for Altria to use to reengage with JUUL.

Q. Okay.

MR. BUCHMAN: I'd like to take a five-minute break just to take a bathroom break, and then we'll head back and hopefully wrap things up and then opposing counsel will have questions.

THE VIDEOGRAPHER: The time is 3:07 p.m.

We are going off the record.

(Whereupon, a recess was taken at 3:07 p.m.)

THE VIDEOGRAPHER: The time is 3:17 p.m.

Page 256

We are back on the record.

MR. BUCHMAN: Thank you very much for appearing today, Mr. Wappler. I appreciate your testimony. We're all finished.

MR. RUFFINO: Are there any other counsel who have questions for this witness?

MR. RODNEY: I do, but I still – I would still like five minutes because I thought you were going to keep going. So we can take like a literal five-minute recess before we go –

MR. BUCHMAN: Sure.

(Simultaneous unreportable crosstalk occurs among parties.)

MR. RUFFINO: Off the record.

THE VIDEOGRAPHER: The time is 3:17 p.m.

We are going off the record.

(Whereupon, a recess was taken at 3:17 p.m.)

THE VIDEOGRAPHER: The time is 3:25 p.m.

We are back on the record.

Page 257

EXAMINATION

BY MR. RODNEY:

Q. Mr. Wappler, good afternoon. I'm Paul Rodney from Arnold & Porter. I represent the Altria defendants in this case. We met briefly earlier.

A. Good afternoon.

Q. Thank you for your patience. I just have a couple of questions. I wanted to follow up on a few things that you testified about just to make sure the record is clear.

Earlier you testified that FDA was putting increased regulatory pressure on e-vapor products.

Do you remember that?

A. Yes.

Q. What is your understanding of the regulatory pressure that FDA was bringing to bear?

A. They were at that time focused on reducing perceived youth usage of the products particularly related to flavors and asking e-vapor companies to convince them, essentially provide plans that would

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
James Wappler on 11/05/2024

Confidential

Page 258

mitigate youth usage, and as part of that, included a likely ban of flavors inclusive of fruit, candy, sweet flavors as well as menthol.

Q. And did that pressure bear any relevance to your work analyzing the e-vapor work for Altria in 2018?

A. It did. It made us scrutinize JUUL's potential growth prospects through a different lens of their ability to operate effectively on a standalone basis.

And it also made us think about valuation slightly differently because of that.

Q. How did it affect your view of valuation?

A. We anticipated when the news first hit it would put a downward pressure on valuation.

Q. And was that supposition borne out in reality?

A. Ultimately it was not. JUUL continued to demonstrate solid commercial success and was not from a valuation expectation perspective, not impacted by

Page 259

the regulatory climate.

Q. Was Altria's portfolio affected by the regulatory climate?

MR. BUCHMAN: Objection to form.

THE WITNESS: Yes. Not necessarily on the e-vapor side of things, because they had minimal market share. However, there was additional focus on even things like menthol cigarettes and the broader nicotine landscape at that time.

And, yes, it raised the bar, so to speak, on their ability – or the market's perception of their ability to navigate regulatory hurdles going forward.

BY MR. RODNEY:

Q. And what was your understanding – or did you have an understanding of what – the market's view of Altria's ability to navigate the regulatory hurdles?

A. My understanding was that the market viewed Altria as better equipped to navigate regulatory hurdles with the FDA than a company like JUUL.

Page 260

Q. You testified earlier that – well, let me ask you this: Do you remember testifying earlier that JUUL was differentiated from other companies because of its tech-oriented innovation capabilities, as you phrased it?

A. Yes.

Q. Do you have a view of what Altria's tech-oriented innovation capabilities were?

A. I do.

Q. What's that view?

A. They don't have any essentially.

Q. And you testified earlier that you weren't aware of new vapor products in the pipeline at Altria.

Is that because they – the use of a lack of tech innovation capability?

MR. BUCHMAN: Objection to form.

THE WITNESS: Yes. My – my understanding is that their R&D capabilities are not very effective, and they're having – they have had a very hard time developing innovative products.

Page 261

BY MR. RODNEY:

Q. You also – you talked about the stops and starts in the negotiation process along the way, and not long ago we looked at the relationship agreement that JUUL and Altria entered in December of 2018.

Right up until the time that agreement was signed, did it look to you like there was a chance that the deal would not get done?

A. Yes.

Q. And, to your recollection, when was the deal certain?

MR. BUCHMAN: Objection to form.

THE WITNESS: The 11th hour, so to speak. There had been so many starts and stops, I wasn't sure the transaction would close until the very end.

BY MR. RODNEY:

Q. So you also testified – you recall you gave testimony to the effect that you were focused on the terms for JUUL's valuation and governance of the deal with Altria.

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
James Wappler on 11/05/2024

Confidential

Page 262

Do you remember that?

A. Yes.

Q. You also testified that you were not focused on the noncompete terms.

Do you remember that?

A. Yes.

Q. Do you recall who was focused on the noncompete terms?

MR. BUCHMAN: Objection to form.

THE WITNESS: I don't recall his name. I believe there was an antitrust specialist at Wachtel who was primarily focused on that.

BY MR. RODNEY:

Q. So as you sit here today, your recollection is that antitrust lawyers were addressing the antitrust concerns?

A. Yes.

Q. In any of the negotiations between Altria and JLI, do you recall JLI ever expressing concern about having to compete with MarkTen products?

MR. BUCHMAN: Objection to form.

THE WITNESS: No.

///

Page 263

BY MR. RODNEY:

Q. Did you – do you recall, as you sit here today, JLI expressing any concern that MarkTen products might be divested to a third party?

A. No.

Q. That's all I have.

MR. RUFFINO: Is there anybody else on the line or in the room with additional questions for the witness?

(No response.)

MR. RUFFINO: I do not have questions for the witness, but before we close the record I wanted to give Mr. Rodney an opportunity to make a protective order designation for the transcript of this deposition.

MR. RODNEY: Yes. So thank you. I will note that all the exhibits in this deposition are subject to the protective order in the case and they're marked confidential and we'll preserve the confidentiality.

MR. BUCHMAN: Just a follow-up question to Mr. Rodney's examination.

Page 264

EXAMINATION

BY MR. BUCHMAN:

Q. You've testified just a few moments ago in response to one of his questions that you weren't sure that the deal was going to get done until the very last minute, correct?

A. Correct.

Q. And when you are doing deals of this nature, there's always some level of uncertainty that the deal isn't really going to get done until it's actually done, correct?

A. Yes.

Q. Thank you very much, sir. I have no further questions.

MR. RUFFINO: Okay. I think we're done. Off the record.

THE VIDEOGRAPHER: The time is 3:32 p.m.

We are off the record.

(Time noted: 3:32 p.m.)

Page 265

REPORTER CERTIFICATE

I, the undersigned, do hereby certify:

That JAMES WAPPLER was by me duly sworn in the within-entitled cause; that said deposition was taken at the time and place herein named; and that the deposition is a true record of the witness's testimony as reported by me, a disinterested person, and thereafter was transcribed.

I further certify that I am not interested in the outcome of the said action, nor connected with, nor related to any of the parties in said action, nor to their respective counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 7th day of November, 2024.

Signature: __Requested__Waived_X_Not Requested

_____
JESSICA R. WAACK
Registered Diplomate Reporter
Certified Realtime Reporter
California Certified Realtime Reporter
New York Realtime Court Reporter
New York Association Court Reporter
Notary Public, State of New York
CCR-NJ (No. 30XI008238700) CSR-TX (No. 11958)
CCR-WA (No. 21007264), CSR-CA (No. 14420)

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
**James Wappler on 11/05/2024**

Confidential

Page 266

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 268

ERRATA SHEET

WITNESS: JAMES WAPPLER
Date of Deposition: November 5, 2024

Reason Codes: 1. Clarify the record
2. Conform to the facts
3. Correct transcription errors

Page    Line    Reason
From            To
Page    Line    Reason
Page            To
Page    Line    Reason
From            To
Page    Line    Reason
From            To
Page    Line    Reason
From            To
Page    Line    Reason
From            To
Page    Line    Reason
From            To
Page    Line    Reason
From            To
Page    Line    Reason
From            To
Page    Line    Reason
From            To
Page    Line    Reason
From            To
Page    Line    Reason
From            To
Page    Line    Reason
From            To
Page    Line    Reason
From            To
Page    Line    Reason
From            To

_____

JAMES WAPPLER

Page 267

DECLARATION UNDER PENALTY OF PERJURY

Date of Deposition: November 5, 2024

I, JAMES WAPPLER, hereby certify under penalty of perjury under the laws of the State of _____ that the foregoing is true and correct.

Executed this____ day of ____, 2024, at _____.

_____

JAMES WAPPLER

SUBSCRIBED AND SWORN BEFORE ME
THIS ___ DAY OF _____, 20
_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:_____

**Exhibits**

**WapplerJ 234**
 7:5 15:14

**WapplerJ 235**
 7:6 27:3

**WapplerJ 236**
 7:8 29:17

**WapplerJ 237**
 7:10 32:2

**WapplerJ 238**
 7:12 52:21

**WapplerJ 239**
 7:15 63:24

**WapplerJ 240**
 7:17 74:10

**WapplerJ 241**
 7:20 88:17

**WapplerJ 242**
 7:22 108:20

**WapplerJ 243**
 8:5 130:7

**WapplerJ 244**
 8:8,11 138:6

**WapplerJ 245**
 8:11 143:16

**WapplerJ 246**
 8:13 151:21

**WapplerJ 247**
 8:15 156:6

**WapplerJ 248**
 8:17 162:6

 210:8

**WapplerJ 249**
 8:20 168:17

**WapplerJ 250**
 8:24 178:1

**WapplerJ 251**
 9:5 189:6

**WapplerJ 252**
 9:7 196:2

**WapplerJ 253**
 9:10 200:4

**WapplerJ 254**
 9:12 213:11

**WapplerJ 255**
 9:14 220:1

**WapplerJ 256**
 9:17 223:20

**WapplerJ 257**
 9:19 232:7

**WapplerJ 258**
 9:21 235:11

**WapplerJ 259**
 10:5 236:10

**WapplerJ 260**
 10:8 240:11

**WapplerJ 261**
 10:9 245:20

**WapplerJ 262**
 10:12 246:24

**WapplerJ 263**
 10:14 248:8

**WapplerJ 265**

 10:18 251:11

**WapplerJ 266**
 10:20 252:10

**WapplerJ 268**
 10:23 253:15

**WapplerJ 269**
 11:5 254:11

---

**$**

**$13** 158:13

**$60** 204:2,4,
 14

---

**(**

**(5)** 139:20
 140:2

**(5).doc** 139:17
 140:17

**(f)** 218:8
 219:9

---

**0**

**00002251**
 100:21

**00002257** 94:12

**00002258** 94:21

**0000252** 92:8

**00014520**
 243:18

**001** 170:5

**002** 248:12

**003** 247:3

---

**1**

**1** 12:7 127:4
 184:17

**10** 16:22 21:2
 103:11
 104:21

**10:11** 237:10
 238:17

**10:36** 87:10,
 13

**10:49** 87:15

**11** 220:24
 222:2,3

**1179** 196:7

**11:05** 100:11,
 14

**11:08** 100:16
 249:9

**11:10** 237:9

**11:37** 65:11

**11:38** 250:4

**11:56** 169:11

**11th** 261:15

**12** 53:16
 56:19 57:3
 247:10,24
 249:9 250:4

**12.1** 221:22,
 24

Confidential                                                           Index: 12.11..2132-001

**12.11**  222:1

**12.6**  211:10
  239:16 240:1

**12055**  82:5

**12079**  222:15

**12752**  189:23

**12:06**  148:8,
  11

**12:37**  148:12,
  14

**13**  158:11
  254:17

**1390**  162:11

**1496**  170:4

**1496-003**  170:8

**1496-0037**
  171:8

**15**  21:2 31:1
  139:5 141:23
  142:7,23
  143:6 236:5

**15:37:08**
  239:19

**16**  172:24
  175:3,16
  176:21 177:4

**1622-001**  247:2

**17**  175:1,3
  176:22 177:4

**18**  75:8 125:4
  152:7,15
  170:18,21

176:15 190:1
191:4,14
246:11
251:21
252:18

**19**  131:6
  132:14
  133:14,15
  136:3 137:10
  196:18
  253:24

**1:32**  189:12,
  15

**1:33**  189:17

**1:56**  209:2,5

─────────────
             **2**
─────────────

**2**  66:21
  191:15 227:6

**20**  201:1
  240:18 241:3
  243:8

**2000**  116:5

**2008**  28:25

**2014**  42:15
  44:5,8,20

**2016**  117:24

**2017**  17:1
  106:12

**2018**  36:7,10,
  16 37:14
  38:8,17,21
  40:12,25

41:15,25
42:8 44:21
46:17 51:15,
19 52:18
53:16 57:3
64:19,22
68:25 72:15,
23 75:9,12
79:14 80:24
87:23 90:10
92:10,19
97:8,10
98:12 100:4
102:6 107:7,
17 109:2
112:9 113:12
114:23
115:22 116:5
117:2 121:21
123:24 125:4
131:6,16
133:11,13,
14,15 136:3
137:10 139:5
141:23
142:7,24
143:7 149:10
152:7 154:8,
24 156:20
162:25
163:12 165:3
168:6 169:10
170:18
174:23,25
176:15
178:9,22
189:25 190:1
191:4,14,25

192:3 196:18
198:19
201:1,5,16
205:21
206:19
215:15 216:2
220:24
222:5,7,12
232:23
234:1,14
236:6,25
237:3,10
240:18 241:3
243:8 244:23
246:11
247:10 250:4
251:21
253:24
254:18 258:7
261:6

**2019**  73:8
  214:24
  225:18
  226:16
  228:16
  231:9,18,23

**2020**  184:8

**2021**  32:9
  33:2,14 35:4

**2022**  114:15

**2024**  12:3,11

**20:22:34**
  138:24

**21**  242:18

**2132-001**

235:16

**2132-002**
235:23

**2132-017**
235:17

**217**  138:11

**22**  169:10

**2258**  103:9,17
106:22 107:4

**2268**  103:11,
21

**23**  156:20
243:18

**2305**  88:23

**234**  15:13,14

**235**  27:3

**236**  29:17

**237**  32:2

**238**  52:21

**239**  63:24

**24**  76:5 77:19

**240**  74:10,23
246:19

**241**  88:17

**242**  108:20

**243**  130:7

**244**  138:6
148:22

**245**  143:16
144:20

**246**  151:21

**247**  156:6

**248**  162:6
210:8

**249**  168:17

**25**  187:10
225:18
231:9,18,23

**250**  178:1

**251**  189:6

**252**  196:2

**253**  200:4

**254**  213:11
219:24

**255**  220:1

**256**  223:20

**257**  232:7

**258**  235:11

**259**  236:10

**26**  237:3,10
238:1

**260**  240:11

**261**  245:20

**262**  246:23,24

**263**  248:8
250:25

**265**  251:10,11

**266**  252:10

**268**  253:15

**269**  254:11

**27**  236:25
238:10

**28**  211:10

**29**  32:9 33:2,
14 35:4
234:1,6,14
235:2

**2:00**  213:17

**2:02**  209:7

**2:16**  132:13

---
### 3
---

**3**  132:20,21
242:22
244:13

**3.1**  243:20,25
244:12

**3.2**  243:21
244:1,16,18

**30**  22:10
90:10 102:6
109:2 112:9
178:9,21
232:23

**3157**  88:22

**3163**  74:14
245:25 246:4

**3163-002**  246:2

**3163-020**  246:3

**3169**  156:12

**3173**  64:5

**3176**  252:16

**3179**  248:13

**3179-001**
248:12

**3180**  53:1

**3185**  251:18

**3185-001**
251:17

**3188**  223:25
224:12 225:5

**3196**  236:17

**35**  36:6,9,15
41:3 86:23
187:8,10
188:2

**3:00**  133:1
136:5

**3:07**  255:20,
23

**3:17**  255:25
256:19,22

**3:25**  256:24

**3:32**  264:20,
22

**3:37**  238:11

---
### 4
---

**4**  68:20

**4200**  200:15

**4254**  200:9

**44**  104:25

**45**  22:10
211:11

**48**  77:19

**4819**  108:25

**49.9**  158:11

**4:00**  138:24

**4:07**  237:4

---
**5**
---

**5**  12:3,11
70:13 162:25
163:12 165:3
168:6 228:17
229:21 230:3
231:16,22
251:1,2

**523**  213:20

**524**  213:16

**575**  23:20

---
**6**
---

**6**  65:10 131:5
223:1

**62139**  169:4

**62153**  168:23

**6600**  164:9
165:4

**6601**  162:13
164:10

**66068**  153:16

**66069**  153:17
154:13

**6612**  152:1

---
**7**
---

**7**  64:19,22

**7054**  82:19

**7055**  83:5

**7062**  74:17

**726601**  212:10

**767**  23:21,22

---
**8**
---

**8.PDF**  91:3

**8/1**  126:24

**8/5/18**  164:11

**816**  64:6

**8216**  144:11

**8219**  149:24

**8220**  143:21

**8438**  178:12

**8596**  53:4

**8:00**  233:12

---
**9**
---

**9/7/23**  28:2

**986**  236:15

**9:05**  12:3,13

**9:31**  163:2

**9:31:02**
162:22,25

**9:36**  39:20,23

**9:37**  39:25

---
**A**
---

**a.m.**  12:3,13
39:20,23,25
87:10,13,15
100:11,14,16
238:17 249:9

**AB**  198:17,20
199:5 202:8
209:24

**abbreviation**
58:1

**ABI**  86:2

**ABI/GRUPO**
84:19 86:2,
19

**Abigail**  53:20
139:6 225:17
248:18

**ability**  47:19
59:14,19
62:24 258:10
259:13,14,20

**accelerate**
166:5,12

**accept**  177:10

**acceptable**
146:3
147:14,23

**149:1,4
150:2,4
151:9**

**accepted**
151:17

**accepts**  172:4

**access**  150:17
201:11
203:22

**accommodate**
211:8

**accounting**
187:6

**accuracy**  33:19
34:9

**accurate**  17:7
30:19 32:19,
25

**accurately**
104:2

**acquire**  36:8,
14 70:23
104:22
157:15
187:15 188:3

**acquired**  36:6
135:5,18

**acquirer**  132:6
135:11,14
183:11 188:3

**acquirers**
171:25

**acquiring**

41:3,9 50:4 69:20

**acquisition** 69:16 81:24 98:2,5,6 106:13

**acquisitions** 20:25 41:22

**act** 48:15

**acting** 147:18

**action** 28:4, 11,12

**actions** 28:7

**activated** 188:17

**actively** 61:6

**activities** 175:4,14

**actual** 83:1

**Adam** 45:8 48:6 81:3 90:14 125:5

**add** 30:24 31:12 58:16

**added** 104:7

**addition** 106:22,25 145:17 172:5

**additional** 121:12,13 124:20 126:9 176:22 259:8 263:10

**address** 249:4, 19 250:8

**addressed** 155:16

**addresses** 106:8

**addressing** 262:17

**administrative** 153:10

**adult** 47:19

**advance** 24:13 101:4 175:21 176:2 243:5

**advantage** 150:22

**advice** 25:24 42:12

**advise** 41:20

**advised** 43:4

**advisement** 112:2,3 124:11,19

**advising** 41:14,17 42:1,2,7,11 43:1

**advisor** 50:12 160:2

**advisories** 52:12

**advisors** 51:25 52:1

**advisory** 41:20,22 44:21

**affect** 17:11 258:15

**affected** 259:2

**affiliate** 172:8,13

**affiliates** 145:18 171:25 172:3,10

**affiliates/ acquirers** 171:21

**affirmed** 14:3

**afford** 63:18

**afforded** 33:17

**aforementioned** 154:22

**afternoon** 55:10 132:1, 18 148:17 257:3,7

**agree** 154:17 211:1,7

**agreed** 175:20 194:24

**agreeing** 175:25 176:6 210:18 211:13 234:16

**agreement** 21:3 61:4 172:9 180:21 227:3 229:2 241:1 242:15 261:5,8

**agrees** 55:10

**ahead** 16:1 30:7 103:11 109:24,25 113:16 134:9 153:25 210:13

**ALF** 168:22

**ALGAT** 162:11

**ALGAT004893321** 130:16

**ALGFTC0000072659 8** 162:12

**ALGFTC0000106213 9** 168:22

**ALGFTC0001062141** 170:9

**ALGFTC0001062145** 171:9

**ALGFTC000106605** 152:1

**ALGFTC000106606** 152:10

**aligned** 34:1

**allegation** 36:2

**allegations**

Confidential                                                Index: alleged..Altria's

26:21

**alleged**  35:24

**allowing**
  150:15

**Alternatives**
  179:15

**Altria**  13:17
  32:10 36:4,
  6,8,14,17
  38:9,18,22
  40:11,13,20
  41:3,8,13,
  14,18 42:1,
  7,13,14
  43:1,4 44:5,
  8,14,20
  45:22 46:13
  48:13,20,22
  49:8,13,19
  50:3,7,14,22
  51:9,14,24
  52:2,5,15
  55:25 57:2
  59:9 61:1,2,
  3 62:23,24
  63:8 65:5
  66:7 67:24
  68:2,7 69:3,
  5,14,16,20,
  24 70:5,14,
  21,24 71:1
  72:12,17,22
  73:9,14,23
  75:19 76:23
  77:4,18
  78:2,7
  80:11,13

83:25 91:25
92:13 93:15
94:2 95:20
97:17 98:5,
6,11,20
99:18 100:1
101:16
102:13,23
104:22,24
105:21
107:8,9
108:4,8
109:2 110:9,
14,17 111:10
113:25
114:22
115:11,21,23
116:15,19
118:19 119:3
120:22
121:20
122:3,8,14,
24 123:9
125:13
129:20
131:3,20
134:5 135:6,
18,24 136:8
137:15
141:14,18
142:21
143:1,6
146:17,20
147:3,5,18
149:3,4,12
150:4,20,23
151:10,17
153:4,17

154:17
155:21,24
157:13
158:1,17,21
159:3,8,14,
18 160:20
161:4 162:2
165:3,10,12,
14 166:4,5,
10,12
167:11,16
173:4 174:21
175:12
176:12
177:3,13
179:3
180:13,17,
19,21 181:10
182:5,7
183:6,8,11
184:6,13,18
185:20,23
186:11,21
187:24
191:23
192:6,14
193:19,23
194:2,18
195:14,19,22
196:25
197:3,10,15
199:5 200:25
202:12,14
204:13,25
205:25
206:6,24
208:3 209:15
211:7 212:21

213:4 214:16
215:14,15,24
217:3,15,16
218:19
219:15
222:12
223:15
228:24 229:9
234:14
237:16
238:3,12
239:6,7
240:16,17
241:2,11,20
242:2,16
255:11 257:5
258:7 259:23
260:16
261:6,25
262:20

**Altria's**  26:12
  35:25 43:12,
  23 45:25
  49:24 50:18
  51:21,24
  62:12 68:12,
  16 72:24
  78:13 80:3
  83:8 87:22
  107:17 108:1
  121:3 125:4
  128:1 134:15
  135:2 147:19
  151:13
  154:25 155:7
  156:25 159:9
  161:23
  167:7,8

175:14
184:14
188:25
204:10
211:11
212:22
215:12
219:3,12,13,
18,19 223:9
259:2,20
260:9

**Altria-eagle**
187:4

**Altria-juul**
31:23 126:24
127:3 144:13
182:17

**Altria-pmi**
187:25

**amend** 35:2

**amended** 28:3,
10

**American** 59:9
106:10,13
187:23

**amount** 61:20

**analyses** 49:14
191:9

**analysis** 51:4
94:22 103:22
116:16
118:13
120:15
122:15,17,
19,20 123:9

179:12
191:12
247:24

**analyst** 58:10,
17,19 59:23
116:25
198:5,6,22,
24 199:3
201:9,14,23
202:2,14
203:6,11,15,
22 209:14,23
210:4 214:15

**analyst's**
205:21

**analysts**
59:12,13,23
62:21 197:25
198:3,13
201:14 210:5
215:17

**analytics**
217:6

**analyze** 46:15

**analyzed** 73:6

**analyzes**
115:24

**analyzing**
258:6

**and/or** 14:3
52:11 97:17
126:1

**Andrew** 13:12
20:6

**announced**
208:20

**announcement**
54:25 207:8
223:4

**announcements**
54:21

**ans** 145:17

**answering**
15:20,24
30:5 53:9
64:9 74:20
109:6 112:11
138:14
143:24

**Anthony** 131:25

**Anticipate**
113:9

**anticipated**
114:14,22
258:17

**anticompetitive**
27:2 35:24
228:12

**antitrust** 12:9
28:5 51:6
195:19,21
204:25
227:22
228:9,17
230:4 231:3
239:14,21,25
240:2,6
262:11,16,17

**Apex** 113:10,
12,13

**apologies**
61:12 245:18

**appearances**
14:9

**appearing**
15:11 16:10
256:3

**appears** 56:25
65:9 67:13
81:20 93:2
97:3 104:5
105:12 119:5
126:17
135:15,17
144:12
153:16 155:6
158:8 170:14
177:22
180:10 181:2
190:22
196:11
223:12
237:24 253:8
255:7

**appetite** 63:13

**applies** 172:2

**approval**
114:13
192:25
239:15,25

**approvals** 63:7

**approximate**
104:21

**approximately**
24:4 44:21
47:6 65:15
105:4,5

**area** 47:23
107:13,21
174:2 210:5
231:1

**areas** 227:24
231:6,7,14

**arise** 205:5

**Arnold** 13:17
257:4

**arrived** 195:11

**article**
242:22,23
243:1 244:13

**aspect** 49:22
181:8

**aspects** 49:18
74:7

**assert** 26:25

**assertion** 19:6

**assessed** 223:5

**asset** 197:21

**assets** 145:21
193:2

**assigned**
125:25
126:13

**assigning**
125:19

**assignment**
44:21 126:6

**assume** 22:14
132:21 222:5
227:12

**assuming** 55:22
62:8 68:15
72:8,19
182:17
190:25

**assumption**
147:1,3
167:17

**assumptions**
197:15
253:11

**attached** 58:17
77:4 91:9
92:2,4 164:5
167:21
168:21 248:3

**attachment**
55:5 75:22
78:24 80:7
88:25 91:1,6
97:5 102:6
144:10
148:21
162:15,16
169:25
220:4,18
221:20,21
222:17
247:20,23

**attachments**

78:25 100:22
140:16
141:25 153:7

**attempt** 70:23
105:16

**attend** 101:10,
22 238:7

**attended**
102:12

**attending**
14:12 132:19

**attention**
89:10 154:14
169:3

**attorney** 19:2
20:3,5 22:18
145:10

**attorney-client**
22:13

**attorneys** 51:6
150:11

**attributed**
115:18

**August** 64:19,
22 65:10
68:25 72:14,
23 127:4
131:5,6,16
132:14
133:11,13,
14,15 136:3
137:10 139:5
141:23
142:7,23

143:6 149:10
162:25
163:12 165:3
168:6 169:10
170:18,21
176:15
236:25
237:3,10
238:1,10

**Austin** 31:8

**author** 53:15
75:6 152:3
162:24 176:8
251:19
252:17
254:16

**authored** 139:4
156:19
163:11 247:7
253:21

**authorization**
113:10,17

**Avenue** 23:20,
21

**avoid** 181:17

**aware** 42:16
114:21
117:16,19
132:14
149:14,20,21
150:14
159:16 160:2
176:23
206:10,13
207:3,5,10,

23,25 208:18
209:22 210:3
260:15

awareness
134:3

---

**B**

---

BA   31:9

back   40:1
50:5 62:18
76:23 87:16,
21 89:17
100:17,19,21
109:10
124:11
129:13
130:10
148:3,15
153:8 158:1
189:18 209:8
210:8 219:24
241:10 251:9
255:16
256:1,25

bad   133:16
198:10
239:19

Bailey   53:17,
24 54:16
139:6 225:17
231:22 232:1

ball   15:3

ban   258:2

banks   202:6

bar   259:12

Barclays   202:7

based   15:24
28:18 30:1
34:24 35:2,6
46:10 53:9
55:22 57:14
64:9 76:13
109:6 112:12
138:14
143:24 152:8
155:6 157:20
164:18
170:17 171:4
176:14
187:20
193:10
197:17
214:24
227:11

basically
85:23 94:17

basis   33:4
71:21 141:4
202:20
258:11

BAT   106:9
187:15 223:4

Bates   53:3
74:16 94:11
108:25
130:15
138:10 152:1
156:13
178:7,9
189:21 196:6

200:9 202:10
213:15
240:19
245:17

bathroom
255:15

BBA   31:10

bear   257:20
258:5

Beard   163:17

bears   240:18

began   41:13
46:13

begin   15:12

beginning   12:7
41:15,25
42:8,15
51:14 76:6
121:10

begins   235:15

behalf   12:22,
25 13:3,9,17
14:15,19
147:19 242:1

behavior   27:2
35:25

belief   71:22

benefit   106:12

benefits
215:18
223:13

Bernstein
198:17,20

199:5 202:8

Bernstein's
209:24

big   224:17

billion
158:11,13
211:10 240:1

Billy   234:21

bind   171:23

binds   132:6
135:10,13
171:20

bit   78:14
216:8

blank   92:7

Blankenship
14:17,18,21

blanking   48:6

Blaylock   91:24
110:17,18,24
121:24
128:2,5,12,
16 129:7,20
163:17
220:24 247:9

Blaylock's
122:2

bn   239:16

board   49:23
91:5 92:9,19
93:15 95:2
101:1,4,5,6,
14,21 102:1,

Confidential                                    Index: BOD..Buchman

5,9,12,18
103:5 109:17
110:20,25
111:4,10
150:17
157:25
187:10
221:13,14
238:18,25
239:4,6,7

**BOD**  91:2,5
92:3 100:22
221:11,13,22

**Boffi**  53:17,
18,24 54:16
90:14 139:6
153:5 163:18
225:16
231:16
252:18
253:10,23
254:18

**Booth**  31:6

**border**  101:10

**borne**  258:20

**bottom**  181:7
190:3 202:11
222:13
248:18

**bound**  135:19

**box**  183:18,22
184:5 185:5
186:19,20
191:3 194:13

**bracket**  212:7,

8,12

**bracketed**
58:16 158:11

**brackets**
106:14
211:16

**brand**  38:24
39:6 88:3,8

**break**  18:8,9,
11 20:1 40:9
63:19 86:24
87:1,6
148:3,10
208:23
209:12
228:15
229:24
245:2,8,12
255:14,15

**breakdown**
185:3

**brevity**  29:25

**briefly**  15:8
27:12 87:22
100:21
188:23 253:4
257:6

**bring**  197:14

**bringing**
257:19

**British**  59:9
106:10
187:23

**broad**  158:13

**broader**  42:16,
20 47:25
120:21,25
121:19
259:10

**broadly**  123:6
134:3,25

**Bryan**  91:16,
21,24 110:17
121:22,24
122:2 128:1,
12,16 220:24
247:9

**Buchman**  12:21
13:10,19
14:10,22,25
15:6,9,16
16:13,14
23:4 26:1,9,
14 27:5,19,
24 29:19
32:4,22
33:4,10,12
35:8 36:12
38:15 39:13,
17 40:2
41:16 51:8
52:24 64:1
66:18 67:6
68:19 74:6,
12,23 75:1
87:7,17
88:19 89:5
98:16 100:9,
18 103:2
108:17,22
111:22

112:3,5
116:9
123:15,19
124:6,23,24
126:14
128:22
129:17
130:9,12
136:21 138:8
140:12
143:18
145:11
146:15
147:8,22
148:2,16
151:7,15,23
153:14 156:9
160:7 161:2,
10,11,20
162:8 168:19
173:20 176:7
178:3
179:22,24
180:2,5,15
181:13 186:1
188:18
189:4,10,19
192:10,18
193:3,5
194:8 195:6,
16 196:4
200:6
207:13,17
208:13,22
209:9,21
210:6 212:19
213:13
218:22

219:6,25
220:6,9,11
223:22
224:12,23
225:5,10
229:24 230:2
232:14,17
235:13
236:12
240:13
244:24
245:6,13,18,
22 246:20
247:1 248:10
250:22
251:2,7,13
252:13
253:18
254:14
255:13
256:2,14
259:4 260:19
261:14
262:9,23
263:24 264:2

**bullet**  59:17,
21 62:19
63:11 83:7,
14,22 84:15
96:13,18,20
99:14,17
104:16
105:6,13,19
106:4 120:10
122:21
126:23 144:2
145:12 146:8
148:19,24,25

149:24 150:1
165:24
171:17,21
172:1,21
173:22
175:19
177:9,18
187:3 194:16
195:2 210:15
211:6,15
212:6,10

**bullets**  164:21

**Burling**  13:13

**Burns**  155:18
242:8,10

**business**  31:7,
9 43:24
44:1,2 53:25
54:9 64:23
65:2 67:16
68:2,8,13,17
72:25 75:13,
17 80:17
90:18,21
106:9 131:9,
14,19
139:10,14
150:13
157:1,16
158:14
163:13,16,
22,25
166:14,15
167:8,10,14,
15 169:14,18
172:9 193:19
199:7

201:10,17
202:4 203:7
211:18
212:23 213:6
221:1,8
225:21 226:1
233:1,4
247:13,16
248:23
249:1,13,16
250:12,15
251:23
252:3,21,24
254:2,5,21,
24

**butcher**  36:25
199:17

**buy**  198:10

**buyer**  193:1

---

### C

---

**C-A-L-L-U-M**
199:12

**C-H-E-N**  200:1

**CAGNY**  214:9,
13,14,22
217:14,17

**call**  22:4
71:16 76:14,
22 131:22
132:21
137:12
154:13
167:22

**called**  14:3
37:17 73:5
75:22 88:12
89:19 132:16
136:4 153:5
165:24
186:22 229:8

**calling**  132:25
184:14

**Callum**  199:11,
12

**Canadian**  95:20
96:3

**canceled**
128:19

**candy**  258:3

**cannabis**  95:20
96:3 216:2

**cannibalize**
166:15

**cap**  57:23,25
150:15

**capabilities**
160:4 218:12
219:4,13,19
260:6,10,22

**capability**
260:18

**capital**  66:14

**capitalization**
55:2 58:1

**caps**  66:25
67:4,10

Confidential                                                    Index: capture..closed

capture  105:22

captures  72:19 77:11

capturing  80:2 190:23

Carmine  131:3, 17 167:19 247:8

carries  210:16

case  17:21 25:12,18 26:16,21 28:4 67:3 81:13,17 82:19,21,24 83:5 84:5,17 257:6 263:21

cases  66:23

cash  50:14 191:12

catch  132:1

categories 47:18 99:2 113:4 119:24,25

category  46:24 71:9 88:1 113:9,15,25 120:4 122:9 196:21 229:5

category/juul 120:8

cc'd  75:7 153:9 248:20

cease  172:13, 15

center  202:6

CEO  216:5,6

cetera  77:6

chain  164:18

chairman 241:16

challenged 120:8

challenges 106:8 112:23 228:11

chance  30:4 59:18 100:19 112:10 162:17 178:16 220:14,20 224:3 235:18 251:14 261:9

change  35:7 183:14,25 184:23 185:12,16,19 186:8,10 187:13

changing  78:14 119:2

check  239:16 240:1

Chen  199:25

Chicago  31:6

chief  241:15, 16 242:11

Chipotle  85:8, 23 86:6,10

Chris  153:5 253:9

Christopher 53:17 90:14 139:6 225:16 252:18 253:23 254:18

chunk  72:20

cigalike  37:16 38:4,21,24 88:1 113:24

cigarette-type 71:20

cigarettes 37:7 42:22 43:14 71:17 118:7 205:7, 9,13 259:10

cigars  42:23 43:14 118:7

circumstances 145:23 146:22 157:9 180:7,13 207:6

City  238:4

civil  26:11

clarification 67:7 137:7

clarified 175:5,15

clarify  43:3 100:24

clarity  234:20

class  28:3, 11,12

classify  44:17

clear  22:11 69:6 78:2 82:11 106:7 124:25 173:3 182:15 186:17 207:22 208:17 257:12

Cleary  14:18

clever  96:2

client  43:10 92:13 109:3 202:22,23

client's 249:25

Clients  222:12

climate  259:1, 3

close  23:23 238:19,21 239:1,9,24 261:18 263:14

closed  78:3

87:20 114:1,
3 132:9
183:7 215:14

**closed-tank**
87:22,25

**closes** 56:7
182:4

**closing** 211:13

**Coast** 47:22
48:1

**code** 96:1

**collaborate**
94:2 105:23
110:9

**collaborated**
164:19

**collaboration**
81:25 197:12

**collate** 153:7

**colleagues**
107:22

**collected**
124:21

**color** 201:3
248:3

**column** 196:21

**combination**
69:14 188:16
189:1 223:6,
15

**combine** 104:9,
19 105:21

**combined**
104:16,25
183:8,13
184:17
186:23
187:3,25
205:9

**Combined/altria**
185:11

**combines**
184:7,13
186:21

**combust** 61:18

**combustible**
37:6 43:14
71:17,20
166:15

**combustibles**
159:10

**combustion**
61:23

**comfortable**
15:23 27:11
30:5 53:8
54:3 64:9
74:20 109:5
112:11
138:14
143:23

**commences**
172:23
173:25
174:11

**commencing**
211:12

**comment** 127:13

**commentary**
58:10 67:3

**Commentary/
implications**
179:16

**commenting**
190:17

**comments** 72:1
90:24 111:9,
19 127:19,22
137:4 144:25
145:1,3,6,9
176:22
243:19

**commercial**
258:23

**commercialized**
38:23

**Commission**
20:20

**commit** 108:8

**commitment**
107:18
147:13,16

**commitments**
146:1

**commits** 99:18
194:18

**committing**
107:9

**common** 202:21

**commonly**

172:6,13

**communicate**
66:15,23
67:19 179:21

**communicating**
146:7 149:3

**communication**
168:12 213:3

**communications**
22:14 25:15,
23 68:5 70:4
72:21 107:8,
16 168:10
176:12 177:3
205:25
206:5,23
208:2 212:21
237:20
244:11,15,17

**companies**
46:21,25
47:3 55:3
57:17,19
59:8 62:23
63:7 69:17
81:22 83:11,
12 85:13,16
116:22
185:21 198:9
201:15
214:16
257:24 260:4

**company** 46:12
47:23 54:4
59:8 85:5,7
95:20 96:3

105:1 135:5,
18,19
150:15,16,25
183:13
184:18
186:23
187:22,25
193:24
216:11 242:6
259:25

**comparable**
117:14

**compare** 103:14

**compares** 80:5

**compete**
145:19,23
146:22 149:5
150:5,24
154:19
173:18 174:7
175:21
176:1,2
183:12
184:18,19,20
185:7 186:7,
23 262:22

**competed** 71:14
161:7,15,25
162:4

**competes** 71:11

**competing**
50:24 71:16
155:1 185:22

**competition**
26:20 172:14

205:7

**competitive**
120:11,19
122:6,22
123:22,23
124:8 125:2

**competitor**
36:20 187:1

**competitor's**
218:13
219:13,19

**competitors**
219:5

**compile** 152:19

**complaint**
28:4,11,12

**complete** 17:7

**completed** 66:4
123:11,14

**completing**
189:3

**component**
61:25

**components**
37:22

**compound**
179:23
218:20

**comprehensive**
31:4 49:20
69:18 121:23
122:14,17,19

**concede** 140:22

141:2,13,21

**concept** 205:23

**concern** 50:25
78:15 98:11,
19 108:5
144:1 150:14
151:5 167:5
205:4 228:15
262:21 263:3

**concerned**
150:19,23
186:25

**concerns**
180:17
204:25 205:5
231:3 262:17

**concludes**
205:6

**conclusion**
141:4 193:17

**conclusions**
197:16

**conduct** 82:24
99:18 107:9,
18 108:8
116:4,17
120:18
122:16,20
194:18

**conducted** 16:8
102:19
115:21
116:11
122:7,14
123:8,25

125:2 191:23
192:5,20
193:7
218:11,18
219:14,17

**conducting**
125:12

**conference**
214:15 217:7
219:2

**confidential**
164:10
263:22

**confidentiality**
263:23

**confirm** 118:12
172:21
173:23 227:7

**confirmed**
73:15 74:5
124:16

**confused** 73:17
175:2

**connected**
148:23
220:10

**Connecticut**
16:23

**connection**
21:8 22:18
25:8 43:19
44:9,13,18
51:20 71:6
82:18 86:11

122:21
142:22
143:14 156:1
175:15 179:4
199:6
201:22,25
202:15 203:9

**consideration**
119:25
164:12,16,24
165:10
210:25
228:14,18,
20,22 230:18

**considerations**
80:2 223:13
227:23
228:9,18
229:20 230:4
231:3

**considered**
205:14

**consisted**
37:21 229:16

**consistent**
58:25 154:19

**consolidated**
28:3,10,12

**consolidation**
106:7 134:7

**constructively**
62:25

**consult** 19:22

**consulting**

31:2 45:21
205:12

**consumer** 85:19
214:15

**consummating**
206:8

**contained**
30:18 55:4
145:1 146:8
158:20
176:21
244:12

**contemplating**
83:25

**context** 20:8
81:20 128:10
137:25
144:15 153:3
166:25
191:11 214:6
215:4 217:1
218:24 253:6

**continually**
223:5

**continue** 87:4
245:15

**continued**
258:23

**continuing**
63:18

**continuous**
66:8

**contribute**
166:6,13

**control** 187:13

**controlled**
172:3,6,10,
13

**controlling**
83:11 172:6,
8,12 211:14

**conversation**
22:6,9,16,
22,24,25
23:6 51:23
137:8,25
208:7 212:15

**conversations**
68:10 136:2,
8,10 137:14
168:2 177:6
227:18
231:21

**convert** 47:19

**converting**
46:22

**convey** 57:13,
16 59:4,12

**conveyed**
181:23
223:10

**conveying**
70:17

**convince**
257:24

**coordinate**
132:4
133:18,23

**coordinated**
91:17

**copies** 102:20
224:7

**copy** 32:1,19,
25 111:2,8,
13,23 124:7
128:6 129:13
225:1

**core** 106:8

**corner** 53:4
57:22 79:6
92:16 94:11
143:21 152:9
170:7 189:22
190:3 222:14

**corporations**
81:21

**correct** 17:4,
5,12,24,25
23:12 24:10
28:16 31:10,
11,24 32:16,
17 33:14,15
34:16,17
35:11,12,15,
16 36:3 42:9
43:5,6 44:6
47:12 48:4
51:16 53:12,
20,22 54:1,
2,10,11,13
55:5 56:14
58:7 59:2,22
60:17,21
62:20 63:12

65:2,6,7,12, 17,18,20 66:16,25 68:3,4 75:9, 10,20,23,24 76:20 77:12, 13 79:1,7,8 82:15,16 85:25 86:1,4 90:22,24,25 91:3 92:11, 12,15,20 94:8,13,19, 22 95:2,14, 17,21 96:14, 18,19 97:1 99:15,16 100:5 104:7 105:2,17,18 107:4,5 109:17,18 110:10,11 115:2 124:11 125:8,9 128:25 130:22 131:22 133:20 136:24 137:3 138:4 139:1, 7,18,19 140:17 141:25 142:15,19 146:25 147:5,19,25 148:1 149:8 151:2

155:18,22 156:2,16,20, 21 157:4,5 160:11,18,22 163:13 169:18,19,22 170:18,19 171:12,17 173:5,11 175:10,16 177:16 180:21 181:1 182:19 183:3 185:8,14,15 186:12 191:16 192:16 194:3 196:18 198:3 199:23 203:7,12,13, 16,19,23,24 204:6 208:11 209:18 213:10 214:10,18,19 216:19 221:1,2,8, 11,12,18,19, 22 222:6,8, 15,21 225:13,18 226:7 227:3, 6,8,9,17,19 229:17 230:4 232:23,24 233:5,8 236:21 237:11,17,18

239:2,16 241:13,14, 23,24 242:3, 4,8 247:21, 25 248:20 249:20 250:5,24 251:19 252:6 253:3 254:8 255:2 264:7, 8,13

**corrections**
  34:14,15

**correctly**
  55:14 56:3, 21 60:2 63:1 72:4 76:8 77:1,7,15,21 78:5 79:15 83:15 84:21 90:12 91:19 98:25 99:5, 20 113:1,19 114:16 119:18 127:1 132:8,10,22 140:24 146:4 155:14 158:4 166:20 175:6,23 177:11 208:15 211:20 215:20 218:16 226:13 227:10 228:2

233:14
238:20

**cost**  105:22
  204:5

**cost-savings**
  193:24

**counsel**  12:18
  13:13 16:7
  19:17 25:16
  34:14 179:23
  195:20,21
  234:23
  250:18
  255:17 256:7

**counsel's**
  21:4,8

**couple**  30:10
  56:11 76:21
  109:11 257:9

**court**  12:15,
  19 17:15,19
  19:11

**covered**
  117:22,24
  183:22,23
  188:23

**Covington**
  13:13

**create**  29:9,12
  43:18,22

**created**  29:11,
  15 30:10,12
  57:2,4 82:21
  127:19

214:21 229:17 230:9

creates   61:21

creating   57:7 99:9 179:25

creation   93:21 99:8

Cronos   215:18

Cronus   216:3

crosstalk   224:19 256:16

Crosthwaite   80:16 121:25 168:5 234:22 247:8

CSEV   88:12

cues   18:17

current   57:23, 25 58:2,4 77:11 99:25 112:21 145:17 154:18 165:19 171:23 191:14 224:9

cut   125:16 183:17

cutting   239:15 240:1

cylinder   37:17

cylindrical

61:14,17

Cync   113:18 114:8

—————————

D

—————————

damages   27:1

Darien   16:22

data   116:23 117:1,14 189:25 191:4,5,13

date   12:11 22:3 40:24 66:10 133:14 178:23 243:13

dated   189:25 201:1 236:5 240:17 246:11

dates   226:19

Dave   53:17 139:6 225:17

David   121:24 156:20,22 241:22 247:9

day   15:18 18:7 19:3,24 76:14 137:13 207:6 234:18 235:8 238:9 250:23

days   29:23

DCF   91:13

de   193:9

deal   48:24 49:17 73:20 78:19 83:1 86:5,11,14 95:16,19,22, 23 121:1 182:17 204:17,23 206:8 208:5 209:17 224:17 261:9,13,24 264:6,11

deals   85:2 204:16 264:9

December   36:7, 9,16 37:14 40:25 92:10, 19 95:2 189:25 190:1 191:4,14 192:3 196:22 198:19 201:1,5,16 206:19 220:24 221:25 222:2,3,12 236:5 240:18 241:3 243:8 244:23 261:6

decent   59:18

decides   183:11 184:18,19

185:7 186:23

decision   182:2 184:20 186:7 188:17 206:12,18 208:19

declined   106:11

declines   70:21

defendants   13:18 257:5

define   38:5 98:7

defines   205:8

definition   37:1 173:16 182:11 205:17

degree   61:20 166:18 205:18

deliver   37:22 157:14

delivered   37:17 93:15

delivery   37:3, 6,9 61:22 128:20 172:8

Deloitte   31:2

demanding   141:12

demonstrate   258:23

**demonstrating**
  167:1
  211:15,17
  212:8 213:4

**depend**   137:17

**depending**
  201:20

**deposed**   17:23
  18:2 31:21,
  22 32:10
  33:13

**deposition**
  12:8 16:8
  19:10 20:16
  21:5,11,12,
  15 24:17
  25:1,9
  32:13,15,20
  33:1,17,18
  34:22,25
  35:10 40:5
  53:2 64:5
  74:15 81:9
  88:22 121:10
  156:12
  162:11
  191:22
  223:25
  224:24
  246:5,7
  250:24
  263:17,20

**describe**   42:25
  90:1 182:1
  197:11
  237:19

**describing**
  219:3

**designation**
  263:16

**designed**   129:4
  180:10
  218:25

**detail**   72:2

**details**   204:17
  209:25
  237:23

**determining**
  171:3

**develop**   56:6
  77:4 159:15
  197:7 253:10

**developed**
  93:13 115:11
  116:2,14
  153:13

**developing**
  69:25 160:20
  161:4 162:2
  260:24

**development**
  94:3 131:19
  145:25
  146:24
  149:6,12,15,
  22 150:6
  153:11 157:1
  158:2 159:4,
  13,17,23
  160:5,9,11,
  13,16,21

161:1,5,14,
  23 175:10
  191:1

**device**   57:11

**devices**   37:10,
  13,15,18,21

**differentiated**
  47:16 260:4

**differently**
  258:13

**difficult**
  19:12 193:13

**digit**   250:20

**direct**   12:22,
  25 13:10
  15:10 28:7
  205:7
  243:16,25

**directly**   91:16

**director**
  102:13,18
  103:5

**directors**
  91:5,12
  93:16 101:1,
  14,21 102:1,
  5 109:17
  221:13,14
  239:6,8

**disclosed**
  116:21
  193:21

**discontinuation**
  209:14

**discontinue**
  207:4

**discontinued**
  205:1 206:11

**discontinuing**
  208:3

**discounted**
  191:11

**discuss**   77:24
  78:3,8 94:25
  137:21
  142:10 143:5
  215:15

**discussed**
  65:16 71:5
  126:7 129:9
  137:22 141:9
  143:9 167:21
  229:16 235:2
  240:6

**discussing**
  68:12 72:2
  167:22

**discussion**
  48:18 50:2
  51:4 79:4
  80:10 97:16
  124:14 134:4
  135:2 136:6
  165:15 206:4
  214:18
  215:2,7
  221:21
  222:18 235:5

**discussions**

52:2 55:12 69:23 73:9, 15,18 74:4 77:6 89:18 119:6 134:1, 25 137:18 154:20 176:19 226:21 227:1,16 231:16,20 232:1

**dispute** 32:24

**disrupt** 89:6 167:8

**disruption** 105:17

**disruptive** 46:12,19 106:8

**distant** 205:15

**distinct** 229:1

**distinguished** 47:18

**distribution** 61:4 229:2

**divest** 146:1 147:13,16

**divested** 263:4

**divestiture** 192:2

**Divider** 94:14

**dividing** 94:18

**divulge** 22:15 25:14

**doc** 189:5 247:7 250:18 251:1

**docs** 48:11

**document** 15:19,24 16:2,16 27:7,9,15,21 28:2,6,8,9, 15,18 30:9, 18 31:19 32:7 35:18 52:19 53:6, 11,12,14,15, 23 54:8,12, 15,19 56:24 57:7 63:16 64:8,10,14, 17,21,25 65:5 68:18 71:25 74:20, 21 75:3,5,6, 11,15,25 78:23 79:5, 10,12,19 80:7 86:22 90:5,6,9 92:9 93:4, 10,17,22 94:8 97:8 104:3 108:19,24 109:1,4,6, 11,13,15,22 110:3,16,23

111:3,16,18, 24 112:7,12 119:15 123:16 124:2 126:17 127:16,19, 20,23 128:5, 7,11,24 129:2,3,8, 19,24 130:6, 18,22 131:13,22,24 138:15,25 139:12 141:5 143:12,14, 15,20,23 144:7,11,16, 18,20 145:1 146:11,12 148:4,18,21 149:24 151:9,20 152:2,5,8,9, 13,15,18,22, 23 153:8,12 154:7 155:6 156:5,15 162:15 164:8 165:17,20 166:9 167:19 168:16,21,25 169:5,13,17 170:1,3,12, 13,23 171:4, 12,14 172:25 176:9 177:8, 24 178:7,13, 14,16

180:10,16 181:1 188:5, 7 189:21 190:10,13, 18,21,23 191:1,3,16, 18 196:1,6, 9,10,16 197:8,17,23 200:8,12,19, 24 202:10 203:25 204:6 209:11 210:1,21 213:15,23 214:3,4,9,21 215:5,6 216:14 217:22,25 218:24 219:23 221:6,10,21 222:11 223:11,19,24 224:2,7,20 225:12,15,24 226:3 229:22 232:6,18,21 233:24 234:5 235:19,22 236:9 240:10,15, 22,23,25 241:11 242:1,19 243:1,4,9,15 244:10,19 246:1,6

247:3,6,15,
18 248:7,12,
14 250:14
251:15,19
252:9,16,20
253:19
254:4,8,15,
16,23

**document's**
170:16

**documentation**
152:6,14
154:8

**documents**
22:23 24:8,
22 43:18,21,
23 110:10,19
111:8 121:13
152:20
193:15 198:2
201:24
220:21
244:25

**downstream**
172:4

**downward**
258:18

**draft** 79:4
92:10,20
93:14 110:3
139:17,21
140:16
141:22
142:22
143:7,10
144:13

146:14
157:4,6,17,
18 164:2,10,
11,15,16,24
165:9 168:11
170:15,18,21
176:15
190:21
196:17
210:23
211:22,25
212:14
214:18
215:2,7
216:21
217:24
243:10

**drafted** 144:18
159:17
164:17

**drafting** 140:9
144:23
157:19
216:13

**drafts** 217:24
243:12,15

**drag** 138:17

**dragged**
187:14,18

**drive** 105:16
197:20

**drop** 86:10

**Duly** 218:22

**duplicate**
106:22

**dynamic** 215:24

---

**E**

---

**e-cigarette**
249:4,19
250:8

**e-vape** 43:16
116:1

**e-vapor** 36:18,
23 37:1,7,
10,17,20,22
46:12,20,23
47:1 54:23,
24 57:18
62:3 67:15
68:2,8,13,16
70:7 71:11,
14 72:25
89:24 90:2
99:18 100:2
106:1,3
107:10,18
108:8 113:25
116:12,17
117:16 118:7
120:5,7,16,
20 122:7,23
123:24 125:3
134:15 135:3
149:13
154:20 155:2
159:11
160:15
161:3,5,8,
13,24,25
162:3 167:15

192:14
194:19 216:4
218:13
219:5,14,20
229:6,8,14
230:25
257:15,24
258:7 259:6

**e.g** 132:5

**e.g.** 187:14

**Eagle** 68:21,
24 71:6
73:3,4 96:22
97:12,18,22
98:8,10
103:23
104:1,6,10,
19,21 107:3
132:5,15
133:19,24
134:10,21
135:8
180:14,18
182:6,11
183:8,24
184:6,7,14,
18 185:6,7,
11 186:22
188:12,16,20
221:22
222:11,19,
21,23 226:4,
6,7,10,16,
20,21
230:13,16

**Eagle-pmi**
184:7

**earlier** 31:20 81:1,9 84:1 87:18 88:10 107:24 113:24 126:7 129:9 149:16 150:8 185:18 197:24 221:18 222:24 229:15 230:6 233:16 237:5,13 257:6,13 260:1,3,14

**early** 46:11 47:3 206:19 214:24 227:13

**earnest** 52:8

**earnings** 58:6

**earnout** 77:6

**Eastern** 12:13

**economic** 183:15,25 184:23 185:13,17 187:5

**economics** 185:19

**ecosystem** 115:24

**edits** 91:9,16 92:2 109:14 110:19 128:6

129:3,10,21 137:5

**educate** 43:8,9 171:1

**education** 30:20 31:6, 13

**effect** 261:22

**effective** 63:6 260:22

**effectively** 258:11

**efforts** 121:4

**eighth** 165:23

**electronic** 111:18 123:14 124:2 129:25 136:23

**Electronically** 111:13,14

**elements** 227:4

**Eliminate** 105:14

**elimination** 26:20

**Elite** 39:8 88:4 113:18 114:3,4 172:23 173:24 174:6,15,18, 22 191:25

192:11

**Elliot** 199:11

**else's** 89:12

**email** 55:4,8, 9 62:14 65:8,10,14, 17 76:2,13, 19 78:25 88:24 91:2, 8,22 92:4 97:5 100:20 102:7 130:3, 15,18,24 131:2,25 133:3 138:3, 23,24,25 139:3,4,17 140:15,20 141:8 148:21 149:9 152:2, 4,6 156:11, 16,18 157:3, 21,23 158:9 159:2,5 162:15,21, 23,24 163:11,15 164:9,18 167:18 168:12,21 169:4,5,8, 10,20,24 170:1,5 220:4,17,18, 23 221:4 222:7,17 224:25

225:6,16 231:11,17,23 235:15,16,25 236:20,23,24 237:2,9,24 238:16 239:18 245:24 246:10 247:7 248:4,17,18 249:9 250:3 252:18 253:2,5,7,21 254:17

**emailing** 121:16

**emails** 125:7 136:3 138:13 237:20

**employed** 88:12

**empty** 56:10 92:7

**encaptioned** 28:4

**end** 126:10 149:25 151:6 158:10 172:3 205:8,15 224:24 245:1 250:23 261:19

**endeavor** 34:9 200:15

**endeavored** 35:13

engage   155:20

engaging
  193:24

ensure   33:25

enter   227:2

entered   40:14
  261:6

Enterprises
  240:17
  241:20 242:3

entire   35:14
  157:17
  187:22
  204:22
  213:23

entirety
  19:14,19
  27:7 89:2
  112:11
  162:17
  178:17
  240:22

entitled   28:3
  65:20 66:21
  68:21 79:12
  83:5 92:9
  94:21 95:13
  109:1 128:24
  154:7 178:21
  189:24
  196:17
  222:11
  240:15

entrant   63:4

entrants
  120:5,7

EPS   58:3,4,6

equals   73:10
  104:20

equipped
  259:23

equity   55:2
  57:18 59:7
  187:5 204:11
  249:25

errata   34:16,
  18

essentially
  106:21
  150:20
  257:25
  260:13

establish
  165:25
  166:4,10

established
  62:22

esteemed   31:16

estimate   58:5

ETD   138:24

Euromonitor
  116:24
  117:7,10,18,
  21 118:11

European
  117:11

evaluated

84:16

evaluation
  48:19 218:12
  219:3,8,10,
  12,18

evening   56:1
  57:3 132:19

events   51:20
  55:11,17,19

evolved   118:19
  119:3,8

examination
  14:7 15:5
  144:1 257:1
  263:25 264:1

examined   14:4

examples   83:10

Excel   196:11

exception
  174:19

excerpt   29:22

excited   215:16

excitement
  230:24

exclusive
  100:2 134:5,
  12 135:20
  154:21
  200:24

exclusively
  99:19
  107:10,19
  108:9 194:19

exclusivity
  150:9 194:14

excuse   13:5
  30:15 31:10
  166:7 171:15
  207:21
  246:17 251:3

execute   44:1

executed
  244:20

execution
  188:20 244:9

executive
  80:12 242:11

exhibit   15:14
  20:9 27:3,18
  29:17 32:2
  52:19,21
  63:24 64:4
  74:10 88:17
  108:20 130:7
  138:6 143:16
  151:21 156:6
  162:6 168:17
  178:1,20
  189:6 196:2
  200:4 210:8
  213:11
  220:1,5,17
  223:20
  224:9,10
  225:4 229:16
  232:7,13
  235:11
  236:10
  240:11

Confidential                                               Index: exhibiting..financial

245:20
246:24 248:8
250:19
251:11
252:10
253:15
254:11

**exhibiting**
217:4

**exhibits**  191:8
232:12
263:19

**exist**  123:10

**existed**  117:2
159:18

**existence**
160:9

**existing**
145:24
146:23 149:5
180:20
183:14
184:21
185:11
192:15
211:18
212:23 213:5

**exists**  124:17

**exit**  166:14
167:10
172:16
194:14

**exits**  172:6

**expand**  223:16

**expansive**
158:20

**expect**  43:25
113:15
166:5,11

**expectation**
258:25

**expectations**
49:11 80:5

**expected**  52:13
125:11 129:6

**expenses**
105:14

**experience**
30:20,21,24
44:9 126:1

**explain**  61:10
181:6 215:13
217:6,10

**exploration**
141:11

**exposed**  112:22

**expressing**
262:21 263:3

**extend**  171:24

**extent**  25:21
36:21

---
**F**
---

**Fabre**  90:11

**facing**  15:3

**fact**  32:14

193:11

**factor**  71:23

**fair**  180:22

**fall**  191:25

**familiar**  16:4
47:25 79:22,
25 113:13
114:7,10,20
128:10
190:11,12
197:2 199:2
214:5

**family**  192:13

**fast**  52:17
228:8

**favor**  167:4
187:13

**FDA**  54:21
55:23 56:19
57:15 59:6,
14,18 62:25
63:6,9
113:9,16
247:24
249:3,18
250:7
257:13,19
259:24

**February**
214:23
225:18
226:15
228:16
231:9,18,23

**Federal**  20:19

**feel**  15:18
91:15 138:21
200:19
202:24
213:22,23

**felt**  48:23

**file**  56:10
92:7 140:10

**filed**  28:2

**fill**  34:18

**filled**  34:16

**final**  109:21
110:23
111:23
127:18
128:7,13,17
129:19
172:21
186:24
217:22
236:1,2,6,7
241:3 242:15

**finalized**
152:23,24

**finally**  59:16

**finance**  31:10

**financial**
41:20,22
50:12 51:25
52:1 160:2
191:13 198:7
241:17

**financials**
  204:17

**find**  124:20
  164:6 238:12

**fine**  87:3,4
  112:4 223:17

**fingers**  197:13

**finished**  16:15
  31:18 35:17
  63:16 86:21
  108:18
  168:15 188:4
  195:25
  197:22
  219:22
  223:18 232:5
  236:8 240:9
  248:6 252:8
  256:5

**firm**  20:13,
  15,23 21:4
  41:20 195:24
  198:22,24
  199:1,9

**firms**  201:19

**five-minute**
  255:14
  256:13

**flagged**  238:5

**flavors**  54:24
  257:23
  258:2,3

**flew**  238:13

**flexibility**

211:17
212:22 213:5

**floating**  66:11

**flow**  91:11
  191:12

**flowchart**
  180:1 181:8,
  21 182:2
  229:17,20
  230:7,10,12,
  16,20

**fluid**  78:14

**flux**  77:10

**focus**  50:21
  107:13,21,24
  108:5 117:10
  138:19
  150:10 169:2
  198:14 210:5
  213:18,21
  215:12 259:9

**focused**  49:22
  50:13 51:7
  85:13,21
  150:11 174:3
  177:1 199:5
  212:25
  257:21
  261:23
  262:4,7,13

**focusing**  90:5
  108:16 158:1
  162:20
  198:24

**folks**  234:24

**follow**  56:12
  152:16 188:6
  257:10

**follow-up**  76:3
  263:24

**follow-ups**
  109:12

**food**  85:24

**footnote**  91:13

**forced**  166:16
  187:24 188:1

**forces**  105:15

**forecast**
  115:5,7,10,
  14,15,22
  116:4,11,14,
  18 197:2,6,
  14 253:11

**forecasts**
  115:25

**form**  32:21
  33:3,5 35:5
  36:11 38:11
  41:11 51:1
  62:6 66:17
  67:1 68:14
  69:15 71:20,
  23 74:2
  98:13 102:24
  108:11,14
  111:21 116:6
  123:9,10,12,
  18 124:1,3
  126:2 128:8
  129:15

136:18 140:7
145:7 146:9
147:6,20
151:3,11
153:1 159:25
160:23
161:9,17
173:15 176:4
180:3 181:11
185:24
188:14,21
192:7,17,21
194:4 195:3,
15 205:16
207:11,15
208:12
209:19 210:2
211:19
212:17,23
213:6 218:21
229:23 259:4
260:19
261:14
262:9,23

**formal**  73:8
  78:4,9
  158:23 192:9

**format**  111:13
  129:25

**forward**  52:17
  72:1 139:17
  155:12,25
  169:21 217:3
  238:13
  249:22
  259:16

Confidential                                    Index: foundation..group's

foundation
  33:7

founded  47:24

fourth  173:22

frame  28:25
  41:1 42:19
  54:20 144:15
  182:21
  237:23

frames  226:19

framework  77:4

Francisco
  47:23

free  15:18
  91:15 213:22

front  76:5
  215:25

fruit  258:3

FTC  17:24
  31:23 35:3,
  20 53:2 64:4
  74:15 88:22
  156:12
  162:11 205:5
  223:25
  224:8,10
  228:11
  232:10 246:4

FTC's  35:24
  36:2

FTC/DOJ  204:24

full  16:18
  155:10

215:11

future  96:22
  97:13,18,22,
  25 98:10
  105:24 107:3
  115:13 134:8
  145:18
  146:1,25
  149:6,18,19
  150:6 154:18
  171:23
  180:14 182:6
  215:17
  216:11

FYE  196:22

FYI  138:20

─────────────
        G
─────────────

G-A-R-G  199:19

gain  157:24

Garg  199:16,
  18

Garnick  168:4
  234:22

gave  33:16
  35:3,9,19
  41:6 261:22

general  27:8
  41:22 42:23
  203:7

generally
  25:17 26:22
  34:7 35:20,
  22 62:22

77:5 85:4
  136:7 202:3

generation
  139:21

gentleman
  45:7,8

geographies
  229:1

Gifford  168:4
  234:21
  241:13

give  15:20
  16:6 17:7
  19:16 42:12
  143:13
  263:14

giving  35:15

glad  171:5
  250:22

global  12:17
  43:12 132:5
  135:10
  198:24 199:6
  201:9

globally
  60:10,12
  229:11

go-to  126:4

Goldman  52:1
  76:14,19,24
  78:3,8 202:6

good  13:19
  15:7 26:6
  72:20 87:6

96:11 117:12
  148:17
  198:10
  245:10
  257:3,7

Gotcha  107:1
  163:4

Gottlieb  14:18

governance
  49:21 50:15
  183:15,25
  184:24
  185:13,17,19
  187:4 261:24

Governance/other
  99:4,13

graphical
  180:11

Great  19:22
  26:9

Green  206:7,
  14,22 208:3,
  10 209:15

gross  25:2

ground  18:4

group  86:2
  115:23 125:7
  199:6 200:25
  202:13
  240:16
  241:11
  248:19

group's  164:6

growth  43:24
   46:14  52:3
   105:16
   166:6,12
   215:13  258:9

GS  76:18,24
   77:19

guess  27:1

guide  80:10

guys  96:1,5

—————————

H

—————————

H-E-R-R-I-C-K
   45:18

H2o  95:14,22
   96:13
   103:19,24,25

half  158:14

halfway  158:9

Hamilton  14:19

hand  62:21
   229:17  230:9
   251:9

hand-created
   229:19

handed  27:25
   64:2  108:23
   130:13
   151:24  200:7
   236:13
   245:23,24
   252:14

handful  47:8

handheld  37:15

handing  29:20
   74:13

handwriting
   56:13,17,23
   58:12,24,25
   89:9,12
   92:18,23,25
   93:1,3,4,8
   94:5,13
   104:10,14
   106:16  115:1
   118:17,23
   119:12,13
   126:18  137:2
   178:13  179:9

handwritten
   58:9  62:6
   109:14
   127:13
   136:13,16,23

Hannan  12:24

happen  73:11
   135:4  180:12
   183:16

happened  46:5,
   6  48:17  73:2
   82:9,20
   188:11
   203:1,2

happy  18:22
   63:17

hard  111:13
   115:3  126:11
   140:10  171:2

236:4  260:24

harm  105:15

harmful  37:9

head  18:16
   122:1  147:9
   255:15

heading  98:23
   103:21
   132:17  157:3
   171:11
   241:11

headings  104:3
   179:15

headquartered
   47:23

headquarters
   72:13

heads  239:21

headwinds
   192:24
   193:13

healthier
   61:23

hear  13:4,5,6
   18:23  88:11
   167:4

heard  37:23
   70:2  89:18
   198:16,18
   199:1,10,15
   205:19

heat-not-burn
   60:6,7  71:9

118:8  229:3

heater  61:16

heating  76:11

heats  61:17,
   19

heavily  190:25

heavy  197:15

helped  46:15
   152:19

helps  200:16

Herrick  45:9,
   18  125:6
   253:23

hey  217:5

high  46:6
   49:7,9,11

high-growth
   46:11

high-level
   205:13

highlight
   106:17,20,
   23,24

highly  214:17
   215:1  239:10

historically
   216:9

hit  70:15
   258:18

hold  143:11
   172:9  198:11

home   238:13

hope   157:23
  217:5

hour   24:4,20
  63:17 86:23
  261:15

hours   76:5
  77:20 233:11

Howard   80:15
  153:18 155:7
  216:6 234:21

Howard's
  167:22

Howe   200:25
  201:6

Hudson   114:14,
  19

Humor   171:7

hundreds   33:9

hurdles
  259:15,21,24

Huseby   12:17

hypothetical
  124:13
  180:17
  184:12
  186:21
  187:21

hypothetically
  126:12

—————————
        I
—————————

i.e.   172:4,7

IAC/MATCH
  84:20 85:17

idea   46:7

identification
  15:15 27:4
  29:18 32:3
  52:22 63:25
  74:11 88:18
  108:21 130:8
  138:7 143:17
  151:22 156:7
  162:7 168:18
  178:2 189:7
  196:3 200:5
  213:12 220:2
  223:21 232:8
  235:12
  236:11
  240:12
  245:21
  246:25 248:9
  251:12
  252:11
  253:16
  254:12

identified
  65:16 125:24
  168:3 174:18
  178:8 215:11

identifies
  222:18,19

identify   14:13

222:4

II   81:13
  191:16

III   153:18

illustrate
  182:22

illustration
  184:16

Illustrative
  79:13 179:11

immediately
  155:12,25
  211:12

impact   55:11
  134:7 180:19

impacted
  258:25

impactful
  249:24 250:2

impair   17:11

implemented
  129:14

implications
  132:4,15
  133:18,23
  134:20 181:9
  182:10

imply   135:17

important
  137:20

in-depth
  218:11,18
  219:7,10,11,

18

in-person
  21:23 23:11,
  13 24:11
  101:5

inaudible   13:3

include   84:18
  106:2,3
  121:2 212:14

included
  118:13
  121:15 258:2

including   66:3
  78:20 88:3
  98:5 103:22
  116:1 211:9

inclusive
  118:6 120:22
  159:10
  253:10 258:2

Incorrect
  204:7

increase   59:7
  158:16

increased
  54:22 57:16,
  20 63:13
  257:14

increases
  70:12

incurred   27:1

indicating
  237:25

indirect    14:16
  243:17
  244:1,19

indiscernible
  246:16

individual
  125:20 152:4
  199:11,16

individuals
  47:24 51:10
  80:13 81:1,
  2,8 121:14
  125:1,7,23
  136:8 142:17
  143:5 167:20
  168:2 241:25
  248:20

industries
  69:7 198:14

industry   83:13
  85:10,24
  86:3 203:3,
  15

influence
  49:24 187:2

informally
  77:25

information
  26:3 30:17
  48:14 116:21
  146:7 150:21
  196:25 202:3
  203:19,23

informed
  201:24

206:18

initial    50:25
  187:12

initially   50:3

innovation
  47:17,21
  260:5,9,18

innovative
  69:25 260:24

input    111:17
  116:15 129:7
  197:15
  243:19,24
  244:6

insert    94:17
  115:4

inspiration
  217:13

inspire    218:25

institution
  198:8

intact    184:22

intercede
  22:13

interest    42:7
  43:5 46:8
  51:21 60:25
  61:2 98:11
  151:1 191:12
  223:5

interested
  41:9 48:14
  50:3 98:20

internal    158:1
  159:2,3,8
  218:12
  219:4,12,18
  231:12

internally
  194:2 215:8

International
  59:10 69:8,
  9,15 70:22
  73:24 97:25

International's
  60:6

interpose
  19:17

interpretation
  146:18 174:4
  175:17 204:9
  222:2

interrupt
  19:10 110:1
  181:15

introduce
  12:18 27:20
  52:19

introduction
  70:6

intrusions
  166:19

intuitive
  186:9

investing
  119:16

investment
  26:13 35:25
  36:5 41:15
  100:3 119:24
  121:3 134:16
  135:3 151:1
  182:5 216:3,
  4 229:10

investments
  81:22,23
  105:15
  198:10 216:1
  217:4

investor
  150:22
  202:23
  241:20 242:2

invite    200:18

involved    37:2
  45:7 79:23
  93:19,20,23
  99:10 120:23
  121:25
  176:11
  190:25 244:8

involvement
  79:18 83:17
  99:8 112:18
  152:25
  190:16

involving
  25:24 61:25

ipad-type
  57:10

IPO    52:4,8,14

Confidential                                                          Index: IQOS...JUUL

59:20 76:17

**IQOS** 59:25 60:4,5,8,22, 25 61:5,9,24 70:14 71:1, 5,7,16 88:10

**IQS** 60:8

**IR** 202:22

**issue** 19:24 50:18 98:15, 18 151:14 170:17 176:24 177:21 239:21 240:2,6

**issues** 169:22 170:14 176:14,17, 24,25

**item** 176:25

**items** 196:21 226:10

**iteration** 174:5

---

**J**

---

**J.P.** 202:7

**Jack** 166:17, 19 170:18, 20,22 172:4 173:11 176:15 177:15

**Jack's** 166:6, 12 177:10

**James** 12:8 14:2 16:19 71:25

**January** 32:9 33:2,14 35:4 75:8,12 79:14 80:24 106:12 246:11 253:24

**Japan** 187:23

**Jessie** 12:16 87:2 245:14

**JLI** 262:20 263:3

**job** 19:11

**join** 105:15

**journey** 215:14 216:8,17

**Jr** 241:13

**JT** 187:15

**judge** 17:20

**judgment** 204:14

**July** 109:2 112:9 113:12 114:23 115:22 116:5 117:2 121:20 123:24 125:4 156:20

251:21

**junior** 45:6 96:7

**jury** 17:20 181:7

**Justin** 14:14, 21

**JUUL** 12:9 14:19 26:13 28:5 32:11 36:1,5,7,9, 14,15 41:4, 10,13,15,18 42:1,8 43:2, 5 45:22 46:9,10 47:10,16 48:19,21,23, 24 49:3,11, 16,25 50:4, 7,9,10,17,21 51:16,21,24 52:6,8,11 57:18 63:4 66:7 70:14 71:1 76:5,16 83:9 95:17 100:2 115:12 119:6,16 121:3 126:25 127:4,8,11 134:2,6,14 135:2,24 141:12 142:17 145:20 147:25

149:2,4 150:4,22,24 151:1 155:18,22 156:1 157:15,25 158:17,21 162:4 165:11,13,15 166:3 173:11 174:7 175:15 176:13 177:15 179:4 180:21 182:5 183:6,7,12, 14 184:19,21 185:14,22,23 186:11,24 187:21 188:3 195:12,14 197:6,7 205:3 206:9 209:17 212:24 213:7,20 215:19 216:4 218:4 229:10 230:25 233:12,17 234:14 237:16 238:2,12 240:16 241:2 242:7,11,16 250:2 253:12 255:11 258:22 259:25 260:3

261:5

**JUUL's** 49:15
50:24 51:25
52:3 59:13,
19 63:13
80:5 146:13
150:14 151:8
157:16
161:15,25
167:3 258:9
261:24

**JUUL-ALTRIA**
25:6

_____
**K**
_____

**K-** 163:18

**K-A-L-L-A-U-S**
45:13

**K-A-N-E** 45:18

**K.C.** 80:15
121:25
234:21

**Kallaus** 45:8
90:15 125:6

**Kallaus'** 45:11

**Kane** 45:8,16
125:6 163:19
169:10
253:23

**Karen** 13:2,8

**Karessa** 169:10

**KC** 55:10

**keeping** 50:23

**Kevin** 80:15
155:17
242:8,10
247:8

**key** 49:22
50:20 60:7
98:15,18
140:22
141:2,21
210:5 226:10
227:4

**keyboard**
197:13

**kind** 37:19
47:17,24,25
48:25 182:7,
9 190:22
201:19
217:2,3
238:10

**kindly** 19:14
112:16
119:11
143:12 179:6
194:10 218:3

**knew** 160:8
199:22

**knowledge**
36:13 61:13
86:7 87:24
93:5,6,24
109:19
115:21 173:5
190:16
195:17,18
199:4 207:1

217:25 218:1
229:7

_____
**L**
_____

**Labs** 12:9
14:19 26:13
28:5 31:23
32:11 240:16
242:7,11

**lack** 61:13,16
260:18

**laid** 171:1

**landscape**
42:17,18,21,
24 48:1
259:11

**Lane** 16:22

**language** 67:14
108:7 135:16
141:19
159:18
167:9,11,12
186:4

**large** 85:6,14
150:15
166:18

**large-scale**
55:3

**larger** 37:19

**Larson** 163:18

**late** 40:25

**latest** 68:17
126:25 127:4

132:2,5
133:4,19,24
134:21 155:7

**launch** 114:14

**launching**
114:22

**lawyer** 19:23

**lawyers** 25:23
107:24 108:1
262:16

**laymen** 61:11

**layperson**
173:14

**lead** 125:11,
18

**leading** 42:18
215:25
243:13

**leak** 73:14
78:16 188:24

**Leaks** 78:18,
20

**learned** 208:9

**left** 92:16
99:3 106:15
181:7,19

**left-hand**
57:22 79:6
152:9 190:3
222:13

**legal** 16:18
25:24 145:9
164:20

lens  258:10

letter  153:16 154:9 155:16

letterhead 79:6 92:14 109:3 153:17

letters  66:15

level  46:6 49:7,9,24 205:4 230:24 264:10

life  197:14

limit  59:19 200:15

limitation 194:25 195:5,7

limited  83:8 98:2 172:5

lines  76:22 151:6 155:13,25

Linkedin 28:20,23 29:2,5,9,12, 22 30:2,10

Lipton  164:20

list  49:21 121:13,23 169:22 170:14,17 176:14,17, 24,25 226:10 253:8

listed  196:21

lists  84:18 113:17

literal  256:12

litigation 12:10,17 26:12 28:6

lived  16:24

LLC  240:17 241:20 242:3

LLP  13:13

location  72:13

logic  217:8

logical  91:11

logo  190:2 222:13

long  16:24 18:9 22:8 24:2 34:2 40:17 137:8 211:8 261:4

long-term 215:12,18

longer  63:8 118:20 119:1

looked  69:4,13 103:8 117:3, 5 198:2 229:15 261:4

lose  187:4,10

loss  172:16

lot  46:22

48:19 50:1,5 51:3 141:9 215:15

lower  53:3 57:22 66:23 67:2 79:6 92:16 94:10 133:3 143:20 152:9 170:6 189:22

lunch  148:10

————————————
M
————————————

M&a  52:6 215:25 217:2 239:12

made  54:21 55:1 81:21 92:1 96:16 102:4 109:13,21 110:5,12 111:8,15,19 127:12,22 188:7 194:2 206:19 207:3,5,23, 25 208:18 216:1 258:8, 12

magnitude 52:15

maintain  187:8

major  202:5

majority  50:4 143:25

make  19:18 34:14 82:10 91:10,16 97:7 101:13 102:1 110:19 113:15 132:3 133:18 182:14 186:8 208:16 217:17 232:12 257:11 263:15

makes  19:11, 21 132:17 153:12

making  32:12 102:10 109:21 129:3 186:16 243:19

management 80:12,17 195:19 217:15

manner  34:10 154:19

manufacture 38:9

manufacturing 38:13

Maple  95:14, 19 96:2

Confidential                                                    Index: margin..meant

103:18,24,25

**margin**  193:20

**mark**  31:25
231:14

**marked**  15:13,
14 20:8 27:3
28:1 29:17,
21 32:2
52:21 53:1
56:10 63:24
64:3,5
74:10,14
88:17,20,21
108:20,24
130:7,14
138:6,9
143:16,19
151:21,25
156:6,10
162:6,9,10
164:10
168:17,20
170:4 178:1,
4 189:6,20
196:2,5
200:4,8
213:11,14
220:1,16
223:20,23,24
232:7
235:11,14
236:10,14,17
240:11,14
245:20
246:1,4,24
247:2 248:8,
11,13

251:11,18
252:10,15,16
253:15
254:11
263:22

**marker**  224:10

**market**  37:11
38:9 40:14,
21 43:12
44:10,14
50:19 55:1
56:7,20
57:23,25
60:8,11 70:8
71:11,14
73:16 86:11
87:23
114:14,23
116:12
117:11,22
118:3,4,6
120:8,12,20
122:7,23
123:24 125:3
149:13
154:21 155:2
174:23
188:24
189:25
191:4,5,10,
13 192:3
203:10
205:8,16
206:8,16,23
208:4,11
239:11
247:19,20

259:7,23

**market's**
259:14,20

**marketplace**
46:22 50:24
61:7 78:18,
21 84:4
161:7

**marking**  220:3

**Markten**  38:24
39:1,4,6,7
40:20 88:3,4
113:17,18,
22,24 114:3,
4,6 145:24
146:2,23
147:4,13,16
149:5,15
150:5 172:22
173:24
174:6,15,17,
22 191:24,25
192:9,11,12
206:7,14,21
208:3,9
209:15
262:22 263:4

**Markten-type**
40:14

**Markten/green**
205:1

**material**
100:25

**materials**  65:5
91:3 100:23

101:3 109:16
124:20
221:22
222:18

**matter**  12:9
20:12 21:9
22:18 25:6
31:23 32:11
45:2 53:2

**matters**  20:14
41:21 42:15
132:20

**MBA**  31:7

**Mccombs**  31:8

**Mcdonald's**
85:8,22
86:6,9

**Mcdonald's/
chipotle**  84:19

**meaning**  28:10
67:23,24
68:2 104:20
183:1,9
184:7 221:13

**meaningful**
36:18,20
166:6,13
216:2

**means**  69:7
77:24 91:5
105:25
146:17 175:9

**meant**  60:18
71:2 87:20
97:21 181:23

216:23

measure  193:25

mechanism 172:17

media  12:7 85:18

medication 17:10

meet  23:25 44:2 72:12 238:3

meeting  21:23, 25 23:8,11, 14,16,25 24:2,5,6,9, 12,15,19,23 95:2 101:5,7 102:9,15,21 103:4 126:24 127:3 128:18 140:23 141:13,22 142:3,6,9, 10,14 211:9 226:11,16 238:7 239:19

meetings 21:16,18 101:11,22 102:13,14,19 103:5 142:20 143:1,2 226:20

member  131:18 153:6 156:25

157:13 192:12

members  45:6 80:12,16 96:8 143:1 164:19

memory  17:11 34:1 47:7 55:22 57:14 62:3 121:23

menthol  258:4 259:9

mentioned 23:10 31:22 44:4 59:5 60:22 150:8

Mercer  31:3

merger  69:17 73:10 74:4 98:2,6 104:20 231:4

mergers  20:24 41:21

MESH  62:1,2 70:5,6 88:13 227:23 228:14,18 229:8,12 230:19,24

Messrs  53:24 54:16 163:17

met  15:8 257:6

metadata

148:20 220:9

method  96:5 187:6

methodical 34:6,10

metrics  253:11

Michael  12:21 15:2,9

mid-afternoon 238:10

middle  67:12 113:15 169:3 204:1

mind  178:24 224:11

mindset  48:2

mine  107:14, 21 164:22 224:15

minimal  259:7

minimis  193:9

minority 210:19 211:13

minuses  223:14

minute  264:7

minutes  22:10 86:23 102:15,17,21 103:1,4 132:1 256:10

misspoke  87:19

mistake  22:12 120:3

mitigate 105:16 119:17 258:1

MLE  105:1

MO  223:6,8

model  196:11, 14 197:19

Modelo  84:19 86:3,19

modifications 96:17 113:16

modify  35:2

MOE  104:20

moment  13:21 19:15 41:2 78:12 103:9, 13 189:9

moments  48:20, 22 264:4

momentum 157:24 238:1

Monday  196:18 238:4,9

monetize 193:14

money  202:6 203:21

monitor  12:12

Monsees  48:3

months  31:1,3

**Morales** 12:14

**Morgan** 202:6,7

**morning** 13:19 15:7,8 149:17

**Morris** 59:10 60:5 69:7,15 70:22 73:24 97:24

**motivated** 50:11

**Motley** 12:22, 25 13:3,9 15:9

**move** 76:6 112:6 151:19 193:3 205:3 209:16 210:7 213:17 218:7

**moving** 181:7 184:5

**multiple** 48:25 83:10 194:1

**multiples** 191:9

**Murray** 234:22

**N**

**named** 45:7,8

**names** 47:4 88:8 96:1 126:9

**naming** 140:10

**nature** 264:10

**navigate** 59:14 259:15,21,24

**NDA** 227:7,12, 14

**nearing** 245:1

**necessarily** 81:23 85:11 115:16,19 259:6

**needed** 137:22 227:14

**negative** 193:20,21

**negatively** 188:25

**negotiated** 195:13

**negotiating** 141:16

**negotiation** 77:11 141:10 165:1 261:3

**negotiations** 157:12 195:12 237:15 250:1,2 262:19

**network** 39:12

**networking** 29:3,6

**news** 239:19

258:17

**nicely** 180:4

**Nicholas** 155:17

**Nick** 90:10

**nicotine** 37:3, 6,9,22 42:17,21,23, 24 43:12 44:10,14,23 46:15 61:21 63:5 115:24 118:6 159:9 198:25 199:7 201:10,17 202:4 203:10,15 259:10

**night** 233:13

**nod** 18:16

**nodding** 147:9

**non-lawyers** 108:3,16

**noncompete** 132:6 135:10 150:9 171:12,19,22 172:1,2,20, 23 173:13, 17,24 174:9 175:16,22 176:3,21,23 180:20,25 181:10 182:18 183:1

235:1 242:22 243:16,17,25 244:1,8,12, 19 262:4,8

**nondisclosure** 227:3

**nonlegal** 173:14

**Nonresponsive** 193:4

**nonverbal** 18:17

**normal** 110:7,8 111:7 137:14

**note** 106:9,17 232:10 263:19

**noted** 218:22 264:22

**notes** 136:10, 14,17,20,23 137:5

**notice** 89:8 224:7

**notified** 238:11

**notion** 150:9

**November** 12:3, 11 90:10 97:8,10 98:12 100:4 102:6 107:7, 17 196:18

**number** 12:7 27:18 47:8 49:13,23 51:5 52:11 94:11 98:4 101:24 102:3 109:14 115:17 194:24 205:12 225:4 245:11 246:18

**numbering** 224:20

**numbers** 77:9 245:17 250:19

**numeral** 213:20 218:4

**Nussbaum** 163:18

---

### O

**oath** 14:3 17:3 35:10

**object** 36:11 38:11 41:11 51:1 68:14 74:2 98:13 108:13 116:6 140:7 146:9 147:6 151:3, 11 159:25 173:15 176:4 180:3 185:24 188:14,21 192:17,21 195:3,15 208:12 209:19 210:2 212:17 218:21

**objection** 19:18 32:21 33:3,5 35:5 66:17 67:1 102:24 108:11 111:21 123:12,18 124:3 126:2 128:8 129:15 136:18 145:7 147:20 153:1 160:23 161:9,17 180:2 181:11,18 192:7 194:4, 5 207:11,15 229:23 259:4 260:19 261:14 262:9,23

**objective** 215:10

**objects** 19:2

**obligated** 172:17 187:11

**Observations** 58:23

**observed** 84:4

**occasionally** 72:11

**occasions** 18:1 20:22 66:24

**occur** 49:4 137:9

**occurred** 76:10

**occurs** 182:7 224:19 256:16

**October** 152:7, 15 154:8,24 178:9,21 232:23 234:1,6,14 235:2

**offer** 158:10, 16 203:16,18

**office** 23:19 233:11 234:7,16 235:8

**officer** 241:17 242:11

**oftentimes** 197:12

**one's** 246:23

**open** 37:20, 23,24 38:1 87:19

**open-tank** 38:6,8,13

**operate** 258:10

**operated** 228:25 229:1

**operating** 105:14

**operational** 211:12

**operations** 99:19 107:10,18 108:9 194:19

**opinion** 73:16 188:24 193:1

**opportunity** 15:21 19:17 33:18 43:2 45:22 46:8, 16 47:11 51:15 53:6 63:19 74:19 89:1 130:17 138:13 143:22 168:25 190:6 200:13 263:15

**opposing** 255:17

**optimism** 230:24

**optimistic** 62:22

**option** 97:12,

18,21 98:9
107:3 184:17

**options** 96:21
184:15

**oral** 35:15
42:23 118:8

**orally** 18:15
32:10

**order** 42:12
170:23 181:1
201:24
203:22 206:9
211:19
212:23 213:6
263:16,21

**ordinary** 53:25
54:9 64:23
65:1 75:13,
16 90:17,21
131:8,13
139:9,13
163:12,16,
21,25
169:14,17
220:25 221:7
225:21,25
232:25 233:4
247:12,16
248:22,25
249:12,15
250:11,15
251:22
252:3,21,23
254:1,5,20,
24

**orient** 215:17

**original** 30:9
96:21

**outline** 214:10
215:12
230:20

**outlined** 156:1

**output** 123:6

**outright** 81:23

**overlap** 229:11

**overlapping**
229:6

**Overview** 83:6

**owned** 85:15
113:25

**ownership** 50:6
84:3 187:5

**owns** 85:6

---

**P**

---

**p.m.** 65:11
132:13,21
133:1 136:5
138:24
148:8,11,12,
14 162:22,25
169:11
189:12,15,17
209:2,5,7
213:17
233:12 237:4
238:11
255:20,23,25
256:19,22,24
264:20,22

**package** 152:21
154:11

**pages** 30:2
33:9 56:11,
12,13 59:1
89:8 103:11,
14 152:15
181:3

**paragraph**
67:13 150:1
155:10
157:22 159:1
166:23
172:24 173:3
175:16
176:21,22
177:4
204:20,22
206:1 209:25
215:11,23
216:14,24
219:9 227:6
229:21 230:3
233:10
238:16 240:3

**paragraphs**
213:19

**paren** 132:9

**parental**
132:20

**parenthetical**
205:2 231:10

**part** 93:21
107:12
120:24
121:3,19

158:25
164:17,20
176:18
205:16
206:12
230:19 233:4
258:1

**partial** 81:24
84:3

**participant**
36:18,22

**participates**
214:16

**parties** 120:23
224:19
227:15
256:16

**partner** 63:14

**partners** 13:14
21:10 23:18
31:1 41:19
79:5 80:11
84:24 93:20
152:8 190:2
196:13 197:5
221:3

**partnership**
118:18 119:2
166:1,4,11
211:19
212:9,24
213:7

**parts** 93:22
104:14

**party** 166:17

167:7
173:17,18
263:5

**pass**  19:15

**past**  29:23
82:9,20
121:16

**pathway**  52:3,6
76:17 182:3
183:10
238:13

**pathways**
183:10

**patience**  257:8

**Paul**  13:16
257:4

**pause**  64:11
74:24 89:4,
15 109:8
112:13 144:5
162:18
178:18
200:21
213:25 224:5
235:20
236:18

**pay**  89:9
203:21

**paying**  21:7

**pays**  104:21

**pending**  18:9,
11

**people**  121:7
126:8 137:15

142:21
203:3,5,10,
21

**perceive's**
59:24

**perceived**  37:8
61:22 257:22

**percent**  36:6,
9,15 41:3
50:2 70:13
104:21,25
106:11
158:11
187:8,10
188:2 211:11

**perception**
203:14
209:13
259:14

**Perella**  13:14
21:10 23:18
25:5 30:25
41:19 45:2
53:25 54:4,
8,10 64:23
65:1 75:8,
13,16 79:5
80:10,18
84:23 90:18,
20 93:19,23
94:1,6 97:17
103:4
107:16,22
110:9,14,15
116:10,14,19
120:24

122:8,16,20
123:4,8,25
125:15
127:16 130:3
131:9,12
139:10,13
152:7
163:13,22,24
167:11
168:10
169:14,16
176:20
190:2,13
191:23 192:6
196:12
197:4,9,12
201:8,15
213:4 215:8
218:19
219:17
221:1,7
225:22,25
231:12
233:1,3,5
238:8 243:24
244:4,7
247:13,15
248:23,25
249:15
250:12,14
251:25
252:2,21,23
254:2,4,21,
23

**perfect**  234:20

**performed**
84:5,9,12

**period**  68:7
121:20
122:13 123:1
132:9 135:1
142:16,23
154:21,22
168:11
172:12 195:9
206:9

**periods**  66:6

**person**  21:19,
21 29:13
34:6 118:11
125:11 126:5

**personally**
29:12 51:2

**personnel**
160:3

**perspective**
50:12 69:19
80:3 146:13
150:14 191:8
245:5 258:25

**perspectives**
198:8

**peruse**  27:10

**perused**  27:12
30:18

**perusing**  32:7

**Peter**  25:1
45:5 64:18
75:7 80:19
125:5 139:5
236:25

238:5,11
249:10,23
250:4 251:22
253:22

**Philip** 59:9
60:5 69:7,14
70:22 73:24
75:7 76:2
97:24 253:22

**phrased** 260:6

**physically**
234:6

**Pick** 96:9

**picked** 70:14
71:1

**pipeline**
150:18 158:3
159:4,13,18,
23,24 160:5,
9,11,13,16,
22 161:1,6,
14,23 192:15
260:16

**place** 22:1
23:14,17
24:16 182:10
201:20
227:7,12

**plaintiffs**
12:23 13:9,
11 14:16
15:11 26:25

**plan** 43:24
44:1,2 94:25
132:25 207:4

217:4

**plans** 77:18
193:19
257:25

**played** 17:19

**plural** 59:24

**pluses** 223:14

**PLX** 15:13

**PLX-** 235:22
246:15

**PLX-234** 27:21

**PLX-235** 27:20
28:1

**PLX-236** 29:21

**PLX-237** 32:1
40:4

**PLX-238** 52:20,
25

**PLX-239** 64:3

**PLX-240** 74:14,
22

**PLX-241** 88:21
89:3

**PLX-242** 108:24
112:9

**PLX-243** 130:14

**PLX-244** 138:10
148:22

**PLX-245** 143:20
144:17

**PLX-246** 151:25

**PLX-247** 156:11

**PLX-248** 162:10
210:8

**PLX-249** 168:21

**PLX-250** 178:5,
20

**PLX-251** 189:21

**PLX-252** 196:6

**PLX-253** 200:8

**PLX-254** 213:15

**PLX-255** 220:7,
17

**PLX-256** 223:24
225:5

**PLX-258** 235:15

**PLX-259** 236:14

**PLX-260** 240:15

**PLX-261** 245:24

**PLX-262** 246:21

**PLX-263** 248:11

**PLX-264** 250:17

**PLX-266** 252:15

**PMI** 61:4
68:21 69:3,
7,16,20,24
70:5 73:9,15
74:1,8 98:5,
6 105:22
134:7 135:7
180:19
181:10
183:9,10

184:13
186:22
189:1,3
222:24
226:7,17
227:13
228:24 229:7

**PMI's** 62:3
71:8 73:18
89:24 223:5,
14 229:14
230:23

**PMI-ALTRIA**
231:4

**PMI/ALTRIA**
183:13

**PMTA** 114:12

**pod** 37:19

**pod-based**
37:18 38:4,
16,17,20
114:5,9

**Podolsky**
163:18

**point** 18:6
50:21 59:21
62:19 63:11
69:19 73:5,7
84:15 96:20
97:25 99:17
105:7,13,20
106:5 120:10
122:21
126:8,23
134:4 144:2

**IN RE: JUUL LABS, INC. ANTITRUST LITIGATION**
James Wappler on 11/05/2024

Confidential                                                Index: points..presently

145:13 146:8 148:20,24,25 149:24 150:11 154:14 165:25 171:18 173:22 175:20 177:9,18 187:20 193:22 194:16 195:2 210:15 211:6,15 212:6,10 235:5 255:10

**points** 96:14, 18 99:14 140:22 141:2,8,13, 21 157:14 165:14 167:22 217:13 219:1

**portal** 250:21

**Porter** 13:17 257:4

**portfolio** 112:22 158:2 159:3,8,9 259:2

**portion** 58:9 66:13 67:12 99:12 159:5 171:14 204:1

205:19 211:22 212:1

**portions** 66:22 79:24 190:20

**position** 43:13 120:8 151:8 154:25 170:21,22 171:3 211:14

**positive** 59:25

**possibly** 128:1

**Post-8.8.16** 113:6 114:12

**potential** 41:14 42:7 43:5 51:21 52:4,7 66:2 69:2 70:20 73:10,17 76:16 78:16 95:1,16 97:24 134:7 165:13 189:1 214:9 217:12 218:25 223:15 226:19,22 228:11 231:2 235:24 238:1 255:1,4 258:9

**potentially** 59:19 61:1 69:16 166:7, 14,16 167:10

229:6

**power** 245:2, 4,9

**Powerpoint** 62:6 124:1,4 137:1 188:8 222:15 248:2 253:9

**Pre-8.8.16** 113:4,5,8,14

**precedent** 81:20 82:1, 3,8,13,18 83:8 239:11

**precursor** 205:3 208:5 209:16

**preemptive** 187:9

**preference** 76:23

**preliminary** 66:2 79:3 92:10,20 214:17 215:1,6 217:24 226:21,24

**premium** 104:22

**prep** 226:10

**preparation** 24:11,25 40:6 79:18 176:13

190:17 191:21

**prepare** 21:12, 14 23:7 24:6,16 101:6 175:21 176:2 181:1 201:24

**prepared** 79:9 93:17 157:25 158:10

**preparing** 176:18

**present** 234:6

**presentation** 46:1 62:7 84:2 93:14 94:3 99:11 100:1 102:5 124:1,5 128:18,20 217:17 221:15 248:3

**presentations** 101:13,25 137:1 221:11

**presented** 15:25 46:7 110:24 111:3,4,9 158:21

**presenting** 110:20

**presently** 227:12

**preserve** 96:21
97:12,17,21
107:2 183:13
187:5 263:23

**preserved**
185:11

**preserving**
98:9

**president**
241:23

**pressure** 57:17
257:14,19
258:5,18

**pretty** 91:14

**preview** 91:2
92:3 100:22,
25 101:3
109:16

**previous** 44:9
154:20

**previously**
37:11 53:1
64:4 88:21
124:21
156:12
158:17
162:10 170:4
223:24
236:17 246:4
248:13
251:18
252:15

**price** 73:18
74:3 106:10
189:2 198:11

204:10

**price/2019**
58:4

**price/zone**
58:3

**primarily**
38:23 50:13
85:13 150:10
213:21
262:12

**primary** 71:8

**print** 29:24
224:22

**printout**
196:15

**prior** 20:16
21:11 22:23
23:5 24:5,9
28:14 40:5
42:11 43:1
44:3,7 52:8
53:1 58:25
76:10,14
77:5 118:20,
25 140:22
141:13,21
142:2 144:11
152:16 206:8
207:1 208:11
226:10
228:25 235:3
237:4
239:15,25
244:9,19

**Pritzker**

155:17

**private** 250:21

**privilege**
19:5,24

**privy** 160:4

**proceed** 14:23
19:15 32:5
39:14
155:12,25
183:5 184:10
227:15

**proceeding**
17:24 20:20
31:23 35:4,
14

**PROCEEDINGS**
12:2

**process** 76:6
110:3 206:12
211:9 261:3

**produce** 124:21

**product** 37:2
39:7 40:15
50:25 60:6
61:10,11,14,
25 62:3
71:8,10,13
88:12 89:17,
19,25 90:2
94:6 100:2
113:5,6,14,
24 114:5,9,
12 124:8
134:15 135:3
147:5 150:18

153:11 158:2
159:3,12,17,
23 160:8,11,
12,16,21,25
161:5,13,15,
23 197:8,9,
10 206:21
229:4,8,11,
14

**products** 37:16
38:22,24
39:3,6
40:11,20
43:15,16
50:18,23
60:7 69:25
86:10 87:23
88:1,3,5,7
105:24,25
106:1 114:22
116:1 118:7,
9,12 120:11,
16,19 122:6,
12,22,25
123:7,23
125:3
145:24,25
146:1,23,24,
25 147:4
149:6,7,12,
14,16,19,22
150:5,6,7
159:10,14,
16,22
160:15,21
161:4,6,8,
13,14,22,24
162:1,3

174:22,25
191:25
192:14
193:12,20
205:2,6,9,10
206:7,11,14,
22 207:2
208:4,10,19
209:16
257:15,23
260:15,25
262:22 263:4

**Professional**
29:3,6

**profile** 29:9,
11,13,14,22
30:3

**profitability**
43:25

**profound** 55:11

**project** 68:21,
24 71:6
73:3,4,5
79:12 98:7,
24 101:10,18
102:2 103:6,
25 104:6
109:1 112:8
114:13,19
126:8,10
128:25
132:5,15
133:19,24
134:10,21
135:8,23
136:9,20,25

137:16
142:17,21
152:6,14
154:7 156:2
164:11 168:5
170:17
176:14
178:8,21,24
179:4 180:18
184:14
186:13,22
188:12,16,20
189:24
190:24
196:17
197:20
201:22,25
202:16 208:5
209:17
210:21
222:11,19,
20,23 226:7
230:13,15
234:13
237:16

**projects** 98:3
102:22

**pronouncing**
53:18 90:12

**proposal** 76:25
78:4,9
118:20 119:1
126:25
127:5,9,11
157:24
158:6,7
177:10

188:20

**proposals**
110:13
158:19 188:7

**proposed** 83:2,
8 95:23
109:21 119:1
122:9
127:13,24
129:7,13

**proposing**
119:20,24
120:18

**prospects**
46:14 52:3
76:16 258:9

**protected**
227:18

**protective**
263:16,21

**provide** 49:16
50:14 172:18
187:11
203:19
257:25

**provided**
167:3,6
172:11 243:3

**providing**
32:13 197:4

**provision**
86:14 97:11,
14 180:25
182:18

185:18
210:12 235:2

**provisions**
135:20
186:14

**public** 207:7

**publicized**
74:5

**publicly**
83:11,12
85:5,7,14,15
116:20
193:21 198:9
206:19
208:20

**pull** 103:10

**pulled** 29:23

**purchaser**
12:23 13:10
14:16 15:10
28:7

**purchasers**
13:1

**purpose** 80:6
93:10 154:6,
11 164:23

**purposes** 29:25
79:4 214:18
215:2,3,7

**pursuant** 16:8,
10

**pursue** 48:21,
23 52:6,14
59:20 80:4

Confidential                                                    Index: pursued..questions

95:14 96:12, 22 97:12,18, 22 98:10 103:18,24,25 104:6 107:3 180:13,18 182:5

**pursued** 183:6

**pursuing** 52:8 73:19

**put** 37:18 61:15 78:16 106:14 135:9 143:12 195:1 258:18

**putting** 83:18 112:19 257:14

**PWP** 84:16,23 107:22 120:22 152:7,15,19 202:11,23 221:3

**PWP_00000261** 98:23

**PWP_000010523** 218:4

**PWP_00001147** 196:7

**PWP_000012727** 194:11

**PWP_00001273** 189:22

**PWP_00002251** 88:23

**PWP_00002253** 92:11

**PWP_00004199** 200:9

**PWP_00004804** 108:25

**PWP_00004806** 112:16

**PWP_00004809** 118:15

**PWP_00004814** 119:12

**PWP_00004817** 126:16

**PWP_00007043** 74:16 245:25

**PWP_00007044** 78:23 246:2

**PWP_00007054** 81:13

**PWP_00007062** 246:3

**PWP_00008048** 156:14

**PWP_0000815** 64:6

**PWP_00008216** 138:11

**PWP_00008219** 143:21 148:19

**PWP_00008435** 178:10

**PWP_00008436** 179:7

**PWP_00008592** 53:4

**PWP_00008593** 56:10

**PWP_00008594** 56:18

**PWP_00010521** 213:16

**PWP_00012061** 220:18

**PWP_00012062** 220:19 222:14

**PWP_00014494** 240:19

**PWP_00014518** 242:19

**PWP_00014555** 241:5

**PWP_00014557** 240:20

**PWP_00019923** 224:1 225:6

**PWP_00042985** 236:14

**PX** 53:1 64:5 74:14 88:22 156:12 162:11

170:4,8 171:8 223:25 224:12 225:4,5 235:16,17,23 236:17 245:25 246:2,3,4 247:2 248:12,13 251:17,18 252:16

—————————

Q

—————————

**quarters** 51:19

**question** 18:9, 10,23,24,25 19:3,5,13,19 26:3,6 29:8 32:23 39:2 42:4 66:20 91:12,18 108:10 117:12 118:2 135:3 139:25 179:23 181:14 194:7,9 206:20 231:14 233:21,23 244:16 263:25

**questioning** 87:18

**questions**

Confidential                                                    Index: quick..recall

15:20,24
18:15,20
19:25 22:12
27:9,13
28:18 30:1,6
31:21 32:8
53:9 64:9
74:21 88:10
89:11 103:15
109:6 112:12
130:6 138:14
143:24 156:5
163:8 177:24
200:15 228:7
232:2 245:11
255:18 256:7
257:9
263:10,13
264:5,16

**quick** 40:9
208:23

**quickly** 76:7,
11,24 109:11

**quiet** 76:4

**quo** 103:18,23
183:24 184:4

**quote** 78:2,3
172:3 205:8,
14,15
215:13,14

**quotes** 58:16

————————
**R**
————————

**R&d** 160:3
175:4,9,14

260:21

**RAI** 106:12
223:4

**raised** 259:12

**range** 167:2

**rarely** 136:15

**rates** 43:24
191:12

**re-review**
186:4

**reached** 197:17

**reaching**
193:16

**reacted** 188:25

**reaction** 56:20
247:19,21

**read** 28:15
55:13 56:3,
20 57:22
60:2 63:1
72:4 76:8
77:1,7,14,21
78:5 79:15
83:14 84:21
91:19 98:25
99:5,20
104:13 106:5
108:7 113:1,
19 114:16
119:18 120:6
127:1 132:8,
10,22 140:24
146:4 154:15
155:14 158:4

166:20
171:16
173:22
175:6,23
177:11
180:8,9
204:21
211:20
215:20
218:16
226:13
227:10 228:2
233:14
238:20
239:24
242:22,25
245:16

**reading** 115:4
214:25

**reading/
reviewing**
64:11 74:24
89:4,15
109:8 112:13
144:5 162:18
178:18
200:21
213:25 224:5
235:20
236:18

**reads** 62:20
99:17 145:13

**ready** 32:5
39:14 103:15
155:11,20,24
156:8 163:9
190:8 225:8

232:16
252:12

**Reale** 131:3,
17 132:12
136:2 137:9,
13,21 163:17
167:19 168:3
247:9

**reality** 258:21

**realize** 213:16

**realm** 150:12

**realtime**
202:20,24

**reason** 17:6
32:24 73:13
178:24 179:2
193:25 212:3

**reasonable**
147:2

**reasons** 47:15
73:13 78:10
119:10

**recall** 28:13,
23 34:4,20,
21 35:20
38:12,19
39:5 40:13,
17,23,24
45:20,25
46:3,10
47:2,4,5
49:21 50:20
51:10,11,12,
22,23 52:10,
11 54:18

57:8 60:24
62:9 65:24
66:9 68:9
69:1,12,20
70:1,9 72:8,
18,21 73:1
76:12 78:11
79:9 80:8
83:19 84:7,
8,10 85:11
88:15 93:11,
18,25 95:11
97:15 98:21
101:2 102:4,
13 103:3
105:10
107:7,15
108:15
109:23
111:1,5
116:13
122:11
123:5,6
125:19 126:3
127:6,10
129:5,18,22
133:25
134:3,23
136:1,5,19,
22 137:10,24
140:9 141:7
142:8,20
143:8 144:9,
14,23 151:12
152:18
154:10
157:8,19
158:23

160:14
164:21
165:2,19
166:25
167:13
168:1,7,9
176:17 177:5
180:6 181:24
182:20 192:8
194:23 195:8
197:18 199:8
202:9 205:22
206:3,17
207:5,18,20
208:6 210:4
211:24
212:20,25
214:6,20,22
215:4
216:15,25
226:20
231:19,25
233:19
234:8,17,19
235:4,6
240:8 243:7,
11,18,23
244:3,5,7,
14,17 253:6
255:6 261:22
262:7,10,20
263:2

**recalled**
233:17

**recalling**
208:14

**receive** 110:22

111:2,8,12,
23 124:7
221:3 243:9

**received** 26:4
64:16,18,21
65:9 102:20
103:4
111:17,25
124:9 128:6,
13 129:23,24
149:23
169:13,20,24
202:15
220:25 237:2
243:12,14
248:22

**receiving**
103:1 129:19

**recently** 205:1

**recess** 39:22
87:12 100:13
189:14 209:4
255:22
256:13,21

**recipient**
152:4 169:9

**recognize**
92:22

**recollection**
32:9 50:16
62:11 127:8
142:14 143:4
155:4 213:2
216:13
233:25
234:12 235:1

261:12
262:16

**Recommended**
126:21

**reconnecting**
39:11

**record** 14:11
16:18 39:16,
18,21 40:1
45:12 52:25
57:21 63:8
69:6 87:11,
16 100:8,12,
17,25 134:19
136:11
148:6,9,15
154:16
171:17
173:2,23
179:20
189:9,13,18
204:21
209:3,8
224:24
255:21
256:1,17,20,
25 257:12
263:14
264:18,21

**record's**
182:15

**recorded** 17:15
32:16 35:2
102:14,17
138:2 216:24

**red** 31:8

**reduce** 62:5 105:15

**reduced** 106:2 188:8

**reduced-risk** 37:2 43:16 71:8 105:24, 25

**reducing** 257:22

**redundant** 105:14

**reengage** 155:11 255:11

**refer** 36:24 98:1 147:24

**reference** 30:25 65:5 68:16 81:20 88:2 133:4 139:20 140:16 144:13 146:16 216:7 241:19 242:6,7,21

**referenced** 68:18 69:21 76:18 78:24 81:1,9 82:19 84:1 85:2 135:10 141:24 144:11

160:10 188:12 191:6 198:3 229:21 230:13,16 231:10 237:5 239:4 243:17

**references** 100:22 113:10 147:4 165:4,17,21 173:4 174:1 223:3 226:6 228:10

**referencing** 69:2 97:23 106:9,13 135:7 141:22 146:20 240:2

**referred** 62:1 87:19 155:21,22

**referring** 20:19 54:4 55:20 58:20 69:11 70:20 73:22 80:7 82:6 91:22, 23 92:3 108:7 115:8 121:6 135:23 142:7 149:20 158:7 217:11 229:13

**refers** 147:3 185:14,17 214:13

**reflect** 99:23 229:20

**reflected** 62:13 129:8 151:8 231:7

**reflecting** 146:13 155:7

**reflects** 32:15 94:6 99:24 230:4

**refresh** 32:8 233:24

**regard** 19:24 30:19 31:5, 13 38:16 40:4 46:7 50:22 51:15 61:9 86:18 97:11 134:20 138:23 152:5 155:1 161:12 181:20 185:20 186:13 192:1 209:10 226:7 228:17 232:2 243:16,20,24 244:16

**regulation** 54:22

**regulatory** 57:17 63:7 112:22 192:24 193:13 205:11

257:14,19 259:1,3,15, 21,24

**relate** 63:10 98:4

**related** 20:17 26:11 35:25 43:23 54:21, 24 55:23 61:4 68:10 73:9 91:13 110:4 157:9 170:15 180:7 185:21 190:24 191:9 253:12 257:23

**relates** 28:6 107:20

**relations** 202:23

**relationship** 134:6,12 183:14 184:21 185:12 240:15 241:1 242:15 261:5

**release** 249:18 250:8

**released** 249:3

**relevance** 258:6

**relevant** 85:4 120:15

202:25

**relied** 116:15
203:11

**rely** 116:19
193:15
203:3,5

**remain** 172:19
182:9 184:22

**remaining**
50:19 56:13

**remains** 182:7

**remember** 22:2
28:24 32:12
34:23 39:7
41:5 45:10,
24 49:10
52:10 55:21
57:11 58:21
61:6 62:15
70:18 79:20
80:14 88:7
95:24 97:19
98:14 99:9,
10 101:23
102:3,9,16
103:1 107:12
119:4,9
122:4 123:2
133:12 135:1
137:11
142:25
156:24
159:22 179:5
187:20
188:10
196:13,14

201:18
207:12,16
226:18
233:20
234:15
237:22
257:16 260:2
262:1,5

**remote** 14:11

**remotely** 14:13

**removal** 206:24
207:2 208:11

**remove** 208:19

**removed** 40:20
206:22
208:10

**removing** 192:2
207:1 212:16

**renumber** 251:5

**renumbered**
251:10

**repeat** 18:25
81:6 194:6
246:18

**rephrase** 18:22

**report** 125:21
202:19,24
205:20,21
206:2

**reporter**
12:15,20
17:15

**reporter's**

19:11

**reports** 58:17,
19 201:9,23
202:2,14
203:6,11,16,
22

**represent**
15:10 257:5

**representation**
21:8 180:11

**represented**
20:2,11,15,
23 99:25
219:8

**representing**
20:7

**represents**
230:3

**request** 124:7,
18 125:4

**requested**
123:9 211:9

**require** 227:1

**required** 35:7
114:13

**requires** 227:2

**research** 42:17
59:13 116:25
175:9 198:6,
21,23
201:12,19
202:5,19,24
214:14

**researched**
43:11

**researching**
45:1

**reshuffling**
91:10 92:2

**residence**
16:21

**resolved**
177:19,21

**resonate** 88:15
199:13,20
200:2

**resources**
116:3,8,18

**respect** 49:8
102:21 103:5
148:25
149:25
204:24
230:19

**respond** 18:15
132:24

**responded**
249:6,8

**responding**
67:9

**responds**
132:13

**response** 46:1,
4 67:4
263:11 264:4

**responsible**

125:21

**rest** 180:9

**result** 166:18
180:20

**retail** 85:19

**retain** 146:21
149:4 150:4

**retained**
145:22

**retaining**
146:21

**revealing**
25:22

**revenue** 115:17

**review** 15:21
22:23 24:8,
22 27:7 30:5
33:18 34:24
35:6 53:6,9
64:7 74:19
88:24 89:1,6
109:4 112:10
120:10,19
122:5,12,22
123:10,22
124:8 125:2,
12,20 126:24
127:4 130:18
138:13
143:23
162:14,17
163:7 164:7
168:25
178:16
190:5,7

200:11,13
201:23
210:11
213:18,22
220:14,20
224:2,4
232:12
235:18
240:21
251:14

**reviewed** 15:23
33:25 34:8
40:4 80:1
93:7 137:4
141:6 149:16
176:16 246:8

**reviewing**
15:19 89:7
157:10

**revised** 164:6
165:5,18

**revisions**
128:13,16

**Reynolds**
106:13

**rhythm** 181:15

**Riaz** 155:17

**Rice** 12:22,25
13:3,9 15:9

**Richard** 12:14
170:21
171:23
172:2,10,11,
15,18 173:4
175:12,21

176:1 177:9,
13 235:25

**Richard's**
171:20
172:10
175:4,9

**Richmond** 72:3,
7,10,12,15

**rifle** 228:6

**right-hand**
53:3 94:11
143:21
189:22

**rights** 172:16
187:2,4,9
194:14

**risk** 119:17

**Risks** 119:16

**rod** 37:17
61:15,17

**Rodney** 13:16
36:11 38:11
41:11 51:1
68:14 74:2
98:13
108:11,13
116:6 140:7
146:9 147:6
151:3,11
159:25
173:15 176:4
180:3 185:24
188:14,21
189:8
192:17,21

194:5 195:3,
15 208:12
209:19 210:2
212:17
218:21
224:6,14,16
225:3,7
232:9,15
245:9
246:15,19
256:9 257:2,
4 259:17
261:1,20
262:14
263:1,15,18

**Rodney's**
263:25

**role** 79:21
160:1

**Roman** 81:13
213:20 218:4

**room** 141:18
234:9 263:9

**row** 106:17,
20,23,24

**Ruffino** 13:12
14:8 16:12
20:6 21:17
22:5,17,22
23:1,6,11,24
24:12 25:20
26:4 27:17
32:21 33:3,6
35:5 66:17
67:1 74:22
87:1,5

102:24
111:21 112:1
123:12,18
124:3,12
126:2 128:8
129:15
136:18 145:7
147:20 153:1
160:23
161:9,17
181:11 192:7
194:4
207:11,15
219:24
220:3,8
224:15
229:23
245:14
256:6,17
263:8,12
264:17

**rules** 18:4

**runs** 118:11

─────────
**S**
─────────

**S-H-R-E-E-Y-A**
199:17

**Sachs** 52:1
76:14,19,24
202:6

**sale** 187:14,
18

**sales** 115:15,
19 117:16

**Sam** 14:21

**same/similar**
83:13

**Samuel** 14:17

**San** 47:23

**save** 65:1
225:25

**saved** 54:8
90:20 131:12
163:24
169:16 221:7
233:3 247:15
248:25
249:15
250:14
252:2,23
254:4,23

**saves** 75:16
139:13

**scanned** 57:9

**scenario** 94:22
95:13
103:17,22
104:7 106:15
179:11
184:13
186:21,25
187:21

**scenarios**
95:1,13
103:23

**Schacter** 14:15

**scheduled**
226:17

**School** 31:7,8

**schools** 31:16

**scientific**
37:1 61:13

**scope** 175:4,8

**screen** 118:11

**script** 157:4,
6,18 164:3,
11,16,24
165:9,16
167:1 168:6,
12 210:23
211:23
212:1,14
217:12
255:2,4,10

**scripts** 219:1

**scrutinize**
258:8

**scrutiny** 54:22
204:24

**seats** 49:23
187:11

**second-to-last**
155:9

**secrets** 150:20

**section** 94:14
165:24
213:20
216:20
227:22
228:17
231:16,22
239:23
243:25

244:1,12,18

**sections**
243:20

**sector** 36:19,
23 63:5
85:19,20,21

**seek** 34:15

**Seiden** 13:2,6,
8

**Seirafi** 12:24
224:21

**selected** 58:10
84:17 85:3,9
94:21 98:24
103:22

**sell** 38:10,
18,22 166:17
167:6
187:22,24
188:1 198:11

**selling** 38:13,
19

**send** 54:15
55:25 57:2
62:11 91:15
110:13
128:12,16
129:12 153:8
165:12
202:23
253:22

**sending** 62:15
78:4,8 91:9
165:5,11

237:4

**seniority**
126:1

**sense**  19:21
132:17
135:17
153:12
158:15  186:9

**sentence**  55:16
146:17,20
149:2,25
155:10  159:1
239:13

**sentences**
55:14

**separate**
172:11

**separation**
228:24

**September**
52:18  53:16
56:19  57:3
247:10,24
249:9  250:4
252:18
254:17

**serves**  62:4

**services**  41:23
85:24  154:23
172:18
187:12
222:13

**Services'**
92:14  109:3

**set**  29:14
155:13  180:4

**severe**  192:24
193:12

**shading**  201:2

**share**  58:6
73:18  74:3
106:10  189:2
198:11
202:14
204:10  259:8

**shared**  45:23

**shareholders**
104:24
215:17

**sheet**  34:16,
19  65:20,22,
25  66:1,11,
14,22  68:17
107:13,21
132:2  133:5,
9  134:2,24
135:16,21,
22,23  139:22
141:23
142:11,23
143:7,10
146:14
147:19
150:12
158:21,24
165:6,18,19,
20  169:22
170:17
174:3,6
176:14  179:3

233:12,17,25
234:13,16
235:3,7
236:1,3

**sheets**  133:8
170:15

**Shepard**  53:20,
24  54:16
139:7  225:17
232:3  248:18

**shift**  216:8
217:1

**short**  87:6

**shotting**  228:6

**show**  15:13
100:1

**showed**  193:19

**showing**  115:12

**Shreeya**  199:17

**shut**  67:15
68:1

**shutting**  68:7,
12  72:24

**side**  99:3
106:15
114:11
143:13
227:1,2
238:13
239:20  259:6

**sideways**
170:13

**sign**  238:19,

21  239:1,8,
24

**signaling**
52:12  70:13

**signature**
153:23  154:4
241:12  242:8

**signed**  34:21
153:17  179:3
227:8,14
233:12,18,25
234:5  242:1
243:2,4
261:8

**significance**
187:1  195:9

**significant**
52:13  113:16

**signing**  172:23
173:25
174:5,11
234:12,17
235:3,7

**similar**  59:5
71:19  83:1
85:10,24
86:3  113:23
172:16
209:24
221:17
229:22

**simultaneous**
224:18
238:21,23
239:1,8

256:15

**sincerely**
157:23

**single** 202:18
220:4,17

**single-page**
130:15
156:11 225:6

**sir** 53:12,21
55:5 56:14
58:13 68:22
69:6 79:1,7
104:18
108:23 138:3
139:1 142:4
144:21
147:5,9
152:11
156:16
160:17 163:3
164:13 165:7
169:5,6
173:5 182:19
186:2 194:17
206:20 218:5
225:11
227:25
228:10
253:14
264:15

**sister** 172:7

**sit** 17:8 35:1
84:11 99:22
107:6 109:20
127:7 141:3
142:13 145:4

149:10
150:16
160:14
174:17
209:23 212:6
215:23
234:3,11,25
244:22
262:15 263:3

**situation**
20:17,18
56:2 59:14
66:10 70:21
85:4 101:3
165:2 197:3

**situations**
81:21 84:17
128:11,15

**six-year**
187:12 195:7

**sixth** 154:14

**skeptical**
59:13

**sketched** 57:9,
10

**slide** 57:1
82:5 99:8
119:20,23
122:9,10
127:12 188:9

**slides** 55:25
56:6 62:6,
11,12 80:1
94:1 253:9

**slightly**

158:14
258:13

**slower** 245:17

**small** 47:3
245:11,12

**smoke** 61:21
205:2 206:7,
14,22 208:4,
10 209:15

**smokers** 46:23
47:19

**socialize**
77:18,23

**sold** 40:11

**solid** 258:23

**sophisticated**
61:9

**sort** 52:6
57:10 61:21
81:25
170:22,25
182:3 198:7
205:20
216:10

**source** 117:15

**sources** 116:23
117:19

**space** 44:23
46:12,15
47:1 54:23,
24 57:18
173:19
218:14
219:5,14,20

**speak** 24:12
126:5 197:14
259:13
261:16

**speaking** 25:17
26:22 34:7
45:21 136:7
168:7

**specialist**
262:12

**specialists**
51:6

**specific** 28:24
37:4 40:24
46:3 47:4,8
52:11 68:9
78:11 88:8
93:25 98:3
101:2,23
102:9 116:13
119:9 123:2,
5 127:10
128:10
133:12
134:1,24
137:24
142:25
149:21
151:13
154:10 155:3
156:24 157:8
159:20,21
160:5 165:2
166:25 177:5
180:7 182:20
186:4 201:18
214:6 217:1

226:18
231:19,25
234:17 235:5

**specifically**
43:8 54:23
55:20 73:25
79:21 115:9
125:10 126:4
180:19 191:5
192:1
195:10,13
234:9 243:15

**specifics**
45:24 54:19
55:21 57:8
69:13 70:18
72:18 76:12
80:9 85:12
93:11 97:19
111:5 119:4
128:21 141:7
142:8 143:8
243:11 255:6

**spell** 45:11

**spelled** 199:18

**spend** 51:3

**spent** 233:11

**spoke** 51:14
55:9 121:9

**spoken** 25:1,4

**spooked** 73:19,
21,25 74:8
189:2

**squiggle** 105:3

**staff** 96:7

**stage** 46:11
47:3 158:24
182:16

**stages** 227:13

**stake** 36:7,9,
15 41:3,9
50:2,6 81:24
85:6,15
150:16,21
157:16
158:12
166:17 167:7
187:8,14,17
188:2 210:19
211:13

**stakes** 83:12
84:3

**stamp** 108:25
202:11
240:19

**stamped** 53:3
74:16 130:15
138:10 152:1
156:13
178:8,9
189:21 196:6
200:9 213:15

**stance** 151:13

**stand** 154:1
155:11,20
178:23

**standalone**
95:1 182:8
258:11

**standpoint**
192:25

**Stanley** 202:7

**star** 58:15
115:4

**start** 15:20
27:12

**started** 41:14,
17,25 42:2,6
44:19,24
45:1,21

**starts** 48:19,
25 49:2,7,
10,19 50:9,
17 66:6,9
119:5 141:10
155:4 157:11
164:25
165:25 211:1
237:14 255:8
261:3,17

**state** 16:18,
20 104:2
110:2 179:19
216:11

**statements**
67:10 194:1

**States** 38:10
60:11,16,19
61:7 117:16,
18 171:22

**status** 103:18,
23 133:9,13
134:1,24
137:17

160:25
183:24 184:3

**stealing**
150:20

**Steen** 14:18

**stenographer**
13:4,7,21
14:20,24
32:16 87:3
100:7 245:16
246:17
251:4,8

**steps** 126:21
187:9 249:4,
19 250:8

**stick** 37:19

**sticker** 232:10
251:6

**stipulate** 16:7

**stock** 70:12,
15,21

**stood** 93:12
155:5

**stop** 66:6
182:12
184:25

**stopped** 255:9

**stops** 48:20
49:1,2,7,10,
19 50:8,17
66:9 119:6
141:10 155:5
157:11 165:1
237:14,15

255:8 261:3,
17

**straightforward**
91:15

**strategic**
41:21 63:13
121:4 179:15
188:2

**strategies**
119:16
218:13
219:14,20

**strategy** 80:17
91:24 94:2
120:21,25
121:4,19
122:1 128:1
131:19 157:1
215:18 217:2
231:1

**streamline**
138:16

**Street** 116:25

**stricken** 146:2
147:14,17

**strike** 38:7
40:17 70:2
71:11 76:1
89:22 97:6,
13 99:13
102:10 117:9
118:25
120:17
127:17
140:19 157:2

161:3 193:3
212:3 234:4
249:7

**strikethrough**
95:4,8 97:2
145:14,15,
17,18

**strikethroughs**
144:25

**strokes** 158:13

**strong** 135:17

**struck** 95:10
96:25 107:2
118:19

**structural**
80:2

**structure**
76:25 77:19
79:13 83:9,
25 175:3

**structure.pdf**
75:23 79:1

**stuck** 47:10

**studies** 81:14,
18 82:21
83:6 84:17

**study** 81:17
82:19,25
84:5

**sub-bullet**
83:15,23

**sub-bullets**
187:7

**subcomponents**
38:25

**subject** 54:12
65:4 75:19
77:10 90:23
131:21
139:16
141:24 164:2
169:21
172:7,19
204:23
221:10 226:3
233:7
247:18,20
249:3 250:7
252:5 253:1
254:7 255:1
263:20

**subpart** 59:22
62:19 63:11
66:21 83:9

**subpoena** 16:5,
9,11 20:8
27:22

**subs** 172:19

**subscribe**
201:9,15

**subscription**
201:20
202:13 204:6

**subsequently**
183:8

**subsidiaries**
154:18
171:24

**substance**
22:16 25:14,
22 136:6

**substitute**
205:15

**success** 258:24

**successors**
145:15,16

**suggested**
122:8 125:12

**suggests**
148:20 166:9
220:10
235:25

**sum** 22:15

**summarize**
181:22 253:4

**summarized**
181:2

**summary** 56:2
58:23 66:2
67:5 72:19
158:19
180:23
190:23
191:16
235:24

**Sunday** 131:10
136:3
137:13,23,25
237:3

**Super** 15:1

**supplement**
224:23

Confidential                                                    Index: support..terms

support   154:23
  172:18
  187:11
  211:12

supposition
  258:20

surprise   52:15
  141:12

surprised
  73:17

surrounded
  52:2

sustainable
  215:13

swear   12:20

sweet   258:3

sworn   14:2

symbol   165:24
  223:9

synergies
  91:14 105:23
  166:7,13

system   37:24
  38:2 70:7

systems   37:6
  38:2,6,9,14,
  17,18,20

————————————
        T
————————————

tactic   141:16

tactical   165:2

taking   136:20,

22 170:23

talk   72:16
  87:22 132:17
  148:4 182:8

talked   149:1
  176:24 261:2

talking   40:10
  41:2 44:20
  157:14
  165:14
  167:15
  209:12
  217:13 219:1
  222:24

Tamara   200:25
  201:6

tank   37:24
  38:1 87:19,
  20 114:1,3

target   198:11
  204:10

Tarshis   14:14,
  21

task   126:13
  153:10

tax   91:17

taxes   91:13

team   25:5
  45:6 55:9
  56:1 57:2
  62:12 80:12,
  17,20,21,24
  91:24 94:3
  120:21,25

121:1,4,19
  125:24 126:7
  128:1 131:19
  141:14 143:1
  153:6 157:1,
  13 164:20
  195:19
  196:13
  231:12

tech   48:1
  250:18,19
  251:1 260:18

tech-oriented
  47:17,21
  260:5,9

technology
  70:6 88:13

technology-based
  70:7

telephonic
  21:20,22,24
  22:6,8,24
  23:5

tend   198:13

term   37:23
  61:16 65:20,
  22,25 66:1,
  11,14,21
  68:17 86:14
  104:1,6
  107:13,20
  108:16 132:2
  133:4,8,9
  134:2,24
  135:16,21,

22,23 139:21
  141:22
  142:11,22
  143:7,10
  146:14
  147:19
  150:12
  158:21,23
  165:5,18,19,
  20 169:22
  170:15,17
  174:3,5
  176:14 179:3
  182:23,24
  186:5 187:12
  216:17
  233:12,17,25
  234:13,16
  235:3,7
  236:1,3
  244:15

termination
  175:22 176:3

terms   61:11
  66:2 98:24
  99:25 132:5
  133:19,24
  134:21
  139:17
  140:16
  142:11
  144:13 155:8
  167:2,6
  182:9 183:15
  184:1,24
  185:13,17,19
  190:23

Confidential                                               Index: testified..today

195:14
204:17 217:8
228:12
235:24 244:8
261:23
262:4,8

**testified** 14:4
26:17 42:6
47:14 51:13
107:23 192:4
197:25 208:9
237:13
257:11,13
260:1,14
261:21 262:3
264:3

**testifying**
260:3

**testimony** 16:6
17:7,14
35:3,15,19
41:5 44:3
124:13
208:14 256:4
261:22

**Texas** 31:8

**thing** 29:24
39:12 207:24

**things** 49:3,4
76:4,10
78:16 81:19
93:12 98:5
141:17
255:16
257:10
259:7,9

**thinking** 76:15
77:12 78:11,
13 118:18
119:2 155:8
181:8,20
217:3,7
231:8

**third-party**
116:23
117:1,19

**thought** 59:17
115:12 167:3
224:9 250:1
256:11

**thoughts** 49:14

**thoughts/
suggestions**
226:12

**three-page**
178:12

**ticker** 204:13
223:9

**time** 12:12,13
15:19 22:5
27:14 28:22,
25 33:8
39:19,24
40:19 41:1
42:18 45:23
46:16 47:1
48:13 51:3
52:7 54:17,
20 60:4,9
61:1,2,3,24
65:23 66:5,
12,16 67:20

68:6,13
69:4,5,22,24
71:13 72:17
73:6 80:23
87:6,9,14
97:4,16
98:20
100:10,15
102:23 111:3
115:3 121:20
122:1,3,13,
25 123:1,7,
24 126:6
127:9,11
129:3 133:9
135:1 138:1
141:23
142:16,23
143:2 144:15
148:7,13
149:9,23
150:22
151:1,9,14,
16 156:23
159:15,19,24
160:6,22
161:16,19
162:1 165:20
168:11 171:2
172:12 179:1
181:24
182:20
189:11,16
192:15,20
194:2 195:9,
22 201:21
202:4 203:6,
11,12 209:1,

6 213:9
216:6,18
226:15,19,23
228:16,19
229:9 237:23
240:7 241:15
242:10
249:23
255:19,24
256:18,23
257:21
259:11
260:24 261:7
264:19,22

**timely** 172:15

**times** 20:22

**title** 122:3
156:25

**titled** 170:16

**tobacco** 43:15
55:3 57:19
59:8,9 61:15
106:9,10
116:21
150:15
187:23
198:25 199:6
201:10,16
202:4
203:10,15

**today** 15:11
16:6,10
17:4,8,14
20:3 21:5
28:14 31:20
35:1 40:6

84:11 99:23
107:6 109:20
127:7
132:20,21
141:3 142:13
145:4 149:11
152:16
160:15
167:21
174:17
197:24
209:23 212:6
215:23
221:18 230:6
233:16
234:3,11,25
239:20
244:22 246:9
256:3 262:15
263:3

**today's** 12:11
21:11 24:17,
25 40:5
55:11,17,19
59:24 191:21

**told** 207:20

**tone** 216:20,
24

**Tony** 199:25

**top** 56:17
58:23 71:24
119:15
126:20
138:19,23
140:21
162:21 165:4

177:9 179:10
181:7 183:18
200:23
202:12 204:1
210:16
211:16 214:8
223:3 235:23
236:24 237:6
239:18 240:3

**topic** 65:19
170:20 177:6

**topics** 65:15
72:16

**track** 63:8

**trade** 20:19
150:20
204:14

**traded** 73:18
83:11,12
85:5,7,14,15
189:2 198:9

**trading** 191:9

**traditional**
43:15 46:23
55:3 59:7
61:23

**transaction**
66:4 69:3,4,
11,21 73:11
79:13 80:4
83:9 97:24
98:24 99:3
180:14
182:4,6,22
183:7,24

184:6 185:22
189:3 226:22
228:13
235:24 238:2
239:12
261:18

**transactions**
20:25 121:2

**transcribed**
17:14

**transcript**
32:1,20
33:1,19
34:9,13,15,
22,25 40:5
74:15 156:13
263:17

**transition**
154:22

**transitioning**
216:10

**translates**
186:5

**transpired**
44:22 51:20

**treasurer**
241:23

**tree** 54:13
55:12 75:23
78:25 79:13
94:15 95:14,
16 98:24
99:19 101:20
102:2 103:6,
18,24

107:11,19
108:9 109:1
112:8 128:25
132:2 133:4
135:23
136:9,20,25
137:16
140:21
141:20
142:18,22
152:6,14
154:7 156:2
164:11
167:23 168:6
170:17
176:14
178:8,21,25
179:4,17
182:2,4
183:25
184:22,23
185:8,12,13,
14,16 186:25
187:15
188:17
189:24
190:24
194:19
196:17
197:20
201:23,25
202:16 208:5
209:17
210:21
222:19
234:13
237:16
239:20 254:8

Tree's   186:14

Tree/maple
  96:13

trends   43:13

trial   17:20,
  21

trip   72:7,15,
  23

true   32:19,25

truth   17:3
  35:11,14

Tuesday   132:19

turn   56:9
  58:8,22
  78:22 81:12
  83:4 92:6
  94:10 98:22
  103:10
  112:16
  114:25
  118:14
  119:11
  126:15
  153:15
  154:12 170:8
  171:8 177:7
  179:6 194:10
  196:20
  204:15
  217:19 218:3
  222:10 223:1
  241:4 242:18

two-page
  143:20
  248:2,12

type   43:21
  54:7 64:25
  75:15 115:10
  123:16
  139:12
  207:24 221:6
  225:24

types   38:2

typical   141:15
  226:25

typically   66:1
  69:13 77:24
  78:12 83:3
  96:7 101:3
  110:15,19
  116:15
  129:16 198:7
  214:23

_____

U

_____

U.S.   43:11
  60:20 115:24
  117:22
  118:3,4
  145:19
  154:20 155:1
  172:5 204:2,
  14 208:4
  211:11

UBS   202:7

Uh-huh   153:19,
  21 178:6,11
  179:13
  200:10
  204:19

236:16

ultimately
  49:15 73:11
  93:15 197:19
  258:22

umbrella   39:6
  88:3

unable   26:2,5
  233:22
  238:12

uncertainty
  205:18
  264:11

uncommon   94:1

undergo   172:15

understand
  17:2,13,18
  18:12,14,19
  19:7,19
  49:14 67:8,
  22,23 71:2
  104:15
  108:10 118:4
  147:24 152:3

understanding
  25:12,18
  26:10,16,19,
  23 51:5
  70:16 82:2
  83:22,24
  113:21
  114:18 133:8
  140:1 141:3
  145:5 146:6
  149:11 150:3

151:4 154:25
  166:22
  173:14
  174:1,16
  175:20 176:1
  180:25 186:6
  187:16,19
  192:22
  194:22 212:5
  214:12
  215:22
  257:18
  259:18,19,22
  260:21

understood
  22:19,20
  76:15 89:13
  145:13

undertake   23:7

undertaking
  44:13

undertook   43:1

unique   84:3

unit   115:12

United   38:10
  60:11,15,19
  61:7 117:15,
  18 171:22

units   115:17,
  18

Universe   73:5

University
  31:6,7

unknown   106:11

Confidential                                              Index: unprofitable..wanted

| | | | |
|---|---|---|---|
| **unprofitable** 192:23 193:12 | 52:13,16 66:3 99:3 158:16 166:18 190:24 191:7,10,16, 19,22 192:5, 9,19 193:7 196:17 197:7,21 211:10 218:19 253:12 258:13,16, 19,24 261:24 | **VEEV** 89:19, 21,23,24 | **views** 203:19 |
| **unreportable** 224:18 256:15 | | **vehicle** 145:20 | **VIM** 113:18 114:6 |
| **unusual** 199:24 239:10 | | **verbal** 18:16 | **vis-à-vis** 135:8 |
| **update** 55:23 56:20 57:15 59:6,18,24 92:9,19 94:15 109:2 112:9 128:25 129:4 247:24 252:5 254:8 | | **version** 28:9, 15 30:9 62:12 91:3 109:22 110:23 111:18,24 127:18 128:7,14,17 129:19 140:3 164:6 196:10 197:19 204:5 214:3 217:23 241:3 242:15 243:3,9 | **volume** 115:5, 7,13,14,19, 22 116:4,11, 18 253:11 |
| | | | **vote** 187:9,13 |
| | **values** 57:19 | | **vulnerability** 70:11 |
| **updates** 233:8 | **vaping** 205:2, 4,6,9,10,15 206:7 208:4 209:16 | | |
| **uploaded** 250:21 | | **versus** 164:22 216:9 230:25 | **W** |
| **upstream** 171:20,25 172:7 | **vapor** 112:22 145:19,21 166:14 167:14 211:18 212:23 213:5 260:15 | **vice** 241:16, 23 | **Waack** 12:16 |
| | | **videotape** 17:16,19 | **Wachtel** 164:20 195:23 233:11 234:23 262:12 |
| **usage** 257:22 258:1 | | **view** 193:9,10 197:5 205:13,20 209:24 258:15 259:20 260:8,12 | |
| **V** | **vaporization** 37:3 | | **Wachtel's** 234:7,15 235:8 |
| **V-E-E-V** 89:19 | **varies** 201:19 | | **wait** 166:7 239:14 |
| **vague** 47:7 | **variety** 20:24 37:5,10,21 73:13 78:10 115:25 152:20 253:8 | **viewed** 239:10 259:23 | **walk** 46:5 49:6 51:18 170:25 181:4,9,19 183:20 |
| **Valani** 155:17 | | | |
| **valid** 118:20 119:1 | | **viewpoint** 228:23 | **Wall** 116:24 |
| **valuation** 49:12 50:13 | | | **wanted** 36:17 43:7 48:15, |

Confidential    Index: Wappler..Yates

21 49:3
72:16 133:22
137:21 238:3
257:9 263:14

**Wappler** 12:8
13:20 14:2
15:7 16:9,
17,19 20:2
25:11 27:25
28:19 29:20
33:13 40:3
53:5 64:2,13
72:6 74:13
75:2 88:20
98:17 112:15
130:13,21
138:9 143:19
148:17
151:24
156:10
161:12 162:9
168:20 178:4
189:20 193:6
196:5 197:24
200:23
209:10
213:14
223:23
240:14
246:10 256:3
257:3

**ways** 63:6

**week** 22:2

**weekend** 137:22

**weekends**
137:15,18,19

**Weinberg** 13:14
21:10 23:18
30:25 41:19
45:5 64:18,
22 65:9,10
66:15,24
67:9,13,20
68:6,11
70:10,20,25
75:8 79:5
80:11,19
84:23 93:20
125:5 139:5
152:8 190:2,
13 196:12
197:5 232:22
236:25
237:3,21
238:6,17
249:10,23
250:5 251:22
253:22

**Weinberg's**
67:4

**West** 47:22
48:1

**Willard** 80:15
153:18 168:3
234:21

**Willard's**
153:22

**William** 241:13

**Winding** 16:22

**Wise** 121:24
156:20,22
241:22 247:9

**withdraw** 29:8
32:23 39:1
42:3 66:19
67:21 123:20
139:24
161:21
174:21,24
181:14 194:9
217:20

**withdrawing**
206:6

**withdrawn**
51:12 67:20
151:18
161:10
206:15,16
244:23

**word** 44:17
46:18 67:22
82:1,2,8,13,
18 119:8
120:6 187:17
191:19
212:7,9

**words** 70:25
206:25

**work** 30:19,24
41:24 42:12,
25 43:8,19
44:4,12,22
45:2 55:7
62:24 94:6
123:5 132:21
197:9,10
215:16
258:6,7

**worked** 25:5
42:14 50:7
77:3 84:13
205:11

**working** 44:7,
19 63:6 79:3
80:20,21,23
92:10,20
101:9 102:22
108:4 125:24
150:25 160:6

**worldwide**
171:20

**worries** 225:3

**worth** 49:15

**wrap** 255:16

**write** 159:4

**writing** 67:3
78:17 181:24
207:14

**written** 21:3
123:10
216:16

**wrong** 34:13
59:23 62:21
63:12 94:14

**wrote** 60:9

_____
X
_____

**XL** 113:17,22

_____
Y
_____

**Yates** 75:7

253:22

**year** 31:3
73:8 221:25
222:4

**years** 20:25
21:1,2
30:10,12,13
31:1,2 44:22
51:22
194:20,22,23
195:10
205:12
215:25
228:24

**yellow** 106:17,
19,23

**yesterday**
23:15 233:11

**York** 12:4
23:19 132:18
214:15 238:4

**youth** 249:4,
19 250:8
257:22 258:1

**Yup** 163:6

---

**Z**

---

**zoom** 14:9
39:10

**Zwerling** 14:15

# EXHIBIT E

# EXHIBIT 11

# FILED UNDER SEAL

Produced in Native Format

Produced in Native Format

CONFIDENTIAL – FTC Docket No. 9393

PWP_00011909

# Board Update

## *December 2018*

**Preliminary Working Draft**
*Subject to Further Review*



Altria
Altria Client Services

# Nu Mark Update

- **Oct. 25, 2018, Altria announced changes to e-vapor portfolio aimed at addressing underage use**

  - Removal of MarkTen Elite and Apex pod-based products from the market until these products receive a market order from the FDA or the youth issue is otherwise addressed

  - MarkTen and Green Smoke cig-a-like products to be sold in tobacco, menthol and mint

- **Upon further consideration, management recommends ceasing support for all MarkTen and Green Smoke cig-a-like products**

  - 3YP forecasts aggregate losses of ~[$230] million; products are not forecasted to break even in current 3YP cycle

  - Low adult smoker and vaper conversion rates

  - Product currently at retail can be "sold through;" no additional shipments

- **Financial and other resources can be more effectively used to invest in "leap-frog" / next generation products and technologies**

  - Currently reviewing growth team budgets to appropriately allocate funds



# Summary observations on tobacco sector

- **Significant pressure on Altria and tobacco sector valuation over past 2 years**

  - Altria's share price down 21% and P/E multiple has contracted by 8.4x since January 2017

    - Compares to peer share price decline of 19% and multiple contraction of 4.2x

  - Primarily related to regulatory headwinds, disruption from e-vapor and macro factors such as rising interest rates

- **Regulatory headwinds likely to continue as FDA evaluates menthol ban and nicotine standards**

  - Reduced harm assets receiving valuation premium as investors recognize profit pool is shifting away from traditional tobacco toward innovation / reduced harm

- **Although FDA actions could be years away, combined with disruptive threats from Tree, expect continued pressure on Altria valuation assuming status quo strategy**

  - Backdrop merits evaluation of initiatives to more directly participate in high growth segments


Altria
Altria Client Services

# Altria absolute share price performance

*FDA announcements have been the key catalyst for the decline in Altria's share price...*

**Altria Absolute Share Price Performance**

July 28, 2017: FDA extends PMTA window for RHPs; potential restriction on nicotine levels in cigarettes

January 25, 2018: FDA TPSAC fails to support iQOS health claim

November 9, 2018: FDA restrictions on e-vapor flavors and potential ban on menthol cigarettes

(12%)

+8%

(8%)

November 28, 2017: Tax reform

(14%)

(18%)

$53.72

April 2018: PMI Q1 results; FDA e-vapor youth access announcement



# Altria relative share price performance

*...and have caused Altria's share price to fall more than peers*



# Selected scenario analysis

| Scenario | Description / Assumptions |
|---|---|
| *Status Quo* (*Maple + H2O*) | ▪ ███████████<br>▪ Nu Mark commercialization efforts end in December 2018 to focus on true leap-frog technologies<br>▪ Maple and H2O provide long-term potential…<br>…but expect increasing pressure on earnings growth and market valuation until resolution of disruptive threats to core tobacco business |
| *Pursue Tree, Maple and H2O* | ▪ Invest in leading innovative platform to accelerate growth and mitigate disruption risk<br>▪ Would pressure near term earnings but provide platform for sustainable growth / cash flows in mid- to long-term |



Altria
Altria Client Services

# *Maple Update*




Altria
Altria Client Services

# Cronos Group - overview



- Cronos is a vertically integrated cannabis company with operations in North America, Latin America, Europe, Australia and the Middle East

- Operates two subsidiaries: Peace Naturals Project Inc. (medical) and Original BC (Cove and Spinach brands)

- The company focuses heavily on R&D

  - Patent pending cannabis extraction technology

  - Actively researching plant genetics, growing methodologies, chemical processing and product formulation

  - Recently invested in laboratory cannabinoid production through its partnership with Ginkgo Bioworks

- In March 2018, announced the sale of 10.4 million shares for proceeds of C$100 million

  - Proceeds used to fund investment in international operations and capacity expansion

- Trades on the Toronto Stock Exchange (TSX: CRON) and the NASDAQ (NASDAQ: CRON)



# Summary observations on Cronos

## Strengths

➕ Differentiated player – intense focus on R&D / innovation

➕ Diverse, highly-skilled management team with extensive experience in M&A, finance and law

➕ Early stage, but promising focus on customer segmentation and brand development

➕ ███████████████████████████

███████████████████████████████

## Considerations

❌




Altria
Altria Client Services



# Proposal summary

| Term | As Agreed with Cronos on November 8th |
|---|---|
| **Initial Stake** | <ul><li>45% stake (new shares issued to Altria)</li><li>Purchase price of CAD$16.25 per share or USD$1.8B</li><li>44% premium to current 10-day VWAP</li><li>Cash investment used to fund future growth of Cronos</li></ul> |
| **Call Option on Incremental Stake** | <ul><li>10% stake (55% total)</li><li>Purchase price of CAD$19.00 per share or USD $1.0B</li><li>68% premium to current 10-day VWAP</li><li>Cash investment used to fund future growth of Cronos</li><li>4 year option term</li></ul> |
| **Governance** | <ul><li>Altria to nominate 4 out of 7 Cronos directors</li><li>Altria to receive proportional voting rights to ownership stake (45% → 55%)</li></ul> |


Altria
Altria Client Services

# Financial impact to Altria

*(USD $ in millions and per share, unless indicated otherwise)*

|  | Initial Investment | Top up to 55% |
|---|---|---|
| **Assumed Time of Investment** | Jan 2019 | Jan 2021 |
| Proposed Purchase Price per Share ($CAD) | $16.25 | $19.00 |
| Implied Purchase Price per Share ($USD) | $12.23 | $14.30 |
| Shares Issued to Altria (M) | 146.2 | 72.2 |
| **Altria Cash Investment** | $1,788 | $1,032 |
|  |  | Cumulative: $2,820 |

Source:  Cronos management plan. Factset as of 11/30/18
Note:  (1) Calculated versus Altria management plan



# *Tree Update*




Altria
Altria Client Services

# Project Tree backdrop

- Altria has been engaged in discussions with Tree since April 2017

- Tree has achieved robust growth on a standalone basis and has historically had limited appetite to partner with or sell to major tobacco companies

- Altria dialogue with Tree has therefore had numerous starts and stops, including Altria walking away from Tree discussions in September 2018 due to concerns about valuation and governance

- Altria re-engaged with Tree in October amidst a period of regulatory uncertainty related to e-vapor

- Conversations had a different tone at that time and Altria / Tree agreed to non-binding terms on October 29th (see next page)

- Due diligence currently underway; preliminary findings support valuation and investment thesis

- Although progress has been made a potential deal with Tree is still highly uncertain and subject to many factors



# Project Tree selected transaction terms

| | |
|---|---|
| **Transaction** | ■ Altria to acquire 35% stake in Tree parent (U.S. + international)<br><br>■ Simultaneous sign and close (no shareholder vote required; parties to seek HSR approval after close)<br><br>■ Proceeds used to provide liquidity to existing shareholders (Tree to maintain $500 million - $1 billion on balance sheet to fund future growth) |
| **Valuation** | ■ $36.0 billion valuation<br><br>■ $12.6 billion for 35% stake<br><br>■ Pre-emptive rights to maintain 35% stake |
| **Governance / Other** | ■ 35% voting rights<br><br>■ Right to appoint 4 out of 12 Board seats after HSR approval<br><br>■ Altria commits to conduct e-vapor operations exclusively through Tree<br><br>■ Right to exit over time following six year period |



**Altria**
Altria Client Services

# Tree financial summary (as provided by Tree)

*($ USD in billions and pods in millions)*

|  | 2018 | 2019 | Dec 2019 Run-Rate |
|---|---|---|---|
| U.S. Volume (Pods) | 505 | 825 | 1,050 |
| **Net Revenue** | | | |
| U.S. | $1.3 | $2.3 | $3.0 |
| International | 0.0 | 0.4 | 0.9 |
| **Total** | **$1.3** | **$2.7** | **$3.9** |
| *% Growth* | *515%* | *112%* | |
| U.S. Gross Profit | $0.7 | $1.5 | $2.2 |
| *% Margin* | *52%* | *64%* | *73%* |
| U.S. EBITDA[1] | $0.1 | $0.5 | $1.1 |
| *% Margin* | *10%* | *21%* | *36%* |

Source:    S&BD estimates, Project Tree management estimates and dataroom
Note:      (1) Includes impact of regulatory costs; international EBITDA not provided by Tree Management
Altria Client Services I S&BD| December 2018 I Draft I Highly Confidential    16



**Altria**
Altria Client Services

# Illustrative scenario analysis – U.S.

| Scenario | Description / Assumptions |
|---|---|
| **S&BD Latest Estimate ("LE")** | ▪ Reflects long-term shift from combustibles to e-vapor<br>▪ E-vapor 2021 share of category increases ██████████████ ██ |
| **LE + Cigarette Menthol Ban** | ▪ Cigarette menthol ban introduced in 2024<br>██████████████████████ |
| **LE + Cigarette Nicotine Ceiling & Cigarette Menthol Ban** | ▪ Cigarette menthol ban introduced in 2024<br>▪ Nicotine ceiling introduced in 2028<br>– ██████████████████████████ |
| **E-Vapor Regulatory Risk Downside** | ▪ Assumed haircut to volume as a result of increased regulatory intervention / scrutiny<br>▪ ████████████████████ |



# Long-term Tree financial overview – latest estimate

*($ USD in billions)*



**U.S.**

**International**

**Proportion of Space**

| | 5% | 14% | 20% | | -% | 5% | 7% |

■ Net Revenue  ■ EBITDA

U.S.:
- 2019 (Year 1): Net Revenue $2, EBITDA $0.4
- 2024 (Year 6): Net Revenue $7, EBITDA $4, 59%
- 2030 (Year 12): Net Revenue $11, EBITDA $8, 70%

International:
- 2019 (Year 1): Net Revenue $0.5, EBITDA ($0.3)
- 2024 (Year 6): Net Revenue $8, EBITDA $3, 39%
- 2030 (Year 12): Net Revenue $11, EBITDA $7, 59%

**Altria**
Altria Client Services

Source:  S&BD estimates, Tree management estimates and dataroom
Note:    International share of space only considers markets in commercialization

Altria Client Services  I  S&BD |  December 2018  I  Draft  I  Highly Confidential     18

# Illustrative Tree DCF analysis (highly preliminary)

*($ USD in billions)*

| Scenario | Tree Consolidated | | |
| --- | --- | --- | --- |
| | Low | Midpoint | High |
| Latest Estimate | $30 | $40 | $56 |



| | | | |
| --- | --- | --- | --- |
| E-Vapor Regulatory Downside | $25 | $34 | $47 |

Source:  S&BD estimates, Project Tree management estimates and dataroom
Note:  Valuation figures above reflect value of standalone Tree business (U.S. + International). Assumes 10% - 15% discount rate for U.S. business
and 12.5% - 17.5% discount rate for international business. DCF value of $500 million annual cost savings is $3.9 billion assuming 10.0%
discount rate and 0% perpetuity growth



**Altria**
Altria Client Services

# Implied Altria NPV summary

*($ USD in billions)*

| Scenario | Altria Consolidated | |
| --- | --- | --- |
| | **Status Quo**<br>*(with Maple & H20)* | **Tree[1]**<br>*(with Maple & H20)* |
| **Latest Estimate** | $111 | $128 |



| | | |
| --- | --- | --- |
| **E-Vapor Regulatory Downside** | $119 | $134 |

*Current Altria enterprise value (market perspective): $112 billion*

Source:    S&BD estimates, Project Tree management estimates and dataroom
Note:    Tree valuation figures above reflect value of consolidated Tree business (U.S. + International)
    (1)   Based on 35% of midpoint valuation on page 18



Altria Client Services

Altria Client Services  | S&BD | December 2018 | Draft | Highly Confidential   20

S&BD estimates.

Altria
Altria Client Services

# Selected scenario analysis (including Eagle)

| Scenario | Description / Assumptions |
|---|---|
| **Status Quo (Maple + H2O)** | ▪ ███████████████████<br><br>▪ Nu Mark commercialization efforts end in December 2018 to focus on true leap-frog technologies<br><br>▪ Maple and H2O provide long-term potential…<br><br>…but expect increasing pressure on earnings growth and market valuation until resolution of disruptive threats to core tobacco business |
| **Pursue Tree, Maple and H2O** | ▪ Invest in leading innovative platform to accelerate growth and mitigate disruption risk<br><br>▪ Would pressure near term earnings but provide platform for sustainable growth / cash flows in mid- to long-term |
| **Pursue Project Eagle in Near Term** | ▪ Combine with Eagle either through an MoE or Eagle pays ████████ ████████<br><br>▪ Eliminate redundant operating expenses and join forces in reduced harm investments in an attempt to drive growth and mitigate disruption<br><br>▪ Not clear consolidation addresses disruptive challenges to core tobacco business (note BAT share price has declined 38% since January 2017 even with the benefit of the RAI acquisition) |



Source:    S&BD estimates, Project Tree management estimates and dataroom

**Altria**
Altria Client Services

# *Backup Materials*





# *Tree Backup*




Altria
Altria Client Services

# Long-term Tree financial overview – U.S.

*($ USD in billions)*

## 2030 Revenue and EBITDA

$11.2

$7.8

70% Margin

LE

$9.1

$6.1

67% Margin

Regulatory Downside

**■ Net Revenue**     **■ EBITDA**



Source:     S&BD estimates, Project Tree management estimates and dataroom

Altria Client Services  I  S&BD |  December 2018  I  Draft  I  Highly Confidential     27

# Summary of key Tree KPIs – U.S.

*(Pod volume in millions)*





Source:    S&BD estimates, Project Tree management estimates and dataroom



# Long-term Tree forecast overview – U.S.

*(Pod volume in millions)*

## Tree U.S. Pod Volume

**4,569**

**3,066**

**2,555**

**2,044**

| 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |

## Tree % of Total Tobacco Space

| 3% | 5% | 7% | 9% | 11% | 13% | 14% | 16% | 17% | 18% | 18% | 19% | 20% |

*Regulatory Downside*

| 3% | 5% | 6% | 7% | 9% | 10% | 11% | 13% | 14% | 14% | 15% | 15% | 16% |



Source:     S&BD estimates, Project Tree management estimates and dataroom

# Illustrative Tree international forecast analysis

- **Three tier forecast for ~30 individual markets**
  - *Tier 1 (10% long-term market share by 2026)*: Western Europe, Canada, Israel, New Zealand
  - *Tier 2 (10% long-term market share with by 2030)*: Russia, Eastern Europe, South Africa
  - *Tier 3 (3% long-term market share with by 2026)*: Indonesia, India, Philippines
  - Weighted average long-term share of 6% - 7% for participating markets

- **Retail and manufacturer pricing based on country business plans provided**
  - Weighted average refill kit pricing at a 20% - 25% discount to U.S.

- **Long-term margin at a ~10% discount to U.S. EBITDA margin**
  - COGS in line with U.S. market (centralized sourcing)
  - Higher employee expense to account for country-specific sales force and regulatory teams



Altria
Altria Client Services

# Long-term Tree forecast overview – international

*(Pod volume in millions)*

## Tree International Pod Volume

**3,138**

| 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |

## Tree % of Total Tobacco Space in Participating Markets

| 0% | 0% | 1% | 2% | 3% | 4% | 5% | 6% | 6% | 6% | 7% | 7% | 7% |


Altria
Altria Client Services

Source:    S&BD estimates, Project Tree management estimates and dataroom

Altria Client Services I S&BD| December 2018 I Draft I Highly Confidential    31

# Long-term Tree financial overview – international

*($ USD in billions)*

**Revenue and EBITDA**



$11.3

$9.1

$6.7

59%
Margin

$4.1

45%
Margin

$3.5

$0.4

| 2021 | 2025 | 2030 |
| (Year 3) | (Year 7) | (Final Year) |



Net Revenue      EBITDA



Source:     S&BD estimates, Project Tree management estimates and dataroom

# Illustrative Tree DCF analysis (highly preliminary)

*($ USD in billions)*

## U.S.

*Assumes illustrative WACC of 10% - 15% and perpetuity growth rate of 0.0% - (1.0%)*

## International

*Assumes illustrative WACC of 12.5% - 17.5% and perpetuity growth rate of 0.5% - (0.5%)*



$37

$20

$28

$15

LE

Regulatory Downside



$19

$10

International

Source:     S&BD estimates, Project Tree management estimates and dataroom



**Altria**
Altria Client Services



S&BD estimates.



S&BD estimates.

# Market Update Backup





# Trading multiple progression over time

*Altria's multiple has declined 40% since January 2017, while industry peers have declined 24%*



**Price / NTM EPS (Consensus)**



Note:    (1)  Peers include British American Tobacco, Imperial Tobacco, Japan Tobacco, Phillip Morris International, and Swedish Match
Altria Client Services I S&BD| December 2018 I Draft I Highly Confidential    37

# Current trading multiples

*Current trading multiples primarily driven by exposure to regulatory challenges and access to RHPs rather than near-term financials (e.g. PMI trading at 7.7x premium to BAT but has lower EPS growth)*



# Altria relative share price performance

*...and have caused Altria's share price to fall more than peers*

**Altria Relative Share Price Performance**



# *Eagle Backup*





Altria
Altria Client Services

# Investor concerns regarding IQOS's future growth potential have significantly dampened share price performance



PMI Share Price (8/1/2016 – To Date)

$140

2016 Full-Year Results — Nicotine Update — iQOS TPSAC — Youth Update — Flavor / Menthol Update

April 19: PMI announces FY2018 Q1 earnings

$100.15

$34.05

$60

**8/1/2016**

**11/23/2018**

Altria Client Services | S&BD | December 2018 | Draft | Highly Confidential    41

# Since the announcement of BAT – RAI, we have continually assessed PMI's interest in a MO combination

**Benefits** *(PMI perspective)*

- Creates world's largest listed tobacco company

- Enhances and diversifies portfolio and provides truly global footprint

- Maximizes reduced harm opportunities and provides control over IQOS in the U.S.

- Strong financial rationale

**Considerations** *(PMI perspective)*

- PMI share price has fallen significantly in 2018

- Near-term cost synergies alone may not justify significant acquisition premium

- Uncertainty over U.S. regulatory framework

- U.S. RHP strategy may require broader development of portfolio outside of IQOS


Altria
Altria Client Services

# Altria's relative market capitalization versus PMI has ranged between 40-50% and is currently at 44%

*($ in billions)*

## Altria Market Capitalization / (Altria + PMI Market Capitalization)

2 Year Average: 44.8%

43.5%

Favorable to Altria

Favorable to PMI

| | |
|---|---|
| **Altria Market Cap.** | **$101** |
| **PMI Market Cap.** | **131** |
| **Combined Market Cap.** | **232** |

Nov-16

Nov-17

Nov-18

Source: Factset as of 11/23/18


Altria
Altria Client Services

Altria Client Services | S&BD | December 2018 | Draft | Highly Confidential    43



Altria
Altria Client Services

Source: Company filings, Wall Street research, CapIQ, Factset as of 11/23/18



# PMI will perceive an Altria investment in Tree as a threat to their IQOS strategy and international combustible business

## PMI Perspective

- Signal that Altria is not "all-in" on IQOS

- Perceived as massive investment by Altria relative to Altria's willingness to invest in IQOS licensing agreement

- Possible that PMI sees the strategic benefit of owning both Tree and IQOS in the U.S. (clear #1 RHP portfolio)

- Increased Altria leverage would limit available balance sheet capacity to finance transaction

## Public Market Perspective

- Tree announcement likely leads to decline in PMI share price:

  - Sign that Altria is committed to portfolio of RHP but only has modest expectations for IQOS in the U.S.

  - More visibility to Tree's international initiatives and performance

- Tree transaction may strengthen Altria's negotiating leverage on a PMI-MO combination





Source: Company filings, Wall Street research, CapIQ, Factset as of 11/23/18
Note: (1) Assumes Altria makes $14.7 billion payment for acquisitions of Tree, Maple, and H2O (reduces PMI balance sheet capacity by $14.7 billion)



Source: Company filings, Wall Street research, CapIQ, Factset as of 11/23/18
Note: (1) Assumes Altria makes $14.7 billion payment for acquisitions of Tree, Maple, and H2O (reduces PMI balance sheet capacity by $14.7 billion)

# *Maple Backup*





# Cronos financial summary

*($ USD in millions, except per share values)*

## Capitalization

| | |
|---|---|
| Share Price ($USD) | $9.18 |
| **Market Capitalization** | **$1,640** |
| Plus: Net Debt & Other | (30) |
| **Enterprise Value** | **$1,610** |

| Top 5 Shareholders | Shares (M) | % Outstanding |
|---|---|---|
| Chescapmanager | 9.0 | 5.1% |
| Penserra Capital Management | 6.8 | 3.8% |
| Jason Marc Adler (Director) | 6.7 | 3.7% |
| ETF Managers Group | 5.7 | 3.2% |
| Horizons ETFs Management (Canada), Inc. | 4.0 | 2.3% |

## Key Financial Metrics (CY)

| | 2018E | 2019E | 2020E |
|---|---|---|---|
| **Revenue** | **$17** | **$75** | **$179** |
| *% growth* | 453% | 338% | 140% |
| | | | |
| **EBITDA** | **($5)** | **$27** | **$70** |
| *% growth* | NM | NM | 158% |
| *% margin* | (26%) | 36% | 39% |
| | | | |
| **Net Income** | **NM** | **$15** | **$42** |
| *% growth* | NM | NM | 175% |



Source:    Wall Street research, Factset as of 11/30/18

# Cronos share price progression: last twelve months

*(CAD $ per share)*

**Cronos Share Price: Last Twelve Months**



# Implied premium analysis

*(CAD $ per share)*

| Tranche | Price per Share ($CAD) | Premium to 11/7 VWAP |
|---|---|---|
| Initial Purchase | $16.25 |  |
| Tranche A | $19.00 | |

Call option valuation of CAD $1.49 per share of initial 45% purchase



Source:    Factset, S&BD estimates



Source: Company filings, Factset, CapIQ as of 11/30/18
Note: Share prices rounded to the nearest $0.25

# EXHIBIT F

# EXHIBIT 14

# FILED UNDER SEAL

## BEFORE THE UNITED STATES FEDERAL TRADE COMMISSION

In the Matter of the Proposed Acquisition by Altria Group, Inc. of Certain Voting Securities of JUUL Labs, Inc.

FTC Trans. No. 20190791

## CONFIDENTIAL TREATMENT REQUESTED

RESPONSE OF JUUL LABS, INC.
TO THE REQUEST FOR ADDITIONAL INFORMATION AND DOCUMENTARY
MATERIALS

October 10, 2019

Jerry Masoudi
Chief Legal Officer

Scott Richburg
Vice President of Litigation

JUUL, Labs, Inc.
560 20th Street
San Francisco, CA 94107-4344

David I. Gelfand
Jeremy J. Calsyn
Matthew Bachrack
Jessica Hollis
Huanbing Xu
Cleary Gottlieb Steen & Hamilton LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037

Michael L. Sibarium
Robert C. K. Boyd
Evan Storm
David C. Grossman
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW
Washington, DC 20036

*Antitrust Counsel for JUUL Labs, Inc.*

JLI-AT-02604986

**Confidential**

*General Responses*

This response, along with all related supporting documents, exhibits, and previous submissions as noted herein, constitutes the response of JUUL Labs, Inc. ("JLI" or "the Company") to the Request for Additional Information and Documentary Material issued to the Company by the Federal Trade Commission (the "FTC" or the "Commission") on April 8, 2019, pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "Second Request").

The Second Request has been modified in a number of respects by agreement with Commission staff. Correspondence relating to such modifications is provided on the enclosed hard drive in the folder labeled "JLI Exhibit A." In certain cases, JLI's responses to particular specifications cite correspondence relevant to the modifications of those specifications. There may be additional modifications that are not cited in JLI's responses or included in JLI Exhibit A. Copies of additional correspondence between the Company or its counsel and the Commission are included on the enclosed hard drive in the folder labeled "JLI Exhibit B."

To the extent any privileged document or information has been inadvertently produced, the Company did not intend to waive and has not waived any privilege by such production, including the attorney-client privilege, attorney work-product doctrine, joint defense privilege, or any other privilege. Any inadvertently produced documents or information should be returned to the Company immediately and without further review.

This response and its attachments contain confidential and proprietary information of the Company and are submitted with the understanding that the Commission will afford them confidential treatment pursuant to all applicable statutes and regulations.

2

JLI-AT-02604987

Confidential

*Specification 1*

## Specification 1

Submit:

(a) one copy of each organization chart in effect since January 1, 2017 for the Company as a whole and for each of the Company's facilities or divisions involved in any activity relating to any Relevant Product;

(b) a list of all agents and representatives of the Company, including, but not limited to, all attorneys, consultants, investment bankers, product distributors, sales agents, and other Persons retained by the Company in any capacity relating to the Proposed Transaction or any Relevant Product (excluding those retained solely in connection with environmental, tax, human resources, pensions, benefits, ERISA, or OSHA issues);

(c) for each agent and representative listed in response to Specification 1(b), the agent's or representative's title, business address, and telephone number; and

(d) a Data Map for the Company.

## Response to Specification 1

Response to Subpart (a)

JLI does not maintain formal organization charts of its departments in the ordinary course of its business. Therefore, JLI created organization charts in response to Specification 1(a).

In emails from Michael Sibarium to Kristian Rogers, April 30, 2019 and May 1, 2019, regarding "Confidential: HSR Trans. No. 20190791 -- JUUL Labs, Inc. Proposed Custodians," JLI produced one copy of each organization chart currently in effect for JLI, at JUUL0001003-1020. Please note that since the creation of these organization charts, JLI has experienced certain personnel changes. A consolidated set of Company organizational charts, including these changes, may be found in the file "JLI Exhibit 1.1," located on the enclosed hard drive in the folder labeled "JLI Exhibit 1." The recent changes are reflected on JUUL0001003, JUUL0001005, and JUUL0001007 of JLI Exhibit 1.1.

3

Confidential Treatment Requested

JLI-AT-02604988

**Confidential**

*Specification 1*

<u>Response to Subparts (b) and (c)</u>

JLI refers the Commission to "JLI Exhibit 1.2," which may be found on the enclosed hard drive in the folder labeled JLI Exhibit 1, for a list of the agents and representatives retained by JLI in any capacity relating to the Proposed Transaction or any Relevant Product. Titles, business addresses, and telephone numbers are provided for agents and representatives to the best of JLI's knowledge and otherwise based on how such information is kept in the ordinary course of business in the Company's invoicing systems.

<u>Response to Subpart (d)</u>



4

Confidential Treatment Requested

JLI-AT-02604989

*Specification 2*

## Specification 2

List each brand of Relevant Product manufactured or sold by the Company in the Relevant Area since January 1, 2015, and for each:

     (a) identify each SKU of each brand of Relevant Product, and for each SKU identify the associated trade name and describe the distinguishing characteristics, including but not limited to product design, features, and packaging.

     (b) state the division, subsidiary, or affiliate of the Company that manufactures or sells or has manufactured or sold the product.

## Response to Specification 2

JUUL is the only brand of Relevant Product sold by the Company in the Relevant Area since January 1, 2015.

### Response to Subpart (a)

JLI's response to this subpart may be found in "JLI Exhibit 11.3," which was produced to the Commission on August 23, 2019.

The JUUL system is a closed electronic cigarette system consisting of a reusable device and disposable pods (with e-liquid). The disposable pods used with closed systems cannot be refilled with e-liquid and must be replaced once empty, unlike open systems, which allow users to manually refill the tank with e-liquid. JLI currently restricts sales of JUULpods to the following eight product flavors: Menthol; Classic Tobacco; Cucumber; Mint; Crème; Fruit; Mango; and Virginia Tobacco. Furthermore, in response to concerns expressed by some that flavors may play a role in driving youth usage, JLI suspended distribution of non-tobacco and non-menthol-based flavored JUUL products to over 90,000 traditional retail outlets. JLI limits sales of these flavors, which are effective tools to help adult smokers switch from combustible cigarettes, to JUUL.com, where JLI utilizes additional age-verification measures and restricts

5

Confidential Treatment Requested

**Confidential**

*Specification 2*

sales to two devices and fifteen JUULpods packages per month to prevent bulk shipments to those attempting to distribute to minors.

<u>Response to Subpart (b)</u>

JLI does not conduct any manufacturing itself or through subsidiaries or affiliates. All manufacturing is conducted by third parties and overseen by JLI's Supply Chain group. The division of the Company responsible for sales of JLI's products since 2017, when Pax Labs, Inc. ("Pax Labs") was renamed JUUL Labs, Inc., is JUUL Americas. Prior to 2017, JUUL products were sold by Pax Labs (formerly known as Ploom).

6

Confidential Treatment Requested

JLI-AT-02604991

**Confidential**

**Specification 3**

Since January 1, 2015, for each Relevant Product listed in response to Specification 2 above, state or provide:

(a) the Company's Sales to all customers in each Relevant Area, stated separately in units and dollars;

(b) that portion of the Company's Sales to customers in each Relevant Area, stated separately in units and dollars, that were of products manufactured in the U.S.;

(c) that portion of the Company's Sales to customers in each Relevant Area, stated separately in units and dollars, that were of products manufactured outside the U.S.;

(d) that portion of the Company's Sales to customers in each Relevant Area, stated separately in units and dollars, that were of products purchased from sources outside the Company and resold by the Company rather than of products manufactured by the Company;

(e) for each Channel, the names and addresses of the 25 Persons who purchased the greatest unit and dollar amounts of the Relevant Product from the Company in the United States;

(f) a sample contract for each customer type; and

(g) the name, address, estimated Sales, and estimated market share of the Company and each of the Company's competitors in each Relevant Area in the manufacture or sale of the Relevant Product, stated separately by Channel and, for Electronic Cigarettes, by system type (e.g., cig-a-like, open, pod).

**Response to Specification 3**

The Company's response to Specification 3 was provided to the Commission on September 20 and September 27, 2019.

7

Confidential Treatment Requested

JLI-AT-02604992

Confidential

## Specification 4

State the location of each facility that manufactures or sells, including distribution centers, etc., or has manufactured or sold, any Relevant Product in the Relevant Area for the Company, and for each such facility state: the current nameplate and practical capacity and the monthly capacity utilization rate for production of each Relevant Product manufactured at the facility, specifying all other factors used to calculate capacity; the number of shifts normally used at the facility; and the feasibility of increasing capacity by 10% or more, including the costs and time required.

## Response to Specification 4

The Company's JUUL system is an electronic nicotine delivery system, comprised of an electronic device and a liquid-filled pod. All of JLI's devices and pods, including the e-liquid, are contract-manufactured at third-party facilities and distributed through third-party facilities. "JLI Exhibit 4.1," which may be found on the enclosed hard drive in the folder labeled "JLI Exhibit 4," reports, based on information available to JLI about each third party facility, JLI's understanding of the nameplate capacity, practical capacity, monthly utilization rates, factors used to calculate capacity, number of shifts, as well as the feasibility of increasing capacity by 10 percent for each facility.

*E-liquids*



On information and belief, JLI estimates that

8

JLI-AT-02604993

Confidential

*Specification 4*

*Device and pod manufacture*

JLI contract-manufactures and packages its JUUL devices through two firms located in

Confidential Treatment Requested

JLI-AT-02604994

Confidential

*Specification 4*

*Pod filling, sealing, and packaging*

10

Confidential Treatment Requested

JLI-AT-02604995

Confidential

*Specification 4*

JLI-AT-02604996

Confidential

11

Confidential Treatment Requested

JLI-AT-02604996

## Specification 5

For each Relevant Product manufactured or sold in the Relevant Area, submit (a) one copy of all current selling aids and promotional materials and (b) all documents relating to advertising and marketing Plans and strategies, including but not limited to promotional programs, partnership programs, and incentives relating to shelf space and positioning.

## Response to Specification 5

Against the backdrop of unacceptable levels of youth usage and eroding public confidence in the industry, JLI announced on September 25, 2019 that it is suspending all broadcast, print, and digital product advertising in the U.S.[1]

### Response to Subpart (a)

Documents available at JLIFTC02317094 to JLIFTC02317442 contain all of JLI's current selling aids and promotional materials that relate to any Relevant Product manufactured or sold in any Relevant Area.

### Response to Subpart (b)

To the extent that documents responsive to this specification are in its possession, custody, or control, JLI has produced or is submitting concurrently herewith non-privileged documents responsive to this specification.

---

[1]    *See* JLI press release, September 25, 2019, available at https://newsroom.juul.com/juul-labs-names-new-leadership-outlines-changes-to-policy-and-marketing-efforts/.

12

Confidential Treatment Requested

JLI-AT-02604997

**Confidential**

**Specification 6**

Submit all documents relating to the Company's or any other Person's Plans relating to any Relevant Product in the Relevant Area, including, but not limited to, business plans; plans related to marketing and trade incentive programs; plans related to regulatory approval; short-term and long-range strategies and objectives; expansion or retrenchment plans; research and development efforts; presentations to management committees, executive committees, and boards of directors; investment banker and other consultant reports; and budgets and financial projections. For regularly prepared budgets and financial projections, the Company need only submit one copy of final year-end documents for prior years, and cumulative year-to-date documents for the current year.

**Response to Specification 6**

To the extent that documents responsive to this specification are in its possession, custody, or control, JLI has produced or is submitting concurrently herewith non-privileged documents responsive to this specification. For regularly prepared budgets and financial projections, JLI directs the Commission's attention to JLI's response to Specification 14.

13

Confidential Treatment Requested

JLI-AT-02604998

**Confidential**

**Specification 7**

Submit all documents relating to competition in the manufacture or sale of any Relevant Product in the Relevant Area, including, but not limited to, market studies, forecasts and surveys, and all other documents relating to:

(a) the Sales, market share, or competitive position of the Company or any of its competitors;

(b) the relative strength or weakness of Persons producing or selling each Relevant Product;

(c) supply and demand conditions;

(d) attempts to win customers from other Persons and losses of customers to other Persons;

(e) allegations by any Person that any Person that manufactures or sells any Relevant Product is not behaving in a competitive manner, including, but not limited to, customer and competitor complaints; threatened, pending, or completed lawsuits; and federal and state investigations; and

(f) any actual or potential effect on the supply, demand, cost, or price of any Relevant Product as a result of competition from any other possible substitute product.

**Response to Specification 7**

To the extent that documents responsive to this specification are in its possession, custody, or control, JLI has produced or is submitting concurrently herewith non-privileged documents responsive to this specification.

14

Confidential Treatment Requested

JLI-AT-02604999

**Confidential**

## Specification 8

Submit:

(a) all documents relating to the Company's or any other Person's price lists, pricing Plans, pricing policies, pricing forecasts, pricing strategies, price structures, pricing analyses, price zones, and pricing decisions relating to any Relevant Product in the Relevant Area; and

(b) all studies, analyses, or assessments of the pricing or profitability of any Relevant Product.

## Response to Specification 8

To the extent that documents responsive to this specification are in its possession, custody, or control, JLI has produced or is submitting concurrently herewith non-privileged documents responsive to this specification.

15

Confidential Treatment Requested

JLI-AT-02605000

## Specification 9

Identify the Person(s) at the Company responsible for creating or monitoring price strategy, price zones, pricing practices, and pricing policies for the Relevant Product in the Relevant Area. Describe in detail the Company's pricing strategy, pricing practices, and pricing policies, including, but not limited to:

> (a) a description regarding how, and how often, the prices for each Relevant Product in each Relevant Area are determined;
>
> (b) whether, and how, pricing based on customer characteristics, presence of other competitors, or other factors are used by the Company in determining the prices for each Relevant Product in each Relevant Area; and
>
> (c) whether, and how, price zones and/or pricing based on geographic areas, the presence of local competitors, or other factors are used by the Company for each Relevant Product in each Relevant Area.

## Response to Specification 9

JLI sets three types of pricing for its products: (i) list prices to distributors (and recommended dealer pricing for sales to retailers); (ii) list prices for sales directly to self-distributing retailers, which are the same as the recommended dealer pricing for sales to retailers; and (iii) e-commerce prices (which match JLI's manufacturer's suggested retail prices ("MSRP")). Rebates are discussed further in the Company's response to Specification 16.



16

Confidential Treatment Requested

JLI-AT-02605001

Confidential

*Specification 9*

[REDACTED]

### Response to Subpart (a)

JLI's MSRP has not changed since the product launch in June 2015. JLI's list prices to distributors, list prices for its sales directly to retailers, and recommended dealer prices have been adjusted only once since JUUL's launch. [REDACTED] JLI increased the list price and recommended dealer prices for 4-packs of JUULpods. This price change is described in further detail in JLI's response to Specification 17.

[REDACTED]

17

Confidential Treatment Requested

JLI-AT-02605002

Confidential

*Specification 9*

Response to Subpart (b)

Response to Subpart (c)

End consumer pricing may differ regionally due to excise tax differences.

18

Confidential Treatment Requested

JLI-AT-02605003

**Confidential**

## Specification 10

Identify each electronic database used or maintained by the Company in connection with any Relevant Product at any time after January 1, 2015, that contains information concerning the Company's (i) products and product codes; (ii) facilities; (iii) production; (iv) shipments; (v) bids or sales proposals; (vi) sales; (vii) prices; (viii) margins; (ix) costs, including but not limited to pr0duction costs, distribution costs, standard costs, expected costs, and opportunity costs; (x) patents or other intellectual property; (xi) research or development projects; or (xii) customers. For each such database:

    (a) identify the (i) database type, i.e., flat, relational, or enterprise; (ii) fields, query forms, and reports available or maintained; (iii) software product(s) or platform(s) required to access the database;

    (b) for each Relevant Product in each Relevant Area, compile and submit one or more Data Sets from the database comprising data used or maintained by the Company at any time after January 1, 2015 that constitutes, records, or discusses:

        (i)    discount requests or approvals (including rebates and other promotions);

        (ii)    sales personnel call reports;

        (iii)    meeting competition requests or approvals;

        (iv)    win/loss reports;

        (v)    prices, quotes, estimates, or bids submitted to any customer;

        (vi)    the results of any bid or quote submitted to any customer or prospective customer;

        (vii)    customer relationships; and

        (viii)    for each Channel, transaction-level Sales data for the Company's top 50 customers by revenue and unit volume and a 10 percent random sample of the remaining customers, including, but not limited to, customer name, customer address, product code, product description, and transaction date; and

    (c) for each Data Set provided in response to Specification 10(b), provide a data dictionary that includes:

        (i)    a list of field names and a definition for each field contained in the Data Set;

        (ii)    the meaning of each code that appears as a field value in the Data Set; and

        (iii)    the primary key in the Data Set or table that defines a unique observation.

Confidential Treatment Requested

JLI-AT-02605004

**Confidential**

*Specification 10*

The Company should consult Instruction I(3) regarding the inclusion of Sensitive Personally Identifiable Information or Sensitive Health Information in a Data Set(s) responsive to Specification 10.

**<u>Response to Specification 10</u>**

The Company's response to Specification 10 was provided to the Commission on October 4, 2019.

20

Confidential Treatment Requested

JLI-AT-02605005

**Specification 11**

Since January 1, 2015, for each SKU identified in response to Specification 2, for each Relevant Area, and for each Channel, state on a monthly and annual basis:

(a) the Company's gross sales and net sales, stated separately in units and dollars, and the Company's prices, including but not limited to: (i) list price; (ii) average wholesale price; and (iii) average selling price;

(b) any deductions from the Company's gross sales, identified separately by deduction type, including but not limited to: (i) allowances; (ii) discounts; (iii) returns; (iv) promotional payments; (v) excise taxes; and (vi) any other dollar amount deducted to reach true net sales total;

(c) the Company's cost of goods sold, stated separately in units and dollars, for total production cost per unit and separately for the following components: (i) tobacco; (ii) other materials; (iii) packaging; (iv) direct labor; (v) plant overhead costs; and (vi) any other costs (itemized by title) that are used to calculate cost of goods sold, or if the product sold is purchased or co-packed, provide the purchase price;

(d) gross margins;

(e) selling expenses by type, including but not limited to advertising and promotional costs;

(f) customer training expenses by type, including but not limited to conferences, sessions, and workshops;

(g) research and development costs by type;

(h) royalty expenses;

(i) any other costs, stated separately, directly attributable to the SKU;

(j) general and administrative expenses by type;

(k) operating margins;

(l) any assets or liabilities directly attributable to the SKU as tracked in the ordinary course of business, by type; and

(m) the Company's estimated market share, stated separately in units and dollars, for the sale of the relevant SKU.

All cost data should be identified as to whether it reflects: (a) indirect costs; (b) direct costs; (c) fixed costs; (d) variable costs; (e) indirect fixed costs; (f) indirect variable costs; (g) direct fixed costs; (h) direct variable costs; and (i) any other related cost types used in the ordinary course of business. All terms, calculations, and methods of computation must be clearly explained and

21

Confidential Treatment Requested

JLI-AT-02605006

Confidential

*Specification 11*

defined; the costs must be disaggregated to the greatest extent possible and fully allocated to the relevant SKU as applicable.

**Response to Specification 11**

The Company's response to Specification 11 was provided to the Commission on August 23, 2019.  On September 4, the Company produced data inadvertently omitted from JLI Exhibit 11.5.

22

Confidential Treatment Requested

JLI-AT-02605007

Confidential

*Specification 12*

**Specification 12**

Since January 1, 2015, at the lowest level of aggregation that the Company maintains for each Relevant Product sold in each Relevant Area, state on a monthly and annual basis:

(a) the Company's production cost variances stated separately by type;

(b) stated separately, the Company's expenditures on: (i) wholesale trade discounts; retail trade discounts; (iii) free goods; (iv) direct mail discounts; (v) media and advertising; (vi) point-of-sale displays; (vii) returned goods; and (viii) stated separately, any other type of wholesale, retail, and consumer discount or promotion that the Company has accounted for individually; and

(c) the Company's expenditures on other SG&A and overhead.

**Response to Specification 12**

The Company's response to Specification 12 was provided to the Commission on August 23, 2019.

23

Confidential Treatment Requested

JLI-AT-02605008

**Confidential**

**Specification 13**

Identify all data and reports received by the Company or to which the Company has access, including but not limited to data and reports from retailers, wholesalers, and data analytics companies (e.g., Management Science Associates, Inc., Information Research, Inc.) related to any Relevant Product, and submit all such data and reports received since January 1, 2015.

**Response to Specification 13**

The Company's response to Specification 13 was provided to the Commission on August 23 and September 4, 2019.

24

Confidential Treatment Requested

JLI-AT-02605009

**Confidential**

*Specification 14*

## Specification 14

Provide each financial statement, budget, profit and loss statement, cost center report, profitability report, and any other financial report regularly prepared by or for the Company on any periodic basis, since January 1, 2016, including, but not limited to, such statements and reports for the Company as a whole; for each of the Company's manufacturing facilities, sales offices, and distribution facilities relating to the research, development, manufacture, license, sale, or provision of any Relevant Product in each Relevant Area; and for any product line or customer for any Relevant Product in each Relevant Area. For each such statement, budget, or report, state how often it is prepared, and identify the Person responsible for its preparation; provide all such statements and reports on both a quarterly basis and a yearly basis. For each Relevant Product, provide all regularly prepared customer profitability reports and product line profitability reports.

## Response to Specification 14

JLI has maintained documents responsive to this specification from 2018 to

present day.



*Weekly Profit & Loss "Flash"*



25

Confidential Treatment Requested

JLI-AT-02605010

Confidential

*Specification 14*



26

Confidential Treatment Requested

JLI-AT-02605011

Confidential

*Specification 14*



*Audited annual financial statements*

These reports are prepared by PricewaterhouseCoopers on an annual basis and each contain three years' worth of financial information, projections, and related information. So far, JLI has received reports containing information from the years 2016, 2017, and 2018. Rupesh Maheshwari, an Assistant Controller at JLI, is responsible for this report. JLI directs the Commission's attention to JLIFTC02318181 to JLIFTC02318217 for documents responsive to this category.

27

Confidential Treatment Requested

JLI-AT-02605012

**Confidential**

*Specification 14*

*Quarterly investor reports*

JLI prepares these reports on a quarterly basis for its investors.  The first such report was issued for the fourth quarter of 2017.  Joseph Schmidt, a Director of Investor Relations, is responsible for these reports.  JLI directs the Commission's attention to JLIFTC02318265 to JLIFTC02318301 for documents responsive to this category.

28

Confidential Treatment Requested

JLI-AT-02605013

Confidential

**Specification 15**

Provide all documents, including but not limited to surveys, studies, analyses, and reports, since January 1, 2015, relating to customer purchasing patterns, substitution, switching, dual use or poly-use among any set of Relevant Products, and submit any underlying data and programs used in the creation of any such documents.

**Response to Specification 15**

To the extent that documents responsive to this specification are in its possession, custody, or control, JLI has produced or is submitting concurrently herewith non-privileged documents responsive to this specification.  Documents available at JLIFTC02314243 to JLIFTC02314401 contain underlying data and programs used in the creation of documents responsive to this specification.

29

Confidential Treatment Requested

JLI-AT-02605014

Confidential

*Specification 16*

## Specification 16

For each brand of Relevant Product identified in response to Specification 2, describe in detail the Company's promotional programs and marketing strategies (including but not limited to buydowns, rebates, coupons, incentives for retail shelf space or position) since January 1, 2016. Identify the Person(s) at the Company responsible for developing and approving any such programs or strategies.

## Response to Specification 16

Both the Brand Marketing and Sales divisions of JLI are responsible for promotional programs and marketing strategies. The marketing team in the Sales division focuses on the brand's image at the point-of-sale. Brand Marketing has overall responsibility for marketing the brand and reviews proposals from the marketing team in the Sales division. Additionally, the PRGM Team within the Sales division is responsible for developing, executing, and analyzing distributor promotions.

Brand Marketing is segmented internally into Business-to-Business ("B2B") and Business-to-Consumer ("B2C") marketing. B2B marketing, or trade marketing, develops materials disseminated to distributors or retail customers. B2C marketing focuses on consumer messaging and programs that touch the end consumer, such as advertising campaigns or in-store programs.[2]

*People responsible for promotional programs and marketing strategies*

Craig Brommers, Chief Marketing Officer, in consultation with the individuals listed below has responsibility for developing and approving JLI's brand marketing strategies:

- Ann Hoey, Vice President of Direct to Consumer Marketing, is responsible for leading JLI's end-to-end direct to consumer experience. Until Craig

---

[2] As discussed further in its response to Specification 5, JLI announced on September 25, 2019 that it is suspending all broadcast, print, and digital product advertising in the U.S.

30

Confidential Treatment Requested

JLI-AT-02605015

**Confidential**

*Specification 16*

Brommers joined JLI in April 2019, Ms. Hoey was primarily responsible for all branded marketing activities.

- Joe Lunn, Vice President of Global Brand Marketing, is responsible for "Go To Market" marketing, formulating plans for JLI's launch into new countries.

- Gary Ross, Vice President of Americas Marketing, is responsible for Above the Line ("ATL") (*e.g.*, television and radio marketing) and Below the Line ("BTL") (*e.g.*, direct to consumer emails), marketing programs for consumers, supporting trade marketing, and ensuring global consistency across all marketing programs.

Previously, the following individuals also had responsibility for developing and approving brand marketing strategies:

- Chelsea Kania was the Executive Director of Marketing from July 2017 to July 2018. Prior to that, Ms. Kania was JLI's Director, Product Marketing and Brand Manager for JUUL, a position she obtained prior to JUUL's launch in 2015. Ms. Kania was responsible for developing the go-to-market strategy for the JUUL brand and, as Executive Director of Marketing, remained responsible for JUUL brand and product marketing activities.

- Brian Baron, Vice President for Marketing Performance and Analytics, led JLI's Global Marketing Intelligence group from March 2018 to September 6, 2019. His group leveraged data to provide information on the effectiveness of JUUL advertising and better understand consumer interactions with the Company.

31

JLI-AT-02605016

**Confidential**

*Specification 16*

- Richard Mumby was the Chief Marketing Officer for Pax Labs from May 2015 through January 2017. In that capacity, Mr. Mumby was involved in the limited JUUL-related marketing efforts that took place in 2016.

Bob Robbins, President of JUUL Americas, in consultation with the individuals listed below, has responsibility for developing and approving sales marketing and promotional programs.

- Gary Ross, Vice President of Americas Marketing. See above.

- Kevin Cooke, Senior Vice President of U.S. Commercial Sales. This is the most senior sales role under JUUL Americas. Among other things, Mr. Cooke oversees go-to-market strategy and structures.

- Erik Searles, Vice President of Retail, leads JLI's global retail strategy development and rollout in the U.S. and International markets. He plays a key role in creating alignment between retail and corporate functions, including marketing.

- Kayne Burk, Senior Director of Commercial Programs, develops programs to prevent product churn amongst JUUL users. He leads all Americas Direct to Consumer activities, including consumer registration, customer life cycle, JUUL's membership program, and e-commerce.

- Alexander Cantwell, Vice President of Sales Strategy, develops overall sales strategy, including approval of promotional sales.

- Jason Prior, Director, Pricing and Revenue Management, manages the PRGM Team and is responsible for pricing strategy as well as distributor promotions.

32

Confidential Treatment Requested

JLI-AT-02605017

Confidential

*Specification 16*

- Mark Ginn, Head of Trade Marketing, is responsible for creating and implementing all of the signage, display cases and shelving used in retail locations.

The employees primarily responsible for trade marketing include Mark Ginn and Gary Ross.  Previously, the following individuals also has responsibility for developing and approving trade marketing activities:

- Peter Bain was the Vice President of Marketing for Pax Labs from July 2015 through June 2017, where he was responsible for trade marketing activities.

- Amanda Mason is Senior Director, Global Marketing at JLI.  Ms. Mason previously served as Director of National Accounts, Channel Marketing Manager.  Ms. Mason managed both national and regional accounts in this capacity.  She was responsible for supporting the deployment and allocation of trade assets, including custom requests, and was involved in the development of trade collateral.  She provided guidance to retailers on how JUUL assets should be used in the market.  She acted in the role of VP of Trade Marketing until her replacement (Mark Ginn) was hired.  Ms. Mason transitioned to an internationally-focused role in September 2018.

*Promotional programs and marketing strategies*

JUUL-related marketing activities were extremely limited until 2018.  The 2015 product launch campaign lasted approximately six months and did not result in significant sales. Very little marketing activity occurred in 2016 and 2017.  Following its rapid growth beginning in late 2017, JLI has been expanding its marketing program.  JLI engages or has engaged in the following marketing approaches:

33

Confidential Treatment Requested

JLI-AT-02605018

**Confidential**

*Specification 16*

### Promotional discounting and rebates

JLI began offering seasonal promotions on devices late 2017. Three times a year, in Spring, Summer, and Fall, JLI offers promotions on 4-pack starter kits, 2-pack starter kits, or basic kits.[3] These promotions run for two months each. In the past, these promotions were offered as rebates to distributors, with the expectation that the distributors would pass them on to retailers. However, some distributors did not pass these promotions on to retailers, and as of Fall 2018, the Company began offering the promotion as a rebate directly to the larger chain retailers that passed them on to end consumers and only to distributors for sales to independent and smaller retailers that occur during the promotional pricing window. The discount that JLI expects to be passed on to consumers is $20 off of a 4-pack starter kit and $15 off of a 2-pack starter or basic kit. The promotional amount offered to retailers and distributors varies between approximately $14 to $20 off of a 4-pack starter kit and between $10 to $15 off of a 2-pack starter or basic kit.

JLI offers distributors and self-distributing retailers the ability to achieve rebates based on:



---

[3] Sales by JLI of 4-pack starter kits for distribution to traditional retail outlets were suspended in November 2018 because they contain a crème flavored pod. As discussed in the Company's response to Specification 2, JLI suspended sales of certain flavored pods to retail outlets in response to concern expressed by some that flavors may play a role in driving youth usage. JLI introduced the 2-pack starter kit in January 2019. Basic kits contain only a JUUL device.

34

Confidential Treatment Requested

JLI-AT-02605019

**Confidential**

*Specification 16*

JLI also offers promotions directly to end consumers, including through its e-commerce site since mid-2018. Customers who opt for auto-shipping receive a discount when they purchase six 4-packs of JUULpods in a given period of time. Customers who opt for auto-shipping are also offered free shipping on orders of two or more JUULpod packs. Other ongoing promotions on JLI's e-commerce site include $25 off of the first order and free shipping on orders over $34. JLI also occasionally partners with retailers to offer promotions through the retailers' customer loyalty program.

---

[4] The qualifying JUUL SKUs are the Starter Kit, Slate Device Kit, Silver Device Kit, and 12 Refill Kits.

[5] The eligible Refill Kits are 5% 2-packs of Menthol, Classic Tobacco, Mint, and Virginia Tobacco; 3% 4-packs of Mint and Virginia Tobacco; and 3% 2-packs of Mint and Virginia Tobacco.

35

Confidential Treatment Requested

JLI-AT-02605020

**Confidential**

*Specification 16*

The Company has also offered product discount codes for customer service purposes.

### Affiliate marketing program

Beginning in September 2015, JLI offered third-party affiliates – generally vaping discussion communities, enthusiasts, and product review websites, all of whom have primarily adult audiences – the opportunity to provide advertising links that route traffic to the age-gated JUUL e-commerce website in exchange for commissions based on sales generated through those links. In some instances, affiliates were able to offer discount codes to individuals who clicked on the links from their websites. Between September 2015 and February 2017, JLI contracted with an affiliate marketing firm called Commission Junction to coordinate its affiliate marketing program. ███████████████████████████████████████████ ███████████████████████████████ However, the Company stopped all affiliate marketing in October 2018.

### Trade collateral and retail marketing

JLI has disseminated trade collateral and other materials to retailers and distributors and displayed materials at retail stores since JUUL's launch. Until early 2018, JLI typically used counter display units in convenience stores. ████████████████████

████████████████████████████████████████████████████████

36

Confidential Treatment Requested

JLI-AT-02605021

**Confidential**

*Specification 16*

### Social media

Social media activities have constituted a small part of the Company's marketing program. JLI maintained a limited presence on three social media channels from JUUL's launch through November 13, 2018: Twitter, Facebook, and Instagram. In addition, JLI occasionally posted corporate messages on Reddit. JLI ended all promotional social media activities in the U.S. effective November 13, 2018. JLI will maintain its Twitter account but will limit posts to non-promotional communications, such as results of research studies, executive hires, and product safety announcements.

### Video and YouTube content

Since August 2017, JLI has posted videos to its website and to a YouTube page featuring adult users of its products sharing their personal experience of switching from combustible cigarettes to JUUL. As discussed further in its response to Specification 5, JLI announced on September 25, 2019 that it is suspending all broadcast, print, and digital product advertising in the U.S.

---

[6]    See Attachment 3(b)-2 to JLI's HSR Form.

37

JLI-AT-02605022

**Confidential**

*Specification 16*

Digital advertising

From April 2015 through December 2016, JLI placed banners and other digital advertisements in various online publications. Digital advertisements were also circulated between September 30, 2018 and October 20, 2018. Additionally, podcast advertising aired on a variety of podcasts from September 24, 2018 through October 31, 2018. As discussed further in its response to Specification 5, JLI announced on September 25, 2019 that it is suspending all broadcast, print, and digital product advertising in the U.S.

Radio advertising

JLI ran radio advertisements from its launch through mid-2016. Additional radio advertising has been broadcast since June 2018. As discussed further in its response to Specification 5, JLI announced on September 25, 2019 that it is suspending all broadcast, print, and digital product advertising in the U.S.

Billboard and outdoor advertising

In connection with JUUL's launch, the Company ran outdoor advertisements in the following select markets in February and April 2016: Chicago; Cleveland; Phoenix; Providence; Hartford; Nashville; and Oklahoma City. As discussed further in its response to Specification 5, JLI announced on September 25, 2019 that it is suspending all broadcast, print, and digital product advertising in the U.S.

Newspaper advertisements

JLI has used newspaper advertisements since June 2018. As discussed further in its response to Specification 5, JLI announced on September 25, 2019 that it is suspending all broadcast, print, and digital product advertising in the U.S.

38

Confidential Treatment Requested

JLI-AT-02605023

**Confidential**

*Specification 16*

Email and other direct marketing

Since early 2015, JLI has disseminated marketing emails to e-commerce customers or other individuals who have signed up on JUUL's website to receive email updates from the Company. JLI also disseminated marketing emails to two lists of adult smokers that it purchased through Lumanu, a media firm. These individuals were contacted in August 2017 and approximately half of those contacted received an offer for $20 off a JUUL starter kit.

Pursuant to the Service Agreements with Altria, in the first half of 2019, JLI distributed coupons to adult smokers through direct mail (2.5 million people) and e-mail (approximately 500,000 people).[7] Additionally, JLI placed coupon offers for JUUL as inserts in 50 million packs of Altria's portfolio brands.[8]

From March through November 2018, the Company conducted mobile phone advertising, including SMS/text messaging, to e-commerce customers who opted in to the receipt of such marketing materials from the Company.

Influencer activities

JLI does not have a traditional celebrity or influencer program. At the time of JUUL's launch in 2015, before it became a regulated tobacco product by the Food and Drug Administration (the "FDA"), the Company engaged a marketing agency to identify celebrities and other high-profile individuals of legal age who were known smokers or users of vaping products and send them or their managers JUUL samples. JLI also identified names of

---

[7] See Statement of Work #11 Direct Marketing and Database Support Services by and between Altria Client Services LLC and JUUL Labs, Inc., effective as of March 28, 2019 [JLIFTC●2245768]; Statement of Work #3 Direct Marketing and Database Support Services by and between Altria Client Services LLC and JUUL Labs, Inc., effective as of January 16, 2019 [JLIFTC●2245666]; and Statement of Work #8 Direct Marketing and Database Support Services by and between Altria Client Services LLC and JUUL Labs, Inc., effective as of January 21, 2019 [JLIFTC●●668199].

[8] See Statement of Work #2 Direct Marketing Support Services by and between Philip Morris USA Inc. and JUUL Labs, Inc., effective as of January 18, 2019 [JLIFTC●●14880●].

39

Confidential Treatment Requested

JLI-AT-02605024

**Confidential**

*Specification 16*

celebrities of legal age who were known to be smokers and sent emails to the celebrities or to

their managers offering each a free JUUL starter kit. ████████████████████

████████████████████████████████████After JUUL's launch

campaign, the Company did not engage in any efforts to further develop its influencer program

until September 2017. ██████████████████████████████████

████████████████████████████████████████████████

████████████████ As part of these efforts, the Company provided product discount codes to

certain individuals. The Company ceased its influencer-related activities in November 2018.

Referral Program

The Company also has a referral program, through which existing e-commerce

customers can send a unique product discount code or personalized link to another individual,

who can then purchase JUUL products through juul.com at a discount. Once the referred

individual purchases a JUUL product through juul.com, the referring individual also receives a

discount. The value of the discount has varied over time; prior to March 2019, it was $15, and

currently the value is $25.

As discussed further in its response to Specification 5, JLI announced on

September 25, 2019 that it is suspending all broadcast, print, and digital product advertising in

the U.S.

40

Confidential Treatment Requested

JLI-AT-02605025

Confidential

*Specification 17*

## Specification 17

Identify each instance since January 1, 2016, in which the Company has increased its wholesale list price for any brand of Relevant Product identified in response to Specification 2, and for each such instance:

> (a) Identify (i) the brand of Relevant Product; (ii) the effective date of the increase; (iii) the amount of the increase; (iv) any other manufacturer of any Relevant Product that increased its wholesale list price within three months of the effective date of the Company's increase; (v) the effective date of the increase by any such other manufacturer; and (vi) how the Company became aware of the increase by any such other manufacturer; and

> (b) State whether the price increase was rescinded at any point and the reasons for the rescission.

## Response to Specification 17

### Response to Subpart (a)

JLI's wholesale list prices have only been increased once since JUUL's launch in 2015. In August 2018, the Company announced an increase in the list price to distributors and the list price for sales directly to retailers of JUULpod 4-packs. The increase was implemented from November 1, 2018 to January 1, 2019.



JLI does not track wholesale list price increases by other manufacturers of electronic cigarettes or manufacturers of combustible cigarettes.

---

[9] The following 4-pack JUULpod products were later reintroduced at the new 4-pack pricing: JUULpods Southern Tobacco 5.0% 2.8ml 4-pack; JUULpods Classic Tobacco 3.0% 2.8ml 4-pack; and JUULpods Menthol 3.0% 2.8ml 4-pack.

41

Confidential Treatment Requested

JLI-AT-02605026

**Confidential**

*Specification 17*

<u>Response to Subpart (b)</u>

The price increase described in Subpart (a) above has not been rescinded.

42

Confidential Treatment Requested

JLI-AT-02605027

## Specification 18

State the name and address of each Person that has entered or attempted to enter into, or exited from, the manufacture or sale of each Relevant Product in any Relevant Area from 2009 to the present. For each such Person, state:

> (a) the product(s) it sells, sold, or attempted to sell in each Relevant Area;
>
> (b) the date of its entry into, attempted entry into, or exit from the market; and
>
> (c) whether such Person constructed a new facility, converted assets previously used for another purpose, or began using facilities that were already being used for the same purpose.

## Response to Specification 18

### Response to Subparts (a) and (b)

JLI does not track in the ordinary course of its business all Persons that have entered, attempted to enter, or exited from the manufacture or sale of each Relevant Product in the Relevant Area. JLI has used reasonable efforts to compile information responsive to this specification as described below based on the information available to it in the ordinary course of its business. For information regarding the Company's own entry, attempts at entry, or exit from the manufacture or sale of Relevant Products, JLI refers the Commission to its responses to Specifications 21, 27, and 28, which are incorporated by reference herein.

"JLI Exhibit 18.1" and "JLI Exhibit 18.2," which may be found on the enclosed hard drive in the folder labeled "JLI Exhibit 18," identify all Persons that may have entered, attempted to enter, or exited the manufacture or sale of a Relevant Product nationally or in specific states as reflected in IRI's product-level data to which JLI subscribes. As discussed below, however, these lists are not likely to constitute a complete and exhaustive list of entrants from 2009 to the present, and may include some Persons who are not actually entrants or attempted entrants.

43

Confidential Treatment Requested

JLI-AT-02605028

**Confidential**

*Specification 18*

As discussed in JLI's response to Specification 13, JLI's IRI data reflect the identities of manufacturers and their Relevant Products that had sales in the Relevant Area during the time period indicated (either electronic cigarettes or combustible cigarettes). These data reflect the first recorded date of a purchase, as well as the last recorded date of a purchase, of each manufacturer's relevant product in a store and state that is tracked by IRI. As a result, IRI data can be used to identify some brands of Relevant Products that have entered the market during the period of 2009 to the present (*i.e.*, brands that appear for the first time during that span) or exited the market during that same period (*i.e.*, brands that no longer appear in the data during that span).

But note several limitations of using the IRI data for this purpose. This data only captures product-level purchases for retail channels such as convenience stores, drug stores, and supermarkets in a select number of states. IRI collects data from a select number of stores within each state and uses priority algorithms to create state-wide or nationwide estimates of sales. These data would not reflect sales from channels such as e-commerce, wholesale, or independent vape stores or specialty shops. Furthermore, JLI only warehouses state-level data at the convenience channel level (*i.e.*, brands sold in convenience stores), though it warehouses national-level data that includes convenience, drugstore, and supermarkets. The IRI dataset does not include information that would allow the reliable tracking of entries and exits at the MSA-level, and the dataset does not contain each manufacturer's address. In terms of temporal scope, in the ordinary course of business, JLI has only downloaded IRI's product-level data used for the estimates beginning March 2016, which accordingly limits the Company's response. These factors potentially underestimate the list of actual entrants and exiting manufacturers in the Relevant Area.

44

Confidential Treatment Requested

JLI-AT-02605029

**Confidential**

*Specification 18*

JLI Exhibits 18.1(combustible cigarettes) and 18.2 (electronic cigarettes) contain a variety of tabs. The first tab of each exhibit provides a list of each manufacturer identified as a potential entrant or exit and the respective product(s) that each manufacturer has sold or sells in the United States. The second tab of each exhibit provides lists that, at a state level, show manufacturers identified as a potential entrant or exit and their respective product(s). To be clear, JLI believes that there may be additional entrants to these markets since 2009 that are not reflected in the IRI data. This response presents lists of manufacturers that sold Relevant Products subject to the limitations of data in the possession, custody, or control of the Company.

The third tab of each exhibit provides a list of each manufacturer that JLI can identify as a potential entrant anywhere in the United States, or as having potentially exited the United States, since 2016. The fourth tab of each exhibit reports a list of each manufacturer that entered or exited during this time at the state level.

As the exhibits note, potential entrants are identified as those whose first purchased product in any retail store occurred at least six months after the beginning of the data timeframe (*i.e.*, after September 13, 2016). Potential exiting manufacturers are identified as those whose last purchased product in any retail store was six months before the end of the data timeframe (*i.e.*, before February 18, 2019). Manufacturer name changes for the same product through the time period, whether through acquisition, company restructuring, partnerships, or otherwise, are preserved as different manufacturers. Attempted entry by a manufacturer is flagged if the manufacturer enters and exits during the time-period studied. Additionally, the third and fourth tabs of each exhibit list the dates of each potential entry or exit, as determined by each manufacturer's first and last date of sale. While it is possible that additional manufacturers may have taken some steps toward entry but never actually sold a product in the Relevant Area,

45

Confidential Treatment Requested

JLI-AT-02605030

**Confidential**

*Specification 18*

the IRI data set does not provide any insight into the identity of these companies, if any exist, and JLI does not track such attempted entry or attempted sales in the ordinary course of its business.

Response to Subpart (c)

JLI does not track in the ordinary course of its business whether entrants or attempted entrants into the manufacture or sale of any Relevant Product sought to enter by constructing a new facility, converting assets previously used for another purpose, or using facilities that were already being used for the same purpose. JLI believes that many Electronic Cigarettes manufacturers and entrants rely on contract manufacturers, which is precisely what the Company did with its JUUL product.

46

Confidential Treatment Requested

JLI-AT-02605031

Confidential

*Specification 19*

## Specification 19

For each Relevant Product, identify or describe (including the bases for your response) and submit all documents relating to:

(a) requirements for entry into the production or sale of the Relevant Product in each Relevant Area including, but not limited to, research and development, planning and design, production requirements, distribution systems, service requirements, patents, licenses, sales and marketing activities, and any necessary governmental and customer approvals, and the time necessary to meet each such requirement;

(b) the total costs required for entry into the production or sale of the Relevant Product in each Relevant Area; the amount of such costs that would be recoverable if the entrant were unsuccessful or elected to exit the manufacture or sale of the Relevant Product; the methods and amount of time necessary to recover such costs; and the total Sunk Costs entailed in satisfying the requirements for entry;

(c) possible new entrants into the manufacture or sale of the Relevant Product in each Relevant Area; and

(d) the Minimum Viable Scale; the minimum and optimum plant size, production line size, capacity utilization rate, and production volume; requirements for multi-area, multi-plant, multi-product, or vertically integrated operations; and other factors required to attain any available cost savings, economies of scale or scope, or other efficiencies necessary to compete profitably in the manufacture or sale of the Relevant Product in each Relevant Area.

## Response to Specification 19

To the extent that documents responsive to this specification are in its possession, custody, or control, JLI has produced or is submitting concurrently herewith non-privileged documents responsive to this specification.

Response to Subparts (a) and (b)

the Company does not possess information or data regarding the entry requirements and costs for combustible cigarette production and, as a result,

47

Confidential Treatment Requested

JLI-AT-02605032

**Confidential**

*Specification 19*

cannot provide a response regarding those topics.  To the extent that any answer is required from

JLI on these points, JLI refers the Commission to Altria's response to Specification 20.

To enter *de novo* into electronic cigarettes, a new entrant would generally need to:

1) develop or acquire a product; 2) determine how to manufacture the product at quality and

scale; 3) determine how to sell the product; and 4) develop a distribution system.  With the FDA

regulation of electronic cigarettes, a new entrant also would need to develop a regulatory plan to

bring a product to market.  The governmental approvals required for entry, as well as the time

and cost to achieve them, are discussed in response to Specification 20, which is incorporated

herein by reference.[10]  Other steps necessary for entry are discussed below.  Additionally, JLI

notes that expansion of existing Relevant Products is also possible as discussed in its responses

to Specifications 21 and 27, which are incorporated herein by reference.

*Product*

An entrant could either develop a new product entirely or acquire an existing

product to bring into the United States or expand in the United States.

There are generally two types of electronic cigarettes: closed system and open

system devices.[11]  If a new entrant launched a closed system design, it would need to develop a

device (including, among other features, a battery and aerosolizing mechanism), an e-liquid tank

or cartridge, and an e-liquid.  A new entrant could choose to enter using an open system design,

---

[10]  The costs associated with regulatory approvals are not traditionally recoverable.  However, the FDA's recent
September 2019 proposed rule suggests that manufacturers may be able to bundle multiple products together in
a single PMTA.  See 84 Fed. Reg. 50,566 at 50,627.  Thus, some overlap may be possible, for example by using
a single set of scientific studies for multiple products that are bundled and submitted in a single PMTA.  This
could reduce an entrant's burden of compliance with governmental regulations..

[11]  An open system e-cigarette is a modular product that allows the user to refill the product's e-liquid manually,
and may also permit further alterations to the product, such as manual replacement of batteries and other
components.  By contrast, a closed system e-cigarette, such as the JUUL device, uses a non-refillable pod or
cartridge, containing a precise amount of e-liquid with a precise nicotine concentration, which the user disposes
of once empty.  For further detail, JLI directs the Commission to the Company's response to Specification 2.

48

JLI-AT-02605033

*Specification 19*

which allows the user to refill the e-liquid cartridge and would require design of the device (including, among other features, a battery and aerosolizing mechanism) and a refillable e-liquid tank. For the development of a new electronic cigarette product, research and development efforts and product development and design would require the development of new products that do not infringe on existing patents and other intellectual property, or the license of necessary patents or intellectual property. JLI does not have a clear estimate for the cost of hypothetical product development done in tandem with an intellectual property analysis to avoid potential patent and intellectual property infringement issues because this would depend on the desired approach (*e.g.*, product features and business plan) for designing the new product. Nonetheless, JLI estimates it could take a new entrant at least ██ █████ ██████ ████ to develop a new electronic cigarette product of reasonable sophistication *de novo* and cost $█ ██████ or more. These estimates would necessarily vary depending on, among other factors, the sophistication and features of the hypothetical device, the level of beta testing, and the level of manufacturing output/capacity at launch that was desired.

These estimates do not take into account the money and time associated with filing a Premarket Tobacco Application ("PMTA") with the FDA. This would include additional research and development, clinical tests and consumer trials, surveys of customers, additional product design, and so forth. JLI directs attention to the Company's response to Specification 20 for more information on these requirements.

For a new entrant seeking to enter the electronic cigarette market via acquisition, JLI believes that there are a number of devices with associated deemed e-liquids that are currently on the market with small distribution that could be acquired and expanded under the same or another brand. In this manner, the time to enter would be minimal – typically just a few

49

**Confidential**

*Specification 19*

months to negotiate a purchase agreement. The cost to acquire a product varies based on the particular assets. Recent examples of M&A transactions in the electronic cigarette market of which JLI is aware have ranged from $58 million to $135 million.[12] For example, in 2012, Lorillard acquired the e-cigarette company Blu E-cigs for approximately $135 million.

The costs associated with research and development, product planning and design, and acquisition of patents and licenses for a new electronic cigarette are potentially recoverable if the new entrant can sell its intellectual property to another manufacturer. It is difficult to predict what price a firm could receive when selling the rights to a product as this is specific to the product and the value may be impacted by the FDA's regulatory approach. JLI estimates that a new entrant could recover 100% of its development costs depending on factors such as the scale of the company, quality of the product, existing distribution, customer acceptance, and status with FDA; however, the business may also take a significant loss, recovering a smaller fraction of such costs if the new product were not successful. Aside from a sale, however, these would be sunk costs.

*Manufacturing*

For electronic cigarette manufacturing, a new entrant could build manufacturing capabilities itself or find a contract manufacturer to produce the device and e-liquid. Building a manufacturing facility could take years and cost tens of millions of dollars, if not more, but would depend greatly on variables such as location, product design, raw materials, volume discounts, vendor relationships, and so forth. Negotiating a

---

[12]    See 4(d)-1 at 7.

50

Confidential Treatment Requested

JLI-AT-02605035

Confidential

*Specification 19*

contract with an existing contract manufacturer could take a few months and not necessarily require any investment of capital. The entrant also has the option of purchasing certain automation manufacturing equipment, as JLI did, to be installed at a contract manufacturer's facilities – the acquisition and installation for which the Company estimates would cost approximately ██ ████ for a single manufacturing line and take little time (depending on features of the product and if existing automation equipment on the market could be utilized) to purchase and install. However, should the entrant need to purchase ISO 13485-compliant facilities (*i.e.*, a clean room), this would incur an additional cost, perhaps $██ ████ and require additional time for installation, perhaps twelve to eighteen months.

The cost of developing in-house manufacturing facilities (*i.e.*, the production requirements for entry), are potentially recoverable through the sale of assets, which could take a few months to negotiate. JLI expects that a seller would be able to recover nearly all of its asset costs for such a facility, particularly if its fixed assets could be leveraged by another e-cigarette company or manufacturer. The costs of using contract manufacturing would generally not be recoverable, but investments in machinery used by contract manufactures could be.

### Sales force

An entrant for any Relevant Product would need sales services. A new entrant could develop sales force capabilities in-house, by hiring employees to engage with retailers. To develop an in-house sales force requires time and expense to train, both of which will vary depending on how many stores one intends to call on. To train someone to call on a small geographic area would take days, whereas developing and training a national sales force could take years. Similarly, the cost of developing such a sales force would vary with scale, though generally would not require investment aside from salaries and related incidental costs.

51

Confidential Treatment Requested

JLI-AT-02605036

**Confidential**

*Specification 19*

Alternatively, the entrant could engage a third-party broker such as a traditional logistics provider like McLane Company or a dedicated vape-shop supply company, like Wholesale Vaping Supply, EC Supply, or VAPRO USA, to call upon retail stores on behalf of the company. This would take only as long as one needed to negotiate terms – typically a few weeks or less – and would not involve the investment of capital, assuming that the product would be accepted by retailers, not require a slotting fee, and would fit within existing merchandising fixtures that retailers have.

For a less expensive sales method, a new entrant could rely on e-commerce sales only. A website and sales platform can be built in a matter of months or less and be quite inexpensive, depending on variables such as website complexity, the scale of the company, and the scale of the company's transactions. An e-commerce site would also need to comply with relevant regulations, which would include fraud prevention and age verification mechanisms developed either by the entrant or provided by third-party providers. All told, JLI estimates that a new entrant could develop an e-commerce platform for as little as $█████ on the lowest bound, or as much as █████ on the highest bound, depending on the factors noted above.

There are no service requirements or customer approvals that a new entrant would have to provide to accompany a new electronic cigarette product.

The costs associated with developing a sales force, conducting sales, and marketing activities generally are not recoverable.

*Distribution*

Distribution for any Relevant Product could be done at a small scale using UPS or another logistics provider and at no cost to the firm as this can be passed on to customers. At a larger scale, entrants would likely use third-party wholesalers/distributors, which JLI estimates

52

JLI-AT-02605037

Confidential

*Specification 19*

could cost up to a 20-25% margin on sales for the wholesaler/distributor. There is no significant lead time with using UPS or another logistics provider and using wholesalers would again depend on the length of time to negotiate terms, but could be done in a few months or less.

There are not significant capital expenditures required with any of these distribution options and generally the costs are not recoverable.

In summary, the total estimated time for entry into the electronic cigarette segment is very little if the new entrant acquires an electronic cigarette product that was on the U.S. market as of the FDA's deeming date of August 8, 2016. However, to bring a new electronic cigarette product to market, the estimated time for entry for a new entrant is up to two years to develop the product, establish manufacturing, sales, and distribution. In addition, the new entrant would need to prepare for, submit, and receive PMTA approval. Given the uncertainty around the FDA process as well as the outcome of its reviews, JLI cannot reliably predict the cost and time necessary for a purely hypothetical entrant to obtain PMTA approval. Total sunk costs associated with satisfying the requirements for entry would be as high as tens of millions of dollars or more depending on the sophistication of the product and the costs and time necessary to navigate the PMTA approval and related regulatory hurdles. For an in-depth discussion of such costs, JLI directs the Commission's attention to the Company's response to Specification 20.

Response to Subpart (c)

The Company does not track in the ordinary course of its business potential new entrants into the electronic cigarette category. However, as described in the Company's response to Specification 18, which is incorporated by reference, a wide array of companies have entered into the sale of electronic cigarette products in the last several years.

53

Confidential Treatment Requested

JLI-AT-02605038

**Confidential**

*Specification 19*

<u>Response to Subpart (d)</u>

JLI does not believe there is an industry wide minimum viable scale; minimum plant size, production line size, capacity utilization rate, and production volume; requirement for multi-area, multi-plant, multi-product, or vertically integrated operations; economies of scale or scope; or efficiencies necessary to compete profitably in the manufacture or sale of electronic cigarettes in each Relevant Area. Similarly, JLI does not believe there is a general optimum plant size, production line, or production volume necessary to compete profitably. These are specific to the costs of any particular firm. Small scale companies can still be competitive and profitable. For example, NJOY, LLC, which in August 2018 captured less than 2% of e-cigarettes as reported by IRI, has grown in the past year and as of August 2019 accounts for approximately 9%.

Manufacturing operations generally have an optimal capacity utilization. This would be accurate for the manufacture of Relevant Products as well. Typically, a manufacturer wants to have as high of a utilization as possible so as to spread out its sunk costs over greater production volume, provided that some downtime likely will always be necessary for both scheduled and unexpected maintenance. JLI uses contract manufacturing for its electronic cigarette products and thus avoids most sunk costs associated with owning manufacturing facilities. However, JLI has purchased automation equipment for contract manufacturers; these costs are sunk costs.

54

Confidential Treatment Requested

**Confidential**

*Specification 20*

**Specification 20**

For each Relevant Product, describe: (a) the federal and state rules and regulations governing the development, marketing, or sale of the Relevant Product in any Relevant Area; and (b) the cost and time required to comply with each such regulation. Submit all documents since January 1, 2016, related to the impact of the FDA Deeming Regulation or changes in the PMTA Submission Deadline on the development, marketing, or sale of any Electronic Cigarette.

**Response to Specification 20**

To the extent that documents responsive to this specification are in its possession, custody, or control, JLI has produced or is submitting concurrently herewith non-privileged documents responsive to this specification.

With respect to the federal and state rules and regulations governing the development, marketing, or sale of any Relevant Product in any Relevant Area and the cost and time to comply with each such regulation, JLI responds as follows.

*FDA market authorization requirements*

Electronic cigarettes are subject to market authorization requirements administered by the FDA under the Family Smoking Prevention and Tobacco Control Act ("Tobacco Control Act"), enacted in 2009.[13] Although originally enacted to regulate combustible cigarettes, the Tobacco Control Act became applicable to electronic cigarettes once the FDA formally deemed them as tobacco products subject to regulation in 2016.

The Tobacco Control Act governs the marketing and sale of Relevant Products nationwide, and indirectly, their development as well. The Tobacco Control Act establishes three pathways for an electronic cigarette to come to market. First, if an electronic cigarette was on the market as of February 15, 2007, it can remain on the market without any approval by the FDA ("Grandfathered Product"). Second, a company can apply to the FDA for approval to

---

[13]    21 U.S.C. § 387(j)

Confidential Treatment Requested

JLI-AT-02605040

**Confidential**

*Specification 20*

market its product as the substantial equivalent to a "predicate" product that was on the market as of February 15, 2007 or to a product previously found to be substantially equivalent to a product that was on the market as of February 15, 2007 ("SE Pathway").[14]  Lastly, a company can seek premarket approval from the FDA through the PMTA process ("PMTA Pathway").

To be on the market as a Grandfathered Product, a company need only be prepared to demonstrate that the product was actually sold on the market prior to February 1, 2007, such as with sales records, receipts, or photos.  No pre-market FDA approval is required under this pathway; thus there is no time required under the FDA regulatory framework for a company to be on the market with a Grandfathered Product.

To follow the SE Pathway, a company is required to submit a premarket report showing that the new product either has the same characteristics (defined as the materials, ingredients, design, composition, heating source, and other features) as the predicate tobacco product or does not raise different questions of public health.[15]

Under the PMTA Pathway, the FDA will evaluate the proposed new product based on a public health standard, considering the risks and benefits of the product to the population as a whole.[16]  The FDA will deny the PMTA if the manufacturer has not shown that marketing the product is appropriate for the protection of public health.[17]

---

[14]  Note that while the predicate product for the SE Pathway must either have been on the market as of February 15, 2007, or itself be substantially equivalent to such a product, there is no requirement that the predicate product be on the market at the time a Substantial Equivalence application is filed.

[15]  FDA, Substantial Equivalence, *available at* https://www.fda.gov/tobacco-products/market-and-distribute-tobacco-product/substantial-equivalence.

[16]  Premarket Tobacco Product Applications, https://www.fda.gov/tobacco-products/market-and-distribute-tobacco-product/premarket-tobacco-product-applications.

[17]  FDA Guidance Document, Premarket Tobacco Product Applications for Electronic Nicotine Delivery System, 11-12, June 2019, *available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/premarket-tobacco-product-applications-electronic-nicotine-delivery-systems-ends.

56

Confidential Treatment Requested

JLI-AT-02605041

**Confidential**

*Specification 20*

Electronic Cigarettes

As a result of FDA's Deeming Rule promulgated in 2016, a manufacturer must obtain FDA authorization for any new electronic cigarette product. JLI did not introduce its products to the market until June 2015; indeed, JLI does not believe electronic cigarettes were on the market in any capacity in the United States as of February 15, 2007. Thus, from a practical perspective, neither the Grandfathered Product status nor the SE Pathway is available to an electronic cigarette manufacturer.

When the FDA deemed electronic cigarettes to be subject to the Tobacco Control Act, they allowed certain products following the PMTA Pathway to remain on the market while pursuing the approval of a PMTA. Electronic cigarettes modified or first introduced into the market between February 15, 2007 and August 8, 2016 were permitted to remain on the market provided the manufacturers file PMTAs for these products with the FDA by a future date. PMTA filings for such products were due August 8, 2022. Due to current litigation,[18] however, the date that PMTA applications are due for a company that wants to remain on the market with a provisional product is uncertain. As of July 12, 2019, a federal district court judge issued a Memorandum Opinion and Order imposing a deadline of May 11, 2020 for such submissions and a subsequent one year deadline for FDA approval.[19] If a company offers a product that was on the market as of August 8, 2016, obtaining FDA approval will not impose any time delay on entering the market, as such products are permitted to remain on the market for one year pending PMTA approval.

According to the guidance published by the FDA, there are numerous requirements a PMTA should address if it is to be successful, including numerous scientific and

---

[18]    *Am. Academy of Pediatrics et al. v. FDA et al.*, No. PWG-18-883 (D. Md.).

[19]    *Am. Academy of Pediatrics et al. v. FDA et al.*, No. PWG-18-883, 2019 WL 3067492 (D. Md. July 12, 2019).

57

Confidential Treatment Requested

JLI-AT-02605042

**Confidential**

clinical studies.[20]  The FDA has estimated that PMTA preparation will cost approximately

$117,000-$466,000.[21]  However, the FDA estimates do not account for the complexity of an

electronic cigarette supply chain that involves numerous components, which can add significant

costs to the work that must be done for the PMTA filing.  JLI estimates that a PMTA for an

electronic cigarette would cost between $5 million and $10 million per electronic cigarette SKU,

and require two and a half years to prepare after the product design is finalized.  Note too that the

FDA considers each SKU a different product for purposes of a PMTA.  Accordingly, an

electronic cigarette manufacturer with numerous e-liquid flavors must conduct separate studies

for each SKU separately.  However, the FDA's recent September 2019 proposed rule suggests

that manufacturers may have the ability to bundle multiple products together in one application,

which may reduce the burden of preparing and submitting a PMTA.[22]

Finally, to obtain PMTA approval, a company must go through an inspection

process of its manufacturing facilities, as well as any contract manufacturer facilities and clinical

lab facilities used in support of the PMTA.  For its e-vapor portfolio, JLI estimates that it spent

approximately $22 million to develop, implement, and maintain quality standards in preparation

for these inspections over a period of approximately 2.5 years.

Combustible Cigarettes

JLI is not in, nor does it intend to enter, the business of manufacturing or selling

combustible cigarettes.  JLI does not maintain any books, records, or any other information or

---

[20]  FDA Guidance Document, Premarket Tobacco Product Applications for Electronic Nicotine Delivery System, June 2019, *available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/premarket-tobacco-product-applications-electronic-nicotine-delivery-systems-ends.

[21]  FDA, Commonly Asked Questions: About the Center for Tobacco Products*, available at* https://www.fda.gov/tobacco-products/about-center-tobacco-products-ctp/commonly-asked-questions-about-center-tobacco-products#2 (last visited September 17, 2019).

[22]  "FDA anticipates that applicants will submit bundled PMTAs, which are single submissions containing PMTAs for a number of similar or related products.  We estimate that a bundle will contain on average between 6 and 11 distinct products."  84 Fed. Reg. 50,566 at 50,627.

58

Confidential Treatment Requested

JLI-AT-02605043

**Confidential**

*Specification 20*

data regarding the federal and state rules and regulations governing the development, marketing, or sale of combustible cigarettes, and as a result, cannot provide a reasonable estimate about those topics. For further information regarding the development, marketing, and sale of combustible cigarettes, JLI refers the Commission to Altria's response to Specification 21.

### *Other FDA regulatory requirements*

Aside from the marketing requirements under the Tobacco Control Act discussed above, there are a number of other regulatory requirements the FDA administers that govern the development, marketing, and sale of Relevant Products on a nationwide basis.

First, manufacturers of Relevant Products must analyze and list Harmful and Potentially Harmful Constituents ("HPHCs") with the FDA at the time that they file their application.[23] JLI estimates that compliance with these requirements costs approximately $26,000 per formulation of Relevant Product – *e.g.*, a JUULpod's flavor at a specific nicotine strength would count as a single formulation. Furthermore, compliance takes between five and six weeks, but a product continues to remain on the market – and thus need not file another list of HPHCs – so long as all applicable annual filing deadlines are met.

Second, manufacturers of Relevant Products must develop and file a twice-annual report with the FDA reflecting any changes in their products' ingredient registration.[24] These reports typically contain product information on a per-SKU basis, including a supply plan forecast and, when appropriate, labeling, consumer information, and advertising.[25] Compliance with this requirement does not carry a specific cost, though JLI would certainly expend some

---

[23]  21 U.S.C. § 387d

[24]  21 U.S.C. § 387e

[25]  As discussed further in its response to Specification 5, JLI announced on September 25, 2019 that it is suspending all broadcast, print, and digital product advertising in the U.S.

59

Confidential Treatment Requested

JLI-AT-02605044

**Confidential**

*Specification 20*

incidental costs and time to hire and retain personnel and staff, whose job duties would include fulfillment of this obligation.

Third, the FDA requires manufacturers of Relevant Products to conduct post-market surveillance of their products and to submit those findings in an annual report.[26] This surveillance typically contains a post-market surveillance plan, which details approach, methodology, data sources, and procedures for monitoring conduct and progress of the surveillance, among other elements. JLI estimates that compliance with this requirement costs approximately $3.4 million to complete. Once submitted, the FDA has 60 days to review the manufacturer's submission.

*State requirements*

While the federal laws and regulations administered by the FDA preempt state laws in many areas, companies that want to sell Relevant Products must comply with a number of state-specific laws and regulations as well. For example, many states have product registration requirements for Relevant Products, which may be used in connection with state revenue collection. To take another example, some states have enacted laws or regulations to limit or prohibit the use of any Relevant Product in certain public places, or may limit purchase of Relevant Products only to individuals above a certain age threshold. States also have enacted restrictions on the sale and distribution of Relevant Products, including restrictions on flavors associated with Relevant Products. Moreover, states have enacted varying taxation policies that impact Relevant Products. These requirements are necessarily state-specific and may vary based on the location of the distribution or ultimate sale of any Relevant Product.

Finally, many states and localities have different advertising and marketing

---

[26]    21 C.F.R. § 822.1 *et seq.*

60

JLI-AT-02605045

**Confidential**

*Specification 20*

restrictions (*e.g.*, the location of signage at a retail location, outdoor advertising restrictions, online sales restrictions), which must be complied with in the sale of Relevant Products. Such state level compliance efforts are typically covered by JLI's Brand Marketing team, led by Craig Brommers.

Confidential Treatment Requested

JLI-AT-02605046

Confidential

## Specification 21

State whether the Company has entered into the manufacture or sale of any Relevant Product in any Relevant Area from January 1, 2013 to the present and provide date(s) of entry. For each Relevant Product in each Relevant Area, describe in detail the steps taken by the Company to enter, including but not limited to steps related to research and development, planning and design, production, distribution, patents, licenses, sales and marketing activities, and any necessary governmental and customer approvals, and the time required to complete each step. For each entry event provide the costs associated with each step taken by the Company to enter.

## Response to Specification 21

*Combustible Cigarettes*

JLI has not entered into the manufacture or sale of combustible cigarettes since January 1, 2013 and has never manufactured or sold combustible cigarettes.

*Electronic Cigarettes*

On June 1, 2015, JLI, then operating under the name Pax Labs, launched its electronic nicotine delivery system ("ENDS") product under the trade name "JUUL." Since that date, all of JLI's activities have been in support of a single product: the JUUL system, and the 2015 launch of the JUUL system constitutes JLI's only entry in the manufacture or sale of a Relevant Product since January 1, 2013. The steps JLI took to enter the market with the JUUL system can generally be categorized as: (1) Product Development; (2) Manufacturing; (3) Sales and Marketing; and (4) Distribution.

Product Development

The Company entered the market by developing a new closed ENDS, which entailed, among many things, development of a new and proprietary nicotine salt e-liquid formulation, a new vaporization device and associated cartomizer (including, among other features, a battery and electronics for controlling the vaporization of the proprietary e-liquid), and a disposable cartomizer/cartridge that holds the proprietary e-liquid for vaporization.

Confidential Treatment Requested

JLI-AT-02605047

**Confidential**

*Specification 21*

Founders James Monsees and Adam Bowen met as students at Stanford University where they were enrolled in a graduate program called "Product Design" in the mid-2000's. They started the Company—then known as Ploom in 2007—to initially make a "heat-not-burn" tobacco vaporizer device. Ploom was later renamed as Pax Labs in February 2015. Formal product development of the JUUL system began in mid-2013 with the product launch taking place in June 2015. In 2017, Pax Labs was spun off from the company that became JLI.



63

Confidential Treatment Requested

JLI-AT-02605048

**Confidential**

*Specification 21*

███████████████████████████████████████████

This product development process began in mid-2013 and continued until late February to mid-March of 2015. It is difficult for JLI to provide a precise number concerning its spend on research and development attributable solely to the JUUL system given that at the time, it was a small, privately held company of approximately 30-60 employees and its research and development team were also conducting research and development related to the Company's other vaporization products at the same time.

███████████████████████████████████████████

███████ Despite the challenges associated with putting forward a precise number regarding the R&D spend to bring the JUUL system to launch, the Company estimates that it invested roughly $███████ in the effort.

While the team that developed the JUUL system had developed certain knowledge and know how through its work on Pax Labs' other projects and developed through

64

Confidential Treatment Requested

JLI-AT-02605049

**Confidential**

*Specification 21*

the course of their education and professional careers, the creation of the JUUL system was, from the very beginning, unique. The engineering and design process sought to develop a differentiated product that was not only distinct from Pax Labs other products but also from all ENDS products that had been or were then on then on the market. As such, the Company did not enter into any licenses for intellectual property while it was developing the JUUL system or since the product's launch. While obtaining patent, trademark and copyright protections was not a requirement for entry into the market, the Company sought to protect its innovations from the beginning of product development on the JUUL System by filing, where appropriate, for patent, trademark and copyright protections to cover the JUUL system. To that end, JLI estimates that it spent approximately $███ ███ in legal costs in 2015 and 2016 to pursue intellectual property protection for its products.

<u>Manufacturing</u>



The Company does not specifically track the amount spent on manufacturing design, which was developed in parallel with the JUUL system itself as different iterations of the product were prototyped and tested.



65

Confidential Treatment Requested

JLI-AT-02605050

Confidential

*Specification 21*



For itemized information on JLI's historical cost of goods sold upon entry into the market, please refer to data provided in response to Specification 11.

For itemized information on JLI's historical manufacturing and assembly costs for its initial run of sales, please refer to data provided in response to Specification 11.

66

**Confidential**

*Specification 21*

### Sales and Marketing

The initial marketing efforts for the JUUL system were focused on developing consumer awareness for the product and marketing directly to retailers to carry the product. For the 2015 launch, the Company's marketing staff attended trade shows and worked to arrange direct meetings with individual retailers to introduce them to JUUL products. During 2015, the Company targeted specialty vape stores as potential purchasers given their existing connection to adult smokers. The Company also focused on convenience store accounts and by 2016 was available in almost 10,000 storefronts. JLI did not develop relationships with major distributors or chain retailers until 2017. These early sales efforts to retailers were led by JLI's founders and an 11-person Pax Labs sales team. However, JLI did not have its own sales team until it became a separate entity from Pax Labs in 2017, so these individuals were primarily dedicated to marketing Pax Labs products, and the majority shared responsibilities between JLI and Pax Labs. As a result, JLI cannot separately identify employees or costs that were dedicated to selling the JUUL system at launch.



67

Confidential Treatment Requested

JLI-AT-02605052

**Confidential**

*Specification 21*

██████████████████████ During 2015, the Company spent $8,821,903 to advertise, market and promote the JUUL system in the following channels:

- $███████ on trade marketing, including in-store fixtures, advertising, or displays;

- $██████ on media marketing, including radio, print media, and other activities;

- $█████ on e-commerce marketing, consisting of non-personnel-related operating expenses in connection with the Company's online business and the costs of operating the Company's websites;

- $██████ related to sponsorships and tradeshows, including branded and unbranded sponsorship of customer and trade events and participation at trade shows;

- $████ on endorsers, influencers, content creators, and word-of-mouth ambassadors; and

- $██████ on price discounts and promotional allowances to retailers and distributors.

Little formal market research was conducted prior to the launch of the JUUL system. Approximately one year before the product was launched in June 2015, a Pax Labs marketing employee was assigned to conduct research on potential market opportunities for JLI, and the company retained ███████████████████████████████████████████████████████████████████████████████████████████████████████████████

The Company also invested in ████████ ████ ██ ███████ ██████ to launch the JUUL system. The Company offered a one-year warranty against defects in materials and

68

Confidential Treatment Requested

JLI-AT-02605053

**Confidential**

*Specification 21*

workmanship for the JUUL device from the date or retail purchase by the original purchaser. If a purchaser filed a claim within the one-year warranty period, JLI would either repair the defect or exchange the purchaser's device for a new one. At launch, customer support and warranty activities were handled by Pax Labs employees, who primarily did work related to existing Pax Labs products, so JLI cannot separately track the amount spent on customer service for the JUUL system at launch. JLI invested about $█████████ in warranty reimbursements for purchasers of the JUUL system from January 2016 to June 2019, and detailed data on warranty reimbursement costs for the initial run of JLI products is available in the data sets submitted in response to Specification 11.

### Distribution

As described above, the Company launched the JUUL system by selling directly to individual retailers. JLI shipped its products to retailers for sale in an initial "wave" in December 2015 and January 2016. At launch, JLI distributed its products via commercial logistics firms, such as DCL and UPS for shipment to retailers. The Company's distribution costs were passed on to consumers as a margin on sales, which is described in detail in the margin data produced in response to Specification 11. The product was priced for distributors on an SKU level, and the average distribution cost for products sold at launch is reflected in JLI's operating expenses, produced to the Commission in JLI Exhibit 11.7.

In parallel with retail distribution, the Company began selling the JUUL system directly to consumers via the website juulvapor.com in June 2015. The site was an integrated part of the existing Pax Labs ecommerce site, which launched in August 2012 to sell Pax Labs products. The Pax Labs website used ecommerce software provided by Magento, which allowed for the creation of different branded "storefronts" for various products using the same underlying

69

Confidential Treatment Requested

**Confidential**

*Specification 21*

platform and already incorporated age verification software. Because JUUL was launched using the existing Pax Labs ecommerce site, there was minimal additional development required to distribute the JUUL system online, and the Company cannot isolate ecommerce costs specifically related to the launch of the JUUL products in June 2015.

<u>Governmental Approvals</u>

Electronic cigarettes are subject to market authorization requirements administered by the FDA, which also governs the marketing and sale of electronic cigarettes nationwide, but the JUUL system was launched prior to the advent of any FDA regulation of electronic cigarettes, so regulatory compliance was not a significant cost of entry into the market. As described in detail in JLI's response to Specification 20, the FDA did not promulgate its Deeming Rule requiring FDA authorization for new electronic cigarette products until August 2016. Because the JUUL system was introduced onto the market before August 8, 2016, it was permitted to remain on the market while JLI filed the required PMTA applications. Thus, while FDA compliance was not a significant expenditure for JLI at the time the JUUL system was launched, since its launch, JLI has invested significantly in PMTA approval. These efforts and expenditures are described in detail in JLI's response to Specification 20.

70

Confidential Treatment Requested

**Confidential**

*Specification 23*

**Specification 22**

Submit all documents relating to any Plans of the Company or any other Person for the construction of new facilities, the closing of any existing facilities, or the expansion, conversion, or modification (if such modification has a planned or actual cost of more than $1,000,000) of current facilities for the manufacture or sale of any Relevant Product.

**Response to Specification 22**

To the extent that documents responsive to this specification are in its possession, custody or control, JLI has produced or is submitting concurrently herewith non-privileged documents responsive to this specification.

71

Confidential Treatment Requested

JLI-AT-02605056

**Confidential**

**Specification 23**

Identify, and state whether the Company is a member of or subscribes to, all trade associations, information services, and other organizations relating to the production or sale of any Relevant Product. Submit one copy of all documents submitted to or received from each identified organization (or its agents) by any Person that discuss or describe production, Sales, prices, competition, or entry conditions relating to the Relevant Product.

**Response to Specification 23**

In response to this specification, JLI employees with the most knowledge regarding JLI's interaction with trade associations and other organizations relating to the production or sale of any Relevant Product identified the following organization:[27]

- Vapor Technology Association ("VTA") – JLI a is a member of VTA, which focuses on providing public affairs advocacy and lobbying for the vapor technology, e-cigarette, and e-liquid industry at both the federal and state level.

JLI does not provide trade associations or information services with production, sales, prices, competition, or entry condition information relating to its products. To the extent that documents responsive to this specification are in its possession, custody, or control, JLI has already produced or is submitting concurrently herewith non-privileged documents responsive to this specification at bates ranges: JLIFTC02316949 to JLIFTC02317093 and JLIFTC02318313 to JLIFTC02318447.

---

[27] Separately, in response to Specification 13, JLI has identified information services and data analytics companies from which it obtains data.

72

Confidential Treatment Requested

JLI-AT-02605057

**Confidential**

**Specification 24**

Submit all documents relating to the Company's or any other Person's Plans for, interest in, or efforts undertaken to bring about any acquisition, divestiture, joint venture, alliance, or merger of any kind involving the manufacture or sale of any Relevant Product other than the Proposed Transaction. Provide a copy of all submissions provided to any regulatory agency relating to or in connection with any prior transaction involving the manufacture or sale of any Relevant Product in the Relevant Area other than the Proposed Transaction.

**Response to Specification 24**

To the extent that documents responsive to this specification are in its possession, custody, or control, JLI has produced or is submitting concurrently herewith non-privileged documents responsive to this specification. JLI has provided no submissions to any regulatory agency relating to or in connection with a prior transaction involving the manufacture or sale of any Relevant Product in the Relevant Area other than the Proposed Transaction.

73

Confidential Treatment Requested

JLI-AT-02605058

Confidential

*Specification 25*

**Specification 25**

Submit all documents (except documents solely relating to environmental, tax, human resources, OSHA, or ERISA issues) relating to the Proposed Transaction and provide:

(a) a timetable for the Proposed Transaction, a description of all actions that must be taken prior to consummation of the Proposed Transaction, and any harm that will result if the Proposed Transaction is not consummated or is delayed;

(b) a detailed description of (including the rationale for) all Plans for changes in the Company's and Altria's operations, structure, policies, strategies, corporate goals, financing, business, officers, employees, or any other area of corporate activity as a result of the Proposed Transaction. Include a detailed description of (including the rationale for) all services Altria has provided, plans to provide, or may provide to the Company in connection with the Proposed Transaction, including but not limited to services relating to distribution, logistics, and marketing (e.g., shelf space, access to customer information, sales support). For each service, state the time frame and geographic scope for the provision, planned provision, or proposed provision of the service. Identify all documents directly or indirectly used to prepare the Company's response to this subpart;

(c) a detailed description of the reasons for the Proposed Transaction and the benefits, costs, and risks anticipated as a result of the Proposed Transaction; and

(d) a detailed description of all statements or actions by any Person (identifying the Person by name, title, and business address) in support of, in opposition to, or otherwise expressing opinions about the Proposed Transaction or its effects.

**Response to Specification 25**

Documents responsive to this specification have been submitted as indicated below. To the extent that additional documents responsive to this specification are in its possession, custody, or control, JLI has produced or is submitting concurrently herewith non-privileged documents responsive to this specification.

Response to Subpart (a)

Pursuant to an executed Class C-1 Common Stock Purchase Agreement (the "Purchase Agreement") by and among JUUL Labs, Inc., Altria Group, Inc., and Altria

74

Confidential Treatment Requested

JLI-AT-02605059

**Confidential**

*Specification 25*

Enterprises, LLC, dated December 20, 2018,[28] Altria purchased non-voting convertible common shares of JLI, representing 35% of JLI's outstanding capital stock as of the closing date.

Conversion from non-voting to voting shares (the "Transaction") will occur automatically upon the expiration or termination of any waiting period (and any extension thereof) applicable to the Transaction under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"). Altria and JLI filed Premerger Notification and Report Forms pursuant to the HSR Act on February 4, 2019. On February 22, 2019, Altria's counsel orally informed the FTC of Altria's intent to voluntarily withdraw the Premerger Notification and Report Forms, and confirmed this intent in writing to the FTC on February 28, 2019. Premerger Notification and Report Forms were voluntarily withdrawn on March 6, 2019 and resubmitted on March 8, 2019. On April 8, 2019, Altria and JLI each received a Request for Additional Information and Documentary Material under the HSR Act.

Before the parties may complete the Transaction, the Commission must terminate the applicable waiting periods, or each of Altria and JLI must certify substantial compliance with its Second Request, observe the relevant waiting period, and comply with the terms of the Timing Agreement dated June 7, 2019 between the Commission and the Parties.

The Parties anticipate closing the Transaction as soon as practicable.

Any delay in the closing of the proposed Transaction will result in substantial harm to the parties, their customers, and their shareholders. The harms to JLI include the delay in fully realizing the benefits of the Altria Services Agreement, discussed in further detail in the Company's responses to Subpart (b) and Specification 26. Further delay will also increase

---

[28] See Attachment 3(b)-1 to Altria's Hart-Scott-Rodino Notification and Report Form, filed on February 4, 2019 (the "JLI HSR Form").

75

Confidential Treatment Requested

JLI-AT-02605060

**Confidential**

*Specification 25*

uncertainty among the distributors, wholesalers, retailers, and customers with whom JLI does business because of a lack of clarity regarding the Altria investment.

In addition, the parties will have incurred substantial expense, burden, and management distraction in anticipation of the Transaction. The uncertainty related to delay in closing the Transaction could also negatively impact the Company's businesses, customers, employees, and investors and result in materially increased fees and expenses.

Further harms are described in Altria's response to its Specification 26.

Response to Subpart (b)

*Plans for changes to the Company's business*

After completion of the Transaction, JLI remains fully independent and retains full operating control. This is confirmed in the Relationship Agreement by and among JUUL Labs, Inc., Altria Group, Inc., and Altria Enterprises LLC, dated December 20, 2018 (the "Relationship Agreement"),[29] which states that "[Altria] shall have no right, directly or indirectly, as a result of its investment in [JLI] or otherwise, to direct or control [JLI] . . . and shall have no power to direct the management or policies of [JLI]."[30]

Post-conversion, Altria will obtain both voting rights and the ability to designate members of JLI's board of directors. As explained in the Eighth Amended and Restated Voting Agreement (the "Voting Agreement") by and among JUUL Labs, Inc., Altria Group, Inc., and Altria Enterprises LLC, dated December 20, 2018,[31] prior to conversion of Altria's non-voting shares into voting shares, Altria has no board representation, but may designate a non-voting

---

[29]    See Attachment 3(b)-5 to the JLI HSR Form.

[30]    Relationship Agreement Sec. 6.4.

[31]    See Attachment 3(b)-6 to JLI's HSR Form.

76

JLI-AT-02605061

Confidential

*Specification 25*

board observer.[32]  After the conversion into voting shares, Altria will have the right to designate one-third of the board seats, consistent with its level of investment.[33]  Both now and after conversion, Altria is subject to a standstill obligation barring the acquisition of additional voting or economic shares beyond 35%.[34]

*Services Altria is providing or plans to provide*

Pursuant to the Services Agreement,[35] Altria has agreed to provide JLI services that will accelerate JLI's ability to provide an alternative to current adult smokers of combustible cigarettes.  Services are to be provided in the United States and any requests for services outside of the United States are limited to where Altria has a permanent establishment for tax purposes or currently files net income tax returns.[36]  Altria has agreed to provide services for a six year term, subject to renewal periods of three years.[37]

Services are to be provided upon request by JLI.  The Company's ability to request services commenced on December 20, 2018.  Services that could be utilized include mission support, governmental and regulatory affairs, distribution support, fixture services, database access, legal and related services, records management, brand and trade channel integrity services, direct marketing support (including direct mail and inserts/onserts), sales services, payment management, trade relations services, and marketplace data analytics services.[38]  JLI also may identify additional services similar to but different from the services

---

[32]    Voting Agreement Sec. 2(g)(iii).

[33]    Voting Agreement Sec. 2(b)(i).

[34]    Relationship Agreement Sec. 6.1.

[35]    See Attachment 3(b)-2 to JLI's HSR Form.

[36]    Services Agreement Exhibit A, Sec. 2.2.

[37]    Services Agreement, Sec. 5.1–5.2.

[38]    Services Agreement Sec. 5.1, Exhibits A-B.

77

Confidential Treatment Requested

JLI-AT-02605062

**Confidential**

*Specification 25*

being performed by Altria.[39]  JLI will be charged for such services according to charging principles agreed upon in the Services Agreement.[40]  Additional information about the services that Altria has provided or may provide upon the request of JLI are described in the Company's response to Specification 26.

*Documents used to prepare JLI's response*

In order to prepare the Company's response to this subpart, the Company reviewed the Services Agreement, Relationship Agreement, Voting Agreement, Altria's March 4, 2019 response to the FTC's February 21, 2019 Voluntary Access Letter, Altria Services Agreement Program Tracker of April 26, 2019 [JLIFTC02246586], Altria Services Agreement Program Tracker of July 7, 2019 [JLIFTC02061212], Altria Group Distribution Company Sales & Marketing Services Review, July 29, 2019 [JLIFTC02080893], and the executed Statements of Work ("SOW") referenced in the Company's response to Specification 26.

Response to Subpart (c)

JLI entered into the Transaction with Altria because it determined that Altria would further JLI's core mission to improve the lives of the world's one billion adult smokers through tangible actions and real value.  JLI wanted an investor that would both provide access to financial resources and services necessary to accelerate the provision of a meaningful alternative to current adult smokers of combustible cigarettes.  JLI also wanted to ensure that it retained complete control over its business.[41]

The Transaction with Altria accomplishes these goals.  Through the Services Agreement, JLI has access to Altria services and expertise that provide JLI with real value in

---

[39]    Services Agreement Sec. 2.5.

[40]    Services Agreement Exhibit Art. IV.

[41]    See Attachment 4(c)-7 to the JLI HSR Form, at 2–3..

78

JLI-AT-02605063

**Confidential**

*Specification 25*

addition to Altria's financial investment.  Altria will expand distribution of JLI's products by placing JUUL products alongside combustible cigarettes in Altria's innovative tobacco products retail shelf space, will enable direct communications with adult smokers via Altria companies' smokers' databases and through marketing inserts in combustible cigarette packs, will expand JLI's reach and efficiency through Altria' logistics and distribution experience, and will give JLI the option to be supported by Altria's sales organization.[42]  As discussed above, JLI also has retained operational control of its business.

Additional information regarding the Transaction's benefits and the associated costs may be found in the Company's response to Specification 26.

Response to Subpart (d)

Statements regarding the Transaction have been made in publicly available sources, including news articles and industry analyst publications.  Documents containing statements responsive to this subpart, if any, have been produced.  In the ordinary course of business, JLI does not collect or maintain detailed descriptions of such statements or actions by any person in support of, in opposition to, or otherwise expressing opinions about the Transaction.

---

[42]  *Id.*

79

Confidential Treatment Requested

JLI-AT-02605064

## Specification 26

Describe in detail, quantify (if possible), and submit all documents relating to the benefits, costs, and risks anticipated as a result of the Proposed Transaction, including, but not limited to, all cost savings, economies, or other efficiencies of any kind anticipated as a result of the Proposed Transaction, including:

(a) a description of the steps the Company will take to achieve each benefit, cost saving, economy, or other efficiency;

(b) the estimated time and cost required to achieve each benefit, cost saving, economy, or other efficiency and an explanation for how the cost was derived;

(c) the estimated dollar value of each benefit, cost saving, economy, or other efficiency, stating separately the one-time fixed cost savings, recurring fixed cost savings, and variable cost savings in dollars per unit and dollars per year, and an explanation of how that value was derived;

(d) an explanation of why the Company could not achieve each benefit, cost saving, economy, or other efficiency without the Proposed Transaction; and

(e) the identity of each Person (including the Person's title and business address) employed or retained by the Company with any responsibility for achieving, analyzing, or quantifying each benefit, cost saving, economy, or other efficiency described.

## Response to Specification 26

To the extent that documents responsive to this specification are in its possession, custody, or control, JLI has produced or is submitting concurrently herewith non-privileged documents responsive to this specification.

In order to further its mission of improving the lives of the world's one billion adult smokers by providing the first true alternative to combustible cigarettes, JLI sought an investor that would be committed to supporting this goal. Altria committed to that mission not only through its financial investment in JLI, but also by agreeing to leverage its significant capabilities to offer a host of valuable services to JLI.[43]

---

[43]    JUUL Labs, Inc., Press Release, JUUL Statement About Altria Minority Investment and Service Agreements, https://newsroom.juul.com/juul-statement-about-altria-minority-investment-and-service-agreements/.

80

Confidential Treatment Requested

JLI-AT-02605065

**Confidential**

*Specification 26*

As discussed in the Company's response to Specification 25, Altria has agreed to provide JLI services that will accelerate and improve JLI's ability to reach and provide an alternative to current adult smokers of combustible cigarettes.  The Services Agreement enables JLI to request Altria's services within the United States for mission support, governmental and regulatory affairs, distribution support, fixture services, database access, direct marketing support (including direct mail and inserts/onserts), legal and related services, records management, brand and trade channel integrity services, sales services, payment management, trade relations services, and marketplace data analytics services.[44]  JLI also may identify and request additional services similar to but different from the services being performed by Altria.[45]  The Agreement runs for a six year term, with renewal periods of three years.[46]  As discussed in more detail below, the various services provided by Altria will enable JLI to reach consumers more frequently and effectively and at lower cost than would be possible absent the Transaction.

After JLI requests services under the Service Agreement, the terms are agreed to in a statement of work ("SOW") between the Company and Altria.  The relevant time period and cost of each service is set forth in the associated statement of work and calculated based on Altria's cost plus 3%, as set forth in the Services Agreement.[47]

To date JLI and Altria have executed SOW Nos. 1-16, 18-25, and 27.  SOW No. 17, related to email marketing, was drafted, but has been placed on hold while JLI and Altria continue to discuss how best to execute email marketing campaigns.  The SOWs, as well as plans

---

[44]   Services Agreement Sec. 5.1, Exhibits A–B, available at Attachment 3(b)-2 to JLI's HSR Form.

[45]   Services Agreement Sec. 2.5.

[46]   Services Agreement Sec. 5.1–5.2.

[47]   Services Agreement Exhibit Art. IV.

81

Confidential Treatment Requested

JLI-AT-02605066

**Confidential**

*Specification 26*

for future services under the Services Agreement, are discussed below.  The SOWs have been included in the company's production of documents to the Commission.

Response to Subparts (a)-(c)

Below the Company describes the benefits and costs associated with the following services:  distribution support, fixture services, government and regulatory support, database access and direct marketing, sales services, legal support, and mission support.  JLI expects these services to reduce its costs significantly.  The Company continues to evaluate potential savings from the executed SOWs.  Moreover, as described in more detail below, the various services allow JLI to serve its customers more quickly and effectively, and the Company has not yet determined the financial value of this.

While JLI has not identified particular risks associated with the Services Agreement, other than those described further below, it is possible that Altria will not able to provide a service included within the terms of the Services Agreement or live up to the terms of an executed SOW.  It is also possible that the JLI will not realize the entirety of the expected benefits.

*Distribution support*

Altria and JLI will integrate JLI's distribution processes into Altria's nationwide distribution network.  JLI believes that access to this distribution network will allow it to deliver new and existing products faster and more consistently than it has been able to achieve on its own.  For example, Altria has established relationships with nearly two dozen third-party warehouses (public warehouses) that receive products from central warehouses operated by third party DSC Logistics and direct line haul freight.  As a result, Altria has demonstrated the ability

82

Confidential Treatment Requested

JLI-AT-02605067

**Confidential**

*Specification 26*

to reach 90% distribution of new products in 2.5 weeks (Marlboro ICE and Copenhagen Long Cut Mint),[48] which is faster and more effective than JLI.

The Parties have signed three SOWs to date in which Altria has committed to providing distribution services, such as freight to Altria's primary warehouse facility, offsite distribution, public warehouse storage and handling, last mile customer delivery freight, and supply chain management consulting and reporting services.

SOW No. 10[49] provides JLI with access to Altria's warehouse facility in Richmond, VA. This allows JLI to move obsolete and excess inventory out of its ▮ ▮ third party distribution center ▮ ▮ so the SOW will alleviate space concerns. In addition, Altria is charging JLI a flat rate for receipt, storage, and handling of JLI products. JLI views the associated costs, estimated at $▮ per year, as a significant improvement over rates available from ▮ ▮ or other third party providers. Moreover, the flat rate provides JLI with greater certainty regarding its logistics costs.

SOW Nos. 9 and 16 enable pooled distribution of JLI and Altria products. The companies determined that they have clusters of nearby customers in California, Arizona, and Nevada and Texas, Louisiana, and Oklahoma. Prior to execution of these SOWs, JLI sent product to customers in these areas using ▮ ▮ In addition, upon arrival at the destination warehouse, the product might have to sit in storage while waiting for last-mile delivery to the customer.

---

[48]    JLIFTC0038612●.

[49]    Statement of Work #1● Distribution Support Services by and between Altria Group Distribution Company and JUUL Labs, Inc., effective as of March 29, 2●19 [JLIFTC02●8●826].

83

JLI-AT-02605068

**Confidential**

*Specification 26*

Beginning in May 2019 for California, Arizona, and Nevada and July 2019 for Texas, Louisiana, and Oklahoma, Altria and JLI products are combined in a single truck, ensuring that the truck is full, and sent to a public warehouse used by Altria in either San Bernardino, CA or Fort Worth, TX. Upon arrival, the parties' products do not sit in storage. Instead, they are separated by company, and Altria arranges for last-mile delivery of the JLI product from the public warehouse to the customer.

These services have reduced JLI's product delivery time from █████████ for California, Arizona, and Nevada[50] and from ████████ for Texas, Louisiana, and Oklahoma.[51] JLI's lead times for product delivery have also become more consistent. Importantly, the services also reduce the risks of product theft, loss, and damages, as well as JLI's dependency on less than truckload shipments. As such, JLI has reduced its shipping costs on these routes from ████████ per weight for the California, Arizona, and Nevada area and to 42 cents per weight for the Texas, Louisiana, and Oklahoma area.[52]

JLI estimates the annual savings from utilizing Altria's pool distribution at $██ ███ a ██ savings over JLI's previous arrangement with ████ ████ JLI estimates that if it were to move its full U.S. B2B volume to pool distribution with Altria, it could save $██ ██████ year, a ███ savings over JLI's current distribution arrangement.[53]

---

[50]   JLIFTC02318466

[51]   *Id.*

[52]   JLIFTC02318467

[53]   JLITFC01778284.

84

Confidential Treatment Requested

JLI-AT-02605069

**Confidential**

*Specification 26*

Annual costs for pooled distribution support, including public warehouse storage and last mile freight in California and Texas for 2019 are estimated to be ███████ in 2019 and ████████████ in 2020.

Below are the details regarding each relevant SOW:

- SOW No. 10, in effect March 29 to December 31, 2019, for Altria to provide offsite distribution support, including freight from JLI's current ███████ ████ third party distributor, ████ ██████, to Altria's warehouse facility in Richmond, VA, and warehouse storage and handling.[54]

- SOW No. 9, in effect April 26 to December 31, 2019, for Altria to provide offsite distribution support, including line haul freight, public warehouse storage and handling in Altria's warehouse in San Bernardino, CA, and supply chain management services, including consultation and product delivery resolution and standard reporting.[55]

- SOW No. 16, in effect July 1 to December 31, 2019, for Altria to provide distribution support on the West Coast, including line haul freight, public warehouse storage and handing in Altria's facility in San Bernardino, CA, and last mile freight to customers, as well as supply chain management services, including consultation and product delivery resolution and standard reporting.[56]

*Fixture services*

---

[54] Statement of Work #10 Distribution Support Services by and between Altria Group Distribution Company and JUUL Labs, Inc., effective as of March 29, 2019 [JLIFTC02080826].

[55] Statement of Work #9 Distribution Support Services by and between Altria Group Distribution Company and JUUL Labs, Inc., effective as of April 26, 2019 [JLIFTC02080817].

[56] Statement of Work #16 Distribution Services by and between Altria Group Distribution Company and JUUL Labs, Inc., effective as of July 1, 2019 [JLIFTC02082881].

85

Confidential Treatment Requested

JLI-AT-02605070

**Confidential**

*Specification 26*

less than eight to more than eight facings in retail locations could result in an estimated sales lift of 2-3%.[61]

Furthermore, JLI has estimated that utilizing Altria's Field Sales team for fixtures support and handling collateral marketing materials will represent approximately 16-20% in cost savings.[62]

Annual costs for fixture services related to ITP space are estimated to be ███ ███ in 2019 and ███ ███ in 2020.

The Parties have executed three SOWs to date.

- SOW No. 1, in effect January 30 to July 31, 2019, to engage Altria's Field Sales Force Services for fixture services with initial rollout of up to 1,073 stores by March 21, 2019.[63]

- SOW No. 5, in effect January 2019, 2019 to January 4, 2021, to engage Altria for fixture services at over 40,000 ITP stores.[64]

- SOW No. 6, in effect February 12 to May 25, 2019, for fixture services at up to 97,087 stores.[65] This SOW is discussed further under the Sales Services section.

[61] JLIFTC00386128-29.

[62] JLIFTC00067807.

[63] Statement of Work #1 Fixture and Sales Support Services Speedway by and between Altria Group Distribution Company and JUUL Labs, Inc., effective as of January 30, 2019 [JLIFTC00668237].

[64] Statement of Work #5 Fixture and Sales Support Services by and between Altria Group Distribution Company and JUUL Labs, Inc., effective as of January 29, 2019 [JLIFTC00668185].

[65] Statement of Work #6 Sales Support Services by and between Altria Group Distribution Company and JUUL Labs, Inc., effective as of February 12, 2019 [JLIFTC00723818].

87

Confidential Treatment Requested

JLI-AT-02605072

**Confidential**

*Specification 26*

*Government and Regulatory support*

Altria will provide assistance on federal, state, and local regulatory and taxation matters. This includes FDA-related compliance and regulatory reporting. Altria's expertise in this area is particularly valuable to JLI in light of the July 12, 2019 district court decision to shorten the PMTA filing deadline to May 2020–cutting over two years from the prior August 2022 deadline.[66] Altria has offered is entire suite of regulatory, clinical, and community relations capabilities. This includes access to all relevant Altria team members, 25 regulatory sciences/modeling matter experts, and several clinical project managers.

This access will accelerate JLI's FDA application process and advance the sophistication of JLI's science programs. JLI estimates that its PMTA and Modified Risk Tobacco Products ("MRTP") application timeline will improve by ▌ months. It also expects to save ▌ ▌▌ ▌ in regulatory-related expenses.[67] These benefits will be achieved in three ways.

Regulatory consultation

JLI will leverage Altria's regulatory experience with combustible products and MarkTen to accelerate the timeline of JLI's PMTA, MRTP, and other regulatory approval processes. Altria will be able to provide the necessary legal, project management, and other support to enable FDA-related compliance, regulatory reporting, and engagement activities. JLI will also gain access to Altria's existing models to facilitate and improve its regulatory approval applications, such as the population health index model and methods for in-house testing of device and e-liquid prototypes, which JLI would not have been able to develop on its own by the

---

[66] *See* Memorandum Opinion and Order, *Am. Academy of Pediatrics v. FDA*, 8:18-cv-00883 (July 12, 2019 D. Md.).

[67] JLIFTC00721159.

88

Confidential Treatment Requested

JLI-AT-02605073

**Confidential**

*Specification 26*

advanced PMTA filing deadline. Such access is expected to accelerate the PMTA/MRTP

timeline by ████ months.

Research

JLI will gain access to Altria's established testing facilities, equipment, and the

relevant proprietary test methods for the necessary pre-clinical and clinical research. As a result,

JLI can bypass the lengthy request for proposal process for contract laboratories. This is

expected to accelerate the PTMA timeline by ████ months and achieve cost-saving of at least ███

████. [68]

JLI also will gain immediate access to relevant research results, methods, and

studies and receive support for sourcing of clinical research organizations (CROs) sites and

networks.[69] This is expected to accelerate the PMTA timeline by ██ ████ and achieve cost-

saving of ████ █ █ ████ over 12 months.[70]

Scientific affairs

The PMTA application requires that JLI complete a comprehensive review of all

academic literature and research on topics such as electronic nicotine delivery systems and the

prevalence of tobacco usage. This review is time-consuming and costly. As a result of the

Services Agreement, JLI will gain access to results from Altria's previously completed

comprehensive literature review.

In accordance with terms of the SOWs, annual costs for literature review work are

estimated to be ████ ████ in 2019 and $2.5 million in 2020. Annual costs for consulting

services related to the PMTA, including pre-clinical, clinical, aerosol profiling, modeling and

---

[68]    *Id.*

[69]    *Id.*

[70]    *Id.*

Confidential Treatment Requested

JLI-AT-02605074

**Confidential**

*Specification 26*

simulation, sensory and population research, and study designs, are estimated to be ▮ ▮▮▮ in

2019 and ▮▮ ▮▮▮ in 2020.

To date, JLI and Altria have signed ten SOWs related to regulatory support:

- SOW No. 7, in effect from February 25 to August 25, 2019, for Altria to
  provide scientific consulting services, including pre-clinical (chemistry,
  toxicology and biological sciences), clinical, aerosol, modeling and
  simulation, sensory and population research (perception, behavior, population
  modeling, consumer research and post-market surveillance).[71]

- SOW No. 12, in effect from July 26, 2019 to January 26 , 2019, to extend
  term of SOW 7.[72]

- SOW No. 15, in effect from May 20 to September 30, 2019, for Altria to
  provide scientific services to study Air-Liquid Interface (ALI) exposure
  characterization in support of regulatory submissions.[73]

- SOW No. 19, in effect from May 21, 2019 to November 30, 2020, for Altria
  to provide consulting services related to perception, behavior, and intentions
  studies in support of regulatory submissions.[74]

---

[71] Statement of Work #7 Premarket Tobacco Product Application Support Services by and between Altria Client Services LLC and JUUL Labs, Inc., effective as of February 25, 2019 [JLIFTC00733405].

[72] Statement of Work #12 Premarket Tobacco Product Application Support Services by and between Altria Client Services LLC and JUUL Labs, Inc., effective as of July 26, 2019 [JLIFTC02249481].

[73] Statement of Work #15 Premarket Tobacco Product Application Support Services by and between Altria Client Services LLC and JUUL Labs, Inc., effective as of May 20, 2019 [JLIFTC02318448].

[74] Statement of Work #19 Premarket Tobacco Product Application Support Services by and between Altria Client Services LLC and JUUL Labs, Inc., effective as of May 21, 2019 [JLIFTC02249475].

Confidential Treatment Requested

JLI-AT-02605075

**Confidential**

*Specification 26*

- SOW No. 20, in effect May 20 to December 31, 2019, for Altria to provide consulting services related to preclinical in vivo inhalation exposure methods in support of regulatory submissions.[75]

- SOW No. 21, in effect August 1 to November 1, 2019, for Altria to provide consulting services related to Passive Vaping Modeling in support of regulatory submissions.[76]

- SOW No. 22, in effect April 15, 2019 to February 2021, for Altria to provide consulting services related to Non-targeted GC/MS profiling analysis in support of regulatory submissions.[77]

- SOW No. 23, in effect July 1, 2019 to January 28, 2021, for Altria to provide consulting services related to population modeling in support of regulatory submissions.[78]

- SOW No. 25, in effect August 15, 2019 to February 28, 2021, for Altria to provide literature review services in support of JLI's PMTA submission.[79]

*Database access and direct marketing support*

Altria has agreed to provide JLI access to Altria's database of adult smokers, including direct mail addresses, consistent with applicable privacy laws. The database can be

---

[75] Statement of Work #20 Premarket Tobacco Product Application Support Services by and between Altria Client Services LLC and JUUL Labs, Inc., effective as of May 20, 2019 [JLIFTC02249470].

[76] Statement of Work #21 Premarket Tobacco Product Application Support Services by and between Altria Client Services LLC and JUUL Labs, Inc. effective as of August 1, 2019 [JLIFTC02249465].

[77] Statement of Work #22 Premarket Tobacco Product Application Support Services by and between Altria Client Services LLC and JUUL Labs, Inc., effective as of April 15, 2019 [JLIFTC02249459].

[78] Statement of Work #23 Premarket Tobacco Product Application Support Services by and between Altria Client Services LLC and JUUL Labs, Inc., effective as of July 1, 2019 [JLIFTC02249454].

[79] Statements of Work #25 Premarket Tobacco Product Application Support Services by and between Altria Client Services LLC and JUUL Labs, Inc., effective as of August 15,2019 [JLIFTC02318453].

91

JLI-AT-02605076

**Confidential**

*Specification 26*

used to further the direct marketing support that Altria has agreed to provide JLI, including direct mail and email campaigns. Additionally, Altria has agreed to distribute JUUL product inserts and/or onserts on Altria's cigarette packaging and to provide direct marketing consulting services as necessary. JLI expects that these efforts will provide JLI with access and exposure to many more potential customers than it could reach on its own.

The first direct mailing campaign, executed in March 2019, sent coupons to prospective customers and achieved 33,000 redemptions and generated ███ ████ in revenue. The second direct mailing campaign occurred in September 2019 and is expected to result in 63,000 redemptions and generate ██ ████ in revenue. A third direct mailing campaign is planned for December 2019, that will result in the circulation of 3.8 million coupons to prospective customers. For 2020, JLI has requested █ ████ ████ █ █ ████ unique consumers over three waves with coupons allowing for online and offline redemptions. As a result of these and other planned direct mailing campaigns, JLI expects to reach █ ████ unique potential customers in 2019 and █ ████ in 2020.[80]

The first set of JUUL inserts were placed in Altria products in May 2019. JLI had Altria insert coupons for online redemption in ██ ████ L&M and Parliament packages. The second set of inserts, launched in September 2019, offered both online and offline redemption opportunities ($10 off) and were placed in 30 million Marlboro packs.[81]

Finally, the Company is working with Altria to overcome technical hurdles associated with email campaigns. Once up and running, this will allow JLI to send email

---

[80] JLIFTC02318465.

[81] JLIFTC02253922; JLIFTC00720866.

92

Confidential Treatment Requested

JLI-AT-02605077

**Confidential**

*Specification 26*

marketing materials to Altria's database of adult smokers.[82] If deliverability issues are resolved,

JLI believes it can reach ██████ users in 2020.[83]

Annual costs for email marketing are estimated to be ████ in 2019 and

████ in 2020.  Annual costs for direct mail campaigns are estimated to be $████ in

2019 and have yet to be determined for 2020.  Annual costs for placement of inserts in Altria

cigarette packs are estimated to be ████ in 2019 and have yet to be determined for 2020.

The Parties have signed six SOWs to date.

- SOW No. 2, in effect January 18 to September 4, 2019, whereby 20 million

  JUUL product inserts were be placed in L&M and Parliament brand cigarette

  packs by May 20, 2019 and another 30 million were placed in Marlboro brand

  cigarette packs by September 6, 2019.[84]

- SOW No. 3, in effect January 16 to December 31, 2019, whereby Altria

  provided database services and circulated 1.5 million coupons by direct mail

  by March 20, 2019.[85]

- SOW No. 11, in effect March 28, 2019 to January 31, 2020, whereby Altria

  will provide database services and circulate one million coupons by direct

  mail by May 20, 2019.[86]

---

[82] JLIFTC02091120.

[83] JLIFTC02253922.

[84] Statement of Work #2 Direct Marketing Support Services by and between Philip Morris USA Inc. and JUUL Labs, Inc., effective as of January 18, 2019 [JLIFTC00148809].

[85] Statement of Work #3 Revised Direct Marketing and Database Support Services by and between Altria Client Services LLC and JUUL Labs, Inc., effective as of January 16, 2019 [JLIFTC02245666].

[86] Statement of Work #11 Direct Marketing and Database Support Services by and between Altria Client Services Inc. and JUUL Labs, Inc., effective as of March 28, 2019 [JLIFTC02245768].

93

Confidential Treatment Requested

JLI-AT-02605078

**Confidential**

*Specification 26*

- SOW No. 8, in effect January 21, to June 30, 2019, whereby Altria will provide database services and execute email campaigns. To date, 246,000 emails have been sent to smokers in Altria's database. However, delivery failures, difficulty passing spam filters, and low open rates have caused the campaign to be placed on hold. Parties are testing ways to improve the efficacy of these campaigns.[87]

- SOW No. 18, in effect July 3, 2019 to March 31, 2020, whereby Altria provided database services and circulated 2.5 million coupons by direct mail by September 16, 2019.[88]

- SOW No. 27, in effect August 15, 2019 to March 31, 2020, whereby Altria will provide database services and circulate 3.8 million coupons by direct mail in December 2019.[89]

*Sales services*

Altria has agreed to provide trade marketing and other sales-related services, including price callout management, key retail account services, wholesale account services, field sales force management, retailer and wholesaler payment management, trade relations services (such as state-required licenses and interaction with wholesale and retail trade associations), and marketplace data analytics.

Altria's sales team has a significant in-store presence that can help ensure JUUL product availability and pricing accuracy across all locations. For example, though 145,000

---

[87]    JLIFTC02253922.

[88]    Statement of Work #18 Direct Marketing and Database Support Services by and between Altria Client Services LLC and JUUL Labs, Inc., effective as of July 3, 2019 [JLIFTC02083413].

[89]    Statement of Work #27 Direct Marketing and Database Support Services by and between Altria Client Services LLC and JUUL Labs, Inc., effective as of August 15, 2019 [JLIFTC02318468].

94

Confidential Treatment Requested                    JLI-AT-02605079

**Confidential**

*Specification 26*

monthly calls to stores, Altria covers stores representing 88% of electronic cigarette industry volume, and key chain accounts are supported by 64 established account teams with 180 staff on both a national and regional basis.[90]

More specifically, Altria's large sales force will provide valuable assistance addressing out of stock ("OOS") and distribution gaps by working with wholesalers and retailers to "pre-book" orders and reduce supply chain lags. JLI is engaging with the Altria team to address OOS and distribution gaps using three key levers: (1) retail and field sales services; (2) distribution; and (3) data. Through retail and field sales services, JLI seeks to ensure proper stocking and on-hand inventory levels across convenience stores. Altria Territory Sales Managers will update planned order volumes, restock OOS with existing door inventory, and place pre-book, or early, orders through Altria's eOrder system at non-ITP doors. Through distribution services, JLI seeks to ensure sufficient product supply is available to distributors and retailers. To do this JLI will use Altria support to provide projected pre-book and other information to distributors. Finally, JLI will work with Altria to ensure consistent tracking, measurement, and definitions of OOS and effectiveness of field sales and distributor levers.[91]

Altria will primarily assist at chain convenience stores. Altria also will partner with JLI in independent c-stores with respect to re-ordering, managing space, and non-promotional collateral. JLI will continue to handle promotional material, pricing, new product, and merchandising.[92]

JLI estimates that as a result of reduced OOS and more effective pre-booking, these services, including the Territory Sales Manager calls and pre-ordering support, will result

---

[90]   JLIFTC●●386117.

[91]   JLIFTC●●669473.

[92]   JLIFTC●2●59426

95

Confidential Treatment Requested

JLI-AT-02605080

**Confidential**

*Specification 26*

in ██ ████ in additional revenue net of the Territory Sales Manager costs.[93] To date, JLI has experienced a 10% reduction in OOS, which corresponds to a ██ ████ benefit.[94]

Annual costs for Altria's sales services support are estimated to be ██ ████ in 2019. The scope and costs of services for 2020 have yet to be determined.

The Parties have signed five SOWs to date.

- SOW No. 6, in effect February 12 to May 25, 2019, whereby Altria will address out of stocks, execute light merchandising, manage accounts, and track initiative insights in over 97,000 stores.[95]

- SOW No. 4, in effect January 29 to March 31, 2019, engaging Altria's Key Retail and Wholesale Account Services to execute pre-orders of certain JUUL SKUs and Altria's Field Sales Force Management to set up pre-book reporting.[96]

- SOW No. 13, in effect May 29 to August 23, 2019, to provide various levels of sales services depending on the point-of-sale, to include surveying and photographing the vapor category; executing collateral; placing retailer's price on collateral and displaying in store; promoting JLI initiatives such as new product launch to HQ or at store level; and training store personnel.[97]

---

[93] JLIFTC00667736.

[94] JLIFTC02318465.

[95] Statement of Work #6 Sales Support Services by and between Altria Group Distribution Company and JUUL Labs, Inc., effective as of February 12, 2019 [JLIFTC00723818].

[96] Statement of Work #4 Sales Support Services by and between Altria Group Distribution Company and JUUL Labs, Inc., effective as of January 29, 2019 [JLIFTC00668179].

[97] Statement of Work #13 Sales Support Services: June Thru August 2019 by and between Altria Group Distribution Company and JUUL Labs, Inc., effective as of May 29, 2019 [JLIFTC02248636].

96

Confidential Treatment Requested

JLI-AT-02605081

**Confidential**

*Specification 26*

- SOW No. 24, in effect August 16 to October 25, 2019, to provide various levels of sales services depending on the point-of-sale, to include surveying and photographing the vapor category; executing collateral; placing retailer's price on collateral and displaying in store; promoting JLI initiatives such as new product launch to HQ or at store level; and training store personnel.[98] Additionally, Altria will provide warehousing and logistics services for point-of-sale materials (collateral) to support JLI retail activity.

- SOW No. 14, in effect June 4 to 14, 2019, enabling JLI to participate in Altria Group Distribution Company's Retail Council and trade show.[99]

---

[98] Statement of Work #24 Sales Support Services: September Thru October 2019 by and between Altria Group Distribution Company and JUUL Labs, Inc., effective as of August 16, 2019 [JLIFTC02083883].

[99] Statement of Work #14 Sales Support Services by and between Altria Group Distribution Company and JUUL Labs, Inc., effective as of June 4, 2019 [JLIFTC02083050].

97

Confidential Treatment Requested

JLI-AT-02605082

**Confidential**

*Specification 26*

*Legal and related services*

Altria has committed to provide JLI general legal assistance on various topics, including corporate responsibility, litigation, document discovery, and regulatory and governmental affairs. Altria has also agreed to provide advice on record management services. Finally, Altria has agreed to provide advice on topics such as monitoring the marketplace for contraband-related activity, engaging with law enforcement and regulatory offices on illegal trade activities associated with the companies' products, brand protection product services, communications related to brand integrity, and brand protection investigational resources. As of late September 2019, none of these services have been requested. The Parties continue to evaluate opportunities.

*Mission support*

If requested, Altria has agreed to cooperate on initiatives to support adults switching from combustible cigarettes to electronic cigarettes and to prevent the underage use of electronic cigarettes. As of late September 2019, none of these services have been requested.

Response to Subpart (d)

JLI would not be able to achieve the benefits of the Services Agreement without the Proposed Transaction. Altria offers a depth of regulatory experience, a large sales force, and an extensive distribution network. Altria would not offer the full range of services absent the Transaction.

98

JLI-AT-02605083

**Confidential**

*Specification 26*

<u>Response to Subpart (e)</u>

The CEO has ultimate responsibility for achieving each benefit, cost saving, economy, or other efficiency.  Brian An and Jed Cullen, both in Strategic Finance, are responsible for tracking, analyzing, and quantifying each benefit, cost saving, economy, or other efficiency.

Other individuals who have had some responsibility for identifying and analyzing potential efficiencies are:

- Nelson Baltazar, VP, Global Logistics

- Alex Cantwell, VP, Sales Strategy

- Peter Hagstom, VP, Global Operations Strategy

- Willie McKinney, VP, Global Regulatory Affairs

- Kate Morgan, Brand Marketing, Director

- Bob Robbins, President of JUUL Americas

- Gary Ross, VP, Americas Marketing

99

Confidential Treatment Requested

JLI-AT-02605084

**Specification 27**

Describe and submit all documents related to any Relevant Product that discuss the Company's Plans or attempts to:

(a) reduce its costs;

(b) improve its products or services;

(c) expand its sales or distribution efforts;

(d) introduce new products or services;

(e) integrate the Relevant Products sold by the Company with any products sold by Altria;

(f) improve its operating performance, financial condition, or competitive viability;

(g) close, consolidate or rationalize any facility;

(h) discontinue the research, development, manufacture, license, or sale of any Relevant Product or product line; and

(i) achieve any benefits as a result of any multi-plant, multi-product, or vertically integrated operation of the Company.

**Response to Specification 27**

Documents responsive to this specification have been submitted as indicated below. To the extent that additional documents responsive to this specification are in its possession, custody, or control, JLI has produced or is submitting concurrently herewith non-privileged documents responsive to this specification.

Responses to Subparts (a), (f), (g), and (i)

*Manufacturing*

Many of the steps JLI has taken to reduce its costs, improve its performance, close, consolidate, or rationalize facilities, and achieve benefits of multi-plant, multi-product, or vertical integration, relate to the manufacturing process. All of JLI's products are manufactured

100

JLI-AT-02605085

**Confidential**

*Specification 27*

by third party contractors. JLI designs its products and purchases the equipment used in third-party manufacturing facilities. JLI also instructs those third-party manufacturers on where to purchase their sourcing material.



101

Confidential Treatment Requested

JLI-AT-02605086

Confidential

*Specification 27*



102

Confidential Treatment Requested

JLI-AT-02605087

**Confidential**

*Specification 27*

**D**istribution

JLI intends to utilize Altria's support in logistics and distribution to expand JLI's reach and efficiency.[100] JLI has already signed two SOW with Altria for freight, warehouse storage and handling, last mile freight to customer, and supply chain management services. These services include consultation and product delivery resolution and shipment and delivery confirmation.[101] JLI expects that leveraging the Altria network for final mile delivery will reduce lead times and result in ███ ████ in savings.[102]

---

[100]   See Attachment 4(c)-7 to JLI's HSR Form, at 2–3.

[101]   Statement of Work #9 Distribution Support Services by and between Altria Group Distribution Company and JUUL Labs, Inc., effective as of April 26, 2019 [JLIFTC02080817]; Statement of Work #10 Distribution Support Services by and between Altria Group Distribution Company and JUUL Labs, Inc. effective as of March 29, 2019 [JLIFTC02080826].

[102]   See JLIFTC02246586.

103

Confidential Treatment Requested

JLI-AT-02605088

**Confidential**

*Specification 27*

### Response to Subparts (b) and (d)

Under the Tobacco Control Act, no new tobacco product can be legally sold in interstate commerce unless the FDA has granted an order permitting the product to be marketed. In 2016, the FDA extended its authority to cover e-cigarettes, among other tobacco products. Any e-cigarette product not on the market as of August 8, 2016 (the "deeming date"), or on the market and later modified rendering it a new tobacco product, would have to submit a PMTA and receive premarket authorization prior to being sold in the U.S. E-cigarette products already on the market as of August 8, 2016 have until May 2020 to file a PMTA. All JLI products sold in the U.S. were on the market as of the deeming date. JLI has not yet filed a PMTA, and the FDA has not issued a premarket order for any JUUL product. Therefore, since August 8, 2016, JLI has been unable to significantly improve upon or release any new e-cigarette product in the United States.



104

Confidential Treatment Requested

JLI-AT-02605089

Confidential

*Specification 27*



Response to Subpart (c)

When JUUL launched in 2015, Pax Labs had to convince retailers to purchase

JUUL products. To do this, Pax Labs attended trade shows and worked to get meetings with

105

**Confidential**

*Specification 27*

retailers. Throughout 2015 and 2016, Pax Labs gained traction with independent specialty vape stores that recognized JLI's resonance with adult smokers. Pax Labs also began having success with convenience store accounts. For example, Speedway was one of the earlier chain accounts to commit to JUUL products. During 2016, however, JUUL products were available in less than 10,000 storefronts, or points of sale.

In 2017, Pax Labs, which became JLI as described in the Company's response to Specification 2, developed relationships with major distributors and chain retailers and grew its footprint. By the end of 2017, JUUL was available through approximately 24,000 – 28,000 points of sale. However, expansion was constrained by product availability. As discussed elsewhere in the Company's response to this specification, JLI invested in manufacturing automation to help eliminate such restraints on expansion.

In 2018, JLI expanded its footprint to approximately 97,000 – 101,000 points of sale. To achieve this growth, JLI engaged its sales team. Sales team members went door-to-door to independent single store locations and engaged chain stores at the headquarters level. At these meetings, sales team members stressed the fit of JUUL products as an alternative for adult smokers, margins from sales of JUUL products, and that JUUL could eventually be a driver of foot traffic. For some retailers, JLI offered to pay for the display hardware on shelves where JUUL products are displayed.

By the end of 2019, JUUL will be available in approximately 125,000 points of sale, plus any potential points of sale that implement JLI's Retail Access Control Standards ("RACS").[103] Expansion within existing stores will be achieved in part through the Altria

---

[103] RACS are a set of guidelines set forth by JLI that enables retailers to enforce age and bulk purchase restrictions by partnering with point of sale software systems. See JUUL Labs, Inc., About RACS, https://www.racscompliance.org/documentation/.

106

Confidential Treatment Requested

JLI-AT-02605091

**Confidential**

*Specification 27*

Services Agreement, pursuant to which JLI gained access to space allocated to Altria by retailers through Altria's ITP program. As discussed further in the Company's response to Specification 26, this allows JUUL products to appear alongside combustible cigarettes and enables JLI to access significantly more retail shelf space potentially several years faster than JLI would have been able to achieve on its own.

JLI's main focus in 2019 is on improving the footprint it already has. For example, JLI is working to improve in-store execution by reducing out of stock issues and ensuring retailers display JUUL signage. The Altria Services Agreement plays an important role in improving in-store execution. The Company has signed four SOWs engaging Altria for sales and fixture services. Altria's salesforce will assist with inventory, merchandizing, and account management, including by making store visits, resetting ITP shelf space allocated by retailers for JUUL products, distributing marketing materials and light merchandizing, tracking initiative insights, and selling and executing pre-books, which ensure retailers place orders in advance to prevent out of stocks.[104]

JLI also engages in marketing to expand sales. Until late 2017, JUUL's marketing department only consisted of a handful of employees, most of whom were focused on marketed efforts related to Pax Labs products. Only in late 2017 and 2018, after the Pax Labs spin-off, did JLI really develop its marketing department. Marketing efforts are discussed in further detail in the Company's response to Specification 16. The Altria Services Agreement also will play an important role in JLI's marketing efforts. JLI has signed four SOWs with Altria, pursuant to which Altria will give JLI access to its database of smokers and will support

---

[104] See Statement of Work #1 [JLIFTC●●668237]; Statement of Work #4 Sales Support Services by and between Altria Group Distribution Company and JUUL Labs, Inc., effective as of January 29, 2●19 [JLIFTC●●668179]; Statement of Work #5 [JLIFTC●●668185]; Statement of Work #6 [JLIFTC●●723818].

107

Confidential Treatment Requested

JLI-AT-02605092

**Confidential**

*Specification 27*

JLI's efforts to distribute coupons through inserts in cigarette packs, direct mail, and email campaigns.[105] These efforts enable JLI to communicate directly with adult smokers and encourage them to switch to JUUL products.

### Response to Subpart (e)

As explained in the Company's responses to Subpart (c) and Specifications 25 and 26, Altria is providing to JLI space allocated to Altria by retailers through its ITP program as well as allowing JLI to place coupon inserts for JUUL products in Altria cigarette packs. JLI otherwise has no plans to integrate the Relevant Products sold the by the Company with any products sold by Altria.

### Response to Subpart (h)

When JLI, then Pax Labs, launched JUUL in June 2015, the JUUL device and four flavors of JUULpods in 5% nicotine strength were available for sale in four-packs: Virginia Tobacco, Cool Mint (now Mint), Fruit Medley (now Fruit), and Crème Brulee (now Creme). JLI also sold starter kits that contained a JUUL device and four JUULpods of different flavors. From December 2015 to January 2016, Pax Labs expanded its JUULpod offerings to include additional e-liquid flavors, nicotine strengths of 0.5%, 1.7%, 3%, and 5%, and a new 30 ml size container of e-liquid, at various nicotine strengths, for use with open e-vapor systems. In August 2016, Pax Labs again expanded its JUULpod offerings to include additional e-liquid flavors,

---

[105] Statement of Work #2 Direct Marketing Support Services Inserts by and between Philip Morris USA Inc. and JUUL Labs, Inc., effective as of January 18, 2019 [JLIFTC00148809]; Statement of Work #3 Direct Marketing And Database Support Services by and between Altria Client Services LLC and JUUL Labs, Inc., effective as of January 16, 2019 [JLIFTC02245666]; Statement of Work #8 Direct Marketing And Database Support Services by and between Altria Client Services LLC and JUUL Labs, Inc., effective as of January 21, 2019 [JLIFTC00668199]; Statement of Work #11 Direct Marketing And Database Support Services by and between Altria Client Services LLC and JUUL Labs, Inc., effective as of March 28, 2019 [JLIFTC02245768].

108

Confidential Treatment Requested

JLI-AT-02605093

**Confidential**

*Specification 27*

some of which were sold in two-packs in addition to four-packs, as well as additional 30 ml size

containers of e-liquid, at multiple nicotine strengths, for use with open e-vapor systems.

The four initial JUULpod flavors launched in June 2015 have consistently

remained on the market since JUUL's launch. The products added in the two expansions

following the initial launch were sold only through a limited number of independent, specialty

vape shops during this time period, and JLI does not currently sell the vast majority of these

products. After August 8, 2016, JLI could not launch any new e-cigarette products in the U.S.

due to FDA restrictions described in the Company's response to Specification 20.

In Fall 2017, JLI began relaunching some flavors, including Mango, Classic

Tobacco, Cucumber, and Menthol. Today, JLI manufactures and sells JUULpods in eight

flavors in 5% and 3% nicotine strengths: Virginia Tobacco, Mint, Fruit, Crème, Mango, Classic

Tobacco, Cucumber, and Menthol. JLI does not currently plan to reintroduce additional flavors

in the U.S.

In October 2018, JLI purchased VMR Products LLC ("VMR"). VMR produced

numerous e-cigarette products, which it sold at retail and through its e-commerce



109

Confidential Treatment Requested

JLI-AT-02605094

**Confidential**

*Specification 27*

Research and development efforts relevant to this subpart are discussed in the

Company's response to Specification 27(b).

110

Confidential Treatment Requested

JLI-AT-02605095

**Specification 28**

Describe in detail (including the time and cost required to achieve), quantify (if possible), and submit all documents related to projected and actual cost savings, economies, or other efficiencies resulting or predicted to result from each previous merger, acquisition, or joint venture by the Company that is being relied upon by the Company to support any claim of predicted cost savings, economies, or other efficiencies expected to result from the Proposed Transaction.  Provide a copy of all submissions provided to any regulatory agency relating to expected efficiencies with respect to any prior transaction.


**Response to Specification 28**

The company is not relying on efficiencies resulting from or predicted to result from any previous mergers, acquisitions, or joint ventures to support any claim of predicted cost savings, economies, or other efficiencies expected to result from the Transaction.

111

Confidential Treatment Requested

JLI-AT-02605096

**Confidential**

## Specification 29

Submit, without regard to custodian:

    (a)  all documents provided to the Company's Board of Directors relating to any Relevant Product in any Relevant Area; and

    (b)  all minutes or other recordings of meetings of the Company's Board of Directors relating to any Relevant Product in any Relevant Area.

## Response to Specification 29

Response to Subpart (a)

Documents available at JLIFTC02314402 to JLIFTC02314512 and JLIFTC02314781 to JLIFTC02316861 contain all documents provided to JLI's Board of Directors that relate to any Relevant Product in any Relevant Area.

Response to Subpart (b)

Documents available at JLIFTC02314588 to JLIFTC02314779 and JLIFTC02316931 to JLIFTC02316947 contain all minutes of JLI's Board of Directors that relate to any Relevant Product in any Relevant Area.

Confidential Treatment Requested

JLI-AT-02605097

**Confidential**

## Specification 30

Submit documents sufficient to show and, to the extent not reflected in such documents, describe in detail the Company's policies and procedures relating to the retention and destruction of documents.

## Response to Specification 30

Documents available at JLIFTC02317443 to JLIFTC02317451 contain documents sufficient to show and describe in detail JLI's policies and procedures relating to the retention and destruction of documents.

113

Confidential Treatment Requested

JLI-AT-02605098

*Specification 31*

## Specification 31

List (a) each federal judicial district (e.g., District of Columbia, Southern District of New York) within the United States in which the Company has an agent to receive service of process, and provide each such agent's name, current business and home addresses, and telephone numbers; (b) each federal judicial district within the United States in which the Company is incorporated or licensed to do business or currently is doing business; and (c) each federal judicial district within the United States in which the Company has an office or a facility, and, for each such office or facility, list the address and the individual in charge (with his or her title).

Alternatively, the Company may respond to this Specification by providing a written stipulation that it agrees to accept service of process, and to subject itself to personal jurisdiction, in all federal judicial districts within the United States.

## Response to Specification 31

### Response to Subpart (a)

JLI directs the Commission to "JLI Exhibit 31.1," which may be found on the enclosed hard drive in the folder labeled "JLI Exhibit 31," for a list of the federal judicial districts in which JLI has an agent to receive service of process, as well as those agents' identities, names, addresses, and telephone numbers. Because the local offices of the Company's registered agent do not handle telephone calls that relate to service of process issues, JLI has provided the telephone number of its agent's service team, which handles service of process issues for all states.

### Response to Subpart (b)

JLI is incorporated, licensed to do business, or is currently doing business in all fifty states and the District of Columbia and, as a result, every federal judicial district located within that geographic area.

114

Confidential Treatment Requested

JLI-AT-02605099

**Confidential**

*Specification 31*

<u>Response to Subpart (c)</u>

JLI leases a number of offices and/or facilities, as well as utilizes shared workspaces – such as WeWork – in the course of its business.  In the case of shared workspaces, JLI does not track the names of the individuals in charge of such offices and/or facilities; JLI has provided what information is available to the Company.  JLI directs the Commission to "JLI Exhibit 31.2," which may be found on the enclosed hard drive in the folder labeled JLI Exhibit 31, for a list of federal judicial districts in which JLI has an office or a facility, along with that office or facility's address and individual in charge.

115

Confidential Treatment Requested

JLI-AT-02605100

Confidential

## Specification 32

Identify the Person(s) responsible for preparing the response to this Request and submit a copy of all instructions prepared by the Company relating to the steps taken to respond to this Request. Where oral instructions were given, identify the Person who gave the instructions, describe the content of the instructions, and identify the Person(s) to whom the instructions were given. For each Specification, identify the individual(s) who assisted in the preparation of the response, with a listing of the Persons (identified by name and corporate title or job description) whose files were searched by each.

## Response to Specification 32

In consultation with counsel for JLI, appropriate personnel were directed to obtain information, documents, and other materials called for by the Second Request. During this effort to comply with the Second Request, numerous oral instructions were provided by or at the direction of counsel. JLI asserts attorney-client privilege and attorney work product protection as to all such communications. Any written instruction to individuals involved in preparing the responses to the Second Request were also given by counsel or at their direction. JLI asserts attorney-client privilege and attorney work product protection as to all such communications as well.

JLI searched ███████ custodians for documents in response to the Second Request, whose names, titles, and departments are reported in "JLI Exhibit 32.1" which may be found on the enclosed hard drive in the folder labeled "JLI Exhibit 32." Administrative assistants and clerical staff were also searched to the extent that they maintain files for the Custodians, as well as individuals who held a custodian's position or was charged with their job duties during the relevant time period.

A list of persons who participated in the preparation of JLI's responses to the specifications of the Second Request, including responses to data requests, interrogatories, and

116

Confidential Treatment Requested

JLI-AT-02605101

**Confidential**

*Specification 32*

the production of databases, is reported in "JLI Exhibit 32.2," which may be found on the

enclosed hard drive in the folder labeled JLI Exhibit 32.

117

Confidential Treatment Requested

JLI-AT-02605102

Confidential

*Specification 33*

### Specification 33

Identify any electronic production tools or software packages utilized by the Company in responding to this Request for: keyword searching, Technology Assisted Review, email threading, de-duplication, and global de-duplication or near-de-duplication (please note that the use of all forms of de-duplication requires advance approval from Commission staff per Instruction I(4)(e)), and:

    (a) if the Company utilized keyword search terms to identify documents and information responsive to this Request, provide a list of the search terms used for each custodian;

    (b) if the Company utilized Technology Assisted Review software:

        (i) describe the collection methodology, including: (a) how the software was utilized to identify responsive documents; (b) the process the Company utilized to identify and validate the seed set documents subject to manual review; (c) the total number of documents reviewed manually; (d) the total number of documents determined nonresponsive without manual review; (e) the process the Company used to determine and validate the accuracy of the automatic determinations of responsiveness and nonresponsiveness; (f) how the Company handled exceptions ("uncategorized documents"); and (g) if the Company's documents include foreign language documents, whether reviewed manually or by some technology-assisted method; and

        (ii) provide all statistical analyses utilized or generated by the Company or its agents related to the precision, recall, accuracy, validation, or quality of its document production in response to this Request; and

    (c) identify the Person(s) able to testify on behalf of the Company about information known or reasonably available to the organization, relating to its response to this Specification.

### Response to Specification 33

As described in the June 5, 2019 email to the Commission summarizing the

Company's document processing plan, the Company utilized █████████████

███████████████████

118

**Confidential**

*Specification 33*

### Response to Subpart (a)

The Company used search terms to identify responsive documents (i) gathered from Slack and (ii) collected as part of the "refresh" of Priority Custodian documents pursuant to Instruction 2, as modified.  The list of search terms used is reported in the file "JLI Exhibit 33.1," which may be found on the enclosed hard drive in the folder labeled "JLI Exhibit 33."

### Response to Subpart (b)



119

Confidential Treatment Requested

JLI-AT-02605104

Confidential

Specification 33

120

Confidential Treatment Requested

JLI-AT-02605105

# EXHIBIT G

Robin F. Zwerling (*pro hac vice*)
Justin M. Tarshis (*pro hac vice*)
**ZWERLING, SCHACHTER**
  **& ZWERLING, LLP**
41 Madison Avenue
New York, NY 10010
Telephone: (212) 223-3900
Facsimile: (212) 371-5969
Email: rzwerling@zsz.com
        jtarshis@zsz.com

*Interim Lead Counsel and Proposed Class Counsel*
*for the Indirect Purchaser Plaintiffs*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE JUUL LABS, INC. ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>**All Indirect Purchaser Actions** | Master File No. 3:20-cv-02345-WHO<br><br>**INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Date: October 10, 2025<br>Time: 2:00 p.m.<br>Judge: Hon. William H. Orrick |

**PROVISIONALLY FILED UNDER SEAL**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   RESPONSE TO DEFENDANTS' "STATEMENT OF FACTS" ...................... 2

III.  COMMON ISSUES PREDOMINATE REGARDING IMPACT AND
      INJURY ............................................................................................................. 3

      A.    Overcharges Are Established Through Common Proof ........................... 4

            1.    Dr. Macartney Considered All Appropriate Variables ...................... 4

            2.    Dr. Macartney's Second Damages Period Has Evidentiary
                  Support ............................................................................................. 6

      B.    Pass Through Is Established Through Common Proof ............................ 7

IV.   DR. MACARTNEY'S MODEL FITS THE CLASS DEFINITION .............. 11

V.    THE COURT SHOULD CERTIFY THE CARWRIGHT ACT CLASS ......... 12

      A.    Altria's Contacts with California Satisfy Due Process ......................... 12

      B.    The Cartwright Act Can Be Applied Extraterritorially Based on
            California's Significant Contacts with IPPs' Claims ............................ 14

      C.    The Governmental Interest Analysis Favors the Cartwright Act Class . 16

            1.    Variances that are not material do not give rise to true conflicts ...... 17

                  a.    The *AGC* factors do not affect standing in this case .................. 17

                  b.    Pre-suit notice rules are preempted ........................................... 18

                  c.    Class action bars are pre-empted by Rule 23 ............................. 19

                  d.    No conflict arises from consumer protection statutes
                        interpreted in harmony with federal antitrust laws .................... 19

            2.    State interests underlying variances in remedial provisions are
                  not impaired by application of the Cartwright Act .......................... 20

                  a.    There are no true conflicts in approaches to duplicative
                        recovery .................................................................................. 20

                  b.    Minimum damages provisions incentivize the enforcement
                        of antitrust claims ................................................................... 21

INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

      c.   Missouri's interest in punitive damages is accommodated by the Cartwright Act's provision of treble damages ................ 22

      d.   Defendants have identified no material difference or true conflict among states allowing multiple damages awards ........ 22

      e.   Comparative impairment analysis allows the Cartwright Act to apply to claims arising from purchases made in repealer states that do not award multiple or punitive damages .............. 23

VI.     CONCLUSION ................................................................................. 25

INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds,*
568 U.S. 465 (2013) ............................................................................................ 4

*Arthur v. Microsoft Corp.,*
676 N.W.2d 29 (Neb. 2004) .............................................................................. 25

*Associated Gen. Contractors of Cal. v. Cal. State Council of,*
*Contractors,* 459 U.S. 519 (1983) .................................................................... 17

*AT&T Mobility LLC v. AU Optronics Corp.,*
707 F. 3d 1106 (9th Cir. 2013) .............................................................. 12, 14, 15

*Bernhard v. Harrah's Club,*
16 Cal. 3d 313 (1976) .................................................................................. 17, 23

*Bunker's Glass Co. v. Pilkington PLC,*
75 P.3d 99 (Ariz. 2003) .................................................................................... 25

*California v. ARC Am. Corp.,*
490 U.S. 93 (1989) ............................................................................................ 21

*California v. Infineon Techs. AG,*
2008 WL 4155665 (N.D. Cal. Sept. 5, 2008) .................................................... 9

*Cassirer v. Thyssen-Bornemisza Collection Found.,*
89 F.4th 1226 (9th Cir. 2024) ...................................................................... 17, 23

*Chiulli v. Liberty Mut. Ins., Inc.,*
146 N.E.3d 471 (Mass. App. 2020) .................................................................. 22

*Cianci v. Superior Ct.,*
40 Cal. 3d 903 (1985) ........................................................................................ 16

*Clausen v. M/V New Carissa,*
339 F.3d 1049 (9th Cir. 2003).............................................................................. 7

*Clayworth v. Pfizer, Inc.,*
49 Cal. 4th 758 (2010) ................................................................................ 20, 25

*Collazo v. Wen by Chaz Dean, Inc.,*
2015 WL 4398559 (C.D. Cal. July 17, 2015) .................................................. 15

*Comes v. Microsoft Corp.,*
646 N.W.2d 440 (Iowa 2002) ........................................................................... 25

*Crown Oil Corp. v. Superior Ct.,*
  177 Cal. App. 3d 604, 223 Cal. Rptr. 164 (Ct. App. 1986) .............................................. 20

*Diamond Multimedia Sys., Inc. v. Superior Court,*
  19 Cal. 4th 1036 (1999) .................................................................................................... 15

*Fed. Trade Comm'n v. Cement Inst.,*
  333 U.S. 683 (1948) .......................................................................................................... 20

*Fernandez v. CoreLogic Credco, LLC,*
  593 F. Supp. 3d 974 (S.D. Cal. 2022) .............................................................................. 15

*Fish v. 3M Co.,*
  2014 WL 12966934 (C.D. Cal. Dec. 1, 2014) ................................................................. 23

*Haley Nursery Co. v. Forrest,*
  381 S.E.2d 906 (S.C. 1989) .............................................................................................. 23

*Haley v. Tchrs. Ins. & Annuity Ass'n,*
  344 F.R.D. 284 (S.D.N.Y. 2023) ...................................................................................... 10

*Hall v. Marriott Int'l, Inc.,*
  344 F.R.D. 247 (S.D. Cal. 2023)....................................................................................... 11

*Hawaii v. Standard Oil Co. of Cal.,*
  405 U.S. 251 (1972)........................................................................................................... 22

*Howard v. Hain Celestial Grp., Inc.,*
  2024 WL 718180 (N.D. Cal. Feb. 22, 2024) .................................................................... 11

*Humana Inc. v. Bausch Health Cos. Inc.,*
  2023 WL 4552005 (Cal. Super. Ct. July 05, 2023) .......................................................... 21

*Hurtado v. Superior Ct.,*
  11 Cal. 3d 574 (1974) ....................................................................................................... 24

*In re Aftermarket Filters Antitrust Litig.,*
  2009 WL 3754041 (N.D. Ill. Nov. 5, 2009)...................................................................... 18

*In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.,*
  2001 WL 34136015 (S.D. Ind. Aug. 14, 2001) ................................................................ 14

*In re Capacitors Antitrust Litig.,*
  106 F. Supp. 3d 1051 (N.D. Cal. 2015) ............................................................................ 13

*In re Capacitors Antitrust Litig.,*
  2020 WL 6462393 (N.D. Cal. Nov. 3, 2020)..................................................................... 16

*In re Dealer Mgmt. Sys. Antitrust Litig.,*

INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

362 F. Supp. 3d 510 (N.D. Ill. 2019) ................................................................. 19

*In re Disk Drive Suspension Assemblies Antitrust Litig.*,
2025 WL 71988 (N.D. Cal. Jan. 10, 2025) ............................................... 3, 8, 12

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
516 F. Supp. 2d 1072 (N.D. Cal. 2007) .............................................................. 18

*In re Generic Pharms. Pricing Antitrust Litig.*,
368 F. Supp. 3d 814 (E.D. Pa. 2019) ................................................................. 18

*In re Graphics Processing Units Antitrust Litig.*,
527 F. Supp. 2d 1011 (N.D. Cal. 2007) .............................................................. 13

*In re Graphics Processing Units Antitrust Litig.*,
253 F.R.D. 478 (N.D. Cal. 2008) ......................................................................... 9

*In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*,
2021 WL 4306018 (N.D. Cal. Sept. 22, 2021) .................................................... 19

*In re HIV Antitrust Litig.*,
2022 WL 22609107 (N.D. Cal. Sept. 27, 2022) ........................................... 16, 23

*In re HIV Antitrust Litig.*,
2023 WL 3011624 (N.D. Cal. Apr. 18, 2023) .................................................... 21

*In re Hyundai & Kia Fuel Econ. Litig.*,
926 F.3d 539 (9th Cir. 2019) .............................................................................. 17

*In re JUUL Labs, Inc., Mktg. Sales Pracs. and Prods. Liab. Litig.*,
609 F. Supp. 3d 942 (N.D. Cal. 2022) ................................................................ 11

*In re Korean Ramen Antitrust Litig.*,
2017 WL 235052 (N.D. Cal. Jan. 19, 2017) ............................................... *passim*

*In re Lithium Ion Batteries Antitrust Litig.*,
2014 WL 4955377 (N.D. Cal. Oct. 2, 2014) ....................................................... 19

*In re Live Concert Antitrust Litig.*,
863 F. Supp. 2d 966 (C.D. Cal. 2012) .................................................................. 6

*In re Methionine Antitrust Litig.*,
204 F.R.D. 161 (N.D. Cal. 2001) .......................................................................... 9

*In re Moon*,
1997 WL 34625685 (Bankr. E.D. Va. Dec. 17, 1997) ........................................ 21

*In re Myford Touch Consumer Litig.*,
2016 WL 7734558 (N.D. Cal. Sept. 14, 2016) ................................................... 19

INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

*In re Optical Disk Drive Antitrust Litig.,*
2012 WL 1366718 (N.D. Cal. Apr. 19, 2012) ........................................................................ 19

*In re Optical Disk Drive Antitrust Litig.,*
303 F.R.D. 311 (N.D. Cal. 2014) .............................................................................................. 9

*In re Optical Disk Drive Antitrust Litig.,*
2016 WL 467444 (N.D. Cal. Feb. 8, 2016) ............................................................................ 15

*In re OSB Antitrust Litig.,*
2007 WL 2253425 (E.D. Pa. Aug. 3, 2007) ............................................................................. 9

*In re Packaged Seafood Prods. Antitrust Litig,*
332 F.R.D. 308 (S.D. Cal. July 30, 2019) ......................................................................... 14, 15

*In re Processed Egg Prods. Antitrust Litig.,*
312 F.R.D. 124 (E.D. Pa. 2015) ............................................................................................. 10

*In re Relafen Antitrust Litig.,*
221 F.R.D. 260 (D. Mass. 2004) ............................................................................................. 14

*In re St. Jude Med. Inc.,*
425 F.3d 1116 (8th Cir. 2005) ................................................................................................. 14

*In re Static Random Access Memory (SRAM) Antitrust Litig.,*
264 F.R.D. 603 (N.D. Cal. 2009) .............................................................................................. 8

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
2012 WL 555090 (N.D. Cal. Feb. 21, 2012) ............................................................................ 8

*In re Turkey Antitrust Litig.,*
2025 WL 264021 (N.D. Ill. Jan. 22, 2025) ............................................................................... 9

*Jackson v. Tesla, Inc.,*
772 F. Supp. 3d 1111 (N.D. Cal. 2025) .................................................................................. 24

*Jensen v. Natrol, LLC,*
2020 WL 416420 (N.D. Cal. Jan. 27, 2020) ........................................................................... 11

*Johnson v. Gen. Mills, Inc.,*
276 F.R.D. 519 (C.D. Cal. 2011) ............................................................................................ 10

*Jones v. Micron Tech. Inc.,*
400 F. Supp. 3d 897 (N.D. Cal. 2019) .................................................................................... 18

*Kee v. Shelter Ins.,*
852 S.W.2d 226 (Tenn. 1993) ................................................................................................. 19

*Klein v. Meta Platforms, Inc.,*

Case No. 3:20-cv-02345-WHO
INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

766 F. Supp. 3d 956 (N.D. Cal. 2025) ................................................................................. 10

*Krommenhock v. Post Foods, LLC*,
334 F.R.D. 552 (N.D. Cal. 2020) ......................................................................................... 12

*Lara v. First Nat'l Ins. Co. of Am.*,
25 F.4th 1134 (9th Cir. 2022) ................................................................................................. 4

*Leardi v. Brown*,
474 N.E.2d 1094 (Mass. 1985) ............................................................................................. 21

*Lorix v. Crompton Corp.*,
736 N.W.2d 619 (Minn. 2007) ............................................................................................. 25

*Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co.*,
2015 WL 4755335 (N.D. Cal. Aug. 11, 2015) .................................................................... 19

*Lytle v. Nutramax Lab'ys, Inc.*,
114 F.4th 1011 (9th Cir. 2024) ............................................................................................... 5

*Martin v. Pierce Cnty.*,
34 F.4th 1125 (9th Cir. 2022) ............................................................................................... 18

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012) ................................................................................................ 17

*McCann v. Foster Wheeler LLC*,
48 Cal.4th 68 (2010) ............................................................................................................ 24

*Munguia v. Bekins Van Lines*, *LLC*,
2012 WL 5198480 (E.D. Cal. Oct. 19, 2012) ..................................................................... 24

*Offshore Rental Co. v. Cont'l Oil Co.*,
22 Cal. 3d 157 (1978) .......................................................................................................... 24

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) ........................................................................................ *passim*

*Opperman v. Path, Inc.*,
87 F. Supp. 3d 1018 (N.D. Cal. 2014) ................................................................................. 16

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985) ........................................................................................................ 12, 14

*Ray v. Nat'l Collegiate Athletic Ass'n*,
2025 WL 775753 (E.D. Cal. Mar. 11, 2025) ......................................................................... 5

*Schoonover v. Iovate Health Sciences U.S.A. Inc.*,
2023 WL 7107132 (C.D. Cal. Aug. 21, 2023) ..................................................................... 12

INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

*Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010) ................................................................................................ 19, 22

*Sidibe v. Sutter Health*,
  333 F.R.D. 463 (N.D. Cal. 2019) ..................................................................................... 10

*Soetaert v. Novani Flips, LLC*,
  631 S.W.3d 580 (Mo. Ct. App. 2021) ............................................................................... 23

*Sperry v. Crompton Corp.*,
  863 N.E.2d 1012 (N.Y. 2007) .......................................................................................... 22

*Stromberg v. Qualcomm Inc.*,
  14 F.4th 1059 (9th Cir. 2021) .......................................................................................... 16

*Sullivan v. Oracle Corp.*,
  51 Cal. 4th 1191 (2011) ................................................................................................... 15

*Tidwell v. Thor Indus., Inc.*,
  2007 WL 8083631 (S.D. Cal. Mar. 26, 2007) ................................................................. 14

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) .......................................................................................................... 5

*Victorino v. FCA US LLC*,
  2021 WL 662264 (S.D. Cal. Feb. 19, 2021) .................................................................... 12

*W. Waste Serv. Sys., Inc. v. Superior Ct. In & For Maricopa Cnty.*,
  584 P.2d 554 (Ariz. 1978) ................................................................................................ 23

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ......................................................................................................... 10

*Washington Mut. Bank, FA v. Superior Ct.*,
  24 Cal. 4th 906 (2001) ..................................................................................................... 17

*Wilson v. Wavestream Corp.*,
  2024 WL 3914475 (C.D. Cal. May 13, 2024) .................................................................. 15

*Zanakis-Pico v. Cutter Dodge, Inc.*,
  47 P.3d 1222 (Haw. 2002) ............................................................................................... 21

**Statutes**

N.Y. Gen. Bus. Law § 340(5) .............................................................................................. 22

Utah Code Ann. § 76-10-3109(1)-(2) ................................................................................... 22

INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

**GLOSSARY OF TERMS**

| Term | Definition |
|---|---|
| **ALJ** | Administrative Law Judge in the FTC Action (defined below) |
| **Altria** | Altria Group, Inc. and Altria Enterprises LLC |
| **Bamberger Decl.** | Omnibus Declaration of Nowell D. Bamberger in Support of Defendants' Motions to Exclude Expert Opinions and Oppositions to Plaintiffs' Motions for Class Certification (ECF No. 520-13) |
| **Barber Decl.** | Omnibus Declaration of Jeremy Barber in Support of Defendants' Motions to Exclude Expert Opinions and Oppositions to Plaintiffs' Motions for Class Certification (ECF No. 521-1) |
| **Cartwright Act Class** | Proposed class applying California's Cartwright Act to the 31 Indirect Purchaser States (defined below) |
| **Classes** | The Cartwright Act Class and the statewide California, Florida, Hawaii, Massachusetts, New York and Rhode Island classes |
| **Closed-System E-Cigarettes** | E-cigarettes (including pod-based devices and "cigalikes") that use their own branded, pre-filled cartridges or pods and do not allow users to fill their devices with e-liquids |
| **Defendants** | Altria and JLI (defined below) |
| **Defs.' Opp'n to DPP Mot.** | Defendants' Opposition to Direct Purchaser Plaintiffs' Motion for Class Certification (ECF No. 520-8) |
| **FTC Complaint or FTC Action** | The April 1, 2020 Complaint filed by the Federal Trade Commission in *In the Matter of Altria Group, Inc. and JUUL Labs, Inc.*, Case No. 9393, alleging violations of federal antitrust laws |
| **Indirect Purchaser or Repealer States** | Arizona, Arkansas, California, the District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, and Wisconsin |
| **IPPs' *Daubert* Opp.** | IPPs' concurrently filed Memorandum of Law in Opposition to Defendants' Motion to Exclude the Overcharge Models and Damages Opinions of Dr. Gareth Macartney |
| **JLI** | Juul Labs, Inc. |
| **Macartney Reb.** | Rebuttal Expert Report of Gareth Macartney, Ph.D, dated March 21, 2025 (attached as Ex. 10 to the Zwerling Decl.) |
| **Macartney Reply** | Reply Expert Report of Gareth Macartney, Ph.D, dated May 1, |

INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

| | 2025 (attached as Ex. 11 to the Zwerling Decl.) |
|---|---|
| **Macartney Rpt.** | Expert Report of Gareth Macartney, Ph.D, dated January 21, 2025 (attached as Ex. 9 to the Zwerling Decl.) |
| **Macartney Tr.** | Deposition Transcript of Gareth Macartney (attached as Ex. 54 to the Barber Decl.) |
| **Motion or Mot.** | Indirect Purchaser Plaintiffs' Motion for Class Certification (ECF No. 492-3) |
| **Murphy Am. Reb.** | Amended Expert Rebuttal Report of Dr. Kevin Murphy dated May 12, 2025 (attached as Ex. 49 to the Barber Decl.) |
| **Opposition or Opp.** | Defendants' Opposition to IRPs' and IPPs' Motions for Class Certification (ECF No. 520-11) |
| **Plaintiffs or IPPs** | Indirect Purchaser Plaintiffs Kurt Doughty, Allison Harrod, Michael Imai, Daraka Larimore, Adam Matschullat, Dylan Pang and Kerry Walsh |
| **Zwerling Decl.** | Declaration of Robin F. Zwerling in Support of IPPs' Motion for Class Certification (ECF No. 492-4) |
| **Zwerling Reply Decl.** | Reply Declaration of Robin F. Zwerling in Further Support of IPPs' Motion for Class Certification and in Opposition to Defendants' Motion to Exclude Expert Opinions |

INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

## I.    INTRODUCTION

Defendants do not seriously dispute that IPPs meet Rule 23(a)'s threshold requirements. Instead, they focus on predominance under Rule 23(b)(3), wrongly claiming IPPs lack common proof of impact and injury. The law and record show otherwise: IPPs' expert applied accepted methodologies that demonstrate classwide injury and damages.

The attacks on Dr. Macartney's model ignore well-established precedent allowing for regression analyses and pass-through estimates to support certification in antitrust class actions. Plaintiffs do not need to prove the merits at this stage—only that common questions predominate and that the proposed models are *capable* of showing classwide injury and damages through common proof. Dr. Macartney's models isolate the overcharges resulting from Defendants' unlawful conduct and apply consistent methodologies across the Classes. Arguments about purportedly omitted variables or retailer pass-through are erroenous and do not undermine Rule 23 sufficiency.

Defendants' additional criticism that Dr. Macartney's model does not "fit" the class definition because some unknown consumers might have illegally resold JUUL pods to minors is baseless. Dr. Macartney's model calculates damages for the Classes as they are currently defined. At most, subsequent resales may affect individual damages, but they do not undermine predominance or Rule 23's "fit" requirement.

Defendants' arguments in opposition to certification of the Cartwright Act Class fare no better. Courts routinely allow multistate classes where anticompetitive conduct has significant California ties. Here, both Defendants held ownership in a California-based company and product, and the key terms of the conspiracy were negotiated in California. Both stood to profit from JUUL's supra-competitive prices. Because this California-centered conspiracy harmed consumers nationwide, extraterritorial application of the Cartwright Act is proper and consistent with due process and California choice-of-law principles.

In sum, class treatment is not just appropriate—it is the only practical way to resolve these claims.

Case No. 3:20-cv-02345-WHO
INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

## II.    RESPONSE TO DEFENDANTS' "STATEMENT OF FACTS"

Defendants attempt to hang their hat on the ALJ decision dismissing the FTC Complaint.[1] But, the full FTC Commission vacated the ALJ decision; therefore, it has no precedential effect. *See* Barber Decl., Ex. 25 (Commission Order at 3-4) ("[T]he Commission has vacated initial decisions when it questioned the ALJ's rationale for dismissing a case but ordered dismissal on other grounds such as mootness or lack of public interest.").

Although Defendants acknowledge that the Commission clarified its position on certain issues when vacating the decision, they dismiss the Commission's analysis as mere dicta. Defs.' Opp'n to DPP Mot. at 3 n.1. However, the Commission's reasoning undermines many of the ALJ's findings and underscores key differences from the claims here.

First, the Commission observed that the FTC Complaint only pled a Sherman Act Section 1 claim under the "rule of reason," and not under a *per se* theory, as Plaintiffs do here. Barber Decl., Ex. 25 (Commission Order at 4). The Commission explained:

> **The alleged unwritten agreement for Altria to exit the market – separate and apart from [Defendants'] formal, written non-compete – seems to be a naked elimination of competition of a type that warrants *per se* condemnation**. . . . Such an agreement is not ancillary to procompetitive economic activity and is subject to *per se* condemnation.

*Id*. at 5 (emphasis added). The Commission expressly referenced Plaintiffs' *per se* theory here and that it was found to be properly pled. *Id*. The Commission concluded that the "[t]he ALJ undoubtedly would have addressed certain issues differently under a *per se* theory." *Id*.

Second, the Commission expressed its views "on the appropriate approach for analyzing whether the parties have acted by agreement, as required under Section 1 of the Sherman Act." *Id*. The Commission "reiterate[d] that antitrust conspiracy evidence must be evaluated in its totality . . . [and] the proponent of an inference of conspiracy need not exclude all possibility of independent action to prevail." *Id*. at 7 (citations omitted). Instead, the Commission "will analyze such evidence as a whole in light of the reasonable inferences to be derived therefrom, in order to determine whether proof of coordinated conduct renders

___

[1] Defendants incorporate by reference the Statement of Facts from their brief opposing the DPPs' motion for class certification. Opp. at 3 (citing Defs.' Opp'n to DPP Mot. at 3–6).

INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

the conspiracy more likely than not." *Id*.

Third, the Commission took issue with the ALJ's finding that competitive harm was unproven because the closed-system e-cigarette market had become more competitive after the Transaction. *Id*. at 8. The Commission concluded that "the pertinent question is whether it would have become still more so in the absence of the Transaction." *Id*.

Fourth, the Commission found that the closed system e-cigarette market was highly concentrated pre-Transaction and the increase in concentration post-Transaction "far exceed the thresholds needed for application of the presumption that the Transaction may substantially lessen competition." *Id*. at 8. "The ALJ thus erred by failing to find a presumption that the Transaction was unlawful." *Id*. at 8.

Finally, the Commission emphasized the evidence showing that Altria was an actual competitive threat to JLI. *Id*. at 9. The Commission pointed to Altria's "intensive, multi-million dollar R&D effort to develop and launch new products" and other developmental activities that were in the works pre-Transaction. *Id*. at 10. The Commission found "Altria's development efforts were credible and expansive . . . and their loss harmed competition." *Id*.

Thus, the vacated ALJ decision provides no support for Defendants. In the end, and for purposes of the present motion, there is no dispute that the facts necessary to prove or disprove the alleged conspiracy are common to all class members.

## III.   COMMON ISSUES PREDOMINATE REGARDING IMPACT AND INJURY

Aside from a footnote equating commonality with predominance, Defendants do not dispute that the other Rule 23 requirements are met.[2] The central issue of predominance asks whether common questions predominate on the elements of IPPs' claims—antitrust violation, impact, and damages. Mot. at 13-14. Rule 23(b)(3) "does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide

---

[2] Defendants' Rule 23(a)(2) argument (Opp. 13 n.5) ignores other common questions, namely the alleged conspiracy. *See In re Disk Drive Suspension Assemblies Antitrust Litig.*, 2025 WL 71988, at *4 (N.D. Cal. Jan. 10, 2025) ("[C]ourts have consistently held that the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist." (citation omitted)).

- 3 -                                              Case No. 3:20-cv-02345-WHO

proof." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 465, 469 (2013) (cleaned up). Common questions need only "predominate over any questions affecting only individual class members." *Id*. (cleaned up). Similarly, IPPs need only show that "a common question is *capable* of classwide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 666-67 (9th Cir. 2022), c*ert. denied sub nom. StarKist Co. v. Olean Wholesale Grocery Coop., Inc.*, 143 S. Ct. 424 (2022). The need for some individualized determinations does not defeat class certification. *Amgen*, 568 U.S. at 469; *Olean*, 31 F.4th at 668-69.

Defendants ignore these principles, and instead argue that IPPs' model "must *prove both* an overcharge by JLI to the direct purchasers and that this overcharge was passed through to *and* absorbed by them." Opp. at 1 (first emphasis added). But, at this stage, IPPs' model simply must be "capable" of proving those things. *Olean*, 31 F.4th at 666.

Indeed, the Ninth Circuit in *Olean* explained that class plaintiffs—including end-purchaser class plaintiffs—can sustain their burden by using aggregated overcharge and pass-through regression results, and need not separately analyze impact on every class member. *Id*. at 677-78, 684-85. The Ninth Circuit also does not require that every single class member suffer impact or damages. *Id*. at 669 & n.13. As in *Olean*, Dr. Macartney's methodologies are capable of proving common impact and injury through common proof.[3]

### A.    Overcharges Are Established Through Common Proof

Defendants' attacks on Dr. Macartney's overcharge regression repeat the same arguments from their *Daubert* motion (ECF No. 520-9)—that his model purportedly omits 'major variables' and that his second damages period lacks support (Opp. at 6-8). As more fully set forth in IPPs' *Daubert* Opp. (incorporated by reference), both arguments lack merit.

### 1.    Dr. Macartney Considered All Appropriate Variables

In opposing class certification, defendants may "argue that the [expert] evidence is not

---

[3] Defendants rely on *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134 (9th Cir. 2022), which did not involve any expert or model to determine classwide injury. Further, the nature of plaintiffs' claims required discerning the actual value of an already totaled vehicle for each potential class member to determine if the respective class member was injured. *Id.* at 1139.

- 4 -

capable of answering a common question on a classwide basis," *Olean*, 31 F.4th at 665, but not demand the court address the ultimate persuasiveness of the evidence. *See id*. at 672 n. 16. Indeed, "when . . . the concern about the proposed class is not that it exhibits some fatal dissimilarity but, rather, a fatal similarity—[an alleged] failure of proof as to an element of the plaintiffs' cause of action—courts should engage that question as a matter of summary judgment, not class certification." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 457 (2016) (cleaned up). Indeed, even the "theoretical possibility that [an expert's] model, when executed, will reveal no damages . . . does not undermine predominance, because that result would nonetheless be common to the class." *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1023 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1308 (2025).

Here, Defendants' challenges to Dr. Macartney's overcharge model do not undermine predominance because they fail to suggest any differences among class members. It is indisputable that whether illegal disposable e-cigarettes or JLI's financial condition impacted JUUL's price will affect every class member in exactly the same way. Thus, though they avoid the terminology, Defendants are, in essence, asking the court to decide the persuasiveness of Plaintiffs' expert's opinions. At class certification, where an issue "comes down to a merits-based dispute between the parties' experts concerning the appropriate method for measuring impact . . . [i]t is not for the court to engage in a 'battle of the experts' over the merits at this juncture." *Ray v. Nat'l Collegiate Athletic Ass'n*, 2025 WL 775753, at *9 (E.D. Cal. Mar. 11, 2025); *see also Olean*, 31 F.4th at 667.

Defendants' criticisms of Dr. Macartney's models—namely, that he did not include variables for JUUL's loss of market share, including from illegal disposables, or JLI's financial condition—are precisely the kind of methodological disputes that go to weight. *See* IPPs' *Daubert* Opp. at 10-13. Dr. Macartney relied on a well-accepted methodology, incorporated a broad set of explanatory variables including cost, cigarette prices, disposable income, product characteristics, and fixed effects, and rigorously tested his model for reliability. *Id*. at 2-6, 13. He addressed the very variables Defendants claim were ignored,

INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

showing they were either accounted for in his models, economically irrelevant, or had no effect on JUUL's pricing. *Id*. at 14-19. Indeed, Defendants' own expert found the competition from disposables variable statistically insignificant, confirming its irrelevance. *Id*. at 17.[4]

## 2. Dr. Macartney's Second Damages Period Has Evidentiary Support

Defendants do not dispute that after dismissal of the FTC Complaint on February 15, 2022, JLI discussed and implemented its first price increases since the FTC's 2019 investigation. *Id*. at 20. ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████. *Id*.; Bamberger Decl., Ex. 25 (PLX620). Five days later, he forwarded his email to Gregg Augustine, who was in charge of JLI's pricing strategy. IPPs' *Daubert* Opp. at 7-8. Mr. Augustine's supervisor, COO David Dickey, approved the price increase on May 25. *Id*. at 8.

Dr. Macartney did not arbitrarily select his second damages period; he grounded it in economic data, the timing of the price increases, and JLI's own internal communications. He considered all of Defendants' alternative explanations—such as purported regulatory uncertainty, JUUL's declining market share and general pricing discussions prior to the ALJ decision—and found them to be unsupported, contradicted by the record, or fail to explain why JLI did not raise prices earlier. IPPs' *Daubert* Opp. at 20-23.[5]

"[A]ll that [is] necessary at the class certification stage" is whether Dr. Macartney's opinion is "*capable* of showing that the [ ] class members suffered antitrust impact on a class-wide basis, *notwithstanding* [defendants' expert's] critique." *Olean*, 31 F. 4th at 681; *see also id*. ("Reasonable minds may differ as to whether" an expert's opinion "is probative as to all purchasers in the class, but that is a question of persuasiveness for the jury once the evidence

---

[4] Defendants' authority, including *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966 (C.D. Cal. 2012), is inapposite as it involved experts who, unlike Dr. Macartney, ignored plainly material factors that they conceded affected price. IPPs' *Daubert* Opp. at 12-13.

[5] Defendants' claim that the July 2022 price hikes were not explicitly tied to the end of FTC scrutiny deserves no more weight than Altria's failure to link its e-cigarette product withdrawals to the conspiracy. Nor is it "unreasonable" to infer that Defendants delayed price increases while being investigated and prosecuted. Ultimately, the reason for this ████████████████████████████ is for the jury to decide.

- 6 -                                     Case No. 3:20-cv-02345-WHO

is sufficient to satisfy Rule 23.") (cleaned up); *In re Korean Ramen Antitrust Litig.*, 2017 WL 235052, at *13 (N.D. Cal. Jan. 19, 2017) ("Defendants' criticisms . . . rest primarily on disputes of fact and the reasonableness of assumptions made by the experts on both sides. There is nothing in [the expert's] approach that fatally undermines the reliability of his methodology or model such that [the expert's] opinion should be excluded under *Daubert* or his determination of classwide impact significantly discounted."). At most, acceptance of Defendants' position would only shorten the Class Period, not create individualized issues.[6]

**B.    Pass Through Is Established Through Common Proof**

Dr. Macartney employed nine regression models—drawing on both retail scanner data and pricing data from JLI's largest distributors—to measure how much of the overcharges were passed through to consumers. Mot. at 21; Macartney Rpt. ¶¶ 128-135. Controlling for product characteristics and cost factors, his models show strong price correlation and estimate pass-through rates ranging from 82.4% to 114.9%.[7] Dr. Macartney's analysis shows JLI's distributor and wholesale prices moved in near lockstep with both consumer prices and the prices charged by JLI's largest distributors to retailers.. Macartney Reply ¶¶ 38.

In calculating pass through, Dr. Macartney did not rely on a narrow data sample. He analyzed: (i) the complete set of JLI transactional data for JUUL Pod sales to distributors and wholesalers; (ii) distributor transactional data from JLI's largest direct customers—covering tens of millions of sales to retailers; and (iii) the full IRI dataset produced by JLI, capturing retail JUUL Pod sales to consumers across the multi-outlet and convenience store channel. Mot. at 20-22. Defendants challenge neither the scope or quality of this data nor the accuracy of Dr. Macartney's pass-through regression calculations.

Rather, Defendants' challenge is that Dr. Macartney does not account for variability

---

[6] Because Dr. Macartney considered Defendants' alternative theories, their lone citation, *Clausen v. M/V New Carissa*, 339 F.3d 1049 (9th Cir. 2003), is inapposite. Moreover, *Clausen* involved the reliability of expert testimony in the context of differential diagnoses (the determination of which of two or more diseases a patient is suffering), which as the Ninth Circuit explained, constitutes its own "whole sub-body of *Daubert* law." *Id*. at 1057.

[7] Dr. Macartney's use of the more conservative 82.4% figure in performing his damage calculations (Macartney Rpt. ¶ 131), "further supports the reasonableness of his approach at this juncture." *In re Korean Ramen*, 2017 WL 235052, at *19.

in the pass-through rates among individual retailers and some retailers may not have passed along the full amount of overcharge, resulting in class members with no injury. Opp. 8-11. As Defendants appear to recognize (*id*. at 9 n.4), the Ninth Circuit has rejected the "argument that Rule 23 does not permit certification of a class that potentially includes more than a de minimis number of uninjured class members." *Olean*, 31 F. 4th at 669.[8]

Defendants' focus on purported variations in retailer pass-through is unavailing. Courts, including the Ninth Circuit, have repeatedly held that such differences do not preclude class certification. As the Ninth Circuit explained, "individualized differences among the overcharges imposed on each purchaser may require a court to determine *damages* on an individualized basis . . . [but] such a task would not undermine the regression model's ability to provide evidence of common *impact*." *Olean* 31 F. 4th at 679; *see also In re Disk Drive Suspension*, 2025 WL 71988, at *20 (rejecting argument that pass-through methodology "would require an individualized determination as to the experiences of each reseller."); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 614 (N.D. Cal. 2009) (rejecting defendants' criticism that indirect purchaser plaintiffs' use of average and aggregated data in their structural model could yield "false-positive pass-through") (citation omitted); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 555090, at *9 (N.D. Cal. Feb. 21, 2012) (finding end-user class "may establish pass-through by showing that companies in the manufacturing and distribution chains passed along cost increases in general"; rejecting argument that plaintiff must "establish[ ] how every intermediary treated every [subject] product").

Further, the "evidence" that Defendants rely on to show purported variations in retailer pass through consists of a 2-month snapshot. Opp. at 10 (citing Murphy Am. Reb., Ex. 45). As Dr. Macartney explained, this evidence says nothing about pass-through rates or prices across the Class Period. Macartney Tr. 226:16-228:17. There could often be a lag between a list price increase and a corresponding increase at the retail level. Dr. Macartney

---

[8] Of course, Defendants have pointed to no evidence of any uninjured class members, let alone more than a de minimis amount of such individuals.

examined *all* of the data over the *entire* Class Period to arrive at this pass-through rate. Moreover, Dr. Murphy's exhibit still shows that the vast majority of all retail stores examined increased prices by some amount even during this limited period. Murphy Am. Reb., Ex. 45.[9] At best, if Defendants are able to demonstrate through expert testimony that a few retailers never passed along any overcharges for the entire Class Period, that is an issue that can be managed at trial or during the damages phase, and does not defeat a finding of predominance. *See, e.g., In re Turkey Antitrust Litig.*, 2025 WL 264021, at *22 (N.D. Ill. Jan. 22, 2025) (explaining that "Defendants remain free to challenge the representativeness of the [pass-through analysis] through cross-examination or presentation of contrary evidence at trial.").

Defendants rely on authority that bears no meaningful resemblance to the facts or Dr. Macartney's analysis in this case. *See California v. Infineon Techs. AG*, 2008 WL 4155665, at *9 (N.D. Cal. Sept. 5, 2008) (expert explained methodology "in general and broad terms" and did not explain "how he actually proposes to apply any particular methodology "); *In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 164-65 (N.D. Cal. 2001) (proposed class included both resellers and consumers and expert merely suggested he could calculate pass-through rates to establish impact, but did not do the analysis); *In re OSB Antitrust Litig.*, 2007 WL 2253425, at *8-11 (E.D. Pa. Aug. 3, 2007) (expert failed to identify data needed for, or variables to be used in, regression analysis not yet performed and where the expert's "opinion makes no sense and confounds the English language."); *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 322 (N.D. Cal. 2014) (denying class certification because of complexities for purchasers who bought the products at issue, optical disk drives, after they were incorporated in computers); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 499, 505-06 (N.D. Cal. 2008) (complex market with intricate distribution chain where methodology must account for fact that graphic chips are a component product, sometimes sold on stand-alone basis and other times bundled in computers and where expert

---

[9] Further, JLI's price increases are not the only evidence that demonstrates impact. That impact is also shown by JLI's ability to maintain prices while its costs were decreasing. Macartney Tr. 226:16-228:17; Macartney Rpt. ¶¶ 114-116.

- 9 -                                                      Case No. 3:20-cv-02345-WHO
INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

did not yet have data needed for pass-through regression); *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 158-59 (E.D. Pa. 2015) (finding pass-through model insufficient where it was based on "limited data" and where eggs are "often sold as 'loss leaders' whereby retailers sell eggs below costs in order to attract customers"); *Haley v. Tchrs. Ins. & Annuity Ass'n*, 344 F.R.D. 284, 287-88, 291 (S.D.N.Y. 2023) (proposed ERISA class action involving loans that differed in key respects, each governed by separate contracts, administered by distinct ERISA fiduciaries, and subject to varying terms).[10]

Defendants' analogy to the "trial by formula" rejected in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) (Opp. at 12) is misplaced. *Wal-Mart* did not hold that individualized damages defeat predominance under Rule 23(b)(3); it rejected certification under Rule 23(b)(2) and the use of "trial by formula" for back-pay, emphasizing that damages in Rule 23(b)(3) classes must be proven by standard methods after liability is established. *Id.* at 365-66. "As this class [would be] certified based on the requirements of 23(b)(3), such individualized determinations at the damages stage, so long as common issues predominate, do not warrant decertification." *Johnson v. Gen. Mills, Inc.,* 276 F.R.D. 519, 523–24 (C.D. Cal. 2011) (distinguishing *Wal-Mart* in Rule 23(b)(3) context); *see also Olean*, 31 F.4th at 669 (holding certification is appropriate "even if plaintiffs may have to prove individualized damages at trial").[11]

"[A] district court does not abuse its discretion in concluding that a regression model such as the one used by Dr. [Macartney] may be *capable* of showing class-wide antitrust impact, provided that the district court considers factors that may undercut the model's reliability (such as unsupported assumptions, erroneous inputs, or nonsensical outputs such

---

[10] This Court previously distinguished the complex markets at issue in some of these cases. *See In re Korean Ramen*, 2017 WL 235052, at *19.

[11] Other cases cited by Defendants are equally distinguishable. *See, e.g., Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 963 (N.D. Cal. 2025) (excluding expert testimony as baseless where no evidence supported but-for world conduct and record showed none occurred); *Sidibe v. Sutter Health*, 333 F.R.D. 463, 493-98 (N.D. Cal. 2019) (denying class certification where expert's model failed to account for 3 of the 5 health plans (a portion of the proposed class) and where expert "assum[ed] what she needs to prove" regarding pass through and relied on limited data).

INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

as false positives) and resolves disputes raised by the parties." *Olean*, 31 F.4th at 683. Here, Defendants do not offer any evidence of "unsupported assumptions, erroneous inputs, or nonsensical outputs. . . ." *Id*. Rather, Defendants' objection reduces to alleged variations in retailer pass-through rates, which, as discussed above, is no basis to deny certification.

## IV.    DR. MACARTNEY'S MODEL FITS THE CLASS DEFINITION

Defendants argue that Dr. Macartney's model does not fit IPPs' class definitions because it cannot identify what proportion of the proposed Classes might have resold JUUL Pods to minors or other unspecified individuals. Opp. at 13. Again, this is a potential damages issue, not a fault with Dr. Macartney's model.

Defendants cite to *In re JUUL Labs, Inc., Mktg. Sales Pracs. and Prods. Liab. Litig.,* 609 F. Supp. 3d 942 (N.D. Cal. 2022) for the proposition that minor class members would purchase JUUL Pods from non-retailers. Opp. at 15. Yet, Defendants ignore that this Court rejected variants of the same argument with respect to the plaintiffs' expert's methodology in that case. The defendants argued that plaintiffs' model overstated damages by "double-count[ing] pod purchases where a youth buys from a friend who bought from a retailer store." *In re JUUL Mktg.*, 609 F. Supp. 3d at 979. The Court found such arguments "**do not undermine predominance or raise *Comcast* fit issues**. They can be raised on cross examination and argued to the trier of fact." *Id*. (emphasis added). The same holds true here.

Defendants rely on a string of cases involving allegations of inadequate disclosures or misleading advertising. *See Hall v. Marriott Int'l, Inc.*, 344 F.R.D. 247 (S.D. Cal. 2023); *Howard v. Hain Celestial Grp., Inc.*, 2024 WL 718180 (N.D. Cal. Feb. 22, 2024); *Jensen v. Natrol, LLC*, 2020 WL 416420 (N.D. Cal. Jan. 27, 2020). In those cases, certification was denied because, *inter alia*, it was undisputed that the proposed classes included uninjured members. Here, all IPP class members were injured at the time of purchase, and that is exactly what Dr. Macartney's model measures. That some unknown percentage of class members might have resold some products potentially raises an issue of damages, but it does not undermine Dr. Macartney's model. *See In re JUUL Mktg.*, 609 F. Supp. 3d at 985 (rejecting

- 11 -                                              Case No. 3:20-cv-02345-WHO

Altria's argument that "resold-purchases must be excised from the class" and finding the issue more appropriately resolved at summary judgment or post-trial); *Victorino v. FCA US LLC*, 2021 WL 662264, at *3 (S.D. Cal. Feb. 19, 2021) (rejecting argument that plaintiff's damages model does not "fit" because it fails to account for resales).

Accordingly, it is not surprising that consumer classes with the same "not for resale" exclusion" in their class definitions are routinely certified. *See, e.g., In re Disk Drive Suspension*, 2025 WL 71988, at *3; *Schoonover v. Iovate Health Sciences U.S.A. Inc.*, 2023 WL 7107132, at *9 (C.D. Cal. Aug. 21, 2023); *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 561 (N.D. Cal. 2020); *In re Korean Ramen*, 2017 WL 235052, at *24. Dr. Macartney's model fits IPPs' class definitions.

## V.    THE COURT SHOULD CERTIFY THE CARWRIGHT ACT CLASS[12]

### A.    Altria's Contacts with California Satisfy Due Process

Due process requires only that the forum have a "significant contact or aggregation of contacts" to the claims. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-22 (1985) ("*Shutts*") (cleaned up); *see also AT&T Mobility LLC v. AU Optronics Corp.*, 707 F. 3d 1106, 1113 (9th Cir. 2013) ("[A]nticompetitive conduct by a defendant within a state that is related to a plaintiff's alleged injuries and is not 'slight and casual' establishes a 'significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair.'" (footnote and citations omitted)). That standard is easily satisfied with respect to the claims against Altria.

This case concerns anticompetitive agreements entered in connection with Altria's pursuit of JLI, a California-headquartered company. Altria invested $12.8 billion dollars for a 35% ownership stake with a path to full ownership.[13] It joined JLI's board.[14] It abandoned its own competing e-cigarette business and agreed to participate in the e-cigarette market

---

[12]  This section, and accompanying exhibits, is substantially similar to the equivalent section in the IRP's class certification reply brief.

[13]  Zwerling Decl., Ex. 62 (PX2141 at 006-07).

[14]  Zwerling Reply Decl., Ex. 1 (PX2010 at 007).

exclusively through JLI.[15] It agreed to assist with JLI's efforts in expanding distribution of JLI products nationwide.[16] It agreed to assist with JLI's regulatory efforts to secure FDA authorization.[17] Altria's sole purpose in joining forces with JLI was to share in the supra-competitive profits earned by a California company.

Altria does not deny there were meetings in California with JLI concerning the agreement. One of those meetings, on August 18, 2018, involved significant discussions regarding the treatment of Altria's competing e-cigarette products and the scope of the non-compete agreement. Indeed, Altria's outline for the August 18 meeting indicates that at that meeting, Altria told JLI that it agreed in substance to JLI's demand that it exit the e-cigarette market and enter a non-compete, but that its decision to remove language used by JLI in the term sheet was "driven by antitrust and for the protection of both companies." Zwerling Decl., Ex. 55 (PX1493 at 2). Altria's outline for the August 18 meeting explained "[w]e can't agree to these terms under antitrust laws prior to receiving HSR approval, which was driving our clarifications in the term sheet." *Id*. In other words, in an attempt to evade antitrust scrutiny, Altria refused to include the exact language written by JLI, but reassured JLI that it agreed to exit the market and be bound by a non-compete.

While Altria asserts that it did not agree to anything at the August 18 meeting (Opp. at 27), that is beside the point. Altria continues to deny to this day that it withdrew its competing products as part of any conspiracy. But Altria did withdraw its products and this issue was discussed during the August 18 meeting, including the attendant "antitrust issue." It is for the jury to determine whether Altria's withdrawal was part of a conspiracy, but there is no dispute that the central aspect of the conspiracy was negotiated in California.[18]

---

[15] Zwerling Decl., Ex. 36 (Valani IHT at 63:4-64:4) (testifying that Altria realized "probably pretty early on" in negotiations that it must agree to participate in e-cigarettes exclusively through JLI).

[16] Zwerling Reply Decl., Ex. 1 (PX2010 at 007).

[17] *Id*.

[18] Defendants rely on authority that is factually distinguishable and irrelevant. *See In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1028 (N.D. Cal. 2007) (finding lack of sufficient contacts where "plaintiffs have never alleged the specific locations

Nor is it correct that "'each member of the plaintiff class' must have sufficient contacts with California." Opp. at 28 (citing *Shutts,* 472 U.S. at 821). *Shutts* requires that the forum *state*—not each class member—have a sufficient connection to the *claims*. *Shutts*, 472 U.S. at 821-22. Altria's reliance on out-of-circuit authority that focus on the place of purchase[19] cannot be squared with Ninth Circuit precedent holding that "the 'transaction or occurrence' proscribed by the Cartwright Act includes not only the sale of price-fixed goods, but the full extent of incipient conspiratorial conduct described in section 16720 of the Act." *AT&T Mobility*, 707 F.3d at 1110; *see also id.* ("[T]he plain text of the Cartwright Act reveals that the district court's place-of-purchase focus severely truncates the scope of anticompetitive conduct that the Act proscribes."). This Court also distinguished Altria's authority in an earlier case. *See In re Korean Ramen*, 2017 WL 235052, at *21 n.42 (finding *In re Relafen* and *In re Graphics Processing "*unpersuasive" in opposing application of the Cartwright Act outside of California).

"Thus, in-state conduct that causes out-of-state injuries can be relevant to a due process analysis, in the antitrust context and otherwise." *AT&T Mobility*, 707 F.3d at 1112. Altria's contacts with California are not "minimal" or "passive" and they include contacts relating to the core of IPPs' conspiracy claim. *See, e.g.*, *id.* at 1112; *In re Korean Ramen,* 2017 WL 235052, at *22; *In re Packaged Seafood Prods. Antitrust Litig*, 332 F.R.D. 308, 345 (S.D. Cal. July 30, 2019).

### B.    The Cartwright Act Can Be Applied Extraterritorially Based on California's Significant Contacts with IPPs' Claims

of any of the meetings between defendants"); *In re Capacitors Antitrust Litig*., 106 F. Supp. 3d 1051, 1074 (N.D. Cal. 2015) (finding "hardly any contacts at all with the state of California" and where "[m]ost of the defendants are headquartered abroad, and the meetings and conduct at issue are also mostly alleged to have taken place outside of the United States."); *Tidwell v. Thor Indus., Inc.*, 2007 WL 8083631, at *8 (S.D. Cal. Mar. 26, 2007) (finding insignificant connection to California in non-antitrust case involving claims of defective products against defendants with "limited conduct . . . in California, and such a small percentage of travel trailers having been sold in California").

[19] *See In re St. Jude Med. Inc*., 425 F.3d 1116, 1120 (8th Cir. 2005); *In re Relafen Antitrust Litig*., 221 F.R.D. 260, 277 (D. Mass. 2004); *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 2001 WL 34136015, at *10 (S.D. Ind. Aug. 14, 2001).

Given the strong nexus between California and the alleged conduct, there is no prohibition on applying California law extraterritorially, as numerous courts—including this one—have recognized. *See, e.g.*, *In re Packaged Seafood*, 332 F.R.D. at 336-46 (applying Cartwright Act to out-of-state purchases where California had substantial contacts with the alleged anticompetitive conduct and the choice-of-law analysis supported its application).[20]

Defendants' reliance on *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191 (2011)*,* is misplaced. In *Sullivan*, the California Supreme Court evaluated whether California's Unfair Competition Law ("UCL") applied to alleged violations of the federal Fair Labor Standards Act for work performed by nonresidents in other states. *Id*. at 1206-09. The lone connection to California was that Oracle, located in California, misclassified the employees that did not receive overtime wages for work performed outside of California. *Id.* at 1208. The court explained that the UCL would have applied to "any unlawful business act or practice committed in California," but it clarified that Oracle's "erroneous classification policy [was] not unlawful in the abstract." *Id.* Therefore, there was no unlawful conduct within the state.

Thus, the relevant inquiry is not where the injury occurred, but whether the conduct giving rise to that injury is sufficiently connected to California. *See AT&T Mobility*, 707 F.3d at 1110 ("[T]he 'transaction or occurrence' proscribed by the Cartwright Act includes not only the sale of price-fixed goods, but the full extent of incipient conspiratorial conduct described in section 16720 of the Act.").[21] Here, the wrongful conduct giving rise to all class

---

[20]  *See also In re Korean Ramen*, 2017 WL 235052, at *22 (same); *In re Optical Disk Drive Antitrust Litig.*, 2016 WL 467444, at *13-14 (N.D. Cal. Feb. 8, 2016) (same); *Fernandez v. CoreLogic Credco, LLC*, 593 F. Supp. 3d 974, 992 (S.D. Cal. 2022) (extraterritorial application of California law appropriate where defendant's principal place of business, its management level employees, and two-thirds of workforce are located in the state and unlawful conduct emanated from California); *Collazo v. Wen by Chaz Dean, Inc.*, 2015 WL 4398559, at *3 (C.D. Cal. July 17, 2015) (nonresidents can assert claims under California law where defendants' principal place of business was in California and alleged misconduct occurred in California).

[21]  *See also Wilson v. Wavestream Corp.*, 2024 WL 3914475, at *4 (C.D. Cal. May 13, 2024) (distinguishing *Sullivan* and holding that the presumption against extraterritoriality is overcome where "the violative conduct occurred within California"); *Diamond Multimedia Sys., Inc. v. Superior Court*, 19 Cal. 4th 1036, 1059 (1999) (the presumption against extraterritoriality depends not on where the injury occurs, but where "the conduct which gives rise to liability" occurs).

INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

members' injuries—Defendants' unlawful conspiracy and restraint of trade—occurred, in significant part, in California. Under these facts, *Sullivan* "d[oes] not undermine the established presumption that nonresident plaintiffs may assert California claims to address unlawful conduct committed in California by a California resident. . . ." *Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1041 (N.D. Cal. 2014).

Finally, the *dicta* from *In re HIV Antitrust Litig.*, 2022 WL 22609107, at *9 (N.D. Cal. Sept. 27, 2022) and *In re Capacitors Antitrust Litig.*, 2020 WL 6462393, at *1 (N.D. Cal. Nov. 3, 2020)*,* is inapposite. Both courts declined to resolve the extraterritoriality question. And, unlike in those cases, the claims here have significant ties to California, including in-person conspiratorial conduct in California.

### C. The Governmental Interest Analysis Favors the Cartwright Act Class

Relying on *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059 (9th Cir. 2021), Defendants argue that the Ninth Circuit prohibits multistate Cartwright Act claims. Opp. at 18-19. But in *Stromberg*, the variance in state law was outcome determinative—repealer states offer a claim to indirect plaintiffs who would be left without redress by non-repealer states.[22] The Ninth Circuit has recognized the interest of non-repealer states in welcoming to out-of-state defendants even at the expense of full enforcement of their antitrust laws. But most states allow indirect purchasers to sue and have expressed an equally strong *shared* interest in fostering free markets through deterrence of anticompetitive behavior. *See Cianci v. Superior Ct.*, 40 Cal. 3d 903, 918 (1985) ("[U]nrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions." (cleaned up)).

According to Defendants, the shared interest of repealer states in incentivizing private

---

[22] *In Stromberg* the Ninth Circuit held that purchases made in non-repealer states must be carved out of a nationwide indirect purchaser class. *Id.* at 1074. The Ninth Circuit held that the district court failed to give appropriate weight to the interest of non-repealers in implementing policies that seek to protect in-state commerce by shielding out-of-state businesses from "excessive liability" for antitrust violations. *Id.* at 1073. Repealer states, on the other hand, have policies that promote commerce by preserving competitive markets.

INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

enforcement can be thwarted by blocking multistate class actions due to *any* variation of law. By affording all variances equal weight, Defendants give short shrift to two fundamental aspects of California's choice-of-law approach. First, California defaults to its own law where the variance would make no difference in the case and cannot give rise to a true conflict between state interests. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 590-91 (9th Cir. 2012).

Second, California's comparative approach allows courts to weigh, among other things, "the extent to which one jurisdiction's laws either impose similar duties to the other jurisdiction's laws, or are accommodated by the other jurisdiction's laws, such that the application of the other jurisdiction'' laws would only partially—rather than totally—impair the interests of the state whose law is not applied." *Cassirer v. Thyssen-Bornemisza Collection Found.*, 89 F.4th 1226, 1237 (9th Cir. 2024), *vacated on other grounds*, 145 S. Ct. 1331 (2025). This allows courts to weigh the reality that antitrust harms are spread widely but the cost of bringing suits is prohibitive unless claims can be grouped together. If the cases cannot be economically brought than the shared interest of repealer states are not served.

Defendants raise variances that they say require the application of the law of the place of the sales transaction. But they do not do the variance-by-variance interest analysis that the Ninth Circuit requires, and which is defendants' burden to undertake. *Bernhard v. Harrah's Club*, 16 Cal. 3d 313, 316 (1976) ("[W]e no longer adhere to the rule that the law of the place of the wrong is applicable in a California forum regardless of the issues before the court.").[23] That analysis reveals that each variance is either (i) immaterial to this litigation and thus cannot give rise to a true conflict; or (ii) based on state interests that will not be substantially impaired *in this litigation* by the application of California law.

### 1. Variances that are not material do not give rise to true conflicts

    a.  The *AGC* factors do not affect standing in this case

---

[23] *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 562 (9th Cir. 2019) ("If the objectors fail to meet their burden at any step in the analysis, the district court 'may properly find California law applicable without proceeding' to the rest of the analysis."); *Washington Mut. Bank, FA v. Superior Ct.*, 24 Cal. 4th 906, 921 (2001) (discussing burdens in context of certification of national class).

INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

Defendants assert that states differ in whether they apply the test developed by the U.S. Supreme Court to determine whether a plaintiff's injury is too remote or speculative under state antitrust laws. Opp. at 22-23 (discussing *Associated Gen. Contractors of Cal. v. Cal. State Council of Contractors*, 459 U.S. 519 (1983) ("*AGC*")). But Defendants do not explain why application of *AGC* would make any difference here.

IPPs seek damages for overcharges passed through a chain of distribution. Repealer states have determined that such claims are cognizable. *Cf. In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041, at *7 (N.D. Ill. Nov. 5, 2009) ("*AGC* was obviously never intended to apply to the instant situation involving claims of price fixing down a chain of distribution, because in the federal context such claims were already barred by Illinois Brick.").

A review of every case cited by Defendants (Barber Decl., Ex. 57)—along with every state court case available on Westlaw that cites *AGC*—reveals no case in which a court relied on *AGC* to dismiss an indirect purchaser claim in a similar context. Zwerling Reply Decl., Ex. 2. *Cf. In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1090 (N.D. Cal. 2007) (dismissing claims based on purchases in a separate but related market). Defendants have not argued that the IPPs made their purchases in a secondary or unrelated market or set forth any case-law indicating that *AGC* would otherwise disqualify them as indirect purchasers. The variance in state adoption of *AGC* is irrelevant to this case.

### b.   Pre-suit notice rules are preempted

Defendants identify nine states whose laws require pre-suit notice to state attorney generals. Opp. at 22. No such statute calls for dismissal for failure to provide notice. Zwerling Reply Decl., Ex. 3. Federal courts have found notice requirements procedural and irrelevant to the substantive elements of a plaintiff's claim, and dismissal at odds with the remedial intent of the state's antitrust laws. *Martin v. Pierce Cnty.*, 34 F.4th 1125, 1132 (9th Cir. 2022) (citing with approval the Sixth Circuit's finding that state pre-suit notice requirements are pre-empted in federal court by Fed. R. Civ. P. 3).[24]

---

[24] *See also Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 923 (N.D. Cal. 2019) (courts

Case No. 3:20-cv-02345-WHO
INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

### c.  Class action bars are pre-empted by Rule 23

Defendants argue that class actions are barred under the laws of Arkansas, South Carolina, Tennessee, and Virginia. Opp. at 22. In *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010), the U.S. Supreme Court held that Rule 23 preempts state-law class action restrictions. Under the narrowest reading of *Shady Grove*, in order to avoid a finding of preemption, defendants must show that a class action bar is "so intertwined with a state right or remedy that it functions to define the scope of the state-created right." *Shady Grove*, 559 U.S. at 423 (Stevens, J., concurring). Defendants make no such showing, and therefore cannot show that these bars would apply in a federal action or that they could a make a difference in the outcome of this litigation. *In re Lithium Ion Batteries Antitrust Litig.,* 2014 WL 4955377, at *21 (N.D. Cal. Oct. 2, 2014) (under Ninth Circuit law, "the class-action bans challenged here are procedural, not substantive, and [ ] application of Rule 23 to them would not modify any substantive right."); *In re Myford Touch Consumer Litig.*, 2016 WL 7734558, at *27 (N.D. Cal. Sept. 14, 2016) (Rule 23 preempts Virginia's class action bar that is part of its "default" procedural rules); Zwerling Reply Decl., Ex. 4.[25]

In addition, Tennessee's class action bar went into effect in April 2024. Zwerling Reply Decl., Ex. 5 (prior version of statute). If the bar is deemed substantive, it is not retroactive. *See generally Kee v. Shelter Ins.*, 852 S.W.2d 226, 228 (Tenn. 1993). If procedural, it is preempted under *Shady Grove*.

### d.  No conflict arises from consumer protection statutes interpreted in harmony with federal antitrust laws

Six repeater states allow antitrust claims to be brought under their broader consumer

---

holding that notice requirements do not alter substantive elements of state antitrust claims and are not pleading requirements); *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 835 (E.D. Pa. 2019) (same); *In re Aftermarket Filters,* 2009 WL 3754041, at *6 ("Plaintiffs are correct that nothing in the statutory scheme suggests that defendants may use the statute as a shield to avoid answering for alleged anti-competitive behavior.").

[25] *See also Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co.,* 2015 WL 4755335, at *21 (N.D. Cal. Aug. 11, 2015) (holding South Carolina ban pre-empted by Rule 23)*; In re Optical Disk Drive Antitrust Litig.,* 2012 WL 1366718, at *8 (N.D. Cal. Apr. 19, 2012) (declining to dismiss class claim); *In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, 2021 WL 4306018, at *23 (N.D. Cal. Sept. 22, 2021) (same); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 553 (N.D. Ill. 2019) (same).

protection statutes. Relying on *dicta* in *Stromberg*, and without elaboration, Defendants assert that this represents a "significant variance" (Opp. at 20), but provide no explanation as to why it is material. Florida, Massachusetts, Missouri and South Carolina have specific provisions that require these consumer protection statutes to be interpreted in harmony with Section 5(a)(1) of the Federal Trade Commission Act, which in turn looks to caselaw under the Sherman Act. *See Fed. Trade Comm'n v. Cement Inst.,* 333 U.S. 683, 694 (1948) (all conduct violative of the Sherman Act comes within the prohibitions of the FTC Act); Zwerling Reply Decl., Ex. 6. Arkansas and Virginia lack such provisions but are broad, flexible statutes flexible statutes that have been held to cover the fact patterns here. *Id*. Defendants have failed to point to any aspect of these statutes that presents a conflict.

### 2. State interests underlying variances in remedial provisions are not impaired by application of the Cartwright Act

#### a. There are no true conflicts in approaches to duplicative recovery

The Cartwright Act accommodates state interests in preventing duplicative recovery. First, there is no risk of duplicative recovery in this litigation that is, as of yet, more than hypothetical. Defendants have separately challenged DPPs' adequacy to represent more than direct consumers (Def. Opp. to DPP Mot. at 15-24), and the two indirect classes seek only their proportional share of overcharges passed down from distributors and wholesalers.

Second, California's Supreme Court has held that the Cartwright Act's overarching goal is to "maximize deterrence," and has left to trial courts the flexibility to fairly allocate damages among multiple levels of purchasers in a manner that "avoid[s] duplication in the recovery of damages." *Clayworth v. Pfizer, Inc*., 49 Cal. 4th 758, 783, 787 (2010).[26] Defendants and IPPs agree that every state to consider the issue have settled on a substantially similar policy, and Defendants have pointed to no authority to indicate the remaining states would proceed differently or that suggests they have an interest in applying their law to this case. Opp. at 22; Zwerling Reply Decl., Ex. 7.

---

[26] *Crown Oil Corp. v. Superior Ct.,* 177 Cal. App. 3d 604, 613 (Ct. App. 1986) ("We, as others, are confident that when the threat of double recovery occurs, the trial court will fashion relief accordingly.").

INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

Because federal claims are not subject to a pass-on defense, allocation can only be achieved in this case between the two indirect classes who have brought their claims under state law.[27] Defendants suggest that state-law policies would also require the Court to discount any amount awarded to indirect purchasers by any settlements paid to DPPs. Opp. at 21. Unsurprisingly, they cite no federal case in which this was actually done.[28] Such an approach is not dictated by any state's statute or its underlying policies. Zwerling Reply Decl., Ex. 7; *see also In re HIV Antitrust Litig.*, 2023 WL 3011624, at *3 (N.D. Cal. Apr. 18, 2023) (reviewing state statutes for multiple recovery language and rejecting defendants' argument that there be an offset against IPP damages). In any event, this issue is premature.

b. Minimum damages provisions incentivize the enforcement of antitrust claims

Defendants identify two states (Massachusetts and Virginia) who have minimum damages provisions that apply to class actions, and a third (Hawaii) that has a minimum damage provision that explicitly does not apply to class actions. Opp. at 22. Minimum damages provisions are procedural in nature and intended to incentivize the vindication of claims that are too small to otherwise justify legal action. *Leardi v. Brown*, 474 N.E.2d 1094, 1104 (Mass. 1985) (analyzing purpose of Massachusetts rule in the context of a class action); *Zanakis-Pico v. Cutter Dodge, Inc.*, 47 P.3d 1222, 1230 (Haw. 2002) (minimum recovery provision intended as "additional deterrent"); *In re Moon*, 1997 WL 34625685, at *24 (Bankr. E.D. Va. Dec. 17, 1997) (finding Virginia's rule to be procedural in nature). Allowing small claims to be brought together in a single, multistate class under the Cartwright Class serves the same remedial interest.

[27] In upholding the right of states to pass repealer statutes, the U.S. Supreme Court has held that there is no federal policy against multiple liability that would pre-empt the reach of such statutes. *California v. ARC Am. Corp.*, 490 U.S. 93, 105 (1989).

[28] Defendants cite instead to a California trial court decision that *denied* defendants motion to dismiss the state law claims of indirect plaintiffs based on a private settlement with direct purchasers in a related federal action. *Humana Inc. v. Bausch Health Cos. Inc.*, 2023 WL 4552005, at *8 (Cal. Super. Ct. July 05, 2023). In denying defendants' motion, the court noted defendants had decided not to include the indirect plaintiffs in their settlement discussions and that decision could not be used to simply extinguish the indirect plaintiffs' claims. *Id.* at *9-10.*

- 21 -    Case No. 3:20-cv-02345-WHO

c. <u>Missouri's interest in punitive damages is accommodated by the Cartwright Act's provision of treble damages</u>

*See* discussion in Section IV.C.2.d. below.

d. <u>Defendants have identified no material difference or true conflict among states allowing multiple damages awards</u>

Defendants identify no material variation in the relevant damages provision of California, District of Columbia, Kansas, Maine, Minnesota, New York,[29] North Carolina, Oregon, Rhode Island, South Dakota, Utah,[30] Vermont, West Virginia, and Wisconsin, which each automatically treble damages. Zwerling Reply Decl., Ex. 9 (Table A). New Mexico allows but does not require trebling. *Id.,* Table B. Antitrust laws incorporate treble damages remedies to promote enforcement and deter violations. *Hawaii v. Standard Oil Co. of Cal*., 405 U.S. 251, 262 (1972) ("By offering potential litigants the prospect of a recovery in three times the amount of their damages, Congress encouraged these persons to serve as 'private attorneys general.'").

Arizona, Iowa, Massachusetts, Michigan, New Hampshire, North Dakota, South Carolina, Virginia award double or treble damages where a violation is "willful," "knowing," or "flagrant." Zwerling Reply Decl., Ex. 9 (Table C). These words reference violations that are deliberate, as opposed to mere negligence.[31] Defendants have not demonstrated that such a qualifier would make a difference here, where Plaintiffs must prove Defendants *knowingly agreed* that Altria would exit the e-cigarette market and cease development activities in

---

[29] New York's antitrust law awards treble damages. N.Y. Gen. Bus. Law § 340(5). Defendants cite *Sperry v. Crompton Corp*., 863 N.E.2d 1012, 1017–18 (N.Y. 2007), for the proposition that treble damages cannot be awarded for class claims. However, *Sperry*, relies on an application of New York's C.P.L.R. 901(b), which the U.S. Supreme Court held is pre-empted by Rule 23 in federal litigation. *Shady Grove*, 559 U.S. at 416.

[30] A Utah court may reduce a treble damages award as necessary to avoid a defendant's insolvency. Utah Code Ann. § 76-10-3109(1)-(2). No showing of such necessity has been made. JLI has now received FDA approval and is well-positioned in the market. *See* Zwerling Reply Decl., Ex. 8 (7/17/25 JLI press release).

[31] *See, e.g., W. Waste Serv. Sys., Inc. v. Superior Ct. In & For Maricopa Cnty*., 584 P.2d 554, 556 (Ariz. 1978); *Chiulli v. Liberty Mut. Ins., Inc*., 146 N.E.3d 471, 483 (Mass. App. 2020) ("To be wilful or knowing, a violation need not be malicious, but must constitute more than negligence. Within that range is conduct that is intentionally gainful or demonstrates a wilful recklessness or conscious, knowing disregard for its likely results" (cleaned up)).

INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

return for a piece of JLI—intentional conduct that it is either *per se* illegal or must be proven to be unreasonable to give rise to liability.[32] Therefore, they have not shown a true conflict.

Mississippi awards $500 per injury in addition to actual damages and Missouri's statute specifically provides for punitive damages. These provisions serve the same remedial purpose as treble damages. *See Soetaert v. Novani Flips*, *LLC*, 631 S.W.3d 580, 597 (Mo. Ct. App. 2021) ("These remedial measures are designed not *only* to remedy violations of the MMPA, but also prospectively to deter prohibited conduct and protect Missouri citizens."). *See* Zwerling Reply Decl., Ex. 9 (Tables D-E).

All states that allow damages beyond actual damages do so in the interest of deterrence and incentivizing suit, and modest variations should not be used to undermine the overarching interest of these states in the vigorous enforcement of antitrust laws. *See Bernhard,* 16 Cal. 3d at 323 (applying California law that imposes civil liability where Nevada would impose only criminal liability, despite the place of wrong, since application of California law merely imposed additional economic exposure but not a new duty).

> e.  <u>Comparative impairment analysis allows the Cartwright Act to apply to claims arising from purchases made in repealer states that do not award multiple or punitive damages</u>

Arkansas, Florida, Hawaii, Nebraska, and Tennessee limit awards to actual damages. Zwerling Reply Decl., Ex. 9 (Table F). As recognized in *Stromberg*, these states have an interest in encouraging potential defendants to conduct business in their states and in balancing that interest with their enforcement of their substantive laws. Under the circumstances of *this case*, however, that interest is illusory. *Cassirer*, 89 F.4th at 1237 (courts "are directed to measure the interests of each jurisdiction based on 'the circumstances of the present case'—the facts of this particular dispute—not the jurisdiction's general policy goals expressed in the laws implicated." (citation omitted)).[33]

---

[32] *Fish v. 3M Co.*, 2014 WL 12966934, at *4 (C.D. Cal. Dec. 1, 2014) (defendant's burden to show different culpability standards would lead to different outcome); *see also Haley Nursery Co. v. Forrest*, 381 S.E.2d 906, 909 (S.C. 1989) (conduct not willful when not expressly prohibited by statute and "in accord with the common practice of the trade").

[33] Defendants rely on *In re HIV*, 2022 WL 22609107, at *13. There, Judge Chen pointed to

INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

JUUL Pods enter these states through sales by intermediaries to convenience stores and retailers. The majority of repealer states award treble damages, yet there is no evidence that JLI ever attempted to limit sales to states that follow the majority approach. *See Jackson v. Tesla, Inc.*, 772 F. Supp. 3d 1111, 1130 (N.D. Cal. 2025) ("*Tesla*") ("Given that Tesla continues to sell its vehicles in states like California that do not impose any cap whatsoever on non-economic damages, Tesla cannot credibly contend that it will cease selling vehicles to individuals in Maryland if courts fail to apply its cap on non-economic damages under circumstances like those presented here."); *Offshore Rental Co. v. Cont'l Oil Co.*, 22 Cal. 3d 157, 168 (1978) (degree of impairment depends on realities of each case, and courts should seek "maximum attainment of underlying purpose by all governmental entities").

Nor would applying the law of these states protect a resident defendant, an interest that California has recognized. *See Hurtado v. Superior Ct.*, 11 Cal. 3d 574, 580–81 (1974); *Munguia v. Bekins Van Lines, LLC*, 2012 WL 5198480, at *10 (E.D. Cal. Oct. 19, 2012) ("California courts, when determining whether a foreign jurisdiction's stricter recovery rules should apply over California's more liberal rule, have held that a jurisdiction's only interest in having its damages limitation rules applied is to protect its resident defendants from excessive financial burdens or exaggerated claims, or to protect defendants who have a connection to the foreign state.")

California has an interest in regulating the conduct of businesses headquartered within its borders, and the conduct of companies that reach into the state to buy those companies. *See Tesla*, 772 F. Supp. 3d at 1130; *McCann v. Foster Wheeler LLC*, 48 Cal.4th 68, 97 (2010). All repealer states also have an interest in deterring anticompetitive conduct by allowing indirect purchaser claims to be litigated together. Repealer states recognize that "[t]he purpose behind both state and federal antitrust law is to apply a uniform standard of

material variances among repealer states in the availability of enhanced damages *and* the statute of limitations, but his analysis did not explore the different interests underlying the two types of variances. A statute of limitations variance, immaterial here, is outcome determinative, as was the variance at issue in *Stromberg*. When the variance is as to the remedy alone, comparative impairment analysis requires a court to consider the interest of all states in enforcement of the substantive law.

- 24 -    Case No. 3:20-cv-02345-WHO

conduct so that businesses will know what is acceptable conduct and what is not acceptable conduct." *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 446 (Iowa 2002). In rejecting *Illinois Brick*'s indirect purchaser bar, 31 repealer states have found it in conflict with this overarching purpose, which they find best served by allowing all injured purchasers the ability to enforce the law by bringing suit. *Id*. at 447.[34]

Without an effective way to bring suit, the goals of antitrust law cannot be achieved. *Clayworth*, 49 Cal. 4th at 768 ("[T]hose who violate the antitrust laws by price fixing or monopolizing would retain the fruits of their illegality because no one was available who would bring suit against them." (citation omitted)). Private actions are intended to supplement the limited resources of prosecutors. But direct purchasers often fail to come forward for fear of retaliation.[35] Here, Defendants object to certification of a DPP class including wholesalers and distributors because no class representative serves in such a role.

California and all repealer states's strong interest in the enforcement of their antitrust laws will be more severely impaired if the Cartwright Act Class cannot proceed. Because Arkansas, Florida, Hawaii, Nebraska, and Tennessee have the same shared interest in enforcement, and there is no evidence that their consumers will be deprived of a nationally sold commodity if their actual damages limit is not applied, California's choice-of-law rules favors the Cartwright Act here.

## VI.    CONCLUSION

IPPs respectfully request that the Court grant their motion for class certification.

---

[34] *See, e.g., Arthur v. Microsoft Corp.*, 676 N.W.2d 29, 37 (Neb. 2004) (holding that Nebraska antitrust laws should be construed to effect their purpose "to provide consumers with protection against unlawful practices in the conduct of any trade or commerce which directly or indirectly affects the people of Nebraska"); *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 624 (Minn. 2007) ("The private causes of action created by Minnesota antitrust law 'reflect a clear legislative policy encouraging aggressive prosecution of statutory violations.'" (citations omitted)).

[35] *Bunker's Glass Co. v. Pilkington PLC*, 75 P.3d 99, 109 n.9 (Ariz. 2003) ("An auto dealer who relies on the manufacturer for delivery of popular models of cars does not strike us as likely to sour the relationship with the manufacturer by suing over a price increase, especially if it can pass along overcharges to purchasers.").

INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

DATED: September 8, 2025

/s/ Robin F. Zwerling

Robin F. Zwerling (*pro hac vice*)
Justin M. Tarshis (*pro hac vice*)
**ZWERLING, SCHACHTER & ZWERLING, LLP**
41 Madison Avenue
New York, NY 10010
Telephone: (212) 223-3900
Email: rzwerling@zsz.com
        jtarshis@zsz.com

*Interim Lead Counsel and Proposed Class Counsel
for the Indirect Purchaser Plaintiffs*

Betsy C. Manifold (SBA 182450)
**WOLF HALDENSTEIN ADLER FREEMAN &
HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Email: manifold@whafh.com

Thomas H. Burt (*pro hac vice*)
Kate M. McGuire (*pro hac vice*)
**WOLF HALDENSTEIN ADLER FREEMAN &
HERZ LLP**
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Email: burt@whafh.com

Fred T. Isquith, Sr. (*pro hac vice*)
**ISQUITH LAW PLLC**
103 East 84th Street
New York, NY 10028
Telephone: (718) 775-6478
Email: isquithlaw@gmail.com

Merle C. Meyers (SBN 66849)
Michele Thompson (SBN 241676)
**MEYERS LAW GROUP, P.C.**
44 Montgomery St. Suite 1010
San Francisco, CA 94104
Telephone: (415) 362-7500
Email: mmeyers@meyerslawgroup.com
        mthompson@meyerslawgroup.com

*Counsel for Indirect Purchaser Plaintiffs*

INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2025, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record. I also caused a copy of the under-seal documents to be served via email on all counsel of record.


*/s/ Robin F. Zwerling*

Case No. 3:20-cv-02345-WHO

INDIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

# EXHIBIT H

Robin F. Zwerling (*pro hac vice*)
Justin M. Tarshis (*pro hac vice*)
**ZWERLING, SCHACHTER**
  **& ZWERLING, LLP**
41 Madison Avenue
New York, NY 10010
Telephone: (212) 223-3900
Facsimile: (212) 371-5969
Email: rzwerling@zsz.com
      jtarshis@zsz.com

*Interim Lead Counsel and Proposed Class Counsel*
*for the Indirect Purchaser Plaintiffs*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE JUUL LABS, INC. ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>**All Indirect Purchaser Actions** | Master File No. 3:20-cv-02345-WHO<br><br>**INDIRECT PURCHASER PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OVERCHARGE MODELS AND DAMAGES OPINIONS OF DR. GARETH MACARTNEY**<br><br>Date: October 10, 2025<br>Time: 2:00 p.m.<br>Judge: Hon. William H. Orrick |

## PROVISIONALLY FILED UNDER SEAL

**TABLE OF CONTENTS**

I.     INTRODUCTION ......................................................................................... 1

II.    DR. MACARTNEY'S ANALYSIS ............................................................. 2

III.   BACKGROUND ......................................................................................... 6

IV.    LEGAL STANDARD ................................................................................. 9

V.     ARGUMENT ............................................................................................ 10

    A.   Disagreements Regarding the Selection of Variables Go to Weight ............ 10

    B.   Dr. Macartney Considered All of the Identified Variables ........................... 13

        1.   Demand Elasticity and Illegal Disposables ........................................... 14

        2.   JLI's Financial Condition ...................................................................... 18

        3.   Defendants' Motion is a Side-Door Challenge of Market Definition ......................................................................................... 19

    C.   Evidentiary Support Exists for a Second Damages Period in July 2022 ...... 20

    D.   Defendants' Selective Reliance on Two of Dr. Macartney's Prior Cases Fails to Show that His Opinions Are Unreliable or Inadmissible ...... 24

VI.    CONCLUSION ......................................................................................... 25

IPPs' MEM. OF LAW IN OPP'N TO DEFS.' MOT. TO EXCLUDE THE
OVERCHARGE MODELS AND DAMAGES OPINIONS OF DR. GARETH MACARTNEY

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
  738 F.3d 960 (9th Cir. 2013) .......................................................................................... 9

*Bazemore v. Friday*,
  478 U.S. 385 (1986) ...................................................................................................... 11

*Bergen v. F/V St. Patrick*,
  816 F.2d 1345 (9th Cir. 1987) ...................................................................................... 21

*Bickerstaff v. Vassar College*,
  196 F.3d 435 (2d Cir. 1999) .......................................................................................... 13

*Bigelow v. RKO Radio Pictures, Inc.*,
  327 U.S. 251 (1946) ...................................................................................................... 10

*Buchanan v. Tata Consultancy Servs., Ltd.*,
  2017 WL 6611653 (N.D. Cal. Dec. 27, 2017) .............................................................. 11

*Claar v. Burlington N. R.R. Co.*,
  29 F.3d 499 (9th Cir. 1994) .......................................................................................... 21

*Clausen v. M/V New Carissa*,
  339 F.3d 1049 (9th Cir. 2003) ...................................................................................... 21

*Cooper v. Brown*,
  510 F.3d 870 (9th Cir. 2007) .......................................................................................... 9

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ........................................................................................................ 9

*Elosu v. Middlefork Ranch Inc.*,
  26 F.4th 1017 (9th Cir. 2022) ................................................................................. 20, 23

*Equal Emp. Opportunity Comm'n v. R&L Carriers, Inc.*,
  664 F. Supp. 3d 784 (S.D. Ohio 2023) ........................................................................ 11

*Freeland v. AT & T Corp.*,
  238 F.R.D. 130 (S.D.N.Y. 2006) .................................................................................. 13

*Fujifilm Corp. v. Motorola Mobility LLC*,
  182 F. Supp. 3d 1014 (N.D. Cal. 2016) ....................................................................... 25

*GSI Tech., Inc. v. Cypress Semiconductor Corp.*,
  2015 WL 365491 (N.D. Cal. Jan. 27, 2015) ................................................................ 19

*Hamm v. Mercedes-Benz USA, LLC*,
  2021 WL 1238304 (N.D. Cal. Apr. 2, 2021) ................................................................ 11

Case No. 3:20-cv-02345-WHO

*In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*,
 276 F.R.D. 364 (C.D. Cal. 2011) ................................................................................... 14

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
 2013 WL 5429718 (N.D. Cal. June 20, 2013) ............................................................... 12

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
 2023 WL 5963475 (N.D. Cal. Sept. 12, 2023) ......................................................... 11, 13

*In re High-Tech Emp. Antitrust Litig.*,
 2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) .................................................................. 10

*In re Juul Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.,*
 2022 WL 1814440 (N.D. Cal. June 2, 2022) .............................................................. 10, 11

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
 2025 WL 354671 (S.D.N.Y. January 30, 2025) .............................................................. 24

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
 2025 WL 1802952 (S.D.N.Y. June 30, 2025)................................................................... 24

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*,
 892 F.3d 624 (4th Cir. 2018)........................................................................................... 23

*In re Live Concert Antitrust Litig.*,
 247 F.R.D. 98 (C.D. Cal. 2007) ...................................................................................... 19

*In re Live Concert Antitrust Litig.*,
 863 F. Supp. 2d 966 (C.D. Cal. 2012) ............................................................................ 12

*In re Pac. Fertility Ctr. Litig.*,
 2021 WL 842739 (N.D. Cal. Mar. 5, 2021)..................................................................... 21

*In re Packaged Seafood Prods. Antitrust Litig.*,
 332 F.R.D. 308 (S.D. Cal. 2019)..................................................................................... 10

*In re Packaged Seafood Prods. Antitrust Litig.*,
 2024 WL 1269863 (S.D. Cal. Mar. 25, 2024) ................................................................ 21

*In re Polypropylene Carpet Antitrust Litig.*,
 996 F. Supp. 18 (N.D. Ga. 1997) .................................................................................... 14

*In re Telescopes Antitrust Litig.*,
 348 F.R.D. 455 (N.D. Cal. 2025)..................................................................................... 13

*In re Urethane Antitrust Litig.*,
 768 F.3d 1245 (10th Cir. 2014)....................................................................................... 14

*J. Truett Payne Co., v. Chrysler Motors Corp.*,
 451 U.S. 557 (1981)........................................................................................................... 9

*Kim v. Benihana, Inc.,*
 2024 WL 3550390 (C.D. Cal. May 20, 2024) ................................................................ 12

IPPs' MEM. OF LAW IN OPP'N TO DEFS.' MOT. TO EXCLUDE THE
OVERCHARGE MODELS AND DAMAGES OPINIONS OF DR. GARETH MACARTNEY

*Klein v. Meta Platforms, Inc.*,
766 F. Supp. 3d 956 (N.D. Cal. 2025) .................................................................................. 23

*Lin v. Solta Med., Inc.*,
2024 WL 5199905 (N.D. Cal. Dec. 23, 2024) ...................................................................... 21

*Malden Transportation, Inc. v. Uber Techs., Inc.*,
404 F. Supp. 3d 404 (D. Mass. 2019) ................................................................................. 12

*McCrary v. Elations Co. LLC*,
2014 WL 12589137 (C.D. Cal. Dec. 2, 2014) ..................................................................... 13

*Messick v. Novartis Pharms. Corp.*,
747 F.3d 1193 (9th Cir. 2014) ............................................................................................... 9

*Miami Prods. & Chem. Co. v. Olin Corp.*,
2023 WL 8946114 (W.D.N.Y. Dec. 28, 2023) ................................................................... 12

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) ..................................................................................... 5, 10, 14

*Primiano v. Cook*,
598 F.3d 558 (9th Cir. 2010) .................................................................................................. 9

*Reed Construction Data Inc. v. McGraw-Hill Companies*,
49 F. Supp. 3d 385 (S.D.N.Y. 2014) ................................................................................... 14

*Smith v. City of Oakland*,
2025 WL 490474 (N.D. Cal. Feb. 13, 2025) ....................................................................... 12

*Syufy Enterprises v. American Multicinema, Inc.*,
793 F.2d 990 (9th Cir.1986) ................................................................................................. 19

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
875 F.2d 1369 (9th Cir.1989) ............................................................................................... 19

*United States v. Artero*,
121 F.3d 1256 (9th Cir. 1997) ............................................................................................. 12

*United States v. Brody*,
2023 WL 2541118 (N.D. Cal. Mar. 16, 2023) ...................................................................... 9

IPPs' MEM. OF LAW IN OPP'N TO DEFS.' MOT. TO EXCLUDE THE
OVERCHARGE MODELS AND DAMAGES OPINIONS OF DR. GARETH MACARTNEY

**GLOSSARY OF TERMS**

| Term | Definition |
|------|------------|
| **ALJ** | Administrative Law Judge in the FTC Action (defined below) |
| **Altria** | Altria Group, Inc. and Altria Enterprises LLC |
| **Bamberger Decl.** | Omnibus Declaration of Nowell D. Bamberger in Support of Defendants' Motions to Exclude Expert Opinions and Oppositions to Plaintiffs' Motions for Class Certification (ECF No. 520-13) |
| **Barber Decl.** | Omnibus Declaration of Jeremy Barber in Support of Defendants' Motions to Exclude Expert Opinions and Oppositions to Plaintiffs' Motions for Class Certification (ECF No. 521-1) |
| **Cartwright Act Class** | Proposed class applying California's Cartwright Act to the 31 Indirect Purchaser States (defined below) |
| **Class Period** | October 25, 2018 through March 29, 2024 |
| **Classes** | The Cartwright Act Class and the statewide California, Florida, Hawaii, Massachusetts, New York and Rhode Island classes |
| **Closed-System E-Cigarettes** | E-cigarettes (including pod-based devices and "cigalikes") that use their own branded, pre-filled cartridges or pods and do not allow users to fill their devices with e-liquids |
| **Defendants** | Altria and JLI (defined below) |
| **FTC Complaint or FTC Action** | The April 1, 2020 Complaint filed by the Federal Trade Commission in *In the Matter of Altria Group, Inc. and JUUL Labs, Inc.*, Case No. 9393, alleging violations of federal antitrust laws |
| **Indirect Purchaser States** | Arizona, Arkansas, California, the District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, and Wisconsin |
| **IPPs' Mot. for Class Cert.** | Indirect Purchaser Plaintiffs' Motion for Class Certification (ECF No. 492-3) |
| **JLI** | Juul Labs, Inc. |
| **Macartney Reb.** | Rebuttal Expert Report of Gareth Macartney, Ph.D, dated March 21, 2025 (attached as Ex. 10 to the Zwerling Decl.) |
| **Macartney Reply** | Reply Expert Report of Gareth Macartney, Ph.D, dated May 1, 2025 (attached as Ex. 11 to the Zwerling Decl.) |
| **Macartney Rpt.** | Expert Report of Gareth Macartney, Ph.D, dated January 21, 2025 |

IPPs' MEM. OF LAW IN OPP'N TO DEFS.' MOT. TO EXCLUDE THE
OVERCHARGE MODELS AND DAMAGES OPINIONS OF DR. GARETH MACARTNEY

| | (attached as Ex. 9 to the Zwerling Decl.) |
|---|---|
| **Macartney Tr.** | Deposition Transcript of Dr. Gareth Macartney (attached as Ex. 54 to the Barber Decl.) |
| **Motion or Mot.** | Defendants' Motion to Exclude the Overcharge Models and Damages Opinions of Indirect Reseller Plaintiffs' Expert, Dr. Keith Leffler, and Indirect Purchaser Plaintiffs' Expert, Dr. Gareth Macartney (ECF No. 520-9) |
| **Murphy Am. Reb.** | Amended Expert Rebuttal Report of Dr. Kevin Murphy dated May 12, 2025 (attached as Ex. 49 to the Barber Decl.) |
| **Murphy Tr.** | Deposition Transcript of Dr. Kevin Murphy (attached as Ex. 51 to the Barber Decl.) |
| **Plaintiffs or IPPs** | Indirect Purchaser Plaintiffs Kurt Doughty, Allison Harrod, Michael Imai, Daraka Larimore, Adam Matschullat, Dylan Pang and Kerry Walsh |
| **Transaction** | Altria's partial acquisition of JLI, which provided Altria with a 35 percent equity stake in JLI |
| **Zwerling Decl.** | Declaration of Robin F. Zwerling in Support of IPPs' Motion for Class Certification (ECF No. 492-4) |
| **Zwerling Reply Decl.** | Reply Declaration of Robin F. Zwerling in Further Support of IPPs' Motion for Class Certification and in Opposition to Defendants' Motion to Exclude Expert Opinions |

IPPs' MEM. OF LAW IN OPP'N TO DEFS.' MOT. TO EXCLUDE THE
OVERCHARGE MODELS AND DAMAGES OPINIONS OF DR. GARETH MACARTNEY

## I.     INTRODUCTION

IPPs submitted the expert reports of Dr. Gareth Macartney, who opines that standard antitrust methodologies can reliably calculate classwide damages in this case. Defendants do not, and cannot, dispute his qualifications: his advanced economics education, teaching, publications, consulting experience, and extensive expert testimony across a vast array of industries demonstrate the depth and relevance of his specialized knowledge       .

Similarly, Defendants do not challenge Dr. Macartney's conclusions that the Closed-System E-Cigarette market was conducive to anticompetitive conduct (Macartney Rpt., § II), that Defendants' actions were consistent with such conduct (*id*., § III), or his estimation of the overcharge pass-through to the IPP Classes (*id*., § IV.C). Nor do they dispute that his reduced-form pricing regression is a sound, common method for isolating anticompetitive pricing effects. Their objections are limited to two points—the choice of variables in his regression and the second damages period starting July 2022—both of which are meritless

*First*, Defendants' assertion that Dr. Macartney's overcharge opinions should be excluded as ignoring two purportedly key variables is legally and factually baseless. Courts consistently hold that the choice of variables in a regression analysis affects the weight to be given expert testimony, not its admissibility. Moreover, Dr. Macartney *did* consider the variables cited by Defendants and concluded they did not impact JUUL's pricing, and therefore did not warrant inclusion in his model. Defendants should not be permitted to use this motion as a side-door attempt to challenge the product market definition.

*Second*, far from "manipulat[ing] [his] regression[] to gin up higher overcharges" by adding a second damages period beginning in 2022 (Mot. at 2), Dr. Macartney examined the complete record of JLI's price increases, including contemporaneous internal documents, prevailing economic conditions, and all alternative explanations offered by Defendants' expert. He reasonably concluded that the July 2022 price increase was prompted by the dismissal of the FTC Complaint. While Defendants may argue to the jury that it was mere coincidence that this "long overdue" price increase occurred immediately after relief from

IPPs' MEM. OF LAW IN OPP'N TO DEFS.' MOT. TO EXCLUDE THE
OVERCHARGE MODELS AND DAMAGES OPINIONS OF DR. GARETH MACARTNEY

FTC scrutiny, there is ample factual support for Dr. Macartney's second damages period.

Even if Defendants' criticisms had merit—which they do not—they would go only to weight, not admissibility. Defendants' bid to exclude Dr. Macartney's opinions is a premature attempt to litigate factual disputes for the factfinder, and should be rejected.

## II.    DR. MACARTNEY'S ANALYSIS

**Market Analysis.** Dr. Macartney finds that at the time of the Transaction, the Closed-System E-Cigarette market was characterized by high levels of concentration, increasing the likelihood for anticompetitive conduct because the ease and potential returns for such conduct are higher. Macartney Rpt. ¶ 34. In 2018, the market was dominated by six manufacturers: JLI, Altria, Imperial Brands PLC, Logic, NJOY and British American Tobacco Group. *Id*. ¶ 35. At the time of the Transaction, JLI accounted for nearly 59% of the U.S. Closed-System E-Cigarette market based on IRI data.[1] *Id*. ¶ 42. JLI's competitors made up substantially less of the market: British American (15.2%); Imperial Brands (9.3%); Altria (6.9%); Logic (4.9%); and NJOY (1.8%). *Id*.

One common measure of market concentration is the Herfindahl-Hirschman Index ("HHI"), which is the sum of the squares of the market shares. *Id*. ¶ 43. Under the FTC and DOJ Merger Guidelines (the "Merger Guidelines"), "[m]arkets with an HHI greater than 1,800 are highly concentrated" and a "merger that creates or further consolidates a highly concentrated market that involves an increase in the HHI of more than 100 points is presumed to substantially lessen competition or tend to create a monopoly." *Id*. The DOJ and FTC have also found that "[t]he higher the concentration metrics over these thresholds, the greater the risk to competition suggested by this market structure analysis." *Id*.

Dr. Macartney calculated the HHI of the U.S. Closed-System E-Cigarette market at the time of the Transaction to be 3,873, meaning the industry would be categorized as highly concentrated. *Id*. ¶ 44. Further, the Transaction increased the HHI by 814 points based on the Merger Guidelines formula, far exceeding the 100 point increase the Merger Guidelines

---

[1] IRI data, which is also used by JLI in its regular course of business, consists of multi-outlet and convenience store data at the national level. Macartney Rpt. ¶ 129 n.383.

IPPs' MEM. OF LAW IN OPP'N TO DEFS.' MOT. TO EXCLUDE THE
OVERCHARGE MODELS AND DAMAGES OPINIONS OF DR. GARETH MACARTNEY

"presumed to substantially lessen competition or tend to create a monopoly." *Id.*

Economists also understand that barriers to entry lead to reduced levels of competition as prospective new firms are restricted from participating in the market. *Id.* ¶ 45. Such barriers lead to higher levels of market concentration and allow incumbents to maintain market power. *Id.* The greater the barriers to entry, the higher the expected returns and the greater the likelihood of competitors engaging in horizontal mergers that limit competition. Dr. Macartney identifies several significant barriers to entry that new entrants in the Closed System E-Cigarette market face, including: FDA regulations (*id.* ¶¶ 47-50), shelf space restrictions in retail stores (*id.* ¶¶ 51-52), consumer switching costs (*id.* ¶¶ 53-55), and technology costs (*id.* ¶¶ 56-59).

In sum, Dr. Macartney found that market concentration and JLI's then-existing market power, as well as barriers to entry, made the Closed-System E-Cigarette market conducive to anticompetitive conduct, because JLI would have been able to exercise its increased market power without being undermined by existing competitors or new entrants. *Id.* ¶ 60. Having determined that the market was *conducive* to anticompetitive conduct, Dr. Macartney then analyzed the common evidence concerning Defendants' conduct and found that the conduct is *consistent* with anticompetitive conduct. Macartney Rpt. ¶¶ 61-112.

**Overcharges to Direct Purchasers.** To test whether Defendants' conspiracy caused direct purchasers to pay higher prices, Dr. Macartney analyzed JLI transaction data to track the price of JLI's most popular product, the four-pod pack refills with 5% nicotine concentration. *Id.* ¶ 114.[2] The data shows that JLI increased the prices it charged to direct purchaser wholesalers and retailers in November 2018—after Altria announced the withdrawal of its then-competing e-cigarette products—and maintained them, even though

_____

[2] This product was chosen █████████████████████████████████████████████
██████████████████████████████████████████████████████████████
Macartney Rpt. at 70 n.358. Of all JUUL products, the refill pods represented the vast majority of JLI's revenue (97% in 2024). *See* Macartney Reb. at 55 fig.39.

JLI's costs were declining. *Id*. ¶ 114.[3] In July 2022, following the dismissal of the FTC Complaint, JLI substantially increased prices. *Id*.

To estimate any direct overcharge, Dr. Macartney uses the most common statistical method employed in antitrust litigation: a reduced-form pricing regression. *Id*. ¶ 118. This method enables an economist to simultaneously calculate the relationship between changes in a dependent variable (*e.g.*, JUUL pod prices) and changes in multiple independent variables (*e.g.*, supply and demand factors). *Id*. The methodology tests if an overcharge exists and measures the extent (if at all) that the actual prices paid were higher as a result of the anticompetitive conduct. *Id*. ¶ 118. The model compares prices in the period after the Transaction to a competitive benchmark period before the Transaction. *Id*. Backing out the effect of any changes in supply and demand between the two periods, the model estimates by how much prices were higher in the later period as a result of the Transaction. *Id*.

Dr. Macartney estimated the direct overcharges for two periods: (a) October 25, 2018 (the start of the Class Period) through June 30, 2022; and (b) July 1, 2022 through March 29, 2024 (the last date for which JLI produced data).[4] *Id*. ¶ 119. For his benchmark, Dr. Macartney relied on JLI data for the period January 2016 through October 24, 2018 (the period prior to Altria's withdrawal from the market). *Id*.

Dr. Macartney's regression model controlled for various factors, including: supply (costs), demand, product characteristics, and customer and health concerns. *Id*. ¶¶ 120-125. The conservative results of the model calculate an overcharge of 3.56% for the period October 25, 2018 through June 30, 2022 and 11.96% for the period July 1, 2022 through March 29, 2024. *Id*. ¶ 127. The overcharge indicators in Dr. Macartney's model were found to be highly statistically significant and the model explains 84% of the variation in prices, which is high by professional standards, demonstrating that the model is reliable. *Id*. ¶ 126.

**Pass Through to Consumers.** To test whether the inflated prices were passed through

---

[3] Dr. Macartney analyzed wholesale and retail data representing nearly 70% of all JUUL pod sales through the wholesale/retail channel. Macartney Rpt. ¶ 115.

[4] As discussed in detail below, the second damages period beginning in July 2022 was chosen as a result of JLI's price increases following the dismissal of the FTC Complaint.

IPPs' MEM. OF LAW IN OPP'N TO DEFS.' MOT. TO EXCLUDE THE
OVERCHARGE MODELS AND DAMAGES OPINIONS OF DR. GARETH MACARTNEY

to indirect purchasers, Dr. Macartney formulated a similar econometric model to test whether increased direct prices led to higher retail prices. This model is a common and formulaic model that measures the pass-through rate in percentage terms. It provides a formula that can be used to calculate pass-through for the entire Class. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 683-84 (9th Cir.) (accepting use of pass-through regression to demonstrate common impact to indirect classes), c*ert. denied sub nom. StarKist Co. v. Olean Wholesale Grocery Coop., Inc.*, 143 S. Ct. 424 (2022).

To calculate the pass-through rate, Dr. Macartney matched JUUL pod prices from the wholesale/retail channel to IRI scanner data on the prices paid in retail stores by consumers. Macartney Rpt. ¶¶ 128-129. Using the matched weekly prices, Dr. Macartney runs regression models with the price consumers pay (*i.e.*, the IRI scanner price) as the dependent variable and the price JLI charges wholesalers and retailers as the independent variable of interest, while controlling for product characteristics and cost factors associated with distributing the product such as wages of wholesale and retail industry employees, and shipping expenses. *Id*. ¶ 130. All three of the regression models employed by Dr. Macartney explain 97% of the variation in prices. *Id*. ¶ 131. The conservative results of the pass-through models indicate a low-end pass-through rate of 82.4% with a high-end estimate of 114.9%. *Id*.

Dr. Macartney then cross-checked the pass-through regression with other regressions on additional data sets. Dr. Macartney analyzed distributor data from two of JLI's largest distributor customers (McLane Company, Inc. ("McLane") and Core-Mark Holdings Company, Inc. ("Core-Mark")) and ran additional regression models. *Id*. ¶¶ 132-135.[5] The data shows a strong relationship between what McLane and Core-Mark pay to JLI and what they charge their customers. *Id*. ¶¶ 132, 134. Similar to the regression analysis performed with respect to the IRI data, Dr. Macartney runs three different regression models on the McLane and Core-Mark data, while controlling for product characteristics and costs factors. *Id*. ¶¶ 133, 135. The results yield pass-through rates ranging from 97.5% to 107.8%. *Id*. In

---

[5] McLane is JLI's largest direct customer; it produced transactional data spanning more than 15 million sales records. Macartney Rpt. ¶ 132.

- 5 -                                    Case No. 3:20-cv-02345-WHO

all, Dr. Macartney used nine regressions with either IRI scanner or distributor data to demonstrate pass-through. These results strongly support Dr. Macartney's finding (using the IRI data) of a high pass-through rate through the full distribution chain. *Id.* ¶¶ 131, 133, 135.

**Classwide Damage Calculations.** Using JLI's transaction data, IRI data, the overcharge rates and the conservative pass-through rate, Dr. Macartney calculates damages for the Cartwright Act Class to be $152,390,664. *See* Macartney Rpt. ¶¶ 136-139. He performed similar calculations for each State Class. *See* Macartney Reb. at 2 n.6.

## III.    BACKGROUND

Plaintiffs respond briefly to Defendants' "Background" section to correct mischaracterizations of the record and highlight numerous disputed issues of fact.

**Altria's Competing E-Cigarette Products.** Defendants contend Altria's withdrawal from the closed-system e-cigarette market reflected an inability to compete because it lacked viable products. Mot. 4-5. This, however, is merely one of Defendants' pretextual explanations for Altria's withdrawal—directly at odds with the conspiratorial motive established by Plaintiffs' evidence—and is an ultimate question for the jury. As detailed at length in Dr. Macartney's reports, Altria was committed to long-term competition in e-cigarettes, was destined on becoming the market leader, already held a leading e-cigarette brand, was experiencing growing sales, was actively developing its next-generation products and was considered a major threat and competitor to JUUL. *See* Macartney Rpt. ¶¶ 62-81; Macartney Reb. ¶¶ 16-55; Macartney Reply ¶¶ 10-11; *see also* IPPs' Mot. for Class Cert. at 2–4. This factual dispute has no bearing on the admissibility of Dr. Macartney's testimony.

**JUUL Pod Price Increase in November 2018.** Defendants contend that the November 2018 price increase could not be linked to the Transaction because it purportedly occurred during a "time when negotiations between the two companies had broken down." As an initial matter, Plaintiffs dispute that the evidence cited by Defendants indicates that negotiations had "broken down." In the JLI Board Minutes cited by Defendants, JLI's Board explicitly instructed JLI CEO Kevin Burns "to maintain communication" with Altria.

Bamberger Decl., Ex. 11 (Aug. 9, 2018 JLI Board Minutes at JLI-AT-02617458). The parties continued regular communications throughout October, including Altria's October 5, 2018 statement agreeing to "not compete," and culminating with Defendants' agreement on final terms on October 29, 2018. *See* Macartney Rpt. ¶¶ 96-100, 104. Thus, regardless of prior internal JLI communications concerning general pricing strategy, the price increase was only implemented *after* Altria had already withdrawn its pod-based products and flavored cigalikes form the market, and *after* Defendants reach a final agreement on deal terms, including the non-compete. Macartney Reply ¶¶ 14-15; Macartney Tr. 332:11-333:14.

Defendants further contend that the November 2018 price increase only applied to distributors and that its Manufacturers' Suggested Retail Price ("MSRP") for JUUL pods remained unchanged. However, the MSRP is merely a *suggested* retail price. Dr. Macartney examined the *actual* prices paid by consumers, and found that the actual prices increased. *See* Macartney Reb. ¶¶ 60-70; *see also* Macartney Tr. 134:7-12 ("I looked at evidence with respect to the IRI data, which showed the prices increasing in 2018 and then prices increased substantially later on with respect to that.") (corrected by errata).[6] Moreover, while Defendants describe this increase as "modest" in scope, it occurred while JLI's costs were decreasing, further increasing its profits. Macartney Reb. ¶ 64; Macartney Tr. 170:13-171:3, 176:20-24. It is not just that JLI increased prices, but also that it was able to maintain prices, even as its costs were decreasing. Macartney Rpt. ¶¶ 114-116.

**JUUL Pod Price Increase in July 2022.** Defendants similarly try to attribute the July 2022 price increases to reasons other than the alleged anticompetitive conduct, another disputed question of fact. But the timing and evidence surrounding this price increase provides more than a sufficient foundation that ties it to the alleged misconduct.

[6] Dr. Macartney's signed errata is attached as Ex. 10 to the Zwerling Reply Decl.

IPPs' MEM. OF LAW IN OPP'N TO DEFS.' MOT. TO EXCLUDE THE
OVERCHARGE MODELS AND DAMAGES OPINIONS OF DR. GARETH MACARTNEY

."[7] Bamberger Decl., Ex. 25 (Feb. 23, 2022 Email from M. Batchan, JLI-NDCA-10287565 at 1). ████████████████████████████████████████

████████████████████████████████████████████████████████

████ Mot. at 23. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████ Zwerling Reply Decl., Ex. 11 (Augustine Tr. 162:10-12, 164:5-165:7). On July 8, 2022, JLI announced the price increase to distributors. Macartney Rpt. ¶ 111.

While Defendants proffer alternative reasons for the price increases—which Dr. Macartney considered—it is undisputed that JLI held off on implementing price increases while the FTC was investigating and prosecuting Defendants for anticompetitive conduct. Immediately after being relieved of FTC scrutiny, JLI sets the wheels in motion for "████████████ price increases, which are implemented shortly thereafter.

**JUUL Device Prices.** Defendants' discussion of JUUL device price reductions is irrelevant: devices account for a negligible share of JLI's revenue and fall outside the class definitions. *See* IPPs' Mot. for Class Cert. at ix (Classes consist of purchasers of JUUL Pods and exclude devices). In 2024, devices constituted only 2% of JLI's revenue. Macartney Reb. ¶ 72. And from 2017 through 2021, devices on average constituted only 5% of JLI's total revenue. *Id*. As Dr. Macartney describes, JLI was merely following the razor/blade pricing strategy to drive sales of pods and "there is no link between device price decreases and JUUL's overcharges on pods." Macartney Reply ¶ 37; *see also* Macartney Rpt. ¶¶ 54-55.

**Competition from Illegal Disposable E-Cigarettes.** Defendants cite to the rise in illegal sales of disposable e-cigarettes beginning in 2020. However, despite Defendants' expert's contention that JUUL faced intense competition from the proliferation of these illegal disposables, JLI has never reduced its prices in response to any such competition. Macartney Reb. ¶ 89; Macartney Reply ¶¶ 19, 35. In fact, as discussed above, it *raised* prices in 2022, despite the increasing presence of illegal disposables.

---

[7] The ALJ decision was issued on February 15, 2022. *See* Barber Decl., Ex. 22.

- 8 -                                          Case No. 3:20-cv-02345-WHO
IPPs' MEM. OF LAW IN OPP'N TO DEFS.' MOT. TO EXCLUDE THE
OVERCHARGE MODELS AND DAMAGES OPINIONS OF DR. GARETH MACARTNEY

## IV.   LEGAL STANDARD

Expert testimony is admissible under Rule 702 if it is both relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). "[R]elevance means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007). For reliability, the expert testimony must "ha[ve] a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). To assess reliability, the court must "assess the [expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Id*. at 564. These factors are "helpful, not definitive," and a court has discretion to test reliability "based on the particular circumstances of the particular case." *Id*. (cleaned up).

The Ninth Circuit has emphasized that Rule 702 "should be applied with a 'liberal thrust' favoring admission." *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (citing *Daubert*, 509 U.S. at 588); *United States v. Brody*, 2023 WL 2541118, at *5 (N.D. Cal. Mar. 16, 2023) (Orrick, J.). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564. A district court "is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). "The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id.* at 969-70.

*Daubert*'s liberal admissibility standard also comports with Plaintiffs' relaxed burden for proving antitrust damages. Antitrust plaintiffs are not required to estimate damages with a watchmaker's precision. To the contrary, the Supreme Court has long emphasized that reasonable estimates will suffice. *J. Truett Payne Co., v. Chrysler Motors Corp.*, 451 U.S. 557, 565-66 (1981) ("The Court has repeatedly held that in the absence of more precise proof, the factfinder may conclude as a matter of just and reasonable inference from the proof of

defendants' wrongful acts and their tendency to injure plaintiffs' business . . . that defendants' wrongful acts had caused damage to the plaintiffs." (citation omitted)). The reason for this long-settled relaxed standard is that "the most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946).

## V.    ARGUMENT

Defendants do not contest that Dr. Macartney's methodology—multiple regression analysis—is "a generally reliable econometric technique to control for the effects of the differences among class members and isolate the impact of the alleged antitrust violations on the prices paid by class members." *Olean*, 31 F.4th at 677; *see also In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. 308, 322 (S.D. Cal. 2019) ("This approach is a 'widely used econometric technique for determining whether prices were higher during a class period than they otherwise would have been without anti-competitive conduct.'" (citation omitted)).

Instead, Defendants only object to two aspects of Dr. Macartney's model: (1) his selection (or omission) of certain variables in his overcharge regression analysis; (2) his decision to include a second damages period beginning in July 2022. Both objections lack merit for the reasons described below. At bottom, Dr. Macartney used reliable principles and methods to analyze the available facts and data in this case. Given his unimpeachable qualifications and the broad acceptance his methodology enjoys, and the reliability of his methods, this Court should reject Defendants' attempt to usurp the factfinders' role.

### A.    Disagreements Regarding the Selection of Variables Go to Weight

Courts routinely reject efforts to exclude economic experts in antitrust cases based on disagreements over the selection of variables in regression models. As this Court has held, criticisms concerning a regression analysis that go toward "the inputs used and results generated . . . are **classic criticisms that go to weight, not admissibility**." *In re Juul Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.,* 2022 WL 1814440, at *20 (N.D. Cal. June 2, 2022) (Orrick, J.) (emphasis added); *see also In re High-Tech Emp. Antitrust Litig.*, 2014

WL 1351040, at *20 (N.D. Cal. Apr. 4, 2014) (assertions that models are flawed for failure to include particular variables are "prototypical concern[s] that go[ ] to weight, not admissibility.'"). Instead, "criticisms regarding the data used and variables included or omitted within [the expert's] damages model should be properly challenged in the adversarial process through competing evidence and incisive cross-examination." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2023 WL 5963475, at *1-2 (N.D. Cal. Sept. 12, 2023) (internal quotation marks and citation omitted).

Courts have repeatedly rejected exclusion on this basis. *See*, *e.g.*, *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (partial concurrence) (the propriety of controlling for particular variables in a regression analysis goes to weight rather than admissibility); *Hamm v. Mercedes-Benz USA, LLC*, 2021 WL 1238304, at *14 (N.D. Cal. Apr. 2, 2021) (rejecting argument that expert's damages model was "fatally flawed because of the data inputs used in creating the regression model").[8]

Moreover, as this Court has held:

> **[A] regression analysis does not become inadmissible as evidence simply because it does not include every variable that is quantifiable and may be relevant to the question presented** . . . [I]f a regression analysis omits variables it is for the finder of fact to consider the variables that have been left out of an analysis and the reasons given for the omissions, and then to determine the weight to accord the study's results.

*In re JUUL Mktg.,* 2022 WL 181440, at *20 (emphasis added) (second alteration in original) (citation omitted). In short, a defendant "cannot simply identify non-discriminatory variables and assert that controlling for such variables would cure the observed statistical disparities [but rather that] defendant must "produce credible evidence that curing the alleged flaws must also cure the statistical disparity." *Buchanan v. Tata Consultancy Servs., Ltd.*, 2017 WL 6611653, at *9 (N.D. Cal. Dec. 27, 2017) (citation omitted).  Defendants have failed to do so here.

That this case is at the class certification stage also weighs against excluding the testimony. As this Court held in *In re Korean Ramen Antitrust Litig.*, "it is not [the court's]

---

[8] Defendants' authority is in accord. *See, e.g., Equal Emp. Opportunity Comm'n v. R&L Carriers, Inc.*, 664 F. Supp. 3d 784 (S.D. Ohio 2023) (denying motion to exclude and holding that party challenging regression analysis must show omitted variable is truly significant).

- 11 -                                    Case No. 3:20-cv-02345-WHO

job to choose which side's experts appear strongest, at least at this stage." 2017 WL 235052, at *2 (N.D. Cal. Jan. 19, 2017) (Orrick, J.); *see also In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2013 WL 5429718, at *22 (N.D. Cal. June 20, 2013), *report and recommendation adopted*, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013) (at class certification, "it is unnecessary to delve further into the merits by going point-by-point through each expert's theory to decide who has designed the 'better' multiple regression equation.") (cleaned up).

Defendants rely heavily on *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 973 (C.D. Cal. 2012) and similar cases. These cases are inapposite; they permit exclusion only where an omitted variable is shown to be outcome-determinative, not merely because a variable was left out. In *Live Concert*, the court held that a court "cannot simply assume that variables omitted from the analysis are, in fact, 'major factors,' which should have been included [but rather t]here must be some indication that the excluded variables would have impacted the results." *Id.* at 974. Here, as discussed below, Dr. Macartney considered the omitted variables and found them to be insignificant to his analysis.

Many of Defendants' cases are distinguishable on this basis. In *Live Concert*, the expert failed to consider the impact of an artist's popularity on ticket price, a factor that the expert *conceded* affected ticket prices, and one as to which he *admitted* that the "check" he performed was "meaningless." *Id*. at 975. In *United States v. Artero*, 121 F.3d 1256, 1260-61 (9th Cir. 1997), defendant's expert compared grand jury candidates to the county's overall Hispanic population—rather than to eligible Hispanic jurors—despite acknowledging that Hispanics in the county were less likely to be registered voters and thus citizens eligible to serve. In *Smith v. City of Oakland*, 2025 WL 490474, at *5 (N.D. Cal. Feb. 13, 2025), the expert did not include any of an array of variables in his analysis that he conceded contributed to price differences. In *Kim v. Benihana, Inc.,* 2024 WL 3550390, at *5 (C.D. Cal. May 20, 2024), the expert omitted the defendants' own prices for the food products and factors that other restaurants used in setting their prices beyond the defendant's conduct. In *Miami Prods. & Chem. Co. v. Olin Corp.*, 2023 WL 8946114, at *16 (W.D.N.Y. Dec. 28, 2023), a key factor was global demand, but the expert used a proxy instead for global demand which contained conceded unknowns rendering it unreliable. In *Malden Transportation, Inc. v.*

IPPs' MEM. OF LAW IN OPP'N TO DEFS.' MOT. TO EXCLUDE THE
OVERCHARGE MODELS AND DAMAGES OPINIONS OF DR. GARETH MACARTNEY

*Uber Techs., Inc.*, 404 F. Supp. 3d 404, 417 (D. Mass. 2019), the court found a regression model flawed where, *inter alia*, it "failed to include taxi driver hourly wages as a variable in his model even though he conceded that drivers' wages and perceived economic health would affect drivers' decisions to lease medallions and did not explain his omission"). In *Bickerstaff v. Vassar College*, 196 F.3d 435, 449 (2d Cir. 1999), an employment discrimination case addressing salary, the expert failed to account for two of the three variables on which the school gave merit pay increases, and as to the third she admitted "that this variable is not totally reliable." Relatedly distinguishable is *Freeland v. AT & T Corp.*, 238 F.R.D. 130, 146 (S.D.N.Y. 2006), where, unlike here, the expert offered no support for his opinion that the omitted factor was irrelevant to price.[9]

### B.   Dr. Macartney Considered All of the Identified Variables

Dr. Macartney relied on a methodology that is well-regarded in the field and constructed his models using the appropriate variables. He used a reduced form model of multivariant regression, which, as he testified, is often cited in academic literature as the most commonly used method for calculating overcharges in similar cases. Macartney Tr. 149:16-150:6. It is both reliable and well-suited for estimating damages and is a model that Dr. Macartney has implemented numerous times across various cases. *Id.* 149:16-150:6. Dr. Macartney also properly designed and tested his model. *Id.* 179:12-15 ("I designed the model, I considered what explanatory variables to include in it, I tested the model, I found it to be reliable, and I reported the model.").

Dr. Macartney's model included four variables recognized by Defendants: cost, cigarette price, disposable income, and health impact. However, Dr. Macartney's models also included, "other explanatory variables, including customer fixed effects and product characteristic combinations of concentration pack, kind, and the flavor. And there's a lot of those." Macartney Tr. 155:24-156:15.

---

[9] Other courts have distinguished some of this authority on similar grounds. *See*, *e.g.*, *In re Telescopes Antitrust Litig.*, 348 F.R.D. 455, 473-74 (N.D. Cal. 2025) (distinguishing *Live Concert, Smith* and *Kim*); *McCrary v. Elations Co. LLC*, 2014 WL 12589137, at *8 (C.D. Cal. Dec. 2, 2014) (distinguishing *Live Concert*); *In re Cathode Ray Tube*, 2023 WL 5963475, at *1-2 (same).

IPPs' MEM. OF LAW IN OPP'N TO DEFS.' MOT. TO EXCLUDE THE
OVERCHARGE MODELS AND DAMAGES OPINIONS OF DR. GARETH MACARTNEY

Defendants identify only two variables that they assert Dr. Macartney should have, but did not, incorporate in his model: (1) decreased demand elasticity due to competition from JUUL's rivals (including the impact of illegally imported disposable flavored e-cigarettes); and (2) the impact of JLI's deteriorating financial condition on JUUL pricing.[10] Contrary to Defendants' arguments, Dr. Macartney *did* consider these variables and explained why it was not necessary and would not have been appropriate to include them. To exclude Dr. Macartney's opinions on overcharges and damages would require ruling on battle of the experts and deciding which methodology is superior. However, as the previously cited authority makes clear, "where a court is confronted with two opposing expert analyses or econometric models . . . the [c]ourt is not supposed to decide at the certification stage which expert analysis or model is better." *In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 373-74 (C.D. Cal. 2011).[11]

**1. Demand Elasticity and Illegal Disposables**

Dr. Macartney considered both the impact of legal pod-based product competitors and the impact of illegally imported disposables, which skirted the FDA's flavored ban. *See, e.g.,* Macartney Tr. 185:21-24 (testifying that it is inaccurate to say that he included no variable reflecting the competition JUUL faced from other e-cigarette brands).

---

[10] None of Defendants' authority require any particular sensitivity testing for factors that the expert determines clearly would not change the analysis. Moreover, because Dr. Macartney *has* considered these factors, Defendants' citation to *In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014) is unavailing. There, defendants argued that plaintiffs' expert "engaged in 'variable shopping' by choosing variables based on whether they would generate supra-competitive prices," but the court admitted the opinion, holding that, "[t]his argument bore on the weight of Dr. McClave's opinions, not their admissibility." *Id*. at 1260. *In re Polypropylene Carpet Antitrust Litig.*, 996 F. Supp. 18 (N.D. Ga. 1997) does not address a *Daubert* motion. It allows reliance on an expert's report at class certification before all model variables were identified. *Id*. at. 28. *Reed Construction Data Inc. v. McGraw-Hill Companies*, 49 F. Supp. 3d 385, 404 (S.D.N.Y. 2014), *aff'd,* 638 F. App'x 43 (2d Cir. 2016) is inapposite because the expert tried to show that variable was not essential because it could have impact in two opposite directions, and because, *inter alia*, the expert "concede[d] that the price indices are highly negatively correlated with the [omitted] data, indicating that [the omitted data] has an effect and that the effect is significant and negative."

[11] Courts do not decide which expert's model is "better" on *Daubert* motions. Even at class certification, as the Ninth Circuit explained in *Olean*, a court may engage in "'[w]eighing conflicting expert testimony'" and "'[r]esolving expert disputes,'" only "where necessary to ensure that Rule 23(b)(3)'s requirements are met and the 'common, aggregation-enabling' issue predominates over individual issues." 31 F.4th at 666 (citations omitted).

Case No. 3:20-cv-02345-WHO

First, regarding legal competitors, Dr. Macartney explained that "[t]he competition that Juul is facing from other e-cigarette brands, pod-based say, is reflected in Juul's pricing," and therefore, its impact *is*, in fact, "reflected in the dependent variable" used in his models. Macartney Tr. 186:2-6 (emphasis added). In other words, if JUUL pricing was constrained by the increased market share of a competitor, such as Vuse, that would already be reflected in JUUL's pricing, and thus a separate variable is unnecessary. *Id*. 186:11-19. Dr. Macartney further explained that it would not be appropriate to include the pricing of JUUL's primary pod competitor, Vuse, as a control variable because there could be feedback between JUUL's and Vuse's pricing. *Id*. 186:120-23. It was not necessary to use statistical techniques to address a potential endogenous variable relating to that competition because, again, JUUL's pricing already reflects the impact of the competitor. *Id*. 187:24-188:14 ("the extent that [Vuse] constrained the price of JUUL is already reflected in JUUL's pricing . . . [so that constraint is] already reflected in the model."). There is no reason to break that constraint out further because doing so would not affect the overall price.

With respect to competition from illegal disposables, as Dr. Macartney points out, Defendants' expert, Dr. Murphy, has unwittingly disproved his own thesis. Indeed, he found "a statistically *insignificant* coefficient on his share of disposables variable." Macartney Reply ¶ 35. "Not only does this mean that the variable's inclusion in the model is unnecessary, it is also fatal to a central theme of Dr. Murphy's report that competition from illegal, disposable imports constrained JUUL's pricing." *Id.* Dr. Murphy admitted that a statistically insignificant coefficient could be replaced with zero without affecting the result at a certain confidence level. Murphy Tr. 362:15-363; *see also* Macartney Reply ¶ 34 (finding Dr. Murphy's "flavor ban variable makes no difference."). Dr. Murphy's insignificant result proves Dr. Macartney's position that disposables did not affect JUUL's pricing, and demonstrates that Dr. Macartney was correct not to include it. *See* Macartney Reply ¶ 35 (Figure 4) (demonstrating the lack of responsiveness of JUUL's pricing to disposables around the time of the flavor ban).

Further, Dr. Macartney considered the potential impact on JUUL consumers' price sensitivity, and in turn, JUUL's price, caused by JUUL's competition from pod-based and

- 15 -

disposable market participants and the FDA's flavor ban. When asked if he conducted any econometric study to rule out the possibility that the price sensitivity of JUUL's remaining customers changed after JUUL lost share to those competitors, Dr. Macartney explained:

> Certainly I would say I have analyzed that, and I see no evidence of that because when Vuse Alto's share was increasing, Juul's price was not changing. It kept its price completely stable. After its initial increase at the end of 2018, it kept its price stable until the FTC decision. And certainly the rise of disposables, the rise in Vuse's market share, there was no price response to that.

Macartney Tr. 64:9-22. He added, "even when Dr. Murphy does tests for . . . what happened around the time of the flavor ban, he doesn't find anything that supports that hypothesis. When he introduces that variable, it's got a negative coefficient, which cuts against that hypothesis." *Id.* 63:10-15. When the illegal imports "accelerated the most, JUUL didn't change its pricing," demonstrating lack of pricing impact. *Id.* 48:1-7.

Defendants' erroneous argument that the loss of price-sensitive customers to competitors should have been included in Plaintiffs' expert's models is also flawed because it relies on an internally inconsistent section of Dr. Murphy's amended rebuttal report. Dr. Murphy purports to add explanatory variables for the federal flavor ban and the proliferation of illegal flavored disposables and finds that they had an impact. Murphy Am. Reb. ¶¶ 273–78, Exs. 32–33. However, as Dr. Macartney explains, Dr. Murphy's theory on the influence of those disposables on JUUL's pricing directly conflicts with his own theory:

> Dr. Murphy's theory concerning the effect of competition from disposables on JUUL pricing directly contradicts his theory concerning the flavor ban. Concerning disposables, he writes that "as JLI's customer base was eroded by the increased availability of low-price disposables, the elasticity of demand it faced likely fell giving rise to an incentive to *raise price*." Concerning the flavor ban, he writes that it "put JLI at a competitive disadvantage relative to disposables, *constraining JLI's pricing*." So, according to Dr. Murphy, the rise of disposables (helped by the flavor ban), both increased and decreased JUUL's prices. This is contradictory.

Macartney Reb. ¶ 35. Because Dr. Murphy's findings are internally inconsistent, they are unreliable and do not provide support for Defendants' position.

Dr. Murphy's analysis in this regard is riddled with problems. In his Exhibit 33, Dr. Murphy purports to make alterations to Dr. Macartney's overcharge model, but does so only

- 16 -

Case No. 3:20-cv-02345-WHO

by stacking these alterations on top of the assumptions in his Exhibit 31, which are fundamentally flawed for the reasons stated above.

Dr. Murphy's Exhibit 33 adds a "flavor ban" variable, coded as binary as of February 2020. But in fact, JLI discontinued retail sales of flavored products in November 2018, and online sales in October 2019. Murphy Tr. 383:20-384:22. Also, the coefficients change by tiny amounts, from just .023 to .024 in the first period, and .106 to .111 in the second, and even Dr. Murphy concedes it did not coincide with a change in nominal price. *Id*. 386:14-387:8. Worse, the change is in the wrong direction for Dr. Murphy's hypothesis, so that by not using this variable, Dr. Macartney's analysis was conservative.

Dr. Murphy's illegal disposable share variable is even less compelling. The increase in illegal disposable sales, included as a variable in Dr. Murphy's Ex. 33, produces results that are not statistically significant at any level for either period. They could be replaced with zero without altering the outcome of the dependent variable.

Defendants offer a competing hypotheses: first, that the disposables would constrain or erode prices; but also, second, that by taking out the most price-sensitive customers, and reducing the sensitivity of the remaining customers, this dynamic would allow JLI to raise its prices. Mot. at 16; *see also* Murphy Am. Reb. ¶¶ 93, 272(c). In fact, the variable he proposes makes no statistical difference, which supports Dr. Macartney's determination that the disposable share variable had no effect, and never belonged in the regression at all.

Dr. Macartney specifically considered the impact of the illegal importation and sales of disposable products, including those with flavors that were sold in the United States after the FDA implemented a flavor ban for cartridge based e-cigarettes. Dr. Macartney's Rebuttal Report reveals the flaw in Defendants' argument that changing market conditions, including the rise of illegal disposables, caused, JLI to raise prices in July 2022 because it suddenly considered higher prices more important than other considerations. Macartney Reb. ¶ 19 ("But, according to Dr. Murphy, JUUL's market share decrease and the rise of disposables significantly predated its July 2022 price increase, by years, and JUUL did not adjust its prices."). Moreover, Dr. Macartney explained that Defendants' assertion that before its 2022

IPPs' MEM. OF LAW IN OPP'N TO DEFS.' MOT. TO EXCLUDE THE
OVERCHARGE MODELS AND DAMAGES OPINIONS OF DR. GARETH MACARTNEY

price increases, JLI was constrained from raising prices by competition is not consistent with their actions. Macartney Tr. 261:2-25 (It is "not consistent . . . because in 2022, when it did increase its prices substantially, why was it not constrained in 2022 from the disposables that were still there?   It's not consistent."). Dr. Macartney offers a better explanation—that JUUL's 2022 price increases immediately followed the dismissal of the FTC Complaint, as discussed below.[12]

Dr. Murphy also adds a lagged Consumer Price Index variable—although Dr. Macartney already included an inflation variable—selecting an apparently arbitrary twelve-month lag. This is a classic dispute over variables that goes to weight and not admissibility.

Because Dr. Murphy's findings contradict the data and economic logic, and, as set forth above, are internally inconsistent, they do not provide support for Defendants' position that Plaintiffs' experts models are fatally flawed for not including the variables identified.

### 2.  JLI's Financial Condition

Defendants next erroneously argue that Dr. Macartney should have included a variable addressing JLI's declining financial condition in 2022. However, Dr. Macartney explains why that factor logically would not have, and did not, affect JUUL's pricing, and thus why it need not be included as a separate variable. As Dr. Macartney explains: "Dr. Murphy appeals to JUUL's declining market share, which he in part attributes to the rise of disposables, as a reason it valued current high prices more . . . [b]ut, according to Dr. Murphy, JUUL's market share decrease and the rise of disposables significantly predated its July 2022 price increase, by years, and JUUL did not adjust its prices." Macartney Reply ¶ 19. Moreover, Dr. Macartney found that a decision to raise prices because of JUUL's financial condition was not supported by either the record or rational economics, because "if there's

---

[12] Dr. Macartney also testified that his "model ultimately controls for flavors." Macartney Tr. 142:12. While much of Defendants' argument, and Plaintiffs' response, about the FDA's flavor ban is intertwined with argument about the rise of disposables, Dr. Macartney proffered an additional reason why the flavor ban did not impact JUUL's price: "I would say that when you're selling both flavored and unflavored, you're optimally pricing both of them. So when you remove one of them, it doesn't -- it doesn't follow that the optimal price of the unflavored would change." Macartney Tr. 60:17-61:4.

- 18 -

IPPs' MEM. OF LAW IN OPP'N TO DEFS.' MOT. TO EXCLUDE THE
OVERCHARGE MODELS AND DAMAGES OPINIONS OF DR. GARETH MACARTNEY

uncertainty, then it's irrational to destroy your customer base, lose customers through price gouging or whatever you want to call it, when there's a probability less than one that the existential crisis will happen." Macartney Tr. 402:12-23; s*ee also id*. 402:5-11 ("I don't think companies sort of look at their situation and think, oh, the game's potentially up, let's just throw caution to the wind and hike our prices because it's all going to be over soon."). Dr. Macartney further testified that JLI hypothetically needing to quickly raise capital should not affect JUUL's optimal pricing because, "optimal pricing is the price at which [a product] can generate the most revenue," and, because companies always want money, and they already will have "price[d] optimally . . . given market power, cost, demand." Macartney Tr. 57:18-58:10. Again, Dr. Macartney considered the factor Defendants identified, and appropriately rejected as not moving price.

### 3. Defendants' Motion is a Side-Door Challenge of Market Definition

Finally, Defendants' argument on this issue should be denied because it is a thinly veiled attempt to get around a well-established rule: "the Court cannot resolve [a] dispute over market definition in a motion for class certification . . . [because] [d]efining' the [r]elevant market is a factual issue which is decided by the jury.'" *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 130 (C.D. Cal. 2007) (last alteration in original) (quoting *Syufy Enterprises v. American Multicinema, Inc.,* 793 F.2d 990, 994 (9th Cir.1986)). "The Ninth Circuit has held that a dispute over the definition of the relevant product market is a 'factual inquiry for the jury.'" *GSI Tech., Inc. v. Cypress Semiconductor Corp.*, 2015 WL 365491, at *6 (N.D. Cal. Jan. 27, 2015) (quoting *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir.1989)).

Here, IPPs' expert has made clear that his market definition does not include illegally imported disposables and *does* includes legal cigalike disposables. *See* Macartney Tr. 236:7-237:5, 255:5-11. Market definition is an empirical question, determined by whether consumers substitute between products in response to price changes. If cigalikes are excluded from the market definition, it must be because consumers find them so undesirable that they will not switch even if pod prices rise. However, according to Defendants, consumers also

do not find them undesirable enough to forego switching to them when flavors become unavailable in pod systems.[13]

The trier of fact would likely be skeptical of this apparent contradiction. Hence, instead of arguing it before the jury, Defendants disguise it as a *Daubert* issue. However, their assertion that Dr. Macartney's work is flawed for failure to measure the impact of illegal disposables logically and inescapably requires the Court to first decide that Defendants are correct, and that that illegal disposables were in the market and constrained prices. However, market definition is an issue for the jury.

### C.    Evidentiary Support Exists for a Second Damages Period in July 2022

Defendants do not dispute that immediately following the dismissal of the FTC Complaint in February 2022, JLI internally discussed raising the prices of JUUL Pods to distributors and then did so. Macartney Report ¶¶ 110-111; Macartney Reply ¶¶ 16-19. Previously, and unsurprisingly, JLI had not increased prices since the FTC began investigating Defendants for alleged anticompetitive behavior in 2019. Dr. Macartney's reliance on the contemporaneous documentary and economic evidence surrounding this price increase, combined with his consideration of Defendants' alternative, unsubstantiated explanations, provide more than a sufficient foundation for his second damages period.

Dr. Macartney appropriately relies on the evidence discussed above (*see* Section III) as support that the July 2022 price increase stemmed from JLI being relieved of regulatory scrutiny.[14] While Defendants are free to proffer alternative explanations for the price increase to the jury, Dr. Macartney's second damages period rests on a sufficient factual foundation. At best, Defendants' arguments go to weight, not admissibility. *See Elosu v. Middlefork Ranch Inc.*, 26 F. 4th 1017, 1028 (9th Cir. 2022) ("alternative explanations that could lead to alternative outcomes" and competing interpretations do not render an expert opinion

---

[13] Dr. Murphy takes the position that cigalikes (some of which are also disposable) are not in the relevant market, yet illegal disposables (some of which are also cigalikes) do belong in the same market. Murphy Tr. 102:10-103:13.

[14] Defendants contend that the ALJ dismissal was appealed (Mot. at 23), but at that point, any price increase would have no bearing on the appeal, which would obviously only concern the evidentiary record before the ALJ.

inadmissible (quotation marks and citation omitted)); *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1352 n.5 (9th Cir. 1987) ("The relative weakness or strength of the factual underpinnings of the expert's opinion goes to weight and credibility, rather than admissibility." (quotation marks and citation omitted)), *opinion modified on reh'g*, 866 F.2d 318 (9th Cir. 1989); *In re Packaged Seafood Prods. Antitrust Litig.*, 2024 WL 1269863, at *7 (S.D. Cal. Mar. 25, 2024) ("Whether an expert's assumptions have a sufficient basis in facts or data speaks to the weight and not reliability of the opinion. . . ."); *In re Pac. Fertility Ctr. Litig.*, 2021 WL 842739, at *6 (N.D. Cal. Mar. 5, 2021) ("If the jury does not believe that testimony, then they will likewise discount [the expert's] opinion. That his opinion is based on a particular theory, however, is not a basis to disregard it outright.").

Contrary to Defendants' assertions, Dr. Macartney considered all of the alternative explanations for the July 2022 price increases proffered by Defendants' expert and concluded that they were unsupported by the record and inconsistent with the available evidence. *See* Macartney Tr. 388:15-389:11 (testifying that he "considered all of the reasons that Dr. Murphy puts forward and Mr. Augustine" regarding the 2022 price increases and found none of them to be consistent with the evidentiary record); *id*. at 393:21-394:6 ("[W]hen I look at the record evidence and the pricing behavior and all of the other supposed explanations from Dr. Murphy, I find it's consistent with using the contemporaneous evidence that . . . right when the FTC decision came down, that's when Juul said internally at the time ████████ ████████████████ and then increased prices substantially.").[15]

For example, Dr. Murphy hypothesizes that JLI increased its prices beginning in July 2022 because, due to future market uncertainty driven by the FDA's market denial order ("MDO") for JUUL, the company began to value current revenue more than future revenue. Murphy Reb. ¶¶ 213-19. However, as Dr. Macartney explains:

[T]he timing of JUUL's July 2022 price increase is not consistent with this

---

[15] Because Dr. Macartney evaluated and ruled out alternative explanations, Defendants' cited authority is inapplicable. *See* Mot. at 22 (citing *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1058 (9th Cir. 2003); *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499 (9th Cir. 1994); *Lin v. Solta Med., Inc.*, 2024 WL 5199905, at *7 (N.D. Cal. Dec. 23, 2024)).

hypothesis either ███████████████████████████████ But the FDA issued its MDO to JUUL on June 23, 2022. ███████████████████

Macartney Reply ¶ 19 (footnotes omitted); *see also* Zwerling Reply Decl., Ex. 11 (Augustine Tr. 194:17-20).[16]

Dr. Murphy also points to JLI's declining market share, which he in part attributes to the rise of disposables, as a reason JLI valued current high prices more. Macartney Reply ¶ 19. According to Dr. Murphy, though, JUUL's market share decrease and the rise of disposables significantly predated the July 2022 price increase, by years, and JLI did not adjust its prices. *Id.*

Finally, "Dr. Murphy's arguments that JUUL increased prices because it *wanted* to recover things like increased legal costs, ignores that JUUL *could* increase prices because it had greater market power because of the Transaction with Altria." *Id.* (emphasis in original); *see also* Macartney Tr. at 392:5-14 ("[T]he fact that that was possible to do that optimally supports that they had increased market power to do that. Just because you've got increased legal costs doesn't give you increased market power to do that or change your optimal pricing.").

Defendants also assert that the July 2022 price increase was being discussed well in advance of the ALJ decision, citing to the declaration and testimony of Mr. Augustine and certain of his emails. Mot. at 23. However, Mr. Augustine's declaration and related testimony reveals nothing other than he joined JUUL (from Altria) and started to look at general market information to get himself up to speed on how JUUL might go about price increases.[17] Mr.

---

[16] Further, the MDO was administratively stayed by the FDA on July 5, 2022. Macartney Reply ¶ 19. As Dr. Macartney explains: "In the context of Dr. Murphy's theoretical model, JUUL would have been foregoing potential future revenues by increasing current prices and failing to attract more future customers, even though the MDO may never have been implemented." *Id.* n.81. On July 17, 2025, the FDA granted marketing authorization to JUUL allowing it to remain on the market. Zwerling Reply Decl., Ex. 8 (7/17/25 JLI press release).

[17] Mr. Augustine acknowledges that his declaration was drafted by counsel ("with [his] support"). Zwerling Reply Decl., Ex. 11 (Augustine Tr. 172:2-6). It should be the finder of fact that weighs JLI's (and Mr. Augustine's) self-serving testimony about the price increases.

IPPs' MEM. OF LAW IN OPP'N TO DEFS.' MOT. TO EXCLUDE THE
OVERCHARGE MODELS AND DAMAGES OPINIONS OF DR. GARETH MACARTNEY

Augustine joined JLI on January 18, 2022, having previously worked for Altria prior to the Transaction. Zwerling Reply Decl., Ex. 11 (Augustine Tr. 34:2-18; 43:18-44:8). Moreover, regardless of general, non-concrete discussions of price increases, it is undisputed that nothing was implemented until after the ALJ decision. *See* Macartney Tr. 343:18-344:12 ("Juul spent a long time talking about various strategies. Companies talk about various pricing strategies. They've been talking about it for this period of time, very many different things, a lot of which they didn't do."); *see also id*. 392:15-393:6 ("It is consistent evidence that [JLI] had increased market power, that they could increase their price, and that they waited to do so until after the scrutiny by the FTC. So it doesn't really support, in economic terms, [defendants'] hypothesis.").[18]

None of Defendants' arguments render Dr. Macartney's model implausible or unreliable. "Rule 702 does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage." *Elosu*, 26 F.4th at 1026. "Each of the defendant's countervailing considerations [are] appropriate matters for impeachment, not admissibility." *Id*. at 1025.[19]

---

[18] Defendants' contention that Dr. Macartney's higher overcharge calculations for the second damages period are unreliable because they occurred "further in time" from the JLI-Altria deal (Mot. at 24), ignores that Defendants withheld price increases during the FTC proceeding. Defendants' recycled arguments about the purported absence of a competitive threat from Altria's e-cigarette products (*id*.) are contradicted by substantial record evidence (*see* Section III) and, present a question of fact for the jury.

[19] Defendants' remaining does not warrant a different result. *See Klein v. Meta Platforms, Inc*., 766 F. Supp. 3d 956, 963-64 (N.D. Cal. 2025) (excluding expert opinion that "is without basis," "untethered to real-world evidence" and where expert "did not identify reliable and validated economic literature to support his specific conclusion"); *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig*., 892 F.3d 624, 632-35 (4th Cir. 2018) (excluding expert testimony where, *inter alia,* statistician was making medical determinations, included only supporting test results and omitted unfavorable results, and used "convoluted, and flawed" reasoning to support certain metrics used in his analysis). Defendants also cite *Jarose v. County of Humboldt*, but in that case the court *denied* a motion to exclude expert testimony, rejected arguments that the opinions at issue were speculative and unreliable, and noted that "the rejection of expert testimony is the exception rather than the rule." 2023 WL 2333880, at *7 (N.D. Cal. Mar. 1, 2023) (citation omitted).

IPPs' MEM. OF LAW IN OPP'N TO DEFS.' MOT. TO EXCLUDE THE
OVERCHARGE MODELS AND DAMAGES OPINIONS OF DR. GARETH MACARTNEY

**D.    Defendants' Selective Reliance on Two of Dr. Macartney's Prior Cases Fails to Show that His Opinions Are Unreliable or Inadmissible**

Defendants' attempt to discredit Dr. Macartney by invoking prior decisions in which certain aspects of his testimony were excluded is misplaced and misleading. Mot. at 2-3. The two cases they cite—of the more than 45 cases in which Dr. Macartney has served as an expert witness—are factually and methodologically inapposite.

In *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, the court's primary concern was the selected benchmark, which, due to the particular structure of that market, was found to be "likely the benchmark that is most affected by the anticompetitive conduct, and in a way that is most likely to be favorable to [plaintiff's] damages estimation." 2025 WL 354671, at *15 (S.D.N.Y. Jan. 30, 2025). That case involved a yardstick approach that the court found problematic due to "virtually any yardstick" in that context having inherent issues. *Id.* at *14–15. The court further found that the selection of an inappropriate benchmark was compounded by an arbitrary end date for the damages period. *Id.* at *15.

By contrast, here, Dr. Macartney relies on a benchmark period that predates the challenged conduct—*i.e.*, prior to Altria's investment in JLI—during which there is no dispute that the market was unaffected by the alleged anticompetitive behavior. Defendants do not challenge the benchmark period he selected, nor do they question its relevance to the alleged conduct. Rather, their criticisms focus on the structure of his damages model and his purported failure to consider certain variables or alternative explanations—arguments that even the court in *Keurig* acknowledged go to weight, not admissibility. *See In re Keurig*, 2025 WL 354671, at *11. Moreover, unlike in *Keurig*, Dr. Macartney's selection of a second damages period beginning in July 2022 is supported by contemporaneous record evidence and reflects market dynamics tied to the alleged conduct. *See* Section V.C, *supra*.[20]

In *Miami Prods. & Chem. Co. v. Olin Corp.*, the court had already denied a motion for class certification brought by direct purchasers. 2024 WL 5116568, at *1 (W.D.N.Y. Dec.

_____

[20]  Subsequently, the court granted leave to amend Dr. Macartney's report. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 1802952 (S.D.N.Y. June 30, 2025).

16, 2024). On the heels of that denial, the indirect plaintiffs moved for class certification. *Id*. The court denied the indirect plaintiffs' motion for similar reasons, including the extreme complexity of the caustic soda market and the diversity of contracts pursuant to which caustic soda is sold. *Id*. at *7-8. With respect to Dr. Macartney's opinions, the court held that it "need not resolve Defendants' challenges to the admissibility of Dr. Macartney's opinions, because the Court finds class certification unwarranted even assuming *arguendo* that all of his opinions are admissible" and denied the motion to strike as moot. *Id*. at *5.

The court criticized Dr. Macartney for relying on the same dataset as the direct purchasers' expert, which the court concluded was "compiled from inaccurate, incomplete databases and is by definition also incomplete and inaccurate." *Id*. at *10. The court, thus, held that "a regression model built on an incomplete, inaccurate dataset cannot demonstrate anything by a preponderance of the evidence." *Id*. Here, Defendants lodge no comparable objections to the accuracy or completeness of the data utilized by Dr. Macartney.

Accordingly, neither *Keurig* nor *Miami Prods.* undermines the reliability or admissibility of Dr. Macartney's opinions in this case, and Defendants' selective invocation of these distinguishable decisions only highlights the weakness of their *Daubert* challenge.[21]

## VI.    CONCLUSION

"When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *In re Korean Ramen*, 2017 WL 235052, at *9 (cleaned up). For the foregoing reasons, the Court should deny Defendants' motion and let the jury weigh Dr. Macartney's opinions.

---

[21] To the extent that Dr. Macartney's opinions in unrelated prior cases are relevant, this Court previously denied a motion to exclude his testimony. *See Fujifilm Corp. v. Motorola Mobility LLC*, 182 F. Supp. 3d 1014, 1042 (N.D. Cal. 2016) (Orrick, J.).

IPPs' MEM. OF LAW IN OPP'N TO DEFS.' MOT. TO EXCLUDE THE
OVERCHARGE MODELS AND DAMAGES OPINIONS OF DR. GARETH MACARTNEY

DATED: September 8, 2025

/s/ Robin F. Zwerling
Robin F. Zwerling (*pro hac vice*)
Justin M. Tarshis (*pro hac vice*)
**ZWERLING, SCHACHTER & ZWERLING, LLP**
41 Madison Avenue
New York, NY 10010
Telephone: (212) 223-3900
Email: rzwerling@zsz.com
            jtarshis@zsz.com

*Interim Lead Counsel and Proposed Class Counsel for the Indirect Purchaser Plaintiffs*

Betsy C. Manifold (SBA 182450)
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Email: manifold@whafh.com

Thomas H. Burt (*pro hac vice*)
Kate M. McGuire (*pro hac vice*)
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Email: burt@whafh.com

Fred T. Isquith, Sr. (*pro hac vice*)
**ISQUITH LAW PLLC**
103 East 84th Street
New York, NY 10028
Telephone: (718) 775-6478
Email: isquithlaw@gmail.com

Merle C. Meyers (SBN 66849)
Michele Thompson (SBN 241676)
**MEYERS LAW GROUP, P.C.**
44 Montgomery St. Suite 1010
San Francisco, CA 94104
Telephone: (415) 362-7500
Email: mmeyers@meyerslawgroup.com
            mthompson@meyerslawgroup.com

*Counsel for Indirect Purchaser Plaintiffs*

IPPs' MEM. OF LAW IN OPP'N TO DEFS.' MOT. TO EXCLUDE THE OVERCHARGE MODELS AND DAMAGES OPINIONS OF DR. GARETH MACARTNEY

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2025, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record. I also caused a copy of the under-seal documents to be served via email on all counsel of record.


*/s/ Robin F. Zwerling*

# **EXHIBIT I**

# Exhibit 11
## (FILED UNDER SEAL)

                                                      Page

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

----------------------------X
IN RE: JUUL LABS, INC.         )
ANTITRUST LITIGATION           )   Case No.
                               )
This Document Relates To:      )   3:20-cv-02345-WHO
                               )
ALL ACTIONS                    )
----------------------------X

***HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY***

REMOTE VIDEOTAPED DEPOSITION OF

GREGG GERARD AUGUSTINE

Monday, April 21, 2025; 1:06 p.m. EDT

Reported by:  Cindy L. Sebo, RMR, CRR, CLR, RPR, CCR, CSR, RSA, CA CSR 14409, NJ Certified CR 30XI0024460, NJ Certified RT 30XR00019500, NM CSR 589, NY Realtime Court Reporter, NY Association Certified Reporter, OR CSR 230105, TN CSR 998, TX CSR 12778, WA CSR 23005926, Remote Counsel Reporter, LiveLitigation Authorized Reporter, Notary Public

Job No. 00152117

**Page 34**
Page

BY ATTORNEY KATCHER:

Q.    And I'll represent to you, Mr. Augustine, that this is a document that was produced by JLI in this action.

Does it appear to be an e-mail sent by David Dickey on January 14th, 2022?

A.    Yes, it does.

Q.    And the Subject line is Company News, Commercial Leadership Update.

Do you see that?

A.    Yes.

Q.    Okay.  And I think you had testified earlier that you thought you joined the company either on January 18th or January 20th.

Does this e-mail refresh your recollection that it was January 18th?

A.    Yes, this e-mail does state that my starting date was January the 18th.

Q.    Okay.  Immediately prior to joining JLI, did you work for a company called Koupon?

A.    Yes, I did.

**Page 35**
Page

Q.    What is the business of Koupon?

A.    Koupon was a, basically, Software as a Service provider that enabled brands, as well as retailers, to execute mobile coupons within their retail stores.

Q.    Is Koupon related to any tobacco or nicotine business, to the best of your knowledge?

A.    I'm not sure I fully understand your question.

Q.    Yeah, you've -- we'll get to this more, but you've -- before you worked at Koupon, you worked at Altria, right?

A.    Yes, I did.

Q.    And you currently work for JLI, right?

A.    Yes.

Q.    Was -- and you would say both of those are in the nicotine business, just as a general category.

Is that fair?

ATTORNEY BAMBERGER:  Elana, we --

**Page 36**
Page

we've lost you for a second.

ATTORNEY KATCHER:  Oh.  Shall I repeat my question, or do you -- are you still having problems?

It sounds like we need to go off the record.

Does anyone hear me?

Does anyone hear me?

ATTORNEY BAMBERGER:  Yep, you're back.

THE WITNESS:  We can hear you now.

ATTORNEY KATCHER:  Oh, how odd.  Okay.  I don't know what happened, so, hopefully, that won't repeat.

BY ATTORNEY KATCHER:

Q.    So I -- as I was asking before the mysterious interruption, is it fair to say both JLI and Altria sell products that contain nicotine?

A.    Yes.

Q.    Do you know if Koupon was related

**Page 37**
Page

in any way to a company that sell -- sells nicotine?

A.    Yes.  So I was hired by Koupon to help them stand up a new portion of business in the age-related brand space, so I was helping Koupon establish relationships with alcohol companies, tobacco and other nicotine companies and also CBD companies to essentially use the Koupon platform and products to be able to offer age-restricted coupons within retail loyalty programs or retailer couponing environments.  But all of my work with Koupon was in the age-restricted space --

Q.    Okay.

A.    -- alcohol, tobacco, nicotine, CBD.

Q.    Okay.  And just to clarify -- that was all helpful, but just to clarify my question, do you know whether Koupon itself was related, meaning was it a parent, a subsidiary, an affiliate of a company that sold nicotine-containing products?

A.    I -- I know that Altria was

Q.    Did you do any consulting work for a manufacturer of e-cigarettes, to the best of your recollection?

A.    I don't remember having a specific client that was a manufacturer of e-cigarettes during that period of time.

Q.    So prior to the consulting work, you did -- you worked for Altria, right?

A.    Yes, that's correct.

Q.    And you also worked for Altria back when it was called Philip Morris, right?

A.    That is correct.

Q.    You started in 1996; is that right?

A.    I did.

Q.    Is it fair to say you had sales-related positions throughout your career at Altria?

A.    Yes, that is true.  I had a variety of positions, but I certainly started my career with Philip Morris USA in the sales function. And then I had a variety of other roles, both in sales, in marketing and also in strategy.

Q.    And were your -- was your strategy role in your later years at Altria?

A.    Yes, it was.

Q.    Okay.  Did you have a role in pricing strategy at Altria?

A.    My -- when I was the brand director for the Parliament brand, we were certainly responsible for the pricing and promotion related to that brand.

Q.    And Parliament is a brand of cigarettes, right?

A.    Yes, it is.

Q.    Okay.  Did you ever have any pricing role when you were at Altria in connection to its e-cigarettes, to the best of your recollection?

A.    No, I did not.

Q.    Okay.  So you left Altria in December 2018; is that right?

A.    It's around that time.  I -- I thought it was October of -- of '18, but I think technically -- I think technically, I -- my last

day was in October, but I was still employed with the company through the end of that calendar year.  So I think yes, it would be fair to say that I left there in December of 2018.

Q.    Okay.  So is it -- is it fair to say that you knew you were leaving in October but actually left in December?

A.    Yes.

Q.    Okay.  And why did you leave Altria?

A.    I was -- I was offered a package to leave the company.  I had been offered a -- an opportunity to move back to Richmond, Virginia to the corporate headquarters for the third time in my career.

I have two children.  One of my children was born prematurely.  She was born with some developmental challenges, and we had her in a specialized private school here in Atlanta, and there were no similar-type schools available to me.  And after 23 years, I made a decision that my children were more important

than my career.

And I had some very honest conversations with my supervisor at the time about that.  We had worked through several options or alternatives for me to stay with the company, but -- not to move back to Richmond, but, ultimately, that wasn't an option, and I was offered a package to leave the company.

Q.    I thank you for the candor of explaining that.

And so is it fair to say that your leaving Altria had nothing to do with the transaction between Altria and JL- -- JLI?

A.    That is correct.

Q.    Okay.  It sounds like it was for personal, family reasons.

Is that fair?

A.    Yes, it is.

Q.    Okay.  And were you, in your strategic role, privy to the negotiations between Altria and JLI that led to Altria's investment in JLI?

**Page 162**

at -- I apologize for that delay, and now we can go to Tab 31, which we're marking as PLX-698.

And for the record, if I didn't say it earlier, this is JLI-NDCA-10286513.

(Whereupon, the witness reviews the material provided.)

THE WITNESS:  Okay.

BY ATTORNEY KATCHER:

Q.    Okay.  Is this an e-mail that you received from Mr. Dickey on May 25th, 2022?

A.    Yes.

Q.    Okay.  And did the other recipients on this e-mail include Parker Kasmer, Zane Underwood, Walter Kinsey, Joseph Lunn, Joe Murillo, Tyler Mace and K.C. Crosthwaite?

A.    Yes.

Q.    Okay.  And is the Subject Confidential - U.S. Business Review — Action Items?

A.    Yes.

Q.    Okay.  And do you see that

**Page 163**

Mr. Dickey writes, [as read] All — thanks for the time and the engaging discussion yesterday. The following is my notes on the action items we discussed/agreed to.  Please reply with any additions or clarifications?

Do you see that?

A.    Yes.

Q.    And the engaging discussions yesterday is -- is that a reference, do you know, to the meeting that Mr. Dickey had been trying to set up with you and Mr. Underwood and Mr. Crosthwaite and others?

A.    Yes, it is.

Q.    Okay.  So does this refresh your recollection that that actually took place on or around May 24th, 2022?

A.    Yes.

Q.    Okay.  And do you see in this e-mail -- if you look at -- a little bit down in the text, do you see where it says, Near term?

Yeah.

A.    Yes.

**Page 164**

Q.    And it says -- and the word "▮▮▮▮▮" is right above that.

Do you see that?

A.    Yes.

Q.    Okay.  And do you see that it says, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

Do you see that?

A.    Yes.

Q.    Okay.  And so at -- at this point in time, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

A.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Q.    Okay.  And was this ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

A.    I don't -- I don't recall specifically, but I think, again, David knew

**Page 165**

that this was going to be a conversation that we were having with K.C. and others.  And so, you know, David ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Q.    Okay.

Okay.  You can put this aside.

And let's see.

ATTORNEY KATCHER:  So let's go to Tab 24.

And for the record -- well, first, this is going to be PLX-699, and the exhibit number is JLI-NDCA-10286063.

--oOo--

(PLX Deposition Exhibit Number 699, E-mail, Bates stamped JLI-NDCA-10286063, marked for identification, as of this date.)

--oOo--

(Whereupon, the witness reviews the

through JLI-NDCA-10211159, marked for identification, as of this date.)

--oOo--

ATTORNEY KATCHER:  And for the record, it is JLI-NDCA-10211155.

BY ATTORNEY KATCHER:

Q.    Okay.  And, Mr. Augustine, when you're ready, please let me know if this is JLI's internal announcement of another refill kit price increase.

A.    It is.

Q.    Okay.  And was this one effective on February 23rd, 2023?

A.    Yes.

Q.    Okay.  How many list price increases on refill kits has JLI taken since you joined the company in January 2022?

A.    I'd have to honestly go back and look through my notes.  We've taken at least -- at least three or four.

Q.    Okay.

ATTORNEY KATCHER:  Okay.  So let's pull up Tab 2 and mark it as 702 -- PLX-702.

--oOo--

(PLX Deposition Exhibit Number 702, Declaration of Gregg Augustine, marked for identification, as of this date.)

--oOo--

BY ATTORNEY KATCHER:

Q.    Let me know when you're ready for this.

A.    Okay.

(Whereupon, the witness reviews the material provided.)

THE WITNESS:  Okay.

BY ATTORNEY KATCHER:

Q.    Okay.  Mr. Augustine, you recognize this document, right?

A.    I do.

Q.    Okay.  Did you -- is this a declaration that you e-signed on March 21st,

2025?

A.    Yes.

Q.    Okay.  And who drafted this declaration?

A.    This was a declaration that was drafted by counsel with my support.

Q.    Do you recall when you received a draft of this declaration?

A.    I do not off the top of my head, but it was within probably a couple of weeks of when it was ultimately e-signed.

Q.    And you say it was drafted by counsel with your support.

How many hours did you spend working on this declaration?

A.    I don't know.  It's a good question.  I'd say -- yeah, I honestly don't know.  I'd have to go back and -- I mean, I guess I could refer to my calendar, but I -- I don't -- I don't know.

Q.    And I'm only asking for your best recollection today.  There's no need to look at

your calendar.

Did you -- and also for the purpose of these questions, I'm not asking for the contents of any communications that you had with your counsel.  So if there's some ambiguity about whether you can answer it, just let us know so you can speak with Mr. Bamberger.

But how much time -- how many conversations with counsel did you have about the contents of the declaration Before receiving the draft that you have?

ATTORNEY BAMBERGER:  Elana, I'm going to instruct him not to answer that question.  If you want to ask him if he discussed the substance of the declaration with counsel before receiving a draft, that's fine, but I think the number is -- is privileged.

ATTORNEY KATCHER:  I think it's similar to asking somebody how many times you spoke with your counsel before a deposition, don't you?



Page 194
Page

You have no way of knowing whether this idea that ████████████ ████████████ -- whether the genesis of that was connected in any way with the status of the FTC proceeding, right?

A.    I do not.

Q.    In Paragraph 13, you write, On June 23rd, 2022, the United States Food and Drug Administration (FDA) issued a marketing denial order (MDO) for all JUUL products. ███████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████

It was your view that ███████ ████████████████████████████████ ███████████████, right?

A.    That is true.

ATTORNEY KATCHER:  I have no further questions for you, Mr. Augustine.

Page 195
Page

Thank you very much.  I'll pass you to your counsel, if he has questions of his own.

ATTORNEY BAMBERGER:  Yeah, I'm going to have a few.  Can we take a very short break?

ATTORNEY KATCHER:  Sure.

THE VIDEOGRAPHER:  We're going off the record at 5:48 p.m.  Stand by.

--oOo--

(Whereupon, a recess was taken from 5:48 p.m. EDT to 5:52 p.m. EDT.)

--oOo--

THE VIDEOGRAPHER:  We're back on the record at 5:52 p.m.

--oOo--

EXAMINATION BY COUNSEL FOR JUUL LABS, INC.

--oOo--

BY ATTORNEY BAMBERGER:

Q.    So, Mr. Augustine, I'd like to ask you just a few questions to follow up on the questions that Ms. Katcher asked you.

At the very end of your

Page 196
Page

testimony, she asked you whether you knew what K.C. Crosthwaite considered when he considered approving the price increase that you recommended.

Do you remember that?

A.    Yes.

Q.    Do you have any reason to believe that he was considering the FTC matter in making that -- or giving that approval?

ATTORNEY KATCHER:  Objection: foundation.

THE WITNESS:  No.

BY ATTORNEY BAMBERGER:

Q.    And similarly for Mr. Dickey, do you have any reason to believe that he was considering the FTC matter in approving the price increase in 2022?

ATTORNEY KATCHER:  Objection: foundation.

THE WITNESS:  No.

BY ATTORNEY BAMBERGER:

Q.    Do you have any reason to believe

Page 197
Page

that for either of them, the pendency of the FTC matter was relevant to pricing decisions made before 2022?

ATTORNEY KATCHER:  Objection: foundation.

THE WITNESS:  No.

BY ATTORNEY BAMBERGER:

Q.    We've looked at -- earlier an exhibit that was marked as Exhibit 697.

ATTORNEY BAMBERGER:  If we can pull that back up.  It's the May 21st, 2022 e-mail with an attached slide deck, or the May 24th, 2022 business review meeting.

BY ATTORNEY BAMBERGER:

Q.    Do you have that document?

A.    Yes.

Q.    Okay.  If you look at Page 2 of that document, there's an Exclusive Summary. Under a heading that says ██████████, there's a note that the ██████████████████ ████████████████████████████████ ████████████████████████████████

# EXHIBIT J

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan (admitted *pro hac vice*)
*rkaplan@kaplanfox.com*
Elana Katcher (admitted *pro hac vice*)
*ekatcher@kaplanfox.com*
800 Third Avenue, 38th Floor
New York, New York 10022
Telephone: (212) 687-1980

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206423)
*lking@kaplanfox.com*
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: (415) 772-4700

*Steering Committee Counsel for Indirect
Purchaser Plaintiffs and the Indirect
Reseller Plaintiffs and Counsel for Plaintiffs
Sofijon, Inc., Rose And Fifth, Inc., and
Napht, Inc.*

**CERA LLP**
Solomon B. Cera (SBN 099467)
*scera@cerallp.com*
50 California St., Suite 1500
San Francisco, CA 94111
Telephone: (415) 777-2230

C. Andrew Dirksen (SBN 197378)
cdirksen@cerallp.com
529 Main St., Suite P200
Boston, MA 02129
Telephone: (857) 453-6555

*Counsel for the Indirect Reseller Plaintiffs
and Steering Committee Counsel for Indirect
Purchaser Plaintiffs and the Indirect Reseller
Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE JUUL LABS, INC. ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>**All Indirect Reseller Plaintiff Actions** | Master File No. 3:20-cv-02345-WHO<br><br>**REPLY IN SUPPORT OF INDIRECT RESELLER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>JUDGE: William H. Orrick<br>DATE: October 10, 2025<br>Time: 2:00 p.m.<br>CTRM: 2, 17th Floor |

## <u>HIGHLY CONFIDENTIAL</u>

### PROVISIONALLY FILED UNDER SEAL

**TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................... iii

I.    INTRODUCTION ..................................................................................................... 1

II.   THE COURT SHOULD CERTIFY THE PROPOSED CLASSES ........................... 2

    A.    IRPs Have Provided Reliable Common Proof of Classwide Injury .......... 2

        1.    Dr. Leffler's Regression Model Accounts For All Major Variables .............. 3

        2.    The Second Damages Period Has A Reliable Factual Basis ......................... 5

    B.    IRPs Have Presented Classwide Proof of Pass-Through ........................... 6

III.  THE COURT SHOULD CERTIFY THE MULTISTATE CARTWRIGHT ACT
      CLASS ..................................................................................................................... 10

    A.    Altria's Contacts with California Satisfy Due Process ............................. 10

    B.    The Cartwright Act Can Be Applied Extraterritorially Based on California's
        Significant Contacts with IRPs' Claims ................................................... 12

    C.    California's Governmental Interest Analysis Favors Plaintiffs' Multistate
        Cartwright Act Class. ............................................................................... 14

        1.    Variances that are not material do not give rise to true conflicts. ............... 16

            a.    The *AGC* factors do not effect standing in this case. ....................... 16

            b.    Pre-suit notice rules are preempted. ................................................ 17

            c.    Class action bars are preempted. ..................................................... 17

            d.    No conflict arises from consumer protection statutes
                interpreted in harmony with federal antitrust laws. .......................... 18

        2.    State interests underlying remedial provisions are not impaired by
            application of the Cartwright Act. ................................................................. 18

            a.    There are no true conflicts in approaches to duplicative
                recovery. ........................................................................................... 18

            b.    Minimum damages provisions incentivize the enforcement of
                 antitrust claims, an interest otherwise accommodated by the
                application of California law here. ..................................................... 20

i

c.      Missouri's interest in punitive damages is accommodated by the Cartwright Act's provision of treble damages. ...........................20

d.      Defendants have identified no material difference or true conflict among states allowing multiple damages awards. ...............20

e.      Comparative impairment analysis allows the Cartwright Act to apply to claims arising from purchases made in repealer states that do not award multiple or punitive damages. ...............................22

IV.    COMMON PROOF SUPPORTS THE IRPS' PROPOSED CLASS PERIOD ...................25

V.     CONCLUSION .................................................................................................................25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Arthur v. Microsoft Corp.*,
676 N.W.2d 29 (Neb. 2004)............................................................................................24

*Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*,
459 U.S. 519 (1983) .......................................................................................................16

*AT&T Mobility LLC v. AU Optronics Corp.*,
707 F.3d 1106 (9th Cir. 2013)............................................................................. 10, 12, 13

*Bernhard v. Harrah's Club*,
16 Cal. 3d 313 (1976) ............................................................................................... 15, 22

*Bunker's Glass Co. v. Pilkington PLC*,
206 Ariz. 9 (2003) ..........................................................................................................24

*California v. ARC Am. Corp.*,
490 U.S. 93 (1989) ..........................................................................................................19

*California v. Infineon Technologies AG*,
2008 WL 4155665 (N.D. Cal. Sept. 5, 2008) ............................................................... 8, 9

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
89 F.4th 1226 (9th Cir. 2024) .................................................................................. 15, 22

*Chiulli v. Liberty Mut. Ins., Inc.*,
146 N.E.3d 471 (Mass. App. 2020)..................................................................................21

*Cianci v. Superior Ct.*,
40 Cal. 3d 903 (1985)......................................................................................................14

*Clayworth v. Pfizer, Inc.*,
49 Cal. 4th 758 (2010) .............................................................................................. 19, 24

*Collazo v. Wen by Chaz Dean, Inc.*,
2015 WL 4398559 (C.D. Cal. July 17, 2015) ...................................................................13

*Comes v. Microsoft Corp.*,
646 N.W.2d 440 (Iowa 2002) ................................................................................... 23, 24

*Crown Oil Corp. v. Superior Ct.*,
177 Cal. App. 3d 604 (1986)...........................................................................................19

*Diamond Multimedia Sys., Inc. v. Superior Court*,
19 Cal. 4th 1036 (1999).................................................................................................13

iii

*F.T.C. v. Cement Inst.,*
  333 U.S. 683 (1948) ..........................................................................................................18

*Fernandez v. CoreLogic Credco, LLC*,
  593 F.Supp.3d 974 (S.D. Cal. 2022) .................................................................................12

*Fish v. 3M Co.*,
  2014 WL 12966934 (C.D. Cal. Dec. 1, 2014) ...................................................................21

*Freeman Indus., LLC v. Eastman Chem. Co.*,
  172 S.W.3d 512 (Tenn. 2005) ...........................................................................................24

*Haley Nursery Co. v. Forrest*,
  381 S.E.2d 906 (1989) .......................................................................................................21

*Hanover Shoe v. United Shoe Mach.*,
  392 U.S. 481 (1968) ...........................................................................................................24

*Hawaii v. Standard Oil Co. of Cal.*,
  405 U.S. 251 (1972) ...........................................................................................................21

*Humana Inc. v. Bausch Health Companies Inc.*,
  2023 WL 4552005 (Cal. Super. July 05, 2023) .................................................................19

*Hurtado v. Superior Ct.*,
  11 Cal. 3d 574 (1974) ........................................................................................................23

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977) ................................................................................................. 1, 16, 23

*In re Aftermarket Filters Antitrust Litig.*,
  2009 WL 3754041 (N.D. Ill. Nov. 5, 2009) ............................................................... 16, 17

*In re Capacitors Antitrust Litig.*,
  106 F.Supp.3d 1051 (N.D. Cal. 2015)................................................................................11

*In re Capacitors Antitrust Litig.*,
  2020 WL 6462393 (N.D. Cal. Nov. 3, 2020) ....................................................................14

*In re Crop Prot. Prods. Loyalty Program Antitrust Litig.*,
  2025 WL 315835 (M.D.N.C. Jan. 28, 2025) .....................................................................17

*In re Disk Drive Suspension Assemblies Antitrust Litig.*,
  2025 WL 71988 (N.D. Cal. Jan. 10, 2025) ................................................................. 6, 7, 9

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  516 F.Supp.2d 1072 (N.D. Cal. 2007)................................................................................16

*In re Generic Pharms. Pricing Antitrust Litig.*,
  368 F.Supp.3d 814 (E.D. Pa. 2019)....................................................................................17

iv

*In re Graphics Processing Units Antitrust Litig.* (GPU I),
  527 F.Supp.2d 1011 (N.D. Cal. 2007) ................................................................................. 11, 12

*In re Graphics Processing Units Antitrust Litig.* (GPU II),
  253 F.R.D. 478 (N.D. Cal. 2008) .................................................................................................. 8

*In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*,
  2021 WL 4306018 (N.D. Cal. Sept. 22, 2021) .......................................................................... 18

*In re HIV Antitrust Litig.*,
  2023 WL 3011624 (N.D. Cal. Apr. 18, 2023) ........................................................................... 20

*In re HIV Antitrust Litig.*,
  2022 WL 22609107 (N.D. Cal. Sept. 27, 2022) .................................................................. 14, 22

*In re Hyundai & Kia Fuel Econ. Litig.*,
  926 F.3d 539 (9th Cir. 2019)...................................................................................................... 15

*In re Korean Ramen Antitrust Litig.*,
  2017 WL 235052 (N.D. Cal. Jan. 19, 2017) .......................................................................... 3, 12

*In re Lithium Ion Batteries Antitrust Litig.*,
  2014 WL 4955377 (N.D. Cal. Oct. 2, 2014).............................................................................. 17

*In re Moon*,
  1997 WL 34625685 (Bankr. E.D.Va. Dec. 17, 1997) ............................................................... 20

*In re Myford Touch Consumer Litig.*,
  2016 WL 7734558 (N.D. Cal. Sept. 14, 2016) .......................................................................... 18

*In re Optical Disk Drive Antitrust Litig.*,
  303 F.R.D. 311 (N.D. Cal. 2014) ................................................................................................. 9

*In re Optical Disk Drive Antitrust Litig.*,
  2016 WL 467444 (N.D. Cal. Feb. 8, 2016) ............................................................................... 12

*In re Optical Disk Drive Antitrust Litig.*,
  2012 WL 1366718 (N.D. Cal. Apr. 19, 2012) ........................................................................... 18

*In re OSB Antitrust Litig.*,
  2007 WL 2253425 (E.D. Pa. Aug. 3, 2007) ................................................................................ 9

*In re Packaged Seafood Prods. Antitrust Litig.*,
  332 F.R.D. 308 (S.D. Cal. 2019)................................................................................................. 12

*In re Processed Egg Prods. Antitrust Litig.*,
  312 F.R.D. 124 (E.D. Pa. 2015) ................................................................................................... 9

*In re Relafen Antitrust Litig.*,
  221 F.R.D. 260 (D. Mass. 2004) ................................................................................................. 12

v

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
  355 F.Supp.3d 145 (E.D.N.Y. 2018) ........................................................................... 17

*Jackson v. Tesla, Inc.*,
  772 F.Supp.3d 1111 (N.D. Cal. 2025) ......................................................................... 23

*Jones v. Micron Tech. Inc.*,
  400 F.Supp.3d 897 (N.D. Cal. 2019) ........................................................................... 17

*Kee v. Shelter Ins.*,
  852 S.W.2d 226 (Tenn. 1993) ..................................................................................... 18

*Leardi v. Brown*,
  474 N.E.2d 1094 (1985) ............................................................................................. 20

*Live Concert Antitrust Litig.*,
  863 F.Supp.2d 966 (C.D. Cal. 2012) ............................................................................. 5

*Lorix v. Crompton Corp.*,
  736 N.W.2d 619 (Minn. 2007) .................................................................................... 24

*Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co.*,
  2015 WL 4755335 (N.D. Cal. Aug. 11, 2015) ............................................................ 18

*Martin v. Pierce Cnty.*,
  34 F.4th 1125 (9th Cir. 2022) ..................................................................................... 17

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ...................................................................................... 15

*McCann v. Foster Wheeler LLC*,
  48 Cal. 4th 68 (2010) ................................................................................................. 23

*Munguia v. Bekins Van Lines, LLC*,
  2012 WL 5198480 (E.D. Cal. Oct. 19, 2012) .............................................................. 23

*Offshore Rental Co. v. Cont'l Oil Co.*,
  22 Cal. 3d 157 (1978) ................................................................................................ 23

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) ............................................................................... 2, 3, 7

*Opperman v. Path, Inc.*,
  87 F.Supp.3d 1018 (N.D. Cal. 2014) .......................................................................... 14

*Parks v. Eastwood Ins. Servs., Inc.*,
  2002 WL 34370244 (C.D. Cal. July 29, 2002) ............................................................ 13

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985) ............................................................................................ 10, 11

*Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010) ................................................................................ 17, 18, 20

*Soetaert v. Novani Flips*, LLC,
    631 S.W.3d 580 (Mo. Ct. App. 2021) .............................................................. 21

*Sperry v. Crompton Corp.*,
    8 N.Y.3d 204, 863 N.E.2d 1012 (N.Y. 2007) .................................................. 20

*Stromberg v. Qualcomm Inc.*,
    14 F.4th 1059 (9th Cir. 2019) ........................................................... 14, 18, 22

*Sullivan v. Oracle Corp.*,
    51 Cal. 4th 1191 (2011) .................................................................................. 13

*Teradata Corp. v. SAP SE*,
    124 F.4th 555 (9th Cir. 2024) ........................................................................ 25

*Tidwell v. Thor Indus., Inc.*,
    2007 WL 8083631 (S.D. Cal. Mar. 26, 2007) ................................................ 11

*W. Waste Serv. Sys.*, *Inc. v. Superior Ct. In & For Maricopa Cnty.*,
    120 Ariz. 90, 584 P.2d 554 (1978) ................................................................. 21

*Washington Mut. Bank, FA v. Superior Ct.*,
    24 Cal. 4th 906 (2001) ................................................................................... 15

*Whitley v. Baptist Health*,
    2020 WL 4575991 (E.D. Ark. Aug. 7, 2020) .................................................. 18

*Wilson v. Wavestream, Corp.*,
    2024 WL 3914475 (C.D. Cal. May 13, 2024) ................................................. 13

*Zanakis-Pico v. Cutter Dodge, Inc.*,
    98 Haw. 309, 47 P.3d 1222 (2002)................................................................. 20

**Statutes**

N.Y. Gen. Bus. Law § 340(5) ............................................................................. 20

Utah Code Ann. § 76-10-3109(1)-(2) (2019) .................................................... 20

**Rules**

Fed. R. Civ. P. 23 ................................................................................2, 17, 18, 20

N.Y. C.P.L.R. § 901(b)........................................................................................ 20

## I.    INTRODUCTION

Four basic facts support the certification of the proposed Indirect Reseller Plaintiff ("IRP") classes and the rejection of defendants' opposition. First, it is easier to raise prices in a closed market with only one significant competitor (R.J. Reynold's Vuse) than it is to raise prices in a market with more than one significant competitor and low entry barriers. Second, it is easier to raise prices after a trial by an antitrust regulator has concluded than while its investigation and enforcement action is pending. Third, it is easier for indirect purchasers without direct relationships with Altria and Juul Labs, Inc. ("JLI") to serve as class representatives than it is for a large, direct wholesaler that fears retaliation. Fourth, because indirect purchaser claims are smaller than direct purchaser claims, allowing indirect claims to be linked together in a large class action serves the underlying deterrence goals of *Illinois Brick* repealer states more effectively than individual actions or small, state-specific class claims.

Defendants do not challenge numerosity, typicality, commonality, superiority, or adequacy. They contest predominance, the scope of the Multistate Cartwright Class, and the appropriate end-point for IRPs' damages calculation. Defendants' arguments should be rejected. Dr. Leffler's regression model accounted for all major variables and his analyses give proper weight to the changing e-cigarette landscape, including the effect of the ban on flavored products and the resulting shift of some demand into an unauthorized market. Dr. Leffler finds that removing one of the largest viable threats to JLI from an effectively closed authorized market had long-term upwards effects on pod prices. Unsurprisingly, large wholesalers and distributors that purchase directly from JLI passed on their overcharges to the small businesses who sell JLI pods in convenience stores and other shops. Also unsurprisingly, Dr. Leffler finds that these small businesses, which lack the same bargaining power and efficiency, have been unable to pass all of those overcharges on to their own

customers. Dr. Leffler reliably estimates the rate of pass-through of overcharges down the chain of distribution.

Perhaps acknowledging that IRPs are ideally suited to serve as plaintiffs in an antitrust case in which no wholesaler or distributor has stepped forward, defendants rely heavily on a choice-of-law argument in an effort to eliminate the proposed Multistate Cartwright Act Class. However, California law choice-of-law rules call for forum law to be applied where a defendant fails to show a variation in law that gives rise to a true conflict or where a state interest analysis favors it. Here, all 31-repealer states have a shared interest in the effective enforcement of antitrust law by indirect purchasers, and defendants have failed to point to any variation of law that overcomes that interest. The IRPs' motion for class certification should be granted.

## II.     THE COURT SHOULD CERTIFY THE PROPOSED CLASSES

### A.     IRPs Have Provided Reliable Common Proof of Classwide Injury

Defendants contend that Dr. Leffler's regression model is unreliable and thus incapable of providing common proof of classwide injury because the model "fail[s] to account for 'major variables' necessary to accurately calculate any alleged overcharge," and because it calculates overcharges without a "reliable factual basis" within "a second damage period beginning on July 1, 2022," by "linking JUUL price increases starting in 2022 to the alleged anticompetitive [Altria-JLI Transaction]" three-and-a-half years earlier. *See* Opp. Br. at pp. 6-8. Defendants' arguments are legally and factually unfounded.

In order to determine if Rule 23(b)(3)'s predominance requirement is satisfied and to "resolv[e] whether the evidence establishes that [the] common question[s]" of injury and damages from allegedly anti-competitive conduct are "*capable* of class-wide resolution," courts may engage in "[w]eighing conflicting expert testimony" and "'[r]esolving expert disputes,' . . . where necessary to ensure that Rule 23(b)(3)'s requirements are met and the 'common, aggregation-enabling' issue[s] predominate[ ] over individual issues." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 666-67 (9th Cir. 2022) (internal quotation marks and citations omitted). In other words, in resolving expert disputes "where necessary to ensure that" common

questions of classwide injury and damages will predominate over individual issues, courts should "not [determine] whether the [expert] evidence in fact establishes that plaintiffs would win at trial." *Olean*, 31 F.4th at 666-67; *cf. In re Korean Ramen Antitrust Litig.*, 2017 WL 235052, at *2, *13 (N.D. Cal. Jan. 19, 2017) (Orrick, J.) ("[I]t is not [the court's] job to choose which side's experts appear strongest, at least at this stage.").

### 1.    Dr. Leffler's Regression Model Accounts For All Major Variables

According to Defendants, Dr. Leffler's regression model did not account for "two significant factors" affecting JLI's pricing in the years following Altria's enormous investment in JLI, namely, "JLI's loss of share to competitors (such as pods like Vuse Alto and flavored disposables)," and "JLI's deteriorated financial position," and that Dr. Leffler never "conducted any sensitivity testing to measure [the] effects on JLI's pricing" of these factors. Opp. Br. at 7. These contentions are demonstrably false. In fact, in specifying the model, Dr. Leffler considered whether these factors—and many others—had an effect on JLI's pricing in the evolving competitive environment in the years following the anti-competitive Altria-JLI agreement.[1] His model accounts for competitive conditions and evolving market structure, including Juul's loss of share to products like Vuse Alto and unauthorized flavored disposables, through direct controls and robust sensitivity analysis, as discussed in his report. *See gen.* Ex. 1, Leffler Rpt., ¶¶ 20-23, ¶¶ 37–38, 62–64.[2] For example, Dr. Leffler's model includes controls for input cost changes, demand shocks and seasonality, and the broader business environment that negatively impacted JLI's financial condition, such as the use of (combustible, traditional) cigarettes as a substitute for e-cigarette products, and even the dramatically increased public attention to the health risks of e-cigarettes by

---

[1] IRPs' opposition to defendants' *Daubert* motion (incorporated by reference) explains in greater detail why Dr. Leffler's regression model and the supporting economic analyses and data considered in specifying the model and estimating overcharges, taken together, are capable of resolving the common questions of classwide injury, proof of past-through of an overcharge, and overcharges to the IRPs. *See* IRPs' Mem/ of Law in Opp. to Defendants' Motion to Exclude the Overcharge Models and Damages Opinions of IRPs' Expert, Dr. Keith Leffler, submitted contemporaneously with this Reply.

[2] Exhibits 1-96 are to the previously filed Declaration of Elana Katcher, dated June 20, 2025. Exhibits 97-110 are to the Reply Declaration of Elana Katcher, dated September 8, 2025.

-3-

using a Google Trends proxy. *See, e.g.*, Ex. 1, ¶¶ 63–74. Dr. Leffler even graphically illustrates Juul's declining market share over the relevant period in a chart, a decline that obviously impacted JLI's finances and is central evidence for his regression model's specification. *See* Ex. 1, ¶ 62, Chart 11.

Indeed, the fact that Dr. Leffler's model uses JLI's transaction data, pricing, and cost data (among other data) to estimate overcharges over two separate damages periods in light of the evidentiary record, spanning the entire period through the end of JLI's data in March 2024, necessarily means that the model accounts for the rise of competing pod products, which JLI factored into their pricing decisions, and the rapid growth of unauthorized flavored disposables (*i.e.*, "JLI's loss of share to competitors"), but also "JLI's deteriorated financial position" (also factored by JLI into its pricing decisions) resulting from the share loss. Opp. Br. at 7. Dr. Leffler addresses this evolving competitive landscape in detail, including the timing and impact of the market entry and growth of competing products, and also explains why, using market share data, authorized pod-based products—not illegally imported flavored disposables—is the proper focus for the but-for competitive benchmark until disposables become relevant much later in time. Ex. 1, ¶¶ 37-38 and the accompanying table.

In his Reply Report, Dr. Leffler directly responds to defendants' and Dr. Murphy's critiques by undertaking both robustness and sensitivity checks, *e.g.*, by incorporating moving averages for demand; expanding cost controls to include tariffs and freight; and testing the segmenting of the damage periods to ensure the regression results are robust to different model choices. *See* Ex. 97, Leffler Reply at ¶¶ 12-35. Because these stress tests do not undermine the regression model's overcharge results and their statistical significance, Dr. Leffler found the model's quantitative findings to be reliable over the relevant period, even as Juul lost share to an evolving set of other products. *Id.*, ¶¶ 15, 17, 21, 23-31, 35; *see also* Ex. 98, Leffler Dep. Tr. at 46:10-48:25 (Dr. Leffler re-estimated overcharge using new costs, even though he did not agree it was necessary); 192:5-10 (estimated overcharge co-efficient accurate despite Dr. Murphy's criticism); 272:24-273:9 (pass-on

-4-

overcharge quantification valid).[3]

**2.    The Second Damages Period Has A Reliable Factual Basis**

Defendants argue that Dr. Leffler's model "lack[s] a reliable factual basis" with respect to its second damages period beginning on July 1, 2022, because "JUUL price increases starting in [July] 2022" that occurred through 2024 are "link[ed] . . . to the alleged anticompetitive conduct . . . [*i.e.*,] to Altria's investment in JUUL three-and-a-half years prior." Opp. Br. at 7. Defendants contend that the "only support for this theory is a single email sent in February 2022, eight days after the FTC Administrative Law Judge ["ALJ"] issued his initial decision rejecting the claims," an "email [that] does not even mention the FTC trial, let alone link any price increase to Defendants' victory [before the FTC]." Opp. Br. at 8. This is both false and misleading. It is false because there is considerable economic evidence discussed by Dr. Leffler that the second damages period beginning in July 2022, when JLI announced its first price increase since before the Altria-JLI transaction, could be linked to that transaction years earlier. *See gen*. Ex. 1, ¶¶ 56-63. In the period between the transaction and July 2022, JLI held its prices steady despite a collapse in demand, cost reduction, and significant competition, as shown in Dr. Leffler's price and margin charts. *Id.*, Charts 10A, 10B, and 11. In other words, even when JLI faced significant challenges affecting its bottom line, it did not respond with notable price hikes or discount reversals. After the FTC's ALJ's decision in February 2022, however, with this regulatory constraint relaxed, JLI finally could exploit its market power in light of Altria's sustained absence from the market and the resulting reduction in competition, and successfully impose significant price increases. *See* Ex. 1, ¶¶ 9, 61-63; Chart 10. This is also why Defendants are wrong that it is "nonsensical" that "the alleged overcharge *increased* the more JLI lost market share and the further [the passage of] time from the Altria-JLI deal." Opp. Br. at 8 (emphasis in original).

---

[3] Defendants' reliance on *Live Concert Antitrust Litig.*, 863 F.Supp.2d 966, 973 (C.D. Cal. 2012), is inapposite. Opp. Br. at 6-7. There, quite unlike here, in a damages model, the expert failed to include or even consider the impact of a major explanatory variable (an artist's popularity) on the dependent variable (the ticket price), an explanatory variable that the expert conceded effected ticket prices, yet his "check" on that variable was "glaring[ly] flaw[ed]" and "a simple tautology" that he even conceded at deposition was "meaningless." *Live Concert*, 863 F.Supp.2d at 975-76.

-5-

Defendants' contention that the "only support for [the] theory" behind a second damages period "is a single email sent in February 2022 . . . [that] does not . . . mention the FTC trial" is misleading because, in fact, this record is an email thread with the subject ████████████ ██████" in which a ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████" Ex. 63 (emphasis added); Ex. 1, ¶ 60. Given the timing and context of this email exchange among high-level JLI employees, it is for the trier of fact to decide whether the price increases beginning in July 2022, the first increases after the ALJ's initial decision, are "link[ed]" to the anti-competitive Altria-JLI transaction three-and-a-half years earlier. *Id.*, ¶¶ 60-63 and Chart 11.

**B.     IRPs Have Presented Classwide Proof of Pass-Through**

Defendants contend that Dr. Leffler's model is incapable of serving as common proof that IRPs paid, and did not pass on, part of the overcharge from the defendants' anti-competitive agreement. Defendants assert that the model does not account for the evidence indicating "that the extent to which any overcharge would have been passed down the distribution chain varies significantly by retailer," and therefore, individualized questions about the amount of the overcharge passed-on or passed-through the wholesaler direct purchasers to each member of the proposed class of IRPs that they in turn did not themselves pass-on to their customers, *i.e.*, each reseller's individual damages, will predominate over the common question of whether all or nearly all IRPs paid an overcharge at all. Opp. Br. at 9-12. This contention is inaccurate as a matter of law and fact.

Recently, a court in this district considered and rejected this argument and certified a class of indirect reseller plaintiffs whose expert's regression model and requisite economic analyses were attacked by defendants, like Dr. Leffler's here, as "flawed" because the regression "should have used different or additional variables" and failed to account for variability in "pass-through rates," making the regression incapable of showing that "impact was common to the" putative class. *See In re Disk Drive Suspension Assemblies Antitrust Litig.*, 2025 WL 71988, *6, *15-17 (N.D. Cal. Jan.

10, 2025) (following other courts in holding, among other things, that "any dispute regarding whether an overcharge was passed on from one class member to another does not pertain to the determination of issues central to the litigation, namely, liability and the aggregate amount of damages," and that not only have "numerous courts" approved the use of "averaged and aggregated data" in a regression model to measure impact, but also the Ninth Circuit held in *Olean*, 31 F.4th at 683, that the "results of [the] regression model [are] 'capable of showing class-wide impact' where [the] model 'assum[ed] that all [resellers] paid a common overcharge and that the same overcharge was passed through to the individual [resellers]'") (Chesney, J.). In *Disk Drive*, the court wrote:

> As the Ninth Circuit has explained, in response to a challenge to an expert's use of averages to calculate whether an overcharge was passed through to retailers . . . a district court 'is not free to prefer its own views about the economics of the [relevant] market over the statistical evidence submitted by the plaintiffs.' *See Olean*, 31 F.4th at 678. Moreover, although 'individualized differences among the overcharges imposed on each [reseller] may require a court to determine damages on an individualized basis, ... such a task would not undermine the regression model's ability to provide evidence of common impact.' *See id.* at 679.

*Disk Drive*, 2025 WL 71988 at *15. This is the situation here, and defendants' arguments against the efficacy of Dr. Leffler's model should be rejected. His model does not assume every reseller and putative class member experiences identical pass-on, but rather computes the aggregate relationship between wholesale and retail price changes across a nationwide data set. Ex. 97, ¶ 48. Dr. Leffler's regression model and pass-through analyses used JLI's wholesale transaction data and IRI (also known as Circana) retail scanner data to show that:

- more than 96% of resellers (retailers) experienced a wholesale price increase after JLI began increasing prices, and that virtually all class members had at least one purchase with supracompetitive pricing;

- the primary regression showed a pass-through rate of 73% by resellers, which is the proportion of the overcharge that members of the putative IRP class of resellers passed-through to their customers;

- leaving 27% of the overcharge as the net overcharge or harm to the putative class of indirect resellers.

-7-

*See* Ex. 97, ¶¶ 47-49; Ex. 1, ¶¶ 73-74 and Table 7. Said differently, for every $1 of overcharge at the wholesale direct purchaser level, about $0.73 was passed-through and reflected as higher retail prices to consumers, and about $0.27 stuck with the reseller, representing direct harm to the putative indirect reseller class. *Id.*

Dr. Leffler also performed additional economic work to empirically verify the full-wholesaler pass-on rate (100% to the IRPs) assumption using transaction-level data from the two largest wholesalers, Core-Mark and McLane, which together account for about 39% of purchases by resellers from all wholesalers. Ex. 97, ¶¶ 47-49. The regression in that distribution channel showed a pass-on rate greater than 100%, affirming that this observed pass-through path substantiates the assumption used in the damages model that the wholesale direct purchaser channel, overall, fully passed-on overcharges to their retailer or reseller customers. *Id.* and nn. 88-89. In other words, using JLI and retailer data, Dr. Leffler's model is common proof capable of showing classwide injury and estimating damages, because it shows that statistically on average the direct purchaser wholesalers not only were overcharged in purchasing Juul pods, that overcharge was passed-through them to their customers, members of the putative IRP class, who in turn passed-on about 73% of those overcharges to their own customers. *Id.*, ¶¶ 47-49; Ex. 1, ¶¶ 73-74 and Table 3.

Defendants rely on *In re Graphics Processing Units Antitrust Litig.* (*GPU II*), 253 F.R.D. 478, 491–92 (N.D. Cal. 2008), *California v. Infineon Technologies AG*, 2008 WL 4155665 (N.D. Cal. Sept. 5, 2008), to contend that, given the "variability in passthrough rates" and "layers of reselling," there will be "individualized inquiries on passthrough" of resellers at trial that will predominate over the jury's answers to the common questions of classwide injury or impact and damages. Opp. Br. at 9-12. As demonstrated above, those "inquiries" will not predominate here and the cases defendants cite are distinguishable. In *GPU II*, the court refused to credit an expert's correlation and regression models as being "plausibly reliable" and capable of proving classwide injury or impact where the plaintiffs had failed to obtain through discovery "the data to formulate their regression analyses with more precision" (unlike here); where the market involved a "strong diversity of products and purchasers," where the plaintiffs' expert's model used average prices paid

by consumers (not retail scanner data as Dr. Leffler uses here); where the expert's report also did not explain how "specific product pricing was correlated across buyers or whether prices paid for multiple products by particular direct purchasers were correlated;" and where "data points [were] lumped together and averaged before the analysis, [compromising] the ability to tease meaningful relationships out of the data." 253 F.R.D. at 491–95, 504-506 (emphasis added). *See also Disk Drive*, 2025 WL 71988 at \*16 (distinguishing *Infineon*, 2008 WL 4155665, at \*9, because the plaintiffs there "failed to come forward with a sufficiently plausible methodology" capable of constituting common proof showing that common questions regarding impact would predominate).

Similarly, *In re Processed Egg Prods. Antitrust Litig.*, the court held that "common issues do not predominate as to antitrust impact" where, unlike here, "[p]laintiffs' evidence of common impact on the retailers suffers from a number of flaws of varying degrees, including the failure to isolate the effects of the conspiracy . . . and most critically, the model does not show that common evidence can prove antitrust impact at the level of the indirect purchasers—*i.e.*, that retail customers were the ones paying the premium resulting from the conspiracy." 312 F.R.D. 124, 160 (E.D. Pa. 2015). In *In re Optical Disk Drive Antitrust Litig.*, the court held that the indirect plaintiffs' "methodology of common proof" was incapable of showing that "antitrust *injury* (or 'impact') and resulting damages can be shown on a class-wide basis" because although the expert's "correlation analysis" (not conducted by Dr. Leffler here) showed "a relatively high correlation between prices across customers and across different types of ODDs," correlation could not "serve as common proof of class-wide impact, particularly in light of defendants' evidence that such correlations would exist in any event in the steadily declining prices that befell the ODD industry during the relevant period." 303 F.R.D. 311, 323-24 (N.D. Cal. 2014). *See also In re OSB Antitrust Litig.*, 2007 WL 2253425, at \*11 (E.D. Pa. Aug. 3, 2007) (finding that expert's "opinion regarding pass-through for home buyers has little probative value because he [did] not conduct[ ] any analysis of the 'real economic world.'").

-9-

## III.    THE COURT SHOULD CERTIFY THE MULTISTATE CARTWRIGHT ACT CLASS[4]

### A.    Altria's Contacts with California Satisfy Due Process

Due process requires only that the forum have a "significant contact or aggregation of contacts" to the claims. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-22 (1985); *see also AT&T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106, 1113 (9th Cir. 2013) ("[A]nticompetitive conduct by a defendant within a state that is related to a plaintiff's alleged injuries and is not 'slight and casual' establishes a 'significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair.'") (citations and footnote omitted). That standard is easily satisfied with respect to the claims against Altria.

This case concerns anticompetitive agreements entered in connection with Altria's pursuit of JLI, a California-headquartered company. Altria invested $12.8 billion dollars for a 35% ownership stake with a path to full ownership.[5] It joined JLI's board.[6] It abandoned its own competing e-cigarette business and agreed to participate in the e-cigarette market exclusively through JLI.[7] It agreed to assist with JLI's efforts in expanding distribution of JLI products nationwide.[8] It agreed to assist with JLI's regulatory efforts to secure FDA authorization.[9] Altria's sole purpose in joining forces with JLI was to share in the supra-competitive profits earned by a California company.

Altria does not deny there were meetings in California between the two companies concerning the agreement. One of those meetings, on August 18, 2018, involved significant discussions regarding the treatment of Altria's competing e-cigarette products and the scope of the

---

[4] Section III of this reply brief, along with its accompanying exhibits, is substantially similar to the equivalent section in the IPP reply brief.
[5] Ex. 100, PX2141 at 006-07.
[6] Ex. 101, PX2010 at 007.
[7] Ex. 102, Valani IH Tr. at 63:4-64:4 (testifying that Altria realized "probably pretty early on" in negotiations that it must agree to participate in e-cigarettes exclusively through JLI).
[8] Ex. 101, PX2010 at 007.
[9] Ex. 101, PX2010 at 007.

-10-

non-compete agreement. Indeed, Altria's outline for the August 18 meeting indicates that at that meeting, Altria told JLI that it agreed in substance to JLI's demand that it exit the e-cigarette market and enter a non-compete, but that its decision to remove language used by JLI in the term sheet was "driven by antitrust and for the protection of both companies." Ex. 48, PLX179 at 2. Altria's outline for the August 18 meeting explained "[w]e can't agree to these terms under antitrust laws prior to receiving HSR approval, which was driving our clarifications in the term sheet." *Id*. In other words, in an attempt to evade antitrust scrutiny, Altria refused to include the exact language written by JLI, but reassured JLI that it agreed to exit the market and be bound by a non-compete.

While Altria asserts that it did not formally agree to anything at the August 18 California meeting (Opp. Br. at 27), that is beside the point. Altria continues to deny to this day that it withdrew its competing products as part of any conspiracy. But Altria did withdraw its products and this issue was discussed during the August 18 meeting, including the attendant "antitrust issue." It is for the jury to determine whether Altria's market withdrawal was part of a conspiracy, but there is no dispute that the central aspect of the conspiracy alleged was negotiated in-person in California.[10]

Nor is it correct that "'each member of the plaintiff class' must have sufficient contacts with California." Opp. Br. at 28 (citing *Shutts,* 472 U.S. at 821). *Shutts* requires that the forum *state*—not each class member—have a sufficient connection to the *claims*. *Shutts*, 472 U.S. at 821-22. Altria's reliance on out-of-circuit authority that focus on the place of purchase cannot be squared with Ninth

---

[10] Defendants rely on authority that is factually distinguishable and irrelevant. *See In re Graphics Processing Units Antitrust Litig.* ("GPU I"), 527 F.Supp.2d 1028 (N.D. Cal. 2007) (finding lack of sufficient contacts where "plaintiffs have never alleged the specific locations of any of the meetings between defendants"); *In re Capacitors Antitrust Litig.*, 106 F.Supp.3d 1051, 1074 (N.D. Cal. 2015) (finding "hardly any contacts at all with the state of California" and where "[m]ost of the defendants are headquartered abroad, and the meetings and conduct at issue are also mostly alleged to have taken place outside of the United States."); *Tidwell v. Thor Indus., Inc.*, 2007 WL 8083631, at *8 (S.D. Cal. Mar. 26, 2007) (finding insignificant connection to California in non-antitrust case involving claims of defective products against defendants with "limited conduct . . . in California, and such a small percentage of travel trailers having been sold in California".).

-11-

Circuit precedent holding that "the 'transaction or occurrence' proscribed by the Cartwright Act includes not only the sale of price-fixed goods, but the full extent of incipient conspiratorial conduct described in section 16720 of the Act." *AT&T Mobility*, 707 F.3d at 1110; *see also id*. ("[T]he plain text of the Cartwright Act reveals that the district court's place-of-purchase focus severely truncates the scope of anticompetitive conduct that the Act proscribes."). This Court also distinguished Altria's authority in an earlier case. *See Korean Ramen.*, 2017 WL 235052, at *21 n.42 (finding *In re Relafen* and *GPU I* "unpersuasive" in opposing application of the Cartwright Act outside of California).

"Thus, in-state conduct that causes out-of-state injuries can be relevant to a due process analysis, in the antitrust context and otherwise." *AT&T Mobility*, 707 F.3d at 1112. Altria's contacts with California are not "minimal" or "passive" and they include contacts relating to the core of IRPs' conspiracy claim. *See, e.g.*, *id.* at 1112; *Korean Ramen*, 2017 WL 235052, at *22; *In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. 308, 345 (S.D. Cal. 2019). In short, Altria "cannot reasonably complain that the application of California law is arbitrary or unfair when its alleged conspiracy took place, at least in part, in California." *AT&T Mobility*, 707 F.3d at 1113.

**B.    The Cartwright Act Can Be Applied Extraterritorially Based on California's Significant Contacts with IRPs' Claims**

Given the strong nexus between California and the alleged conduct, there is no prohibition on applying California law extraterritorially, as numerous courts—including this one—have recognized. *See, e.g.*, *In re Packaged Seafood*, 332 F.R.D. at 336-46 (applying Cartwright Act to out-of-state purchases where California had substantial contacts with the alleged anticompetitive conduct and the choice-of-law analysis supported its application).[11]

---

[11] *See also Korean Ramen*, 2017 WL 235052, at *22 (same); *In re Optical Disk Drive Antitrust Litig.*, 2016 WL 467444, at *13-14 (N.D. Cal. Feb. 8, 2016) (same); *see also Fernandez v. CoreLogic Credco, LLC*, 593 F.Supp.3d 974, 992 (S.D. Cal. 2022) (extraterritorial application of

-12-

Defendants' reliance on *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191 (2011), is misplaced. In *Sullivan*, the California Supreme Court evaluated whether California's Unfair Competition Law ("UCL") applied to alleged violations of the federal Fair Labor Standards Act for work performed by nonresidents in other states. *Id.* at 1206-09. The lone connection to California was that Oracle, located in California, misclassified the employees that did not receive overtime wages for work performed outside of California. *Id.* at 1208. The court explained that the UCL would have applied to "any unlawful business act or practice committed in California," but it clarified that Oracle's "erroneous classification policy [was] not unlawful in the abstract." *Id.* Therefore, there was no unlawful conduct within the state of California.

Thus, the relevant inquiry is not where the injury occurred, but whether the conduct giving rise to that injury is sufficiently connected to California. *See AT&T Mobility LLC v. AU Optronics Corp.*, 707 F.3d at 1110 ("the 'transaction or occurrence' proscribed by the Cartwright Act includes not only the sale of price-fixed goods, but the full extent of incipient conspiratorial conduct described in section 16720 of the Act.").[12]

Here, the wrongful conduct giving rise to all class members' injuries—Defendants' unlawful conspiracy and restraint of trade—occurred, in significant part, in California. Under these facts, *Sullivan* "d[oes] not undermine the established presumption that nonresident plaintiffs may assert

California law is appropriate where defendant's principal place of business, its management level employees, and two-thirds of its workforce are located in the state and unlawful conduct emanated from California); *Collazo v. Wen by Chaz Dean, Inc.*, 2015 WL 4398559, at *3 (C.D. Cal. July 17, 2015) (nonresidents can assert claims under California law where defendants' principal place of business was in California and alleged misconduct occurred in California); *Parks v. Eastwood Ins. Servs., Inc.*, 2002 WL 34370244, at *2 (C.D. Cal. July 29, 2002) (holding that California law could apply to injuries suffered by nonresidents where the defendant was headquartered in California, maintained most of its offices there, and committed the alleged wrongdoing in the state).

[12] *See also Wilson v. Wavestream Corp.*, 2024 WL 3914475, at *4 (C.D. Cal. May 13, 2024) (distinguishing *Sullivan* and holding that the presumption against extraterritoriality is overcome where "the violative conduct occurred within California"); *Diamond Multimedia Sys., Inc. v. Superior Court*, 19 Cal. 4th 1036, 1059 (1999) (the presumption against extraterritoriality depends not on where the injury occurs, but where "the conduct which gives rise to liability" occurs).

-13-

California claims to address unlawful conduct committed in California by a California resident." *Opperman v. Path, Inc.*, 87 F.Supp.3d 1018, 1041 (N.D. Cal. 2014).

Finally, the *dicta* from *In re HIV Antitrust Litig.*, 2022 WL 22609107, at *9 (N.D. Cal. Sept. 27, 2022) and *In re Capacitors Antitrust Litig.*, 2020 WL 6462393, at *1 (N.D. Cal. Nov. 3, 2020), is inapposite. Both courts declined to resolve the extraterritoriality question. And, unlike in those cases, where the courts found weak ties to California, here, the claims have significant ties to California, including in-person conspiratorial conduct in California.

### C.    California's Governmental Interest Analysis Favors Plaintiffs' Multistate Cartwright Act Class.

Relying on *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059 (9th Cir. 2019), defendants argue that the Ninth Circuit prohibits multistate Cartwright Act claims. Opp. Br. at 18-19. But in *Stromberg*, the variance in state law was outcome determinative—repealer states offer a claim to indirect plaintiffs who would be left without redress by non-repealer states. [13] The Ninth Circuit has recognized the interest of non-repealer states in making their home markets welcoming to out-of-state defendants even at the expense of full enforcement of their antitrust laws. But the majority of states allow indirect purchasers to sue and have expressed an equally strong *shared* interest in fostering free markets through the deterrence of anticompetitive behavior. *See Cianci v. Superior Ct.*, 40 Cal. 3d 903, 918–19 (1985) (premise of antitrust laws is "that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions.").

---

[13] *In Stromberg* the Ninth Circuit held that purchases made in non-repealer states must be carved out of a nationwide indirect purchaser class. *Id.* at 1074. The Ninth Circuit held that the district court had failed to give appropriate weight to the interest of non-repealers in implementing policies that seek to protect in-state commerce by shielding out-of-state businesses from "excessive liability" for antitrust violations. *Id.* at 1073. Repealer states, on the other hand, have policies that promote commerce by preserving competitive markets.

According to defendants, the shared interest of repealer states in incentivizing private enforcement can be thwarted by blocking multistate class actions due to *any* variation of law. But by affording all variances equal weight, defendants give short shrift to two fundamental aspects of California's choice-of-law approach. First, California defaults to its own law where the variance at issue would make no difference to the outcome of a case and cannot give rise to a true conflict between state interests. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 590–91 (9th Cir. 2012).

Second, California's comparative approach allows courts to weigh, among other things, "the extent to which one jurisdiction's laws either impose similar duties to the other jurisdiction's laws, or are accommodated by the other jurisdiction's laws, such that the application of the other jurisdiction's laws would only partially—rather than totally—impair the interests of the state whose law is not applied." *Cassirer v. Thyssen-Bornemisza Collection Found.*, 89 F.4th 1226, 1237 (9th Cir. 2024), *vacated on other grounds*, 145 S.Ct. 1331 (2025). This allows courts to give weight to the reality that the antitrust harms are spread widely but the cost of bringing antitrust suits is prohibitive unless claims can be grouped together. If the cases cannot be economically brought than the shared interest of repealer states are not served.

Defendants raise variances that they say require the application of the law of the place of the sales transaction. But they do not do the variance-by-variance interest analysis that the Ninth Circuit requires, and which is defendants' burden to undertake. *Bernhard v. Harrah's Club*, 16 Cal. 3d 313, 316 (1976) ("[W]e no longer adhere to the rule that the law of the place of the wrong is applicable in a California forum regardless of the issues before the court.").[14] That analysis reveals that each variance is either (i) immaterial to this litigation and thus cannot give rise to a true conflict; or (ii)

---

[14] *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 562 (9th Cir. 2019) ("If the objectors fail to meet their burden at any step in the analysis, the district court 'may properly find California law applicable without proceeding' to the rest of the analysis."); *Washington Mut. Bank, FA v. Superior Ct.*, 24 Cal. 4th 906, 921 (2001) (discussing burdens in context of certification of national class)

-15-

based on state interests that will not be substantially impaired *in this litigation* by the application of California law.

### 1.   Variances that are not material do not give rise to true conflicts.

### a.   The *AGC* factors do not effect standing in this case.

Defendants assert that states differ in whether they apply the test developed by the U.S. Supreme Court to determine whether a plaintiff's injury is too remote or speculative under state antitrust laws. Opp. Br. at 22-23 (discussing *Associated Gen. Contractors of California Inc., v. California State Council of Carpenters* ("*AGC*"), 459 U.S. 519 (1983)). But defendants fail to offer any explanation as to why the application of *AGC* would make a difference in this litigation.

IRPs claim damages for overcharges passed down through a chain of distribution. Repealer states have already determined that such claims are cognizable. *Cf. In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041, at *7 (N.D. Ill. Nov. 5, 2009) ("*AGC* was obviously never intended to apply to the instant situation involving claims of price fixing down a chain of distribution, because in the federal context such claims were already barred by *Illinois Brick*.").

A review of every case cited by defendants (*see* Barber Decl., Exh. 57)—along with every state court case available on Westlaw that cites *AGC*—reveals no case in which a court relied on *AGC* to dismiss an indirect purchaser claim based on a similar context. Exh. 103. *Cf. In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F.Supp.2d 1072, 1090 (N.D. Cal. 2007) (dismissing claims based on purchases in a separate but related market). Defendants have not argued that the IRPs made their purchases in a secondary or unrelated market or set forth any caselaw indicating that *AGC* would otherwise disqualify them as indirect purchasers. The variance in state adoption of *AGC* is irrelevant to this case.

-16-

### b.    Pre-suit notice rules are preempted.

Defendants identify nine states whose laws require pre-suit notice to state attorneys general. Opp. Br. at 22. No such statute calls for dismissal for failure to provide notice. Ex. 104. Federal courts have found notice requirements procedural and irrelevant to the substantive elements of a plaintiffs' claim, and dismissal at odds with the remedial intent of the state's antitrust laws. *See Martin v. Pierce Cnty.*, 34 F.4th 1125, 1132 (9th Cir. 2022) (citing with approval the Sixth Circuit's finding that state pre-suit notice requirements are preempted in federal court by Rule 3).[15]

### c.    Class action bars are preempted.

Defendants argue that class actions are barred under the laws of Arkansas, South Carolina, Tennessee, and Virginia. Opp. Br. at 22. In *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010), the U.S. Supreme Court held that Rule 23 preempts state-law class action restrictions. Under the narrowest reading of *Shady Grove*, in order to avoid a finding of preemption, defendants must show that a class action bar is "so intertwined with a state right or remedy that it functions to define the scope of the state-created right." *Shady Grove*, 559 U.S. at 423 (Stevens, J., concurring). Defendants make no such showing, and thus cannot show that these bars would apply in a federal action or that they could a make a difference in the outcome of this litigation. *See* Ex. 105.[16]

---

[15] *See, e.g.*, *Jones v. Micron Tech. Inc.*, 400 F.Supp.3d 897, 923 (N.D. Cal. 2019) (district courts have explicitly held that these notice requirements do not alter the substantive elements of state antitrust claims and do not constitute pleading requirements); *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F.Supp.3d 814, 835 (E.D. Pa. 2019) (same); *In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041, at *6 (N.D. Ill. Nov. 5, 2009) ("Plaintiffs are correct that nothing in the statutory scheme suggests that defendants may use the statute as a shield to avoid answering for alleged anti-competitive behavior."); *In re Crop Prot. Prods. Loyalty Program Antitrust Litig.*, 2025 WL 315835, at *26 (M.D.N.C. Jan. 28, 2025) (declining to dismiss claim due to failure to comply with notice provision); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 355 F.Supp.3d 145, 156 (E.D.N.Y. 2018) (same).

[16] *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377, at *21 (N.D. Cal. Oct. 2, 2014) (Under Ninth Circuit law, "the class-action bans challenged here are procedural, not substantive,

-17-

In addition, Tennessee's class action bar went into effect in April 2024. Ex. 106 (prior version of statute). If the bar is deemed substantive, it is not retroactive. *See gen. Kee v. Shelter Ins.*, 852 S.W.2d 226, 228 (Tenn. 1993). If procedural, it is preempted under *Shady Grove*.

### d. No conflict arises from consumer protection statutes interpreted in harmony with federal antitrust laws.

Six repealer states allow antitrust claims to be brought under their broader consumer protection statutes. Relying on *dicta* in *Stromberg*, and without elaboration, defendants assert that this represents a "significant variance," (Opp. Br. at 20), but provide no explanation as to why it is material. Florida, Massachusetts, Missouri and South Carolina have specific provisions that require these consumer protection statutes to be interpreted in harmony with Section 5(a)(1) of the Federal Trade Commission Act, which in turn looks to caselaw under the Sherman Act. *See F.T.C. v. Cement Inst.*, 333 U.S. 683, 694 (1948) (all conduct violative of the Sherman Act comes within the prohibitions of the FTC Act); *see also* Ex. 107. Arkansas and Virginia lack such provisions but are broad, flexible statutes that have been held by federal courts to cover antitrust cases. *Id.* Defendants have failed to point to any aspect of these statutes that presents a conflict.

### 2. State interests underlying remedial provisions are not impaired by application of the Cartwright Act.

### a. There are no true conflicts in approaches to duplicative recovery.

The Cartwright Act accommodates state interests in preventing duplicative recovery. First, there is no risk of duplicative recovery in this litigation that is, as of yet, more than hypothetical.

---

and [ ] application of Rule 23 to them would not modify any substantive right."); *In re Myford Touch Consumer Litig.*, 2016 WL 7734558, at *27 (N.D. Cal. Sept. 14, 2016) (Rule 23 preempts Virginia's class action bar that is part of its "default" procedural rules); *Whitley v. Baptist Health*, 2020 WL 4575991, at *1 (E.D. Ark. Aug. 7, 2020) ("[Rule] 23 trumps the ADTPA's class action prohibition"); *Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co.*, 2015 WL 4755335, at *21 (N.D. Cal. Aug. 11, 2015) (holding South Carolina ban pre-empted by Rule 23); *In re Optical Disk Drive Antitrust Litig.*, 2012 WL 1366718, at *8 (N.D. Cal. Apr. 19, 2012) (declining to dismiss class claim); *In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, 2021 WL 4306018, at *23 (N.D. Cal. Sept. 22, 2021) (same).

Defendants have separately challenged DPPs' adequacy to represent more than direct consumers (Def. Opp. to DPPs' Class Cert. at 15-24), and the two indirect classes seek only their proportional share of overcharges that would be passed down from distributors and wholesalers.

Second, California's Supreme Court has held that the Cartwright Act's overarching goal is to "maximize deterrence," and has left to trial courts the flexibility to fairly allocate damages among multiple levels of purchasers in a manner that "avoid[s] duplication in the recovery of damages." *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 783, 787 (2010).[17] Defendants and IRPs agree that every state to consider the issue has settled on a substantially similar policy, and defendants have pointed to no authority to indicate the remaining states would proceed differently or that suggests they have an interest in applying their law to this case. Opp. Br. at 22; Ex. 108.

Because federal claims are not subject to a pass-on defense, allocation can only be achieved in this case between the two indirect classes who have brought their claims under state law.[18] Defendants suggest that state-law policies would also require the court to discount any amount actually awarded to indirect purchasers by settlement amounts that defendants may agree to pay to DPPs. Opp. Br. at 21. Unsurprisingly, they cite no federal case in which this was actually done.[19] Such an approach is not dictated by any state's statute or its underlying policies. *See* Ex. 108; *see*

---

[17] *Crown Oil Corp. v. Superior Ct.*, 177 Cal. App. 3d 604 (1986) ("We, as others, are confident that when the threat of double recovery occurs, the trial court will fashion relief accordingly."). *Accord Humana Inc. v. Bausch Health Companies Inc.*, 2023 WL 4552005, at *10 (Cal. Super. July 05, 2023) ("Where the fact of damages is certain, the amount of damages need not be calculated with absolute certainty.")

[18] In upholding the right of states to pass repealer statutes, the U.S. Supreme Court has held that there is no federal policy against multiple liability that would pre-empt the reach of such statutes. *California v. ARC Am. Corp.*, 490 U.S. 93, 105 (1989).

[19] Defendants cite instead to a California trial court decision that *denied* defendants motion to dismiss the state law claims of indirect plaintiffs based on a private settlement with direct purchasers in a related federal action. *Humana*, 2023 WL 4552005, at *8. In denying defendants' motion, the court noted defendants had decided not to include the indirect plaintiffs in their settlement discussions and that decision could not be used to simply extinguish the indirect plaintiffs' claims. *Id.* at *9-10.

-19-

*also In re HIV Antitrust Litig.*, 2023 WL 3011624, at *3 (N.D. Cal. Apr. 18, 2023) (reviewing state statutes for multiple recovery language and rejecting defendants' argument that there be an offset against IPP damages). In any event, this issue is premature.

### b. Minimum damages provisions incentivize the enforcement of antitrust claims, an interest otherwise accommodated by the application of California law here.

Defendants identify two states (Massachusetts and Virginia) who have minimum damages provisions that apply to class actions, and a third (Hawaii) that has a minimum damage provision that explicitly does not apply to class actions. Opp. Br. at 22. Minimum damages provisions are procedural in nature and intended to incentivize the vindication of claims that are too small to otherwise justify legal action. *Leardi v. Brown*, 474 N.E.2d 1094, 1104 (Mass. 1985) (analyzing purpose of Massachusetts rule in the context of a class action); *Zanakis-Pico v. Cutter Dodge, Inc.*, 47 P.3d 1222, 1230 (Haw. 2002) (minimum recovery provision intended as "additional deterrent"); *In re Moon*, 1997 WL 34625685, at *24 (Bankr. E.D.Va. Dec. 17, 1997) (finding Virginia's rule to be procedural in nature). Allowing small claims to be brought together in a single, multistate class under the Cartwright Class serves the same remedial interest.

### c. Missouri's interest in punitive damages is accommodated by the Cartwright Act's provision of treble damages.

See discussion in Section III.C.2.d. below.

### d. Defendants have identified no material difference or true conflict among states allowing multiple damages awards.

Defendants have identified no material variation in the relevant damages provision of California, District of Columbia, Kansas, Maine, Minnesota, New York,[20] North Carolina, Oregon,

---

[20] New York's antitrust law awards treble damages. N.Y. Gen. Bus. Law § 340(5). Defendants cite *Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1017-18 (N.Y. 2007), for the proposition that treble damages cannot be awarded for class claims. However, *Sperry*, relies on an application of New York's C.P.L.R. § 901(b), which the U.S. Supreme Court has specifically held is pre-empted by Rule 23 in federal litigation. *Shady Grove*, 559 U.S. at 416.

-20-

Rhode Island, South Dakota, Utah,[21] Vermont, West Virginia, and Wisconsin, which each automatically treble damages. *See also* Ex. 110, Table A. New Mexico allows but does not require trebling. *Id.* at Table B. Antitrust laws incorporate treble damages remedies to promote enforcement and deter violations. *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 (1972) ("By offering potential litigants the prospect of a recovery in three times the amount of their damages, Congress encouraged these persons to serve as 'private attorneys general.'").

Arizona, Iowa, Massachusetts, Michigan, New Hampshire, North Dakota, South Carolina, and Virginia award double or treble damages where a violation is "willful," "knowing," or "flagrant." Ex. 110, Table C. Each of these words reference violations that are deliberate in nature, as opposed to mere negligence.[22] Defendants have not demonstrated that such a qualifier would make a difference here, where plaintiffs must prove defendants *knowingly agreed* that Altria would exit the e-cigarette market and cease all development activities in return for a piece of the market leader—intentional conduct that it is either *per se* illegal or that must be proven to be unreasonable to give rise to liability.[23] Therefore, they have not shown a true conflict.

Mississippi awards $500 per injury in addition to actual damages and Missouri's statute provides for punitive damages. These provisions serve the same remedial purpose as treble damages. *See Soetaert v. Novani Flips*, *LLC*, 631 S.W.3d 580, 597 (Mo. Ct. App. 2021) ("These

---

[21] A Utah court may reduce a treble damages award as necessary to avoid a defendant's insolvency. Utah Code Ann. § 76-10-3109(1)-(2). No showing of such necessity has been made. JLI has now received FDA approval and is well-positioned in the market. *See* Ex. 109 (JLI press releases).

[22] *See, e.g., W. Waste Serv. Sys.*, *Inc. v. Superior Ct. In & For Maricopa Cnty.*, 584 P.2d 554, 556 (Ariz. 1978) (flagrant describes conduct which is "glaring" or "open, notorious or willful in nature"); *Chiulli v. Liberty Mut. Ins.*, *Inc.*, 146 N.E.3d 471, 483 (Mass. App. 2020) ("To be wilful or knowing, a violation need not be malicious, but must constitute more than negligence. Within that range is conduct that is intentionally gainful, ... or demonstrates a wilful recklessness or conscious, knowing disregard for its likely results").

[23] *Fish v. 3M Co.*, 2014 WL 12966934, at *4 (C.D. Cal. Dec. 1, 2014) (defendant's burden to show that different culpability standards would lead to a different outcome in this case). *See also Haley Nursery Co. v. Forrest*, 381 S.E.2d 906, 909 (S.C. 1989) (conduct not willful when not expressly prohibited by statute and "in accord with the common practice of the trade").

-21-

remedial measures are designed not only to remedy violations of the MMPA, but also prospectively to deter prohibited conduct and protect Missouri citizens."). *See* Ex. 110, Tables D-E.

All states that allow damages beyond actual damages do so in the interest of deterrence and incentivizing suit, and modest variations should not be used to undermine the overarching interest of these states in the vigorous enforcement of antitrust laws. *See Bernhard,* 16 Cal. at 323 (applying California law that imposes civil liability where Nevada would impose only criminal liability, despite the place of wrong, since application of California law merely imposed additional economic exposure but not a new duty).

> **e.    Comparative impairment analysis allows the Cartwright Act to apply to claims arising from purchases made in repealer states that do not award multiple or punitive damages.**

Arkansas, Florida, Hawaii, Nebraska, and Tennessee limit awards to actual damages. Ex. 110, Table F. As recognized in *Stromberg*, these five states have an interest in encouraging potential defendants to conduct business in their states and in balancing that interest with their enforcement of their substantive laws. Under the circumstances of *this case*, however, that interest is illusory. *Cassirer*, 89 F.4th at 1237 (courts "are directed to measure the interests of each jurisdiction based on 'the circumstances of the present case'—the facts of this particular dispute—not the jurisdiction's general policy goals expressed in the laws implicated.").[24]

The Juul pods at issue enter these states through sales by intermediaries to convenience stores and other small businesses that buy them for resale. The majority of repealer states award treble damages, yet there is no evidence that JLI has ever attempted to limit the sales of its products

---

[24] Defendants rely on *In re HIV Antitrust*, 2022 WL 22609107, at \*13. There, Judge Chen pointed to material variances among repealer states in the availability of enhanced damages <u>and</u> the statute of limitations, but his analysis did not explore the different interests underlying the two types of variances. A statute of limitations variance, immaterial here, is outcome determinative, as was the variance at issue in *Stromberg.* When the variance is as to the remedy alone, comparative impairment analysis requires a court to consider the interest of all states in enforcement of the substantive law.

-22-

to states that follow the majority approach. *See Jackson v. Tesla, Inc.*, 772 F.Supp.3d 1111, 1130 (N.D. Cal. 2025) (Pitts, J.) ("Given that Tesla continues to sell its vehicles in states like California that do not impose any cap whatsoever on non-economic damages, Tesla cannot credibly contend that it will cease selling vehicles to individuals in Maryland if courts fail to apply its cap on non-economic damages under circumstances like those presented here."); *Offshore Rental Co. v. Cont'l Oil Co.*, 22 Cal. 3d 157, 168 (1978) (degree of impairment depends on realities of each case, and courts should seek "maximum attainment of underlying purpose by all governmental entities").

Nor would applying the law of these states protect a resident defendant, an interest that California has recognized. *See Hurtado v. Superior Ct.*, 11 Cal. 3d 574, 580-81 (1974); *Munguia v. Bekins Van Lines, LLC*, 2012 WL 5198480, at *10 (E.D. Cal. Oct. 19, 2012) ("California courts, when determining whether a foreign jurisdiction's stricter recovery rules should apply over California's more liberal rule, have held that a jurisdiction's only interest in having its damages limitation rules applied is to protect its resident defendants from excessive financial burdens or exaggerated claims, or to protect defendants who have a connection to the foreign state.")

California has an interest in regulating conduct surrounding the sale of a substantial stake in a California company. *See Tesla, Inc.*, 772 F.Supp.3d at 1127, 1130 (California has an interest in "regulating home-state industries" that is forwarded by its law on noneconomic damages); *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 97 (2010) (Oklahoma has an interest in regulating conduct that occurs within its borders). All repealer states also have a shared interest in deterring anticompetitive conduct by allowing indirect purchaser claims to be efficiently litigated together. Repealer states recognize that "[t]he purpose behind both state and federal antitrust law is to apply a uniform standard of conduct so that businesses will know what is acceptable conduct and what is not acceptable conduct." *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 446 (Iowa 2002). In rejecting *Illinois Brick*'s indirect purchaser bar, 31 repealer states have found it in conflict with this

-23-

overarching purpose, which they find best served by allowing all injured purchasers the ability to enforce the law by bringing suit. *Comes*, 646 N.W. 2d at 447.[25]

Without an effective way to bring suit, the goals of antitrust law cannot be achieved *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 768 (2010) ("those who violate the antitrust laws by price fixing or monopolizing would retain the fruits of their illegality because no one was available who would bring suit against them") (quoting *Hanover Shoe v. United Shoe Mach.*, 392 U.S. 481 (1968)). Private rights of action are available as a means to supplement the limited resources of prosecutors. But direct purchasers often fail to come forward for fear of retaliation from suppliers.[26] In this litigation, defendants argue against certification of a DPP class that includes wholesalers and distributors because no class representative serves in such a role.

California and all repealer states' strong interest in the enforcement of their antitrust laws will be the more severely impaired if the Multistate claim cannot proceed. Because Arkansas, Florida, Hawaii, Nebraska, and Tennessee have the same shared interest in enforcement as all other repealer states, and there is no evidence that their consumers will be deprived of a nationally sold commodity if their actual damages limit is not applied, California's choice-of-law rules favor the Cartwright Act here.

---

[25] *See also Arthur v. Microsoft Corp.*, 676 N.W.2d 29, 37 (Neb. 2004) (holding that Nebraska antitrust laws should be construed to effect their purpose "to provide consumers with protection against unlawful practices in the conduct of any trade or commerce which directly or indirectly affects the people of Nebraska"); *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 624 (Minn. 2007) ("The private causes of action created by Minnesota antitrust law 'reflect a clear legislative policy encouraging aggressive prosecution of statutory violations.'"); *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 520 (Tenn. 2005) ("We do not believe that the ends of justice should be defeated simply because the risk of complicated litigation exists.").

[26] *Bunker's Glass Co. v. Pilkington PLC*, 206 Ariz. 9, 19, 75 P.3d 99, 109 n.9 (2003) ("An auto dealer who relies on the manufacturer for delivery of popular models of cars does not strike us as likely to sour the relationship with the manufacturer by suing over a price increase, especially if it can pass along overcharges to purchasers."); *Comes*, 646 N.W. 2d at 450 (observing that direct purchasers like Dell, Compaq, and IBM did not bring suit against Microsoft for antitrust violations);

-24-

## IV.    COMMON PROOF SUPPORTS THE IRPS' PROPOSED CLASS PERIOD

Defendants argue that the IRPs' proposed class period should end on March 29, 2024, when the JLI sales and price data ends, and not be extended a year to March 31, 2025. Opp. Br. at 28-29. Defendants are wrong. Dr. Leffler's extrapolation using JLI's pricing, sales, and cost data for the year before the extended period was reasonably based on the economic findings and econometric modeling in his reports, which among other things account for the fact that "JLI lost significant share" over the course of the entire relevant period, including the benchmark period for estimating damages. *Id.*; Ex. 1, ¶¶ 75-77 and n.153; *Teradata Corp. v. SAP SE*, 124 F.4th 555, 570-71 (9th Cir. 2024) ("expert[s] may extrapolate harm to competition on a market-wide level based on" record evidence, and also make factual claims that are "'reasonable extrapolation[s]' from the evidence" and "sufficiently plausible to constitute a 'competing version[ ] of the evidence'" and reach "other conclusions [based on evidence about which] a trier of fact might disagree") (internal quotation marks and citation omitted). Defendants cite no evidence within the extended period suggesting that this extrapolation was unreasonable.

Defendants also criticize the IRPs for starting their class period on December 1, 2018, rather than December 7, 2018, the date on which Altria announced it was fully withdrawing from the e-cigarette market (Opp. Br. at 29, n.14). However, Altria announced that it was ending sales of its pod products on October 25, 2018, and IRPs allege that decision was made as part of an agreement with JLI. Thus, a December 1, 2018 start date is reasonable.

## V.    CONCLUSION

For the reasons set forth herein, the proposed Indirect Reseller Class should be certified, and Elana Katcher of Kaplan Fox and Andrew Dirksen of Cera LLP should be appointed as Class Counsel for the Indirect Reseller Plaintiff Classes.

Dated: September 8, 2025                         Respectfully submitted,

*/s/ Elana Katcher*

-25-

Robert N. Kaplan (*pro hac vice*)
Elana Katcher (*pro hac vice*)
**KAPLAN FOX & KILSHEIMER LLP**
800 Third Avenue, 38th Floor
New York, New York 10022
Telephone: (212) 687-1980
Email: rkaplan@kaplanfox.com
        ekatcher@kaplanfox.com


*/s/ C. Andrew Dirksen*
C. Andrew Dirksen (SBN 197378)
**CERA LLP**
529 Main Street, Suite P200
Boston, MA 02129
Telephone: (857) 453-6555
Email: cdirksen@cerallp.com


Solomon B. Cera (SBN 099467)
**CERA LLP**
50 California St. Suite 1500
San Francisco, CA 94111
Telephone: (415) 777-2230
Email: scera@cerallp.com

*Steering Committee Counsel for Indirect Purchaser Plaintiffs and Indirect Reseller Plaintiffs*

-26-

# EXHIBIT K

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan (admitted *pro hac vice*)
Elana Katcher (admitted *pro hac vice*)
800 Third Avenue, 38th Floor
New York, New York 10022
Telephone: (212) 687-1980
Email: rkaplan@kaplanfox.com
Email: ekatcher@kaplanfox.com

Laurence D. King (SBN 206423)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: (415) 772-4700
Email: lking@kaplanfox.com

*Steering Committee Counsel for Indirect
Purchaser Plaintiffs and the Indirect
Reseller Plaintiffs and Counsel for Plaintiffs
Sofijon, Inc., Rose And Fifth, Inc., and
Napht, Inc.*

**CERA LLP**
Solomon B. Cera (SBN 099467)
50 California St., Suite 1500
San Francisco, CA 94111
Telephone: (415) 777-2230
Email: scera@cerallp.com

C. Andrew Dirksen (SBN 197378)
529 Main St., Suite P200
Boston, MA 02129
Telephone: (857) 453-6555
Email: cdirksen@cerallp.com

*Steering Committee Counsel for Indirect
Purchaser Plaintiffs and the Indirect Reseller
Plaintiffs and Counsel for the Indirect
Reseller Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE JUUL LABS, INC. ANTITRUST LITIGATION | Master File No. 3:20-cv-02345-WHO |
| This Document Relates To: | **INDIRECT RESELLER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OVERCHARGE MODELS AND DAMAGES OPINIONS OF DR. KEITH LEFFLER** |
| **All Indirect Reseller Plaintiff Actions** | Judge: Hon. William H. Orrick<br>Date:  October 10, 2025<br>Time: 2:00 p.m.<br>By Videoconference |

## HIGHLY CONFIDENTIAL

## PROVISIONALLY FILED UNDER SEAL

**TABLE OF  CONTENTS**

Page(s)

TABLE OF AUTHORITIES ................................................................................................ii

I.    INTRODUCTION ..................................................................................................... 1

II.   LEGAL STANDARDS..............................................................................................3

III.  DR. LEFFLER'S OPINIONS AND CONCLUSIONS ARE RELIABLE AND WILL
      ASSIST THE TRIER OF FACT ................................................................................ 4

      A.    Dr. Leffler's regression model is well-specified, includes all major variables,
            and is a reliable method capable of showing classwide impact and estimating
            damages sustained by members of the proposed IRP class in the event of
            trial. ................................................................................................................. 5

            1.    Dr. Leffler's model accounts for the evolution and changing elasticity
                  of demand for Juul and JLI's loss of market share in the years
                  following the Agreement. ..................................................................... 8

            2.    Dr. Leffler's model accounts for changes in JLI's financial condition
                  beginning in 2022. .............................................................................. 13

      B.    The creation of two damages periods is reliably based on record evidence..............14

      C.    The extension of the second damages period by one year, after the undisputed
            February 2024 Juul price increase, is reasonably and reliably based on real-
            world data and unchallenged economic assumptions. ............................................ 16

IV.   CONCLUSION ....................................................................................................... 17

-i-

IRP'S OPPOSITION TO DEFENDANTS' MTN TO EXCLUDE THE OVERCHARGE MODELS AND DAMAGES OPINIONS OF DR. KEITH LEFFLER
MASTER FILE NO. 3:20-CV-02345-WHO

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
738 F.3d 960 (9th Cir. 2013)................................................................................4

*Bazemore v. Friday*,
478 U.S. 385 (1986) ......................................................................................5, 6

*City of Pomona v. SQM N. Am. Corp.*,
750 F.3d 1036 (9th Cir. 2014)........................................................................ 4, 15

*Daubert v. Merrell Dow Pharm.*,
509 U.S. 579 (1993) .......................................................................................3

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011).............................................................................4

*In re High-Tech Employee Antitrust Litig.*,
2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) ......................................................... 12

*In re Juul Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*,
2022 WL 1814440 (N.D. Cal. June 2, 2022) ..................................................... 5, 15

*In re Korean Ramen Antitrust Litig.*,
2017 WL 235052 (N.D. Cal. Jan. 19, 2017) ......................................................... 12

*In re Telescopes Antitrust Litig.*,
348 F.R.D. 455 (N.D. Cal. 2025) ........................................................................5

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ......................................................................................3, 4

*Primiano v. Cook*,
598 F.3d 558 (9th Cir. 2010).............................................................................4

*Rushing v. Williams-Sonoma, Inc.*,
2024 WL 779601 (N.D. Cal. Feb. 21, 2024) ......................................................... 16

*Teradata Corp. v. SAP SE*,
124 F.4th 555 (9th Cir. 2024) ........................................................................... 16

*Wendell v. GlaxoSmithKline LLC*,
858 F.3d 1227 (9th Cir. 2017)............................................................................4

**Rules**

Fed. R. Evid. 702...........................................................................................4

-ii-

Indirect Reseller Plaintiffs ("IRPs") respectfully submit this opposition to Defendants' Motion to Exclude the Overcharge Models and Damages Opinions of Dr. Keith Leffler, IRPs' expert economist in this case ("Motion" or "Def. Br." Dkt. 520-9, filed by Altria Group, Inc. and Altria Enterprises LLC (together "Altria"), and Juul Labs Inc. ("JLI"), provisionally under seal as a motion to also exclude the overcharge models and damages opinions of the expert for the Indirect Purchaser Plaintiffs ("IPPs"), Dr. Gareth Macartney).

## I.    INTRODUCTION

After spending hundreds of millions of dollars and many years to research and develop e-cigarette products, acquire e-cigarette companies, and grow e-cigarette sales, all while boasting to investors about their efforts to become a leader in the e-cigarette industry, Altria suddenly eliminated itself as a competitor within the e-cigarette space co-incident with its agreement with JLI in December 2018 to purchase 35% of JLI and its then-dominant share of the e-cigarette market for $12.8 billion dollars ("Agreement" or "Transaction"). IRPs allege that this agreement between Altria, the largest U.S. cigarette company, and JLI, the leading e-cigarette company at the time, was unlawful in violation of Section 1 of the Sherman Act and artificially increased the prices of JLI's e-cigarette, Juul, causing everyone who purchased Juul to be unlawfully overcharged, whether they purchased from JLI, or from one of JLI's customers (such as a distributor), or from a retailer—a member of the putative IRP class. In other words, Altria, with its vast marketing and distribution resources and valuable point-of-sale shelf-space, said, "*if we can't beat 'em, join 'em*," and vaporized its own e-vapor business, paid $12.8 billion dollars to join forces and reach the Agreement with JLI, and overcharged thousands of consumers (individuals and businesses) by making them pay a little more for Juul than they otherwise would have paid "but for" the agreement—precisely the type of injury that Rule 23 and the class action device exist to remedy.

Defendants' Motion tries to sugarcoat this clear-cut story of the elimination of competition in the e-cigarette industry while criticizing and mischaracterizing the testimony and regression

-1-

model of IRPs' expert, Dr. Leffler.[1] Defendants accuse Dr. Leffler of failing to account for purportedly major variables in his regression model that affected the price of Juul, but this is baseless: not only does Dr. Leffler's regression rely on JLI's pricing and cost data, *every one of Dr. Leffler's reports* discusses the use and interaction of supply and demand explanatory variables in the model and their effects on Juul's price (the dependent variable to be explained), including regression specifications controlling for shifts in the elasticity of demand over time and other market developments, such as the evolution of demand for Juul due to the withdrawal of (legal) flavored products and Juul's loss of market share to competition from new entrants, legal and illegal disposables and pod-based products, including Vuse Alto and illegally imported flavored disposables—share loss that affected JLI's financial condition.[2]

Defendants also argue that Dr. Leffler "unreliably connect[s]" the Altria-JLI Transaction in December 2018 with the first Juul price increase that began three-and-one-half years later in July 2022, and then continued with increases in February 2023, August 2023, and February 2024.[3] Defendants further contend that, in making this "unreliabl[e] connect[ion]," Dr. Leffler ignores the "stated reasons for JLI's price increases, all unrelated to Altria's 2018 investment," as set forth in snippets of the record.[4] In accord with the Federal Rules of Evidence ("FRE"), however, Defendants are free to argue to the jury at trial that those "stated reasons for JLI's price increases [are] all unrelated to Altria's 2018 investment," so long as Dr. Leffler and IRPs are free to inform the jury

---

[1] Dr. Leffler has "been performing economic analysis in antitrust cases since 1976" and has "worked with the U.S. Department of Justice, the Federal Trade Commission, [and] many states' Attorneys General" among others. Ex. 1, Leffler Rpt., ¶ 2. As detailed in his reports, he conducted analyses to "determine the relevant economic market that may have been impacted by the Agreement, to evaluate the competitive impact of the Agreement, to assess the expected impact on the [IRP] Class from the Agreement, and to quantify any damages the [IRP] Class incurred because of the Agreement." *Id.*, ¶ 5. References to Exhibits 1-96 are to certification the previously filed Declaration of Elana Katcher (ECF No. 490), dated June 20, 2025. Exhibits 97-110 are to the Reply Declaration of Elana Katcher, dated September 8, 2025, which is being filed on today's date in further support of the IRP's class certification briefing.

[2] Def. Br. at 12-21; Ex. 1, Leffler Rpt. ¶¶ 41-45, 58-65, 73-78 (incl. Charts and Tables); Ex. 99, Leffler Reb. ¶¶ 22-26, 29-30, 44-45; Ex. 97, Leffler Reply ¶¶ 4-5, 10, 19, 25, 30, 38-42.

[3] Def. Br. at 21-24.

[4] Def. Br. at 21.

-2-

that, among other things, <u>undisputed record evidence</u> shows that soon after the transaction in December 2018, the Federal Trade Commission ("FTC") began investigating its legality and sued defendants, alleging that the transaction was an unlawful agreement to eliminate competition in the closed-system e-cigarette products market; that a week after an FTC Administrative Law Judge ("ALJ") dismissed the FTC's antitrust complaint against the defendants for their Transaction, ████ ██████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████"[5] (emphasis added); and that, just shy of five months following the ALJ's dismissal of the FTC's complaint, in July 2022, JLI increased Juul's prices *for the first time since the Transaction*, and then continued to increase them several more times through February 2024.[6]

Defendants' Motion mischaracterizes Dr. Leffler's analyses, as it must in order to try to convince the Court to exclude his relevant and reliable testimony. As his reports attest, however, Dr. Leffler's opinions and conclusions are based on an extensive review of record evidence, as well as Juul and other real-world price, cost and other data, economic and econometric principles and methods commonly used in antitrust cases, and a well-specified regression model capable of reliably demonstrating classwide injury to the IRPs and estimating their damages (*i.e.*, the amount of overcharge passed-through to the resellers or retailers by direct purchasers (*e.g.*, distributors or wholesalers), that the resellers did not in turn pass-on to their customers, the IPPs). Dr. Leffler's testimony is reliable and admissible. Defendants' Motion should be denied.

## II.    LEGAL STANDARDS

Expert testimony must be both relevant and reliable to be admissible. *See, e.g.*, *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection

---

[5] Ex. 63, PLX 620 ("…Date: Wed, Feb 23, 2022 at 9:37 PM[ ]Subject: ████████████████████ ████████████████████████████████████████████████████████████████████████████████████ ███████████████████████████[.]"

[6] Def. Br. at 8; Ex. 1, Leffler Rpt., ¶¶ 60-62, Chart 11.

to the pertinent inquiry" and "it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). Courts must find that the expert's testimony "'rests on a reliable foundation and is relevant to the task at hand.'" *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014) (quoting *Primiano,* 598 F.3d at 564). To be admissible under FRE 702, the proponent of the expert testimony must also show that it is more likely than not that the expert's specialized knowledge will assist the trier of fact in understanding the evidence or making factual determinations, but FRE 702 "should be applied with a 'liberal thrust' favoring admission." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (citations omitted).

Although in "assess[ing] the reasoning or methodology" of an expert the court's "inquiry must be flexible," *Primiano,* 598 F.3d at 564-65, and "unreliable nonsense opinions" should be excluded, courts must "'not exclude opinions merely because they are impeachable'" because "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *SQM N. Am.*, 750 F.3d at 1044, quoting *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc*., 738 F.3d 960, 969 (9th Cir. 2013). Simply put, under *Daubert*, courts must "exclude junk science that does not meet [FRE] 702's reliability standards by making a preliminary determination that the expert's testimony is reliable" and will assist a jury in its deliberations, but must leave it for the jury to decide the credibility of the proffered expert's testimony. *Ellis v. Costco Wholesale Corp*., 657 F.3d 970, 982 (9th Cir. 2011), citing *Kumho Tire,* 526 U.S. at 145, 147-49; *SQM N. Am.*, 750 F.3d at 1044.

## III.    DR. LEFFLER'S OPINIONS AND CONCLUSIONS ARE RELIABLE AND WILL ASSIST THE TRIER OF FACT

Defendants contend in their Motion that Dr. Leffler's regression model is unreliable and his testimony inadmissible because the model purportedly fails to account for major factors, referred to by Defendants as "market developments," that affected the price of Juul, namely, the changing elasticity of demand for Juul when JLI lost substantial market share to competing products, particularly illegally imported flavored disposables, and JLI's poor financial condition in 2022,

-4-

when JLI began increasing Juul prices, that also affected JLI's e-cigarette market share.[7] Defendants also argue that Dr. Leffler "unreliably connect[s]" the allegedly anti-competitive Altria-JLI transaction in December 2018 with the first Juul price increase in July 2022 and with subsequent price increases thereafter through February 2024.[8] Defendants' arguments are factually and legally without merit.

> **A.** **Dr. Leffler's regression model is well-specified, includes all major variables, and is a reliable method capable of showing classwide impact and estimating damages sustained by members of the proposed IRP class in the event of trial.**

Without explicitly stating it, and thus ironically omitting it, Defendants criticize the specifications of Dr. Leffler's regression model for omitted variable bias. *See Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (appellate court erred in finding regression analyses unacceptable as evidence where "they did not include all measurable [explanatory] variables thought to have an effect" on the dependent variable, because "[w]hile the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the major factors must be considered unacceptable as evidence") (internal quotation marks omitted); *In re Telescopes Antitrust Litig.*, 348 F.R.D. 455, 473 (N.D. Cal. 2025) (collecting cases and affirming their reasoning that although a regression model's omission of significant variables can render the model "so incomplete as to be inadmissible *as irrelevant*" (*Bazemore*, 478 U.S. at n.10 (emphasis added)), courts "generally do not dictate which factors must be included in regression studies" and normally the failure to include or omit variables, or what variables an expert selects for inclusion in a regression analysis, will affect the probativeness of the expert's analysis and not its admissibility, which is why it is for the fact finder at trial to consider the omission of any variables and the reasons given for their omission, and then determine the weight to accord the regression's results) (internal quotation marks and citations omitted); *In re Juul Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2022 WL 1814440, at *20 (N.D. Cal. June 2, 2022) (criticisms of a regression analysis

---

[7] Def. Br. at 12-21.
[8] Def. Br. at 21-23.

directed at "the inputs used and results generated . . . are classic criticisms that go to weight, not admissibility.") (Orrick, J.).

Defendants contend that none of the "explanatory variables [ ] included in [Dr. Leffler's] regressions control for" the "impact[ ] [on] JUUL's pricing" of two "major factors" or "types of market developments" that affected Juul prices, rendering the model's overcharge and damages estimates "so incomplete as to be inadmissible," misleadingly quoting *Bazemore,* which in fact states, "There may, of course, be some regressions *so incomplete as to be inadmissible* <u>as irrelevant</u>." *Bazemore*, 478 U.S. at 400 n.10 (emphasis added).[9] Defendants do not argue that Dr. Leffler's overcharge and damages regression model is mis-specified with "irrelevant" explanatory variables or is itself "irrelevant." *Id*. Rather, defendants accuse Dr. Leffler and his model of "fail[ing] to account for two major factors that affected JLI's pricing *decisions*," namely, two "*types* of market developments" that Dr. Leffler "concede[d] . . . *could have* impacted JUUL's pricing," specifically: (1) "increased competition from compet[ing] [products,] including new pod-based and flavored disposable e-cigarette products[,] [that] caused JLI to lose customers, leaving it with a residual but loyal customer base that was less sensitive to changes in price;" and, (2) "JLI's precarious [financial] position as it entered 2022" and its "deteriorat[ing]" financial condition thereafter that "led the company to prioritize short-term profits . . . [and] focus[ ] on generating cash as quickly as possible," *i.e*., to increase Juul prices. [10] The specification of Dr. Leffler's regression model, however, does account for any significant effects on Juul prices from these market developments, regardless of whether or not they are characterized as "major." Defendants are wrong.

Initially, Defendants criticize Dr. Leffler for being unable to "point to any econometric analysis [he conducted] that excludes these [two market] developments as major factors" affecting Juul prices, but this is utterly unreasonable and impossible for two simple reasons. *First*, **Dr. Leffler relies on and uses JLI's real-world pricing and cost data in his regression model** and so

---

[9] Def. Br. at 15.
[10] Def. Br. at 14.

it is impossible, as a matter of economics, to "exclude" anything that "*could have impacted* JUUL's pricing."[11] *Second*, it is impossible to *include everything* that "could have impacted JUUL's pricing," as Dr. Leffler attested at his deposition: "**You can never completely explain prices. It is a fool's errand. It will never happen.**" [12]

Defendants' baseless criticism of Dr. Leffler's specification of his regression model is indicative of their distortion throughout their Motion of his evidence-based econometric analyses, which rely not only on his fifty years "performing economic analysis in antitrust cases," but also on JLI's pricing and cost data and defendants' business records, *i.e.*, record evidence.[13] For example, defendants falsely claim that Dr. Leffler "initially found an overcharge rate of 4.6% for the first damage period, which increases to 13.0% for the second damage period [Leffler Rep. ¶ 70]," but then, "in his reply report, **he revised his overcharge rate [and recalculated damages without] explicitly stat[ing] the revised rate in the report**," citing ¶ 15 of Dr. Leffler's reply report.[14] Dr. Leffler did not "revise[ ] [either of] his overcharge rate[s]," because the specifications of his classwide injury and damages regression model, which uses a cost variable "**obtained from Juul data** that record variable costs at the product level," that calculated the overcharge estimates for damages period one and two (4.6% and 13%, respectively), never changed from his initial to his reply report.[15] In ¶ 15 of his reply report, as he explains in the preceding paragraphs, Dr. Leffler responds to Dr. Murphy's view that the regression's cost variable should account for certain other variable costs, *e.g.* tariffs and duties, by re-estimating the overcharge regression using a new "alternative cost variable" that accounts for these costs, and that new regression only negligibly

[11] Def. Br. at 15 (emphasis added); *see, e.g.*, Leffler Rpt., ¶¶ 63-66 (explaining use of Juul's transactional pricing data (for January 2016–March 2023) and Juul's per-unit monthly cost ("cost") data as a control variable to account for supply-side changes in the regression), ¶¶ 68-71 (discussing how the regression compares Juul price data before and after the Agreement, controlling for cost changes, and the interpretation of the regression output); Ex. 99, Leffler Reb., ¶¶ 25, 28, 34-45 (JLI price and cost data are inputs in the regressions and robustness models).
[12] Ex. 98, Leffler Tr. at 128:15-16 (emphasis added).
[13] Ex. 1, Leffler Rpt., ¶¶ 2, 63-66.
[14] Def. Br. at 11 (emphasis added), citing Ex. 97, Leffler Reply, ¶ 15.
[15] Ex. 1, Leffler Rpt., ¶ 11; Ex. 97, Leffler Reply, ¶ 13.

-7-

reduced estimated class damages, from $42.4 million to $41.6 million (2%).[16]

Most importantly Dr. Leffler explains in the preceding paragraph (¶ 14):

The overcharge regression analysis explains Juul's pod prices at the product level such that the cost variable [used in the regression model to help explain those prices] should also be at the product level. Data regarding the tariffs, freight and other likely variable costs noted above [in ¶ 13] are provided [by JLI] only at the aggregate overall level. Taking account of these other costs requires some arbitrary method to allocate those costs. Dr. Murphy allocates the cost of tariffs and duties according to total product revenue shares. This allocation will introduce errors in variables issues, such that it is not clear that taking account of these other costs is proper. Therefore, **I do not agree that this alternative cost variable is preferred to what was used in my analysis [in] my Initial Report**."[17]

In other words, Dr. Murphy recommended that Dr. Leffler add new variable costs to his regression model's cost variable where the data for them were at the aggregate and not product level and therefore had to be allocated, even though Dr. Leffler's overcharge and damages model already uses a cost variable "**obtained from Juul data that record variable costs at the product level**."[18] Then, after Dr. Leffler ran the regression using the "alternative cost variable"—that he "d[id] not agree" was preferable to his use of JLI's own variable cost data at the product level—and re-calculated the total overcharges to the proposed IRP class, defendants accuse him of "revis[ing] his overcharge rate . . . [and] not explicitly stat[ing] the revised rate in [his reply] report" when he did no such thing.[19] Defendants' mischaracterizations of Dr. Leffler's well-specified regression and reliable overcharge and damages estimates did not stop there.

> **1.      Dr. Leffler's model accounts for the evolution and changing elasticity of demand for Juul and JLI's loss of market share in the years following the Agreement.**

Defendants' argument that Dr. Leffler's regression model fails to account for the "increased

---

[16] Ex. 97, Leffler Reply, ¶¶ 13-15.

[17] Ex. 99, Leffler Reb., ¶ 14 (emphasis added).

[18] Ex. 99, Leffler Reb., ¶ 13 (emphasis added).

[19] Def. Br. at 11. It is possible that what Defendants had intended to note is that Dr. Leffler changed his pass-on rate from the indirect retailers or resellers to their consumer customers in his initial report from 73% to 79% based on data errors pointed out by Dr. Murphy, but Dr. Leffler notes this in ¶ 15, n. 34, and explains it in ¶ 46 of his Reply Report.

-8-

competition" JLI faced and its loss of market share during the period following the agreement, including from legal pod-based and illegally imported flavored disposable e-cigarettes, that reduced "JUUL's demand elasticity" and "caused JLI to lose customers, leaving it with a residual but loyal customer base that was less sensitive to changes in price," mischaracterizes the model's specification.[20]

Dr. Leffler's regression model accounts for the evolving competitive environment JLI faced, including the rise of Vuse Alto and the entry of illegally imported flavored disposables, as well as JLI's loss of share in the years following the agreement by, among other things:

- addressing in his regression design and specification competitive dynamics and their timing in the market, by incorporating key control variables for supply, demand, and public perception shocks: JLI variable cost per product data (to account for cost shocks), disposable income per capita (demand proxy), the Consumer Price Index for cigarettes (substitute competition), and Google Trends (public perceptions of vaping health risks); these control variables, coupled with product and customer fixed effects variables, are explicitly designed to absorb the effects on JLI's pricing from entry and expansion of competing products, as well as changing demand elasticities (*see* Leffler Rpt., ¶¶ 63-67);

- graphically illustrating Juul's declining market share over the relevant period, which is central evidence of the model's design and specification, *i.e.*, the model is empirically anchored in the period during which any change in demand elasticity for Juul occurred, including any purported increase of Juul's "loyal customer base [who were] less sensitive to changes in price" (Def. Br. at 14) (*see* Leffler Rpt., ¶ 62, Chart 11);

- considering the issue of residual, loyal Juul users and its implication for Juul's changing demand elasticity, *see* Leffler Rpt., ¶ 71 ("A possible explanation is that heightened health concerns shrink the pool of casual or price sensitive customers while leaving a core of more 'loyal' less price-sensitive consumers."), which is directly modeled through the regression specification's controls for health risk perception and demand proxies (Leffler Rpt., ¶ 70, Table 2 and results discussion);

- discussing the timing and impact of the market entry and growth of pod-based competing products and illegally imported flavored disposables throughout both damages periods (December 2018 – March 2024) and explaining why, based on market share data, authorized pod-based products—not disposables—remain the proper focus for the but-for competitive benchmark

---

[20] Def. Br. at 14.

period, until disposables become relevant much later in time (*see* Leffler Rpt., ¶¶ 36-53, accompanying Charts and Table 1);

- presenting multiple alternative model specifications and robustness checks in his reply report responding directly to Dr. Murphy's critiques—*e.g.*, by incorporating moving four-month averages of disposable income to ensure that changes in the demand environment (from shifting consumer composition or competitive entry) do not undermine the regression's results; expanding cost controls to include tariffs and freight (even though he did not agree this was proper); and test segmenting the damages periods to ensure the regression results are robust to different model choices—and concluding that, because the overcharge results and their statistical significance consistently persist under these stress tests, even as Juul's market share declined as the set of competitive products evolved, the regression model's findings are stable and meaningful. *See* Leffler Reply, ¶¶ 10-47.

Defendants are wrong that Dr. Leffler's model ignores market developments, including competition from new entrants and any resulting decline in Juul's demand elasticity, or any increase in brand or customer loyalty, that had an impact on Juul's pricing and market share loss in the years following the Agreement.[21] Defendants even quote Dr. Leffler out of context to make it appear that his "position" on running an explanatory variable purportedly impacting Juul demand and price that Dr. Murphy chose to run in Dr. Leffler's regression, a variable for the federal flavor ban, "undermines itself."[22]

First, when Altria and JLI reached the allegedly anti-competitive Agreement, legal flavored e-cigarettes (that had been marketed to youth) were in the process of being eliminated, and they are not in the closed-system e-cigarette product market that Altria ceased to compete in against Juul.[23] Second, as Dr. Leffler explained, because Dr. Murphy's federal flavor ban variable "is so highly correlated with the damage period variables," he could "not really separate [ ] out" their impact on the dependent Juul price variable in his regression.[24] In other words, because the damage period and

---

[21] Ex. 1, Leffler Rpt., ¶¶ 62–64, 71, Chart 11, Table 2; Leffler Reply, Table 6; Ex. 98, Leffler Tr. at 123:21-124:16, 128:8–129:14, 147:22–149:1, 187:5–14 (testimony that demand elasticity is a function of many observable and unobservable market characteristics, and that Dr. Leffler's regression model, by using control variables, implicitly addresses shifts in underlying market factors).

[22] Def. Br. at 18.

[23] Ex. 1, Leffler Rpt., ¶ 10, 32, 40-41, 159-161 (and Exs. 36-37).

[24] *Ibid*.

flavor ban variables are highly correlated with each other, they essentially signify nearly the same thing and have nearly the same effects, and so although the model can discern the <u>combined</u> effect of these coinciding variables on price, it is statistically impossible for the model to reliably disentangle how much of that combined price effect during the damages period is due to the Agreement or the flavor ban.

Defendants then misleadingly quote Dr. Leffler's testimony , <u>in a different context</u>, arguing that "elsewhere he agrees that it would be improper to exclude a variable that is highly correlated with damages variables" (said differently, that it would be proper to include a variable in a regression that is highly correlated with damages variables), and quote Dr. Leffler saying: "What I don't want to do is exclude a variable that, in fact, is *highly correlated* with one of my damage period variables so that I am picking up something with my damage variable that's not damage."[25] But, <u>defendants</u> omit the context. Dr. Leffler made this statement in answer to a question that he interpreted as requiring that perfection was necessary in specifying a regression model, and then he made up a hypothetical example to explain that if one of the highly correlated variables is substantively irrelevant to the analysis in the first place, it does not make the regression's specification more or less valid whether it is included or excluded as a variable (as the federal flavor ban is here):

```
23· ·Q.· It is important to include the variables that explain to
24· · · ·at least a very significant degree the price that was
25· · · ·set in the market; isn't that right?
·1· ·A.· No.· I mean, that is better -- that would be good but it
·2· · · ·is certainly not necessary to have a per[fect]ly valid
·3· · · ·specified econometric model.· What I don't want to do is
·4· · · ·exclude a variable that, in fact, is highly correlated
·5· · · ·with one of my damage period variables so that I am
·6· · · ·picking up something with my damage variable that's not
·7· · · ·damage, something else.
·8· · · · · · · · · ·So let's just say that -- let's say that from
·9· · · ·-- I am making this up -- hypothetically from December
10· · · ·2018 to July -- June 2022 every state imposed a five
11· · · ·percent sales tax on vaping products and I didn't have
12· · · ·that variable in there, well, I am -- I am picking it up
13· · · ·pretty good but I am calling it damages one and I should
```

---

[25] *Ibid.*, Ex. 98, Leffler Tr at 129:3-7 (emphasis added).

-11-

**14· · · ·be calling it this little period of state excise taxes.**[26]

In other words, hypothetically, the damages period one estimate of a 4.6% overcharge "pick[s] [ ] up" every state's imposition of a five percent sales tax on vaping products during the coincident December 2018 – June 2022 damages period, even though that sales tax variable (highly correlated with the damages period one variable) was excluded from the regression.[27] The point is that, econometrically, you get out of a regression what you put into it, and if you add variables to a regression that are highly correlated with each other (multicollinearity) without a sound economic basis, those variables will tend to undermine the interpretability of the regression, so rather than clarifying causation, it may be impossible to reliably distinguish among competing explanations for the movements in the dependent variable the regression is trying to explain.[28] *See In re Korean Ramen Antitrust Litig*., 2017 WL 235052, *13 (N.D. Cal. Jan. 19, 2017) (plaintiffs' expert's regression model was not unreliable or fatally undermined by the defense expert's multicollinearity criticism of it, and collecting and citing cases discussing multicollinearity, including *In re High-Tech Employee Antitrust Litig*., 2014 WL 1351040, at *21 (N.D. Cal. Apr. 4, 2014) ("Other courts have admitted regressions even in the face of expert disagreement regarding whether collinearity posed a problem.... This is not surprising given that the concept of collinearity is not a methodology, but a common phenomenon that results when using the methodology of regression analysis." (citation omitted)) (Orrick, J.).

Dr. Leffler's regression model is reliable and well-specified and shows that reduced competition from Altria's market exit—not JLI's market share loss from increased competition and decreased demand—explains the market and price dynamics observed, and that it is also capable of showing classwide injury and estimating damages to members of the proposed class.[29]

---

[26] Ex. 98, Leffler Tr. at 128:23 – 129:14.
[27] *Ibid*.
[28] Ex. 97, Leffler Reply, ¶¶ 32-34, discussing how Dr. Murphy's addition of a flavor ban and two other variables that have "close relationships . . . to the damage variable results in severe multicollinearity."
[29] Ex. 1, Leffler Rpt., ¶¶ 70-80.

-12-

### 2.     Dr. Leffler's model accounts for changes in JLI's financial condition beginning in 2022.

The contention in defendants' Motion that Dr. Leffler's regression model fails to account for JLI's "precarious [financial] position as it entered 2022" and its "deteriorat[ing]" financial condition thereafter that "led the company to prioritize short-term profits . . . [and] focus[ ] on generating cash as quickly as possible" is without merit.

Although the model does not include an explicit variable for JLI's financial condition or JLI's increased bankruptcy risk, legal settlements, or changes in discount rate that may have arisen beginning in 2022, the model controls directly for key supply and demand factors known to drive Juul's pricing in the closed-system e-cigarette products market, *e.g.*, Juul's marginal costs, disposable income per capita, the retail price of cigarettes (for cross-price competition), Google search trends for vaping health risks, and a comprehensive set of product, customer, and other fixed effects variables.[30]

With respect to JLI's specific financial deterioration in 2022—as a result of litigation expenses, regulatory actions such as the FDA's Marketing Denial Order ("MDO"), or strategic considerations around short-term versus long-term profitability—there is no explanatory variable or variables about this within Dr. Leffler's regression, because any direct effects of JLI's financial distress on Juul's pricing would operate through observable supply and demand explanatory variables already included in the model, as well as JLI's pricing and variable cost data, upon which the model relies.[31] For example, heightened litigation costs likely would affect JLI's marginal costs and be reflected in Dr. Leffler's cost control variable that uses Juul's cost data.[32] Changes in demand conditions due to regulatory shocks or public health events are captured in the model's demand-side control variables and the Google Trends proxy variable for the public's perceptions of the health risks of vaping.[33]

---

[30] Ex. 1, Leffler Rpt., ¶¶ 61–73.

[31] Ex. 1, Leffler Rpt., ¶¶ 26, 62-67 (incl. Chart 11).

[32] *Ibid*.

[33] *Ibid*.

-13-

There is no evidence for any unmeasured financial risk (such as a spike in JLI's discount rate or other balance-sheet distress) that had a direct causal impact on Juul's pricing independent or outside of what the model already accounts and controls for using the variables in its specification. Dr. Leffler's model is designed so that, after accounting for all these variables, remaining unexplained price increases—like those observed in July 2022 and beyond—are economically and statistically attributable to the effects of Altria's exit on competition, the Agreement, and the impaired market structure, not generic firm-specific shocks.[34] Despite JLI's ongoing market share declines and financial operating pressures, Dr. Leffler's regression model, using JLI's pricing and cost data, consistently finds overcharges, indicating that JLI's financial problems or declining market share cannot explain sustained or rising Juul prices beginning in July 2022.[35]

**B.     The creation of two damages periods is reliably based on record evidence.**

Defendants' argument that Dr. Leffler "unreliably connect[s]" the allegedly anti-competitive Altria-JLI Transaction in December 2018 with the first Juul price increase that began four-and-one-half years later in July 2022, and also with the increases that occurred in February 2023, August 2023 and February 2024, should be made to the trier of fact at trial.[36] Defendants put their spin on the factual record, contending that Dr. Leffler makes an unreliable and "flawed assumption" that the 2022-2024 Juul price increases were tied to the allegedly anti-competitive Agreement in December 2018, because he "ignores all of the stated reasons for JLI's price increases, all unrelated to Altria's 2018 investment."[37] As a matter of law, however, because Dr. Leffler's creation of a second damages period in July 2022 is reliably based on record evidence, defendants should be free to argue to the jury that those "stated reasons for JLI's price increases [are] all unrelated to Altria's 2018 investment," just as Dr. Leffler and IRPs should be free to impeach that story by informing jurors what the undisputed record evidence shows as a matter of fact:

---

[34] Ex. 1, Leffler Rpt., ¶¶ 55-79.
[35] *Id*. at 63-74; *see also, e.g*., Ex. 97, Leffler Reply, ¶¶ 17, 21.
[36] Def. Br. at 21-24.
[37] Def. Br. at 21.

-14-

- following the transaction in December 2018, the FTC immediately began investigating the legality of the Transaction and sued Defendants, because it alleged that the Transaction was an unlawful agreement to eliminate competition in the e-vapor market;

- on February 15, 2022, an FTC ALJ issued a decision dismissing the FTC's antitrust complaint against the Defendants for their Transaction (diminishing the risk of any future governmental regulatory restraint);

- on February 23, 2022, ████████████████████████████ ████████████████████████████████ ████████████████████████████████ ██████; [38] and

- months after that ALJ's decision, in July 2022, JLI increased Juul's prices *for the first time since the Transaction*, and then continued to increase them several more times through February 2024. [39]

Whether Dr. Leffler was "right or wrong" to create the two damages periods based on this evidence and the evidence discussed throughout his reports (including JLI's pricing data and defendants' business records), is a question for the jury to decide. *SQM N. Am.*, 750 F.3d at 1044 ("The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury.") (internal quotation marks and citation omitted); *cf. In re Juul Labs, Inc. Mktg.*, 2022 WL 1814440, at *20 (criticisms of a regression analysis directed at "the inputs used and results generated . . . are classic criticisms that go to weight, not admissibility." ) (Orrick, J.).

---

[38] Ex. 63, PLX 620.
[39] Def. Br. at 8; Ex. 1, Leffler Rpt., ¶¶ 61-63, Chart 11.

-15-

**C.    The extension of the second damages period by one year, after the undisputed February 2024 Juul price increase, is reasonably and reliably based on real-world data and unchallenged economic assumptions.**

Defendants contend that Dr. Leffler's "extrapolat[ion] [of] an additional $11.5 million in damages for the period from April 2024 through March 2025 . . . is <u>not based on any analysis of JLI's pricing data</u> . . . [but] [i]nstead . . . on an assumption that the 'volume of Juul sales to the Class in this period is the same as in the period April 2023 to March 2024,' and 'that the same direct overcharge percentage and pass-on estimates from damage period 2 apply.'" (emphasis added) [40] This is untrue. Dr. Leffler <u>relies on JLI's pricing, sales and cost data</u> for the April 2023 to March 2024 period *to extrapolate the anti-competitive harm to IRPs* for the April 2024 to March 2025 period, <u>as well as other economic evidence</u>, particularly his well-specified regression model's reliable overcharge and pass-through estimates for the July 2022 – March 2024 period, consistent with standard practice in economics and Ninth Circuit authorities.[41] *See, e.g.*, *Teradata Corp. v. SAP SE*, 124 F.4th 555, 570-71 (9th Cir. 2024) ("expert[s] may extrapolate harm to competition on a market-wide level based on" record evidence, and also make factual claims that are "reasonable extrapolation[s] from the evidence" and "sufficiently plausible to constitute a competing version[ ] of the evidence" and reach "other conclusions [based on evidence about which] a trier of fact might disagree") (internal quotation marks and citation omitted); *cf. Rushing v. Williams-Sonoma, Inc.*, 2024 WL 779601, *18 (N.D. Cal. Feb. 21, 2024) (denying motion to exclude expert's hedonistic-regression model before "damages discovery [was] completed," even though the model was only "proposed" and not "conduct[ed]," included an underlying assumption concerning the relationship of demand and pricing that was inconsistent with certain testimony concerning "the real world," and—as the expert admitted—would be "artificially constructed," because **the model was nevertheless "based on real world transactions and real word [sic] data regarding price and other variables," and so the defendant was free to "offer to the jury evidence of its pricing**

---

[40] Def. Br. at 11 citing and quoting Ex. 1, Leffler Rpt., ¶ 12 n.7.

[41] Ex.1, Leffler Rpt., ¶¶ 75-77 (incl. footnotes).

**strategies to rebut or challenge the damages produced by [the expert's] model**.") (Orrick, J.) (emphasis added). *Id.*

Dr. Leffler's extrapolation to estimate future damages, based on real-world JLI data and other evidence, is reasonable and reliable, particularly where, as here, it is undisputed that there was a Juul price increase in February 2024,[42] and there are no supply, demand, pricing, or other economic conditions indicating that JLI's supra-competitive pricing (overcharges on Juul purchases) ceased in March 2024, the end of JLI's transactional data produced in discovery.

## IV.    CONCLUSION

For the reasons set forth herein, Defendants' Motion should be denied.

Dated: September 8, 2025                          Respectfully submitted,

*/s/ Elana Katcher*
Robert N. Kaplan (*pro hac vice*)
Elana Katcher (*pro hac vice*)
**KAPLAN FOX & KILSHEIMER LLP**
800 Third Avenue, 38th Floor
New York, NY 10022
Telephone: (212) 687-1980
Email: rkaplan@kaplanfox.com
       ekatcher@kaplanfox.com

*Steering Committee Counsel for Indirect Purchaser Plaintiffs and the Indirect Reseller Plaintiffs and Counsel for Plaintiffs Sofijon, Inc., Rose and Fifth, Inc., and Napht, Inc.*

*/s/ C. Andrew Dirksen*
C. Andrew Dirksen (SBN 197378)
**CERA LLP**
529 Main Street, Suite P200
Boston, MA 02129
Telephone: (857) 453-6555
Email: cdirksen@cerallp.com

Solomon B. Cera (SBN 099467)
**CERA LLP**
50 California St. Suite 1500
San Francisco, CA 94111

---

[42] Def. Br. at 8.

-17-

Telephone: (415) 777-2230
Email: scera@cerallp.com

*Steering Committee Counsel for Indirect*
*Purchaser Plaintiffs and Indirect Reseller*
*Plaintiffs*

-18-

# EXHIBIT L

# Exhibit 102

# Provisionally Filed Under Seal

# In the Matter of:

# Altria Group and JUUL Labs

*February 5, 2020*
*Riaz Valani*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX7011-001

**1**

FEDERAL TRADE COMMISSION

In the Matter of:          )
ALTRIA GROUP               )
and                        ) File No. 191-0075
JUUL LABS, INC.            )
----------------------------)

Wednesday, February 5, 2020

Room 7103
Federal Trade Commission
Constitution Center
400 7th Street, S.W.
Washington, D.C.  20024

The above-entitled matter came on for investigational hearing, pursuant to subpoena, at 9:14 a.m.

**2**

APPEARANCES:

ON BEHALF OF THE FEDERAL TRADE COMMISSION:
        MEREDITH R. LEVERT, ESQ.
        ERIK M. HERRON, ESQ. (a.m. session)
        JOONSUK LEE, ESQ
        U.S. Federal Trade Commission
        Bureau of Competition
        Constitution Center
        400 7th Street, S.W.
        Washington, D.C.  20024
        (202) 326-2881
        mlevert@ftc.gov


ON BEHALF OF ALTRIA GROUP:
        MICHAEL J. GUZMAN, ESQ.
        Kellog, Hansen, Todd, Figel & Frederick, P.L.L.C.
        Sumner Square
        1615 M Street, N.W.
        Suite 400
        Washington, D.C.  20036
        (202) 325-7910
        mguzman@kellogghansen.com

**3**

APPEARANCES: (continued)

ON BEHALF OF ALTRIA GROUP:
        MICHAEL L. SIBARIUM, ESQ.
        DAVID C. GROSSMAN, ESQ.
        Pillsbury Winthrop Shaw Pittman LLP
        1200 Seventeenth Street, N.W.
        Washington, D.C.  20036-3006
        (202) 663-9202
        michael.sibarium@pillsburylaw.com

ON BEHALF OF JUUL LABS:
        JEREMY CALSYN, ESQ.
        Cleary Gottlieb Steen & Hamilton LLP
        2112 Pennsylvania Avenue, N.W.
        Washington, D.C.  20037-3229
        (202) 974-1522
        jcalsyn@cgsh.com

ALSO PRESENT:
        WILLIAM WATKINS, Economist - FTC

**4**

FEDERAL TRADE COMMISSION
I N D E X

WITNESS:            EXAMINATION:           PAGE
RIAZ BADRUDIN VALANI BY MS. LEVERT            5


PREMARKED EXHIBITS REFERENCED
PX                 PAGE
Number 1276            139
Number 1303             89
Number 2022            123
Number 2025             96
Number 2026             58
Number 2117             75
Number 2122             66
Number 2130            133
Number 2147            118
Number 2152            116
Number 2173             79
Number 2185            104
Number 2248            172
Number 9029            179

1 (Pages 1 to 4)

5

PROCEEDINGS

- - - - -

Whereupon --

RIAZ BADRUDIN VALANI

a witness, called for examination, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. LEVERT:

Q. Good morning, Mr. Valani.

A. Good morning.

Q. I know we met off the record, but for the record, I'm Meredith Levert, an attorney at the Federal Trade Commission.

Mr. Valani, can you please state your full name for the record.

A. Riaz Badrudin Valani.

Q. We are here today for a nonpublic investigational hearing in furtherance of the FTC's investigation of Altria's proposed acquisition of voting securities in JUUL Labs. This hearing will be conducted under the FTC rules.

Have you had your deposition taken before or otherwise given testimony under oath before?

A. Yes.

Q. Okay. So you may be familiar with the ground

6

rules, but just -- just to be sure, we'll go over them and hopefully refresh you on kind of how the process works today.

The court reporter, as you can see, is transcribing everything that we say. She can't record head nods, so please try to answer verbally.

A. Okay.

Q. It's important that we try not to talk over each other. There are going to be times when you can probably anticipate what the rest of my question is, but please try to let me go ahead and finish the question before you start answering. Likewise, I will do my best to let you finish your answer before I start asking another question.

Please try to speak slowly, and I will try to do the same.

Your counsel may object to my questions from time to time. Those objections are for the court reporter to record. Unless your counsel instructs you not to answer, you should go ahead and answer the question.

If you don't understand a question that I ask, please let me know, and I will try to clarify it. If you do answer a question, I will assume that you understood it.

7

We will take periodic breaks throughout the day. If you need a break, let me know. But if there is a question pending at the time, I would just ask that you answer it before we take the break.

Do you understand the instructions I've just given to you?

A. I do.

Q. Do you understand that you've taken an oath to tell the truth today?

A. I do.

Q. Is there anything that may affect your ability to give truthful and complete testimony today?

A. No.

Q. Throughout the day I will refer to JUUL Labs, Inc. as either JUUL or JLI.

Will you understand that?

A. Yes.

Q. Altria made an investment in JLI in December 2018; correct?

A. That's correct.

Q. If I refer to that and the associated agreements as the Altria investment or the Altria transaction, will you understand that to mean the December 2018 investment?

A. Yes.

8

Q. Okay. Great.

To start off, I'm going to get a high-level overview of your work and educational background, and then I'll ask more detailed questions about your involvement with JUUL.

Where did you attend college or university?

A. I attended NYU, but I did not graduate.

Q. And when did you leave NYU?

A. 1996-97.

Q. Okay. At a very high level, if you could walk me through your work history after college, starting from your first job.

A. Sure. Yeah. I mean, during -- I'll start actually during college.

Q. Okay.

A. So my first job, I was working at a firm called Gruntal and Company, which was a financial services and investment banking firm, G-R-U-N-T-A-L. And I started my career working in asset securitizations and so packaging loans and other financial assets, leases, into bond-type instruments.

And I left Gruntal and Company and went into business, you know, for myself -- and the name of the firm is Global Asset Capital -- around 1997, so I was very young. And originally, our business was focused

2 (Pages 5 to 8)

**61**

a majority interest in the company?

A. I don't think that we were really certain that this is something that we wanted to do. It was more like at this point, you know, there had been, as you can imagine, kind of six, nine -- you know, nine, ten months of some type of, you know, back-and-forth socialization, and so it was, you know, natural to -- if you try to keep talking, even if your goal is to keep talking, there was, you know, I think some moment in time when we actually laid down, you know, what the terms would be.

I don't know that there was a huge desire on the part of JUUL. Kevin Burns, who was just hired, was a new CEO, so he had only been there for like five months at the time this letter was written. And we were focused on building the business, and yet we were supposed to be responsive to Altria, and so this probably reflects some manifestation of those conversations.

But I would not characterize it as JUUL was very -- was set at all on doing any transaction with them.

And I would say also that recollecting, you know, from these conversations, the conversations that we had with Altria were frequently, you know,

**62**

we're sure that all the financial terms, you know, could be worked out but really what are the commitments you're willing to make as relates to, you know, what we viewed as our mission.

Q. And you already mentioned the Tobacco to 21 issue.

Were there any other commitments you were looking for Altria to make to further JUUL's mission?

A. An example of such commitments was what ended up in the actual transaction as was consummated. But, at the time, we didn't really know. And I think a lot of the suggestions that they had for how they could be helpful from a mission perspective, you know, weren't really detailed. And we just kept pressing for more detail because it was a natural way to have the conversations continue without any, you know, certain decision point, if you will. And I think we were genuinely interested in what would a large company faced with this situation be willing to do.

Q. And turning to the page ending in 003, the last sentence of the second bullet point reads, "JUUL's and Altria's respective antitrust counsel would discuss and develop a plan with respect to seeking and obtaining regulatory approval for the majority investment, including the treatment of any competitive products

**63**

owned by Altria."

Do you see that sentence?

A. I do.

Q. And when you reviewed this letter before it was sent, what was your understanding of what the phrase "any competitive products owned by Altria" referred to?

A. I would say just as a general precept for, you know, what it would take for Altria to ever have an involvement with JUUL would be that they -- that they couldn't have a directly competitive offering of their own and -- and they did have I guess directly competitive -- I meant -- I should be clear -- e-vapor offering of their own. And so -- or e-cigarette offering I mean, depending on how you want to characterize it, but -- and so, you know, we had said that, you know, if you were to work with us, you'd need to be exclusive because we couldn't have you selling some product you own a hundred percent of competing on the shelf with something that, you know, you own less percentage of.

Q. What was Altria's response to that?

A. I mean, you can see that topic manifest in the documents and so, you know, it may be better -- I mean, I give you candid responses, but it may be better to

**64**

refer to documents to see how that topic has shown up in print. But I think that they realized that we just weren't going to do anything unless that was the case probably pretty early on.

Q. Were they initially willing to commit to not having any competitive products of their own?

A. I don't know what point in time, you know, they committed to it or, you know, expressed that they would accede to that requirement and how they would accede to that requirement, but I know that in subsequent paper that was exchanged between the companies it does show up.

Q. And I believe you said that the notion that Altria could not have any competing e-vapor products was I believe you said precept and like a necessary -- a necessary part of any deal that might happen. Can you explain why?

A. Just like no polygamy.

So I -- why was it a precept for us?

Q. Right.

A. Well, I mean, even in this, you know -- in this, you know, deal construct, there's -- JUUL and its I guess shareholder group would own 49 percent and Altria would own 50.1 percent, so, you know, a natural incentive could be for someone to push a product they

16 (Pages 61 to 64)

Valani

Altria Group and JUUL Labs                                                    2/5/2020

65

own a hundred percent of, you know, in contravention.

It's hard to ever pinpoint anyone else's intentions in life in general, right, so -- and in this, you know, vis-à-vis this, they could be very excited about JUUL's ascent and really supportive of it, but these are large companies and people change and even intent changes in a fast-moving environment, a fast-changing environment, and so I think that Altria, you know, we felt that it was a risk we shouldn't take, you know, being, you know, in bed with them in any way and having the ability for them to have something that they have a greater incentive to sell that directly, you know, is in market next to our product as a similar offering.

Q. Do you recall what e-vapor products Altria had on the market at the time of this letter?

A. I don't know at the exact time of this letter.

I do know that they had a product line that they purchased called Green Smoke that became -- I think became MarkTen. And then they -- and these are all products that, you know, there's a few contract manufacturers in China that kind of represent the design and assembly of -- kind of integrated design and contract manufacturing companies.

And they had contracted with one of these

66

companies to distribute a product called MarkTen Elite, which was meant to be very similar to JUUL. And I don't know if that was released by the date of this letter or not, but if not, it was, you know, in market soon thereafter.

(Pause in the proceedings.)

Q. And Mr. Valani, feel free to take your time reading the document I've just handed you, which is PX 2122.

A. Thank you.

Q. I'm not going to ask you any specific questions about the substance, if that helps. I'm just going to ask you to identify what it is.

(Document review.)

A. Okay.

Q. For the record, PX 2122 consists of a cover e-mail chain. And the bottom e-mail in that chain is from Howard Willard to Mr. Burns, Mr. Nick Pritzker and Mr. Valani, with the subject of Proposal Letter. And the e-mail is dated May 3, 2018. And Mr. Willard writes, "I attach our response letter."

Turning to the page ending in 003, did you review this letter when you received it via Mr. Willard's e-mail?

A. I did.

67

Q. Okay. And did you understand this to be Altria's response to JUUL's letter dated April 20, 2018 that we just looked at in PX 2026?

A. Yes. I think so.

And to be clear, I'm not sure who's responding to whom when in the succession of these communiques, but yeah, I do think it's a direct response.

Q. Around this time in 2018, was JUUL in talks with any other potential investors besides Altria?

A. You mean strategic or nonstrategic or both?

Q. Both.

A. Yeah. I mean, JUUL completed a financing round in 2018, which I don't know the date of, but there was -- yeah. There was a financing consummated maybe like in -- it might have been June or July -- that included ███████████████ ████████████████████████ But I'm not sure of the date of that financing, but that was -- and there was a lot of inbound interest from nonstrategic investors. But, you know, JUUL did make the decision to try to limit such dialogue because, you know, fund-raising is distracting to a management team.

And in addition, at some point in 2018 -- and I can't remember when -- British American Tobacco, which owns R.J. Reynolds, indicated interest in investing in

68

the company, and there was some meetings that I attended with them.

Q. Roughly how many meetings did you attend with British American Tobacco?

A. Maybe like two to four.

Q. Okay.

A. I think. Yeah.

Q. Who else from JUUL participated in those meetings?

A. Kevin Burns, Nick Pritzker, and in a meeting in London at their office Isaac Pritzker I think, and at a meeting in San Francisco I think various members of the JUUL management team.

Q. How far along did the talks with British American Tobacco progress?

A. They offered to pay ████████████████ of the company globally, so no separating the business. And then -- and then due to -- and I don't know that we had -- I don't think that we had a position on whether or not we wanted to do that.

███████████████████████████████████

17 (Pages 65 to 68)

201

internationally like IQOS MESH?

A. Yeah, you know your stuff.

So I -- I actually don't know. I mean, you know, I think that because, you know, it depends, you know, if they were one organization or separate ones, and I guess I'm not sure actually how that would work.

Q. Okay.

A. As you know, their merger talks were called off, so -- publicly.

Q. And switching gears a little bit for the last few questions, for the Altria board observer, do you know what types of information is provided to the observer?

A. So we're quite careful. You know, we try to be quite careful I should say, so I think anything that's legally privileged is typically not in the purview of someone with observer status, you know, be they an Altria observer or otherwise, and so that's kind of one area.

Another area where we've been sensitive is on the product development pipeline. And you can imagine even with this we'd be more concerned.

And then I think matters relating to Altria-related issues they're just, you know -- they

202

recuse themselves from.

Q. Was Mr. Gifford recused from the JUUL board discussions involving the revised terms of the Altria transaction?

A. Yeah. But I think that it was more fell into the bucket of pre-recusal I think that we excluded observers because of the legal implications to all of the matters under discussion.

Q. And just to follow up, so Mr. Gifford was not present for the board discussions about amending the terms of the Altria transaction.

A. That is correct.

Q. Okay. And you listed some types of information that JUUL -- the JUUL board is careful not to give the board observers.

What types of information does the Altria observer receive?

A. Well, it's standard board packages, you know, with -- and board materials but with redacted sections primarily from those three areas.

To repeat, legally privileged, product development and -- legally privileged, product development and something -- and anything related to Altria specifically.

MS. LEVERT: Okay. And I think that's all I

203

have for you. Thank you very much for your time. I know it's a long day, and we appreciate you being here.

THE WITNESS: Thank you, guys.

MR. GUZMAN: Thank you.

MR. SIBARIUM: Thank you.

MS. LEVERT: Off the record.

(Whereupon, the foregoing investigational hearing was concluded at 4:46 p.m.)

204

DISTRICT OF COLUMBIA, to wit:

I, Josett F. Whalen, before whom the foregoing deposition was taken, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me, according to law, was examined by counsel.

I further certify that the examination was recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any party, nor an employee of counsel, nor related to any party, nor in any way interested in the outcome of this action.

As witness my hand and notarial seal this 19th day of February, 2020.

s/Josett F. Whalen
JOSETT F. WHALEN
Notary Public
MY COMMISSION EXPIRES: 5-31-2020

51 (Pages 201 to 204)

PX7011-052

205

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections that I feel are necessary I will attach on a separate sheet of paper to the original transcript.

I hereby certify, under penalty of perjury, that I have affixed my signature hereto on the date so indicated.

DATED:

RIAZ BADRUDIN VALANI

206

WITNESS:  RIAZ BADRUDIN VALANI
DATE:  February 5, 2020
CASE:  Altria/JUUL
Please note any errors and the corrections thereof on this errata sheet.  The rules require a reason for any change or correction.  It may be general, such as "to correct stenographic error" or "to clarify the record" or "to conform with the facts."
PAGE LINE  CORRECTION        REASON FOR CHANGE

52 (Pages 205 to 206)

PX7011-053

**Errata Sheet of Investigational Hearing of Riaz Valani**

In re: Altria Group and JUUL Labs
Before the Federal Trade Commission
File No. 191-0075
February 5, 2020

**CORRECTIONS**

| PAGE:LINE | TRANSCRIPT | CORRECTION |
|---|---|---|
| 2:16 | ON BEHALF OF ALTRIA GROUP: | ON BEHALF OF RIAZ VALANI |
| 3:3 | ON BEHALF OF ALTRIA GROUP: | ON BEHALF OF JUUL LABS |
| 14:4 | came in the company | came into the company |
| 16:2 | heat some matter and | heat some matter, and |
| 16:16 | And they would heat the pod | And it would heat the pod |
| 17:12 | Ploom ModelTwo | Ploom Model Two |
| 17:16 | ModelTwo | Model Two |
| 18:6 | the Japan Tobacco | Japan Tobacco |
| 20:4–20:5 | the Pax platform, which is the loose matter, and which is frequently cannabis, and the | the Pax platform, which uses loose matter—which is frequently cannabis—and the |
| 21:22 | was a couple of financing rounds that were done | were a couple of financing round that were done |
| 24:2 | As corporate governance | Corporate governance |
| 24:14 | there's frequently board calls | there are frequently board calls |
| 26:17 | sanctioned by with the awareness of | sanctioned by and with the awareness of |
| 27:10 | general feeling around | general feelings around |
| 30:5 | as a member of the strategic committee | I was a member of the strategic committee |
| 35:8 | people in industry | people in the industry |

PX7011-085

| PAGE:LINE | TRANSCRIPT | CORRECTION |
|---|---|---|
| 36:22 | Altria sued JUUL | PMI sued JUUL |
| 37:3 | Altria asserted that | PMI asserted that |
| 37:14 | We agreed to change | We agreed to change the design |
| 38:17 | so had raised a lot of questions | so it raised a lot of questions |
| 39:6 | to represent them in, | to represent us in, |
| 41:17 | and so we're very careful | and so we were very careful |
| 44:21 | I think primary – you know, primary, | I think primarily – you know, primarily, |
| 45:18 | have always something to learn | always have something to learn |
| 46:16–46:17 | you know, a lovely thought. | you know, it was a lovely thought. |
| 50:24 | the international business wasn't an interest | the international business wasn't of interest |
| 51:9 | mission perspective for us and 95 percent of the | mission perspective for us, 95 percent of the |
| 52:7 | always playing catchup | always playing catch-up |
| 60:3 | this is something that we wanted to do. | this was something that we wanted to do. |
| 63:10 | for Altria to ever have an involvement | for Altria to ever have involvement |
| 63:25 | I give you candid responses | I'll give you candid responses |
| 68:1 | there was some meetings | there were some meetings |
| 71:7 | decline because of the customers died | decline because the customers died |
| 74:22–74:23 | and might have been part of the | and they might have been part of the |
| 85:25 | feel like we have general alignment | feel like we had general alignment |
| 86:11 | I don't know there's anything | I don't know if there's anything |

2

PX7011-086

| PAGE:LINE | TRANSCRIPT | CORRECTION |
|---|---|---|
| 87:18 | I told them, Sorry, I can't make it | I told them, sorry, I can't make it |
| 93:5 | I was -- you know, generally, generally frustrating. | I was -- you know, generally, generally frustrated. |
| 93:18 | there was things | there were things |
| 113:15 | believed in, believes them | believed in, believed them |
| 118:18 | we're prepared to give them | we were prepared to give them |
| 125:9 | they're moving forward with the transaction | they were moving forward with the transaction |
| 129:1 | financially attractives | financially attractive |
| 138:3 | indeed that they were offering to us | that they were offering to us |
| 142:15 | were taking. | were making. |
| 143:19 | something that he'd be very | something that he was very |
| 144:24 | just like once a month | just like a once a month |
| 147:10 | large corporates | large corporations |
| 150:22 | building 123 Mission | building at 123 Mission |
| 151:15 | it's as if without criticism | it's without criticism |
| 151:17 | huge amount of energy | a huge amount of energy |
| 153:16 | that's muscle | that's a muscle |
| 157:14 | you got to get that | you've got to get that |
| 159:14 | kind of a -- deliverables | kind of -- deliverables |
| 161:23 | Well, A, we had told him | Well, we had told him |
| 166:24 | it's implausible as | as implausible as |
| 178:12 | a little shocked at kind of aggressive tone | a little shocked at the kind of aggressive tone |
| 178:21 | toward indemnification | to indemnification |

3

PX7011-087

4

| PAGE:LINE | TRANSCRIPT | CORRECTION |
|:---:|---|---|
| 181:2 | so needs | so it needs |
| 195:2 | as relates to JUUL board | as relates to the JUUL board |
| 198:6 | Well, we gone | Well, we got |
| 198:7 | won't be like a release | would be like a release |
| 202:6 | the bucket of pre-recusal I think that we excluded | the bucket of pre-recusal. I think that we excluded |

PX7011-088