# EXHIBIT A

Beth A. Wilkinson (*pro hac vice*)
James M. Rosenthal (*pro hac vice*)
Matthew Skanchy (*pro hac vice*)
Alysha Bohanon (*pro hac vice*)
Jenna Pavelec (*pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
jrosenthal@wilkinsonstekloff.com
mskanchy@wilkinsonstekloff.com
abohanon@wilkinsonstekloff.com
jpavelec@wilkinsonstekloff.com

Moira K. Penza (*pro hac vice*)
Jeremy Barber (*pro hac vice*)
**WILKINSON STEKLOFF LLP**
130 West 42nd Street, 24th Floor
New York, NY 10036
Telephone: (212) 294-8914
Facsimile: (202) 847-4005
mpenza@wilkinsonstekloff.com
jbarber@wilkinsonstekloff.com

*Attorneys for Defendants Altria Group, Inc.,
and Altria Enterprises, LLC*

David I. Gelfand (*pro hac vice*)
Jeremy J. Calsyn (SBN 205062)
Nowell D. Bamberger (*pro hac vice*)
Caleb J. Robertson (*pro hac vice*)
**CLEARY GOTTLIEB STEEN &
HAMILTON LLP**
2112 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
Telephone: (202) 974-1752
Facsimile: (202) 974-1599
dgelfand@cgsh.com
jcalsyn@cgsh.com
nbamberger@cgsh.com
cjrobertson@cgsh.com

*Attorneys for Defendant Juul Labs, Inc.*

[Additional Counsel Identified on Signature Page]

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

IN RE: JUUL LABS, INC.
ANTITRUST LITIGATION

This Document Relates to:

**ALL DIRECT PURCHASER ACTIONS**

Case No. 3:20-CV-02345-WHO

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO EXCLUDE THE OVERCHARGE MODEL AND DAMAGES OPINIONS OF DIRECT PURCHASER PLAINTIFFS' EXPERT, DR. PIERRE THOMAS LÉGER**

Judge: Hon. William H. Orrick
Date: October 10, 2025
Time: 2 P.M.

DEFENDANTS' REPLY IN SUPPORT OF THEIR
MOTION TO EXCLUDE THE OVERCHARGE
MODEL AND DAMAGES OPINIONS OF DPP
EXPERT, DR. PIERRE THOMAS LÉGER

CASE NO. 3:20-CV-02345-WHO

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

INTRODUCTION ........................................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

I.       Use Of The Antitrust Logit Model Retrospectively To Determine Injury And Damages Is Unreliable And Unprecedented ...................................................................................... 2

II.      The DPPs Cannot Prove That The Proportional-Substitution Assumption Holds In This Case ............................................................................................................................ 5

III.     Dr. Léger's ALM Relies On Additional Baseless Assumptions That Render His Methods Unreliable ............................................................................................................... 8

CONCLUSION ............................................................................................................................ 11

## TABLE OF AUTHORITIES

**Cases**                                        **Page(s)**

*Allegra v. Luxottica Retail N. Am.*,
341 F.R.D. 373 (E.D.N.Y. 2022) ...................................................................................................5

*Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*,
135 F. Supp. 2d 1031 (N.D. Cal. 2001) .........................................................................................2

*Am. President Lines, LLC v. Matson, Inc.*,
775 F. Supp. 3d 379 (D.D.C. 2025) ...............................................................................................8

*Bakst v. Cmty. Mem'l Health Sys., Inc.*,
2011 WL 13214315 (C.D. Cal. Mar. 7, 2011) .............................................................................11

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)....................................................................................................................7, 9

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962).......................................................................................................................6

*Castro v. Sanofi Pasteur Inc.*,
134 F. Supp. 3d 820 (D.N.J. 2015) ................................................................................................4

*Domingo ex rel. Domingo v. T.K.*,
289 F.3d 600 (9th Cir. 2002) .........................................................................................................9

*In re Dial Complete Mktg. & Sales Pracs. Litig.*,
320 F.R.D. 326 (D.N.H. 2017) ......................................................................................................5

*In re Google Play Store Antitrust Litig.*,
2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) .................................................................1, 5, 7, 11

*In re Telescopes Antitrust Litig.*,
348 F.R.D. 455 (N.D. Cal. 2025)....................................................................................................5

*Klein v. Meta Platforms, Inc.*,
766 F. Supp. 3d 956 (N.D. Cal. 2025) ...................................................................................7, 9, 10

*Lassalle v. McNeilus Truck & Mfg., Inc.*,
2017 WL 3115141 (N.D. Cal. July 21, 2017).............................................................................9, 11

*Laumann v. Nat'l Hockey League*,
117 F. Supp. 3d 299 (S.D.N.Y. 2015).............................................................................................4

*Riley v. Tesla, Inc.*,
603 F. Supp. 3d 1259 (S.D. Fla. 2022) ..........................................................................................8

**Cases (Continued)**

*Ticketmaster Corp. v. Tickets.Com, Inc.*,
  2003 WL 25781900 (C.D. Cal. Jan. 27, 2003) ....................................................................................4

*W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*,
  2015 WL 12806484 (D. Del. Sep. 25, 2015) ........................................................................................5

**INTRODUCTION**

The Direct Purchaser Plaintiffs ("DPPs") claim that the Antitrust Logit Model is "widespread," but cannot identify a single case that has affirmed its use to assess antitrust injury and damages. There are none. Indeed, another court in this district recently rejected the use of an ALM in nearly identical circumstances. *See In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *8–9 (N.D. Cal. Aug. 28, 2023). And for good reason: economists have long warned that such models can be unreliable because they rely on assumptions that rarely hold true in the real world.

Those inherent failings of the ALM are on full display here. Dr. Léger made his overcharge determination by freezing the market in place as of 2018 and making assumptions about the market that are directly contradicted by real-world evidence:

- He assumes that cig-a-likes and pod-based products are proportional substitutes, despite having conducted no diversion analysis to test this assumption. *See* July 28, 2025 Declaration of Jeremy Barber ("Barber Decl."), Ex. 46 (Deposition Testimony of Pierre Léger ("Léger Tr.") 254:22–255:3).

- He assumes that the other market participants (and their respective market positions) never changed and that the ever-shifting regulatory regime had no impact on the market. In reality, JLI's share fell from almost 70% in 2019 to 20% in 2024, *see* June 20, 2025 Declaration of Joseph Saveri ("Saveri Decl."), Ex. 7 (Expert Report of Pierre Léger ("Léger Rep.") Ex. 6), in the face of new competition from other pod-products like Vuse Alto and from disposables.

- He assumes Altria would have had *at least* a 10% share (and as much as 30%) had it remained in the e-cigarette market, but ignores the undisputed fact, corroborated by another of the DPPs' experts, that Altria's share was approximately 6% at the time its products exited the market and was declining precipitously in the leadup to that exit. Léger Tr. 296:22–297:7; July 28, 2025 Barber Decl., Ex. 50 (Deposition Testimony of Bryan J. Perry ("Perry Tr.") 281:24–282:4).

- He assumes a whopping 28.9% profit margin for Altria's e-vapor business, Nu Mark, even though it is undisputed that Nu Mark's actual margin was only 2% in 2018.  *See* Léger Tr. 272:23–274:18; Léger Rep. Ex. 9.

- He fails to analyze available sales data concerning online consumers (who are members of the direct class) and instead assumes that online consumers overpaid for JUUL products at the same rate as retail consumers, while acknowledging reasons the two groups would pay different prices.  *See* Léger Tr. 352:8–353:3.

- He assumes that the average of Circle K's and Wawa's pass-through rates in two states applies to all independent vape shops nationwide, even though he admitted he did not know whether those rates were representative of other retailers and made no effort to check.  *See* Léger Tr. 371:5–16.

These many erroneous assumptions exacerbate the unreliability of Dr. Léger's ALM and his resulting overcharge and damages calculations.  *See Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041–42 (N.D. Cal. 2001) (excluding antitrust model that contained "entirely too many assumptions and simplifications that are not supported by real-world evidence").  And none of the DPPs' arguments to the contrary change that.

This Court should decline the DPPs' invitation to be the first in the nation to permit the use of an ALM to assess antitrust injury and damages and instead exclude Dr. Léger's injury and damages opinions.

## **ARGUMENT**

### I.  USE OF THE ANTITRUST LOGIT MODEL RETROSPECTIVELY TO DETERMINE INJURY AND DAMAGES IS UNPRECEDENTED AND UNRELIABLE

The DPPs admit that ALMs are "typically implemented in the merger context" prospectively to predict the consequences of an anticipated merger.  ECF No. 569-4, DPP Opp. To Defs.' Mot. To Exclude The Overcharge Model & Damages Ops. Of Dr. Pierre Léger ("Opp.") at 6.  But they also admit that here, Dr. Léger applied the ALM "retrospectively rather than prospectively" to attempt to determine the effects of Altria's investment in JLI after it had occurred.  *Id*.  Using an ALM in this way is

DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO EXCLUDE THE OVERCHARGE MODEL AND DAMAGES OPINIONS OF DPP EXPERT, DR. PIERRE THOMAS LÉGER

2

CASE NO. 3:20-CV-02345-WHO

unprecedented for good reason. In the pre-merger context, economists do not have the benefit of real-world data to inform their analysis of competitive effects. Without that data, economists are forced to rely solely on hypothetical but-for worlds. The post-merger context is different: once a transaction has occurred and there is actual market data available, there is no basis for ignoring those real-world developments when discerning the effects of the merger. Yet Dr. Léger did just that, creating his own hypothetical world based solely on evidence from 2018, while blindly ignoring years of real-world data.

The use of a prospective tool like an ALM is particularly problematic here given that, as the DPPs concede, "the e-cigarette market was changing rapidly" after 2018. Opp. at 12; *see also* ECF No. 520-2, Defs.' Mot. To Exclude The Overcharge Model & Damages Ops. of Dr. Pierre Thomas Léger ("Mot.") at 3–5 (discussing dynamic nature of the market). The DPPs do not dispute that in determining an overcharge, Dr. Léger's ALM freezes the market in place as of 2018 by assuming that (1) the market participants in 2018 maintained their relative position in the market for the entire damages period, (2) there were no new market entrants, and (3) FDA regulations did not require the removal of products from the market. *See* Mot. at 14–17. Nor do the DPPs dispute that each of these assumptions is contradicted by what actually transpired in the real world. Nevertheless, the DPPs shrug off this concern by blithely claiming that "every but-for world damages model necessarily simplifies the world," Opp. at 11–12 (cleaned up), and characterizing Dr. Léger's freezing of the competitive environment in 2018 as "a textbook and well-recognized property of the ALM," *id.* at 13.

The DPPs attempt to make much of the fact that Dr. Léger looked at JLI's sales data from after the transaction, Opp. at 13, but they ignore the purpose for which he used that data. The JLI sales data is *not* an input that the ALM used to generate an overcharge estimate. *See* Léger Rep. 84–86 (data used in ALM only includes firm-level variable profit margins, market shares "for the 12-month period prior to the Transaction," and average prices). In other words, the ALM produces the same overcharge rate regardless of how many sales JLI had in the real world and, in fact, would find the same overcharge even if JLI had no sales following the transaction. JLI's sales data only comes into play when Dr. Léger calculates *damages*, because he multiplies the overcharge found by his ALM against JLI's sales data to

generate a class-wide damages amount. Léger Rep. 77–79. As a result, although the DPPs are correct that damages would go down as JLI's sales fall, Opp. at 13, that is only because there are fewer sales for which JUUL purchasers can claim damages. At the end of the day, the DPPs cannot dispute that the ALM's overcharge is dependent on assumptions of a static market that are contradicted by what transpired in the real world.

Nor can the DPPs refute that Dr. Léger's model always finds an overcharge, which he assumed lasts in perpetuity. *See* Opp. at 15–16. The DPPs point to testimony of Dr. Léger that an ALM may not produce an overcharge in certain circumstances where companies are pricing at cost, but he also acknowledged that in this case—because his model "take[s] as given that these are firms that have market power," Léger Tr. 258:6–16, and imposes that JLI's shares necessarily increase as a result of Altria's withdrawal of products, *id.* at 255:10–22, 258:17–23—it will always produce an overcharge, *see id.* at 258:6–23. The DPPs' further argue that the facts of the case allow Dr. Léger to find impact in perpetuity, Opp. at 16, but that directly contradicts Dr. Léger's testimony that he has not analyzed the facts of the case to determine when "the market [would have] regained the lost competition that was due to Altria's exit." *See* Léger Tr. 232:1–233:3. Notably, Dr. Hoelle, the DPPs' rebuttal expert, found that any overcharge subsided by December 2021. July 28, 2025 Barber Decl., Ex. 52 (May 22, 2025 Deposition Testimony of Matthew Hoelle 124:18–125:12).

That fundamental mismatch between Dr. Léger's ALM and the real world renders his damages opinions unreliable and inadmissible. *See, e.g.*, *Laumann v. Nat'l Hockey League*, 117 F. Supp. 3d 299, 315 (S.D.N.Y. 2015) (excluding demand opinions where "time and time again, [the expert] substitutes mathematical assumptions for actual, readily-obtainable information in determining how hockey and baseball fans will behave in the [but-for world]"). Unsurprisingly, none of the cases cited by the DPPs support using an ALM under these circumstances.

The DPPs misleadingly claim that courts "routinely admit merger simulations . . . to measure antitrust impact and damages." Opp. at 7. But none of the three cases that the DPPs cite involved an ALM like Dr. Léger's. *See Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 828 (D.N.J. 2015)

DEFENDANTS' REPLY IN SUPPORT OF THEIR
MOTION TO EXCLUDE THE OVERCHARGE
MODEL AND DAMAGES OPINIONS OF DPP
EXPERT, DR. PIERRE THOMAS LÉGER

4

CASE NO. 3:20-CV-02345-WHO

(Bertrand model); *Ticketmaster Corp. v. Tickets.Com, Inc.*, 2003 WL 25781900, at *3 (C.D. Cal. Jan. 27, 2003) (discussing Nash-Cournot equilibrium within Cournot model); *In re Telescopes Antitrust Litig.*, 348 F.R.D. 455, 462–63 (N.D. Cal. 2025) (Cournot model).  Moreover, none of these courts had to consider the impact of proportional substitution (*see infra*, at 5–8) in assessing the reliability of these models.

The DPPs also claim that "courts have approved economists' use of logistical regression models to establish price impact in antitrust and unfair trade practices cases," Opp. at 7, but cite no antitrust case in support.  *See W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, 2015 WL 12806484, at *1 (D. Del. Sep. 25, 2015) (patent infringement); *Allegra v. Luxottica Retail N. Am.*, 341 F.R.D. 373, 388 (E.D.N.Y. 2022) (false and misleading statements under state law); *In re Dial Complete Mktg. & Sales Pracs. Litig.*, 320 F.R.D. 326, 328 (D.N.H. 2017) (same).  Notably, the models admitted in those cases were "nested" (*W.L. Gore*) or "mixed" (*Allegra* and *In re Dial*) logit models, which are fundamentally different from the ALM because they control for the ALM's "well-known weakness" of proportional substitution by relaxing or eliminating it.  *See* Zetenyi & Beckford, *Logit or Leave It?*, COMPETITION POLICY INT'L (Aug. 11, 2024), https://perma.cc/H553-63NX.  Thus, far from showing that the ALM is a generally accepted method, these cases demonstrate only that courts admit different types of models that account for the ALM's central shortcoming.

## II.    THE DPPS CANNOT PROVE THAT THE PROPORTIONAL-SUBSTITUTION ASSUMPTION HOLDS IN THIS CASE

The DPPs agree that Dr. Léger's ALM, "contains a 'proportional substitution' assumption." Opp. at 2.  In other words, the ALM assumes that when Altria withdrew its products, its customers switched to competitors' products in proportion to the competitors' share of the market in 2018.  That means the ALM assumes that most Altria customers switched to JUUL, even though the overwhelming majority of Altria's products sold were cig-a-likes and JUUL is a pod product. Mot. at 10–13.  Economists have called such an assumption a "well-known weakness" of the model, *see* Zetenyi, *Logit or Leave It?*, and have warned that such an assumption "can lead to unrealistic forecasts," *Google Play*, 2023 WL 5532128, at *8 (quoting Kenneth Train, *Logit,* DISCRETE CHOICE METHODS WITH SIMULATION 52

(Cambridge Univ. Press 2009)).

The DPPs do not point to any analysis from Dr. Léger specifically studying whether the proportional-substitution assumption is reliable in the e-cigarette market. Nor could they; Dr. Léger conceded that he did nothing to test this assumption. Léger Tr. 254:22–255:3. Instead, the DPPs argue that Dr. Léger is "entitled to assume" that there was proportional substitution, Opp. at 2, because two other experts—Dr. Perry (the DPPs' market-definition expert) and Dr. Leffler (the IRPs' economist)— opine that cig-a-likes and pod products should be considered part of the same antitrust market, *id.* at 9– 11.

The DPPs' argument fails because market definition is not the same as proportional substitution. The DPPs do not—and cannot—cite a single case holding that two types of products must be proportional substitutes to be comprised within the same market. Instead, the Supreme Court has held that "[t]he outer boundaries of a product market are determined by . . . *reasonable interchangeability*"— not that the products in the market must all be perfect substitutes for each other. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (emphasis added). As a result, none of the *Brown Shoe* factors used to help define the relevant market address whether the products in question are proportional substitutes. *Id.* (listing "practical indicia" including "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors").

Indeed, the ALJ in the related FTC matter determined that the relevant market included both cig-a-likes and pods, but nonetheless concluded that the assumption of proportional substitution was "not economically sound." July 28, 2025 Barber Decl., Ex. 22 (*In re Altria Group, Inc. and Juul Labs, Inc.*, No. 9393, ALJ Initial Decision 22, 91 (FTC Feb. 15, 2022)). In short, even if the DPPs were correct that cig-a-likes are part of the market, that does not establish that there would be proportional substitution between cig-a-likes and pods.

Nor does any of the specific evidence relied upon by Dr. Perry and Dr. Leffler in support of their market-definition opinions justify a proportional-substitution assumption. The DPPs do not point to

analysis from either expert that studied the extent to which cig-a-like users proportionally switched to pods. *See* July 28, 2025 Barber Decl., Ex. 49 (Amended Expert Rebuttal Report of Kevin Murphy ("Murphy Am. Reb.") ¶ 43 (neither expert "conduct[ed] any analyses of actual substitution patterns")). Dr. Perry instead merely discussed some common characteristics of cig-a-likes and pod-based products (as well as their differences). *See* June 20, 2025 Saveri Decl., Ex. 9 (Expert Report of Bryan J. Perry ¶¶ 44 & Tbl. 1, 46 & Fig. 7, 71); Murphy Am. Reb. ¶¶ 52, 114. And then he and Dr. Leffler conducted hypothetical monopolist tests ("HMTs") that do not speak at all to substitution patterns between cig-a-likes and pod products. *See* Opp. at 9. Instead, Dr. Perry's HMT was designed to determine whether the relevant market definition should be *broadened* to include open-system e-cigarettes or combustible cigarettes. Perry Tr. 149:11–150:2. As a result, he conceded that he "did not conduct a[n] [HMT] of a closed-system e-cigarettes excluding cig-a-like products market and, therefore, cannot speak to whether—what that would have said one way or the other." *Id.* at 151:16–152:1. And Dr. Leffler's HMT similarly focused on whether open systems should be included in the market and did not analyze cig-a-likes vis-à-vis pod-based products, much less show that they are proportionate substitutes. *See* July 28, 2025 Barber Decl., Ex. 42 (Expert Rebuttal Report of Keith Leffler ¶ 23).

"[A]n expert does not have license to simply disregard reality," *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 964 (N.D. Cal. 2025), or "substitute" his testimony for "market facts," *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993). Indeed, it was this very "unsupported assumption" of proportional substitution that compelled the court in *Google Play* to exclude an ALM as unreliable. 2023 WL 5532128, at *8–9. The court there accepted that the products in question were part of the same market, but still found that there was no basis to assume that there would be proportional substitution:

> The model does not give the jury a sound basis on which to make a reasoned and reasonable judgment about antitrust impact and damages *in a product market that does not show proportional substitution across alternatives*[.]

*Id.* at *9 (emphasis added).

The DPPs' response to *Google Play* is to submit a new declaration from Dr. Léger summarily

asserting that "[m]y application of the ALM does not suffer from the same flaw as the ALM in *Google Play.*" ECF No. 569-8, Declaration of Pierre Thomas Léger ("Léger Decl.") at 11. Even if this new declaration were proper,[1] on its face it cannot carry the DPPs' burden of establishing that there would be proportional substitution in this case. Dr. Léger's declaration offers no evidence of the extent to which cig-a-like consumers would switch to pods and tacitly concedes that the two types of e-cigarettes are not "perfect substitutes." *Id.* ¶ 82. Instead, Dr. Léger's declaration makes clear that the basis for his assumption is Dr. Perry's opinion that cig-a-likes and pods should be in the same market, *id.* ¶ 84, which again does not answer the question of whether there is proportional substitution between the two types of products.

## III.    DR. LÉGER'S ALM RELIES ON ADDITIONAL BASELESS ASSUMPTIONS THAT RENDER HIS METHODS UNRELIABLE

The DPPs fail to defend several additional baseless assumptions that further undermine the reliability of Dr. Léger's ALM.

***Erroneous Assumed Market Share.*** Driving Dr. Léger's overcharge and damages calculations is his adoption of three hypothetical scenarios, in which he assumes that Altria would have achieved and maintained at least a 10% market share, and as high as a 30% market share, over the entire damages period had it not discontinued its e-cigarette sales. *See* Mot. at 18–21. The DPPs defend the 10% market share assumption as "Altria simply maintain[ing]" its share when it exited, Opp. at 18, disregarding that their own market-definition expert, Dr. Perry, calculated that Altria's share at exit had declined to only 6–7%, Perry Tr. 281:24–282:4 (Nu Mark's share in Q3 2018 was 6%); June 20, 2025 Saveri Decl., Ex. 10 (Expert Rebuttal Report of Bryan J. Perry Suppl. Tbl. 8 (Nu Mark's share in Q3 was 7%)). The DPPs seek to cast aside Dr. Perry's calculation as based on a "different[] point of reference," Opp. at 18, but that difference is critical: only Dr. Perry calculated Altria's share at exit. *See* Léger Rep. Ex. 7 (Dr.

---

[1] As explained more fully in ECF No. 570-4, Defs.' Reply In Support Of Their Mot. To Exclude The Overcharge Regressions Of DPPs' Expert, Dr. Matthew Hoelle at 6–7, Dr. Léger's newly disclosed opinions in his newly submitted declaration are improper and should not be relied on here. *See Am. President Lines, LLC v. Matson, Inc.*, 775 F. Supp. 3d 379, 423 (D.D.C. 2025) (striking declaration submitted with *Daubert* briefing); *Riley v. Tesla, Inc.*, 603 F. Supp. 3d 1259, 1275 (S.D. Fla. 2022) (same).

Léger averaged shares over a year). In any event, there is no dispute on the critical points: Dr. Léger does not dispute that Altria's market share was consistently declining in the year leading up to its exit. *See* Léger Tr. 296:22–297:7. And Dr. Léger does not dispute the reasonableness of Dr. Perry's calculations. *See id.* at 300:15–24. Instead, he simply ignores all of this evidence. *See id.* at 297:18–298:4 ("I have not looked at [Dr. Perry's] arguments to the 6 percent."). Because Dr. Léger provides no econometric support for his assumptions and ignores available contrary real-world evidence, his opinions based on these scenarios should be excluded. *See Lassalle v. McNeilus Truck & Mfg., Inc.*, 2017 WL 3115141, at *4–5 (N.D. Cal. July 21, 2017) (excluding expert testimony where "[r]ather than engag[ing] with the evidence and explain[ing] any scientific basis for dismissing alternate theories, his only methodology was to ignore anything inconsistent with [his] conclusion").

***Erroneous Assumed Profit Margin.*** The DPPs do not dispute that Dr. Léger's model assumes that Altria had a 28.9% profit margin throughout the entire damages period when in reality Altria had a 2% profit margin in 2018 at the start of the damages period. *See* Léger Decl. ¶ 92 (agreeing that Altria's margin "prior to its exit was 2%"). Although the DPPs elsewhere defend the fact that the ALM generally freezes the market in place as of 2018 as a "textbook and well-recognized property of the ALM," Opp. at 13, on this point they go in the opposite direction and argue that Dr. Léger was entitled to assume that Altria "would experience greater long-run profits" in the future, *id.* at 20. But Dr. Léger offers no basis to assume that Altria's profit margin would magically increase 14 times. His rationale that Altria's margins would necessarily follow the same trajectory as JLI's or Reynolds' margins, *see* Opp. 20–21, is belied by the fact that those two companies had a product Altria did not—a pod product with 5% nicotine and nicotine salts, *see* Mot. 3–4. And as the case law requires, "there must be a sound foundation in the evidence to support every step on the way to [an expert's] conclusions." *See Klein*, 766 F. Supp. 3d at 967; *see also Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) ("The reasoning between steps in a theory must be based on objective, verifiable evidence[.]"); *Brooke Grp.*, 509 U.S. at 242 ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support

a jury's verdict."). Dr. Léger has not provided that foundation here, so his resulting injury and damages conclusions should be excluded.

***Erroneous Assumed Overcharge Rates For Online Purchasers.*** With little explanation and no analysis, Dr. Léger assumed that the same overcharge rate for retail consumers applied to online consumers who purchased directly from JLI. *See* Mot. at 21–22; *see also* Opp. at 22 (conceding assumption). Dr. Léger makes this assumption despite acknowledging that retail consumers may pay a premium to have instant access to e-cigarettes, Léger Tr. 353:22–25, and that retail products go through multiple intermediaries, *id.* at 352:11–353:3, and thus their prices include pass-through costs that online purchasers would not have to pay, *see* Léger Rep. 77–79; Léger Tr. at 352:8–10. In an attempt to salvage this unsupported assumption, the DPPs point to one sentence from Dr. Léger's deposition that asserts that, generally, online prices would be constrained by retail prices and vice versa. *See* Opp. at 22 (citing Léger Tr. 353:9–15). But Dr. Léger does nothing to actually examine this theory in the context of this case and has no quantitative or other evidence to corroborate it. Léger Tr. 355:22–356:11; *see also Klein*, 766 F. Supp. 3d at 963 ("[C]itations to economic literature do not demonstrate that the economic principles . . . were reliably applied to the facts of this case."). This erroneous assumption forecloses the application of Dr. Léger's model to the portion of the proposed DPP class that purchased online.

***Erroneous Assumed Pass-Through Rates.*** Dr. Léger simply averaged the pass-through rates of Circle K (in Arizona) and Wawa (in New Jersey) and applied that to the smaller "retailers" (independent vape shops)[2] that are a third category of direct purchasers. The DPPs ignore Dr. Léger's fatal concession that he "do[es] not" know if the pass-through rates for Circle K and Wawa are representative of this category of retailers. Léger Tr. 371:5–16. Instead, they merely note that Wawa and Circle K's pass-through rates are similar to one another, Opp. at 23, which is beside the point. The issue is whether Wawa and Circle K's passthrough rates are representative of the smaller retailers that are part of Dr. Léger's "retailer" category, not whether each of these very large retailers is representative of the other.

---

[2] Dr. Léger testified that he "believe[s]" his retailer category included "channel vape shops" that "for a period of time, were able to purchase directly from JLI." Léger Tr. 373:19–375:12.

The DPPs thus fail to explain how Dr. Léger's averaging could be representative, given the size discrepancy between Circle K and Wawa and the retailer category. *Compare* Léger Rep. Ex. 3, *with* Murphy Am. Reb. Ex. 52 (showing that the DPP retailer group makes up only 0.6% of JLI's sales of at-issue products, ████████████████████████████████ This baseless assumption forecloses the application of Dr. Léger's model to the portion of the proposed DPP class labeled "retailers."

## CONCLUSION

Dr. Léger's many assumptions do not simply go to weight as the DPPs would have the Court believe. They are fundamental problems with the ALM—which economists have time and again cautioned against—that are further amplified by the model's ill-fitting application in this case. The DPPs and Dr. Léger seek to brush over these flawed assumptions, but the case law is clear that it is exactly these types of unproven assumptions that render the ALM—and Dr. Léger's resulting damages opinions—unreliable and inadmissible. *See, e.g.*, *Google Play*, 2023 WL 5532128, at *8–9; *Lassalle*, 2017 WL 3115141, at *4–5 (explaining that "conclusions and methodology are not entirely distinct from one another" and "[a] district court may . . . exclude evidence if it conclude[s that] there is simply too great an analytical gap between the data and the opinion proffered" (citations omitted) (second alteration in original)); *Bakst v. Cmty. Mem'l Health Sys., Inc.*, 2011 WL 13214315, at *20 (C.D. Cal. Mar. 7, 2011) (excluding damages calculation that was "based on factual assumptions that are entirely unsupported in the record").

For these reasons, Defendants respectfully request that the Court exclude Dr. Léger's overcharge model and damages opinions.

Dated: September 22, 2025

Respectfully submitted,

*/s/ Beth A. Wilkinson*
Beth A. Wilkinson (*pro hac vice*)
James M. Rosenthal (*pro hac vice*)
Matthew Skanchy (*pro hac vice*)
Alysha Bohanon (*pro hac vice*)
Jenna Pavelec (*pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
*bwilkinson@wilkinsonstekloff.com*
*jrosenthal@wilkinsonstekloff.com*
*mskanchy@wilkinsonstekloff.com*
*abohanon@wilkinsonstekloff.com*
*jpavelec@wilkinsonstekloff.com*

Moira K. Penza (*pro hac vice*)
Jeremy Barber (*pro hac vice*)
**WILKINSON STEKLOFF LLP**
130 West 42nd Street, 24th Floor
New York, NY 10036
Telephone: (212) 294-8914
Facsimile: (202) 847-4005
*mpenza@wilkinsonstekloff.com*
*jbarber@wilkinsonstekloff.com*

Lauren Sachi Wulfe (SBN 287592)
**ARNOLD & PORTER KAYE SCHOLER LLC**
777 S. Figueroa Street, 44th Floor
Los Angeles, CA 90017
Telephone: (213) 243-4211
Facsimile: (213) 243-4199
*lauren.wulfe@arnoldporter.com*

*Attorneys for Defendants Altria Group, Inc., and Altria Enterprises, LLC*

DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO EXCLUDE THE OVERCHARGE MODEL AND DAMAGES OPINIONS OF DPP EXPERT, DR. PIERRE THOMAS LÉGER

12

CASE NO. 3:20-CV-02345-WHO

*/s/ Nowell D. Bamberger*
Nowell D. Bamberger (*pro hac vice*)
David I. Gelfand (*pro hac vice*)
Jeremy J. Calsyn (SBN 205062)
Caleb J. Robertson (*pro hac vice*)
**CLEARY GOTTLIEB STEEN &
HAMILTON LLP**
2112 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
Telephone: (202) 974-1752
Facsimile: (202) 974-1599
*dgelfand@cgsh.com*
*jcalsyn@cgsh.com*
*nbamberger@cgsh.com*
*cjrobertson@cgsh.com*

*Attorneys for Defendant Juul Labs, Inc.*

*/s/ Michael J. Guzman*
Mark C. Hansen (*pro hac vice*)
Michael J. Guzman (*pro hac vice*)
David L. Schwarz (SBN 206257)
**KELLOGG, HANSEN, TODD, FIGEL &
FREDERICK, P.L.L.C.**
1615 M Street, NW Suite 400
Washington, DC 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
*mhansen@kellogghansen.com*
*mguzman@kellogghansen.com*
*dschwarz@kellogghansen.com*

*Attorneys for Individual Defendants
Nicholas Pritzker and Riaz Valani*

**FILER'S ATTESTATION**

In compliance with Civil Local Rule 5-1(i)(3), I, Beth A. Wilkinson, hereby attest that each of the signatories identified above has concurred in this filing.

*/s/ Beth A. Wilkinson*
Beth A. Wilkinson (*pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
*bwilkinson@wilkinsonstekloff.com*

# EXHIBIT B

Beth A. Wilkinson (*pro hac vice*)
James M. Rosenthal (*pro hac vice*)
Matthew Skanchy (*pro hac vice*)
Alysha Bohanon (*pro hac vice*)
Jenna Pavelec (*pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
jrosenthal@wilkinsonstekloff.com
mskanchy@wilkinsonstekloff.com
abohanon@wilkinsonstekloff.com
jpavelec@wilkinsonstekloff.com

Moira K. Penza (*pro hac vice*)
Jeremy Barber (*pro hac vice*)
**WILKINSON STEKLOFF LLP**
130 West 42nd Street, 24th Floor
New York, NY 10036
Telephone: (212) 294-8914
Facsimile: (202) 847-4005
mpenza@wilkinsonstekloff.com
jbarber@wilkinsonstekloff.com

*Attorneys for Defendants Altria Group, Inc.,
and Altria Enterprises, LLC*

David I. Gelfand (*pro hac vice*)
Jeremy J. Calsyn (SBN 205062)
Nowell D. Bamberger (*pro hac vice*)
Caleb J. Robertson (*pro hac vice*)
**CLEARY GOTTLIEB STEEN &
HAMILTON LLP**
2112 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
Telephone: (202) 974-1752
Facsimile: (202) 974-1599
dgelfand@cgsh.com
jcalsyn@cgsh.com
nbamberger@cgsh.com
cjrobertson@cgsh.com

*Attorneys for Defendant Juul Labs, Inc.*

[Additional Counsel Identified on Signature Page]

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: JUUL LABS, INC. ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>**ALL INDIRECT RESELLER ACTIONS**<br><br>**ALL INDIRECT PURCHASER ACTIONS** | Case No. 3:20-CV-02345-WHO<br><br>**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO EXCLUDE THE OVERCHARGE MODELS AND DAMAGES OPINIONS OF INDIRECT RESELLER PLAINTIFFS' EXPERT, DR. KEITH LEFFLER, AND INDIRECT PURCHASER PLAINTIFFS' EXPERT, DR. GARETH MACARTNEY**<br><br>Judge: Hon. William H. Orrick<br>Date: October 10, 2025<br>Time: 2 P.M. |

DEFENDANTS' REPLY IN SUPPORT OF MOTION
TO EXCLUDE OVERCHARGE MODELS AND
DAMAGES OPINIONS OF INDIRECT PLAINTIFFS'
EXPERTS, DR. LEFFLER AND DR. MACARTNEY

CASE NO. 3:20-CV-02345-WHO

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...............................................................................................................ii

INTRODUCTION ..........................................................................................................................1

ARGUMENT ..................................................................................................................................3

I.       Dr. Leffler's And Dr. Macartney's Overcharge Regressions Are Unreliable Because They Fail To Account For Major Variables.................................................................................3

         A.       Major Factor #1: Increased Competition Caused JLI To Lose Price-Sensitive Customers, Incentivizing It To Raise Prices.............................................................4

                  1.       IRPs' Arguments Fail ...............................................................................4

                  2.       IPPs' Arguments Fail................................................................................7

         B.       Major Factor #2: JLI's Declining Financial Condition Caused It To Prioritize Short-Term Profits, Incentivizing It To Raise Prices.............................................11

                  1.       IRPs' Arguments Fail .............................................................................11

                  2.       IPPs' Arguments Fail..............................................................................12

II.      Dr. Leffler's And Dr. Macartney's Second Damage Period Is Unreliable Because It Is Not Grounded In A Reliable Methodology ..................................................................13

CONCLUSION.............................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**                                                                                                              **Page(s)**

*Alsadi v. Intel Corp.*,
　　2019 WL 4849482 (D. Ariz. Sep. 30, 2019)...............................................................................15

*Bazemore v. Friday*,
　　478 U.S. 385 (1986)..........................................................................................................3

*Bickerstaff v. Vassar Coll.*,
　　196 F.3d 435 (2d Cir. 1999)..............................................................................................3

*Cartwright v. Home Depot U.S.A., Inc.*,
　　936 F. Supp. 900 (M.D. Fla. 1996).................................................................................15

*Claar v. Burlington N. R.R. Co.*,
　　29 F.3d 499 (9th Cir. 1994) ............................................................................................14

*Clausen v. M/V New Carissa*,
　　339 F.3d 1049 (9th Cir. 2003) ........................................................................................14

*Freeland v. AT&T Corp.*,
　　238 F.R.D. 130 (S.D.N.Y. 2006) ...............................................................................passim

*In re High-Tech Emp. Antitrust Litig.*,
　　2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) ...............................................................6, 8

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
　　2025 WL 354671 (S.D.N.Y. Jan. 30, 2025) ...................................................................4

*In re Korean Ramen Antitrust Litig.*,
　　2017 WL 235052 (N.D. Cal. Jan. 19, 2017) ...................................................................6

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
　　299 F. Supp. 3d 430 (S.D.N.Y. 2018)..............................................................................6

*In re Live Concert Antitrust Litig.*,
　　863 F. Supp. 2d 966 (C.D. Cal. 2012) .....................................................................2, 3, 9

*Lin v. Solta Med., Inc.*,
　　2024 WL 5199905 (N.D. Cal. Dec. 23, 2024)...............................................................14

*Miami Prods. & Chem. Co. v. Olin Corp.*,
　　2023 WL 8946114 (W.D.N.Y. Dec. 28, 2023)................................................................4

**Rules**

Federal Rule of Evidence 702................................................................................................................14

**Other Authorities**

Reference Manual on Scientific Evidence (3d ed., 2011) ........................................................................7

**INTRODUCTION**

Plaintiffs do not dispute that the e-cigarette market has evolved rapidly since Altria invested in Juul Labs, Inc. ("JLI") in 2018. Plaintiffs do not dispute that, almost immediately after the investment, JUUL began to lose significant market share to other pod products that (like JUUL and unlike Altria's pod product) came in 5.0% nicotine strength and used nicotine salts. Plaintiffs do not dispute that Vuse Alto, one of the pod products with those features, surpassed JUUL in market share of devices by August 2020 and pods by December 2022. Nor do Plaintiffs dispute that beginning with FDA's flavor ban in February 2020 and continuing through today, illicit flavored disposable products have become the most popular e-cigarettes on the market. In the years since FDA banned e-cigarette flavors other than tobacco and menthol, domestic manufacturers (like JLI) have followed the law, but foreign manufacturers have not, flooding the market with cheap, flavored products that contain nicotine salts and relatively high nicotine concentrations. Those illicit flavored disposables have supplanted brands like JUUL.

As a consequence of these and other developments, JLI faced a potential bankruptcy in 2022. JLI's delicate position worsened when the FDA issued a marketing denial order ("MDO") for JUUL that summer, ordering JLI's only product off the market. Although JLI was able to secure an administrative stay of the MDO and avoid bankruptcy through a large infusion of capital from its chief investors, Plaintiffs do not contest that JLI's financial position remained precarious.

Despite acknowledging the uniquely dynamic nature of the e-cigarette market due to government regulation and expanding (licit and illicit) product offerings, Dr. Leffler and Dr. Macartney created overly simplistic regressions that failed to account for any of these major market developments that affected JUUL's pricing. Specifically, Dr. Leffler and Dr. Macartney find significant overcharges and damages because they did not account for: (1) competition from other e-cigarette brands over the years that caused JUUL to lose significant market share, leaving it with a residual but loyal customer base that was less sensitive to changes in price; and (2) JLI's increasingly precarious financial position heading into 2022, which led the company to reevaluate its pricing strategy and prioritize short-term profits to avoid bankruptcy. Defendants' expert Dr. Murphy's illustrative analyses demonstrate that adding

variables to Dr. Leffler's and Dr. Macartney's regressions that control for these major developments significantly reduces, if not eliminates, their estimated overcharge. Nothing Plaintiffs argue in their oppositions changes this fact.

Given the inherent difficulties in analyzing such a dynamic and "unusual" market, July 28, 2025 Declaration of Jeremy Barber ("Barber Decl."), Ex. 53 (Deposition Testimony of Keith Leffler ("Leffler Tr.") 265:4–8), it was imperative that Plaintiffs' experts controlled for all major variables that affected the price of JUUL to avoid wrongly attributing innocuous pricing decisions to Altria's investment. Indeed, "[t]he importance of accounting for the relevant 'major variables' has been recognized as particularly important in the context of antitrust litigation." *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 973 (C.D. Cal. 2012). Failure to do so requires exclusion under *Daubert* and Rule 702. *See id.* at 974 ("[T]he key question regarding the admissibility of [an expert's] statistical analyses is whether they account for the 'major factors.'"). That is so because, as the Indirect Reseller Plaintiffs ("IRPs") recognize, "you get out of a regression what you put into it." ECF No. 566-3, IRP Opp. To Defs.' Mot. To Exclude Ops. Of Dr. Keith Leffler ("IRP Opp.") at 12. The IRPs are exactly right. If an expert does not include a major explanatory variable in their pricing regression, they will *never* attribute anything to that variable, no matter its economic importance. Instead, they will find an "overcharge" that is actually explained by the missing variable. That is what happened here.

Dr. Leffler and Dr. Macartney never tested to see whether major market developments like the FDA flavor ban and the proliferation of flavored disposables affected JUUL's pricing. They just assumed they did not. That approach is unreliable. "[T]he entire objective of undertaking [a] regression analysis [is] to discover which independent variables affected . . . price." *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 146 (S.D.N.Y. 2006). Dr. Leffler and Dr. Macartney never conducted such an inquiry.

Adding insult to injury, Dr. Leffler and Dr. Macartney constructed a second damage period in their regressions that adds millions of dollars in damages based solely on the timing of a single email sent by someone without pricing authority. Plaintiffs' theory is that the timing of this email connects JLI's price increases starting in 2022 to the Administrative Law Judge's ("ALJ") decision in favor of

Defendants in the related FTC matter. But the email does not mention the FTC proceedings at all. And there is substantial evidence—including sworn testimony and contemporaneous documents—that planning for a price increase predated the ALJ's decision and was not related to it. Plaintiffs' only response is that their experts have already rejected any evidence that contradicts their theory. But they do not offer any justification for rejecting this evidence *other than* the timing of a single email. That approach is not a proper methodology for rejecting substantiated alternative explanations. Dr. Leffler's and Dr. Macartney's second damage period should be excluded, along with the rest of their overcharge models and damages opinions.

### ARGUMENT

**I.    DR. LEFFLER'S AND DR. MACARTNEY'S OVERCHARGE REGRESSIONS ARE UNRELIABLE BECAUSE THEY FAIL TO ACCOUNT FOR MAJOR VARIABLES**

The parties largely agree on the legal standard. Although Plaintiffs cite cases holding that disagreements about the inputs in a regression generally go to weight and not admissibility (which Defendants do not dispute), Plaintiffs also acknowledge the long-standing principle that the omission of a *major* variable can render the regression "so incomplete as to be inadmissible as irrelevant." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 449 (2d Cir. 1999) (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 n.10 (1986) (Brennan, J., joined by all other Members of the Court, concurring in part)). And consistent with this law, both Plaintiffs' experts concede that selecting the right variables in a regression is crucial to reliably estimating overcharge. *See* Leffler Tr. 128:23–129:14; July 28, 2025 Barber Decl., Ex. 54 (Deposition Testimony of Gareth Macartney ("Macartney Tr.") 153:8–20, 182:13–183:10).

Although the Indirect Purchaser Plaintiffs ("IPPs") recognize the major omitted variable doctrine, they take a run at weakening it by insisting that the omitted variable must be "shown to be outcome determinative." ECF No. 564-3, IPP Opp. To Defs.' Mot. To Exclude Ops. Of Dr. Gareth Macartney ("IPP Opp.") at 12. The IPPs cite no authority for this claim, and it is contradicted by the case law. The court in *Live Concert* required only "some indication that the excluded variables would have *impacted* the results." 863 F. Supp. 2d at 974 (emphasis added); *see also, e.g.*, *Freeland*, 238 F.R.D. at 146 (evaluating whether the additional explanatory variable "resulted in a *reduced* estimate of

DEFENDANTS' REPLY IN SUPPORT OF MOTION                3                CASE No. 3:20-CV-02345-WHO
TO EXCLUDE OVERCHARGE MODELS AND
DAMAGES OPINIONS OF INDIRECT PLAINTIFFS'
EXPERTS, DR. LEFFLER AND DR. MACARTNEY

the effect of the [allegedly anticompetitive] practices" (emphasis added)); *Miami Prods. & Chem. Co. v. Olin Corp.*, 2023 WL 8946114, at \*16 (W.D.N.Y. Dec. 28, 2023) (evaluating whether the "additional explanatory variable resulted in significant *changes* to the coefficient estimates on the previously included explanatory variables" (emphasis added)).

Regardless of the precise wording used to articulate the standard, Plaintiffs cannot carry their burden of establishing "that the major factors have been accounted for." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 354671, at \*17 (S.D.N.Y. Jan. 30, 2025) (citation omitted). Defendants' motion identified two factors that qualify as major but were omitted from the Plaintiffs' regressions: (1) the increased competition from new pod-based and flavored disposable e-cigarette products that caused JLI to lose customers, leaving it with a residual but loyal customer base that was less sensitive to changes in price, ECF No. 520-9, Defs.' Mot. To Exclude Ops. Of Dr. Keith Leffler And Dr. Gareth Macartney ("Mot.") at 15–19, and (2) JLI's precarious financial position as it entered 2022, which led the company to prioritize short-term profits by raising its prices, *id.* at 19–21. None of the scattershot arguments that Plaintiffs offer in their oppositions justifies omitting these two factors.

### A. Major Factor #1: Increased Competition Caused JLI To Lose Price-Sensitive Customers, Incentivizing It To Raise Prices

#### 1. IRPs' Arguments Fail

***Dr. Leffler did not include this factor in his regression.*** The IRPs do not contest that increased competition from other pods and flavored disposables could change the price sensitivity of JLI's customers and impact JUUL's pricing. And the IRPs do not challenge Dr. Murphy's analysis illustrating how the exclusion of these variables affected Dr. Leffler's results. *See* July 28, 2025 Barber Decl., Ex. 49 (Amended Expert Rebuttal Report of Kevin Murphy ("Murphy Am. Reb.") ¶¶ 272–79 & Ex. 32). Instead, they suggest that Dr. Leffler's model already "accounts" for this major factor. *See* IRP Opp. at 9–10.

Contrary to the IRPs' contentions, none of the four explanatory variables in Dr. Leffler's regression accounts for this increased competition. Dr. Leffler's regression includes four explanatory variables: (i) JLI's cost of goods sold; (ii) disposable income per capita; (iii) combustible cigarette

prices; and (iv) health concerns relating to vaping. June 20, 2025 Declaration of Elana Katcher, Ex. 1 (Expert Report of Keith Leffler ("Leffler Rep.") ¶ 64). Dr. Leffler's first variable (cost of goods sold) is on the supply-side, so it does not measure customer price sensitivity. His second and third variables (disposable income and cigarette prices) are general demand measures that have nothing to do with competition from other e-cigarette brands. And his fourth variable (health concerns) is related to customer price sensitivity, but only in relation to public perceptions of the harmfulness of vaping. None of these variables address the declining price sensitivity of JUUL's remaining customers due to the loss of price-sensitive customers to other manufacturers.

The IRPs also point to other analyses in Dr. Leffler's expert report, including a graph of market share data and a qualitative discussion of demand elasticity. IRP Opp. at 9–10. But these analyses are independent of Dr. Leffler's regression—they are not inputs in his regression and thus do not affect its results. The sensitivity analyses the IRPs cite are also unhelpful; none of them tested adding additional explanatory variables. *Id.* These other analyses do not change the fact that Dr. Leffler's regression does not account for this major factor.[1]

***The IRPs' multicollinearity argument demonstrates why Dr. Leffler's model is unreliable.*** Notwithstanding their contention that Dr. Leffler already accounts for this increased competition, the IRPs go on to argue that it would not be possible to have included a variable for one key event that led to the growth of flavored disposable e-cigarettes—the FDA flavor ban. According to the IRPs, adding this variable would be "highly correlated" with Dr. Leffler's damage period variables, creating what is known as "multicollinearity." *Id.* at 11–12.

If true, the IRPs' argument actually demonstrates why Dr. Leffler's model is unreliable. The IRPs say that it is "statistically impossible" for Dr. Leffler's model "to reliably disentangle" "the [Altria-JLI] Agreement" from "the flavor ban." *Id.* at 11. That is a concession that Dr. Leffler's model is

---

[1] Notably, the IPPs do not make the same argument even though Dr. Macartney included the same explanatory variables as Dr. Leffler. To the contrary, as addressed below, the IPPs argue that Dr. Macartney did not need explanatory variables to control for this major factor at all. *See* IPP Opp. at 14 ("Dr. Macartney did consider these variables and explained why it was not necessary and would not have been appropriate to include them." (emphasis removed)).

incapable of determining whether the overcharge that he found is attributable to the alleged anticompetitive conduct or an innocuous pricing effect (the FDA flavor ban). A model that cannot distinguish an innocuous but critically important externality from tens of millions of dollars in liability is unreliable. *See, e.g.*, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 487 (S.D.N.Y. 2018) (excluding regression model for failing to separate "the effects of economic events and business developments" from allegedly unlawful conduct).

In any event, the IRPs ignore that there are standard statistical techniques for dealing with highly correlated variables and multicollinearity, none of which Dr. Leffler used. Mot. at 18. And the cases the IRPs cite in their brief discussing multicollinearity only prove Defendants' point, *see* IRP Opp. at 12, as both cases stand for the proposition that multicollinearity does *not* render a regression model unreliable, *see In re Korean Ramen Antitrust Litig.*, 2017 WL 235052, at *13 (N.D. Cal. Jan. 19, 2017) (Orrick, J.) (citation omitted); *In re High-Tech Emp. Antitrust Litig.*, 2014 WL 1351040, at *21 n.51 (N.D. Cal. Apr. 4, 2014). As the *High-Tech Employee* court concluded, collinearity is "a common phenomenon that results when using the methodology of regression analysis." 2014 WL 1351040, at *21 n.51. Thus, even if the FDA flavor ban variable is highly correlated with Dr. Leffler's damage period variables as the IRPs argue, that does not permit them to ignore it as they have done, because "the inclusion of a demonstrably (and logically) relevant but multicollinear variable into such an incomplete regression analysis . . . could only increase its probative value." *Freeland*, 238 F.R.D. at 147, 149 (striking regression for failure to include major explanatory variables).

Dr. Leffler himself agrees with this. At his deposition, he acknowledged that "[w]hat I don't want to do is exclude a variable that, in fact, is *highly correlated* with one of my damage period variables *so that I am picking up something with my damage variable that's not damage*." Leffler Tr. 128:23–129:14 (emphases added). The IRPs' only response is that Dr. Leffler made the statement when discussing a hypothetical variable related to state excise taxes. IRP Opp. at 11. That is a distinction without a difference. The specific variable Dr. Leffler was discussing is irrelevant; what matters is that

he agrees that it would not be proper to ignore a major variable just because it might be multicollinear. But that is what he did here, rendering his model unreliable.[2]

### 2. IPPs' Arguments Fail

***Dr. Macartney was wrong to exclude variables addressing Major Factor #1.*** The IPPs take a different approach, acknowledging that Dr. Macartney did not include variables in his model that measure increased competition, but contending that there was no need to do so. IPP Opp. at 14.

*First*, the IPPs erroneously argue that the effects of competition from other e-cigarette brands would already be reflected in JLI's pricing and thus do not require any explanatory variables. *Id.* at 15. The point of a regression analysis in an antitrust case is to understand causes—more precisely, to help distinguish innocuous causes from anticompetitive ones in determining whether there is an overcharge. *See* Macartney Tr. 163:7–21; July 28, 2025 Barber Decl., Ex. 3 (Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, *in Reference Manual on Scientific Evidence* 303, 309–10 (3d ed., 2011) (explaining how to properly use multiple regression analysis to analyze causation)). If increased competition from other brands such as Vuse Alto systematically affected JUUL's pricing, then failing to include a variable for it means that the regression cannot disentangle the effect of that increased competition from the alleged anticompetitive conduct. Put in econometric terms, if increased competition explains JUUL's pricing (as the IPPs seem to concede), then it belongs on the right side of the regression formula along with the other explanatory variables. Dr. Macartney acknowledged during his deposition that there are statistical techniques for implementing this sort of variable. *See* Macartney

---

[2] The IRPs also accuse Defendants of "falsely claim[ing]" that Dr. Leffler revised his overcharge rate without specifying his revised rate in his reply report. IRP Opp. at 7. They claim that "the specifications of his . . . regression model . . . never changed from his initial to his reply report." *Id.* The IRPs are wrong. Dr. Leffler's opening report finds $44.7 million in damages. Leffler Rep. ¶ 76. In his reply report, he revised his base damages estimate to $42.4 million because of two changes: (1) he updated his cost of goods sold ("COGS") variable to remove $1 that he had inexplicably added; and (2) he re-estimated passthrough. July 28, 2025 Barber Decl., Ex. 47 (Expert Reply Report of Keith Leffler ("Leffler Reply Rep.") ¶ 15 & n.34). Dr. Murphy originally identified the COGS issue and generated a version of Dr. Leffler's regression that corrects for it; that correction shows a slight reduction in Dr. Leffler's overcharge rate. *See* Murphy Am. Reb. ¶ 259 & Ex. 30 (Regression Specification 3, Remove $1 Addition to Cost). Dr. Leffler made that same correction in his reply report. *See* Leffler Reply Rep. ¶ 15 & n.34. Thus, Dr. Leffler *did* update the specification of his regression model and the resulting overcharge rate between his initial report and his reply report.

DEFENDANTS' REPLY IN SUPPORT OF MOTION          7          CASE NO. 3:20-CV-02345-WHO
TO EXCLUDE OVERCHARGE MODELS AND
DAMAGES OPINIONS OF INDIRECT PLAINTIFFS'
EXPERTS, DR. LEFFLER AND DR. MACARTNEY

Tr. 187:2–23 (discussing endogeneity). And his regression already includes one—specifically, his explanatory variable for combustible cigarette prices. June 20, 2025 Declaration of Robin Zwerling, Ex. 9 (Expert Report of Gareth Macartney ("Macartney Rep.") ¶ 122). There is no reason then that other products that are even closer substitutes to JUUL—such as other pod-based e-cigarette products and flavored disposables—should not also be accounted for by including an explanatory variable in his regression.

The same reasoning explains why the lack of a visible price reduction while competing products took market share from JUUL, *see* IPP Opp. at 16 (quoting Macartney Tr. 64:9–22), is not evidence that this competition did not constrain JUUL's pricing from rising *even further*, *see* Mot. at 19. In theory, the effects of competition are already baked into the price of JUUL, as is *every* factor that affected pricing. But the point of running a regression is to disaggregate the effects of innocuous influences on pricing from other putative causes like the Altria-JLI deal—to see what caused what. *See* Macartney Tr. 163:7–21; *High-Tech Emp.*, 2014 WL 1351040, at *5 n.7 (explaining that "[r]egression analysis can be used to isolate the effect of an alleged conspiracy on price, taking into consideration other factors that might also influence price"). Dr. Macartney cannot reliably perform that inquiry unless he controlled for the effects of competition from other e-cigarette brands.

*Second*, the IRPs mistakenly contend that Dr. Macartney was correct to exclude these factors because Defendants are supposedly inconsistent about the impact of this competition on JUUL's pricing. Not so. Dr. Macartney conceded that new products entering the market can *constrain* prices. *See* Macartney Tr. 164:6–165:9. And Dr. Macartney also conceded that the entry of new products can impact demand elasticity and lead to *higher* prices as the customer base becomes smaller, more loyal, and less price sensitive. *See id.* at 61:5–63:2. In other words, the entry of new competitive products could have impacted pricing in different ways at different times, first by constraining prices as JLI sought to maintain its market share and then, once JLI had lost sufficient market share that its remaining customers were less price sensitive, incentivizing it to raise prices.

Because Dr. Macartney never tested the impact of including these variables in a regression, *id.* at 179:16–180:19, he is in no position to opine how they should have impacted pricing. As the *Freeland* court explained, "the entire objective of undertaking the regression analysis [is] to discover which independent variables affected . . . price." 238 F.R.D. at 146. Thus, because Dr. Macartney never undertook a regression analysis that includes these variables, he lacks any "empirical analysis to support his conclusion that the [variables] w[ere] irrelevant to [JUUL's] average price." *See id.*

***The IPPs' challenges to Dr. Murphy's testing of Dr. Macartney's regression are meritless.*** To illustrate how excluding e-cigarette competition from his regression affected Dr. Macartney's results, Dr. Murphy tested the inclusion of explanatory variables that control for the effects of the FDA flavor ban and the rise of illicit flavored disposables. *See* Murphy Am. Reb. ¶¶ 272–79 & Ex. 33. Doing so made Dr. Macartney's (and Dr. Leffler's) overcharge estimates for the first damage period statistically indistinguishable from zero. *See id.* ¶¶ 272–79 & Exs. 32–33 (Regression Specification 5, Control for Flavor Ban, Flavored Disposable Share, and Inflation). And they reduced Dr. Macartney's estimate for the second damage period by nearly a quarter (and Dr. Leffler's by nearly half). *Id.* These results demonstrate that this factor is sufficiently significant to render their models unreliable. *See Live Concert*, 863 F. Supp. 2d at 974 (requiring "some indication that the excluded variables would have impacted the results").

Unlike the IRPs, the IPPs quibble over Dr. Murphy's analyses, but none of their challenges hold water. *First*, the IPPs improperly attempt to disaggregate the variables Dr. Murphy tested, focusing on whether each single variable in isolation had a statistically significant effect on Dr. Macartney's results. *See* IPP Opp. at 15–17. That misses the point. What matters is the impact on the analysis of including all of the variables, and Dr. Murphy's analysis shows that Dr. Macartney's results are significantly impacted by the exclusion of these variables.

*Second*, the IPPs note that when Dr. Murphy tested the impact of adding these additional explanatory variables, he also made other modifications to Dr. Macartney's model. IPP Opp. at 16–17.[3] The IPPs summarily claim that these other modifications are "fundamentally flawed for the reasons stated above," *id.* at 17, but those reasons do not actually appear in their brief. The IPPs then criticize Dr. Murphy for adding a variable that reflects "the time it would take for JLI to monitor inflation, factor that into their pricing decisions and implement a price increase." Murphy Am. Reb. ¶ 272(b); IPP Opp. at 18. But Dr. Macartney (and Dr. Leffler) assumed without any basis that JLI adjusted its prices instantaneously to reflect inflation. Mot. at 17 n.8. The IPPs do not explain why adding this variable undermines Dr. Murphy's modifications to their regression. But more fundamentally, the IPPs are again missing the point. Defendants are not arguing that Dr. Macartney's regression should be excluded because he failed to properly account for any of these other issues. Rather, it should be excluded because he failed to account for the changing price sensitivity of JLI's customers due to increased competition from other pods and flavored disposables. And Dr. Murphy's analyses illustrate how adding variables that control for this market development can materially impact Dr. Macartney's results.

*Third*, the IPPs complain about the date of Dr. Murphy's FDA flavor ban variable, which is February 2020. IPP Opp. at 17. The IPPs seem to think it should be earlier because JLI discontinued retail sales of its flavored products in late 2018 and online sales in late 2019. *See id.* But FDA did not ban sales of products with flavors other than menthol and tobacco until February 2020. As a result, other e-cigarettes, such as Vuse Alto and NJOY Ace, continued to sell flavors long after JLI's voluntary removal. *See* July 28, 2025 Barber Decl., Ex. 39 (Expert Report of Kevin MurphyExs. 4–5 (showing sales of flavored Vuse Alto and NJOY Ace pods up until February 2020)). And it was FDA's February 2020 flavor ban that gave rise to the explosion of flavored disposables. *See, e.g.*, Murphy Am. Reb. ¶ 94 ("Sales of disposables accelerated after the Federal Flavor Ban[.]"). And even if Dr. Murphy's date were

---

[3] Dr. Murphy made three other modifications to Dr. Macartney's model: (1) he corrected Dr. Macartney's method for calculating standard errors; (2) he corrected Dr. Macartney's COGS variable to include tariffs and duties; and (3) he corrected Dr. Macartney's disposable income variable by smoothing it based on a two-month rolling average. Murphy Am. Reb. ¶ 262 & Ex. 31.

incorrect, that would not undermine the need to account for the impact of the federal flavor ban in some fashion in Dr. Macartney's regressions.

***Defendants are not making a side-door challenge to Plaintiffs' market definition.*** Finally, the IPPs conflate two separate issues in complaining that Defendants are attempting to "side-door challenge" their proposed market definition. IPP Opp. at 19–20 (capitalization altered). To be sure, there is a dispute amongst the various parties as to whether illicit flavored disposables should be considered part of the market: the Direct Plaintiffs and Defendants include them in the market, whereas the Indirect Plaintiffs do not. *See* Murphy Am. Reb. ¶ 24; July 28, 2025 Barber Decl., Ex. 50 (Deposition Testimony of Bryan J. Perry 65:12–19). But the question of which products are part of the market is fundamentally distinct from whether competition from flavored disposables should be included as an explanatory variable in a regression. Indeed, Dr. Macartney includes combustible cigarette pricing as an explanatory variable in his regression, even though he does not include cigarettes in his proposed antitrust market. Macartney Rep. ¶¶ 22, 122.

**B.      Major Factor #2: JLI's Declining Financial Condition Caused It To Prioritize Short-Term Profits, Incentivizing It To Raise Prices**

**1.      IRPs' Arguments Fail**

The IRPs acknowledge that Dr. Leffler's "model does not include an explicit variable" addressing JLI's deteriorating financial condition, but nonetheless contend that his existing variables already account for this major factor. IRP Opp. at 13. They are wrong.

Again, the four explanatory variables in Dr. Leffler's regression are JLI's cost of goods sold, disposable income, cigarette prices, and health concerns about vaping. *See supra*, at 4–5. On their face, it is clear that none of these variables measure whether JLI was in financial crisis in 2022 and whether that impacted its pricing incentives. *See* Murphy Am. Reb. ¶¶ 210, 217–18. The IRPs summarily contend that the health concerns variable would "capture[]" JLI's financial condition, IRP Opp. at 13, but fail to explain how. The IRPs also contend that JLI's litigation costs (which was only one of several factors contributing to JLI's financial crisis) were included in Dr. Leffler's cost of goods sold variable. *Id.* But the portions of Dr. Leffler's report that they cite do not say this. *See* Leffler Rep. ¶¶ 26, 62–67.

DEFENDANTS' REPLY IN SUPPORT OF MOTION          11          CASE NO. 3:20-CV-02345-WHO
TO EXCLUDE OVERCHARGE MODELS AND
DAMAGES OPINIONS OF INDIRECT PLAINTIFFS'
EXPERTS, DR. LEFFLER AND DR. MACARTNEY

And they are mistaken in any event; JLI's costs data does not include JLI's settlement liabilities. *See* Murphy Am. Reb. App. Ex. C.7 (disaggregating JLI's cost of good sold by component, which does not include settlement liabilities).

### 2.    IPPs' Arguments Fail

The IPPs do not dispute that JLI was teetering on the edge of bankruptcy in 2022 and agree that Dr. Macartney did not include JLI's deteriorating financial condition as a variable in his regression. The IPPs defend that decision by pointing to Dr. Macartney's summary conclusion that "a decision to raise prices because of JUUL's financial condition was not supported by either the record or rational economics." IPP Opp. at 18.

The undisputed factual record flatly contradicts Dr. Macartney's bald assertion. The only record evidence that the IPPs point to is that JLI began losing market share before 2022 and did not immediately change prices. *Id.* But the mere fact that a company is losing market share is not the same as a company facing an imminent threat of bankruptcy. JLI's settlement liabilities from litigation did not reach a level threatening insolvency until 2022. *See* July 28, 2025 Barber Decl., Ex. 36 (Deposition Testimony of Chirag Patel (JLI 30(b)(6)) ("Patel Tr.") 155:21–156:16). And JLI did not receive its MDO until June 2022, after which JLI's sales volume dropped off "a cliff" and the company faced challenges raising capital. *See id.* In other words, JLI's financial crisis did not come to a head *until* 2022, well after it began losing market share.

*see also* Murphy Am. Reb. ¶ 210 (explaining that JLI's "large and growing liabilities created a financial risk that would have substantially increased JLI's discount rate—*i.e.*, the rate at which JLI would have discounted future sales and profits"); Mot. at 20. The two JLI witnesses who were questioned on pricing both testified that JLI

started raising prices in 2022 because it needed to address its deteriorated financial condition. Patel Tr. 155:21–157:24; *see also* July 28, 2025 Bamberger Decl., Ex. 32 (Mar. 21, 2025 Declaration of Gregg Augustine ("Augustine Decl.") ¶¶ 6–9, 11, 13, 15). Dr. Macartney simply disregards this evidence because it contradicts his preferred narrative.

And contrary to the IPPs' claim that raising prices to obtain short-term profits does not make sense for a company in financial peril, Dr. Murphy constructed a formal, mathematical model that demonstrates why this dynamic incentivized JLI to increase prices. *See* Murphy Am. Reb. ¶¶ 217–21 & App. E (Dynamic Model). The IPPs and Dr. Macartney do not even attempt to challenge this model; instead, they pretend it does not exist.

*        *        *

In sum, Dr. Leffler's and Dr. Macartney's regressions are unreliable, and the market developments that Defendants have highlighted are "too significant not to be accounted for in the regression analysis in this case." *Freeland*, 238 F.R.D. at 147. Their overcharge models and damages opinions should be excluded.

## II.    DR. LEFFLER'S AND DR. MACARTNEY'S SECOND DAMAGE PERIOD IS UNRELIABLE BECAUSE IT IS NOT GROUNDED IN A RELIABLE METHODOLOGY

Plaintiffs' oppositions confirm that their experts' second damage period is based solely on the fact that a JLI employee without decision-making authority over pricing sent an email eight days after the ALJ issued its initial decision in favor of Defendants in the FTC case that mentions the employee's personal belief that JLI is ▮▮▮▮ for price increases. *See* July 28, 2025 Bamberger Decl., Ex. 25 (Feb. 23, 2022 Email from M. Batchan, JLI-NDCA-10287565). The email does not mention the FTC proceedings. Yet Dr. Leffler and Dr. Macartney point only to the timing of this email to reach the conclusion that JLI intentionally waited to raise prices until after the ALJ issued his decision, and thus the price increases that began in 2022 are attributable to Altria's withdrawal from the market three-and-a-half years earlier.

Plaintiffs do not dispute that record evidence explains the reasons for JLI's price increases beginning in 2022, and those explanations have nothing to do with the ALJ's decision. *See* IRP Opp.

at 14–15; IPP Opp. at 20–23. But they assert that their experts are entitled to completely disregard this evidence, and their decision to do so cannot be challenged in a *Daubert* motion because it merely goes to weight and not admissibility. They are wrong. Failure to adequately account for obvious alternative explanations renders expert opinions inadmissible. *See Clausen v. M/V New Carissa*, 339 F.3d 1049, 1058 (9th Cir. 2003); *see also* Fed. R. Evid. 702, Advisory Committee Notes on 2000 Amendments ("Courts both before and after *Daubert* have found other factors relevant in determining whether expert testimony is sufficiently reliable . . . [including w]hether the expert has adequately accounted for obvious alternative explanations." (citing *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499 (9th Cir. 1994))). Indeed, "[i]n determining reliability," courts must "asses[] whether an expert has adequately accounted for obvious alternative explanations." *Lin v. Solta Med., Inc.*, 2024 WL 5199905, at *2 (N.D. Cal. Dec. 23, 2024). And in accounting for obvious alternative explanations, "[t]he expert must provide reasons . . . using *scientific methods and procedures*[,] and the elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation." *Clausen*, 339 F.3d at 1058 (emphasis added) (internal quotation marks omitted) (quoting *Claar*, 29 F.3d at 502).[4] Dr. Leffler and Dr. Macartney do not come close to passing that test here. Their methods for ruling out JLI's rationale for the price increase are not scientific and rest only on their speculative, subjective belief that JLI was waiting for a favorable decision from the ALJ to do so.

For context, Plaintiffs' theory that JLI waited to raise prices until after the ALJ's initial decision appeared for the first time in Dr. Leffler's and Dr. Macartney's initial expert reports. Because it is so outlandish, Defendants offered the testimony of Gregg Augustine, who was responsible for JLI's pricing strategy starting in January 2022, to rebut it. *See, e.g.*, Augustine Decl. ¶ 12; July 28, 2025 Barber Decl., Ex. 44 (Deposition Testimony of Gregg Augustine 191:11–192:4, 195:19–197:6). Mr. Augustine's declaration and sworn testimony could not be clearer: "[T]he pending FTC Matter and the [related] February 15, 2022 Initial Decision were never factors that were considered in connection with JLI's

---

[4] The IPPs attempt to distinguish this authority with single, conclusory footnote that merely states that Dr. Macartney "evaluated and ruled out alternative explanations." IPP Opp. at 21 n.15.

pricing strategy." Augustine Decl. ¶ 12. Dr. Leffler and Dr. Macartney's only basis for rejecting this testimony, and the other documentary evidence chronicling the real reasons for the 2022 price increase, Mot. at 23–24, is the timing of one email. *See* IRP Opp. at 14–15; IPP Opp. at 20–23. But "an expert's causation opinion based solely on a temporal relationship is not derived from the scientific method and therefore is insufficient to satisfy the requirements of Rule 702." *Alsadi v. Intel Corp.*, 2019 WL 4849482, at *10 (D. Ariz. Sep. 30, 2019) (citing *Cartwright v. Home Depot U.S.A., Inc.*, 936 F. Supp. 900, 906 (M.D. Fla. 1996)). Because Dr. Leffler and Dr. Macartney reject sworn percipient witness testimony and contemporaneous documentary evidence, their decision to create a second damage period is unreliable and must be excluded.

## CONCLUSION

For the foregoing reasons, the Court should exclude the overcharge models and damages opinions of Dr. Leffler and Dr. Macartney.

Dated: September 22, 2025                                  Respectfully submitted,

                                                          */s/ Beth A. Wilkinson*
                                                          Beth A. Wilkinson (*pro hac vice*)
                                                          James M. Rosenthal (*pro hac vice*)
                                                          Matthew Skanchy (*pro hac vice*)
                                                          Alysha Bohanon (*pro hac vice*)
                                                          Jenna Pavelec (*pro hac vice*)
                                                          **WILKINSON STEKLOFF LLP**
                                                          2001 M Street NW, 10th Floor
                                                          Washington, DC 20036
                                                          Telephone: (202) 847-4000
                                                          Facsimile: (202) 847-4005
                                                          *bwilkinson@wilkinsonstekloff.com*
                                                          *jrosenthal@wilkinsonstekloff.com*
                                                          *mskanchy@wilkinsonstekloff.com*
                                                          *abohanon@wilkinsonstekloff.com*
                                                          *jpavelec@wilkinsonstekloff.com*

                                                          Moira K. Penza (*pro hac vice*)
                                                          Jeremy Barber (*pro hac vice*)
                                                          **WILKINSON STEKLOFF LLP**
                                                          130 West 42nd Street, 24th Floor
                                                          New York, NY 10036
                                                          Telephone: (212) 294-8914
                                                          Facsimile: (202) 847-4005
                                                          *mpenza@wilkinsonstekloff.com*
                                                          *jbarber@wilkinsonstekloff.com*

                                                          Lauren Sachi Wulfe (SBN 287592)
                                                          **ARNOLD & PORTER KAYE
                                                          SCHOLER LLC**
                                                          777 S. Figueroa Street, 44th Floor
                                                          Los Angeles, CA 90017
                                                          Telephone: (213) 243-4211
                                                          Facsimile: (213) 243-4199
                                                          *lauren.wulfe@arnoldporter.com*

                                                          *Attorneys for Defendants Altria Group, Inc.,
                                                          and Altria Enterprises, LLC*

DEFENDANTS' REPLY IN SUPPORT OF MOTION          16                CASE NO. 3:20-CV-02345-WHO
TO EXCLUDE OVERCHARGE MODELS AND
DAMAGES OPINIONS OF INDIRECT PLAINTIFFS'
EXPERTS, DR. LEFFLER AND DR. MACARTNEY

*/s/ Nowell D. Bamberger*

Nowell D. Bamberger (*pro hac vice*)
David I. Gelfand (*pro hac vice*)
Jeremy J. Calsyn (SBN 205062)
Caleb J. Robertson (*pro hac vice*)
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
2112 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
Telephone: (202) 974-1752
Facsimile: (202) 974-1599
*dgelfand@cgsh.com*
*jcalsyn@cgsh.com*
*nbamberger@cgsh.com*
*cjrobertson@cgsh.com*

*Attorneys for Defendant Juul Labs, Inc.*

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO EXCLUDE OVERCHARGE MODELS AND DAMAGES OPINIONS OF INDIRECT PLAINTIFFS' EXPERTS, DR. LEFFLER AND DR. MACARTNEY

17

CASE NO. 3:20-CV-02345-WHO

**FILER'S ATTESTATION**

In compliance with Civil Local Rule 5-1(i)(3), I, Beth A. Wilkinson, hereby attest that each of the signatories identified above has concurred in this filing.

> /s/ Beth A. Wilkinson
> Beth A. Wilkinson (*pro hac vice*)
> **WILKINSON STEKLOFF LLP**
> 2001 M Street NW, 10th Floor
> Washington, DC 20036
> Telephone: (202) 847-4000
> Facsimile: (202) 847-4005
> *bwilkinson@wilkinsonstekloff.com*

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO EXCLUDE OVERCHARGE MODELS AND DAMAGES OPINIONS OF INDIRECT PLAINTIFFS' EXPERTS, DR. LEFFLER AND DR. MACARTNEY          18          CASE NO. 3:20-CV-02345-WHO