**Pages 1 - 52**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

| | |
|---|---|
| IN RE: JUUL LABS, INC.,<br>ANTITRUST LITIGATION | )<br>)<br>)   **NO. 20-CV-02345 WHO**<br>)<br>) |

San Francisco, California
Monday, February 2, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

  JOSEPH SAVERI LAW FIRM
  601 California Street - Suite 1000
  San Francisco, California  94108
 **BY:** **JOSEPH R. SAVERI, ATTORNEY AT LAW**
   **RONNIE SPIEGEL, ATTORNEY AT LAW**
   **DAVID H. SEIDEL, ATTORNEY AT LAW**
   **TREVOR YOUNG, ATTORNEY AT LAW**

  ZWERLING, SCHACHTER AND ZWERLING LLP
  41 Madison Avenue - 32nd Floor
  New York, New York  10010
 **BY:** **ROBIN F. ZWERLING, ATTORNEY AT LAW**
   **SUSAN SALVETTI, ATTORNEY AT LAW**

  KAPLAN FOX KILSHEIMER
  850 Third Avenue - 14th Floor
  New York, New York  10022
 **BY:** **ELANA KATCHER, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

Remotely Reported:  Marla F. Knox, CSR No. 14421, RMR, CRR
   United States Official Reporter

**APPEARANCES:**  (continued)

For Plaintiffs:

                        CERA LLP
                        529 Main Street - Suite P200
                        Boston, Massachusetts  02129
                   BY:  **CHARLES A. DIRKSEN, ATTORNEY AT LAW**

For Riaz Valani & Nicholas Pritzker:

                        KELLOGG, HANSEN, TODD, FIGEL & FREDERICK
                        1615 M Street, NW - Suite 400
                        Washington, D.C.  20036
                   BY:  **ANDREW SKARAS, ATTORNEY AT LAW**

                        KELLOGG, HANSEN, TODD, FIGEL & FREDERICK
                        13712 Springhaven Drive
                        Chantilly, Virginia  20151
                   BY:  **STEPHANIE LEVIN, ATTORNEY AT LAW**


For Defendant Altria Group, Inc:

                        WILKINSON STEKLOFF LLP
                        2001 M Street, NW - 10th Floor
                        Washington, D.C.  20036
                   BY:  **JAMES M. ROSENTHAL, ATTORNEY AT LAW**
                        **JENNA P. SWARBRICK, ATTORNEY AT LAW**

                        WILKINSON STEKLOFF LLP
                        130 West 42nd Street - 24th Floor
                        New York, New York  10036
                   BY:  **JEREMY S. BARBER, ATTORNEY AT LAW**

For Defendant Juul Labs, Inc.:

                        CLEARY GOTTLIEB STEEN & HAMILTON LLP
                        2112 Pennsylvania Avenue NW
                        Washington, D.C.  20037
                   BY:  **DAVID I. GELFAND, ATTORNEY AT LAW**
                        **NOWELL BAMBERGER, ATTORNEY AT LAW**

**Monday - February 2, 2026**                              **1:56 p.m.**

**P R O C E E D I N G S**

**---000---**

THE CLERK:  We are here in case number 20-2345, In Re: Juul Labs Incorporated Antitrust Litigation.

Counsel, if you would please, come forward or have a representative come forward and state your appearances for the record.

MR. SAVERI:  Good afternoon, Your Honor, Joseph Saveri on behalf of Direct Purchaser Plaintiffs.

THE COURT:  Welcome.

MR. SEIDEL:  Good afternoon, Your Honor, David Seidel, also on behalf of the Direct Purchaser Plaintiffs.

MR. YOUNG:  Good afternoon, Your Honor, Trevor Young, also on behalf of Direct Purchaser Plaintiffs.

MS. ZWERLING:  Good afternoon, Your Honor, Robin Zwerling on behalf of the Indirect Purchaser Plaintiffs and the Indirect Reseller Plaintiffs.

MS. KATCHER:  Good afternoon, Elana Katcher from Kaplan, Fox & Kilsheimer on behalf of the Indirect Reseller Purchasers.

MR. DIRKSEN:  Good afternoon, Your Honor, Andrew Dirksen, CERA LLP, on behalf of the Indirect Reseller Plaintiffs.

THE COURT:  All right.

**MR. GELFAND:** Good afternoon, Your Honor, David Gelfand on behalf of JLI.

**MR. BAMBERGER:** Good afternoon, Your Honor, Nowell Bamberger, also on behalf of JLI.

**MS. SWARBRICK:** Good afternoon, Your Honor, Jenna Swarbrick on behalf of Altria.

**MR. ROSENTHAL:** Good afternoon, Your Honor, James Rosenthal on behalf of Altria.

**MR. BARBER:** Good afternoon, Your Honor, Jeremy Barber on behalf of Altria.

**MR. SKARAS:** Good afternoon, Your Honor, Andrew Skaras on behalf of Nicholas Pritzker and Riaz Valani.

**MS. LEVIN:** Good afternoon, Your Honor, Stephanie Levin, also on behalf of Nicholas Pritzker and Riaz Valani.

**THE COURT:** Great. Well, welcome, everybody. You have seen my detailed tentative -- first of all, I want to apologize to you for not getting the class certification order out. I'm hoping that that will happen this week. It's not because I'm changing my mind about things. I'm just having production issues.

And with that, I gave you what I think -- I do know the underlying facts very well. So, you can tutor me on the law and tell me what I need to do. Mr. Saveri, go ahead.

**MR. SAVERI:** Your Honor, Joseph Saveri. I think -- on the Direct side, I think the way we have allocated

responsibilities is I'm going to handle Section 1 and perhaps if there are any case management issues that may come up at the end.  My colleague Mr. Seidel will address Section 7 issues.

THE COURT:  Okay.

MR. SAVERI:  And my colleague Mr. Young will address any issues that may come up with respect to the Pritzker and Valani motions.

THE COURT:  Okay.

MR. SAVERI:  So, that's the way we have divided it.  I also know that Ms. Zwerling has also indicated to me that she needs some time to address the Indirects.

THE COURT:  Okay.

MR. SAVERI:  So, if that's helpful at all --

THE COURT:  That's helpful.  And you get to start, so...

MR. SAVERI:  Again, Joseph Saveri on behalf of the Direct Purchaser Plaintiffs.  We have -- I'm going to address the Section 1 issues.

We have your tentative and I guess I make a couple observations.  The -- and I want to address in particular the issues regarding the application of the per se rule.

We moved for summary judgment on the legal standard for an order that this case going forward will be adjudicated under the per se rule.  We have our -- we have your, I guess, indication of where you are going.  We read that as an -- in

essence a denial of the motion and that we will address the issue about the applicable standard later.  We are going to have in limine motions and a charging conference.

So, I guess I would want to make a couple points.  The difference between the per se rule and the rule of -- in a case to be adjudicated under the rule of reason really involves additional proof that's required under the rule of reason.  In particular, proof of pro-competitive justifications, anticompetitive effects and other market effects.

In a per se case because of experience with these types of restraints, that proof is not necessary.  There are lots of efficient reasons that the cases have identified for going forward on that basis.

Cases like *Maricopa* say that that means that in certain cases -- perhaps at the borders -- there might be cases that should be or could be rule of reason cases but because of experience with these restraints, we are going to treat them as a per se case.

So, the issue of whether there is an independent business justification, which is one of the key arguments the Defendants make in this case, goes to the issue whether there is an agreement or not.  That is, we say there was an agreement. They say, no, you have that wrong; that the conduct was unilateral.  That is, there was no agreement.

And regardless of whether it is going to be a per se case

or a rule of reason case, the Plaintiffs have to prove that agreement.  That's true whether the additional anticompetitive effects, pro-competitive justifications are required to be proved by the Plaintiffs.

So, the argument -- and we can address this later based on the evidence and the in-limine instructions or at the charging conference as the case progresses -- the argument that there are independent business justifications is from our position based on the case law is not a legitimate pro-competitive justification.  It goes to the issue of whether the conduct was unilateral or not.

It is not a legitimate pro-competitive justification that parties to an illegal agreement had their own reasons for doing that.

If that were the case, Your Honor, there would never be any violations because unless parties are held hostage or under duress, they have their own reasons for doing that.  We will address that in due course; but at least from our perspective, the -- we want to be clear, that the issue of whether there is -- the conduct was unilateral or concerted is going to come up in a per se or a rule of reason case.  I just wanted to be very clear about that.

I don't think it makes sense, unless you want to hear about it, to recite all of the evidence that we have put into the record, which we believe show that there was, in fact,

concerted activity here, both direct and circumstantial evidence. We can have arguments about whether certain pieces of evidence are direct or circumstantial; but for present purposes for Rule 56, that's not what we need to do today.

So, with respect to the Section 1 issues, I really don't have anything else to add; but I'm here to answer any questions.

**THE COURT:** No. You know, I think you have laid it out and for -- and I'm certainly going to keep my ears open during the course of the trial, but you do -- you have diametrically opposed positions, and yours are -- theirs are based on a lot of documents that say something that supports them; and yours are a lot of other things -- and some of those documents that you interpret a different way -- but I don't know how, at least at this stage, I could make a determination that the per se standard applied. So, I think you did -- I think your argument was exactly right.

**MR. SAVERI:** Okay. Fair enough. Thank you, Your Honor.

**THE COURT:** Okay. All right.

**MS. ZWERLING:** Good afternoon, Your Honor, Robin Zwerling on behalf of the Indirect Purchaser Plaintiffs and the Indirect Reseller Plaintiffs. I don't want to reiterate or, you know, repeat what Mr. Saveri said so well; but, I mean, we are aligned with the direct -- the Direct Plaintiffs on this

issue, and, you know, that this is a per se case.  We agree with the way the Commission saw the issue.

There -- their conclusion about it being a market allocation scheme in its order, we think, was correct.  These are horizontal competitors which, of course, makes this case more meaningful to a per se case.

Also, in particular the agreement that Altria -- the agreement that Altria would leave the market is a market allocation case.  I don't think there's much of a question about that.  And it's the kind of thing that could and we believe should be treated as a per se case.

The Commission saw it as the naked elimination of competition.  So do we.  And, you know, they had -- they had common motives and they -- they had an agreement which we say was a violation.

**THE COURT:**  Okay.  Thank you.

**MS. ZWERLING:**  Thank you.

**MR. SEIDEL:**  Good afternoon, Your Honor, David Seidel on behalf of the Direct Purchaser Plaintiffs.

I'm going to address whether JLI can be held liable under Section 7.  And your first question was about the case law, and I think we win on that issue, Your Honor, under both *United States v. Columbia Pictures* and also *United States v. ITT Baking* [sic].

And in particular under the *Columbia Pictures* case, that

case was about a distribution license and the court held that a distribution license was an asset that could be held liable under Section 7.

And I think the key language, Your Honor, appears at page 182 of that case where the court held -- and this is a quote -- (as read:) "The statute imposes no specific method of acquisition.  It is primarily concerned with the end result of a transfer of a sufficient part of the bundle of legal rights and privileges from the transferring person to the acquiring person to give the transfer economic significance and prescribed adverse effects."

And then the court also held just two paragraphs down, it stated (as read:) "Consistent with the broadly drawn language is the word "assets."  It is not a word of art nor is it given a built-in definition by statute.  As used in this statute and depending upon the factual context, "assets" may mean anything of value."

And that's how broad the term "assets" has been interpreted under Section 7, and that continued through *Gerlinger*, you know, to the present day in this district.

THE COURT:  So, under your thinking then, money is certainly an asset.  And so, that should be covered by Section 7?

MR. SEIDEL:  No.  I think you are right; that currency is sort of the one thing that, I guess, is something of value

that's not an asset because it is -- in itself is value.  It is not really a thing of value.  So, I think "assets," you know, is interpreted extremely broadly to mean anything of value but not money I think, Your Honor.  I think that's correct.

And so, you know, here, JLI acquired a whole number of assets from Altria -- and this is all in Exhibit 66 of the -- of our -- of our exhibits -- Exhibit 66, this is the services agreement; and Defendants have no longer designated this as confidential.

And as you -- and if you look in that document at Exhibit A -- and this is at page PX1275-027, that's where it begins and it continues through there -- and there you will see that what JLI acquired from Altria was a whole number of extremely valuable assets.  They acquired Altria's shelf space. They acquired Altria's distribution network.  They acquired Altria's key warehouse facilities.  They acquired Altria's database of adult smokers.  They acquired access to Altria's tobacco products for marketing purposes.

So, for example, on a Marlboro pack of cigarettes, JLI put advertisements -- Altria and JLI together put Juul advertisements in Marlboro cigarettes.  And JLI also --

THE COURT:  Is that -- under your thinking, that's an asset?

MR. SEIDEL:  Correct, Your Honor, I do believe that that's an asset because that's an important part of marketing;

and there is a limited number of these placements; right. Altria has one of the pre-eminent tobacco brands. Marlboro is everywhere. And only a limited number of companies can put advertisements in those Marlboro packs. In fact, most people can never do that but JLI was able to do that. That's an extremely important thing of value. It's an asset and it's important for competition.

THE COURT: And would that also apply for a lease as opposed to ownership, so, the shelf space or those sorts of things. Is it a permanent -- asset? Is it permanent or can it just be for a day I get this and that's an asset?

MR. SEIDEL: Yes, I think so, Your Honor. I think that's spelled out in the *Columbia* decision because in the *Columbia* decision, that was a license. That was not a permanent thing, you know, thing. It was a license there. And so, it was temporary.

THE COURT: Okay.

MR. SEIDEL: JLI also acquired Altria's retail sales managers to work on their retail product placement and Altria's expertise with regulatory and PMTA work.

And so, I do just want to briefly go through Exhibit 66 and call out some of the areas where these assets are spelled out. So, on page PX1275-028 of Plaintiffs' Exhibit 66, you will see Section 2 talks about government and regulatory affairs. And in Section F it states that Altria will provide

legal project management and other support for advancing JLI's products through the PMTA.

So, Altria is actually going to donate employees that have really extensive expertise in this area to work on JLI's behalf.

Then if you look at Section 3 of the distribution support, it says that Altria is going to distribute JLI's products through integration of JLI's product distribution processes into Altria's nationwide distribution network, and that includes -- in point number 1 -- shuttle freight, which is Altria's primary warehouse facility in Richmond, Virginia, and also other warehouse storage and handling.

And then if you go on to the next page, you'll see under Section 4, it talks about fixture services.  And this is shelf space.  And we think this is a really key asset that JLI acquired from Altria.  And this is where it talks about shelf space.  If you look at point number 4A on page 029 -- that's PX1275-029, it says that Altria will make available for placement of JLI's products space on Altria's existing ITP space including the header and shelf space.

And Altria's ITP space was its placement in retail stores, which were done by contract -- exclusive contract for multiyear periods.  And so, what that meant was that all of Altria's placement -- premier placement that -- and if you think about it, Your Honor, shelf space is a very limited --

**THE COURT:** No.  I remember this from --

**MR. SEIDEL:** Yeah.  And so, JLI is now -- all over the place that Altria's products could go with all of its contracts, now all of the sudden JLI's products are going there and no other e-vapor competitors are going there, only JLI's.

And you can go through Exhibit A,and there are other assets in there; but I want to focus on the shelf space.  And before I do that, though, there is also another exhibit, Your Honor, that I think is worth calling out.  That's Exhibit 62 in Plaintiffs' exhibit packet.  Exhibit 62 is the master Q and A document that JLI used to discuss -- or it's basically the talking points of how JLI was going to discuss the acquisition.  And, again, this is a document that Defendants also no longer designate as confidential.

And if you look in this document, I would call attention -- this is where JLI describes just how valuable these assets are.  And at page PX2010-003, in the very first question on that page is what was announced today.  And if you look at the second bullet point, it says (as read:) "As part of the investment we" -- and that's JLI -- "entered into a services agreement that will allow Juul to leverage Altria's infrastructure, distribution network, exclusive shelf space and smoker database to help Juul build on its success."

And then again if you look down at the second question at the third bullet point, it says that the support Altria is

giving JLI through the services agreement could take years of effort to achieve on JLI's own, and then I think a key piece to this is the shelf space.

And if you look at the next page, the fourth question down in the middle of the page asks, what are the operational logistical advantages?  Can't you get more shelf space through organic growth?  This is, you know, a question that JLI was preparing for.

And in the second bullet point, JLI states (as read:) "Without the services agreement, we simply would not have access to Altria's premier retail shelf space.  That space is allocated on multiyear exclusive contracts, which Altria and other tobacco companies own.  There is no substitute for this premium placement particularly as we work to broaden the reach of our products nationwide."

So, I think those are key, you know, considerations of JLI themselves as to just how valuable that shelf space was.

Lastly, Your Honor, there's also the IP agreement.  I'm not going to walk through this.  It is a long document.  But this is Plaintiffs' Exhibit 69.  And the key provision in this IP agreement is on page PX2139-002 of Exhibit 69.

And if you look in the middle of that page -- and, again, this is also something that Defendants no longer designate as confidential.  If you look on this page at point number 2.1, intellectual property license, this is the simple paragraph

where Altria hereby grants and shall grant to JLI a worldwide, non-exclusive, royalty-free, fully paid up, perpetual, irrevocable license solely in the field of the e-vapor business.

And then it has the rest of this agreement, which is a long agreement, is all of the IP that's listed that JLI is receiving.  So, there is a whole lot that JLI was actually acquiring in this deal.

And in particular I want to focus -- I mean, all of those we think are assets that individually could hold JLI liable, in the aggregate certainly.  And I want to pay particular attention to shelf space.  You know, shelf space is highly limited.  It is extremely important and it is set on multiyear exclusive contracts that Altria and these other tobacco companies already owned in retailers nationwide.

So, this was an extremely valuable asset to all e-vapor companies, and through this agreement JLI is getting it; and JLI is getting that exclusive use of Altria's premier placement and shelf space.  And we talk about it in our expert reports, Your Honor, just how valuable to competition this was.

And what I would direct Your Honor to is our *Perry* report at paragraphs 133 to 139.  And at paragraph 136 in particular, Your Honor, our expert states that JLI perceived Altria's ITP program, which is that shelf space, to be a particularly urgent threat which could cost JLI's business a whole lot of money in

sales per year.

And also, in the ledger opening report -- we talk about this at pages 55 to 65 as well.  So, when you are thinking about this, Your Honor, from my perspective, JLI is really the acquiring company in this merger.

Now, in a lot of mergers -- in most mergers maybe, there's only one acquiring company because the acquiring company gets the stock and it gets the assets.  Usually one company is just gobbling up another.  And so, there is really only one acquiring company.

In this transaction, though -- it is a little interesting, though -- because JLI gave stock to Altria in exchange for all of Altria's assets related to e-vapor.  So, if you think about it, JLI is actually more of the acquiring company than Altria.  JLI gave a percentage of its business to Altria in order to basically take all of Altria's competing e-vapor business.

Now, Altria's current products in the market left.  It had this non-compete, so it couldn't reenter.  But all of the existing infrastructure, the distribution network, the database of smokers to market to, the shelf space, all of that -- which is key competition that JLI recognized, you know, was keeping them up at night, why Altria was this formidable competitor -- all of that went to JLI.

So, my concern, Your Honor, is that in this case Your Honor might be thinking that it has less relevance because

Altria is definitely on the hook since stock is something that's called out specifically in the statute.  So, you may be thinking, it doesn't matter.  You can already get Altria on the hook.

The problem is if Your Honor holds that none of these are assets under Section 7, then we can imagine a future merger case in which no challenge would even be possible.  For example, imagine this case except that the only -- all of the assets from Altria to JLI are the same but instead of JLI giving stock to Altria, imagine JLI just purchased from Altria its e-vapor business and all of its infrastructure and distribution network.

In that case -- if Your Honor holds that these assets aren't assets under Section 7, nobody would be able to challenge the merger at all because under that scenario, JLI hasn't purchased any assets under Section 7.  And I think that's just wrong.

And so, I do think, Your Honor, that in this case, it is a unique merger in that JLI is giving Altria a percentage of its business in exchange for receiving all those valuable assets. So, in this case both can be held liable.

**THE COURT:**  Okay.

**MR. SEIDEL:**  And I would end there.

**THE COURT:**  Besides *Columbia Pictures*, was there another case that you mentioned where I would see the same sort

of assets thing discussed.

MR. SEIDEL: Yeah, I think *United States v. ITT Continental Baking* is also a helpful case. It's 485 F.2d 16. It's a Tenth Circuit case from 1973. And in that case the only issue was a local delivery network for baked goods. And, again, it was one company acquiring the delivery network to be able to deliver goods to customers, which is at issue here in this case, one of the many assets that JLI got.

And I also think that *Gerlinger* -- even though that case specifically said, you know, there wasn't ruling on the issue and it left things vague as to that case. I mean, *Gerlinger* I think is helpful because it does list cases that show that patents and trademarks and sales routes and leases and licenses are all fair game under Section 7. So, unless Your Honor has any further questions, that's it.

THE COURT: That's great. Thank you.

MR. SEIDEL: Thank you.

THE COURT: So, let's start there.

MR. GELFAND: Thank you, Your Honor, David Gelfand on behalf of the JLI. You would like me to begin with the Section 7 issue?

THE COURT: I would, yes, please.

MR. GELFAND: Okay. So, our view is nothing that JLI received was an asset for the purposes of Section 7 of the Clayton Act. There's a lot of emphasis placed on *Columbia*.

And if you look at that case -- I'm sure Your Honor has -- it involved a portfolio of 600 films that were being exclusively licensed to the defendant there for, like, 14 years.  And the court made it a point of pointing out that it was exclusive. That test of whether it is a sufficient bundle of the rights such that it ought to be recognized as an asset was something that court was considering in 1960 when it looked at that particular transaction.

Here, the licenses are non-exclusive.  They really were included so that Altria couldn't turn around and sue JLI under these patents.  It is not like JLI went and used the patents to come up with new products or new inventions or anything like that.  It is a typical kind of provision.  You are doing a transaction with somebody.  You are collaborating.  Altria is coming in and helping JLI with its technology.  It is going to learn a lot of things.  JLI doesn't want Altria to turn around and sue them.  So, that was really the purpose of that license but it was not exclusive.

Now, I know the Plaintiffs' Counsel didn't make a point of it here -- I know he will in his rebuttal -- but they say it was a de facto exclusive license.  Simply not true.  The license agreement itself says that it is not exclusive.  The license agreement has a provision that says notwithstanding a provision anywhere else, the license agreement prevails; and the license agreement even recognizes the possibility that

Altria would be licensing to others.

And I will just point Your Honor to that provision briefly. So, if you look at section 3.10 of the license agreement, it says (as read:) "In the event of conflict with respect to the subject matter hereof, between this agreement and the relationship agreement, purchase agreement or services agreement, the provisions of this agreement, the license agreement shall prevail."

So, that was contemplated. The argument that our colleagues on the other side make is that the relationship agreement said you, Altria, will not assist anyone else in the e-vapor business as part of the overall non-compete. They have reported that accurately to the Court, but the license agreement prevails over that because the license agreement is non-exclusive.

And I think it is telling that in Section 2.2 of the license agreement it says (as read:) "Licensor shall not grant or purport to grant any exclusive license in the field of e-vapor after the date hereof unless subject to the license granted here under."

So, at the time the parties negotiated this, it was contemplated that Altria could license the same technology to other third parties. And all JLI was saying was if you do that, you have to make it subject to our rights. We don't want you to give exclusive rights to somebody else who is now going

to come in and sue us under that IP.

So, it's complicated -- I appreciate that -- but the idea was that this was going to be a non-exclusive license, and the parties very deliberately said any conflict between the license agreement and any other agreement they were entering into at the time, in the event of such a conflict, the license agreement would prevail.  So --

THE COURT:  Okay.  So, your argument is the -- with respect to this that if it is not exclusive, it can't be an asset?

MR. GELFAND:  Well, if it is not exclusive, there is no case law on their side on that.  Look, I think it's possible.  I don't want to rule anything out entirely.  I haven't seen a case among the cases they cite.  Honestly, I don't know what the baking case is.  I don't think it was cited in their brief.  We will go look at it.  I doubt we will have -- feel a need to supplement the record, but the -- but the cases that were cited -- *Gerlinger*, which was the Amazon/Borders arrangement, *Columbia Pictures*, itself -- those all involved -- well, *Gerlinger* didn't because the defendant won there but *Columbia* involved somebody taking an exclusive right over 14 years, that is a very substantial ownership interest in the films at issue there.  That defendant for 14 years had the exclusive right to air that content on the television network.  So, of course, the court said, yeah,

that's substantial enough to be an acquisition of an asset.

But, here, we are one of many potential licensees that Altria could have made the technology available to.  Under the plain terms, Altria could have turned around the day after all these agreements were signed and licensed that same IP to any of our competitors or any new entrant or anybody else they wanted to so long as the license said "but this is subject to JLI's non-exclusive license" by the plain terms of the agreement.

THE COURT:  What about the shelf space?

MR. GELFAND:  Well, shelf space to me is very similar to the services that Amazon was offering in *Gerlinger* to Borders.

So, in Amazon/Borders, you had a transaction in which Borders was kind of a flailing book retailer -- I'm sure you recall -- and they were trying to figure out what are they going to do to get into the 21st century with the way they were selling books.  And they went and did a deal with Amazon, who was a competitor.  And the deal said:  Let's do a joint website.  We can't figure out how to make website buying work, so we will have a joint website that will be branded under Borders.  So, Amazon has the right to operate that.  Amazon agreed to do fulfillment services, to list the products on the website, all that virtually equivalence of shelf space.

And I do want to come back to shelf space in a minute

because this was not an asset that even Altria had.  Altria doesn't own the shelf space.  Altria doesn't own retail stores. Altria has to deal with retailers who themselves own the shelf space.  And what Altria was saying is we will help you get on the shelves, but that's not an asset that Altria has --

THE COURT:  You can have some of my space; right? That was space that you -- for, you know, however you had developed the relationships, whatever the agreements were, you had that shelf space and you were able to -- or Altria had that shelf space, and you were able to get it from them.

MR. GELFAND:  Subject to what the retailers were willing to do because the retailers own that asset.  Shelf space is an asset that's owned by the retailers.  Altria had whatever contract rights they had to try to convince the retailers to put certain products on the shelves -- and I can't claim to be fluent in all of those agreements.  I haven't even had visibility into all of these agreements.  In fact, this was very short lived that this was something Altria was doing for JLI; but it was not like a transfer of an asset where they actually owned the shelf space.

If 7-Eleven wanted to turn around and say to Altria, "I'm not carrying Juul's products on my shelves.  I don't think it's right for our customers.  It is not what we agreed to when we did a deal with you," I'm sure 7-Eleven, owner of the shelf space, would have had a lot of levers at its disposal to push

back on that.  And all Altria could do was offer the service of trying to get us on those shelves just like Amazon was offering to Borders the service of trying to get Borders onto the website and try to get customers to want to buy books from Borders through the website.

It is a very analogous thing.  And the court there had no difficulty saying there is no asset here that Borders is acquiring for the purposes of Section 7.  That was -- I think it was -- I don't remember if it was summary judgment or dismissal -- but as a matter of law, the court said Borders is not acquiring anything subject to Section 7.  And then the court even grappled briefly with the question of whether Amazon was acquiring any IP by having the right to use the Borders name on the website that was created.  But then the court said, I don't need to reach that issue because there's no evidence of any anticompetitive effect from that.

And that's the other point I want to make on these arguments, Your Honor.  Quite a part from whether there is potential invocation of Section 7, whether this is potentially an asset or any of these are assets that are going in the other direction from what this entire transaction was -- and, by the way, I know we are probably well beyond it -- but none of this was laid out in the complaint.  Even at the time of the motion to dismiss argument, the directs were simply arguing that they needed us in the Section 7 case because of the injunctive

relief, which is now moot.  So, this is sort of -- these are after-the-fact arguments that are being developed to try to keep a hook into us under Section 7, but -- I kind of loss my train of thought, Your Honor, as you know, happens.

THE COURT:  Glad you made that point.

(Laughter)

MR. GELFAND:  But quite a part from whether that was an asset that could justify invocation, there is no evidence that JLI receiving things from Altria in the context of this transaction had any anticompetitive effect.  And Section 7 is very clear.  No person shall acquire -- so, only the acquirer -- and then where the effect of such acquisition -- so, you look at the specific thing that's being acquired and you ask where the effect of that may substantially lessen competition.

If all we are getting is access to shelf space and we are getting non-exclusive IP rights; we are getting assistance to get our product approved and out to the market -- put aside what anybody might think about vaping process.  That's not the issue here -- we are getting approval for the products, and we are getting onto the market quicker.  None of that is substantially lessening competition.  It is increasing competition.  It is making us better able to compete against Reynolds and NJOY and the dozen of other importers who have since entered the market and knocked us from 60 percent down to

20 or 30 percent or whatever it is now.  This is an extremely competitive product.  We have a lot of rivals, Your Honor.

Those services -- to the extent we took advantage of them -- were pro-competitive.  They have no evidence that -- even if you consider them assets; that those particular -- acquisitions of those things substantially lessen competition.

So, just like in *Gerlinger*, Your Honor doesn't need to reach this issue on whether these various things were assets.

Now, I don't deny they have value.  That's not the issue really.  If I contract with somebody to build a home or build an office park, I'm probably going to pay them a lot of money; and they are going to do valuable services.  I'm going to get their construction services.  I'm going to get something at the end of the day, but those services are not an asset for the purposes of Section 7.

I have been doing this for a long time, Your Honor. Section 7 is what I do for a living, and I have never seen it suggested -- and the FTC here never suggested after a long investigation, after a lawsuit through an administrative trial, even those couple of commissioners -- three commissioners at the end -- who dismissed this as moot and provided some dicta about what they thought, even they never suggested that the issue here was that we were getting assets at JLI.

Services are not assets.  They are executory contracts. They are either performed or not.  They don't give you

ownership of anything other than the ability to go sue somebody under a breach of contract theory. And, as I understood the tentative, Your Honor wanted to know is there case law actually supporting. *Gerlinger* doesn't. *Columbia* doesn't. I will be interested to read the baking company. I actually just don't recall it from the briefs, but --

THE COURT: You are not going to cite me one?

MR. GELFAND: Excuse me?

THE COURT: You are not going to cite me a case that would support their position on assets?

MR. GELFAND: I don't have one in my back pocket. I really don't. In the interest of candor, if I knew of one certainly in the controlling jurisdiction, I would tell Your Honor. I actually don't know of one anywhere. And so, these are questions, but I think they are questions susceptible to resolution on summary judgment.

THE COURT: All right. Thank you.

MR. GELFAND: Yep. The other thing I'm tasked with is per se, which I don't think I have much to address at this point, given that I think my colleague, Mr. Saveri -- I will say friend and colleague because we have known each other for 30 years. He is a good guy. He brought a baseless case here, Your Honor, but he's a good guy. I don't hear him asking Your Honor to re-visit your tentative on that.

THE COURT: Right.

**MR. GELFAND:**  I think it is probably the right thing to do.  I would like to make one point, though, because I know Your Honor will be thinking about this a lot.  The per se versus rule of reason question goes to the alleged agreement.  It doesn't go to the action that Altria took when it withdrew the product.  That's an action.  That's not an agreement.

Now, I'm sure they are going to argue -- they already have -- that that is pursuant to some kind of agreement, and I'm sure they are going to argue that it is circumstantial evidence of something; but the question is not whether withdrawing the product was a per se violation because by definition that's just an action.  It is not itself an agreement.  They have got to prove that it was somehow the consequence of an agreement, among many other things they have to prove.

But when you are thinking about per se versus rule of reason, the issue is going to be what is the character of the agreement time.  And time and time again, the Plaintiffs in this case have said that the nature of the agreement was that Altria -- not Altria's product, Altria -- would not compete going forward, and that Altria would put that in front of the FTC; and that the FTC would decide -- just like it's done hundreds of other times and the DOJ has done hundreds of other times -- the agency would decide whether that product needs to be divested, whether it can be contributed, whether it even

matters.  Maybe the agency would review this and say it really doesn't matter.  Now, they didn't agree with that at the end of the day.  They obviously brought an administrative case, which we won at trial, but that could be the consequence of that.

I think it is fair for me to say that nobody in the history of this area of law has ever suggested that two parties negotiating a corporate transaction in which they recognize the potential for an antitrust -- what we call an antitrust overlap, two products that are arguably competing -- I don't think anybody has ever suggested that that kind of agreement was even a violation of the antitrust laws much less a per se violation.

And, of course, before one could classify something per se, this would be a long history under *Leegin*, under *Khan*, there has to be a long history of cases finding that very kind of situation to be anticompetitive.

And what that means here is there would have to be a long line of cases saying that when two companies are negotiating a corporate transaction and one element of that is that one of the companies will exit the market and put the product in front of the agency for review, that there is a long history of that being anticompetitive.

There is no way -- no way, Your Honor, that they can satisfy that burden.  Every corporate transaction that involves a merger involves a term sheet at one time or another that

involves eliminating competition.  That's what mergers are.  You stop competing 100 percent.  So, every time two companies are discussing a corporate merger -- and many of them are put in front of the agencies, in front of the Court, Your Honor decided the (inaudible) -- I was at the DOJ at the time.  I was actually in this courtroom for some of that trial -- nobody has ever suggested that simply negotiating the merger and having a term sheet or an agreement that, okay, well, we are going to stop competing pursuant to an agreement.  Now, let's put it in front of an agency, that that -- what you call a pre-agreement, that that somehow violates the antitrust laws.

So, all I ask Your Honor is as we approach this trial, as we approach this issue, we all keep in mind that the thing that has to be per se unlawful is the agreement itself.

Now, we say -- and my colleague will explain to Your Honor -- there was no pre-agreement.  That's fine.  We accept that -- you know, that happens against us for the purposes of my point about per se versus not.  But even still, one has to think about what the character of the agreement is, not what Altria ended up doing supposedly as a result of that agreement.

THE COURT:  All right.

MR. GELFAND:  Thank you very much, Your Honor.  I appreciate it.

(Pause in proceedings.)

**MS. SWARBRICK:** Good afternoon, Your Honor, Jenna Swarbrick on behalf of Altria. I will take a few minutes to cover the Section 1 issue, the question of whether -- I'm going to focus on Altria's opening motion for summary judgment here.

**THE COURT:** Okay.

**MS. SWARBRICK:** So, we have your tentative. I understand that Your Honor is very familiar with the facts in this case, so I'm not going to spend much time on the facts. I know that you have read the record and you have read our briefs; but I am going to take a few minutes to hopefully persuade you to think a little differently on the summary judgment standard.

**THE COURT:** Okay.

**MS. SWARBRICK:** So, as I understand your tentative, Your Honor's view is that there is credible evidence on both sides of this case; but I would submit to you that in the unique context of summary judgment in an antitrust case, that actually means that Plaintiffs have failed to carry their burden. As Your Honor knows, the question here is whether they have identified specific evidence that tends to rule out Altria's plausible explanations for its independent decisions.

And that burden is especially heavy here because Altria, as you noted, has a lot of contemporaneous evidence explaining why they did what they did at the time. The record is filled with explanations for Altria's decisions in October to remove

its products in response to FTA and also in December when Altria was facing serous financial problems with its Newmark company and had to decide whether to go forward or to shut it down.

So, Altria has clearly satisfied its burden at summary judgment, which is to put forward a plausible and justifiable explanation for its decision that is consistent with permissible business conduct.  It has shown that its actions were independent.

And the only question then is:  Have Plaintiffs put forward enough evidence that tends to rule that out?  And it has to be evidence that permits the jury to reasonably infer that there is a conspiracy.  So, it's not just enough to say there is evidence on each side of the ledger.  Their evidence actually has to rule out what we have put forward.  They have to rule out that plausible explanation we have offered.

And as you explained in your Korean Ramen decision, that evidence needs to be sufficiently unambiguous.  And there, frankly, just isn't anything like that here.  All they have is speculation.

And now, I think Your Honor mentions that there are different ways you might interpret some pieces of evidence in the record.  And I think the Ninth Circuit decision in *Richards v. Neilsen* is particularly instructive on that point. If you look at what happened in *Richards*, the Ninth Circuit was

confronting a piece of deposition testimony; and that deposition testimony was about a potential gentleman's agreement.  When the Ninth Circuit looked at that testimony they said, there's three different ways we can interpret this.  One of those is consistent with the plaintiffs' theory of conspiracy, but there are two other ways you can interpret that testimony; and both of those are consistent with independent action.

And when confronting those three possible interpretations, what the court said was:  The jury cannot draw a reasonable inference of conspiracy from this evidence that's subject to these different interpretations.  It's simply not enough.

So, the Ninth Circuit affirmed the grant of summary judgment there.

**THE COURT:**  But isn't that -- isn't that the point; that if -- as long as there is a reasonable inference from the Plaintiffs' case, doesn't that -- don't I then need to send the case to trial?  Or are you saying that the -- it's not just a reasonable inference.  I have -- it has to be undisputed fact that -- that they bring and they don't have it.

**MS. SWARBRICK:**  I think the key here is what it takes to be a reasonable inference in the unique context of an antitrust case.  What we have here is a lot of conduct that on its face, absent an agreement with JLI, is totally lawful.  And so, the fact that Altria pulled its products from the market is

in and of itself lawful, permissible business conduct.  They are allowed to exercise business judgment and do what they want to do on that front.

So, the burden is on the Plaintiffs to say that actually wasn't because of these independent reasons you've offered but instead because of some unwritten conspiracy that we are alleging.

So, in order to get the case to the jury, they have to have evidence that the jury could infer -- could make reasonable inferences from that evidence in order to reach the conspiracy conclusion.  And the problem is that the evidence that they have identified is largely consistent with the steps that Altria took.  It is consistent with the idea that what Altria did was independent.

They haven't identified evidence that rules out that independent explanation.  And to the extent that the evidence could cut either way, what the case law says is in the antitrust context, that means the defendant wins.  That means that we grant summary judgment.

**THE COURT:**  Even though a reasonable jury would go the other way?

**MS. SWARBRICK:**  So, I think that that's perhaps where the source of the disagreement is.  I think what the case law is saying that a reasonable juror couldn't draw that inference in this context because we want businesses to freely exercise

their business judgment.  And if they take steps that are on the one hand consistent with independent action and also consistent with possible conspiracy, the Plaintiffs need to do something more to bring their case into this area of disputed fact in order to proceed to the jury.

And I think that's what *Matsushita* instructs.  I think it's what *Citrus Acid* instructs.  I think that's what the court was saying in *Richards*.  I mean, I think the fact that the court in *Richards* said, there are three different ways we could read this testimony; but that means that we have to grant summary judgment, I think that answers the question here.

**THE COURT:**  Okay.

**MS. SWARBRICK:**  Thank you, Your Honor.

**THE COURT:**  Thank you.

**MR. SKARAS:**  Thank you, Your Honor, Andrew Skaras from Kellogg Hansen on behalf of Nicholas Pritzker and Riaz Valani.  I understand Your Honor's tentative regarding the rule of reason and the per se standard, so I would just like to take a couple of minutes to talk about how that relates to our clients, the individual directors.

Per *Murphy Tugboat*, there is a higher standard for individual liability in antitrust cases than for corporate defendants.  That standard requires plaintiffs establish per se Sherman Act Section 1 violation, and that's for good reason. *Murphy Tugboat* explained that this standard was appropriate

because the Sherman Act speaks at a high level of generality. The line between proper and improper conduct is often uncertain, and there is a social interest in not deterring economically useful conduct through excessive antitrust risk. And only the per se category gives that kind of concrete guidance.

Plaintiffs in their opposition do not meaningfully dispute that *Murphy Tugboat* provides the relevant standard, what's described as inherently wrongful conduct or that inherently wrongful conduct requires a per se violation. And they certainly did not propose some alternative standard for the Court to apply.

And I'm not going to re-tread the ground that Mr. Gelfand and Ms. Swarbrick already covered, but Mr. Pritzker and Mr. Valani join their arguments as to why the rule of reason applies in this case and not the per se standard.

And as to the proper standard for summary judgment, this matters for the individuals because there is -- as Ms. Swarbrick explained -- a limitation on the rule of reasonableness of inferences in antitrust cases under *Matsushita*. And the Plaintiffs haven't put forth solid factual foundation for their alternative explanation of Mr. Pritzker or Mr. Valani's conduct.

In light of the failure to do so, they have not excluded the possibility that Mr. Pritzker and Mr. Valani acted

independently of Altria.  And that is the reason that summary judgment should be granted in their favor.

In sum, the Court should conclude now that they are not viable per se claims against Mr. Pritzker and Mr. Valani, and they should not be subjected to the burdens of trial.  I can answer any questions if Your Honor has any.

**THE COURT:**  Okay.  Thank you.

(Pause in proceedings.)

**MR. YOUNG:**  Good afternoon, Your Honor, Trevor Young for the Direct Purchaser Plaintiffs.  I want to quickly respond to the points on individual liability.  I think importantly here the standard is that Pritzker and Valani can be held individually liable if they participated in inherently wrongful conduct.  That's the standard cited by *Murphy Tugboat*.

Obviously, you have our per se motion on the standard, which argues that Pritzker and Valani did exactly that; participate in a conspiracy that should be held to the per se standard.

Here on Defendants' motion, I think ultimately -- and as your tentative suggests -- if there is any possibility that the per se standard would apply under these facts, then I think it is proper to deny Defendants' motion.

I think we have put forward a lot of evidence that Pritzker and Valani were involved in this.  This conspiracy was initiated by Riaz Valani.  He reached out to his friend, Dinyar

Devitre, to initiate the negotiations. They were the largest shareholders in JLI. They were on the board of directors. They formed a strategic committee in which they led all of the negotiations. We believe that they were the ringleaders of this conspiracy and they should be held individually liable.

THE COURT: Okay. Thank you.

MR. SAVERI: Your Honor, Joseph Saveri on the Section 1 issues, just briefly, Your Honor. It is certainly true that Mr. Gelfand and I go back a very long way. We actually were representing adversaries in antitrust cases when we were much, much, much, younger. So, we have known each other for an awful long time. So, it is one of the good things about this practice is that we are able to have our paths cross. So, it is good to see him again. But, of course, as he was 30 years ago, he is wrong.

THE COURT: Well, I saw you stand up when he said "baseless."

MR. SAVERI: Well, and so, a couple points, look, the -- where he -- the conspiracy we allege includes the pre-agreement, all of the conduct resulting in the December 18th agreement. That is our claim. It is a broad conspiracy claim, which involves all of that conduct. You know, we heard some attempt to distinguish the act from the charged conduct. Well, the act, which is consistent with the agreement, is evidence of the agreement.

I think Mr. Gelfand said he has never heard an argument in the history of antitrust law.  It strikes me that the same argument could be made about bank robbery.  I mean, if there is an agreement to rob a bank and lo and behold they rob a bank, that's evidence of the agreement.  And we believe that is direct evidence of the agreement.

With respect to the Section 1 arguments about burden, first of all, I think there's an argument under *Nissan Fire* that they have the burden.  We don't even have to respond if they don't have evidence that negates the existence of the conspiracy.  I would argue that all of the evidence that they cite is entirely -- doesn't do that.

From our perspective, we have a combination of direct and circumstantial evidence.  We can have an argument about what is direct and, perhaps, what is circumstantial.  It includes the party admissions.  It includes the term sheets.  It includes the draft purchase agreement.  It includes the evidence of the negotiations.  It includes the evidence of Altria's conduct.  All of that is direct evidence.  You don't need any inference to understand that.

There is other circumstantial evidence, which also is consistent with our theory, which shows that the conspiracy is plausible.  Certainly doesn't negate the existence of the agreement.  Those are acts against interest.

There are the arguments, which we still hear today --

which are essentially pretextual -- that the -- that the decision was made not to -- the decision was made to address youth vaping. We think that's pretextual. They didn't remove the products because of -- well, their argument is they removed the products because of concerns with the -- with the FDA. We think that's false or that the product was failing.

We also think that there is admissible evidence, which we have cited in our briefs, which is also -- goes to the same point, which is entirely consistent with the allegations of a conspiracy. Those are plausible inferences. A jury can consider some or all of that and reach the conclusion that the conduct was not unilateral but was, in fact, concerted activity and conducted pursuant to a plan or conspiracy or common understanding.

And that is more than sufficient at this juncture. And that's what the jury is going to have to decide, whether this conduct is concerted, whether it was unilateral. And that's the question of fact. And Rule 56 does not permit the Court to take that from the jury.

THE COURT: Okay. Thank you.

MR. SEIDEL: Brief opportunity to respond on the Section 7 issues.

THE COURT: Sure.

MR. SEIDEL: I just have three points to make. The first one is that Counsel for Defendants said that contracts

cannot be assets.  I don't think that's true.  The *Columbia Pictures* case was about the license.  What is a license?  A license is a contract.  And the fact that people can breach contracts, you know, doesn't matter.

In the *Columbia Pictures* case, they granted a distribution license.  Sure, they could have breached that contract and then they wouldn't have had the license; but that doesn't really matter.  And the same thing here with the shelf space.

I also don't believe Defendants have cited to any case that says that an asset has to be exclusive.  While it's true that the *Columbia Pictures* case concerned an exclusive license agreement, I don't think there is any such limitation in *Columbia Pictures* or in any other case.

And, again, going back to shelf space, that is an exclusive asset.  Shelf space is a limited set of spaces.  When Altria has a contract with a whole bunch of retailers nationwide and says, we are now -- pursuant to that agreement, where I get to -- you know, as Altria, Altria gets to place whatever products it wants pursuant to that contract, when it puts Juul's products in that space, it is exclusive to any other e-vapor competitor from putting its products in that space.

And then lastly, Your Honor, about substantially lessening competition, I mean, ultimately that's for the jury.  And I don't think Your Honor can say that Juul can't be liable under

Section 7 because this agreement doesn't substantially lessen competition in the same way that this should go to the jury for both Altria and JLI.

And I think the key is that if Your Honor holds that none of these are assets, I am concerned that in a future agreement where JLI purchases these assets, no one will be able to challenge this under Section 7.  And I think that's a problem, and I do think that this agreement -- where JLI essentially got all of the infrastructure and distribution network and shelf space from Altria and had a non-compete in it -- should be challengeable under Section 7 regardless of whether they gave stock to Altria.  And with that, I will conclude.

**THE COURT:**  Okay.  Thank you.  Anybody else?  Going once?  Oh, Mr. Gelfand.

**MR. GELFAND:**  One minute.  I just saw that Section 7 issue.

**THE COURT:**  Right.

**MR. GELFAND:**  I think we have beaten per se to death at this point.  I just want to make clear that my point about contracts was that when you contract for services that in my experience not viewed as an asset, you are just getting services.  It is possible that you have a bundle of contracts or something and you transfer those contracts over.  Maybe that's viewed as a bundle of assets in certain situations.  I don't know.  But that was the point its trying to make here.

I also heard just a hint of something at the end of my colleague's remarks there that I want to make sure we are very careful about. There is a sense from their papers -- and now just at the end of his argument -- that if JLI was getting anything, then somehow you put all of the effects of the overall transaction together for the purposes of Section 7 as it relates to JLI.

And that was the point I was trying to make about the exact language of Section 7, which says no one shall acquire where the effect of such acquisition is to substantially lessen competition. To me, that means they have the burden -- and they can't meet it because there is no evidence in the record -- of proving that any of these things -- whether it is the shelf space or the regulatory services or anything else -- substantially lessens competition, where all they did was help JLI compete more effectively against its other rivals.

So -- and *Gerlinger*, that's exactly what the court did. The court said, I don't have to reach the issue of whether it's an asset or not, this website, because I find it could not have substantially lessened competition since all Amazon was doing was helping Borders. They weren't tying Borders' hands or hurting Borders. They were helping Borders compete more effectively against the remaining competition in the market.

So, there is that second, you know, substantial lessening point that I think we are entitled to summary judgment on.

Thank you, Your Honor.

**THE COURT:** All right. Thank you.

**MR. ROSENTHAL:** Thank you. Just one quick point in response to the Plaintiffs. On Mr. Valani, setting aside whether or not Mr. Valani did set off the negotiations, there is a difference between starting negotiations with a corporate counterparty in a transaction that has express documentation for its consummation under the review of the FTC and whether there is a separate unwritten conspiracy that is of the ilk that Plaintiffs have alleged. And we would proffer that even if Mr. Valani was an initiator of general corporate transactions, that's not necessarily evidence that goes to his participation in an unwritten conspiracy. Thank you.

**THE COURT:** Okay.

**MR. YOUNG:** Just briefly. Not only did Riaz Valani initiate --

**COURT REPORTER:** I'm sorry, this is the court reporter. Can I please have Counsel identify themselves? Thank you.

**MR. YOUNG:** Sorry, Trevor Young with the Direct Purchaser Plaintiffs.

Importantly, Riaz Valani and Dinny Devitre operated as a back-channel for the communications involving the conspiracy. He didn't simply initiate the negotiations here. He went further than that and was the primary back-channel between

Altria and JLI.  And for that reason, there is additional evidence besides him just initiating the negotiations of the transaction.

**THE COURT:**  Thank you.  Thank you.  All right.  Did I see any other movement from any source?

(No response.)

**THE COURT:**  All right.  Mr. -- somebody said something about case management, so let's talk about that for a second.

**MR. SAVERI:**  Joseph Saveri again.  I was the one, I think.  So, yeah, we have a couple things to, I guess, I don't know, consider that we would want at least ventilate given where we are.

**THE COURT:**  Yeah.

**MR. SAVERI:**  And we have a trial date in this matter set for May 12th.  We have our pretrial conference on April 6th.  We have -- we heard you on the class certification order, but one of the things that we need to address -- and I don't want to be presumptuous -- but in the event that the class is certified, we need to provide notice to the class.

And given where we are, it's certainly doable; but from my perspective, I don't want to have days go by unnecessarily and I want to attend to that.  So, I'm in a little bit of a predicament where I haven't seen your Court's order.  The last thing I want to do is presume a result, and the last thing I want to do is get ahead of myself.

But nonetheless, that's an important thing to consider.  I mean, all the evidence we heard today was entirely common evidence.  All the argument, all the facts -- we are not going to re-argue that -- but we do have -- so, those are the things that are coming up.  We are hard at work at -- we are starting to do all of the exchanges.  And so, those are the case management issues, I guess, from my perspective, that it's important to start to have some dialogue on it.

In the event that the class is going to be certified, we would like to submit a notice plan to you in post haste and get that under way.  We have started the work on it.  We have put some of that in the class certification papers, but we are kind of at a point where if we are going to -- we would like to proceed, but it doesn't make any sense until we hear more from --

**THE COURT:**  No.  That is -- I'm aware and I appreciate that the longer this -- my production issue continues, I'm jeopardizing what I really want to do.

**MR. SAVERI:**  Okay.

**THE COURT:**  So, I will -- again, I can't tell you but it is my -- it is my fondest hope that I will have an order out this week.

**MR. SAVERI:**  And, Your Honor, I appreciate that.  If I may, in the event that that were to happen -- and, again, I'm speaking -- I'm trying to be very careful.

**THE COURT:** Yeah.

**MR. SAVERI:** Could we figure out a time -- maybe in connection with the issuance of the order -- to get back in front of you here because there are things that the Court needs to do along the way. There is a notice to draft. There is a notice plan. There is a schedule. And those are important milestones, and we would want to submit those to Your Honor as quickly as we can. I mean, we have started on it but we certainly can't submit them now. So, maybe we could think about what the next step would be.

**THE COURT:** Okay.

**MR. SAVERI:** If that's fair.

**THE COURT:** It is. If I hadn't created this problem, I would say it is very unfair; but I did create this problem, so I think it's fair.

**MR. SAVERI:** Well, again, Your Honor, I'm trying -- I'm not casting aspersions. I'm --

**THE COURT:** No, no, no, it's not a problem. I'm going to be leaving town for two weeks on a week from today. That's why I really want to get this done.

So, that's the next earliest time the next earliest time depending on when I get the order done, would be February 25th or 26th.

**MR. SAVERI:** Again, with all of this cautionary language, can we reserve a date to get back in front of you --

**THE COURT:** Sure.

**MR. SAVERI:** -- some time that week? And if we don't use it, we don't use it.

**THE COURT:** Yes. How about February 27th? I wanted to hear from you today, Mr. Rosenthal, so thank you for saying okay. Okay, February 27 then. What time works? I have a 10:00 o'clock. Do you want to do it in the afternoon? What's the easiest for your travel?

**MR. SAVERI:** If we are going to do it in person -- I'm mean, I'm in town. I can do whatever time works.

**THE COURT:** We don't have to do it -- if we can do it by Zoom, then so much the better.

**MR. SAVERI:** That's fine with me.

**MR. ROSENTHAL:** We are totally fine with Zoom.

**THE COURT:** Okay. So, 10:00 o'clock here, 1:00 o'clock back East?

**MR. ROSENTHAL:** That's fine.

**THE COURT:** 10:00 o'clock on February 27th, all the things.

**MR. ROSENTHAL:** May I just be heard for a minute?

**THE COURT:** Yes.

**MR. ROSENTHAL:** Mr. Saveri sort of stole my thunder. I was going to ask us to get together after the class cert decision as well. Just looking at the math, it is really difficult to see how we go to trial in May. I mean, I haven't

seen their notice plan.

**THE COURT:**  Yeah.

**MR. ROSENTHAL:**  They have to put it together.  They have to have publication notice.  That takes time.  You've got to have the opt-out period.  There is a series of motions that Mr. Bamberger discussed with you back at the class cert hearing that can't take place until we know who is a member of the class.  That takes additional briefing.  We also -- I understand we have no automatic right to an appeal.  We do have a right to file a 23(f).  The Ninth Circuit on average takes 90 days to decide just whether to grant it.  It was 120 in the MDL.  So, I'm not asking --

**THE COURT:**  It's really annoying, by the way.  I just want you to know.

**MR. ROSENTHAL:**  I know.  I mean, I live in this world too from a different side of the perspective.  It is very challenging to see how this gets done in time.  And so, I do think it makes sense February 27th that we can talk about all of this.  We will have a better sense of a notice plan and whether it really is feasible.

**MR. SAVERI:**  Sorry, I didn't mean to interrupt.

**MR. ROSENTHAL:**  No.  I'm done.

**MR. SAVERI:**  Excuse me.  Your Honor, I think that's fine.  I think there are other things to say about that.  We have a different view but there's no reason to hash that out

now if we are going to be here on February 27th.  So, the sooner the better, but we -- but -- that will work.  Look, I mean, if -- it seems to me if one of the things we are talking about is arbitration, I think the fact the Defendant's summary judgment motion says a lot about whether they have preserved those rights; but we can talk about that on February 27th as well.

**THE COURT:**  Right.  Well, but the other thing, though is -- and I have been thinking about this too and is if the Defendants -- I'm going to certify something.  The Defendants -- if the Defendants are going to want to test that, it takes forever for the Ninth Circuit to look at these things. So, that is -- makes me sad about the trial date, but I have done this to myself, so it's my problem.

**MR. SAVERI:**  Your Honor, I appreciate that and I'm fine with addressing you all of this stuff on February 27th. I'm not -- I'm more sanguine about how we can solve these problems, perhaps, than Mr. Rosenthal.  But, again, let's deal with it on the 27th.

**THE COURT:**  Why don't you work it through and see what -- what you think the earliest plausible date would be so then I can work it through on my calendar.

**MR. SAVERI:**  Your Honor, is it fair in preparation for that, given where we are now, to start to try to put together a plan assuming -- without the order in hand -- but assuming that

something would be certified.

**THE COURT:**  Yeah.

**MR. SAVERI:**  With that I can get working.

**THE COURT:**  Yeah, get working.  Because, I mean, that's -- that's going to happen.  What exactly the permutations and everything, I do want to finish it.

**MR. SAVERI:**  Fair enough.

**THE COURT:**  So, yes, that's fine.  And then talk through what is a sensible, as fast as possible given this tardy judge, path to the trial.

**MR. ROSENTHAL:**  Thank you, Your Honor.

**MR. SAVERI:**  Thank you.

**THE COURT:**  Thank you all.

(Proceedings adjourned at 3:10 p.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:    February 4, 2026




_____

Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court - Official Reporter