UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE: JUUL LABS, INC. ANTITRUST LITIGATION** | Case No. 20-cv-02345-WHO<br><br>**ORDER GRANTING IN PART MOTIONS FOR CLASS CERTIFICATION AND DENYING MOTIONS TO STRIKE OR EXCLUDE**<br><br>Re: Dkt. Nos. 486, 490, 492, 496, 497, 498, 496, 510, 520, 539, 563, 564, 565, 566, 567, 568, 569, 570, 572, 573, 574, 575 |

Three sets of plaintiffs – the Direct Purchaser Plaintiffs ("DPPs"), Indirect Purchaser Plaintiffs ("IPPs") and Indirect Reseller Plaintiffs ("IRPs," collectively "Indirect Plaintiffs") bring antitrust and related state law claims against Altria and JUUL Labs, Inc. ("JLI")[1] challenging an allegedly unlawful and anticompetitive agreement Altria entered into with JLI.[2] The three sets of plaintiffs move for certification of nationwide, multistate, and single state classes for the different categories of purchasers.

On February 5, 2026, I issued a short order GRANTING the DPPs' motion for class certification, GRANTING IN PART the IPPs' and IRPs' motions for class certification and resolving the parties' motions to strike and exclude experts and their opinions. *See* Dkt. No. 627.

---

[1] The DPPs also allege federal antitrust claims against two of JLI's Board of Directors, Nicholas Pritzker and Riaz Valani.

[2] The parties are familiar with the factual allegations and prior proceedings. Those allegations and that history will not be repeated here. *See* Dkt. Nos. 270 (August 2021 Order on Motions to Compel and Motions to Dismiss); 304 (January 2022 Order Granting Motion to Compel); 330 (August 2022 Order Staying Case Pending FTC Proceedings); 347 (July 2023 Order Lifting Stay); 381 (February 2024 Order Granting Motion to Dismiss and Compel).

This Order explains the reasoning behind those rulings.[3]

**LEGAL STANDARD**

Federal Rule of Civil Procedure 23 governs class actions. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663–64 (9th Cir. 2022) (en banc). "[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis,'" that the requirements of Rule 23 are met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011) (quoting *Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147, 161 (1982)). "[P]laintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence." *Olean*, 31 F.4th at 665.

A "plaintiff[] must make two showings" to certify its purported class. *Olean*, 31 F.4th at 663. "First, the plaintiffs must establish 'there are questions of law or fact in common to the class,' as well as demonstrate numerosity, typicality, and adequacy of representation." *Id*. (quoting Fed. R. Civ. Proc. 23(a)). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" and the "claims must depend upon a common contention." *Wal-Mart*, 564 U.S. at 349–50 (quoting *Falcon*, 457 U.S. at 157).

"Second, the plaintiffs must show that the class fits into one of three categories" as provided in Rule 23(b). *Olean*, 31 F.4th at 663. Under Rule 23(b)(3), a class may be certified if "questions of law or fact common to class members predominate over the questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. Proc. 23(b)(3). "To prove there is a common question of law or fact that relates to a central issue in an antitrust class action, plaintiffs must establish that 'essential elements of the cause of action,' such as the existence of an antitrust violation or antitrust impact, are capable of being established through a common body of evidence, applicable to the whole class." *Olean*, 31 F.4th at 666.

"[P]laintiffs must prove the facts necessary to carry the burden of establishing that the

---

[3] I recognize that defendants have filed a motion for leave to file a motion for reconsideration, asking me to use a specific end date for the DPP class period. *See* Dkt. No. 634. The motion for reconsideration on that narrow issue is GRANTED and the end date for the DPP class will be discussed at the February 27, 2026 Case Management Conference.

prerequisites of Rule 23 are satisfied by a preponderance of the evidence.  In carrying the burden of proving facts necessary for certifying a class under Rule 23(b)(3), plaintiffs may use any admissible evidence." *Olean*, 31 F.4th at 665 (citing *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 454-55 (2016)).  While the class-certification analysis "may entail some overlap with the merits of the plaintiff's underlying claim, Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (internal citations and quotation marks omitted).  "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id*. (citation omitted).

## DISCUSSION

## I.   DIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

The named DPPs in the Third Amended Complaint are Devin Black, Robert Thompson, and Jake Sieber, individuals who purchased e-cigarette products directly from JLI.  Third Amended Consolidated Class Action Complaint [Dkt. No. 357] ¶¶ 13-15.  The DPPs move to certify the following class:

> All natural persons and entities in the United States that purchased e-cigarette products directly from Defendant Juul Inc. or any of its subsidiaries or affiliates, from October 5, 2018 to the present (the "Class Period")

DPP Motion for Class Certification ("DPP MCC," Dkt. No. 497-2).  The class "is limited to individuals and entities who purchased JUUL e-cigarette products directly from JLI. The proposed class excludes consumers who purchased from secondary retailers, defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; class counsel and employees; and the judicial officers, their immediate family members, and associated court staff assigned to this case.  TAC ¶ 35." *Id*. at n. 1.

### A.   Rule 23 (a) Factors

Considering the four Rule 23(a) prerequisites, there is no dispute that numerosity is satisfied; I find it is easily satisfied given the hundreds of thousands of class members.

Defendants also do not challenge plaintiffs' persuasive showing that common questions of law and fact exist (they do challenge predominance and superiority, addressed below). Instead, they argue that the DPP class representatives are not typical or adequate and that differences between members of the class require individual analysis, precluding a finding of predominance.

### 1.    Typicality & Adequacy – Scope of Class

Defendants argue that the three named DPPs – individuals who purchased approximately $2000 of JUUL product – are not typical of and cannot adequately represent vape shops and large distributor-direct purchasers who purchased millions of dollars' worth of JUUL products and who make up 93% of the direct purchaser market between November 2018 and March 2024. Defendants argue that because the named DPPs engaged in fundamentally different transactions from the large companies whose purchases dominated the market, the three named DPPs are atypical and should "at most" "represent a class of other online purchasers only – not distributors or retailer stores." Defendants Joint Opposition to the DPP MCC (Dkt. No. 520-8, "Oppo. DPP MCC") at 15, 16.

Defendants contend similar distinctions led the Honorable William A. Alsup in *In re Graphics Processing Units Antitrust Litigation* ("*GPU*") to find individual purchasers "atypical" from the other types of direct purchasers, and as result certified only a limited class of similarly situated direct purchasers. 253 F.R.D. 478, 490 (N.D. Cal. 2008) (representative plaintiff who purchased a single graphics card at a non-negotiable price was atypical of "wholesale purchasers who collectively comprised over 99.5% of defendants' business" and "purchased a vast array of products on individually negotiated terms," because the "representative plaintiffs simply do not have the appropriate incentive to establish antitrust violations with respect to all of the absent class members" based on those differences). Similarly in *In re Optical Disk Drive Antitrust Litigation*, the Honorable Chief Judge Richard Seeborg found that "small companies with three or four individuals" were inadequate and atypical to represent larger manufacturers and distributors who comprised 87% of purchases of optical disk drives. 303 F.R.D. 311, 317 (N.D. Cal. 2014) (representatives who "purchased non-customized ODDs (or computers containing ODDs) from a defendant at nonnegotiable, list prices through a defendant's distribution subsidiary or retail

United States District Court
Northern District of California

website," not typical given "the putative class encompasses a myriad of other ODD purchasers whose volumes and means of ODD purchases do not compare").

There are material distinctions here that distinguish this case from those. Here there are only two defendants, three channels of distribution (wholesaler, direct retailer, and direct to customer), and one set of products (JUUL pods). *See, e.g., In re Cathode Ray Tube Antitrust Litig.*, No. 07-CV-05944-JST, 2022 WL 4596621, at \*4 (N.D. Cal. Aug. 1, 2022) (distinguishing *GPU* because with cathode ray tubes "customization was far more limited, there are far fewer types of CRT products at issue and wholesale purchases were rarely negotiated individually . . . and the products involved in *GPU* were customized and not fungible"). The differences identified by defendants do not undermine typicality or adequacy of the named DPP representatives given the posture of this case.

Defendants next assert that the named DPPs who purchased through the JLI website are fundamentally atypical for Rule 23 purposes because the distributor and retailer DPPs, who make up 93% of the market, negotiated separate purchasing contracts with JLI to determine price, to secure rebates and other off-invoice discounts, and to determine how JUULs would be advertised and resold. As examples, defendants point to a period in 2018 where prices for JUUL pods stayed the same for individuals like the three named DPPs purchasing through JLI's website, but increased for distributors as JLI moved to recapture some of the "margin" given to large distributors. JLI also points to its reduction of rebates and discounts for those large distributors and retailers starting in 2019. Oppo. DPP MCC at 18-19.

Differences in purchasing prices as a result of negotiations or favorable deals to large distributors or retailers – to the extent relevant, given the lack of a pass-through defense to the federal antitrust claims[4] – are matters that can and presumably will be addressed by the experts and presented to the jury. These distinctions do not undermine the *typicality* of the named DPPs or call into question their ability to represent the class of DPPs who do not opt out. While the distributors and retailers may have received rebates or other incentives, given the limited set of

---

[4] *See, e.g., In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 748 (9th Cir. 2012 ("Defendants may not use a pass-on theory to challenge the standing of direct purchasers").

United States District Court
Northern District of California

products and distribution channels in this case for JLI's singular product, there are no concerns that the three named plaintiffs do not have "the appropriate incentive to establish antitrust violations with respect to all of the absent class members," *GPU*, 253 F.R.D. at 490, as the DPPs' evidence-based claim is that *all* channel prices were inflated by the anticompetitive conduct. Plaintiffs also dispute the significance of defendants' examples, pointing out that the price increases JLI instituted in 2018 were also rolled out to consumers like the named DPPs. Their view of the evidence is that prices across the three channels were "generally uniform." *See, e.g.*, Declaration of Pierre Thomas Leger [Dkt. No. 569-8] ¶ 111. At base, in this conspiracy case, "plaintiffs' claims are typical of the class because proof of their section 1 claim will depend on proof of violation *by defendants*, and not on the individual positioning of the plaintiff." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486 PJH, 2006 WL 1530166, at *5 (N.D. Cal. June 5, 2006) (emphasis in original).[5]

Defendants' typicality and adequacy arguments fail. The three named DPPs have claims typical across the DPP class for allegedly being overcharged due to the alleged anticompetitive conduct between Altria and JLI and they are adequately incentivized to pursue those claims.

### 2. Adequacy of DPPs

Defendants also argue that the individual consumer DPPs are inadequate to represent the class, pointing out that DPPs Black and Sieber in their depositions were not aware that they were representing anyone other than online purchasers. *See* Oppo. to DPP MCC at 21. Defendants acknowledge that DPP Thompson knew he represented distributors, but argue that he was unfamiliar with any distributors in the proposed class, how they obtained product, or how they negotiated with JLI. *Id*. Defendants assert that because none of the DPPs have knowledge about distribution, regulation of retail sales, or corporate knowledge – whereas knowledgeable and powerful distributors like McLane, Core-Mark and Eby-Brown have all declined to file cases against JLI – the three named DPPs are inadequate.

---

[5] Defendants also argue the three named DPPs are not typical of or adequate to represent DPPs who may be bound by JLI's arbitration agreement or forum selection clauses as a result of their individually negotiated purchase contracts. Those arguments are addressed below.

That two of the named plaintiffs had an imperfect understanding of the class does not fatally undermine their adequacy as long as they have a basic understanding of the nature of the claims at issue and their responsibilities as class members. *See Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 611 (N.D. Cal. 2004), *amended in part*, 2012 WL 3070863 (N.D. Cal. July 26, 2012) ("The threshold of knowledge required to qualify a class representative is low; a party must be familiar with the basic elements of her claim[], and will be deemed inadequate only if she is 'startlingly unfamiliar' with the case."); *see also In re Facebook Biometric Info. Priv. Litig.*, 326 F.R.D. 535, 543 (N.D. Cal. 2018), *aff'd sub nom. Patel v. Facebook, Inc.*, 932 F.3d 1264 (9th Cir. 2019 ("Even if the named plaintiffs have relied heavily on the advice of attorneys and others, it is hardly a badge of inadequacy to seek help from those with relevant expertise, particularly in a complex case like this one."). The named DPPs have that basic level of knowledge about this case.

### B.     Forum Selection Clauses and Arbitration Agreements

Defendants next argue that the many distributor and retailer DPPs covered by forum selection clause or arbitration agreements should be excluded from any class that is certified. Oppo. to DPP MCC at 22-27.[6]  Defendants assert that given JLI's forum selection clauses (with distributors) and arbitration agreements (with online purchasers, but also negotiated with distributors), the court should "require the DPPs to revise their class definition, or else amend it, to exclude from the class pursuing claims against JLI and the Director Defendants those who have contractually agreed not to do so in this forum." *Id*. at 26; *see also* Declaration of Nowell D. Bamberger [Dkt. No. 520-13] ¶ 36 & Ex. 35 (tables identifying "Online Purchasers" allegedly subject to arbitration agreements and "Entity Purchasers" subject to arbitration agreements and/or forum selection clauses).

### 1.     Forum Selection Clause

Defendants contend that the named plaintiffs are not typical of and cannot adequately represent the distributors, 70 of whom have forum selection clauses mandating a venue outside of California.  As examples, defendants identify distributor McLane, whose contracts select Texas as

---

[6] Defendants' contractual arguments are not identified as specific Rule 23(a) or a Rule 23(b) challenges, but arguably implicate both.

United States District Court
Northern District of California

the forum for disputes, and other large distributors that selected New York, Pennsylvania, or Delaware. Oppo. to DPP MCC at 22. According to defendants, the enforceability of the forum selection clauses creates a host of individual issues and that even though the forum selection clauses run only to JLI, it would be inefficient for the same claim to proceed in parallel in separate forums. *Id*. at 22-23.

As an initial matter, what forum selection clauses may be asserted depends on whether the entities subject to forum selection clauses opt-out or remain in this action. If entities covered by forum selection clauses opt-out, then this is a non-issue. If entities covered by forum selection clauses remain in the DPP class, the enforceability of those clauses can – if JLI moves to enforce them – be handled at that juncture.

I also do not agree with defendants that the named DPPs are unable to credibly test the enforceability of forum selection clause if and when they are asserted against class members. The concern animating the line of cases finding named class representatives who opt out of arbitration agreements atypical is that those who opted-out cannot credibly challenge the same arbitration agreements on behalf of putative class members who did not opt out on unconscionability grounds. *See Rushing v. Williams-Sonoma, Inc*., No. 16-CV-01421-WHO, 2024 WL 779601, at *6 (N.D. Cal. Feb. 21, 2024) (discussing and distinguishing cases, including *Tan v. Grubhub, Inc*., No. 15-CV-05128-JSC, 2016 WL 4721439, at *3 (N.D. Cal. July 19, 2016)); *see also Nitsch v. Dreamworks Animation SKG Inc*., 315 F.R.D. 270, 284 (N.D. Cal. 2016) ("the fact that Defendants may have affirmative defenses against some absent class members does not affect the Court's typicality analysis. In the instant case, all class members were injured by the same alleged antitrust conspiracy and incurred the same alleged injury—suppressed compensation caused by Defendants' single antitrust conspiracy. This is all that is required to show typicality."). Those concerns are not present here where the named DPPs did not opt out. The DPPs and their counsel have demonstrated ability to challenge similar agreements on unconscionability and other grounds. *See* Dkt. Nos. 270, 304, 381.

The enforceability of forum selection clauses for entities who remain in the class may have to be addressed, but that does not mean that individualized issues will predominate. First, the

issue applies only to JLI, not Altria.  Moreover, courts routinely address enforceability of contractual forum claims in the context of class actions and, if I determine those agreements are enforceable for plaintiffs who do not opt out, at most there will be a narrowing or redefinition of the DPP class.

### 2.    Arbitration Agreements & Class Action Waivers

Similarly, defendants argue that "substantial portions" of online purchasers will be covered by JLI's arbitration agreement, which has already been considered by the court in three orders compelling online purchasers who were proposed DPPs to arbitration.  Dkt. Nos. 270, 304, 381.  Collectively, according to JLI, these decisions provide that anyone who created an account on or after August 8, 2018 or who logged into that account on or after September 18, 2019, will be bound by an enforceable arbitration agreement.  According to JLI's sales data, 88% of purchases from Q4 2018 through Q4 2020 would be subject to arbitration agreements.[7]

Defendants argue that Black, who is not subject to an arbitration provision, has no standing to challenge the arbitration agreements or is atypical, relying on my decision in *Rushing v. Williams-Sonoma, Inc.*, 2024 WL 779601 at *6.  In that opinion I acknowledged different lines of authority but did not decide to follow any particular line because the plaintiff there had successfully challenged the asserted arbitration agreement and therefore was not subject to unique defenses or was otherwise unable to credibly challenge the enforcement of arbitration agreements on behalf of absent class members.  *Id*.  As with the forum selection clauses, if and when JLI moves to enforce the arbitration agreements, Black may credibly challenge the enforcement or unconscionability of those agreements as to the claims against JLI which, as plaintiffs point out, provide for joint and several liability with Altria.

The DPPs have satisfied the Rule 23(a) factors.

### C.    Rule 23(b)(3) Factors

Turning to the 23(b)(3) factors, the DPPs identify numerous antitrust class action decisions

---

[7] JLI argues that because Sieber and Thompson's personal claims were compelled to arbitration (as a result of the February 2024 Order), those two DPPs cannot be class representatives.  That may be true, although it depends on how and when those arbitrations resolve.

recognizing that antitrust liability is a common and predominant issue. *See, e.g.*, *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 612-613 (N.D. Cal. 2009) (recognizing that "[m]any courts have recognized a presumption of class-wide antitrust impact" but also recognizing that "[n]otwithstanding this presumption, IP Plaintiffs cannot demonstrate common impact by simply alleging a price-fixing conspiracy" and certifying a direct purchaser class after finding "the methodologies advanced by DP Plaintiffs' expert would allow impact to be demonstrated with generalized proof"). DPPs argue that the "predominant view," consistent with basic economics and common sense, is that a conspiracy to allocate markets or fix prices creates a strong inference of class-wide impact and injury. DPP CC Reply at 4 (citing *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1254 (10th Cir. 2014) ("The district court did not abuse its discretion in determining that impact involved a common question that would override other individualized issues. Under the prevailing view, price-fixing affects all market participants, creating an inference of class-wide impact even when prices are individually negotiated.")). Even if there is no inference, the DPPs assert that they will demonstrate impact through common, predominant proof in defendants' business records, witness testimony, and expert testimony to prove that defendants' conspiracy "widely raised prices" for JLI's products.

Defendants' primary predominance challenge is aimed at the DPPs' experts; (1) Dr. Pierre Thomas Leger, the DPPs injury and damages expert who uses an antitrust logit model ("ALM") to show class-wide impact from the conspiracy; (2) Dr. Brian Perry who opines on competition and market dynamics before and after the alleged agreement; and (3) Dr. Matthew Hoelle, offered by the DPPs to rebut defendants' expert Dr. Kevin M. Murphy.

I address the challenges to Leger and Hoelle in connection with defendants' motions to exclude or strike those opinions. For the reasons discussed below, I will not exclude Leger's model or opinions at this juncture. The use of the ALM may not be standard, but it fits the theory of this case and provides a path to common proof. The assumptions that underlie that model are not, on their face, untenable or illogical and they may be attacked by defendants on their merits at trial or post-trial. Whether Leger's ALM appropriately accounts for online purchases and appropriately estimates overcharge rates for independent vape shops are likewise matters to be

10

tested at trial or post-trial.  These arguments do not – at this juncture based on the record before me – support exclusion of Leger's model or conclusions therefrom.

For Hoelle, I agree in part with defendants' motion to exclude or strike in that Hoelle may only testify in rebuttal to Murphy.  His opinions will not be otherwise excluded if offered as rebuttal.

As to Perry, there is no dispute that he does not offer a model to estimate the overcharge damages.  He instead offers testimony regarding competition and the dynamics of the market pre and post the alleged conspiracy.  His analysis is based not merely on theory but on evidence from defendants as well as concentration figures using the Herfindahl-Hirschman Index ("HHI"), a method the Federal Trade Commission ("FTC") found supported a presumption of competitive harm in the proceedings before the FTC.  *See* DPP CC Reply at 13, fns. 13 & 14.  Whether that evidence – alone or in conjunction with Leger or Hoelle in rebuttal – will persuade the jury and withstand post-trial analysis (if and as necessary) is to be determined.

In sum, in addition to the strong inference of class-wide impact, the DPPs have shown how they intend to show class-wide impact and damages as the result of the alleged conspiracy.  Common, predominant questions abound regarding whether there was a conspiracy, when it started and ended, whether it impacted the class of DPPs, and what the damages to the DPPs were.  There is no dispute that addressing these claims through a class action is far superior to addressing them direct purchaser by direct purchaser, although the DPPs will be given an opportunity to opt out.  The DPPs have shown predominance and superiority under Rule 23(b)(3).

### D.     Scope of Class

Finally, defendants argue that the DPPs baselessly propose to start the class period on October 5, 2018 and continue it through "present."  Defendants contend both the start and end date are inappropriate because the class period (if any) should start as of December 7, 2018 (the date Altria announced it would shut down its e-cigarette business) and end by March 29, 2024, the date when the data Leger considered ended.  They assert that Leger inappropriately used forecasted data to extend the class period a further nine months.  The DPPs counter with evidence supporting their view that the conspiracy began on October 5, 2018 and that competition remains lessened to

this date.

At base, these questions go to whether the jury believes the evidence the DPPs offer and what supportable inferences can be drawn from that evidence. For purposes of class certification, the class period sought by the DPPs has a basis in the proof, taking the rational inferences in the DPPs' favor.[8]

The DPPs motion for class certification is GRANTED.

### E.    Defendants' Motions to Exclude

#### 1.    Motion to Exclude Leger

As noted above, defendants move to exclude the opinions of Dr. Pierre Thomas Leger, the DPPs' injury and damages expert. Dkt. No. 520-2. Leger used an "antitrust logit model" or ALM to estimate a but-for world where Altria remained in the market at 10%, 20% and 30% of the market. Leger then estimated a second world based on Altria leaving the market, assuming that Altria's market share proportionally diverted to other market participants based on their market shares in 2018. He then compared prices from this post-world to the but-for world to determine three overcharge rates. *See* Leger Report & Rebuttal Report, Exhibits 7 & 8 to the Declaration of Joseph Saveri (Dkt. Nos. 497-5 & 497-6).

#### a.    Antitrust Logit Model ("ALM")

Defendants attack Leger first on his "novel" use of an ALM in this price overcharge case. They argue ALM models are typically used to predict impact from mergers – where real world data about the impact of antitrust conduct is not available – and not to measure antitrust impact from agreements not to compete that allegedly went into effect. *See* Motion to Exclude ("MTE") Leger [Dkt. No. 520-2] at 9-10. The DPPs dispute whether the use of an ALM model is novel, pointing out that it is frequently used in merger analyses and also in cases like this one where the alleged agreement removed Altria as a competitor in the market, the distinction being retroactive application of the ALM as opposed to prospective application in the potential merger scenario. According to the DPPs, that distinction does not matter and the ALM remains an accepted and

---

[8] As noted, above the end date of the DPP class will be reconsidered at the February 27, 2026 Case Management Conference.

United States District Court
Northern District of California

reliable method of assessing antitrust impact and injury. *See* DPP Oppo. to MTE Leger [Dkt. No. 569-4] at 7.

The heart of defendants' complaints about the use of the predictive ALM model is that its use is inappropriate where there is real world data. In defendants' view, ignoring that data makes the assumptions in Leger's ALM model impermissibly counter-factual. However, that the model is based on economic theory and assumptions is not a reason to exclude it. S*ee In re Telescopes Antitrust Litig.*, 348 F.R.D. 455, 470-71 (N.D. Cal. 2025) (accepting "Cournot model" with "its textbook assumptions, which is widely accepted by economists as a reliable way to calculate overcharge" over defendants' objections that model relied on theoretical simulations "rather than relying on an empirical analysis of actual telescope prices"); *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 837 (D.N.J. 2015 (approving use of predictive "Bertrand model" although "the context here is not a merger, the purpose is similar: simulation of competitive pressures in a but-for world with different competitors"). As discussed below, defendants may attack the DPPs use of a model based on economic theory at trial and post-trial, in light of the existence of the real world market data.

### b.       Status Quo/Market Realities

Defendants next attack the ALM – assuming that its use in this type of case is acceptable – because it relies on "counter-factual assumptions," primarily that Leger attributed the redistribution of Altria's market share to JLI and the existing competitors in 2018 in proportion to JLI and the other competitors' market share existing at that time. The "proportional substitution" concept applied by Leger in his ALM assumes that most of Altria's customers switched to JUUL because JUUL had largest market share at the time Altria left the market. Defendants argue that presumption is fatally problematic because it ignores consumer preferences and the significant differences between Altria's cig-a-like product and JUUL's pod products, as well as other pod-type products flooding the market.

Defendants complain that ignoring similar consumer preferences and product differences is what led the Honorable James Donato to exclude an antitrust model based on counter-factual presumptions. *See In re Google Play Store Antitrust Litig.*, No. 20-CV-05761-JD, 2023 WL

5532128, at *9 (N.D. Cal. Aug. 28, 2023 ("the model does not give the jury a sound basis on which to make a reasoned and reasonable judgment about antitrust impact and damages in a product market that does not show proportional substitution across alternatives, at least not on a Play Store category share basis as Dr. Singer has modeled.").[9]  The differences between apps available in the Google Play Store across many categories of content and purpose, however, appears – at this stage at least – to be materially more significant than the purported differences in the electronic nicotine delivery devices ("ENDS") at issue here.  The *significance* of the differences between ENDS – differences in the nicotine strength, flavors, or possible abuse liability – is hotly disputed.  Whether the different ENDS products on the market in 2018 or thereafter are so significantly different that the utility of the ALM model is undermined may be tested at trial and post-trial.

Second, defendants argue that using proportional substitution also impermissibly ignores the market realities of what actually happened post-2018 in a rapidly developing market. Defendants contend that while Leger's model maintains JLI's dominant market position after 2018, that ceased to be accurate when VUSE Alto took over the lead in 2022, and ignores the impacts to the market caused by the FDA's flavor ban and the flooding of the market with cheap disposable products.  Defendants note that the Administrative Law Judge ("ALJ") in the FTC proceedings rejected a similar presumption of proportional diversion as incorrect based on the real world.  MTE Leger at 12.[10]  According to plaintiffs, the FTC's expert's error was attempting to

---

[9] Judge Donato found the model sufficient for class certification purposes showing how the "pass-through formula 'derived from a logit model'" would correctly model "the demand curve faced by the developers who sell apps and content in the Google Play Store," but excluded it on summary judgment when it became clear that it was based on unrealistic assumptions:  "in Dr. Singer's model, when the price of an app goes up, the consumer will necessarily switch to a different app in the same category, based purely on the popularity of those other apps. As Dr. Singer acknowledges, this approach works only if the apps within each category are proportional substitutes for one another. This is an unproven assumption in Dr. Singer's work. It cannot be squared with the economic literature . . . and it flies in the face of the huge diversity of apps within the Play Store categories. . . . given the broad categories in the Google Play Store, which developers self-select, the [] assumption that 'all apps are substitutes and substitution is proportional to shares' is not factually supported in this context."  *Id*. at *8.

[10] Defendants also rely on *Laumann v. Nat'l Hockey League*, 117 F. Supp. 3d 299, 315 (S.D.N.Y. 2015), where the court rejected plaintiffs' expert's estimates that did "not rely on sufficient data about consumer tastes and preferences. Instead, time and time again, Dr. Noll substitutes

model *both* price overcharges as well as sales volumes, where Leger here used actual sales volume figures.  DPP Oppo. MTE Leger at 8 n.4.  These are arguments that go to the weight of Leger's overcharge opinions and do not justify excluding them.

Defendants identify other allegedly unsupported and erroneous inputs in Leger's model and argue that those, too, require exclusion of the ALM.  For example, Altria argues that Leger erroneously calculated its share of the market in 2018 and ignored that by Q3 of that year Altria's share was down to 6-7% because – according to defendants – consumers preferred the pod and salts-based products and because regulatory hurdles prevented Altria from introducing a more competitive project.  Defendants also contend that Leger's ALM imposes an inflated profit margin and unrealistic assumptions – taken from Altria's own projections – about Altria's market share. *See* MTD Leger at 18-21.  These arguments are based on defendants' characterization of the market and evidence, which are matters disputed by plaintiffs.  They go at most to the weight of Leger's opinions and do not support excluding his opinion.

### c.    Online Consumers & Independent Vape Shops

Defendants finally argue that the application of Leger's overcharge rates (derived from the ALM) is overly simplistic, further undermining "the reliability of his injury and damages opinions."  MTE Leger at 21-23.  The defendants point out that Leger used retail store data only from two large retailers (WaWa and Circle K) based on purchases in New Jersey and Arizona and then assumed that overcharge rate applied equally to online customers like the named DPPs, as well as distributors and independent vape shops who bought directly from JLI.  Defendants argue that assumption is faulty and undermines the reliability of Leger's damages opinions.

Leger's assumption was based on accepted economic analysis and in plaintiffs' opinion is confirmed by JLI's pricing structure, as online prices were constrained by the prices the large retailers actually charged.  DPP Oppo. to MTE Leger at 22.  This is another example of the defendants and the DPPs having different views of what the evidence shows and the inferences

mathematical assumptions for actual, readily-obtainable information in determining how hockey and baseball fans will behave in the BFW.").  As noted above, the significance of differences between the ENDS products at issue is strongly debated and not obviously similar to non-fungible sports fan bases.

that should be drawn from the evidence. At this juncture, Leger has shown a rational basis for how he developed his overcharge rates and applying them across the DPP class.

Defendants' motion to exclude Leger is DENIED.

### 2.    Motion to Exclude Hoelle

Defendants also move to exclude the overcharge opinions of DPP expert Dr. Matthew Hoelle, offered in his rebuttal report and supplemental report in response to defendants' expert, Dr. Kevin Murphy. Dkt. No. 520-6. The heart of this argument (which was raised initially in April 2025) is that Hoelle's regression-based analyses cannot be proper rebuttal of Murphy because Murphy did not perform a regression-based analysis of the data. *See* Dkt. Nos. 472, 520-6.

Since April 2025, Hoelle has been deposed, and then submitted a supplemental report following that deposition. Defendants moved to strike the supplement, but withdrew it in exchange for a 2 hour follow-up deposition that took place on August 29, 2025. *See* Dkt. No. 520-6 at 3. Then, as required by my Short Order, Hoelle was required to be produced for another supplemental two hour deposition, and Murphy was allowed to prepare a supplemental report to respond to Hoelle's supplemental opinions. Dkt. No. 627. Given the follow up discovery allowed and the lack of prejudice, the motion to exclude is DENIED. That said, Hoelle's testimony is only admissible in rebuttal if Murphy opines on the topics Hoelle rebuts. *See* Dkt. Nos. 578, 627.[11]

### 3.    Motion to Exclude Singh

Defendants move to exclude the opinions of DPP expert Tara Singh about "precedent market transactions analysis." Dkt. No. 520-4. Singh was retained to assess Altria's position that its "business had little or no value" and to "provide comments regarding: i) the historical financial performance of Altria's E-vapor business prior to the Transaction, and (ii) its forecast financial performance but for the Agreement." Singh Report, Dkt. No. 541-8. Singh conducted a review of "precedent market transactions" which "suggest that Altria's E-vapor business was likely valuable to Altria, but for the Agreement." *Id*. ¶ 36.

---

[11] The DPPs' motion for leave to file a sur-reply, Dkt. No. 574, is GRANTED. I have considered all arguments raised by the defendants and the DPPs on this issue.

United States District Court
Northern District of California

Defendants move to exclude Singh's precedent market transaction analysis because Singh admitted in her deposition that she did not conduct a "valuation report" – something she regularly conducts in her professional capacity – and instead provided the transaction analysis as "illustrative" of possible valuations of Altria's Nu Mark product line. The failure to produce a valuation report and use of illustrative values, according to defendants, makes Singh's opinions fatally unreliable. Defendants also criticize the comparable transactions Singh relied on to reach her conclusions, arguing that she looked at products and transactions that were not comparable to Altria's Nu Mark product line, further undermining the reliability of her opinions.

Plaintiffs respond that Singh did not need to perform a valuation report. She applied her expertise and standard practice to identify an illustrative range of values of the Nu Mark line in support of her aim to test Altria's statement that the Nu Mark line had little to no value to Altria as of the time of the alleged agreement.

The motion to exclude is DENIED. Singh was not required to produce a full valuation report and she utilized accepted methods to provide a range of possible valuations. Whether she chose non-comparable transactions goes to the weight of her opinions. The testimony Singh will be allowed to provide will depend on evidence introduced at trial. Defendants may explore at trial why Singh did not conduct a full valuation report and instead relied on her precedent market transactions analysis.

### F. DPPs' Motions to Exclude

#### 1. Motion to Exclude Murphy

The DPPs move to exclude four opinions of Dr. Kevin M. Murphy, the defendants' damages expert: (1) cig-a-like products and pod products are not substitutable based solely on Murphy's chart concerning cig-a-like products (Murphy Report ¶¶ 66–67 & Ex. 8); (2) Murphy's cig-a-like volume regression (Ex. 1, Rep. ¶¶ 68–69 and App'x Ex. D.4); (3) Altria's cig-a-like e-cigarettes did not compete with JLI's pod-based e-cigarettes (Ex. 1, Rep. ¶¶ 12, 13, 22–25, 30, 42, 62–69, 168); and (4) Murphy's before-and-after analysis that failed to analyze the "but-for" world (Ex. 1, Rep. ¶¶ 17, 86–139, 169). DPP MTE Murphy (Dkt. No. 539-2) at 24-25.

The DPPs argue, first, that Murphy's opinion that cig-a-like and pod-based products were

United States District Court
Northern District of California

not close substitutes when Altria exited the market is unreliable because it is substantively incorrect, inconsistent with defendants' internal documents, and inconsistent with existing marketplace realities. The failure of Murphy to acknowledge substitutability was the result of other asserted errors, including that he failed to consider the hypothetical monopolist test ("HMT"), solely relied on a chart concerning cig-a-like products, and failed to consider the *Brown Shoe* factors to accurately determine the market. These fundamental errors, according to the DPPs, mean that Murphy did not compare cig-a-like products and pod products in his volume regressions rendering his model incapable of measuring substitutability. Moreover, the DPPs argue that Murphy's post-transaction market assessment is unreliable because he failed to analyze a "properly defined" but-for world that controlled for "confounding factors" including the changed economic and regulatory conditions in the market after Altria left and Murphy failed to correctly model what Altria would have done in the but-for world. Dkt. No. 539-2.

Murphy was entitled to rely on real-world data. There is no requirement that a defense expert use HMT or any other analysis to define a market or run their own but-for analysis. As it is plaintiffs' burden to define the market and they bear the burden of proof, defense experts may simply challenge plaintiffs' showing on market definition and on whether plaintiffs' but-for world it so counterfactual that it is not persuasive. In addition, whether cig-a-like products and pod products like JUUL should be considered in the same market –because they are substantially similar as opposed to being significantly different – is disputed. That Murphy limited his regression analysis to include only cig-a-like products is a matter for cross-examination and not exclusion.

The motion to exclude Murphy is DENIED.

### 2. Motion to Exclude M. David Dobbins

The DPPs move to exclude one opinion of M. David Dobbins, an attorney offered as an expert on the FDA regulatory system. Dkt. No. 539-5. The DPPs object to Dobbins's opinion that it was "reasonable" for Altria to leave the market in response to the FDA's letter, the ramp-up of regulation of ENDS and the expected PMTA process, and Altria's concerns about youth vaping. *See* Dobbins Report ¶ 50 (explaining why "it would make sense for a manufacturer to decide to

United States District Court
Northern District of California

withdraw e-cigarette products in 2018 with the characteristics of Nu Mark's products."). The DPPs argue that Dobbins should not be allowed to opine on reasonableness because this topic is irrelevant and beyond the scope of expert testimony and because he ignores significant evidence that Altria and JLI had agreed to Altria's exit before the FDA issued its letter, ignored evidence regarding Altria's millions of dollars in investment, and ignored the evidence of Altria's substantial regulatory expertise. As such, according to the DPPs, Dobbins's opinion is based on *ipse dixit,* not based on sufficient facts or any methodology. They also argue it is impermissible subjective testimony regarding "corporate intent" that invades the jury's province to determine what was reasonable.

Dobbins' reasonableness opinion appears to encroach on the province of the jury and is impermissible state of mind testimony. The DPPs' motion to exclude is GRANTED in limited part. Dobbins may not testify as to the "reasonableness" of Altria's exit. The boundaries of other testimony he may provide should be revisited on a motion in limine or through objections at trial. *See In re Juul Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig*., No. 19-MD-02913-WHO, 2022 WL 1814440, at *14 (N.D. Cal. June 2, 2022 ("Generally, "state of mind" and "intent" objections are better ruled on at trial").

### 3.    Motion to Exclude Henningfield

The DPPs move to exclude the opinions of Dr. Jack E. Henningfield, who appeared in the related MDL litigation to testify regarding abuse liability and public health benefits to switching to ENDS from combustible tobacco products. Dkt. No. 539-4. The DPPs have two main objections to Henningfield's opinion that because Altria's products had lower nicotine and, therefore, a lower "abuse liability," Altria's product would not have been successful in the market. First, the DPPs argue that testimony regarding the public health concerns regarding nicotine addiction and health dangers from combustible cigarettes is totally irrelevant to this antitrust case and should be excluded, along with Henningfield's opinions that ENDS are less harmful and addictive than combustible cigarettes.[12] The DPPs also point out that Henningfield's use of "success" in his

---

[12] Henningfield's Opinions 1-5.

report and opinions (*e.g.*, that MarkTen did not have features that made JUUL as "successful"), would confused the jury because while Henningfield defines success as "switching" smokers to e-cigarettes (an issue irrelevant to this case), the jury and the rest of this case will consider "success" as success in the marketplace (on which Henningfield does not have expertise to opine). According to the DPPs, Henningfield's switching argument ignores the reality that only a small portion of ENDS users were adults seeking to switch and the more significant segment of the market was new and youth users for whom switching was irrelevant.  The DPPs assert that allowing this testimony from Henningfield will divert trial time into an irrelevant mini-trial where the DPPs have to put on evidence that ENDS are gateway products to nicotine addiction and caused great public health concerns.

The DPPs also move to exclude Henningfield's "market-based opinions"; that because Altria's products had lower nicotine delivery (1.9 % vs JUUL 5%) JLI's products were better at getting smokers to switch to safer ENDS than Altria's products, and that products that have gained acceptance are more similar to JUUL 5% than MarkTen.[13]  The DPPs argue that the opinions regarding the potential success or failure of Altria's products in the market exceed his expertise, lack a methodology, are likely to confuse the jury, and should be excluded under Rule 403.  Dkt. No. 539-4.

Defendants respond that Henningfield will offer narrow opinions on the pharmacology that is common to "successful" products (JUUL, VUSE Alto, NJOY, disposables) and dissimilar from those that have not been successful (including Altria's MarkTen products).  568-2.  His testimony will be limited to explaining why certain pharmacological characteristics are more attractive to individuals who already use nicotine.   He intends to explain that those products approximate the JUUL 5% strength and use nicotine salts and have a mildly acidic PH, whereas Altria's products had lower nicotine strength and were alkaline-based, increasing throat harshness.  Henningfield will also "criticize the reliability" of the regression models of Dr. Leger, Perry, and Macartney as well as Singh's valuation range "on the grounds they fail to account for the deficiencies in Altria's

---

[13] Henningfield Opinions 6-8.

20

products in their assessments of the viability of those products." Finally, he will discuss how some products identified by plaintiffs' experts as potential competitor products would not have been taken up by consumers given their high alkaline PH. Dkt. No. 568-2.

The DPPs motion to exclude is GRANTED in limited part. Henningfield may not opine on issues of economics or market share for which he is not qualified. Henningfield's testimony regarding comparisons on the health impacts of ENDS versus combustibles will be strictly limited to avoid the need for a largely irrelevant minitrial. Further boundaries of Henningfield's testimony may be revisited on a motion in limine or through objections at trial.

### 4.    Motion to Exclude Garza

Finally, the DPPs move to exclude the opinions of Deborah A. Garza, who was asked to opine on how companies prepare for premerger notifications required by the Hart Scott Rodino ("HSR") Act. Dkt. No. 539-3. The DPPs argue many of Garza's opinions – companies typically engage in pre-merger negotiations and term sheets, retain counsel to negotiate antitrust clearance before seeking clearance with the DOJ, and condition clearance on divestiture of assets – are irrelevant to this Section 1 case and under Rule 403 could confuse or mislead the jury. The DPPs also argue that Garza's "typicality" opinions are unreliable and if at all relevant should come in through percipient witnesses from the parties who have decades of experience in the industry. Finally, the DPPs object that Garza's opinions frequently diverge into impermissible state of mind testimony and ultimate facts for jury determination (*e.g.*, that Altria's decision to leave the market was unilateral and taken for its own business purposes).

Defendants do not dispute that percipient witnesses could discuss the HSR filings and the typicality of the antitrust clearance provisions in the agreement. They argue that expert testimony from Garza is necessary to contextualize the language in the agreement and rebut plaintiffs' repeated insinuations during depositions that the clearance provisions in their agreement are evidence of an alleged secret, unwritten side deal.

The motion to exclude is GRANTED, subject to reconsideration at trial. If plaintiffs solicit testimony questioning the typicality of antitrust clearance provisions, a limiting instruction may cure any inference that seeking clearance is itself anticompetitive conduct. Depending on the

testimony plaintiffs solicit and whether a limiting instruction suffices, I may reconsider allowing limited testimony from Garza at trial.

## II.    INDIRECT PURCHASER & INDIRECT RESELLER PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

The Indirect Purchaser Plaintiffs ("IPPs") are Kurt Doughty, Allison Harrod, Michael Imai, Daraka Larimore, Adam Matschullat, Dylan Pang and Kerry Walsh.  The IPPs seek to certify the following classes:

> **Cartwright Act Class** (All Plaintiffs): All persons or entities in the Indirect Purchaser States who purchased JUUL pods, excluding devices or JUUL kits containing devices ("JUUL Pods"), indirectly from JLI, for personal use and not resale, from October 25, 2018 through March 29, 2024 (the "Class Period").

> **California Class** (Daraka Larimore and Adam Matschullat): All persons or entities in the State of California that purchased JUUL Pods indirectly from JLI, for personal use and not resale during the Class Period.

> **Florida Class** (Allison Harrod): All persons or entities in the State of Florida that purchased JUUL Pods indirectly from JLI, for personal use and not resale during the Class Period.

> **Hawaii Class** (Michael Imai): All persons or entities in the State of Hawaii that purchased JUUL Pods indirectly from JLI, for personal use and not resale during the Class Period.

> **Massachusetts Class** (Kerry Walsh): All persons or entities in the State of Massachusetts that purchased JUUL Pods indirectly from JLI, for personal use and not resale during the Class Period.

> **New York Class** (Dylan Pang): All persons or entities in the State of New York that purchased JUUL Pods indirectly from JLI, for personal use and not resale during the Class Period.

> **Rhode Island Class** (Kurt Doughty): All persons or entities in the State of Rhode Island that purchased JUUL Pods indirectly from JLI, for personal use and not resale during the Class Period.

The IPP classes are "limited to individuals who purchased JUUL Pods from brick-and-mortar retailers for their personal use (not for resale), and exclude: defendants and their counsel, officers, directors, management, employees, parents, subsidiaries, and affiliates; federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; and the judges in this case and any members of their immediate families.  IPP Motion for Class Certification ("IPP MCC"), Dkt. No. 492-3.

22

United States District Court
Northern District of California

The Indirect Reseller Plaintiffs ("IRPs") are Napht Inc., Noor Baig, Inc., Rose and Fifth, Inc., Sofijon, Inc. and Somerset Party Store, Inc.  The IRPs seek to certify the following classes:

**Multistate Cartwright Act Class** (Napht, Rose and Fifth, and Sofijon): A class, pursuing claims under the Cartwright Act, Sections 16700-16770 of the California Business and Professions Code ("The Cartwright Act"), defined as:

All businesses and entities in the States of Arizona, Arkansas, California, the District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, and Wisconsin that purchased Juul pods (excluding Juul devices or Juul kits containing devices) indirectly from Juul Labs, Inc. for resale, from December 1, 2018 through March 31, 2025 (the "Class Period").

**California State Class** (Napht, Rose and Fifth, and Sofijon). A class, pursuing claims under the Cartwright Act, Section 16700-16770 of the California Business and Professions Code, and California's Unfair Competition Law, Cal. Bus. & Prof. Code Section 17200, et. seq. defined as:

All businesses and entities in the State of California that purchased Juul pods (excluding Juul devices or Juul kits containing devices) indirectly from Juul Labs, Inc. for resale, from December 1, 2018 through March 31, 2025.

**Florida State Class** (Noor Baig). A class, pursuing claims under the Florida Deceptive & Unfair Trade practices Act, Florida Stat. Sections 501.201 et seq. (the "FDUTPA"), defined as:

All businesses and entities in the State of Florida that purchased Juul pods (excluding Juul devices or Juul kits containing devices) indirectly from Juul Labs, Inc. for resale, from December 1, 2018 through March 31, 2025.

**Michigan State Class** (Somerset Party Store). A class, pursuing claims under the Michigan Antitrust Reform Act, Mich. Comp. Laws Section 445.771 et seq., defined as:

All businesses and entities in the State of Michigan that purchased Juul pods (excluding Juul devices or Juul kits containing devices) indirectly from Juul Labs, Inc. for resale, from December 1, 2018 through March 31, 2025.

The proposed IRP classes exclude: defendants and their counsel, officers, directors, management, employees, parents, subsidiaries, and affiliates; federal governmental entities and instrumentalities of the federal government; and states and their subdivisions, agencies and instrumentalities.  IRP

Motion for Class Certification ("IRP MCC"), Dkt. No. 490-3.

Defendants oppose certification, arguing that the experts for the IPPs and IRPs are incapable of showing class-wide proof of injury, the IPP expert's model does not fit the IPP definition, and neither Cartwright Act nationwide classes can be certified. Def. Oppo. to IPP and IRP Mots. Dkt. No. 520-11.

Defendants do not dispute that Rule 23(a)'s numerosity, commonality, typicality and adequacy requirements have been satisfied by the Indirect Plaintiffs' showings, and I find that they have been. *See* IPP MCC at 10-13; IRP MCC at 11-15. The classes are obviously numerous, the identified class representatives have claims typical of the other indirect class members, and their selected counsel are adequate. As with the DPPs showing, common questions of law and fact are plentiful. Rule 23(b)(3)'s superiority requirement is also met. The benefit of handling the indirect purchaser claims through this class action is obvious. The disputed issues concern only predominance and the shape of the indirect classes.

### A.     Common Proof of Class-wide Injury

The Indirect Plaintiffs assert that class-wide proof of antitrust liability will be shown through evidence regarding the conspiracy, and antitrust impact and injury will be shown through IPP expert Dr. Gareth Macartney and IRP expert Dr. Keith Leffler. These experts analyzed data and documentary evidence and applied accepted economic theory using "regression techniques" to determine (i) the direct overcharge paid by distributors and retailers, (ii) the estimated percentage of overcharge passed from retailers to consumers, and (iii) aggregate damages, applying the overcharge pass-through rate to the relevant volume of commerce. The Indirect Plaintiffs contend that this expert testimony is materially similar to the expert testimony on behalf of reseller plaintiffs approved in *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 682 (9th Cir. 2022).

Defendants' main attack, as with the DPPs, is on the Indirect Experts' showing of class-wide injury. They argue that the Indirect Experts used the wrong variables in their models, failing to account for JLI's loss of shares to competitors, that left it with a loyal base that is less sensitive to price and a deteriorated financial position which incentivized it to pursue short-term profits.

24

Defendants also argue that the Indirect Experts' creation of a second damages period starting in July 2022, based on one email, is contrary to other facts that defendants believe should be more persuasive.

As discussed in more detail below in connection with defendants' motion to exclude, these arguments go to weight and not admissibility.

### 1.    Common Proof for Passthrough

Relevant only to the Indirect Plaintiffs, defendants also argue that determining passthrough rates requires individualized analysis, defeating predominance. Defendants contend that there are no reliable methods for determining on a class-wide basis which resellers passed on overcharges or accounting for retailers who did not pass on the overcharges. *See GPU*, 253 F.R.D. at 505 ("Class certification is problematic where a plaintiff's method of proving pass-through requires a reseller-by-reseller analysis."). Defendants argue that here, as in *GPU*, the only way to identify the passthrough rate is through an individual wholesaler-by-wholesaler and retailer-by-retailer analysis. In support, defendants point to evidence in the record from the IRPs' depositions and evidence from major retailers that indirect sellers changed the passthrough depending on price increases and other factors. Oppo to Indirect MCC at 10. They argue that the Indirect Experts' use of averages to estimate passthrough rates is legally insufficient.

Plaintiffs respond that their experts conducted regression analyses using retailer scanner data and pricing information from JLI and its largest distributors to achieve an evidence-based passthrough rate. Plaintiffs dispute whether anything more than a de minimis number of indirect plaintiffs were uninjured, but that disputed issue does not preclude class certification. *See Olean*, 31 F.4th at 669 ("We reject the dissent's argument that Rule 23 does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members."). More fundamentally, "[w]hile individualized differences among the overcharges imposed on each purchaser may require a court to determine damages on an individualized basis, . . . such a task would not undermine the regression model's ability to provide evidence of common impact." *Id*., 31 F.4th at 679; *see also In re Disk Drive Suspension Assemblies Antitrust Litig*., No. 19-MD-02918-MMC, 2025 WL 71988, at \*20 (N.D. Cal. Jan. 10, 2025) (rejecting passthrough defense to

25

indirect purchaser class).

Any evidence showing that specific retailers faced significantly different passthrough rates can be presented to the trier of fact. *See In re Turkey Antitrust Litig.*, No. 19 C 8318, 2025 WL 264021, at \*22 (N.D. Ill. Jan. 22, 2025 ("criticisms may be relevant to the evidentiary weight of [an expert's] pass-through testimony, but it is not a reason to question the reliability of his method. Defendants remain free to challenge the representativeness of the [] direct purchaser resellers through cross-examination or presentation of contrary evidence at trial.").

### 2.     Macartney IPP Model Fit

Separately, defendants attack Macartney's model for failing the "fit" requirement of *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). They argue that while the IPPs' class definition is limited to individuals who purchased JUUL products for personal use and not resale, Macartney's model does not exclude resellers. Defendants point to evidence of the informal secondary resale market, recognized in *In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prods. Liab. Litig.*, 609 F. Supp. 3d 942, 1000 (N.D. Cal. 2022) ("JLI points to Youth Class member testimony indicating that a large number of the youth purchases were the result of reseller conduct."). However, those issues "do not undermine predominance or raise *Comcast* fit issues. They can be raised on cross-examination and argued to the trier or fact." *Id*. at 979. That some unidentified and possibly de minimis number of indirect purchasers resold informally to others raises at most a damages issue and does not create a fit issue with Macartney's model.

### 3.     Class Period

As with the DPP class, defendants argue that the end date of any IRP class certified should be no later than March 29, 2024 (at the end of the actual data analyzed by Leffler) and not through the date requested by plaintiffs based on "extrapolated" data through March 31, 2025. Oppo Indirects' CC at 29. As above, the expert's use of the regression model to extend the class period based on economic theory (and prior evidence) is not a reason to shorten the class period. It may, however, be tested at trial or post-trial.

I find that all Rule 23 factors have been satisfied for the states where individual Indirect Plaintiff class representative reside. The question about whether and how far to apply the

26

Cartwright Act to repealer states without a named class representative is addressed below.

## B.    Cartwright Act

Both sets of Indirect Plaintiffs seek to certify "Multistate Cartwright Act" classes.  They argue that California's Cartwright Act may be applied to 31 jurisdictions that have enacted *Illinois Brick* repealer laws.  Defendants object to exporting the Cartwright Act to those states.  At most, defendants argue that I may certify classes "for seven states for which the Indirect Plaintiffs have identified proposed class representative" under those states' laws.  Oppo. to Indirect CC at 16.

### 1.    Extraterritorial Application

Defendants first argue that extraterritorial application of the Cartwright Act is impermissible, identifying two recent decisions from this District where the judges "questioned" extraterritorial application of the Cartwright Act.  However, neither judge reached the question, and either denied or modified the classes sought on other grounds.  *See In re HIV Antitrust Litig.*, No. 19-CV-02573-EMC, 2022 WL 22609107, at *9 (N.D. Cal. Sept. 27, 2022 ("regulation of actual sales out of state implicates potential conflicts with other states' laws, and there is no indication that the California legislature intended to invite such conflict through extraterritorial application of the Cartwright Act or the UCL."); *In re Capacitors Antitrust Litig.,* No. 17-MD-02801-JD, 2020 WL 6462393, at *7 (N.D. Cal. Nov. 3, 2020) ("The limits on the extraterritorial application of the California Cartwright Act and UCL are another reason to doubt the propriety of a multi-state class.").  While defendants cite a number of opinions declining to certify nationwide or multistate Cartwright Act classes, none of those cases declined certification solely because of extraterritoriality concerns.  Instead, those opinions declined nationwide or multistate classes under the required choice of law analysis.

### 2.    Choice of Law

The Indirect Plaintiffs argue, based on their charts, that under California's choice of law test the Cartwright Act can be applied to each of the 31 repealer states identified.  They rely on decisions from this District certifying multistate repealer classes under the Cartwright Act.  *See, e.g., In re Korean Ramen Antitrust Litig.*, No. 13-CV-04115-WHO, 2017 WL 235052, at *22 (N.D. Cal. Jan. 19, 2017) ("The only potential conflict between state laws identified by

United States District Court
Northern District of California

defendants—and it is their burden to identify conflicts—is the distinction between states who have repealed Illinois Brick and allow indirect purchaser plaintiffs to pursue price-fixing claims and those that have not. [] Defendants have not identified any conflicts to applying the Cartwright Act to the 24 Illinois Brick repealer jurisdictions, and therefore class certification for those jurisdictions is appropriate."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 608 (N.D. Cal. 2010), amended in part, No. M 07-1827 SI, 2011 WL 3268649 (N.D. Cal. July 28, 2011) ("*TFT*").

Defendants respond that under California's choice of law analysis, repealer states should not be included within the class due to conflicts and material differences between the Cartwright Act and the other states' laws that would be impaired if the Cartwright Act were applied. Defendants assert that the Ninth Circuit's 2021 decision, *Stromberg v. Qualcomm Inc*., 14 F.4th 1059 (9th Cir. 2021) rejecting a nationwide Cartwright Act class, undermined the analyses in *In re Korean Ramen* and *TFT*.  They also point to *In re HIV Antitrust Litig.* and *In re Capacitors Antitrust Litig*., discussed above, where the courts declined to certify the requested multi-jurisdiction repealer state classes under the Cartwright Act.  *See In re HIV Antitrust Litig*., 2022 WL 22609107; *In re Capacitors Antitrust Litig*., 2020 WL 6462393.

The analysis is not as simple as suggested by either the Indirect Plaintiffs or defendants. Material distinctions exist between the facts and posture of the Indirect Plaintiffs' motions for class certification under the Cartwright Act and the cases defendants rely on, most significantly the extensive connection to California and plaintiffs' request to certify a multistate class including only repealer states.  *See Stromberg*, 14 F.4th at 1074 (where plaintiffs sought to apply Cartwright Act to nationwide class covering non-repealer states, "the district court improperly impaired non-repealer state policy by allowing California to set antitrust enforcement policy for the entire country"); *In re HIV Antitrust Litig*., 2022 WL 22609107 at *9 (numerous defendants were not based in California and the case concerned both prices charged and reimbursements made directly to purchasers outside of California); *In re Capacitors Antitrust Litig*., 106 F. Supp. 3d at 1074 (few contacts with California and much of the antitrust conduct took place outside of the United States).

28

Looking to California's choice of law test, "the class action proponent bears the initial burden to show that application of California law is constitutional" under due process considering the significance of contacts to California. Assuming that plaintiffs satisfy due process, the "burden shifts to the other side to demonstrate" that the other states laws should apply. *Stromberg*, 14 F.4th at 1067–68. To determine those respective governmental interests, I must determine: (1) whether the relevant law of the repealer states is the same or different from the Cartwright Act; (2) if there is a difference, whether the difference creates a "true conflict" between California law and the laws of the repealer states; and (3) if there is a true conflict, I must evaluate the "'nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state.'" *Id*. at 1068 (quoting *Chen v. Los Angeles Truck Ctrs., LLC*, 7 Cal. 5th 862, 868 (Cal. 2019)).

### a.     Due Process

Defendants do not contest the adequacy of contacts to California with respect to JLI, who was based in California during the relevant time periods. Instead, they argue that due process prohibits application of the Cartwright Act to Altria, as Altria's contacts with California are minimal and the out-of-state plaintiffs likewise have minimal contacts with California given that their indirect purchases took place outside of California. Plaintiffs point to evidence that the alleged anticompetitive agreement between JLI and Altria was reached through at least four in person meetings in California and then effectuated from California. That establishes more than a de minimis connection to California and satisfies plaintiffs' burden. *See AT & T Mobility LLC v. AU Optronics Corp*., 707 F.3d 1106, 1113 (9th Cir. 2013) ("we hold in this case that the Cartwright Act can be lawfully applied without violating a defendant's due process rights when more than a de minimis amount of that defendant's alleged conspiratorial activity leading to the sale of price-fixed goods to plaintiffs took place in California.").

Next, defendants attempt to meet their burden to show that true and material conflicts exist between the Cartwright Act and the repealer states, and that those conflicts would result in a greater impairment of the repealer states' interests if the Cartwright Act were applied to claims

United States District Court
Northern District of California

from residents of those states.

### b.    Consumer Protection Laws

Defendants point out that Arkansas, Florida, Massachusetts, Missouri, South Carolina and Virginia limit their repealer statutes to their consumer protection laws.  They have not shown that this distinction creates a true conflict or is otherwise material.  The Indirect Plaintiffs note that Florida, Massachusetts, Missouri and South Carolina have specific provisions requiring that their consumer protection laws to be interpreted consistently with federal antitrust laws.  *See* IPP Reply CC at 20; IRP Reply CC at 18.  Plaintiffs acknowledge that Arkansas and Virginia lack those express provisions, but argue that courts have broadly interpreted those two states' consumer protection statutes to cover antitrust violations.  Defendants have not demonstrated that the limitation of indirect purchaser claims under these states' consumer protection statutes creates a true conflict.

### c.    Notice to State Officials

Defendants next identify nine states where pre-suit notice to the state's attorney generals is required; Arizona, Hawaii, Minnesota, Nevada, New York, Oregon, Rhode Island, South Carolina and Utah.  The mere fact notice is required to attorneys general prior to inception of an indirect purchaser class action does not amount to a true conflict with the substantive provisions of the Cartwright Act.  Defendants cite no case finding that differences among states with respect to pre-suit notice requirements creates a true, material conflict for purposes of antitrust or consumer protection enforcement.  Indeed, "district courts have explicitly held that these notice requirements do not alter the substantive elements of state antitrust claims and do not constitute pleading requirements."  *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 923 (N.D. Cal. 2019).  The differences in notice requirements do not amount to a true conflict.

### d.    Standing

Defendants argue that judicial opinions in some repealer states have added a standing requirement following the Supreme Court's *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*") opinion, limiting who can sue under their antitrust statutes.  In *AGC*, the Supreme Court recognized a balancing test to

United States District Court
Northern District of California

evaluate indirect purchaser standing. Defendants point to federal court decisions that have found a split in authority concerning whether the California law incorporates *AGC* standing. They assert that *AGC* standing is required under judicial opinions from or applying the laws of Iowa, Nebraska, Nevada, New Hampshire, Rhode Island, but not under judicial opinions from or applying the laws of Florida, Minnesota, Missouri, and South Carolina. Oppo. to Indirect CC at 23.

Assuming *AGC* standing questions are potentially relevant to the indirect purchaser claims in federal court under state law – as indirect claims are barred under federal law by *Illinois Brick* – standing questions in this class action do not appear to present a true conflict. Neither side has identified a court that relied on *AGC* standing to refuse to certify indirect purchaser claims in a multistate class action context. At least one case, affirmed on appeal, found that it does not raise a material conflict. *See In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. 308, 337 (S.D. Cal. 2019), aff'd sub nom. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) ("defendants have not met their required burden to show that this difference in laws" concerning standing under *ACG* "is material in this case").

### e.    Available Recoveries

Defendants present a more substantial showing as to true conflicts between the Cartright Act and repealer states' laws concerning available recoveries. The Cartwright Act provides for treble damages (as do a handful of other repealer states), but other states allow treble or otherwise enhanced damages only upon a showing of specific levels of culpability, and some limit damages to actual damages. Oppo. to Indirect CC at 20-22. Defendants also note that some repealer states allow for punitive damages or provide minimum damages, whereas the Cartwright Act provides neither. *Id*. at 21. Finally, defendants identify states where courts are instructed to avoid "double recovery," consistent with Cartwright Act authority recognizing need to apportion damages, but other states have not addressed the issue. *Id*. at 22.

As an initial matter, double or apportioned recovery cannot be a true conflict simply because some states have *not* addressed it by statute or in judicial authority. As to the other recovery differences identified by defendants – treble damages or otherwise enhanced or minimum

31

damages – there may be true conflicts. But under the third prong of the conflicts of interest analysis, they do not preclude class certification. Any true and material differences between the Cartwright Act and repealer states' damage provisions are readily respected and managed through jury instructions or a special verdict form where the jury is tasked with awarding only damages allowed under each repealer state's laws. Therefore, while there might be true conflicts in terms of permissible recovery, it is not outcome determinative on class certification. After liability is determined, damage difference can be readily managed to preserve each repealer state's interests. The recovery differences identified by defendants will not be impaired by determining liability under the Cartwright Act.[14]

### f.   Representative Cause of Action

I find that defendants do raise a true, material conflict between the Cartwright Act and the four states that do not allow representative or class actions for indirect purchaser antitrust claims. Defendants argue and the Indirect Plaintiffs do not dispute that collective actions are prohibited in Arkansas, South Carolina, Tennessee,[15] and Virginia. Plaintiffs argue that collective action bars are preempted under *Shady Grove*, but even if not, that defendants have failed to show that the class action bar is "so intertwined with a state right or remedy that it functions to define the scope of the state-created right." *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 423 (2010) (Stephens, J., concurring); *see also In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 4955377, at *21 (N.D. Cal. Oct. 2, 2014 ("The Court concludes that the class-action bans challenged here are procedural, not substantive, and that application of Rule 23 to them would not modify any substantive right. Rule 23 therefore governs

---

[14] At oral argument defendants argued this might create manageability problems or a "Frankenstein" trial. However, different jury instructions and a special verdict form will already be required given the state subclasses plaintiffs have moved to certify through the named Indirect Plaintiff Class Representatives. Defendants make no superiority or predominance arguments in light of the state subclasses. District Courts are used to trying cases under numerous state laws and I have faith that federal court juries will be able to readily parse and consider instructions and verdict forms directed to various state laws, if and as necessary.

[15] The prohibition on collective actions is effective April 2024 in Tennessee. While this case was filed in 2020, because class certification is being considered after the effective date, I find that indirect claims from Tennessee cannot be included in the certified Cartwright Act case.

32

and the challenged claims may be asserted on a representative basis in this federal court.").

I respectfully disagreed with *In re Lithium Ion Batteries Antitrust Litig.* in *United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1084 & n. 44 (N.D. Cal. 2014) (finding "the no non-Attorney General class action rule enacted as part of the Illinois Antitrust Act to be substantive and intertwined with the creation of the substantive right of indirect purchasers to sue"). In response to defendants' argument, the Indirect Plaintiffs do not point to anything in the statutes or decisions from Arkansas, South Carolina, Tennessee, or Virginia that differentiate these states laws from that of Illinois in *In re Lithium Ion Batteries Antitrust Litig* for purposes of choice of law analysis at class certification.

The Indirect Plaintiffs' motions for class certification are GRANTED, as modified to exclude Arkansas, South Carolina, Tennessee, and Virginia, as those states do not allow class actions for the antitrust claims at issue. The damages issues identified by defendants can be fully accommodated by jury instructions and other trial and post-trial measures.

### C.    Defendants' Motion to Exclude Leffler & Macartney

Defendants move to exclude the damages opinions of the IPPs' damages expert Dr. Keith Leffler and the IRPs' damages expert Dr. Gareth Macartney (collectively "Indirect Experts"), who both used a multivariate regression methodology to estimate overcharge and damages. Dkt. No. 520-9. Defendants argue that the regression models of both should be excluded because the Indirect Experts ignore "major" variables, making their models unreliable. Specifically, they allegedly ignored: (1) the elasticity of demand, as JLI lost a substantial part of the market due to competition by other pod products (VUSE), illegal flavored products (following to 2020 FDA flavor ban), and regulatory hurdles, leaving JLI with a much reduced but "loyal" customer base who were less sensitive to changes in price; and (2) JLI's diminished financial condition. Defendants also argue that the Indirect Experts "unreliably connect" JUUL price increases starting in 2022 to the alleged anticompetitive conduct, relying on one email and failing to account for other, better support theories explaining the 2022 price increases.

Both of these arguments go to the weight of Leffler and Macartney's opinions and not to

33

their admissibility. Regarding the variables, the Indirect Plaintiffs' experts did not ignore the variables defendants identify, but instead considered them and excluded them from their models because they believe those variables did not significantly impact JLI's pricing or because inclusion would introduce avoidable problems in the models. *See* IRP Oppo. to MTE Leffler [Dkt. No. 566-3] at 8-13; IPP Oppo. to MTE Macartney [Dkt. No. 564-3] at 14-19. Whether the omitted variables significantly impacted JLI's pricing is obviously disputed, a basis for cross-examination and not exclusion. *In re Juul Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 19-MD-02913-WHO, 2022 WL 1814440, at *20 (N.D. Cal. June 2, 2022) (disputes as to variables used and results generated "are classic criticisms that go to weight, not admissibility"). Similarly, the amount of weight to be put on the email on which the Indirect Experts rely – and the weight to be given to the other market considerations identified by defendants – will be determined by the trier of facts in conjunction with the other testimony and evidence presented.

The defendants' motion to exclude the indirect experts is grounded in significant disputes over what the evidence shows and the reasonable inferences to be drawn from that evidence. It is DENIED.

## III.    MOTIONS TO SEAL

The parties have filed numerous administrative motions to seal broad portions of the briefing and exhibits filed in support of or in opposition to class certification. Within thirty (30) days of the date of this Order, the parties shall submit one joint chart identifying what information each identified party believes should remain under seal under the compelling justifications standard. All continued sealing requests must be as narrowly tailored as possible and should be informed by the sealing requests I either granted or denied at the merits stages in the related *In Re: Juul Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation*.

### CONCLUSION

Having satisfied the Rule 23(a) and (b)(3) requirements, the Direct Purchaser Plaintiffs' motion for class certification: GRANTED. The following class is certified:

> All natural persons and entities in the United States that purchased e-cigarette products directly from Defendant Juul Inc. or any of its subsidiaries or affiliates, from October 5, 2018 to the present (the

"Class Period").

The following Indirect Purchaser Plaintiffs ("IPP") classes are certified with identified class representatives:

**Cartwright Act Class** (All Plaintiffs): All persons or entities in the Arizona, California, the District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Utah, Vermont, West Virginia, and Wisconsin who purchased JUUL pods, excluding devices or JUUL kits containing devices ("JUUL Pods"), indirectly from JLI, for personal use and not resale, from October 25, 2018 through March 29, 2024 (the "Class Period").

**California Class** (Daraka Larimore and Adam Matschullat): All persons or entities in the State of California that purchased JUUL Pods indirectly from JLI, for personal use and not resale during the Class Period.

**Florida Class** (Allison Harrod): All persons or entities in the State of Florida that purchased JUUL Pods indirectly from JLI, for personal use and not resale during the Class Period.

**Hawaii Class** (Michael Imai): All persons or entities in the State of Hawaii that purchased JUUL Pods indirectly from JLI, for personal use and not resale during the Class Period.

**Massachusetts Class** (Kerry Walsh): All persons or entities in the State of Massachusetts that purchased JUUL Pods indirectly from JLI, for personal use and not resale during the Class Period.

**New York Class** (Dylan Pang): All persons or entities in the State of New York that purchased JUUL Pods indirectly from JLI, for personal use and not resale during the Class Period.

**Rhode Island Class** (Kurt Doughty): All persons or entities in the State of Rhode Island that purchased JUUL Pods indirectly from JLI, for personal use and not resale during the Class Period.

The following Indirect Reseller Plaintiffs ("IRPs") classes are certified with identified class representatives:

**Multistate Cartwright Act Class** (Napht, Rose and Fifth, and Sofijon): A class, pursuing claims under the Cartwright Act, Sections 16700-16770 of the California Business and Professions Code ("The Cartwright Act"), defined as:

All businesses and entities in the States of Arizona, California, the District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Utah, Vermont, West Virginia, and Wisconsin that purchased Juul pods (excluding Juul devices or Juul kits containing devices) indirectly

35

United States District Court
Northern District of California

from Juul Labs, Inc. for resale, from December 1, 2018 through March 31, 2025 (the "Class Period").

**California State Class** (Napht, Rose and Fifth, and Sofijon). A class, pursuing claims under the Cartwright Act, Section 16700-16770 of the California Business and Professions Code, and California's Unfair Competition Law, Cal. Bus. & Prof. Code Section 17200, et. seq. defined as:

> All businesses and entities in the State of California that purchased Juul pods (excluding Juul devices or Juul kits containing devices) indirectly from Juul Labs, Inc. for resale, from December 1, 2018 through March 31, 2025.

**Florida State Class** (Noor Baig). A class, pursuing claims under the Florida Deceptive & Unfair Trade practices Act, Florida Stat. Sections 501.201 et seq. (the "FDUTPA"), defined as:

> All businesses and entities in the State of Florida that purchased Juul pods (excluding Juul devices or Juul kits containing devices) indirectly from Juul Labs, Inc. for resale, from December 1, 2018 through March 31, 2025.

**Michigan State Class** (Somerset Party Store). A class, pursuing claims under the Michigan Antitrust Reform Act, Mich. Comp. Laws Section 445.771 et seq., defined as:

> All businesses and entities in the State of Michigan that purchased Juul pods (excluding Juul devices or Juul kits containing devices) indirectly from Juul Labs, Inc. for resale, from December 1, 2018 through March 31, 2025.

**IT IS SO ORDERED.**

Dated: February 26, 2026

William H. Orrick
United States District Judge